ACCEPTED
04-15-00469-CV
FOURTH COURT OF APPEALS
SAN ANTONIO, TEXAS
9/3/2015 10:37:38 AM
KEITH HOTTLE
CLERK

NO. 04-15-00469-CV

IN THE FOURTH COURT OF APPEALS
AT SAN ANTONIO, TEXAS

FILED IN
4th COURT OF APPEALS
SAN ANTONIO, TEXAS
09/3/2015 10:37:38 AM
KEITH E. HOTTLE
Clerk

## CASH BIZ, LP, CASH ZONE, LLC
## D/B/A CASH BIZ and REDWOOD FINANCIALS, LLC

*Appellants.*

v.

## HIAWATHA HENRY, ADDIE HARRIS, MONTRAY NORRIS, and ROOSEVELT COLEMAN, JR., on behalf of themselves and for all other similarly situated

*Appellees.*

From the 224th Judicial District Court for
Bexar County, Texas, No. 2015-CI-01545

## BRIEF ON INTERLOCUTORY APPEAL

Edward S. Hubbard
State Bar No. 10131700
ehubbard@coatsrose.com

Patrick E. Gaas
State Bar No. 07562790
pgaas@coatsrose.com

**COATS, ROSE, YALE, RYMAN & LEE, P.C.**
9 Greenway Plaza, Suite 1100
Houston, Texas 77046
(713) 651-0111
(713) 651-0220 Facsimile
**COUNSEL FOR APPELLANT**

**ORAL ARGUMENT REQUESTED**

010725.000005\4816-2886-4038.v2

NO. 04-15-00469-CV

IN THE FOURTH COURT OF APPEALS
AT SAN ANTONIO, TEXAS

**CASH BIZ, LP, CASH ZONE, LLC
D/B/A CASH BIZ and REDWOOD FINANCIALS, LLC**

*Appellants.*

v.

**HIAWATHA HENRY, ADDIE HARRIS, MONTRAY NORRIS,
and ROOSEVELT COLEMAN, JR., on behalf of
themselves and for all other similarly situated**

*Appellees.*

From the 224th Judicial District Court for
Bexar County, Texas, No. 2015-CI-01545

**IDENTITY OF PARTIES AND COUNSEL**

In compliance with Rule 38.1(a), Appellants provide the following list of the parties to the trial court order at issue, and the names and addresses of trial and appellate counsel for the parties:

010725.000005\4816-2886-4038.v2

**Appellants:**                     **CASH BIZ, LP, CASH ZONE, LLC**
                                    **d/b/a Cash Biz and Redwood Financial,**
                                    **LLC**
                                    **("Cash Biz")**

Represented by:                     **Coats, Rose, Yale, Ryman & Lee, P.C.**
                                    Edward S. Hubbard
                                    State Bar No. 10131700
                                    ehubbard@coatsrose.com
                                    Patrick E. Gaas
                                    State Bar No. 07562790
                                    pgaas@coatsrose.com
                                    9 Greenway Plaza, Suite 1100
                                    Houston, Texas 77046
                                    (713) 651-0111
                                    (713) 651-0220 facsimile


**Appellees:**                      **HIAWATHA HENRY, ADDIE HARRIS,**
                                    **MONTRAY NORRIS, and**
                                    **ROOSEVELT COLEMAN, JR., on**
                                    **behalf of themselves and for all other**
                                    **similarly situated**

Represented by:                     Daniel Dutko
                                    State Bar No. 24054206
                                    Hanszen Laporte
                                    11767 Katy Freeway, Suite 850
                                    Houston, Texas 77079

# TABLE OF CONTENTS

IDENTITY OF PARTIES AND COUNSEL ............................................................... i

TABLE OF CONTENTS............................................................................................ iii

INDEX OF AUTHORITIES...................................................................................... iv

STATEMENT OF CASE .......................................................................................... ix

STATEMENT REGARDING REQUEST FOR ORAL ARGUMENT ...................... xi

ISSUES PRESENTED.............................................................................................. xii

STATEMENT OF FACTS ......................................................................................... 1

SUMMARY OF ARGUMENT ................................................................................. 7

ARGUMENT............................................................................................................. 9

    A.    The Standard of Review............................................................................. 9

    B.    The Burdens of Proof............................................................................... 11

    C.    Cash Biz met its burden of proof to enforce the arbitration provision ................ 14

        1.    A valid and enforceable arbitration agreement exists.............................. 14

        2.    The dispute falls within the scope of the arbitration provision................ 15

    D.    The Appellees failed to meet their burden to prove waiver and prejudice .......... 21

        1.    Filing information or complaints with prosecutors does not waive a contractual right to arbitrate civil claims ................................................. 21

        2.    The Appellees failed to meet their burden on the issue of waiver............ 25

    E.    The trial court erred by not enforcing the waiver-of-class-action provision ........ 29

CONCLUSION......................................................................................................... 31

PRAYER FOR RELIEF ........................................................................................... 31

CERTIFICATE OF COMPLIANCE......................................................................... 33

CERTIFICATE OF SERVICE ................................................................................. 34

## INDEX OF AUTHORITIES

**Cases**

*Alvarez v. Anesthesiology Associates,*
   967 S.W.2d 871 (Tex. App.—Corpus Christi 1998, no writ) .........................27

*Am. Realty Trust, Inc. v. JDN Real Estate-McKinney, L.P.,*
   74 S.W.3d 527 (Tex. App.—Dallas 2002, pet. denied) ..................................18

*Amalgamated Local No. 55, United Automobile, Aerospace & Agricultural Implement Workers of Am. v. Metal and Alloy Div. of Silver Creek Precision Corp.,*
   396 F.Supp. 667 (W.D. N.Y. 1975)...................................................................24

*American Employers' Ins. Co. v. Aiken,*
   942 S.W.2d 156 (Tex. App.—Fort Worth 1997, no writ)...............................19

*BG Group, PLC v. Republic of Argentina,*
   134 S. Ct. 1198 (2014)......................................................................................20

*Browning-Ferris Indus. v. Lieck,*
   881 S.W.2d 288 (Tex. 1994) ....................................................................... 20, 27

*Cantella & Co., Inc. v. Goodwin,*
   924 S.W.2d 943 (Tex. 1996) ...........................................................................12

*Capital Income Properties v. Blackmon,*
   843 S.W.2d 22 (Tex. 1992). ..............................................................................9

*Coker v. Coker,*
   650 S.W.2d 391 (Tex. 1983) ...........................................................................17

*Consorcio Rive, S.A. De C.V. v. Briggs of Cancun, Inc.,*
   134 F.Supp.2d 789 (E.D. La. 2001)..................................................................23

010725.000005\4816-2886-4038.v2

*Cooper Indus., LLC v. Pepsi-Cola Metro. Bottling Co., Inc.*,
    2015 Tex. App. LEXIS 8882 (Tex. App.—Houston [14th Dist.], August 25,
    2015) ................................................................ 9, 10, 12, 13, 14, 20, 21, 23, 28

*East Montgomery Cty. Mun. Utility Dist. No. 1 v. Roman Forest Consol. Mun.
    Utility Dist.*,
    620 S.W.2d 110 (Tex. 1981) ................................................................ 17, 18

*Forest Oil Corp. v. McAllen*,
    268 S.W.3d 51 (Tex. 2008) ................................................ 12, 13, 14, 21, 26

*Fridl v. Cook*,
    908 S.W.2d 507 (Tex. App.—El Paso 1995, writ dism'd w.o.j.)....................11

*Frost Nat'l Bank v. L&F Distributors, Ltd.*,
    165 S.W.3d 310 (Tex. 2005) ........................................................................17

*G.T. Leach, Builders L.L.C. v. Sapphire VP, L.P.*,
    458 S.W.3d 502 (Tex. 2015) ................................ 11, 13, 20, 22, 23, 25, 26, 28

*Gatlin v. P.O.A. Criscione Star #16195*,
    2008 WL 2745956 (N.D. Ill. 2008) ........................................................ 21, 24

*Griffin v. Burlington Volkswagon, Inc.*,
    411 N.J.Super. 515 988 A.2d 101 (NJ. App. Div. 2010) ........................ 23, 24

*Hearthshire Braeswood Plaza Ltd. Partnership v. Bill Kelly Co.*,
    849 S.W.2d 380 (Tex. App.—Houston [14th Dist.] 1993, writ denied).........11

*Heritage Res. v. Nationsbank*,
    939 S.W.2d 118 (Tex. 1996) ........................................................................17

*Holmes, Woods & Diggs v. Gentry*,
    333 S.W.3d 650 (Tex.App.—Dallas 2009, no pet.) ......................................28

*Howsam v. Dean Witter Reynolds, Inc.*,
    537 U.S. 79 (2002)........................................................................................20

*In re Bruce Terminix Co.*,
    988 S.W.2d 702 (Tex.1998) ........................................................................26

*In re Christus Spohn Health Sys. Corp.*,
    231 S.W.3d 475 (Tex. App.—Corpus Christi-Edinburg 2007, orig.
    proceeding) ........................................................................ 22, 23, 25

*In re Conseco Finance Servicing Corp.*,
    19 S.W.3d 562 (Tex. App.—Waco 2000, orig. proceeding) .................... 18, 19

*In re D. Wilson Constr. Co.*,
    196 S.W.3d 774 (Tex. 2006) ........................................ 10, 23, 28

*In re FirstMerit Bank, N.A.*,
    52 S.W.3d 749 (Tex. 2001) .............................................................. 18

*In re Fleetwood Homes*,
    257 S.W.3d 692 (Tex. 2008) ........................................................... 11

*In re Kaplan Higher Educ. Corp.*,
    235 S.W.3d 206 (Tex. 2007) ...................................................... 13, 21

*In re Kellogg Brown & Root*,
    166 S.W.3d 732 (Tex. 2005) ...................................................... 12, 14

*In re Koch Indus., Inc.*,
    49 S.W.3d 439 (Tex. App.—San Antonio 2001, orig. proceeding) ......... 12, 14

*In re Oakwood Mobile Homes, Inc.*,
    987 S.W.2d 571 (Tex. 1999) ...................................................... 12, 13

*In re Olshan Foundation Repair Co., Inc.*,
    328 S.W.3d 883 (Tex. 2010) ........................................................... 17

*In re Service Corp. Int'l*,
    85 S.W.3d 171 (Tex. 2002) .............................................................. 25

*In re Universal Underwriters of Texas Ins. Co.*,
    345 S.W.3d 404 (Tex. 2011) ........................................................... 12

*In re Vesta Ins. Group, Inc.*,
    192 S.W.3d 759 (Tex. 2006) ...................................................... 20, 21

010725.000005\4816-2886-4038.v2

*In re Weekley Homes, L.P.*,
 180 S.W.3d 127 (Tex. 2005) ...............................................................................9

*J.M. Davidson, Inc. v. Webster*,
 128 S.W.3d 223 (Tex. 2003) ........................................... 10, 11, 12, 13, 17, 21

*Jack B. Anglin Co., Inc. v. Tipps*,
 842 S.W.2d 266 (Tex. 1992) ..................................................... 10, 12, 19

*Kennedy Hodges, L.L.P. v. Gobellan*,
 433 S.W.3d 542 (Tex. 2014) ............................................ 11, 13, 14, 21, 26

*Kroger Tex. L.P. v. Suberu*,
 216 S.W.3d 788 (Tex. 2006) ...............................................................20

*Mendelsohn v. A&D Catering Corp.*,
 119 Misc.2d 581 N.Y.S.2d 331 (N.Y. 1983)....................................................24

*Menna v. Romero*,
 48 S.W.3d 247 (Tex. App.—San Antonio 2001, pet. dism'd) ........................13

*Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.*,
 460 U.S. 1 (1983)..................................................................................26

*Myers v. Rosenberg*,
 1986 WL 3329 (N.D.Ill.1986) ................................................................24

*NCP Finance Ltd. Partnership v. Escatiola*,
 350 S.W.3d 152 (Tex. App.—San Antonio, no pet.) ........................... 9, 17, 30

*Perry Homes v. Cull*,
 258 S.W.3d 580 (Tex. 2008) ..................................... 11, 12, 13, 14, 21, 25, 26

*Porter & Clements, LLP v. Stone*,
 935 S.W.2d 217 (Tex. App.—Houston [1st Dist.] 1996, no writ) ..................15

*Prescott-Follett & Assocs., Inc. v. Delasa/Prescott Folett & Assocs.*,
 2002 WL 31528463 (E.D. La. 2002)................................................. 24, 25, 27

010725.000005\4816-2886-4038.v2

*Prudential Securities, Inc. v. Marshall,*
  909 S.W.2d 896 (Tex. 1995) ..................................................... 12, 13

*Richmont Holdings, Inc. v. Superior Recharge Sys., L.L.C.,*
  455 S.W.3d 573 (Tex. 2014) ................................... 13, 14, 21, 23, 25, 26, 28

*Seagull Energy E & P, Inc. v. Eland Energy, Inc.,*
  207 S.W.3d 342 (Tex. 2006) ...................................................17

*Taft v. Burttram,*
  254 Ga. 687, 333 S.E.2d 585 (1985) ...........................................24

*Taylor v. Gately,*
  870 S.W.2d 204 (Tex. App.—Waco 1994, writ dism'd.) ..............................27

*Valero Energy Corp. v. Teco Pipeline Co.,*
  2 S.W.3d 576 (Tex. App.—Houston [14th Dist.] 1999, no pet.) ....... 10, 11, 26

*Willis v. Donnelly,*
  199 S.W.3d 262 (Tex. 2006) ..................................................17

**Statutes**

9 USCA §§ 1-16 ..................................................................12
9 USCS § 2 ....................................................................35
9 USCS § 3 ....................................................................35
9 USCS § 16 ...................................................................35
TEX. CIV. PRAC. & REM. CODE § 51.06 ...........................................35
TEX. CIV. PRAC. & REM. CODE § 171.021 .........................................35
TEX. CIV. PRAC. & REM. CODE § 171.021(b) ......................................10
TEX. CIV. PRAC. & REM. CODE § 171.098 .........................................35
TEX. CIV. PRAC. & REM. CODE §§ 171.001-171.098 ................................12
TEX. PENAL CODE § 2.04 .........................................................5
TEX. PENAL CODE § 2.05 .........................................................5
TEX. PENAL CODE § 32.41 ........................................................4

010725.000005\4816-2886-4038.v2

## STATEMENT OF CASE

This is an interlocutory appeal brought pursuant to Sections 51.016 and 171.098(a)(1) of the Texas Civil Practice and Remedies Code, and in accordance with Rule 28.1 of the Texas Rules of Appellate Procedure. Specifically, Appellants, Cash Biz, LP, Cash Zone, LLC d/b/a Cash Biz, and Redwood Financial, LLC (collectively referred to as either "Appellants" or "Cash Biz") appeal the trial court's interlocutory order of July 9, 2015, which denied Cash Biz's motion to compel arbitration and to enforce a waiver-of-class-action provision.

This case arises from separate, individual credit services agreements ("CSO Agreements") and credit services disclosures statements ("Disclosure Statements"), between each of the Appellees and Cash Biz, as well as Loan Disclosures, Promissory Note and Security Agreements ("Promissory Notes") (hereinafter collectively referred to as "Loan Contracts"). Each contract with each Appellee was in writing and contained a provision requiring arbitration and waiving class action lawsuits and arbitrations. After the Appellees defaulted on the repayment obligation under their respective Loan Contracts, Cash Biz conducted separate investigations that, in each instance, uncovered information that led Cash Biz to believe that each Appellee had engaged in separate, specific criminal acts

010725.000005\4816-2886-4038.v2

during the formation and performance of their respective Loan Contracts. Based on the concerns raised by the information that Cash Biz uncovered, it separately reported this information to each state prosecutor with jurisdiction over each Appellee. Prosecutors subsequently filed criminal actions against each of the Appellees.

The Appellees joined together and filed this malicious prosecution, fraud and statutory action against Cash Biz, seeking class action status, in the 224th District Court of Bexar County, Texas. In response, Cash Biz filed its motion to compel arbitration, to enforce the contractual waiver of class action lawsuits, and to stay the litigation pursuant to the Texas Arbitration Act ("TAA"), Sections 171.001-171.098 of the Texas Civil Practice and Remedies Code, and the Federal Arbitration Act ("FAA"), 9 U.S.C.A. §§ 1-16.

The motion was assigned for hearing to the 166th District Court of Bexar County, Texas. An oral hearing was held and transcribed on Cash Biz's motion on July 9, 2015. At the close of the hearing, the trial court denied the motion in its entirety and signed the order from which Cash Biz now appeals.

As more fully set forth below, Cash Biz seeks an order from this Court reversing the decision of the trial court and rendering an order compelling arbitration and enforcing the contractual waiver of class action lawsuits.

010725.000005\4816-2886-4038.v2

## STATEMENT REGARDING REQUEST FOR ORAL ARGUMENT

Cash Biz believes oral argument would help this Court to resolve the issues raised in this appeal. Primarily, Cash Biz believes oral argument would help this Court resolve an apparent question of first impression in Texas.

Based on the research completed as of the date of the filing of this brief, it appears that this appeal presents a case of first impression in Texas under both the Texas Arbitration Act and the Federal Arbitration Act. The unique issue is whether the presentation of factual information to a prosecutor about possible criminal acts arising from or related to the formation or performance of a contract (including the presentation of sworn criminal complaints) constitutes "substantial invocation of the judicial process" that waives a litigant's right to enforce a contractual arbitration provision in a later civil proceeding between the parties to the contract. Oral argument should help this Court evaluate both the relevant statutory provisions of each law, and the case law interpreting those provisions, in order to resolve this issue of first impression.

## ISSUES PRESENTED

1.  Did the trial court abuse its discretion when it denied Appellants' motion to compel arbitration, because

    - the uncontested evidence presented to trial court showed that the Appellant and each Appellee had valid, written agreements to arbitrate;

    - the claims of malicious prosecution, fraud, and statutory violations, as well as a defense of material breach of contract, were within the scope of the arbitration agreement as a matter of law;

    - there could be no waiver by the Appellants of their right to arbitrate when merely filing information of potential criminal activity with a prosecutor is not "a substantial invocation of the judicial process" as a matter of law; and

    - the Appellees failed to meet their burdens of proof on their allegation that the Appellants had waived their right to arbitrate by substantially invoking the judicial process by filing information with criminal prosecutors?

2.  Did the trial court abuse its discretion when it denied enforcement of the waiver-of-class-action provision in the contracts with the Appellees?

010725.000005\4816-2886-4038.v2

IN THE FOURTH COURT OF APPEALS
AT SAN ANTONIO, TEXAS

**CASH BIZ, LP, CASH ZONE, LLC
D/B/A CASH BIZ and REDWOOD FINANCIALS, LLC**

*Appellants.*

v.

**HIAWATHA HENRY, ADDIE HARRIS, MONTRAY NORRIS,
and ROOSEVELT COLEMAN, JR., on behalf of
themselves and for all other similarly situated**

*Appellees.*

From the 224th Judicial District Court for
Bexar County, Texas, No. 2015-CI-01545

**STATEMENT OF FACTS**

The record below consists of the pleadings, motions and responses filed by the parties pertaining to the enforcement of the contractual arbitration provision in the Loan Contracts; the materials attached to those filings and submitted to the trial court during an oral hearing; and the transcript of the oral hearing. The following Statement of Facts is derived solely from that record.

Cash Biz is a Credit Service Organization which is regulated pursuant to Chapter 393 of the Finance Code. (CR, 131). Each Appellee (Montray Norris, Hiawatha Henry, Roosevelt Coleman and Addie Johnson) obtained consumer credit (loans) from Cash Biz pursuant to written Loan Contracts. (CR, 132, 80-130).

Each of these Loan Contracts contains the following arbitration provision, which mandates that the Appellees arbitrate all of their disputes against Cash Biz (and related third-parties) on an individual basis, and which contains an express waiver of class-action claims in court and in arbitration:

> **WAIVER OF JURY TRIAL AND ARBITRATION PROVISION. … YOU ACKNOWLEDGE AND AGREE AS FOLLOWS:**
>
> 1. For purposes of this Waiver of Jury Trial and Arbitration Provision …, the words "dispute" and "disputes" are given the broadest possible meaning and include, without limitation … (d) all common law claims, based on contract, tort, fraud, or intentional torts; (e) all claims based on a violation of any state or federal constitution, statute or regulation; … (g) all claims asserted by you individually against us …, including claims for money damages and/or equitable or injunctive relief; … (i) all claims asserted by you as a private attorney general, as a representative and member of a class of persons, or in any other representative capacity, against us …; and/or (j) all claims arising from or relating directly or indirectly to the disclosure by us … of any non-public personal information about you.
>
> 2. You acknowledge and agree that by entering into this Arbitration Provision:

010725.000005\4816-2886-4038.v2

**(a)** **YOU ARE GIVING UP YOUR RIGHT TO HAVE A TRIAL BY JURY TO RESOLVE ANY DISPUTE ALLEGED AGAINST US, THE LENDER AND/OR OUR/ITS RELATED THIRD PARTIES;**

**(b)** **YOU ARE GIVING UP YOUR RIGHT TO HAVE A COURT, OTHER THAN A SMALL CLAIMS TRIBUNAL, RESOLVE ANY DISPUTE ALLEGED AGAINST US, THE LENDER AND/OR OUR/ITS RELATED THIRD PARTIES; and**

**(c)** **YOU ARE GIVING UP YOUR RIGHT TO SERVE AS A REPRESENTATIVE, AS A PRIVATE ATTORNEY GENERAL, OR IN ANY OTHER REPRESENTATIVE CAPACITY, OR TO PARTICIPATE AS A MEMBER OF A CLASS OF CLAIMANTS, IN ANY LAWSUIT FILED AGAINST US, THE LENDER AND/OR OUR/ITS RELATED THIRD PARTIES. YOUR DISPUTE MAY NOT BE CONSOLIDATED WITH THE DISPUTE OF ANY OTHER PERSON(S) FOR ANY PURPOSE(S).**

3. . . .[A]ll disputes including any Representative Claims against us, the Lender and/or our/its related third parties shall be resolved by binding arbitration only on an individual basis with you.

… [T]he validity, effect and enforceability of this waiver of class action lawsuit and class-wide arbitration shall be determined solely by a court of competent jurisdiction and not by the arbitrator. …

7. This Arbitration Provision is made pursuant to a transaction involving interstate commerce and shall be governed by the FAA. If a final, non-appealable judgment of a court having jurisdiction over this transaction finds, for any reason that the FAA does not apply to this transaction then our agreement to arbitrate shall be governed by the arbitration law of the State of Texas.

010725.000005\4816-2886-4038.v2

(CR, 81-82, 85-86, 89-91, 93-94, 97-98, 101-03, 105-06, 109-110, 113-15, 117-18, 122-23, 126-28; See also, Appendix No. 8).

After each Appellee executed the Loan Contracts, Cash Biz arranged to extend the Appellees credit by providing them with the amount of funds described in each Loan Contract by and through a third-party lender. (CR, 132, 80-130). However, each of the Appellees failed refused to repay funds due and owing under the loan contracts. (CR, 132, 145-46).

After each of the Appellees defaulted on their repayment obligations, Cash Biz conducted investigations in an effort to recover the debts, including contacting each of the Appellees. As a result of these investigations, Cash Biz obtained information that led it to believe that these Appellees engaged in criminal conduct during the formation and performance of the loan transactions, including the issuance of bad checks and check fraud.[1] (SCR, 10). Cash Biz provided this information to local district attorneys with jurisdiction over each Appellee and sought their assistance to determine whether criminal activity had occurred and to take any appropriate action if criminal activity had occurred. (SCR, 10).

Cash Biz, could not, and did not initiate or procure any prosecution of any of its customers. (SCR, 10). After Cash Biz presented the information to prosecutors,

---

[1] *See, e.g.,* TEX. PENAL CODE § 32.41.

010725.000005\4816-2886-4038.v2

including in the form of sworn complaints,[2] Cash Biz took no further action in any criminal proceeding: it could not, and did not make any formal charges; it was not a witness in, was not asked to appear in, and did not otherwise participate in, any criminal trial; and it could not, and did not obtain criminal judgments. (SCR, 10). Cash Biz simply provided the information to each district attorney and left further action entirely to the discretion of the district attorneys. (SCR, 10).

Eventually, prosecutors did file criminal charges against each of the Appellees related to the formation or performance of the loan transactions. (CR, 145-247).

The Appellees filed the present suit claiming that Cash Biz committed the torts of malicious prosecution and fraud, violated certain Texas statutes, and committed a material breach of the Loan Contracts, by "using the criminal justice system to collect a civil debt" arising from their failure to pay the amounts they owed under the Loan Contracts. (CR, 1-11, 15-26, 147-48, 257-58). In fact, the Appellees stipulated to the existence of such debts owed to Cash Biz, and that their suit related to the collection of those debts. (RR, 21:11-13). They sought monetary damages, including statutory damages, related to criminal fines, jail time, loss of reputation related to criminal convictions, as well as equitable and injunctive relief. (CR, 3, 257-58).

---

[2] *See, e.g.,* TEX. PENAL CODE § 2.04 and 2.05.

010725.000005\4816-2886-4038.v2

In response, Cash Biz sought to enforce the contractual arbitration and waiver-of-class-action provision by filing a motion to compel. (CR, 52-133). Prior to the hearing on the motion to compel held on July 9, 2015, Cash Biz submitted the Loan Contracts, and the affidavits of David Flannagan, who authenticated the Loan Contracts and transactions, and swore to the limited involvement of Cash Biz in the process of providing information to prosecutors. (CR, 131-33, SCR, 10).

The Appellees provided no evidence controverting either the Loan Contracts or the affidavits. Instead, they filed a response that quoted interviews and papers from private organizations contained on websites of news organizations; provided copy of criminal court webpages listing Cash Biz as a complainant in certain criminal cases; and offered conclusory arguments about what other evidence would show in support of their malicious prosecution claim—but provided no such evidence to the court either before or during the hearing. (CR, 137-43; RR, 13:20-14:9, 19:12-21:21, 22:7-10, 24:2-25:10, 29:16-23:10, 32:17-33:14).

During the hearing on the motion to compel, the trial court made several observations and asked questions based on her stated knowledge of and experience about the process used by certain prosecutors when handling bad-check complaints. (RR, 28:15-22, 30:22-24, 31:14-18). None of the statements made by the trial court were based on any evidence submitted in support of, or in opposition

010725.000005\4816-2886-4038.v2

to, the motion to compel. After making those observations, and asking questions of Cash Biz's counsel based on those observations, the trial court summarily denied the motion and received a written order to sign from Appellees' counsel. (RR, 33:16-19).

Counsel for the Appellees submitted a pre-prepared written order with specific findings, and the trial court signed the order at the close of the hearing without making any edits. (CR, 246-47, 257-58). The order found that the Appellees' claims arose from Cash Biz's use of the "the criminal justice system to enforce a civil debt;" that the arbitration and waiver provision did not apply to such a dispute; and that Cash Biz waived its right to enforce the arbitration and waiver provision by substantially invoking the judicial process when it submitted information about criminal activity to prosecutors. (CR, 257-58).

The order was entered on July 9, 2015. (CR, 258). The Appellants timely filed their notice of appeal pursuant to Sections 51.016 and 171.098(a)(1) of the Texas Civil Practice and Remedies Code on July 24, 2015. (CR, 259-63).

## SUMMARY OF ARGUMENT

This case involves contractual debts that each of the Appellees admit exist because of their failure to pay amounts owed under credit contracts with the Appellants. Each of the credit contracts contained an arbitration agreement with a

010725.000005\4816-2886-4038.v2

waiver-of-class-action provision. The Appellees do not contest the validity of the credit contracts, or the arbitration and waiver-of-class-action provisions.

The malicious prosecution, fraud, and statutory claims, as well as the contractual defense of material breach, brought by the Appellees fall within the scope of the arbitration and waiver-of-class action provisions, because such claims arise out of and relate to the credit contracts. Specifically, the claims are based on allegations that Cash Biz used "the criminal justice system to enforce a civil debt" that was created by the formation and performance of the credit contracts.

When the Appellees did not contest the validity of the arbitration agreements, and their claims fell within the scope of those agreements, the trial court abused its discretion as a matter of law by not granting the motion to compel arbitration.

Moreover, the trial court further abused its discretion when it found an implied waiver by Cash Biz of its right to enforce arbitration, because

- Providing information of criminal activity to prosecutors, including in the form of a sworn criminal complaint, is not factually or legally a substantial invocation of the judicial process;

- The trial court made no finding of prejudice;

- The Appellees presented no evidence of waiver or prejudice; and

- The trial court's consideration of her own experience was improper and constituted no evidence to support its ruling.

010725.000005\4816-2886-4038.v2

Additionally, the trial court abused its discretion by failing to follow the language of the arbitration provision, and this Court's own precedent, when it denied enforcement of the waiver-of-class-action provision. *See NCP Finance Ltd. Partnership v. Escatiola*, 350 S.W.3d 152, 155 (Tex. App.—San Antonio, no pet.).

As more fully set forth below, Cash Biz seeks an order from this Court reversing the decision of the trial court and rendering an order compelling arbitration and enforcing the contractual waiver of class action lawsuits.

---

## ARGUMENT

---

### A.    The Standard of Review

Cash Biz seeks to enforce the arbitration agreement containing the waiver-of-class-action provision under both the TAA and the FAA. Under such situations, Texas trial courts are to apply both the procedural rules and substantive law of Texas to determine whether the parties must arbitrate. *In re Weekley Homes, L.P.*, 180 S.W.3d 127, 130 (Tex. 2005); *Cooper Indus., LLC v. Pepsi-Cola Metro. Bottling Co., Inc.*, 2015 Tex. App. LEXIS 8882, *6-8 (Tex. App.—Houston [14th Dist.], August 25, 2015). The FAA is part of the substantive law of Texas. *Capital Income Properties v. Blackmon*, 843 S.W.2d 22, 23 (Tex. 1992).

Under Texas law, a party seeking to compel arbitration is entitled to a summary determination of its motion by the trial court, in a proceeding similar to a

summary judgment proceeding. TEX. CIV. PRAC. & REM. CODE § 171.021(b); *Jack B. Anglin Co., Inc. v. Tipps*, 842 S.W.2d 266, 268–69 (Tex. 1992); *Cooper Indus., LLC*, 2015 Tex. App. LEXIS 8882, *6-7. Typically, the question as to whether the disputes come within the scope of the arbitration provision is also a question of law to be resolved summarily by comparing the arbitration provision with the pleadings and any supporting affidavits or discovery. TEX. CIV. PRAC. & REM. CODE § 171.021(b); *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 227 (Tex. 2003). Appellate courts defer to a trial court's factual determinations that are supported by sufficient evidence, but appellate courts are to review legal determinations *de novo*. *Cooper Indus., LLC*, 2015 Tex. App. LEXIS 8882, *7-8.

Accordingly, a trial court's ruling denying a motion to compel arbitration often involves a series of summary determinations and questions of law, which will be reviewed under the *de novo* standard by the appellate court. *See J.M. Davidson, Inc.*, 128 S.W.3d at 227; *Valero Energy Corp. v. Teco Pipeline Co.*, 2 S.W.3d 576, 581 (Tex. App.—Houston [14th Dist.] 1999, no pet.); *see also In re D. Wilson Constr. Co.*, 196 S.W.3d 774, 778–81 (Tex. 2006). The *de novo* standard specifically applies to appellate review of questions of law and legal conclusions, including the existence of a valid arbitration agreement, whether the scope of the arbitration provision includes the dispute at issue, and whether waiver or other defenses apply to defeat enforcement of an otherwise valid and applicable

010725.000005\4816-2886-4038.v2

arbitration provision. *In re Fleetwood Homes*, 257 S.W.3d 692, 694 (Tex. 2008) (citing *Perry Homes v. Cull*, 258 S.W.3d 580, 590, 598 (Tex. 2008)); *J.M. Davidson, Inc.*, 128 S.W.3d at 227; *G.T. Leach, Builders L.L.C. v. Sapphire VP, L.P.*, 458 S.W.3d 502, 511 (Tex. 2015); *Kennedy Hodges, L.L.P. v. Gobellan*, 433 S.W.3d 542, 545 (Tex. 2014).

To the extent any of the decisions of the trial court involve findings of fact, those findings will be reviewed by an appellate court under the legal sufficiency or "no evidence" standard of review. *Valero Energy Corp.*, 2 S.W.3d at 581; *Fridl v. Cook*, 908 S.W.2d 507, 511 (Tex. App.—El Paso 1995, writ dism'd w.o.j.); *Hearthshire Braeswood Plaza Ltd. Partnership v. Bill Kelly Co.*, 849 S.W.2d 380, 384 (Tex. App.—Houston [14th Dist.] 1993, writ denied). However, where no factual dispute is raised as to an issue addressed by the trial court, or where there are no findings of fact entered by the trial court as to such issues, the *de novo* standard of review will apply to such issues. *G.T. Leach, Builders L.L.C.*, 458 S.W.3d at 511; *Kennedy Hodges, L.L.P.*, 433 S.W.3d at 545; *Perry Homes*, 258 S.W.3d at 598.

In the present case, all of the issues before this Court require application of either the *de novo* or legal sufficiency standards of review.

B.    **The Burdens of Proof**

Texas public policy heavily favors enforcement of contractual terms that provide private mechanisms for resolving disputes outside of the courthouse. *See,*

010725.000005\4816-2886-4038.v2

*e.g., In re Universal Underwriters of Texas Ins. Co.*, 345 S.W.3d 404 (Tex. 2011) (contractual appraisal clause); *Perry Homes v. Cull*, 258 S.W.3d 580 (Tex. 2008) (contractual arbitration provision). The TAA and FAA embody this State's public policy favoring the enforcement of arbitration agreements. TEX. CIV. PRAC. & REM. CODE §§ 171.001-171.098; 9 USCA §§ 1-16; *Cantella & Co., Inc. v. Goodwin*, 924 S.W.2d 943, 944 (Tex. 1996); *Prudential Securities, Inc. v. Marshall,* 909 S.W.2d 896, 898-99 (Tex. 1995); *Tipps*, 842 S.W.2d at 268.

Under Texas law, the movant has the initial burden to prove, and the court must initially decide, only two issues:

a.      Is there a valid arbitration agreement; and

b.      If so, does the agreement encompass the claim.

*In re Kellogg Brown & Root,* 166 S.W.3d 732, 737 (Tex. 2005); *J.M. Davidson, Inc.*, 128 S.W.3d at 227; *In re Oakwood Mobile Homes, Inc.,* 987 S.W.2d 571, 573 (Tex. 1999); *see also Forest Oil Corp. v. McAllen*, 268 S.W.3d 51, 61 (Tex. 2008); *In re Koch Indus., Inc.*, 49 S.W.3d 439, 444 (Tex. App.—San Antonio 2001, orig. proceeding); *Cooper Indus., LLC*, 2015 Tex. App. LEXIS 8882, *8. In answering these questions, the court must apply a reasonable presumption, and resolve all doubts, in favor of compelling arbitration. *In re Kellogg Brown & Root,* 166 S.W.3d at 737.  Resolution of these issues is a question of law for the court to resolve.  *Forest Oil Corp.*, 268 S.W.3d at 55 & n.9; *J.M. Davidson, Inc.*, 128

010725.000005\4816-2886-4038.v2

S.W.3d at 227.

If the movant meets its burden, the trial court has no discretion but to compel arbitration, unless the non-movant can show that it has a defense to the applicability or enforcement of the arbitration provision or that the movant has waived its right to compel arbitration. *J.M. Davidson, Inc.*, 128 S.W.3d at 227; *In re Oakwood Mobile Homes, Inc.*, 987 S.W.2d at 573; *Prudential Securities, Inc.*, 909 S.W.2d at 898-99; *Menna v. Romero,* 48 S.W.3d 247, 250-51 (Tex. App.—San Antonio 2001, pet. dism'd). Waiver may be express or implied. *G.T. Leach, Builders L.L.C.*, 458 S.W.3d at 511; *Cooper Indus., LLC*, 2015 Tex. App. LEXIS 8882, *23. An implied waiver may be proved if the non-movant can show based on a totality of circumstances that the party seeking to enforce arbitration substantially invoked the judicial process to the non-movant's detriment or prejudice. *G.T. Leach, Builders L.L.C.*, 458 S.W.3d at 511-12; *Kennedy Hodges, L.L.P.*, 433 S.W.3d at 543; *Richmont Holdings, Inc. v. Superior Recharge Sys., L.L.C.*, 455 S.W.3d 573, 574-75 (Tex. 2014); *Perry Homes*, 258 S.W.3d at 589-93.

The non-movant has the burden of proof and persuasion on the issue of waiver and prejudice. *Forest Oil Corp.*, 268 S.W.3d at 56; *Perry Homes*, 258 S.W.3d at 589; *In re Kaplan Higher Educ. Corp.*, 235 S.W.3d 206, 208–09 (Tex. 2007); *Cooper Indus., LLC*, 2015 Tex. App. LEXIS 8882, *23-24. Because of the strong presumption against waiver of arbitration, "this hurdle is a high one."

010725.000005\4816-2886-4038.v2

*Kennedy Hodges, L.L.P.*, 433 S.W.3d at 543; *Richmont Holdings, Inc.*, 455 S.W.3d at 574-75; *Perry Homes*, 258 S.W.3d at 589-90.

If the non-movant does not meet its burden on the issue of waiver and prejudice, the trial court has no discretion but to compel arbitration. *Forest Oil Corp.*, 268 S.W.3d at 56, 61. Resolution of the issue as to whether an implied waiver and prejudice have occurred is also a question of law for the court to decide. *Perry Homes*, 258 S.W.3d at 598; *Cooper Indus., LLC*, 2015 Tex. App. LEXIS 8882, *23-24.

**C.**     **<u>Cash Biz met its burden of proof to enforce the arbitration provision</u>**

Cash Biz had the initial burden to prove the two initial elements required to compel arbitration:

a.     Is there a valid arbitration agreement; and

b.     If so, does the agreement encompass the claim.

*In re Kellogg Brown & Root,* 166 S.W.3d at 737; *In re Koch Indus., Inc.*, 49 S.W.3d at 444. The Loan Contracts and the affidavits of David Flannagan, together with the authorities provided in its motion and reply, met this burden of proof.

### *1. A valid and enforceable arbitration agreement exists*

The Loan Contracts provided the prima facie evidence of the existence of valid and enforceable arbitration provisions binding each of the Appellees. Each Appellee executed the Loan Contracts containing the arbitration provision that

010725.000005\4816-2886-4038.v2

referred all disputes between the parties to binding arbitration on an individual basis as indicated above. Each Appellee enjoyed the benefits of the Loan Contracts and obtained benefits or funds based on, and arising out of, the Loan Contracts. Each Appellee agreed to be bound by the arbitration provision, and none of the Appellees opted out of the arbitration provision. The arbitration provision is binding, because the agreement states that it is binding and a court may enter judgment on the award. *See Porter & Clements, LLP v. Stone*, 935 S.W.2d 217, 220-21 (Tex. App.—Houston [1st Dist.] 1996, no writ).

The Appellees did not contest the existence and validity of the arbitration agreement contained in the Loan Contracts, and the trial court's order did not address it. Therefore, Cash Biz met its burden as a matter of law to prove the first of the two elements it must prove to compel arbitration.

## 2. *The dispute falls within the scope of the arbitration provision*

As for the second element, the order signed by the trial court contained a conclusion that the arbitration and waiver-of-class-action provision was inapplicable to the Appellee's allegations related to "use of the criminal justice system to enforce a civil debt," and to damage claims "related to criminal fines, jail time, and loss of reputation related to [Appellees'] criminal convictions." The trial court abused its discretion as a matter of law in making this determination, because it is not consistent with the law, and is not supported by any evidence presented by

010725.000005\4816-2886-4038.v2

the parties. Instead, the law is clear that the dispute pled by the Appellees falls within the scope of the arbitration provision.

The Appellees pled tort and statutory causes of action, and a contractual defense, before the trial court at the time of the hearing on the motion to compel. They pled that Cash Biz's alleged improper "use of the criminal justice system to enforce a civil debt" constituted the basis for the torts of malicious prosecution and fraud, for statutory violations, and for the defense of material breach of the Loan Contracts. (CR, 6-9, 21-23, 147-48). Additionally, they sought to recover monetary damages caused by such conduct. (CR, 10, 11, 17, 24, 25). These claims fall squarely within the four corners of the arbitration provision.

Paragraph 1of the arbitration provision states that the agreement requires arbitration of all disputes between the parties to the Loan Contracts, including the following:

> … (d) all common law claims, based on contract, tort, fraud, or intentional torts; (e) all claims based on a violation of any state or federal constitution, statute or regulation; … (g) all claims asserted by you individually against us …, including claims for money damages and/or equitable or injunctive relief; … and/or (j) all claims arising from or relating directly or indirectly to the disclosure by us … of any non-public personal information about you.

(CR, 81-82, 85-86, 89-91, 93-94, 97-98, 101-03, 105-06, 109-110, 113-15, 117-18, 122-23, 126-28). Therefore, the Appellees' tort and statutory causes of action, and their contractual defense are covered by the referrals under

010725.000005\4816-2886-4038.v2

Paragraph 1(d) and (e) of the provision. Moreover, the damages sought by the Appellees are covered by the broad referral under Paragraph 1(g) of the provision.

Arbitration agreements, like other contracts, are subject to the legal rules of contract construction. *In re Olshan Foundation Repair Co., Inc.*, 328 S.W.3d 883, 889 (Tex. 2010). No party claimed the Loan Contracts were ambiguous, so the trial court was required to interpret the arbitration provision as a matter of law. *Willis v. Donnelly*, 199 S.W.3d 262, 275 (Tex. 2006); *Seagull Energy E & P, Inc. v. Eland Energy, Inc.*, 207 S.W.3d 342, 345 (Tex. 2006); *see generally, Coker v. Coker*, 650 S.W.2d 391, 393-94 (Tex. 1983). In construing a contract, courts must ascertain and give effect to the parties' intentions as expressed in the document. *Frost Nat'l Bank v. L&F Distributors, Ltd.*, 165 S.W.3d 310 (Tex. 2005); *J.M. Davidson, Inc.* 128 S.W.3d at 229. Unambiguous contracts are enforced as written, therefore the language of the arbitration provision is the best evidence as to whether the Appellees' claims fall within the scope of the arbitration provision. *Heritage Res. v. Nationsbank*, 939 S.W.2d 118, 121 (Tex. 1996); *see, e.g.,NCP Finance Ltd. Partnership v. Escatiola*, 350 S.W.3d 152, 155 (Tex. App.—San Antonio, no pet.). The conduct of the parties is ordinarily immaterial to the determination of the construction of an unambiguous contract. *East Montgomery*

*Cty. Mun. Utility Dist. No. 1 v. Roman Forest Consol. Mun. Utility Dist.*, 620 S.W.2d 110, 112 (Tex. 1981).

Applying these rules of construction, courts must resolve any doubts about an arbitration agreement's scope in favor of arbitration. *In re FirstMerit Bank, N.A.,* 52 S.W.3d 749, 753 (Tex. 2001). A broad arbitration clause, purporting to cover all claims, disputes, and other matters arising out of or relating to the contract, creates a presumption of arbitrability. *Am. Realty Trust, Inc. v. JDN Real Estate-McKinney, L.P.,* 74 S.W.3d 527, 531 (Tex. App.—Dallas 2002, pet. denied).

Appellees pled tort and statutory claims, and a contractual defense against Cash Biz and seeks to recover monetary damages. All of these claims are expressly covered by the arbitration provision. Therefore, under the proper rules of construction, the Appellees' claims fell within the scope of the arbitration provision.

Even if this Court feels it needs to look deeper into the basis for the Appellees' claims, it is clear that the underlying dispute as described in both the order and Appellees' pleadings—"use of the criminal justice system to enforce a civil debt"—fall within the scope of the arbitration provision. Efforts to collect debts owed under a contract are covered under broad arbitration clauses. See *In re*

010725.000005\4816-2886-4038.v2

*Conseco Finance Servicing Corp.,* 19 S.W.3d 562, (Tex. App.—Waco 2000, orig. proceeding). In *Conseco,* the Court specifically found as such and stated:

> Although true that the claim raised by [Plaintiff] is not based on the formation or the terms of the contract, the arbitration clause is not so limited. Rather, the clause provides for arbitration of any claims "arising from or relating to" the contract. [Plaintiff's] complaint arises from Conseco's alleged efforts to collect the amounts due under the terms of the agreement. Absent the contract, there would be no relationship between [Plaintiff] and Conseco, and there would have been no debt the collection of which caused the difficulty between them. *See American Employers' Ins. Co. v. Aiken,* 942 S.W.2d 156, 160 (Tex. App.—Fort Worth 1997, no writ). Therefore, we conclude that [Plaintiff's] claims based on Conseco's acts in collecting the debt owed on the contract arise from or relate to the contract and so are within the scope of the arbitration clause. Furthermore, the Texas Supreme Court has held that claims under the DTPA fall within the scope of an arbitration agreement. *Jack B. Anglin Co., Inc. v. Tipps,* 842 S.W.2d 266, 270-71 (Tex. 1992).

*In re Conseco*, 19 S.W.3d at 570. In the present case, the "civil debt" at issue arises from and directly relates to the obligations created by the Loan Contracts. Therefore, the dispute falls squarely within the scope of the arbitration provision.

Even if the trial court could look beyond the express language of the arbitration provision, as well as its application to the "civil debt" dispute, the malicious prosecution and fraud claims are torts within the scope of a broad arbitration provision. Typically, the test for applying a broad arbitration provision to a tort claim is whether the liability arises from the contract that contains the arbitration provision, or whether the liability arises from general obligations

010725.000005\4816-2886-4038.v2

imposed by law. *In re Vesta Ins. Group, Inc.*, 192 S.W.3d 759, 761 (Tex. 2006); *Cooper Indus., LLC*, 2015 Tex. App. LEXIS 8882, *9.

In the present case, the malicious prosecution and fraud claims arise from the allegations that Cash Biz chose an improper method of collecting the contractual debt, and failed to disclose this alleged method to the Appellees before the contracts were signed and the money was loaned. Without the formation and performance of the Loan Contracts containing the arbitration provisions, there would be no debt and there would be no issue of disclosure. The Appellees' own conduct in incurring their debts under the Loan Contracts, as well as what they understood at the time they entered into the contracts, will be at issue in this case.[3] Therefore, liability arises from and/or relates to the formation and performance of the Loan Contracts, so that the malicious prosecution and fraud claims fall within the scope of the arbitration provisions. *In re Vesta Ins. Group, Inc.*, 192 S.W.3d at

---

[3] Although the merits of the Appellees' malicious prosecution claim should not have been in front of the trial court, much of the argument made by the Appellees' in their filings and during the hearing in response to the motion to compel focused on the what they believed they could prove in support of their tort claim. (CR, 137-43; RR, 13:20-14:9, 19:12-21:21, 22:7-10, 24:2-25:10, 29:16-23:10, 32:17-33:14). It is important to remember in evaluating these arguments that malicious prosecution claims are disfavored, because they tend to discourage the reporting of crimes. *Browning-Ferris Indus. v. Lieck*, 881 S.W.2d 288, 291 (Tex. 1994). Moreover, such a claim cannot be proven unless the plaintiff was innocent of the charge and the prosecution was terminated in the plaintiff's favor. *Kroger Tex. L.P. v. Suberu*, 216 S.W.3d 788, 792 n.3 (Tex. 2006). In the order at issue, which was submitted by the Appellees, the court finds that the Appellees' damage claims arise, in part, from their "criminal convictions." If that statement is correct, there is no substance to the tort claims as a matter of law. In any event, any issue as to whether a malicious prosecution claim is a tort or intentional tort that can survive and be litigated is a question of substantive arbitrability that is referred to the arbitrator to decide. *G.T. Leach, Builders L.L.C.*, 458 S.W.3d at 520-23; *BG Group, PLC v. Republic of Argentina*, 134 S. Ct. 1198, 1206-07 (2014); *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 81 (2002).

010725.000005\4816-2886-4038.v2

761; *accord, Gatlin v. P.O.A. Criscione Star #16195*, 2008 WL 2745956, \*3 (N.D. Ill. 2008).

So, under any way to look at the issue of the scope of the arbitration clause in this case, the Appellees' claims fall within that scope as a matter of law. Therefore, because Cash Biz met its burden on the two threshold elements to support its motion to compel, the trial court erred in making its conclusions contained in its order, and abused its discretion when it denied Cash Biz's motion to compel. *J.M. Davidson, Inc.*, 128 S.W.3d at 227.

**D.** **The Appellees failed to meet their burden to prove waiver and prejudice**

The Appellees had the "high" burden of proof and persuasion on the issue of waiver and prejudice. *Kennedy Hodges, L.L.P.*, 433 S.W.3d at 543; *Richmont Holdings, Inc.*, 455 S.W.3d at 574-75; *Forest Oil Corp.*, 268 S.W.3d at 56; *Perry Homes*, 258 S.W.3d at 589-90; *In re Kaplan Higher Educ. Corp.*, 235 S.W.3d at 208–09; *Cooper Indus., LLC*, 2015 Tex. App. LEXIS 8882, \*23-24. Because they failed to meet this burden, the trial court erred as a matter of law by denying Cash Biz's motion to compel. *Forest Oil Corp.*, 268 S.W.3d at 56, 61; *Perry Homes*, 258 S.W.3d at 598; *Cooper Indus., LLC*, 2015 Tex. App. LEXIS 8882, \*23-24.

**1.** ***Filing information or complaints with prosecutors does not waive a contractual right to arbitrate civil claims***

Appellees seek to avoid the enforcement of the arbitration and waiver-of-class-action provision by claiming an implied waiver by Cash Biz. An implied

010725.000005\4816-2886-4038.v2

waiver may be proved if the non-movant can show, based on a totality of circumstances, that the party seeking to enforce arbitration substantially invoked the judicial process to the non-movant's detriment or prejudice. *G.T. Leach, Builders L.L.C.*, 458 S.W.3d at 511-12. Specifically, the Appellee's claim that Cash Biz substantially invoked the judicial process by being the complainant in criminal proceedings arising from the Appellees' conduct during the formation and performance of the Loan Contracts.

The Appellees admitted during the hearing on the motion to compel that they could not cite to any case law supporting their argument (RR, 17:3-6), and, to date, Cash Biz has found no such case law in Texas. Even in light of the Appellees' admission, and of the a strong presumption against finding that a party has waived its right to arbitration, the order signed by the trial court found waiver by Cash Biz based on the Appellees' argument. This ruling is not supported by the law or any evidence provided to the trial court.

Although there is no case law in Texas addressing the specific issue as to whether the filing of a criminal complaint constitutes a substantial invocation of the judicial process[4] (and there are very few such cases from other jurisdictions),

---

[4] The only Texas case found by Cash Biz by the time of the filing of this brief that even remotely addresses waiver related to involvement in a criminal proceeding is *In re Christus Spohn Health Sys. Corp.*, 231 S.W.3d 475 (Tex. App.—Corpus Christi-Edinburg 2007, orig. proceeding). However, *Christus Spohn* is factually and legally distinguishable from the present case, and supports the general rule that active participation over and above merely filing a petition or complaint is required for implied waiver.

010725.000005\4816-2886-4038.v2

Texas courts have consistently found that active participation in a court proceeding is required for waiver—not the mere filing or initiation of litigation. *G.T. Leach, Builders L.L.C.*, 458 S.W.3d at 512; *Richmont Holdings, Inc.*, 455 S.W.3d at 574-75; *In re D. Wilson Constr. Co.*, 196 S.W.3d at 783; *Cooper Indus., LLC*, 2015 Tex. App. LEXIS 8882, *25-26. Consistent with this rule, one federal court found that the mere filing of a criminal complaint in Mexico parallel to an ongoing arbitration did not constitute a substantial invocation of the judicial process. *See Consorcio Rive, S.A. De C.V. v. Briggs of Cancun, Inc.*, 134 F.Supp.2d 789, 795-97 (E.D. La. 2001).

Like the court in *Consorcio Rive*, the vast majority of the few courts that have looked at this issue under the FAA, or another federal or state arbitration statute, have found the filing of a criminal complaint cannot and does not waive arbitration of a civil dispute. *See, e.g., Griffin v. Burlington Volkswagon, Inc.*, 411

---

In *Christus Spohn*, the court found that the party seeking arbitration had waived the right to arbitrate by engaging in a totality of conduct that substantially invoked the judicial process, while qualifying its ruling by stating that none of the factors alone would have established waiver. *Id.*, at 482. One of the factors considered by the court was the intervention by the movant into a parallel criminal proceeding to obtain a contempt ruling related to discovery in the civil dispute, which the court found to be "part of its strategic plan of defense in the underlying matter that would be inconsistent with a right to arbitrate." *Id.*, at 481. However, the court specifically noted that the facts of this case were unique, and that it "ordinarily would not consider actions in a separate cause to be indicative of waiver." *Id.*

In the present case, such unique circumstances do not exist to allow consideration of actions in a separate criminal proceeding to be indicative of waiver. No civil suits were pending when Cash Biz presented information and filed criminal complaints. There is no evidence in the record to show that Cash Biz took any active role in the criminal proceedings after providing such information, let alone evidence that its presentation of information was "part of its strategic plan of defense in the underlying matter that would be inconsistent with a right to arbitrate."

010725.000005\4816-2886-4038.v2

N.J.Super. 515, 988 A.2d 101, 104 (NJ. App. Div. 2010); *Gatlin v. P.O.A. Criscione Star #16195*, 2008 WL 2745956, at \*3; *Prescott-Follett & Assocs., Inc. v. Delasa/Prescott Folett & Assocs.*, 2002 WL 31528463, \*4-5 (E.D. La. 2002); *Myers v. Rosenberg*, 1986 WL 3329, \*2 (N.D. Ill. 1986); *Amalgamated Local No. 55, United Automobile, Aerospace & Agricultural Implement Workers of Am. v. Metal and Alloy Div. of Silver Creek Precision Corp.*, 396 F.Supp. 667, (W.D. N.Y. 1975); *c.f., Mendelsohn v. A&D Catering Corp.*, 119 Misc.2d 581, 464 N.Y.S.2d 331 (N.Y. 1983).[5]

In *Prescott-Follett*, the United States District Court looked at the FAA, and cited to the earlier opinion in *Myers v. Rosenberg*, to find that filing of separate criminal complaints is not inconsistent with arbitration:

> Federal courts have held that the FAA, while promoting arbitration, does not contemplate the arbitration of criminal activity. See *Myers v. Rosenberg,* 1986 WL 3329, \*2 (N.D.Ill.3/7/86). Therefore, defendants' alleged filing of criminal charges cannot be held to be inconsistent with their desire to arbitrate. … Accordingly, plaintiffs fail to meet their burden of proving a waiver of the arbitration.

---

[5] To date, Cash Biz has found only one, 30-year-old court ruling that is consistent with the Appellees' argument and the trial court's order. *See Taft v. Burttram*, 254 Ga. 687, 333 S.E.2d 585, 586 (1985). In *Taft*, the Georgia Supreme Court was looking at the issue in the context of an arbitration pursuant to the rules of the National Association of Securities Dealers ("NASD"). In that case, the court found that the swearing out of criminal complaints instead of seeking to arbitrate their disputes, constituted a waiver of their right to arbitrate the dispute under the NASD rules. *Id.* Although the court in *Taft* based its ruling on the breadth of the NASD arbitration rule that required "all disputes" to be arbitrated, this interpretation appears to be at odds with those cases interpreting the FAA, which have found that criminal activity cannot be arbitrated under the FAA. *Prescott-Follett & Assocs., Inc.*, 2002 WL 31528463, \*5; *Myers v. Rosenberg*, 1986 WL 3329, \*2.

010725.000005\4816-2886-4038.v2

*Prescott-Follett & Assocs., Inc.*, 2002 WL 31528463, *5.

Consistent with the court's reasoning in *Prescott-Follett*, the totality of circumstances test described in *Perry Homes* and applied by the Texas Supreme Court for the last decade focuses on factors that involve litigation and delay in the same (or directly related) civil proceeding in which arbitration is sought to be compelled. *Perry Homes*, 258 S.W.3d at 589-92; *see G.T. Leach, Builders L.L.C.*, 458 S.W.3d at 511-14; *Richmont Holdings, Inc.*, 455 S.W.3d at 575 n.1; *see also, In re Service Corp. Int'l*, 85 S.W.3d 171, 174-76 (Tex. 2002); *In re Christus Spohn Health Sys. Corp.*, 231 S.W.3d at 481 (courts "ordinarily would not consider actions in a separate cause to be indicative of waiver.").

There is nothing in the recent decisions of the Texas Supreme Court, let alone the few cases from other jurisdictions that have looked at the specific issue, that give any support for the determination made by the trial court that filing a criminal complaint substantially invokes the judicial process in a civil dispute so as to waive the right to arbitration. Therefore, the trial court erred as a matter of law by concluding that Cash Biz's submission of criminal complaints against the Appellees substantially invoked the litigation process so as to waive the contractual right to arbitrate the present civil dispute.

## 2. *The Appellees failed to meet their burden on the issue of waiver*

Even if it is legally possible under Texas law to substantially invoke the judicial process by submitting a criminal complaint separate from seeking

010725.000005\4816-2886-4038.v2

arbitration in a later civil dispute, the Appellees failed to come up with any evidence under the totality of circumstances test to meet their high burden on the issue of waiver and prejudice. *G.T. Leach, Builders L.L.C.*, 458 S.W.3d at 511-12; *Kennedy Hodges, L.L.P.*, 433 S.W.3d at 543; *Richmont Holdings, Inc. v. Superior Recharge Sys., L.L.C.*, 455 S.W.3d 573, 574-75 (Tex. 2014); *Forest Oil Corp.*, 268 S.W.3d at 56; *Perry Homes*, 258 S.W.3d at 589-93. Because the Appellees did not come forward with legally sufficient evidence to meet their burden, and all doubts are to be resolved in favor of arbitration, the trial court had no discretion to deny arbitration. *Forest Oil Corp.*, 268 S.W.3d at 56, 61; *Valero Energy Corp.*, 2 S.W.3d at 581; *In re Bruce Terminix Co.*, 988 S.W.2d 702, 705 (Tex.1998); *Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983).

The Appellees came forward with no evidence to controvert the affidavits from David Flannagan, in which he testified regarding the limited extent of Cash Biz's involvement in the criminal process. Instead, they presented copies of pages from website listing Cash Biz as a complainant in criminal cases. All of the rest of the Appellees' presentation was comprised of restatements and citations to third-party statements, interviews, and opinions on the websites of news organizations, including the Texas Observer, ProPublica and the Huffington Post; and statements from outside the record submitted to the court about what they could prove if they

brought witnesses to the hearing. None of this constituted evidence to support waiver or prejudice, and, at most, it indicated the type of proof the Appellees believe they can muster in support of the merits of their liability claims.

To the extent the copies from websites listing Cash Biz as a criminal complainant could provide some evidence, it is not proof that Cash Biz was actively involved in the bringing of criminal charges, or the prosecution of these Appellees. An individual cannot procure or initiate a criminal prosecution in Texas; the acceptance of a criminal complaint, and the filing of a criminal charge are within the sole discretion of the prosecuting attorney. *Alvarez v. Anesthesiology Associates*, 967 S.W.2d 871 (Tex. App.—Corpus Christi 1998, no writ); *Taylor v. Gately*, 870 S.W.2d 204, 204 (Tex. App.—Waco 1994, writ dism'd.). The exercise of the district attorneys' discretion makes the initiation of the prosecution its own and not the person who submits the information to the officer (district attorney). *Browning-Ferris Industries, Inc.*, 881 S.W.2d at 293-294. Any later filing of criminal charges by the district attorney after a complaint has been made cannot be held to be inconsistent with the complainant's desire to later arbitrate a separate civil dispute. *Prescott-Follett & Associates, Inc.*, 2002 WL 31528463, at *5.

The only evidence submitted to the trial court by either party showed that Cash Biz merely submitted information of criminal activity to the district attorney.

010725.000005\4816-2886-4038.v2

Without more, the only evidence before the court was evidence of the mere filing of a complaint in a separate proceeding, which the courts of this state have found not to rise to the level of waiver. *G.T. Leach, Builders L.L.C.*, 458 S.W.3d at 512; *Richmont Holdings, Inc.*, 455 S.W.3d at 574-75; *In re D. Wilson Constr. Co.*, 196 S.W.3d at 783; *Cooper Indus., LLC*, 2015 Tex. App. LEXIS 8882, *25-26.

The Appellees argue that *Holmes, Woods & Diggs v. Gentry*, 333 S.W.3d 650 (Tex.App.—Dallas 2009, no pet.) supports their position. In *Gentry*, the Dallas Court of Appeals concluded that a law firm substantially invoked the litigation process when it initiated litigation against a former client and initially agreed to arbitration, but then "aggressively" pursued litigation for two years before filing a motion to compel arbitration. *Id.* at 653-55.

However, *Gentry* is distinguishable on its facts, even if it still survives the recent Supreme Court decision in *Kennedy Hodges, L.L.P.* Unlike *Gentry*, Cash Biz has not aggressively pursued litigation against the Appellees in any forum. It filed criminal complaints based on information it had, but it had not pursued civil claims against these Appellees. Instead, the Appellees filed this suit over the "civil debt." Only in defense of this suit did Cash Biz seek to enforce the arbitration provision. Because the facts at hand differ substantially from those in *Gentry*, the case is not instructive, persuasive or even applicable.

010725.000005\4816-2886-4038.v2

Not only did the Appellees provide no evidence to show a substantial invocation of the judicial process, a significant portion of the hearing on the motion to compel dealt with the trial court's personal observations and experiences with the process followed by some prosecutors to pursue bad-check criminal charges. None of what was discussed by the trial court was supported by evidence in the record, nor was would it have been appropriate for the trial court to take judicial notice of such personal observations and experiences. To the extent the trial court's observations and experiences formed the basis of the findings and conclusions in the order, those findings and conclusions were based on no evidence.

Because the Appellees failed to meet their high burden of proof on the defense of waiver and prejudice, the trial court erred and abused its discretion by finding that Cash Biz waived its right to enforce the arbitration provision and denying the motion to compel arbitration and enforcement of the waiver-of-class-action provision.

E. **The trial court erred by not enforcing the waiver-of-class-action provision**

Even if the trial court's order can be upheld as to arbitration, its ruling on the enforcement of the waiver-of-class-action provision is wrong as a matter of law, and ignores this Court's ruling in *NCP Finance*.

010725.000005\4816-2886-4038.v2

It is well-settled that Texas law enforces arbitration agreements and class-action waivers of the type contained in the Loan Contracts. In fact, the San Antonio Court of Appeals has enforced an arbitration provision prohibiting class actions in an almost identical suit brought by borrowers against a Credit Service Organization, involving language remarkably similar to the arbitration agreements at issue in this case. *See NCP Finance Ltd. Partnership*, 350 S.W.3d at 155.

*NCP Finance* is controlling in this jurisdiction on the questions before this Court. The arbitration agreements are similar; the class-action waivers are similar; and the claims and causes of action are similar. Under the contract provisions at issue in both cases the question of enforcement of the class-action waiver provision was expressly reserved to a court at law. *Id.* Like in *NCP Finance*, not only are the Appellees prohibited from litigating the class action in court, they are required to arbitrate their claims on an individual basis. Like in *NCP Finance*, Plaintiffs are prohibited from pursuing a class action in the arbitration proceeding. *Id.*

The trial court ignored the express language of the Loan Contracts, and the binding precedent from this Court in *NCP Finance*, by failing to enforce the class-action waiver provision. This decision was an error of law and should be reversed. Pursuant to the Loan Contracts and *NCP Finance*, an order should be entered prohibiting the Appellees from pursuing the claims raised in their Petition as a class.

010725.000005\4816-2886-4038.v2

## CONCLUSION

This case requires the enforcement of a contractual arbitration and class-action waiver provision in a suit related the Appellees' contractual debts. The Appellees do not contest the existence or validity of the Loan Contracts, or the arbitration provision. The tort and statutory claims, and breach-of-contract defense, brought by the Appellees fall within the scope of the arbitration, and the Appellees failed to meet their high burden of proof to establish that Cash Biz's right to arbitration had been waived. Therefore, Cash Biz seeks an order from this Court reversing the decision of the trial court and rendering an order compelling arbitration and enforcing the contractual waiver of class action lawsuits.

## PRAYER FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, the Appellants pray for an order from this Court reversing the decision of the trial court and rendering an order compelling arbitration and enforcing the contractual waiver of class action lawsuits; and that the Appellants be granted such other and further relief to which they may show themselves justly entitled.

010725.000005\4816-2886-4038.v2

Respectfully submitted,

**COATS ROSE YALE RYMAN & LEE, P.C.**

By:        */S/ Edward S. Hubbard*
         Edward S. Hubbard
         State Bar No. 10131700
         ehubbard@coatsrose.com
         Patrick E. Gaas
         State Bar No. 07562790
         pgass@coatsrose.com
         9 Greenway Plaza, Suite 1100
         Houston, Texas  77046-0307
         (713) 651-0111
         (713) 651-0220 facsimile

**ATTORNEYS FOR THE APPELLANTS, Cash Biz, LP, Cash Zone, LLC d/b/a Cash Biz, and Redwood Financial, LLC**

**CERTIFICATE OF COMPLIANCE**

Pursuant to Rule 9(i)(2)(B) and (i)(3) of the Texas Rules of Appellate Procedure, the undersigned certifies that this Petition complies with the Rule's word limits. The word count of the Brief from page 1 through page 31 is 7,691 words, excluding the parts of the brief exempted by Rule 9(i)(1). This word court is based on the count provided by the "word count" function of Microsoft Word 2010, which is the computer program used to prepare this Petition.

/S/ Edward S. Hubbard
Edward S. Hubbard

Attorney for Appellants,
Cash Biz, LP, Cash Zone, LLC d/b/a
Cash Biz, and Redwood Financial,
LLC

Dated: September 3, 2015

## CERTIFICATE OF SERVICE

I hereby certified that a true and correct copy of the foregoing instrument has been served upon all counsel of records, listed below, by certified mail, return receipt requested, or by facsimile, or by hand delivery of same on the 3rd day of September, 2015.

Daniel Dutko
Hanszen Laporte
11767 Katy Freeway, Suite 850
Houston, Texas 77079

_/S/ Edward S. Hubbard_
Edward S. Hubbard

# APPENDIX

In accordance with Rule 38.1(k)(1) of the Texas Rules of Civil Procedure, the following documents are contained in the Appendix:

1.    Order;

2.    9 USCS § 2;

3.    9 USCS § 3;

4.    9 USCS § 16;

5.    TEX. CIV. PRAC. & REM. CODE § 51.06;

6.    TEX. CIV. PRAC. & REM. CODE § 171.021;

7.    TEX. CIV. PRAC. & REM. CODE § 171.098;

8.    Text of Contractual Arbitration Provision



Positive

As of: September 1, 2015 5:37 PM EDT

## *Alvarez v. Anesthesiology Assocs.*

Court of Appeals of Texas, Thirteenth District, Corpus Christi

March 26, 1998, Delivered ; March 26, 1998, Filed

NUMBER 13-96-385-CV

**Reporter**

967 S.W.2d 871; 1998 Tex. App. LEXIS 1877

RAMONA ALVAREZ, ET AL., Appellants, v. ANESTHESIOLOGY ASSOCIATES, ET AL., Appellees.

**Subsequent History:** **[\*\*1]** Released for Publication May 28, 1998. Rehearing Granted May 28, 1998.

**Prior History:** On appeal from the 117th District Court of Nueces County, Texas.

**Disposition:** Affirmed in part and reversed and remanded in part.

## Core Terms

summary judgment, appellees, cause of action, appellants', intentional infliction of emotional distress, bruises, medical records, probable cause, deposition, malicious prosecution, summary judgment motion, trial court, procured, monitor, arrest, apnea, matter of law, new trial, conspiracy, records, reflux, neck, standard of care, no writ, initiated, reporting, negate, marks, criminal prosecution, gross negligence

## Case Summary

### Procedural Posture

Plaintiff mother appealed a decision from the 117th District Court of Nueces County (Texas), which granted summary judgment in favor of defendants doctors in her suit for malicious prosecution, intentional infliction of emotional distress, civil conspiracy, and negligence resulting from defendants' medical treatment of plaintiff's son.

### Overview

Plaintiff mother was indicted for abuse of her son, but the indictment was dismissed. Plaintiff mother and her parents then filed suit against defendant doctors. Summary judgment was granted in favor of defendants and plaintiff appealed. Summary judgment as to malicious prosecution was appropriate as to defendant doctors who never spoke to officials regarding abuse allegations and as to defendant doctor whose reporting was based on a reasonable belief and who reported in good faith and had immunity pursuant to Tex. Fam. Code Ann. § 34.03. Summary judgment was inappropriate where good faith was in question. Affidavits of doctors negating plaintiffs' cause of action for intentional infliction of emotional distress were insufficient basis for summary judgment because they were merely sworn denials of plaintiff's claims. Affidavit evidence that did not indicate a lack of discussion among defendants about the case was not sufficient to negate a conspiracy claim. Defendant

doctor's failure to delineate a standard of care owed or how his conduct complied with that standard was not sufficient to negate a claim of negligence. Judgment was affirmed in part and reversed and remanded in part.

**Outcome**

In plaintiff mother's case against defendant doctors for malicious prosecution, intentional infliction of emotional distress, civil conspiracy, and negligence, summary judgment was affirmed as to defendant doctor who in good faith reported suspected abuse. Summary judgment was affirmed in part as to doctors who did not speak to authorities, and summary judgment was reversed and remanded as to doctor whose good faith in reporting was in question.

# LexisNexis® Headnotes

Civil Procedure > Appeals > Summary Judgment Review > General Overview

Civil Procedure > Appeals > Summary Judgment Review > Standards of Review

Civil Procedure > ... > Summary Judgment > Burdens of Proof > General Overview

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > General Overview

*HN1* The standards of review for a summary judgment are well-established. The movant must show there is no genuine issue concerning a material fact that would entitle the movant to judgment as a matter of law. *Tex. R. Civ. P. 166a (c)*.

Civil Procedure > ... > Summary Judgment > Burdens of Proof > General Overview

*HN2* A defendant who conclusively negates at least one essential element of a plaintiff's claim or who conclusively establishes all the elements of an affirmative defense is entitled to summary judgment. However, in reviewing a summary judgment, all evidence is to be construed in favor of the nonmovant, to whom every reasonable inference is allowed and on whose behalf all doubts are resolved.

Torts > Intentional Torts > Malicious Prosecution > General Overview

Torts > ... > Malicious Prosecution > Elements > General Overview

*HN3* In order to maintain a malicious prosecution action, a plaintiff must prove: 1) the commencement of a criminal prosecution against the plaintiff; 2) initiated or procured by the defendant; 3) which terminated in the plaintiff's favor; 4) the plaintiff was innocent; 5) there was no probable cause for the proceedings; 6) malice; and 7) damages.

Civil Procedure > ... > Pleadings > Complaints > General Overview

Torts > Intentional Torts > Malicious Prosecution > General Overview

*HN4* Initiation occurs when a defendant is the entity that actually files the charges. Procurement is defined as follows: A person procures a criminal prosecution if his actions were enough to cause the prosecution, and but for his actions the prosecution would not have occurred. A person does not procure a criminal prosecution when the decision whether to prosecute is left to the discretion of another, including a law enforcement official or the grand jury, unless the person provides information which he knows is false.

Family Law > Family Protection & Welfare > Children > General Overview

*HN5* See Tex. Fam. Code Ann. § 34.01 (1989).

Family Law > Family Protection & Welfare > Children > General Overview

Torts > Public Entity Liability > Immunities > Judicial Immunity

*HN6* See Tex. Fam. Code Ann. §§ 34.03 (a), (b).

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > General Overview

Healthcare Law > Healthcare Litigation > Actions Against Healthcare Workers > General Overview

Torts > Intentional Torts > Defenses > Intent

*HN7* Bad faith and malice are elements that are not properly disposed of by summary judgment because they entail the evaluation of intent.

Torts > Intentional Torts > Malicious Prosecution > General Overview

Torts > ... > Elements > Lack of Probable Cause > General Overview

Torts > ... > Elements > Lack of Probable Cause > Determinations of Probable Cause

*HN8* To prevail on a defense to malicious prosecution, a defendant must show that probable cause justified the initiation of criminal proceedings. In the context of malicious prosecution, probable cause is the existence of such facts and circumstances as would excite belief in the mind of a reasonable person, acting on facts within his knowledge, that the person charged was guilty of the crime for which he was prosecuted.

Torts > Intentional Torts > Malicious Prosecution > General Overview

Torts > ... > Elements > Lack of Probable Cause > Evidence

*HN9* There is an initial presumption in malicious prosecution cases that the defendant acted in good faith and had probable cause to initiate or procure the prosecution. That presumption disappears once a plaintiff produces evidence that the motives, grounds, beliefs, and other evidence upon which the defendant acted did not constitute probable cause.

Family Law > Family Protection & Welfare > Children > General Overview

*HN10* *Tex. Fam. Code Ann. § 261.102* (1996) compels doctors having cause to believe that a child's physical and mental health or welfare has been adversely affected by abuse or neglect to orally report their suspicions within forty-eight hours.

Torts > Intentional Torts > Intentional Infliction of Emotional Distress > General Overview

*HN11* A plaintiff establishes intentional infliction of emotional distress if he or she can show: (1) the defendant acted intentionally or recklessly; (2) the conduct was extreme and outrageous; (3) defendant's conduct caused the plaintiff emotional distress; and (4) the emotional distress was severe.

Civil Procedure > ... > Summary Judgment > Burdens of Proof > General Overview

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Legal Entitlement

Civil Procedure > ... > Summary Judgment > Supporting Materials > General Overview

*HN12* Testimony comprised only of legal conclusions is insufficient to support summary judgment as a matter of law. Likewise, conclusory statements made by an expert witness are insufficient to support summary judgment.

Torts > ... > Concerted Action > Civil Conspiracy > General Overview

Torts > ... > Concerted Action > Civil Conspiracy > Elements

**HN13** To prove civil conspiracy, a plaintiff must show the following elements: (1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object to be accomplished; (4) one or more unlawful, overt acts; and (5) damages as the proximate result.

Civil Procedure > ... > Summary Judgment > Burdens of Proof > General Overview

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > General Overview

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Genuine Disputes

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Materiality of Facts

Torts > Malpractice & Professional Liability > Healthcare Providers

Torts > ... > Proof > Evidence > Expert Testimony

**HN14** In a medical malpractice suit, because the trier of fact must be guided by the opinion testimony of experts, a defendant physician can obtain summary judgment based on his uncontroverted testimonial evidence if he establishes, as a matter of law, that no genuine issue of material fact exists as to one or more elements of the plaintiff's cause of action. *Tex. R. Civ. P. 166a(c)*.

Civil Procedure > ... > Summary Judgment > Burdens of Proof > General Overview

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > General Overview

Evidence > ... > Testimony > Expert Witnesses > General Overview

Healthcare Law > ... > Actions Against Facilities > Standards of Care > General Overview

Torts > Malpractice & Professional Liability > Healthcare Providers

Torts > ... > Proof > Custom > Expert Testimony

Torts > ... > Standards of Care > Special Care > General Overview

Torts > ... > Standards of Care > Special Care > Highly Skilled Professionals

**HN15** The threshold question in a medical malpractice case is the standard of care, which must be established by expert testimony. Testimony from an interested expert, such as the defendant doctor, can establish the standard of care and support summary judgment if the testimony is clear, direct, positive, otherwise credible, free of contradictions and inconsistencies, and capable of being readily controverted. It is not sufficient for an expert to simply state he knew the standard of care and conclude it was met. Rather, the expert must state what the standard is and explain how the defendant's acts met it.

Civil Procedure > Judgments > Relief From Judgments > General Overview

Civil Procedure > Judgments > Relief From Judgments > Motions for New Trials

Civil Procedure > Judgments > Relief From Judgments > Newly Discovered Evidence

**HN16** The appellate court reviews denials of motions for new trial based on newly discovered evidence under an abuse of discretion standard. In order to obtain a new trial, a plaintiff must show that (1) the evidence has come to their attention since the trial; (2) it was not discovered earlier due to the lack of diligence; (3) the evidence is not cumulative; and (4) it is so material that it would produce a different result if a new trial were granted.

**Counsel:** FOR APPELLANTS: Craig S. Smith, Donald B. Edwards, Smith & Edwards, Corpus Christi, TX.

FOR APPELLEES: Linda C. Breck, Brin & Brin, Attorneys at Law, Corpus Christi, TX. Carolos Villarreal, Hunt, Hermansen, McKibben & Barger, Corpus Christi, TX. Thomas E. Nye, Brin & Brin, Attorneys at Law, Corpus Christi, TX.

**Judges:** Before Justices Dorsey, Yanez, and Rodriguez. Opinion by Justice Rodriguez.

**Opinion by:** Nelda V. Rodriguez

## Opinion

[*873] OPINION

Opinion by Justice Rodriguez

This is an appeal from a summary judgment granted in favor of appellees Anesthesiology Associates and Mary Dale Peterson, M.D. (collectively referred to herein as "Peterson"); Edgar Cortes, M.D. ("Cortes"); Tom McNeil, M.D. ("McNeil"); and William Dirksen, M.D. ("Dirksen") for claims of malicious prosecution, intentional infliction of [*874] emotional distress, civil conspiracy, and negligence resulting from appellees' medical treatment of Michael Harwood. We affirm in part and reverse and remand in part.

### Standard of Review

*HN1* The standards of review for a summary judgment are well-established. The movant must show there is no genuine issue concerning a material fact which would entitle the movant to judgment as a matter of law. *TEX. R. CIV. P. 166a(c)*; *Cathey v. Booth, 900 S.W.2d 339, 341 (Tex. 1995)*. *HN2* A defendant who conclusively negates at least one essential element of a plaintiff's claim or who conclusively [**2] establishes all the elements of an affirmative defense is entitled to summary judgment. *Wornick Co. v. Casas, 856 S.W.2d 732, 733 (Tex. 1993)*. However, in reviewing a summary judgment, all evidence is to be construed in favor of the nonmovant, to whom every reasonable inference is allowed and on whose behalf all doubts are resolved. *El Chico v. Poole, 732 S.W.2d 306 (Tex. 1987)*; *Nixon v. Mr. Property Management Co., 690 S.W.2d 546, 548-49 (Tex. 1985)*; *Dickson v. State Farm Lloyds, 944 S.W.2d 666, 667 (Tex. App.--Corpus Christi 1997, no writ)*. It is not the purpose of summary judgment to deprive a litigant of his right to a full hearing on the merits of any real issue of fact, but to eliminate patently unmeritorious claims and untenable defenses. *City of Garland v. Booth, 895 S.W.2d 766, 768 (Tex. App.--Dallas 1995, writ denied)*.

### Facts

Viewing the evidence in the light most favorable to appellants shows that Michael Harwood was the infant son of Roxanne Alvarez and Clifford Harwood. Since his birth, the baby was regularly treated at Driscoll Children's Hospital ("Driscoll") for asthma, pneumonia, and gastrointestinal or gastroesophegeal reflux. He had [**3] a history of sleep apnea -- periods when he would stop breathing while sleeping. On several occasions in late 1992 and early 1993, Alvarez brought Michael to see Dr. Steve Oshman concerning his various medical problems. Michael was prescribed a heart monitor for the apnea and the drug Reglan to control the reflux.

On January 27, 1993, Alvarez found Michael turning blue, and she rushed him to Driscoll for treatment. On the 28th, Michael again turned blue and Alvarez ran to the nurses' station screaming for help. A nurse found Michael to be cyanotic and unresponsive. He was revived and ultimately discharged on February 3, 1993.

Michael had an asthma attack on April 10, 1993, and again Alvarez took him to Driscoll, where McNeil treated him. He was then transferred out of the emergency room and placed under the care of Dirksen. He was not prescribed a heart monitor, and his Reglan was discontinued. On April 12th, at approximately 3:30 a.m., Michael was found not breathing by Norma Gonzalez, the respiratory therapist. She turned Michael onto his back and applied CPR. The resuscitation effort restored Michael's breathing, but he did not regain consciousness. [1] Michael was transferred [**4] to pediatric ICU and placed under the care of Peterson and Cortes.

After Michael was in ICU for approximately thirty-six hours, red marks appeared on the back of his neck and head. Cortes called Children's Protective Services ("CPS") to report suspected child abuse. The risk management department at Driscoll was also notified.

On April 15th, Alvarez and Harwood were informed of Michael's vegetative condition. Harwood demanded to know the reason for CPS involvement and suggested the doctors and the hospital had engaged in a cover-up of their negligence. Also on April 15th, the police were summoned to Driscoll. Alvarez was interviewed and Michael was photographed.

In addition to initially reporting to CPS, Cortes wrote to CPS on April 24, 1993, and stated Alvarez had not informed the hospital of Michael's previous medical history; that the apnea attacks occurred only in Alvarez's presence; and that Alvarez seemed more concerned with getting Harwood [**5] out of prison than in Michael's health.

 [*875] On April 29th Peterson gave a statement to CPS concurring with Cortes. She also concluded the bruises found on Michael's neck could not be caused by resuscitation efforts, but only by being held face down. Cortes contacted CPS for a third time on May 6, 1993 and opined that Alvarez deliberately attempted to suffocate Michael by forcing his head into the mattress.

Alvarez was ultimately indicted, but on April 14, 1994, the indictment was dismissed. Alvarez and her parents filed suit against appellees [2] asserting claims for malicious prosecution, intentional infliction of emotional distress, civil conspiracy, and negligence. The appellees filed motions for summary judgment, which the court granted.

**Analysis**

Because appellants alleged the [**6] same four causes of action against each of the appellees, for ease of reference we will first set out the elements of each cause of action and then address the merits of each appellee's motion for summary judgment in the context of these elements.

*I. Malicious Prosecution*

*HN3* In order to maintain a malicious prosecution action, a plaintiff must prove: 1) the commencement of a criminal prosecution against the plaintiff; 2) initiated or procured by the defendant; 3) which terminated in the plaintiff's favor; 4) the plaintiff was innocent; 5) there was no probable cause for the proceedings; 6) malice; and 7) damages. *Browning-Ferris Indus., Inc. v. Zavaleta, 827 S.W.2d 336, 338 (Tex. App.--Corpus Christi 1991, writ denied)*.

In *Browning-Ferris Indus., Inc. v. Lieck, 881 S.W.2d 288 (Tex. 1994)*, the supreme court modified the causation element of a malicious prosecution case. The court expressly rejected the concept that the prosecution could be

---

[1]  Michael remained in a coma and died after several months.

[2]  She also sued Driscoll Foundation Children's Hospital; Driscoll Children's Hospital; The Children's Clinic; Steve Oshman, M.D.; Odent Youssef, M.D.; and Norma Gonzales, R.T. They are not before the Court in this appeal.

brought about merely through a defendant's aid or cooperation. Instead, the court held that malicious prosecution occurs only when a defendant "initiates" or "procures" the prosecution. *Lieck, 881 S.W.2d at 293*. **HN4** "Initiation" **[\*\*7]** occurs when a defendant is the entity that actually files the charges. The court defined "procurement" as follows:

> A person procures a criminal prosecution if his actions were enough to cause the prosecution, and but for his actions the prosecution would not have occurred. A person does not procure a criminal prosecution when the decision whether to prosecute is left to the discretion of another, including a law enforcement official or the grand jury, *unless the person provides information which he knows is false*.

*Lieck, 881 S.W.2d at 293* (emphasis added).

Appellants alleged appellees knew that any injury to Michael was the result of their own negligence in failing to adequately treat him. Appellants contended appellees engaged in a cover-up of the doctors' and the hospital's liability by accusing Alvarez of injuring her own child; that Alvarez's prosecution was procured and propelled in bad faith or maliciously in an effort to deflect attention from the negligent medical care given to Michael.

All appellees claimed immunity from malicious prosecution under the mandatory child abuse reporting provisions of the Texas Family Code. At the time of the incidents **[\*\*8]** in question, the family code provided:

> **HN5** A person having cause to believe that a child's physical or mental health or welfare has been or may be adversely affected by abuse or neglect by any person shall report in accordance with Section 34.02 of this code.

TEX. FAM. CODE ANN. § 34.01 (Vernon 1989) (Act of June 16, 1989, 71st Leg., R.S., ch. 1265, § 2, 1989 Tex. Gen. Laws 5849 (repealed 1995) (current version at *TEX. FAM. CODE ANN. § 261.101(a)* (Vernon 1996)). The code further provided:

> **HN6** (a) Except as provided by Subsection (b) of this section, a person reporting or assisting in the investigation of a report pursuant to this chapter is immune from liability, civil or criminal, **[\*876]** that might otherwise be incurred or imposed. Immunity extends to participation in any judicial proceedings resulting from the report.
>
> (b) Persons who report their own conduct or who otherwise report in bad faith or malice, or assist in the investigation of a report in bad faith or malice, are not protected by this section.
>
> TEX. FAM. CODE ANN. § 34.03 (Vernon 1989) (Act of June 14, 1989, 71st Leg., R.S., ch. 371, § 8, 1989 Tex. Gen. Laws 1466 (repealed 1995) (current version **[\*\*9]** at *TEX. FAM. CODE ANN. § 261.106(a)*, *(c)* (Vernon 1996)).
>
> Appellants counter with the argument that if a jury determines any of the doctors were negligent and sought to cover up their negligence through the prosecution of Alvarez, they will have shown the requisite bad faith or malice that exempts the doctors from immunity. **HN7** Bad faith and malice are elements that are not properly disposed of by summary judgment because they entail the evaluation of intent. *Villacana v. Campbell, 929 S.W.2d 69, 73 (Tex. App.--Corpus Christi 1996, writ denied)*; *Wofford v. Blomquist, 865 S.W.2d 612, 614 (Tex. App.--Corpus Christi 1993, writ denied)*.

### A. McNeil and Dirksen

In their motions for summary judgment, McNeil and Dirksen attached their affidavits, each stating

> I deny that I had any conversations whatsoever with anyone from Child Protective Services or any other department or investigating agency for which the Plaintiffs' claims seem to be based. I had no contact

with them whatsoever in any manner with respect to the case of Michael Harwood. . . . I simply did not in any way whatsoever, speak with, write, talk to, or otherwise communicate with Child Protective Services [**10] or any other investigation agency in this matter.

Appellants did not refute these affidavits by providing any competent summary judgment evidence that McNeil and Dirksen were involved in any way with the reporting of the incident to CPS or with CPS's subsequent investigation.

McNeil's and Dirksen's affidavits established as a matter of law that they neither initiated nor procured the criminal prosecution of Alvarez. Having negated one element of appellants' cause of action, the trial court did not err in granting summary judgment on this cause of action. Points of error three and four are overruled.

### B. Peterson

*HN8* To prevail on a defense to malicious prosecution, a defendant must show that probable cause justified the initiation of criminal proceedings. *Ellis County State Bank v. Keever, 888 S.W.2d 790, 793-94 (Tex. 1994)* (opinion on reh'g); *Akin v. Dahl, 661 S.W.2d 917, 920 (Tex. 1983)*, cert. denied, *466 U.S. 938, 80 L. Ed. 2d 460, 104 S. Ct. 1911 (1984)*; *Zavaleta, 827 S.W.2d at 338*. In the context of malicious prosecution, probable cause is "the existence of such facts and circumstances as would excite belief in the mind of a reasonable [**11] person, acting on facts within his knowledge, that the person charged was guilty of the crime for which he was prosecuted." *Richey v. Brookshire Grocery Co., 952 S.W.2d 515, 517 (Tex. 1997)* (citing *Akin, 661 S.W.2d at 921*)); *Metzger v. Sebek, 892 S.W.2d 20, 42 (Tex. App.--Houston [1st Dist.] 1994, writ denied)* (quoting *Compton v. Calabria, 811 S.W.2d 945, 949 (Tex. App.--Dallas 1991, no writ))*. The question to be answered is not what the facts actually were, but rather what the defendant honestly and reasonably believed the facts to be. *Metzger, 892 S.W.2d at 42*; *Compton, 811 S.W.2d at 950*.

Peterson delineated her probable cause as follows:

1.

    Pulmonary arrest was suspicious because Michael's lungs were "working well."

2.

    Upon review of the medical records, she observed the apnea attacks occurred only in Alvarez's presence, and she appeared to be sleeping, although monitors were going off during one incident.

3.

    Alvarez persistently fed Michael by propping up his bottle while Michael was laying down, a practice she had been instructed not to do.

4.

    A review of the medical records indicated neither [**12] the admitting physician, resident, [*877] or nurse were informed by Alvarez that Michael had been hospitalized previously for apnea or gastro-esophegeal reflux, that he was on medication to control the reflux, and that he had been on an apnea monitor.

5.

    When Peterson interviewed Alvarez, she (Alvarez) contradicted herself regarding whether she had informed admitting personnel about Michael's medical history; and

6.

She noticed red marks on the back of the child's neck that looked like fingerprints, which she did not believe to have been caused by resuscitation efforts.

*HN9* There is an initial presumption in malicious prosecution cases that the defendant acted in good faith and had probable cause to initiate or procure the prosecution. *Richey, 952 S.W.2d at 517*. That presumption disappears once a plaintiff produces evidence that the motives, grounds, beliefs, and other evidence upon which the defendant acted did not constitute probable cause. *Richey, 952 S.W.2d at 518*.

Appellants' response questioned whether Peterson had probable cause and whether she reasonably believed Alvarez had attempted to suffocate Michael. Their summary judgment proof included the **[**13]** following:

1.

Michael's hospital records from the admission in question, as well as his previous admissions. These records showed Michael was born with "Mongolian spots"; he had been admitted to Driscoll for asthma and bronchitis; his condition required a breathing monitor; and he was on medication to control gastroesophageal reflux, a condition which can cause vomiting and aspiration of the vomitus.

2.

Alvarez's deposition, in which she states:

(a)

at least one of Michael's apneic attacks occurred in January 1993 when Michael was in his room directly across from the nurses' station.

(b)

other than on one occasion in which she propped up Michael's bottle, and after she was instructed not to do so, Alvarez did not feed Michael by the bottle propping method; she always held him upright because of his reflux problem.

(c)

she did not withhold information from the doctors and/or hospital staff. To the contrary, in her deposition, Alvarez related an incident with the nursing staff in which she insisted Michael have a breathing monitor, that he had had one during his previous admissions and that the nurses refused **[**14]** to give Michael a monitor because he did not need one and no doctor had prescribed it.

3.

Police photographs, taken on April 15, 1993, which did not indicate the presence of any bruises on Michael's head or neck.

4.

The deposition of Dr. Joseph Anzaldua, plaintiff's expert, in which he testified he could not tell from looking at the blurry Polaroid pictures taken by the hospital staff on April 13, 1993, whether there were any bruises on Michael. He specifically declined to say the marks were bruises.

5.

The deposition of Dr. Steve Oshman, Michael's treating physician, in which he described one of the steps in administering CPR to an infant as placing the thumbs behind the back of the baby's head to tilt the head backwards and clear the airway.

Alvarez did not produce any evidence which suggested Peterson knew the information provided to CPS was false. While Alvarez's summary judgment evidence creates a fact question with respect to whether she caused Michael's injuries, it does not controvert Peterson's evidence that she acted in good faith. Peterson simply offered her opinion, based on facts as provided to her by the other **[**15]** doctors and the medical records. Unlike the other doctors, who are business associates, Peterson was not alleged to have committed any act of malpractice, not having seen Michael until he was already comatose and on a ventilator.

The critical facts relied on by Peterson were not disputed. She was faced with an infant who had suddenly lapsed into a life-threatening coma and concluded the child's lungs appeared healthy and would not explain respiratory failure. She was told by other doctors that, in their opinion, the circumstances **[*878]** of the child's infirmity were suspicious. She was apprised that Cortes had indeed contacted CPS, based on his apparent suspicions. She observed the medical records which, as described above, suggested Alvarez was not forthcoming with information, had disregarded prior medical advice concerning her child's well-being, and was the only person present when the child suffered his attacks. Based on the records relied upon by Peterson, as well as her conferring with other doctors, together with Alvarez's inability to refute the veracity of Peterson's statements (*i.e.* that these items were in records which she relied on to form her conclusions), we find Alvarez **[**16]** failed to rebut the presumption that Peterson had probable cause to suspect abuse.

Peterson's discussions with the other doctors, review of the medical records, and her cooperation with CPS investigation were apparently based on nothing more than sound medical practice. Indeed, *HN10* the Texas Family Code compels doctors having cause to believe that a child's physical and mental health or welfare has been adversely affected by abuse or neglect to orally report their suspicions within forty-eight hours.

There are important policy considerations which favor affirming the summary judgment with respect to Peterson as well. It has often been stated generally that "actions for malicious prosecution are not favored in the law." *Lieck, 881 S.W.2d at 291* and cases cited therein. This cause of action involves "a delicate balance between society's interest in the efficient enforcement of the criminal law and the individual's interest in freedom from unjustifiable and oppressive criminal prosecution." *Richey, 952 S.W.2d at 517*. Doctors and other health care professionals have an affirmative duty to report suspected abuse. The law does not require them to be certain abuse has occurred before **[**17]** they report, but merely "to have cause to believe." [3] Given the language in the statute and the burden imposed by it, we believe physicians should be afforded deference in reporting such matters. The life threatening injury was sustained by Michael before Peterson treated him. She set out an objectively reasonable basis for her belief Alvarez had abused Michael, and therefore, the immunity afforded by the family code is extended to her.

Point of error one is overruled. Based on this same analysis, we also overrule point of error five (the trial court erred in granting Peterson's motion for summary judgment on Alvarez's claim of intentional infliction of emotional distress), and point of error nine (the trial court erred in granting Peterson's motion for summary judgment on Alvarez's claim of conspiracy).

**C.**

**Cortes**

Cortes **[**18]** delineated his probable cause to notify CPS as follows:

Following Michael's cardio-respiratory arrest, it was noted by myself and other treating physicians, that the recurrent episodes of respiratory arrest and near arrest occurred only in the presence of the mother and never when another person was present. This, coupled with the fact that shortly after this final

---

[3] The code indicates the report "should reflect the reporter's belief that a child has been or may be abused or neglected." TEX. FAM. CODE ANN. § 261.102 (Vernon 1996).

episode, Michael developed some suspicious bruising on the back of his head and neck, lead the health care providers to suspect that there may have been or may be in the future some intentional harm to Michael by the mother. . . .

In their response, appellants questioned whether Cortes "honestly and reasonably, or actually, believed that Michael Harwood had suffered a failed suffocation attempt by his mother." They provided the following summary judgment evidence:

1.

   Michael's medical records. In addition to describing his previous admissions and treatments, the records stated Michael suffered a cardio/pulmonary arrest that was the "possible result of regurgitation and aspirating."

2.

   Peterson's deposition in which she admitted (1) Michael's condition, including the apnea, aspiration [**19] and reflux problems could have caused his respiratory arrest; and (2) she is not a forensic pathologist [*879] and is not qualified to determine the cause of Michael's cardio/pulmonary arrest, nor is she qualified to assess the cause of any red marks or bruises that may have been visible on Michael's body. Peterson said she would not have notified CPS.

3.

   The records from the CPS investigation. Ms. Bonneau noted she had called Cortes on April 13, 1993 at approximately 2:30 to question him about the incident. "I asked Dr. Cortes, 'Can you tell me about the monitor the child had in the past?' Dr. Cortes did not respond to the question," but instead continued to assert Alvarez had pushed Michael's face into the mattress.

4.

   Dr. Joseph Anzaldua's deposition in which he stated, "it just seems to me that everything starts coming into play after the lawsuit or after all these incidents and all of a sudden these physicians kind of decide, through whatever inspiration they have, that this mother is a bad mother doing all these bad things to this poor child. It just doesn't fit. And the medical records, as I stated before, do not substantiate any of their theories or [**20] scenarios or possibilities that they seem to be postulating, as we say, in the records that I've reviewed."

   When asked whether the red marks observed on Michael were bruises as alleged by the doctors, Anzaldua stated, "Specifically in this case of everything I know about this case, I would not feel comfortable agreeing to that. I mean, the very people that are making those allegations are the people that are named in this lawsuit are turning right around and accusing the mother of injury to the child. I really in good conscience cannot agree to that. In this particular case, I couldn't do it."

5.

   Dr. Oshman's deposition testimony outlining the procedure for infant CPR.

6.

   Police photographs, taken on April 15, 1993, that do not indicate the presence of any bruises on Michael's head or neck.

We conclude appellants' summary judgment evidence created fact questions with respect to not only the origin and cause of any marks on Michael's head, but more importantly, whether Cortes reasonably believed Alvarez had injured Michael.

Appellants' theory of the case must be kept in mind -- that the entire story of Alvarez's abuse was fabricated **[\*\*21]** by appellees, acting in concert, as a cover-up for their medical negligence. In light of this unique framework, we disagree with appellees' prophecy that our holding will have a chilling effect on the mandatory reporting of suspected child abuse or neglect. Our opinion is limited to the facts of this case, that being those situations where the plaintiff claims the defendant fabricated the existence of abuse or neglect or fabricated the existence of probable cause to cover up his own negligent conduct in causing injury to the child.

Point of error two is sustained.

## II. Intentional Infliction of Emotional Distress

*HN11* A plaintiff establishes intentional infliction of emotional distress if he can show: (1) the defendant acted intentionally or recklessly; (2) the conduct was extreme and outrageous; (3) defendant's conduct caused the plaintiff emotional distress; and (4) the emotional distress was severe. *Twyman v. Twyman, 855 S.W.2d 619, 621 (Tex. 1993)*.

In their motions for summary judgment, both McNeil and Dirksen stated only that appellants "have no proof of three of the four requisite elements in this case." Cortes stated appellants "have no proof of two of the **[\*\*22]** four requisite elements in this case." While appellants would ultimately have the burden of proof at trial to present sufficient evidence to prove each of the elements of this cause of action, they were not required to do so before that time. [4] Neither Cortes, McNeil, nor Dirksen delineated what appellants' lack of proof was, nor did they provide any evidence to negate the elements of intentional infliction **[\*880]** of emotional distress. Their sole evidence consisted of the following:

Affidavit of McNeil and Dirksen

> I have been informed what the elements of a claim for Intentional Infliction of Emotional Distress . . . are. I have reviewed Plaintiffs' Third Amended Original Petition with respect to their claims of Intentional Infliction of Emotional Distress . . . . I specifically deny each and every **[\*\*23]** one of the claims in each of the aforementioned causes of action with respect to any care and treatment rendered by me in this case.

McNeil and Dirksen also denied having any conversations with anyone from CPS or with any other investigating agency.

Affidavit of Cortes

> I have been informed what the elements of a claim for intentional infliction of emotional distress are. With respect to Plaintiffs' claims for intentional infliction of emotional distress, I specifically deny each and every one of those claims. I deny that I acted intentionally or recklessly to cause harm to the Plaintiffs. I deny that my contact by merely exercising my duty was in anyway [sic] extreme or outrageous. I further deny that Plaintiffs were caused emotional distress or that said distress was severe as a result of any actions that were taken by me.

In *Anderson v. Snider, 808 S.W.2d 54, 55 (Tex. 1991)*, the supreme court held that *HN12* testimony comprised only of legal conclusions is insufficient to support summary judgment as a matter of law. *See also Mercer v. Daoran Corp., 676 S.W.2d 580, 583 (Tex. 1984)*; *Hidalgo v. Surety Savings & Loan Ass'n, 487 S.W.2d 702, 703 (Tex. **[\*\*24]** 1972)* (per curiam). Likewise, conclusory statements made by an expert witness are insufficient to support summary judgment. *Anderson, 808 S.W.2d at 55*; *Vinklarek v. Cane, 691*

---

[4] The new "no evidence" summary judgment rule was not in effect when appellees filed their motions. *See* Order of April 16, 1997, 60 TEX. B.J. 534 (amending TEX. R. CIV. P. 166a, eff. Sept. 1, 1997).

*S.W.2d 108, 111 (Tex. App.--Austin 1985, writ ref'd n.r.e.)*. These doctors' affidavits are wholly insufficient to negate appellants' cause of action for intentional infliction of emotional distress as a matter of law; they are merely sworn denials of appellants' claims.

Appellants' sixth, seventh and eighth points of error are sustained.

### III. Conspiracy

*HN13* To prove civil conspiracy, the plaintiff must show the following elements: (1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object to be accomplished; (4) one or more unlawful, overt acts; and (5) damages as the proximate result. *Triplex Communications, Inc. d/b/a Radio Station KZZB-95 FM v. Riley, 900 S.W.2d 716, 719 (Tex. 1995)*; *Massey v. Armco Steel Co., 652 S.W.2d 932, 934 (Tex. 1983)*; *Bernstein v. Portland Sav. & Loan Ass'n., 850 S.W.2d 694, 706 (Tex. App.--Corpus Christi 1993, writ denied)*.

In their motions for summary judgment, McNeil and Dirksen provided the affidavits **[**25]** set out above. While the affidavits are sufficient to establish that neither McNeil nor Dirksen communicated with CPS, neither appellee stated he did not discuss the case with any of the other appellees. On this basis alone, we find this affidavit evidence insufficient as a matter of law to negate appellants' claim of conspiracy.

Moreover, appellants' summary judgment proof included excerpts from McNeil's deposition in which he stated he had several conversations with Cortes regarding Michael's bruising and Michael's "unexplained" apneic episodes. McNeil stated Michael's apnea was caused by abuse, an opinion substantiated by viewing the child in ICU and the bruises to the back of his head. McNeil conceded, however, that he did not go to look at Michael in ICU until requested to do so by Cortes. He also conceded he saw no signs of abuse when Michael was admitted in the emergency room and he made no notation in Michael's emergency room record that he suspected any abuse.

Dirksen stated in his deposition that he went to see Michael in ICU even though at that time Michael was no longer his patient, but was Cortes's patient. He observed bruising on the back of Michael's neck. He consulted **[**26]** with Cortes and Peterson about it. When asked if he considered whether the bruising could have occurred when Norma Gonzales attempted to resuscitate Michael after he had vomited and aspirated milk, **[*881]** Dirksen stated he was not aware Michael had vomited, nor was he aware that the medical records contained notations that Michael had vomited. The following transpired:

Q:

Would you like to read them [the medical records] now if you've never read them before?

A:

Yes, please.

Q:

Don't you think before you start speculating that a mother might have intended harm to her --

A:

I, sir --

Q:

-- own child that you might read the medical records --

A:

I --

Q:

-- sir?

A:

I, sir, did not -- I have a -- I have a legal responsibility that if I think that a child has been abused that I need to report it. Dr. Cortes and I discussed it. He did in fact report it. If he hadn't, I would have.

Also attached to appellants' response to both McNeil's and Dirksen's motions were excerpts from Cortes's deposition in which he stated "it was now **the consensus of the doctors** who **[\*\*27]** were caring for [Michael] that he might have been the victim of abuse." (Emphasis added). Cortes stated he was sure all the doctors discussed the case and before he called CPS, Cortes talked to McNeil and Dirksen.

Appellees included the foregoing testimony of Cortes in their response to his motion for summary judgment as well.

Appellants' summary judgment proof creates a fact question regarding elements one, two, and three set out in *Riley* and *Massey*. Points of error ten, eleven, and twelve are sustained.

## IV. Negligence

### A.Peterson

In point of error thirteen, appellants complain the trial court erred in granting summary judgment in favor of Peterson on their claims of negligence and gross negligence. During oral argument, appellants informed the Court they were waiving this point of error. Accordingly, it is not necessary to address it. *TEX. R. APP. P. 47.1*.

### B.Cortes

In point of error fourteen, appellants complain the trial court erred in granting summary judgment in favor of Cortes on their claims of negligence and gross negligence. *HN14* In a medical malpractice suit, because the trier of fact must be guided **[\*\*28]** by the opinion testimony of experts, *Hart v. Van Zandt, 399 S.W.2d 791, 792 (Tex. 1965)*, a defendant physician can obtain summary judgment based on his uncontroverted testimonial evidence if he establishes, as a matter of law, that no genuine issue of material fact exists as to one or more elements of the plaintiff's cause of action. *TEX. R. CIV. P. 166a(c)*; *Davis v. Manning, 847 S.W.2d 446, 449 (Tex. App.--Houston [14th Dist.] 1993, no writ)*.

*HN15* The threshold question in a medical malpractice case is the standard of care, which must be established by expert testimony. *Hall v. Tomball Nursing Center, Inc., 926 S.W.2d 617, 620 (Tex. App.--Houston [14th Dist.] 1996, no writ)*; *Chopra v. Hawryluk, 892 S.W.2d 229, 233 (Tex. App.--El Paso 1995, writ denied)*; *Armbruster v. Memorial Southwest Hosp., 857 S.W.2d 938, 941 (Tex. App.--Houston [1st Dist.] 1993, no writ)*. Testimony from an interested expert, such as the defendant doctor, can establish the standard of care and support summary judgment if the testimony is clear, direct, positive, otherwise credible, free of contradictions and inconsistencies, and capable of being readily controverted. *Hall, 926 S.W.2d at* **[\*\*29]** *620*; *Chopra, 892 S.W.2d at 233*. It is not sufficient for an expert to simply state he knew the standard of care and conclude it was met. Rather, the expert must state what the standard is and explain how the defendant's acts met it. *Hall, 926 S.W.2d at 620*; *Nicholson v. Naficy, 747 S.W.2d 3, 4-5 (Tex. App.--Houston [1st Dist.] 1987, no writ)*.

Cortes's sole summary judgment evidence consisted of his affidavit. He stated:

I am familiar with the definition of gross negligence, that being explained to me as meaning more than momentary thoughtlessness, inadvertence, or error of judgment. **[\*882]** It means such an entire want of care as to establish that the act or omission in question was the result or actual conscious indifference to the rights, welfare, or safety of the persons affected by it. I specifically deny the allegations of gross negligence made by the Plaintiffs pertaining to me.

I am familiar with the definition of negligence per se, that being explained to me as conduct, whether of action or omission, which may be declared and treated as negligence without any argument or proof as to the particular surrounding circumstances, either because it is in **[\*\*30]** violation of a statute or valid municipal ordinance, or because it is so palpably opposed to the dictates of common prudence that it can be said without hesitation or doubt that no careful person would have been guilty of it. I specifically deny the allegations of negligence per se made by the Plaintiffs pertaining to me.

I have reviewed the Plaintiffs' Third Amended Petition in this case. I deny that any act or omission on my part as specifically stated therein was in any way negligent or grossly negligent or in any way adversely affected the health and safety of Michael Harwood.

Further, it is my expert opinion, based on a reasonable degree of medical probability, that none of the damages Plaintiff claims in Plaintiffs' latest Petition were in any way caused by any negligent act or omission on my part.

Cortes' affidavit falls far short of the requirements set out in *Hall*. Nowhere in this affidavit did Cortes delineate the standard of care, state he was familiar with the standard of care, or how his conduct complied with that standard. As in *Hall*, although Cortes's affidavit stated that no act or omission on his part caused damage to Michael, **[\*\*31]** we find the statement conclusory because we do not know what actions were taken by Cortes in treating Michael. He merely stated:

The next time I saw Michael was on April 13, 1993. He had been admitted to the hospital on April 10, 1992 [sic] by my associate, Dr. Tom McNeil for treatment of symptomatic asthma. At the time that I saw Michael, he had already experienced the cardio-pulmonary arrest made the basis of this lawsuit, and had been transferred to the Pediatric Intensive Care Unit. Michael was in a coma and remained so throughout the entire remainder of his hospital stay at Driscoll.

As appellants noted in their response to Cortes's motion, Cortes's affidavit lacked factual detail to the extent they would have had great difficulty controverting it. *Hall, 926 S.W.2d at 620*. We conclude Cortes's affidavit does not set out the applicable standard of care and does not negate appellants' claim of negligence as a matter of law.

Point of error fourteen is sustained.

By point of error fifteen, appellants complain of the trial court's failure to grant their motion for new trial. The motion was based on two factors: (1) that they had acquired new evidence -- what **[\*\*32]** they term the "defendants' manual of strategies for avoiding litigation" [5] and (2) a new trial should be granted in the interest of justice. Neither point has merit.

**HN16** We review denials of motions for new trial based on newly discovered evidence under an abuse of discretion standard. *Jackson v. Van Winkle, 660 S.W.2d 807, 809 (Tex. 1983)*. In order to obtain a new trial, a plaintiff must show that (1) the evidence has come to their attention since the trial; (2) it was not discovered earlier due to the lack of diligence; (3) the evidence is not cumulative; and (4) it is so material that it would produce a different result if a new trial were granted. *Id. at 809*.

---

[5]   What was obtained was Driscoll's Risk Management Policy and Procedure Manual.

After reviewing the statement of facts from the hearing on the motion for new trial, we conclude appellants failed to establish the second and third prongs of the *Jackson* test. After hearing the argument of counsel, the trial court concluded that, although appellants **[**33]** did request appellees produce the manual and any incident reports, when the information was not forthcoming, appellants did not file a motion to compel. The court stated:

 **[*883]** Those were matters that could have been brought up pre-trial so to speak. You did have the right to compel the other side to deliver documents and answer questions and so forth . . . . and I think you missed your opportunity.

Moreover, appellants failed to put on any evidence that the manual would not be cumulative of other evidence already before the court via the motions for summary judgment.

Finding that the trial court did not abuse its discretion in denying the motion for new trial, we overrule point of error number fifteen.

The judgment of the trial court is AFFIRMED with respect to Peterson on all causes of action and with respect to McNeil and Dirksen on Alvarez's cause of action for malicious prosecution. The judgment is REVERSED and REMANDED on all causes of action with respect to Cortes and with respect to McNeil and Dirksen on Alvarez's causes of action for conspiracy and intentional infliction of emotional distress.

Nelda V. Rodriguez

Justice

Opinion delivered and filed **[**34]** this the 26th day of March, 1998.



⚠ Caution

As of: September 1, 2015 5:09 PM EDT

## *American Realty Trust v. JDN Real Estate*

Court of Appeals of Texas, Fifth District, Dallas

April 10, 2002, Opinion Filed

No. 05-01-00488-CV

**Reporter**

74 S.W.3d 527; 2002 Tex. App. LEXIS 2534

AMERICAN REALTY TRUST, INC., Appellant v. JDN REAL ESTATE-MCKINNEY, L.P., Appellee

**Subsequent History:** Rehearing Denied May 17, 2002. Released for Publication June 3, 2002.

**Prior History:** **[**1]** On Appeal from the County Court at Law No. 3. Dallas County, Texas. Trial Court Cause No. CC-00-12954-C.

**Disposition:** AFFIRMED.

## Core Terms

arbitration, parties, trial court, issues, escrow, conclusions of law, arbitration clause, prerequisites, commerce

## Case Summary

**Procedural Posture**

In a dispute over offered bids for a construction project, appellee foreign limited partnership demanded arbitration pursuant to its agreement with appellant foreign corporation. After the arbitrator entered an award in favor of the limited partnership, the corporation filed a petition seeking to vacate the award. The County Court at Law No. 3, Dallas County, Texas, confirmed the arbitration award and the corporation appealed.

**Overview**

The underlying action was based on an agreement the foreign parties entered into concerning construction on a tract of land in Texas. On review, the corporation complained the trial court erred in implicitly finding the arbitrator had jurisdiction over some of the limited partnership's claims and in allowing the arbitrator to determine his own jurisdiction. Although the agreement did not define the words "dispute" and "claim," the appellate court looked to their plain, grammatical meaning in determining the parties had a "dispute" concerning a "claim." Thus, the trial court could have found the controversy between the parties should have been arbitrated because, under the parties' agreement, the arbitrator had been given jurisdiction to hear a dispute or claim. Further, once the trial court properly determined the parties had an agreement to arbitrate and the subject matter of the dispute fell within that arbitration agreement, compliance with any contractually-based prerequisites to arbitration fell to the arbitrator to decide. Thus, the trial court properly concluded that the parties' controversies fell within the scope of the arbitration clause.

**Outcome**

The judgment was affirmed.

# LexisNexis® Headnotes

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview

Civil Procedure > ... > Arbitration > Federal Arbitration Act > General Overview

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Validity of ADR Methods

Constitutional Law > Supremacy Clause > General Overview

Contracts Law > Contract Conditions & Provisions > Arbitration Clauses

International Trade Law > Dispute Resolution > International Commercial Arbitration > Arbitration

*HN1* The Federal Arbitration Act (FAA), *9 U.S.C.S. §§ 1-16*, preempts all otherwise applicable state laws, including the Texas General Arbitration Act, *Tex. Civ. Prac. & Rem. Code Ann. §§ 171.001-.098*. The FAA applies if the arbitration clause is part of a written contract evidencing a transaction involving commerce. *9 U.S.C.S. § 2 (1999)*. "Commerce" is construed broadly under the FAA and encompasses contracts relating to interstate commerce. The amount of commerce need not be substantial for the FAA to apply.

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > Arbitrability

Civil Procedure > ... > Arbitration > Federal Arbitration Act > General Overview

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Validity of ADR Methods

Contracts Law > Contract Conditions & Provisions > Arbitration Clauses

International Trade Law > Dispute Resolution > International Commercial Arbitration > Arbitration

*HN2* When the Federal Arbitration Act (FAA), *9 U.S.C.S. §§ 1-16*, applies, federal law determines whether the dispute is arbitrable. Under federal law, the trial court is responsible for determining two issues: (1) whether a party can be compelled to arbitrate under the contract, and (2) what issues a party agreed to arbitrate. Under the FAA, any doubts as to whether claims fall within the scope of an agreement must be resolved in favor of arbitration.

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Judicial Review

Civil Procedure > Appeals > Standards of Review > De Novo Review

*HN3* The appellate court reviews de novo a trial court's confirmation of an arbitration award.

Civil Procedure > Appeals > Standards of Review > General Overview

*HN4* When the trial court filed no findings of fact and conclusions of law, the appellate court presumes it found any disputed fact issues in a manner necessary to support its judgment and affirms the judgment on any valid legal theory supported by the pleadings and evidence.

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Judicial Review

Civil Procedure > Appeals > Standards of Review > General Overview

*HN5* On review of an arbitration decision, the court gives strong deference to the arbitrator with respect to issues properly left to the arbitrator's resolution.

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Mandatory ADR

*HN6* An arbitrator may not determine his or her own jurisdiction. Whether a party may be compelled to arbitrate a particular issue is a question of contract interpretation; thus, it is a question for a court to decide. However, if a court determines the parties have an obligation to submit the subject matter of a dispute to arbitration, "procedural" questions concerning the dispute and bearing on its final disposition are left to the arbitrator. Such procedural questions include whether any contractually-based prerequisites to arbitration have been satisfied, at least when such issues are intertwined with the underlying facts of the dispute.

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview

Contracts Law > Contract Conditions & Provisions > Arbitration Clauses

*HN7* An arbitrator's jurisdiction is defined by the parties' contract. A broad arbitration clause, purporting to cover all claims, disputes, and other matters relating to the contract or its breach, creates a presumption of arbitrability.

Contracts Law > Contract Conditions & Provisions > Arbitration Clauses

Contracts Law > Contract Interpretation > General Overview

*HN8* When deciding whether the parties agreed to arbitrate a matter, courts should apply ordinary state law principles governing the formation of contracts. Courts also use ordinary principles of contract law to ascertain the true intentions of the parties as expressed in the entire contract.

Contracts Law > Contract Interpretation > General Overview

*HN9* Words used in a contract should be given their plain grammatical meaning unless it definitely appears such a meaning would defeat the intentions of the parties.

Contracts Law > Contract Conditions & Provisions > Arbitration Clauses

Contracts Law > Contract Interpretation > General Overview

International Trade Law > Dispute Resolution > International Commercial Arbitration > Arbitration

*HN10* In interpreting the language of an arbitration clause, the court has determined that a "dispute" is a controversy, debate, or quarrel while a "claim" is a request or demand.

**Counsel:** For Appellant: Charles Imlay Appler, Bennett, Weston & LaJone, P.C., Dallas, TX.

For Appellee: Paul E. Ridley, Dallas, TX.

**Judges:** Before Justices Moseley, O'Neill, and Richter. Opinion By Justice Moseley.

**Opinion by:** JIM MOSELEY

# Opinion

[*529]  Opinion By Justice Moseley

American Realty Trust, Inc. (ART) appeals the trial court's confirmation of an arbitration award in favor of JDN Real Estate-McKinney, L.P. (JDN). We conclude that if an agreement to arbitrate exists with respect to the subject matter of a certain dispute, "procedural" questions that are intertwined with the underlying facts of the dispute, including whether any contractually-based prerequisites to arbitration have been satisfied, are properly left to the arbitrator to decide. Therefore, we affirm the trial court's judgment.

INTRODUCTION

ART, a Georgia corporation, and JDN, a Georgia limited partnership, entered into a written agreement concerning construction on a tract of land in McKinney, Texas. The parties escrowed funds to pay for the construction. If certain costs exceeded the amount escrowed, the agreement required the party responsible for paying that particular line item to contribute additional funds to the escrow account to cover [**2]  the increased cost. When the parties disagreed over offered bids for the construction project and the amount of money each party was required to contribute to the escrow account, JDN demanded arbitration pursuant to the agreement.

 [*530]  ART claims that, thereafter, during the course of the arbitration, JDN sought to add new damage claims for cost overruns that had occurred in the course of the work on the construction project. ART objected to these claims, contending they were not properly before the arbitrator.

The arbitrator entered an award in favor of JDN that included the "new" claims relating to the cost overruns. ART filed a petition in the trial court seeking to vacate the award. In response, JDN filed an answer and a motion to confirm the award. After a hearing that was not recorded, the trial court confirmed the arbitration award. ART appealed and in three issues complains the trial court should not have implicitly found the arbitrator had jurisdiction over some of JDN's claims, the arbitrator could not determine his own jurisdiction, and the trial court failed to make findings of fact and conclusions of law.

FINDINGS OF FACT AND CONCLUSIONS OF LAW

ART requested the trial [**3]  court to make findings of fact and conclusions of law under *Texas Rule of Civil Procedure 296*. *See TEX. R. CIV. P. 296*. However, ART did not file a notice of past due findings of fact and conclusions of law as required by *rule 297*. *See TEX. R. CIV. P. 297*. Therefore, ART has waived its ability to complain on appeal about the failure of the trial court to file findings of fact and conclusions of law. *See In re Guthrie, 45 S.W.3d 719, 722* (Tex. App.-Dallas 2001, pet. denied). We overrule ART's third issue.

APPLICATION OF THE FEDERAL ARBITRATION ACT

Before addressing the remainder of ART's issues, we must determine whether the federal or state arbitration act applies to this case. *HN1* The Federal Arbitration Act (FAA) preempts all otherwise applicable state laws, including the Texas General Arbitration Act. *Thomas James Assocs., Inc. v. Owens, 1 S.W.3d 315, 319* (Tex. App.-Dallas 1999, no pet.). The FAA applies if the arbitration clause is part of a written contract "evidencing a transaction involving commerce." *9 U.S.C.A. § 2 (West 1999)*. "Commerce" is construed broadly under the FAA and encompasses contracts relating [**4]  to interstate commerce. *Thomas James Assocs., 1 S.W.3d at 319*. The amount of commerce need not be substantial for the FAA to apply. *Lost Creek Mun. Util. Dist. v. Travis Indus. Painters, Inc., 827 S.W.2d 103, 105* (Tex. App.-Austin 1992, writ denied). Here, two Georgia companies and a Texas corporation, acting as an escrow agent, entered into a contract calling for construction in Texas. We conclude the FAA applies to this dispute. *See In re L & L Kempwood Assocs., L.P., 9 S.W.3d 125, 127 (Tex. 1999)*

(orig. proceeding) (per curiam) (finding contract involved interstate commerce where Texas business renovated apartments in Texas for Georgia owners).

STANDARD OF REVIEW

*HN2* Because the FAA applies, federal law determines whether the dispute is arbitrable. *In re Gardner Zemke Co., 978 S.W.2d 624, 626-27* (Tex. App.-El Paso 1998, orig. proceeding). Under federal law, the trial court is responsible for determining two issues: (1) whether a party can be compelled to arbitrate under the contract, and (2) what issues a party agreed to arbitrate. *Executone Info. Sys., Inc. v. Davis, 26 F.3d 1314, 1321 (5th Cir. 1994)*. **[**5]** Under the FAA, any doubts as to whether claims fall within the scope of an agreement must be resolved in favor of arbitration. *Prudential Sec. Inc. v. Marshall, 909 S.W.2d 896, 899 (Tex. 1995)*.

*HN3* **[*531]** We review de novo a trial court's confirmation of an arbitration award. *Thomas James Assocs., 1 S.W.3d at 320*. However, because *HN4* the trial court filed no findings of fact and conclusions of law, we presume it found any disputed fact issues in a manner necessary to support its judgment, and we affirm the judgment on any valid legal theory supported by the pleadings and evidence. *Harlandale Indep. Sch. Dist. v. Cornyn, 25 S.W.3d 328, 331* (Tex. App.-Austin 2000, pet. denied). Additionally, *HN5* like the trial court, we give strong deference to the arbitrator with respect to issues properly left to the arbitrator's resolution. *See Babcock & Wilcox Co. v. PMAC, Ltd., 863 S.W.2d 225, 229* (Tex. App.-Houston [14th Dist.] 1993, writ denied).

JURISDICTION OF ARBITRATOR

In its first two issues, ART complains the trial court erred in implicitly finding the arbitrator had jurisdiction over some of JDN's claims and in allowing the arbitrator **[**6]** to determine his own jurisdiction. ART contends the arbitrator did not have jurisdiction to hear some of JDN's claims because, with respect to those claims, JDN did not make a written demand for additional funds or have ART approve the additional work. Therefore, ART contends, a "dispute" or "claim" did not exist between the parties as to those issues, as required by the arbitration agreement. Thus, as to these additional matters, a contractual prerequisite to ART's obligation to arbitrate did not exist. The parties do not dispute the validity of the arbitration clause in the contract; rather, they dispute the scope of the clause and what issues properly fall within its purview.

We agree with the abstract statement that *HN6* an arbitrator may not determine his or her own jurisdiction. *See Smith Barney Shearson, Inc. v. Boone, 47 F.3d 750, 752 (5th Cir. 1995)*. Whether a party may be compelled to arbitrate a particular issue is a question of contract interpretation; thus, it is a question for a court to decide. *Babcock & Wilcox, 863 S.W.2d at 229-30*. However, if a court determines the parties have an obligation to submit the subject matter of a dispute to **[**7]** arbitration, "procedural" questions concerning the dispute and bearing on its final disposition are left to the arbitrator. *John Wiley & Sons v. Livingston, 376 U.S. 543, 557, 11 L. Ed. 2d 898, 84 S. Ct. 909 (1964)*. Such procedural questions include whether any contractually-based prerequisites to arbitration have been satisfied, at least when such issues are intertwined with the underlying facts of the dispute. *Del E. Webb Constr. v. Richardson Hosp. Auth., 823 F.2d 145, 149 (5th Cir. 1987)*.

*HN7* An arbitrator's jurisdiction is defined by the parties' contract. *Executone Info. Sys., 26 F.3d at 1323*. A broad arbitration clause, purporting to cover all claims, disputes, and other matters relating to the contract or its breach, creates a presumption of arbitrability. *Lost Creek, 827 S.W.2d at 105*. In this case, the arbitration clause agreed to by ART and JDN reads:

The parties shall make a good faith effort to settle *any dispute or claim arising under this Agreement*, including without limitations, any dispute as to the disposition of [sic] distribution of the Contributions. If the parties fail to resolve *a dispute* **[**8]** *or claim*, the parties, including the Escrow Agent, shall submit it to arbitration under the rules of the American Arbitration Association then in effect. Judgment on arbitration awards may be entered by any Court with appropriate jurisdiction.

(Emphasis added).

Generally, *HN8* when deciding whether the parties agreed to arbitrate a matter, courts should apply ordinary state law principles governing the formation of contracts. *First Options of Chicago, Inc. v.* **[*532]** *Kaplan, 514 U.S. 938, 944, 131 L. Ed. 2d 985, 115 S. Ct. 1920 (1995)*. Courts also use ordinary principles of contract law to ascertain the true intentions of the parties as expressed in the entire contract. *Kline v. O'Quinn*, 874 S.W.2d 776, 782 (Tex. App.-Houston [14th Dist.] 1994, writ denied).

*HN9* Words used in a contract should be given their plain grammatical meaning unless it definitely appears such a meaning would defeat the intentions of the parties. *Id*. *HN10* A "dispute" is a controversy, debate, or quarrel. WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY UNABRIDGED 655 (1981). A "claim" is a request or demand. *Id. at 414*. A reasonable construction of the arbitration clause is that **[**9]** the parties intended for the words "dispute" and "claim" to be given their plain grammatical meaning.

Using the plain grammatical meaning of the words, the parties here have a "dispute" concerning a "claim." Thus, the trial court could have found the controversy between ART and JDN should be arbitrated because, under the parties' agreement, the arbitrator had been given jurisdiction to hear "a dispute or claim."

ART argues paragraph 5 of the agreement limits the definition of a "dispute" or "claim." This argument is unpersuasive. Paragraph 5 reads:

JDN and American [ART] have simultaneously with the execution of this Agreement made certain contributions ("Contributions") delivered to the Escrow Agent for the payment for Work in the amount of and for the purposes set forth on the attached Exhibit "E". If any particular line item of cost exceeds the amount reflected on Exhibit "E", the party responsible for the payment of such cost as denoted on Exhibit "E" will contribute the additional funds needed within fifteen (15) days following the written request of the other party.

The agreement does not define, in paragraph 5 or elsewhere, the words "dispute" or "claim." Further, **[**10]** once the trial court properly determined (1) the parties had an agreement to arbitrate and (2) the subject matter of the dispute fell within that arbitration agreement, compliance with any contractually-based prerequisites to arbitration, such as the existence of a written demand or whether the parties worked in good faith to resolve their disputes, fell to the arbitrator to decide. *See Executone Info. Sys., 26 F.3d at 1321*; *Del E. Webb Constr., 823 F.2d at 149*.

Although the arbitrator could not determine his own jurisdiction, the trial court could have concluded, as do we, that the controversies between ART and JDN fell within the scope of the arbitration clause. *See Smith Barney Shearson, 47 F.3d at 752*. Thus, the trial court properly allowed the arbitrator to decide whether any contractually-based prerequisites to arbitration were satisfied. *See Del E. Webb Constr., 823 F.2d at 149*. Therefore, we overrule ART's first two issues.

Having overruled each of ART's issues on appeal, we affirm the judgment of the trial court.

JIM MOSELEY

JUSTICE



Positive

As of: September 1, 2015 5:28 PM EDT

# *Amalgamated Local No. 55, etc. v. Metal & Alloy Div. of Silver Creek Precision Corp.*

United States District Court for the Western District of New York

June 19, 1975

No. Civ-74-397

**Reporter**

396 F. Supp. 667; 1975 U.S. Dist. LEXIS 11820; 89 L.R.R.M. 2922; 77 Lab. Cas. (CCH) P11,051

Amalgamated Local No. 55, United Automobile, Aerospace and Agricultural Implement Workers Of America, Plaintiff v. Metal And Alloy Division Of Silver Creek Precision Corporation, Defendant

## Core Terms

arbitration, parties, collective bargaining agreement, welfare fund, grievance, arbitration clause, employees

## Case Summary

### Procedural Posture

Plaintiff union filed an action against defendant pursuant to § 301 of the Labor Management Relations Act, *29 U.S.C.S. § 185*, to compel arbitration under a collective bargaining agreement. The union filed a motion for summary judgment.

### Overview

The collective bargaining agreement required all issues regarding the interpretation or application of any term of the agreement upon which the parties could not agree to be submitted to arbitration. The union contended that there was an arrearage in defendant's contributions to an employee welfare fund. Defendant refused to arbitrate that dispute. The court granted summary judgment. The court held that an order to arbitrate the grievance should not be denied unless it could be said with positive assurance that the arbitration clause was not susceptible of an interpretation that covered the asserted dispute. The court found that defendant was contractually bound to arbitrate the dispute because the arbitration clause clearly required that all disputes regarding any such term of the agreement be submitted to arbitration and defendant has not show that the issue was not covered by the arbitration clause. The court also held that the union did not repudiated its right to arbitrate when it filed a criminal information charging one of defendant's officers with violating *N.Y. Lab. Law § 198(c)* and when it filed an unfair labor practice charge with the National Labor Relations Board.

### Outcome

The court granted summary judgment in favor of the union and against defendant directing defendant to submit to arbitration.

## LexisNexis® Headnotes

Contracts Law > Contract Conditions & Provisions > Arbitration Clauses

Labor & Employment Law > Collective Bargaining & Labor Relations > Labor Arbitration > Enforcement

*HN1* An order to arbitrate a particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage.

Labor & Employment Law > Collective Bargaining & Labor Relations > Labor Arbitration > Enforcement

*HN2* The function of a court is very limited when the parties have agreed to submit all questions of contract interpretation to an arbitrator. It is confined to ascertaining whether the party seeking arbitration is making a claim that on its face is governed by the contract. Whether the moving party is right or wrong is a question of contract interpretation for the arbitrator. In these circumstances the moving party should not be deprived of the arbitrator's judgment, when it was his judgment and all that it connotes that was bargained for.

**Judges:** **[**1]** Curtin, D. J.

**Opinion by:** CURTIN

## Opinion

**[*667]** CURTIN, D. J.:

This is an action brought by Amalgamated Local No. 55 pursuant to § 301 of the Labor Management Relations Act, *29 U.S.C. § 185*, to compel arbitration under a collective bargaining agreement. The agreement, which was executed in 1968 and amended on September 1, 1972, **[*668]** contains an arbitration clause requiring all issues regarding interpretation or application of any term of the agreement upon which the parties cannot agree to be submitted to the office of the New York State Board of Mediation for a panel of nine names, from which the name of an arbitrator could be chosen to arbitrate the dispute. [1] **[**2]** The issue the plaintiff seeks to submit to arbitration stems from defendant's alleged failure to contribute to an employee welfare fund, as required by

---

[1] Article VI, § 4 of the collective bargaining agreement, as amended, provides:

4. If the third step should fail to secure satisfactory settlement, the grievance may be submitted to the office of the New York State Board of Mediation for a panel of nine (9) names.

(a) In the event that an arbitrator is required, he shall be selected from the arbitration panel provided either by mutual agreement or by each party alternately striking off a name from the panel. The remaining name shall be the arbitrator who shall arbitrate the grievance or grievances pending.

(b) The arbitrator shall fix and notify the parties of the time and place for arbitration of the grievance.

(c) Any issue involving the interpretation or application of any term of this agreement shall be initiated by the Union directly at step 3. Upon the failure of the parties to agree, the Union may then appeal the issue to arbitration for a decision.

(d) The decision of the arbitrator shall be final and binding upon both parties, but he shall have no power either to add to, subtract from or modify any of the terms, conditions or limitations of this agreement or any agreement made supplementary hereto . . . .

Article XI, Section 5 of the amended agreement. [2] The case is now before the court on plaintiff's motion for summary judgment brought pursuant to *Rule 56 of the Federal Rules of Civil Procedure*.

The facts in this case are not in dispute. Defendant corporation terminated its manufacturing operations on or about August 13, 1973, at which time employees represented by plaintiff were laid off. [3] On September 14, 1973, plaintiff [**3] union informed defendant that an arrearage in its contributions payable to the Local 55 UAW Welfare Fund, pursuant to Article XI, Section 5 of their collective bargaining agreement, had developed. Plaintiff received no response and, therefore, again notified defendant of the arrearage on February 27, 1974. At that time plaintiff also stated that if the amount was not paid within ten days, the plaintiff would submit the dispute to arbitration. Further letters followed in March and April 1974, reiterating plaintiff's intention to arbitrate the dispute. Thereafter plaintiff contacted the New York State Mediation Board on March 26, 1974 and requested that a panel of nine names be submitted to the parties from which an arbitrator could be selected pursuant to their agreement. On April 11, 1974, plaintiff was informed by both the Mediation Board and defendant's attorney that defendant refused to arbitrate the dispute. This action was then begun on August 16, 1974.

 [**4]  The precise question raised by the plaintiff's summary judgment motion is whether the defendant's alleged failure to pay into the union's welfare fund is an arbitrable dispute subject to the arbitration clause. In deciding this  [*669]  question, the role of the court under § 301 of the Labor Management Relations Act has been narrowly limited to a consideration of ″whether the reluctant party did agree to arbitrate the grievance.″ *United Steelworkers of America v. Warrior & Gulf Navigation Co., 363 U.S. 574, 582, 4 L. Ed. 2d 1409, 80 S. Ct. 1347 (1960)*. Furthermore,

> *HN1* [an] order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage. *Id. at 582-83*.

In another case, *United Steelworkers of America v. American Mfg. Co., 363 U.S. 564, 567-68, 4 L. Ed. 2d 1403, 80 S. Ct. 1343 (1960)*, decided on the same day as the above cited case, the role of the court was similarly delineated:

> *HN2* The function of the court is very limited when the parties have agreed [**5]  to submit all questions of contract interpretation to the arbitrator. It is confined to ascertaining whether the party seeking arbitration is making a claim which on its face is governed by the contract. Whether the moving party is right or wrong

---

[2]   Article XI, § 5 of the collective bargaining agreement, as amended, provides:

5. *Insurance*:

(a) Effective February 1, 1972, the Company shall continue as a contributing employer to Local 55, UAW Welfare Fund which has been established under an Agreement and Declaration of Trust dated September 1, 1958 which said Agreement and Declaration of Trust the Company hereby ratifies and is deemed to be a part of this Agreement. The Company will contribute the cost of $26.46 for each single, active working employee and $52.62 for each married, active working employee to the Local 55, UAW Welfare Fund including employees on sick leave not to exceed twelve (12) months for any one sick leave with an initial master list and subsequent monthly supplemental list for those for whom premiums have been paid by the fifth (5th) day of each calendar month . . . .

[3]   Defendant, in para. 6 of his answer, filed October 8, 1974, denies that the plaintiff's employee members were laid off.

is a question of contract interpretation for the arbitrator. In these circumstances the moving party should not be deprived of the arbitrator's judgment, when it was his judgment and all that it connotes that was bargained for.

Under the standards set forth above, and reiterated in other Supreme Court cases, [4] this court must therefore initially make a determination whether the company contractually bound itself to arbitrate. *John Wiley & Sons, Inc. v. Livingston, 376 U.S. 543, 547, 11 L. Ed. 2d 898, 84 S. Ct. 909 (1964)*; *Atkinson v. Sinclair Refining Co., 370 U.S. 238, 241, 8 L. Ed. 2d 462, 82 S. Ct. 1318 (1962)*; *Necchi v. Necchi Sewing Machine Sales Corp., 348 F.2d 693 (2d Cir. 1965)*, *cert. denied*, 383 U.S. 909, 15 L. Ed. 2d 664, 86 S. Ct. 892 (1966). After this primary determination has been made, the decision of whether or not arbitration should be compelled can be made.

 [**6]  Plaintiff has submitted both the text of the arbitration clause, Article VI, Section 4, and the insurance provision, Article XI, Section 5, contained in the September 1, 1972 contract, as amended. [5] Defendant has acknowledged both the existence of this contract and the provisions in question. An issue has clearly arisen regarding contributions to the welfare fund. [6] The arbitration clause, in concise, unambiguous language, requires that all disputes regarding any such term of the agreement must be submitted to arbitration. Since defendant has not given the court any positive assurance that the insurance issue is *not* covered by the arbitration clause, it is clear that the company has agreed to arbitrate disputes such as this. *John Wiley & Sons, Inc. v. Livingston, supra.*

 [**7]  Defendant has argued that plaintiff's motion for summary judgment directing defendant to submit to arbitration should not be granted because plaintiff has repudiated its right to arbitration. This repudiation occurred, according to defendant, through plaintiff's filing of a criminal information  [*670]  in the City Court of Buffalo on December 12, 1973, charging one of defendant's officers with a violation of *§ 198(c)* of the New York State Labor Law, [7] [**10]  and through plaintiff's filing an unfair labor practice charge with the National

---

[4]   For the third case in the famous *Steelworkers'* trilogy, *see United States Steelworkers of America v. Enterprise Wheel and Car Corp., 363 U.S. 593, 4 L. Ed. 2d 1424, 80 S. Ct. 1358 (1960)*. The Second Circuit has applied the standard set in the *Steelworkers'* trilogy, stating:

> Only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail. *Strauss v. Silvercup Bakers, 353 F.2d 555, 557 (2d Cir. 1965)*. *See also Publishers Association of New York City v. New York Mailers Union No. 6, 317 F.2d 624 (2d Cir. 1963)*.

[5]   *Supra*, nn. 1 and 2.

[6]   Plaintiff has stated that there have been arrearages in payments to the welfare fund, while defendant has denied the allegation. Although it is not within the province of this court to pass on the merits of the allegation, it is clear that a dispute does exist.

[7]   N.Y. Labor Law § 198-c (McKinney's Supp. 1975) states:

> 1. In addition to any other penalty or punishment otherwise prescribed by law, any employer who is party to an agreement to pay or provide benefits or wage supplements to employees or to a third party or fund for the benefit of employees and who fails, neglects or refuses to pay the amount or amounts necessary to provide such benefits or furnish such supplements within thirty days after such payments are required to be made, shall be guilty of a misdemeanor, and upon conviction shall be punished as provided in section one hundred ninety-eight-a of this article. Where such employer is a corporation, the president, secretary, treasurer or officers exercising corresponding functions shall each be guilty of a misdemeanor.

> 2. As used in this section, the term "benefits or wage supplements" includes, but is not limited to, reimbursement for expenses; health, welfare and retirement benefits; and vacation, separation or holiday pay.

 This charge was dismissed on February 24, 1974 because the court felt that plaintiff should seek other means of collecting the

Labor Relations Board on April 18, 1974. [8] The court finds no merit to defendant's argument that plaintiff has waived arbitration. Only one circuit court of appeals has found that a union's action in bringing suit in a federal district court against their employer for back wages, instead of seeking arbitration, was a waiver of the union's right to compel arbitration. *Morales Rivera v. Sea Land of Puerto Rico, Inc., 418 F.2d 725 (1st Cir. 1969)*. However, the *Morales Rivera* case differs from the instant case in that the union had decided to file suit in the district court instead of compelling arbitration under the collective bargaining agreement. **[**8]** In this case the action in City Court was not brought instead of arbitration. To the contrary, plaintiff had informed defendant of the arrearage at the time the complaint was filed. The action instituted in City Court was not instituted to resolve the merits of the dispute between the parties; nor could it have served that purpose since it was a criminal complaint based upon different issues than those before this court and brought against an individual, Manuel Llop, not the defendant corporation. The criminal court action was brought after plaintiff had informed defendant of its intention to arbitrate the dispute if the amount was not paid to the welfare fund, clearly indicating that the criminal action was not brought in lieu of arbitration. Nor can plaintiff's action in filing a charge with the National Labor Relations Board be construed as a waiver of their contract rights to arbitration, *Glass Bottle Blowers Association of the United States and Canada, AFL-CIO, et al. v. Arkansas Glass Container Corp., 183 F. Supp. 829, 830-31 (E.D. Ark. 1960)*, especially since the NLRB dismissed the charge because defendant's remedy was deemed to be under the contract provision for arbitration. **[**9]** [9]

Therefore, since it appears from the record that there is a valid collective bargaining agreement between **[**11]** the parties which provides for arbitration of the present dispute, summary judgment **[*671]** is granted for the plaintiff against the defendant directing the defendant to submit to arbitration. Plaintiff shall prepare judgment and present it to the court after notice to defendant.

So ordered.

---

monies due.

[8] This charge was dismissed on May 24, 1974.

[9] The reasons for the dismissal of the unfair labor charge by the National Labor Relations Board, similar to the reasons of the City Court judge, did not go to the merits. According to a letter of the National Labor Relations Board dated May 24, 1974, the reasons for dismissal were as follows:

> As a result of the investigation, it does not appear that further proceedings on the charge are warranted inasmuch as the investigation revealed that all employees represented by the Charging Party were terminated more than eight months ago as the Respondent closed its business for economic reasons. Furthermore, there was no successor to take over and honor the collective bargaining agreement negotiated on behalf of the predecessor. It is also noted that the Union's remedy for an enforcement of a contract in the circumstances herein is not within the jurisdiction of this Agency. I am, therefore, refusing to issue complaint in this matter.



Positive

As of: September 1, 2015 5:12 PM EDT

## *American Employers' Ins. Co. v. Aiken*

Court of Appeals of Texas, Second District, Fort Worth

March 13, 1997, DELIVERED

NO. 2-96-295-CV

**Reporter**
942 S.W.2d 156; 1997 Tex. App. LEXIS 1192

AMERICAN EMPLOYERS' INSURANCE COMPANY, COMMERCIAL UNION INSURANCE COMPANY, THE EMPLOYERS' FIRE INSURANCE COMPANY, THE NORTHERN ASSURANCE COMPANY OF AMERICA, AND CU LLOYDS OF TEXAS, APPELLANT v. LANNY AIKEN, LaVERA AIKEN and LANNY AIKEN INSURANCE AGENCY, INC., APPELLEE

**Subsequent History:** **[\*\*1]** Appellee's Motion for Rehearing Overruled April 24, 1997.

**Prior History:** FROM THE 355TH DISTRICT COURT OF HOOD COUNTY.

**Disposition:** Sustained all points of error, and because the errors complained of on appeal denied Commercial Union's rights to an extent reasonably calculated to cause, and probably did cause, rendition by the trial court of an improper order from which this appeal was taken, the order of the trial court is reversed.

## Core Terms

arbitration, agency agreement, arbitration clause, parties, unconscionable, termination, trial court, insurer, bargaining, insurance company, agency's, policyholders, asserts, lawsuit, scope of arbitration, cancellation, contractual, synopsis, notice, lines

## Case Summary

### Procedural Posture

Appellants sought review of the 355th District Court of Hood County (Texas), which denied their motion to compel arbitration and stay the lawsuit of appellees who claimed appellants wrongfully terminated its agency agreement. Appellants challenged the trial court's findings that the claims were not within the scope of the agency agreement's arbitration provision and that the provision was unconscionable and unenforceable.

### Overview

Appellee individuals were shareholders of appellee insurance agency. Appellee and appellants contracted for appellee agency to represent appellants in certain insurance lines. Although several prior agreements had not contained an arbitration clause, the new agreement did. Appellee had read the synopsis of the contract but had not read the actual contract before signing it. Appellees filed suit claiming appellants had wrongfully terminated its agency agreement. Appellants filed a motion to compel arbitration and stay the lawsuit. The motion was

denied by the trial court. The court reversed and entered an order compelling arbitration and staying the lawsuit finding that the arbitration clause was not unconscionable and appeared to be a valid, enforceable, and irrevocable agreement between the parties. The court held there was nothing per se unconscionable about an arbitration contract and appellees did not meet their burden of proven the arbitration clause in their contract was unconscionable. The court found all of appellees' claims were within the scope of the arbitration agreement, thus, the trial court abused its discretion in denying appellants' motion to compel arbitration.

**Outcome**

The denial of appellants motion to compel arbitration was reversed and the cause was stayed pending arbitration because all of the claims asserted were within the scope of the arbitration agreement. Furthermore, the trial court erred by ruling that the arbitration clause was unconscionable and unenforceable as a matter of law.

# LexisNexis® Headnotes

Administrative Law > Agency Adjudication > Alternative Dispute Resolution

Business & Corporate Law > Agency Relationships > Establishment > Agency Agreements

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Validity of ADR Methods

Contracts Law > Contract Conditions & Provisions

Contracts Law > Contract Conditions & Provisions > Arbitration Clauses

*HN1* Whether an agreement imposes a duty to arbitrate a particular dispute is a matter of contract interpretation and a question of law for the court. Any doubts regarding the scope of an arbitration agreement should be resolved in favor of arbitration.

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > General Overview

Civil Procedure > Appeals > Standards of Review > Abuse of Discretion

Labor & Employment Law > Collective Bargaining & Labor Relations > Labor Arbitration > Enforcement

*HN2* See *Tex. Civ. Prac. & Rem. Code Ann. § 171.001* (Supp. 1996).

Civil Procedure > ... > Discovery > Methods of Discovery > Stipulations

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Mandatory ADR

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Validity of ADR Methods

Civil Procedure > Appeals > Standards of Review

Contracts Law > Defenses > Unconscionable > General Overview

*HN3* A trial court that is asked to evaluate the scope of a contract's arbitration clause may summarily decide whether to compel arbitration, based on affidavits, pleadings, discovery, and stipulations. On appeal, the court is asked to review whether the trial court's rulings as to scope and unconscionability were an abuse of discretion. The court must decide whether the trial court's rulings were arbitrary and unreasonable, that is, made without reference to any guiding rules or principles.

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > General Overview

Contracts Law > Contract Conditions & Provisions

Insurance Law > Liability & Performance Standards > Disclosure Obligations by Insureds > General Overview

Torts > ... > Fraud & Misrepresentation > Negligent Misrepresentation > General Overview

Torts > Intentional Torts > Intentional Infliction of Emotional Distress > General Overview

Torts > ... > Types of Negligence Actions > Negligent Infliction of Emotional Distress > General Overview

***HN4*** A party may not avoid the responsibility to arbitrate a contract dispute by attempting to cast complaints in tort rather than contract.

Contracts Law > Breach > Breach of Contract Actions > General Overview

Contracts Law > Breach > General Overview

***HN5*** A dispute arising out of a contractual relationship may give rise to both breach of contract and tort claims at the same time because the breach of a duty owed under the contract may involve tortious conduct. But, if a defendant's negligent conduct would give rise to liability only because it breaches the parties' agreement, then the claim sounds only in contract.

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Mandatory ADR

Contracts Law > Contract Conditions & Provisions > General Overview

Contracts Law > Contract Conditions & Provisions > Arbitration Clauses

Contracts Law > Defenses > Unconscionable > General Overview

Labor & Employment Law > Collective Bargaining & Labor Relations > Labor Arbitration > Enforcement

***HN6*** When a contract is between private persons who bargain from positions of substantially equal strength, the agreement is ordinarily enforced. When deciding whether a contractual provision such as an arbitration clause is unconscionable, a court must consider the entire atmosphere in which the agreement was made. The court must look at the bargaining process the parties went through and must evaluate the fairness of a contractual provision in controversy by determining whether there are legitimate commercial reasons that justify its inclusion as part of the agreement. Although unconscionability is a question of law, the trial court is entitled to hear evidence on the issue.

Contracts Law > Defenses > Ambiguities & Mistakes > General Overview

Contracts Law > ... > Affirmative Defenses > Fraud & Misrepresentation > General Overview

Contracts Law > Defenses > Unconscionable > General Overview

Contracts Law > Remedies > Reformation

***HN7*** A party who knowingly enters a lawful but improvident contract is not entitled to protection by the courts. In the absence of any mistake, fraud, or oppression, the courts, as such, are not interested in the wisdom or impolicy of contracts and agreements voluntarily entered into between parties compos mentis and sui juris. Such parties to contracts have the right to insert any stipulations that may be agreed to, provided they are neither unconscionable nor otherwise illegal or contrary to public policy. It has accordingly been said that, almost without limitation, what the parties agree upon is valid, the parties are bound by the agreement they have made, and the fact that a bargain is a hard one does not entitle a party to be relieved therefrom if he assumed it fairly and voluntarily.

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > General Overview

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview

Contracts Law > Contract Conditions & Provisions > Arbitration Clauses

Contracts Law > Defenses > Unconscionable > General Overview

Contracts Law > Defenses > Unconscionable > Arbitration Agreements

**HN8** The courts of Texas view arbitration agreements with favor and have done so since at least 1845. There is nothing unconscionable per se about an arbitration contract, and the party claiming unconscionability has the burden to prove it.

Administrative Law > Agency Adjudication > Alternative Dispute Resolution

Contracts Law > Formation of Contracts

Contracts Law > Formation of Contracts > Execution

Evidence > Inferences & Presumptions > General Overview

**HN9** Contracting parties are obligated to protect themselves by reading what they sign. A person who signs a contract, is presumed as a matter of law to know its terms.

**Counsel:** DAVID R. HUDGINS, TOM J. STOLLENWERCK, DALLAS, TEXAS.

DAVID MARTIN, WACO, TEXAS.

**Judges:** PANEL B: DAY, LIVINGSTON, and HOLMAN, JJ.

**Opinion by:** DIXON W. HOLMAN

## Opinion

 **[*157] OPINION**

This interlocutory appeal is authorized by *TEX. CIV. PRAC. & REM. CODE ANN. § 171.017*(Vernon Supp. 1996). [1] A group of insurance companies collectively called "Commercial Union" appeal the trial court's denial of their motion to compel arbitration  **[*158]**  and stay the lawsuit of an insurance agency and the agency shareholders, who claim the insurers wrongfully terminated its agency agreement. See id. § 171.002. The appeal challenges the trial court's findings that the agency's claims are not within the scope of the agency agreement's arbitration **[**2]**  provision and that the provision is unconscionable and unenforceable. See id. *§ 171.001*. Because the evidence establishes that the agency's claims are within the scope of the arbitration provision and because that provision is valid, enforceable, and not unconscionable, we reverse.

**Background**

Lanny Aiken and his wife, Lavera Aiken, are shareholders of Lanny Aiken Insurance Agency, Inc., in Granbury, Texas. Since 1958, when Mr. Aiken entered the insurance business, he has represented more than 20 insurance companies and has signed more than 30 agency agreements. The first agreement for the Aiken agency to

---

[1]   Formerly TEX. REV. CIV. STAT. ANN. art. 238-2, redesignated as TEX. CIV. PRAC. & REM. CODE ANN. § 171.017, Acts 1995, 74th Leg., ch. 588, § 1, eff. Sept. 1, 1995.

represent Commercial Union in selling only commercial insurance lines became effective July 1, 1982 and did not contain an arbitration clause. At that time, the Aiken agency was located in Fort Worth. The second agreement between **[\*\*3]** the agency in Fort Worth and Commercial Union was signed only two months later on September 1, 1982 and did include an arbitration clause. The next agreement Mr. Aiken signed was in 1985 for his Fort Worth agency to represent Commercial Union for commercial lines. In 1986, after moving his agency to Granbury, Mr. Aiken signed another agreement for the agency to represent the insurer for personal lines. The 1985 and 1986 agreements did not contain an arbitration clause.

**The Arbitration Clause**

The arbitration clause in the September 1, 1982 agency agreement states:

> (18) *Arbitration. If any dispute or disagreement shall arise in connection with any interpretation of this agreement, its performance or non-performance*, or the figures and calculations used, *the parties shall make every effort to meet and settle their dispute in good faith informally*. *If the parties cannot agree* on a written settlement to the dispute within fourteen (14) days after it arises, or within a longer period agreed upon by the parties, *then the matter in controversy shall be settled by arbitration, in accordance with the rules of the American* **[\*\*4]** *Arbitration Association, and judgment upon the award rendered by the arbitrator(s) may be entered in any court having jurisdiction.*
>
> The parties may agree to submit the dispute to one arbitrator; otherwise there shall be three, one named in writing by each party within ten days after notice of arbitration is served by either party upon the other, and a third arbitrator selected by these two arbitrators within fifteen days thereafter. If the arbitrators are unable to agree upon a third arbitrator, then the third arbitrator shall be chosen impartially by the American Arbitration Association. The determination of the arbitrator(s) shall be final and binding on all parties, provided such determination is made in writing and signed by a majority of the arbitrator(s). Where arbitration results in an award, such award shall include interest in the amount of six percent (6%) per annum running from the date when the amount that is the subject of the award first became due. The costs of arbitration shall be borne equally by the parties. [Emphasis added].

On November 3, 1989, Commercial Union sent Mr. Aiken a letter about a proposed new agency agreement, including a synopsis **[\*\*5]** of the proposed new terms, pointing out the fact that those terms would include an arbitration agreement. Mr. Aiken testified that he read the synopsis and saw the information about an arbitration clause. Eventually, he received the new agency agreement by mail and signed it on January 1, 1990. Although the agreement covered the Aiken agency's sales of both personal and commercial lines of insurance for Commercial Union, Mr. Aiken testified that he had read the synopsis of the contract but did not read the actual agreement before he signed it.

Approximately seven months later, on July 16, 1990, the agreement was amended again, **[\*159]** and the arbitration clause remained intact. The other changes made in the July amendment are not in controversy. The text of the July 16 arbitration clause is identical to the arbitration clauses of both the September 1, 1982 and January 1, 1990 agreements between the Aiken agency and Commercial Union. The appeal focuses on the July 16, 1990 agency agreement because it is the one that was in effect when this dispute arose.

**Scope of the Arbitration Clause**

The first point of error asserts that the trial court erred by finding that the **[\*\*6]** complaints made by the Aiken agency in this lawsuit are not within the scope of the agency agreement's arbitration clause. *HN1* Whether the agreement imposes a duty to arbitrate this particular dispute is a matter of contract interpretation and a question

of law for the court. *Kline v. O'Quinn, 874 S.W.2d 776, 782* (Tex. App.--Houston [14th Dist.] 1994, writ denied), cert. denied, *515 U.S. 1142, 132 L. Ed. 2d 829, 115 S. Ct. 2579* (199__). Any doubts regarding the scope of an arbitration agreement should be resolved in favor of arbitration. *Cantella & Co., Inc. v. Goodwin, 924 S.W.2d 943, 944 (Tex. 1996)* (orig. proceeding); *Merrill Lynch, Pierce, Fenner & Smith v. Eddings, 838 S.W.2d 874, 880* (Tex. App.--Waco 1992, writ denied).

**Standard of Review**

The Texas General Arbitration Act includes this statement:

> **HN2** A written agreement to submit any existing controversy to arbitration or a provision in a written contract to submit to arbitration any controversy thereafter arising between the parties is valid, enforceable and irrevocable, save upon such grounds as exist at law or in equity for the revocation of any contract.

*TEX. CIV. PRAC. & REM. CODE* **[**7]** ANN. § 171.001 (Vernon Supp. 1996). **HN3** A trial court that is asked to evaluate the scope of a contract's arbitration clause may summarily decide whether to compel arbitration, based on affidavits, pleadings, discovery, and stipulations. Jack B. Anglin Co., *Inc. v. Tipps, 842 S.W.2d 266, 269 (Tex. 1992)*.

On appeal, we are asked to review whether the trial court's rulings as to scope and unconscionability were an abuse of discretion. Commercial Union asserts that the rulings were an abuse, and the Aikens say there was no abuse. We must decide whether the trial court's rulings were arbitrary and unreasonable, that is, made without reference to any guiding rules or principles. *Worford v. Stamper, 801 S.W.2d 108, 109 (Tex. 1990)*; *Southwest Health Plan, Inc. v. Sparkman, 921 S.W.2d 355, 357* (Tex. App.--Fort Worth 1996, no writ).

**Termination of the Agency Agreement**

In June 1992, Commercial Union evaluated the losses it had experienced on claims filed by the holders of its insurance policies written through the Aiken agency and elected to terminate the Aiken agency's authority to write personal lines insurance under the July 16, 1990 agency agreement. The July **[**8]** 16, 1990 agreement includes this language:

20. Termination.

. . . .

(C)

> This agreement may be terminated by [Commercial Union] at any time upon written notice to agent stating when, not less than ninety (90) days after mailing of such notice, such cancellation shall become effective.

. . . .

(E)

> All termination procedures are subject to any statutory or regulatory requirements.

Mr. and Mrs. Aiken and their agency contend in this lawsuit that the method by which Commercial Union terminated the agency agreement violated a statutory requirement that before a fire and casualty insurer may terminate an agency agreement that has been in effect for a period of two years in Texas, the insurer must give

the agency at least six-months' advance notice in writing. See *TEX. INS. CODE ANN. art. 21.11-1* (Vernon 1981 & Supp. 1997). While the Aikens are maintaining that Commercial Union did not comply with the statutory notice requirement, the insurer is contending that it did. The Aikens also assert that because the termination of the agency agreement caused the **[*160]** insurers' cancellation of policies held by the agency's policyholders, the agency termination **[**9]** violated a statutory prohibition against canceling a homeowner's policy unless the insured had filed three or more claims under the policy within a three year period. See id. art. 21.49-B § 7. Determining which party enjoys the correct position on the agency's claims that there were statutory violations by Commercial Union is simply an evidentiary matter not ripe for our review in this appeal. However, the impasse between the parties about whether the insurers did or did not satisfy the contractual obligation to comply with statutory requirements raises the question of whether that impasse is a "dispute or disagreement" that the parties' own contract requires them to arbitrate because the dispute arose in connection the insurer's alleged nonperformance of the agency agreement. It is.

### The Agency's Tort Theories

The Aikens' third amended original petition also asserts tort claims. They allege that because the termination of the agency agreement resulted in cancellation of the outstanding insurance policies that were written while the agency agreement was in force, the policy cancellations amounted to defamation of the Aikens and their agency, interference with business **[**10]** relations between the agency and its policyholders, negligence, gross negligence, negligent misrepresentation, and intentional infliction of emotional distress. However, *HN4* a party may not avoid the responsibility to arbitrate a contract dispute by attempting to cast complaints in tort rather than contract. *Merrill Lynch, 838 S.W.2d at 880*.

Here, the contract included the agreement to arbitrate *any dispute* arising in connection with nonperformance of the contract. And *HN5* a dispute arising out of a contractual relationship may give rise to both breach of contract and tort claims at the same time because the breach of a duty owed under the contract may involve tortious conduct. *Montgomery Ward & Co. v. Scharrenbeck, 146 Tex. 153, 204 S.W.2d 508, 510 (Tex. 1947)*. But, if a defendant's negligent conduct would give rise to liability only because it breaches the parties' agreement, then the claim sounds only in contract. *Southwestern Bell Tel. Co. v. Delanney, 809 S.W.2d 493, 494 (Tex. 1991)*; *Valero Energy Corp. v. Wagner & Brown II, 777 S.W.2d 564, 566* (Tex. App.--El Paso 1989, writ denied). The Aikens' claims asserting tort liability are so interwoven with their contract **[**11]** claims that they do not stand alone, for the agency contract is the only basis for a legal relationship between the parties. In fact, in their brief the Aikens concede that their claims are within the scope of the arbitration clause.

Because we find that all of the claims asserted by the Aikens in this lawsuit are within the scope of the arbitration agreement, we hold that the trial court abused its ed.

### Unconscionability

The second point of error asserts that the arbitration clause is not unconscionable and that the trial court erred in relying on unconscionability as the basis for denying the motion to compel arbitration and to stay the lawsuit. *HN6* When a contract is between private persons who bargain from positions of substantially equal strength, the agreement is ordinarily enforced. *Interstate Fire Ins., Co. v. First Tape, Inc., 817 S.W.2d 142, 145* (Tex. App.--Houston [1st Dist.] 1991, writ denied). When deciding whether a contractual provision such as the arbitration clause is unconscionable, a court must consider the entire atmosphere in which the agreement was made. *Delanney, 809 S.W.2d at 498* (Gonzales, J., concurring). The court must look at the bargaining **[**12]** process the parties went through and must evaluate the fairness of a contractual provision in controversy by determining whether there are legitimate commercial reasons that justify its inclusion as part of the agreement. *Id. at 499*. Although unconscionability is a question of law, the trial court is entitled to hear evidence on the issue. *Wade v. Austin, 524 S.W.2d 79, 85* (Tex. Civ. App.--Texarkana 1975, no writ).

The Aikens insist that the arbitration clause in their agency agreement is unconscionable because they had no bargaining power whatsoever in negotiating that agreement **[*161]** and were forced to accept the arbitration clause, waiving their right of access to the courts, in order to preserve the economic viability of the agency and the interests of its policyholders. The Aikens contend that when they made their agency agreement with Commercial Union, there were no available alternatives for keeping their agency financially sound and also protecting the agency's 750 policyholders against being left without insurance coverage.

The Aikens offer that rationale for the argument that they suffered from a coercive atmosphere in the bargaining process between themselves **[**13]** and Commercial Uitude of the Commercial Union personnel about the contract was simply "take it or leave it."

The Aikens cite _Wade, 524 S.W.2d at 86_, as authority for the premise that their present description of the bargaining atmosphere in which they negotiated the agency agreement compelled the trial court, and should now compel us, to determine that the contract's arbitration clause is oppressive, unreasonable, and unconscionable. A similar argument relying on unequal bargaining power of the contracting parties was rejected by the court in Wade when the real estate listing agreement before that court was found to not be unconscionable. Id. The Wade opinion also cautions that:

> **HN7** [A] party who knowingly enters a lawful but improvident contract is not entitled to protection by the courts. 'In the absence of any mistake, fraud, or oppression, the courts, as such, are not interested in the wisdom or impolicy of contracts and agreements voluntarily entered into between parties compos mentis and sui juris. Such parties to contracts have the right to insert any stipulations that may be agreed to, provided they are neither unconscionable nor otherwise illegal or **[**14]** contrary to public policy. It has accordingly been said that, almost without limitation, what the parties agree upon is valid, the parties are bound by the agreement they have made, and the fact that a bargain is a hard one does not entitle a party to be relieved therefrom if he assumed it fairly and voluntarily . . . ."

_Id. at 86_.

**HN8** The courts of Texas view arbitration agreements with favor and have done so since at least 1845. Jack B. Anglin Co., Inc., 842 S.W.2d at 268. There is nothing unconscionable per se about an arbitration contract, and the party claiming unconscionability has the burden to prove it. _Emerald Texas, Inc. v. Peel, 920 S.W.2d 398, 402_ (Tex. App.--Houston [1st Dist.] 1996, no writ). Here, the trial court appropriately heard evidence that is in the appellate record. After carefully reviewing the record, we are persuaded that the trial court erred by ruling that the arbitration clause is unconscionable and unenforceable as a matter of law.

The arbitration clause in the contract is plain and unambiguous. Its wording is identical to arbitration clauses that Mr. Aiken agreed to in the September 1, 1982 agency agreement and the January **[**15]** 1, 1990 agency agreement. He testified that he knew in advance that the July 16, 1990 agency agreement would include an arbitration clause, that he had read a synopsis of the agreement, that he thought he understood it, and that he signed the agreement. Mr. Aiken's admission from the witness stand that he had read and understood the synopsis conflicts with his contention that someone with Commercial Union fraudulently told him that the new agency agreement would not include an arbitration clause, thereby inducing him to sign the agreement without reading it. **HN9** Contracting parties are obligated to protect themselves by reading what they sign. _G-W-L, Inc. v. Robichaux, 643 S.W.2d 392, 393 (Tex. 1982)_. A person who signs a contract, is presumed as a matter of law to know its terms. _D. Wilson Constr. Co. v. McAllen Indep. Sch. Dist., 848 S.W.2d 226, 230_ (Tex. App.--Corpus Christi 1992, writ dism'd w.o.j.).

This is not a disparate bargaining power case in which the insurer had vastly superior expertise and knowledge of agency agreements when compared with Mr. Aiken's knowledge. The evidence is clear that Mr. Aiken had

38 years of experience in the **[*162]** insurance business **[**16]** and had been a party to more than 30 agency agreements during that time. He was a member of at least five professional insurance agent organizations or societies. He professed to be an expert consultant for other insurance agents in Texas on the subject of their agency agreements and actually served other agents in that expert capacity.

In a contractual bargaining process analogous to that in which the Aiken agency agreement was negotiated, a "take it or leave it" contract was held not unconscionable as a matter of law because the complaining party, a physician, could have contracted his services to another hospital. See *Dillee v. Sisters of Charity, 912 S.W.2d 307, 310-11* (Tex. App.--Houston [14th Dist.] 1995, no writ). Although Mr. Aiken initially testified and contends on appeal that his agency had no alternative but to sign the Commercial Union agency agreement because he could not have moved his 750 policyholders to any other insurance company, other evidence refuted that contention. In March or April 1990, before he signed the July 16, 1990 agency agreement, Mr. Aiken rejected offers to sign agency agreements and do business through Kemper Insurance Company, Cigna Insurance **[**17]** Company, Transamerica Insurance Company, Continental Insurance Company, and Republic Insurance Company. We conclude from the evidence that the Aiken agency did have other alternatives for continuing to serve its policyholders.

As a matter of law, the arbitration clause in the Aiken agency agreement is fair to the contracting parties. There is no evidence that the clause contains unique or unusual provisions, and we recognize that the stated public policy of Texas is to encourage the peaceable resolution of disputes, even the early settlement of pending litigation, through voluntary settlement procedures, including arbitration. See *TEX. CIV. PRAC. & REM. CODE ANN. §§ 154.002*, *154.003*, *154.027*; Jack B. Anglin Co. Inc., 842 S.W.2d at 268. Because the arbitration clause is not unconscionable and because it appears to be a valid, enforceable, and irrevocable agreement between the parties, the second point of error is sustained. The third point of error asserts that because no other grounds exist to support the trial court's order, the court erred in denying the motion to compel arbitration and stay the lawsuit. Based on our review of the record, we agree and sustain the third **[**18]** point of error.

**Conclusion**

We have sustained all points of error, and because the errors complained of on appeal denied Commercial Union's rights to an extent reasonably calculated to cause, and probably did cause, rendition by the trial court of an improper order from which this appeal was taken, the order of the trial court is reversed. See TEX. R. APP. P. 81(b)(1). We render judgment compelling arbitration and staying the cause pending arbitration. See TEX. R. APP. P. 81(c).

DIXON W. HOLMAN

JUSTICE

PANEL B:

DAY, LIVINGSTON, and HOLMAN, JJ.

[DELIVERED MARCH 13, 1997]



Positive

As of: September 1, 2015 5:17 PM EDT

# BG Group PLC v. Republic of Arg.

Supreme Court of the United States

December 2, 2013, Argued; March 5, 2014, Decided

No. 12-138

**Reporter**

134 S. Ct. 1198; 188 L. Ed. 2d 220; 2014 U.S. LEXIS 1785; 82 U.S.L.W. 4166; 24 Fla. L. Weekly Fed. S 599; 2014 WL 838424

BG GROUP plc, Petitioner v. REPUBLIC OF ARGENTINA

**Notice:** The LEXIS pagination of this document is subject to change pending release of the final published version.

**Prior History:** [***1] ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

*Republic of Arg. v. BG Group PLC, 665 F.3d 1363, 398 U.S. App. D.C. 500, 2012 U.S. App. LEXIS 905 (2012)*

**Disposition:** Reversed.

## Core Terms

arbitration, treaty, parties, investor, courts, tribunal, contracting parties, arbitration agreement, contracts, disputes, bilateral, arbitration clause, provisions, terms, conditions, country's, de novo, formation, sovereign, condition precedent, ordinary contract, unilateral, matters, final decision, private party, determinations, precondition, confirms, domestic, provides

## Case Summary

**Procedural Posture**

Petitioner foreign investment firm obtained an arbitral award against respondent foreign country, and the foreign country asserted that the arbitrators lacked authority to excuse compliance with a requirement for local litigation prior to arbitration under a treaty. Upon a grant of a writ of certiorari, the firm appealed the judgment of the U.S. Court of Appeals for the District of Columbia that the arbitrability issue was a matter for a court.

**Overview**

The foreign country contended that the investment treaty expressly provided for exhaustion of local litigation prior to arbitration, and that the arbitrators exceeded their authority in determining that the provision did not apply to the arbitration. The U.S. Supreme Court held that the local litigation requirement was a matter for the arbitrators primarily to interpret and apply, and the arbitrators' interpretation was entitled to judicial deference. Under the traditional standards for arbitration agreements, there was a presumption that the parties to the treaty

intended the arbitrators to decide the nonsubstantive dispute about the interpretation and application of the procedural precondition for the use of arbitration, in the absence of a treaty provision to the contrary. The fact that the document at issue was a treaty rather than an ordinary contract made no significant difference since the treaty was in fact a contract between the foreign countries, and interpretation of the treaty was a matter of determining the countries' intent.

**Outcome**

The judgment requiring judicial interpretation of the arbitration provision was reversed. 7-2 Decision; 1 Concurrence in part; 1 Dissent.

# LexisNexis® Headnotes

International Law > Dispute Resolution > Arbitration & Mediation > Agreements

*HN1* Article 8 of an investment treaty between the United Kingdom and Argentina contains a dispute-resolution provision, applicable to disputes between one of those nations and an investor from the other. Agreement for the Promotion and Protection of Investments, Arg.-Gr. Brit., art. 8(2), Dec. 11, 1990, 1765 U.N.T.S. 38 (hereinafter Treaty). The provision authorizes either party to submit a dispute to the decision of the competent tribunal of the contracting party in whose territory the investment was made, i.e., a local court. Treaty art. 8(1). And it provides for arbitration: (i) where, after a period of eighteen months has elapsed from the moment when the dispute was submitted to the competent tribunal, the said tribunal has not given its final decision; or (ii) where the final decision of the aforementioned tribunal has been made but the parties are still in dispute. Treaty art. 8(2)(a). The Treaty also entitles the parties to agree to proceed directly to arbitration. Treaty art. 8(2)(b).

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > Arbitrability

Civil Procedure > ... > Arbitration > Federal Arbitration Act > Arbitration Agreements

*HN2* Where ordinary contracts are at issue, it is up to the parties to determine whether a particular matter is primarily for arbitrators or for courts to decide. If the contract is silent on the matter of who primarily is to decide threshold questions about arbitration, courts determine the parties' intent with the help of presumptions.

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > Arbitrability

Civil Procedure > ... > Arbitration > Federal Arbitration Act > Arbitration Agreements

*HN3* Courts presume that the parties intend courts, not arbitrators, to decide disputes about arbitrability. These include questions such as whether the parties are bound by a given arbitration clause, or whether an arbitration clause in a concededly binding contract applies to a particular type of controversy.

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > Arbitrability

Civil Procedure > ... > Arbitration > Federal Arbitration Act > Arbitration Agreements

*HN4* Courts presume that parties intend arbitrators, not courts, to decide disputes about the meaning and application of particular procedural preconditions for the use of arbitration. These procedural matters include claims of waiver, delay, or a like defense to arbitrability. And they include the satisfaction of prerequisites such as time limits, notice, laches, estoppel, and other conditions precedent to an obligation to arbitrate.

International Law > Dispute Resolution > Arbitration & Mediation > Agreements

International Law > Dispute Resolution > Arbitration & Mediation > Judicial Review

International Law > Treaty Interpretation > Intent > General Overview

*HN5* As a general matter, a treaty is a contract, though between nations. Its interpretation normally is, like a contract's interpretation, a matter of determining the parties' intent. And where a federal court is asked to interpret that intent pursuant to a motion to vacate or confirm an arbitration award made in the United States under the Federal Arbitration Act, it should normally apply the presumptions supplied by American law.

International Law > Treaty Interpretation > General Overview

*HN6* In the absence of explicit language in a treaty demonstrating that the parties intended a different delegation of authority, a court's ordinary interpretive framework applies.

## Lawyers' Edition Display

### Decision

[**220] Arbitrators held to have authority to excuse compliance with treaty's requirement of local litigation prior to arbitration under treaty.

### Summary

**Procedural posture:** Petitioner foreign investment firm obtained an arbitral award against respondent foreign country, and the foreign country asserted that the arbitrators lacked authority to excuse compliance with a requirement for local litigation prior to arbitration under a treaty. Upon a grant of a writ of certiorari, the firm appealed the judgment of the U.S. Court of Appeals for the District of Columbia that the arbitrability issue was a matter for a court.

**Overview:** The foreign country contended that the investment treaty expressly provided for exhaustion of local litigation prior to arbitration, and that the arbitrators exceeded their authority in determining that the provision did not apply to the arbitration. The U.S. Supreme Court held that the local litigation requirement was a matter for the arbitrators primarily to interpret and apply, and the arbitrators' interpretation was entitled to judicial deference. Under the traditional standards for arbitration agreements, there was a presumption that the parties to the treaty intended the arbitrators to decide the nonsubstantive dispute about the interpretation and application of the procedural precondition for the use of arbitration, in the absence of a treaty provision to the contrary. The fact that the document at issue was a treaty rather than an ordinary contract made no significant difference since the treaty was in fact a contract between the foreign countries, and interpretation of the treaty was a matter of determining the countries' intent.

**Outcome:** The judgment requiring judicial interpretation of the arbitration provision was reversed. 7-2 Decision; 1 Concurrence in part; 1 Dissent.

## Headnotes

TREATIES §20 > DISPUTE RESOLUTION -- ARBITRATION > Headnote:

*LEdHN[1]* [1]
Article 8 of an investment treaty between the United Kingdom and Argentina contains a dispute-resolution provision, applicable to disputes between one of those nations and an investor from the other. Agreement for the Promotion and Protection of Investments, Arg.-Gr. Brit., art. 8(2), Dec. 11, 1990, 1765 U.N.T.S. 38 (hereinafter

Treaty). The provision authorizes either party to submit a dispute to the decision of the competent tribunal of the contracting party in whose territory the investment was made, i.e., a local court. Treaty art. 8(1). And it provides for arbitration: (i) where, after a period of eighteen months has elapsed from the moment when the dispute was submitted to the competent tribunal, the said tribunal has not given its final decision; or (ii) where the final decision of the aforementioned tribunal has been made but the parties are still in dispute. Treaty art. 8(2)(a). The Treaty also entitles the parties to agree to proceed directly to arbitration. Treaty art. 8(2)(b). (Breyer, J., joined by Scalia, Thomas, Ginsburg, Alito, Sotomayor, and Kagan, JJ.)

ARBITRATION §6 > THRESHOLD QUESTIONS -- PARTIES' INTENT > Headnote:

*LEdHN[2]* [2]

Where ordinary contracts are at issue, it is up to the parties to determine whether a particular matter is primarily for arbitrators or for courts to decide. If the contract is silent on the matter of who primarily is to decide threshold questions about arbitration, courts determine the parties' intent with the help of presumptions. (Breyer, J., joined by Scalia, Thomas, Ginsburg, Alito, Sotomayor, and Kagan, JJ.)

EVIDENCE §385 > PRESUMPTION -- DISPUTES ABOUT ARBITRABILITY > Headnote:

*LEdHN[3]* [3]

Courts presume that the parties intend courts, not arbitrators, to decide disputes about arbitrability. These include questions such as whether the parties are bound by a given arbitration clause, or whether an arbitration clause in a concededly binding contract applies to a particular type of controversy. (Breyer, J., joined by Scalia, Thomas, Ginsburg, Alito, Sotomayor, and Kagan, JJ.)

EVIDENCE §385 > PRESUMPTION -- ARBITRATION -- PROCEDURAL PRECONDITIONS > Headnote:

*LEdHN[4]* [4]

Courts presume that parties intend arbitrators, not courts, to decide disputes about the meaning and application of particular procedural preconditions for the use of arbitration. These procedural matters include claims of waiver, delay, or a like defense to arbitrability. And they include the satisfaction of prerequisites such as time limits, notice, laches, estoppel, and other conditions precedent to an obligation to arbitrate. (Breyer, J., joined by Scalia, Thomas, Ginsburg, Alito, Sotomayor, and Kagan, JJ.)

EVIDENCE §385 TREATIES §3 TREATIES §12 > CONTRACT -- PARTIES' INTENT -- PRESUMPTIONS > Headnote:

*LEdHN[5]* [5]

As a general matter, a treaty is a contract, though between nations. Its interpretation normally is, like a contract's interpretation, a matter of determining the parties' intent. And where a federal court is asked to interpret that intent pursuant to a motion to vacate or confirm an arbitration award made in the United States under the Federal Arbitration Act, it should normally apply the presumptions supplied by American law. (Breyer, J., joined by Scalia, Thomas, Ginsburg, Alito, and Kagan, JJ.)

TREATIES §12 > PARTIES' INTENT > Headnote:

*LEdHN[6]* [6]

In the absence of explicit language in a treaty demonstrating that the parties intended a different delegation of authority, a court's ordinary interpretive framework applies. (Breyer, J., joined by Scalia, Thomas, Ginsburg, Alito, Sotomayor, and Kagan, JJ.)

## Syllabus

[**225]

[*1201] An investment treaty (Treaty) between the United Kingdom and Argentina authorizes a party to submit a dispute "to the decision of the competent tribunal of the Contracting Party in whose territory the investment was made," *i.e.*, a local court, Art. 8(1); and permits arbitration, as relevant here, "where, after a period of eighteen months has elapsed from the moment when the dispute was submitted to [that] tribunal . . . , the said tribunal has not given its final decision," Art. 8(2)(a)(i).

Petitioner BG Group plc, a British firm, belonged to a consortium with a majority interest in MetroGAS, an Argentine entity awarded an exclusive license to distribute natural gas in Buenos Aires. At the time of BG Group's investment, Argentine law provided that gas "tariffs" would be calculated in U. S. dollars and would be set at levels sufficient to assure gas distribution firms a reasonable return. But Argentina later amended the law, changing (among other things) the calculation basis to pesos. MetroGAS' profits soon became losses. Invoking Article 8, BG Group sought arbitration, [***2] which the parties sited in Washington, D. C. BG Group [**223] claimed that Argentina's new laws and practices violated the Treaty, which forbids the "expropriation" of investments and requires each nation to give "fair and equitable treatment" to investors from the other. Argentina denied those claims, but also argued that the arbitrators lacked "jurisdiction" to hear the dispute because, as relevant here, BG Group had not complied with Article 8's local litigation requirement. The arbitration panel concluded that it had jurisdiction, finding, among other things, that Argentina's conduct (such as also enacting new laws that hindered recourse to its judiciary by firms in BG Group's situation) had excused BG Group's failure to comply with Article 8's requirement. On the merits, the panel found that Argentina had not expropriated BG Group's investment but had denied BG Group "fair and equitable treatment." It awarded damages to BG Group. Both sides sought review in federal district court: BG Group to confirm the award under the New York Convention and the Federal Arbitration Act (FAA), and Argentina to vacate the award, in part on the ground that the arbitrators lacked jurisdiction under the [***3] FAA. The District Court confirmed the award, but the Court of Appeals for the District of Columbia Circuit vacated. It found that the interpretation and application of Article 8's requirement were matters for courts to decide *de novo, i.e.,* without deference to the arbitrators' views; that the circumstances did not excuse BG Group's failure to comply with the requirement; and that BG Group had to commence a lawsuit in Argentina's courts and wait 18 months before seeking arbitration. Thus, the court held, the arbitrators lacked authority to decide the dispute.

*Held:*

1. A court of the United States, in reviewing an arbitration award made under the Treaty, should interpret and apply "threshold" provisions concerning arbitration using the framework developed for interpreting similar provisions in ordinary contracts. Under that framework, the local litigation requirement is a matter for arbitrators primarily to interpret and apply. [*1202] Courts should review their interpretation with deference. *Pp. ___ - ___, 188 L. Ed. 2d, at 227-234*.

(a) Were the Treaty an ordinary contract, it would call for arbitrators primarily to interpret and to apply the local litigation provision. In an ordinary contract, the parties determine whether [***4] a particular matter is primarily for arbitrators or for courts to decide. See, *e.g.,Steelworkers v. Warrior & Gulf Nav. Co., 363 U. S. 574, 582, 80 S. Ct. 1347, 4 L. Ed. 2d 1409*. If the contract is silent on the matter of who is to decide a "threshold" question

about arbitration, courts determine the parties' intent using presumptions. That is, courts presume that the parties intended courts to decide disputes about "arbitrability," *e.g., Howsam v. Dean Witter Reynolds, Inc., 537 U. S. 79, 84, 123 S. Ct. 588, 154 L. Ed. 2d 491*, and arbitrators to decide disputes about the meaning and application of procedural preconditions for the use of arbitration, see *id., at 86, 123 S, Ct. 588, 154 L. Ed. 2d 491*, including, *e.g.,* claims of "waiver, delay, or a like defense to arbitrability," *Moses H. Cone Memorial Hospital v. Mercury Constr. Corp., 460 U. S. 1, 25, 103 S. Ct. 927, 74 L. Ed. 2d 765*, and the satisfaction of, *e.g.,* " 'time limits, notice, laches, [or] estoppel,' " *Howsam, 537 U. S., at 85, 123 S. Ct 588, 154 L.* **[**224]** *Ed. 2d 491*. The provision at issue is of the procedural variety. As its text and structure make clear, it determines *when* the contractual duty to arbitrate arises, not *whether* there is a contractual duty to arbitrate at all. Neither its language nor other language in Article 8 gives substantive weight to the local court's determinations on the **[***5]** matters at issue between the parties. The litigation provision is thus a claims-processing rule. It is analogous to other procedural provisions found to be for arbitrators primarily to interpret and apply, see, *e.g.,ibid.*, and there is nothing in Article 8 or the Treaty to overcome the ordinary assumption. *Pp. ____ - ____, 188 L. Ed. 2d, at 228-230*.

(b) The fact that the document at issue is a treaty does not make a critical difference to this analysis. A treaty is a contract between nations, and its interpretation normally is a matter of determining the parties' intent. *Air France* v. *Saks*, 470 U. S. 392, 399, 105 S. Ct. 1338, 84 L. Ed. 2d 289. Where, as here, a federal court is asked to interpret that intent pursuant to a motion to vacate or confirm an award made under the Federal Arbitration Act, it should normally apply the presumptions supplied by American law. The presence of a condition of "consent" to arbitration in a treaty likely does not warrant abandoning, or increasing the complexity of, the ordinary intent-determining framework. See, *e.g.,Howsam, supra, at 83-85, 123 S. Ct. 588, 154 L. Ed. 2d 491*. But because this Treaty does *not* state that the local litigation requirement is a condition of consent, the Court need not resolve what the effect of any such language would be. **[***6]** The Court need not go beyond holding that in the absence of language in a treaty demonstrating that the parties intended a different delegation of authority, the ordinary interpretive framework applies. *Pp. ____ - ____, 188 L. Ed. 2d, at 230-232*.

(c) The Treaty contains no evidence showing that the parties had an intent contrary to the ordinary presumptions about who should decide threshold arbitration issues. The text and structure of Article 8's litigation requirement make clear that it is a procedural condition precedent to arbitration. Because the ordinary presumption applies and is not overcome, the interpretation and application of the provision are primarily for the arbitrators, and courts must review their decision with considerable deference. *Pp. ____ - ____, 188 L. Ed. 2d, at 232-234*.

2. While Argentina is entitled to court review (under a properly deferential standard) of the arbitrators' decision to excuse BG Group's noncompliance with the **[*1203]** litigation requirement, that review shows that the arbitrators' determinations were lawful. Their conclusion that the litigation provision cannot be construed as an absolute impediment to arbitration, in all cases, lies well within their interpretative authority. Their factual findings that Argentina **[***7]** passed laws hindering recourse to the local judiciary by firms similar to BG Group are undisputed by Argentina and are accepted as valid. And their conclusion that Argentina's actions made it "absurd and unreasonable" to read Article 8 to require an investor in BG Group's position to bring its grievance in a domestic court, before arbitrating, is not barred by the Treaty. *Pp. ____ - ____, 188 L. Ed. 2d, at 234-235*.

*665 F. 3d 1363, 398 U.S. App. D.C. 500*, reversed.

**Counsel:** Thomas C. Goldstein argued the cause for petitioner.

Ginger D. Anders argued the cause for the United States, as amicus curiae, by special leave of court.

Jonathan I. Blackman argued the cause for respondent.

**Judges:** Breyer, J., delivered the opinion of the Court, in which Scalia, Thomas, Ginsburg, Alito, and Kagan, JJ., joined, and in which Sotomayor, J., joined except for Part IV-A-1. Sotomayor, J., filed an opinion concurring in part. Roberts, C. J., filed a dissenting opinion, in which Kennedy, J., joined.

**Opinion by:** Breyer

## Opinion

[**225] JUSTICE Breyer delivered the opinion of the Court.

*HN1 LEdHN[1]* [1] Article 8 of an investment treaty between the United Kingdom and Argentina contains a dispute-resolution provision, applicable to disputes between one of those nations and an investor from the other. See Agreement for the Promotion and Protection of Investments, Art. 8(2), Dec. 11, 1990, 1765 U. N. T. S. 38 (hereinafter Treaty). The provision authorizes either party to submit a dispute "to the decision of the competent tribunal of [***8] the Contracting Party in whose territory the investment was made," *i.e.*, a local court. Art. 8(1). And it provides for arbitration

> "(i) where, after a period of eighteen months has elapsed from the moment when the dispute was submitted to the competent tribunal . . ., the said tribunal has not given its final decision; [or]

> "(ii) where the final decision of the aforementioned tribunal has been made but the Parties are still in dispute." Art. 8(2)(a).

The Treaty also entitles the parties to agree to proceed directly to arbitration. Art. 8(2)(b).

This case concerns the Treaty's arbitration clause, and specifically the local court litigation requirement set forth in Article 8(2)(a). The question before us is whether a court of the United States, in reviewing an arbitration award made under the Treaty, [*1204] should interpret and apply the local litigation requirement *de novo*, or with the deference that courts ordinarily owe arbitration decisions. That is to say, who—court or arbitrator—bears primary responsibility for interpreting and applying the local litigation requirement to an underlying controversy? In our view, the matter is for the arbitrators, and courts must review their determinations [***9] with deference.

I

A

In the early 1990's, the petitioner, BG Group plc, a British firm, belonged to a consortium that bought a majority interest in an Argentine entity called MetroGAS. MetroGAS was a gas distribution company created by Argentine law in 1992, as a result of the government's privatization of its state-owned gas utility. Argentina distributed the utility's assets to new, private companies, one of which was MetroGAS. It awarded MetroGAS a 35-year exclusive license to distribute natural gas in Buenos Aires, and it submitted a controlling interest in the company to international public tender. BG Group's consortium was the successful bidder.

At about the same time, Argentina enacted statutes providing that its regulators would calculate gas "tariffs" in U. S. dollars, and that those tariffs would be set at levels sufficient to assure gas distribution firms, such as MetroGAS, a reasonable return.

In [***10] 2001 and 2002, Argentina, faced with an economic crisis, enacted new [**226] laws. Those laws changed the basis for calculating gas tariffs from dollars to pesos, at a rate of one peso per dollar. The exchange

rate at the time was roughly three pesos to the dollar. The result was that MetroGAS' profits were quickly transformed into losses. BG Group believed that these changes (and several others) violated the Treaty; Argentina believed the contrary.

B

In 2003, BG Group, invoking Article 8 of the Treaty, sought arbitration. The parties appointed arbitrators; they agreed to site the arbitration in Washington, D. C.; and between 2004 and 2006, the arbitrators decided motions, received evidence, and conducted hearings. BG Group essentially claimed that Argentina's new laws and regulatory practices violated provisions in the Treaty forbidding the "expropriation" of investments and requiring that each nation give "fair and equitable treatment" to investors from the other. Argentina denied these claims, while also arguing that the arbitration tribunal lacked "jurisdiction" to hear the dispute. App. to Pet. for Cert. 143a-144a, 214a-218a, 224a-232a. According to Argentina, the arbitrators lacked jurisdiction **[***11]** because: (1) BG Group was not a Treaty-protected "investor"; (2) BG Group's interest in MetroGAS was not a Treaty-protected "investment"; and (3) BG Group initiated arbitration without first litigating its claims in Argentina's courts, despite Article 8's requirement. *Id.*, at 143a-171a. In Argentina's view, "failure by BG to bring its grievance to Argentine courts for 18 months renders its claims in this arbitration inadmissible." *Id.*, at 162a.

In late December 2007, the arbitration panel reached a final decision. It began by determining that it had "jurisdiction" to consider the merits of the dispute. In support of that determination, the tribunal concluded that BG Group was an "investor," that its interest in MetroGAS amounted to a Treaty-protected "investment," and that Argentina's own conduct had waived, or excused, BG Group's failure to comply with Article 8's local litigation **[*1205]** requirement. *Id.,* at 99a, 145a, 161a, 171a. The panel pointed out that in 2002, the President of Argentina had issued a decree staying for 180 days the execution of its courts' final judgments (and injunctions) in suits claiming harm as a result of the new economic measures. *Id.*, at 166a-167a. In addition, **[***12]** Argentina had established a "renegotiation process" for public service contracts, such as its contract with MetroGAS, to alleviate the negative impact of the new economic measures. *Id.*, at 129a, 131a. But Argentina had simultaneously barred from participation in that "process" firms that were litigating against Argentina in court or in arbitration. *Id.*, at 168a-171a. These measures, while not making litigation in Argentina's courts literally impossible, nonetheless "hindered" recourse "to the domestic judiciary" to the point where the Treaty implicitly excused compliance with the local litigation requirement. *Id.,* at 165. Requiring a private party in such circumstances to seek relief in Argentina's courts for 18 months, the panel concluded, would lead to "absurd and unreasonable result[s]." *Id.*, at 166a.

On the merits, the arbitration panel agreed with Argentina that it had not "expropriate[d]" BG Group's investment, but also found that Argentina had denied BG Group "fair and equitable treatment." *Id.*, at 222a-223a, **[**227]** 240a-242a. It awarded BG Group $185 million in damages. *Id.*, at 297a.

C

In March 2008, both sides filed petitions for review in the District Court for the District of Columbia. **[***13]** BG Group sought to confirm the award under the New York Convention and the Federal Arbitration Act. See Convention on the Recognition and Enforcement of Foreign Arbitral Awards, Art. IV, June 10, 1958, 21 U. S. T. 2519, T. I. A. S. No. 6997 (New York Convention) (providing that a party may apply "for recognition and enforcement" of an arbitral award subject to the Convention); *9 U. S. C. §§204*, *207* (providing that a party may move "for an order confirming [an arbitral] award" in a federal court of the "place designated in the agreement as the place of arbitration if such place is within the United States"). Argentina sought to vacate the award in part on the ground that the arbitrators lacked jurisdiction. See *§10(a)(4)* (a federal court may vacate an arbitral award "where the arbitrators exceeded their powers").

The District Court denied Argentina's claims and confirmed the award. *764 F. Supp. 2d 21 (DC 2011)*; *715 F. Supp. 2d 108 (DC 2010)*. But the Court of Appeals for the District of Columbia Circuit reversed. *665 F. 3d 1363, 398 U.S. App. D.C. 500 (2012)*. In the appeals court's view, the interpretation and application of Article 8's local litigation requirement was a matter for courts to decide *de novo*, *i.e.*, **[***14]** without deference to the views of the arbitrators. The Court of Appeals then went on to hold that the circumstances did not excuse BG Group's failure to comply with the requirement. Rather, BG Group must "commence a lawsuit in Argentina's courts and wait eighteen months before filing for arbitration." *Id., at 1373*. Because BG Group had not done so, the arbitrators lacked authority to decide the dispute. And the appeals court ordered the award vacated. *Ibid.*

BG Group filed a petition for certiorari. Given the importance of the matter for international commercial arbitration, we granted the petition. See, *e.g.*, K. Vandevelde, Bilateral Investment Treaties: History, Policy & Interpretation 430-432 (2010) (explaining that dispute-resolution mechanisms allowing for arbitration are a "critical element" of modern day bilateral investment treaties); C. Dugan, D. Wallace, N. Rubins, & B. Sabahi, Investor- **[*1206]** State Arbitration 51-52, 117-120 (2008) (referring to the large number of investment treaties that provide for arbitration, and explaining that some also impose prearbitration requirements such as waiting periods, amicable negotiations, or exhaustion of local remedies).

## II

As we have said, the **[***15]** question before us is who—court or arbitrator—bears primary responsibility for interpreting and applying Article 8's local court litigation provision. Put in terms of standards of judicial review, should a United States court review the arbitrators' interpretation and application of the provision *de novo*, or with the deference that courts ordinarily show arbitral decisions on matters the parties have committed to arbitration? Compare, *e.g., First Options of Chicago, Inc. v. Kaplan, 514 U. S. 938, 942, 115 S. Ct. 1920, 131 L. Ed. 2d 985 (1995)* (example where a "court makes up its mind about [an issue] independently" because the parties did not agree it should be arbitrated), with *Oxford Health Plans* **[**228]** *LLC v. Sutter, 569 U. S. ___, ___, 133 S. Ct. 2064, 186 L. Ed. 2d 113 (2013)* (example where a court defers to arbitrators because the parties "'bargained for'" arbitral resolution of the question (quoting *Eastern Associated Coal Corp. v. Mine Workers, 531 U. S. 57, 62, 121 S. Ct. 462, 148 L. Ed. 2d 354 (2000)))*. See also *Hall Street Associates, L. L. C. v. Mattel, Inc., 552 U. S. 576, 588, 128 S. Ct. 1396, 170 L. Ed. 2d 254 (2008)* (on matters committed to arbitration, the Federal Arbitration Act provides for "just the limited review needed to maintain arbitration's **[***16]** essential virtue of resolving disputes straightaway" and to prevent it from be-coming "merely a prelude to a more cumbersome and time-consuming judicial review process" (internal quotation marks omitted)); *Eastern Associated Coal Corp., supra, at 62, 121 S. Ct. 462, 148 L. Ed. 2d 354* (where parties send a matter to arbitration, a court will set aside the "arbitrator's interpretation of what their agreement means only in rare instances").

In answering the question, we shall initially treat the document before us as if it were an ordinary contract between private parties. Were that so, we conclude, the matter would be for the arbitrators. We then ask whether the fact that the document in question is a treaty makes a critical difference. We conclude that it does not.

## III

*HN2 LEdHN[2]* [2] Where ordinary contracts are at issue, it is up to the parties to determine whether a particular matter is primarily for arbitrators or for courts to decide. See, *e.g., Steelworkers v. Warrior & Gulf Nav. Co., 363 U. S. 574, 582, 80 S. Ct. 1347, 4 L. Ed. 2d 1409 (1960)* ("[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit"). If the contract is silent on the matter of who primarily is to decide "threshold" **[***17]** questions about arbitration, courts determine the parties' intent with the help of presumptions.

*HN3* LEdHN[3] [3] On the one hand, courts presume that the parties intend courts, not arbitrators, to decide what we have called disputes about "arbitrability." These include questions such as "whether the parties are bound by a given arbitration clause," or "whether an arbitration clause in a concededly binding contract applies to a particular type of controversy." *Howsam v. Dean Witter Reynolds, Inc., 537 U. S. 79, 84, 123 S. Ct. 588, 154 L. Ed. 2d 491 (2002)*; accord, *Granite Rock Co. v. Teamsters, 561 U. S. 287, 299-300, 130 S. Ct. 2847, 177 L. Ed. 2d 567 (2010)* (disputes over "formation of the parties' arbitration agreement" **[\*1207]** and "its enforceability or applicability to the dispute" at issue are "matters . . . the court must resolve" (internal quotation marks omitted)). See *First Options, supra, at 941, 943-947, 115 S. Ct. 1920, 131 L. Ed. 2d 985* (court should decide whether an arbitration clause applied to a party who "had not personally signed" the document containing it); *AT&T Technologies, Inc. v. Communications Workers, 475 U. S. 643, 651, 106 S. Ct. 1415, 89 L. Ed. 2d 648 (1986)* (court should decide whether a particular labor-management layoff dispute fell within the arbitration clause of a collective-bargaining contract); *John Wiley & Sons, Inc. v. Livingston, 376 U. S. 543, 546-548, 84 S. Ct. 909, 11 L. Ed. 2d 898 (1964)* **[\*\*\*18]** (court should decide whether an arbitration provision survived a corporate merger). See generally *AT&T Technologies, supra, at* **[\*\*229]** 649, 106 S. Ct. 1415, 89 L. Ed. 2d 648 ("Unless the parties clearly and unmistakably provide otherwise, the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator").

*HN4* LEdHN[4] [4] On the other hand, courts presume that the parties intend arbitrators, not courts, to decide disputes about the meaning and application of particular procedural preconditions for the use of arbitration. See *Howsam, supra, at 86, 123 S. Ct. 588, 154 L. Ed. 2d 491* (courts assume parties "normally expect a forum-based decisionmaker to decide forum-specific *procedural* gateway matters" (emphasis added)). These procedural matters include claims of "waiver, delay, or a like defense to arbitrability." *Moses H. Cone Memorial Hospital v. Mercury Constr. Corp., 460 U. S. 1, 25, 103 S. Ct. 927, 74 L. Ed. 2d 765 (1983)*. And they include the satisfaction of "'prerequisites such as time limits, notice, laches, estoppel, and other conditions precedent to an obligation to arbitrate.'" *Howsam, supra, at 85, 123 S. Ct. 588, 154 L. Ed. 2d 491* (quoting the Revised Uniform Arbitration Act of 2000 §6, Comment 2, 7 U. L. A. 13 (Supp. 2002); emphasis deleted). See also §6(c) ("An arbitrator shall decide whether **[\*\*\*19]** a condition precedent to arbitrability has been fulfilled"); §6, Comment 2 (explaining that this rule reflects "the holdings of the vast majority of state courts" and collecting cases).

The provision before us is of the latter, procedural, variety. The text and structure of the provision make clear that it operates as a procedural condition precedent to arbitration. It says that a dispute "shall be submitted to international arbitration" if "one of the Parties so requests," as long as "a period of eighteen months has elapsed" since the dispute was "submitted" to a local tribunal and the tribunal "has not given its final decision." Art. 8(2). It determines *when* the contractual duty to arbitrate arises, not *whether* there is a contractual duty to arbitrate at all. Cf. 13 R. Lord, Williston on Contracts §38:7, pp. 435, 437; §38:4, p. 422 (4th ed. 2013) (a "condition precedent" determines what must happen before "a contractual duty arises" but does not "make the *validity* of the contract depend on its happening" (emphasis added)). Neither does this language or other language in Article 8 give substantive weight to the local court's determinations on the matters at issue between the parties. **[\*\*\*20]** To the contrary, Article 8 provides that *only* the "arbitration decision shall be final and binding on both Parties." Art. 8(4). The litigation provision is consequently a purely procedural requirement—a claims-processing rule that governs when the arbitration may begin, but not whether it may occur or what its substantive outcome will be on the issues in dispute.

Moreover, the local litigation requirement is highly analogous to procedural provisions that both this Court and others have found are for arbitrators, not courts, primarily to interpret and to apply. See **[\*1208]** *Howsam, supra, at 85, 123 S. Ct. 588, 154 L. Ed. 2d 491* (whether a party filed a notice of arbitration within the time limit provided by the rules of the chosen arbitral forum "is a matter presumptively for the arbitrator, not for the judge"); *John Wiley, supra, at 555-557, 84 S. Ct. 909, 11 L. Ed. 2d 898* (same, in respect to a mandatory prearbitration grievance procedure that involved holding two conferences). See also *Dialysis Access Center,*

*LLC v. RMS Lifeline, Inc., 638 F. 3d 367, 383* **[**230]** *(CA1 2011)* (same, in respect to a prearbitration "good faith negotiations" requirement); *Lumbermens Mut. Cas. Co. v. Broadspire Management Servs., Inc., 623 F. 3d 476, 481 (CA7 2010)* (same, in respect to **[***21]** a prearbitration filing of a "Disagreement Notice").

Finally, as we later discuss in more detail, see *infra, at ___ - ___, 188 L. Ed. 2d, at 232-233*, we can find nothing in Article 8 or elsewhere in the Treaty that might overcome the ordinary assumption. It nowhere demonstrates a contrary intent as to the delegation of decisional authority between judges and arbitrators. Thus, were the document an ordinary contract, it would call for arbitrators primarily to interpret and to apply the local litigation provision.

## IV

### A

We now relax our ordinary contract assumption and ask whether the fact that the document before us is a treaty makes a critical difference to our analysis. The Solicitor General argues that it should. He says that the local litigation provision may be "a condition on the State's consent to enter into an arbitration agreement." Brief for United States as *Amicus Curiae* 25. He adds that courts should "review de novo the arbitral tribunal's resolution of objections based on an investor's non-compliance" with such a condition. *Ibid.* And he recommends that we remand this case to the Court of Appeals to determine whether the court-exhaustion provision is such a condition. *Id.*, at 31-33.

### 1

We do not accept the Solicitor **[***22]** General's view as applied to the treaty before us. **HN5 LEdHN[5]** [5] As a general matter, a treaty is a contract, though between nations. Its interpretation normally is, like a contract's interpretation, a matter of determining the parties' intent. *Air France* v. *Saks*, 470 U. S. 392, 399, 105 S. Ct. 1338, 84 L. Ed. 2d 289 (1985) (courts must give "the specific words of the treaty a meaning consistent with the shared expectations of the contracting parties"); *Sullivan v. Kidd, 254 U. S. 433, 439, 41 S. Ct. 158, 65 L. Ed. 344 (1921)* ("[T]reaties are to be interpreted upon the principles which govern the interpretation of contracts in writing between individuals, and are to be executed in the utmost good faith, with a view to making effective the purposes of the high contracting parties"); *Wright v. Henkel, 190 U. S. 40, 57, 23 S. Ct. 781, 47 L. Ed. 948 (1903)* ("Treaties must receive a fair interpretation, according to the intention of the contracting parties"). And where, as here, a federal court is asked to interpret that intent pursuant to a motion to vacate or confirm an award made in the United States under the Federal Arbitration Act, it should normally apply the presumptions supplied by American law. See New York Convention, Art. V(1)(e) (award may be "set aside or suspended by a competent **[***23]** authority of the country in which, or under the law of which, that award was made"); Vandevelde, Bilateral Investment Treaties, at 446 (arbitral awards pursuant to treaties are "subject to review under the arbitration law of the state where the arbitration takes place"); Dugan, Investor-State Arbitration, at 636 ("[T]he national courts and the law of the legal situs of arbitration **[*1209]** control a losing party's attempt to set aside [an] award").

The Solicitor General does not deny that the presumption discussed in **[**231]** Part III, *supra* (namely, the presumption that parties intend procedural preconditions to arbitration to be resolved primarily by arbitrators), applies both to ordinary contracts and to similar provisions in treaties when those provisions are not also "conditions of consent." Brief for United States as *Amicus Curiae* 25-27. And, while we respect the Government's views about the proper interpretation of treaties, *e.g.*, *Abbott v. Abbott, 560 U. S. 1, 15, 130 S. Ct. 1983, 176 L. Ed. 2d 789 (2010)*, we have been unable to find any other authority or precedent suggesting that the use of the "consent" label in a treaty should make a critical difference in discerning the parties' intent about whether courts or arbitrators should **[***24]** interpret and apply the relevant provision.

We are willing to assume with the Solicitor General that the appearance of this label in a treaty can show that the parties, or one of them, thought the designated matter quite important. But that is unlikely to be conclusive. For parties often submit important matters to arbitration. And the word "consent" could be attached to a highly procedural precondition to arbitration, such as a waiting period of several months, which the parties are unlikely to have intended that courts apply without saying so. See, *e.g.*, Agreement on Encouragement and Reciprocal Protection of Investments, Art. 9, Netherlands-Slovenia, Sept. 24, 1996, Netherlands T. S. No. 296 ("Each Contracting Party hereby consents to submit any dispute . . . which they can not [*sic*] solve amicably within three months . . . to the International Center for Settlement of Disputes for settlement by conciliation or arbitration"), online at *www.rijksoverheid.nl/documenten-en-publicaties/besluiten/2006/10/17/slovenia.html* (all Internet materials as visited on Feb. 28, 2014, and available in Clerk of Court's case file); Agreement for the Promotion and Protection of Investments, Art. 8(1), **[\*\*\*25]** United Kingdom-Egypt, June 11, 1975, 14 I. L. M. 1472 ("Each Contracting Party hereby consents to submit" a dispute to arbitration if "agreement cannot be reached within three months between the parties"). While we leave the matter open for future argument, we do not now see why the presence of the term "consent" in a treaty warrants abandoning, or increasing the complexity of, our ordinary intent-determining framework. See *Howsam, 537 U. S., at 83-85, 123 S. Ct. 588, 154 L. Ed. 2d 491*; *First Options, 514 U. S., at 942-945, 115 S. Ct. 1920, 131 L. Ed. 2d 985*; *John Wiley, 376 U. S., at 546-549, 555-559, 84 S. Ct. 909, 11 L. Ed. 2d 898*.

2

In any event, the treaty before us does *not* state that the local litigation requirement is a "condition of consent" to arbitration. Thus, we need not, and do not, go beyond holding that, **HN6 LEdHN[6]** [6] in the absence of explicit language in a treaty demonstrating that the parties intended a different delegation of authority, our ordinary interpretive framework applies. We leave for another day the question of interpreting treaties that refer to "conditions of consent" explicitly. See, *e.g.,* United States-Korea Free Trade Agreement, Art. 11.18, Feb. 10, 2011 (provision entitled "Conditions and Limitations on Consent of Each Party" and providing that "[n]o claim may be **[\*\*\*26]** submitted to arbitration under this Section" unless the claimant waives in writing "any right" to press his claim before an "administrative tribunal or court"), online at *www.ustr.gov/trade-agreements/free-trade-agreements/korus-fta/final-text;* **[\*\*232]** North American Free Trade Agreement, Arts. 1121-1122, Dec. 17, 1992, 32 I. L. M. 643-644 (providing that each party's "[c]onsent to [a]rbitration" is conditioned **[\*1210]** on fulfillment of certain "procedures," one of which is a waiver by an investor of his right to litigate the claim being arbitrated). See also 2012 U. S. Model Bilateral Investment Treaty, Art. 26 (entitled "Conditions and limitations on Consent of Each Party"), online at *www.ustr.gov/sites/default/files/BIT%20text%20for%20ACIEP%20Meeting.pdf*. And we apply our ordinary presumption that the interpretation and application of procedural provisions such as the provision before us are primarily for the arbitrators.

B

A treaty may contain evidence that shows the parties had an intent contrary to our ordinary presumptions about who should decide threshold issues related to arbitration. But the treaty before us does not show any such contrary intention. We concede that the local litigation requirement **[\*\*\*27]** appears in ¶(1) of Article 8, while the Article does not mention arbitration until the subsequent paragraph, ¶(2). Moreover, a requirement that a party exhaust its remedies in a country's domestic courts before seeking to arbitrate may seem particularly important to a country offering protections to foreign investors. And the placing of an important matter prior to any mention of arbitration at least arguably suggests an intent by Argentina, the United Kingdom, or both, to have courts rather than arbitrators apply the litigation requirement.

These considerations, however, are outweighed by others. As discussed *supra, at ___ - ___, 188 L. Ed. 2d, at 229-230*, the text and structure of the litigation requirement set forth in Article 8 make clear that it is a

procedural condition precedent to arbitration—a sequential step that a party must follow before giving notice of arbitration. The Treaty nowhere says that the provision is to operate as a substantive condition on the formation of the arbitration contract, or that it is a matter of such elevated importance that it is to be decided by courts. International arbitrators are likely more familiar than are judges with the expectations of foreign investors and recipient nations **[***28]** regarding the operation of the provision. See *Howsam, supra, at 85, 123 S. Ct. 588, 154 L. Ed. 2d 491* (comparative institutional expertise a factor in determining parties' likely intent). And the Treaty itself authorizes the use of international arbitration associations, the rules of which provide that arbitrators shall have the authority to interpret provisions of this kind. Art. 8(3) (providing that the parties may refer a dispute to the International Centre for the Settlement of Investment Disputes (ICSID) or to arbitrators appointed pursuant to the arbitration rules of the United Nations Commission on International Trade Law (UNCITRAL)); accord, UNCITRAL Arbitration Rules, Art. 23(1) (rev. 2010 ed.) ("[A]rbitral tribunal shall have the power to rule on its own jurisdiction"); ICSID Convention, Regulations and Rules, Art. 41(1) (2006 ed.) ("Tribunal shall be the judge of its own competence"). Cf. *Howsam, supra, at 85, 123 S. Ct. 588, 154 L. Ed. 2d 491* (giving weight to the parties' incorporation of the National Association of Securities Dealers' Code of Arbitration into their contract, which provided for similar arbitral authority, as evidence that **[**233]** they intended arbitrators to "interpret and apply the NASD time limit rule").

The upshot is that our **[***29]** ordinary presumption applies and it is not overcome. The interpretation and application of the local litigation provision is primarily for the arbitrators. Reviewing courts cannot review their decision *de novo.* Rather, they must do so with considerable deference.

C

The dissent interprets Article 8's local litigation provision differently. In its view, **[*1211]** the provision sets forth not a condition precedent to arbitration in an already-binding arbitration contract (normally a matter for arbitrators to interpret), but a substantive condition on Argentina's con-sent to arbitration and thus on the contract's formation in the first place (normally something for courts to interpret). It reads the whole of Article 8 as a "unilateral standing offer" to arbitrate that Argentina and the United Kingdom each extends to investors of the other country. *Post, at ___, 188 L. Ed. 2d, at 242* (opinion of Roberts, C. J.). And it says that the local litigation requirement is one of the essential "'terms in which the offer was made.'" *Post, at ___, 188 L. Ed. 2d, at 240* (quoting *Eliason v. Henshaw, 17 U.S. 225, 4 Wheat. 225, 228, 4 L. Ed. 556 (1819)*; emphasis deleted).

While it is possible to read the provision in this way, doing so is not consistent with our case law interpreting similar **[***30]** provisions appearing in ordinary arbitration contracts. See Part III, *supra.* Consequently, interpreting the provision in such a manner would require us to treat treaties as warranting a different kind of analysis. And the dissent does so without supplying any different set of general principles that might guide that analysis. That is a matter of some concern in a world where foreign investment and related arbitration treaties increasingly matter.

Even were we to ignore our ordinary contract principles, however, we would not take the dissent's view. As we have explained, the local litigation provision on its face concerns arbitration's timing, not the Treaty's effective date; or whom its arbitration clause binds; or whether that arbitration clause covers a certain kind of dispute. Cf. *Granite Rock, 561 U. S., at 296-303, 130 S. Ct. 2847, 177 L. Ed. 2d 567* (ratification date); *First Options, 514 U. S., at 941, 943-947, 115 S. Ct. 1920, 131 L. Ed. 2d 985* (parties); *AT&T Technologies, 475 U. S., at 651, 106 S. Ct. 1415, 89 L. Ed. 2d 648* (kind of dispute). The dissent points out that Article 8(2)(a) "does not simply require the parties to wait for 18 months before proceeding to arbitration," but instructs them to *do* something—to "submit their claims for adjudication." *Post, at ___, 188 L. Ed. 2d, at 242*. That is correct. **[***31]** But the something they must do has no direct impact on the resolution of their dispute, for as we previously pointed out, Article 8 provides that only the decision of the arbitrators (who need not give weight

to the local court's decision) will be "final and binding." Art. 8(4). The provision, at base, is a claims-processing rule. And the dissent's efforts to imbue it with greater significance fall short.

The treatises to which the dissent refers also fail to support its position. *Post, at ___, ___, 188 L. Ed. 2d, at 239, 240*. Those authorities primarily describe how an offer to arbitrate in an investment treaty can be accepted, such as through an investor's filing of **[**234]** a notice of arbitration. See J. Salacuse, The Law of Investment Treaties 381 (2010); Schreuer, Consent to Arbitration, in The Oxford Handbook of International Investment Law 830, 836-837 (P. Muchlinski, F. Ortino, & C. Schreuer eds. 2008); Dugan, Investor-State Arbitration, at 221-222. They do not endorse the dissent's reading of the local litigation provision or of provisions like it.

To the contrary, the bulk of international authority supports our view that the provision functions as a purely procedural precondition to arbitrate. See 1 G. Born, International **[***32]** Commercial Arbitration 842 (2009) ("A substantial body of arbitral authority from investor-state disputes concludes that compliance with procedural mechanisms in an arbitration agreement (or bilateral investment treaty) is not ordinarily a jurisdictional prerequisite"); Brief for Professors and Practitioners of Arbitration Law as *Amici Curiae* 12-16 (to assume the parties intended *de novo* review of the provision by a court "is likely **[*1212]** to set United States courts on a collision course with the international regime embodied in thousands of [bilateral investment treaties]"). See also Schreuer, Consent to Arbitration, *supra*, at 846-848 ("clauses of this kind . . . creat[e] a considerable burden to the party seeking arbitration with little chance of advancing the settlement of the dispute," and "the most likely effect of a clause of this kind is delay and additional cost").

In sum, we agree with the dissent that a sovereign's consent to arbitration is important. We also agree that sovereigns can condition their consent to arbitrate by writing various terms into their bilateral investment treaties. *Post, at ___ - ___, 188 L. Ed. 2d, at 242-243*. But that is not the issue. The question is whether the parties intended to give **[***33]** courts or arbitrators primary authority to interpret and apply a threshold provision in an arbitration contract—when the contract is silent as to the delegation of authority. We have already explained why we believe that where, as here, the provision resembles a claims-processing requirement and is not a requirement that affects the arbitration contract's validity or scope, we presume that the parties (even if they are sovereigns) intended to give that authority to the arbitrators. See Parts III, IV-A and IV-B, *supra*.

V

Argentina correctly argues that it is nonetheless entitled to court review of the arbitrators' decision to excuse BG Group's noncompliance with the litigation requirement, and to take jurisdiction over the dispute. It asks us to provide that review, and it argues that even if the proper standard is "a [h]ighly [d]eferential" one, it should still prevail. Brief for Respondent 50. Having the relevant materials before us, we shall provide that review. But we cannot agree with Argentina that the arbitrators "'exceeded their powers'" in concluding they had jurisdiction. *Ibid.* (quoting *9 U. S. C. §10(a)(4)*).

The arbitration panel made three relevant determinations:

(1) "As a **[***34]** matter of treaty interpretation," the local litigation provision "cannot be construed as an absolute impediment to arbitration," App. to Pet. for Cert. 165a;

(2) Argentina enacted laws that "hindered" "recourse to the domestic judiciary" by those "whose rights were allegedly affected by the emergency **[**235]** measures," *id.*, at 165a-166a; that sought "to prevent any judicial interference with the emergency legislation," *id.*, at 169a; and that "excluded from the renegotiation process" for public service contracts "any licensee seeking judicial redress," *ibid.*;

(3) under these circumstances, it would be "absurd and unreasonable" to read Article 8 as requiring an investor to bring its grievance to a domestic court before arbitrating. *Id.*, at 166a.

The first determination lies well within the arbitrators' interpretive authority. Construing the local litigation provision as an "absolute" [***35] requirement would mean Argentina could avoid arbitration by, say, passing a law that closed down its court system indefinitely or that prohibited investors from using its courts. Such an interpretation runs contrary to a basic objective of the investment treaty. Nor does Argentina argue for an absolute interpretation.

As to the second determination, Argentina does not argue that the facts set forth by the arbitrators are incorrect. Thus, we accept them as valid.

The third determination is more controversial. Argentina argues that neither the 180-day suspension of courts' issuances of final judgments nor its refusal to allow litigants (and those in arbitration) to [*1213] use its contract renegotiation process, taken separately or together, warrants suspending or waiving the local litigation requirement. We would not necessarily characterize these actions as rendering a domestic court-exhaustion requirement "absurd and unreasonable," but at the same time we cannot say that the arbitrators' conclusions are barred by the Treaty. The arbitrators did not "'stra[y] from interpretation and application of the agreement'" or otherwise "'effectively "dispens[e]" '" their "'own brand of . . . justice.'" [***36] *Stolt-Nielsen S. A. v. AnimalFeeds Int'l Corp., 559 U. S. 662, 671, 130 S. Ct. 1758, 176 L. Ed. 2d 605 (2010)* (providing that it is only when an arbitrator engages in such activity that "'his decision may be unenforceable'" (quoting *Major League Baseball Players Assn. v. Garvey, 532 U. S. 504, 509, 121 S. Ct. 1724, 149 L. Ed. 2d 740 (2001)* (*per curiam*)).

Consequently, we conclude that the arbitrators' jurisdictional determinations are lawful. The judgment of the Court of Appeals to the contrary is reversed.

*It is so ordered.*

**Concur by:** Sotomayor

# Concur

JUSTICE Sotomayor, concurring in part.

I agree with the Court that the local litigation requirement at issue in this case is a procedural precondition to arbitration (which the arbitrators are to interpret), not a condition on Argentina's consent to arbitrate (which a court would review *de novo*). *Ante, at ___, ___, 188 L. Ed. 2d, at 229, 233*. Importantly, in reaching this conclusion, the Court acknowledges that "the treaty before us does *not* state that the local litigation requirement is a 'condition of consent' to arbitration." *Ante, at ___, 188 L. Ed. 2d, at 231*. The Court thus wisely "leave[s] for another day the question of interpreting treaties that refer to 'conditions of consent' explicitly." *Ibid.* [**236] I join the Court's opinion on the understanding that it does not, in fact, [***37] decide this issue.

I write separately because, in the absence of this express reservation, the opinion might be construed otherwise. The Court appears to suggest in dictum that a decision by treaty parties to describe a condition as one on their consent to arbitrate "is unlikely to be conclusive" in deciding whether the parties intended for the condition to be resolved by a court. *Ante, at ___, 188 L. Ed. 2d, at 231*. Because this suggestion is unnecessary to decide the case and is in tension with the Court's explicit reservation of the issue, I join the opinion of the Court with the exception of Part IV-A-1.

The Court's dictum on this point is not only unnecessary; it may also be incorrect. It is far from clear that a treaty's express use of the term "consent" to describe a precondition to arbitration should not be conclusive in

the analysis. We have held, for instance, that "a gateway dispute about whether the parties are bound by a given arbitration clause raises a 'question of arbitrability' for a court to decide." *Howsam v. Dean Witter Reynolds, Inc., 537 U. S. 79, 84, 123 S. Ct. 588, 154 L. Ed. 2d 491 (2002)*. And a party plainly cannot be bound by an arbitration clause to which it does not consent. See *Granite Rock Co. v. Teamsters, 561 U. S. 287, 299, 130 S. Ct. 2847, 177 L. Ed. 2d 567 (2010)* **[***38]** ("Arbitration is strictly 'a matter of consent'" (quoting *Volt Information Sciences, Inc. v. Board of Trustees of Leland Stanford Junior Univ., 489 U. S. 468, 479, 109 S. Ct. 1248, 103 L. Ed. 2d 488 (1989))*.

Consent is especially salient in the context of a bilateral investment treaty, where the treaty is not an already agreed-upon arbitration provision between known parties, but rather a nation state's standing offer to arbitrate with an amorphous class of private investors. In this setting, a nation-state **[*1214]** might reasonably wish to condition its consent to arbitrate with a previously unspecified investor counterparty on the investor's compliance with a requirement that might be deemed "purely procedural" in the ordinary commercial context, *ante, at ___, 188 L. Ed. 2d, at 229*. Moreover, as THE CHIEF JUSTICE notes, "[i]t is no trifling matter" for a sovereign nation to "subject itself to international arbitration" proceedings, so we should "not presume that any country . . . takes that step lightly." *Post, at ___, 188 L. Ed. 2d, at 242* (dissenting opinion).

Consider, for example, the United States-Korea Free Trade Agreement, which as the Court recognizes, *ante, at ___ - ___, 188 L. Ed. 2d, at 231-232*, includes a provision explicitly entitled "Conditions and Limitations on Consent of Each Party." Art. **[***39]** 11.18, Feb. 10, 2011. That provision declares that "[n]o claim may be submitted to arbitration" unless a claimant first waives its "right to initiate or continue before any administrative tribunal or court . . . any proceeding with respect to any measure alleged to constitute a breach" under another provision of the treaty. *Ibid*. If this waiver condition were to appear without the "consent" label in a binding arbitration agreement between two commercial parties, one might characterize it as the kind of procedural "'condition precedent to arbitrability'" that we presume parties intend for arbitrators to decide. *Howsam, 537 U. S., at 85, 123 S. Ct. 588, 154 L. Ed. 2d 491*. But where the waiver requirement is expressly denominated **[**237]** a "condition on consent" in an international investment treaty, the label could well be critical in determining whether the states party to the treaty intended the condition to be reviewed by a court. After all, a dispute as to consent is "the starkest form of the question whether the parties have agreed to arbitrate." *Post, at ___, 188 L. Ed. 2d, at 245*. And we ordinarily presume that parties intend for courts to decide such questions because otherwise arbitrators might "force unwilling parties to arbitrate a matter **[***40]** they reasonably would have thought a judge . . . would decide." *First Options of Chicago, Inc. v. Kaplan, 514 U. S. 938, 945, 115 S. Ct. 1920, 131 L. Ed. 2d 985 (1995)*.

Accordingly, if the local litigation requirement at issue here were labeled a condition on the treaty parties' "consent" to arbitrate, that would in my view change the analysis as to whether the parties intended the requirement to be interpreted by a court or an arbitrator. As it is, how-ever, all parties agree that the local litigation requirement is not so denominated. See Agreement for the Promotion and Protection of Investments, Art. 8(2), Dec. 11, 1990, 1765 U. N. T. S. 38. Nor is there compelling reason to suppose the parties silently intended to make it a condition on their consent to arbitrate, given that a local court's decision is of no legal significance under the treaty, *ante, at ___ - ___, 188 L. Ed. 2d, at 229-230*, and given that the entire purpose of bilateral investment agreements is to "reliev[e] investors of any concern that the courts of host countries will be unable or unwilling to provide justice in a dispute between a foreigner and their own government," Brief for Professors and Practitioners of Arbitration Law as *Amici Curiae* 6. Moreover, Argentina's conduct confirms **[***41]** that the local litigation requirement is not a condition on consent, for rather than objecting to arbitration on the ground that there was no binding arbitration agreement to begin with, Argentina actively participated in the constitution of the arbitral panel and in the proceedings that followed. See *Eastern Airlines, Inc. v. Floyd,*

*499 U. S. 530, 546, 111 S. Ct. 1489, 113 L. Ed. 2d 569 (1991)* (treaty interpretation can be informed by parties' postenactment conduct). [*]

 [*1215] In light of these many indicators that Argentina and the United Kingdom [**238] did not intend the local litigation requirement to be a condition on their consent to arbitrate, and on the understanding that the Court does not pass on the weight courts should attach to a treaty's use of the term "consent," [***43] I concur in the Court's opinion.

**Dissent by:** Roberts

# Dissent

CHIEF JUSTICE Roberts, with whom JUSTICE Kennedy joins, dissenting.

The Court begins by deciding a different case, "initially treat[ing] the document before us as if it were an ordinary contract between private parties." *Ante, at ___, 188 L. Ed. 2d, at 228*. The "document before us," of course, is nothing of the sort. It is instead a treaty between two sovereign nations: the United Kingdom and Argentina. No investor is a party to the agreement. Having elided this rather important fact for much of its analysis, the majority finally "relax[es] [its] ordinary contract assumption and ask[s] whether the fact that the document before us is a treaty makes a critical difference to [its] analysis." *Ante, at ___, 188 L. Ed. 2d, at 230*. It should come as no surprise that, after starting down the wrong road, the majority ends up at the wrong place.

I would start with the document that *is* before us and take it on its own terms. That document is a bilateral investment treaty between the United Kingdom and Argentina, in which Argentina agreed to take steps to encourage U. K. investors to invest within its borders (and the United Kingdom agreed to do the same with respect to Argentine investors). Agreement for [***44] the Promotion and Protection of Investments, Dec. 11, 1990, 1765 U. N. T. S. 33 (Treaty). The Treaty does indeed contain a completed agreement for arbitration—between the signatory countries. Art. 9. The Treaty also includes, in Article 8, certain provisions for resolving any disputes that might arise between a signatory country and an investor, who is not a party to the agreement.

One such provision—completely ignored by the Court in its analysis—specifies that disputes may be resolved by arbitration when the host country and an investor "have so agreed." Art. 8(2)(b), 1765 U. N. T. S. 38. No one doubts that, as is the normal rule, whether there was such an agreement is for a court, not an arbitrator, [*1216] to decide. See *First Options of Chicago, Inc. v. Kaplan, 514 U. S. 938, 943-945, 115 S. Ct. 1920, 131 L. Ed. 2d 985 (1995)*.

---

[*] The dissent discounts the significance of Argentina's conduct on the ground that Argentina "object[ed] to the [arbitral] tribunal's jurisdiction to hear the dispute." *Post, at ___, 188 L. Ed. 2d, at 246, n. 2*. But there is a difference between arguing that a party has failed to comply with a procedural condition in a binding arbitration agreement and arguing that noncompliance with the condition negates the existence of consent to arbitrate in the first place. Argentina points to no evidence that its objection was of the consent variety. This omission is notable because Argentina knew how to phrase its arguments before the arbitrators in terms of consent; it argued separately that it had not consented to arbitration with BG Group on the ground that BG was not a party to the [***42] license underlying the dispute. See App. to Pet. for Cert. 182a-186a. *First Options of Chicago, Inc. v. Kaplan, 514 U. S. 938, 115 S. Ct. 1920, 131 L. Ed. 2d 985 (1995)*, is not to the contrary, as that case held that "arguing the arbitrability issue to an arbitrator" did not constitute "clea[r] and unmistakabl[e]" evidence sufficient to override an indisputably applicable presumption that a court was to decide whether the parties had agreed to arbitration. *Id., at 944, 946, 115 S. Ct. 1920, 131 L. Ed. 2d 985*. The question here, by contrast, is whether that presumption attaches to begin with—that is, whether the local litigation requirement was a condition on Argentina's consent to arbitrate (which would trigger the presumption) or a procedural condition in an already binding arbitration agreement (which would not). That Argentina apparently took the latter position in arbitration is surely relevant evidence that the condition was, in fact, not one on its consent.

When there is no express agreement between the host country and an investor, they must form an agreement in another way, before an obligation to arbitrate arises. The Treaty by itself cannot constitute an agreement to arbitrate with an investor. How could it? No investor is a party to that Treaty. Something else must happen to *create* an agreement where there was none before. Article 8(2)(a) makes clear **[***45]** what that something is: An investor must submit his dispute to the courts of the host country. After 18 months, or an unsatisfactory decision, the investor may then request arbitration.

Submitting the dispute to the courts is thus a condition to the formation of an agreement, not simply a matter of performing an existing agreement. Article 8(2)(a) constitutes in effect a unilateral *offer* to arbitrate, which an investor may accept by complying with its terms. To be sure, the local litigation requirement might not be absolute. In particular, an investor might argue that it was an implicit **[**239]** aspect of the unilateral offer that he be afforded a reasonable opportunity to submit his dispute to the local courts. Even then, however, the question would remain whether the investor has managed to form an arbitration agreement with the host country pursuant to Article 8(2)(a). That question under Article 8(2)(a) is—like the same question under Article 8(2)(b)—for a court, not an arbitrator, to decide. I respectfully dissent from the Court's contrary conclusion.

I

The majority acknowledges—but fails to heed—"the first principle that underscores all of our arbitration decisions: Arbitration is strictly **[***46]** 'a matter of consent.'" *Granite Rock Co. v. Teamsters, 561 U. S. 287, 299, 130 S. Ct. 2847, 177 L. Ed. 2d 567 (2010)* (quoting *Volt Information Sciences, Inc. v. Board of Trustees of Leland Stanford Junior Univ., 489 U. S. 468, 479, 109 S. Ct. 1248, 103 L. Ed. 2d 488 (1989))*; see *ante, at ___, 188 L. Ed. 2d, at 228*. We have accordingly held that arbitration "is a way to resolve those disputes—but only those disputes—that the parties have agreed to submit to arbitration." *First Options of Chicago, Inc., supra, at 943, 115 S. Ct. 1920, 131 L. Ed. 2d 985*. The same "first principle" underlies arbitration pursuant to bilateral investment treaties. See C. Dugan, D. Wallace, N. Rubins, & B. Sabahi, Investor-State Arbitration 219 (2008) (Dugan); J. Salacuse, The Law of Investment Treaties 385 (2010); K. Vandevelde, Bilateral Investment Treaties: History, Policy, and Interpretation 433 (2010). So only if Argentina agreed with BG Group to have an arbitrator resolve their dispute did the arbitrator in this case have any authority over the parties.

The majority opinion nowhere explains when and how Argentina agreed *with BG Group* to submit to arbitration. Instead, the majority seems to assume that, in agreeing with the United Kingdom to adopt Article 8 along with the rest of the Treaty, Argentina thereby formed an agreement with **[***47]** all potential U. K. investors (including BG Group) to submit all investment-related disputes to arbitration. That misunderstands Article 8 and trivializes the significance to a sovereign nation of subjecting itself to arbitration anywhere in the world, solely at the option of private parties.

A

The majority focuses throughout its opinion on what it calls the Treaty's "arbitration clause," *ante, at ___, 188 L. Ed. 2d, at 225*, but that provision does not stand alone. Rather, it is only part—and a subordinate part at **[*1217]** that—of a broader dispute resolution provision. Article 8 is thus entitled "Settlement of Disputes Between an Investor and the Host State," and it opens without so much as mentioning arbitration. 1765 U. N. T. S. 37. Instead it initially directs any disputing investor and signatory country (what the Treaty calls a "Contracting Party") to court. When "an investor of one Contracting Party and the other Contracting Party" have an investment-related dispute that has "not been amicably settled," the Treaty commands that the dispute "*shall be submitted*, at the request of one of the Parties to the dispute, to the decision of the competent tribunal of the Contracting Party in whose territory the investment **[***48]** was made." Art. 8(1), *id.*, at 37-38. (emphasis added). This provision could not be clearer: Before taking any other steps, an aggrieved investor must submit its **[**240]** dispute with a Contracting Party to that Contracting Party's own courts.

There are two routes to arbitration in Article 8(2)(a), and each passes through a Contracting Party's domestic courts. That is, the Treaty's arbitration provisions in Article 8(2)(a) presuppose that the parties have complied with the local litigation provision in Article 8(1). Specifically, a party may request arbitration only (1) "after a period of eighteen months has elapsed from the moment when the dispute was submitted to the competent tribunal of the Contracting Party in whose territory the investment was made" and "the said tribunal has not given its final decision," Art. 8(2)(a)(i), *id.*, at 38, or (2) "where the final decision of the aforementioned tribunal has been made but the Parties are still in dispute," Art. 8(2)(a)(ii), *ibid.* Either way, the obligation to arbitrate does not arise until the Contracting Party's courts have had a first crack at the dispute.

Article 8 provides a third route to arbitration in paragraph 8(2)(b)—namely, "where the **[***49]** Contracting Party and the investor of the other Contracting Party have so agreed." *Ibid.* In contrast to the two routes in Article 8(2)(a), this one does not refer to the local litigation provision. That omission is significant. It makes clear that an investor can bypass local litigation only by obtaining the Contracting Party's explicit agreement to proceed directly to arbitration. Short of that, an investor has no choice but to litigate in the Contracting Party's courts for at least some period.

The structure of Article 8 confirms that the routes to arbitration in paragraph (2)(a) are just as much about eliciting a Contracting Party's consent to arbitrate as the route in paragraph 8(2)(b). Under Article 8(2)(b), the requisite consent is demonstrated by a specific agreement. Under Article 8(2)(a), the requisite consent is demonstrated by compliance with the requirement to resort to a country's local courts.

Whereas Article 8(2)(a) is part of a completed *agreement* between Argentina and the United Kingdom, it constitutes only a unilateral standing *offer* by Argentina with respect to U. K. investors—an offer to submit to arbitration where certain conditions are met. That is how scholars **[***50]** understand arbitration provisions in bilateral investment treaties in general. See Dugan 221; Salacuse 381; Brief for Practitioners and Professors of International Arbitration Law as *Amici Curiae* 4. And it is how BG Group itself describes this investment treaty in particular. See Brief for Petitioner 43 (the Treaty is a "standing offer" by Argentina "to arbitrate"); Reply Brief 9 (same).

An offer must be accepted for a legally binding contract to be formed. And it is an "undeniable principle of the law of contracts, that an offer . . . by one person to another, imposes no obligation upon the former, until it is accepted by the latter, **[*1218]** *according to the terms in which the offer was made.* Any qualification of, or departure from, those terms, invalidates the offer." *Eliason v. Henshaw, 17 U.S. 225, 4 Wheat. 225, 228, 4 L. Ed. 556 (1819)* (emphasis added). This principle applies to international arbitration agreements just as it does to domestic commercial contracts. See Dugan 221-222; Salacuse 381; Schreuer, Consent to Arbitration, in The Oxford Handbook of International Investment Law 830, 836-837 (P. Muchlinski, F. Ortino, & C. Schreuer eds. 2008).

**[**241]** By incorporating the local litigation provision in Article 8(1), **[***51]** paragraph 8(2)(a) establishes that provision as a term of Argentina's unilateral offer to arbitrate. To accept Argentina's offer, an investor must therefore first litigate its dispute in Argentina's courts—either to a "final decision" or for 18 months, whichever comes first. Unless the investor does so (or, perhaps, establishes a valid excuse for failing to do so, as discussed below, see *infra, at ___, 188 L. Ed. 2d, at 247*), it has not accepted the terms of Argentina's offer to arbitrate, and thus has not formed an arbitration agreement with Argentina. [1]

Although the majority suggests that the local litigation requirement would not be a "condition of consent" even if the Treaty explicitly called it one, the Court's holding is limited to treaties that contain no such clear statement.

---

[1]   To be clear, the only question is whether BG Group formed an *arbitration* agreement with Argentina. To say that BG Group never formed such an agreement is not to call into question the validity of its various commercial agreements with Argentina.

See *ante, at ___ - ___, 188 L. Ed. 2d, at 231-232*. But there is no reason to think that such a clear statement should be required, for we generally do not require "talismanic words" in treaties. *Medellin v. Texas, 552 U. S. 491, 521, 128 S. Ct. 1346, 170 L. Ed. 2d 190 (2008)*. **[***52]** Indeed, another arbitral tribunal concluded that the local litigation requirement was a condition on Argentina's consent to arbitrate despite the absence of the sort of clear statement apparently contemplated by the majority. See *ICS Inspection & Control Servs. Ltd.* v. *Argentine Republic*, PCA Case No. 2010-9, Award on Jurisdiction, ¶262 (Feb. 10, 2012). Still other tribunals have reached the same conclusion with regard to similar litigation requirements in other Argentine bilateral investment treaties. See *Daimler Financial Servs. AG* v. *Argentine Republic*, ICSID Case No. ARB/ 05/1, Award, ¶¶193, 194 (Aug. 22, 2012); *Wintershall Aktiengesellschaft* v. *Argentine Republic*, ICSID Case No. ARB/04/14, Award, ¶116 (Dec. 8, 2008).

In the face of this authority, the majority quotes a treatise for the proposition that "'[a] substantial body of arbitral authority from investor-state disputes concludes that compliance with procedural mechanisms in an arbitration agreement (or bilateral investment treaty) is not ordinarily a jurisdictional prerequisite.'" *Ante, at ___, 188 L. Ed. 2d, at 234* (quoting 1 G. Born, International Commercial Arbitration 842 (2009)). But that simply restates the question. The whole issue is whether **[***53]** the local litigation requirement is a mere "procedural mechanism" or instead a condition on Argentina's consent to arbitrate.

BG Group concedes that other terms of Article 8(1) constitute conditions on Argentina's consent to arbitrate, even though they are not expressly labeled as such. See Tr. of Oral Arg. 57 ("You have to be a U. K. investor, you have to have a treaty claim, you have to be suing another party to the treaty. And if those aren't true, *then there is no arbitration agreement*" (emphasis added)). The Court does not explain why the *only other term*—the litigation requirement—should be viewed differently.

**[*1219]** Nor does the majority's reading accord with ordinary contract law, which treats language such as the word "after" in Article 8(2)(a)(i) as creating conditions, even though such **[**242]** language may not constitute a "clear statement." See 13 R. Lord, Williston on Contracts §38:16 (4th ed. 2013). The majority seems to regard the local litigation requirement as a condition precedent to *performance* of the contract, rather than a condition precedent to *formation* of the contract. *Ante, at ___ - ___, 188 L. Ed. 2d, at 229-230*; see 13 Lord §§38:4, 38:7. But that cannot be. Prior to the fulfillment of the local litigation **[***54]** requirement, there was no contract be-tween Argentina *and BG Group* to be performed. The Treaty is not such an agreement, since BG Group is of course not a party to the Treaty. Neither the majority nor BG Group contends that the agreement is under Article 8(2)(b), the provision that applies "where the Contracting Party and the investor of the other Contracting Party have so agreed." An arbitration agreement must be *formed*, and Article 8(2)(a) spells out how an investor may do that: by submitting the dispute to local courts for 18 months or until a decision is rendered.

Moreover, the Treaty's local litigation requirement certainly does not resemble "time limits, notice, laches, estoppel," or the other kinds of provisions that are typically treated as conditions on the performance of an arbitration agreement, rather than prerequisites to formation. Revised Uniform Arbitration Act of 2000 §6(c), Comment 2, 7 U. L. A. 26 (2009). Unlike a time limit for submitting a claim to arbitration, see *Howsam v. Dean Witter Reynolds, Inc., 537 U. S. 79, 85, 123 S. Ct. 588, 154 L. Ed. 2d 491 (2002)*, the litigation requirement does not simply regulate the timing of arbitration. As the majority recognizes, *ante, at ___ - ___, 188 L. Ed. 2d, at 233-234*, the provision **[***55]** does not simply require the parties to wait for 18 months before proceeding to arbitration, but instead requires them to submit their claims for adjudication during that period. And unlike a mandatory pre-arbitration grievance procedure, see *John Wiley & Sons, Inc. v. Livingston, 376 U. S. 543, 556-559, 84 S. Ct. 909, 11 L. Ed. 2d 898 (1964)*, the litigation requirement sends the parties to court—and not just any court, but a court of the host country.

The law of international arbitration and domestic contract law lead to the same conclusion: Because paragraph (2)(a) of Article 8 constitutes only a unilateral standing offer by the Contracting Parties to each other's investors

to submit to arbitration under certain conditions, an investor cannot form an arbitration agreement with a Contracting Party under the Treaty until the investor accepts the actual terms of the Contracting Party's offer. Absent a valid excuse, that means litigating its dispute in the Contracting Party's courts to a "final decision" or, barring that, for at least 18 months.

## B

The [***56] nature of the obligations a sovereign incurs in agreeing to arbitrate with a private party confirms that the local litigation requirement is a condition on a signatory country's consent to arbitrate, and not merely a condition on performance of a pre-existing arbitration agreement. There are good reasons for any sovereign to condition its consent to arbitrate disputes on investors' first litigating their claims in the country's own courts for a specified period. It is no trifling matter for a sovereign nation to subject itself to suit by private parties; we do not presume that any [**243] country—including our own—takes that step lightly. Cf. *United States v. Bormes, 568 U. S. ___, ___, 133 S. Ct. 12, 184 L. Ed. 2d 317 (2012)* (Congress must "unequivocally express[ ]" its intent to waive the sovereign immunity of the United [*1220] States (quoting *United States v. Nordic Village, Inc., 503 U. S. 30, 33, 112 S. Ct. 1011, 117 L. Ed. 2d 181 (1992)*; internal quotation marks omitted)). But even where a sovereign nation has subjected itself to suit in its own courts, it is quite another thing for it to subject itself to international arbitration. Indeed, "[g]ranting a private party the right to bring an action against a sovereign state in an international [***57] tribunal regarding an investment dispute is a revolutionary innovation" whose "uniqueness and power should not be over-looked." Salacuse 137. That is so because of both the procedure and substance of investor-state arbitration.

Procedurally, paragraph (3) of Article 8 designates the Arbitration Rules of the United Nations Commission on International Trade Law (UNCITRAL) as the default rules governing the arbitration. Those rules authorize the Secretary-General of the Permanent Court of Arbitration at The Hague to designate an "appointing authority" who—absent agreement by the parties—can select the sole arbitrator (or, in the case of a three-member tribunal, the presiding arbitrator, where the arbitrators nominated by each of the parties cannot agree on a presiding arbitrator). UNCITRAL Arbitration Rules, Arts. 6, 8-9 (rev. 2010 ed.). The arbitrators, in turn, select the site of the arbitration (again, absent an agreement by the parties) and enjoy broad discretion in conducting the proceedings. Arts. 18, 17(1).

Substantively, by acquiescing to arbitration, a state permits private adjudicators to review its public policies and effectively annul the authoritative acts of its legislature, [***58] executive, and judiciary. See Salacuse 355; G. Van Harten, Investment Treaty Arbitration and *Public Law 65-67 (2007)*. Consider the dispute that gave rise to this case: Before the arbitral tribunal, BG Group challenged multiple sovereign acts of the Argentine Government taken after the Argentine economy collapsed in 2001—in particular, Emergency Law 25,561, which converted dollar-denominated tariffs into peso-denominated tariffs at a rate of one Argentine peso to one U. S. dollar; Resolution 308/02 and Decree 1090/02, which established a renegotiation process for public service contracts; and Decree 214/02, which stayed for 180 days injunctions and the execution of final judgments in lawsuits challenging the effects of the Emergency Law. Indeed, in awarding damages to BG Group, the tribunal held that the first three of these enactments violated Article 2 of the Treaty. See App. to Pet. for Cert. 241a-242a, 305a.

Perhaps they did, but that is not the issue. Under Article 8, a Contracting Party grants to private adjudicators not necessarily of its own choosing, who can meet literally anywhere in the world, a power it typically reserves to its own courts, if it grants it at all: the power [***59] to sit in judgment on its sovereign acts. Given these stakes, one would expect the United Kingdom and Argentina to have taken particular care in specifying the limited circumstances in which foreign investors can trigger the Treaty's arbitration process. And that is precisely what they did in Article 8(2)(a), requiring investors to afford a country's own [**244] courts an initial

opportunity to review the country's enactments and assess the country's compliance with its international obligations. Contrast this with Article 9, which provides for arbitration between the signatory countries of disputes under the Treaty without any preconditions. Argentina and the United Kingdom considered arbitration with particular foreign investors to be different in kind and to require special limitations on its use.

The majority regards the local litigation requirement as toothless simply because **[*1221]** the Treaty does not require an arbitrator to "give substantive weight to the local court's determinations on the matters at issue between the parties," *ante, at ___, 188 L. Ed. 2d, at 229*; see also *ante, at ___ - ___, 188 L. Ed. 2d, at 233-234*, but instead provides that "[t]he arbitration decision shall be final and binding on both Parties," Art. 8(4), 1765 U. N. T. S. **[***60]** 38. While it is true that an arbitrator need not defer to an Argentine court's judgment in an investor dispute, that does not deprive the litigation requirement of practical import. Most significant, the Treaty provides that an "arbitral tribunal shall decide the dispute in accordance with . . . the laws of the Contracting Party involved in the dispute." Art. 8(4), *ibid.* I doubt that a tribunal would give no weight to an Argentine court's authoritative construction of Argentine law, rendered in the same dispute, just because it might not be formally bound to adopt that interpretation.

The local litigation requirement can also help to narrow the range of issues that remain in controversy by the time a dispute reaches arbitration. It might even induce the parties to settle along the way. And of course the investor might prevail, which could likewise obviate the need for arbitration. Cf. *McKart v. United States, 395 U. S. 185, 195, 89 S. Ct. 1657, 23 L. Ed. 2d 194 (1969)*.

None of this should be interpreted as defending Argentina's history when it comes to international investment. That history may prompt doubt that requiring an investor to resort to that country's courts in the first instance will be of any use. But that **[***61]** is not the question. Argentina and the United Kingdom reached agreement on the term at issue. The question can therefore be rephrased as whether it makes sense for either Contracting Party to insist on resort to its courts before being compelled to arbitrate anywhere in the world before arbitrators not of its choosing. The foregoing reasons may seem more compelling when viewed apart from the particular episode before us.

II

Given that the Treaty's local litigation requirement is a condition on consent to arbitrate, it follows that whether an investor has complied with that requirement is a question a court must decide *de novo*, rather than an issue for the arbitrator to decide subject only to the most deferential judicial review. See, *e.g.*, *Adams v. Suozzi, 433 F. 3d 220, 226-228 (CA2 2005)* (holding that compliance with a condition on formation of an arbitration agreement is for a court, rather than an arbitrator, to determine). The logic is simple: Because an arbitrator's authority depends on the consent of the parties, the arbitrator should not as a rule be able to decide for himself whether the parties have in fact consented. Where the consent of the parties is in question, "reference **[***62]** of the gateway dispute to the court avoids the risk of forcing parties **[**245]** to arbitrate a matter that they may well not have agreed to arbitrate." *Howsam, 537 U. S., at 83-84, 123 S. Ct. 588, 154 L. Ed. 2d 491*.

This principle is at the core of our arbitration precedents. See *Granite Rock Co., 561 U. S., at 299, 130 S. Ct. 2847, 177 L. Ed. 2d 567* (questions concerning "the formation of the parties' arbitration agreement" are for a court to decide *de novo*). The same principle is also embedded in the law of international commercial arbitration. 2 Born 2792 ("[W]here one party denies ever having made an arbitration agreement or challenges the validity of any such agreement, . . . the possibility of de novo judicial review of any jurisdictional award in an annulment action is logically necessary"). See also Restatement (Third) of U. S. Law of International Commercial Arbitration **[*1222]** §4-12(d)(1) (Tent. Draft No. 2, Apr. 16, 2012) ("a court determines de novo . . . the existence of the arbitration agreement").

Indeed, the question in this case—whether BG Group accepted the terms of Argentina's offer to arbitrate—presents an issue of contract formation, which is the starkest form of the question whether the parties have agreed to arbitrate. In *Howsam* v. *Dean Witter Reynolds,* **[***63]** *Inc.*, we gave two examples of questions going to consent, which are for courts to decide: "whether the parties are bound by a given arbitration clause" and "whether an arbitration clause in a concededly binding contract applies to a particular type of controversy." *537 U. S., at 84, 123 S. Ct. 588, 154 L. Ed. 2d 491*. In both examples, there is at least a putative arbitration agreement between *the parties to the dispute*. The only question is whether the agreement is truly binding or whether it covers the specific dispute. Here, by contrast, the question is whether the arbitration clause in the Treaty between the United Kingdom and Argentina gives rise to an arbitration agreement between Argentina *and BG Group* at all. Cf. *ante, at ___, 188 L. Ed. 2d, at 236* (Sotomayor, J., concurring in part) ("Consent is especially salient in the context of a bilateral investment treaty, where the treaty is not an already agreed-upon arbitration provision between known parties").

The majority never even starts down this path. Instead, it preempts the whole inquiry by concluding that the local litigation requirement is the kind of "procedural precondition" that parties typically expect an arbitrator to enforce. *Ante, at ___ - ___, 188 L. Ed. 2d, at 229-230*, But as explained, the local litigation **[***64]** requirement does not resemble the requirements we have previously deemed presumptively procedural. See *supra, at ___, 188 L. Ed. 2d, at 233*. It does not merely regulate the timing of arbitration. Nor does it send the parties to non-judicial forms of dispute resolution.

More importantly, all of the cases cited by the majority as examples of procedural provisions involve commercial contracts between two private parties. See *ante, at ___, 188 L. Ed. 2d, at 242*. None of them—not a single one—involves an agreement between sovereigns or an agreement to which the person seeking to compel arbitration is not even a party. The Treaty, of course, is both of those things.

The majority suggests that I am applying "a different kind of analysis" from that governing private commercial contracts, just because what is at issue is a treaty. *Ante, at ___, 188 L. Ed. 2d, at 229*. That is not so: The key **[**246]** point, which the majority never addresses, is that there is no completed agreement whatsoever between Argentina and BG Group. An agreement must be formed, and whether that has happened is—as it is in the private commercial contract context—an issue for a court to decide. See *supra, at ___ - ___, 188 L. Ed. 2d, at 244-245*.

The distinction between questions concerning consent to arbitrate and mere procedural requirements **[***65]** under an existing arbitration agreement can at times seem elusive. Even the most mundane procedural requirement can be recast as a condition on consent as a matter of technical logic. But it should be clear by now that the Treaty's local litigation requirement is not a mere formality—not in Buenos Aires, not in London. And while it is true that "parties often submit important matters to arbitration," *ante, at ___, 188 L. Ed. 2d, at 231*, our precedents presume that parties do not submit to arbitration the most important matter of all: whether they are subject to an agreement to arbitrate in the first place.

Nor has the majority pointed to evidence that would rebut this presumption by showing that Argentina "'clearly and **[*1223]** unmistakably'" intended to have an arbitrator en-force the litigation requirement. *Howsam, supra, at 83, 123 S. Ct. 588, 154 L. Ed. 2d 491* (quoting *AT&T Technologies, Inc. v. Communications Workers, 475 U. S. 643, 649, 106 S. Ct. 1415, 89 L. Ed. 2d 648 (1986))*. As the majority notes, *ante, at ___, 188 L. Ed. 2d, at 232*, the Treaty incorporates certain arbitration rules that, in turn, authorize arbitrators to determine their own jurisdiction over a dispute. See Art. 8(3). But those rules do not operate until a dispute is properly before an arbitral tribunal, and of course the whole question **[***66]** in this case is whether the dispute between BG Group and Argentina was before the arbitrators, given BG Group's failure to comply with the 18-month local litigation requirement. As a leading treatise has explained, "[i]f the parties have not validly agreed to any arbitration

agreement at all, then they also have necessarily not agreed to institutional arbitration rules." 1 Born 870. "In these circumstances, provisions in institutional rules cannot confer any [such] authority upon an arbitral tribunal." *Ibid.*

I also see no reason to think that arbitrators enjoy comparative expertise in construing the local litigation requirement. *Ante, at ___, 188 L. Ed. 2d, at 233*. It would be one thing if that provision involved the application of the arbitrators' own rules, cf. *Howsam, supra, at 85, 123 S. Ct. 588, 154 L. Ed. 2d 491*, or if it were "intertwined" with the merits of the underlying dispute, *John Wiley & Sons, 376 U. S., at 557, 84 S. Ct. 909, 11 L. Ed. 2d 898*. Neither is true of the litigation requirement. A court can assess compliance with the requirement at least as well as an arbitrator can. Given the structure of Article 8 and the important interests that the litigation requirement protects, it seems clear that the United Kingdom and Argentina thought the same. [2]

III

Although the Court of Appeals got **[\*\*247]** there by a slightly different route, it correctly concluded that a court must decide questions concerning the interpretation and application of the local litigation requirement *de novo*. *665 F. 3d 1363, 1371-1373, 398 U.S. App. D.C. 500 (CADC 2012)*. At the same time, however, the court seems to have simply taken it for granted that, because BG Group did not submit its dispute to the local courts, the arbitral award in BG Group's favor was invalid. Indeed, the court addressed the issue in a perfunctory paragraph at the end of its opinion and saw "'only one possible outcome'": "that BG Group was required to commence a lawsuit in Argentina's courts and wait eighteen months before filing for arbitration." *Id., at 1373* (quoting **[\*1224]** *Stolt-Nielsen S. A. v. AnimalFeeds Int'l Corp., 559 U. S. 662, 677, 130 S. Ct. 1758, 176 L. Ed. 2d 605 (2010)*).

That conclusion is not obvious. A leading treatise has indicated that "[i]t is a necessary implication from [a unilateral] offer that the offeror, in addition, makes a subsidiary offer by which he or she promises to accept a tender of performance." 1 Lord §5:14, at 1005. On this understanding, **[\*\*\*69]** an offeree's failure to comply with an essential condition of the unilateral offer "will not bar an action, if failure to comply with the condition is due to the offeror's own fault." *Id.,* at 1005-1006.

It would be open to BG Group to argue before the Court of Appeals that this principle was incorporated into Article 8(2)(a) as an implicit aspect of Argentina's unilateral offer to arbitrate. Such an argument would find some support in the background principle of customary international law that a foreign individual injured by a host country must ordinarily exhaust local remedies—unless doing so would be "futile." See Dugan 347-357. In any event, the issue would be analyzed as one of contract formation, and therefore would be for the court to decide. I would accordingly vacate the decision of the Court of Appeals and remand the case for such an inquiry.

I respectfully dissent.

---

[2] JUSTICE **[\*\*\*67]** Sotomayor contends that "Argentina's conduct confirms that the local litigation requirement is not a condition on consent, for rather than objecting to arbitration on the ground that there was no binding arbitration agreement to begin with, Argentina actively participated in the constitution of the arbitral panel and in the proceedings that followed." *Ante,* at ___, 188 L. Ed. 2d, at 237 (opinion concurring in part). But as the arbitral tribunal itself recognized, Argentina *did* object to the tribunal's jurisdiction to hear the dispute. App. to Pet. for Cert. 99a, 134a, 143a, 161a-163a. And we have held that "merely arguing the arbitrability issue to an arbitrator"—say, by "filing with the arbitrators a written memorandum objecting to the arbitrators' jurisdiction"—"does not indicate a clear willingness to arbitrate that issue, *i.e.,* a willingness to be effectively bound by the arbitrator's decision on that point." *First Options of Chicago, Inc.* v. *Kaplan*, 514 U. S. 938, 946, 115 S. Ct. 1920, 131 L. Ed. 2d 985 (1995). The concurrence contends that Argentina "apparently" argued its jurisdictional objection in terms of procedure rather than consent, *ante,* at ___, 188 L. Ed. 2d, at 237, n., but the one piece of evidence cited—a negative inference from the *arbitrator's* characterization **[\*\*\*68]** of Argentina's argument on a subsidiary issue—hardly suffices to distinguish *First Options*.

## References

Effective Legal Negotiation and Settlement § 15.05 (Matthew Bender)L Ed Digest, Treaties § 20L Ed Index, Arbitration and Award; Treaties, and similar predecessor **[\*\*\*70]** .



⚠ Caution

As of: September 1, 2015 5:15 PM EDT

## *Browning-Ferris Indus. v. Lieck*

Supreme Court of Texas

October 13, 1993, Argued ; June 2, 1994, Delivered

No. D-3616

**Reporter**

881 S.W.2d 288; 1994 Tex. LEXIS 81; 37 Tex. Sup. J. 851

BROWNING-FERRIS INDUSTRIES, INC. AND JAMES MESZAROS, PETITIONERS v. KENNETH LIECK AND NYDIA HINOJOSA LIECK, RESPONDENTS

**Prior History:** **[\*\*1]** ON APPLICATION FOR WRIT OF ERROR TO THE COURT OF APPEALS FOR THE THIRTEENTH DISTRICT OF TEXAS.

**Disposition:** For the reasons explained, we reverse the judgment of the court of appeals, remand Kenneth Lieck's action against BFI and Meszaros to the trial court for further proceedings, and render judgment that Nydia Lieck take nothing.

## Core Terms

procurement, criminal prosecution, initiates, malicious prosecution, damages, proceedings, causation, trial court, cooperate, ref'd, law enforcement officer, consortium, cases, prosecute, court of appeals, physical injury, malicious prosecution action, requirements, provides, bid, judgment rendered, damages for loss, private person, grand jury, no writ, investigators, indictment, malicious, aided

## Case Summary

### Procedural Posture

Petitioners, company and its employee, sought review of an order entered by the Court of Appeals for the Thirteenth District of Texas, which affirmed a judgment in favor of respondents, city official and his wife, in a malicious prosecution action. Petitioners claimed that the causation instruction was erroneous, that there was no liability unless the statements were false, and that damages for spousal consortium required physical injury.

### Overview

Respondents, city official and his wife, filed a malicious prosecution action after petitioner employee informed law enforcement officials that he believed that respondent city official released confidential information to one of petitioner's competitors. Petitioner employee knew, but did not tell the official, that the information had been made part of a public record. Respondent husband's indictment was subsequently dismissed. The court reversed the lower court's rulings and held that the causation instruction was erroneous because it permitted the jury to impose liability against petitioners for merely aiding or cooperating in a criminal prosecution, which was incorrect. The court stated that the instruction should have recited that petitioners initiated or procured the

prosecution. The court held that by not making a full and fair disclosure to investigating officers, petitioners could be liable for malicious prosecution. Finally, the court held that respondent wife was not entitled to damages for loss of consortium because there was no physical injury. The case was remanded to the trial court for further proceedings.

**Outcome**

The court reversed the judgment for respondents, city official and wife, and remanded the case to the trial court. The court held that the causation instruction was erroneous because it permitted the jury to impose liability against petitioners for merely aiding or cooperating in a criminal prosecution. The court also held that respondent wife was not entitled to damages for loss of consortium because there was no physical injury.

## LexisNexis® Headnotes

Torts > Intentional Torts > Malicious Prosecution > General Overview

Torts > ... > Malicious Prosecution > Elements > General Overview

*HN1* A private person who initiates or procures the institution of criminal proceedings against another who is not guilty of the offense charged is subject to liability for malicious prosecution if (a) he initiates or procures the proceedings without probable cause and primarily for a purpose other than that of bringing an offender to justice, and (b) the proceedings have terminated in favor of the accused.

**Counsel:** FOR PETITIONERS: Townsend, Mr. Roger, Powers, Jr., Mr. W., Powell, Ms. Lisa, Murray, Mr. Charles.

FOR RESPONDENTS: Norquest, Mr. Neil, E., Colvin, Jr., Mr. N., Briscoe, Mr. Gordon.

**Judges:** HECHT, PHILLIPS, HIGHTOWER, CORNYN, GAMMAGE, ENOCH, SPECTOR, DOGGETT

**Opinion by:** NATHAN L. HECHT

## Opinion

[*289] JUSTICE HECHT delivered the opinion of the Court, in which CHIEF JUSTICE PHILLIPS, JUSTICE HIGHTOWER, JUSTICE CORNYN, JUSTICE GAMMAGE, JUSTICE ENOCH, and JUSTICE SPECTOR join. JUSTICE DOGGETT joins in Parts I-IV only, and notes his dissent to Part V. JUSTICE GONZALEZ not sitting.

We address three questions in this malicious prosecution action: first, whether the trial court properly instructed the jury concerning the causal connection a plaintiff must prove between defendant's conduct and plaintiff's criminal prosecution to establish liability; second, whether [**2] a defendant can ever be liable for making statements to law enforcement officials which he did not actually know were false; and third, whether damages for loss of consortium can be awarded for harm to a spouse that involves no physical injury? For reasons that follow, we answer the first and third questions ″no″, and the second question ″yes″. The district court rendered judgment against defendants, which a sharply divided court of appeals, en banc, affirmed with some modifications. *845 S.W.2d 926 at 950*. We reverse and remand the case for further proceedings.

I

A detailed account of the evidence in this case has been made by the court of appeals in assessing the sufficiency of the evidence to support the judgment. As we have not been asked to review the method or standard used in that assessment, we need not recapitulate the entire record. We focus instead on the circumstances directly relevant to the legal issues raised here.

When James Meszaros, an employee of Browning-Ferris Industries, Inc., heard that the Texas Rangers were investigating the purchasing practices of the City of Brownsville, he became concerned that they might question his attempt to make a financial contribution [**3] to the reelection campaign of one of the members of the City Commission at a time when BFI was bidding on the City's garbage collection business. Meszaros asked another BFI employee and former Ranger, Dan North, to contact his friends among the Rangers and try to determine the scope of the investigation. North did so, and arranged for Meszaros to meet with two officials involved in the investigation.

At that meeting, Meszaros brought up the subject of the bidding on the City's garbage collection business. BFI had submitted its bid on its standard form contract, which was similar to the ones it, and its competitors, used with other Texas cities. Garbage Management Services also bid on the City's business. The terms of the bids were summarized by Brownsville's City Manager, Kenneth Lieck, distributed to members of the City Commission and to the press, and discussed at several City Commission meetings [*290] which were open to the public. After the Commission voted to award the business to GMS, Lieck gave GMS' representative, Robert Torres, a slightly modified form of the contract BFI had submitted, and that proposed contract became the basis of the final negotiations between the [**4] City and GMS. Meszaros complained to the investigators that the contract Lieck had given Torres was confidential information. North showed the two investigators a statute from which they concluded, after reading it, that Lieck had violated the law.

At the request of various other law enforcement officials, Meszaros and an attorney for BFI provided additional statements and affidavits. Two City Commissioners also told officials that Lieck had given Torres confidential information. Meszaros, by his own admission at trial, never told officials that the terms of BFI's contract had been made public during the City Commission's consideration of the bids, even though he knew that was true, nor did he tell officials that he believed Lieck had not committed a crime, even though that was his belief. From these admissions it may thus be fairly said that Meszaros withheld from law enforcement officials information which they might well have considered important in deciding whether to prosecute Lieck.

An assistant district attorney reviewed the matter and presented it to the grand jury, which indicted Lieck for giving Torres confidential information, specifically, the contract BFI had submitted [**5] to the Brownsville City Commission. The indictment alleged a misdemeanor, although it did not state what statute had been violated. The indictment was dismissed about two months later because the grand jury had been improperly constituted. A second grand jury refused to indict Lieck, and the prosecution was then terminated.

Lieck and his wife Nydia sued BFI and Meszaros for malicious prosecution. The jury rendered a verdict favorable to the Liecks on all issues and found actual damages of $ 706,500 for Lieck [1] and $ 250,000 for his wife for loss of consortium, and punitive damages against BFI of $ 1,500,000. The trial court rendered judgment awarding Lieck his actual damages against BFI and Meszaros, jointly and severally, and his punitive damages against BFI, but rendered judgment non obstante veredicto that Nydia Lieck take nothing. The court of appeals reversed in part, awarding Nydia the consortium damages found by the jury, then modified the punitive damages, apportioning them between Nydia and Kenneth, and otherwise affirmed the judgment. *845 S.W.2d 926*.

---

[1] The jury found Lieck's damages to be $ 50,000 for past loss of earning capacity, $ 0 for future loss of earning capacity, $ 50,000 for past mental anguish, $ 100,000 for future mental anguish, $ 500,000 for injury to reputation, and $ 6,500 attorney fees to defend the criminal charges.

**[**6]** II

Before we turn to petitioners' complaints, it is necessary to recognize the important societal interests in tension in the tort of malicious criminal prosecution. A century ago this Court wrote:

> It is important that every citizen should be protected against malicious prosecutions, and it is equally important that crimes should be punished, in order that the law-abiding citizen may be secure in life, liberty, and property. To make the citizen liable to be mulcted in damages for an honest discharge of duty is to give immunity to crime, and to weaken the restraining power of the criminal law, thereby endangering the security of law-abiding people.

*Sebastian v. Cheney, 86 Tex. 497, 25 S.W. 691, 694 (Tex. 1894)*. The Restatement (Second) of Torts describes these competing interests similarly:

> The first is the interest of society in the efficient enforcement of the criminal law, which requires that private persons who aid in the enforcement of the law should be given an effective protection against the prejudice that is likely to arise from the termination of the prosecution in favor of the accused. The second is the interest that the individual citizen **[**7]** has in being protected against unjustifiable and oppressive litigation of criminal charges, which not only involve pecuniary loss but also distress and loss of reputation.

**[*291]** RESTATEMENT (SECOND) OF TORTS ch. 29, topic 6, intro. note, at 405 (1977) [hereinafter "the RESTATEMENT"]. These interests are balanced by carefully defining the elements of an action for malicious prosecution, and the balance is maintained by strictly adhering to these elements.

It is frequently said that actions for malicious prosecution are not favored in the law. *E.g.*, *Sullivan v. O'Brien, 85 S.W.2d 1106, 1112* (Tex. Civ. App.--San Antonio 1935, writ ref'd); *Diamond Shamrock Corp. v. Ortiz, 753 S.W.2d 238, 241* (Tex. App.--Corpus Christi 1988, writ denied); *Parker v. Dallas Hunting & Fishing Club, 463 S.W.2d 496, 499* (Tex. Civ. App.--Dallas 1971, no writ); *Montgomery Ward & Co. v. Kirkland, 225 S.W.2d 906, 909* (Tex. Civ. App.--San Antonio 1949, writ ref'd n.r.e.); *Deaton v. Montgomery Ward & Co., 159 S.W.2d 969, 972* (Tex. Civ. App.--Beaumont 1942, writ ref'd w.o.m.); *Reed v. Lindley, 240 S.W. 348, 351* (Tex. Civ. App.--Ft. Worth 1922, no writ); 54 C.J.S. **[**8]** *Malicious Prosecution* § 4, at 524-25 (1987); *52 AM. JUR. 2D Malicious Prosecution § 5*, at 188 (1970). This aphorism is far too vague to serve as an analytical tool. As with any other cause of action, if the elements of malicious prosecution are proved, liability is established. What is distinctive about malicious prosecution is that there is little room for error in applying the law. Even a small departure from the exact prerequisites for liability may threaten the delicate balance between protecting against wrongful prosecution and encouraging reporting of criminal conduct. It is in this context that we consider the issues raised.

III

A

Petitioners complain that the trial court erred in refusing to require the jury to find whether Meszaros' actions actually caused the indictment of Lieck. The trial court asked instead:

> Did James R. Meszaros, acting without probable cause and with malice, cause, *or aid or cooperate in causing*, a criminal prosecution to be commenced against Kenneth J. Lieck?

(Emphasis added.) The trial court did not define "cause, or aid or cooperate in causing" in the jury charge.

Giving these words their plain meaning, the jury could [**9] have concluded that it was enough for Meszaros to have aided or cooperated with law enforcement officials in bringing about Lieck's prosecution. Petitioners argue that this does not satisfy the requirements for liability.

The court of appeals rejected petitioners' argument in a single sentence: "The courts of this State have repeatedly stated that the causation issue submitted in this case is the proper question for malicious prosecution cases." *845 S.W.2d at 943*. The court cited four cases in support of this statement. In *Davis v. City of San Antonio, 752 S.W.2d 518 (Tex. 1988)*, this Court held that there was evidence to support a finding that defendant caused, aided or contributed to a criminal prosecution, but did not consider -- because it was not questioned by the parties -- whether such a finding was sufficient for liability. In *Bass v. Metzger, 569 S.W.2d 917, 924* (Tex. Civ. App.--Corpus Christi 1978, writ ref'd n.r.e.), and *Ellis v. Sinton Sav. Ass'n, 455 S.W.2d 834, 836* (Tex. Civ. App.--Corpus Christi 1970, writ ref'd n.r.e.), the court listed the elements of a malicious prosecution action as including that defendant have caused, or aided or cooperated in [**10] causing, plaintiff's prosecution. Neither of these cases considered the causation element specifically; each merely listed the element among the other requirements to establish liability. *See also Yianitsas v. Mercantile Nat'l Bank, 410 S.W.2d 848, 850* (Tex. Civ. App.--Dallas 1967, no writ). Finally, *Thomas v. Cisneros, 596 S.W.2d 313, 316-17* (Tex. Civ. App.--Austin 1980, writ ref'd n.r.e.), also lists the same elements but later refers to a requirement that defendant's actions have proximately caused plaintiff's prosecution. Thus, none of the cases cited by the court of appeals, or by respondents, specifically considers the element of causation.

The statement of the element as "cause, or aid or cooperate in causing", appears to have originated in *Flowers v. Central Power & Light Co., 314 S.W.2d 373, 375* (Tex. Civ. App.--Waco 1958, writ ref'd n.r.e.). That case cites no authority for so broad an element [*292] of causation. Prior decisions included among the required elements a stricter showing that defendant actually caused the prosecution. *See Davidson v. First State Bank, 310 S.W.2d 678, 680* (Tex. Civ. App.--El Paso 1958, no writ); *Kirkland, 225 S.W.2d [**11] at 907-08*; *Meyer v. Viereck, 286 S.W. 894, 897* (Tex. Civ. App.--Galveston 1926, writ dism'd w.o.j.); *Reed, 240 S.W. at 351*. Although as noted above several courts of appeals have recited the *Flowers* version of the elements of malicious prosecution, several others have referred to the pre-*Flowers* version of the causation element. *See McHenry v. Tom Thumb Page Drug Stores, 696 S.W.2d 664, 665* (Tex. App.--Dallas 1985, writ dism'd); *Blanton v. Morgan, 681 S.W.2d 876, 878* (Tex. App.--El Paso 1984, writ ref'd n.r.e.); *Fisher v. Beach, 671 S.W.2d 63, 66* (Tex. App.--Dallas 1984, no writ); *Martin v. Trevino, 578 S.W.2d 763, 766* (Tex. Civ. App.--Corpus Christi 1978, writ ref'd n.r.e.); *Lloyd v. Almeda State Bank, 346 S.W.2d 947, 951* (Tex. Civ. App.--Waco 1961, writ ref'd n.r.e.).

The RESTATEMENT formulates the causation element as "initiates or procures". RESTATEMENT § 653. [2] A person initiates a criminal prosecution if he makes a formal charge to law enforcement authorities. *Id*. cmt. c. A person procures a criminal prosecution if his actions are enough to cause the prosecution, and but for his actions the prosecution would not have occurred. [**12] *Id*. cmts. d, f-h. In other words, procurement requires that a person's actions be both a necessary and a sufficient cause of the criminal prosecution. Thus, a person cannot procure a criminal prosecution when the decision whether to prosecute is left to the discretion of another person, a law enforcement official or the grand jury. *Id*. An exception, which we discuss below, occurs when a person provides information which he knows is false to another to cause a criminal prosecution. *Id*. cmt. g.

The concept of procurement in the RESTATEMENT is essentially the same as the cause-in-fact element of [**13] proximate cause. Cause in fact is ordinarily defined as "that cause which, in a natural and continuous sequence, produces an event, and without which cause such event would not have occurred". 1 STATE BAR OF TEXAS, TEXAS PATTERN JURY CHARGES PJC 2.04 (1987). A person procures a criminal prosecution if

---

[2] "HN1 A private person who initiates or procures the institution of criminal proceedings against another who is not guilty of the offense charged is subject to liability for malicious prosecution if (a) he initiates or procures the proceedings without probable cause and primarily for a purpose other than that of bringing an offender to justice, and (b) the proceedings have terminated in favor of the accused."

his actions in the course of things bring it about, and if, but for his actions, the prosecution would not have occurred. Just as there may be more than one proximate cause of an event, a single prosecution may be procured by more than one person. The RESTATEMENT idea of procurement does not, however, include the foreseeability component of proximate cause, which requires that "the act or omission complained of must be such that a person using *ordinary care* would have foreseen that the event, or some similar event, might reasonably result therefrom." *Id*. Foreseeability is not an appropriate requirement for procurement. An ordinary person simply cannot be expected to foresee that his communication with law enforcement officials either will or will not lead to a criminal prosecution. There are too many participants in the process to foresee what the outcome of one person's role **[**14]** in the investigatory process is likely to be.

The RESTATEMENT rule does not subject a person to liability for merely aiding or cooperating in causing a criminal prosecution. We agree that liability should be thus restricted. Were it otherwise, persons only incidentally involved in a criminal investigation might find themselves facing allegations in a civil suit. The prospect of such liability poses too great a disincentive for people to cooperate freely with law enforcement officials. As many Texas courts have already recognized, a person's actions must be the cause in fact of a criminal prosecution before he can be liable for malicious prosecution. The trial court's instruction permitted the jury to find liability under a lesser standard and was therefore in error.

**[*293]** The RESTATEMENT concepts of initiation and procurement are better suited to malicious prosecution cases than the more general idea of causation. In such cases in the future, the jury should be asked, not whether the defendant "caused" criminal proceedings, but whether he either "initiated" or "procured" them, depending on the nature of the case. Initiation would not ordinarily need to be defined, as it would **[**15]** be demonstrated by evidence that defendant filed formal charges against plaintiff, but procurement should be defined as follows:

> A person procures a criminal prosecution if his actions were enough to cause the prosecution, and but for his actions the prosecution would not have occurred. A person does not procure a criminal prosecution when the decision whether to prosecute is left to the discretion of another, including a law enforcement official or the grand jury, unless the person provides information which he knows is false. A criminal prosecution may be procured by more than one person.

We discuss below the basis for the exception for providing false information.

B

Respondents argue that even if the trial court erred in failing to instruct the jury properly on the element of causation, that error was harmless, citing *Island Recreational Dev. Corp. v. Republic of Texas Sav. Ass'n, 710 S.W.2d 551 (Tex. 1986)*. Petitioners urge us to overrule *Island Recreational* as having been wrongly decided. *See* 34 GUS. M. HODGES & T. RAY GUY, THE JURY CHARGE IN TEXAS CIVIL LITIGATION § 34, at 92-94 (Texas Practice 1988). *Island Recreational* considered whether **[**16]** the trial court's failure to instruct the jury on a party's theory was reversible error. In the present case, the trial court affirmatively charged the jury on the wrong standard of causation. We have not extended the holding of *Island Recreational*, *see Exxon Corp. v. Perez, 842 S.W.2d 629 (Tex. 1992)* (per curiam), and we do not do so in this case. We need not consider here whether *Island Recreational* should be overruled.

The trial court rendered judgment against petitioners on a verdict which allowed the jury to find only that Meszaros aided or cooperated in causing Lieck's criminal prosecution. The trial court's failure to limit the jury to the proper standard of causation constitutes reversible error.

IV

Petitioners also argue that a person who cooperates with law enforcement authorities by providing them information should not be liable for malicious prosecution unless he knows the information to be false. Petitioners base their argument on the RESTATEMENT § 653, cmt. g, quoted in *Thomas, 596 S.W.2d at 317*, and policy considerations underlying actions for malicious prosecution and defamation.

Comment g describes the circumstances under which a person may **[**17]** be said to have procured a criminal prosecution by influencing a public prosecutor. The comment states:

> A private person who gives to a public official information of another's supposed criminal misconduct, of which the official is ignorant, obviously causes the institution of such subsequent proceedings as the official may begin on his own initiative, but giving the information or even making an accusation of criminal misconduct does not constitute a procurement of the proceedings initiated by the officer if it is left entirely to his discretion to initiate the proceedings or not. When a private person gives to a prosecuting officer information that he believes to be true, and the officer in the exercise of his uncontrolled discretion initiates criminal proceedings based upon that information, the informer is not liable under the rule stated in [§ 653] even though the information proves to be false and his belief was one that a reasonable man would not entertain. The exercise of the officer's discretion makes the initiation of the prosecution his own and protects from liability the person whose information or accusation has led the officer to initiate the proceedings.

**[**18]**

> If, however, the information is known by the giver to be false, an intelligent exercise **[*294]** of the officer's discretion becomes impossible, and a prosecution based upon it is procured by the person giving the false information. In order to charge a private person with responsibility for the initiation of proceedings by a public official, it must therefore appear that his desire to have the proceedings initiated, expressed by direction, request or pressure of any kind, was the determining factor in the official's decision to commence the prosecution, or that the information furnished by him upon which the official acted was known to be false.

Plainly, comment g does not support petitioners' argument. The last sentence states that a person may be liable, not only when he gives information he knows is false to a prosecutor, but also when his conduct is the determining factor in the prosecutor's decision to prosecute. The comment states that a person who provides information which he believes is true but is in fact false is not liable *when* the prosecutor relies upon his own discretion in deciding whether to prosecute. If the prosecutor does not exercise his own **[**19]** discretion, however, the comment indicates that the provider of information has procured a criminal prosecution whether he knew the information to be false or not.

The comment states that an intelligent exercise of discretion is impossible when a prosecutor is provided false information. This is not literally true in all instances. Prosecutors may well suspect that information they receive is unreliable and decide not to initiate criminal proceedings. What is true is that a person who provides false information cannot complain if a prosecutor acts on it; he cannot be heard to contend that the prosecutor should have known better. Such a person has procured the resulting prosecution, regardless of the actions of the prosecutor, and the causation element for malicious prosecution is satisfied. This rule does not assist the Liecks. The jury found that Meszaros did not make full and fair disclosure to investigating officers. This is not the equivalent of a finding that Meszaros made statements he knew were false.

Petitioners have cited no authority from any other jurisdiction which supports their argument, and we are aware of none. They argue that a person would not be liable for defamation **[**20]** of a public official, like Lieck, without proof that statements made were known to be false, and that the same rule should apply in a malicious

prosecution case. Otherwise, they argue, the imposition of civil liability will infringe upon constitutionally guaranteed freedom of speech. We are not persuaded. As we noted above, the conflicting policies underlying malicious prosecution actions must be carefully balanced. The requirements that a person make statements without probable cause and with malice, and the stringent requirement of procurement, are sufficient protection to those cooperating with law enforcement officials.

Accordingly, we conclude that the trial court did not err in refusing to instruct the jury that Meszaros could not be liable for malicious prosecution unless he knew the statements he made to investigators to be false.

V

We turn finally to the question whether Nydia Lieck is entitled to damages for loss of consortium when Lieck suffered no physical injury. Although we have never held that damages for loss of spousal consortium cannot be recovered absent proof of physical injury, the only cases in which we have allowed such damages did involve physical injury. **[**21]** *See Reed Tool Co. v. Copelin, 610 S.W.2d 736 (Tex. 1980)*; *Whittlesey v. Miller, 572 S.W.2d 665 (Tex. 1978)*. Moreover, in *Reagan v. Vaughn, 804 S.W.2d 463, 467 (Tex. 1990)*, we limited recovery of damages for loss of parental consortium to those cases where the parent has sustained "serious, permanent, and disabling" physical injuries. There is no reason to have one rule for parental relationships and another rule for spousal relationships. We are bound by *Reagan* to hold that damages for loss of spousal consortium are not recoverable absent proof of physical injury.

Furthermore, we believe that the conflicting policies underlying malicious prosecution actions require that recovery of damages be limited to the person prosecuted, and should not extend to members of his family. A person who provides information leading to **[*295]** the prosecution of another should not face liability for damages other than to the person prosecuted.

Nydia cites decisions by four intermediate appellate courts in other states which have permitted recovery of consortium damages in malicious prosecution cases without proof of physical injury. *See Minion v. Gaylord's Int'l Corp.,* **[**22]** *541 So. 2d 209 (La. Ct. App. 1989)*; *Rivers v. Ex-Cell-O Corp., 100 Mich. App. 824, 300 N.W.2d 420 (Mich. Ct. App. 1980)*; *Zalewski v. Gallagher, 150 N.J. Super. 360, 375 A.2d 1195 (N.J. Super. Ct. App. Div. 1977)*; *Dunn v. Alabama Oil & Gas Co., 42 Tenn. App. 108, 299 S.W.2d 25 (Tenn. Ct. App. 1956)*. She does not cite a case from any state's highest court, and we are aware of none. We decline to follow these authorities.

Accordingly, we hold that Nydia is not entitled to recover damages for loss of consortium.

* * * *

For the reasons explained, we reverse the judgment of the court of appeals, remand Kenneth Lieck's action against BFI and Meszaros to the trial court for further proceedings, and render judgment that Nydia Lieck take nothing.

Nathan L. Hecht

Justice

Opinion delivered: June 2, 1994



⚠ Caution

As of: September 1, 2015 4:41 PM EDT

# *Cantella & Co. v. Goodwin*

Supreme Court of Texas

June 28, 1996, Delivered

No. 95-0819

**Reporter**

924 S.W.2d 943; 1996 Tex. LEXIS 87; 39 Tex. Sup. J. 856

CANTELLA & CO., INC., RELATOR v. THE HONORABLE GERALD A. GOODWIN, JUDGE, RESPONDENT

**Disposition:** [**1] Mandamus relief conditionally granted.

## Core Terms

arbitration, arbitration provision, arbitration agreement, Securities, mandamus

## Case Summary

**Procedural Posture**

Relator securities broker petitioned for a writ of mandamus, seeking relief from the order of respondent trial court (Texas) denying arbitration of a city's suit against relator arising from a securities transaction.

**Overview**

Relator securities broker entered into an agreement with a city to handle securities transactions. The agreement provided for arbitration between the parties. The arbitration clause stated that arbitration was to be conducted pursuant to the Federal Arbitration Act, *9 U.S.C.S. § 1 et seq.* The city brought suit against relator for fraud and negligence. Relator sought a stay in the suit and compelled arbitration. The trial court denied relator's motion. The court of appeals denied relator's mandamus relief against respondent trial court. The court granted the petition for writ of mandamus, conditionally. It reasoned that because of the document's nature, combined with the legal presumption that a party who signs a contract knows its contents, the city's argument that it did not agree to arbitrate because it did not see the arbitration provision in the agreement was without merit. The arbitration provision was highlighted in capital letters and bold text.

**Outcome**

The court conditionally granted mandamus relief because the parties had entered into a valid arbitration agreement under the Federal Arbitration Act. The court directed the trial court to order that the city's claims against relator proceed to arbitration. The clerk was instructed to issue the writ only if the trial court did not follow its direction.

## LexisNexis® Headnotes

Civil Procedure > ... > Defenses, Demurrers & Objections > Affirmative Defenses > General Overview

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview

Civil Procedure > ... > Arbitration > Federal Arbitration Act > General Overview

Civil Procedure > ... > Arbitration > Federal Arbitration Act > Arbitration Agreements

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Validity of ADR Methods

International Trade Law > Dispute Resolution > International Commercial Arbitration > Arbitration

*HN1* Federal and state law strongly favor arbitration. A presumption exists in favor of agreements to arbitrate under the Federal Arbitration Act, *9 U.S.C.S. § 1 et seq.* Courts must resolve any doubts about an agreement to arbitrate in favor of arbitration.

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview

Civil Procedure > ... > Arbitration > Federal Arbitration Act > General Overview

Civil Procedure > ... > Arbitration > Federal Arbitration Act > Arbitration Agreements

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Mandatory ADR

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Validity of ADR Methods

Contracts Law > Contract Conditions & Provisions > Arbitration Clauses

International Trade Law > Dispute Resolution > International Commercial Arbitration > Arbitration

*HN2* Once a party seeking to compel arbitration establishes that an agreement exists under the Federal Arbitration Act, *9 U.S.C.S. § 1 et seq.*, and that the claims raised are within the agreement's scope, the trial court has no discretion but to compel arbitration and stay its proceedings pending arbitration.

Civil Procedure > ... > Arbitration > Federal Arbitration Act > General Overview

Civil Procedure > Remedies > Writs > General Overview

Civil Procedure > ... > Writs > Common Law Writs > Mandamus

International Trade Law > Dispute Resolution > International Commercial Arbitration > Arbitration

*HN3* A party who is erroneously denied the right to arbitrate under the Federal Arbitration Act, *9 U.S.C.S. § 1 et seq.*, has no adequate remedy at law and mandamus relief is appropriate.

**Counsel:** For RELATOR: Herron, Ms. Carla Powers, Gilman, Mr. James A., Shook Hardy & Bacon, Houston, TX.

For RESPONDENT: King, Mr. Kyle W., Houston, TX. McKinney, Mr. Hugh L., Houston, TX. Henke, Mr. Charles L., Houston, TX. O'Neill, Mr. John E., Clements O'Neill Pierce & Nickens, Houston, TX. Napoli, Mr. Michael, Clements O'Neill Pierce & Nickens, Houston, TX. Flournoy, Mr. Robert L., City Attorney, Lufkin, TX. Tibbs, Mr. Eric, Houston, TX.

# Opinion

[*944]  ON PETITION FOR WRIT OF MANDAMUS

Per Curiam

In this original proceeding, Cantella & Company seeks relief from the trial court's order denying arbitration of the City of Lufkin's suit against Cantella arising from a securities transaction. Because the parties entered into a valid arbitration agreement under the Federal Arbitration Act (the FAA) [1], we conditionally grant mandamus relief.

In 1993, Cantella and the City entered into a "Client's Agreement" whereby Cantella agreed [**2] to handle securities transactions for the City. The agreement has an arbitration clause. It provides that "all controversies which may arise between us. . .shall be determined by arbitration." The agreement further provides that arbitration "shall be conducted pursuant to the Federal Arbitration Act. . . ." Darryl Mayfield, the City's assistant city manager, signed the agreement on the City's behalf, and Atha Stokes, the city secretary, attested to it.

In 1994, the City sued Cantella for fraud, Texas Securities Act violations, negligence and gross negligence. Cantella moved to stay the suit and to compel arbitration. At a hearing on the motion, Cantella proved up the arbitration agreement and that the subject matter involved commerce, thereby bringing the agreement within the FAA's scope. *See Jack B. Anglin Co., Inc. v. Tipps, 842 S.W.2d 266, 269-70 (Tex. 1992)*. Nevertheless, the trial court denied Cantella's motion. The court of appeals denied Cantella mandamus relief.

*HN1* Federal and state law strongly favor arbitration. *See Moses H. Cone Memorial Hosp. v. Mercury Contr. Corp., 460 U.S. 1, 24-25, 74 L. Ed. 2d 765, 103 S. Ct. 927 (1983)*; *Prudential Sec., Inc. v. Marshall* [**3] *, 909 S.W.2d 896, 898 (Tex. 1995)*; *Capital Income Properties-LXXX v. Blackmon, 843 S.W.2d 22, 23 (Tex. 1992)*; *Tipps, 842 S.W.2d at 268*. Indeed, a presumption exists in favor of agreements to arbitrate under the FAA. *Marshall, 909 S.W.2d at 898-99*. Courts must resolve any doubts about an agreement to arbitrate in favor of arbitration. *Marshall, 909 S.W.2d at 899*. A party opposing an arbitration agreement bears the burden of defeating it. *Marshall, 909 S.W.2d at 900*. *HN2* Once a party seeking to compel arbitration establishes that an agreement exists under the FAA, and that the claims raised are within the agreement's scope, the trial court "has no discretion but to compel arbitration and stay its proceedings pending arbitration." *See Shearson Lehman Bros., Inc. v. Kilgore, 871 S.W.2d 925, 928* (Tex. App. -- Corpus Christi 1994, orig. proceeding).

The City argues that it did not agree to arbitrate and, therefore, the courts cannot require it to submit to the process. *See Freis v. Canales, 877 S.W.2d 283, 284 (Tex. 1994)*(holding that a court cannot order arbitration absent an agreement between the parties). Specifically, the City argues that the arbitration [**4] provision was "hidden" on the back of the client's agreement, and consequently, Mayfield did not know about the arbitration provision when he signed the document. Therefore, the City argues that Mayfield did not agree to arbitration on the City's behalf. This argument does not persuade us.

The agreement is a single page with text on both sides. Nothing is "hidden" on the back side of the document. The arbitration provision is quite conspicuous. It is separately numbered and captioned in bold print, "**ARBITRATION**". Also, the entire arbitration provision, unlike other provisions in the agreement, is typed in all capital letters. Because of the document's nature, combined with the legal presumption that a party who signs a contract knows its contents, we reject the City's argument that it did not agree to arbitrate because it did not see the arbitration provision in the agreement. *See Thigpen v. Locke, 363 S.W.2d 247, 253 (Tex. 1962)*; *Kilgore, 871 S.W.2d at 928-29*.

---

[1]  *See 9 U.S.C. § 1 et seq.*

Alternatively, the City asserts that because the arbitration provision does not strictly comply with National Association of Securities Dealers (NASD) rules, the agreement is void. Specifically, the City **[\*\*5]** complains that Cantella did not comply with NASD Manual-Rules of Fair Practice (CCH) **[\*945]** P 2171, Art. III, Sec. 21(f), because: (1) it neglected to place a disclosure statement above the signature line of the agreement, warning of the arbitration provision; (2) it did not highlight the arbitration provision; and, (3) it did not forward a conformed copy of the agreement to the City.

Our review of the document reveals that the arbitration provision is "highlighted" in all capital letters and in bold text. The City's argument that it did not receive a conformed copy of the agreement is based on Mayfield and Stokes' affidavits, stating that they could not find a copy of the agreement in the City's files. Cantella concedes that the agreement does not comply with section 21(f) to the extent that the disclosure warning of arbitration is located at the bottom of the client's agreement instead of being properly placed immediately above the signature line.

The NASD is a private, independent, self-regulating organization. *See Mueske v. Piper, Jaffray & Hopwood, Inc., 260 Mont. 207, 859 P.2d 444, 448-49 (Mont. 1993)*. Under 15 U.S.C. § 78o-3, the Securities and Exchange Commission **[\*\*6]** reviews and approves NASD's rules and procedures. While some NASD rules preclude arbitration for non-compliance, there is no such penalty for non-compliance with section 21(f). Instead, the remedies for a broker's section 21(f) violations are censure, suspension, expulsion, fine and sanctions. *See* NASD Manual-Rules of Fair Practice (CCH) P 2301, Art. V, *Sec. 1*; *Mueske, 859 P.2d at 450* (Nelson, J., dissenting). These remedial remedies are consistent with the strong public policy emphasized by caselaw favoring arbitration agreements between parties. *See Moses H. Cone Memorial Hosp., 460 U.S. at 24-25*; *Tipps, 842 S.W.2d at 268*.

The City relies on two recent cases for the proposition that Cantella's alleged non-compliance with NASD rules, section 21(f), makes the agreement void. *See Nielsen v. Piper, Jaffray & Hopwood, Inc., 66 F.3d 145 (7th Cir. 1995)*; *Mueske, 859 P.2d at 444*. These cases are distinguishable. In both *Nielsen* and *Mueske*, the courts declared the respective arbitration agreements void because the contracts had specific language requiring that arbitration "shall be in accordance with the rules [of] the National Association of Securities **[\*\*7]** Dealers, Inc. [NASD]." *See Nielsen, 66 F.3d at 148*; *Mueske, 859 P.2d at 446*. Because the defendants' contracts in *Nielsen* and *Mueske* violated NASD rules at the same time that they expressly called for NASD rules to apply, the courts declared the arbitration agreements invalid. *See Nielsen, 66 F.3d at 146-47*; *Mueske, 859 P.2d at 450*.

Here, the agreement between Cantella and the City does not require that NASD rules apply. Instead, the agreement specifically provides for arbitration under the FAA. Regardless, if Cantella violated section 21(f), as the City alleges, voiding the agreement is not the appropriate remedy under NASD rules. *See Mueske, 859 P.2d at 450* (Nelson, J., dissenting); *cf. Nielsen, 66 F.3d at 147* (recognizing that new NASD rule did not allow for enforcement of arbitration agreement in class action suit). Accordingly, we reject the City's argument that Cantella should be forced to forego its contractual right to arbitrate because of any non-compliance with section 21(f) of NASD rules.

*HN3* A party who is erroneously denied the right to arbitrate under the FAA has no adequate remedy at law and mandamus relief is appropriate. *Marshall* **[\*\*8]** *, 909 S.W.2d at 900*; *Tipps, 842 S.W.2d at 272-73*. Because Cantella established an agreement to arbitrate with the City under the FAA, we conditionally grant writ of mandamus. *See* TEX. R. APP. P. 122. We direct the trial court to order that the City's claims against Cantella proceed to arbitration. The clerk is instructed to issue the writ only if the trial court does not follow our direction.

OPINION DELIVERED: June 28, 1996



Positive

As of: September 1, 2015 2:34 PM EDT

# Capital Income Properties-LXXX v. Blackmon

Supreme Court of Texas

December 16, 1992, Delivered

NO. D-2848

**Reporter**

843 S.W.2d 22; 1992 Tex. LEXIS 171; 36 Tex. Sup. J. 356

CAPITAL INCOME PROPERTIES-LXXX; CRI, INC.; WILLIAM B. DOCKSER; MARTIN C. SCHWARTZBERG; H. WILLIAM WILLOUGHBY; C.R.C.C. OF CORPUS CHRISTI, LTD.; CRICO-TEXAS GROWTH PARTNERS LIMITED PARTNERSHIP AND CRICO SECURITIES CORPORATION, RELATORS v. THE HONORABLE ROBERT M. BLACKMON, JUDGE, RESPONDENT

**Disposition:** **[\*\*1]** Accordingly, because CIP has shown that a written arbitration agreement exists and that the Plaintiffs' claims fall within the scope of that agreement, without hearing oral argument and pursuant to Texas Rule of Appellate Procedure 122, a majority of the court conditionally grants the writ of mandamus and directs the trial court to order that all claims proceed to arbitration under the Federal Arbitration Act. The clerk is instructed to issue the writ only should the trial court fail to follow our direction.

## Core Terms

arbitration, trial court, mandamus, enforceable, arbitration clause, compel arbitration, partnership, agreement to arbitrate, court of appeals, limited partnership agreement, arbitration agreement, interlocutory appeal, adequate remedy, fiduciary duty, writ petition, state court, inducement, undisputed, commerce, abused, invest

## Case Summary

### Procedural Posture

Relator partnership sought a writ of mandamus against respondent judge of the 117th Judicial District Court of Nueces County, Texas, to direct him to compel arbitration pursuant to the Federal Arbitration Act, *9 U.S.C.S. § 1 et seq.*, in the underlying fraud action between relator and its investors.

### Overview

Investors from several different states brought fraud and other claims against relator partnership and relator requested that respondent judge compel arbitration of the matter pursuant to a valid arbitration clause under the Texas General Arbitration Act, *Tex. Rev. Civ. Stat. Ann. art. 224*, and the Federal Arbitration Act (FAA), *9 U.S.C.S. § 1 et seq.* Respondent found that the claims of the investors were not within the scope of the arbitration clause. On petition for writ of mandamus, the court conditionally granted the writ and found that respondent had abused his discretion when he failed to compel arbitration because the transaction which formed the basis of the underlying suit involved commerce and was, therefore, subject to the FAA.

### Outcome

The court conditionally granted writ of mandamus against respondent judge because he failed to compel arbitration on a valid and enforceable arbitration clause under federal law.

## LexisNexis® Headnotes

Admiralty & Maritime Law > Arbitration > General Overview

Admiralty & Maritime Law > Arbitration > Enforcement of Arbitration

Admiralty & Maritime Law > Maritime Contracts > General Overview

Civil Procedure > ... > Arbitration > Federal Arbitration Act > General Overview

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Mandatory ADR

International Trade Law > Dispute Resolution > International Commercial Arbitration > Arbitration

*HN3* See Federal Arbitration Act, *9 U.S.C.S. § 2*.

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview

Civil Procedure > ... > Arbitration > Federal Arbitration Act > General Overview

Civil Procedure > ... > Arbitration > Federal Arbitration Act > Arbitration Agreements

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Mandatory ADR

Contracts Law > Contract Conditions & Provisions > Arbitration Clauses

International Trade Law > Dispute Resolution > International Commercial Arbitration > Arbitration

*HN1* The Federal Arbitration Act, *9 U.S.C.S. § 1 et seq.*, which applies to transactions "involving commerce," dictates enforcement of an arbitration agreement upon evidence that a written agreement to arbitrate exists and that the claims raised are within the scope of the agreement. The Federal Arbitration Act is part of the substantive law of Texas.

Civil Procedure > ... > Arbitration > Federal Arbitration Act > General Overview

Civil Procedure > ... > Arbitration > Federal Arbitration Act > Arbitration Agreements

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Mandatory ADR

International Trade Law > Dispute Resolution > International Commercial Arbitration > Arbitration

*HN2* A party denied the benefit of an agreement to arbitrate is without an adequate remedy by appeal when pursuing application of the Federal Arbitration Act, *9 U.S.C.S. § 1 et seq.*, in state court, and mandamus is therefore appropriate.

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Mandatory ADR

Contracts Law > Contract Conditions & Provisions > Arbitration Clauses

Contracts Law > Contract Interpretation > Fiduciary Responsibilities

Contracts Law > ... > Affirmative Defenses > Fraud & Misrepresentation > General Overview

Contracts Law > Types of Contracts > Partnership Agreements

Governments > Fiduciaries

International Trade Law > Dispute Resolution > International Commercial Arbitration > Arbitration

*HN4* Deceptive Trade Practice Act claims may be subject to arbitration and the United States Supreme Court has held that a claim of fraud in the inducement unless specifically directed to the making of the arbitration clause does not defeat application of that clause to the agreement as a whole.

**Counsel:** For Judge: Hon. Robert M. Blackmon, JUD 002397000 512/888-0344, 117th District Court, Nueces County Courthouse, 901 Leopard Street, Corpus Christi, TX 78401.

For Relator: Kelly M. Crawford, ATT 005030700 214/953-5400, Herbert, Adams, Crawford & Atwood, 1260 Maxus Energy Tower, 717 N. Harwood Street, Dallas, TX 75201, Mr. C. Kent Adams, ATT 000851050 214/953-2400, Herbert, Adams, Crawford & Atwood, 1260 Maxus Energy Tower, 717 North Harwood, Dallas, TX 75201, Mr. Scott G. Campbell, ATT 214800050 214/808-7740, Kelley, Drye & Warren, 101 Park Avenue, Suite 3229, New York, NY 10178.

Mr. Cary N. Goldberg, ATT 312750460 312/750-4646, Mr. Ronald A. Schy, ATT 312750464 **[**2]** 312/750-4646, Beigel & Sandler, Ltd., 311 South Wacker Drive, Suite 650, Chicago, IL 60606, Mr. Thomas L. Busby, ATT 003491520 512/884-3551, Ms. Kathryn F. Green, ATT 007419100 512/884-3551, Kleberg & Head, P.C., 1200 MBank Center North, 500 North Water Street, Corpus Christi, TX 78471, Mr. Bruce W. Collins, ATT 004604700 214/855-3000, Carrington, Coleman, Sloman & Blumenthal, 200 Crescent Court, Suite 1500, Dallas, TX 75201.

**Opinion by:** PER CURIAM

# Opinion

**[\*22]** ON PETITION FOR WRIT OF MANDAMUS

Per Curiam

Capital Income Properties-LXXX and seven other defendants (collectively CIP) have filed a motion for leave to file a petition for writ of mandamus, requesting that we direct the trial court to compel arbitration of the claims raised by thirty plaintiffs in the underlying suit. Concluding that CIP has established that the trial court abused its discretion in refusing to order arbitration and that CIP does not have an adequate remedy by appeal, we conditionally grant the relief requested. [1]

**[\*\*3]** Plaintiffs, residents of fourteen different states, purchased shares in CIP, a District **[\*23]** of Columbia limited partnership formed to develop and operate a Corpus Christi hotel. Article 12.01 of the limited partnership agreement provided that "any dispute, controversy or claim arising out of or in connection with or relating to this Agreement . . . shall, upon the request of any party involved, be submitted to and settled by arbitration . . . ." Plaintiffs filed suit in 1991, seeking return of their initial investments plus damages based on fraud, breach of fiduciary duty, negligent misrepresentation, and violation of the Deceptive Trade Practices Act. Urging the application of the Texas General Arbitration Act, *TEX. REV. CIV. STAT. ANN. art. 224--236-8* (the Texas Act), and the Federal Arbitration Act, 9 U.S.C. § 1--16 (the Federal Act), CIP requested that the trial court compel arbitration.

---

[1] CIP also filed an application for writ of error from the judgment of the Thirteenth Court of Appeals dismissing CIP's interlocutory appeal for want of jurisdiction. *Capital Income Properties-LXXX v. Waldman*, 835 S.W.2d 152 (Tex. App.--Corpus Christi 1992). The court of appeals held that the arbitration clause was not enforceable under Texas law and that federal law did not permit an interlocutory appeal in state court. That application is denied by separate order.

At the conclusion of a hearing on the motion to compel arbitration, the trial court determined that the agreement to arbitrate was binding and enforceable but that the claims raised were not within the scope of the arbitration clause. CIP's request for mandamus relief from the [**4] Thirteenth Court of Appeals was denied.

After reviewing the mandamus record before us, we conclude that although the trial court correctly concluded that the arbitration clause is valid and enforceable, it abused its discretion in failing to compel arbitration under the Federal Act. [2] We have recently reiterated the strong policy preference for enforcing arbitration clauses. *Jack B. Anglin Co. v. Tipps*, ___ S.W.2d ___ (Tex. 1992) (orig. proceeding). *HN1* The Federal Act, which applies to transactions "involving commerce," dictates enforcement of an arbitration agreement upon evidence that a written agreement to arbitrate exists and that the claims raised are within the scope of the agreement. The Federal Act is part of the substantive law of Texas. *Southland Corp. v. Keating, 465 U.S. 1, 14-16, 79 L. Ed. 2d 1 , 104 S. Ct. 852 (1984)*; *Anglin*, ___ S.W.2d at ___ ; *Batton v. Green, 801 S.W.2d 923, 927* (Tex. App.--Dallas 1990, no writ). In *Anglin* we also concluded that *HN2* a party denied the benefit of an agreement to arbitrate is without an adequate remedy by appeal when pursuing application of the Federal Act in state court, and that mandamus is therefore appropriate. ___ [**5] S.W.2d at ___.

The undisputed facts of this case establish the applicability of the Federal Act: citizens from a number of different states have purchased interests from a business entity in one state for the purpose of carrying out a commercial venture in another state. *See Prima Paint v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 401, 18 L. Ed. 2d 1270, 87 S. Ct. 1801 n.7 (1967); *Mesa Operating Ltd. Partnership v. Louisiana Intrastate Gas Corp., 797 F.2d 238, 243 (5th Cir. 1986)*; *Lost Creek Util. v. Travis Indep. Painter, 827 S.W.2d 103, 105* (Tex. App.--Austin 1992, writ denied).

It is also undisputed [**6] that the Plaintiffs claim that CIP breached its fiduciary duty to them in operating and managing the partnership, in repeatedly misrepresenting the financial health of the operation, and in fraudulently inducing them to invest in the partnership. These claims arise out of and relate to the limited partnership agreement. In *Anglin* we held that *HN4* Deceptive Trade Practice Act claims may be subject to arbitration, ___ S.W.2d at ___, and the United States Supreme Court has held that a claim of fraud in the inducement unless specifically directed to the making of the arbitration clause does not defeat application of that clause to the agreement as a whole. *Prima Paint Corp.* 388 U.S. at 406; *Mesa Operating 797 F.2d at 244*.

[*24] Accordingly, because CIP has shown that a written arbitration agreement exists and that the Plaintiffs' claims fall within the scope of that agreement, without hearing oral argument and pursuant to Texas Rule of Appellate Procedure 122, a majority of the court conditionally grants the writ of mandamus and directs the trial court to order that all claims proceed to arbitration under the Federal Arbitration Act. The clerk is instructed to issue the [**7] writ only should the trial court fail to follow our direction.

OPINION DELIVERED: December 16, 1992

---

[2] *HN3* Section 2 of the Federal Act provides that:

> a written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.



⚠ Caution

As of: September 1, 2015 5:04 PM EDT

## *Coker v. Coker*

Supreme Court of Texas

May 4, 1983

No. C-1728

**Reporter**

650 S.W.2d 391; 1983 Tex. LEXIS 295; 26 Tex. Sup. J. 368

MAC L. COKER, JR., Petitioner v. FRANCES KINCAID COKER, Respondent

**Subsequent History:** **[\*\*1]** Rehearing Denied June 8, 1983.

**Prior History:** From Dallas County Fifth District.

## Core Terms

commissions, ambiguous, parties, divorce decree, guaranteed, provisions, property settlement agreement, accounts receivable, court of appeals, trial court, purchaser, assigned, guaranty, default, seller, separate property, agree to pay, construe, ranch

## Case Summary

### Procedural Posture

Petitioner former husband sought review of the decision of the Fifth District Court of Appeals, Dallas County (Texas), which affirmed the trial court's decision that a part of a property settlement agreement was one of guaranty and rendered summary judgment that respondent former wife recover additional funds from petitioner.

### Overview

Respondent wife brought an action against petitioner husband when commission payments she was receiving stopped being paid, claiming that she was entitled to receive payment of $ 25,000. Paragraph five of the property settlement gave respondent the right to commissions payable to petitioner being approximately $ 25,000. Paragraph eight provided that petitioner guaranteed that respondent would receive up to $ 25,000 or he would not interfere with the payments. The trial court granted summary judgment to respondent, holding that the agreement was a guaranty. The court of appeals affirmed. The court reversed, holding that the agreement, as it pertained to paragraphs five and eight, was ambiguous and that the trial court erred by granting summary judgment. The court found that paragraph eight could be construed as a guaranty or a promise not to interfere with the payments. The court could not say that petitioner promised to pay respondent the money regardless of the payment of the commission. Thus, paragraph five would be surplusage and the court would not construe the agreement to render part of it meaningless. The court remanded for the trier of fact to resolve the ambiguity.

### Outcome

The court reversed the decision holding that the paragraphs five and eight of the settlement agreement between petitioner husband and respondent wife were ambiguous as to whether respondent was entitled to commission payment made to petitioner, which ceased to be made, required petitioner to pay the difference up to $ 25,000.

## LexisNexis® Headnotes

Contracts Law > Contract Interpretation > General Overview

*HN1* In construing a written contract, the primary concern of the court is to ascertain the true intentions of the parties as expressed in the instrument. To achieve this objective, courts should examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless. No single provision taken alone will be given controlling effect; rather, all the provisions must be considered with reference to the whole instrument. In harmonizing these provisions, terms stated earlier in an agreement must be favored over subsequent terms.

Civil Procedure > Trials > Jury Trials > Province of Court & Jury

Contracts Law > Contract Interpretation > Ambiguities & Contra Proferentem > General Overview

Contracts Law > Defenses > General Overview

Contracts Law > Defenses > Ambiguities & Mistakes > General Overview

Contracts Law > Formation of Contracts > Mistake > General Overview

*HN2* If the written instrument is so worded that it can be given a certain or definite legal meaning or interpretation, then it is not ambiguous and the court will construe the contract as a matter of law. A contract, however, is ambiguous when its meaning is uncertain and doubtful or it is reasonably susceptible to more than one meaning. Whether a contract is ambiguous is a question of law for the court to decide by looking at the contract as a whole in light of the circumstances present when the contract was entered. When a contract contains an ambiguity, the granting of a motion for summary judgment is improper because the interpretation of the instrument becomes a fact issue.

Contracts Law > Contract Interpretation > General Overview

Contracts Law > Types of Contracts > Guaranty Contracts

*HN4* A guarantor is entitled to have his agreement strictly construed so that it is limited to his undertakings, and it will not be extended by construction or implication. Where uncertainty exists as to the meaning of a contract of guaranty, its terms should be given a construction which is most favorable to the guarantor.

Contracts Law > Contract Interpretation > General Overview

Energy & Utilities Law > Oil & Petroleum Products > Franchising & Marketing

*HN3* Courts must favor an interpretation that affords some consequence to each part of the instrument so that none of the provisions will be rendered meaningless.

**Counsel:** Emil Lippe, Dallas, Texas, for Petitioner.

Bill Neal, Vernon, Texas, for Respondent.

**Judges:** Charles W. Barrow, Justice. Franklin Spears, Justice.

**Opinion by:** BARROW

## Opinion

 [*392]  This suit was brought by Frances Kincaid Coker (Frances) against her former husband, Mac L. Coker, Jr. (Mac), on a property settlement agreement incorporated into their divorce decree. The decree awarded Frances a real estate commission previously earned by Mac from the sale of certain ranch property. The seller of the property was to pay the commission in seven annual installments as payments were made by the purchaser. After Frances received payments totaling $14,317.16, the purchaser defaulted and no further commissions were receivable. The question presented here is whether Mac agreed to pay Frances a minimum of $25,000 or whether Frances was assigned all of Mac's interest in the commissions to be paid by the seller in this particular transaction.

Both parties asserted that the property settlement agreement was unambiguous and each moved for a favorable summary judgment. The trial court construed the agreement **[**2]**  as one of guaranty and rendered summary judgment that Frances recover the sum of $10,682.84 from Mac. The court of appeals affirmed in an unpublished opinion. TEX. R. CIV. P. 452. We reverse the judgments of the courts below and remand the cause to the trial court.

The parties were divorced on September 24, 1971 after being married about ten years. They had accumulated community property consisting of a 1969 Buick automobile, two Dallas Cowboy seat options, unpaid real estate commissions earned by Mac while employed as a broker for the real estate firm of Majors & Majors and certain personal effects. The parties entered into a property settlement agreement which was approved by the trial court and incorporated into the divorce decree. The decree provides in relevant part:

> IT IS THEREFORE FURTHER ORDERED, ADJUDGED AND DECREED that Petitioner Frances Kincaid Coker have and she hereby is awarded as her sole and separate property one 1969 Buick automobile, Serial No. *4443792127816*, all household goods and personal possessions now in her possession or located at her place of residence, one Texas Stadium Bond along with season ticket sold in connection therewith, *and those* **[**3]**  *certain commissions and accounts receivable heretofore earned by husband during his employment with the firm of Majors and Majors in connection with the sale of the "Jinkens Ranch property in Tarrant County, Texas";* that Respondent have and he hereby is awarded as his sole and separate property one Texas Stadium Bond along with season ticket sold in connection therewith, all personal effects in his possession and those certain commissions or accounts receivable owing to him from Majors and Majors being the monthly commissions on leases negotiated while Respondent was in the employment of Majors and Majors. (emphasis added).

The property settlement agreement provides in part:

> 5. Wife shall receive as her sole and separate property, free and clear of any claim, right or title of husband, the following described property: one 1969 Buick automobile, serial no. *4443792127816*, all household goods and personal possessions now in the wife's possession or located at her place of residence, (except that the husband shall receive one bedroom suite now located in Crowell, Texas), and one Texas Stadium bond, free of all indebtedness, along with the season ticket sold in **[**4]**  connection therewith. *The wife shall further have* as her sole and separate property, free and clear  [*393]  of all claim, right or title asserted by husband, *that certain right, commission or account receivable heretofore earned by husband during his employment with the firm of Majors & Majors in connection with the sale of the "Jinkens ranch property in Tarrant County, Texas,"* such future commission or account receivable being in the approximate sum of $25,000.00.

\* \* \* \*

8. Husband represents and warrants to the wife that, to the best of his knowledge, approximately $25,000.00 remains due and owing to him as his portion of commissions earned in connection with the sale of the "Jinkens property in Tarrant County, Texas," and he hereby guarantees to wife that she will receive the said sum of $25,000.00, from Majors & Majors, or from any other payor of such commissions receivable. *Such commission is payable to her as payments are made by purchasers to sellers*, and will normally be received by her through the office of Majors & Majors. In the event, for any reason she fails to receive such installments of commission exactly as husband would have prior to his assignment **[\*\*5]** of his rights thereto to wife, *husband agrees to pay to wife in Dallas County, Texas all such sums of money, which she has failed to receive, up to the guaranteed sum of $25,000.00*. (emphasis added).

The parties thereby agreed that Mac would keep his rights to the monthly commissions earned on leases he had negotiated and Frances would be assigned the commission earned by Mac from the sale of the "Jinkens ranch property in Tarrant County." Prior to the divorce, Mac had participated in the sale of the Jinkens ranch whereby he would receive 40% of the sales commission payable by the seller to Majors & Majors over a seven year period contingent on the annual payments being made by the purchaser. In 1976, however, the purchaser defaulted and according to the terms of the sales contract, the seller was not required to continue payments of the commission. Therefore, Mac's rights in the commission were terminated.

Frances admitted that she had received all the commission payable to Mac prior to default, but she contends that under the property settlement agreement she was to receive a minimum of $25,000. The trial court and the court of appeals agreed with Frances. We must attempt **[\*\*6]** to construe this contract and determine the intent of the parties as shown by the written instruments.

*HN1* In construing a written contract, the primary concern of the court is to ascertain the true intentions of the parties as expressed in the instrument. *R & P Enterprises v. LaGuarta, Gavrel & Kirk, Inc., 596 S.W.2d 517, 518 (Tex. 1980)*; *City of Pinehurst v. Spooner Addition Water Co.*, 432 S.W.2d 515, 518 (Tex. 1968). To achieve this objective, courts should examine and consider *the entire writing* in an effort to harmonize and give effect to *all the provisions* of the contract so that none will be rendered meaningless. *Universal C.I.T. Credit Corp. v. Daniel*, 150 Tex. 513, 243 S.W.2d 154, 158 (1951). No single provision taken alone will be given controlling effect; rather, all the provisions must be considered with reference to the whole instrument. *Myers v. Gulf Coast Minerals Management Corp., 361 S.W.2d 193, 196 (Tex. 1962)*; *Citizens Nat'l Bank in Abilene v. Texas & P. Ry. Co., 136 Tex. 333, 150 S.W.2d 1003, 1006 (1941)*. In harmonizing these provisions, terms stated earlier in an agreement must be favored over subsequent terms. **[\*\*7]** *Ogden v. Dickinson State Bank, 26 Tex. Sup. Ct. J. 200, 202 (Jan. 26, 1983)* .

*HN2* If the written instrument is so worded that it can be given a certain or definite legal meaning or interpretation, then it is not ambiguous and the court will construe the contract as a matter of law. *Universal C.I.T. Credit Corp.*, 243 S.W.2d at 157; *R & P Enterprises, 596 S.W.2d at 519*. A contract, however, is ambiguous when its meaning is uncertain and doubtful or it is reasonably susceptible to more than one meaning. *Skelly Oil Co. v. Archer*, 163 Tex. 336, **[\*394]** *356 S.W.2d 774, 778 (1962)*. Whether a contract is ambiguous is a question of law for the court to decide by looking at the contract as a whole in light of the circumstances present when the contract was entered. *R & P Enterprises, 596 S.W.2d at 518*. When a contract contains an ambiguity, the granting of a motion for summary judgment is improper because the interpretation of the instrument becomes a fact issue. *See Harris v. Rowe, 593 S.W.2d 303, 306 (Tex. 1980)*.

The court of appeals determined that Mac had absolutely guaranteed the payment of $25,000 to Frances. Although the court of appeals recognized that the liability **[\*\*8]** of a guarantor is generally measured by the

liability of the principal, it held that paragraph 8 of the settlement agreement created a broader obligation than the commission sales agreement. This interpretation conflicts with paragraph 5 of the agreement and the language used in the divorce decree.

According to the rules of construction, paragraph 8 must be considered along with paragraph 5 and the underlying circumstances to ascertain the true intention of the parties. *See City of Pinehurst*, 432 S.W.2d at 518, 519. The court of appeals failed to fully consider paragraph 5 of the agreement which clearly states that Mac only assigned that "certain right, commission or account receivable heretofore earned by husband." Also, the language of the divorce decree supports an interpretation only assigning Mac's interest in the commission.

When the language in paragraph 8 is considered alone and particularly the last sentence thereof, the meaning is unclear. The provision could be construed as a guarantee by Mac that Frances would receive $25,000 or merely a promise that he would not interfere with the payments made by Majors & Majors to her after they received the commission from **[**9]** the seller. If we construe the agreement as a contract of guaranty, any uncertainty must be resolved in favor of Mac as guarantor. [1] Even if we conclude the rules of guaranty do not apply, we could not say with certainty that Mac promised to pay Frances $25,000 regardless of the payment of the commission. Such an interpretation would render the provisions in the divorce decree and paragraph 5 relating to the assignment of the commission surplusage. **HN3** Courts must favor an interpretation that affords some consequence to each part of the instrument so that none of the provisions will be rendered meaningless. *See Odgen, 26 Tex. Sup. Ct. J. at 202*; *Portland Gasoline Co. v. Superior Marketing Co., 150 Tex. 533, 243 S.W.2d 823, 824 (1951)*.

**[**10]** The divorce decree and paragraph 5 state what interest is assigned to Frances. Unless paragraph 8 is construed to merely set out the manner in which Frances would receive the annual payments, this paragraph conflicts with paragraph 5 and the divorce decree. This conflict creates an ambiguity as to the intent of the parties as expressed in the written agreement and the decree.

The court of appeals held the provisions of the property settlement agreement unambiguously required Mac to pay Frances $25,000 regardless of whether the commissions were in fact paid by the purchaser. This construction conflicts with paragraph 5 as well as the divorce decree. Therefore, this agreement is ambiguous and the trial court erred in granting summary judgment. The trier of fact must resolve the ambiguity **[*395]** by determining the true intent of the parties. *Trinity Universal Ins. Co. v. Ponsford Bros., 423 S.W.2d 571, 575 (Tex. 1968)*.

We reverse the judgments of the courts below and remand the cause to the trial court.

**Dissent by:** SPEARS

# Dissent

Franklin Spears, Justice

I respectfully dissent.

---

[1] **HN4** A guarantor is entitled to have his agreement strictly construed so that it is limited to his undertakings, and it will not be extended by construction or implication. *Reece v. First State Bank of Denton*, 566 S.W.2d 296, 297 (Tex. 1978); *McKnight v. Virginia Mirror Co.*, 463 S.W.2d 428, 430 (Tex. 1971); *Southwest Savings Association v. Dunagan*, 392 S.W.2d 761, 766 (Tex. Civ. App. -- Dallas 1965, writ ref'd n.r.e.). Where uncertainty exists as to the meaning of a contract of guaranty, its terms should be given a construction which is most favorable to the guarantor. *Commerce Savings Assoc. v. GGE Management Co.*, 539 S.W.2d 71, 78 (Tex. Civ. App. -- Houston [1st Dist.] 1976) *modified and affirmed with per curiam*, 543 S.W.2d 862 (Tex. 1976); *Walter E. Heller & Co. v. Allen*, 412 S.W.2d 712, 721 (Tex. Civ. App. -- Tyler 1967, writ ref'd n.r.e.).

I do not believe that the property settlement agreement entered into by the Cokers is ambiguous. **[\*\*11]** If a written instrument can be given a definite interpretation, it is not ambiguous and the court will construe the contract as a matter of law. *R & P Enterprises v. La Guarta, Gavrel & Kirk, Inc., 596 S.W.2d 517, 518 (Tex. 1980)*.

The majority correctly states that the primary objective in the interpretation of contracts is to give effect to the intentions of the parties as expressed in the instrument. *R & P Enterprises v. La Guarta, Gavrel & Kirk, Inc., 596 S.W.2d at 518*; *Citizens National Bank in Abilene v. Texas & P. Ry. Co., 136 Tex. 333, 150 S.W.2d 1003, 1006 (1944)*. Also, the court must consider the entire instrument so that none of the provisions will be rendered meaningless. *R & P Enterprises, 596 S.W.2d at 519*; *Myers v. Gulf Coast Minerals Management Corp., 361 S.W.2d 193, 196 (Tex. 1962)*.

By applying these rules of construction and looking at the contract as a whole, we see the clear, unambiguous meaning of the words used. It is obvious to me that Frances was to receive a minimum of $25,000. The divorce decree awarded her "those certain commissions and accounts receivable *heretofore earned* by husband . . . ." (emphasis added). Paragraph **[\*\*12]** five of the property settlement provides that Frances shall have as her separate property "that certain right, commission or account receivable *heretofore earned* by husband . . . ." (emphasis added).

In the first sentence of paragraph eight, Mac unconditionally represented and warranted that the "Jinkins property" commission was due and owing to him. He then assigned the commission to Frances and "guaranteed" receipt by her of $25,000. While it is true that the payments of the commission were due only so long as payments on the purchase of the property were made, and upon default no commission would be paid, this limitation is not incorporated in nor alluded to in the agreement setting forth his obligation to pay his wife the $25,000. In fact, the agreement is quite to the contrary.

The third sentence of paragraph eight provides:

> "In the event, *for any reason* she fails to receive such installments of commission *exactly as Husband would have prior to this assignment* of his rights thereto to Wife, Husband agrees to pay Wife in Dallas County, Texas all such sums of money, which she has failed to receive, *up to the guaranteed sum* of $25,000.00." (emphasis added).

 **[\*\*13]**

When this statement is construed with the other provisions of the agreement it is clear that Mac *guaranteed* that Frances would receive $25,000 regardless of what might happen to the commission. The sentence is a directional provision indicating when and how she is to receive the payments. No other provision in the contract pointed to by the majority negates this guarantee; rather, all other provisions are consistent with it. Mac "warranted" the commission was due him and he "guaranteed" the sum of $25,000 would be paid to his ex-wife. In other words, Mac guaranteed that Frances would receive approximately $25,000 from Majors & Majors or any other payor. He further promised that if she failed to receive these payments as he would have prior to assignment directly from the third party payors, he would pay the balance up to $25,000.

Mac's guarantee is unqualified and expresses no other condition for its enforceability than default of performance by the principal obligor. It should be treated, therefore, as the guaranty of payment that it is. An unconditional guaranty for payment becomes a primary obligation upon **[\*396]** default. *See Ferguson v. McCarrell*, 588 S.W.2d 895 (Tex. 1979); **[\*\*14]** *Universal Metals & Machinery, Inc. v. Bohart, 539 S.W.2d 874, 877 (Tex. 1976)*.

The majority curiously finds ambiguity in the words "guarantee," "for any reason," "agrees to pay wife," "all such sums of money which she failed to receive," and "up to the guaranteed sum of $25,000." No draftsman could have made it any plainer. The finding of an ambiguity in this language, which is neither negated nor qualified elsewhere in the contract, expressly or impliedly, is without justification.

I would, therefore, affirm the judgment of the court of appeals, and hold that Mac agreed to pay Frances the $25,000, and that she is entitled to recover the balance of $10,682.84 from him.



Positive

As of: September 1, 2015 5:25 PM EDT

## *Consorcio Rive, S.A. de C.V. v. Briggs of Cancun, Inc.*

United States District Court for the Eastern District of Louisiana

March 13, 2001, Decided ; March 14, 2001, Filed, Entered

CIVIL ACTION NO: 99-2204 SECTION: ″J″(1)

**Reporter**

134 F. Supp. 2d 789; 2001 U.S. Dist. LEXIS 2939

CONSORCIO RIVE, S.A. DE C.V. VERSUS BRIGGS OF CANCUN, INC., ET AL

**Disposition:** **[**1]** Court Ordered that the Mexican arbitration award dated June 24, 1998 and it recognized and enforced against Briggs of Cancun, Inc. in all respects.

## Core Terms

arbitration, parties, arbitration award, arrest, notice, requires, attend, awards, arbitration proceeding, conclusions of law, issues

## Case Summary

**Procedural Posture**

Following plaintiff's foreign arbitration award, the instant court held a two-day trial after another judge had granted a motion to reconsider his prior order to dismiss defendant's counterclaim on the issue of plaintiff's waiver of arbitration.

**Overview**

Following a breach of a contract to build a restaurant in Cancun, plaintiff sought arbitration under the terms of the contract. Plaintiff received a foreign judgment and sought to enforce it pursuant to the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, *9 U.S.C.S. § 201 et seq.* The award was recognized and enforced against defendant. It had been made subject to a treaty which had been incorporated into United Statute. Therefore, it was the highest law of the land. The court rejected defendant's argument that plaintiff had waived its right to arbitration when it filed a criminal statement of facts. The court found this was not a substantial invocation of the judicial process by which defendant was prejudiced. The court also rejected defendant's argument that it had been denied due process because it had failed to attend the arbitration proceeding for fear of the arrest of one its officials. The court found that defendant had participated when it filed documents with the arbitrator and could have attended via telephone or an attorney.

**Outcome**

The foreign arbitration award was recognized and enforced against defendant. Plaintiff's filing of a criminal statement of facts did not constitute waiver of arbitration. Defendant's due process rights were not violated when it chose not to attend the arbitration process.

# LexisNexis® Headnotes

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > Foreign Arbitral Awards

International Law > Dispute Resolution > Arbitration & Mediation > General Overview

International Trade Law > Dispute Resolution > International Commercial Arbitration > Arbitration

International Trade Law > Dispute Resolution > International Commercial Arbitration

*HN1* The Convention on the Recognition and Enforcement of Foreign Arbitral Awards is codified at *9 U.S.C.S. § 201 et seq.*

International Law > Treaty Formation > General Overview

International Law > Treaty Formation > Treaty Negotiations

International Law > Treaty Interpretation > General Overview

*HN2* When a convention is negotiated pursuant to the treaty power set forth in the U.S. Constitution, and the United States Congress passes enabling legislation to make the convention the highest law of the land, the convention must be enforced over all prior inconsistent rules of law.

Civil Procedure > ... > Jurisdiction > Subject Matter Jurisdiction > General Overview

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > Foreign Arbitral Awards

International Law > Dispute Resolution > Arbitration & Mediation > General Overview

International Law > Dispute Resolution > Conflict of Law > General Overview

International Trade Law > Dispute Resolution > International Commercial Arbitration > Arbitration

International Trade Law > Dispute Resolution > International Commercial Arbitration

*HN3* An action or proceeding falling under the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, *9 U.S.C.S. § 201 et seq.*, is deemed to arise under the laws and treaties of the United States. *9 U.S.C.S. § 203*.

Civil Procedure > ... > Jurisdiction > Jurisdictional Sources > General Overview

Civil Procedure > ... > Jurisdiction > Subject Matter Jurisdiction > General Overview

Civil Procedure > ... > Subject Matter Jurisdiction > Jurisdiction Over Actions > General Overview

Civil Procedure > Preliminary Considerations > Venue > General Overview

Civil Procedure > Preliminary Considerations > Venue > Individual Defendants

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview

Civil Procedure > ... > Arbitration > Federal Arbitration Act > General Overview

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > Foreign Arbitral Awards

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Validity of ADR Methods

Contracts Law > Contract Conditions & Provisions > Arbitration Clauses

International Trade Law > Dispute Resolution > International Commercial Arbitration > Arbitration

International Trade Law > Dispute Resolution > International Commercial Arbitration

*HN4* Federal district courts have original jurisdiction over an action or proceeding arising under the laws and treaties of the United States, and venue is proper in any district in which, save for the arbitration agreement, an action or proceeding with respect to the controversy between the parties could be brought, or in such district which embraces the place designated in the agreement as the place of arbitration if such place is within the United States. *9 U.S.C.S. § 204*.

> Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > Foreign Arbitral Awards
>
> International Law > Dispute Resolution > Arbitration & Mediation > General Overview
>
> International Trade Law > Dispute Resolution > International Commercial Arbitration > Arbitration
>
> International Trade Law > Dispute Resolution > International Commercial Arbitration

*HN5* See *9 U.S.C.S. § 202*.

> Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > Foreign Arbitral Awards
>
> International Law > Dispute Resolution > Arbitration & Mediation > General Overview
>
> International Trade Law > Dispute Resolution > International Commercial Arbitration > Arbitration
>
> International Trade Law > Dispute Resolution > International Commercial Arbitration

*HN6* See *9 U.S.C.S. § 201*.

> Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview
>
> Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > Foreign Arbitral Awards
>
> Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Judicial Review
>
> Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Validity of ADR Methods
>
> Contracts Law > Formation of Contracts > Capacities of Parties > General Overview
>
> International Law > Dispute Resolution > Arbitration & Mediation > General Overview
>
> International Law > Dispute Resolution > Arbitration & Mediation > Arbitration Awards
>
> International Trade Law > Dispute Resolution > International Commercial Arbitration > Arbitration
>
> International Trade Law > Dispute Resolution > International Commercial Arbitration

*HN7* Awards of foreign arbitrators that fall under the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, *9 U.S.C.S. § 201 et seq.*, are to be enforced by U.S. courts just as easily as domestic arbitral awards. The Convention requires a U.S. court to treat a foreign arbitral award as it would a domestic award, subject to limited defenses, including incapacity of a party, illegality of the agreement, lack of due process, an award outside the scope of arbitration, an improper arbitration panel, or when the arbitration award has been vacated or is not final.

> Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > Foreign Arbitral Awards
>
> Evidence > Authentication > General Overview
>
> International Law > Dispute Resolution > Arbitration & Mediation > General Overview
>
> International Law > Dispute Resolution > Arbitration & Mediation > Arbitration Awards
>
> International Trade Law > Dispute Resolution > International Commercial Arbitration > Arbitration
>
> International Trade Law > Dispute Resolution > International Commercial Arbitration

*HN8* Article IV of the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, *9 U.S.C.S. § 201 et seq.*, provides the procedure for enforcing arbitral awards and reads, in part, that to obtain the recognition and enforcement mentioned in the preceding article, the party applying for recognition and enforcement shall, at the time of the application, supply: (a) The duly authenticated original award or a duly certified copy thereof; (b) The original agreement referred to in article II or a duly certified copy thereof.

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > Foreign Arbitral Awards

Contracts Law > Contract Conditions & Provisions > Arbitration Clauses

International Law > Dispute Resolution > Arbitration & Mediation > General Overview

International Law > Dispute Resolution > Arbitration & Mediation > Agreements

International Trade Law > Dispute Resolution > International Commercial Arbitration > Arbitration

International Trade Law > Dispute Resolution > International Commercial Arbitration

*HN9* Article II of the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, *9 U.S.C.S. § 201 et seq.*, requires that there be an agreement in writing under which the parties agree to submit to arbitration all or any differences which have arisen or may arise between them in respect of a defined legal relationship, whether contractual or not, concerning a subject matter capable of settlement by arbitration. The term agreement in writing includes an arbitral clause in a contract or an arbitration agreement, signed by the parties or contained in an exchange of letters or telegrams.

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > Foreign Arbitral Awards

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Judicial Review

International Law > Dispute Resolution > Arbitration & Mediation > General Overview

International Law > Dispute Resolution > Arbitration & Mediation > Arbitration Awards

International Trade Law > Dispute Resolution > International Commercial Arbitration > Arbitration

International Trade Law > Dispute Resolution > International Commercial Arbitration

*HN10* Under the terms of the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, *9 U.S.C.S. § 201 et seq.*, and the enabling federal statute, a federal court has the authority to recognize and enforce an arbitral award.

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > Foreign Arbitral Awards

International Law > Dispute Resolution > Arbitration & Mediation > General Overview

International Trade Law > Dispute Resolution > International Commercial Arbitration > Arbitration

International Trade Law > Dispute Resolution > International Commercial Arbitration

*HN11* The Convention on the Recognition and Enforcement of Foreign Arbitral Awards, *9 U.S.C.S. § 201 et seq.*, clearly shifts the burden of proof to the party defending against enforcement and limits his defenses to the seven set forth in Article V of the Convention.

International Law > Dispute Resolution > Arbitration & Mediation > General Overview

International Trade Law > Dispute Resolution > International Commercial Arbitration > Arbitration

International Trade Law > Dispute Resolution > International Commercial Arbitration

**HN12** See *9 U.S.C.S. § 201*.

> Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > Foreign Arbitral Awards
>
> Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > Waiver
>
> International Law > Dispute Resolution > Arbitration & Mediation > General Overview
>
> International Law > Dispute Resolution > Arbitration & Mediation > Arbitration Awards
>
> International Trade Law > Dispute Resolution > International Commercial Arbitration > Arbitration
>
> International Trade Law > Dispute Resolution > International Commercial Arbitration

**HN13** According to the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, *9 U.S.C.S. § 201 et seq.*, and repeated federal decisions in the federal circuits, the only available defenses to an action to enforce a foreign arbitral award are found at *9 U.S.C.S. § 201*.

> Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > Foreign Arbitral Awards
>
> Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > Waiver
>
> Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Judicial Review
>
> International Law > Dispute Resolution > Arbitration & Mediation > General Overview
>
> International Law > Dispute Resolution > Arbitration & Mediation > Arbitration Awards
>
> International Trade Law > Dispute Resolution > International Commercial Arbitration > Arbitration
>
> International Trade Law > Dispute Resolution > International Commercial Arbitration

**HN14** Waiver of the right to arbitrate is not among the seven defenses to enforcement of a foreign arbitral award set forth in the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, *9 U.S.C.S § 201 et seq.*

> Civil Procedure > ... > Defenses, Demurrers & Objections > Affirmative Defenses > General Overview
>
> Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > Foreign Arbitral Awards
>
> International Law > Dispute Resolution > Arbitration & Mediation > General Overview
>
> International Trade Law > Dispute Resolution > International Commercial Arbitration > Arbitration
>
> International Trade Law > Dispute Resolution > International Commercial Arbitration

**HN15** Even if defendant's waiver defense is not precluded by the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, *9 U.S.C.S. § 201 et seq.*, in the United Stated Fifth Circuit, waiver will be found when the party seeking arbitration substantially invokes the judicial process to the detriment or prejudice of the other party. Thus, waiver, if permissible at all, requires both requires both a substantial invocation of the judicial process and either detriment or prejudice to the other party.

> Civil Procedure > ... > Responses > Defenses, Demurrers & Objections > Waiver & Preservation of Defenses
>
> Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview
>
> Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > Arbitrability
>
> Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Validity of ADR Methods

*HN16* Waiver of arbitration is not a favored finding, and there is a presumption against it. Any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract itself or an allegation of waiver, delay, or a like defense to arbitrability.

Civil Procedure > ... > Defenses, Demurrers & Objections > Affirmative Defenses > General Overview

Civil Procedure > ... > Pleadings > Counterclaims > General Overview

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Judicial Review

Civil Procedure > Pretrial Matters > Continuances

*HN17* In the context of waiver of arbitration and considering what amounts to a substantial invocation of the judicial process, federal courts have required active participation in a lawsuit or some other type of act inconsistent with the desire to arbitrate. Actions constituting waiver may include, inter alia, some combination of filing an answer, setting up a counterclaim, pursuing discovery, and moving for a continuance prior to moving for a stay pending arbitration.

Civil Procedure > ... > Defenses, Demurrers & Objections > Affirmative Defenses > General Overview

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Validity of ADR Methods

*HN18* With respect to prejudice, when one party reveals a disinclination to resort to arbitration on any phase of suit involving all parties, those parties are prejudiced by being forced to bear the expenses of a trial. Arbitration is designed to avoid this very expense. Substantially invoking the litigation machinery qualifies as the kind of prejudice that is the essence of waiver. Merely initiating litigation, without more, does not effect a waiver because no actual prejudice results from that isolated action.

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > Foreign Arbitral Awards

Constitutional Law > ... > Fundamental Rights > Procedural Due Process > Scope of Protection

International Law > Dispute Resolution > Arbitration & Mediation > General Overview

International Law > Dispute Resolution > Arbitration & Mediation > Arbitration Awards

International Trade Law > Dispute Resolution > International Commercial Arbitration > Arbitration

International Trade Law > Dispute Resolution > International Commercial Arbitration

*HN19* Article V(1)(b) of the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, *9 U.S.C.S. § 201 et seq.*, states that a foreign arbitration award can be refused confirmation where a party lacked notice or was otherwise unable to present his case. *9 U.S.C.S. § 201*. This defense basically corresponds to the due process defense that a party was not given the opportunity to be heard at a meaningful time and in a meaningful manner.

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > Foreign Arbitral Awards

International Law > Dispute Resolution > Arbitration & Mediation > General Overview

International Trade Law > Dispute Resolution > International Commercial Arbitration > Arbitration

International Trade Law > Dispute Resolution > International Commercial Arbitration

*HN20* The due process guarantee incorporated in article V(1)(b) of the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, *9 U.S.C.S. § 201 et seq.*, requires that an arbitrator must provide a fundamentally fair hearing. A fundamentally fair hearing is one that meets the minimal requirements of fairness, adequate notice, a hearing on the evidence, and an impartial decision by the arbitrator. Parties that have chosen to remedy their disputes through arbitration rather than litigation should not expect the same procedures they would find in the judicial arena. Essentially, in exchange for the convenience and other benefits obtained through arbitration, parties lose the right to seek redress from the court for all but the most exceptional errors at arbitration.

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > Foreign Arbitral Awards

Governments > Legislation > Interpretation

International Law > Dispute Resolution > Arbitration & Mediation > General Overview

International Law > Dispute Resolution > Arbitration & Mediation > Arbitration Awards

International Trade Law > Dispute Resolution > International Commercial Arbitration > Arbitration

International Trade Law > Dispute Resolution > International Commercial Arbitration

*HN21* Consistent with the federal policy of encouraging arbitration and enforcing arbitration awards, the defense that a party was unable to present its case raised pursuant to article V(1)(b) of the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, *9 U.S.C.S. § 201 et seq.*, is narrowly construed.

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview

Criminal Law & Procedure > Preliminary Proceedings > Extradition > General Overview

International Law > Dispute Resolution > Arbitration & Mediation > General Overview

International Law > ... > Extradition Treaties > Procedures > General Overview

*HN22* In the context of international arbitration, fear of arrest and extradition do not constitute an inability to attend an arbitration hearing.

**Counsel:** For CONSORCIO RIVE, S.A. DE C.V., plaintiff: Randall A. Smith, Andrew Lewis Kramer, Smith, Jones & Fawer, New Orleans, LA.

For BRIGGS OF CANCUN INC, DAVID BRIGGS ENTERPRISES, INC., defendants: Robert A. Kutcher, Nicole S. Tygier, Vicki A. Turko, Chopin, Wagar, Cole, Richard, Reboul & Kutcher, LLP, Metairie, LA.

**Judges:** CARL J. BARBIER, UNITED STATES DISTRICT JUDGE.

**Opinion by:** CARL J. BARBIER

# Opinion

 [*790] This matter came on for trial before the Court, sitting without a jury, on February 5 and 6, 2001. At the conclusion of the trial, and upon consideration of all of the evidence and arguments of counsel, the Court dictated oral findings of fact and conclusions of law on the issue of whether Briggs of Cancun, Inc., and David Briggs Enterprises, Inc. should be considered a single business enterprise for purposes of the instant dispute. In

summary, the Court found that these two entities do not comprise a single business enterprise, and thus that any arbitration award confirmed in this proceeding may only be enforced against Briggs of Cancun, Inc.

**[\*\*2]** At that time, the Court also allowed the parties until February 14, 2001 to file post-trial memoranda on the remaining issues, after which it took the matter under submission.

In accordance with *Federal Rule of Civil Procedure 52(a)*, the Court now renders its findings of fact and conclusions of law on the two remaining [1] and related issues: (1) whether plaintiff, Consorcio Rive ("Rive"), waived its right to invoke arbitration of the dispute between the parties by filing a criminal Statement of Facts; and (2) whether the filing of the criminal Statement of Facts precluded Briggs of Cancun, Inc. ("Briggs of Cancun") from meaningfully participating in the arbitration proceedings, thus providing it with a defense to the enforcement of the arbitral award pursuant to article V(1)(b) of the Convention on the Recognition and Enforcement of Foreign Arbitral Awards ("Convention"), codified at *9 U.S.C. § 201 et seq.*

**[\*\*3]** To the extent the findings of fact are more properly classified as conclusions of law, they should be so considered; and to the extent the conclusions of law are more properly classified as findings of fact, they should be so considered.

## I. FINDINGS OF FACT

1. Rive is a corporation organized and existing under the laws of the Country of Mexico, with its principal place of business in Mexico City, Mexico.

2. Briggs of Cancun is a corporation organized and existing under the laws of the State of Louisiana, with its principal place of business in Metairie, Louisiana.

3. On October 1, 1991, Rive, represented by Eugenio Riquelme Valdez, and Briggs of Cancun, represented by David A. Briggs, Jr., ("David Briggs") entered into an "Agreement" by which Rive provided property and permits for Briggs of Cancun **[\*791]** to open a restaurant and bar called Fat Tuesdays in Cancun, Mexico.

4. As memorialized in clause 35 of the Agreement, both parties specifically agreed as follows:

> THIRTY FIFTH. -- Any controversy or claim arising out of, or related to, this agreement, or the making, performance, or interpretation thereof, shall be finally settled by arbitration pursuant to the then-prevailing **[\*\*4]** rules of the INTERAMERICAN COMMERCIAL ARBITRATION COMMISSION and the arbitrators shall be appointed in accordance with such rules. All arbitration proceedings shall take place in Monterrey, N.L., Mexico, and the laws applicable to the arbitration procedure shall be the laws of Mexico. The award of the arbitrator shall be the sole and exclusive remedy between the parties regarding any claims, counterclaims, issues, or accountings presented or pled to the arbitrator; shall be made and shall promptly be payable free of any tax, deduction, or offset; and any costs, fees, or taxes incident to enforcing the award shall, to the maximum extent permitted by law, be charged against the party resisting such enforcement. Judgment upon the award of the arbitrator may be entered in the court having jurisdiction thereof, or application may be made to such court for a judicial acceptance of the award or an order of enforcement. The prevailing party in any such arbitration shall be entitled to recovery of all administration fees and arbitration fees paid. All other costs expenses and fees incurred by either party in connection with such arbitration (including attorneys' fees incurred) shall be borne **[\*\*5]** by the party so incyurring [sic] such fees.

---

[1] On September 20, 2000, Judge Schwartz entered an order granting reconsideration of his prior order dismissing Briggs' counterclaims. The issue for reconsideration was limited solely to the waiver issue (Briggs' Ninth Defense). Rec. Doc. 91.

5. On November 2, 1991, Rive and Briggs of Cancun also entered into an "Management Agreement" and a "Commodatum Agreement" for the operation of the Fat Tuesdays restaurant in Cancun. Like the original Agreement, the Management and Commodatum Agreements also provided for controversies or claims to be resolved by arbitration.

6. As a result of a dispute relating to payments due under the Agreement, Rive initiated an arbitration proceeding against Briggs of Cancun in January of 1996 in Mexico.

7. On or about February 14, 1996, David Briggs, Jr. responded to the Inter-American Commercial Arbitration Commission, designating an arbitrator.

8. On or about March 26, 1996, Rive submitted its formal arbitration demand.

9. On or about August 14, 1996, Rive attorney Jose Manuel Gomez Mont Ureta filed a criminal Statement of Facts requesting that the Attorney General for the State of Quintana Roo, Mexico initiate an investigation of Adalberto de Luna Zuniga, Javier Ramirez Meza, David A. Briggs, Jr., and Raul Torres Rivera, alleging a criminal conspiracy by them to prevent Rive "from exercising its full rights in its capacity as lessor regarding [**6] the property in question." Exh. 174, 4.

10. David Briggs testified that following the filing of the criminal Statement of Facts, he did not enter Mexico for fear of being detained until after the criminal matter was cleared up in 1998.

11. On or about November 26, 1996, Briggs of Cancun answered the allegations of Rive in the arbitration matter by filing a brief and attaching relevant exhibits.

12. Thereafter, the arbitration continued and the parties were given the opportunity to offer further evidence, which was only presented by Rive, because Briggs of Cancun refused to participate in the arbitration due to alleged criminal proceedings in Cancun.

[*792] 13. On or about August 22, 1997, David Briggs, and Danny Drago, Chief Financial Officer of David Briggs Enterprises, Inc.,[2] received a letter from the United Mexican States Solicitor of the General Republic, requesting their appearance on October 5, 1997. The letter stated that failure to appear would result in a "remand [of] the current investigation to the Federal Penal Court so that the corresponding arrest warrant may be issued." Exh. 181.

[**7] 14. David Briggs testified that he voluntarily chose not to comply with the request to appear on October 5, 1997.

15. There was conflicting testimony at trial as to whether an arrest warrant was actually issued for David Briggs. While a document was introduced which appears to reference a pending arrest warrant against David Briggs (Rec. Doc. 178), as well as a document denominated an "amparo" which purports to suspend a warrant (Rec. Doc. 176), no actual arrest warrant for David Briggs was introduced at trial.

16. At trial, David Briggs testified that he did not seek alternative ways to appear at the hearings, such as by telephone, nor did he send a Briggs of Cancun company representative to appear on behalf of the company.

17. In addition, for reasons not explained by the evidence adduced at trial, Briggs of Cancun attorney Andres Gonzalez also failed to appear at the hearings. David Briggs testified that he did **not** instruct Mr. Gonzales not to attend the arbitration hearing.

---

[2] David Briggs Enterprises, Inc. is a related entity which the Court has previously ruled is not an "alter ego" for Briggs of Cancun, Inc.

18. Briggs of Cancun has never presented to this Court a single piece of evidence or information that it alleges it would have presented to the arbitrators, but did not, because it was precluded from **[**8]** participating fully in the arbitration.

19. On November 6, 1997, the Mexican arbitration board held a final hearing, of which all parties were given proper notice. [3] Although Briggs of Cancun did not appear, Rive's counsel presented written conclusions, and subsequently answered questions from the arbitrators. Rec. Docs. 142 & 172 at 256 (″Laudo Definitivo″). No oral testimony was presented at that hearing.

**[**9]** 20. On June 24, 1998, the Mexican arbitration board: (1) ruled that the Agreement was rescinded due to Briggs of Cancun's breaches; (2) awarded Rive $ 150,000 from Briggs of Cancun for obligations under the October 1, 1991 agreement; (3) awarded Rive $ 110,000 from Briggs of Cancun for costs and expenses; (4) awarded Rive $ 2,500,000 from Briggs of Cancun for damages resulting from the breach; and (5) awarded Rive 15% interest after Briggs of Cancun was notified of decision.

21. The arbitration award, totaling $ 2,760,000, excluding interest, was not served on the parties until March 8, 1999.

22. Rive paid all arbitration costs, totaling approximately $ 33,000.

23. In April 1999, Rive made formal demand on Briggs of Cancun at the address set forth in the Agreement for the **[*793]** arbitration award and costs, but received no response.

24. To date, Briggs of Cancun has not paid Rive any amount in satisfaction of the arbitration award.

25. Rive has never expressly waived its right to arbitration under the agreements between Rive and Briggs of Cancun.

26. Neither Rive nor Briggs of Cancun were parties to any criminal proceedings in Cancun, Mexico.

## II. CONCLUSIONS OF LAW

1. The instant **[**10]** litigation has been filed pursuant to *HN1* the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the ″Convention″), codified at *9 U.S.C. § 201 et seq.*, to which both Mexico and the United States are signatories.

2. *HN2* Because the Convention was negotiated pursuant to the Treaty power set forth in the U.S. Constitution, and Congress passed enabling legislation to make the Convention the highest law of the land, the Convention must be enforced over all prior inconsistent rules of law. *Sedco, Inc. v. Petroleos Mexicanos Mexican National Oil Co.*, 767 F.2d 1140, 1145 (5th Cir. 1985).

2. *HN3* An action or proceeding falling under the Convention is deemed to arise under the laws and treaties of the United States. *9 U.S.C. § 203*.

3. *HN4* Federal district courts have original jurisdiction over such an action or proceeding, and venue is proper in any district in which, save for the arbitration agreement, an action or proceeding with respect to the

[3] The notice defense is not one that was specifically preserved by Judge Schwartz. Nonetheless, the Court observes that the documentary evidence presented at trial demonstrated that Briggs was informed that the arbitration would take place on November 6, 1997 at 11:00 a.m. *See, e.g.*, Rec. Doc. 169, at 10285. While Briggs' attorney subsequently misstated the date in correspondence to the Chamber of Commerce of Mexico City (Rec. Doc. 141), the error was pointed out to him in a subsequent letter from the Chairman of the Chamber of Commerce. Rec. Doc 170. At any rate, Gonzalez' mistake and its correction do not alter the fact that notice that the hearing would occur on November 6, 1997 was provided, and the hearing was subsequently held on November 6, 1997.

controversy between the parties could be brought, or in such district which embraces the place designated in the agreement as the place of arbitration if such place is within **[\*\*11]** the United States. *9 U.S.C. § 204*.

4. ***HN5*** Under *9 U.S.C. § 202*, the following arbitration awards fall under the Convention:

> An arbitration agreement or arbitral award arising out of a legal relationship, whether contractual or not, which is considered as commercial, including a transaction, contract, or agreement described in section 2 of this title, falls under the Convention. An agreement or award arising out of such a relationship which is entirely between citizens of the United States shall be deemed not to fall under the Convention unless that relationship involves property located abroad, envisages performance or enforcement abroad, or has some other reasonable relation with one or more foreign states. For the purpose of this section a corporation is a citizen of the United States if it is incorporated or has its principal place of business in the United States.

5. ***HN6*** Under Article III of the Convention, "each Contracting State shall recognize arbitral awards as binding and enforce them in accordance with the rules of procedure of the territory where the award is relied upon . . ." *9 U.S.C. § 201*.

6. The Fifth **[\*\*12]** Circuit has stated that ***HN7*** awards of foreign arbitrators that fall under the Convention are to be enforced by U.S. courts "just as easily as domestic arbitral awards." *Schlumberger Technology Corp. v. United States, 195 F.3d 216, 217 (5th Cir. 1999)*.

7. The Convention requires a U.S. court to treat a foreign arbitral award as it would a domestic award, subject to limited defenses, including incapacity of a party, illegality of the agreement, lack of due process, an award outside the scope of arbitration, an improper arbitration panel, or when the arbitration award has been vacated or is not final. *Id.*, citing Convention, arts. III & V.

8. ***HN8*** Article IV of the Convention provides the procedure for enforcing arbitral awards and reads, in part:

> **[\*794]** 1. To obtain the recognition and enforcement mentioned in the preceding article, the party applying for recognition and enforcement shall, at the time of the application, supply:
>
> > (a) The duly authenticated original award or a duly certified copy thereof;
> >
> > (b) The original agreement referred to in article II or a duly certified copy thereof.

9. ***HN9*** Article II of the Convention requires that there be an "agreement **[\*\*13]** in writing" under which the parties agree to submit to arbitration all or any differences which have arisen or may arise between them in respect of a defined legal relationship, whether contractual or not, concerning a subject matter capable of settlement by arbitration. The term "agreement in writing" includes an arbitral clause in a contract or an arbitration agreement, signed by the parties or contained in an exchange of letters or telegrams.

10. There is no dispute in this matter that the arbitral award and the relevant agreements between Rive and Briggs of Cancun have been supplied to the Court.

11. Thus, ***HN10*** under the terms of the Convention and the enabling federal statute, this Court has the authority to recognize and enforce the arbitral award at issue in this matter.

12. Numerous federal courts have recognized that "***HN11*** The 1958 Convention clearly shifted the burden of proof to the party defending against enforcement and limited his defenses to seven set forth in Article V." *Parsons & Whittemore Overseas Co. v. Societe Generale de L'Industrie du Papier, 508 F.2d 969, 973 (2d Cir. 1974)*.

13. **HN12** Under Article V(1), recognition and enforcement may be refused if the **[\*\*14]** party resisting the award furnished to the competent authority where the recognition and enforcement is sought, proves that:

(a) - the parties to the agreement were under some incapacity, or the agreement is not valid under the law to which the parties have subjected it or, failing any indication thereon, under the law of the country where the award was made; or

(b) - the party against whom the award is invoked was not given proper notice of the appointment of the arbitrator or of the arbitration proceedings or was otherwise unable to present his case; or

(c) - the award deals with a difference not contemplated by or not falling within the terms of the submission to arbitration, or it contains decisions on matters beyond the scope of the submission to arbitration; however, if the decisions on matters submitted to arbitration can be separated from those not so submitted, that part of the award which contains decisions on matters submitted to arbitration may be recognized and enforced; or

(d) - the composition of the arbitral authority or the arbitral procedure was not in accordance with the agreement of the parties, or, failing such agreement, was not in accordance **[\*\*15]** with the law of the country where the arbitration took place; or

(e) - the award has not yet become binding on the parties, or has been set aside or suspended by a competent authority of the country in which, or under the law of which, that award was made.

_9 U.S.C. § 201_.

14. Additionally, Article V(2) provides that recognition and enforcement may be refused if the competent authority finds that:

(a) - the subject matter of the difference is not capable of settlement by arbitration under the law of that [the forum] country; or

**[\*795]** (b) - the recognition or enforcement of the award would be contrary to the public policy of that [the forum] country.

_9 U.S.C. § 201_.

15. **HN13** According to the Convention and repeated federal decisions in this and other circuits, these are the only available defenses to an action to enforce a foreign arbitral award.

16. **HN14** Waiver of the right to arbitrate is not among the seven defenses to enforcement of a foreign arbitral award set forth in the Convention. Thus, as a matter of law, defendant's argument that the arbitration award should not be enforced by this Court because plaintiff **[\*\*16]** waived it is unavailing. [4]

17. Alternatively, **HN15** even if defendant's waiver defense was not precluded by the Convention, in the Fifth Circuit, "waiver will be found when the party seeking arbitration substantially invokes the judicial process to the detriment or prejudice of the other party." _Miller Brewing Co. v. Fort Worth Dist. Co., 781 F.2d 494, 497 (5th Cir. 1986)_. Thus, waiver (if permissible at all in the context presented) requires both a substantial invocation of the judicial process and either detriment or prejudice to the other party.

18. Further, in evaluating whether a waiver occurred under applicable law, it must be borne in mind that "**HN16** waiver of arbitration is not a favored finding, and there is a presumption against it." _Id. at 496_. **[\*\*17]**

---

[4] Moreover, it appears from the evidence that the argument that the filing of the criminal Statement of Facts resulted in a waiver of arbitration by Rive was considered and rejected by the arbitration committee. _See_ Rec. Doc. 169, P c; Rec. Doc. 141 P c.

19. In the same vein, the United States Supreme Court has stated that "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract itself or an allegation of waiver, delay, or a like defense to arbitrability." *Moses H. Cone Memorial Hosp. v. Mercury Construction Corp., 460 U.S. 1, 24-25, 103 S. Ct. 927, 941, 74 L. Ed. 2d 765 (1983)*.

20. *HN17* In considering what amounts to a substantial invocation of the judicial process, federal courts have required active participation in a lawsuit or some other type of act inconsistent with the desire to arbitrate. For example, in *Parcel Tankers, Inc. v. Formosa Plastics Corp.*, 569 F. Supp. 1459, 1467 (S.D. Tex. 1983), the district court found that "actions constituting waiver may include, *inter alia*, some combination of filing an answer, setting up a counterclaim, pursuing discovery, and moving for a continuance prior to moving for a stay pending arbitration."

21. *HN18* With respect to prejudice, the Fifth Circuit has found that "when one party reveals a disinclination to resort to arbitration on any phase of suit involving **[**18]** all parties, those parties are prejudiced by being forced to bear the expenses of a trial . . . Arbitration is designed to avoid this very expense. Substantially invoking the litigation machinery qualifies as the kind of prejudice . . . that is the essence of waiver." *E.C. Ernst, Inc. v. Manhattan Construction Comp. of Texas, 559 F.2d 268, 269 (5th Cir. 1977)*.

22. "Merely initiating litigation, without more, does not effect a waiver" because no actual prejudice results from that isolated action. *Lauricia v. Microstrategy Inc., 114 F. Supp. 2d 489, 492, 2000 WL 1339527 (E.D. Va. 2000)*.

23. The Court finds that Rive's filing of a Statement of Facts with the Attorney General in Quintana Roo did not amount to substantial invocation of the judicial process, and was not inconsistent **[*796]** with Rive's intention to arbitrate, especially given the fact that the Statement of Facts was filed eight months after arbitration was requested. Further, Rive's actions in filing the Statement of Facts did not prejudice Briggs of Cancun with respect to the ongoing arbitration. Accordingly, Rive did not waive its right to arbitration in this matter.

24. *HN19* Article V(1)(b) of the Convention states that **[**19]** a foreign arbitration award can be refused confirmation where a party lacked notice or was "otherwise unable to present his case." *9 U.S.C. § 201*. This defense "basically corresponds to the due process defense that a party was not given 'the opportunity to be heard at a meaningful time and in a meaningful manner' as defined in *Mathews v. Eldridge, 424 U.S. 319, 333, 96 S. Ct. 893, 902, 47 L. Ed. 2d 18*." *Generica Ltd. v. Pharmaceutical Basics, Inc., 125 F.3d 1123, 1129 (7th Cir. 1997)*(other citations omitted).

25. Because Briggs of Cancun was continuously informed of all hearing dates and was provided sufficient opportunity to present witnesses and evidence in defense of the action, Briggs of Cancun was given proper notice of the arbitration proceedings.

26. *HN20* The due process guarantee incorporated in article V(1)(b) of the Convention requires that "an arbitrator must provide a fundamentally fair hearing." *Generica Ltd., 125 F.3d at 1130*. "A fundamentally fair hearing is one that 'meets "the minimal requirements of fairness"-- adequate notice, a hearing on the evidence, and an impartial decision by the arbitrator. **[**20]** "'" *Id*. "Parties that have chosen to remedy their disputes through arbitration rather than litigation should not expect the same procedures they would find in the judicial arena." *Id*. Essentially, in exchange for the convenience and other benefits obtained through arbitration, parties lose "the right to seek redress from the court for all but the most exceptional errors at arbitration." *Dean v. Sullivan, 118 F.3d 1170, 1173 (7th Cir. 1997)*.

27. *HN21* Consistent with the federal policy of encouraging arbitration and enforcing arbitration awards, the defense that a party was "unable to present its case" raised pursuant to article V(1)(b) of the Convention is narrowly construed. *Parsons & Whittemore Overseas Co. v. Societe Generale de L'Industrie du Papier, 508 F.2d 969, 975 (2d Cir. 1974)*.

28. In the instant case, the Court finds that Briggs of Cancun was not "unable to present its case," because Briggs of Cancun could have participated by means other than David Briggs's physical presence at the arbitration. For instance, Briggs of Cancun could have sent a company representative to attend; could have sent its attorney to attend; or David Briggs could **[\*\*21]** have attended by telephone.

28. Moreover, the evidence indicates that Briggs of Cancun **did participate** to the extent that it designated an arbitrator and filed over 80 pages of legal argument and documentation in support of its position. Because Briggs of Cancun has brought forward no additional information or evidence that it would have presented at the arbitration if it had the opportunity to do so, the Court finds that Briggs of Cancun did have an opportunity to meaningfully participate in the arbitration.

29. In a case presenting analogous facts, the district court in *Empresa Constructora Contex Limitada v. Iseki, 106 F. Supp. 2d 1020, 1026 (S.D. Cal. 2000)*, held that the defendant's due process rights under the Convention were not violated when the corporate defendant's owner and C.E.O., as well as other corporate representatives, failed to attend the arbitration held in Chile claiming that they feared arrest. Finding that because the defendant was a corporate entity distinct from **[\*797]** its owners and representatives and could therefore be adequately represented by counsel competent to handle the company's defense, defendant did not prevail in its V(1)(b) defense. **[\*\*22]**

30. Additionally, it has also been held that *HN22* fear of arrest and extradition do not constitute an inability to attend an arbitration hearing. *See, Nat'l Dev. Co. v. Khashoggi, 781 F. Supp. 959 (S.D.N.Y. 1992)*.

31. For the foregoing reasons, the Court finds that Briggs of Cancun's defense under article V(1)(b) of the Convention must fail. The Court also specifically finds that even if there was a valid arrest warrant pending against David Briggs for some period of time, Briggs of Cancun is not entitled to a defense under article V(1)(b) of the Convention because Briggs of Cancun could have participated through its Mexican attorney or corporate representative or by telephone. Further, Briggs of Cancun has not demonstrated that it was prejudiced in any way by whatever restrictions the alleged criminal action might have imposed, because it has not pointed to exonerating evidence that it would have presented, but could not, but for the filing of the criminal Statement of Facts.

32. The Court need not consider the parties' discussion of the public policy defense under the Convention, because that defense is not one of the narrow issues preserved for trial following Judge **[\*\*23]** Schwartz's ruling on the Motion to Reconsider the grant of summary judgment in plaintiff's favor. However, if it were before the Court, the Court would find that its conclusion that due process requirements were met undermines this argument, and that enforcement of this award does not violate the public policies of Mexico, the United States, or the State of Louisiana.

33. Similarly, the Court does not revisit the issue of whether the arbitration award is final, because the issue was previously determined by Judge Schwartz, and further, is mooted by the fact that Briggs of Cancun did not post a bond as requested by the Court.

34. Thus, the Court **ORDERS** that the Mexican arbitration award dated June 24, 1998 be and it is hereby recognized and enforced against Briggs of Cancun, Inc. in all respects.

35. The Court **FURTHER ORDERS** the parties to submit, within ten days from entry of this order, a joint proposed form for final judgment in accordance with these findings and conclusions.

New Orleans, Louisiana, this *13th* day of March, 2001.

CARL J. BARBIER

UNITED STATES DISTRICT JUDGE

UNITED STATES DISTRICT JUDGE



No *Shepard's* Signal™
As of: September 1, 2015 2:33 PM EDT

## *Cooper Indus., LLC v. Pepsi-Cola Metro. Bottling Co.*

Court of Appeals of Texas, Fourteenth District, Houston

August 25, 2015, Opinion Filed

NO. 14-14-00562-CV

**Reporter**

2015 Tex. App. LEXIS 8882

COOPER INDUSTRIES, LLC, COOPER INDUSTRIES, LTD., COOPER US, INC., AND COOPER INDUSTRIES, PLC, Appellants v. PEPSI-COLA METROPOLITAN BOTTLING CO., INC., AND WHITMAN INSURANCE COMPANY LTD., Appellees

**Prior History:** [*1] On Appeal from the 80th District Court, Harris County, Texas. Trial Court Cause No. 2011-77606.

## Core Terms

arbitration, appellees, parties, Guaranty, Mutual, discovery, termination, compel arbitration, waive, arbitration clause, pet, right to arbitration, trial court, settlement, invoked, motion to compel arbitration, tortious interference, estoppel, dealer, merits, obligations, signatory, judicial process, non-signatory, disputes, movant, surety, arbitration agreement, fraudulent transfer, denial of motion

## Case Summary

### Overview

HOLDINGS: [1]-An order denying appellants' motion to compel arbitration was improper because the agreements required arbitration and appellees did not show that appellants waived their right to arbitrate since appellants never opposed arbitration before filing its motion to compel; [2]-Because appellee's tortious interference claims depended on the existence of the manufacturer's obligation in the Stock Purchase Agreement (SPA), which appellants guaranteed, appellants could compel signatory appellee to arbitrate those claims under the SPA; [3]-The record did not demonstrate the extent to which appellees pre-trial costs were self-inflicted and accordingly, there was no showing that appellants unequivocally waived their right to arbitration by substantially invoking the judicial process.

### Outcome

Judgment reversed and remanded.

## LexisNexis® Headnotes

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > Arbitrability

Civil Procedure > ... > Arbitration > Federal Arbitration Act > General Overview

Civil Procedure > Appeals > Standards of Review > Questions of Fact & Law

Civil Procedure > Appeals > Standards of Review > De Novo Review

Contracts Law > Contract Conditions & Provisions > Arbitration Clauses

*HN1* When the Federal Arbitration Act governs an arbitration clause, a Texas trial court conducts a summary proceeding under Texas procedural rules to make the gateway determination of arbitrability, and it applies Texas substantive law regarding whether a litigant must arbitrate. When the trial court does not sign written findings or conclusions, an appellate court may uphold the court's order on any theory supported by the evidence, and the appellate court implies all factual findings supported by the record that are necessary to the order. Appellate courts defer to the trial court's factual determinations that are supported by sufficient evidence, but we review the trial court's legal determinations de novo.

Governments > Courts > Judicial Comity

*HN2* Texas courts may presume that another state's law is the same as Texas law absent proof or argument to the contrary. The party requesting application of a foreign law has the initial burden of showing that the foreign law conflicts with Texas law.

Contracts Law > Contract Conditions & Provisions > Arbitration Clauses

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview

*HN3* Arbitration cannot be ordered in the absence of an agreement to arbitrate. The party moving for arbitration has the initial burden to present evidence that a valid arbitration agreement exists. If there is an agreement to arbitrate, the party must also establish that the claims asserted fall within the scope of the agreement.

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview

*HN4* Whether a non-signatory can compel arbitration questions the existence of a valid arbitration agreement between the parties and therefore is a gateway matter for the court to decide.

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview

Contracts Law > Contract Conditions & Provisions > Arbitration Clauses

Contracts Law > ... > Estoppel > Equitable Estoppel > General Overview

Torts > Business Torts > Commercial Interference > General Overview

*HN5* A person who has agreed to arbitrate disputes with one party may in some cases be required to arbitrate related disputes with others. In particular, a signatory plaintiff who seeks to derive a direct benefit from a contract with an arbitration clause may be equitably estopped from refusing arbitration. Although the boundaries of direct-benefits estoppel are not always clear, the signatory generally must arbitrate claims if liability arises from a contract with an arbitration clause, but not if liability arises from general obligations imposed by law. When the facts are not disputed, the application of estoppel is a question of law, not a matter committed to the trial court's discretion. Tortious interference claims do not fall comfortably within either category.

Torts > ... > Commercial Interference > Contracts > General Overview

*HN6* The obligation not to interfere with existing contracts is a general obligation imposed by law, but it is not imposed on the parties to that contract because a party cannot interfere tortiously with its own contract. A person must be a stranger to a contract to interfere tortiously with it. Thus, a signatory generally is not required to

arbitrate a tortious interference claim against a complete stranger to his contract and its arbitration clause. But if the signatory plaintiff's right to recover and its damages depend on the existence of the contract containing the arbitration clause, or if the non-signatory defendant is an agent or affiliate of a signatory, then the plaintiff can be compelled to arbitrate its claim.

> Contracts Law > Contract Conditions & Provisions > Arbitration Clauses
>
> Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview

*HN7* A guarantor or surety of a party's obligation under a contract containing an arbitration clause may invoke or be bound by that clause in a suit regarding the obligation.

> Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview
>
> Contracts Law > Contract Conditions & Provisions > Arbitration Clauses

*HN8* In general, an arbitration agreement contained within a contract survives the termination or repudiation of the contract as a whole. If the contract does not state that the duty to arbitrate ends with the termination of the contract, the strong policies favoring arbitration should ordinarily lead the court to conclude that the obligation to arbitrate, especially as to claims that accrued during the term of the contract, survives the expiration of the contract.

> Contracts Law > Contract Interpretation > General Overview

*HN9* No single contractual provision taken alone should be given controlling effect; rather, all the provisions must be considered with reference to the whole instrument.

> Contracts Law > Contract Conditions & Provisions > Arbitration Clauses
>
> Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > Waiver
>
> Contracts Law > Defenses > General Overview

*HN10* Once an arbitration movant establishes a valid arbitration agreement that encompasses the claims at issue, a trial court has no discretion to deny the motion to compel arbitration unless the opposing party proves a defense to arbitration such as waiver.

> Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > Waiver
>
> Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview
>
> Civil Procedure > Appeals > Standards of Review > De Novo Review
>
> Civil Procedure > Appeals > Standards of Review > Questions of Fact & Law

*HN11* A party can waive a contractual right to arbitrate either expressly or by implication. Whether waiver has occurred is a question of law for the court that is reviewed de novo. Because public policy favors arbitration, there is a strong presumption against waiver of the right to arbitrate. Express waiver arises when a party affirmatively indicates that it wishes to resolve the case in the judicial forum rather than in arbitration.

> Civil Procedure > ... > Subject Matter Jurisdiction > Jurisdiction Over Actions > Exclusive Jurisdiction
>
> Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > Waiver
>
> Civil Procedure > ... > Venue > Motions to Transfer > General Overview

***HN12*** Moving to dismiss in favor of exclusive jurisdiction in another court is equivalent to moving to transfer venue or filing a notice of removal to another court. The Supreme Court of Texas and many other courts have held that such actions do not waive a right to arbitrate.

Civil Procedure > ... > Venue > Motions to Transfer > General Overview

***HN13*** A motion to transfer venue does not seek a final determination of the litigation.

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > Waiver

Contracts Law > Contract Conditions & Provisions > Arbitration Clauses

***HN14*** A party waives an arbitration clause by implication when it substantially invokes the judicial process to the other party's detriment or prejudice. The hurdle of proving implied waiver is a high bar. In close cases, the strong presumption against waiver should govern. Waiver must be decided on a case-by-case basis, and we look to the totality of the circumstances. The party's conduct must be unequivocally inconsistent with claiming a known right to arbitration.

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > Waiver

Contracts Law > Contract Conditions & Provisions > Arbitration Clauses

Civil Procedure > Appeals > Standards of Review > Questions of Fact & Law

Civil Procedure > Appeals > Standards of Review > De Novo Review

Evidence > Weight & Sufficiency

***HN16*** Whether a party has waived an arbitration right is a question of law that is reviewed de novo. If the trial court is called upon to resolve factual disputes about the conduct in which the party engaged, an appellate court defers to the trial court's implied fact findings if they are supported by sufficient evidence.

Contracts Law > Contract Conditions & Provisions > Arbitration Clauses

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > Waiver

***HN15*** With regard to waiving an arbitration clause, courts consider a wide variety of factors in deciding whether a party substantially invoked the litigation process, such as: whether the party who pursued arbitration was the plaintiff or the defendant; how long the party who pursued arbitration delayed before seeking arbitration; when the party who pursued arbitration learned of the arbitration clause's existence; how much of the pretrial activity related to the merits rather than to arbitrability or jurisdiction; how much time and expense has been incurred in litigation; whether the party who pursued arbitration sought or opposed arbitration earlier in the case; whether the party who pursued arbitration filed affirmative claims or dispositive motions; how much discovery has been conducted and who initiated the discovery; whether the discovery sought would be useful in arbitration; what discovery would be unavailable in arbitration; whether activity in court would be duplicated in arbitration; when the case was to be tried; and whether the party who pursued arbitration sought judgment on the merits.

Contracts Law > Contract Conditions & Provisions > Arbitration Clauses

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > Waiver

***HN17*** The quantum of litigation conduct that constitutes "substantial" invocation of the litigation process depends on the context. A party who enjoys substantial direct benefits by gaining an advantage in the pretrial litigation process should be barred from turning around and seeking arbitration with the spoils. Delay alone generally does not establish waiver. Even substantially invoking the judicial process does not waive a party's

arbitration rights unless the opposing party proves that it suffered prejudice as a result. The arbitration opponent must provide proof of prejudice to overcome the strong presumption against waiver. In the context of waiver of an arbitration right, prejudice relates to the inherent unfairness in terms of delay, expense, or damage to a party's legal position that occurs when the party's opponent forces it to litigate an issue and later seeks to arbitrate that same issue. A party cannot attempt to have it both ways by switching between litigation and arbitration to its own advantage.

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Mediation

Civil Procedure > Settlements > General Overview

Civil Procedure > Preliminary Considerations > Venue > General Overview

Contracts Law > Contract Conditions & Provisions > Forum Selection Clauses

*HN18* Settlement negotiations and mediation do not substantially invoke the judicial process, nor are they inconsistent with a desire to arbitrate. Likewise, venue and jurisdictional motions do not constitute substantial invocation of the judicial process because they do not relate to the merits of the case. A dismissal of all claims to enforce a clause requiring litigation in another forum is a determination that the merits of the claims should be determined elsewhere; therefore, enforcement of such a forum-selection clause is a non-merits basis for dismissal.

Contracts Law > Contract Conditions & Provisions > Arbitration Clauses

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > Waiver

Civil Procedure > Discovery & Disclosure > Discovery

*HN19* Propounding discovery will not, in and of itself, result in waiver of the right to compel arbitration. Length of delay alone is not a basis for inferring waiver.

**Counsel:** For Appellants: J. Christopher Reynolds, Solace Kirkland Southwick, HOUSTON, TX.

For Appellee: Winstol D. Carter, Jr., David J. Levy, John M. Deck, HOUSTON, TX; Allyson Newton Ho, DALLAS TX.

**Judges:** Panel consists of Justices Jamison, Busby, and Brown.

**Opinion by:** J. Brett Busby

# Opinion

This is an interlocutory appeal from an order denying a motion to compel arbitration. Appellee Pepsi-Cola Metropolitan Bottling Co. ("Metro") sued appellants Cooper Industries, LLC, Cooper Industries, Ltd., Cooper US, Inc., and Cooper Industries, PLC (collectively, "Cooper"), seeking to enforce two agreements. Appellee Whitman Insurance Company Ltd. later joined the suit as a plaintiff. Cooper filed a motion to compel arbitration pursuant to the agreements. The trial court denied the motion after a hearing without making findings of fact or conclusions of law.

On appeal, Cooper argues the trial court erred because the agreements require arbitration and appellees did not show that Cooper waived its right to arbitrate. We agree that the trial court erred in denying Cooper's motion to compel arbitration. We therefore reverse the trial court's order, render judgment ordering arbitration of

appellees' claims against the Cooper defendants who are parties to this appeal,[1] and remand this case to the trial court for further proceedings **[*2]** consistent with this opinion, including the grant of an appropriate stay.

BACKGROUND

This case concerns indemnification obligations regarding asbestos claims. Appellees' second amended petition and Cooper's motion to compel arbitration provide the pertinent background of the parties' dispute.[2] We begin by discussing the various transactions that resulted in the current alignment of the parties because they are relevant to our disposition of the case.

IC Industries—Metro's predecessor—acquired Abex Corporation and Pneumo Corporation, two companies that manufactured products containing asbestos. IC Industries sold its stock in both companies to PA Holdings under a Stock Purchase Agreement ("SPA"). **[*3]** Under the SPA, IC Industries agreed to indemnify PA Holdings against certain claims filed between August 29, 1988 and August 29, 1998, and PA Holdings agreed to indemnify IC Industries and its affiliates against claims filed after August 29, 1998. As explained below, a Cooper entity later guaranteed an indemnity of PA Holdings' successor. The SPA provides that if any controversy or claim arising out of or relating to the agreement has not been resolved within twenty-one days after notice is given, either party may initiate arbitration to resolve the dispute.

PA Holdings subsequently became Pneumo Abex, LLC. IC Industries became appellee Metro through a merger and name change. Whitman's predecessor was a captive insurance carrier affiliated with IC Industries, and Whitman is now a subsidiary of Metro.

Pneumo Abex eventually sold one of its product lines to Wagner Electronic Corporation through an Asset Purchase Agreement ("APA"). Under the APA, Wagner agreed to indemnify and hold Pneumo Abex harmless for any obligations Pneumo Abex owed to Metro and Whitman. Like the SPA, the APA contains an arbitration provision. In section 13.2(c), the APA provides that any dispute arising in connection with the agreement **[*4]** and not settled by the parties within sixty days after notice is given "shall be finally settled by arbitration . . . ." The provision states that "[a]ny party may request a court to provide interim relief without waiving the agreement to arbitrate."

Wagner's then-parent company, Cooper Industries, LLC, guaranteed Wagner's indemnification of Pneumo Abex under a Mutual Guaranty agreement signed in 1994. Section 6 of the Mutual Guaranty provides that any claim or dispute "arising in connection with" this agreement shall be resolved in accordance with sections 13.2(b) and (c) of the APA, thus explicitly incorporating the arbitration provision of the APA.

Pneumo Abex filed a lawsuit in New York against various Cooper defendants, contending that Cooper Industries, LLC was mismanaging its assets and thus endangering the Mutual Guaranty. Metro and Whitman were not parties to that suit. In 2011, the Cooper defendants and Pneumo Abex reached a settlement agreement, which the judge in the New York lawsuit approved. Under the settlement agreement, PCT International Holdings, Inc.—then-owner of Pneumo Abex—transferred its ownership interest to a trust. Cooper Industries' indemnities were released and, in exchange, the trust received **[*5]** a cash payment and notes to be paid over five years.

---

[1] Although Cooper Holdings, Ltd. joined appellants in the motion to compel arbitration, the trial court did not rule on the motion with respect to Cooper Holdings, Ltd. The notice of appeal does not list Cooper Holdings, Ltd. as an appellant. Accordingly, Cooper Holdings, Ltd. is not an appellant in this case. We therefore do not address whether it was entitled to arbitration of Metro's and Whitman's claims.

[2] Appellees filed a third amended petition after Cooper had filed its motion to compel arbitration.

In response to the 2011 settlement agreement, Metro filed this lawsuit alleging various causes of action, among them tortious interference with contractual relations, conspiracy to commit tortious interference, fraudulent transfers, and conspiracy to commit fraudulent transfers.[3] The suit named several defendants, including the Cooper appellants.[4] Whitman later joined the suit as a plaintiff, claiming that as successor to an affiliate of IC Industries, it is entitled to indemnification from Pneumo Abex under the SPA. Metro and Whitman alleged that the settlement agreement was the end result of collusive efforts by the defendants that left Pneumo Abex and the trust with a finite amount of assets. In particular, Metro and Whitman alleged that the defendants "conspired to buy their way out of uncapped guaranty obligations" and made Pneumo Abex's performance of its indemnity obligations to Metro and Whitman more "burdensome, difficult, and expensive, if not impossible."

Citing the Federal Arbitration Act, Cooper filed a motion to compel arbitration under various agreements, including the SPA and the Mutual Guaranty. After an unreported hearing, the court denied the motion. This interlocutory appeal followed. *See* *9 U.S.C. § 16(a)(1)(B) (West 2009)*; *Tex. Civ. Prac. & Rem. Code Ann. § 51.016* (West 2015).

## ANALYSIS

On appeal, Cooper argues that the trial court erred in denying the motion to compel arbitration because (1) Metro's and Whitman's claims are subject to arbitration under the SPA and the Mutual Guaranty, and (2) Cooper has not waived the right to arbitrate as to either Metro or Whitman. We address each issue in turn.

*HN1* When the Federal Arbitration Act governs an arbitration clause, a Texas trial court conducts a summary proceeding under Texas procedural rules to make the gateway determination of arbitrability, and it applies Texas substantive law regarding whether a litigant must arbitrate. **[*7]** [5] *See* *In re Weekley Homes, L.P., 180 S.W.3d 127, 130 (Tex. 2005)* (orig. proceeding). Because the trial court did not sign written findings or conclusions, we may uphold the court's order on any theory supported by the evidence, and we imply all factual findings supported by the record that are necessary to the order. *In re W.E.R.*, 669 S.W.2d 716, 717 (Tex. 1984) (per curiam); *Rush v. Barrios, 56 S.W.3d 88, 96 (Tex. App.—Houston [14th Dist.] 2001, pet. denied)*. We defer to the trial court's factual determinations that are supported by sufficient evidence, but we review the trial court's legal determinations de novo. *In re Labatt Food Serv., L.P., 279 S.W.3d 640, 643 (Tex. 2009)*.

## I. Cooper established that appellees' claims fall within the scope of valid arbitration agreements that Cooper can invoke.

---

[3]  Appellees pled additional causes of action later abandoned; therefore, we need not analyze them.

[4]  Metro originally brought this action against Cooper Industries, LLC, Cooper **[*6]** Industries Ltd., Cooper Holdings, Ltd., Cooper US, Inc., Cooper Industries, PLC, M & F Worldwide Corp., MAFCO Worldwide Corp., MAFCO Consolidated Group, LLC, PCT International Holdings, Inc., and the Pneumo Abex Asbestos Claims Settlement Trust. The third amended petition also names Mcg Intermediate Holdings Inc. as a defendant.

[5]  The APA states that it is governed by Delaware law, but the parties do not discuss Delaware law. The SPA contains a clause stating that the "law of the State of New York shall govern the parties' dispute." In appellees' response to Cooper's motion to compel arbitration, they argued that New York law governs the arbitration provision in the SPA. On appeal, however, appellees assert that we need not address the question whether Texas or New York law applies because Cooper is not entitled to compel arbitration under either state's laws. Cooper, for its part, contends that Texas law is entirely consistent with New York law, and that it is entitled to arbitration under the law of both states.

*HN2* Texas courts may presume that another state's law is the same as Texas **[*8]** law absent proof or argument to the contrary. *Coca-Cola Co. v. Harmar Bottling Co.*, 218 S.W.3d 671, 685 (Tex. 2006). The party requesting application of a foreign law has the initial burden of showing that the foreign law conflicts with Texas law. *Greenberg Traurig of New York, P.C. v. Moody*, 161 S.W.3d 56, 70 (Tex. App.—Houston [14th Dist.] 2004, no pet.). Because all parties assert the outcome is the same under both New York and Texas law, and the parties do not address Delaware law, we apply Texas law.

Cooper's first issue asks whether the trial court erred in refusing to compel arbitration because appellees' claims are founded on two contracts that contain mandatory arbitration provisions. *HN3* Arbitration cannot be ordered in the absence of an agreement to arbitrate. *Freis v. Canales, 877 S.W.2d 283, 284 (Tex. 1994)* (orig. proceeding) (per curiam). The party moving for arbitration has the initial burden to present evidence that a valid arbitration agreement exists. *In re Koch Indus., Inc., 49 S.W.3d 439, 444 (Tex. App.—San Antonio 2001, orig. proceeding)*. If there is an agreement to arbitrate, the party must also establish that the claims asserted fall within the scope of the agreement. *In re Kellogg Brown & Root, Inc., 166 S.W.3d 732, 737 (Tex. 2005)*.

**A. Cooper may compel arbitration against Metro under the SPA**.

Cooper argues that Metro's claims are subject to arbitration under the SPA, which contains a broad clause requiring arbitration of **[\*9]** any controversy or claim arising out of or relating to the agreement. The parties to the SPA are Pneumo Abex and a company that later became known as Metro. Metro is thus a signatory to the agreement, but Cooper is not. Appellees Metro and Whitman respond that Cooper cannot compel arbitration as a non-signatory. *HN4* Whether a non-signatory can compel arbitration questions the existence of a valid arbitration agreement between the parties and therefore is a gateway matter for the court to decide. *See In re Weekley Homes, L.P., 180 S.W.3d 127, 130 (Tex. 2005)*.

The supreme court has recognized that *HN5* "[a] person who has agreed to arbitrate disputes with one party may in some cases be required to arbitrate related disputes with others." *Meyer v. WMCO-GP, LLC, 211 S.W.3d 302, 304 (Tex. 2006)*. In particular, a signatory plaintiff who seeks to derive a "direct benefit" from a contract with an arbitration clause may be equitably estopped from refusing arbitration. *Id. at 305*; *see also In re Kellogg, 166 S.W.3d at 739* (discussing direct-benefits estoppel of non-signatories). Although the boundaries of direct-benefits estoppel are not always clear, the signatory generally must arbitrate claims if liability arises from a contract with an arbitration clause, but not if liability arises from general obligations imposed by law. *In re Vesta Ins. Group, Inc., 192 S.W.3d 759, 761 (Tex. 2006)* (per curiam). When the **[\*10]** facts are not disputed, the application of estoppel is a question of law, not a matter committed to the trial court's discretion. *See Meyer, 211 S.W.3d at 308*.

Tortious interference claims do not fall comfortably within either category. *In re Vesta, 192 S.W.3d at 761*. *HN6* The obligation not to interfere with existing contracts is a general obligation imposed by law, but it is not imposed on the parties to that contract because a party cannot interfere tortiously with its own contract. *Id.* (citing *Holloway v. Skinner, 898 S.W.2d 793, 796 (Tex. 1995))*. A person must be a stranger to a contract to interfere tortiously with it. *Id.* (citing *Morgan Stanley & Co. v. Texas Oil Co., 958 S.W.2d 178, 179 (Tex. 1997))*. Thus, a signatory generally is not "required to arbitrate a tortious interference claim against a complete stranger to his contract and its arbitration clause." *Id. at 763*. But if the signatory plaintiff's right to recover and its damages depend on the existence of the contract containing the arbitration clause, or if the non-signatory defendant is an agent or affiliate of a signatory, then the plaintiff can be compelled to arbitrate its claim. *Meyer, 211 S.W.3d at 306-07*; *In re Vesta, 192 S.W.3d at 762*; *PER Group, L.P. v. Dava Oncology, L.P., 294 S.W.3d 378, 387-88 (Tex. App.—Dallas 2009, no pet.)*; *see also In re Kellogg, 166 S.W.3d at 739* (listing estoppel and agency among the theories for requiring arbitration with non-signatory).

Cooper contends that it may enforce the arbitration clause under the supreme court's opinion in *Meyer*. Appellees argue **[\*11]** that *Meyer* is distinguishable because the non-signatories in that case were not strangers to the agreement, as they contend Cooper is here.

In *Meyer*, Ford Motor Company's agreement with one of its dealers provided Ford with an assignable right of first refusal to acquire the dealer's business if the dealer decided to sell. *211 S.W.3d at 304*. When the dealer later signed an agreement to sell its business to WMCO, Ford exercised its right and assigned that right to Meyer and

his company. *Id.* WMCO then sued the dealer, Meyer, and Ford, alleging, among other things, that Meyer tortiously interfered with WMCO's agreement to buy the dealer's business. *Id.* Meyer and Ford moved to compel arbitration under a clause in the agreement between the dealer and WMCO. *Id. at 304-05*. Meyer and Ford contended that because WMCO made the agreement with the dealer, WMCO was equitably estopped from refusing arbitration. *Id. at 305*. The supreme court agreed, noting that WMCO's claims against Ford and Meyer "depend on the existence of" WMCO's agreement with the dealer:

> If [the dealer] properly terminated the [agreement with WMCO], based on Ford's exercise of its right of first refusal, then there would be no claim for tortious interference, no **[*12]** need to decide whether Ford validly exercised the right of first refusal, and no need to decide whether Meyer and Ford conspired to violate statutes protecting dealers from certain actions by manufacturers.

*Id. at 307*. The court also considered it important that WMCO's damages "cannot be calculated without reference to the [agreement]." *Id.* The court thus held that Meyer and Ford, although nonsignatories to the agreement between WMCO and the dealer, could compel arbitration under the agreement's arbitration clause. *Id. at 308*.[6]

Similarly, appellees' tortious interference claims against Cooper in their second amended petition depend on the existence of the SPA and Cooper's guaranty of Pneumo Abex's performance thereunder. *See Smith v. Kenda Capital, LLC, 451 S.W.3d 453, 460 (Tex. App.—Houston [14th Dist.] 2014, no pet.)* ("[D]irect benefits estoppel analysis focuses on whether a contract containing the clause at issue also **[*13]** includes other terms on which the signatory plaintiff must rely to prosecute its claims."). As discussed above, the SPA required Pneumo Abex to indemnify Metro's predecessor, and Cooper and its then-subsidiary guaranteed that indemnity in 1994. Appellees allege that in 2011, Cooper tortiously caused (and conspired with others to cause) Pneumo Abex to breach its indemnity obligation to Metro under the SPA, which contains an arbitration clause.[7] If Pneumo Abex did not breach the SPA in restructuring the guaranty and other commitments backing its indemnity obligation, then there would be no claim for tortious interference or conspiracy. Moreover, the remedies appellees seek under each cause of action are the direct benefit of the indemnity obligation to Metro under the SPA: they request injunctive relief obligating Cooper to fund any shortfall in the trust set up to pay the indemnity, or alternatively damages for the loss of Cooper's guaranty of that indemnity—damages that cannot be calculated without reference to the terms of the indemnity obligation in the SPA. For these reasons, *Meyer* supports Cooper's ability to compel Metro to arbitrate its tortious interference claims under the SPA's **[*14]** arbitration clause.

Relying on our decision in *Brewer & Pritchard, P.C. v. AMKO Resources International, LLC*,[8] appellees argue that Cooper nevertheless cannot compel arbitration because it is a complete stranger to the SPA. They point out that Cooper had no relationship with the SPA's signatories—Metro's predecessor and Pneumo Abex—when the SPA was executed, and that the SPA itself did not require Cooper to guarantee Pneumo Abex's performance. We do not agree that these facts defeat direct-benefits estoppel.

---

[6] In a portion of the *Meyer* opinion, the supreme court also noted allegations of substantially interdependent and concerted misconduct. 211 S.W.3d at 307-08. But the court compelled arbitration on a theory of direct-benefits estoppel, and it declined to adopt a theory of concerted-misconduct estoppel in a subsequent case. *In re Merrill Lynch Trust Co. FSB, 235 S.W.3d 185, 191 & n.22 (Tex. 2007)* (orig. proceeding). We rely solely on the theory of direct-benefits estoppel here.

[7] Alternatively, appellees allege that Cooper's actions rendered Pneumo Abex's performance of its obligations to Metro under the SPA more difficult, if not impossible.

[8] No. 14-13-00113-CV, 2014 Tex. App. LEXIS 7627, 2014 WL 3512836, at *11 (Tex. App.—Houston [14th Dist.] July 15, 2014, no. pet.) (mem. op.) (holding buyer of leases was stranger to seller's fee agreement with law firm that had represented seller in dispute with lease operator, and therefore firm could not use arbitration clause in fee agreement to compel buyer to arbitrate claims regarding buyer's failure to pay firm a portion of sales price).

Unlike in *Brewer & Pritchard*, Cooper guaranteed the performance of one of the agreement's signatories, Pneumo Abex, in 1994—long before the allegedly tortious 2011 transactions made the basis of this suit. **[*15]** Moreover, *Brewer & Pritchard* did not involve a non-signatory defendant seeking to compel arbitration with a signatory plaintiff (as our inquiry under the SPA does), nor did it address whether the plaintiff's right to recover and its damages depended on the existence of the agreement containing the arbitration clause. Metro's tortious interference claims do depend on the existence of the SPA, so *Meyer* supports arbitration of those claims as explained above. Other courts agree that **HN7** a guarantor or surety of a party's obligation under a contract containing an arbitration clause may invoke or be bound by that clause in a suit regarding the obligation.[9] Because Metro's tortious interference claims depend on the existence of Pneumo Abex's indemnity obligation in the SPA, which Cooper guaranteed, we hold Cooper may compel signatory Metro to arbitrate those claims under the SPA.[10]

**B. Cooper may compel arbitration against Whitman and Metro under the Mutual Guaranty despite its termination**.

Cooper also argues that both Whitman's and Metro's claims are independently subject to arbitration under the 1994 Mutual Guaranty agreement, which broadly requires arbitration of any dispute arising in connection with the agreement. The parties to the Mutual Guaranty are Pneumo Abex and Cooper Industries, LLC. Thus, appellees Whitman and Metro are not parties to the Mutual Guaranty. Nevertheless, direct-benefits estoppel can also require non-signatory plaintiffs to arbitrate if they seek to derive a direct benefit from a contract containing an arbitration clause. *See In re Kellogg, 166 S.W.3d at 739-741* (considering whether plaintiff's claims seek to enforce contract **[*18]** or stand independently of contract).

In their second amended petition, appellees seek to enforce Cooper's obligations under the Mutual Guaranty. They allege that Cooper's acts of tortious interference in connection with the 2011 settlement (and its agreement with the other defendants to interfere) were undertaken with a specific intent to cap its guaranty obligation, and that Cooper engaged in fraudulent transfers (and conspired to do so) when it obtained a release of its guaranty obligation in exchange for certain payments to the trust. The remedies appellees seek include an injunction obligating Cooper to fund any shortfall in the trust set up to pay the indemnity Cooper had guaranteed, or

---

[9]  *See, e.g., Choctaw Generation L.P. v. Am. Home Assur. Co., 271 F.3d 403, 406-08 (2d Cir. 2001)* (holding surety for one party's obligation under a construction contract containing arbitration clause could compel other party to arbitrate its claims against surety even though surety was not a party to construction contract and surety contract contained no arbitration clause because the controversy presented **[*16]** was linked to the construction contract); *T-Mobile USA, Inc. v. Montijo, No. C12-1317RSM, 2012 U.S. Dist. LEXIS 176236, 2012 WL 6194204, at *4 (W.D. Wa. Dec. 11, 2012)* (same as to guarantors); *Bimota SPA v. Rousseau, 628 F. Supp. 2d 500, 505-06 (S.D.N.Y. 2009)* (same); *Fujian Pac. Elec. Co. v. Bechtel Power Corp., No. C 04-3126 MHP, 2004 U.S. Dist. LEXIS 23472, 2004 WL 2645974, at *6-7 (N.D. Cal. Nov. 19, 2004)* (same); *see also Bell v. Campbell, 143 S.W. 953, 956-57 (Tex. Civ. App.—Amarillo 1911, writ ref'd)* (holding sureties bound by arbitration agreement and award against principal); *Empire Steel Corp. v. Omni Steel Corp., 378 S.W.2d 905, 911 (Tex. Civ. App.—Fort Worth 1964, writ ref'd n.r.e.)* (same as to guarantors). We note that in a subsequent case, the Second Circuit described *Choctaw* as involving a situation in which the non-signatory surety (American Home) was explicitly named in the underlying contract as having certain tasks to perform thereunder. *Ross v. Am. Exp. Co., 547 F.3d 137, 145 (2d Cir. 2008)*. The *Choctaw* opinion does not appear to support this characterization. *See 271 F.3d at 403-05, 407* (noting that underlying contract required party to post and replenish letter of credit, and that American Home contracted separately with party to issue bond securing party's performance but was not party to underlying contract). In any event, none of the cases cited at the beginning of this footnote attach importance to whether the surety or guarantor is identified by name in the underlying agreement containing the arbitration clause.

[10]  Because we conclude that Whitman is bound to arbitrate its claims under the 1994 **[*17]** Mutual Guaranty, as discussed below, we do not address whether Cooper could compel Whitman to arbitrate under the SPA. We also note that the parties have not separately addressed whether Cooper could compel Metro to arbitrate its claims of fraudulent transfer and conspiracy to commit fraudulent transfer. We likewise need not address that issue under the SPA given our conclusion below that Metro is bound to arbitrate those claims under the Mutual Guaranty.

alternatively damages in the amount of the shortfall. In short, appellees are claiming the benefit of the Mutual Guaranty, so they are estopped from avoiding the burden of its arbitration clause. *See* *In re Kellogg, 166 S.W.3d at 739*.

Appellees respond that arbitration can no longer be compelled under the Mutual Guaranty because Cooper, Pneumo Abex, and others terminated that agreement following the 2011 settlement. They point to the following language in the termination agreement:

> Effective as of the Closing, and notwithstanding **[\*19]** any provision of the Mutual Guaranty to the contrary, the Mutual Guaranty shall be fully, finally and irrevocably terminated and of no further force or effect, and no Party nor any other Person shall have any further obligation or liability under the Mutual Guaranty from and after Closing.
>
> . . .
>
> Each Party hereby irrevocably consents and agrees that any dispute regarding this Agreement shall be brought only to the exclusive jurisdiction of the federal or state courts located in New York County, New York . . . .

We disagree with appellees that this language cuts off the estoppel effect of the Mutual Guaranty's arbitration clause.

*HN8* In general, as our sister court has held, an "arbitration agreement contained within a contract survives the termination or repudiation of the contract as a whole." *Cleveland Constr. Inc. v. Levco Constr. Inc., 359 S.W.3d 843, 854 (Tex. App.—Houston [1st Dist.] 2012, pet. dism'd))* (citing *Henry v. Gonzalez, 18 S.W.3d 684, 690 (Tex. App.—San Antonio 2000, pet. dism'd))*.[11] Our facts illustrate the sensible result of applying this rule here. Appellees' position is that the Mutual Guaranty was tortiously and fraudulently terminated by Cooper and that the court should, in effect, require Cooper to honor its guaranty notwithstanding the termination. Having asked the court to ignore the Mutual Guaranty's termination, appellees can hardly complain if its clause requiring **[\*20]** arbitration of any dispute "arising in connection with" the agreement is also given effect.

Appellees urge us instead to follow *TransCore Holdings, Inc. v. Rayner, 104 S.W.3d 317 (Tex. App.—Dallas 2003, pet. denied)*. In *TransCore*, parties including TransCore and Rayner entered into a stock purchase agreement containing an arbitration clause. *Id. at 319*. Subsequently, the parties entered into a termination agreement that included a backward-looking mutual release of obligations and claims and a forward-looking provision requiring actions relating to the agreement to be brought in court. *Id. at 320-21, 323*. Rayner argued that the termination agreement released him from his obligation to arbitrate TransCore's claim that he made misrepresentations prior to termination. *Id. at 321*. The Dallas Court of Appeals agreed, noting that the termination agreement was a new agreement with new consideration that unconditionally released the parties from all previous obligations. **[\*21]** *Id. at 321-22, 323*.

This case differs from *TransCore* in two critical respects. First, the backward-looking release language in the *TransCore* termination agreement is absent here. This termination agreement, which was entered into effective April 5, 2011, only eliminates any "further obligation" to arbitrate under the Mutual Guaranty "from and after" termination. The provision agreeing to bring disputes regarding the termination agreement only to New York

---

[11] *See also* *Butchers, Food Handlers & Allied Workers Union, Local 174 v. Hebrew Nat'l Kosher Foods, Inc., 818 F.2d 283, 287 (2d Cir. 1987)* ("If the contract does not state that the duty to arbitrate ends with the termination of the contract, the strong policies favoring arbitration should ordinarily lead the court to conclude that the obligation to arbitrate—especially as to claims that accrued during the term of the contract—survives the expiration of the contract.").

courts does not address the handling of disputes under the Mutual Guaranty.[12] Thus, the termination agreement leaves intact the obligation under the Mutual Guaranty to arbitrate disputes "arising in connection with the agreement" up to the point of termination. Appellees' claims challenge Cooper's acts leading up to and including the 2011 settlement, which was entered into as of February 1, 2011. Because those claims arise in connection with the Mutual Guaranty agreement as explained above, the termination agreement does not affect the obligation to arbitrate them.

Second, the termination agreement in *TransCore* was between the parties to the original agreement: one party seeking to compel arbitration under the original agreement, and another party **[*22]** arguing that the termination agreement ended its obligation to arbitrate. Here, appellees are not parties to the termination agreement. Instead, appellees are third parties trying to revive the obligations of the original agreement. The logical force of the doctrine of direct-benefits estoppel—which was not at issue in *TransCore*—supports requiring appellees to arbitrate their claims.

Appellees' claims against Cooper hinge on the existence of the Mutual Guaranty, and the gist of their case is to undo its termination. If Cooper "properly terminated the" Mutual Guaranty, then "there would be no claim for tortious interference" or fraudulent transfer and no need to determine whether Cooper "conspired" with the other defendants to do so. *Meyer, 211 S.W.3d at 307*. Appellees cannot have it both ways, picking and choosing which portions of the Mutual Guaranty should be enforced and which portions should not. *See id. at 306*; *cf. Coker v. Coker, 650 S.W.2d 391, 393 (Tex. 1983)* (**HN9** "No single [contractual] provision taken alone [should] be given controlling effect; rather, all the provisions must be considered with reference to the whole instrument").

We hold that the termination of the Mutual Guaranty agreement between Cooper and Pneumo Abex did not abrogate Cooper's ability **[*23]** to compel arbitration of appellees' claims under that agreement. In addition, as explained above, Cooper may compel arbitration of Metro's claims under the SPA. Accordingly, we sustain Cooper's first issue and hold that the trial court erred to the extent it denied Cooper's motion to compel arbitration on the ground that appellees' claims do not fall within the scope of valid arbitration agreements that Cooper can invoke.

**II. Cooper did not expressly waive its right to arbitrate appellees' claims**.

*HN10* Once the arbitration movant establishes a valid arbitration agreement that encompasses the claims at issue, a trial court has no discretion to deny the motion to compel arbitration unless the opposing party proves a defense to arbitration such as waiver. *J.M. Davidson, Inc. v. Webster, 128 S.W.3d 223, 227 (Tex. 2003)*; *In re First Merit Bank, N.A., 52 S.W.3d 749, 753-54 (Tex. 2001)* (orig. proceeding). Cooper's second and third issues ask whether the trial court erred to the extent it denied the motion to compel by finding that Cooper waived its right to arbitration against Metro and Whitman.

*HN11* A party can waive a contractual right to arbitrate either expressly or by implication. *Sedillo v. Campbell, 5 S.W.3d 824, 826 (Tex. App.—Houston [14th Dist.] 1999, no pet.)*. Whether waiver has occurred is a question of law for the court that we review de novo. *Perry Homes v. Cull, 258 S.W.3d 580, 598 (Tex. 2008)*. Because public policy favors arbitration, there is **[*24]** a strong presumption against waiver of the right to arbitrate. *In re Bruce Terminix Co., 988 S.W.2d 702, 704 (Tex. 1998)* (orig. proceeding).

Express waiver arises when a party affirmatively indicates that it wishes to resolve the case in the judicial forum rather than in arbitration. *See Okorafor v. Uncle Sam & Assocs., Inc., 295 S.W.3d 27, 39 (Tex. App.—Houston*

---

12  *See Valero Energy Corp. v. Teco Pipeline Co.*, 2 S.W.3d 576, 587 (Tex. App.—Houston [14th Dist.] 1999, no pet.).

*[1st Dist.] 2009, pet. struck)*. Appellees contend that Cooper expressly waived the right to arbitrate by first moving to dismiss the case in favor of adjudication in New York based on principles of exclusive jurisdiction, comity, and forum non conveniens. In its motion, Cooper argued that the New York court that approved the 2011 settlement had exclusive jurisdiction over questions regarding that settlement.

**HN12** Moving to dismiss in favor of exclusive jurisdiction in another court is equivalent, for present purposes, to moving to transfer venue or filing a notice of removal to another court. The Supreme Court of Texas and many other courts have held that such actions do not waive a right to arbitrate. *E.g., Richmont Holdings, Inc. v. Superior Recharge Sys., L.L.C., 455 S.W.3d 573, 576 (Tex. 2015)* (per curiam); *In re Citigroup Global Markets, Inc., 258 S.W.3d 623, 626 (Tex. 2008)*.[13]

In *Richmont Holdings*, Superior and Richmont signed an asset purchase agreement with an arbitration clause, and Superior's part-owner, Blake, signed a related employment agreement with Richmont that contained a Dallas County forum selection clause. *455 S.W.3d at 575*. Superior and Blake later sued Richmont in Denton County on various causes of action and sought a declaration that a covenant not to compete in the employment agreement was unenforceable. *Id.* In response, Richmont moved to transfer venue to Dallas County and also filed a separate suit against Blake in Dallas County to enforce the covenant not to compete. *Id.* Richmont later filed a motion to compel arbitration in the Denton County suit, but the trial court denied the motion. *Id. at 576*.

The supreme court held that the motion should have been granted because Richmont had not waived arbitration. *Id.* The court explained that "[m]erely filing suit does not waive arbitration, even when the movant, as in this case, files a second, separate suit in another county based in **[*26]** part on a contract at issue in the first action. Nor, we think, does moving to transfer venue. The motion does not address the merits of the case." *Id.* (citations omitted).

Thus, Richmont went far beyond asserting—as Cooper did here—that another forum was the only correct place to decide the parties' disputes. Richmont actually filed a second suit in the other forum, yet the supreme court held that act did not waive Richmont's ability to compel arbitration in the original suit. *Richmont* therefore supports the conclusion that Cooper did not waive its right to arbitration.

Similarly, in *In re Citigroup Global Markets*, the supreme court held that Citigroup did not waive arbitration despite its previous attempts to transfer the case to a federal multidistrict litigation court in New York. *258 S.W.3d at 626*. The court held that despite statements in various transfer pleadings about the case's similarity to others already transferred, the potential savings in consolidated discovery, and the potential convenience of parties and witnesses in consolidated proceedings, Citigroup did not expressly waive its right to arbitrate. *Id.* As the court explained, "we disagree . . . that transfer to an MDL court is necessarily inconsistent **[*27]** with seeking arbitration." *Id.*

Appellees urge that *Citigroup* is distinguishable because in that case, the party seeking to compel arbitration expressly reserved the right to request arbitration early on. *See id.* But the court in *Citigroup* did not hold that a party must expressly reserve its right to arbitrate before seeking to transfer a case. Rather, *Citigroup* simply noted that the party "never opposed arbitration." *Id*. The same is true here: Cooper never opposed arbitration before filing its motion to compel. Accordingly, we hold the trial court erred to the extent it denied the motion to compel arbitration on the ground that Cooper expressly waived its right to arbitrate.

---

[13] *See also In re Bruce Terminix Co., 988 S.W.2d at 704* (citing case holding no waiver by defendant who removed case from state to federal court); *In re Frost Nat'l Bank*, 13-07-00748-CV, 2008 Tex. App. LEXIS 8570, 2008 WL 4889836, at *3 (Tex. App.—Corpus Christi Nov. 7, 2008, no pet.)* (holding party did not waive right to compel arbitration by moving to transfer venue **[*25]** based on provision in agreement) (mem. op.); *Global Fin. Servs., L.L.C. v. Estate of McLean*, No. 04-07-627-CV, 2008 Tex. App. LEXIS 1034, 2008 WL 372521, at *3 (Tex. App.—San Antonio Feb. 13, 2008, no pet.)* (mem. op.); *Granite Constr. Co. v. Beaty*, 130 S.W.3d 362, 367 (Tex. App.—Beaumont 2004, no pet.)* (*HN13* "[A] motion to transfer venue does not seek a final determination of the litigation.").

**III. Cooper did not waive its right to arbitrate by implication**.

*HN14* A party waives an arbitration clause by implication when it substantially invokes the judicial process to the other party's detriment or prejudice. *Perry Homes, 258 S.W.3d at 589-90*. The hurdle of proving implied waiver is a high bar. *Kennedy Hodges, L.L.P. v. Gobellan, 433 S.W.3d 542, 545 (Tex. 2014)* (per curiam). In close cases, the ″strong presumption against waiver″ should govern. *Perry Homes, 258 S.W.3d at 593*.

Waiver must be decided on a case-by-case basis, and we look to the totality of the circumstances. *Id. at 592*. The party's conduct must be unequivocally inconsistent with claiming **[*28]** a known right to arbitration. *See Van Indep. Sch. Dist. v. McCarty, 165 S.W.3d 351, 353 (Tex. 2005)*.[14] *HN15* We consider a wide variety of factors in deciding whether a party substantially invoked the litigation process, such as:

- whether the party who pursued arbitration was the plaintiff or the defendant;

- how long the party who pursued arbitration delayed before seeking arbitration;

- when the party who pursued arbitration learned of the arbitration clause's existence;

- how much of the pretrial activity related to the merits rather than to arbitrability or jurisdiction;

- how much time and expense has been incurred in litigation;

- whether the party who pursued arbitration sought or opposed arbitration earlier in the case;

- whether the party who pursued arbitration filed affirmative claims or dispositive motions;

- how much discovery has been conducted and who initiated the discovery;

- whether the discovery sought would be useful in arbitration;

- what discovery would be unavailable in arbitration;

- whether activity in court would be duplicated in arbitration;

- when the case was to be tried; and

- whether the party who pursued arbitration sought judgment on the merits.

*Baty v. Bowen, Miclette & Britt, Inc., 423 S.W.3d 427, 433 (Tex. App.—Houston [14th Dist.] 2013, pet. denied)* (citing *Perry Homes, 258 S.W.3d at 591-92*).

*HN17* The quantum of litigation conduct that constitutes ″substantial″ invocation of the litigation process depends on the context. *See Perry Homes, 258 S.W.3d at 593*. A party who enjoys substantial direct benefits by gaining an advantage in the pretrial litigation process should be barred from turning around and seeking arbitration with the spoils. *Id.* Delay alone generally does not establish waiver. *See In re Serv. Corp. Int'l, 85 S.W.3d 171, 174 (Tex. 2002)* (orig. proceeding).

″Even substantially invoking the judicial process does not waive a party's arbitration rights unless the opposing party proves that it suffered prejudice as a result.″ *In re Bruce Terminix Co., 988 S.W.2d 702, 704 (Tex. 1998)*. The arbitration opponent must provide proof of prejudice to overcome the strong presumption against waiver. *In re Vesta, 192 S.W.3d at 763*. In the context of waiver of an arbitration right, ″prejudice″ relates to the inherent unfairness in terms of delay, expense, or damage to a party's legal position that occurs when the party's

---

[14]    As noted above, *HN16* whether a party has waived an arbitration right is a question **[*29]** of law that this Court reviews de novo. *See Perry Homes*, 258 S.W.3d at 598. If the trial court is called upon to resolve factual disputes about the conduct in which the party engaged, this Court defers to the trial court's implied fact findings if they are supported by sufficient evidence. *See id.*

opponent forces it to litigate an issue and later seeks to arbitrate **[\*30]** that same issue. *Perry Homes, 258 S.W.3d at 597*. A party cannot attempt to have it both ways by switching between litigation and arbitration to its own advantage. *See Okorafor, 295 S.W.3d at 40* (citing *In re Fleetwood Homes of Texas, L.P., 257 S.W.3d 692, 694 (Tex. 2008))*.

To support their position that Cooper substantially invoked the judicial process, appellees assert that Cooper "inexplicably delayed" moving to compel arbitration until May 2014, twenty-eight months after it was sued. Appellees further contend that Cooper participated in extensive discovery related to the merits. They point out that Cooper sought admissions that Metro is "seeking to void and/or avoid the transfers incident to the creations of the [trust]" and that Pneumo Abex "did not owe a duty to [Metro] to ensure that it obtained consideration that was at least equal to the value" of Cooper's obligations. Appellees argue that those requests relate directly to their claims of fraudulent transfer and tortious interference.

They also point to Cooper's request for the production of "all documents and communications that show what amount would have constituted 'equivalent value' with respect to the settlement of the New York Lawsuit" and "all documents (if any) in which Whitman Insurance Company . . . is identified, as an entity and/or a party **[\*31]** that is entitled to indemnification . . . pursuant to the terms of the SPA." Appellees declare that they have produced more than 21,000 documents, and argue that Cooper is trying to have it both ways by moving to compel arbitration only after receiving extensive discovery responses. The affidavit of appellees' counsel states that, "[t]o date, [appellees'] attorneys and staff have spent over 9,000 hours working on the lawsuit and incurred approximately $3,500,000 in fees and $94,000 in other costs." Appellees also argue that Cooper substantially invoked the judicial process by moving for a continuance and agreeing to an extension of discovery.

We disagree with appellees' position that Cooper substantially invoked the judicial process. In holding that substantial invocation had occurred in *Perry Homes*, the Supreme Court of Texas noted the extensive discovery propounded by the movants but stated that discovery is not the only measure of waiver under the totality-of-the-circumstances test. *Perry Homes, 258 S.W.3d at 596*.[15] The court then pointed out that the movants had objected stridently to arbitration before changing their minds and seeking arbitration shortly before the trial setting. *Id.* The court also invoked the rule **[\*32]** that one cannot wait until the eve of trial to request arbitration, observing that "most of the discovery in the case had already been completed before [movants] requested arbitration." *Id.*

The facts here are different from those in *Perry Homes* and more analogous to *In re Vesta*, in which the supreme court held that arbitration had not been waived. *192 S.W.3d at 763-64*. The parties moving for arbitration in *Vesta* had litigated for two years and engaged in discovery, but they did not initially oppose arbitration. *See Perry Homes, 258 S.W.3d at 600* (distinguishing *Vesta* on those grounds). Furthermore, the *Vesta* case was not close to trial, and the party opposing arbitration incurred most of its discovery expenses in obtaining discovery rather than providing it. *Id.*

Like the parties moving to compel arbitration in *Vesta*, Cooper did not oppose arbitration at any time during the case. In addition, although the parties had engaged in some merits discovery, this case was not on the eve of trial when Cooper filed its motion to compel arbitration in May 2014—approximately four months after Whitman joined the case as **[\*33]** a plaintiff.[16] The record shows that during the first ten months of the case, from

---

[15] *See also G.T. Leach Builders, LLC v. Sapphire V.P., LP, 458 S.W.3d 502, 514 (Tex. 2015)* (collecting cases in which "we have declined to find waiver even when the movant itself propounded written discovery").

[16] Although appellees point to evidence (summarized above) that substantial merits discovery had occurred, the record also contains indications that the situation was not like that in *Perry Homes*, in which most discovery had been completed. According to a filing by appellees in **[\*34]** February 2014, no "meaningful merits discovery" had yet been received from Cooper given the litigation over

December 2011 to October 2012, the parties were engaged in settlement negotiations and Metro sought to extend trial deadlines for that reason.[17] Much of the second year was spent on venue motions, jurisdictional motions, and mediation, which failed in November 2013. *HN18* Settlement negotiations and mediation do not substantially invoke the judicial process, nor are they inconsistent with a desire to arbitrate. *See Tex. Residential Mortg., L.P. v. Portman, 152 S.W.3d 861, 863-64 (Tex. App.—Dallas 2005, no pet.)*. Likewise, venue and jurisdictional motions do not constitute substantial invocation of the judicial process because they do not relate to the merits of the case. *See Granite, 130 S.W.3d at 367*; *Deep Water Slender Wells, Ltd. v. Shell Intern. Exploration & Prod., Inc., 234 S.W.3d 679, 695 (Tex. App.—Houst.[14th Dist.] 2007, pet. denied)* ("A dismissal of all claims to enforce a clause requiring litigation in another forum is a determination that the merits of the claims should be determined elsewhere; therefore, enforcement of such a forum-selection clause is a nonmerits basis for dismissal.").

Appellees cite *Tuscan Builders, LP v. 1437 SH6 L.L.C., 438 S.W.3d 717 (Tex. App.—Houston [1st Dist.] 2014, pet. denied)*, a case in which the First Court of Appeals held that the movant substantially invoked the judicial process. Appellees assert that this case is similar because the movant in *Tuscan* waited for more than a year after the lawsuit was filed before seeking **[*35]** arbitration, did not accompany its answer with a notice to pursue arbitration, completed written discovery on the merits, inspected property at issue in the lawsuit, designated experts, and joined in a motion to extend the discovery period and postpone trial. *Id. at 722-23*.

This case is distinguishable from *Tuscan Builders*. The party seeking to compel arbitration in *Tuscan Builders* filed a third-party action and conducted a building inspection that likely would not have been available in arbitration. *Id. at 723*. The court concluded that the motion to compel arbitration was "more consistent with a late-game tactical decision than an intent to preserve the right to arbitrate." *Id. at 722*. In this case, by contrast, Cooper did not file counterclaims, and appellees do not contend that any merits discovery obtained would not have been available in arbitration. Appellees also "do[] not allege that the discovery already conducted would not be useful in arbitration." *In re Vesta, 192 S.W.3d at 763*; *see also Granite, 130 S.W.3d at 367* (*HN19* "Propounding discovery will not, in and of itself, result in waiver of the right to compel arbitration"). Cooper's twenty-eight-month delay is but one factor, which by itself is insufficient to waive the right to arbitrate. *See In re Serv. Corp. Int'l, 85 S.W.3d at 174*; *see also* **[*36]** *Granite, 130 S.W.3d at 367* ("Length of delay alone is not a basis for inferring waiver.").

Cooper is in court because appellees sued it, and Cooper did not seek disposition on the merits. *See G.T. Leach Builders, LLC v. Sapphire V.P., LP, 458 S.W.3d 502, 512-13 (Tex. 2015)* (noting similar factors in holding right to arbitrate had not been waived). Appellees have not shown that Cooper obtained discovery it otherwise would not have obtained, and this case was not on the eve of trial. As for the expenses appellees incurred in prosecuting their suit, the affidavit does not delineate which costs were incurred in litigating against Cooper and which costs were incurred in litigating against the other named defendants. Nor does it address which costs were incurred in obtaining or responding to discovery. The costs thus likely include those associated with litigating the claims against the other named defendants and those associated with appellees' efforts at obtaining discovery from Cooper. The record does not demonstrate the extent to which appellees "pre-trial costs were . . . self-inflicted." *In re Vesta, 192 S.W.3d at 763*. Accordingly, we hold appellants have not shown that Cooper unequivocally waived its right to arbitration by substantially invoking the judicial process. *Perry Homes, 258 S.W.3d at 593*.

jurisdictional issues. In April 2014, appellees moved to modify the docket control order, stating that the parties had been "prevented . . . from being able to engage in meaningful document discovery on the merits until recently," and that "no fact-witness depositions have been taken on the merits as of this date."

[17] Metro filed its original petition on December 30, 2011. On October 31, 2012, Metro filed an unopposed motion to modify the scheduling order and request for Rule 166 Conference. Metro asserted that the "parties have been engaged in extensive settlement negotiations in an effort to resolve this case. Because the parties' efforts have been focused on resolving the matter short of litigating the issue, the parties request an extension and modification of this Court's docket control order."

Having concluded that under the totality of the **[\*37]** circumstances, Cooper did not substantially invoke the judicial process, we need not address whether appellees suffered prejudice. We sustain Cooper's second and third issues and hold the trial court erred to the extent it ruled that Cooper waived its right to arbitration of appellees' claims.

CONCLUSION

For these reasons, the trial court erred in denying the Cooper appellants' motion to compel arbitration. We reverse the trial court's order denying the motion, render judgment ordering arbitration of appellees' claims against the Cooper defendants who are parties to this appeal, and remand this case to the trial court for further proceedings consistent with this opinion, including the grant of an appropriate stay. *See Tex. Civ. Prac. & Rem. Code Ann. § 171.025(a)* (West 2011).

/s/ J. Brett Busby

Justice


Positive

As of: September 1, 2015 5:08 PM EDT

# *East Montgomery County Municipal Utility Dist. No. 1 v. Roman Forest Consol. Municipal Utility Dist.*

Supreme Court of Texas

July 22, 1981

No. C-346

### Reporter

620 S.W.2d 110; 1981 Tex. LEXIS 345; 24 Tex. Sup. J. 536

EAST MONTGOMERY COUNTY MUNICIPAL UTILITY DISTRICT NO. 1, Petitioner v. ROMAN FOREST CONSOLIDATED MUNICIPAL UTILITY DISTRICT, Respondent

## Core Terms

furnishing, sewage treatment, disposal, services, costs, civil appeals, parties, sewage, water distribution system, contract provides, collection system, operating budget, trial court, contracts, intention of the parties, trial court's judgment, reversing judgment, judgment rendered, contract express, ambiguous, sentence, jointly, agrees, budget

## Case Summary

### Procedural Posture

Petitioner, East Montgomery County Municipal Utility District No. 1, filed writ of error from the judgment of the Court of Appeals of Texas, which reversed the judgment of the trial court and rendered judgment for respondent, Roman Forest Consolidated Municipal Utility District, based upon the intent of the parties in construing two contracts.

### Overview

The court of appeals reversed the judgment of the trial court and rendered judgment for respondent, Roman Forest Consolidated Municipal Utility District, by looking to the conduct of the parties in construing a fresh water furnishing contract and a sewage treatment services contract. The conduct of the parties was only relevant if the contract was ambiguous. As the contract was not ambiguous, the conduct of the parties was irrelevant. The court held that the sewage contract expressed the intent of the parties that petitioner pay only for the cost of the sewage treatment and disposal services. There were no pleadings concerning waiver, estoppel, modification, or any other alternate theories of recovery. Thus, the court granted petitioner's application for writ of error and reversed the judgment of the court of appeals and affirmed the judgment of the trial court.

### Outcome

The court granted petitioner's application for writ of error, and reversed the judgment of the court of appeals and affirmed the judgment of the trial court as the conduct of the parties was irrelevant because the contract was not ambiguous.

## LexisNexis® Headnotes

Contracts Law > Contract Interpretation > General Overview

*HN1* The conduct of the parties is ordinarily immaterial in the determining of the meaning of an unambiguous instrument.

Contracts Law > Contract Interpretation > General Overview

Contracts Law > Contract Interpretation > Ambiguities & Contra Proferentem > General Overview

Contracts Law > Defenses > Ambiguities & Mistakes > General Overview

*HN2* The conduct of the parties is only relevant after the court determines that the contract is ambiguous.

**Counsel:** **[**1]** Counsel: For Petitioner Ernest Coker, Jr., Conroe, Texas.

For Respondent Danny R. Edwards, Houston, Texas.

**Opinion by:** PER CURIAM

## Opinion

 **[*111]** This is an appeal from a declaratory judgment construing two contracts. Under the first contract, Roman Forest agrees to furnish fresh water to East Montgomery. Under the second contract, Roman Forest agrees to provide sewage treatment services for East Montgomery. This lawsuit concerns what expenses Roman Forest may charge East Montgomery under each contract. The trial court rendered a judgment for East Montgomery. The court of civil appeals reversed the judgment of the trial court and rendered judgment for *Roman Forest. 619 S.W.2d 1*.

The two contracts were signed in April, 1975. The first detailed billing was presented to East Montgomery in late 1976. It is not clear from the record whether annual budgets were ever presented to East Montgomery for approval as required by the contracts.

The water furnishing contract provides that Roman Forest will deliver water to East Montgomery at a specified location. East Montgomery will maintain its own water distribution system from that point. Roman Forest has its own separate water **[**2]** distribution system. All water for both systems is furnished from one well. Thus Roman Forest is only providing ″water furnishing″ services to East Montgomery under that contract. The contract provides that East Montgomery will pay a specified portion of the operating budget for Roman Forest's ″said facility.″ The previous sentence mentioned the ″water-furnishing facility.″ The question is whether Roman Forest may include the costs of its own water distribution system as part of the budget of the water furnishing facility.

The trial court's judgment held that only the costs of operating and maintaining the water furnishing system may be considered, and that the costs of Roman Forest's water distribution system should be excluded. The court of civil appeals reversed. It relied on the conduct of the parties.

The sewage treatment contract provides that Roman Forest will treat East Montgomery's sewage. Each district maintains its own separate sewage collection system. There is one jointly operated sewage treatment and disposal system, which serves both East Montgomery and Roman Forest. Thus, Roman Forest is only providing

sewage treatment and disposal services, and is **[*112]** **[**3]** not providing sewage collection services to East Montgomery. The contract provides that East Montgomery will pay a specified portion of the operating budget for Roman Forest's "system." The first sentence of this portion of the contract states: "In consideration for the waste treatment and disposal services to be rendered by [Roman Forest] to [East Montgomery] pursuant to this Contract, [East Montgomery] shall pay operating charges for such waste disposal services in the following manner . . . ." The question is whether Roman Forest may include the costs of its own sewer collection system as part of the operating budget for the jointly operated sewage treatment and disposal system.

The trial court's judgment held that only the costs of operating and maintaining the sewage treatment and disposal plant be included, and that the costs of Roman Forest's sewage collection system not be included. As with the water furnishing contract, the court of civil appeals reversed, relying on the conduct of the parties.

*HN1* The conduct of the parties is ordinarily immaterial in the determining of the meaning of an unambiguous instrument. *Pennell v. United Insurance Co., 150 Tex. 541, 243* **[**4]** *S.W.2d 572, 575 (1951)*; *Universal C.I.T. Credit Corp. v. Daniel*, 150 Tex. 513, 243 S.W.2d 154, 157 (1951); *Richardson v. Hart, 143 Tex. 392, 185 S.W.2d 563 (1945)*; *see* *Harris v. Rowe, 593 S.W.2d 303, 306 (Tex. 1979)*. *HN2* The conduct of the parties is only relevant after the court has determined that the contract is ambiguous. Neither party contends that the contract is ambiguous. The conduct of the parties is therefore irrelevant. We hold that the water furnishing contract expresses the intent of the parties that East Montgomery pay only for the costs of water furnishing facilities. We hold that the sewage contract expresses the intent of the parties that East Montgomery pay only for the cost of the sewage treatment and disposal services.

There were no pleadings concerning waiver, estoppel, modification or any other alternate theories of recovery.

The holding of the court of civil appeals is in conflict with the court's opinion in *Pennell v. United Insurance Co., supra.* Pursuant to Rule 483, Texas Rules of Civil Procedure, we grant the application for writ of error, and without hearing oral argument, reverse the judgment of the court of civil appeals and affirm **[**5]** the judgment of the trial court.


# *Forest Oil Corp. v. McAllen*

Supreme Court of Texas

October 16, 2007, Argued; August 29, 2008, Opinion Delivered

NO. 06-0178

**Reporter**

268 S.W.3d 51; 2008 Tex. LEXIS 768; 51 Tex. Sup. J. 1309; 168 Oil & Gas Rep. 450

FOREST OIL CORPORATION AND DANIEL B. WORDEN, PETITIONERS, v. JAMES ARGYLE MCALLEN, EL RUCIO LAND AND CATTLE COMPANY, INC., SAN JUANITO LAND PARTNERSHIP, AND MCALLEN TRUST PARTNERSHIP, RESPONDENTS

**Subsequent History:** Released for Publication November 14, 2008.
Rehearing denied by *Forest Oil Corp. v. McAllen, 2008 Tex. LEXIS 1039 (Tex., Nov. 14, 2008)*
Appeal after remand at, Sub nomine at *Forest Oil Corp. v. El Rucio Land & Cattle Co., 2014 Tex. App. LEXIS 8068 (Tex. App. Houston 1st Dist., July 24, 2014)*

**Prior History:** [**1] ON PETITION FOR REVIEW FROM THE COURT OF APPEALS FOR THE THIRTEENTH DISTRICT OF TEXAS.
*Forest Oil Corp. v. McAllen, 2005 Tex. App. LEXIS 10441 (Tex. App. Corpus Christi, Dec. 15, 2005)*

## Core Terms

parties, arbitration, disclaimer, Oil, Ranch, settlement agreement, fraudulent inducement, representations, surface, disputes, issues, settlement, Leases, negotiations, releases, arbitration agreement, trial court, waiver-of-reliance, misrepresentation, environmental, attorneys, arbitration provision, compel arbitration, legal counsel, contracts, executing, induced, matters, fraudulent-inducement, terms

## Case Summary

### Procedural Posture

Respondents, companies, a partnership, and a related individual, sued petitioners, a corporation and its employee, to recover for environmental damage. The trial court denied petitioners' motion to compel arbitration under *Tex. Civ. Prac. & Rem. Code Ann. § 171.021*. The Court of Appeals for the Thirteenth District of Texas affirmed and petitioners sought review.

### Overview

The parties, among others, entered into a settlement agreement that released petitioners from claims related to certain leases. The parties reserved the right to arbitrate certain claims, including for environmental liability. After respondents sued petitioners and alleged environmental claims, petitioners sought to compel arbitration, which was denied. On review, the court reversed the appellate court's judgment that affirmed the denial of the

motion to compel and remanded with instructions that the trial court compel arbitration. In this case, although the settlement agreement did not preclude all future environmental disputes, it did require arbitration of them. Respondents' fraudulent inducement claim could not defeat the arbitration provision in the settlement agreement. The arbitration agreement removed the scope determination from the court and placed it with the arbitration panel. The court had no discretion but to direct the trial court to compel arbitration under *Tex. Civ. Prac. & Rem. Code Ann. § 171.021* and stay respondents' litigation. The court remanded the severance issue to the trial court for purposes of *Tex. Civ. Prac. & Rem. Code Ann. § 171.025*.

**Outcome**

The court reversed the appellate court's decision and remanded the case to the trial court to compel arbitration in accordance with the court's opinion. In order to make an informed severance decision, the trial court was to defer its decision until the arbitrators decided which issues were arbitrable.

# LexisNexis® Headnotes

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Judicial Review

Civil Procedure > Appeals > Appellate Jurisdiction > Interlocutory Orders

Civil Procedure > Appeals > Appellate Jurisdiction > State Court Review

Governments > Courts > Judicial Precedent

*HN2* The appellate court has jurisdiction to hear an appeal from an interlocutory order denying arbitration if the court of appeals' decision conflicts with our precedent. *Tex. Gov't Code Ann. §§ 22.001(a)(2)*, *22.225(c)*; *Tex. Civ. Prac. & Rem. Code Ann. § 171.098*.

Civil Procedure > Appeals > Standards of Review > De Novo Review

Civil Procedure > Appeals > Standards of Review > Questions of Fact & Law

*HN1* The appellate court reviews a legal question de novo.

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Judicial Review

Civil Procedure > Appeals > Standards of Review > De Novo Review

Civil Procedure > Appeals > Standards of Review > Questions of Fact & Law

*HN3* When an appeal from a denial of a motion to compel arbitration turns on a legal determination, the appellate court applies a de novo standard. The trial court's determination of the arbitration agreement's validity is a legal question subject to de novo review.

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview

Civil Procedure > Appeals > Standards of Review > General Overview

Contracts Law > Contract Conditions & Provisions > Arbitration Clauses

Contracts Law > ... > Affirmative Defenses > Fraud & Misrepresentation > General Overview

*HN4* Federal and Texas law strongly favor arbitration, and the appellate court upholds arbitration agreements that comport with traditional principles of contract law. While an arbitration agreement procured by fraud is unenforceable, *Tex. Civ. Prac. & Rem. Code Ann. § 171.001(b)*, the party opposing arbitration must show that

the fraud relates to the arbitration provision specifically, not to the broader contract in which it appears. If a trial court finds that the claim falls within the scope of a valid arbitration agreement, the court has no discretion but to compel arbitration and stay its own proceedings.

> Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview

*HN5* Whether a case is governed by the Federal Arbitration Act or the Texas Arbitration Act, many of the underlying substantive principles are the same.

> Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview

> Contracts Law > Contract Conditions & Provisions > Arbitration Clauses

*HN6* See *Tex. Civ. Prac. & Rem. Code Ann. § 171.001(b)*.

> Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview

> Contracts Law > Contract Conditions & Provisions > Arbitration Clauses

> Contracts Law > ... > Affirmative Defenses > Fraud & Misrepresentation > General Overview

*HN7* If a fraudulent-inducement claim attacks the broader contract, then the arbitrator, not a court, considers the matter.

> Contracts Law > Contract Conditions & Provisions > Integration Clauses

> Contracts Law > ... > Affirmative Defenses > Fraud & Misrepresentation > General Overview

*HN8* A disclaimer of reliance on representations, where the parties' intent is clear and specific, should be effective to negate a fraudulent inducement claim.

> Civil Procedure > Settlements > Releases From Liability > General Overview

> Contracts Law > Contract Conditions & Provisions > Arbitration Clauses

> Contracts Law > Contract Conditions & Provisions > Waivers > General Overview

> Contracts Law > Contract Interpretation > General Overview

> Contracts Law > ... > Affirmative Defenses > Fraud & Misrepresentation > General Overview

*HN9* The Texas Supreme Court fails to see how a disclaimer's preclusive effect should be different where the parties agreed to resolve litigated claims and arbitrate future ones. Texas courts should uphold contracts negotiated at arm's length by knowledgeable and sophisticated business players represented by highly competent and able legal counsel, and this principle applies with equal force to contracts that reserve future claims as to contracts that settle all claims. Essentially, case law holds that when knowledgeable parties expressly discuss material issues during contract negotiations but nevertheless elect to include waiver-of-reliance and release-of-claims provisions, the court will generally uphold the contract. An all-embracing disclaimer of any and all representations shows the parties' clear intent. A "once and for all" settlement may constitute an additional factor urging rejection of fraud-based claims, but a freely negotiated agreement to settle present disputes and arbitrate future ones should also be enforceable.

> Civil Procedure > Settlements > Releases From Liability > General Overview

*HN10* The reasoning of Schlumberger Technology Corp. v. Swanson related to releases applies broadly to contracts generally.

Civil Procedure > Settlements > Releases From Liability > General Overview

Contracts Law > Contract Conditions & Provisions > Integration Clauses

Contracts Law > Contract Interpretation > General Overview

Contracts Law > ... > Affirmative Defenses > Fraud & Misrepresentation > General Overview

*HN11* It is true that Schlumberger Technology Corp. v. Swanson noted a disclaimer of reliance will not always bar a fraudulent inducement claim, but this statement merely acknowledges that facts may exist where the disclaimer lacks the requisite clear and unequivocal expression of intent necessary to disclaim reliance on the specific representations at issue. Courts must always examine the contract itself and the totality of the surrounding circumstances when determining if a waiver-of-reliance provision is binding. The Texas Supreme Court did so in Schlumberger, but since courts of appeals seem to disagree over which Schlumberger facts were most relevant, the court now clarifies those that guided our reasoning: (1) the terms of the contract were negotiated, rather than boilerplate, and during negotiations the parties specifically discussed the issue which has become the topic of the subsequent dispute; (2) the complaining party was represented by counsel; (3) the parties dealt with each other in an arm's length transaction; (4) the parties were knowledgeable in business matters; and (5) the release language was clear.

Civil Procedure > Settlements > Releases From Liability > General Overview

Contracts Law > Contract Conditions & Provisions > Integration Clauses

Contracts Law > ... > Affirmative Defenses > Fraud & Misrepresentation > General Overview

*HN12* Refusing to honor a settlement agreement--an agreement highly favored by the law--under certain facts would invite unfortunate consequences for everyday business transactions and the efficient settlement of disputes. After-the-fact protests of misrepresentation are easily lodged, and parties who contractually promise not to rely on extra-contractual statements--more than that, promise that they have in fact not relied upon such statements--should be held to their word. Parties should not sign contracts while crossing their fingers behind their backs. It is not asking too much that parties not rely on extra-contractual statements that they contract not to rely on (or else set forth the relied-upon representations in the contract or except them from the disclaimer). If disclaimers of reliance cannot ensure finality and preclude post-deal claims for fraudulent inducement, then freedom of contract, even among the most knowledgeable parties advised by the most knowledgeable legal counsel, is grievously impaired.

Civil Procedure > Settlements > Settlement Agreements > General Overview

*HN13* Settlements are favored because they avoid the uncertainties regarding the outcome of litigation, and the often exorbitant amounts of time and money to prosecute or defend claims at trial. Settlement agreements are highly favored in the law because they are a means of amicably resolving doubts and preventing lawsuits.

Civil Procedure > Settlements > Releases From Liability > General Overview

Contracts Law > Contract Conditions & Provisions > Waivers > General Overview

Contracts Law > ... > Affirmative Defenses > Fraud & Misrepresentation > General Overview

*HN14* A release that clearly expresses the parties' intent to waive fraudulent inducement claims, or one that disclaims reliance on representations about specific matters in dispute, can preclude a claim of fraudulent inducement. Today's holding should not be construed to mean that a mere disclaimer standing alone will forgive intentional lies regardless of context. The Texas Supreme Court declines to adopt a per se rule that a disclaimer automatically precludes a fraudulent-inducement claim.

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > Arbitrability

*HN16* The Texas Arbitration Act allows personal-injury claims to be arbitrated when each party, on advice of counsel, has agreed to do so in a writing signed by the parties and their attorneys. *Tex. Civ. Prac. & Rem. Code Ann. § 171.002(c)*.

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > Arbitrability

Contracts Law > Contract Conditions & Provisions > Arbitration Clauses

*HN15* Generally, after finding an agreement valid, a court considers the agreement's terms to determine which issues are arbitrable.

Contracts Law > Formation of Contracts > General Overview

*HN17* As a rule, parties have the right to contract as they see fit as long as their agreement does not violate the law or public policy.

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Judicial Review

Civil Procedure > ... > Entry of Judgments > Stays of Judgments > General Overview

*HN18* See *Tex. Civ. Prac. & Rem. Code Ann. § 171.025(a)*.

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Judicial Review

*HN19* *Tex. Civ. Prac. & Rem. Code Ann. § 171.025(b)* expressly allows for the severance of nonarbitrable issues.

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Judicial Review

Civil Procedure > ... > Entry of Judgments > Stays of Judgments > General Overview

*HN20* See *Tex. Civ. Prac. & Rem. Code Ann. § 171.025(b)*.

**Counsel:** For Forest Oil Corporation, PETITIONER: Mr. Geoffrey L. Harrison, Mr. Johnny W. Carter, Mr. Richard Wolf Hess, Susman Godfrey, L.L.P., Houston, TX.; Mr. Mitchell C. Chaney, Brownsville, TX.; Mr. Neil E. Norquest, Rodriguez, Colvin, Chaney & Saenz, L.L.P., Edinburg, TX.; Mr. Aaron Pena Jr., Rodriquez Colvin Chaney

For Daniel B. Worden, PETITIONER: Mr. Geoffrey L. Harrison, Susman Godfrey, L.L.P., Houston, TX.

For James Argyle McAllen, RESPONDENT: Mr. Jon Christian Amberson, Ms. Larissa Janee Hood, Jon Christian Amberson, P.C., San Antonio, TX.; Mr. Rolando Cantu, Rolando Cantu & Associates, P.L.L.C., McAllen, TX.; Mr. John F. Carroll, San Antonio, TX.; Mr. Craig T. Enoch, Mr. David Scott Morris, Winstead Sechrest & Minick P.C., Austin, TX.

For El Rucio Land and Cattle Company, Inc., RESPONDENT: Mr. Jon Christian Amberson, Jon Christian Amberson, P.C., San Antonio, TX.

For San Juanito Land Partnership, RESPONDENT: Mr. Jon Christian Amberson, Jon Christian Amberson, P.C., San Antonio, TX.

For McAllen Trust Partnership, RESPONDENT: Mr. Jon Christian Amberson, Jon Christian Amberson, San Antonio, TX.

**Judges:** JUSTICE WILLETT delivered the opinion of the Court, in which JUSTICE HECHT, JUSTICE O'NEILL, JUSTICE WAINWRIGHT, JUSTICE BRISTER, JUSTICE GREEN, and JUSTICE JOHNSON joined. CHIEF JUSTICE JEFFERSON filed a dissenting opinion, in which JUSTICE MEDINA joined.

**Opinion by:** Don R. Willett

# Opinion

 [*52] This commercial contract case asks whether an unambiguous waiver-of-reliance provision precludes a fraudulent-inducement claim as a matter of law. Here, sophisticated parties represented by counsel in an arm's-length transaction negotiated a settlement agreement that included clear and broad waiver-of-reliance and release-of-claims language. Because that agreement conclusively negates reliance on representations made by either side, any [*53] fraudulent-inducement claim, lodged here to avoid an arbitration provision, is contractually barred. We enforce the parties' contract as written. Thus, we reverse the court of appeals' judgment and remand to the trial court to compel arbitration in accordance with our opinion.

## 1. Factual and Procedural Background

In 1999, Forest Oil Corporation settled a long-running lawsuit over oil and gas royalties [**2] and leasehold development with James McAllen and others with interests in the McAllen Ranch. [1] The settlement agreement resulted from a week-long mediation and released Forest Oil from "any and all" claims "of any type or character known or unknown" that are "in any manner relating to" the McAllen Ranch Leases and the covered lands, whether the claims sound in contract, tort, trespass or any other theory. [2] While this sweeping release resolved the royalty and nondevelopment disputes, the parties reserved the right to arbitrate under the Texas General

---

[1] This appeal does not involve every party to the 1999 settlement agreement at issue. The defendants in the litigation that resulted in that settlement were Forest Oil Corporation, Shell Oil Company, Conoco Incorporated, and Fina Oil & Chemical Company, along with divisions of these entities. The plaintiffs included [**3] various business entities, individuals, and individual trusts. These parties settled their dispute in June 1999.

Five years later, James McAllen and several others filed suit against Forest Oil, its employee (Daniel B. Worden), and ConocoPhillips Corporation. ConocoPhillips was nonsuited, so only Forest Oil and Worden are petitioners here. They are referred to collectively as "Forest Oil." Four plaintiffs to the pending litigation--James McAllen, El Rucio Land & Cattle Company, San Juanito Land Partnership, and McAllen Trust Partnership--are respondents to this appeal and referred to collectively as "McAllen," unless otherwise noted. These four plaintiffs admit they are bound by the 1999 settlement agreement either as signatories or successors in interest thereto. Several other plaintiffs are not parties to this appeal, and Forest Oil concedes the trial court lacked authority to require these other plaintiffs to arbitrate the current dispute.

[2] The release language reads:

  [The plaintiffs] generally and unconditionally RELEASE, DISCHARGE, and ACQUIT [the defendants] of and from any and all claims and causes of action of any type or character known or unknown, which they presently have or [**4] could assert, including but not limited to all claims and causes of action (i) in any manner relating to, arising out of or connected with the McAllen Ranch Leases, or any of them, (ii) in any manner relating to, arising out of or connected with the Lands covered by the McAllen Ranch Leases, or any of them, (iii) in any manner relating to, arising out of or connected with any implied covenants pertaining to the McAllen Ranch Leases, or any of them, including (without limitation) implied covenants or obligations with respect to drainage, development, unitization, marketing or the administration of the McAllen Ranch Leases . . . (vi) all claims and causes of action that the [plaintiffs] asserted or could have asserted in the Lawsuit including (without limitation) matters

Arbitration Act (TAA) claims "for environmental liability, surface damages, personal **[*54]** injury, or wrongful death occurring at any time and relating to the McAllen Ranch Leases." The parties also incorporated into the settlement agreement a separate surface agreement that detailed ongoing care and remediation of the surface estate. [3]

Importantly, the settlement agreement specifically disclaimed reliance "upon any statement or any representation of any agent of the parties" in executing the releases contained in the agreement. [4] The parties also acknowledged they were "fully advised" by legal counsel as to both the contents and consequences of the release.

In 2004, McAllen sued Forest Oil to recover for environmental damage caused when Forest Oil allegedly "used its access under the leases to the surface estate to bury highly toxic mercury-contaminated" material on **[**8]** the

---

arising or sounding in contract, in tort (including intentional torts, fraud, conspiracy, and negligence), in trespass, for forfeiture, or under any other theory or doctrine, including any claim for attorneys fees, costs, and sanctions; and the [plaintiffs] hereby declare that all such claims and causes of action have been fully compromised, satisfied, paid and discharged; except that the [plaintiffs] reserve and except **[**5]** from this release only (a) their rights to receive the consideration (monetary and otherwise) provided in this Agreement, (b) their rights to accrued but unpaid royalties . . . , (c) any rights and claims arising under the McAllen Ranch Leases . . . after the Effective Date of this Agreement, (d) any rights or claims they may have, if any, for environmental liability, surface damages, personal injury, or wrongful death occurring at any time and relating to the McAllen Ranch Leases, (e) the funds held [pursuant to this Agreement], and (f) any intentional act done in contravention of this Agreement or the McAllen Ranch Leases between the date of execution hereof and the Effective Date. Any disputes over any of the above items excepted and reserved from this release shall be resolved in arbitration pursuant to [this Agreement].

[3] The surface agreement required that oil companies remove nonnatural materials from the sites of abandoned wells and "not store or dispose of any hazardous materials on the surface of the Leases." In addition, the surface agreement states plainly that surface issues shall be addressed by arbitration: "Surface issues which arise in connection with the Leases shall **[**6]** be subject to that certain Arbitration Agreement set forth and described in the Settlement Agreement. The specific issues addressed below shall become part of the Settlement Agreement and shall be enforceable in accordance with the terms of such Agreement."

[4] The waiver-of-reliance provision reads:

[1] Each party acknowledges and confirms that each has had the opportunity to consult with counsel and has been fully advised by counsel prior to the execution of this Agreement.

[2] Each of the Plaintiffs and Intervenors expressly warrants and represents and does hereby state and represent that no promise or agreement which is not herein expressed has been made to him, her, or it in executing the releases contained in this Agreement, and that none of them is relying upon any statement or any representation of any agent of the parties being released hereby. Each of the Plaintiffs **[**7]** and Intervenors is relying on his, her, or its own judgment and each has been represented by his, her, or its own legal counsel in this matter. The legal counsel for Plaintiffs have read and explained to each of the Plaintiffs the entire contents of the releases contained in this Agreement as well as the legal consequences of the releases. . . .

[3] Defendants expressly represent and warrant and do hereby state and represent that no promise or agreement which is not herein expressed has been made to them in executing the releases contained in this Agreement, and that they are not relying upon any statement or representation of any of the parties being released hereby. Defendants, and each of them are relying upon its own judgment and each has been represented by its own legal counsel in this matter. The legal counsel for Defendants have read and explained to them the entire contents of the releases contained in this Agreement as well as the legal consequences of the releases.

McAllen Ranch. McAllen also alleged environmental and personal injuries caused when Forest Oil moved oilfield drilling pipe contaminated with radioactive material from the McAllen Ranch to a nearby property, the Santillana Ranch, which housed a sanctuary for endangered rhinoceroses. [5]

Forest Oil sought to compel arbitration under the settlement agreement, but **[\*55]** McAllen argued the arbitration provision was induced by fraud and thus unenforceable. McAllen recounts assurances during the 1999 settlement negotiations that no environmental pollutants or contaminants **[\*\*10]** existed on the property. McAllen claims an unidentified lawyer for one of the four defendants "assured [McAllen] that there was no problem, no issue at all that [he] would be concerned about," and McAllen says he signed the agreement based on that specific representation. McAllen claims that when this assurance of "no environmental issues" was given, Forest Oil knew all about the radioactive-contaminated pipe and the mercury-contaminated material.

After an evidentiary hearing on Forest Oil's motion to compel arbitration, the trial court denied the motion, and the court of appeals affirmed, applying a no-evidence standard of review because the case was "an interlocutory appeal from an order denying a motion to compel arbitration that involves the defense of fraudulent inducement." [6] After examining the testimony of McAllen and a former Forest Oil employee, the court of appeals concluded there was some evidence to support the trial court's determination that the arbitration provision was induced by fraud. [7]

This interlocutory appeal followed. [8] Although the court of appeals treated Forest Oil's argument as an evidentiary challenge, this case fundamentally **[\*\*11]** poses a legal question, not a factual one: does McAllen's disclaimer of reliance on Forest Oil's representations negate the fraudulent-inducement claim as a matter of law? *HN1* We review this legal question de novo. [9]

## 2. Enforcement of the Parties' Arbitration Agreement Under the Texas General **[\*\*12]** Arbitration Act

---

[5] The plaintiffs filed a joint petition asserting negligence, gross negligence, trespass, nuisance, strict liability, negligence per se, misrepresentation, fraud, fraudulent concealment, and intentional battery. The facts giving rise to these causes of action took place on two properties: the Santillana Ranch and the McAllen Ranch. We will refer to the claims arising on the McAllen Ranch as the "McAllen Ranch claims" and claims arising on the Santillana Ranch as the "Santillana Ranch claims."

Forest Oil produces oil on the McAllen Ranch pursuant to the McAllen Ranch Leases; this relationship was the basis of the original 1999 litigation that produced the now-disputed settlement agreement. The Santillana Ranch is owned by John R. Willis Management Partnership; this entity is one of the plaintiffs to the underlying suit that are not parties to this appeal. *See supra* note 1.

The Third Amended Petition claims **[\*\*9]** Forest Oil buried radioactive material on the McAllen Ranch, resulting in groundwater and soil contamination. The petition does not assert personal injuries related to the McAllen Ranch. McAllen tried to establish a rhinoceros sanctuary on the Santillana Ranch and asked Forest Oil, which has no lease on that ranch, to donate oilfield pipe to be used as pen enclosures. Forest Oil took pipe from the McAllen Ranch to the Santillana Ranch, where McAllen and his employees worked on the rhinoceros pens. McAllen claims this pipe was radioactive and has produced both environmental and personal injuries.

Forest Oil claims that because the pipe giving rise to the Santillana Ranch claims came from the McAllen Ranch, the Santillana Ranch claims also fall within the settlement agreement's arbitration clause, which requires arbitration of claims "arising out of or relating to the McAllen Ranch Leases." We do not reach this issue.

[6] __ S.W.3d __, __.

[7] *Id.* at__.

[8] *HN2* We have jurisdiction to hear an appeal from an interlocutory order denying arbitration if the court of appeals' decision conflicts with our precedent. *See* TEX. GOV'T CODE §§ 22.001(a)(2), 22.225(c); TEX. CIV. PRAC. & REM. CODE § 171.098; *Certain Underwriters at Lloyd's of London v. Celebrity, Inc.,* 988 S.W.2d 731, 733 (Tex. 1998). As explained below, the court of appeals' decision conflicts with *Schlumberger Technology Corp. v. Swanson,* 959 S.W.2d 171 (Tex. 1997).

[9] *HN3* When an appeal from a denial of a motion to compel arbitration turns on a legal determination--here, the preclusive effect of the contract's disclaimer--we apply a de novo standard. *J.M. Davidson, Inc. v. Webster,* 128 S.W.3d 223, 227 (Tex. 2003) ("The trial

We first address application of the TAA, which the parties' settlement **[*56]** agreement specifically invoked. *HN4* Federal and Texas law strongly favor arbitration, [10] and we uphold arbitration agreements that comport with traditional principles of contract law. [11] While an arbitration agreement procured by fraud is unenforceable, [12] the party opposing arbitration must show that the fraud relates to the arbitration provision specifically, not to the broader contract in which it appears. [13] If a trial court finds that the claim falls within the scope of a valid arbitration agreement, the "court has no discretion but to compel arbitration and stay its own proceedings." [14]

Forest Oil challenges the trial court's refusal to compel arbitration on three grounds: (1) the waiver-of-reliance provision in the contract precludes as a matter of law McAllen's ability to show the reliance element of fraudulent inducement; (2) McAllen cannot establish justifiable reliance on oral representations that directly contradict the terms of a signed contract; and (3) McAllen cannot establish justifiable **[**14]** reliance on statements made by an adversary. Because Forest Oil's first argument defeats McAllen's claim, we do not reach the other two.

### 3. *Schlumberger* Controls this Relevantly Similar Case: The Parties' Broad Disclaimer of Reliance is Dispositive

Forest Oil contends the waiver-of-reliance provision in the settlement agreement conclusively defeats McAllen's fraudulent inducement claim. We agree.

We considered today's question in *Schlumberger Technology Corp. v. Swanson,* holding that *HN8* a disclaimer of reliance on representations, "where the parties' intent is clear and specific, should be effective to negate a fraudulent inducement claim." [15] In that case--decided eighteen months before the settlement in the instant case and construing virtually identical disclaimer language--Schlumberger and the Swansons agreed to a complete release of claims to settle a dispute involving an underwater diamond-mining project off the South African coast. [16] The Swansons sold their interests in the venture to Schlumberger for roughly $ 1 million, [17] and **[*57]** the parties signed a settlement agreement, which included this waiver-of-reliance provision:

> [E]ach of us [the Swansons] expressly warrants and represents **[**15]** and does hereby state . . . and represent . . . that no promise or agreement which is not herein expressed has been made to him or her in

court's determination of the arbitration agreement's validity is a legal question subject to de novo review."); *see also In re D. Wilson Constr. Co.,* 196 S.W.3d 774, 781 (Tex. 2006).

[10] *Prudential Sec. Inc. v. Marshall,* 909 S.W.2d 896, 898 (Tex. 1995); *see also In re FirstMerit Bank, N.A.,* 52 S.W.3d 749, 753 (Tex. 2001). *HN5* Whether a case is governed by the Federal Arbitration Act (FAA) or the TAA, many of the underlying substantive principles are the same; where appropriate, this opinion relies interchangeably on cases that discuss the FAA and TAA.

[11] *In re D. Wilson Constr. Co.,* 196 S.W.3d at 781; *Webster,* 128 S.W.3d at 227.

[12] TEX. CIV. PRAC. & REM. CODE § 171.001(b) *HN6* ("A party may revoke the agreement **[**13]** only on a ground that exists at law or in equity for the revocation of a contract."); *see also Doctor's Assocs., Inc. v. Casarotto,* 517 U.S. 681, 687, 116 S. Ct. 1652, 134 L. Ed. 2d 902 (1996); *In re Kellogg Brown & Root, Inc.,* 166 S.W.3d 732, 738 (Tex. 2005).

[13] *See Prima Paint Corp. v. Flood & Conklin Mfg. Co.,* 388 U.S. 395, 403-04, 87 S. Ct. 1801, 18 L. Ed. 2d 1270 (1967). *HN7* If a fraudulent-inducement claim attacks the broader contract, then the arbitrator, not a court, considers the matter. *See In re FirstMerit Bank, N.A.,* 52 S.W.3d at 758. In this case, we assume that the alleged fraud went to the arbitration agreement itself since Forest Oil does not argue otherwise. *See* TEX. R. APP. P. 53.2(f); *Ramos v. Richardson,* 228 S.W.3d 671, 673 (Tex. 2007).

[14] *In re FirstMerit Bank, N.A.,* 52 S.W.3d at 753-54; *see also* TEX. CIV. PRAC. & REM. CODE § 171.021.

[15] 959 S.W.2d 171, 179 (Tex. 1997).

[16] *Id.* at 174.

[17] *Id.*

executing this release, and that *none of us is relying upon any statement or representation of any agent of the parties being released hereby. Each of us is relying on his or her own judgment* and each has been represented by Hubert Johnson as legal counsel in this matter. The aforesaid legal counsel has read and explained to each of us the entire contents of this Release in Full, as well as the legal consequences of this Release . . . . [18]

After learning that Schlumberger later sold the interest to DeBeers for about $ 4 million, the Swansons sued, claiming Schlumberger had fraudulently induced them to accept the low-price buyout. [19] They maintained that when Schlumberger entered into the settlement, it knew that the Swansons' interest had a far higher value. [20]

Our decision in *Schlumberger* assumed that (1) the company knew during negotiations that it was misrepresenting the value of the interest, **[**16]** and (2) the misrepresentations were made with the intent of inducing the Swansons to settle. [21] Despite these assumptions, we held as a matter of law that the Swansons could not show fraudulent inducement. [22]

McAllen argues that *Schlumberger* is not controlling because we restricted that holding to the record, and today's case involves "notable distinctions" and "material fact differences." McAllen's chief argument to distinguish *Schlumberger* is that *Schlumberger* "focuses on representations that were made regarding the underlying agreement's core subject matter." The dispute in *Schlumberger* concerned the value of the Swansons' interest in the sea-diamond project, and the alleged misrepresentation, as described by McAllen, "pertained to the very thing disputed, which was resolved 'once and for all' in the settlement." [23] This case is different, says McAllen, because the litigation that led to the 1999 settlement concerned royalty underpayments and mineral underdevelopment, issues having nothing to do with the environmental and personal-injury torts that sparked the current litigation and were excepted from the settlement agreement. That is, while the misrepresentation **[**17]** in *Schlumberger* "pertained to the very matter negotiated, settled, and released"-a factor that McAllen terms "the primary basis" for the Court's holding--the misrepresentation here did not concern known disputed matters (which were settled and released) but potential future disputes (which were set aside and reserved). And the disclaimer applies solely to representations about the former, not the latter. Under this banner, McAllen makes three subsidiary arguments.

First, McAllen stresses that the parties' settlement in *Schlumberger* definitively ended their valuation dispute. McAllen points out that the settled dispute was the only dispute, meaning that the agreed-to disclaimer was sufficiently specific to bar a **[*58]** later fraudulent-inducement suit alleging one side misled the other about valuation. [24] By contrast, in this case, ending the royalty underpayment and mineral underdevelopment dispute was not the sole purpose of the settlement agreement, McAllen argues, making the disclaimer insufficiently specific to be applied to every representation made by Forest Oil.

McAllen identifies a valid factual distinction, but **HN9** we fail to see how the disclaimer's preclusive effect should be different where, as here, the parties agreed to resolve litigated claims and arbitrate future ones.

---

[18] *Id.* at 180. The disclaimer in today's case is virtually the same. *See supra* note 4.

[19] *Id.* at 174.

[20] *Id.*

[21] *Id.* at 178.

[22] *Id.* at 181.

[23] *Id.* at 179-81.

[24] *Id.* at 180 ("The sole purpose of the release was to end the dispute about the value of this commercial project **[**18]** between Schlumberger and the Swansons once and for all.").

Although we noted in *Schlumberger* that the company's representations about the project's value and feasibility led to "the very dispute that the release was supposed to resolve," [25] this language is more accurately interpreted as emphatic language, not limiting language. Our analysis in *Schlumberger* rested on the paramount principle that Texas courts should uphold contracts negotiated at arm's length by "knowledgeable and sophisticated business players" represented by "highly competent and able legal counsel," a principle that applies with equal force to contracts that reserve future claims as to contracts that settle all claims. [26] Essentially, *Schlumberger* holds that when knowledgeable parties expressly discuss material issues during contract negotiations but nevertheless elect to include waiver-of-reliance and release-of-claims provisions, the Court will generally uphold the contract. An all-embracing disclaimer **[\*\*19]** of any and all representations, as here, shows the parties' clear intent. A "once and for all" settlement may constitute an *additional* factor urging rejection of fraud-based claims, but a freely negotiated agreement to settle present disputes and arbitrate future ones should also be enforceable. Moreover, contrary to McAllen's assertions, the parties' discussions here *did* in fact address environmental matters. Not only were such matters "very important" to McAllen during settlement negotiations, as he testified, the parties also negotiated the surface agreement, which directly touches on the subject of Forest Oil's alleged fraud: environmental contamination on the McAllen Ranch. The surface agreement, incorporated into the settlement agreement, required Forest Oil to remove hazardous material and remediate past and future contamination. Therefore, the parties expressly negotiated the treatment of surface issues; environmental issues were an important aspect of the contract. Although the settlement agreement does not preclude all future environmental disputes, it does require arbitration of them.

Second, McAllen contends the settlement language itself compels a different result from *Schlumberger*. McAllen maintains that the disclaimer he signed is limited by its terms to representations about the matters released and settled, not to misrepresentations about matters reserved and excluded from the settlement. Here, the waiver-of-reliance provision states: "Each of the [plaintiffs] expressly warrants and represents and does hereby state and represent that no promise or agreement which is not herein expressed has been made to him, her, or it *in executing the releases* contained in this Agreement ...." [27] McAllen claims the isolated **[\*59]** phrase "in executing the releases" limits the waiver's application only to released claims because the phrase refers to "releases" in the plural. Because an arbitration provision is not a release, he reasons, the parties did not waive reliance with respect to misrepresentations concerning the matters reserved for arbitration. This argument discounts the second half of the same sentence, which makes clear the parties intended an exhaustive waiver unconfined to claims specifically released: "none of them **[\*\*21]** is relying upon *any* statement or *any* representation of *any* agent of the parties being released hereby." [28] Contrary to McAllen's interpretation, a natural and contextual reading, given the repeated and all-encompassing "any" modifier, is not nearly so restrictive. It rather plainly means the parties, "in executing the releases," were not led astray by any representations whatsoever, even representations about nonreleased claims since those, too, can induce someone to release other claims. The disclaimer's words do not say what McAllen construes them to say, that there was "no promise or agreement *concerning the released claims* which is not herein expressed"; those four italicized words do not exist. Waiving reliance on statements made in executing the release provisions encompasses both claims released and reserved because even statements about the latter can nudge assent to settle the former. Notably, in this case, the release *itself* (in a section titled "Releases" no less) specifically requires arbitration, making clear that at the time of the agreement, the parties disclaimed reliance with respect to *all* decisions being made during negotiations, including the decision to resolve **[\*\*22]** future disputes regarding environmental and

---

[25] *Id.* **HN10** The reasoning of the case applies broadly to contracts generally, and we see no reason **[\*\*20]** to accept McAllen's restrictive interpretation.

[26] *Id.*

[27] *See supra* note 4.

[28] *Id.*

personal-injury claims via arbitration. It is difficult to argue that Forest Oil's alleged fraud in obtaining arbitration bears no relation to the release when the arbitration requirement appears in the release. It is similarly difficult to square McAllen's argument with this explicit language from the settlement agreement, which incorporated the surface agreement: "disputes relating to this Agreement . . . will be resolved by arbitration." [29]

Third, McAllen argues that fraudulent inducement "is essentially a meeting-of-the-minds argument," and there was no such meeting here regarding the arbitration agreement because Forest Oil knew all along of the potential for environmental claims while simultaneously assuring McAllen "there [were] no issues having to do with the surface." The parties thus had no common understanding of the facts underlying the contract, according to McAllen. But the settlement agreement itself belies this [**23] argument. The parties agreed that they might disagree and decided to arbitrate any environmental or personal-injury disputes that might later arise. If they were certain such disagreements would never arise, there would have been no need to reserve future claims for arbitration. The act of specifically carving out this discrete category of contamination claims shows that McAllen in fact placed little trust in Forest Oil's assurances that there were "no issues having to do with the surface" and that both parties recognized the possibility that McAllen might pursue future claims. Moreover, there is an arbitration provision in the environment-focused surface agreement itself, not only in the broader settlement agreement. According to the surface agreement, " [*60] [s]urface issues which arise in connection with the Leases" must be arbitrated. McAllen knew environmental disputes might arise and agreed to arbitrate these disputes.

*HN11* It is true that *Schlumberger* noted a disclaimer of reliance "will not always bar a fraudulent inducement claim," [30] but this statement merely acknowledges that facts may exist where the disclaimer lacks "the requisite clear and unequivocal expression of intent necessary [**24] to disclaim reliance" on the specific representations at issue. [31] Courts must always examine the contract itself and the totality of the surrounding circumstances when determining if a waiver-of-reliance provision is binding. We did so in *Schlumberger,* but since courts of appeals seem to disagree over which *Schlumberger* facts were most relevant, [32] we now clarify those that guided our reasoning: (1) the terms of the contract were negotiated, rather than boilerplate, and during negotiations the parties specifically discussed the issue which has become the topic of the subsequent dispute; (2) the complaining party was represented by counsel; (3) the parties dealt with each other in an arm's length transaction; (4) the parties were knowledgeable in business matters; and (5) the release language was clear. These factors were each present in *Schlumberger*, and they are each present in this case.

---

[29] *See also supra* note 3 ("Surface issues which arise in connection with the Leases shall be subject to that certain Arbitration Agreement set forth and described in the Settlement Agreement.").

[30] 959 S.W.2d at 181.

[31] *Id.* at 179.

[32] *See, e.g., Warehouse Assocs. Corporate Ctr. II, Inc. v. Celotex Corp.,* 192 S.W.3d 225, 230-34 (Tex. App.--Houston [14th Dist.] 2006, pet. filed) (limiting *Schlumberger* to cases in which the parties resolve a long-running dispute that is also the topic of the alleged [**25] fraudulent representation); *Coastal Bank SSB v. Chase Bank of Texas, N.A.,* 135 S.W.3d 840, 844 (Tex. App.--Houston [1st Dist.] 2004, no pet.) (considering the broad language of the waiver-of-reliance provision to be the controlling factor); *IKON Office Solutions, Inc. v. Eifert,* 125 S.W.3d 113, 124-28 (Tex. App.--Houston [14th Dist.] 2003, pet. denied) (applying *Schlumberger* in a factual situation that did not involve a settlement agreement or a contract that terminated the parties' relationship); *John v. Marshall Health Servs., Inc.,* 91 S.W.3d 446, 450 (Tex. App.--Texarkana 2002, pet. denied) (refusing to apply *Schlumberger* because "[h]ere, the contract was the beginning, not the end, of the relationship between" the parties).

*HN12* Refusing to honor a settlement agreement--an agreement highly favored by the law [33] --under these facts would invite unfortunate consequences for everyday business transactions and the efficient settlement of disputes. After-the-fact protests of misrepresentation are easily lodged, and parties who contractually promise not to rely on extra-contractual statements--*more than that, promise that they have in fact not relied upon such statements*--should be held to **[**26]** their word. Parties should not sign contracts while crossing their fingers behind their backs. McAllen accuses Forest Oil of deceit, but Forest Oil could make the same allegation against McAllen--who by his own admission and in writing is claiming the opposite now of what he expressly disclaimed then. It is not asking too much that parties not rely on extra-contractual statements that they contract not to rely on (or else set forth the relied-upon representations in the contract or except them from the disclaimer). **[*61]** If disclaimers of reliance cannot ensure finality and preclude post-deal claims for fraudulent inducement, then freedom of contract, even among the most knowledgeable parties advised by the most knowledgeable legal counsel, is grievously impaired.

We conclude the arbitration requirement is integral to the overall release and the settlement agreement's waiver-of-reliance language applies by its terms to the parties' commitment to arbitrate. None of McAllen's arguments materially distinguishes our holding in *Schlumberger*: *HN14* "a release that clearly expresses the parties' intent to waive fraudulent inducement claims, or one that disclaims reliance on representations about specific matters in dispute, can preclude a claim of fraudulent inducement." [34] Today's holding should not be construed to mean that a mere disclaimer standing alone will forgive intentional lies regardless of context. We decline to adopt a *per se* rule that a disclaimer automatically precludes a fraudulent-inducement claim, but we hold today, as in *Schlumberger*, that "on this record," the disclaimer of reliance refutes the required element of reliance.

## 4. Scope of the Arbitration Clause

Having determined that McAllen's fraudulent-inducement claim cannot defeat the arbitration provision in the 1999 settlement agreement, we now turn to whether McAllen's claims fall within the scope of that arbitration **[**28]** provision. [35] *HN15* Generally, after finding an agreement valid, a court considers the agreement's terms to determine which issues are arbitrable. [36] This arbitration agreement, however, removes the "scope determination" from the court and places it with the arbitration panel. [37] This provision, shrinking the court's

---

[33]  *See Transp. Ins. Co. v. Faircloth,* 898 S.W.2d 269, 280 (Tex. 1995) *HN13* ("Settlements are favored because they avoid the uncertainties regarding the outcome of litigation, and the often exorbitant amounts of time and money to prosecute or defend claims at trial."); *Bocanegra v. Aetna Life Ins. Co.,* 605 S.W.2d 848, 855 (Tex. 1980) (Campbell, J., concurring) ("Settlement agreements are highly favored in the law because they are a means **[**27]** of amicably resolving doubts and preventing lawsuits.").

[34]  959 S.W.2d at 181.

[35]  *HN16* The TAA allows personal-injury claims to be arbitrated when each party, on advice of counsel, has agreed to do so in a writing signed by the parties and their attorneys. TEX. CIV. PRAC. & REM. CODE § 171.002(c). All parties to this appeal--or their predecessors in interest--and their attorneys signed the settlement agreement, which contains the arbitration agreement, so there is no statutory prohibition to arbitrating these claims.

[36]  *In re FirstMerit Bank, N.A.,* 52 S.W.3d 749, 753 (Tex. 2001).

[37]  The arbitration provision reads: "All disputes arising out of or relating to the McAllen Ranch Leases, including, without in any way limiting the foregoing, disputes **[**29]** relating to this Agreement or disputes over the scope of this arbitration clause, will be resolved by arbitration in Houston, Texas, using three neutral arbitrators." While this provision clearly encompasses the McAllen Ranch claims, it is not clear that it includes the Santillana Ranch claims.

traditional role and expanding the arbitrators', is not challenged on legal or public policy grounds. [38] Accordingly, we have no discretion but to direct the trial court to compel arbitration and stay McAllen's litigation. [39]

The remaining question is what should happen to the claims brought by the nonsignatory plaintiffs who are not parties to the arbitration requirement (or to this appeal). Forest Oil concedes the trial court cannot order the nonsignatory plaintiffs to arbitration. *Section 171.025(a) of the Civil Practice and Remedies Code* provides that *HN18* "[t]he court shall stay a proceeding that **[*62]** involves an issue subject to arbitration if an order for arbitration or an application for that order is made under this **[**30]** subchapter." *HN19* *Section 171.025(b)* expressly allows for the severance of nonarbitrable issues. [40] Because the trial court is better positioned to make that determination in this instance, we remand the severance issue to that court.

However, as noted above, McAllen and Forest Oil agreed to arbitrate disputes over what the agreement covers. In terms of timing, the arbitrators should decide scope before the trial court decides severance. It is impractical (and probably impossible) for the trial court to decide the severability of the nonsignatories' claims before the arbitration panel has decided the scope of the signatories' claims. Accordingly, the trial court, in order to make an informed severance decision, should defer its decision until the arbitrators decide which issues are arbitrable.

## 5. Conclusion

McAllen may be correct that "[t]he facts of this case are not the facts of *Schlumberger*"--every case involves unique facts--but the decisive ones are assuredly close enough that *Schlumberger* binds this relevantly similar **[**31]** case. The unequivocal disclaimer of reliance in the parties' bargained-for settlement agreement conclusively negates as a matter of law the element of reliance needed to support McAllen's fraudulent-inducement claim. Because Forest Oil has demonstrated that a valid arbitration agreement exists, an agreement that empowers the arbitrators to determine what issues are arbitrable, we reverse the court of appeals' judgment and remand this case to the trial court to compel arbitration in accordance with our opinion.

Don R. Willett

Justice

**OPINION DELIVERED:** August 29, 2008

**Dissent by:** Wallace B. Jefferson

## Dissent

CHIEF JUSTICE JEFFERSON, joined by JUSTICE MEDINA, dissenting.

According to the Court, the considerations most relevant to our analysis in *Schlumberger Technology Corp. v. Swanson, 959 S.W.2d 171 (Tex. 1997)*, were:

---

[38] *In re Prudential Ins. Co. of Am.,* 148 S.W.3d 124, 129-30 (Tex. 2004) *HN17* ("As a rule, parties have the right to contract as they see fit as long as their agreement does not violate the law or public policy."); *see also Fairfield Ins. Co. v. Stephens Martin Paving, LP,* 246 S.W.3d 653, 663-64 (Tex. 2008).

[39] TEX. CIV. PRAC. & REM. CODE § 171.021; *In re Oakwood Mobile Homes, Inc.,* 987 S.W.2d 571, 573 (Tex. 1999).

[40] TEX. CIV. PRAC. & REM. CODE § 171.025(b) *HN20* ("The stay applies only to the issue subject to arbitration if that issue is severable from the remainder of the proceeding.").

(1) the terms of the contract were negotiated, rather than boilerplate, and during negotiations the parties specifically discussed the issue which has become the topic of the subsequent dispute; (2) the complaining party was represented by counsel; (3) the parties dealt with each other in an arm's-length transaction; (4) the parties were knowledgeable in business matters; and (5) the release language **[**32]** was clear.

__S.W.3d __, __. My disagreement with the Court centers on the first point. Under the Court's analysis, a party may intentionally misrepresent facts essential to the bargain to induce the other to sign, as long as the agreement says reliance is waived. This is not sound policy, and *Schlumberger* does not support this result. I would hold that McAllen's fraudulent inducement claim survives the disclaimer of reliance at issue here. Because the Court does not, I respectfully dissent.

# I

## *Schlumberger*

In *Schlumberger,* we noted that we had previously held "as a matter of policy, that a merger clause can be avoided based on fraud in the inducement and that the parol evidence rule does not bar proof of such fraud," and that "[i]n doing so, we brought **[*63]** the law on the subject 'into harmony with the great weight of authority, with the rule of the Restatement of the Law of Contracts, and with the views of eminent textwriters.'" *Schlumberger, 959 S.W.2d at 179* (quoting *Dallas Farm Mach. Co. v. Reaves, 158 Tex. 1, 307 S.W.2d 233, 239 (Tex. 1957))*. This remains the general rule in Texas. *See Prudential Ins. Co. of Am. v. Jefferson Assocs., 896 S.W.2d 156, 162 (Tex. 1995)*; *see also Weitzel v. Barnes, 691 S.W.2d 598, 600 (Tex. 1985)* **[**33]** (admitting parol evidence to establish misrepresentation in DTPA claim); *Restatement (Second) of Contracts, § 214 cmt. c* ("What appears to be a complete and binding integrated agreement may be a forgery, a joke, a sham, or an agreement without consideration, or it may be voidable for *fraud,* duress, mistake, or the like, or it may be illegal. Such invalidating causes need not and commonly do not appear on the face of the writing. *They are not affected even by a 'merger' clause.*") (emphasis added). We then noted that "[j]uxtaposed to this authority, we have a competing concern--the ability of parties to fully and finally resolve disputes between them." *Schlumberger, 959 S.W.2d at 179*. The Court reads *Schlumberger* as settling these competing concerns by precluding a fraudulent inducement claim where there is a disclaimer of reliance and the factors listed above are present.

But *Schlumberger* is not so broad. There, we held that, where the four other factors listed by the Court are present, "a release that clearly expresses the parties' intent to waive fraudulent inducement claims, or one that disclaims reliance on representations about specific matters in dispute, can preclude a claim of **[**34]** fraudulent inducement." *Id. at 181*. The release in *Schlumberger* did not contain an express waiver of fraudulent inducement claims, but did disclaim reliance on representations about specific matters in dispute. *Id. at 180*. The release itself noted that "'there [wa]s considerable doubt, disagreement, dispute and controversy with reference to the validity of the [claim being settled],'" and the "sole purpose of the release was to end [that] dispute." *Id.* The *Schlumberger* Court therefore concluded "that the parties contemplated, by the inclusion of [the disclaimer of reliance], that the Swansons would not rely on any representations of Schlumberger about the commercial feasibility and value of this project, which, after all, was the very dispute that the release was supposed to resolve." *Id.*

That the *Schlumberger* Court limited its holding to a release "that clearly expresses the parties' intent to waive fraudulent inducement claims, or one that disclaims reliance on representations about specific matters in dispute" is clear from the rest of the opinion. *Id. at 181*. Indeed, we "emphasize[d]" in *Schlumberger* "that a disclaimer of reliance or merger clause will not always bar a fraudulent **[**35]** inducement claim." *Id.* We cited *Prudential Insurance Co. of America v. Jefferson Associates,* in which we said "[a] buyer is not bound by an

agreement to purchase something 'as is' that he is induced to make because of a fraudulent representation or concealment of information by the seller." *Prudential, 896 S.W.2d 156, 162 (Tex. 1995)*. This would be a strange authority to cite if *Schlumberger* were as sweeping as the Court suggests: it is difficult to imagine a party making fraudulent representations on a subject that has not been discussed. And while the Court states that ″this statement merely acknowledges that facts may exist where the disclaimer lacks 'the requisite clear and unequivocal expression of intent necessary to disclaim reliance' on the specific representations at issue,″ it does so without addressing *Prudential,* instead quoting an earlier passage **[\*64]** from *Schlumberger.* \_\_S.W.3d at \_\_(quoting *Schlumberger, 959 S. W.2d at 179*).

In sum, in *Schlumberger* we balanced parties' need to settle disputes against our strong aversion to fraud. The result was a narrow exception to the rule that integration clauses do not bar fraudulent inducement claims. By expanding *Schlumberger,* **[\*\*36]** the Court's holding will force courts to honor contracts indisputably induced by fraud on the basis of blanket reliance waivers, like the one at issue here. I would not.

## II

### McAllen's Fraudulent Inducement Claim

As discussed above, under *Schlumberger,* to bar a fraudulent inducement claim, a disclaimer of reliance must either expressly waive the claim or disclaim reliance on representations about the specific disputed matter, *Schlumberger, 959 S.W.2d at 181*; otherwise, the general rule that integration clauses do not bar fraudulent inducement claims applies. The disclaimer in this case does neither. The relevant portion of the disclaimer reads:

> Each of the Plaintiffs and Intervenors expressly warrants and represents and does hereby state and represent that no promise or agreement which is not herein expressed has been made to him, her, or it in executing the releases contained in this Agreement, and that none of them is relying upon any statement or any representation of any agent of the parties being released hereby.

This disclaimer makes no explicit reference to fraudulent inducement. The question, then, is whether it disclaims reliance on representations about a specific disputed matter **[\*\*37]** in the agreement. While the disclaimers in this case and *Schlumberger* may appear to be ″virtually identical,″ \_\_S.W.3d at \_, the factual differences between this case and *Schlumberger* are critical. In *Schlumberger,* there was essentially one dispute--specifically described in the agreement--being settled, and therefore, ″[b]ecause courts are to assume that the parties intended every contractual provision to have some meaning,″ the Court was able to ″presume″ that the disclaimer of reliance applied specifically to representations about that sole dispute. *Schlumberger, 959 S.W.2d at 180*. In the instant case, in contrast, the settlement agreement covered a number of topics, chiefly royalty underpayment and mineral underdevelopment. Thus, unlike *Schlumberger,* we cannot presume that the disclaimer of reliance referred specifically to environmental issues, and the general rule that fraudulent inducement claims are not barred by integration clauses should apply.

## III

### Forest Oil's Remaining Issues

Forest Oil argues that McAllen could not have justifiably relied on Forest Oil's representation that there were no existing issues with the surface because that representation was contradicted by **[\*\*38]** the agreement's express terms. Because the surface agreement contains no contrary statement regarding surface conditions, it is not necessary to examine this claim in detail.

Forest Oil also argues that McAllen could not justifiably rely on the representation of his litigation adversary during settlement negotiations. Forest Oil cites *McCamish, Martin, Brown & Loeffler v. F.E. Appling Interests,*

for the proposition that "a third party's reliance on an attorney's representation is not justified when the representation takes place in an adversarial context." *McCamish, 991 S.W.2d 787, 794 (Tex. 1999)*. This statement, however, refers not to whether attorneys' **[\*65]** statements can provide the grounds for a fraudulent inducement claim, but to individual attorneys' liability for negligent misrepresentation under the *Restatement (Second) of Torts section 552*. *Id. at 795* (concluding "that there is no reason to exempt lawyers from the operation of *section 552*"). Regardless, there is evidence that McAllen relied not only on the statements of "an unidentified lawyer for one of the four defendants," __S.W.3d at __, but on representations made by the parties themselves:

> Q. (By Mr. Mancias) Yes, sir. **[\*\*39]** Were you told in no uncertain terms *by the oil companies,* including Forest Oil Company, that there were no contaminants or pollutants on the surface of your property?
>
> A. (By Mr. McAllen) *Yes.* And all the Forest attorneys were there. I believe Forest Doran himself was there.
>
> Q. Who is Forest Doran?
>
> A. I believe he's the majority stockholder of Forest Oil Company.
>
> Q. Can you tell the Judge whether or not Mr. Doran was present when those representations you just testified about were made to you?
>
> A. That, I can't recall.
>
> Q. All right, sir. But the attorneys were present?
>
> A. The attorneys - - his attorneys were present.
>
> \*\*\*
>
> A. But during the process, *the owners for Forest and Conoco and everybody else who was involved in the lawsuit assured me that there was no issues* [sic] *having to do with the surface,* and if I wanted to get this settlement agreement behind us, I had to do that. But they were very convincing.

(Emphasis added.) McAllen's reliance on these statements was not, therefore, unjustifiable as a matter of law.

## IV

### Conclusion

Today the Court replaces *Schlumberger's* requirement that a release must "clearly express[] the parties' intent to waive fraudulent inducement claims, or . . . disclaim[] **[\*\*40]** reliance on representations about specific matters in dispute" in order to preclude a fraudulent inducement claim, *959 S.W.2d at 181*, with the requirement that the parties merely "specifically discussed the issue which has become the topic of the subsequent dispute" during negotiations, __S.W.3d __. Courts, including this one, have long battled the specter of fraud in contracts; I fear that the Court's opinion may one day be a weapon in the hands of those who profit from it. I respectfully dissent.

Wallace B. Jefferson

Chief Justice

Opinion delivered: August 29, 2008



Warning

As of: September 1, 2015 2:44 PM EDT

# *Fridl v. Cook*

Court of Appeals of Texas, Eighth District, El Paso

August 31, 1995, Decided

No. 08-94-00392-CV

**Reporter**

908 S.W.2d 507; 1995 Tex. App. LEXIS 2110

JAMES FRIDL, Individually and d/b/a CROSS MARKETING, INC., and CROSS MARKETING OF TEXAS, INC., Appellant, v. THOMAS W. COOK, Appellee.

**Subsequent History:** [**1] Rehearing Overruled October 4, 1995.

**Prior History:** Appeal from 142nd District Court of Midland County, Texas. (TC# A-39,704.) Trial Court Judge: Hon. George Gilles.

## Core Terms

arbitration, alter ego, trial court, parties, compel arbitration, tortious interference, breach of contract, Marketing, appearance, subject to arbitration, matter in controversy, contract claim, no writ, issues, trial court's order, arbitration clause, annuities, discovery, products, damages, staying, urges

## Case Summary

**Procedural Posture**

Appellant business owner sought review by interlocutory appeal of a decision of the 142nd District Court of Midland County, Texas, which denied appellant's motions to compel arbitration, stay litigation, and quash discovery requests in appellee salesman's suit for commissions, and which stayed arbitration between the parties.

**Overview**

Appellee salesman entered into a contract with a corporation controlled by appellant business owner, under which he would sell and service financial instruments and be paid commissions. The contract contained an arbitration clause. Appellee brought suit against appellant, claiming breach of contract, tortious interference, and fraud. The corporation filed a motion to stay litigation and compel arbitration. The trial court denied the motion, and also ordered a stay of arbitration. Appellant sought review of the decision. The court affirmed the trial court's orders in part, and reversed in part. The court found that it had jurisdiction under Tex. Rev. Civ. Stat. Ann. art. 238-2 (1973), and that the corporation had subjected itself to jurisdiction. The court held that while the fraud and tortious interference claims did not arise under the contract, and the trial court had not abused its discretion as to those claims, it was an abuse of discretion not to compel arbitration of the contract claims. Because appellee was entitled to a jury trial on the issue of alter ego, however, the court held that the trial court could hold arbitration in abeyance while determining alter ego.

**Outcome**

The court reversed part of the trial court's order staying arbitration pending the determination of all matters in controversy in appellee salesman's suit against appellant business owner for breach of contract, fraud, and tortious interference, because the contract claims were subject to arbitration. In all else, the court affirmed the trial court's order, because the tort claims and allegation of alter ego were not subject to arbitration.

# LexisNexis® Headnotes

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Mandatory ADR

*HN1* See *Tex.Rev. Civ. Stat. Ann. art. 225*, § B (1973).

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Mandatory ADR

Civil Procedure > Appeals > Appellate Jurisdiction > General Overview

Civil Procedure > Appeals > Appellate Jurisdiction > Interlocutory Orders

Civil Procedure > Appeals > Appellate Jurisdiction > State Court Review

*HN2* Generally a court of appeals has no jurisdiction to review interlocutory orders, unless such appeal is permitted by rule or statute.

Civil Procedure > Appeals > Appellate Jurisdiction > Interlocutory Orders

*HN3* See Tex. Rev. Civ. Stat. Ann. art. 238-2 (1973).

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Validity of ADR Methods

Civil Procedure > Appeals > Standards of Review > De Novo Review

Labor & Employment Law > Collective Bargaining & Labor Relations > Labor Arbitration > Enforcement

*HN4* In reviewing factual questions concerning an order denying arbitration, an appellate court uses a ″no evidence″ standard. It reviews legal conclusions de novo.

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > Arbitrability

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Validity of ADR Methods

Contracts Law > Contract Conditions & Provisions > Arbitration Clauses

Labor & Employment Law > Collective Bargaining & Labor Relations > Labor Arbitration > Enforcement

*HN5* Arbitration, as a means of settling disputes between parties, is favored by Texas courts. The party opposing arbitration bears the burden of proving no valid arbitration agreement exists as to the matters in controversy. The courts must indulge every reasonable presumption in favor of arbitration, and all doubts as to the arbitrability of an issue must be decided in favor of arbitration.

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Validity of ADR Methods

*HN6* The test employed in determining whether a tort claim is subject to arbitration is whether the particular tort claim is so interwoven with the contract that it could not stand alone or, on the other hand, is a tort completely independent of the contract and could be maintained without reference to the contract.

Torts > ... > Commercial Interference > Contracts > General Overview

*HN7* A party cannot tortiously interfere with its own contract.

Contracts Law > Breach > General Overview

Torts > ... > Commercial Interference > Contracts > General Overview

Torts > ... > Contracts > Intentional Interference > Remedies

Torts > ... > Types of Damages > Compensatory Damages > General Overview

*HN8* The elements of a tortious interference claim are: the existence of a contract subject to interference, an act of interference that was wilful and intentional, proximately causing plaintiffs damages, with actual damage or loss to plaintiff. Although breach of the interfered-with contract is probably the most common measure of damage, tortious interference does not limit the damage for the tort to that alone.

Civil Procedure > ... > Pleadings > Amendment of Pleadings > General Overview

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Validity of ADR Methods

Contracts Law > Contract Conditions & Provisions > Arbitration Clauses

Labor & Employment Law > Collective Bargaining & Labor Relations > Labor Arbitration > Enforcement

*HN9* If a tort claim against a non-party to a contract is so interwoven with the agreement that it could not stand alone, then arbitration is appropriate. Certainly, where the basis of a claim against an individual is solely that the individual is alter ego of the corporation which is party to a contract, that claim is so connected to the contract claim that the arbitration clause controls.

Civil Procedure > ... > In Rem & Personal Jurisdiction > In Personam Actions > General Overview

*HN10* A party generally appearing in a case waives any complaints as to personal jurisdiction.

Civil Procedure > ... > In Rem & Personal Jurisdiction > In Personam Actions > General Overview

*HN11* In determining whether a voluntary appearance is a general appearance, the emphasis is on affirmative action which impliedly recognizes the court's jurisdiction over the parties. Mere presence of a party or his attorney in the courtroom at the time of a hearing or a trial, where neither participates in the prosecution or defense of the action, is not an appearance.

**Counsel:** For Appellant: Hon. Hector De Leon, Austin, TX.

For Appellee: Hon. James P. Boldrick, Boldrick, Clifton, Nelson & Holland, Midland, TX. Hon. Dick R. Holland, Boldrick, Clifton, Nelson & Holland, Midland, TX.

**Judges:** Before Panel No. 4, Barajas, C.J., Larsen and McClure, JJ.

**Opinion by:** SUSAN LARSEN

# Opinion

[*509] **OPINION**

This is an appeal from the trial court's order denying defendant's motions to compel arbitration, stay litigation, and quash discovery requests. In addition to denying defendant's motions, the trial court ordered that all arbitration be stayed "pending the determination . . . of all matters in controversy between the parties." We affirm in part and reverse in part.

## FACTS

In 1990, Thomas W. Cook entered into a written agreement with Cross Marketing, Inc., under which Cook would sell and service insurance policies, annuities, and investments for CMI throughout West Texas and New Mexico. In return, Cook would receive [*510] 50 percent commission and other compensation for the sales. CMI's president, James Fridl, signed the contract as CMI's representative. [**2] The contract contains an arbitration clause, which states:

> Any and all controversies, disputes or claims arising out of or relating to this Agreement or a breach hereof, except as otherwise provided herein, shall be resolved by arbitration to be held in Houston, Texas, in accordance with the rules then observed by the American Arbitration Association, and judgement upon any award rendered may be entered by any court of competent jurisdiction. The parties shall bear the cost of such arbitration equally.

Cook first filed suit in federal court alleging that he was owed commissions under the contract. Cook made a demand for arbitration under the contract in June 1994, which he later withdrew in a motion for nonsuit without prejudice addressed to the American Arbitration Association. The federal suit had meanwhile been dismissed, and Cook filed a second suit in state court. In this suit, Cook sued "James Fridl d/b/a Cross Marketing, Inc." Cook's first amended petition alleged breach of contract, tortious interference, and fraud against Fridl, as alter ego of CMI.

Fridl entered a general denial. Cross Marketing, Inc. moved to stay litigation and compel arbitration under [**3] the contract, pursuant to _TEX.REV.CIV.STAT.ANN. art. 225_, § B (Vernon 1973). [1] The trial court denied CMIs motion, and further ordered all arbitration be stayed "pending the determination . . . of all matters in controversy between the parties." The case is before us on Fridl's appeal of this interlocutory order. We affirm in part and reverse in part.

## JURISDICTION

As a threshold issue, we must decide whether we enjoy jurisdiction to hear this appeal from the trial court's interlocutory order refusing to compel arbitration; Cook claims we do not. _HN2_ Generally this [**4] Court has no jurisdiction to review interlocutory orders, unless such appeal is permitted by rule or statute. _Jack B. Anglin Co., Inc. v. Tipps, 842 S.W.2d 266, 272 (Tex. 1992)._

_HN3_ The Texas General Arbitration Act does provide for such interlocutory review, stating that:

---

[1]  _HN1_ "On application, the court may stay an arbitration proceeding commenced or threatened on a showing that there is no agreement to arbitrate. Such an issue, when in substantial and bona fide dispute, shall be forthwith and summarily tried and the stay ordered if found for the moving party. If found for the opposing party, the court shall order the parties to proceed to arbitration." TEX.REV. CIV. STAT. ANN. art. 225, § B (Vernon 1973).

Sec. A. An appeal may be taken from:

(1) An order denying an application to compel arbitration . . .

(2) An order granting an application to stay arbitration . . .

. . .

Sec. B. The appeal shall be taken in the manner and to the same extent as from orders or judgments in a civil action. TEX.REV.CIV.STAT.ANN art. 238-2 (Vernon 1973).

Fridl is clearly appealing the trial court's ruling on the application to compel arbitration, as well as the order staying all arbitration proceedings. Thus, by virtue of the arbitration act, we conclude that we have jurisdiction to hear this appeal.

## PARTIES DEFENDANT

This Court finds troublesome the designation and role of parties defendant here, a confusion to which both plaintiff and defendant(s) have contributed. Cook has sued "James Fridl d/b/a Cross Marketing Inc." Fridl has answered with a general denial. Fridl individually filed **[**5]** his cost bond perfecting this appeal. Cross Marketing, Inc., although at least nominally a corporate entity, has never been named as a corporate defendant, has not been served with citation, nor filed an answer. It was CMI, however (without Fridl) who filed the motion for stay of litigation and motion to quash discovery, the orders denying which Fridl now appeals. Fridl denies plaintiffs allegations of alter ego, and there have been no findings or admissions on that issue. We can make sense of this only by interpreting CMI's motion to stay as a general appearance in this **[*511]** case and its submission to the trial court's jurisdiction over it as a party defendant. Appellee has not challenged Fridl's standing to urge on appeal CMI's right to arbitration. In short, Fridl and CMI seem to be operating interchangeably in this litigation, with the acquiescence of all parties. We will analyze the issues on appeal from that perspective.

## STANDARD OF REVIEW

*HN4* In reviewing factual questions concerning an order denying arbitration, we use a "no evidence" standard. *Hearthshire Braeswood Plaza Ltd. Partnership v. Billy Kelly Co., 849 S.W.2d 380, 384* (Tex.App.--Houston [14th Dist.] 1993, **[**6]** writ denied). We review legal conclusions de novo. *Catholic Diocese of Brownsville, Texas v. A.G. Edwards & Sons, Inc., 919 F.2d 1054 (5th Cir. 1990)*.

## ENFORCEABILITY OF ARBITRATION CLAUSE

Appellant Fridl brings three points of error, the first urging that the trial court erred in denying the motion to compel arbitration and stay litigation, as he did not determine whether the parties had agreed to arbitrate, and if so, the scope of such agreement. Fridl urges that whatever obligations he might have toward Cook are necessarily based on the 1990 contract. All claims, he argues, whether framed in contract or tort, whether against the corporate entity or Fridl as alter ego, rise and fall with the contract containing the arbitration clause.

Plaintiff Cook, on the other hand, successfully persuaded the trial court that this lawsuit is not a dispute or claim arising out of or relating to the contract. His argument is based on two premises. First, Cook asserts that his claims against Fridl sound generally in tort, and therefore the trial court properly declined to compel arbitration

under the contract. Second, he argues that because the lawsuit is against James Fridl, who **[\*\*7]** was not a party to the contract, and only parties to the contract can compel arbitration, Fridl cannot compel arbitration. [2]

We begin our analysis by noting that *HN5* arbitration, as a means of settling disputes between parties, is favored by Texas courts. *Brazoria County v. Knutson, 142 Tex. 172, 176 S.W.2d 740, 743 (Tex. 1943)*. The party opposing arbitration bears the burden of proving no valid arbitration agreement exists as to the matters in controversy. *Prudential Securities, Inc. v. Banales, 860 S.W.2d 594* (Tex.App.--Corpus Christi 1993, no writ). The courts must indulge every reasonable presumption in favor of arbitration, and all doubts as to the arbitrability of an issue must be decided in favor of arbitration. **[\*\*8]** *D. Wilson Construction Co., Inc. v. McAllen I.S.D., 848 S.W.2d 226* (Tex.App.--Corpus Christi 1992, writ dism'd w.o.j.).

ARBITRATION OF PLAINTIFF'S CLAIMS

*HN6* The test we employ in determining whether a tort claim is subject to arbitration is:

> Whether the particular tort claim is so interwoven with the contract that it could not stand alone or, on the other hand, is a tort completely independent of the contract and could be maintained without reference to the contract. *Valero Energy Corp. v. Wagner & Brown, 777 S.W.2d 564, 566* (Tex.App.--El Paso 1989, writ denied).

Cook's first amended petition makes claims against Fridl for breach of contract, fraud in inducing Cook to perform services through Fridl's other corporation, rather than under the contract, and tortious interference with contract. The specific allegations Cook makes are:

I. First Claim

> On February 6, 1990, COOK entered into a contractual agreement with Defendant for the sale and service of insurance, annuities and investment products **[\*512]** to be marketed in the States of Texas and New Mexico . . . .
>
> . . .
>
> FRIDL has breached the contract by refusing to pay COOK the commission specified within **[\*\*9]** the contract, and without valid reason, has refused to account to Cook for the commissions owing.

This is a simple breach of contract claim, and is clearly subject to the arbitration clause within the contract. *TEX.REV.CIV.STAT.ANN. art. 224* (Vernon Supp. 1995); *Valero, 777 S.W.2d at 566*. It is contingent, however, on a finding that Fridl is CMI's alter ego. Alter ego is a factual issue, and Cook has asked for a jury trial on all factual issues. It might enhance judicial economy to submit the breach of contract claim to arbitration first, as an alter ego finding matters little if the contract was not breached, or if Cook was not damaged. [3] Nevertheless, we cannot say the trial court abused its discretion here Cook must prevail on both allegations, breach of contract and alter ego, before he can succeed on this claim. Although his breach of contract claim must be arbitrated, he is entitled to a jury trial on the issue of alter ego. The trial court may properly hold arbitration in abeyance while determining alter ego. Indeed, this seems the best way to insure Fridl's participation in the

---

[2]  In his appellate brief, Cook suggests a third reason for affirming the court's order: an implied finding that the contract was unconscionable. There is no evidence to support this theory, so we cannot affirm on that ground. *Hearthshire Braeswood Plaza Ltd. Partnership,* 849 S.W.2d at 384.

[3]  Courts of other jurisdictions have made similar observations where breach of contract and alter ego were both at issue in a case involving arbitration. *See Fisser v. International Bank,* 282 F.2d 231, 234-35 (2nd Cir. 1960); *Laborers' Local Union Nos. 472 and 172 v. Interstate Curb & Sidewalk,* 90 N.J. 456, 448 A.2d 980, 984-85 (N.J. 1982).

arbitration if he is adjudicated CMI's alter ego and held ultimately responsible for **[\*\*10]** CMI's breach of contract, if any. [4] On this claim, although we emphasize that the parties' rights under the contract must be decided by arbitration, nevertheless the trial court has not, thus far, erred.

**[\*\*11]**  II. Second Claim

In his second claim, Cook alleges:

FRIDL knowingly made the following representations and/or knowingly concealed the following information:

1. FRIDL individually and representing CMI represented that CMI had existing contracts with various insurance companies providing for the marketing and sale of insurance, annuities and other investment related products when in fact CMI did not.

2. That the above referenced contracts provide that CMI can employ agents in such marketing and promotion when in fact no contract existed.

3. That CMI was licensed to sell annuity and insurance products in the State of Texas at the time the contract was entered into when in fact CMI was not licensed to sell insurance products.

4. That CMI had existing contracts with various insurance companies (which CMI did not) FRIDL would perform this contract in the name of CMI when, in truth and in fact, FRIDL formed a company called Cross Marketing of Texas, Inc. as his alter ego to reap the benefits of the marketing program sold under the terms and conditions of the contract between COOK and FRIDL.

5. FRIDL's scheme to defraud consisted of inducing COOK to perform under **[\*\*12]** the contract and to set up CMIT to solicit business under the terms of the contract to the exclusion of COOK, to hide behind his other corporate identities, direct Cook to do business in these other entity names and then claim CMI has not made any money under the Contract and, therefore, not pay commissions earned.

. . .

By reason of COOK's reliance upon FRIDL's representations and fraudulent **[\*513]** concealments of material facts described above, COOK has been damaged in an amount far in excess of the minimum jurisdictional limits of the Court.

This is a fraud claim. As we understand it, Cook claims that Fridl had several alter ego corporations, and that he induced Cook into tunneling business through Cross Marketing of Texas, Inc. instead of through CMI. This, Cook claims, enabled Fridl to retain all the profits generated by Cook while claiming that CMI had not shown a profit, and thus that no money was owed under the contract.

We do not see that this is a claim "arising out of or relating to" the contract. Fridl and CMI may have honored their contractual obligations in every respect, and yet be liable for fraudulently inducing Cook to obtain business outside the contract so as **[\*\*13]** to avoid full payment of commissions. We believe this claim is distinguishable from the fraud claim which this Court found subject to arbitration in *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Wilson, 805 S.W.2d 38, 40* (Tex.App.--El Paso 1991, no writ). There, Merrill Lynch could not be liable

---

[4]  In that regard, one court has held that it is fundamentally unfair to bind an individual to the outcome of an arbitration proceeding, where the individual had not at the time of the proceeding been adjudicated alter ego, and had not participated in the arbitration. *Southern California Pipe Trades District Council v. Merritt,* 126 Cal. App. 3d 530, 179 Cal. Rptr. 794, 801 (Cal.Ct.App. 1981). Similarly, another court has held that collateral estoppel will not bind an individual, not adjudicated an alter ego at the time of arbitration, as that individual is not a party to the arbitration. *Marcus v. Superior Court for County of Orange,* 75 Cal. App. 3d 204, 141 Cal. Rptr. 890, 893 (Cal.Ct.App. 1977).

for fraud unless it had breached its obligations under the brokerage contract with Wilson, its client. Here, the fraud claim may be pursued even if no breach of the Cook-CMI contract occurred. We find the trial court did not err in refusing to compel arbitration on this claim.

III. Third Claim

FRIDL as sole shareholder and controller of CMIT [Cross Marketing of Texas, Inc.], caused CMIT to interfere with the contract between CMI and COOK.

This is a claim of tortious interference with contract. It is well settled that *HN7* a party cannot tortiously interfere with its own contract. *LA & N Interests, Inc. v. Fish, 864 S.W.2d 745, 748-49* (Tex.App.--Houston [14th Dist.] 1993, no writ); *Barker v. Brown, 772 S.W.2d 507, 510* (Tex.App.--Beaumont 1989, no writ). *HN8* The elements of a tortious interference claim are: the existence of a contract subject to interference, **[**14]** an act of interference that was wilful and intentional, proximately causing plaintiffs damages, with actual damage or loss to plaintiff. *Murray v. Crest Construction, Inc.,* 1995 WL 371184 (Tex. 1995). Although breach of the interfered-with contract is probably the most common measure of damage, tortious interference does not limit the damage for the tort to that alone. The record does not reveal whether Cook depends upon breach of the CMI contract to establish damages under his tortious interference claim.

Fridl cannot be liable for tortious interference if he is the alter ego of CMI, and as the breach of contract between Cook and CMI may be superfluous to this claim even as to damages, we hold it does not meet the *Valero* test. Cook could bring the same tortious interference claims against a wholly unrelated party, who would certainly not be bound to arbitrate under the contract. That Fridl is alleged to be the alter ego of CMI is not necessarily dispositive of the tortious interference claim. We therefore conclude that the trial court did not abuse its discretion in refusing to compel arbitration on Cook's tortious interference claim.

IV. Fourth Claim

The **[**15]** conduct of FRIDL . . . constitutes tortious interference with the prospective contract between COOK and the actual customers who have purchased annuity and investment products.

Again, this is a claim separate and independent from the parties' rights and duties under the contract. Indeed, this claim does not appear related to the contract containing the arbitration clause at all, but rather relates to potential contracts that might arise, absent interference, between Cook and his clients. The trial court did not abuse its discretion in refusing to compel arbitration on this claim.

**ALTER EGO CLAIM**

Next, we turn to Cook's more unique argument, that because only a party may compel arbitration and because Cook has chosen to sue only Fridl, who was not a party to the contract between Cook and CMI, that the trial court properly denied arbitration. **[*514]** This appears to be an issue of first impression in Texas.

Here, we believe that a variation of the *Valero* test is appropriate. *HN9* If the claim against a non-party to the contract is so interwoven with the agreement that it could not stand alone, then arbitration is appropriate. Certainly, where the basis of a claim against **[**16]** an individual is solely that the individual is alter ego of the corporation which is party to the contract, that claim is so connected to the contract claim that the arbitration clause controls. To hold otherwise would allow a plaintiff, by artful pleading, to avoid arbitration required by the very contract which plaintiff seeks to enforce. A party is not entitled to enforce those portions of a contract which it likes, while avoiding those which it does not. Merely pleading alter ego does not relieve Cook of his

obligation to arbitrate. *Steinberg/W.F.I. Foods, Inc. v. D.C.M. and Assoc.,* 522 So. 2d 512, 513 (Fla.Dist.Ct.App. 1988). We agree with the Florida Court, which observed that:

> We cannot accept the proposition that a party to a contract calling for arbitration may avoid that undertaking by the simple device of joining as defendants in its lawsuit others with which the party has no such agreement to arbitrate [cite omitted]. To permit such an easy means of avoiding a contractual agreement to arbitrate would fly in the face of the Florida legislature's intention . . . to grant legal recognition to arbitration agreements . . . . *Id.*

We think Texas legislation **[**17]** and caselaw similarly require us to honor the arbitration agreement in alter ego situations.

The forum proper for a determination of alter ego, however, is a different question. Surveying how courts of other jurisdictions have handled this question, we find that they generally require the trial court to determine the alter ego question, with referral to arbitration after a finding as to alter ego is made. *Fisser v. International Bank,* 282 F.2d 231, 234 (2nd Cir. 1960); *Habitations Limited, Inc v. BKL Realty Sales Corp., 169 A.D.2d 657, 565 N.Y.S.2d 36, 37 (N.Y.App.Div. 1991)*; *American Builder's Assoc. v. Au-Yang, 226 Cal. App. 3d 170, 276 Cal. Rptr. 262, 266 (Cal.Ct.App. 1990)*; *Ravel v. Dirco Enterprises; Inc., 552 N.Y.S.2d 426, 427, 159 A.D.2d 564 (N.Y.App.Div. 1990)*; *Laborers' Local Union Nos. 472 and 172 v. Interstate Curb & Sidewalk, 90 N.J. 456, 448 A.2d 980, 984 (N.J. 1982)*. We think this is an appropriate course, and will not vacate the trial court's order staying arbitration if the reason for doing so is to allow a determination of whether Fridl is CMI's alter ego before arbitration is compelled. [5] The breach of contract claim, however, **must be arbitrated**, and to **[**18]** the extent that the trial court's actions contemplate a stay of arbitration while it determines all issues, including breach of contract, it is in error and must be vacated.

The tortious interference claim is likewise controlled by the finding as to alter ego, as plaintiff Cook can only prevail on that claim if Fridl is not CMI's alter ego. We conclude that determining the issue of alter ego first, before determining the contract claims subject to arbitration, is a reasonable course of action, and the trial court is within its discretion in addressing the issues in that order, provided he does not usurp those matters subject to arbitration. Point of Error One is therefore **[**19]** overruled.

## ENTRY OF ORDER STAYING ARBITRATION

In his second point of error, Fridl urges that the trial court erred in ordering that the arbitration "be stayed pending the determination by this Court of all matters in controversy between the parties . . . ." We sustain this point for two reasons.

First, as pointed out by Fridl, this portion of the trial court's order granted affirmative relief not requested by any party. The only motions before the trial court were the motion to stay litigation and compel arbitration, and motion to quash discovery. Plaintiff had not asked that arbitration be **[*515]** stayed, and he was not entitled to relief he had never requested. *Bosworth v. Gulf Coast Dodge, Inc., 879 S.W.2d 152, 160* (Tex.App.--Houston [14th Dist.] 1994, no writ). Fridl preserved this complaint by pointing it out to the trial court in his motion for rehearing. We believe the trial court abused its discretion by granting this relief.

Second, as we discussed earlier in this opinion, the trial court does not have jurisdiction to determine all matters in controversy here. The breach of contract issues must be decided by arbitration, as the parties originally

---

[5]   As noted earlier, a finding of alter ego prior to arbitration will bind Fridl to the outcome of those proceedings. If the arbitration occurred prior to an alter ego finding, however, an argument might be made that the alter ego did not participate in the arbitration, and thus due process considerations forbid that the alter ego be bound.

agreed. Although **[**20]** we believe the trial court has discretion to decide in which order the breach of contract and alter ego issues are to be resolved, staying arbitration until it determined all matters in controversy exceeded its authority. Point of Error Two is sustained.

## REFUSAL TO QUASH DISCOVERY AGAINST CMI

In Fridl's third point of error, he claims that the trial court erred in refusing to quash discovery requests against CMI, as it has never been named as an independent defendant nor been served with citation in this cause. We believe CMI has waived complaint by making a general appearance in the case.

It is true, as Fridl urges, that a trial court only possesses jurisdiction over parties properly before it. It is equally true, however, that *HN10* a party generally appearing in a case waives any complaints as to personal jurisdiction.

> [A] general appearance occurs when the party 'invokes the judgment of the court in any way on any question other than that of the court's jurisdiction, without being compelled to do so by previous ruling of the court sustaining the jurisdiction.' *Smith v. Amarillo Hospital Dist., 672 S.W.2d 615, 617* (Tex.App.--Amarillo 1984, no writ).

 **[**21]** *See also* *Toler v. Travis County Child Welfare Unit, 520 S.W.2d 834, 836* (Tex.Civ.App.--Austin 1975, writ ref'd n.r.e.); 3 R. McDonald, Texas Civil Practice § 11:9 (1992). *HN11* In determining whether a voluntary appearance is a general appearance, the emphasis is on affirmative action which impliedly recognizes the court's jurisdiction over the parties. Mere presence of a party or his attorney in the courtroom at the time of a hearing or a trial, where neither participates in the prosecution or defense of the action, is not an appearance. *Smith, 672 S.W.2d at 617*.

We find that CMI's motion to compel arbitration and to stay litigation was an affirmative act recognizing the court's jurisdiction. We therefore conclude that CMI has waived any complaints as to lack of personal jurisdiction. Fridl's Point of Error Three is overruled.

## CONCLUSION

We conclude in this case that Cook's breach of contract claims are subject to arbitration, and that the trial court may not decide them. We nevertheless hold that the issue of alter ego, essential to establishing Fridl's liability here, is a fact question not subject to the arbitration clause in the parties' contract. Moreover, for **[**22]** Fridl to be bound by the arbitration, he must either be adjudicated CMI's alter ego, or otherwise actively participate in the arbitration proceedings. To insure that all necessary parties are bound by the arbitration, it is within the trial court's discretion to determine the alter ego issue before arbitration proceeds.

We emphasize, however, that the trial court cannot decide the breach of contract issue; that was clearly an area the parties agreed to arbitrate when they entered their contract. We therefore reverse that portion of the trial court's order staying arbitration "pending the determination by this Court of all matters in controversy between the parties." In all else, the trial court's order is affirmed.

/s/ SUSAN LARSEN, Justice

August 31, 1995

Before Panel No. 4

Barajas, C.J., Larsen and McClure, JJ.



⚠ Caution

As of: September 1, 2015 5:05 PM EDT

# *Frost Nat'l Bank v. L&F Distribs.*

Supreme Court of Texas

May 27, 2005, Delivered

NO. 04-0074

**Reporter**

165 S.W.3d 310; 2005 Tex. LEXIS 421; 48 Tex. Sup. J. 803

FROST NATIONAL BANK, PETITIONER v. L&F DISTRIBUTORS, LTD., RESPONDENT

**Prior History:** **[\*\*1]** ON PETITION FOR REVIEW FROM THE COURT OF APPEALS FOR THE THIRTEENTH DISTRICT OF TEXAS.

*Frost Nat'l Bank v. L & F Distribs., 122 S.W.3d 922, 2003 Tex. App. LEXIS 10423 (Tex. App. Corpus Christi, 2003)*

## Core Terms

Expiration, vehicles, lease, lessee, purchase option, lease term, lessor, Termination, court of appeals, lease agreement, notice, twenty percent, parties, trial court, last day, unambiguous, provisions, construe, rental

## Case Summary

### Procedural Posture

Petitioner lessor and respondent lessee both sought declaratory relief in a Texas trial court concerning the interpretation of a term equipment-lease agreement with a purchase option provision. The trial court and the Court of Appeals for the Thirteenth District of Texas agreed with the lessee's interpretation. The lessor then petitioned the supreme court for review.

### Overview

The lessor purchased 14 new delivery vehicles and leased them to the lessee, a beer distributor. The lessee attempted to exercise the purchase option and buy the equipment a little over a year into the five-year lease term, but the lessor refused, contending that the contract only allowed the lessee to purchase the equipment when the lease term ended. The trial court and the court of appeals found that the purchase option provision did not create an ambiguity or call for payment only at the end of the 60-month lease term. The supreme court noted that if, after the pertinent rules of construction were applied, a contract could be given a definite or certain legal meaning, it was unambiguous and an appellate court would construe it as a matter of law. The supreme court held that the lease was unambiguous and provided that, while the lessee could give notice at any time during the lease term that it intended to exercise the purchase option, the lessee could actually purchase the vehicles only at the lease's expiration, which occurred 60 months after the lease term began.

### Outcome

The judgment of the court of appeals was reversed, judgment rendered in part for the lessor on its declaratory judgment claim, and the matter was remanded to the trial court for further proceedings.

## LexisNexis® Headnotes

Contracts Law > Contract Interpretation > General Overview

Contracts Law > Defenses > Ambiguities & Mistakes > General Overview

*HN1* In construing a contract, an appellate court must ascertain and give effect to the parties' intentions as expressed in the document. It considers the entire writing and attempt to harmonize and give effect to all the provisions of the contract by analyzing the provisions with reference to the whole agreement. It construes contracts from a utilitarian standpoint bearing in mind the particular business activity sought to be served and will avoid when possible and proper a construction which is unreasonable, inequitable, and oppressive. If, after the pertinent rules of construction are applied, the contract can be given a definite or certain legal meaning, it is unambiguous and an appellate court will construe it as a matter of law. On the other hand, a contract is ambiguous if it is susceptible to more than one reasonable interpretation.

## Opinion

**[*311] PER CURIAM**

This case involves the interpretation of a term equipment-lease agreement with a purchase option provision. The lessee attempted to exercise the purchase option and buy the equipment a little over a year into the five-year lease term, but the lessor refused, contending that the contract only allowed the lessee to purchase the equipment when the lease term ended. The trial court and the court of appeals agreed with the lessee's interpretation, but we agree with the lessor's. Accordingly, we reverse the court of appeals' judgment, render judgment in part for the lessor, and remand the case to the trial court for further proceedings.

Frost National Bank purchased fourteen new delivery vehicles and leased them to Williams Distributors, Inc., a beer distributor. Frost and Williams entered into a sixty-month equipment lease agreement. [1] The lease's purchase option provision, known as a terminal rental adjustment clause, or TRAC, gave the lessee (Williams) the right to purchase the vehicles by giving **[**2]** the lessor (Frost) ninety days' written notice and provided for payment to be made "on the last day of [the lease's] Expiration [in] an amount in cash equal to the then Fair Market Value as hereafter defined in this section, of such Equipment." The agreement then clarified that the lessor would collect an amount equal to twenty percent of the original invoice price of the vehicles when they were sold, whether to the lessee or to a third party; specifically, if the vehicles were sold to a third party, the lessor would pay the lessee any proceeds in excess of that amount, and, should the lessor receive less than the twenty percent from the sale, the lessee would owe the difference as a final rental payment.

Just over a year into the lease term, Williams assigned the lease, with Frost's consent, to L&F **[**3]** Distributors, Inc., another beer distributor. Shortly thereafter, L&F notified Frost of its intent to exercise the purchase option. Before Frost responded, L&F sued Frost for a declaratory judgment, and L&F later amended its petition to add a claim for specific performance. L&F also sent Frost a letter with a payment of $ 169,874.99, which amounted to twenty percent of the original invoice price of the vehicles. Frost rejected and returned L&F's payment, refusing to sell the vehicles until the last day of the lease term, and also counterclaimed for declaratory relief

---

[1]  The parties actually entered into two essentially identical agreements, one concerning eight of the vehicles and one concerning the other six, but for simplicity we will refer to them as a single agreement.

and breach of contract when L&F stopped paying rent on the vehicles. The parties agreed to narrow the scope of the dispute to the declaratory judgment requests and to limit Frost's claim for damages. Both parties filed motions for summary judgment.

The trial court partially granted L&F's motion for summary judgment and denied Frost's motion, declaring that Frost breached the lease agreement by refusing to sell the vehicles when L&F tendered payment. The trial court also awarded L&F its attorney's fees. The court of appeals affirmed, holding that the lease agreement was unambiguous and allowed L&F, as lessee, to purchase **[\*\*4]** the vehicles with proper notice at any time on or before the end of the term. [2] _122 S.W.3d 922, 933_.

_HN1_ In construing a contract, we must ascertain and give effect to the parties' **[\*312]** intentions as expressed in the document. _J.M. Davidson, Inc. v. Webster, 128 S.W.3d 223, 229, 47 Tex. Sup. Ct. J. 196 (Tex. 2003)_; _Lopez v. Munoz, Hockema & Reed, L.L.P., 22 S.W.3d 857, 861, 43 Tex. Sup. Ct. J. 806 (Tex. 2000)_. We consider the entire writing and attempt to harmonize and give effect to all the provisions of the contract by analyzing the provisions with reference to the whole agreement. _Webster, 128 S.W.3d at 229_. We construe contracts "from a utilitarian standpoint bearing in mind the particular business activity sought to be served" and "will avoid when possible and proper a construction which is unreasonable, inequitable, **[\*\*5]** and oppressive." _Reilly v. Rangers Mgmt., Inc., 727 S.W.2d 527, 530, 30 Tex. Sup. Ct. J. 333 (Tex. 1987)_. If, after the pertinent rules of construction are applied, the contract can be given a definite or certain legal meaning, it is unambiguous and we construe it as a matter of law. _Webster, 128 S.W.3d at 229_. On the other hand, a contract is ambiguous if it is susceptible to more than one reasonable interpretation. _Id._

The following provisions of the lease agreement, including the purchase option provision discussed above, are particularly relevant to the parties' dispute:

**MASTER EQUIPMENT LEASE AGREEMENT**

. . . .

Section 2. Terms; Rental; Unconditional Obligations; Security.

A. The lease of each item shall begin on the date of the related Schedule (the "Acceptance Date") and end on the Expiration Date specified in the Schedule (the "Expiration") or on the date of any earlier or later termination hereunder (the "Termination").

. . . .

**LEASE SCHEDULE TO MASTER EQUIPMENT LEASE AGREEMENT**. . . .

C. Term Expiration. (60) Sixty months (the "Expiration" or "Expiration Date"). . . . .

**Lease Schedule to Master Equipment Lease Agreement**

 **[\*\*6]** **Optional Provisions**

. . . .

Section 3. Purchase; Terminal Rental Adjustment

A. Provided no Event of default shall have occurred and then be continuing, Lessee shall have, by giving not less than ninety (90) days prior written notice to Lessor, the right to purchase all but not less than all the Equipment on or before the Expiration. Purchase shall be made by paying to Lessor on the last day of

---

[2]   The court of appeals also affirmed the trial court's denial of Frost's motion to transfer venue. _122 S.W.3d at 927-29_. Frost does not challenge the venue ruling in this Court.

such Expiration an amount in cash equal to the then Fair Market Value as hereafter defined in this section, of such Equipment. . . .

The court of appeals held that the purchase option provision (section 3(A) of the Optional Provisions) is unambiguous. *122 S.W.3d at 931*. Specifically, the court of appeals noted that the first sentence allows L&F to buy the vehicles either on or before the expiration of the lease, the only qualifications being that L&F cannot be in default, must buy all the vehicles, and must give Frost at least ninety days' notice of the purchase. *Id.* The court of appeals then held that the second sentence, which requires payment to be made "on the last day of such Expiration," does not create an ambiguity or call for payment only at the end of **[**7]** the sixty-month lease term. *Id.*

Were we to consider the purchase option provision in isolation, we might agree with the court of appeals' reading. However, when both sentences of the provision are properly considered in conjunction with each other and the rest of the agreement, particularly the contractual definition of **[*313]** the term "Expiration," the agreement unambiguously allows L&F to purchase the vehicles only at the end of the sixty-month lease term. 3

The court of appeals ignored pertinent language in the lease schedule when it held that, should L&F choose to exercise the purchase option before **[**8]** the end of sixty months, the lease would simply expire and payment would be due at the time of purchase. *Id.* The agreement specifically states that the lease ends on the "Expiration" or "Expiration Date," which occurs at sixty months. A different contractual term, "Termination," describes the agreement's being terminated on an earlier or later date. By calling for payment "on the last day of such Expiration [of] an amount in cash equal to the then Fair Market Value," the agreement provides that, should L&F give the requisite notice of its intent to exercise the purchase option, it will pay Frost at the end of the sixty-month lease term the then-fair market value of the vehicles, which will effectively come out to twenty percent of the invoice price. To reach the court of appeals' conclusion requires either substituting the word "Termination" for "Expiration" in the purchase option provision or amending the contractual definition of "Expiration," neither of which is appropriate in construing an agreement.

In addition, L&F's and the court of appeals' construction is "unreasonable, inequitable, and oppressive." *Reilly, 727 S.W.2d at 530*. Such a construction allows **[**9]** the lessee to terminate the lease and purchase the vehicles for the same price (twenty percent of the original invoice price) at any point during the five-year lease term with the requisite notice. At the lessee's discretion, then, the lessor would essentially have to forgo almost the entire rental value of the equipment and sell it almost new for twenty percent of its value, the same price it would receive for selling the equipment at the end of the lease term after collecting rent on it for sixty months. Bearing in mind that our primary goal is to ascertain the intent of the parties when they entered into the agreement, we find such a construction unreasonable. Because there is only one reasonable interpretation of the lease, we construe it as a matter of law.

\* \* \* \*

We hold that the lease is unambiguous and provides that, while the lessee may give notice at any time during the lease term that it intends to exercise the purchase option, the lessee can actually purchase the vehicles only at the lease's expiration, which occurs sixty months after the lease term begins. Accordingly, without hearing oral argument, *TEX. R. APP. P. 59.1*, we reverse the court of **[**10]** appeals' judgment, render judgment for

---

3 Frost also argues that the Uniform Commercial Code, as adopted in Texas, allows us to consider course of dealing, course of performance, and usage of trade to "explain or supplement" the lease. *See* TEX. BUS. & COM. CODE § 2A.202. Because the plain language of the contract is clear and supports Frost's interpretation, we need not consider such evidence for explanatory purposes.

Frost on its declaratory judgment claim, and remand the case to the trial court for further proceedings consistent with this opinion.


# *G.T. Leach Builders, LLC v. Sapphire V.P., L.P.*

Supreme Court of Texas

November 5, 2014, Argued; March 20, 2015, Opinion Delivered

NO. 13-0497

## Reporter

458 S.W.3d 502; 2015 Tex. LEXIS 273; 58 Tex. Sup. J. 532

G.T. LEACH BUILDERS, LLC, ET AL., PETITIONERS, v. SAPPHIRE V.P., LP, RESPONDENT

**Prior History:** [**1] ON PETITION FOR REVIEW FROM THE COURT OF APPEALS FOR THE THIRTEENTH DISTRICT OF TEXAS.

*G.T. Leach Builders, LLC v. Sapphire VP, LP, 456 S.W.3d 570, 2013 Tex. App. LEXIS 6456 (Tex. App. Corpus Christi, May 23, 2013)*

## Core Terms

arbitration, parties, general contract, contractual, deadline, court of appeals, arbitration agreement, waived, trial court, Subcontractors, courts, disputes, subcontracts, right to arbitration, contractor, discovery, joinder, compel arbitration, movant, Engineers, direct benefit, provisions, lawsuit, questions, venue, defenses, enforceable, damages, issues, Defendants'

## Case Summary

### Overview

HOLDINGS: [1]-The developer was required to arbitrate its claims against the general contractor because the developer agreed to arbitrate its claims against the general contractor and the general contractor did not waive its right to demand arbitration; [2]-The developer's argument that a contractual deadline barred the general contractor's demand for arbitration was itself a claim that must be arbitrated; [3]-The developer was not required to arbitrate its claims against the other defendant because it did not agree to do so and the developer was not equitably estopped from denying any such agreement; [4]-Further, the subcontracts did not contain an enforceable arbitration agreement.

### Outcome

Judgment affirmed in part; reversed in part.

## LexisNexis® Headnotes

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > Waiver

*HN1* Texas law encourages parties to resolve disputes through arbitration, but it will not force them to arbitrate unless they have agreed to that alternative. If they have, or if they are equitably estopped from denying their assent to such an agreement, courts must honor the agreement by referring the disputes to arbitration unless the party demanding arbitration has waived that right by substantially participating in the litigation.

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview

Civil Procedure > Settlements > General Overview

*HN2* It is the policy of Texas to encourage the peaceable resolution of disputes through voluntary settlement procedures, including binding and nonbinding arbitration, *Tex. Civ. Prac. & Rem. Code Ann. §§ 154.002*, *154.027*.

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview

*HN3* A court shall order the parties to arbitrate on application of a party showing an agreement to arbitrate; otherwise, the court shall deny the application, *Tex. Civ. Prac. & Rem. Code Ann. § 171.021(a)(1)*, *(b)*.

Civil Procedure > Appeals > Appellate Jurisdiction > Interlocutory Orders

*HN4* Although the Supreme Court of Texas generally lacks jurisdiction over interlocutory appeals, *Tex. Gov't Code Ann. § 22.225(b)(3)*, the supreme court has jurisdiction to review a court of appeals' interlocutory judgment when its holding creates an inconsistency with prior precedent that should be clarified to remove unnecessary uncertainty in the law and unfairness to litigants, *§ 22.225(c)*, *(e)*. If the supreme court's jurisdiction is properly invoked on one issue, it acquires jurisdiction of the entire case.

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > Waiver

*HN5* Waiver of arbitration, the intentional relinquishment of a known right, can occur either expressly, through a clear repudiation of the right, or impliedly, through conduct inconsistent with a claim to the right.

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > Waiver

Civil Procedure > ... > Pretrial Judgments > Default & Default Judgments > Relief From Default

*HN6* The filing of motion to set aside default judgment and set new trial date does not expressly waive arbitration rights. Although the acts of requesting and then agreeing to a new trial date could be inconsistent with an intent to exercise the right to arbitrate, they do not constitute an express waiver of that right.

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > Waiver

*HN7* A party asserting implied waiver as a defense to arbitration has the burden to prove that (1) the other party has substantially invoked the judicial process, which is conduct inconsistent with a claimed right to compel arbitration; and (2) the inconsistent conduct has caused it to suffer detriment or prejudice. Because the law favors and encourages arbitration, this hurdle is a high one.

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > Waiver

*HN8* Whether a party has substantially invoked the judicial process depends on the totality of the circumstances. Courts consider a wide variety of factors, including: how long the party moving to compel arbitration waited to do so; the reasons for the movant's delay; whether and when the movant knew of the arbitration agreement during the period of delay; how much discovery the movant conducted before moving to compel arbitration, and

whether that discovery related to the merits; whether the movant requested the court to dispose of claims on the merits; whether the movant asserted affirmative claims for relief in court; the extent of the movant's engagement in pretrial matters related to the merits (as opposed to matters related to arbitrability or jurisdiction); the amount of time and expense the parties have committed to the litigation; whether the discovery conducted would be unavailable or useful in arbitration; whether activity in court would be duplicated in arbitration; when the case was to be tried.

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > Waiver

*HN9* With regard to the implied waiver of arbitration rights, merely taking part in litigation is not enough. Rather, that conduct must demonstrate that the party has substantially invoked the judicial process to its opponent's detriment. One factor is whether party seeking arbitration was plaintiff who chose to file suit or defendant responding to suit filed against it. Merely filing suit does not waive arbitration. Whether the movant sought disposition on the merits is key factor in deciding waiver.

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > Waiver

*HN10* Merely filing suit does not waive arbitration.

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > Waiver

*HN11* The Supreme Court of Texas has rejected arguments relying on venue challenges to establish waiver of arbitration rights because such challenges do not relate to the merits of the case. Under the rules of procedure, objections to improper venue must be made at the outset of the case.

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > Waiver

*HN12* A party's litigation conduct aimed at defending itself and minimizing its litigation expenses, rather than at taking advantage of the judicial forum, does not amount to substantial invocation of the judicial process. Responding to discovery and simply being named in the lawsuit while discovery is ongoing do not amount to waiver of arbitration rights. To the contrary, the Supreme Court of Texas has declined to find waiver of arbitration rights even when the movant itself propounded written discovery.

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > Waiver

*HN13* A party may protect its existing litigation rights from forfeiture without waiving its right to arbitration.

Evidence > ... > Testimony > Expert Witnesses > General Overview

Civil Procedure > Parties > General Overview

*HN14* The rules of civil procedure impose a default deadline for expert designations when the court has not set one, and the Civil Practice and Remedies Code imposes a deadline for designating responsible third parties, *Tex. R. Civ. P. 195.2*; *Tex. Civ. Prac. & Rem. Code Ann. § 33.004(a)*.

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > Waiver

*HN15* With regard to the waiver of arbitration rights, detriment or prejudice, in this context, refers to an inherent unfairness caused by a party's attempt to have it both ways by switching between litigation and arbitration to its own advantage. Prejudice may result when a party seeking arbitration first sought to use the judicial process to gain access to information that would not have been available in arbitration, but propounding discovery will not, in and of itself, result in waiver of a right to compel arbitration. Similarly, while delay may be a factor both

in terms of whether the movant has substantially invoked the judicial process and whether the nonmovant has suffered prejudice, mere delay is not ordinarily enough, even if it is substantial. Waiver can be implied from a party's unequivocal conduct, but not by inaction.

Civil Procedure > Appeals > Reviewability of Lower Court Decisions > Preservation for Review

*HN16* An issue presented in a petition for review to the Supreme Court of Texas must have been preserved for appellate review in the trial court and assigned as error in the court of appeals, but only if the matter complained of originated in the trial court, *Tex. R. App. P. 53.2(f)*.

Civil Procedure > Appeals > Appellate Briefs

*HN18* Disposing of appeals for harmless procedural defects is disfavored and appellate briefs are to be construed reasonably, yet liberally, so that the right to appellate review is not lost by waiver.

Civil Procedure > Appeals > Appellate Briefs

*HN19* See *Tex. R. App. P. 38.1(f)*.

Civil Procedure > Appeals > Reviewability of Lower Court Decisions > Preservation for Review

*HN17* An issue raised in the Supreme Court of Texas must have been assigned as error in the court of appeals if it originated in the trial court. When the petitioner's argument or complaint first arises from the court of appeals' judgment, it may be raised either in a motion for rehearing in the court of appeals or in a petition for review in the supreme court.

Civil Procedure > Appeals > Reviewability of Lower Court Decisions > Preservation for Review

*HN20* While ordinarily a party waives a complaint not raised in the court of appeals, a complaint arising from the court of appeals' judgment may be raised either in a motion for rehearing in that court or in a petition for review in the Supreme Court of Texas, *Tex. R. App. P. 53.2(f)*.

Civil Procedure > Appeals > Reviewability of Lower Court Decisions > Preservation for Review

*HN21* When a petitioner fails to raise an argument in the court of appeals when the petitioner's complaint first arises from that court's judgment, the Supreme Court of Texas may treat such argument as waived, but it is not required to do so.

Civil Procedure > Appeals > Reviewability of Lower Court Decisions > Preservation for Review

*HN22* The Supreme Court of Texas does not have to address and resolve an argument that the petitioner failed to raise in the court of appeals whenever the asserted error arose from that court's judgment. In the exercise of its discretionary jurisdiction, a court may elect to address the issue, or not. The decision involves important prudential considerations, such as the need to conserve judicial resources, whether allowing lower courts to first consider and rule on the issue will further the goal of accuracy in judicial decision-making, and the duty to promote fairness among litigants.

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview

*HN23* When parties have contractually agreed to arbitrate their future disputes, the courts' obligation to honor and enforce that agreement requires that they refer those disputes to arbitration. The Texas Arbitration Act (TAA) thus provides that courts shall order the parties to arbitrate on application of a party showing: (1) an

agreement to arbitrate; and (2) the opposing party's refusal to arbitrate, *Tex. Civ. Prac. & Rem. Code Ann. § 171.021(a)*. Once the trial court concludes that the arbitration agreement encompasses the claims, and that the party opposing arbitration has failed to prove its defenses, the trial court has no discretion but to compel arbitration and stay its own proceedings.

Civil Procedure > ... > Arbitration > Federal Arbitration Act > Arbitration Agreements

*HN24* The Federal Arbitration Act preempts the The Texas Arbitration Act (TAA) only when it or other state law would not allow enforcement of an arbitration agreement that the FAA would enforce and that party seeking to avoid application of TAA has burden of raising that issue.

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > Arbitrability

Contracts Law > Contract Interpretation > Intent

*HN25* The courts' role is first to decide whether the parties made a valid and presently enforceable agreement to arbitrate. If they did, then the court must decide whether the present disputes fall within the scope of that agreement. These questions that courts must resolve are sometimes referred to as questions of arbitrability. In deciding these questions of arbitrability, courts apply the common principles of general contract law to determine the parties' intent. If, by answering these questions, the court determines that the present disputes are in fact arbitrable under the parties' agreement, the court must complete its role by ordering the parties to arbitration and leaving it to the arbitrators to resolve those disputes, *Tex. Civ. Prac. & Rem. Code Ann. § 171.021*.

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview

*HN26* See *Tex. Civ. Prac. & Rem. Code Ann. § 171.021(b)*.

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > Arbitrability

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > Waiver

*HN27* The question of whether a party has waived its right to arbitration through its litigation conduct is a question of arbitrability for the courts to decide. This is a question of arbitrability, rather than a question to be arbitrated, because (1) contracting parties would expect the court to decide whether one party's conduct before the court waived the right to arbitrate, (2) it is a "gateway" matter regarding whether the parties have submitted a particular dispute to arbitration, and (3) courts decide defenses relating solely to the arbitration clause. In essence, the question of whether a party has waived its right to arbitration by its conduct in litigation is just another way of asking the first question of arbitrability: whether there is a presently enforceable arbitration agreement. If a party's conduct in litigation equates to a waiver of its rights under the arbitration agreement, there is no presently enforceable agreement to arbitrate. In this regard, the United States Supreme Court has recognized a distinction between questions of substantive arbitrability, which courts decide, and procedural arbitrability, which courts must refer to the arbitrators to decide.

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > Waiver

*HN28* Courts should defer to arbitrators to resolve the issue of waiver when waiver concerns limitations periods or waiver of particular claims or defenses, but courts should decide issues of waiver by litigation conduct. Parties generally intend arbitrators to decide matters that grow out of the dispute and bear on its final disposition, such as waiver of a substantive claim or delay beyond a limitations deadline. This is consistent with the prior recognition that, once the party seeking arbitration proves the existence of an enforceable agreement to arbitrate,

Texas and federal law recognize a strong presumption in favor of arbitration such that myriad doubts, as to waiver, scope, and other issues not relating to enforceability, must be resolved in favor of arbitration.

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > Arbitrability

*HN29* Satisfaction of prerequisites such as time limits are questions of procedural arbitrability for the arbitrator to decide.

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > Arbitrability

*HN30* Disputes over a contractual deadline in an arbitration agreement do not always present questions of procedural arbitrability that arbitrators must decide.

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview

*HN31* Sometimes a person who is not a party to the agreement can compel arbitration with one who is, and vice versa. More specifically, non-parties may be bound to an arbitration clause when the rules of law or equity would bind them to the contract generally.

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > Arbitrability

*HN32* A party seeking to compel arbitration must establish that a valid arbitration agreement exists and that the claims at issue fall within the scope of that agreement, *Tex. Civ. Prac. & Rem. Code Ann. § 171.021(a)*. Generally, parties must sign arbitration agreements before being bound by them. However, in some circumstances, a non-signatory can be bound to, or permitted to enforce, an arbitration agreement, such as: (1) incorporation by reference; (2) assumption; (3) agency; (4) alter ego; (5) equitable estoppel, and (6) third-party beneficiary.

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview

*HN33* As a general rule, an arbitration clause cannot be invoked by a non-party to the arbitration contract. The policy favoring arbitration is strong, but it alone cannot authorize a non-party to invoke arbitration. Parties to an arbitration agreement may grant non-signatories the right to compel arbitration.

Civil Procedure > ... > Arbitration > Federal Arbitration Act > Arbitration Agreements

Contracts Law > Contract Interpretation > General Overview

*HN34* When the question requires the Supreme Court of Texas to determine the intent of the parties, as expressed in the terms of the agreement, the court applies ordinary principles of state contract law to determine whether there is a valid agreement to arbitrate. Under the Federal Arbitration Act, ordinary principles of state contract law determine whether there is a valid agreement to arbitrate.

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > Arbitrability

*HN35* A party seeking to compel arbitration must establish both (1) the existence of a valid enforceable agreement to arbitrate; and (2) that the claims at issue fall within the scope of that agreement, *Tex. Civ. Prac. & Rem. Code Ann. § 171.021(a)*.

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview

*HN36* With regard to arbitrations, the word "may" is permissive and imports the exercise of discretion.

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview

Contracts Law > ... > Estoppel > Equitable Estoppel > General Overview

*HN37* Under principles of equitable estoppel, a litigant who sues based on a contract subjects him or herself to the contract's terms, including the Arbitration Addendum. The claimant cannot seek to hold the non-signatory liable pursuant to duties imposed by the agreement, which contains an arbitration provision, but, deny arbitration's applicability because the defendant is a non-signatory. This equitable principle applies when a claimant seeks direct benefits under the contract that contains the arbitration agreement. Whether a claim seeks a direct benefit from a contract containing an arbitration clause turns on the substance of the claim, not artful pleading. It is not enough that the party's claim relates to the contract that contains the arbitration agreement. The party must seek to derive a direct benefit, a benefit that stems directly from that contract. The claim must depend on the existence of the contract, and be unable to stand independently without the contract. The alleged liability must arise solely from the contract or must be determined by reference to it. When the substance of the claim arises from general obligations imposed by state law, including statutes, torts and common law, or federal law, rather than from the contract, direct benefits estoppel does not apply, even if the claim refers to or relates to the contract.

Contracts Law > ... > Estoppel > Equitable Estoppel > General Overview

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > Arbitrability

*HN38* Even if "direct benefits" estoppel does not apply based on the claims in the lawsuit, a non-party may seek or obtain direct benefits from a contract by means other than a lawsuit and application of the doctrine may be based on conduct during the performance of the contract rather than conduct during the lawsuit. When a non-party consistently and knowingly insists that others treat it as a party, it cannot later turn its back on the portions of the contract, such as an arbitration clause, that it finds distasteful.

Torts > Procedural Matters > Multiple Defendants > Joint & Several Liability

*HN39* Texas law permits joint and several liability for most actions based in tort, as long as the percentage of responsibility attributed to the defendant with respect to a cause of action is greater than 50 percent, *Tex. Civ. Prac. & Rem. Code Ann. § 33.013(b)(1)*.

Contracts Law > Types of Contracts > General Overview

Contracts Law > Contract Interpretation > General Overview

*HN40* Generally, the subcontracts must be given their plain meaning and enforced without rendering either provision entirely superfluous. But that cannot be done when the plain meaning of one provision unambiguously requires that we not enforce another.

**Counsel:** Amicus Curiae Texas Association of Defense Counsel: Ruth G. Malinas, Plunkett & Griesenbeck, Inc., San Antonio, TX.

For Nabors Well Services, Ltd., Joe Fuentes, Petitioner: Amy Warr, Anna Meredith Baker, Alexander Dubose Jefferson & Townsend LLP, Austin, TX; David Wayne Lauritzen, W. Bruce Williams, Cotton Bledsoe Tighe & Dawson PC, Midland, TX; Roger D. Townsend, Alexander Dubose Jefferson & Townsend LLP, Houston, TX.

For Armando Loera, individually and as representative of the estate of Josefina Loera, joined by Morayma Loera, Respondent: Charles (Chad) E. Baruch, The Law Office of Chad Baruch, Rowlett, TX; G. David Smith,

Ryan Lee, Law Offices of G. David Smith, P.C., Rockwall, TX; Juan V. Silva, Attorney at Law, Odessa, TX; Misty Dawn Borland, Borland & Borland, P.C., Midland, TX.

**Judges:** JUSTICE BOYD delivered the opinion of the Court.

**Opinion by:** Jeffrey S. Boyd

# Opinion

[*508] *HN1* Texas law encourages parties to resolve disputes through arbitration,[1] but it will not force them to arbitrate unless they have agreed to that alternative.[2] If they have, or if they are equitably estopped [*509] from denying their assent to such an agreement, courts must honor the agreement by referring the disputes to arbitration unless the party demanding arbitration has waived that right by substantially participating in the litigation. We apply these principles in this case to determine whether a property developer must arbitrate its claims against several defendants involved in a construction project. The trial court denied all of the defendants' motions to compel arbitration, and the court of appeals affirmed. We hold that (1) the developer agreed to arbitrate its claims against the general contractor and the general contractor did not waive its right to demand arbitration; (2) the developer's argument that a contractual deadline bars the general contractor's demand for arbitration is itself a claim that must be arbitrated; (3) the developer [**2] did not agree in the general contract to arbitrate its claims against the other defendants; (4) the developer is not equitably estopped from denying any such agreement; and (5) the subcontracts do not contain an enforceable arbitration agreement. In short, we hold that the developer must arbitrate its claims against the general contractor but not its claims against the other defendants.

**I**.

**Background**

In July 2008, Hurricane Dolly caused extensive damage to a luxury condominium project that Sapphire V.P., L.P. was in the process of developing on South Padre Island. Sapphire filed suit against Adams Insurance Services, Inc., Arthur J. Gallagher Risk Management, and Tracy Williams (collectively, the Insurance Brokers), asserting claims for negligence and breach of contract. Sapphire alleged that, eight days before the [**3] hurricane hit, the Insurance Brokers allowed a builder's risk insurance policy to expire and be replaced by a permanent insurance policy even though construction of the project was not yet complete. Sapphire sought to recover millions of dollars for water damage, increased construction costs, delay costs, lost revenue, and other losses that the builder's risk policy allegedly covered or should have covered but the permanent policy did not.

More than two-and-a-half years after the hurricane struck, the Insurance Brokers designated several others as responsible third parties: (1) the project's general contractor, G.T. Leach Builders, L.L.C.; (2) two of G.T. Leach's subcontractors, Power Design, Inc. and Atlas Comfort Systems USA, LLC[3] (collectively, the Subcontractors); and (3) an engineering contractor, CHP & Associates Consulting Engineers, Inc., and its

---

[1] *HN2* "It is the policy of this state to encourage the peaceable resolution of disputes . . . through voluntary settlement procedures," including binding and nonbinding arbitration. Tᴇx. Cɪv. Pʀᴀᴄ. & Rᴇᴍ. Cᴏᴅᴇ §§ 154.002, 154.027.

[2] *HN3* "A court shall order the parties to arbitrate on application of a party showing . . . an agreement to arbitrate;" otherwise, "the court shall deny the application." *Id*. § 171.021(a)(1), (b).

[3] Atlas Comfort is now known as Comfort Systems USA—South Central.

employee Mark Janneck (collectively, the Engineers).[4] Sapphire, in turn, promptly amended its petition to name these parties as defendants, alleging that their negligence and contractual breaches resulted in construction defects that caused the condominium project to sustain the water damage that resulted in the uncovered losses. Although [**4] Sapphire asserted these claims within the four-year statute of limitations applicable to claims [*510] for breach of contract, the two-year statute of limitations on negligence claims had already expired. At that time, however, Texas law allowed a claimant to assert claims against a party designated as a responsible third party even though the statute of limitations barred the claim.[5]

After pursuing pretrial motions and participating in discovery, G.T. Leach—the general contractor—moved to compel arbitration and stay the litigation, relying on an arbitration agreement contained in its general contract with Sapphire. The Insurance Brokers, Subcontractors, and Engineers (collectively, the Other Defendants) subsequently filed similar motions, also relying on the arbitration agreement in the general contract, even though they never signed that contract. The Subcontractors relied, in addition, on language in their subcontracts with G.T. Leach, even though Sapphire never signed the subcontracts. The trial court denied all of the motions without explaining its reasons. The defendants pursued an interlocutory appeal, the court of appeals affirmed,[6] and we granted the defendants' petitions for review.[7]

## II.

### G.T. Leach

We first consider whether G.T. Leach can compel arbitration. In the general contract, G.T. Leach and Sapphire agreed that "[a]ny Claim arising out of or related to the Contract . . . shall . . . be subject to agreed private arbitration" and "shall be decided by binding arbitration."[8] Sapphire [*511] concedes that this is a valid arbitration agreement and that it applies to Sapphire's claims against G.T. [**7] Leach, but contends that G.T.

---

[4] Sapphire initially filed two separate lawsuits, one against the Insurance Brokers and another against the architects who designed the project. The architects first named G.T. Leach, the Subcontractors, and the Engineers as responsible third parties, and Sapphire amended its pleadings to name them as defendants in that suit. When the Insurance Brokers learned of these developments in that suit, they named G.T. Leach, the Subcontractors, and the Engineers as responsible third parties in this suit. The architects later settled and resolved all claims asserted by and against them.

[5] *See* Act of May 4, 1995, 74th Leg., R.S., ch. 136, § 1, sec. 33.004(e), 1995 Tex. Gen. Laws 971, 973, *amended by* Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 4.04, sec. 33.004(e), 2003 Tex. Gen. Laws 847, 856, *repealed* [**5] *by* Act of May 24, 2011, 82d Leg., R.S., ch. 203, § 5.02, sec. 33.004(e), 2011 Tex. Gen. Laws 757, 759.

[6] __ S.W.3d __.

[7] *HN4* Although we generally lack jurisdiction over interlocutory appeals, *see* TEX. GOV'T CODE § 22.225(b)(3), we have jurisdiction to review a court of appeals' interlocutory judgment when its holding creates an inconsistency with prior precedent "that should be clarified to remove unnecessary uncertainty in the law and [**6] unfairness to litigants." *Id*. § 22.225(c), (e); *see also Richmont Holdings, Inc. v. Superior Recharge Sys., L.L.C.*, 392 S.W.3d 633, 635 n.3 (Tex. 2013) (per curiam) ("We have jurisdiction to hear an appeal from an interlocutory order denying arbitration when the court of appeals' decision conflicts with prior precedent."). In this case, the court of appeals' holding creates such an inconsistency with our decision in *Perry Homes v. Cull*, 258 S.W.3d 580, 587—92 (Tex. 2008), and with the court of appeals' decision in *In re Global Constr. Co.*, 166 S.W.3d 795, 798—99 (Tex. App.—Houston [14th Dist.] 2005, no pet.), regarding the issue of whether courts or arbitrators should decide whether a contractual deadline bars a demand for arbitration. The inconsistency on this issue gives us jurisdiction, which permits us to address and resolve all of the issues that all of the parties raise in this case. *See, e.g., Brown v. Todd*, 53 S.W.3d 297, 301 (Tex. 2001) ("As we have repeatedly recognized, if our jurisdiction is properly invoked on one issue, we acquire jurisdiction of the entire case.").

[8] The general contract utilized a "Standard Form of Agreement Between Owner and Contractor" (Form A111-1997) and a form of "General Conditions of the Contract for Construction" (Form A201-1997), both published by the American Institute of Architects. Sapphire and G.T. Leach substantially revised these forms, however, by striking and adding language throughout the contract to reflect their specific agreements. As revised, the arbitration section addresses numerous details including the process for selecting the

Leach expressly and impliedly waived its right to demand arbitration. Alternatively, Sapphire argues that G.T. Leach failed to demand arbitration prior to a deadline that the contract expressly imposes. The court of appeals agreed with Sapphire's second argument and did not reach its first. We conclude that (1) G.T. Leach did not waive its arbitration rights, and (2) the issue of whether the contractual deadline bars G.T. Leach's demand for arbitration is one that the arbitrators—not the courts—must decide. Because the waiver argument challenges G.T. Leach's ability to rely on the arbitration agreement at all, we address it first.

## A. Waiver of Right to Arbitration

Sapphire asserts that G.T. Leach has waived its right to enforce their arbitration agreement. *HN5* Waiver—the "intentional relinquishment of a known right"—can occur either expressly, through a clear repudiation of the right, or impliedly, through conduct inconsistent with a claim to the right. *Perry Homes, 258 S.W.3d at 590—91, 594*; *Moayedi v. Interstate 35/Chisam Rd., L.P., 438 S.W.3d 1, 6 (Tex. 2014)*. Sapphire argues that G.T. Leach both expressly and impliedly waived its right to compel arbitration in this case. The trial court agreed and denied G.T. Leach's motion to compel arbitration, but the court of appeals did not reach the issue. Both parties have fully briefed the issue and urge us to decide it here. When, as here, the relevant facts are undisputed, whether a party waived its right to arbitrate is a question of law. *Kennedy Hodges, L.L.P. v. Gobellan, 433 S.W.3d 542, 545 (Tex. 2014)* (per curiam); *Perry Homes, 258 S.W.3d at 598* & n.102. At the parties' mutual **[**9]** request, we reach the issue here to avoid unnecessary delay. *See, e.g., Placencio v. Allied Indus. Int'l, Inc., 724 S.W.2d 20, 22 (Tex. 1987)* (reaching, rather than remanding, issue of law not reached by court of appeals "[t]o avoid unnecessary delay"). Based on the undisputed facts, we conclude that G.T. Leach has not waived its right to arbitration.

## 1. Express Waiver

Sapphire first argues that G.T. Leach expressly waived its arbitration rights by seeking a continuance and agreeing to a new trial date. Specifically, Sapphire notes that G.T. Leach filed (jointly with the other defendants) a motion for continuance stating that "there is insufficient time for the parties to prepare this case with the current trial setting" and discovery "cannot be completed prior to the current trial setting." When the parties agreed to postpone the trial setting, G.T. Leach then signed a Rule 11 agreement in which all parties agreed to a scheduling order and a new trial date. We do not agree that the statements contained in these documents expressly relinquish and repudiate a right to arbitration. As we explained when addressing nearly identical statements in *In re Fleetwood Homes of Texas, L.P.*, "[n]othing in [these statements] expressly waives arbitration or revokes [an] arbitration demand." **[**10]** *257 S.W.3d 692, 694 (Tex. 2008)*; *see also In re Bank One, N.A., 216 S.W.3d 825, 827 (Tex. 2007)* (per curiam) (holding that *HN6* filing of motion to set aside default judgment and set new trial date does not expressly waive arbitration rights). Although the acts of requesting and then agreeing to a new trial date could be inconsistent with an intent to exercise the right to arbitrate, they do not constitute an *express* waiver of that right.

## 2. Implied Waiver

*HN7* A party asserting implied waiver as a defense to arbitration has the burden **[*512]** to prove that (1) the other party has "substantially invoked the judicial process," which is conduct inconsistent with a claimed right to compel arbitration, and (2) the inconsistent conduct has caused it to suffer detriment or prejudice. *Perry Homes, 258 S.W.3d at 593-94*; *see also Gobellan, 433 S.W.3d at 545*. Because the law favors and encourages arbitration, "this hurdle is a high one." *Richmont Holdings, Inc. v. Superior Recharge Sys., L.L.C., 455 S.W.3d*

arbitrator(s), the **[**8]** rules governing the arbitration, the location and timing of the arbitration, rights to discovery, finality and appeals from the arbitration award, and the duty to continue performing under the contract while the arbitration is pending. As discussed further below, one section addresses the consolidation and joinder of other parties within the arbitration proceeding.

*573, 574, 2014 Tex. LEXIS 1211 (Tex. 2014)* (per curiam) (quoting *Perry Homes, 258 S.W.3d at 589—90*). We conclude that Sapphire has not cleared the hurdle in this case.

**a. Litigation Conduct**

*HN8* Whether a party has substantially invoked the judicial process depends on the totality of the circumstances. *Perry Homes, 258 S.W.3d at 589—90*. Courts consider a "wide variety" of factors, including:

- how long the party moving to compel arbitration waited to do so;

- the reasons for the movant's delay;

- whether and when **[\*\*11]** the movant knew of the arbitration agreement during the period of delay;

- how much discovery the movant conducted before moving to compel arbitration, and whether that discovery related to the merits;

- whether the movant requested the court to dispose of claims on the merits;

- whether the movant asserted affirmative claims for relief in court;

- the extent of the movant's engagement in pretrial matters related to the merits (as opposed to matters related to arbitrability or jurisdiction);

- the amount of time and expense the parties have committed to the litigation;

- whether the discovery conducted would be unavailable or useful in arbitration;

- whether activity in court would be duplicated in arbitration;

- when the case was to be tried.

*Perry Homes, 258 S.W.3d at 590-91*.

Sapphire first initiated this lawsuit against the Insurance Brokers in 2009. In the summer of 2010, it filed a separate lawsuit in Harris County, Texas, against the architects who designed the condominium project, seeking to recover essentially the same damages arising from Hurricane Dolly. Six months later, Sapphire added G.T. Leach to the Harris County lawsuit, and four months after that, Sapphire named G.T. Leach as a defendant in this lawsuit. G.T. **[\*\*12]** Leach moved to compel arbitration the following November. Sapphire asserts that G.T. Leach's actions in this case between May 2011 and November 2012 amount to waiver of any right it has to arbitrate Sapphire's claims. Sapphire contends that G.T. Leach waived its arbitration rights through its actions between May 2011 and November 2012, primarily by filing counterclaims, filing motions for relief, and participating in pretrial discovery. *HN9* "Merely taking part in litigation," however, "is not enough." *In re D. Wilson Constr. Co., 196 S.W.3d 774, 783 (Tex. 2006)* (citations omitted). Rather, that conduct must demonstrate that the party "has substantially invoked the judicial process to [its] opponent's detriment." *Id*. (citing *In re Vesta Ins. Grp., Inc., 192 S.W.3d 759, 762 (Tex. 2006)* (per curiam)).

In considering the relevant factors, we note first that G.T. Leach did not elect to resolve its disputes with Sapphire in court; rather, it is in this lawsuit because Sapphire sued it. *See Perry Homes, 258 S.W.3d at 591* (noting that one factor is whether party seeking arbitration was **[\*513]** plaintiff who chose to file suit or defendant responding to suit filed against it). Although G.T. Leach asserted a counterclaim against Sapphire in the Harris County suit, it did not assert counterclaims seeking affirmative relief in this lawsuit. The counterclaim **[\*\*13]** G.T. Leach filed in Harris County was defensive in nature, and our rules required G.T. Leach to file it or risk losing it altogether. *See Tex. R. Civ. P. 97(a)* (defining compulsory counterclaims). We have held that

*HN10* "[m]erely filing suit does not waive arbitration," *Richmont Holdings, 455 S.W.3d at 576, 2014 Tex. LEXIS 1211 at \*5*, and we have declined to find waiver of the right to arbitrate when a movant filed cross-actions in litigation, *see D. Wilson Constr., 196 S.W.3d at 783*. Moreover, G.T. Leach never sought disposition of its Harris County counterclaim on the merits; instead it merely took the action necessary to preserve that claim once Sapphire initiated a lawsuit arising out of the same subject matter. Nor did G.T. Leach ever seek summary judgment or dismissal of Sapphire's claims on the merits. *See Richmont Holdings, 455 S.W.3d at 575, 2014 Tex. LEXIS 1211 at \*2* (observing that whether movant sought "disposition on the merits" is key factor in deciding waiver); *see also Perry Homes, 258 S.W.3d at 592* (observing that "whether the movant sought judgment on the merits" is a factor).

Instead, G.T. Leach first and primarily sought to transfer venue of this case to Harris County, or alternatively to abate this case while the Harris County case was resolved. Rather than driving up litigation costs—another factor courts consider for waiver—G.T. Leach endeavored to create efficiency by **[\*\*14]** defending Sapphire's claims in a single venue. *Perry Homes, 258 S.W.3d at 591*. *HN11* We have rejected arguments relying on venue challenges to establish waiver because such challenges do not relate to the merits of the case. *See Richmont Holdings, 455 S.W.3d at 576, 2014 Tex. LEXIS 1211 at \*5* (also noting that under rules of procedure, "objections to improper venue must be made at the outset of the case"); *In re Serv. Corp. Int'l, 85 S.W.3d 171, 175 (Tex. 2002)* (holding that parties did not waive right to arbitrate by seeking to move litigation from state to federal court); *In re ADM Investor Servs., Inc., 304 S.W.3d 371, 374 (Tex. 2010)* (applying *Perry Homes* test in context of forum-selection clauses and holding that motion to transfer venue did not waive contractual right).

In addition to its venue challenge, G.T. Leach filed motions to designate responsible third parties, for continuance, and to quash depositions. These motions, however, were defensive, rather than offensive, in nature. *HN12* A party's litigation conduct aimed at defending itself and minimizing its litigation expenses, rather than at taking advantage of the judicial forum, does not amount to substantial invocation of the judicial process. *See Richmont Holdings, 455 S.W.3d at 576, 2014 Tex. LEXIS 1211 at \*6*; *see also Keytrade USA, Inc. v. Ain Temouchent M/V, 404 F.3d 891, 897 (5th Cir. 2005)* (declining to find waiver where movant sought summary judgment "from a defensive posture"); *Rodriguez v. Transnave Inc*., 8 F.3d 284, 288 (5th Cir. 1993) (declining to find waiver where movant voluntarily appeared in suit and sought removal because **[\*\*15]** it was "purely defensive action to preserve its right of removal and to avoid any possibility of a default judgment").

Finally, G.T. Leach participated in pretrial discovery, but it did so because Sapphire engaged it in discovery. Sapphire complains that because the parties agreed to conduct discovery jointly for both cases, all discovery propounded by any party was available to all parties, such that G.T. Leach has received copies of documents produced by other parties and transcripts of depositions taken by other **[\*514]** parties. Sapphire asserts that G.T. Leach acted inconsistently with its right to arbitrate both when it responded to discovery requests and when it resisted discovery by seeking to quash a deposition notice. Responding to discovery and simply being named in the lawsuit while discovery is ongoing do not amount to waiver. To the contrary, we have declined to find waiver even when the movant itself propounded written discovery. *See, e.g., Fleetwood Homes, 257 S.W.3d at 694*; *In re Bruce Terminix, Co., 988 S.W.2d 702, 703—04 (Tex. 1998)*; *EZ Pawn Corp. v. Mancias, 934 S.W.2d 87, 88—89 (Tex. 1996)*. Nor does G.T. Leach's motion to quash, in which it objected to the time and place of a deposition notice served on it by Sapphire, amount to an affirmative invocation of the judicial forum.

The only discovery that G.T. Leach actually propounded **[\*\*16]** was a form request for disclosure that G.T. Leach included in its answer in the case. *See Tex. R. Civ. P. 194.1* (providing required form for requests for disclosure). Such requests seek basic information about a lawsuit: who are the parties and witnesses, what are the theories, and how much is at stake? A defendant needs this information to make intelligent decisions about how to defend the suit, and as we have stated, *HN13* a party may protect its existing litigation rights from forfeiture without waiving its right to arbitrate. We have declined to find waiver of the right to arbitrate in

other cases where the movant made a request for disclosure. *See Richmont Holdings, 455 S.W.3d at 575, 2014 Tex. LEXIS 1211 at *4*; *Vesta Ins., 192 S.W.3d at 763*.

G.T. Leach also designated experts and responsible third parties, but these actions were also defensive in nature and necessary to preserve G.T. Leach's rights. If G.T. Leach had failed to timely designate experts, it would have forfeited the right to present expert witnesses if the suits went to trial. *See Tex. R. Civ. P. 193.6(a)*. Likewise, G.T. Leach had to designate responsible third parties by the deadline imposed in the scheduling order. G.T. Leach did not create the need to timely designate experts and responsible third parties by agreeing to [**17] a scheduling order: *HN14* the rules of civil procedure impose a default deadline for expert designations when the court has not set one, and the Civil Practice and Remedies Code imposes a deadline for designating responsible third parties. *Tex. R. Civ. P. 195.2*; *Tex. Civ. Prac. & Rem. Code § 33.004(a)*.

While we agree that G.T. Leach could have been more prompt in seeking arbitration, most of the delay of which Sapphire complains occurred either during the eighteen months before Sapphire added G.T. Leach to this case or during the four-plus months during which G.T. Leach sought to transfer venue. *See Tex. R. Civ. P. 86* (governing order of pleadings for motion to transfer venue). The delay between the trial court's denial of the motion to transfer venue and G.T. Leach's motion to compel arbitration was between two and three months. We conclude that three months is not a substantial delay relative to the timeline of this case as a whole. *Cf. Fleetwood Homes, 257 S.W.3d at 694* (no waiver despite eight-month delay); *Vesta Ins., 192 S.W.3d at 763* (no waiver despite two-year delay).

Considering the totality of the circumstances, we hold that G.T. Leach has not substantially invoked the litigation process in contravention of its contractual right to arbitration. *See Perry Homes, 258 S.W.3d at 589—90* (adopting [**18] totality-of-the-circumstances test). As in several cases involving similar or greater participation in litigation than occurred here, we decline to find waiver under these circumstances. *See Richmont Holdings, 455 S.W.3d at 576, 2014 Tex. LEXIS 1211 at *4* [*515] (holding that movant did not waive arbitration rights by initiating lawsuit, invoking forum-selection clause, moving to transfer venue, propounding request for disclosure, and waiting nineteen months after being sued to move for arbitration); *Fleetwood Homes, 257 S.W.3d at 694* (holding that movant did not waive arbitration rights by noticing deposition, serving written discovery, and waiting eight months to move for arbitration); *Bruce Terminix, 988 S.W.2d at 703—04* (holding that movant did not waive arbitration rights by propounding requests for production and interrogatories and waiting six months to seek arbitration); *Mancias, 934 S.W.2d at 88-89* (holding that movant did not waive arbitration rights by propounding written discovery, noticing deposition, agreeing to reset trial date, and waiting nearly a year to move for arbitration).

## b. Prejudice

Nor has Sapphire proven that it suffered unfair prejudice as a result of G.T. Leach's litigation conduct. *HN15* Detriment or prejudice, in this context, refers to an "inherent unfairness caused by a 'party's attempt to have it both ways by [**19] switching between litigation and arbitration to its own advantage.'" *In re Citigroup Global Mkts., Inc., 258 S.W.3d 623, 625 (Tex. 2008)* (per curiam) (quoting *Perry Homes, 258 S.W.3d at 597*). Prejudice may result when a party seeking arbitration first sought to use the judicial process to gain access to information that would not have been available in arbitration, but propounding discovery will not, in and of itself, result in waiver of a right to compel arbitration. *Bruce Terminix, 988 S.W.2d at 704*. Similarly, while delay may be a factor both in terms of whether the movant has substantially invoked the judicial process and whether the nonmovant has suffered prejudice, mere delay is not ordinarily enough, even if it is substantial. *Richmont Holdings, 455 S.W.3d at 574, 2014 Tex. LEXIS 1211 at *6*; *see also Fleetwood Homes, 257 S.W.3d at 694* (eight-month delay); *Vesta Ins., 192 S.W.3d at 763* (two-year delay). "Waiver can be implied from a party's unequivocal conduct, but not by inaction." *ADM Investor, 304 S.W.3d at 374* (citing *Perry Homes, 258 S.W.3d at 593*).

G.T. Leach may have had access to more information as a result of this litigation than if Sapphire's dispute with G.T. Leach had originated in arbitration. But Sapphire, not G.T. Leach, chose to initiate this suit in the courts rather than arbitration, and G.T. Leach did not serve a single request for production, interrogatory, or deposition notice in the case. Sapphire's contention (discussed below) that it has been prejudiced by the delay [**20] because the contractual deadline for initiating arbitration expired before G.T. Leach moved to compel arbitration is unavailing because that deadline expired before Sapphire even named G.T. Leach a party to this suit.

In summary, although we agree that G.T. Leach could have demanded waiver more promptly than it did, we hold that the totality of the circumstances do not establish that G.T. Leach substantially invoked the judicial process to the extent required to demonstrate a waiver of its right to arbitration, and its participation in the litigation has not caused Sapphire the kind of prejudice necessary to clear the "high hurdle" of waiver. We thus conclude that G.T. Leach has not impliedly waived its right to demand arbitration in this case.

## B. Contractual Deadline

We now turn to Sapphire's contention that a contractual deadline bars G.T. Leach's arbitration demand. The deadline at issue provides that any

> [*516] demand for arbitration shall be made within . . . a reasonable time after the Claim has arisen, and in no event shall it be made after the date when institution of legal or equitable proceedings based on such Claim would be barred by the applicable statute of limitations as determined [**21] pursuant to Section 13.7.

The court of appeals agreed with Sapphire that this deadline bars G.T. Leach's demand for arbitration because the statute of limitations had run on Sapphire's claims by the time G.T. Leach made its demand.[9] G.T. Leach argues that the court should not have addressed the contractual deadline at all, because Sapphire's contention that the deadline bars G.T. Leach's arbitration demand is itself an issue that Sapphire agreed to resolve through arbitration. In other words, G.T. Leach argues that only the arbitrators—and not the courts—can decide whether the contractual deadline bars G.T. Leach's demand for arbitration. In response, Sapphire asserts that G.T. Leach waived this argument by failing to raise it in the trial court or the court of appeals. We conclude that G.T. Leach did not waive the argument, and we agree that the courts must defer to the arbitrators to determine the meaning and effect of the contractual deadline.

### 1. Waiver

Sapphire contends that G.T. Leach waived its argument that only the arbitrators can decide Sapphire's contractual-deadline defense because G.T. Leach failed to raise the argument in the trial court or in the court of appeals. [**23] In support, Sapphire relies on our well-established error-preservation rules, which preclude a party from seeking appellate review of an issue that the party did not properly raise in the trial court. *See Tex.*

---

[9] By the time Sapphire named G.T. Leach as a defendant—and thus by the time G.T. Leach filed its motion to compel arbitration—the two-year statute of limitations applicable to Sapphire's negligence claims had already run, but the four-year statute applicable [**22] to Sapphire's breach-of-contract claims had not. The court of appeals did not mention this distinction, but instead stated broadly that "[t]he parties do not dispute that the applicable statute of limitations had expired when G.T. Leach sought arbitration." __S.W.3d at __n.6; *see also id.* at __(stating that "G.T. Leach does not contest that the statute of limitations for Sapphire's claims had expired when it filed its motion to compel arbitration."). These statements were incorrect. Although the parties did agree that the two-year statute on Sapphire's negligence claims had expired, they also agreed that the four-year statute on Sapphire's breach-of-contract claims had not. Since we conclude that the arbitrators must resolve Sapphire's contractual-deadline arguments, however, we need not consider the court of appeals' error on this point, and we leave it to the arbitrators to resolve all issues related to the construction and application of the contractual deadline in this case.

*R. App. P. 33.1(a)(1)* (″As a prerequisite to presenting a complaint for appellate review, the record must show that . . . the complaint was made to the trial court . . . .″); *see also In re B.L.D., 113 S.W.3d 340, 350 (Tex. 2003)* (listing cases for proposition that ″error [must be] preserved in the trial court″).[10] These rules do not apply here, however, because Sapphire first raised its contractual-deadline defense in the court of appeals, not in the trial court. Under our rules, *HN16* an issue [*517] presented in a petition for review to this Court must have ″been preserved for appellate review in the trial court and assigned as error in the court of appeals,″ but *only* ″[i]f the matter complained of originated in the trial court.″ *Tex. R. App. P. 53.2(f)*.

In the trial court, Sapphire argued only that G.T. Leach waived its right to arbitration by participating in the litigation. The only time Sapphire referred to the contractual deadline in the trial court was to support its waiver-by-litigation defense and, in particular, its contention that G.T. Leach's participation in the litigation was prejudicial to Sapphire.[11] Sapphire never asserted in the trial court that the contractual deadline independently bars G.T. Leach's arbitration demand. G.T. Leach thus had no reason to argue in the trial court that the arbitrators, rather than the court, must resolve that assertion. On this point, there was no error for G.T. Leach to preserve in the trial court.

Sapphire first relied on the contractual deadline as an independent bar to G.T. Leach's arbitration [**25] demand in its appellee's brief in the court of appeals, and the error that G.T. Leach now complains of (i.e., that the court of appeals should not have decided that issue) first arose from the court of appeals' judgment. Although G.T. Leach could have made this argument in its reply brief or in a motion for rehearing in the court of appeals,[12] our rules do not require petitioners to have made in the court of appeals all arguments that are responsive to arguments that a respondent raised for the first time in that court. *See Key Operating & Equip., Inc. v. Hegar, 435 S.W.3d 794, 797 (Tex. 2014)* (*HN17* ″An issue raised in this Court must have been assigned as error in the court of appeals *if it originated in the trial court*.″) (emphasis added). Instead, we have held that when the petitioner's argument or complaint first arises ″from the court of appeals' judgment,″ it ″may be raised either in a motion for rehearing in the court of appeals or in a petition for review in this Court.″ *Bunton v. Bentley, 153 S.W.3d 50, 53 (Tex. 2004)* (holding that petitioner's [*518] ″complaint that the exemplary damages were

---

[10] Sapphire cites to *Parks v. Developers Surety & Indemnity Co., 302 S.W.3d 920, 924 (Tex. App.—Dallas 2010, no pet.)* (refusing to consider unconscionability as a defense to contract claim because the defendant failed to plead and assert it in the trial court), and *Posey v. Southwestern Bell Yellow Pages, Inc., 878 S.W.2d 275, 281 (Tex. App.—Corpus Christi 1994, no writ)* (″Because the Poseys failed to assert in the court below that the limitation of liability clause was void, unconscionable or unenforceable, [**24] we may not reverse that portion of the summary judgment on appeal.″).

[11] Specifically, Sapphire argued: ″The most prejudicial aspect of allowing arbitration this late in the game is that the Statute of Limitations has already run on all of Plaintiff's negligence claims against all Defendants. This effect is so prejudicial that the express language of the contract prohibits arbitration in this situation.″

[12] Although G.T. Leach did not specifically argue in the court of appeals [**26] that the arbitrators must decide the contractual-deadline issue, it did more broadly assert that ″there is no legitimate issue as to the arbitrability of all of the issues between Sapphire and GTL,″ and ″[b]ecause all of Sapphire's claims against [G.T. Leach] are clearly arbitrable under a valid and enforceable arbitration provision, the only potentially viable argument Sapphire presents against enforcement is waiver.″ Because *HN18* ″disposing of appeals for harmless procedural defects is disfavored,″ and ″[a]ppellate briefs are to be construed reasonably, yet liberally, so that the right to appellate review is not lost by waiver,″ *Perry v. Cohen, 272 S.W.3d 585, 587 (Tex. 2008)* (per curiam), G.T. Leach's broad assertions were arguably sufficient to encompass all supporting arguments, including the argument that Sapphire's claim that the contractual deadline bars G.T. Leach's arbitration demand was ″clearly arbitrable.″ *See, e.g., Plexchem Int'l, Inc. v. Harris Cnty. Appraisal Dist., 922 S.W.2d 930, 930—31 (Tex. 1996)* (holding that the assertion in the court of appeals that ″[t]he trial court erred by granting . . . summary judgment″ was ″sufficient to preserve error and to allow argument as to all possible grounds upon which summary judgment should have been denied″); *see also Tex. R. App. P. 38.1(f)* (*HN19* ″The statement of an issue or point [in an appellate [**27] brief] will be treated as covering every subsidiary question that is fairly included.″). We need not decide that issue, however, since we conclude that G.T. Leach did not waive its argument even if it failed to raise it in the court of appeals.

unconstitutionally excessive arose from the court of appeals' judgment and may therefore be raised in this Court for the first time") (citing *Larsen v. FDIC/Manager Fund, 835 S.W.2d 66, 74 n.12 (Tex. 1992))*.

Our decision in *Gilbert Texas Construction, L.P. v. Underwriters at Lloyd's London* illustrates this point. *327 S.W.3d 118, 125 (Tex. 2010)*. In that case, Gilbert sued Underwriters for breach of contract after Underwriters denied coverage of Gilbert's insurance claim. On cross-motions for summary judgment, the trial court agreed with Gilbert, and having won on the issue of coverage, Gilbert had no obligation to preserve any error in the trial court's judgment. *Id*. Underwriters appealed, however, and argued in the court of appeals that an exclusion to the policy's coverage applied. In that court, Gilbert did not dispute that the exclusion applied, but instead argued that an exception to the exclusion also applied, thus resulting in coverage. The court of appeals reversed and rendered judgment for Underwriters, finding that the exclusion applied and the exception did not. *Id*. In its petition for review in this Court, Gilbert argued both that the exclusion did not apply and, if **[\*\*28]** it did, the exception to the exclusion applied as well. Pet. for Review at ix, *Gilbert Tex. Constr., 327 S.W.3d 118, 2008 WL 2195918, at \*6, \*12*. Underwriters then asserted that Gilbert had waived its argument that the exclusion did not apply by failing to raise it in the court of appeals, but we disagreed. *Gilbert Tex. Constr., 327 S.W.3d at 125*. *HN20* "While ordinarily a party waives a complaint not raised in the court of appeals," we explained, "a complaint arising from the court of appeals' judgment may be raised either in a motion for rehearing in that court or in a petition for review in this Court." *Id*. (citing *Tex. R. App. P. 53.2(f)*; *Bunton, 153 S.W.3d at 53*).[13]

Here, when Sapphire argued for the first time in the court of appeals that the contractual deadline is an independent bar to G.T. Leach's arbitration demand, G.T. Leach neither conceded nor disputed that the court of appeals could decide that issue, and instead argued only that the bar did not apply. After the court of appeals held, for the first time in this case, that the bar applied and precluded arbitration regardless of whether G.T. Leach waived any right to arbitration, G.T. Leach asserted in its petition for review in this Court both that the court could not decide **[\*\*30]** that issue and, if it could, the bar does not apply. Because the error of which G.T. Leach complains did not originate in the **[\*519]** trial court and first arose from the court of appeals' judgment, G.T. Leach did not waive its complaint by raising it for the first time in its petition for review in this Court.

*HN22* That is not to say that we *must* address and resolve an argument that the petitioner failed to raise in the court of appeals whenever the asserted error arose from that court's judgment. In the exercise of its discretionary jurisdiction, a court may elect to address the issue, or not. *See, e.g., United States v. Williams, 504 U.S. 36, 41, 44—45, 112 S. Ct. 1735, 118 L. Ed. 2d 352 (1992)* (finding it "a permissible exercise of our discretion" to address an issue that was not "pressed or passed upon" in the appellate court in the case presently before the Court). The decision involves "[i]mportant prudential considerations," such as the need to conserve judicial resources, whether allowing lower courts to first consider and rule on the issue will "further the goal of accuracy in judicial decision-making," and our duty to "promote fairness among litigants." *In re B.L.D., 113 S.W.3d at 350*. We conclude that G.T. Leach did not waive its right to argue that the arbitrators, rather than the courts, must decide the effect of **[\*\*31]** the contractual-deadline issues, and we elect to exercise our discretionary jurisdiction to resolve that argument now.

---

[13]    We appear to have once held to the contrary in *In re K.A.F., 160 S.W.3d 923 (Tex. 2005)*, in which we stated that, although petitioner's "constitutional complaints relate to her appeal and therefore could not have been asserted in the trial court, she was required to raise them in the court of appeals in order to preserve error." *Id*. at 928 (holding that petitioner "waived these arguments by failing to raise them in the court of appeals"). In support of these statements, however, we cited two cases in which we had addressed only the well-established rule that a party must preserve error by asserting its complaints *in the trial court*. *Id*. at 928 (citing *In re B.L.D.*, 113 S.W.3d at 350—51 (citing cases for the proposition **[\*\*29]** that objections and errors "must be preserved in the trial court"); *Tex. Dep't of Protective & Regulatory Servs. v. Sherry*, 46 S.W.3d 857, 861 (Tex. 2001) (refusing to consider constitutional arguments that petitioner did not assert in the trial court). We cited no rule or authority in *K.A.F.* to support the proposition that *HN21* a petitioner waives an argument by failing to raise it in the court of appeals when the petitioner's complaint first arises from that court's judgment. Consistent with our holdings in *Bunton* and *Gilbert*, as well as our holding today, our statement in *K.A.F.* should be read to mean that we *may* treat such an argument as waived, as we did in that case, but we are not *required* to do so.

## 2. Arbitrability of the Deadline

We now turn to the question of who should decide whether the contractual deadline bars G.T. Leach's demand for arbitration in this case. Ultimately, this is a question of the parties' intent as expressed in their written agreement. *HN23* When parties have contractually agreed to arbitrate their future disputes, the courts' obligation to honor and enforce that agreement requires that they refer those disputes to arbitration. The Texas Arbitration Act (TAA)[14] thus provides that courts *"shall* order the parties to arbitrate on application of a party showing: (1) an agreement to arbitrate; and (2) the opposing party's refusal to arbitrate." *TEX. CIV. PRAC. & REM. CODE § 171.021(a)* (emphasis added); *In re FirstMerit Bank, N.A., 52 S.W.3d 749, 753—54 (Tex. 2001)* ("Once the trial court concludes that the arbitration agreement encompasses the claims, and that the party opposing arbitration has failed to prove its defenses, the trial court has no discretion but to compel arbitration and stay its own proceedings.")

*HN25* The courts' role, then, is first to decide whether the parties made a valid and presently enforceable agreement to arbitrate. *TEX. CIV. PRAC. & REM. CODE § 171.021(b)* (*HN26* "If a party opposing an application [for arbitration] denies the existence of the agreement, the court shall summarily determine that issue."). If they did, then the court must decide whether the present disputes fall within the scope of that agreement. *See id.; In re Hous. Pipe Line Co., 311 S.W.3d 449, 451 (Tex. 2009); J.M. Davidson, Inc. v. Webster, 128 S.W.3d 223, 227 (Tex. 2003)*. These questions that courts must resolve are sometimes referred to as questions of "arbitrability." **[\*520]** *See, e.g., Hous. Pipe Line, 311 S.W.3d at 451—52; Perry Homes, 258 S.W.3d at 587—92*.[15] If, by answering these questions, the court determines that the present disputes **[\*\*33]** are in fact arbitrable under the parties' agreement, the court must complete its role by ordering the parties to arbitration and leaving it to the arbitrators to resolve those disputes. *See TEX. CIV. PRAC. & REM. CODE § 171.021; Venture Cotton Co-op. v. Freeman, 435 S.W.3d 222, 232 (Tex. 2014)*.

We have also recognized that *HN27* the question of whether a party has waived its right to arbitration through its litigation conduct is a question of arbitrability for the courts to decide. *Perry Homes, 258 S.W.3d at 588*. We concluded that this is a question of arbitrability, rather than a question to be arbitrated, because (1) "[c]ontracting parties would expect the court to decide whether one party's conduct before the court waived the right to arbitrate," (2) it is a "gateway" matter regarding "whether the parties have submitted a particular dispute to arbitration," and (3) "courts decide defenses relating solely to the arbitration clause." *Id. at 588—89*. In essence, the question of whether a party has waived its right to arbitration by its conduct in litigation is just another way of asking the first question of arbitrability: whether there is a presently enforceable arbitration agreement. **[\*\*34]** If a party's conduct in litigation equates to a waiver of its rights under the arbitration agreement, there is no presently enforceable agreement to arbitrate.

In this regard, the United States Supreme Court has recognized a distinction between questions of "substantive arbitrability"—which courts decide—and "procedural arbitrability"—which courts must refer to the arbitrators to decide. *See BG Group, PLC v. Republic of Arg., 134 S. Ct. 1198, 1206—07, 188 L. Ed. 2d 220 (2014); Howsam v. Dean Witter Reynolds, Inc., 537 U.S. 79, 81, 123 S. Ct. 588, 154 L. Ed. 2d 491 (2002)*. In *Howsam,*

---

[14] The general contract provides for arbitration under the TAA, and each of the defendants sought to compel arbitration **[\*\*32]** under that Act. While the Federal Arbitration Act (FAA) might also apply, no party argues that the FAA preempts the TAA on any issue in this case, or that the TAA and FAA materially differ on any such issue. We therefore presume that the TAA governs, but we may find guidance in court decisions addressing both acts. *Cf. Elis v. Schlimmer*, 337 S.W.3d 860, 862 (Tex. 2011) (observing that *HN24* FAA preempts TAA "only when it or other state law would not allow enforcement of an arbitration agreement that the FAA would enforce" and that party seeking to avoid application of TAA has burden of raising that issue).

[15] In deciding these questions of arbitrability, courts apply the common principles of general contract law to determine the parties' intent. *In re Poly-Am., L.P.*, 262 S.W.3d 337, 348 (Tex. 2008).

a brokerage firm argued that its client could not initiate an arbitration because the client failed to do so within a six-year deadline that the parties had contractually adopted as part of their arbitration agreement. *537 U.S. at 81*. The Court held that this was not a question of arbitrability for the courts to decide. *Id. at 83*. Although the Court acknowledged that, "[l]inguistically speaking, one might call any potentially dispositive gateway question a 'question of arbitrability,'" it explained that "the phrase 'question of arbitrability' has a far more limited scope" and does not encompass "'procedural' questions which grow out of the dispute and bear on its final disposition" or "allegation[s] of waiver, delay, or a like defense." *Id. at 84* (citation omitted). Quoting the Revised Uniform Arbitration Act of 2000, the Court explained **[**35]** that, "in the absence of an agreement to the contrary, issues of substantive arbitrability . . . are for a court to decide and issues of procedural arbitrability, *i.e.*, whether prerequisites such as time limits, notice, laches, estoppel, and other conditions precedent to an obligation to arbitrate have been met, are for the arbitrators to decide." *Id. at 81* (emphasis and citation omitted, ellipsis in *Howsam*).

The Supreme Court reiterated this distinction in *BG Group*, further clarifying the difference between substantive arbitrability questions addressing the existence, enforceability, and scope of an agreement **[*521]** to arbitrate (which courts decide), and procedural arbitrability questions addressing the construction and application of limits on that agreement (which only arbitrators can decide):

> On the one hand, courts presume that the parties intend courts, not arbitrators, to decide what we have called disputes about "arbitrability." These include questions such as "whether the parties are bound by a given arbitration clause," or "whether an arbitration clause in a concededly binding contract applies to a particular type of controversy."

> On the other hand, courts presume that the parties intend **[**36]** arbitrators, not courts, to decide disputes about the meaning and application of particular procedural preconditions for the use of arbitration. These procedural matters include claims of "waiver, delay, or a like defense to arbitrability." And they include the satisfaction of "prerequisites such as time limits, notice, laches, estoppel, and other conditions precedent to an obligation to arbitrate."

*134 S. Ct. at 1206—07* (citations omitted).

We applied these distinctions when we decided in *Perry Homes* that waiver by litigation conduct presents a question of substantive arbitrability that courts must decide. *258 S.W.3d at 588—89*. We held that, although *Howsam* referenced "waiver" and "delay" as "procedural matters" for arbitrators to decide, it did not mean that the issue of waiver *by litigation conduct* was one for arbitrators, rather than courts. *Id*. Instead, we held that **HN28** courts should defer to arbitrators to resolve the issue of waiver when "waiver concerns limitations periods or waiver of particular claims or defenses," but courts should decide issues of waiver by litigation conduct. *Id. at 588*. We stated that "parties generally intend arbitrators to decide matters that 'grow out of the dispute and bear on its final disposition,'" **[**37]** such as "waiver of a substantive claim or delay beyond a limitations deadline." *Id. at 589*. Our explanation in *Perry Homes* is consistent with our prior recognition that, once the party seeking arbitration proves the existence of an enforceable agreement to arbitrate, Texas and federal law recognize a strong presumption "in favor of arbitration such that myriad doubts—as to waiver, scope, and other issues not relating to enforceability—must be resolved in favor of arbitration." *Poly-Am., 262 S.W.3d at 348*.[16]

In this case, the contractual deadline in the general contract falls squarely within the category of "matters that 'grow out of the dispute and bear on [the arbitrators'] final disposition'" of the claims. *See Perry Homes, 258*

---

[16] The Court in *Poly-America* referenced a "strong federal presumption" in favor of arbitration because the contracts in that case provided for arbitration under the FAA. *Poly-Am., 262 S.W.3d at 348*. But the Court has observed in other cases that Texas law also strongly favors arbitration of disputes and recognizes a presumption in favor of arbitrability. *See, e.g., Prudential Sec. Inc. v. Marshall, 909 S.W.2d 896, 898—99 (Tex. 1995)*.

*S.W.3d at 588*. The deadline does not determine the present existence, enforceability, or scope of the agreement to arbitrate the parties' disputes, but instead imposes a procedural limit on **[**38]** the parties' rights under that agreement. It bears on the arbitrators' final disposition of Sapphire's claims—specifically, whether the arbitrators can award Sapphire a remedy on its negligence claims in light of Sapphire's more than two-year delay in asserting them. More pointedly, it involves an alleged "delay beyond a limitations deadline." *Perry Homes, 258 S.W.3d at 589*; *see also id. at 588* (noting that "federal courts . . . consistently [defer to arbitrators] when waiver concerns limitations periods"). **[*522]** We explained in *Perry Homes* that, absent express contractual agreement to the contrary, issues of this nature must be resolved by arbitrators rather than courts. *See id. at 588—89*; *see also BG Grp., 134 S. Ct. at 1207* (observing that **HN29** "satisfaction of 'prerequisites such as time limits'" are questions of procedural arbitrability for the arbitrator to decide).

Stated another way, the parties' dispute over the meaning and effect of the contractual deadline does not touch upon the issue of whether an enforceable agreement to arbitrate Sapphire's claims exists. Neither party disputes that such an agreement does exist. Instead, they dispute whether, in light of the contractual deadline, the existing, enforceable agreement limits G.T. Leach's rights under the agreement **[**39]** itself. Sapphire's contention that it does and G.T. Leach's contention that it does not are themselves "Claim[s] arising out of or related to the Contract," which the parties expressly agreed to arbitrate.[17] *See In re Wood, 140 S.W.3d 367, 369 (Tex. 2004)* (holding that dispute over whether contract prohibited class arbitration was a contract construction issue, which was a "dispute arising out of" the contract that the parties had committed to the arbitrator) (citing *Green Tree Fin. Co. v. Bazzle, 539 U.S. 444, 123 S. Ct. 2402, 156 L. Ed. 2d 414 (2003)*, for the proposition that whether contract prohibited class arbitration was a "dispute about what the arbitration contract [meant,]" which was "a dispute 'relating to this contract'" that the parties had agreed "an arbitrator, not a judge, would answer").

**HN30** We do not hold that disputes over a contractual deadline in an arbitration agreement will always present questions of **[**40]** procedural arbitrability that arbitrators must decide. If a party contends, for example, that a contractual deadline renders the agreement to arbitrate unconscionable or that the deadline operates to limit the scope of the claims the parties agreed to arbitrate, those contentions might raise issues of substantive arbitrability for the courts to decide. *Cf. Quilloin v. Tenet HealthSystem Phila., Inc., 673 F.3d 221, 234 (3d Cir. 2012)* (considering argument that time limit in arbitration agreement was substantively unconscionable); *but see Kristian v. Comcast Corp., 446 F.3d 25, 43—44 (1st Cir. 2006)* (holding that arbitrator should decide whether contract's one-year limitations provision conflicted with Clayton Act's four-year statute of limitations for antitrust claims). But Sapphire asserts no such contentions in this case. Instead, it concedes the existence of an enforceable arbitration agreement that applies to its claims against G.T. Leach, and argues only that the terms of that agreement limit G.T. Leach's rights under the agreement itself. Consistent with the decisions of numerous federal courts,[18] we **[*523]** conclude that Sapphire's argument presents questions of procedural arbitrability that only the arbitrators can decide, and the court of appeals thus erred by deciding the issue.

---

[17] The general contract defines a "Claim" as

> a demand or assertion by one of the parties seeking, as a matter of right, adjustment or interpretation of Contract terms, payment of money, extension of time or other relief with respect to the terms of the Contract. The term "Claim" also includes other disputes and matters in question between [Sapphire] and [G.T. Leach] arising out of or relating to the Contract.

[18] *See, e.g., United Steel Workers of Am., AFL-CIO-CLC v. Saint Gobain Ceramics & Plastics, Inc., 505 F.3d 417, 418 (6th Cir. 2007)* (holding that application of **[**41]** contractual time limit was issue for arbitrators rather than courts); *Marie v. Allied Home Mortg. Corp., 402 F.3d 1, 11 (1st Cir. 2005)* (holding that trial court erred in interpreting and applying contractual requirement that "[a]rbitration under this section must be initiated within sixty days" of event giving rise to the claim because that issue was for arbitrators to decide); *Shearson Lehman Hutton, Inc. v. Wagoner, 944 F.2d 114, 120—21 (2d Cir. 1991)* ("Although *Conticommodity* [Services Inc. v. Philipp & Lion,

In summary, with respect to Sapphire's claims against G.T. Leach, we hold that G.T. Leach did not expressly or impliedly waive its right to arbitration, and the courts must defer to the arbitrators to decide whether and how the contractual deadline affects that right. We therefore reverse the court of appeals' judgment with respect to the trial court's denial of G.T. Leach's motion to compel arbitration.

## III.

### The Other Defendants

We now turn to the arbitrability of Sapphire's claims against the Other Defendants, which include (1) the Insurance Brokers and Engineers, who each allegedly **[**43]** contracted directly with Sapphire in agreements that undisputedly did not include an enforceable arbitration agreement, and (2) the Subcontractors, who contracted directly with G.T. Leach in agreements that allegedly did include enforceable arbitration agreements. The Other Defendants contend that Sapphire agreed to arbitrate its claims against them in the general contract and the subcontracts, and alternatively, that Sapphire is equitably estopped from denying its assent to the arbitration agreements in those contracts. Although the Other Defendants did not sign the general contract and Sapphire did not sign the subcontracts, we have recognized that *HN31* "sometimes a person who is not a party to the agreement can compel arbitration with one who is, and vice versa." *Meyer v. WMCO-GP, LLC, 211 S.W.3d 302, 305 (Tex. 2006)*. More specifically, "nonparties may be bound to an arbitration clause when the rules of law or equity would bind them to the contract generally." *In re Weekley Homes, L.P., 180 S.W.3d 127, 129 (Tex. 2005)*. We conclude here, however, that neither law nor equity requires Sapphire to arbitrate these claims.

### A. Arbitration Under the General Contract

We begin with the Other Defendants' reliance on the general contract as support for their arbitration demands. We conclude that Sapphire did **[**44]** not agree in the **[*524]** general contract to arbitrate its claims against the Other Defendants and is not equitably estopped from refusing to do so.

### 1. No Agreement to Arbitrate

As we have explained, *HN32* a party seeking to compel arbitration must establish that a valid arbitration agreement exists and that the claims at issue fall within the scope of that agreement. *Tex. Civ. Prac. & Rem. Code § 171.021(a)*; *FirstMerit Bank, 52 S.W.3d at 753*. Sapphire concedes that the general contract contains a valid arbitration agreement, but contends that the Other Defendants cannot enforce that agreement because they are not signatories or parties to the general contract. *See In re Rubiola, 334 S.W.3d 220, 224 (Tex. 2011)* (holding that, generally, "parties must sign arbitration agreements before being bound by them"). We have recognized, however, that in some circumstances a non-signatory can be bound to, or permitted to enforce, an arbitration

---

613 F.2d 1222, 1224—25 (2d Cir. 1980)] involved a one-year time limitation set forth in the arbitration agreement itself, we stated emphatically that *any* limitations defense—whether stemming from the arbitration agreement, arbitration association rule, or state statute—is an issue to be addressed by the arbitrators."); *Nursing Home & Hosp. Union No. 434 AFL-CIO-LDIU by Mackson v. Sky Vue Terrace, Inc., 759 F.2d 1094, 1097 (3d Cir. 1985)* (rejecting argument that grievances were "not subject to the arbitration process because [the other party] did not comply with the specific time limits for filing grievances under the agreement" and stating that "[e]ven assuming [that] argument has merit, the law is clear that matters of procedural arbitrability, such as time limits, are to be left for the arbitrator once the court determines that the parties have agreed in the contract to submit the subject-matter of the dispute to arbitration"); *see also McNamara v. Yellow Transp., Inc., 570 F.3d 950, 957 (8th Cir. 2009)* (adopting reasoning of *Marie* in context of a party's **[**42]** argument that it was harmed by other party's delay in seeking arbitration because by that time party would be contractually barred from initiating arbitration, but directing trial court to retain jurisdiction on remand so that party opposing arbitration would not be left without a forum); *Glass v. Kidder Peabody & Co., 114 F.3d 446, 455 (4th Cir. 1997)* ("Defenses of laches, mere delay, statute of limitations, and untimeliness constitute a broad category of waiver defenses that may be raised to defeat compelled arbitration. Laches, like its companion defenses, however, is a matter of 'procedural arbitrability' solely for the arbitrators' decision and not for the court.").

agreement. *See, e.g., In re Kellogg Brown & Root, Inc., 166 S.W.3d 732, 739 (Tex. 2005)* (listing ″(1) incorporation by reference; (2) assumption; (3) agency; (4) alter ego; (5) equitable estoppel, and (6) third-party beneficiary″).

With regard to the Other Defendants and the general contract, the question in this case, as in *Rubiola*, ″is not whether a non-signatory may be compelled to arbitrate but rather whether a non-signatory **[**45]** may compel arbitration.″ *334 S.W.3d at 224*. **HN33** As a general rule, ″an arbitration clause cannot be invoked by a non-party to the arbitration contract.″ *Grigson v. Creative Artists Agency, L.L.C., 210 F.3d 524, 532 (5th Cir. 2000)*. ″[The] policy favoring arbitration is strong, but it alone cannot authorize a non-party to invoke arbitration.″ *Id*. Thus, the Other Defendants must establish that they have a valid legal right to enforce the general contract's arbitration agreement even though they are not parties to that contract. The Other Defendants contend that Sapphire agreed in the general contract that the Other Defendants could enforce its arbitration provisions. *See Rubiola, 334 S.W.3d at 222* (holding that ″parties to an arbitration agreement may grant non-signatories the right to compel arbitration″).[19]

 **[**46]** This contention raises questions about ″the existence of a valid arbitration clause between specific parties and is therefore a gateway matter for the court to decide.″ *Id. at 224*. Ultimately, **HN34** the question requires us to determine ″the intent of the parties, as expressed in the terms of the agreement,″ so we apply ″ordinary principles of state contract law [to] determine whether there is a valid agreement to arbitrate.″ *Id*. (quoting *Bridas S.A.P.I.C. v. Gov't of Turkm., 345 F.3d 347, 355, 358 (5th Cir.2003))*; *see also Kellogg Brown & Root, 166 S.W.3d at 738* (holding that, ″[u]nder the FAA, ordinary principles of state contract law determine whether there is a valid agreement to arbitrate″). The Other Defendants argue that several provisions of the contract demonstrate Sapphire's intent to allow them to require arbitration, but we find none of them persuasive.

### a. The ″Scope″ of Arbitration

First, the Other Defendants contend that Sapphire's claims against them fall **[*525]** within the scope of the general contract's arbitration agreement because the scope includes ″[a]ny Claim arising out of or related to the Contract,″ and Sapphire expressly agreed that the arbitration could include parties other than G.T. Leach. Specifically, the Other Defendants rely on a provision of the general contract in which Sapphire and G.T. Leach agreed that ″[a]ny arbitration may include, by consolidation or joinder or any other manner, parties other than the Owner, Contractor, a Subcontractor, a separate contractor . . . and other persons substantially involved in a common question of fact or law whose presence is required **[**47]** if complete relief is to be accorded in arbitration.″

The Other Defendants argue that, through this ″joinder provision,″ Sapphire agreed that the scope of the arbitration would include Sapphire's claims against the Other Defendants because those claims ″arise out of or relate to″ the general contract, those claims and Sapphire's claims against G.T. Leach involve common questions of law or fact, and the Other Defendants' presence is ″required″ for complete relief to be accorded in the arbitration. We conclude that the Other Defendants' reliance on the scope of the agreement between Sapphire and G.T. Leach to establish the existence and enforceability of an agreement between Sapphire and the Other Defendants is misplaced. As we have explained, **HN35** a party seeking to compel arbitration must establish *both* (1) the existence of a valid enforceable agreement to arbitrate and (2) that the claims at issue fall within the scope of that agreement. *Tex. Civ. Prac. & Rem. Code § 171.021(a)*; *FirstMerit Bank, 52 S.W.3d at 753*. The Other Defendants' argument that Sapphire agreed that they, as non-signatories, could enforce the arbitration agreement

---

[19]    The agreement at issue in *Rubiola* gave the ″parties″ the right to demand arbitration and defined ″parties″ to include not only ″each and all persons and entities signing this agreement,″ but also all ″individual partners, affiliates, officers, directors, employees, agents, and/or representatives of any party to such documents, and . . . any other owner and holder of this agreement.″ *Rubiola*, 334 S.W.3d at 222—23. We agreed that it thus ″expressly provides that certain non-signatories are to be parties to the agreement.″ *Id. at 224*.

addresses the first issue, not the second. Although Sapphire's claims may fall within the scope of [**48] the agreement, the scope of the arbitration clause "does not answer whether [Sapphire] must arbitrate" with the Other Defendants. *Kellogg Brown & Root, 166 S.W.3d at 739—40*.

### b. The Joinder Provisions

The Other Defendants contend that the joinder provision itself constitutes Sapphire's agreement that they could enforce the general contract's arbitration agreement. Specifically, they contend that, through the joinder provision, Sapphire agreed to allow non-parties to "require" arbitration if their presence is "required" for complete relief to be afforded in the arbitration. The Subcontractors, in particular, note that Sapphire and G.T. Leach specifically revised the AIA form to add a reference to "a Subcontractor" as a party whose presence would be expected in the arbitration. Because Sapphire seeks to recover the same damages from each of the defendants and to hold all of the defendants jointly and severally liable for those damages, they assert, the arbitration can only provide "complete relief" if all of them are parties to it. We do not agree.

To begin with, the joinder provision states that an arbitration "*may* include" other parties, and we find no basis on which to conclude that the parties intended the [**49] word "may" to be mandatory rather than permissive in this context. Cf. *Iliff v. Iliff, 339 S.W.3d 74, 81 (Tex. 2011)* (**HN36** stating that the word "may" is "permissive" and "imports the exercise of discretion"); *Dall. Cnty. Cmty. Coll. Dist. v. Bolton, 185 S.W.3d 868, 874 (Tex. 2005)* ("The words 'may' and 'shall' mean different things, and . . . [t]he context in this case does not require an interpretation of the permissive word 'may' to mean something other than its plain meaning."); *Wichita Cnty., Tex. v. Hart, 917 S.W.2d 779, 782 (Tex. 1996)* ("The Legislature's use of the permissive [*526] term 'may' in the Whistleblower Act's venue provision, in light of its contemporaneous reorganization of the venue statute, strongly suggests that the Act's venue provision is permissive."). The original AIA form provided that "[n]o arbitration shall include, . . . parties other than the Owner, Contractor, a separate Contractor, . . . and other persons substantially involved in a common question of fact or law whose presence is required if complete relief is to be accorded in arbitration." In its original form, the provision thus prohibited joinder of any but the listed parties (at least, absent written consent of all the parties), but it did not require joinder of the listed parties. Sapphire and G.T. Leach revised this provision to state that "*Any* [instead of "No"] arbitration *may* [instead [**50] of "shall"] include parties other than" the listed parties, and added "Subcontractors" to the list. The effect of their revisions was to remove the prohibition against including parties "other than" those listed. Because they changed "shall" to "may," they did not require the joinder of unlisted parties, but neither did they require the joinder of the listed parties. In fact, they retained a sentence from the original form providing that a party's "[c]onsent to arbitration involving an additional person or entity . . . shall not constitute consent to arbitration of a claim not described therein or with a person or entity not named or described therein."

The provision thus permits the parties to the general contract to consent to the joinder of additional parties in the arbitration, but it does not require them to do so. Ultimately, the Other Defendants concede as much by repeatedly acknowledging throughout their briefs that the joinder provision "allows inclusion or joinder," "allow[s] them to be joined" so that they "could participate" in the arbitration, and "permits all parties to arbitrate" together. Nevertheless, they contend that, because this clause is ambiguous as to whether it is mandatory [**51] or permissive, we must construe it as mandatory in support of the law's presumption in favor of arbitration. This presumption, however, requires that doubt "as to waiver, scope, and *other issues not relating to enforceability*—must be resolved in favor of arbitration." *Poly-Am., 262 S.W.3d at 348* (emphasis added). And, in any event, we do not find the language here to be ambiguous. The fact that the provision refers to other parties as those whose presence "is required" to accord complete relief does not make their joinder "required"; rather, it allows for their joinder, but only if their joinder is "required" to provide complete relief. We conclude that the joinder provision does not give the Other Defendants, who are not parties to the general contract, a legal right to require Sapphire to arbitrate with them.

The Other Defendants contend that, at a minimum, the joinder provision gives G.T. Leach a contractual right to join others whose presence is "necessary to completely resolve the dispute," even if it does not give those other parties the right to join themselves. In light of the provision's permissive language and references to the necessity of each party's "consent," as we have just discussed, we disagree. [**52] Moreover, even if the contract gave G.T. Leach such a right, G.T. Leach has not requested that relief in this Court. G.T. Leach asks this Court to "order the claims brought by Sapphire against [G.T. Leach] to arbitration," without reference to the claims brought by Sapphire against the Other Defendants.

### c. The Definition of "Contractor"

The Engineers and Insurance Brokers point out that the general contract states that it is an agreement between "the Owner" and "the Contractor," and that Sapphire [*527] and G.T. Leach each signed the agreement in those respective capacities. They note, however, that the contract provides that the term "Contractor" includes any contractor who executes a separate agreement with the owner. Since Sapphire is suing them for breach of separate agreements directly between each of them and Sapphire, they contend that they are each a "Contractor" under the general contract and thus entitled to enforce its arbitration agreement. The contract, however, expressly provides that the "Contract Documents shall not be construed to create a contractual relationship of any kind . . . between [Sapphire] and a Subcontractor . . . or [] between any persons or entities other than [**53] [Sapphire] and [G.T. Leach]."[20]

In summary, we find no language in the general contract that gives the [**54] Other Defendants rights to enforce the general contract's arbitration clause against Sapphire. We thus conclude that Sapphire did not agree in the general contract to arbitrate its claims against the Other Defendants.

### 2. No Equitable Estoppel

As an alternative to the argument that Sapphire expressly agreed that they can enforce the general contract's arbitration provisions, the Other Defendants argue that Sapphire is equitably estopped from denying its assent to such an agreement. We do not agree.

We have recognized that, *HN37* under principles of equitable estoppel, "a litigant who sues based on a contract subjects him or herself to the contract's terms . . . , including the Arbitration Addendum." *FirstMerit Bank, 52 S.W.3d at 755—56*; *see Meyer, 211 S.W.3d at 305* (listing cases so holding). This is because the claimant cannot "have it both ways"; it cannot, "on the one hand, seek to hold the non-signatory liable pursuant to duties imposed by the agreement, which contains an arbitration provision, but, on the other hand, deny arbitration's applicability because the defendant is a non-signatory." *Meyer, 211 S.W.3d at 306*. This equitable principle applies when a claimant seeks "direct benefits" under the contract that contains the arbitration agreement. *Kellogg Brown & Root, 166 S.W.3d at 739*. "Whether [**55] a claim seeks a direct benefit from a contract containing an arbitration clause turns on the substance of the claim, not artful pleading." *Weekley Homes, 180 S.W.3d at 131—32*.

It is not enough, however, that the party's claim "relates to" the contract that contains the arbitration agreement. *Kellogg Brown & Root, 166 S.W.3d at 741*. Instead, the party must seek "to derive a direct benefit"—that is, a

---

[20] In addition, a supplemental provision of the general contract states that "[n]o person or entity shall be deemed to be a third party beneficiary of any provisions of the Contract, nor shall any provisions thereof be interpreted to create a right of action or otherwise permit anyone not a signatory party to the Contract to maintain an action for personal injury or property damage." While the Other Defendants contend that this provision was in an unsigned supplement to the general contract and, in any event, does not expressly prohibit demands for arbitration, they concede that the contract expressly incorporates these provisions as part of the "Contract Documents." In any event, this provision reflects Sapphire's intent that other parties not have rights under the general contract more clearly than any provision on which the Other Defendants rely reflects an intent that they have such rights. Even ignoring this provision, the lack of *any* provision by which *Sapphire* agrees to allow the Other Defendants to compel arbitration of Sapphire's claims against them defeats their attempts to do so.

benefit that "stems directly"—from that contract. *Id.; In re Morgan Stanley & Co., 293 S.W.3d 182, 184 (Tex. 2009)*. The claim must "depend [*528] on the existence" of the contract, *Meyer, 211 S.W.3d at 307*, and be unable to "stand independently" without the contract, *Kellogg Brown & Root, 166 S.W.3d at 739—40*. The alleged liability must "arise[] solely from the contract or must be determined by reference to it." *Weekley Homes, 180 S.W.3d at 132*. But "when the substance of the claim arises from general obligations imposed by state law, including statutes, torts and other common law duties, or federal law," rather than from the contract, "direct benefits" estoppel does not apply, even if the claim refers to or relates to the contract.[21] *Morgan Stanley, 293 S.W.3d at 184 n.2*; *see also Kellogg Brown & Root, 166 S.W.3d at 740—41* (holding that subcontractor's quantum meruit claim against contractor did not justify direct benefits estoppel to compel arbitration under contract between contractor and owner).

The Other Contractors contend that Sapphire's claims against them seek a "direct benefit" under the general contract, even though they are not parties to that contract, because the claims "arise from and must be determined by reference to" the general contract. More specifically, they assert that the work that they performed was necessary only because of the general contract, and without the general contract they would have had no duties of their own to perform. Sapphire's claims thus "relate to and arise out of" the general contract, they contend, because they are claims for work performed "pursuant to" [**57] the general contract. The Subcontractors also note that the general contract required G.T. Leach to "include terms in the subcontracts . . . binding its subcontractors . . . to the applicable terms of this agreement."

Sapphire is not suing the Other Defendants, however, for breach of obligations under the general contract. Rather, Sapphire alleges in its petition that the Other Defendants each breached duties that they each "contractually agreed" to perform, and failed to perform them as a reasonable professional would have performed them. We agree that Sapphire is not seeking direct benefits under the general contract. We read Sapphire's allegations to refer to separate agreements in which the Engineers agreed with Sapphire to provide engineering services, the Insurance Brokers agreed with Sapphire to provide insurance services, and the Subcontractors agreed with G.T. Leach to provide construction-related services.[22]

The record and briefs in this case reflect that Sapphire contends that the Engineers and Insurance Brokers contracted directly with Sapphire and are what the general contract refers to as a "separate contractor" rather than a "subcontractor." Thus, [*529] although Sapphire's breach of contract claims against the Engineers may "relate to" the general contract, they "arise out of" and directly seek the benefits of a separate alleged agreement between Sapphire and the Engineers. Similarly, Sapphire alleges that the Insurance Brokers "contracted with Sapphire to procure adequate insurance to protect Sapphire while the Sapphire condominiums were being built" and "breached that agreement thereby damaging Sapphire." These claims depend on an alleged insurance-procurement agreement between Sapphire and the Insurance Brokers, not the general contract between Sapphire and G.T. Leach.

And finally, Sapphire asserts that the Subcontractors breached obligations they [**59] accepted in their subcontracts with G.T. Leach, not in the general contract to which Sapphire was a party. While these claims may

---

[21] **HN38** Even if "direct benefits" estoppel does not apply [**56] based on the claims in the lawsuit, we have recognized that "a nonparty may seek or obtain direct benefits from a contract by means other than a lawsuit" and that application of the doctrine may be based on "conduct during the performance of the contract" rather than conduct during the lawsuit. *See Weekley Homes*, 180 S.W.3d at 132—33, 135 (holding that "when a nonparty consistently and knowingly insists that others treat it as a party, it cannot later 'turn[] its back on the portions of the contract, such as an arbitration clause, that it finds distasteful'") (citations omitted). The parties do not advance this theory here.

[22] The Other Defendants point out that Sapphire's experts filed reports in the trial court in which they relied in part on the general contract's specification and notes to establish the standards for the Other Defendants' contractual performance. These reports, however, do [**58] not suggest that the general contract imposed the duty to meet these specifications. Instead, it appears that Sapphire contends that the Other Defendants' separate contractual agreements included promises to comply with these specifications.

bear some relationship to the general contract, the fact that the claims would not have arisen but for the existence of the general contract is not enough to establish equitable estoppel. *See Kellogg Brown & Root, 166 S.W.3d at 739—40*. Sapphire's contract claims against the Other Defendants do not, on their face, seek a "direct benefit" under the general contract; rather, the record at this stage indicates that they seek direct benefits under other alleged contracts. Under these circumstances, we cannot conclude that the "direct benefits" theory of equitable estoppel authorizes the Other Defendants to rely on the arbitration provision in Sapphire's general contract with G.T. Leach. *See Morgan Stanley, 293 S.W.3d at 184*; *Weekley Homes, 180 S.W.3d at 133*; *Kellogg Brown & Root, 166 S.W.3d at 739—40*.

In addition, the Other Defendants argue that, even if Sapphire is not suing them for breach of the general contract, it is seeking to hold them jointly and severally liable for the damages that Sapphire alleges G.T. Leach's breach of that contract caused. Specifically, the Insurance Brokers contend that, "if Sapphire seeks to hold the Insurance Defendants liable for damages **[\*\*60]** arising from G.T. Leach's alleged breach of the [general contract], then Sapphire must necessarily rely on the existence of the [general contract]."[23] But contrary to the Insurance Brokers' argument, Sapphire's pleadings do not assert that the Insurance Brokers are jointly and severally liable for the damages allegedly resulting from G.T. Leach's breach of contract,[24] and the parties have not identified any doctrine that would permit Sapphire to hold them jointly and severally liable **[\*530]** under the facts of this case.[25] **HN39** "Texas law permits joint and several liability for most actions based in tort, as long as 'the percentage of responsibility attributed to the defendant with respect to a cause of action is greater than 50 percent.'" *Sharyland Water Supply Corp. v. City of Alton, 354 S.W.3d 407, 424 (Tex. 2011)* (quoting *Tex. Civ. Prac. & Rem. Code § 33.013(b)(1)*). But the Insurance Brokers' "direct benefits" estoppel argument is premised on Sapphire seeking to hold them jointly and severally liable for G.T. Leach's breach of contract, not its torts.

Finally, the Other Defendants argue that Sapphire is equitably estopped from refusing to arbitrate its tort claims against them because those claims assert only negligent performance of contractual duties, and thus seek only damages resulting from the breach of contractual duties rather than duties imposed by law. Under these circumstances, they contend, the allegedly negligent breaches can "only be characterized as a breach of

---

[23] Alternatively, the Insurance Brokers argue that

> if Sapphire seeks to hold [them] jointly and severally liable for damages with respect to Sapphire's tort claims against [G.T. Leach], then Sapphire must necessarily rely on allegations of interdependent **[\*\*61]** and concerted misconduct between those parties. Either way, Sapphire satisfies one or both bases for imposing equitable estoppel under this Court's decision in *Meyer* and thus must be compelled to arbitrate its claims against the Insurance Defendants.

But we declined to adopt the "concerted misconduct" theory of equitable estoppel in *In re Merrill Lynch Trust Co. FSB, 235 S.W.3d 185, 191—92 (Tex. 2007)*. The Insurance Brokers do not address *Merrill Lynch* or raise any argument that this case is distinguishable in any manner material to our analysis of the "concerted misconduct" theory in that case. We therefore decline to reconsider that decision here.

[24] In fact, Sapphire's fourth amended petition does not reference "joint and several liability" at all. The Other Defendants quote Sapphire's counsel as having orally argued to the trial court that the defendants are jointly and severally liable for all damages, but we must look to the pleadings to determine the nature of Sapphire's claims.

[25] *Cf. S. Union Co. v. City of Edinburg, 129 S.W.3d 74, 87 (Tex. 2003)* (noting that Texas law has recognized specific legal theories under which corporate structure can be disregarded to hold corporate actors jointly and severally liable for corporation's contractual obligations); *Tex. Bus. Orgs. Code § 152.304(a)* (imposing joint and several liability **[\*\*62]** on partners for "all" partnership obligations); *Tex. Water Code § 60.152(b)(1)* (authorizing contractual assumption of joint and several liability in certain government contracts); *Tex. Lab. Code § 407A.056* (requiring contractual assumption of joint and several liability for group and employer under certain group self-insurance agreements); *Tex. Nat. Res. Code § 161.323* (imposing joint and several liability on "veteran purchaser" and subsequent assignees of veteran with respect to certain land contracts under some circumstances).

contract," and the claims thus "sound in contract, not tort." This argument raises a complex legal doctrine: the "economic loss" rule, sometimes referred to in this context as the law of "contorts." *See, e.g., Sw. Bell Tel. Co. v. DeLanney, 809 S.W.2d 493, 494—95 (Tex. 1991)*; *id. at 495* (Gonzales, J., concurring). We need not address this doctrine **[**63]** here, however, because even if Sapphire's tort claims sound in contract, they do no arise solely out of or otherwise seek direct benefits under the general contract. *See Kellogg Brown & Root, 166 S.W.3d at 740—41*. While they have some relationship to the general contract, the mere fact that the claims would not have arisen but for that contract is not enough to establish equitable estoppel. *See id. at 739—40*. We therefore hold that equitable estoppel does not apply to enable the Other Defendants to compel Sapphire to arbitrate its tort claims against them under the general contract.

## B. Arbitration Under the Subcontracts

Finally, we turn to the Subcontractors' arguments that Sapphire agreed through the subcontracts to arbitrate its claims against the Subcontractors, or alternatively, that Sapphire is equitably estopped from denying its assent to the arbitration agreement in the subcontracts. While we note that Sapphire is not a signatory to the subcontracts, its claims that the Subcontractors "contractually agreed" to perform their services and are liable to Sapphire for having breached those agreements at least appear to be "based on" and "directly seek benefits" under the subcontracts, and thus Sapphire may be equitably **[**64]** estopped to deny obligations under the subcontracts. *See FirstMerit Bank, 52 S.W.3d at 755—56*. We need not decide that issue, however, because we conclude that, even if the subcontracts are binding on Sapphire, they do not require the parties to arbitrate these claims.

 **[*531]** The Subcontractors provided their respective services pursuant to essentially identical subcontracts that they entered into with G.T. Leach. Both of these subcontracts contain three sections that pertain to the arbitration of disputes between the parties. First, section 11.1 states the parties' agreement to arbitrate disputes:

> All claims, disputes and other matters in question arising out of, or relating to, this Subcontract or the breach thereof shall be decided by arbitration in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association unless the parties mutually agree otherwise.

Section 11.3 then states that, if G.T. Leach "enter[s] into arbitration with [Sapphire] or others regarding matters relating to this Subcontract, Subcontractor will agree, if requested by [G.T. Leach] to consolidation of this arbitration with [G.T. Leach's] arbitration with [Sapphire]," and in that case the Subcontractors "shall be bound by the result of **[**65]** the arbitration with [Sapphire] to the same degree as [G.T. Leach]." Finally, however, section 12.13 states that the parties do *not* agree to mandatory arbitration:

> Notwithstanding any provision to the contrary contained in the Contract Documents, Subcontractor expressly agrees that this Subcontract does not contain a provision for the mandatory arbitration of disputes, nor does it incorporate by reference such a provision if such is contained in the [general] contract between [G.T. Leach] and [Sapphire].

The court of appeals held that the disclaimer in this section 12.13 "nullif[ies]" the arbitration agreement in section 11.1, and Sapphire relies on that holding here.

The Subcontractors contend that section 12.13's disclaimer does not nullify the agreement in section 11.1 because (1) the agreement appears earlier within the contract, and "terms stated earlier in an agreement must be favored over subsequent terms" in that same agreement, *Coker v. Coker, 650 S.W.2d 391, 393 (Tex. 1983)*; (2) the agreement is more specific than the disclaimer, and specific provisions control over general provisions, *see Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 133—34 (Tex. 1994); (3) we must consider and give effect to

all of the provisions with reference to the whole instrument, *Myers v. Gulf Coast Minerals Mgmt. Corp., 361 S.W.2d 193, 196 (Tex. 1962)*; and (4) we must construe the provisions together if we can, rather than allow one to cancel the other, **[**66]** *In re U.S. Home Corp., 236 S.W.3d 761, 765 (Tex. 2007)*.

We conclude that there is no way to give full effect to both provisions, and that one must necessarily "nullify" the other at least to some extent. If we give effect to the agreement to arbitrate in section 11.1, for example, then we must necessarily conclude that the agreement does "contain a provision for the mandatory arbitration of disputes," and thus nullify section 12.13's disclaimer. The Subcontractors argue that we can give effect to both by construing the disclaimer to mean that arbitration is "mandatory" unless all parties mutually agree not to arbitrate, in which case arbitration would not be mandatory. But parties can always mutually agree not to do what they previously agreed to do, and in any event, section 11.1 already provides that the parties can "mutually agree" not to arbitrate.

*HN40* Generally, we must give the subcontracts their plain meaning and enforce them without rendering either provision entirely superfluous. *Cf.* *El Paso Field Servs., L.P. v. MasTec N. Am., Inc., 389 S.W.3d 802, 808 (Tex. 2012)* (prohibiting such a result); *see also Moayedi, 438 S.W.3d at 7*; *Mercer v. Hardy, 444 S.W.2d 593, 595 (Tex. 1969)*. But we cannot do **[*532]** that when the plain meaning of one provision unambiguously requires that we not enforce another. *See Tex. Lottery Comm'n v. First State Bank of DeQueen, 325 S.W.3d 628, 637 (Tex. 2010)*. There is a direct conflict between section 11.1's provision that all disputes "shall be decided by arbitration" and section 12.13's provision that "this **[**67]** Subcontract does not contain a provision for the mandatory arbitration of disputes." And if that were all that the two provisions provided, an ambiguity might exist that requires us to rely on canons of construction to determine the parties' intent.

But section 12.13 explicitly states that the Subcontract does not require mandatory arbitration "[n]otwithstanding any provision to the contrary" in any of the contract documents. *Cf.* *In re Lee, 411 S.W.3d 445, 454 (Tex. 2013)* ("The use of the word 'notwithstanding' indicates that the Legislature intended *section 153.0071* to be controlling."). Like the statute at issue in *DeQueen*, which expressly provided that any conflicting "rule of law, statute, or regulation . . . is ineffective," the language of section 12.13 "specifically provide[s] the means for resolving conflicts" by providing that, in the event of any conflict, section 12.13 prevails. *DeQueen, 325 S.W.3d at 632, 637*. There is thus no ambiguity, and we need not rely on canons of construction like the rules that earlier or more specific provisions prevail. *Id*. Although these canons provide useful tools for resolving conflicting provisions, there is no conflict to resolve here because the plain language of section 12.13 resolves the conflict. *Id. at 638*. We therefore conclude that, even if Sapphire is equitably estopped from denying its assent to the agreements **[**68]** contained in the subcontracts, those agreements do not include a valid, enforceable agreement to arbitrate its claims against the Subcontractors. The court of appeals, therefore, did not err in affirming the trial court's denial of the Subcontractors' motions to compel arbitration.

We therefore affirm the court of appeals with respect to the trial court's denial of the Insurance Brokers', Engineers', and Subcontractors' motions to compel arbitration.

**IV**.

**Conclusion**

We affirm in part and reverse in part. We affirm the portion of the court of appeals' judgment affirming the trial court's denial of the Engineers', Insurance Brokers', and Subcontractors' motions to compel arbitration of Sapphire's claims against them, and we reverse the portion of the court of appeals' judgment affirming the trial court's denial of G.T. Leach's motion to compel arbitration of Sapphire's claims against it. We remand this case to the trial court for further proceedings consistent with this opinion.

Jeffrey S. Boyd

Justice

Opinion delivered: March 20, 2015.



No *Shepard's* Signal™
As of: September 1, 2015 5:19 PM EDT

## *Gatlin v. Criscione*

United States District Court for the Northern District of Illinois, Eastern Division

July 10, 2008, Decided; July 11, 2008, Filed

No. 1:07-cv-7212

**Reporter**

2008 U.S. Dist. LEXIS 52946; 2008 WL 2745956

GEORGE GATLIN, Plaintiff, vs. P.O. A. CRISCIONE, STAR # 16195, P.O. S. MULKERRIN, STAR # 17071, and ANTHONY CAPUTO, INDIVIDUALLY, and THE CITY OF CHICAGO, ILLINOIS SOLUTION GROUP, AND BILL KAY CHRYSLER, Defendants.

## Core Terms

arbitration, arbitration agreement, parties, false arrest, nonarbitrable, purchase agreement, issues

**Counsel:** [*1] For George Gatlin, Plaintiff: Edward M. Fox, LEAD ATTORNEY, Leslie C. McCoy, Ed Fox & Associates, Chicago, IL.

For A. Criscione, P.O., Star 16195, S. Mulkerrin, P.O., Star 17071, The City of Chicago, Defendants: Tiffany Yvette Harris, City of Chicago Law Department, Chicago, IL.

For Bill Kay Chrysler, Defendant: Stuart David Gordon, LEAD ATTORNEY, John C. Eggert, Gordon & Karr LLP, Chicago, IL; James Hjalmar Whalen, Gordon & Karr, Chicago, IL.

**Judges:** Joan Humphrey Lefkow, United States District Judge.

**Opinion by:** Joan Humphrey Lefkow

## Opinion

### MEMORANDUM OPINION AND ORDER

Plaintiff George Gatlin filed a seven count complaint in this case. He alleges the following: (1) false arrest under *42 U.S.C. § 1983* against Chicago Police Officer defendants Criscione and Mulkerrin; (2) false arrest under *42 U.S.C. § 1983* against defendant Anthony Caputo; (3) excessive force under *42 U.S.C. § 1983* against defendants Criscione and Mulkerrin; (4) failure to provide medical care under *42 U.S.C. § 1983* against defendants Criscione and Mulkerrin; (5) false arrest under Illinois law against defendants Criscione, Mulkerrin, Caputo, Illinois Solution Group ("ISG"), and Bill Kay Chrysler ("Bill Kay"); (6) an Illinois law claim of willful [*2] and wanton conduct for failure to provide medical care against defendants Criscione, Mulkerrin, and the City of Chicago; and (7) malicious prosecution under Illinois law against defendants Caputo, ISG, and Bill Kay.

Before the court is the motion of Ogden Chrysler Plymouth, Inc., the corporate name of Bill Kay, to stay and compel arbitration of the claims against it pursuant to an arbitration agreement between Gatlin and Bill Kay. For

the reasons set forth below, the motion [# 12] will be granted; however, the arbitration will be stayed until Gatlin's nonarbitrable claims have been resolved by the court. [1]

## I. Background

On May 2, 2007, Gatlin signed an agreement to purchase a used vehicle from Bill Kay ("the purchase agreement"). [2] The purchase agreement provided that, while Gatlin was permitted to take the vehicle home that day, completion of the sale was contingent on Bill Kay's securing third party financing for the sale. Gatlin was required to cooperate in Bill Kay's efforts to secure financing, including filling out an accurate credit application as well as providing any necessary documentation. [*3] The purchase agreement also stated that if Bill Kay was unable to secure financing, Gatlin would be required to return the vehicle within 24 hours. Should Gatlin fail to do so, he authorized Bill Kay to repossess the vehicle, "with or without legal process."

Greater Suburban Acceptance Corporation ("GSAC") subsequently agreed to provide financing for Gatlin if it was able to confirm the information provided in his credit application. When GSAC was unable to confirm Gatlin's stated residence, employer, or income, it determined that it would not fund Gatlin's purchase. Bill Kay then requested that Gatlin return the vehicle, and when he failed to do so, Bill Kay hired ISG, a repossession company, to secure its return. Anthony Caputo was ISG's employee.

At some [*4] time before 3:00 on the afternoon of June 4, 2007, Caputo falsely informed officers Criscione and Mulkerrin that Gatlin was in possession of a weapon while driving on Chicago Avenue near Pine Avenue in Chicago. Caputo arranged with the officers that they be present "when Caputo caused Plaintiff's vehicle to be stopped." When stopped, the officers searched Gatlin and his vehicle without lawful cause, arrested him without probable cause, and used excessive force against him. Also on June 4, Caputo on behalf of Bill Kay filed a police report alleging that Gatlin had submitted false information in his credit application in violation of Illinois law. Gatlin was criminally charged with defrauding a financial institution. On July 11, 2007, that charge was terminated in Gatlin's favor.

As relevant to the pending motion, Gatlin alleges arrest without probable cause in violation of the _Fourth Amendment_ against Caputo individually on the basis that he willfully acted in concert with the officers in causing the unlawful arrest (Count II), as well as Illinois common law false arrest and malicious prosecution. He alleges that ISG and Bill Kay are liable for Caputo's state law torts based on the doctrine [*5] of _respondeat superior_ (Count VII). Gatlin seeks compensatory and punitive damages against all the defendants.

Bill Kay maintains that Gatlin's claims of false arrest and malicious prosecution fall within the scope of an arbitration agreement signed by the parties in conjunction with the vehicle purchase agreement. That arbitration agreement provides, in relevant part, that it

> [s]hall apply to any dispute, issue, controversy or claim arising from any events which occurred prior to, on or subsequent to the execution of this Arbitration Agreement. A 'dispute' includes any controversy or claim arising from or relating to the vehicle you have purchased or leased on the date shown above. The term "dispute" also includes, but is not limited to, claims relating to the negotiation of the purchase or lease of the vehicle, and any dispute relating to any vehicle service contract purchased or provided at the time the

---

[1]   The court has jurisdiction over this case pursuant to _28 U.S.C. §§ 1331_, 1343, and 1367.

[2]   The court has taken the facts concerning the purchase agreement and related events, which are not materially disputed, from the Complaint and from Bill Kay's Reply in Support of its Motion. The facts concerning Caputo and the defendant officers are derived from the complaint and are disputed by the defendants but will be presumed true for the purpose of this motion. _Safranek v. Copart, Inc._, 379 F. Supp. 2d 927, 928 (N.D. Ill. 2005)

vehicle was purchased or leased, or thereafter. In addition, the term 'dispute' includes any question regarding whether a matter is subject to arbitration under this Arbitration Agreement.

## II. Legal Standard

The central purpose of the Federal Arbitration Act ("FAA") is to "ensure that **[\*6]** private agreements to arbitrate are enforced according to their terms." *Mastrobuono v. Shearson Lehman Hutton, Inc., 514 U.S. 52, 53-54, 115 S. Ct. 1212, 131 L. Ed. 2d 76 (1995)* (citations omitted). [3] "[W]hen a contract contains an arbitration clause, a strong presumption in favor of arbitration exists and courts have no choice but to order arbitration unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *CK Witco Corp. v. Paper Allied Indus., Chem. & Energy Workers Int'l Union, 272 F.3d 419, 421-22 (7th Cir. 2001)* (internal citations and quotations omitted). "To compel arbitration, a party need only show: (1) an agreement to arbitrate, (2) a dispute within the scope of the arbitration agreement, and (3) a refusal by the opposing party to proceed to arbitration." *Zurich American Ins. Co. v. Watts Indus., Inc., 466 F.3d 577, 580 (7th Cir. 2006)* (citations omitted). "[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense **[\*7]** to arbitrability." *Mastrobuono, 514 U.S. at 62 n.8* (quoting *Moses H. Cone Memorial Hospital v. Mercury Construction Corp., 460 U.S. 1, 24-25, 103 S. Ct. 927, 74 L. Ed. 2d 765 (1983))*. To further this policy in favor of arbitration, Section 3 of the FAA provides, in relevant part:

> If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit or proceeding is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration... shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration.

*9 U.S.C. § 3*. [4]

"[The opponent of arbitration] bears the burden of establishing that the arbitration clause is unenforceable." *Stewart v. Molded Plastic's Research of Ill., Inc., 2001 U.S. Dist. LEXIS 20985, 2001 WL 1607464, at \*1 (N.D. Ill. Dec. 17, 2001)* (citing *Shearson/Am. Express, Inc. v. McMahon, 482 U.S. 220, 226-27, 107 S. Ct. 2332, 96 L. Ed. 2d 185 (1987)* ("The burden is on the party opposing arbitration, however, to show that Congress intended to preclude a waiver of judicial remedies for the statutory rights at issue.")).

## III. DISCUSSION

### A. Bill Kay Did Not Waive its Right to Arbitration

---

[3] Professor Margaret Moses argues forcefully, however, that judges have misinterpreted the FAA, granting it far greater breadth than Congress contemplated when it passed the law:

> ". . . [The Federal Arbitration Act ]--which has been construed to preempt state law, eliminate the requirement of consent to arbitration, permit arbitration **[\*8]** of statutory rights, and remove the jury trial right from citizens without their knowledge or consent--is a statute that would not likely have commanded a single vote in the 1925 Congress."

Margaret L. Moses, *Statutory Misconstruction: How the Supreme Court Created a Federal Arbitration Law Never Enacted by Congress,* 34 FLA. ST. U. L. REV. 99 (2006).

[4] Bill Kay argues that Illinois law also supports his motion, but the plaintiff responds only within the context of the FAA.

Gatlin first contends that because Caputo, acting on behalf of Bill Kay, initiated criminal proceedings against Gatlin, Bill Kay waived its right to arbitration. Choosing **[\*9]** to submit issues which are arbitrable under a contract to a court for decision is a presumptive waiver of the right to arbitrate. *Cabinetree of Wisconsin, Inc. v. Kraftmaid Cabinetry, Inc., 50 F.3d 388, 390 (7th Cir. 1995)*; *Kennedy v. Commercial Carriers, Inc., 630 N.E.2d 1059, 1062, 258 Ill. App. 3d 939, 943, 196 Ill. Dec. 894, 897 (Ill. App. Ct. 1st Dist. 1994)*. This is an unusual fact pattern. At least, neither party has cited any case authority specifically addressing the issue whether initiation of a criminal case in court to resolve a contractual dispute amounts to submitting arbitrable issues to a court for decision. Here, as the facts are presented, Bill Kay through its agent was not seeking resolution of a dispute contemplated by the arbitration clause; it was attempting to effect its contractual right to take possession of the vehicle. Certainly, Bill Kay would not have had a justiciable claim at that point. It follows that Bill Kay has not waived its right to arbitration.

### B. The Arbitrability of Gatlin's Claims against Bill Kay is an Issue to be Determined by the Arbitrator

Gatlin next contends that these claims do not fall within the scope of the arbitration agreement because **[\*10]** false arrest and malicious prosecution claims are too attenuated to have been reasonably considered by the plaintiff at the time he signed the arbitration agreement. One of Bill Kay's points in support of its motion, however, is that the parties agreed to submit the question of arbitrability itself to an arbitrator. As quoted above, the arbitration agreement provides that "'dispute' includes any question regarding whether a matter is subject to arbitration under this Arbitration Agreement."

Under both federal and Illinois law, "courts have recognized that parties are free to agree to submit the question of arbitrability itself to arbitration." *Bahuriak v. Bill Kay Chrysler Plymouth, Inc., 786 N.E.2d 1045, 1050, 337 Ill. App. 3d 714, 719, 272 Ill. Dec. 211 (2003)* (citing *First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 943-45, 115 S. Ct. 1920, 1923-25, 131 L. Ed. 2d 985, 992-94 (1995))*; *Int'l Bhd. of Elec. Workers, Local 21 v. Ill. Bell Tel. Co., 491 F.3d 685, 687 (7th Cir. 2007)* (Issues of arbitrability are to be decided by the court unless the parties have clearly provide otherwise). Gatlin has not responded to this argument in his response brief. The arbitration agreement at **[\*11]** issue clearly stipulates that questions of arbitrability will be submitted to arbitration. The court must therefore submit the question of arbitrability to the arbitrator.

### C. Arbitration will be Stayed Until the Conclusion of this Case

Gatlin's final contention is that his claims against those defendants who were not signatories of the arbitration agreement are intertwined with the claims against Bill Kay and it would therefore be prejudicial to pursue these claims separately. His argument overlooks the fact that "the Federal Arbitration Act '*requires* piecemeal resolution when necessary to give effect to an arbitration agreement' and mandates enforcement of an arbitration agreement 'notwithstanding the presence of other persons who are parties to the underlying dispute but not to the arbitration agreement.'" *Board of Managers of the Courtyards at the Woodlands Condominium Ass'n v. IKO Chicago, Inc., 697 N.E.2d 727, 732, 183 Ill. 2d 66, 75, 231 Ill. Dec. 942, 947 (1998)* (citing *Moses H. Cone Memorial Hospital, 460 U.S. at 20*)). Immediate submission of Gatlin's claims against Bill Kay, however, would undermine the court's jurisdiction over Gatlin's nonarbitrable claims against the other **[\*12]** defendants in this case. Because Bill Kay's liability is premised on *respondeat superior,* it will depend on the liability of Caputo and Illinois Solutions Group and on findings of fact regarding their actions. The arbitrator could not determine Bill Kay's liability without deciding whether Caputo and ISG are liable, and if it decides those issues before the court could do so, its decision could potentially have a *res judicata* effect on the claims against those parties in this case. When a similar situation arose in *Dickinson v. Heinold Securities, Inc., 661 F.2d 638, 644 (7th Cir. 1981)*, the Seventh Circuit said that the district court did not have discretion to force the parties to litigate otherwise arbitrable claims in order to preserve its jurisdiction over nonarbitrable claims, but noted that it *did*

have discretion to stay the arbitration of those claims until the nonarbitrable claims had been decided by the court. Because that course of action would preserve the court's jurisdiction over Gatlin's nonarbitrable claims and would also promote efficiency, arbitration of Gatlin's claims against Bill Kay will be stayed until the conclusion of this case. If the arbitrator determines **[\*13]** that those claims are not arbitrable, they will return to the court, and their resolution will be likely to have been simplified by the proceedings in the interim.

## IV. Conclusion and Order

For the foregoing reasons, Bill Kay's motion to stay and to compel arbitration [# 12] is granted; however, the arbitration is stayed until Gatlin's nonarbitrable claims have been resolved by the court.

**Dated: July 10, 2008**

/s/ Joan H Lefkow

**Joan Humphrey Lefkow**

**United States District Judge**


## *Griffin v. Burlington Volkswagen, Inc.*

Superior Court of New Jersey, Appellate Division

October 27, 2009, Submitted; February 8, 2010, Decided

DOCKET NO. A-2727-08T1

**Reporter**

411 N.J. Super. 515; 988 A.2d 101; 2010 N.J. Super. LEXIS 20

JOSEPH GRIFFIN, PLAINTIFF-APPELLANT, v. BURLINGTON VOLKSWAGEN, INC., AND AUGUSTINE STAINO, DEFENDANTS-RESPONDENTS.

**Subsequent History:** [***1] Approved for Publication February 8, 2010.

Subsequent appeal at, Remanded by *Griffin v. Burlington Volkswagen, 2014 N.J. Super. Unpub. LEXIS 2269 (App.Div., Sept. 18, 2014)*

**Prior History:** On appeal from Superior Court of New Jersey, Law Division, Burlington County, Docket No. L-2756-08.

## Core Terms

arbitration, financing, Retail, parties, arbitration clause, tort claim, subject to arbitration, arrest

## Case Summary

### Procedural Posture

Plaintiff car purchaser sued defendant seller for, inter alia, false arrest, false imprisonment, malicious prosecution, abuse of process, and violation of the New Jersey Civil Rights Act of 2004, *N.J.S.A. §§ 10:6-1* to -2. The seller moved to dismiss on the ground that the purchaser was required to arbitrate his claims. The Superior Court of New Jersey, Law Division, Burlington County, granted the motion; the purchaser appealed.

### Overview

The purchaser signed a retail order form containing an arbitration provision. Approximately a month after he bought the car, he was advised by the seller that the third-party lender it had expected to provide financing had changed its mind and was unwilling to do so. The seller demanded that the purchaser return the car, but he did not comply. He alleged that the seller tried to repossess the car by wrongfully reporting to police that it was stolen, which led to his being arrested while driving it. The appellate court held that under the broad form of the arbitration clause which required the parties to arbitrate any claim that might arise out of or relate to the purchase of the car and the financing thereof, the purchaser was required to arbitrate his claims of false arrest, false imprisonment, and malicious prosecution, based on the seller's reporting the car stolen when the purchaser retained the car despite the seller's demand for its return after financing could not be obtained. The purchaser's tort claims were subject to arbitration because they depended in part on an interpretation of the parties' rights under the retail order form.

**Outcome**

The judgment was affirmed.

## LexisNexis® Headnotes

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Validity of ADR Methods

Contracts Law > Contract Conditions & Provisions > Arbitration Clauses

Evidence > Inferences & Presumptions > Presumptions

*HN1* It is firmly established in New Jersey that because of the favored status afforded to arbitration, an agreement to arbitrate should be read liberally in favor of arbitration. Therefore, courts operate under a presumption of arbitrability in the sense that an order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.

Contracts Law > Contract Conditions & Provisions > Arbitration Clauses

*HN2* Courts have generally read the terms "arising out of" or "relating to" a contract as indicative of an extremely broad agreement to arbitrate any dispute relating in any way to the contract. Arbitration provisions using such expansive language are construed to require arbitration of statutory claims such as alleged civil rights violations and common law torts.

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > Arbitrability

Contracts Law > Contract Conditions & Provisions > Arbitration Clauses

Torts > General Overview

*HN3* For a tort claim to be subject to arbitration under a broad arbitration clause, it must raise some issue the resolution of which requires reference to or construction of some portion of the parties' contract. Where, however, a tort claim is independent of the contract terms and does not require reference to the underlying contract, arbitration is not compelled.

**Counsel:** *J. Craig Currie* (*J. Craig Currie & Associates*), attorney for appellant.

*Wardell, Craig, Annin & Baxter*, attorneys for respondents (*Jeffrey S. Craig* and *Domenic B. Sanginiti, Jr.*, on the brief).

**Judges:** Before Judges SKILLMAN, GILROY and SIMONELLI. The opinion of the court was delivered by SKILLMAN, P.J.A.D.

**Opinion by:** SKILLMAN

## Opinion

[*516] [**101] The opinion of the court was delivered by

SKILLMAN, P.J.A.D.

In August 2006, plaintiff Joseph Griffin purchased a car from defendant Burlington Volkswagen. This purchase required Griffin to obtain financing. According to Griffin, he was assured at the time of the sale by defendant

Augustine Staino, an employee of Burlington Volkswagen, that he had already been approved **[\*\*102]** for such financing. After paying a $ 1,000 deposit and signing a retail order form, Griffin obtained possession of the car and thereafter received what he described as a "certificate of ownership." Griffin subsequently drove the car to Texas where he was enrolled in college.

 **[\*517]** Approximately a month after entering into this transaction, Griffin was informed by Burlington Volkswagen that **[\*\*\*2]** the third-party lender it had expected to provide financing for Griffin's purchase of the car had changed its mind and was unwilling to provide financing. Moreover, Burlington Volkswagen declined to finance the purchase itself and instead undertook efforts to repossess the car from Griffin. According to Griffin, these efforts consisted of harassing telephone calls to Griffin and his employer at Griffin's place of employment and to Griffin and his girlfriend at their residence.

According to Griffin, Burlington Volkswagen also reported to the Burlington Police Department that Griffin had stolen the car by forcibly removing it from their premises. As a result of this report, a warrant was issued for Griffin's arrest. Based on this warrant, Griffin was arrested while driving the car in Mississippi and incarcerated overnight. Griffin had to retain local counsel, post a bond, and remain in Mississippi until he provided an explanation for his possession of the car sufficient for Mississippi law enforcement authorities to allow his release. Griffin also alleges that the Mississippi police seized the car and that he has not seen the car since.

Thereafter, Griffin had to return to New Jersey to **[\*\*\*3]** respond to the criminal charges brought against him as a result of Burlington Volkswagen's report of his theft of the car. On May 7, 2007, those charges were dismissed.

Griffin subsequently brought this damages action against Burlington Volkswagen and Staino in the Law Division, asserting common law claims for false arrest, false imprisonment, malicious prosecution, abuse of process, invasion of privacy, and intentional infliction of emotional distress and a statutory claim under the New Jersey Civil Rights Act of 2004, *N.J.S.A. 10:6-1 to -2*.

Before filing an answer, Burlington Volkswagen moved to dismiss Griffin's complaint on the ground that he was required to arbitrate his claims under an arbitration provision contained in the **[\*518]** retail order form. The trial court granted this motion. Griffin appeals.

The arbitration provision that the trial court concluded requires Griffin to arbitrate his claims against Burlington Volkswagen states in pertinent part:

> The parties to this agreement agree to arbitrate any claim, dispute, or controversy, including all statutory claims and any state or federal claims, that may arise out of or relating to the purchase or lease identified in this Motor Vehicle **[\*\*\*4]** Retail Order and the financing thereof. By agreeing to arbitration, the parties understand and agree that they are waiving their rights to maintain other available resolution processes, such as a court action or administrative proceeding, to settle their disputes. New Jersey Consumer Fraud Act, Used Car Lemon Law, and Truth-in-Lending claims are just three examples of the various types of claims subject to arbitration under this agreement. . . . There are no limitations on the type of claims that must be arbitrated, except for New Car Lemon Law and Magnuson-Moss Warranty Act claims which are excluded from arbitration under this agreement.

**HN1** It is firmly established in this State that "[b]ecause of the favored status **[\*\*103]** afforded to arbitration, '[a]n agreement to arbitrate should be read liberally in favor of arbitration.'" *Garfinkel v. Morristown Obstetrics & Gynecology Assocs., 168 N.J. 124, 132, 773 A.2d 665 (2001)* (quoting *Marchak v. Claridge Commons, Inc., 134 N.J. 275, 282, 633 A.2d 531 (1993)).* Therefore, "courts operate under a 'presumption of arbitrability in the

sense that an order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration **[***5]** clause is not susceptible of an interpretation that covers the asserted dispute.'" *EPIX Holdings Corp. v. Marsh & McLennan Cos., 410 N.J. Super. 453, 471, 982 A.2d 1194 (App.Div.2009)* (quoting *Caldwell v. KFC Corp., 958 F. Supp. 962, 973 (D.N.J.1997))*.

**HN2** Courts have generally read the terms "arising out of" or "relating to" a contract as indicative of an "extremely broad" agreement to arbitrate any dispute relating in any way to the contract. *Angrisani v. Financial Tech. Ventures, L.P., 402 N.J. Super. 138, 149, 952 A.2d 1140 (App.Div.2008)*; *accord EPIX Holdings, supra, 410 N.J. Super. at 472, 982 A.2d 1194* (quoting with approval the court's "expansive interpretation" in *Sweet Dreams Unlimited,* **[*519]** *Inc. v. Dial-A-Mattress Int'l, Inc., 1 F.3d 639, 642 (7th Cir.1993)*, of "an arbitration clause applying to disputes 'arising out of the agreement' as including 'any dispute between the contracting parties that is in any way connected with their contract.'").

Arbitration provisions using such expansive language are construed to require arbitration of statutory claims such as alleged civil rights violations and common law torts. *See, e.g.*, *EPIX Holdings, supra, 410 N.J. Super. at 461, 468-75, 982 A.2d 1194* (tort claims including breach of fiduciary duty, **[***6]** negligent misrepresentation, and fraud); *Alfano v. BDO Seidman, LLP., 393 N.J. Super. 560, 575-77, 925 A.2d 22 (App.Div.2007)* (tort claims including fraud and civil conspiracy); *Gras v. Assocs. First Capital Corp., 346 N.J. Super. 42, 54-57, 786 A.2d 886 (App.Div.2001)* (Consumer Fraud Act claim); *Young v. Prudential Ins. Co., 297 N.J. Super. 605, 608, 614-21, 688 A.2d 1069 (App.Div.1997)* (Law Against Discrimination and Conscientious Employee Protection Act claims).

The retail order form signed by Griffin included an expansive form of arbitration clause under which he agreed "to arbitrate any claim, dispute, or controversy . . . that may arise out of or relating to the purchase . . . identified in the Motor Vehicle Retail Order and the financing thereof." Griffin's claims "arise out of" and "relate to" the actions that Burlington Volkswagen took after Griffin retained possession of the car even though financing for this transaction was not obtained and Griffin made no payments beyond his initial $ 1,000 deposit. Specifically, Griffin alleges that Burlington Volkswagen attempted to repossess the car by wrongfully reporting to the Burlington Police Department that he had stolen it, as a result of which he was arrested and **[***7]** incarcerated in Mississippi and had to defend himself against criminal charges. Griffin's claims of false arrest, false imprisonment, abuse of process, and malicious prosecution based on Burlington Volkswagen's actions will depend, at least in part, on a determination of the parties' respective interests in the car under the Motor Vehicle Retail Order in light of the failure to obtain financing for Griffin's **[*520]** purchase. Therefore, Griffin's claims "arise out of" and "relate to" this consumer transaction and are thus subject to the arbitration clause contained in the retail order form. *See Dan Wachtel Ford, Lincoln, Mercury, Inc. v. Modas*, 891 So. 2d 287 (Ala.2004) (holding that plaintiffs claims of "malicious prosecution . . . and abuse of process [arose] out of **[**104]** actions taken by [defendant upon plaintiff's] refusal to return" a car after defendant was unable to find financing). *But see Mannix v. Hosier, 249 A.D.2d 966, 672 N.Y.S.2d 574, 575 (App.Div.1998)* (holding that plaintiff's claim of malicious prosecution that resulted from harassment charges brought by plaintiff's broker "only collaterally related to the financial relationship between the parties").

Griffin analogizes Burlington Volkswagen's **[***8]** action in reporting that the car had been stolen to the police to a Burlington Volkswagen employee assaulting him in order to regain possession of the car. However, a tort claim based on such an assault would not require a determination of the parties' respective rights in the car under the Motor Vehicle Retail Order. A Missouri court has concluded that

> **HN3** for a tort claim to be subject to arbitration under a broad arbitration clause, it must raise some issue the resolution of which requires reference to or construction of some portion of the parties' contract. Where, however, a tort claim is independent of the contract terms and does not require reference to the underlying contract, arbitration is not compelled.

[*Estate of Athon v. Conseco Finance Servicing Corp., 88 S.W.3d 26, 30 (Mo.Ct.App.2002)* (citations omitted).]

*See also* EPIX Holdings, supra, 410 N.J. Super. at 475, 982 A.2d 1194 (requiring arbitration under expansive arbitration clause because plaintiff could not "maintain its claim for damages without reference to, and reliance upon, the underlying contract"). Under this approach to determining arbitrability under the broad form of arbitration clause involved in this case, a tort claim based **[***9]** on an assault upon Griffin to regain possession of the car would not be subject to arbitration because it would not require "reference to the underlying contract." However, Griffin's tort claims against Burlington Volkswagen are subject to arbitration because they **[*521]** depend in part on an interpretation of the parties' rights under the Motor Vehicle Retail Order.

As alternative grounds for reversal of the judgment dismissing his complaint, Griffin also argues that Burlington Volkswagen should be foreclosed from relying upon the arbitration clause because its invocation of the criminal process to regain possession of the car constituted a waiver or equitably estopped Burlington Volkswagen from seeking arbitration of Griffin's claims. These arguments are clearly without merit. *R. 2:11-3(e)(1)(E)*.

Affirmed.



⚠ Caution

As of: September 1, 2015 2:45 PM EDT

## *Hearthshire Braeswood Plaza Ltd. Partnership v. Bill Kelly Co.*

Court of Appeals of Texas, Fourteenth District, Houston

February 4, 1993, Rendered ; February 4, 1993, Filed

NO. B14-92-00509-CV

**Reporter**

849 S.W.2d 380; 1993 Tex. App. LEXIS 334

HEARTHSHIRE BRAESWOOD PLAZA LIMITED PARTNERSHIP, SMP MED CENTER PARTNERS LIMITED, AND JAMES M. BIRNEY, Appellants v. BILL KELLY COMPANY, Appellee

**Prior History:** [**1] On Appeal from the 129th District Court. Harris County, Texas. Trial Court Cause No. 92-03127.

**Disposition:** Affirmed in Part, Reversed and Remanded in Part

## Core Terms

arbitration, trial court, arbitration provision, no evidence, plea in abatement, appellants', contracts, parties, compel arbitration, motion to stay, disputes, induced, fraud in the inducement, inferred, renovation project, fraud claim, renovation, pleadings, elements of fraud, fraudulently, negotiations, foreclosure, foreclosed, appellant contention, amended petition, unconscionability, allegations, prevails, sections, grounds

## Case Summary

**Procedural Posture**

Appellants, corporate apartment complex owners and their agent, sought review of the order of the 129th District Court of Harris County (Texas), which denied appellants' pleas in abatement and motions to stay litigation and compel arbitration in an action brought by appellee renovator. The action sought a declaratory judgment and asserted claims for breach of contract, foreclosure of liens, fraud, and negligent misrepresentation.

**Overview**

Appellee renovator filed suit against appellants, corporate apartment complex owners and agent, seeking a declaratory judgment that arbitration was unavailable to appellants. Appellee claimed breach of contract, foreclosure of liens, fraud, and negligent misrepresentation, following a contract dispute. The trial court denied appellants' pleas in abatement and motions to stay litigation and compel arbitration. The court, using the ″no evidence″ standard of review, reversed in part and held that appellee's affidavits did not present sufficient evidence to support his claim of fraud in the inducement of the contract as a whole or of the arbitration provision of the contract and that the trial court erred in basing its decision on the claims. The court held that appellee clearly showed intent to be bound by the contract with appellants, that the contract was valid even if an appellant failed to sign it, and that, pursuant to the contract, the issue of whether there was a contractual breach was a

subject for arbitration. The court affirmed the holding that appellee could proceed with the claims against appellants arising from the renovation of a complex not involved in the case.

**Outcome**

The court reversed the order of the lower court that denied appellant corporate apartment complex owners and appellant agent's pleas in abatement and motions to stay litigation and compel arbitration. The court held that appellee renovator failed to prove fraud in the inducement of the contract as a whole or in the arbitration provision of the contract, and the court held that contractual breach was a subject for arbitration.

# LexisNexis® Headnotes

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Mandatory ADR

Civil Procedure > Appeals > Appellate Jurisdiction > Interlocutory Orders

Civil Procedure > Appeals > Standards of Review > General Overview

Civil Procedure > ... > Standards of Review > Substantial Evidence > General Overview

*HN1* In a standard appeal, when the appellant raises "no evidence" and "factual insufficiency" points, the appellate court reviews the "no evidence" point first. If the court finds there is some evidence, it proceeds then to consider the insufficient evidence point. The proper standard of review in an appeal from an interlocutory order concerning a motion to stay litigation and compel arbitration is simply "no evidence."

Civil Procedure > ... > Standards of Review > Substantial Evidence > General Overview

*HN2* In reviewing "no evidence" or legal sufficiency points, the court considers only the evidence and inferences, when viewed in their most favorable light, that tend to support the finding under attack, and disregards all evidence and inferences to the contrary. If there is any evidence of probative force to support the finding, the point must be overruled and the finding upheld. When there are no findings of fact and conclusions of law, the court affirms the judgment if there is evidence to support it upon any legal theory asserted by the prevailing party.

Contracts Law > Contract Conditions & Provisions > General Overview

*HN3* See *Tex. Rev. Civ. Stat. Ann. art. 224* (1992).

Torts > Business Torts > Fraud & Misrepresentation > General Overview

*HN4* In order to prove fraud, a plaintiff has to show that: (1) a material representation was made; (2) the representation was false; (3) when the defendant made it he or she knew it was false, or made it recklessly without any knowledge of the truth and as a positive assertion; (4) the representation was made with the intention that it should be acted upon by the plaintiff; (5) the plaintiff acted in reliance upon the representation; and (6) the plaintiff thereby suffered injury due to its reliance on the representation. Further, because the representation involves a promise to do an act in the future, the plaintiff also has to prove that at the time the representation was made, the defendant had no intention of performing the act.

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Mandatory ADR

Civil Procedure > Appeals > Appellate Jurisdiction > Interlocutory Orders

*HN5* An order overruling a plea in abatement is interlocutory in nature because the order does not finally resolve the controversy.

> Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > General Overview
>
> Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview
>
> Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Validity of ADR Methods
>
> Contracts Law > Contract Conditions & Provisions > Arbitration Clauses
>
> Contracts Law > ... > Affirmative Defenses > Fraud & Misrepresentation > General Overview
>
> Contracts Law > Defenses > Unconscionable > General Overview
>
> Contracts Law > Defenses > Unconscionable > Arbitration Agreements

*HN6* Under the Texas General Arbitration Act, *Tex. Rev. Civ. Stat. Ann. art. 224* (1992), an agreement to arbitrate is valid unless grounds exist for revocation. Fraud and unconscionability are defenses to the enforcement of an arbitration provision under Article 224. Since the law favors arbitration, and Article 224 sets up fraud and unconscionability as defenses, the burden of proof is on the party seeking to avoid arbitration.

> Civil Procedure > Trials > Jury Trials > Jury Deliberations
>
> Civil Procedure > Special Proceedings > Eminent Domain Proceedings > Jury Trials

*HN7* A trial court may disregard a jury's finding to a special issue, only if the finding has no support in the evidence or it is rendered immaterial by other findings.

> Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Mandatory ADR
>
> Civil Procedure > ... > Standards of Review > Substantial Evidence > General Overview
>
> Contracts Law > Contract Conditions & Provisions > Arbitration Clauses

*HN8* When there are no findings of facts and conclusions of law, the court must affirm the judgment if there is evidence to support it on any legal theory raised by the prevailing party.

> Real Property Law > ... > Liens > Nonmortgage Liens > Mechanics' Liens

*HN9* See *Tex. Prop. Code Ann. § 53.154* (1984).

> Governments > Legislation > Statute of Limitations > Time Limitations
>
> Real Property Law > ... > Liens > Nonmortgage Liens > Mechanics' Liens

*HN10* See Tex. Prop. Code. Ann. § 53.18 (1992).

> Real Property Law > ... > Liens > Nonmortgage Liens > Mechanics' Liens

*HN11* *Tex. Prop. Code Ann. § 53.154* and *Tex. Prop. Code Ann. § 53.158* require that a suit for foreclosure must be brought and that the mechanic's lien can only be foreclosed by a court of competent jurisdiction.

> Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > General Overview
>
> Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview
>
> Real Property Law > ... > Liens > Nonmortgage Liens > Mechanics' Liens

*HN12* When a party is entitled to arbitration, the foreclosure of an mechanic and materialman's lien shall be stayed until the arbitrators determine whether the party seeking foreclosure prevails in the underlying dispute.

> Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview
>
> Contracts Law > Breach > General Overview
>
> Contracts Law > Contract Conditions & Provisions > Arbitration Clauses
>
> Torts > Procedural Matters > Alternative Dispute Resolution

*HN13* Causes of action sounding in tort are not automatically exempted from arbitration. A dispute arising out of a contractual relationship may give rise to breach of contract claims and tort claims. To determine whether the particular tort claim is subject to arbitration, the court must determine whether the particular tort claim is so interwoven with the contract that it could not stand alone or, on the other hand, is a tort completely independent of the contract and could be maintained without reference to the contract.

> Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > General Overview
>
> Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview
>
> Contracts Law > Contract Conditions & Provisions > General Overview
>
> Contracts Law > Contract Conditions & Provisions > Arbitration Clauses
>
> Contracts Law > Formation of Contracts > Execution
>
> Torts > Procedural Matters > Alternative Dispute Resolution

*HN14* The Texas General Arbitration Act, *Tex. Rev. Civ. Stat. Ann. art. 224* (1992), provides that arbitration agreements, whether separate or within the confines of a contract, must be in writing. Article 224, however, does not require that the agreement or the contract be signed by the parties in order for the arbitration provision to be valid except in two specific instances: contracts for the acquisition of property, services, money, or credit where the consideration is $ 50,000 or less, and claims for personal injury.

> Contracts Law > Formation of Contracts
>
> Contracts Law > Formation of Contracts > Execution

*HN15* A party is bound by the terms of the contract that he has signed, except upon a showing of special circumstances. Further, for a contract to be valid, it is not necessary that the agreement be signed by both parties. If one party signs, the other may accept by his acts, conduct or acquiescence in the terms of the contract.

**Counsel:** William K. Andrews of Houston, for Appellants.

Stephen A. Mendel of Houston, Daryl L. Moore of Houston, for Appellee.

**Judges:** Panel Consists of Justices Murphy, Cannon and Robert E. Morse (sitting by designation)

**Opinion by:** BILL CANNON

# Opinion

[***382**] OPINION

This is an appeal from the trial court's order denying appellants' pleas in abatement and motions to stay litigation and compel arbitration. The order of the trial court is reversed in part and affirmed in part.

The appellants in this case are: Hearthshire Braeswood Plaza Limited Partnership (Hearthshire), owner of an apartment complex known as the Gardens of Braeswood (the Gardens); James Birney (Birney), a limited partner of and agent for Hearthshire; and SMP Med Center Partners, Ltd. (SMP), a limited partnership and owner of the Braesbrook Landing Apartments (the Landing). Birney is also an agent for SMP. The appellee is Bill Kelly Company (Kelly), a sole proprietorship owned by Mr. Bill Kelly (Mr. Kelly). Mr. Kelly's company renovates apartment complexes.

In 1991, **[\*\*2]** Hearthshire and Kelly entered into two contracts concerning renovation work on the Gardens, one on January 21, 1991 and one on March 28, 1991. Each **[\*383]** contract contained an arbitration clause which provided, in pertinent part:

All claims or disputes between the Contractor and the Owner arising out or relating to the Contract, or the breach thereof, shall be decided by arbitration in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association currently in effect unless the parties mutually agree otherwise and subject to an initial presentation of the claim or dispute to the Architect as required under Paragraph 10.5. [1]

**[\*\*3]**

Subsequently, disputes arose between the parties. Kelly claimed it fully performed under both contracts, but that Hearthshire only paid for the January contract. Hearthshire claimed the work performed by Kelly was unsatisfactory. On December 13, 1991, Hearthshire filed Demands for Arbitration with the American Arbitration Association (AAA) in order to resolve its disputes with Kelly. The demands requested arbitration under the January contract and the March contract. The cases were given two separate case numbers by the AAA. Kelly objected to arbitration claiming that it was unavailable to Hearthshire because: (1) Hearthshire did not comply with paragraph 10.5; (2) certain claims asserted by Hearthshire were not arbitrable; and (3) Hearthshire had failed to give proper notice under the Texas Deceptive Trade Practices Act. None of the reasons asserted by Kelly at that time, concerned fraud in the inducement of the contract or fraud in the inducement of the arbitration provision.

During the following two month period, the parties corresponded with the AAA concerning the arbitrability of the case. This was done at the request of the AAA. In one of the letters to the AAA, Kelly **[\*\*4]** asserted that arbitration was not available to Hearthshire because the March contract had been procured through fraud. In that same letter, Kelly conceded that certain issues in the January contract were potentially arbitrable.

On January 24, 1992, Kelly filed a lawsuit seeking a declaratory judgment that arbitration was unavailable to Hearthshire, asserting the same objections it had initially made to the AAA. In the petition, Kelly also asserted claims against Hearthshire and Birney for breach of contract, foreclosure of a mechanic and materialman's lien, suit on a sworn account, quantum meruit, fraud, promissory estoppel, negligent misrepresentation, and grossly negligent misrepresentation. The basis for these last four claims was Kelly's contention that it had agreed to

---

[1] Paragraph 10.5 states:

The Architect will interpret and decide matters concerning performance under and requirements of the Contract Documents on written request of either the Owner or Contractor. The Architect will make initial decisions on all claims, disputes or other matters in question between the Owner and Contractor, but will not be liable for results of any interpretations or decisions rendered in good faith. The Architect's decisions in matters relating to aesthetic effect will be final if consistent with the intent expressed in the Contract Documents. All other decisions of the Architect, except those which have been waived by making or acceptance of final payment, shall be subject to arbitration upon the written demand of either party.

perform and finance the renovation work at the Gardens because Hearthshire and Birney had allegedly promised Kelly that it would receive the $ 4.5 million renovation project on the Landing. Kelly claimed that in reliance on this representation, it financed and completed the renovation work at the Gardens, but never received a contract to renovate the Landing.

Hearthshire and Birney filed a Plea in Abatement [**5] and Original Answer on February 28, 1992. On March 9, 1992, Kelly amended its petition to add SMP to the suit, asserting against it the same claims which had asserted against Hearthshire and Birney. On March 11, 1992, Hearthshire and Birney filed a Motion to Stay Litigation and Compel Arbitration and a brief in support of the motion. On March 27, 1992, SMP filed its Plea in Abatement, Motion to Stay Litigation and Compel Arbitration and Original Answer. On April 4, 1992, Kelly filed its response to the motions to stay litigation and compel arbitration, and filed an amended petition. In these [*384] documents, Kelly alleged that appellants had fraudulently induced Kelly to enter into the arbitration provision in the March contract. Kelly asserted that it entered into the March contract because Hearthshire and Birney represented that Project Controllers, Inc. (PCI) would initially resolve all disputes between the parties. Kelly based this assertion on the fact that while PCI was referred to in the contract as "project manager", it acted as architect for other purposes, and paragraph 10.5 stated that all disputes would be initially referred to the architect. Kelly had worked with [**6] PCI before and knew it to be qualified. Kelly alleged that this representation induced it to enter into the arbitration provision. Appellants claimed that there was no architect on the project and therefore, the mandates of paragraph 10.5 were inapplicable. As to the January contract, Kelly also claimed that it was not enforceable because Hearthshire had not signed it.

On April 7, 1992, the trial court denied appellants' motions without a hearing. On April 20, 1992, the trial court entered an order denying appellants' pleas in abatement and motions to stay litigation and compel arbitration. The court further ordered that the arbitration proceedings under the January and March contracts be stayed. The trial court did not explain the reasons for, or set out specific grounds for its ruling. Further, the trial court did not file findings of fact and conclusions of law. Appellants appeal from that order.

In their third point of error [2], appellants contend that there was no evidence or insufficient evidence to support the trial court's finding of fraud in the inducement of the contract as a whole.

[**7] *HN1*

In a standard appeal when the appellant raises "no evidence" and "factual insufficiency" points, the appellate court reviews the "no evidence" point first. *Glover v. Texas Gen. Indem. Co., 619 S.W.2d 400, 401 (Tex. 1981)*. If the court finds there is some evidence, it proceeds then to consider the insufficient evidence point. *Id.* Though appellants style this point of error and others as "no evidence" and "insufficient evidence," the proper standard of review in an appeal from an interlocutory order concerning a motion to stay litigation and compel arbitration is simply "no evidence." *Wetzel v. Sullivan, King & Sabom, P.C., 745 S.W.2d 78, 79* (Tex. App.--Houston [1st Dist.] 1988, no writ); *Gulf Interstate Eng'g v. Pecos Pipeline, 680 S.W.2d 879, 881* (Tex. App.--Houston [1st Dist.] 1984, writ dism'd). Therefore, we will review this point of error and the others similarly styled under the "no evidence" standard of review.

*HN2* In reviewing "no evidence" or legal sufficiency points, the court considers only the evidence and inferences, when viewed in their most favorable light, that tend to support the finding under attack, and disregards all evidence and inferences [**8] to the contrary. *Davis v. City of San Antonio, 752 S.W.2d 518, 522 (Tex. 1988)*; *Garza v. Alviar, 395 S.W.2d 821, 823 (Tex. 1965)*. If there is any evidence of probative force to

---

[2] Appellants have listed their points of error in outline form, 1.A. through 1.L. For clarity, we have renumbered the points as numbers one through twelve.

support the finding, the point must be overruled and the finding upheld. *Sherman v. First Nat'l Bank*, 760 S.W.2d 240, 242 (Tex. 1988); *In Re King's Estate, 150 Tex. 662, 244 S.W.2d 660, 661 (Tex. 1951)*. When, as in this case, there are no findings of fact and conclusions of law, we must affirm the judgment if there is evidence to support it upon any legal theory asserted by the prevailing party. *Gulf Interstate, 680 S.W.2d at 881*.

*HN3* Article 224 of the Texas General Arbitration Act states, in pertinent part:

A written agreement to submit any existing controversy to arbitration or a provision in a written contract to submit to arbitration any controversy thereafter arising between the parties is valid, enforceable and irrevocable, save upon such grounds as exist at law or equity for the revocation of any contract. A court shall refuse to enforce an agreement or contract provision to submit a controversy to arbitration if the court **[*385]** finds it was unconscionable at the **[**9]** time the agreement or contract was made.

*TEX. REV. CIV. STAT. ANN. art. 224* (Vernon Supp. 1992).

In its suit for declaratory judgment, Kelly maintained that arbitration was unavailable to appellants because they had fraudulently induced Kelly to enter into the contract as a whole, and that under article 224, this was sufficient to deny appellants' demands for arbitration. Kelly based this contention on its claim that appellants had allegedly represented to Kelly that it would receive the $ 4.5 million renovation project on the Landing if Kelly financed and completed the renovations on the Gardens. Kelly alleged that it fulfilled its end of the bargain, but that appellants did not give Kelly the Landing renovation project as promised. Kelly claimed that the representation as to the $ 4.5 million project induced it to enter the contract, and that this was done fraudulently.

*HN4* In order to prove fraud, Kelly had to show that: (1) a material representation was made; (2) the representation was false; (3) when appellants made it they knew it was false, or made it recklessly without any knowledge of the truth and as a positive assertion; (4) the representation was made with **[**10]** the intention that it should be acted upon by Kelly; (5) Kelly acted in reliance upon the representation; and (6) Kelly thereby suffered injury due to its reliance on the representation. *Trenholm v. Ratcliff, 646 S.W.2d 927, 930 (Tex. 1983)*; *Stone v. Lawyers Title Ins. Corp., 554 S.W.2d 183, 185 (Tex. 1977)*; *New Process Steel Corp., Inc. v. Steel Corp. of Texas, Inc., 703 S.W.2d 209, 213-14* (Tex. App.--Houston [1st Dist.] 1985, writ ref'd n.r.e.). Further, because the representation involved a promise to do an act in the future, i.e., allow Kelly to renovate the Landing in the future, Kelly also had to prove that at the time the representation was made, appellants had no intention of performing the act. *Crim Truck & Tractor v. Navistar Int'l Transp. Corp., 823 S.W.2d 591, 597 (Tex. 1992)*; *Spoljaric v. Percival Tours, Inc., 708 S.W.2d 432, 433 (Tex. 1986)*. The evidence in the record in support of Kelly's contentions consists of two affidavits of Mr. Kelly. One of these affidavits is attached to Kelly's response to appellants' motions to stay litigation and compel arbitration. The other affidavit is attached to Kelly's second amended petition. Besides these **[**11]** affidavits and a copy of the contract, the other documents in the record are pleadings, motions, and responses filed by the parties.

Kelly urges this court to accept the affidavits **and** their pleadings as evidence in support of the fraud claim. Kelly argues that because appellants filed pleas in abatement, the trial court was required to accept as true the factual allegations of fraud in the inducement as set forth in the second amended petition, unless those allegation were disproved. *See Seth v. Meyer, 730 S.W.2d 884, 885* (Tex. App.--Fort Worth 1987, no writ). We refuse to accept Kelly's argument for three reasons: (1) the appellants did not simply file pleas in abatement, rather the pleas in abatement were supplanted by, or at best, coupled with appellants' motions to stay litigation and compel arbitration; (2) the burden of proof is on the party resisting arbitration; and (3) the standard suggested by Kelly for plea in abatement review is incompatible with the ″no evidence″ standard of review also advocated by Kelly.

A fair reading of the motions filed by appellants clearly shows that they were not mere pleas in abatement. The substance of the motions is a request **[**12]** for the trial court to stay the litigation and compel arbitration. The

plea in abatement filed by the appellants Hearthshire and Birney was filed with their original answer as provided for under the Texas Rules of Civil Procedure. *See* TEX. R. CIV. P. 85. Later, they filed their motion to stay litigation and compel arbitration. SMP, who was later added as a defendant by Kelly, simply lumped the plea in abatement in with their original answer and motion to stay litigation and compel arbitration. If the relief sought by appellants had concerned only a plea in abatement, this court would not have jurisdiction over this appeal. **HN5** An order overruling a plea in abatement is interlocutory [*386] in nature because the order does not finally resolve the controversy. 745 S.W.2d 78, 79; *City of Arlington v. Texas Elec. Serv. Co., 540 S.W.2d 580, 582* (Tex. Civ. App.--Fort Worth 1976, writ ref'd n.r.e.). However, we have jurisdiction in this case because the trial court's order did not just overrule a plea in abatement, rather the order required the parties to litigate and stayed the arbitration proceedings. TEX. REV. CIV. STAT. ANN. art. 238-2(1) and (2) (Vernon 1973). Because the [**13] relief sought by appellants and denied by the trial court was not solely for abatement, the cases cited by Kelly in support of its plea in abatement argument are inapplicable.

The cases cited by Kelly, supporting the argument that the trial court had to accept its pleadings as true unless appellants disproved those allegations, do not involve arbitration. [3] The burden of proof in a plea in abatement action is very different from the burden of proof in an action where a party is seeking to avoid arbitration.

Arbitration is favored by the courts of this state. *Manes v. Dallas Baptist College, 638 S.W.2d 143, 145* (Tex. App.--Dallas 1982, writ ref'd n.r.e.); *Carpenter v. North River Ins. Co., 436 S.W.2d 549, 553* (Tex. Civ. App.--Houston [14th Dist.] 1968, writ ref'd n.r.e.). **HN6** Under the Texas General Arbitration Act, an agreement to arbitrate is valid unless grounds [**14] exist for revocation. TEX. REV. CIV. STAT. ANN. art. 224 (Vernon Supp. 1992). As stated in *Gulf Interstate*, fraud and unconscionability are **defenses** to the enforcement of an arbitration provision under article 224. *Gulf Interstate, 680 S.W.2d at 881*. Since the law favors arbitration, and article 224 sets up fraud and unconscionability as defenses, the burden of proof is on the party seeking to avoid arbitration. *See Id.* Because Kelly was the party seeking to avoid arbitration, it was Kelly's burden to prove fraud. Therefore, the trial court was not required to accept the allegations in Kelly's pleadings as true.

Finally, we cannot accept the plea in abatement standard of review suggested by Kelly because it is inconsistent with the "no evidence" standard of review also advocated by Kelly. Under the plea in abatement standard, Kelly argues that the trial court should have accepted Kelly's pleadings as true since appellants failed to disprove them. Kelly's argument on appeal suggests that we are required to do the same; however, Kelly also argues that this court should use the "no evidence" standard. Under this standard, we are required to consider only the evidence [**15] which supports the trial court's order, i.e. Kelly's evidence, and to disregard all evidence to the contrary, i.e. appellants' evidence. If we used both standards, we would have to accept the allegations in Kelly's pleadings as true, and ignore any evidence in the record that contradicted those pleadings. In other words, Kelly would automatically prevail on appeal because its contentions would be accepted and any evidence brought by appellants would be ignored.

It is apparent from our analysis that the plea in abatement argument proposed by Kelly is flawed. Therefore, we hold that Kelly's pleadings are not to be taken as evidence and the proper standard of review in this appeal is the "no evidence" standard.

Since we have determined that Kelly's pleadings do not constitute evidence in this case, we now look to the two affidavits of Mr. Kelly to determine if they are sufficient to sustain Kelly's claim of fraud in the inducement of the contract as a whole.

The affidavit which is attached to Kelly's second amended petition swears to the allegations in the petition concerning Kelly's claim for sworn account. There is nothing in that affidavit to support Kelly's fraud [**16]

---

[3] Seth v. Meyer, 730 S.W.2d 884 (Tex. App.--Fort Worth 1987, no writ); Flowers v. Steelcraft Corp., 406 S.W.2d 199 (Tex. 1966).

claim. Therefore, the affidavit attached to Kelly's response to appellants' motions to stay litigation and compel arbitration is the **[*387]** only document that speaks to Kelly's allegation that it was induced to enter the contract relating to the Gardens because appellants fraudulently represented that Kelly would be given the $ 4.5 million renovation project on the Landing. Now, we must look to the affidavit and determine whether it contains some evidence on each of the elements of fraud.

Paragraphs eleven through thirteen contain statements regarding the Landing. In these paragraphs, Mr. Kelly states that:

1. Birney requested that Kelly perform work on the Landing, a complex owned by SMP.

2. Kelly was not allowed to perform the work on the Landing.

3. The negotiations with Birney for the Landing project were in his individual capacity and/or as president of the general partner for SMP.

4. There was no written agreement between the parties as to the Landing project, and therefore Kelly is not required to arbitrate disputes regarding the Landing.

Viewing these statements in the light most favorable to the trial court's order, Kelly has failed **[**17]** to present sufficient evidence to support its claim of fraud in the inducement of the contract as a whole. The only evidence in this affidavit supporting a fraud allegation is Mr. Kelly's statements that Birney told Kelly that it would receive the Landing project, and that Kelly did not receive the project. There is no evidence that: (1) Birney knew the statement was false when it was made; (2) Birney intended Kelly to rely on the statement; (3) Kelly did in fact enter into the contracts for the Gardens because of this statement; or (4) at the time the representation was made, appellants did not intend to give Kelly the Landing project. Therefore, we hold that there is no evidence of fraud in the inducement of the contract as a whole. Kelly failed to present evidence on each of the elements of fraud. If the trial court based its decision on fraudulent inducement of the contract as a whole, it committed error because there is no evidence to support that contention. Appellants' third point of error is sustained.

In their first point of error, appellants allege that fraud in the inducement of the contract as a whole cannot be used as grounds to defeat an arbitration clause. Because **[**18]** we have determined that there was no evidence to support fraudulent inducement of the contract as a whole, it is unnecessary for us to decide this point of error. Whether a claim of fraudulent inducement of the contract as a whole is sufficient to defeat an arbitration provision is irrelevant in this instance because Kelly failed to present evidence of such fraud.

Since the trial court did not specify the reasons for its ruling, we must proceed with our review of appellants' remaining points to determine if there is any legal theory to support the trial court's decision. *Id.*

Appellants argue, in their fifth point of error, that there was no evidence or insufficient evidence to support the finding of fraud in the inducement of the arbitration provision. Again, using only the "no evidence" standard as set out above at length, we hold that there is no evidence to support a finding of fraud in the inducement of the arbitration provision.

As we have already discussed, only the affidavit attached to Kelly's response to the motions to stay litigation and compel arbitration contains evidence of any type of fraud. We will now examine the affidavit to determine whether **[**19]** it contains evidence on the elements of fraud as set out above, as the claim relates to fraud in the inducement of the arbitration provision. Kelly's argument as to this claim of fraud states that it was fraudulently induced to enter into the arbitration provision because appellants falsely represented the PCI would

act as the initial arbitrator for all disputes between the parties. The pertinent parts of Kelly's affidavit state, as summarized:

1. At the request of PCI, Kelly agreed to renovate the Gardens.

2. All negotiations were with Birney, and PCI participated in the negotiations.

3. The contracts were standard owner/contractor agreements. These types **[*388]** of agreements generally provide that an architect will oversee the work; however, it is not uncommon that another party will be substituted in the architect's place and carry out his duties.

4. Hearthshire substituted PCI as the entity to perform the architect's duties. PCI performed numerous duties, assigned under the terms of the contract, to the architect.

5. When Hearthshire complained about defective workmanship, Kelly had no reason not to believe that PCI would resolve the dispute.

**[**20]** 6. The March contract did not disqualify PCI from handling any disputes. Page one of the contract indicates that PCI is substituted for the architect for all purposes including dispute resolution.

7. Based on the fact that PCI would serve as project manager, the nature of the work PCI would perform, and the language of paragraph 10.5, Kelly agreed to the contract containing the arbitration provision. Kelly also agreed that PCI would substitute for the architect. Kelly was comfortable with the arbitration provision because he had worked with PCI on other projects.

8. Hearthshire never submitted its complaints to PCI as required by the contract. PCI confirmed that Hearthshire never submitted any disputes for resolution.

While the affidavit is more substantial as to fraud in the inducement of the arbitration provision, it still falls short of what is required. In the affidavit, Mr. Kelly states that Hearthshire represented that PCI would be the architect and this representation, coupled with the wording of paragraph 10.5 induced him to enter into the arbitration provision. He further stated that the representation was false when it came to dispute resolution. But, **[**21]** nowhere in the affidavit does Mr. Kelly maintain that appellants knew the statement was false when it was made, that they intended that Kelly act based upon the statement, or that when the agreement was made, appellants had no present intent to perform. Kelly argues that these three elements of fraud can be inferred. In support of this proposition, Kelly cites *New Process Steel Corp., Inc. v. Steel Corp. of Texas, Inc., 703 S.W.2d 209* (Tex. App.--Houston [1st Dist.] 1985, writ ref'd n.r.e.); however, *New Process Steel* is distinguishable from the case before us.

In *New Process Steel*, S & S Alloys (S & S) owed Steel Corporation of Texas (SCOT) an unsecured debt of $ 500,000. Because of the financial condition of S & S, it was questionable whether the debt would ever be paid. *Id. at 211*. When the secured creditors of S & S threatened foreclosure, SCOT bought out their interests, and decided to obtain better management for S & S so that it could become profitable again. *Id.* SCOT's board of directors authorized its president, Kiefer, to negotiate with New Process Steel about taking over management of S & S. *Id.* As a result of the negotiations, a management **[**22]** agreement was reached. New Process Steel agreed to provide management, inventory, and working capital to S & S while deciding if it was interested in purchasing the business. *Id.* SCOT agreed that: (1) it would not try to collect its debt from S & S during the term of the management agreement; and (2) that as the sole secured creditor of S & S, it would place an upper limit on its security interest in an amount equal to the dollar value of that security interest at the time New Process Steel began its management. *Id.* During the management period, New Process Steel made sales and cash

advances to S & S, while the parties continued to negotiate regarding the purchase of S & S. *Id.* New Process Steel considered SCOT's release of its security interest in S & S essential to any agreement. *Id.* Kiefer kept SCOT's executive board informed throughout the negotiations. *Id.*

The parties reached an agreement, and a closing date was set for January 16, 1979. *Id.* Before the closing date, Kiefer spoke with a majority of the executive board members and received their approval. *Id.* At closing, New Process Steel purchased S & S with the understanding that SCOT would accept **[**23]** a new note in exchange for the $ 1,000,000 note that SCOT held against S & S, and the outstanding accounts receivable **[*389]** due to SCOT from S & S. *Id. at 212*. This "understanding" was not reduced to writing at the time of the closing.

After the closing, SCOT's management had second thoughts about the agreement. *Id.* SCOT fired Kiefer in June of 1979, and then advised New Process Steel that it would not perform the January 16 agreement. *Id.* Thereby, in effect, denying the existence of the agreement. New Process Steel brought suit against SCOT for breach of contract and fraud. *Id.* The jury found for New Process Steel on its fraud claim [4], but the trial court refused to give effect to the damage issue based on the fraud claim. *Id. at 213*. New Process Steel complained about this refusal on appeal.

The court of appeals held that **HN7** a trial court may disregard a jury's finding to a special issue, only **[**24]** if the finding has no support in the evidence or it is rendered immaterial by other findings. *Id.* The court then set out to determine whether the evidence was sufficient to support a finding of fraud and the damages awarded by the jury for the fraud claim. As in the case before us, *New Process Steel* involved a promise to take action in the future.

After listing the elements of fraud, including present intent not to perform, the court of appeals stated that fraudulent intent is an element of fraud that is difficult to prove. *Id.*; *see Freeman v. Greenbriar Homes, Inc., 715 S.W.2d 394, 397* (Tex. App.--Dallas 1986, writ ref'd n.r.e.). But, the court stated, when a party denies making the agreement and fails to perform, this constitutes evidence from which lack of present intent to perform may be inferred. *New Process Steel, 703 S.W.2d at 214*. In order for *New Process Steel* to aid Kelly, we must find that the element of "lack of present intent to perform" is in effect the same as the element "knowingly making a false statement." Thus, Kelly's argument must be that if one can infer the former, the latter element of fraud may also be inferred. Further, Kelly **[**25]** would also have this court assume that if these two elements can be inferred, it is reasonable to assume that the statement was made with the intent that it should be acted upon. Kelly wants us to accept this hypothesis because these three elements are the ones not addressed in Mr. Kelly's affidavit. Kelly argues that they should be inferred based upon *New Process Steel*. Even if we were to accept this interpretation, which we do not, Kelly's argument still fails because *New Process Steel* differs in one crucial respect.

In *New Process Steel*, Kiefer testified that he kept the board apprised of the negotiations, had full authority to make the agreement, and that the agreement was approved by the board. *Id.* Despite this, the chairman of the SCOT board **denied** that either he or the board had ever approved the agreement, and the evidence was clear that SCOT failed to perform under the agreement. *Id. at 215*. The court held that the denial of the agreement and the failure to perform was sufficient to allow the jury to infer that SCOT had never intended to perform the agreement, and had therefore defrauded New Process Steel. *See Id.*

In this case, we **[**26]** are not confronted with a party denying the existence of an agreement. Appellants do not deny the existence of the contract or the arbitration provision. In fact, they wish to rely on the arbitration provision and force Kelly to abide by it. Appellants simply do not agree with Kelly's interpretation of the

---

[4] The other jury findings in the case are irrelevant for our purposes here.

contract or the arbitration provision. This is altogether different from denying that the agreement exists. Even if we were to accept Kelly's argument, we cannot, under the facts of *New Process Steel*, infer the missing fraud elements because appellants have not denied the existence of the agreement.

Therefore, since Kelly failed to provide some evidence on each of the elements of fraud in the inducement of the arbitration provision, the trial court erred if its order was based on Kelly's claim of fraud in the inducement of the arbitration provision. In that there is no evidence to support fraud in the inducement of the arbitration provision, **[*390]** appellants' fifth point of error is sustained.

In points of error two, four, and six, appellants contend that the trial court erred in denying their motions to stay litigation and compel arbitration based on unconscionability. **[**27]** After reviewing the record, we find that the legal theory of unconscionability was never raised or argued by Kelly as grounds for avoiding the arbitration provision. *HN8* When there are no findings of facts and conclusions of law, we must affirm the judgment if there is evidence to support it on any legal theory raised by the prevailing party. *Gulf Interstate, 680 S.W.2d at 881*. Since unconscionability was never asserted by Kelly, it could not have been relied on by the trial court in making its determination to deny appellants' motions. Thus, it is unnecessary for us to address points two, four, and six since they could not have been the basis for the trial court's order.

In their seventh point of error, appellants contend that the trial court erred in finding that the Texas Property Code preludes the resolution of the underlying contract dispute by arbitration.

In its second amended petition, Kelly sought enforcement and foreclosure of a mechanic and materialman's lien. Kelly argued in the trial court that under *Texas Property Code §§ 53.154* and *53.158*, it was required to bring the action through a lawsuit and not through arbitration. We agree with Kelly that an M & **[**28]** M lien must be foreclosed by a court of competent jurisdiction; however, this does not mean that the underlying contract, which forms the basis of the lien, cannot be arbitrated.

The Texas Property Code provides:

*HN9* A mechanic's lien may be foreclosed only on judgment of a court of competent jurisdiction foreclosing the lien and ordering the sale of the property subject to the lien.

*TEX. PROP. CODE ANN. § 53.154* (Vernon 1984).

The Code also provides:

*HN10* Suit must be brought to foreclose the lien within two years after the date of filing the lien affidavit under Section 53.052 or within one year after completion of the work under the original contract under which the lien is claimed, whichever is later.

*TEX. PROP. CODE ANN. § 53.158* (Vernon Supp. 1992). Kelly contends that the language of these sections is mandatory, and therefore, arbitration is unavailable on this issue. The sections are mandatory; however, Kelly desires a broader interpretation than is permitted by the clear language of the sections.

*HN11* *Sections 53.154* and *53.158* require that a suit for **foreclosure** must be brought, and that the lien can only be **foreclosed** by a court **[**29]** of competent jurisdiction. Appellants contend that these sections do not state that arbitration is unavailable to determine which party prevails in the underlying dispute. They argue that these sections only require that the actual foreclosure of the lien be performed by a court of competent jurisdiction. In support of their argument, appellants cite *Mountain Plains Constructors, Inc. v. Torrez, 785 P.2d 928 (Colo. 1990)*.

We decline to follow the approach advocated by Kelly, and choose to adopt the one presented by appellants and accepted by the Colorado Supreme Court. In *Mountain Plains*, the Colorado court addressed the issue of the proper disposition of an M & M lien when arbitration is required. The court held that *HN12* when a party is entitled to arbitration, the foreclosure of an M & M lien shall be stayed until the arbitrators determine whether the party seeking foreclosure prevails in the underlying dispute. *Id. at 931*.

Kelly argues that we should not accept this approach because this case is interpreting Colorado statutory law, not Texas law. Though we have found no Colorado statutes that correspond precisely to the language contained *TEX. PROP. CODE ANN.* **[**30]** §§ 53.154 and *53.158*, it is clear from the statutes regarding the enforcement of liens that Colorado also requires that foreclosure be accomplished by filing suit in a court of competent jurisdiction. *See COLO. REV. STAT. ANN. §§ 38-20-106*, *38-22-105.5*, **[*391]** *38-22-110 through 38-22-116*, and *38-22-120* (West 1990 & 1992). Therefore, there is no reason to decline to adopt this approach.

But beyond this, our decision on this issue is the result of common sense. If we allowed Kelly to foreclose the M & M lien before arbitration, and the arbitrators found for appellants, they would be without recourse. The lien would be foreclosed, the property disposed of, and no money judgment could adequately replace the lost property. However, if Kelly prevails in the arbitration, it may then have the arbitration award confirmed by the court under the Texas General Arbitration Act, and can sue to foreclose the M & M lien. TEX. REV. CIV. STAT. ANN. art. 236 (Vernon 1973). Kelly will have an adequate remedy at law. Appellants' seventh point of error is sustained.

In their eighth point of error, appellants allege that the trial court erred in finding that Kelly's claims as to the **[**31]** Landing renovation project are not arbitrable.

As part of its fraudulent inducement claim, Kelly asserted that it had only entered into the contracts involving the Gardens because it had been promised the $ 4.5 million renovation project on the Landing. Besides using this as part of its claim for fraudulent inducement, Kelly, in its second amended petition, filed claims against appellants for negligent and grossly negligent misrepresentation, DTPA, promissory estoppel, and breach of an oral contract based on the Landing project. Appellants contend that all of these claims should be included in the arbitration proceedings because they "arise out of, or relate to the contract or breach thereof," as provided in the arbitration provisions contained in the January and March contracts covering the Gardens.

We agree with appellants that *HN13* causes of action sounding in tort are not automatically exempted from arbitration. A dispute arising out of a contractual relationship may give rise to breach of contract claims and tort claims. *See Valero Energy Corp. v. Wagner & Brown, 777 S.W.2d 564, 566-67* (Tex. App.--El Paso 1989, writ denied). To determine whether the particular tort **[**32]** claim is subject to arbitration, the court must determine whether the particular tort claim is so interwoven with the contract that it could not stand alone or, on the other hand, is a tort completely independent of the contract and could be maintained without reference to the contract. *Id. at 566*. Thus, here, the question is whether Kelly's claims as to the Landing project can stand alone or can be maintained without reference to the contracts involving the Gardens. We hold that they can.

The only connection between the Landing project and the contracts involving the Gardens is Kelly's claim that the promise of the Landing project fraudulently induced it to enter the contracts for the renovation of the Gardens. If necessary, Kelly need not even refer to the contracts involving the Gardens in order to maintain the claims regarding the Landing. Kelly could assert that it was fraudulently promised the Landing project and that the promise was breached, even if the Garden contracts had never existed. Further, when a dispute arises between contracting parties whose relationship includes an agreement to arbitrate any dispute arising out of or under the contract, the trial court **[**33]** must determine whether the issues presented are subject to arbitration under that agreement. *Id. at 567*. The parties must have specifically agreed by clear language to arbitrate the

matters in dispute. *Id.* The contracts covering the Gardens make no reference to the Landing project and it would take a leap of logic to argue that the arbitration provisions in the contracts were meant to encompass any disputes arising out of a project not mentioned in the contract and one that had not even been fully discussed. We hold that the claims arising out of the Landing renovation project are separate and distinct from those arising out of the contracts pertaining to the Gardens. Therefore, the Landing claims do not have to be arbitrated, and Kelly may proceed with the litigation as to those claims. Appellants' eighth point of error is overruled.

 **[*392]** In point of error nine, appellants assert that the trial court erred in finding that the dispute between the parties over paragraph 10.5 of the contract is not a proper subject for arbitration.

Though both sides have made numerous allegations against the other, the real dispute in this case concerns the interpretation **[**34]** of paragraph 10.5 of the contract, i.e., whether PCI was, or was to act as, the architect on the Gardens project. Arbitration is designed for that purpose. If we were to say that it is improper to allow arbitrators to determine the meaning of contractual provisions, we would render the entire arbitrary scheme meaningless. Since we have already determined that Kelly has failed to prove fraud, or any other ground to excuse itself from the arbitration provision, all of the disputes involving the contracts pertaining to the Gardens should be arbitrated, including the interpretation of paragraph 10.5. The issue as to whether there is a valid arbitration provision is separate from the issue of whether the contract was breached, the former is determined the court, and the latter by an arbitrator. *Shearson Lehman Hutton, Inc. v. McKay, 763 S.W.2d 934, 938* (Tex. App.--San Antonio 1989, no writ). Appellants' ninth point of error is sustained.

Appellants next contend that the trial court erred in finding that the arbitration provision of the January contract was not enforceable against Kelly because Hearthshire did not sign the contract.

*HN14* Article 224 of the Texas General Arbitration **[**35]** Act provides that arbitration agreements, whether separate or within the confines of a contract, must be in writing. *TEX. REV. CIV. STAT. ANN. art. 224* (Vernon Supp. 1992). Article 224, however, does not require that the agreement or the contract be signed by the parties in order for the arbitration provision to be valid except in two specific instances: contracts for the acquisition of property, services, money, or credit where the consideration is $ 50,000 or less, and claims for personal injury. Those instances do not apply here.

Since article 224 provides that an arbitration provision may be revoked "upon such grounds as exist at law or in equity for the revocation of any contract," we must determine whether Hearthshire's failure to sign the January contract is a ground to revoke the contract, and therefore, the arbitration provision. Under the general rules of contract law, *HN15* a party is bound by the terms of the contract that he has signed, except upon a showing of special circumstances. *Shearson Lehman Hutton, 763 S.W.2d at 937*. Kelly has produced no evidence of any special circumstances. Further, for a contract to be valid, it is not necessary that the agreement be **[**36]** signed by both parties. *E.g., Velasquez v. Schuehle, 562 S.W.2d 1, 3* (Tex. Civ. App.--San Antonio 1977, no writ). If one party signs, the other may accept by his acts, conduct or acquiescence in the terms of the contract. *Id.* Kelly signed the January contract, and though Hearthshire did not sign the contract, its acts, including the execution of the March contract and the position taken in this appeal, clearly show intent to be bound by the January contract. Appellants' tenth point of error is sustained.

Point of error number eleven states that even if only some of the claims are arbitrable and others are not, the trial court erred in not staying the litigation as to any of the claims that are arbitrable and compelling arbitration of those claims. Our holding in point of error eight makes it unnecessary to review this point of error. We have already determined which claims are not arbitrable and which are. The parties are to arbitrate all claims involving the contracts pertaining to the Gardens. Any claims that relate to the Landing renovation project may proceed to litigation. Our reasons for this decision were spelled out in the discussion under point of error number **[**37]** eight.

In their final point of error, appellants contend that the trial court erred in not consolidating the arbitration proceedings because Kelly presented no evidence, or insufficient evidence that it would be prejudiced by the resolution of all disputes in one consolidated proceeding.

 [*393] When Hearthshire filed its demands for arbitration with the AAA, it filed a separate demand for each contract. It then immediately sought to consolidate them according to AAA procedures. Appellants want this court to order the trial court to consolidate the arbitrable claims into one proceeding.

Because the trial court denied, in error, appellants' motions to stay litigation and compel arbitration, it never reached the issue of whether the arbitration proceedings should be consolidated. We cannot reverse a trial court on a decision it never reached. Appellants' twelfth point of error is overruled.

The order of the trial court is reversed except as to Kelly's claims involving the Landing renovation project. The trial court is directed to make orders such as are necessary to comply with this court's opinion.

Bill Cannon

Justice

Judgment rendered and Opinion [**38] filed February 4, 1993.

Panel Consists of Justices Murphy, Cannon and Robert E. Morse (sitting by designation).



⚠ Caution
As of: September 1, 2015 5:05 PM EDT

## *Heritage Resources v. Nationsbank*

Supreme Court of Texas

November 29, 1995, Argued ; April 25, 1996, Delivered

No. 95-0515

**Reporter**

939 S.W.2d 118; 1996 Tex. LEXIS 41; 39 Tex. Sup. J. 537

HERITAGE RESOURCES, INC., PETITIONER v. NATIONSBANK, CO-TRUSTEE UNDER THE WILL OF DAVID B. TRAMMELL, DECEASED ET AL., RESPONDENTS

**Subsequent History:** [**1] As Corrected May 2, 1996.

**Prior History:** ON APPLICATION FOR WRIT OF ERROR TO THE COURT OF APPEALS FOR THE EIGHTH DISTRICT OF TEXAS.

## Core Terms

royalty, market value, costs, lease, Oil, post-production, deducted, marketing, parties, Lessor's, lessee, processing, compression, court of appeals, transportation, royalty clause, decisions, proceeds, clauses, transportation costs, point of sale, ambiguous, no deduction, courts, royalty interest, market price, sale of gas, oil and gas lease, dehydration, contracts

## Case Summary

**Procedural Posture**

Petitioner, lessees and operator of gas, oil, and mineral leases, sought review of the decision of the Court of Appeals for the Eighth District of Texas that upheld the trial court's summary judgment award in favor of respondents, owners of interests in gas, oil and mineral rights, in respondents' breach of lease action.

**Overview**

Respondents, owners of interests in oil, gas, and mineral rights, filed suit against petitioner, lessee and operator of gas, oil, and mineral leases, arguing that it had deducted transportation costs from respondents' royalty payments in violation of the leases. The court of appeals affirmed the trial court's judgment for respondents, finding that petitioner did not comply with the intent of the royalty clauses. The leases required petitioner to pay respondents their share of the market value at the well. The court found that the lease was not ambiguous, so it applied the commonly accepted meaning of market value and royalty. Because there was no evidence regarding comparable sale prices, it concluded that petitioner was correct in paying a royalty based on the market value at the point of sale less the reasonable postproduction marketing costs. The court determined that pursuant to the divisional orders, petitioner was only liable for the amount of unpaid royalty it retained, because to hold otherwise would benefit other working interest owners who were not parties to the suit. The court reversed the judgment and entered a take-nothing judgment in favor of respondents.

**Outcome**

The court reversed the summary judgment award in favor of respondents, owners of interests in gas, oil and mineral rights, and rendered judgment that respondents take nothing, finding that petitioner, lessee and operator of oil, gas, and mineral leases, had complied with the correct interpretation of the royalty clauses contained in the leases when it deducted transportation costs from royalty payments made to respondents.

# LexisNexis® Headnotes

Contracts Law > Contract Interpretation > Ambiguities & Contra Proferentem > General Overview

Contracts Law > Defenses > Ambiguities & Mistakes > General Overview

Contracts Law > Types of Contracts > Lease Agreements > General Overview

*HN1* The question of whether a contract is ambiguous is one of law for the court. A contract is ambiguous when its meaning is uncertain and doubtful or is reasonably susceptible to more that one interpretation.

Energy & Utilities Law > Leases & Licenses > Royalty Clauses

*HN2* Royalty is commonly defined as the landowner's share of production, free of expenses of production. Although it is not subject to the costs of production, royalty is usually subject to post-production costs, including taxes, treatment costs to render it marketable, and transportation costs. However, the parties may modify this general rule by agreement.

Energy & Utilities Law > Natural Gas Industry > General Overview

Energy & Utilities Law > Leases & Licenses > Royalty Clauses

Energy & Utilities Law > Oil & Petroleum Products > General Overview

Energy & Utilities Law > Royalties > Leasehold Royalty Clauses

*HN3* Market value at the well has a commonly accepted meaning in the oil and gas industry. Market value is the price a willing seller obtains from a willing buyer. There are two methods to determine market value at the well.

Energy & Utilities Law > Leases & Licenses > Royalty Clauses

*HN4* The most desirable method to determine market value at the well is to use comparable sales. A comparable sale is one that is comparable in time, quality, quantity, and availability of marketing outlets.

Contracts Law > Types of Contracts > Lease Agreements > General Overview

Energy & Utilities Law > Oil, Gas & Mineral Interests > Purchase Contracts > Division & Transfer Orders

*HN5* The general rule is that division orders are binding until revoked. When an operator prepares a division order that allocates payments among the interest owners in a manner that differs from the lease provisions and the operator retains the benefits, the division order is not binding.

**Counsel:** For PETITIONER: Long, Mr. D. Patrick, Rockwell, Mr. Brad, Patton Boggs, Dallas, TX.

For RESPONDENTS: Dixon, Jr., Mr. Thomas R., Parker, Mr. Kevin P., Underwood Wilson Berry Stein & Johnson, Amarillo, TX.

**Judges:** JUSTICE BAKER delivered the opinion of the Court, in which CHIEF JUSTICE PHILLIPS, JUSTICE CORNYN, JUSTICE ENOCH, and JUSTICE SPECTOR join. JUSTICE OWEN filed a concurring opinion, in which JUSTICE HECHT joins. JUSTICE GONZALEZ filed a dissenting opinion in which JUSTICE ABBOTT joins. JUSTICE OWEN, joined by JUSTICE HECHT, concurring. JUSTICE GONZALEZ, joined by JUSTICE ABBOTT, dissenting.

**Opinion by:** JAMES A. BAKER

# Opinion

 **[\*120]**  This case involves construction of royalty clauses in several oil and gas leases. NationsBank sued Heritage contending that Heritage deducted transportation costs from the value of NationsBank's royalty in violation of the leases.

The trial court rendered a partial summary judgment against Heritage deciding liability and damages through 1991. NationsBank amended its pleading to include Heritage's deductions **[\*\*2]**  through 1993. After a bench trial, the trial court awarded NationsBank and other royalty owners the transportation costs Heritage deducted plus interest and attorney's fees.

The court of appeals affirmed the trial court's judgment. *Heritage Resources v. Nationsbank, 895 S.W.2d 833 (1995)*. It held that the royalty clauses showed the parties' intent not to deduct the post-production transportation costs when determining market value at the well. *Heritage, 895 S.W.2d at 836-37*. The court of appeals also held that the division orders Heritage and the royalty owners executed did not bind the royalty owners and that Heritage was liable for the full amount deducted. *Heritage, 895 S.W.2d at 839*.

We conclude the trial court and the court of appeals incorrectly interpreted the royalty clauses. We reverse the court of appeals' judgment. We render judgment that NationsBank take nothing. Further, we disapprove of the court of appeals' language about the liability of an operator who underpays royalty interest owners.

Facts

NationsBank is the trustee for owners of interests in gas, oil, and other minerals inherited under David B. Trammel's will. Heritage is the lessee and **[\*\*3]**  operator under a number of leases. Heritage also owns an undivided working interest in some of the leases. Heritage sold gas off the leased premises. Heritage deducted the cost to transport the gas from the wellhead to the point of sale as a post-production cost from the sales price before calculating royalties.

In January 1989, NationsBank noticed that Heritage was deducting severance taxes and transportation charges from the purchase price. NationsBank objected to the transportation charge deduction. NationsBank contended that the leases specifically prohibited the deduction. Three different leases are in issue. The relevant parts are :

3. The royalties to be paid Lessor are . . .

(b) on gas, including casinghead gas or other gaseous substances produced from the land, or land consolidated therewith, and sold or used off the premises or in the manufacture of gasoline or other products therefrom, the market value at the well of 1/5 of the gas so sold or used, provided that on gas sold at the well the royalty shall be 1/5 of the amount realized from such sale provided, however, that there shall be no deductions from the value of the Lessor's royalty by reason **[\*\*4]**  of any required processing, cost of dehydration, compression, transportation or other matter to market such gas.

or:

3.

In consideration of the premises, Lessee covenants and agrees . . .

(b) To pay the Lessor 1/4 of the market value at the well for all gas (including substances contained in such gas) produced from the leased premises; provided, however, that there shall be no deductions from the value of Lessor's royalty by reason of any required processing, cost of dehydration, compression, **[\*121]** transportation, or other matter to market such gas.

or

3.

Lessee shall pay the following royalties subject to the following provisions: . . .

(b) Lessee shall pay the Lessor 1/4 of the market value at the well for all gas (including all substances contained in such gas) produced from the leased premises and sold by Lessee or used off the leased premises, including sulphur produced in conjunction therewith; provided, however, that there shall be no deductions from the value of Lessor's royalty by reason of any required processing, cost of dehydration, compression, transportation, or other matter to market such gas.

Although **[\*\*5]** the court of appeals states that the leases are virtually identical, the first lease is distinctly different from the others. In the first lease, for gas sold on the lease, royalty is on proceeds, with no deduction for marketing costs, but if sold at a point off the lease, the royalty is the market value at the well. However, this difference is irrelevant for purposes of this opinion. All three leases require us to determine if Heritage improperly deducted transportation costs from the royalty payments. The critical clause in all three leases is the requirement that Heritage pay the royalty interest owners their fractional interest of "the market value at the well" of the gas produced.

**Royalty Clause Construction**

Heritage contends that the royalty clauses define the lessor's royalty as a fraction of the market value at the well. Therefore, the clauses limiting deduction from the value of the lessor's royalty simply means that Heritage cannot deduct an amount from the sales price that would make the royalty paid less than the required fraction of market value at the well. Because NationsBank concedes Heritage only deducted reasonable transportation costs from the market **[\*\*6]** value at the point of sale, Heritage did not make a deduction from the "value of the Lessor's royalty."

The court of appeals rejected Heritage's interpretation of the royalty clause. *Heritage, 895 S.W.2d at 836*. The court of appeals reasoned that because royalty interests are normally subject to postproduction costs, Heritage's interpretation renders the post-production clause meaningless. *Heritage, 895 S.W.2d at 837*. Although we do not disagree with the court of appeals' reasoning in this respect, we find that applying the trade meaning of royalty and market value at the well renders the post-production clauses surplusage as a matter of law.

*(a) Applicable Law*

Oil and Gas Lease Construction

*HN1* The question of whether a contract is ambiguous is one of law for the court. *R & P Enters. v. LaGuarta, Gavrel & Kirk, Inc., 596 S.W.2d 517, 518 (Tex. 1980)*. A contract is ambiguous when its meaning is uncertain and doubtful or is reasonably susceptible to more that one interpretation. *Coker v. Coker, 650 S.W.2d 391, 393 (Tex. 1983)*. In construing an unambiguous oil and gas lease our task is to ascertain the parties' intentions as expressed in the lease. *Sun* **[**7]** *Oil Co. v. Madeley, 626 S.W.2d 726, 727-28 (Tex. 1981)*; *McMahon v. Christmann, 157 Tex. 403, 303 S.W.2d 341, 344 (Tex. 1957)*. To achieve this goal, we examine the entire document and consider each part with every other part so that the effect and meaning of one part on any other part may be determined. *Steeger v. Beard Drilling Co., 371 S.W.2d 684, 688 (Tex. 1963)*. We presume that the parties to a contract intend every clause to have some effect. *Ogden v. Dickinson State Bank, 662 S.W.2d 330, 331 (Tex. 1983)*. We give terms their plain, ordinary, and generally accepted meaning unless the instrument shows that the parties used them in a technical or different sense. *Western Reserve Life Ins. Co. v. Meadows, 152 Tex. 559, 261 S.W.2d 554, 557 (Tex. 1953)*, *cert. denied*, *347 U.S. 928, 98 L. Ed. 1081, 74 S. Ct. 531 (1954)*. This Court will enforce the unambiguous document as written. *Sun Oil Co.*, 626 S.W.2d at 728. Both the trial court and the court of appeals determined that the leases in question were unambiguous. We agree.

Royalty

*HN2* Royalty is commonly defined as the landowner's share of production, free of **[*122]** expenses of production. **[**8]** *See* *Delta Drilling Co. v. Simmons, 161 Tex. 122, 338 S.W.2d 143, 147 (Tex. 1960)*; *Alamo Nat'l Bank v. Hurd, 485 S.W.2d 335, 338* (Tex. Civ. App.--San Antonio 1972, writ ref'd n.r.e.); 8 *WILLIAMS & MEYERS, OIL & GAS LAW, 856*-57 (1987); 3 KUNTZ, OIL & GAS LAW, § 42.2 (1989). Although it is not subject to the costs of production, royalty is usually subject to post-production costs, including taxes, treatment costs to render it marketable, and transportation costs. *Martin v. Glass, 571 F. Supp. 1406, 1410 (N.D. Tex. 1983)*, *aff'd*, *736 F.2d 1524 (5th Cir. 1984)*; *WILLIAMS & MEYERS, OIL & GAS LAW, 857* (1987). However, the parties may modify this general rule by agreement. *Martin, 571 F. Supp. at 1410*.

Market Value at the Well

*HN3* Market value at the well has a commonly accepted meaning in the oil and gas industry. *See generally* Wakefield, Annotation, *Meaning of, and Proper Method for Determining, Market Value or Market Price in Oil and Gas Lease Requiring Royalty to be Paid on Standard Measured by Such Terms*, *10 ALR 4TH 732 (1981)*. Market value is the price a willing seller obtains from a willing buyer. *See* *Exxon Corp. v. Middleton, 613 S.W.2d 240,* **[**9]** *246 (Tex. 1981)*. There are two methods to determine market value at the well.

*HN4* The most desirable method is to use comparable sales. *Middleton, 613 S.W.2d at 246*; *Texas Oil & Gas Corp. v. Vela, 429 S.W.2d 866, 872 (Tex. 1968)*. A comparable sale is one that is comparable in time, quality, quantity, and availability of marketing outlets. *Middleton, 613 S.W.2d at 246*; *Vela, 429 S.W.2d at 872*.

Courts use the second method when information about comparable sales is not readily available. *See, e.g., Le Cuno Oil Co. v. Smith, 306 S.W.2d 190, 193 (Tex. Civ. App. Texarkana 1957)*, *cert. denied*, *356 U.S. 974, 78 S. Ct. 1137, 2 L. Ed. 2d 1147 (1958)*; *Clear Creek Oil & Gas Co. v. Bushmiaer, 165 Ark. 303, 264 S.W. 830, 832 (Ark. 1924)*; *see also* Pierce, *Royalty Valuation Principles in a Changing Gas Market*, *in* STATE BAR OF TEXAS PROF. DEV. PROGRAM, 11TH ANNUAL ADVANCED OIL, GAS AND MINERAL LAW COURSE E, E-9 (1993). This method involves subtracting reasonable post-production marketing costs from the market value at the point of sale. *Texas Oil & Gas Corp. v. Hagen, 683 S.W.2d 24, 28* (Tex. App.--Texarkana 1985), *dism'd as moot,* 760 **[**10]** S.W.2d 960 (Tex. 1988). Post-production marketing costs include transporting the gas to the market and processing the gas to make it marketable. *Hagen, 683 S.W.2d at 29*. With either method, the plaintiff has the burden to prove market value at the well. *Hagen, 683 S.W.2d at 29*.

*(b) Application of Law to the Facts*

The court of appeals disregarded the generally accepted meanings of "market value at the well" and "royalty" to determine that Heritage wrongfully deducted post-production costs. The court of appeals' construction results in a royalty clause that specifies royalty payable as a fraction of the market value at the well, to mean the royalty is payable as a fraction of the market value at the point of sale with no deductions for post-production costs.

The terms "royalty" and "market value at the well" have well accepted meanings in the oil and gas industry. The post-production clauses in issue here plainly state that there "shall be no deduction from the *value of the Lessor's Royalty*." The leases clearly set the lessor's royalty as a fraction (1/4 or 1/5) "of the market value at the well." Under the leases, the lessee must determine the value of the lessor's **[**11]** royalty. The lessee accomplishes this by determining market value at the well and multiplying it by the fraction specified in the royalty clause (1/4 or 1/5). This result is the value of the lessor's royalty. The post-production clauses then specifies that there can be no deduction from this value (the value of the lessor's royalty) by reason of any post-production costs.

Here, the only conclusion we can draw is that the post-production clauses merely restate existing law. The post-production clauses illustrate that the lessee cannot pay the lessor less than his fractional value of the comparable sales price (market value). This could occur if the amount realized from the **[*123]** sale of the gas less the post production costs was less than the comparable sales price and the lessee calculated the lessor's royalty by subtracting post production costs from amount realized. At times the amount realized from the sale of gas has varied greatly from the market value of the gas. *See Vela, 429 S.W.2d at 875-76* (evidence sustained trial court's finding that market value was 13.047 cents per mcf even though amount realized by lessee under long term gas sales contract was 2.3 cents **[**12]** per mcf). Even though the *Vela* scenario may be unlikely to reoccur in the future due to changes in the market place, *see,* Pierce, *Royalty Valuation Principles in a Changing Gas Market, in* STATE BAR OF TEXAS PROF. DEV. PROGRAM, 11TH ANNUAL ADVANCED OIL, GAS AND MINERAL LAW COURSE E, E-1 - E-3, the market value may differ from the amount realized.

We recognize that our construction of the royalty clauses in two of the three leases arguably renders the post-productions clause unnecessary where gas sales occur off the lease. However, the commonly accepted meaning of the "royalty" and "market value at the well" terms renders the post-production clause in each lease surplusage as a matter of law.

To determine if Heritage correctly paid royalties under the leases, we must first determine the market value of the gas at the well. NationsBank offered no evidence of comparable sales. However, Heritage conceded in its response to NationsBank's motion for partial summary judgment that the price Heritage received for the gas was the market price at the point of sale. NationsBank conceded at oral argument that the transportation costs Heritage deducted were reasonable.

Because **[**13]** there is no evidence to support the comparable sales method of computing market value at the well, we use the alternate method. Under that method, Heritage must pay a royalty based on the market value at the point of sale less the reasonable post-production marketing costs. *Hagen, 683 S.W.2d at 28*. Based on the parties' concessions, the amount Heritage paid is the correct amount in royalties to NationsBank under the leases.

## Division Orders

Heritage entered into division orders with the royalty owners. The division orders contained the following language:

> All proceeds from the sale of gas shall be paid to the undersigned or their assigns in the proportions as herein set out less taxes and any costs incurred in the handling and transportation to the point of sale, treating,

compressing boosting, dehydrating or any other conditioning necessary, subject to the terms of any contract of purchase and sale with affects the above described property . . .

The court of appeals held that the division orders were of no effect and that Heritage was liable for reimbursement to the royalty owners for transportation costs improperly withheld in payment to Urantia. **[\*\*14]** The court of appeals' discussion about the effect of a division order that contradicts the lease terms conflicts with our earlier opinion in *Gavenda v. Strata Energy, Inc., 705 S.W.2d 690 (Tex. 1986)*.

*HN5* The general rule is that division orders are binding until revoked. *Gavenda, 705 S.W.2d at 691*; *Middleton, 613 S.W.2d at 250*. When an operator prepares a division order that allocates payments among the interest owners in a manner that differs from the lease provisions and the operator retains the benefits, the division order is not binding. *Gavenda, 705 S.W.2d at 692*. The basis of this rule is unjust enrichment. *Gavenda, 705 S.W.2d at 692*. The operator then becomes liable for the part of the interest owner's payments the operator retained. *See Gavenda, 705 S.W.2d at 693*. The operator is not liable for the amounts it paid out to other interest owners. *Gavenda, 705 S.W.2d at 693*.

The court of appeals decision incorrectly states that "Heritage was liable for reimbursement to the royalty owners for transportation costs improperly withheld in payment to Urantia." *Heritage Resources v. Nationsbank, 895 S.W.2d 833, 839 (1995)*. Under *Gavenda*, Heritage **[\*\*15]** would be liable, if at all, only for the amount of the unpaid royalty it retained. In this case, there were other working interest owners who were not parties to the suit. Absent an agreement **[\*124]** otherwise, all the working interest owners would benefit from an improper deduction of transportation charges from the royalties paid to NationsBank. Therefore the trial court could only hold Heritage liable for an amount of unpaid royalties that Heritage retained.

**Summary**

In conclusion, we hold that the court of appeals erred in holding that the lease required Heritage to pay royalties based on the market value at the point of sale. Further, we specifically disapprove of the court of appeals discussion about an erroneous division order's effects. We reverse the court of appeals' judgment and render judgment that NationsBank take nothing from Heritage.

James A. Baker, Justice

OPINION DELIVERED: April 25, 1996

**Concur by:** Priscilla R. Owen

# Concur

I concur in the judgment of the Court. The meaning of "market value at the well," upon which the resolution of this case ultimately turns, is not as clear-cut as the Court's opinion indicates when determining **[\*\*16]** whether post-production costs are to be shared by a royalty owner. I write separately to consider the meaning of "market value at the well" more fully and to recognize that the construction we are compelled to give to the leases at issue may not comport with the subjective intent of at least some of the parties to those agreements.

I

NationsBank, as trustee, is an owner of royalty interests under six leases that are the subject of this suit. Heritage is a working interest owner under each of the leases and is the operator of the wells located on those leases. The specific lease provisions that have given rise to this dispute are set forth in the Court's opinion.

The royalty clauses in contention specifically address marketing costs that may be incurred after the gas leaves the wellhead, including processing, dehydration, compression, and transportation costs. These are sometimes called post-production costs. The only costs at issue in this suit, however, are transportation charges. Simply put, the issue is how the cost of transporting the gas to market is to be allocated under the terms of these leases. This is a question of law. There are no factual disputes. NationsBank has conceded [**17] that the transportation charges were reasonable and in line with market rates. Heritage and NationsBank agree that the prices at which the gas was sold reflected its market value at the point of sale. It is undisputed that the sales of gas at issue have taken place off of the leased premises. The trial court, the court of appeals, and this Court correctly concluded that none of the leases are ambiguous.

II

At the outset, it is important to note that we are construing specific language in specific oil and gas leases. Parties to a lease may allocate costs, including post-production or marketing costs, as they choose. *See generally* 3 WILLIAMS, *OIL & GAS LAW § 645* (1990). Our task is to determine how those costs were allocated under *these* particular leases.

Each of the royalty provisions begins with the statement that royalties are to be paid on gas sold off the lease based on the market value of the gas at the well. The proviso that follows, prohibiting the deduction of marketing costs from the value of the royalty, is virtually identical in all of the leases. Accordingly, any differences among the leases are immaterial for purposes of determining the royalty obligation. [**18] [1]

The starting point in construing the leases is the language chosen by the parties. We first must ascertain the meaning of "market value at the well," which the agreements set [*125] out as the initial benchmark for valuing the royalty. "Market value at the well" tells us how and where the value of the royalty is measured, subject to any other provisions that bear on valuation.

[**19] A number of courts in producing states across the country have considered the meaning of various royalty clauses, including "market value at the well" clauses, in deciding which marketing costs, if any, are to be borne by the royalty owner. The decisions, including those under Texas law, are not uniform. There are two diverse viewpoints, with some decisions picking and choosing between the two, depending on the specific marketing cost under consideration. [2] At one end of the spectrum is the view that because the operator has an implied duty or an implied covenant to market the gas, all costs of marketing must be borne by the operator. Generally speaking, this is the minority view. On the other end of the spectrum, many decisions recognize that while there is an implied duty or covenant to market the gas, this duty does not extend to expenses incurred in sales off the lease; marketing costs are to be shared proportionately by the working interest and royalty owners.

[**20] In examining decisions in this area, it must be borne in mind that not all royalty clauses were created equal. Some are based on "proceeds," some on "amount realized," while others are based on "market value." Some specify the point at which the value of the royalty is determined, such as "at the well." Some do not. Some leases have more than one method for valuing royalty depending on whether the gas is sold or used off the leased premises or is sold at the well. Different courts have accorded differing meanings to the same language.

---

[1] One of the leases differs somewhat from the others. Because of the way in which the royalty clause of that lease is structured, an argument could be made that the proviso prohibiting the deduction of marketing costs from the value of the royalty applies only when the sale of gas occurs at the well and that the proviso does not apply when determining the market value of gas sold off the lease. It is unnecessary to decide that issue, however, because the parties agree that the proviso does apply under this lease as well as under the other leases in determining the market value of gas at the well when it is sold off the premises.

[2] For a general discussion of these competing principles and some of the divergent decisions, see *Wood v. TXO Production Corp.*, 854 P.2d 880 (Okla. 1992). *See also* 3 WILLIAMS, OIL & GAS LAW § 645 (1990).

With these distinctions in mind, I consider Texas decisions first.

A

The concept of "market value" is well-established in our jurisprudence. It is what a willing buyer under no compulsion to buy will pay to a willing seller under no compulsion to sell. *See, e.g., Exxon Corp. v. Middleton, 613 S.W.2d 240, 246 (Tex. 1981)*. This would seem to be a straight-forward measure, but *how* market value is determined in the context of an oil and gas lease is a question that has been before this Court on more than one occasion. We held in *Texas Oil & Gas Corp. v. Vela, 429 S.W.2d 866 (Tex. 1968)* that the price paid under a gas purchase contract **[**21]** between the lessee and the purchaser is not necessarily the market price within the meaning of the lease. *429 S.W.2d 866, 871 (Tex. 1968)*. The parties in that case agreed that the market price of gas is to be determined by sales comparable in time, quality, and availability of marketing outlets. *Id. at 872*. *See also First Nat'l Bank in* *Weatherford, Texas v. Exxon Corp., 622 S.W.2d 80, 82 (Tex. 1981)*(intrastate sales of gas not comparable to interstate sales regulated by the Federal Power Commission).

In *Middleton*, we considered *when* gas is sold within the meaning of a royalty clause based on "market value at the well." Exxon contended that the gas was sold at the time Exxon entered into a long term contract with the purchaser, and that market value should be determined as of then. We disagreed, holding that market value is determined at the point in time when the gas is actually produced and delivered. *613 S.W.2d at 245*. We also concluded that "sold at the wells" means sold at the wells within the lease, not sold at wells within the field. *Middleton, 613 S.W.2d at 243*.

We had occasion to consider whether an operator owes a duty to a non-participating interest **[**22]** owner to process gas in *Danciger Oil & Refineries, Inc. v. Hamill Drilling Co., 141 Tex. 153, 171 S.W.2d 321 (Tex. 1943)*. We determined that the operator was not obligated to process the gas where the agreement provided that an overriding royalty interest would be computed on 1/24th of the gas "produced, saved and marketed at the prevailing market price paid by major companies . . . free and clear of operating expenses." *Danciger, 171 S.W.2d at 322-23*. The only market in the vicinity was for processed **[*126]** gas. There was no market for gas produced in its raw state at the wellhead. We reasoned that the overriding royalty payments were to be made out of gas "if, as and when produced," not out of its value after it had been processed into a more valuable product, even though the clause also referred to gas "marketed." *Danciger, 171 S.W.2d at 322*. We further held that "operating costs" meant the expenses necessary to market the gas, not processing the gas into some other product. *Danciger, 171 S.W.2d at 323*.

We have recognized that for occupation tax purposes, the market value of processed gas is measured as to all ownership interests, including royalty interests, **[**23]** by the total proceeds of the sale of the component parts of the gas after processing, less transportation and processing costs. *Mobil Oil Corp. v. Calvert, 451 S.W.2d 889, 892 (Tex. 1970)*. In *Mobil*, market value was defined in the tax statute as value "at the mouth of the well." *Id. at 891*.

But these decisions do not directly answer the question of who bears marketing costs under a "market value at the well" royalty clause in a lease. Our Court has spoken to this issue only obliquely. In *Upham v. Ladd, 128 Tex. 14, 95 S.W.2d 365, 366 (Tex. 1936)*, we concluded that a lessor suing for underpayment of royalties based on a clause calling for payment of "proceeds" had stated a cause of action, but noted that the question of construction of the lease was not yet before the Court.

Decisions of the courts of appeals and other courts applying Texas law have confronted the question of whether post-production costs may be allocated to the royalty interest owners, but the holdings are not entirely consistent and construe differing provisions.

One of the earliest decisions dealing with Texas law on the subject of marketing costs and payment of royalties was *Phillips Petroleum* **[**24]** *Co. v. Bynum, 155 F.2d 196 (5th Cir. 1946)*. In discussing how to arrive upon the market value of gas, the Fifth Circuit observed that in the absence of available evidence of market price at the well, it "would seem appropriate" to look at the market price paid by the purchasers in the area at the point of sale, and to then deduct transportation costs. *Id. at 198*. The Fifth Circuit assumed without discussion that transportation charges should be deducted in arriving upon market value. *See also Phillips Petroleum Co. v. Johnson, 155 F.2d 185, 189* (5th Cir.), *cert. denied*, *329 U.S. 730, 91 L. Ed. 632, 67 S. Ct. 87 (1946)*(decided the same day, holding that royalty on processed gas is 1/8th of the sale proceeds less a credit for transportation, separation, and sales costs under a royalty clause that called for "1/8th of net proceeds derived from the sale of the gas at the mouth of the well"); *Holbein v. Austral Oil Co., Inc., 609 F.2d 206, 209 (5th Cir. 1980)*(dehydration costs deductible from royalty under clause basing royalty on amount realized from the sale of gas).

At least two decisions from Texas courts of appeals are at odds with the approach taken by the Fifth **[**25]** Circuit. The royalty in *Miller v. Speed, 248 S.W.2d 250, 256* (Tex. Civ. App.--Eastland 1952, no writ), was held to be free of any marketing costs. The provision under consideration was not expressly a market value clause. It simply provided for a royalty of 1/24th of all gas produced, saved and made available for market. The case of *Pan American Petroleum Corp. v. Southland Royalty Co., 396 S.W.2d 519, 524-25* (Tex. Civ. App.--El Paso 1965, writ dism'd w.o.j.), relied on *Miller* and reasoned that a royalty interest is free of the cost of production *and marketing* costs. The poorly worded royalty clause in *Pan American* was based on proceeds and also provided for delivery of the lessor's share of the minerals "free of cost." *See also Skaggs v. Heard, 172 F. Supp. 813 (S.D. Tex. 1959)*(compression costs could not be charged to the lessor where the sale occurred on the lease and the royalty clause provided for royalties based on proceeds).

In contrast, other Texas courts of appeals have allowed certain marketing costs to be allocated to the royalty owner. Only one of those cases dealt with a market value royalty clause, *Texas Oil & Gas Corp. v. Hagen*, 683 **[**26]** S.W.2d 24 (Tex. App.--Texarkana 1984), *writ dism'd as moot*, *760 S.W.2d 960 (Tex. 1988)*. *Hagen* held that market value at the well is the market value of the gas where sold, less reasonable and necessary transportation and processing costs. *Hagen, 683 S.W.2d at 28*. Similarly, in **[*127]** *Parker v. TXO Prod. Corp., 716 S.W.2d 644* (Tex. App.--Corpus Christi 1986, no writ), the royalty owner was required to share in post-production compression costs. In *dicta*, the *Parker* court indicated that all post-production costs could be charged to the royalty owners. *Id. at 648*. The specific terms of the royalty clause cannot be discerned from the opinion in *Parker*.

Marketing costs were also charged to the royalty owners in *Le Cuno Oil Co. v. Smith, 306 S.W.2d 190* (Tex. Civ. App.--Texarkana 1957, writ ref'd n.r.e.), *cert. denied*, *356 U.S. 974, 78 S. Ct. 1137, 2 L. Ed. 2d 1147 (1958)*. The parties agreed that a division order calling for 1/8th of the price received at the wells governed the royalty, and the court held costs of dehydration, gathering, transporting, and processing could be deducted from the gross sales price received by the operator. **[**27]** *Le Cuno Oil, 306 S.W.2d at 193*. *See also Martin v. Glass, 571 F. Supp. 1406, 1411-15 (N.D. Tex. 1983)*, *aff'd*, *736 F.2d 1524 (5th Cir. 1984)* (post-production compression charges held deductible under a royalty clause based on net proceeds at the well). The court found that "net proceeds" contemplated deductions. *571 F. Supp. at 1411*. *See also Maddox v. Texas Co., 150 F. Supp. 175, 180 (E.D. Tex. 1957)*("fair value" was the measure where there was no market and marketing costs must be considered where the lease required the lessor to bear its proportionate cost of rendering gas merchantable).

To add another point of view on this subject, a Texas court of appeals recently held that a royalty clause based on "market value at the well" was ambiguous. That court upheld a jury finding that the parties did not intend to allow the deduction of compression charges from royalties. *Judice v. Mewbourne Oil Co., 890 S.W.2d 180* (Tex. App.--Amarillo 1994), reversed today by this Court in a companion decision, *939 S.W.2d 133*.

While it is fair to say that the greater number of courts considering Texas law have permitted allocation of post-production costs to royalty owners, **[\*\*28]** there are decisions reaching the opposite conclusion. It remains for this Court to determine whether "market value at the well" includes or excludes post-production costs. Decisions from other jurisdictions illuminate the arguments on both sides of the issue and offer a variety of potential resolutions.

B

One of the most comprehensive discussions of "market value at the well" royalty clauses is Judge Wisdom's decision in *Piney Woods Country Life Sch. v. Shell Oil Co., 726 F.2d 225* (5th Cir.), *cert. denied*, *471 U.S. 1005, 85 L. Ed. 2d 161, 105 S. Ct. 1868 (1984)*. Although that decision applies Mississippi law, the court's review of the law is not restricted to Mississippi jurisprudence. Among other authorities, the opinion considers at some length the meaning attributed to "market value at the well" by numerous commentators, concluding that the purpose in specifying "at the well" is to distinguish between gas sold in the form in which it emerges from the wellhead and gas which thereafter has had value added by transportation or processing. *Piney Woods, 726 F.2d at 231, 240*. The Fifth Circuit held that royalties under a "market value at the well" clause should compensate **[\*\*29]** only for the value of the gas at the well, before the operator adds value. *Id.* Accordingly, that court concluded that royalty owners may be charged with all expenses subsequent to production including processing, transportation, removal of sulfur, and other marketing costs where the royalty provision measures value "at the well." *Id.* This reasoning is persuasive.

It has not been followed, however, by the highest courts of some of our sister states. The implied obligation to market gas was held to be paramount in *Garman v. Conoco, Inc., 886 P.2d 652 (Colo. 1994)*. After surveying the law in other jurisdictions and examining the rationale underpinning the various decisions, the Supreme Court of Colorado concluded that the implied covenant to market gas obligates the lessee to incur post-production costs necessary to place the gas in a condition acceptable for market. *Id. at 659*. Examples of costs borne solely by the lessee included gathering and compression costs to move the gas from the wellhead to a processing plant, and dehydration costs. *Garman, 886 P.2d at 655-56 n.8*. The court did draw a distinction, though, between costs necessary to **[\*128]** market the **[\*\*30]** gas and those that increased value after the gas had been rendered marketable. *Id. at 661*. The court imposed the burden on the lessee to demonstrate that costs enhancing an already marketable product are reasonable and that they increase royalty revenues in proportion with those costs. *Id. at 661*. It should be noted that this case was decided essentially in a vacuum, without reference to any specific lease clause. A general question had been certified to the court.

The Oklahoma supreme court, after similarly surveying other states' decisions, concluded that the implied duty to market gas is a duty to "get the product to the place of sale in marketable form." *Wood v. TXO Prod. Corp., 854 P.2d 880, 882 (Okla. 1993)*. A "market value at the well" clause was at issue. The court held that compression charges necessary for the gas to enter the purchaser's pipeline could not be deducted from the royalty where the sale occurred *on the lease premises*. *Id.* In the dissenting opinion, four members of the court found this result "harsh and untenable" and would have adopted the "better-reasoned" approach of allowing the deduction of compression costs. *Id. at 883*.

The **[\*\*31]** majority in *Wood v. TXO* distinguished that court's prior decision in *Johnson v. Jernigan, 475 P.2d 396 (Okla. 1970)*, which held that the obligation to market did not require the operator to absorb the cost of transporting gas ten miles by pipeline to the point of sale *off the lease*. *Johnson* extended the duty to market only to the lease boundaries. *Id. at 399*. The *Johnson* court reached this conclusion even though the lease called for royalties based on the "gross proceeds at the prevailing market rate for all gas sold off the premises." *Id. at 397*. The court reasoned that "gross proceeds" had reference to the value of the gas on the lease property "without deducting any of the expenses involved in developing and marketing the dry gas to this point of delivery." *Id. at 399*.

Kansas courts have also seemed to draw a distinction between sales on the lease premises and those off the premises in deciding whether marketing costs may be passed on to the royalty owner. Language in the lease specifying that royalty is to be determined "at the well" has not appeared to be a factor in the courts' decisions. *Compare Schupbach v. Continental Oil Co., 193* [**32] *Kan. 401, 394 P.2d 1 (Kan. 1964)*(lessee cannot deduct post-production compression costs where sale occurred on the lease and royalty clause was based on proceeds at the mouth of the well; court noted that compression was installed without consulting royalty owners as to size, location and number of compressors); *and Gilmore v. Superior Oil Co., 192 Kan. 388, 388 P.2d 602 (Kan. 1964)*(could not recover compression costs under lease based on "proceeds from the sale of gas at the mouth of the well"; court emphasized that compression was installed *on the lease* and recognized duty to market, distinguishing situations where market is distant from the lease) *with Matzen v. Hugoton Prod. Co., 182 Kan. 456, 321 P.2d 576, 581-82 (Kan. 1958)*(where gas gathered, processed and sold off premises, lessee may deduct these costs from gross proceeds under clause based on proceeds from the sale of gas, even though lease silent as to where market must be found); *and Moliter v. Lewis, 156 Kan. 544, 134 P.2d 404, 406 (Kan. 1943)*(implied covenant to market does not require lessee to bear cost of transporting oil by truck to a distant place even though lease provided for delivery by lessee [**33] to lessor into pipeline "free of cost"). *See also Ashland Oil & Refining Co. v. Staats, Inc., 271 F. Supp. 571, 575 (D. Kan. 1967)*(refusing to enlarge lessee's duty to market to require it to bear full cost of 153-mile pipeline system).

Arkansas seems to recognize a distinction between royalty based on "proceeds" versus "market value at the well," even if the proceeds are to be determined "at the well." *Compare Hanna Oil & Gas Co. v. Taylor, 297 Ark. 80, 759 S.W.2d 563, 564-65 (Ark. 1988)*(compression costs necessary to market gas not deductible under lease providing for royalty on proceeds received at the well), *with Clear Creek Oil & Gas Co. v. Bushmiaer, 165 Ark. 303, 264 S.W. 830, 832 (Ark. 1924)*(under lease calling for royalty based on market price at the wells, royalty was net price after deducting transportation costs).

 [*129] Kentucky and Wyoming decisions appear to permit the deduction of at least transportation charges where the sale occurs off the lease. *Reed v. Hackworth, 287 S.W.2d 912, 913-14 (Ky. Ct. App. 1956)*(where lease silent as to place of market, royalty is based on market at the well); *Kretni Dev. Co. v. Consolidated Oil Corp., 74* [**34] *F.2d 497, 500 (10th Cir. 1934)*, *cert. denied*, *295 U.S. 750, 79 L. Ed. 1694, 55 S. Ct. 829 (1935)*, (obligation to market did not extend to providing ninety-mile pipeline for distant market at sole cost of lessee).

California law appears to allow the deduction of marketing costs under a "market price at the well" clause, absent language to the contrary. *Atlantic Richfield Co. v. State, 214 Cal. App. 3d 533, 262 Cal. Rptr. 683, 688* (Cal. App. 1989, review denied)(unless there is clear language to the contrary, lessor bears proportionate share of processing and transportation costs when term "market price at the well" is used).

The North Dakota supreme court took a route similar to that of our court of appeals in *Judice*. *West v. Alpar Resources, Inc., 298 N.W.2d 484, 490-91 (N.D. 1980)*. The North Dakota court found a royalty clause ambiguous where it specified only that the royalty was "one-eighth of the proceeds from the sale of the gas," and did not specify whether proceeds were to be determined at the well or at the point of sale. The North Dakota court proceeded to construe the lease against the lessor as a matter of law, requiring the lessor to bear all costs. [**35] *Id. at 491*.

Finally, courts applying Louisiana law have uniformly held that post-production costs are deductible under a "market value at the well" clause, commencing with the Louisiana supreme court's decision in *Wall v. United Gas Pub. Serv. Co., 178 La. 908, 152 So. 561, 564 (La. 1934)*(market price means market value in the field and the lessee is not required to bear all the expense of carrying gas to a market beyond the field). Louisiana has applied a "reconstruction" approach to determine market value. Value is "reconstructed" by beginning with the gross proceeds from the sale of the gas and deducting any costs of taking the gas from the wellhead to the

market. *See Merritt v. Southwestern Elec. Power Co., 499 So. 2d 210, 213 (La. Ct. App. 1986)*(compression charges to market gas, as opposed to produce it, could be deducted). For a good discussion of the rationale underpinning Louisiana law in this area, see *Freeland v. Sun Oil Co., 277 F.2d 154 (5th Cir. 1960)*(processing costs can be deducted). *See also Sartor v. United Gas Pipe Pub. Serv. Co., 84 F.2d 436, 440* (5th Cir.), *cert. denied*, *364 U.S. 826 (1936)*(transportation charges deductible **[**36]** under "market value at the well" leases).

Having canvassed the law of other states, it can fairly be said that there is no consensus among other jurisdictions as to when post-production costs are to be shared by the royalty owner, although the majority view appears to be that royalty owners do share in costs, at least where the sale occurs off the lease.

C

In the case before us, the court of appeals concluded that "market value at the well" meant that the royalty interests were subject to costs incurred after production, including taxes, costs of treating the gas, and costs of transportation to market, unless other language in the lease modified this provision. *Heritage Resources v. Nationsbank, 895 S.W.2d 833, 836 (1995)*. This is the better-reasoned view.

While Texas recognizes that the lessee has an implied duty to market gas, *Cabot Corp. v. Brown, 754 S.W.2d 104, 106 (Tex. 1987)*, we have never determined who bears the cost of marketing gas beyond the wellhead in the absence of an express agreement. There is an express agreement in this case as to how and where royalty will be determined. The implied duty to market gas cannot override that agreement. The words "at the **[**37]** well" should be given their straightforward meaning. Market value "at the well" means the value of gas at the well, before it is transported, treated, compressed or otherwise prepared for market.

In construing language commonly used in oil and gas leases, we must keep in mind that there is a need for predictability and uniformity as to what the language used means. Parties entering into agreements expect that **[*130]** the words they have used will be given the meaning generally accorded to them. As we have seen, the decisions under Texas law are not entirely consistent, but the weight of the precedent is that post-production costs are to be shared by the royalty owner under a lease that values the gas based on "market value at the well." *See Phillips Petroleum Co. v. Bynum, 155 F.2d 196, 198 (1946)*; *Martin, 571 F. Supp. at 1411-15*; *Hagen, 683 S.W.2d at 28*; *and Le Cuno Oil Co., 306 S.W.2d at 193*. *See also Parker, 716 S.W.2d at 648*. These decisions are not binding, but are persuasive.

Having concluded that marketing costs are to be shared by the royalty interest owners under a "market value at the well" clause, absent language to the contrary, it must be **[**38]** determined whether there is language in the leases in this case that re-allocates these costs.

II

The language of the pertinent clause states:

> Lessee shall pay the Lessor . . . market value at the well for all gas . . . sold . . . off the leased premises . . . provided, however, that there shall be no deductions from the value of Lessor's royalty by reason of any required processing, cost of dehydration, compression, transportation, or other matter to market such gas.

It is clear certain "deductions" are prohibited. The question that must be answered is from *what* are deductions prohibited. The clause says "from the value of Lessor's royalty." The value of Lessor's royalty is "market value at the well" for gas sold off the leased premises.

The court of appeals correctly observed that the intent of the parties is determined from what they actually expressed in the lease as written, not what they may have intended but failed to express. *Heritage Resources v.*

*Nationsbank, 895 S.W.2d 833, 836 (1995)*. However, the court of appeals did not apply this principle. It reasoned that the parties "must have intended *something* by this language," and in order to give **[**39]** the language some meaning, the court construed the proviso to mean that royalty owners do not share in post-production costs. *Id.*

There is little doubt that at least some of the parties to these agreements subjectively intended the phrase at issue to have meaning. However, the use of the words "deductions from the value of Lessor's royalty" is circular in light of this and other courts' interpretation of "market value at the well." The concept of "deductions" of marketing costs from the value of the gas is meaningless when gas is valued at the well. Value at the well is already net of reasonable marketing costs. The value of gas "at the well" represents its value in the marketplace at any given point of sale, less the reasonable cost to get the gas to that point of sale, including compression, transportation, and processing costs. Evidence of market value is often comparable sales, as the Court indicates, or value can be proven by the so-called net-back approach, which determines the prevailing market price at a given point and backs out the necessary, reasonable costs between that point and the wellhead. But, regardless of how value is proven in a court of law, logic and economics **[**40]** tell us that there are no marketing costs to "deduct" from value at the wellhead. *See Piney Woods Country Life Sch., 726 F.2d at 231*.

Further, prohibiting deductions "from the value of Lessor's royalty" is not the equivalent of directing that value be based on anything other than "market value at the well." The Court is not presented with a clause similar to one at issue in *Judice v. Mewbourne Oil Co.*, __ S.W.2d __, __ (Tex. 1996), where a division order directed royalties to be based on "gross proceeds realized at the well." There is an inherent, irreconcilable conflict between "gross proceeds" and "at the well" in arriving at the value of the gas. That conflict renders the phrase ambiguous. The proviso in the Heritage leases does not create an ambiguity. It is simply ineffective.

As long as "market value at the well" is the benchmark for valuing the gas, a phrase prohibiting the deduction of post-production costs from that value does not change the meaning of the royalty clause. Thus, even if the Court were to hold that a lessee's duty to market gas includes the obligation to absorb all of the marketing costs, the proviso at **[*131]** issue would add nothing to the **[**41]** royalty clause. All costs would already be borne by the lessee. It could not be said under that circumstance that the clause is ambiguous. It could only be said that the proviso is surplusage.

However, the proviso prohibiting the deduction of marketing costs would not be surplusage if we interpreted "market value at the well" to obligate the lessee to pay some, but not all, marketing costs. For example, it has been argued that at least some post-production costs, such as compression, should be borne solely by the lessee as part of its duty to market the gas, but that other costs, such as processing, should be shared by the lessor. *See, e.g.*, *Garman v. Conoco, Inc., 886 P.2d at 654*. Such an interpretation of a royalty clause would mean that value is determined on a basis other than value "at the well." If "value" were not referable to "market value at the well," but encompassed other considerations, then the proviso could be construed to prohibit the deduction of any costs "required . . . to market such gas." But such an approach injects uncertainty into the meaning of "market value at the well" leases, and could lead to a fact-finding inquiry in virtually every case as **[**42]** to what was and was not a cost "required to market the gas." This weighs heavily against adopting the approach apparently taken in Colorado where the lessee has a duty to "create a marketable product," and a fact question exists as to what costs are required to make the gas marketable. *Id.* at n.3. Our Court has correctly concluded that "market value at the well" means just that, what a willing buyer would pay at the well, recognizing there would be costs to get the gas from the wellhead to a market.

There are any number of ways the parties could have provided that the lessee was to bear all costs of marketing the gas. If they had intended that the royalty owners would receive royalty based on the market value at the point of *delivery or sale*, they could have said so. If they had intended that *in addition to* the payment of market value at the well, the lessee would pay all post-production costs, they could have said so. They did not. There is no

direct statement in the leases that the royalty owners are to receive anything *in addition* to the value of their royalty, which is based on value at the well. To the contrary, the leases only prohibit any *deduction* from **[**43]** value at the well. This distinction may be a fine one, but the language used is not ambiguous and must be given its ordinary meaning.

We cannot re-write the agreement for the parties. *See*, *e.g.*, *Exxon v. Middleton, 613 S.W.2d at 245* (quoting *Texas Oil & Gas Corp. v. Vela, 429 S.W.2d 866, 871 (1968))* (explaining that if Exxon had intended its royalty obligation to be based on the prices it actually received under long term sales contracts, it could have agreed in the lease that royalty would be based on the "amount realized" from the sale, rather than "market value at the well").

* * * * *

For the foregoing reasons, I concur in the judgment of the Court.

Priscilla R. Owen

JUSTICE

OPINION DELIVERED: April 25, 1996

**Dissent by:** RAUL A. GONZALEZ

## Dissent

The contract at issue clearly denotes the parties' intent that "there shall be no deductions from the value of Lessor's royalty by reason of any . . . cost of . . . transportation." The Court's unprecedented refusal to enforce the contract as written has generated quite a controversy. Since our original opinions issued on April 25, 1996, the following educational institutions, charitable organizations, **[**44]** independent mineral and royalty owners, and oil and gas practitioners have filed amicus curiae briefs asking the Court to withdraw its prior opinion and grant NationsBank's motion for rehearing: the Texas Land Commissioner; University of Texas System; Southern Methodist University; Baptist Foundation of Texas; Boy Scouts of America; Moody Foundation; Texas Bankers Association; Independent Bankers Association of Texas; National Association of Royalty Owners; National Association of Royalty Owners -- Texas; American National Insurance Co.; River Oaks Trust Company; Texas Commerce Bank; First Victoria National Bank; Moody National Bank; Frost National Bank; Landon Alford; John R. Alford, Jr.; Dan Moody, Jr., Ben F. Vaughan, III and John B. McFarland of Graves, Dougherty, Hearon & Moody, P.C.; C.C. Small, Jr. of Small, Craig & Werkenthin; Jeffery L. Hart and John C. Cardwell of Cardwell & Hart; Cullen R. Looney; Richard Watt; Harry M. Whittington; Howard P. Newton of Wells, Pinckney & McHugh; Clayton Hoover; Randall K. Sadler; and W.F. (Bill) Countiss.

On the whole, these amici support my view that the majority and the concurrence err by discarding the meaning the parties attributed **[**45]** to the "no deductions" language at issue here.

(Gonzalez, J., joined by Abbott, J., dissenting); *see Lenape Resources Corp. v. Tennessee Gas Pipeline Co., 925 S.W.2d 565, 574 (Tex. 1996)* ("In construing a written contract, our primary concern is to ascertain the true intentions of the parties as expressed in the written instrument."); *State Farm Life Ins. Co v. Beaston, 907 S.W.2d 430, 433 (Tex. 1995)* ("When construing a contract, courts must strive to give effect to the written expression of the parties' intent. To do so, they must read all parts of a contract together." (citations omitted)); *Lyons v. Montgomery, 701 S.W.2d 641, 643 (Tex. 1985)* ("Language used by parties in a contract should be accorded its

plain, grammatical meaning unless it definitely appears that the intention of the parties would thereby be defeated."); *R&P Enters. v. LaGuarta, Gavrel & Kirk, Inc., 596 S.W.2d 517, 518-19 (Tex. 1980)* ("In the interpretation of contracts the primary concern of courts is to ascertain and to give effect to the intentions of the parties as expressed in the instrument. To achieve this object the court will examine and consider the entire instrument so that none **[**46]** of the provisions will be rendered meaningless." (citation omitted)); *Mercer v. Hardy, 444 S.W.2d 593, 595 (Tex. 1969)* ("'An interpretation will not be given to one part of a contract which will annul another part of it.'" (quoting 17A C.J.S. *Contracts* § 309)). NationsBank and the amici offer a number of constructions that would give some effect to the royalty clauses at issue. On this basis alone, we should grant the motion for rehearing, withdraw our previous opinions, and issue a new opinion affirming the judgment of the court of appeals.

Amici also cite authorities which raise doubts about the Court's conclusion that the law governing post-production costs is unsettled. In *Wintermann v. McDonald*, 129 Tex. 275, 102 S.W.2d 167 (Tex. 1937), we stated that "the term 'free royalty' . . . must mean that the interest reserved to the State in the minerals produced on school land . . . *must not bear any part of the expense of the production, sale, or delivery thereof.*" *Wintermann, 102 S.W.2d at 173* (emphasis added); *see also Pan Am. Petroleum Corp. v. Southland Royalty Co., 396 S.W.2d 519, 525* (Tex. Civ. App. -- El Paso 1965, writ dism'd) (recognizing "well-adjudicated **[**47]** and accepted legal principle that royalty interests are not chargeable with the expenses of production, preparation, marketing, etc."); *Miller v. Speed, 248 S.W.2d 250, 256* (Tex. Civ. App. -- Eastland 1952, no writ) (stating that "the interest reserved is clearly royalty, hence, free of cost of producing, saving and preparing for market"). The legislation we construed in *Wintermann* contained no definition of the term "free royalty" and did not expressly prohibit deductions for the expenses of production, sale, or delivery. These cases establish that a royalty interest does not bear such expenses, contrary to the result the Court reached.

Finally, numerous amici argue that, if the Court overrules the motion for rehearing, we should apply the new rule of law set out in this case only prospectively. Amici claim that the royalty clauses at issue are similar to most publicly available printed forms used in Texas for the last several decades. "No deductions" clauses like the one used in this case are common to the industry and are understood to allocate some or all post-production costs to the lessee. By altering this industry understanding, the Court's decision will disrupt longstanding **[**48]** contractual and economic relationships, cause uncertainty, and create unnecessary litigation over contracts containing similar language. Thus, at a minimum, the Court should limit this decision to prospective application.

JUSTICE CORNYN and JUSTICE SPECTOR have joined JUSTICE ABBOTT and me in voting to grant NationsBank's motion for rehearing. CHIEF JUSTICE PHILLIPS has also switched his position and now agrees with JUSTICE OWEN'S concurrence, in which JUSTICE HECHT joined. JUSTICE ENOCH has recused himself on rehearing, leaving JUSTICE BAKER as the lone remaining supporter of his original majority opinion. Thus, the Court is now deadlocked four-to-four on the proper disposition of this case. We cannot call upon the Governor to specially appoint a replacement Justice to break the tie under these circumstances, and NationsBank's motion for rehearing is therefore overruled by operation of law. *See Saenz v. Fidelity & Guaranty Ins. Underwriters, 925 S.W.2d 607, 612 (Tex. 1996)* (holding that motion for rehearing is not "a case" or "a decision" requiring majority vote to overrule); *see also* TEX. CONST. art. V, § 2 (mandating concurrence of five Justices to render "a decision **[**49]** of a case"); *id*. § 11 (allowing Governor to appoint substitute when a member of this Court is "disqualified to hear and determine any case"). Because we are without majority agreement on the reasons supporting the judgment, however, the judgment itself has very limited precedential value and controls only this case. *See University of Tex. Medical Branch v. York, 871 S.W.2d 175, 176-77 (Tex. 1994)*. Cases relying on the new rule of law pronounced in the Court's April 25, 1996 opinion are similarly restricted. *See*, *e.g.*, *Judice v. Mewbourne Oil Co., 939 S.W.2d 133 (Tex. 1996)* (citing *Heritage Resources* for proposition that lessee must share in post-production costs because "the royalty is to be determined based on 'market value at the well'").

Lessors should not lose the benefit of their bargain because the Court now reads language clearly prohibiting deductions from royalty as "surplusage." The Court's error in this case will have far-reaching effects on the oil and gas industry in Texas, as millions of dollars will now be placed in dispute. This decision unnecessarily increases the transaction costs of all parties with similar lease provisions. For these **[**50]** reasons, and for the reasons stated in my dissenting opinion of April 25, 1996, we would grant NationsBank's motion for rehearing.

Raul A. Gonzalez

Justice RAUL A. GONZALEZ

The simple question presented in this case is whether Heritage can deduct transportation costs from the value of NationsBank's royalties under these leases. The language at issue, which is common to each contract, reads as follows:

> There shall be no deductions from the value of Lessor's royalty by reason of any required processing, cost of dehydration, compression, transportation, or other matter to market such gas. [1]

What could be more clear? This provision expresses the parties' intent in plain English, and I am puzzled by the Court's decision to ignore the unequivocal intent of sophisticated parties who negotiated contractual terms at arm's length. *See M/S Bremen v. Zapata* **[**51]** *Off-Shore Co., 407 U.S. 1, 12, 32 L. Ed. 2d 513, 92 S. Ct. 1907 (1972)* (noting that, absent compelling reason, contracts "made in an arm's-length negotiation by experienced **[*132]** and sophisticated businessmen . . . should be honored by the parties and enforced by the courts"); *accord Prudential Ins. Co. v. Jefferson Assoc., 896 S.W.2d 156, 161 (Tex. 1995)*. In my opinion, both the trial court and the court of appeals correctly held that this language clearly forbids Heritage from deducting transportation costs to arrive at the market value of the gas on which the royalty payment is based.

Fundamental principles of Texas law hold that competent parties enjoy the utmost freedom of contract and that courts will enforce a contract freely and voluntarily made for a lawful purpose. *Crutchfield v. Associates Inv. Co.*, 376 S.W.2d 957, 959 (Tex. Civ. App.--Dallas 1964, writ ref'd). Under basic rules of contract interpretation, this Court must give effect to the written expression of the parties' intent. *See Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 133 (Tex. 1994). To do so involves reading all parts of the contract together, giving effect to each individual **[**52]** part. *Id*. In this case, however, the Court unnecessarily looks to the trade meaning of the words used to conclude that the post-production clause is surplusage as a matter of law. *939 S.W.2d 118*. Similarly, the concurrence needlessly considers other judicial constructions of "market value at the well," including several non-Texas cases, without analyzing whether those contracts bear any similarity to the ones at issue here. *Id. at 124* (Owen, J., concurring). Neither the majority nor the concurrence give proper legal effect to specific language in these contracts which clearly denotes the parties' intent that "there shall be no deductions from the value of Lessor's royalty by reason of any . . . cost of . . . transportation." *See Forbau*, 876 S.W.2d at 133-34.

Heritage was free to bargain over whether NationsBank would have the right to participate in post-production business activities and receive royalties derived from those activities. The lease provision incorporates all four of the distinct business activities into which most gas production operations can be divided: production, gathering, marketing, and processing. It clearly excludes deductions for "any required **[**53]** processing, cost of dehydration, compression, transportation, or other matter to market such gas." The drafters of this clause could have allowed for deductions of the cost of any of the distinct business activities that occur after the production of gas, but chose not to include language to that effect. The language in the lease provision is clear,

---

[1]   The royalty clause in one lease differs slightly from the others. However, any differences are immaterial to resolving the issue presented.

and in the absence of fraud or misrepresentation, a party is charged with knowing the legal effect of a contract voluntarily made. *Barfield v. Howard M. Smith Co., 426 S.W.2d 834, 838 (Tex. 1968)*. Because the provision at issue is unambiguous, the Court errs by ignoring the clear intent of the parties.

The majority and the concurrence both state that they agree with the trial court and the court of appeals that the leases in question are unambiguous. *Heritage Resources v. Nationsbank, 939 S.W.2d 118, 124 (1996)* (Owen, J., concurring). I find their agreement odd and amusing given that, interpreting the same contracts, both opinions reach a completely opposite result than the lower courts. By definition, if a contract is reasonably susceptible to more than one meaning, it is ambiguous. *Coker v. Coker, 650 S.W.2d 391, 393 (Tex.* **[\*\*54]** *1983)*; *Skelly Oil Co. v. Archer*, 163 Tex. 336, 356 S.W.2d 774, 778 (Tex. 1962). By supplying a meaning not found in the leases for "market value at the well," both the majority and the concurrence create an ambiguity where none exists.

When a contract contains an ambiguity, we consider the words used in the instrument, in light of the surrounding circumstances, and apply the appropriate rules of construction to settle their meaning. *Harris v. Rowe, 593 S.W.2d 303, 306 (Tex. 1980)*. Assuming for the sake of argument that these contracts are ambiguous, we must apply two of the most basic rules governing interpretation of oil and gas leases: (1) contracts are to be construed against the scrivener; and (2) leases are to be construed against the lessee. The "construe against the scrivener" canon flows from basic contract law. *See* Kramer, *The Sisyphean Task of Interpreting Mineral Deeds and Leases: An Encyclopedia of Canons of Construction*, 24 TEX. TECH L. REV. 1, 103 (1993). This canon allocates the burden of uncertainty caused by the use of inappropriate or vague language in a written instrument. To the extent the court can identify the party who either drafted the instrument **[\*\*55]** **[\*133]** or provided the form used, the canon requires that the uncertainty be resolved against that party. The "construe against the lessee" canon functions similarly. When an oil and gas lease is subject to two or more equally reasonable constructions, "the one more favorable to the lessor will be allowed to prevail." *Zeppa v. Houston Oil Co., 113 S.W.2d 612, 615* (Tex. Civ. App.--Texarkana 1938, writ ref'd); *see also Stanolind Oil & Gas Co. v. Newman Bros. Drilling Co., 157 Tex. 489, 305 S.W.2d 169, 176 (Tex. 1957)*. In the present case, Heritage indisputably wrote the lease contracts and occupied the position of lessee. Thus, even if the provision is ambiguous, application of the basic rules of interpreting oil and gas leases would result in a construction against Heritage and in favor of NationsBank.

I have one final concern about today's decision. By attributing an unequivocal, precise meaning to "market value at the well" in oil and gas leases, the Court announces a new rule that should be applied only prospectively. *See generally Carrollton-Farmers Branch Indep. Sch. Dist. v. Edgewood Indep. Sch. Dist., 826 S.W.2d 489, 515-521 (Tex. 1992)* (discussing factors **[\*\*56]** for deciding between retroactive and prospective operation). We have limited the effect of our decisions in this manner when considerations of fairness and policy preclude full retroactivity. *See*, *e.g.*, *Moser v. United States Steel Corp., 676 S.W.2d 99, 103 (Tex. 1984)* (limiting new rule concerning phrase "other minerals" in deeds to prospective application). This result is appropriate in the present case because, before now, the meaning of "market value at the well" was subject to specific negotiation by the parties. Indeed, as the concurring opinion notes, this Court has never decided previously whether "'market value at the well' includes or excludes post-production costs," *Heritage Resources v. Nationsbank, 939 S.W.2d 118, 127 (1996)* (Owen, J., concurring), and lower courts have not reached agreement on the issue. *See Heritage, 939 S.W.2d at 126*. *Compare Texas Oil & Gas Corp. v. Hagen, 683 S.W.2d 24, 28* (Tex. App.--Texarkana 1984) (concluding that "market value at the well" includes deduction for "the reasonable cost of transporting the gas to the market"), *writ dism'd as moot*, *760 S.W.2d 960 (Tex. 1988) with Heritage Resources, Inc. v. NationsBank* **[\*\*57]** , *895 S.W.2d 833, 836-37* (Tex. App.--El Paso 1995) (determining that market-value royalty clause did not allow deduction for transportation costs), *rev'd*, 895 S.W.2d 833 (Tex. 1996). Today, the Court decides that question, but substitutes its own interpretation of the phrase for the meaning the parties intended. The Court blindsides NationsBank and other lessors by mandating that this decision apply retroactively.

This decision wrongfully denies parties such as NationsBank the right to collect royalty payments for which they clearly bargained. For the foregoing reasons, I dissent.

Raul A. Gonzalez

Justice

Opinion delivered: April 25, 1996



⚠ Caution

As of: September 1, 2015 5:39 PM EDT

## *Holmes, Woods & Diggs v. Gentry*

Court of Appeals of Texas, Fifth District, Dallas

July 21, 2009, Opinion Filed

No. 05-08-00723-CV

**Reporter**

333 S.W.3d 650; 2009 Tex. App. LEXIS 5573

HOLMES, WOODS & DIGGS, Appellant v. LAURIE GENTRY, Appellee

**Subsequent History:** Released for Publication August 21, 2009.

**Prior History:** [**1] On Appeal from the County Court at Law No. 2, Dallas County, Texas. Trial Court Cause No. CC 06-00807-B.

## Core Terms

arbitration, parties, trial court, discovery, right to arbitration, bill of review, mediation, waived, fee agreement, invoked, default judgment, trial court's order, counterclaim, depositions

## Case Summary

### Procedural Posture

In an interlocutory appeal, appellant law firm sought review of an order from the County Court at Law No. 2, Dallas County, Texas, which denied its motion to enforce an arbitration clause with regard to an underlying action involving appellee client.

### Overview

The firm argued that the trial court erred because the firm did not waive its right to arbitration. On appeal, the court found that the existence of a valid arbitration agreement and that the claims asserted by both parties fell within the scope of the agreement was undisputed. Further, viewing the totality of the circumstances, the court concluded that the firm's actions evidenced the firm's intent to relinquish its right to arbitrate and that such actions were inconsistent with its subsequent claim of that right. The record showed that the client incurred a specified sum in attorney's fees over a two year period during which she attempted to have a default judgment set aside and filed a counterclaim against the firm. The stated purpose of the arbitration clause in the fee agreement was to resolve disputes in a cost-effective and expeditious manner. The record also showed that the firm attempted to manipulate the process to its advantage and that was precisely the kind of inherent unfairness that constituted prejudice under the Texas General Arbitration Act, Tex. Civ. Prac. & Rem. Code Ann. M§ 171.001-.098 (2005) and the Federal Arbitration Act, *9 U.S.C.S. §§ 1-16*.

### Outcome

The court affirmed the trial court's order.

## LexisNexis® Headnotes

Civil Procedure > ... > Arbitration > Federal Arbitration Act > General Overview

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > Waiver

Civil Procedure > Appeals > Standards of Review > De Novo Review

***HN1*** The standard for determining waiver of the right to arbitration, however, is the same under both the Texas General Arbitration Act (TAA), Tex. Civ. Prac. & Rem. Code Ann. M§ 171.001-.098 (2005) and the Federal Arbitration Act (FAA), *9 U.S.C.S. §§ 1-16*. Under both the FAA and the TAA, whether a party has waived his right to arbitrate is a question of law that an appellate court reviews de novo.

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > Arbitrability

***HN2*** A party seeking to compel arbitration has the initial burden to establish an agreement to arbitrate and that the claims are within the scope of the agreement. *Tex. Civ. Prac. & Rem. Code Ann. § 171.021* (2005). If these showings are made, the burden shifts to the party opposing arbitration to present a valid defense to the agreement.

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > Waiver

***HN3*** Waiver is a valid defense to arbitration. Because public policy favors arbitration, there is a strong presumption against finding that a party has waived his right to arbitration, and the burden to prove waiver is a heavy one. Any doubts regarding waiver are resolved in favor of arbitration. Whether waiver occurs depends on the facts and circumstances of each case.

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > Waiver

***HN4*** The test for determining waiver is two-pronged: (1) did the party seeking arbitration substantially invoke the judicial process, and (2) did the opposing party prove that it suffered prejudice as a result. The judicial process is substantially invoked when the party seeking arbitration has taken specific and deliberate actions, after the filing of the suit, that are inconsistent with the right to arbitrate or has actively tried, but failed to achieve a satisfactory result through litigation before turning to arbitration. Factors considered in determining whether a movant has substantially invoked the judicial process include how much discovery has been conducted and who initiated it, whether the discovery related to the merits rather than arbitrability or standing, how much of the discovery would be useful in arbitration, and whether the movant sought judgment on the merits. Whether the movant is a plaintiff or defendant is also relevant to the consideration, but does not alone justify a finding of waiver or change the totality of the circumstances test.

Civil Procedure > Pleading & Practice > General Overview

Civil Procedure > Discovery & Disclosure > General Overview

***HN5*** The amount of litigation conduct deemed substantial depends on the context: three or four depositions may be all the discovery needed in one case, but merely preliminary in another.

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview

***HN6*** Prejudice refers to the inherent unfairness in terms of delay, expense or damage to a party's legal position when the party's opponent forces it to litigate an issue and later seeks to arbitrate that same issue. A party should

not be allowed purposefully and unjustifiably to manipulate the exercise of its arbitral rights simply to gain an unfair tactical advantage over the opposing party.

**Counsel:** For APPELLANT: Angel Berbarie, Holmes, Diggs, Eames & Puhl, Dallas, TX.

For APPELLEE: James E. Polk, Dallas, TX.

**Judges:** Before Morris, Richter, and Lang-Miers. Opinion By Justice Richter.

**Opinion by:** MARTIN RICHTER

## Opinion

**[*652]** Opinion By Justice Richter

This is an interlocutory appeal from a trial court's order denying a motion to enforce an arbitration clause. In a single issue, appellant Holmes, Woods & Diggs (the ″Firm″) contends the trial court erred because the Firm did not waive its right to arbitration. We conclude the Firm's arguments are without merit and affirm the trial court's order.

### BACKGROUND

In December 2003, Laurie Gentry retained the Firm to represent her in a family law matter. Gentry and the Firm executed a fee agreement in connection with the representation. The fee agreement contains an arbitration clause which provides:

> [To] formulate a quick and inexpensive resolution of any . . . disputes, you and we agree that any disputes arising out of our representation, whether contractual or tortious in nature, will be resolved exclusively by submission to binding arbitration pursuant to the rules of the American Arbitration Association.

According to the agreement, arbitration is to occur in Dallas, Texas ″in accordance **[**2]** **[*653]** with the laws of the State of Texas.″ The agreement further provides that a mediation ″shall be conducted prior to arbitration upon the request of any party.″ The agreement specified that arbitration would apply to:

> [A]ny controversy, claim or dispute in the course and scope of the lawyer-client relationship or arising out of or relating to [the fee agreement] or the breach, termination, enforcement, interpretation or validity thereof, including the scope or applicability of [the] agreement to arbitrate.

A dispute concerning fees arose between the parties and Gentry did not pay the Firm's bill. On March 14, 2005, the Firm filed suit against Gentry claiming it was entitled to recover $ 8, 347.48 plus interest and reasonable attorney's fees. The suit was not served on Gentry until August 2005. After being served with the lawsuit, Gentry attempted to file an answer as a pro se litigant through an on-line service. Two days later, Gentry contacted the Firm to request mediation or arbitration in accordance with the fee agreement by sending an e-mail to Robert Holmes, the general partner with whom she had contact and who executed the agreement on behalf of the Firm. Holmes agreed to mediation **[**3]** or arbitration. Gentry's answer to the lawsuit was never filed, but she believed Holmes was arranging dates for mediation or arbitration.

On September 21, 2005, the Firm filed a motion for default judgment that was granted by the court the same day. The Firm then attempted to execute on its judgment.

Gentry retained an attorney to prevent the Firm from executing a post-judgment attachment and sale of her condominium and second home. To prevent execution of the judgment, Gentry was required to deposit $ 12,000 in her attorney's trust account while the parties negotiated a settlement.

Settlement negotiations failed. Consequently, Gentry filed a bill of review on January 25, 2006. Both parties conducted discovery on the issues to be tried in the bill of review. The discovery included depositions and the exchange of interrogatories and requests for production.

On June 26, 2006, the Firm filed a motion for summary judgment and argued the default judgment should be enforced and the bill of review denied. Gentry filed a response to the motion. The trial court initially granted the motion, but after Gentry filed a motion for rehearing, signed an order setting aside the initial summary judgment **[**4]** order.

The trial court ordered the parties to mediation, but the dispute was not resolved. The bill of review was tried on September 5, 2007. On September 11, 2007, the trial court granted the bill of review and set aside the default judgment. As a result, the Firm's original suit was set on the court's trial docket.

On December 13, 2007, Gentry filed an answer and counterclaim and asserted claims against the Firm for fraudulent inducement, negligence, and breach of contract in connection with the fee agreement. The answer also contained affirmative defenses to the Firm's claim that it was entitled to recover fees from Gentry. The Firm answered the counterclaim. On December 31, 2007, the Firm filed a motion to enforce the arbitration clause in the fee agreement. Gentry responded and asserted the Firm had waived its right to arbitrate. After both parties briefed the issue, on May 9, 2008, the trial court denied the motion. This appeal followed.

## DISCUSSION

In a single issue, the Firm asserts the trial court erred because it did not waive **[*654]** its right to arbitrate. The Firm seeks reversal of the trial court's order, or alternatively, mandamus relief.

Neither the trial court nor the parties indicate **[**5]** whether this action is governed by the Texas General Arbitration Act ("TAA"), *TEX. CIV. PRAC. & REM. CODE ANN. § 171.001-.098* (Vernon 2005), the Federal Arbitration Act ("FAA"), *9 U.S.C. §§ 1-16 (2006)*, or both, and the agreement fails to specify which law applies. **HN1** The standard for determining waiver of the right to arbitration, however, is the same under both the TAA and the FAA. *See Sedillo v. Campbell, 5 S.W.3d 824, 826 (Tex. App.-Houston [14th Dist.] 1999, no pet.)* (combined appeal and orig. proceeding). Under both the FAA and the TAA, whether a party has waived his right to arbitrate is a question of law that we review de novo. *In re Oakwood Mobile Homes, 987 S.W.2d 571, 574 (Tex. 1999)* (per curiam) (FAA); *In re Bruce Terminix Co., 988 S.W.2d 702, 704 (Tex. 1998)* (per curiam) (FAA); *In re Trammell, 246 S.W.3d 815, 820 (Tex. App.- Dallas 2008, no pet.)* (under the TAA, appellate court reviews questions of law de novo).

**HN2** A party seeking to compel arbitration has the initial burden to establish an agreement to arbitrate and that the claims are within the scope of the agreement. *In re D. Wilson Const. Co., 196 S.W.3d 774, 781 (Tex. 2006)* (orig. proceeding); *In re Igloo Prods. Corp., 238 S.W.3d 574, 577 (Tex. App.-Houston [14th Dist.] 2007)* **[**6]** (orig. proceeding); *see also TEX. CIV. PRAC. & REM. CODE ANN. § 171.021* (Vernon 2005). If these showings are made, the burden shifts to the party opposing arbitration to present a valid defense to the agreement. *Igloo Prods. Co., 238 S.W.3d at 577*.

**HN3** Waiver is a valid defense to arbitration. *See, e.g., In re Oakwood Mobile Homes, 987 S.W.2d at 573*. Because public policy favors arbitration, there is a strong presumption against finding that a party has waived his right to arbitration, and the burden to prove waiver is a heavy one. *EZ Pawn Corp. v. Mancias, 934 S.W.2d*

*87, 89 (Tex. 1996)*. Any doubts regarding waiver are resolved in favor of arbitration. *In re Bruce Terminix, 988 S.W.2d at 705*. Whether waiver occurs depends on the facts and circumstances of each case. *Perry Homes v. Cull, 258 S.W.3d 580, 591 (Tex. 2008)*, cert. denied, 129 S. Ct. 952, 173 L. Ed. 2d 116 (2009).

*HN4* The test for determining waiver is two-pronged: (1) did the party seeking arbitration substantially invoke the judicial process, and (2) did the opposing party prove that it suffered prejudice as a result. *Perry Homes, 258 S.W.3d at 589-90*; *In re Bank One N.A., 216 S.W.3d 825, 827 (Tex. 2007)*. The judicial process is substantially invoked **[**7]** when the party seeking arbitration has taken specific and deliberate actions, after the filing of the suit, that are inconsistent with the right to arbitrate or has actively tried, but failed to achieve a satisfactory result through litigation before turning to arbitration. *In re Vesta Ins. Group, Inc., 192 S.W.3d 759, 763 (Tex. 2006)* (orig. proceeding). Factors considered in determining whether a movant has substantially invoked the judicial process include how much discovery has been conducted and who initiated it, whether the discovery related to the merits rather than arbitrability or standing, how much of the discovery would be useful in arbitration, and whether the movant sought judgment on the merits. *Perry Homes, 258 S.W.3d at 591-592*. Whether the movant is a plaintiff or defendant is also relevant to the consideration, but does not alone justify a finding of waiver or change the "totality of the circumstances test." *Perry Homes, 258 S.W.3d at 592*.

Here, the existence of a valid arbitration agreement and that the claims asserted **[*655]** by both parties fall within the scope of the agreement is undisputed. Therefore, we begin our inquiry by examining whether the Firm substantially invoked **[**8]** the litigation process.

The Firm contends it did not substantially invoke the litigation process because there has been no litigation in the case in chief, and virtually all activity in the trial court pertained to the default judgment and Gentry's efforts to have it set aside. We are not persuaded by this argument.

We note at the outset that the parties and the record are not clear as to whether the Firm agreed to "arbitration or mediation" or simply to arbitration. The Firm admits that it agreed to "arbitration or mediation" and never specifically denied Gentry's assertion that it had agreed to arbitration. Because the parties' agreement specifies that a party may request mediation as a precursor to arbitration, and because the record is clear that Gentry believed the parties were proceeding in accordance with the agreement, we view the distinction as immaterial for purposes of our analysis and consider the parties' agreement an agreement to proceed with arbitration.

The Firm not only initiated the litigation, but initially agreed to arbitration. Despite its agreement, the Firm then elected to aggressively pursue litigation. After two years of activity in the trial court, the original **[**9]** case was reinstated on the trial court's docket. Although the discovery may not have involved the merits per se, it did not involve arbitrability or standing. The record does not reflect how much of the discovery might prove useful in the underlying suit. But the discovery, like all of the other activity in the trial court, would never have occurred if the Firm had honored its original agreement to arbitrate. The trial court's order states that the court took judicial notice of the contents of its file in this cause and in the earlier proceeding and the record reflects that the Firm actively attempted to achieve a satisfactory result through litigation before turning to arbitration. The Firm obtained a default judgment, pursued execution of the judgment, and actively opposed the bill of review through summary judgment and then at trial. It was only after the bill of review was denied and Gentry asserted affirmative claims against the Firm that the Firm turned to arbitration. Viewing the totality of the circumstances, we conclude the Firm's actions evidence the Firm's intent to relinquish its right to arbitrate and that these actions are inconsistent with its subsequent claim of that **[**10]** right.

The affidavit of James Polk ("Polk Affidavit"), counsel for Gentry, is also part of the record. The affidavit states that the parties took mutual depositions and the Firm served two sets of interrogatories and one request for production of documents on Gentry. Excerpts from these depositions are also included in the record. Although

the volume of discovery is pertinent to our analysis, the Texas Supreme Court has held that *HN5* the amount of litigation conduct deemed "substantial" depends on the context: three or four depositions may be all the discovery needed in one case, but merely preliminary in another. *Perry Homes, 258 S.W.3d at 593*. Because this case involves a relatively simple fee dispute, we view that the discovery that was conducted, coupled with the extensive briefing and aggressive defense of the default judgment and opposition to the bill of review as substantial. Therefore, we conclude that the Firm substantially invoked the litigation process.

We must next determine whether Gentry suffered prejudice. *HN6* Prejudice refers to the inherent unfairness in terms of delay, expense or damage to a party's legal position when the party's opponent forces [*656] it to litigate an issue and [**11] later seeks to arbitrate that same issue. *Perry Homes, 258 S.W.3d at 597*. "A party should not be allowed purposefully and unjustifiably to manipulate the exercise of its arbitral rights simply to gain an unfair tactical advantage over the opposing party." *Id. citing, In re Tyco Int'l Ltd. Sec. Litig., 422 F.3d 41, 46 n.5 (1st Cir. 2005)*.

Here, the record reflects that Gentry incurred $ 22,612.75 in attorney's fees over the two years she spent attempting to have the default judgment set aside and for filing a counterclaim against the Firm. The stated purpose of the arbitration clause in the fee agreement, however, was to resolve disputes in a cost-effective and expeditious manner. The record also reflects that the Firm attempted to manipulate the process to its advantage, and this is precisely the kind of inherent unfairness that constitutes prejudice under federal and state law. *See Perry Homes, 258 S.W.3d at 597*.

The Firm also argues that even if it waived the right to arbitrate its claim against Gentry, it did not waive the right to arbitrate her counterclaim. The counterclaim, however, arises in the same lawsuit and falls within the scope of the arbitration clause. We are aware of [**12] no reason, nor does the Firm provide one, why the Firm's waiver of the right to arbitrate would not encompass all claims within the scope of the agreement.

Because the Firm substantially invoked the litigation process and Gentry suffered prejudice, we conclude the trial court did not err in its determination that the Firm waived the right to arbitration. We resolve the Firm's issue against it, and affirm the trial court's order. The request for mandamus relief is also denied.

MARTIN RICHTER

JUSTICE



⚠ Caution

As of: September 1, 2015 5:18 PM EDT

## Howsam v. Dean Witter Reynolds

Supreme Court of the United States

October 9, 2002, Argued ; December 10, 2002, Decided

No. 01-800

**Reporter**

537 U.S. 79; 123 S. Ct. 588; 154 L. Ed. 2d 491; 2002 U.S. LEXIS 9235; 71 U.S.L.W. 4019; 2002 Cal. Daily Op. Service 11847; 2002 Daily Journal DAR 13897; 16 Fla. L. Weekly Fed. S 20

KAREN HOWSAM, ETC., PETITIONER v. DEAN WITTER REYNOLDS, INC.

**Prior History:** ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE TENTH CIRCUIT.

*Dean Witter Reynolds, Inc. v. Howsam, 261 F.3d 956, 2001 U.S. App. LEXIS 17971 (10th Cir. Colo. 2001)*

**Disposition:** Reversed.

## Core Terms

arbitration, parties, time limit, gateway

## Case Summary

### Procedural Posture

Respondent securities dealer sued petitioner investor, seeking a declaration that arbitration of the parties' dispute was barred by a time limit imposed by Nat'l Ass'n Sec. Dealers Manual, Code Arb. P.R. 10304. Upon grant of a writ of certiorari, the investor appealed the United States Court of Appeals for the Tenth Circuit's judgment, which held that the timeliness of the arbitration was subject to judicial rather than arbitral resolution.

### Overview

The investor contended that the dealer misrepresented the virtues of an investment, and that the question of whether arbitration of the dispute was time barred under Nat'l Ass'n Sec. Dealers Manual, Code Arb. P.R. 10304, required resolution by the arbitrator. The dealer argued that the timeliness of the arbitration raised a question of arbitrability which could only be determined by a court. The United States Supreme Court held that the applicability of the time limit rule was a matter presumptively for the arbitrator, and did not raise a question of substantive arbitrability requiring judicial intervention. The timeliness of the arbitration was a procedural condition precedent to arbitration but did not involve a question of whether the parties were bound by the arbitration clause of their agreement. Further, it was reasonable to infer that the parties intended that the arbitrator, who was comparatively more expert about the meaning of the time limit rule, was also better able to interpret and apply the rule.

### Outcome

The judgment requiring judicial determination of the timeliness of arbitration under the securities dealers rule was reversed.

## LexisNexis® Headnotes

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Validity of ADR Methods

Securities Law > Regulators > Self-Regulating Entities > National Association of Securities Dealers

*HN1* Nat'l Ass'n Sec. Dealers Manual, Code Arb. P.R. 10304, states that no dispute shall be eligible for submission where six years have elapsed from the occurrence or event giving rise to the dispute.

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Validity of ADR Methods

*HN2* Arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > Arbitrability

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Judicial Review

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Validity of ADR Methods

Contracts Law > Contract Conditions & Provisions > Arbitration Clauses

Labor & Employment Law > Collective Bargaining & Labor Relations > Labor Arbitration > Enforcement

*HN3* Although the United States Supreme Court recognizes and enforces a liberal federal policy favoring arbitration agreements, there is an exception to this policy. The question whether the parties have submitted a particular dispute to arbitration, i.e., the "question of arbitrability," is an issue for judicial determination unless the parties clearly and unmistakably provide otherwise.

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > Arbitrability

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Validity of ADR Methods

*HN4* The United States Supreme Court finds the phrase "question of arbitrability" applicable in the kind of narrow circumstance where contracting parties would likely have expected a court to have decided the gateway matter, where they are not likely to have thought that they had agreed that an arbitrator would do so, and, consequently, where reference of the gateway dispute to the court avoids the risk of forcing parties to arbitrate a matter that they may well not have agreed to arbitrate.

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > Arbitrability

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Validity of ADR Methods

Contracts Law > Contract Conditions & Provisions > Arbitration Clauses

Contracts Law > Formation of Contracts > Execution

*HN5* A gateway dispute about whether the parties are bound by a given arbitration clause raises a ″question of arbitrability″ for a court to decide. Similarly, a disagreement about whether an arbitration clause in a concededly binding contract applies to a particular type of controversy is for the court.

> Civil Procedure > ... > Responses > Defenses, Demurrers & Objections > Waiver & Preservation of Defenses

> Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > Arbitrability

> Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Mandatory ADR

*HN6* The United States Supreme Court finds the phrase ″question of arbitrability″ not applicable in general circumstance where parties would likely expect that an arbitrator would decide the gateway matter. Thus ″procedural″ questions which grow out of the dispute and bear on its final disposition are presumptively not for the judge, but for an arbitrator, to decide. So, too, the presumption is that the arbitrator should decide allegations of waiver, delay, or a like defense to arbitrability.

> Civil Procedure > ... > Defenses, Demurrers & Objections > Affirmative Defenses > Laches

> Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview

> Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > Arbitrability

> Civil Procedure > ... > Arbitration > Federal Arbitration Act > General Overview

> Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Mandatory ADR

> Contracts Law > Contract Conditions & Provisions > Conditions Precedent

> International Trade Law > Dispute Resolution > International Commercial Arbitration > Arbitration

*HN7* Rev. Unif. Arbitration Act of 2000 § 6, 7 U.L.A. 12 (Supp. 2002), states that an arbitrator shall decide whether a condition precedent to arbitrability has been fulfilled. In the absence of an agreement to the contrary, issues of substantive arbitrability are for a court to decide and issues of procedural arbitrability, i.e., whether prerequisites such as time limits, notice, laches, estoppel, and other conditions precedent to an obligation to arbitrate have been met, are for the arbitrators to decide.

> Civil Procedure > ... > Responses > Defenses, Demurrers & Objections > Waiver & Preservation of Defenses

> Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > Arbitrability

> Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Mandatory ADR

> Securities Law > Regulators > Self-Regulating Entities > National Association of Securities Dealers

*HN8* The applicability of the time limit rule of Nat'l Ass'n Sec. Dealers Manual, Code Arb. P.R. 10304, is a matter presumptively for the arbitrator, not for the judge.

> Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview

> Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Validity of ADR Methods

> Contracts Law > Contract Conditions & Provisions > Arbitration Clauses

> Securities Law > Regulators > Self-Regulating Entities > National Association of Securities Dealers

> Securities Law > ... > Self-Regulating Entities > National Securities Exchanges > General Overview

*HN9* National Association of Securities Dealers arbitrators, comparatively more expert about the meaning of their own rules, are comparatively better able to interpret and to apply them. In the absence of any statement

to the contrary in an arbitration agreement, it is reasonable to infer that the parties intended the agreement to reflect that understanding. And for the law to assume an expectation that aligns (1) decisionmaker with (2) comparative expertise will help better to secure a fair and expeditious resolution of the underlying controversy, a goal of arbitration systems and judicial systems alike.

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > Arbitrability

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Mandatory ADR

Securities Law > Regulators > Self-Regulating Entities > National Association of Securities Dealers

*HN10* The time limit rule of Nat'l Ass'n Sec. Dealers Manual, Code Arb. P.R. 10304, falls within the class of gateway procedural disputes that do not present what United States Supreme Court cases call "questions of arbitrability."

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Mandatory ADR

Securities Law > Regulators > Self-Regulating Entities > National Association of Securities Dealers

*HN11* See Nat'l Ass'n Sec. Dealers Manual, Code Arb. P.R. 10324.

# Lawyers' Edition Display

## Decision

National Association of Securities Dealers (NASD) arbitrator, rather than court, held to be decisionmaker that ought to apply, to particular investment-related controversy, NASD's time-limit rule for submitting controversies to arbitration.

## Summary

A controversy arose out of some investment advice which a company had provided a client at some time between 1986 and 1994. This controversy fell within a standard arbitration clause in the parties' client service agreement. The clause provided that any such controversy would be determined by arbitration before any self-regulatory organization or exchange of which the company was a member. Moreover, the agreement provided that the client could select the arbitration forum. In this instance, the client (1) chose arbitration before the National Association of Securities Dealers (NASD), and (2) in 1997, signed NASD's uniform submission agreement, which provided that the controversy was submitted in accordance with the NASD code of arbitration procedure.

One rule of this NASD code set forth a 6-year limit for submitting controversies to arbitration. The company (1) filed suit in the United States District Court for the District of Colorado; (2) asked the court to declare that the parties' controversy was ineligible for arbitration, on the theory that the controversy was allegedly more than 6 years old; and (3) sought an injunction that would have prohibited the client from proceeding in arbitration. However, the District Court dismissed the suit, on the asserted ground that a NASD arbitrator, not the court, ought to interpret and apply the NASD time-limit rule.

On appeal, the United States Court of Appeals for the Tenth Circuit, in reversing and in ordering a remand, expressed the view that (1) application of the NASD time-limit rule presented a question of the underlying controversy's arbitrability that was presumptively for a court, not an arbitrator, to decide; (2) the client service agreement, as supplemented by the submission agreement, did not "clearly and unmistakably" demonstrate the

parties' intent to have the time-limit dispute decided by an arbitrator; and (3) even though the client service agreement included a general provision that the agreement would be governed by New York state law--under which law such time-limit disputes allegedly ought to be decided by an arbitrator--"the federal law of arbitrability," rather New York law, governed the question whether an arbitrator or a court ought to apply the time-limit rule in the case at hand (*261 F3d 956*).

On certiorari, the United States Supreme Court reversed. In an opinion by Breyer, J., joined by Rehnquist, Ch. J., and Stevens, Scalia, Kennedy, Souter, and Ginsburg, JJ., it was held that a NASD arbitrator, rather than a court, was the decisionmaker that ought to apply, to the underlying controversy in the case at hand, NASD's time-limit rule, as:

(1) This time-limit dispute fell within the class of gateway procedural disputes which did not present what the Supreme Court's cases had called "questions of arbitrability" that were presumptively for a court to decide.

(2) Without the help of a special arbitration-disfavoring presumption, the Supreme Court could not properly conclude that the parties intended to have a court, rather than an arbitrator, interpret and apply the time-limit rule.

Thomas, J., concurring in the judgment, expressed the view that arbitrators ought to be permitted to resolve the issues concerning the NASD time-limit rule that had arisen in the case at hand, because (1) New York state case law so provided, (2) the parties had agreed to be bound by New York law, and (3) Supreme Court precedent required the Supreme Court to enforce that agreement.

O'Connor, J., did not participate.

## Headnotes

ARBITRATION §11 > EVIDENCE §385 > -- time limit -- application by arbitrator or court -- presumptions > Headnote:

*LEdHN[1A]* [1A]*LEdHN[1B]* [1B]*LEdHN[1C]* [1C]*LEdHN[1D]* [1D]*LEdHN[1E]* [1E]

With respect to an agreed-upon arbitration, before the National Association of Securities Dealers (NASD), of a controversy concerning some investment advice which a company had provided a client, a NASD arbitrator, rather than a court, was the decisionmaker that ought to apply, to this controversy, the 6-year limit for submitting controversies to arbitration that was set forth in a rule of the NASD code of arbitration procedure, as:

(1) This time-limit dispute fell within the class of gateway procedural disputes which did not present what the United States Supreme Court's cases had called "questions of arbitrability" that were presumptively for a court to decide--and, thus, the applicability of the time-limit rule was a matter presumptively for an arbitrator, not for a judge--in that (a) this time-limit dispute closely resembled the gateway questions which the Supreme Court had found not to be such questions of arbitrability, for the time-limit dispute seemed to be an aspect of the controversy which called the grievance procedures into play; (b) it was reasonable to infer--in the absence of any statement to the contrary in the parties' arbitration agreement--that the parties intended the agreement to reflect an understanding that NASD arbitrators, comparatively more expert about the meaning of their own rule, would be better able to interpret and to apply the rule; and (c) for the law to assume an expectation that aligned the decisionmaker with comparative expertise would help better to secure a fair and expeditious resolution of the underlying controversy, a goal of arbitration systems and judicial systems alike.

(2) Without the help of a special arbitration-disfavoring presumption, the Supreme Court could not properly conclude that the parties intended to have a court, rather than an arbitrator, interpret and apply the NASD time-limit rule, as (a) the parties to an arbitration contract would normally expect a forum-based decisionmaker to decide forum-specific procedural gateway matters; and (2) any temptation to place special antiarbitration weight on the appearance of the word "eligible" (for submission) in the NASD time-limit rule was counterbalanced by a different NASD rule, which provided that arbitrators would be empowered to interpret and determine the applicability of all provisions under the NASD code.

(Thomas, J., dissented in part from this holding.)

ARBITRATION §11  >  EVIDENCE §385 > -- questions for arbitrator or court -- presumptions  > Headnote:

**LEdHN[2A]** [2A]**LEdHN[2B]** [2B]**LEdHN[2C]** [2C]

While the United States Supreme Court has long recognized and enforced a liberal federal policy favoring arbitration agreements, there is a policy exception, pursuant to which there is a presumption, or interpretive rule, that the question whether the parties have submitted a particular dispute to arbitration--that is, the question of arbitrability--is an issue for judicial determination, unless the parties clearly and unmistakably provide otherwise. For such purposes, the phrase "question of arbitrability" has a far more limited scope than encompassing any potentially dispositive gateway question. In regard to particular issues, a gateway dispute about whether the parties are bound by a given arbitration clause raises such a question of arbitrability for a court to decide. Similarly, a disagreement about whether an arbitration clause in a concededly binding contract applies to a particular type of controversy is for a court to decide. However, procedural questions which grow out of a dispute and bear on its final disposition are presumptively not for a judge, but for an arbitrator, to decide. Moreover, the presumption is that an arbitrator should decide allegations of waiver, delay, or a like defense to arbitrability.

## Syllabus

Per respondent Dean Witter Reynolds, Inc.'s standard client agreement, petitioner Howsam chose to arbitrate her dispute with the company before the National Association of Securities Dealers (NASD). NASD's Code of Arbitration Procedure § 10304 states that no dispute "shall be eligible for submission . . . where six (6) years have elapsed from the occurrence or event giving rise to the dispute." Dean Witter filed this suit, asking the Federal District Court to declare the dispute ineligible for arbitration because it was more than six years old and seeking an injunction to prohibit Howsam from proceeding in arbitration. The court dismissed the action, stating that the NASD arbitrator should interpret and apply the NASD rule. In reversing, the Tenth Circuit found that the rule's application presented a question of the underlying dispute's "arbitrability"; and the presumption is that a court will ordinarily decide an arbitrability question.

*Held:* An NASD arbitrator should apply the time limit rule to the underlying dispute. Pp. 3-7.

(a) "Arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Steelworkers v. Warrior & Gulf Nav. Co., 363 U.S. 574, 582, 4 L. Ed. 2d 1409, 80 S. Ct. 1347*. The question whether parties have submitted a particular dispute to arbitration, *i.e.,* the "question of arbitrability,*"* is "an issue for judicial determination unless the parties clearly and unmistakably provide otherwise." *AT&T Technologies, Inc. v. Communications Workers, 475 U.S. 643, 649, 89 L. Ed. 2d 648, 106 S. Ct. 1415*. The phrase "question of arbitrability" has a limited scope, applicable in the kind of narrow circumstance where contracting parties would likely have expected a court to have decided the gateway matter.

But the phrase is *not* applicable in other kinds of general circumstance where parties would likely expect that an arbitrator would decide the question -- "procedural questions which grow out of the dispute and bear on its final disposition," *John Wiley & Sons, Inc. v. Livingston, 376 U.S. 543, 557, 11 L. Ed. 2d 898, 84 S. Ct. 909*, and "allegations of waiver, delay, or a like defense to arbitrability," *Moses H. Cone Memorial Hospital v. Mercury Constr. Corp., 460 U.S. 1, 24-25, 74 L. Ed. 2d 765, 103 S. Ct. 927*. Following this precedent, the application of the NASD rule is not a "question of arbitrability" but an "aspect of the [controversy] which called the grievance procedures into play." *John Wiley & Sons, Inc., supra, at 559*. NASD arbitrators, comparatively more expert about their own rule's meaning, are comparatively better able to interpret and to apply it. In the absence of any statement to the contrary in the arbitration agreement, it is reasonable to infer that the parties intended the agreement to reflect that understanding. And for the law to assume an expectation that aligns (1) decisionmaker with (2) comparative expertise will help better to secure the underlying controversy's fair and expeditious resolution. Pp. 3-6.

(b) Dean Witter's argument that, even without an antiarbitration presumption, the contracts call for judicial determination is unpersuasive. The word "eligible" in the NASD Code's time limit rule does not, as Dean Witter claims, indicate the parties' intent for the rule to be resolved by the court prior to arbitration. Parties to an arbitration contract would normally expect a forum-based decisionmaker to decide forum-specific procedural gateway matters, and any temptation here to place special antiarbitration weight on the word "eligible" in § 10304 is counterbalanced by the NASD rule that "arbitrators shall be empowered to interpret and determine the applicability" of all code provisions, § 10324. Pp. 6-7.

*261 F.3d 956*, reversed.

**Counsel:** Alan C. Friedberg argued the cause for petitioner.

Matthew D. Roberts argued the cause for the United States, as amicus curiae, by special leave of court.

Kenneth W. Starr argued the cause for respondent.

**Judges:** BREYER, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and STEVENS, SCALIA, KENNEDY, SOUTER, and GINSBURG, JJ., joined. THOMAS, J., filed an opinion concurring in the judgment. O'CONNOR, J., took no part in the consideration or decision of the case.

**Opinion by:** BREYER

# Opinion

 [**590]   [*81]   [***495]  JUSTICE BREYER delivered the opinion of the Court.

*LEdHN[1A]* [1A]This case focuses upon an arbitration rule of the National Association of Securities Dealers (NASD). The rule states that no dispute "shall be eligible for submission to arbitration . . . where six (6) years have elapsed from the occurrence or event giving rise to the . . . dispute." NASD Code of Arbitration Procedure § 10304 (1984) (NASD Code or Code). We must decide whether a court or an NASD arbitrator should apply the rule to the underlying controversy.  [***496]  We conclude that the matter is for the arbitrator.

I

The underlying controversy arises out of investment advice that Dean Witter Reynolds, Inc. (Dean Witter), provided its client, Karen Howsam, when, some time between 1986 and 1994, it recommended that she buy and

hold interests in four limited partnerships. Howsam says that Dean Witter misrepresented the virtues of the partnerships. The resulting controversy **[\*\*591]** falls within their standard Client Service Agreement's arbitration clause, which provides:

"all controversies . . . concerning or arising from . . . any account . . ., any transaction . . ., or . . . the construction, performance or breach of . . . any . . . agreement between us . . . shall be determined by arbitration before any self-regulatory organization or exchange of which Dean Witter is a member." App. 6-7.

**[\*82]** The agreement also provides that Howsam can select the arbitration forum. And Howsam chose arbitration before the NASD.

To obtain NASD arbitration, Howsam signed the NASD's Uniform Submission Agreement. That agreement specified that the "present matter in controversy" was submitted for arbitration "in accordance with" the NASD's "Code of Arbitration Procedure." *Id., at 24*. And that Code contains the provision at issue here, *HN1* a provision stating that no dispute "shall be eligible for submission . . . where six (6) years have elapsed from the occurrence or event giving rise to the . . . dispute." NASD Code § 10304.

*LEdHN[1B]* [1B] *LEdHN[2A]* [2A]After the Uniform Submission Agreement was executed, Dean Witter filed this lawsuit in Federal District Court. It asked the court to declare that the dispute was "ineligible for arbitration" because it was more than six years old. App. 45. And it sought an injunction that would prohibit Howsam from proceeding in arbitration. The District Court dismissed the action on the ground that the NASD arbitrator, not the court, should interpret and apply the NASD rule. The Court of Appeals for the Tenth Circuit, however, reversed. *261 F.3d 956 (2001)*. In its view, application of the NASD rule presented a question of the underlying dispute's "arbitrability"; and the presumption is that a court, not an arbitrator, will ordinarily decide an "arbitrability" question. See*, e.g., First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 131 L. Ed. 2d 985, 115 S. Ct. 1920 (1995)*.

The Courts of Appeals have reached different conclusions about whether a court or an arbitrator primarily should interpret and apply this particular NASD rule. Compare, *e.g.*, *261 F.3d 956 (CA10 2001)* (case below) (holding that the question is for the court); *J. E. Liss & Co. v. Levin, 201 F.3d 848, 851 (CA7 2000)* (same), with *PaineWebber Inc. v. Elahi, 87 F.3d 589 (CA1 1996)* (holding that NASD § 15, currently § 10304, is presumptively for the arbitrator); *Smith Barney Shearson, Inc. v. Boone, 47 F.3d 750 (CA5 1995)* (same). We **[\*83]** granted Howsam's petition for certiorari to resolve this disagreement. And we now hold that the matter is for the arbitrator.

II

*LEdHN[1C]* [1C]*LEdHN[2B]* [2B]This Court has determined that *HN2* "arbitration is a matter of contract and a party cannot be required **[\*\*\*497]** to submit to arbitration any dispute which he has not agreed so to submit." *Steelworkers v. Warrior & Gulf Nav. Co., 363 U.S. 574, 582, 4 L. Ed. 2d 1409, 80 S. Ct. 1347 (1960)*; see also *First Options, 514 U.S. at 942-943*.*HN3* Although the Court has also long recognized and enforced a "liberal federal policy favoring arbitration agreements," *Moses H. Cone Memorial Hospital v. Mercury Constr. Corp., 460 U.S. 1, 24-25, 74 L. Ed. 2d 765, 103 S. Ct. 927 (1983)*, it has made clear that there is an exception to this policy: The question whether the parties have submitted a particular dispute to arbitration, *i.e.*, the *"question of arbitrability*," is "an issue for judicial determination [u]nless the parties clearly and unmistakably provide otherwise." *AT&T Technologies, Inc. v. Communications Workers, 475 U.S. 643, 649, 89 L. Ed. 2d 648, 106 S. Ct. 1415 (1986)* (emphasis added); *First Options, 514 U.S. at 944*. We must decide here whether application of the NASD time limit provision falls into the scope of this last-mentioned interpretive rule.

**[\*\*592]** *LEdHN[2C]* [2C]Linguistically speaking, one might call any potentially dispositive gateway question a "question of arbitrability," for its answer will determine whether the underlying controversy will proceed to

arbitration on the merits. The Court's case law, however, makes clear that, for purposes of applying the interpretive rule, the phrase "question of arbitrability" has a far more limited scope. See *514 U.S. at 942*. **HN4** The Court has found the phrase applicable in the kind of narrow circumstance where contracting parties would likely have expected a court to have decided the gateway matter, where they are not likely to have thought that they had agreed that an arbitrator would do so, and, consequently, where reference of the gateway dispute to the court avoids the risk of **[*84]** forcing parties to arbitrate a matter that they may well not have agreed to arbitrate.

Thus, **HN5** a gateway dispute about whether the parties are bound by a given arbitration clause raises a "question of arbitrability" for a court to decide. See *id., at 943-946* (holding that a court should decide whether the arbitration contract bound parties who did not sign the agreement); *John Wiley & Sons, Inc. v. Livingston, 376 U.S. 543, 546-547, 11 L. Ed. 2d 898, 84 S. Ct. 909 (1964)* (holding that a court should decide whether an arbitration agreement survived a corporate merger and bound the resulting corporation). Similarly, a disagreement about whether an arbitration clause in a concededly binding contract applies to a particular type of controversy is for the court. See*, e.g., AT&T Technologies, supra, 475 U.S. 643, at 651-652* (holding that a court should decide whether a labor-management layoff controversy falls within the arbitration clause of a collective-bargaining agreement); *Atkinson v. Sinclair Refining Co., 370 U.S. 238, 241-243, 8 L. Ed. 2d 462, 82 S. Ct. 1318 (1962)* (holding that a court should decide whether a clause providing for arbitration of various "grievances" covers claims for damages for breach of a no-strike agreement).

At the same time **HN6** the Court has found the phrase "question of arbitrability" *not* applicable in other kinds of general circumstance where parties would likely expect that an **[***498]** arbitrator would decide the gateway matter. Thus "'procedural' questions which grow out of the dispute and bear on its final disposition" are presumptively *not* for the judge, but for an arbitrator, to decide. *John Wiley, supra, 376 U.S. 543, at 557* (holding that an arbitrator should decide whether the first two steps of a grievance procedure were completed, where these steps are prerequisites to arbitration). So, too, the presumption is that the arbitrator should decide "allegations of waiver, delay, or a like defense to arbitrability." *Moses H. Cone Memorial Hospital, 460 U.S. at 24-25*. Indeed, **HN7** the Revised Uniform Arbitration Act of 2000 (RUAA), seeking to "incorporate **[*85]** the holdings of the vast majority of state courts and the law that has developed under the [Federal Arbitration Act]," states that an "arbitrator shall decide whether a condition precedent to arbitrability has been fulfilled." RUAA § 6(c) and comment 2, 7 U. L. A. 12-13 (Supp. 2002). And the comments add that "in the absence of an agreement to the contrary, issues of substantive arbitrability . . . are for a court to decide and issues of procedural arbitrability, *i.e.,* whether prerequisites such as *time limits*, notice, laches, estoppel, and other conditions precedent to an obligation to arbitrate have been met, are for the arbitrators to decide." *Id*., § 6, comment 2, 7 U. L. A., at 13 (emphasis added).

*LEdHN[1D]* [1D]Following this precedent, we find that **HN8** the applicability of the NASD time limit rule is a matter presumptively for the arbitrator, not for the judge. The time limit rule closely resembles the gateway questions that this Court has found not to be "questions of arbitrability." *E.g., Moses H. Cone Memorial Hospital, supra, 460 U.S. 1, at 24-25* **[**593]** (referring to "waiver, delay, or a like defense"). Such a dispute seems an "aspect of the [controversy] which called the grievance procedures into play." *John Wiley, supra, 376 U.S. 543, at 559*.

Moreover, **HN9** the NASD arbitrators, comparatively more expert about the meaning of their own rule, are comparatively better able to interpret and to apply it. In the absence of any statement to the contrary in the arbitration agreement, it is reasonable to infer that the parties intended the agreement to reflect that understanding. Cf. *First Options, 514 U.S. at 944-945*. And for the law to assume an expectation that aligns (1) decisionmaker with (2) comparative expertise will help better to secure a fair and expeditious resolution of the underlying controversy -- a goal of arbitration systems and judicial systems alike.

We consequently conclude that *HN10* the NASD's time limit rule falls within the class of gateway procedural disputes that do not present what our cases have called "questions of arbitrability." **[\*86]** And the strong pro-court presumption as to the parties' likely intent does not apply.

III

*LEdHN[1E]* [1E]Dean Witter argues that, in any event, *i.e.,* even without an antiarbitration presumption, we should interpret the contracts between the parties here as calling for judicial determination of the time limit matter. Howsam's execution of a Uniform Submission Agreement with the NASD in 1997 effectively incorporated the NASD Code into the parties' **[\*\*\*499]** agreement. Dean Witter notes the Code's time limit rule uses the word "eligible." That word, in Dean Witter's view, indicates the parties' intent for the time limit rule to be resolved by the court prior to arbitration.

We do not see how that is so. For the reasons stated in Part II, *supra*, parties to an arbitration contract would normally expect a forum-based decisionmaker to decide forum-specific procedural gateway matters. And any temptation here to place special antiarbitration weight on the appearance of the word "eligible" in the NASD Code rule is counterbalanced by a different NASD rule; that rule states that *HN11* "arbitrators shall be empowered to interpret and determine the applicability of all provisions under this Code." NASD Code § 10324.

Consequently, without the help of a special arbitration-disfavoring presumption, we cannot conclude that the parties intended to have a court, rather than an arbitrator, interpret and apply the NASD time limit rule. And as we held in Part II, *supra*, that presumption does not apply.

IV

For these reasons, the judgment of the Tenth Circuit is

*Reversed.*

JUSTICE O'CONNOR took no part in the consideration or decision of this case.

**Concur by:** THOMAS

## Concur

**[\*87]** JUSTICE THOMAS, concurring in the judgment.

As our precedents make clear and as the Court notes, arbitration is a matter of contract. *Ante*, at 3. In *Volt Information Sciences, Inc. v. Board of Trustees of Leland Stanford Junior Univ., 489 U.S. 468, 103 L. Ed. 2d 488, 109 S. Ct. 1248 (1989)*, we held that under the Federal Arbitration Act courts must enforce private agreements to arbitrate just as they would ordinary contracts: in accordance with their terms. Under *Volt*, when an arbitration agreement contains a choice-of-law provision, that provision must be honored, and a court interpreting the agreement must follow the law of the jurisdiction selected by the parties. See *id., at 478-479* (enforcing a choice-of-law provision that incorporated a state procedural rule concerning arbitration proceedings); see also *Mastrobuono v. Shearson Lehman Hutton, Inc., 514 U.S. 52, 67, 131 L. Ed. 2d 76, 115 S. Ct. 1212* **[\*\*594]** *(1995)* (THOMAS, J., dissenting) (concluding that the choice-of-law provision in question was indistinguishable from the one in *Volt* and, thus, should have been given effect). A straightforward application of these principles easily resolves the question presented in this case.

The agreement now before us provides that it "shall be construed and enforced in accordance with the laws of the State of New York." App. 6. Interpreting two agreements containing provisions virtually identical to the ones

in dispute here, the New York Court of Appeals held that issues implicating § 15 (now § 10304) of the National Association of Securities Dealers Code of Arbitration Procedure are for arbitrators to decide. See *Smith Barney Shearson Inc. v. Sacharow, 91 N.Y.2d 39, 689 N.E.2d 884, 666 N.Y.S.2d 990 (1997)*. Because the parties agreed to be bound by New York law **[***500]** and because *Volt* requires us to enforce their agreement, I would permit arbitrators to resolve the § 10304 issues that have arisen in this case, just as New York case law provides. The Court follows a different route to reach the same conclusion; accordingly, I concur only in the judgment.

## References

L Ed Digest, Arbitration 11; Evidence 385L Ed Index, Securities RegulationAnnotation References:.



⚠ Caution

As of: September 1, 2015 5:36 PM EDT

## *In re Bruce Terminix Co.*

Supreme Court of Texas

June 5, 1998, Delivered

No. 98-0030

**Reporter**

988 S.W.2d 702; 1998 Tex. LEXIS 84; 41 Tex. Sup. J. 941

IN RE BRUCE TERMINIX COMPANY, RELATOR

**Disposition:** Writ of mandamus conditionally granted.

## Core Terms

arbitration, waived, trial court, initiate, right to arbitration, compel arbitration, mandamus, parties, court of appeals, judicial process, discovery, courts, inspect, abate

## Case Summary

### Procedural Posture

Petitioner corporation sought writ of mandamus relief from an order of the trial court (Texas), which denied its plea in abatement and motion to compel arbitration of a claim brought by respondent customer.

### Overview

Respondent customer sued petitioner corporation for extermination services that did not work The trial court granted petitioner's motion to have the matter placed into arbitration pursuant to an arbitration clause in the parties' contract. The trial court never signed an order because the parties were unable to agree on the appropriate language. After several months, respondent sent petitioner an executed arbitration form, which was never filed because both parties refused to pay the fee. The trial court later granted respondent's motion to vacate the order compelling arbitration, and set the matter for trial. Petitioner's motion to compel arbitration was denied, and the trial court determined that petitioner had waived its right to compel arbitration, and was in default in proceeding with arbitration. Petitioner's request for mandamus relief was partially granted by the court, which determined that there was a presumption against waiver of arbitration, that petitioner had not availed itself of the judicial process to respondent's detriment before pursuing arbitration, and that it was respondent's duty to arrange for the arbitration of her claim.

### Outcome

The court granted petitioner corporation's request for writ of mandamus relief in part because the trial court abused its discretion in finding that petitioner had waived its right to arbitration of the claim asserted by respondent customer.

## LexisNexis® Headnotes

Civil Procedure > Remedies > Writs > General Overview

Civil Procedure > Appeals > Standards of Review > Abuse of Discretion

*HN1* The reviewing court will grant mandamus when a trial court has clearly abused its discretion and the relator has no adequate remedy by appeal. An error in determining what the law is or applying the law to the facts constitutes an abuse of discretion.

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview

Civil Procedure > ... > Arbitration > Federal Arbitration Act > General Overview

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > Waiver

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Judicial Review

International Trade Law > Dispute Resolution > International Commercial Arbitration > Arbitration

*HN2* Whether a party's conduct waives its arbitration rights under the Federal Arbitration Act is a question of law. There is no adequate remedy by appeal for denial of the right to arbitrate, because the very purpose of arbitration is to avoid the time and expense of a trial and appeal.

Admiralty & Maritime Law > Arbitration > General Overview

Admiralty & Maritime Law > Arbitration > Federal Arbitration Act

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > Arbitrability

Civil Procedure > ... > Arbitration > Federal Arbitration Act > General Overview

Civil Procedure > ... > Arbitration > Federal Arbitration Act > Stay Pending Arbitration

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > Waiver

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Judicial Review

Contracts Law > Contract Conditions & Provisions > Arbitration Clauses

International Trade Law > Dispute Resolution > International Commercial Arbitration > Arbitration

*HN3* The Federal Arbitration Act (Act), *9 U.S.C.S. § 3*, requires courts to stay lawsuits involving arbitrable issues pending arbitration, providing the applicant for the stay is not in default in proceeding with such arbitration. In applying this provision, courts commonly use the term "waiver" rather than the statutory term "default." The Act imposes a strong presumption against waiver. Courts will not find that a party has waived its right to enforce an arbitration clause by merely taking part in litigation unless it has substantially invoked the judicial process to its opponent's detriment.

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Judicial Review

*HN4* Even substantially invoking the judicial process does not waive a party's arbitration rights unless the opposing party proves that it suffered prejudice as a result.

Civil Procedure > ... > Discovery > Methods of Discovery > General Overview

Civil Procedure > ... > Discovery > Methods of Discovery > Inspection & Production Requests

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Judicial Review

*HN5* Responding to one set of requests for production does not establish prejudice because American Arbitration Association rules allow arbitrators to arrange for production of relevant documents and other information.

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Judicial Review

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Mandatory ADR

*HN6* Unless the parties contract otherwise, the burden to initiate arbitration rests on the plaintiff as the party seeking relief.

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > Waiver

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Judicial Review

*HN7* Absent a contrary agreement, a party against whom a claim is asserted does not waive its right to arbitrate by failing to initiate arbitration of that claim.

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Judicial Review

*HN8* The American Arbitration Association's rules define the initiating party in arbitration as the "claimant" and the claimant shall initiate arbitration through a demand containing a statement setting forth the nature of the dispute, the amount involved, and the remedy sought. American Arbitration Association's Comm. Arb. Rule 6(a) (1996). Moreover, the party who files a claim must pay a filing fee that varies based on the amount of the claim. The duty to define the nature of the dispute and the remedy as provided by rule 6(a) naturally and logically falls on the claimant.

**Counsel:** For Relator: Roy L. Stacy, Calhoun & Stacy, Dallas.

For Respondent: Joe Ross Massengill, Mccarty Wilson & Nash, Ennis.

## Opinion

 [**1] [*703] ON PETITION FOR WRIT OF MANDAMUS.

**PER CURIAM**

This is an original proceeding seeking relief from the denial of a plea in abatement and motion to compel arbitration. Because the trial court abused its discretion in finding that relator waived arbitration and because relator has no adequate remedy by appeal, we conditionally grant the petition for writ of mandamus.

In 1990, Kay Bates contracted with relator Bruce Terminix Company for residential termite extermination services. The contract contained an arbitration clause. [1] After Terminix failed to rid Bates's house of termites, she filed suit against Terminix on February 28, 1994. Bates alleged fraud, negligent misrepresentation, breach of contract, and Deceptive Trade Practices Act violations, and she asked the court to reform the contract.

 [**2]  Terminix answered the suit and sent Bates requests for production and interrogatories, which she answered. On August 8, 1994, Terminix moved to abate the action and compel arbitration. At a hearing on September 26, 1994, the trial court orally granted the motion and asked Terminix to prepare a written order. But the parties could not agree on wording and the trial court never signed an order.

Almost a year and a half later, on March 1, 1996, Bates wrote to Terminix requesting its assistance in arranging for the American Arbitration Association ("AAA") to arbitrate the case. After some additional correspondence, Bates sent Terminix a completed AAA Submission to Dispute Resolution form, and on July 5, 1996, Terminix signed the form and returned it to Bates. Because the parties disagreed over who would pay the filing fee, the form was never filed with the AAA.

On September 20, 1996, Bates moved to vacate the 1994 oral order compelling arbitration. At three hearings on the motion, Bates argued that Terminix had waived its right to enforce the arbitration clause. In an order dated July 21, 1997, the court granted Bates's motion, denied Terminix's original 1994 motion to compel arbitration,  [**3]  and set the case for trial. The court made a finding of fact that Terminix had waived its right to compel arbitration and was "in default in proceeding with . . . arbitration" under the Federal Arbitration Act, *9 U.S.C. § 3*, because it had substantially invoked the judicial process to Bates's detriment through its use of discovery in 1994.

Terminix sought mandamus from the court of appeals. The court of appeals denied Terminix's petition on an alternative ground which had been argued but not ruled on in the trial court: that Terminix had waived its rights by failing to initiate arbitration after the trial court granted its motion to compel arbitration on September 26, 1994. *953 S.W.2d 537, 540-41*. Terminix now seeks mandamus from this Court.

*HN1* This Court will grant mandamus when a trial court has clearly abused its discretion and the relator has no adequate remedy by appeal. *See Walker v. Packer, 827 S.W.2d 833, 839-40 (Tex. 1992)*. An error in determining what the law is or applying the law to the facts constitutes an abuse of discretion. *See id. at 840*. *HN2* Whether a party's conduct waives its arbitration rights under  **[\*704]**  the Federal Arbitration Act is a question of law. *See Price* **[\*\*4]** *v. Drexel Burnham Lambert, Inc., 791 F.2d 1156, 1159 (5th Cir. 1986)*. There is no adequate remedy by appeal for denial of the right to arbitrate, because the very purpose of arbitration is to avoid the time and expense of a trial and appeal. *See Jack B. Anglin Co. v. Tipps, 842 S.W.2d 266, 272-73 (Tex. 1992)*.

*HN3* The Federal Arbitration Act requires courts [2] to stay lawsuits involving arbitrable issues pending arbitration, "providing the applicant for the stay is not in default in proceeding with such arbitration." *9 U.S.C. § 3*. In applying this provision, courts commonly use the term "waiver" rather than the statutory term "default." *See Morewitz v. West of Eng. Ship Owners Mut. Protection & Indem. Ass'n*, 62 F.3d 1356, 1365 n.16 (11th Cir.

---

[1]  The clause reads in full:

10. ARBITRATION. The Purchaser and Terminix agree that any controversy or claim between them arising out of or relating to this agreement shall be settled exclusively by arbitration. Such arbitration shall be conducted in accordance with the Commercial Arbitration Rules then in force of the American Arbitration Association. The decision of the arbitrator shall be a final and binding resolution of the disagreement which may be entered as a judgment by any court of competent jurisdiction. Neither party shall sue the other where the basis of the suit is this agreement other than for enforcement of the arbitrator's decision.

[2]  Although section 3 of the Act mentions only "courts of the United States," it applies to state as well as federal courts. *See Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 26 n.34, 74 L. Ed. 2d 765, 103 S. Ct. 927 (1983)*.

1995). Because public policy favors arbitration, however, the Act imposes a strong presumption against waiver. *See Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24, 74 L. Ed. 2d 765, 103 S. Ct. 927 (1983)*; *EZ Pawn Corp. v. Mancias, 934 S.W.2d 87, 90 (Tex. 1996)*; *Prudential Sec., Inc. v. Marshall, 909 S.W.2d 896, 898 (Tex. 1995)*. Courts will not find that a party has waived its right to enforce an arbitration [**5] clause by merely taking part in litigation unless it has substantially invoked the judicial process to its opponent's detriment. *See Walker v. J.C. Bradford & Co., 938 F.2d 575, 577 (5th Cir. 1991)*; *EZ Pawn, 934 S.W.2d at 89*.

Terminix's use of the judicial process was limited to filing an answer and propounding one set of eighteen interrogatories and one set of nineteen requests for production. [3] Terminix moved to abate the judicial proceedings and compel arbitration less than six months after Bates filed suit. The Fifth Circuit has held that a party may invoke court processes to a comparable or even greater extent than this without waiving its arbitration rights. *See J.C. Bradford, 938 F.2d at 576-78* (finding no waiver by defendant who removed case from [**6] state to federal court, participated in scheduling and discovery conferences, and propounded two sets of written discovery one of which was answered). Terminix did not seek a judicial resolution of its dispute with Bates. *Compare J.C. Bradford, 938 F.2d at 577-78* (finding no waiver and noting that defendant "did not ask the court to make any judicial decisions, for example, by requesting summary judgment"), *with Frye v. Paine, Webber, Jackson & Curtis, Inc., 877 F.2d 396, 398 (5th Cir. 1989)* (party who participated in trial waived arbitration); *Price, 791 F.2d at 1162* (party who moved for summary judgment waived arbitration); *and Miller Brewing Co. v. Fort Worth Distrib. Co., 781 F.2d 494, 497-98 (5th Cir. 1986)* (party who filed multiple lawsuits waived arbitration). Thus, this is not a case in which a party who has tried and failed to obtain a satisfactory result in court then turns to arbitration.

[**7] **HN4**

Even substantially invoking the judicial process does not waive a party's arbitration rights unless the opposing party proves that it suffered prejudice as a result. *See Prudential, 909 S.W.2d at 898-99*. The trial court concluded that Bates was prejudiced by Terminix's use of discovery. Although prejudice may result when a party uses judicial processes to gain access to information that would not have been discoverable in arbitration, *see J.C. Bradford, 938 F.2d at 578 n.3*, this case falls under the rule that "when only a minimal amount of discovery has been conducted, which may also be useful for the purpose of arbitration, the court should not ordinarily infer waiver based upon prejudice." *Tenneco Resins, Inc. v. Davy Int'l, 770 F.2d 416, 421 (5th Cir. 1985)*. The fact that Bates **HN5** responded to one set of requests for production does not establish [*705] prejudice because AAA rules allow arbitrators to arrange for "production of relevant documents and other information." AMERICAN ARBITRATION ASS'N, COMMERCIAL ARBITRATION RULES Rule 10 (1996). Bates also answered Terminix's interrogatories, but the only substantive facts her response provided were a list of persons with knowledge [**8] of facts relevant to the dispute and a list of communications between herself and Terminix. Whether or not Terminix would have been able to obtain this information under AAA procedures, it falls short of the level of discovery that courts have held waives the right to arbitrate. *See Zwitserse Maatschappij van Levensverzekering en Lijfrente v. ABN Int'l Capital Markets Corp., 996 F.2d 1478, 1480 (2d Cir. 1993)* (deposition-like witness hearing conducted under foreign law); *St. Mary's Med. Ctr. v. Disco Aluminum Prods., 969 F.2d 585, 591 (7th Cir. 1992)* (depositions).

Bates has not carried the "heavy burden of proof" required to establish waiver of arbitration rights. *See J.C. Bradford, 938 F.2d at 577*. The court must resolve any doubt in favor of arbitration. *See Moses H. Cone, 460*

---

[3] Bates also points out that Terminix's experts inspected and tested her house in May 1994, three months into the litigation. However, Terminix did not obtain the inspection through the judicial process. Instead of filing a request to inspect land with the trial court, *see* TEX. R. CIV. P. 167(1), Terminix simply sent Bates a letter stating, "Please let me know if you will agree to allow [Terminix] to [inspect the house] or whether I need to file a Motion with the Court"; Bates then consented to the inspection.

*U.S. at 24-25*. Under this standard, the trial court abused its discretion by holding that Terminix's 1994 participation in the lawsuit waived its right to enforce the arbitration clause.

We now turn to the court of appeals' alternative rationale for denying Terminix's petition for mandamus. The court of appeals held that as the party seeking to resolve the dispute by arbitration rather than **[**9]** in court, Terminix had the burden to arrange for arbitration of Bates's claims against it. *953 S.W.2d at 540-41*. Thus, the court of appeals reasoned, Terminix waived its rights by failing to initiate arbitration after the trial court granted its motion to abate the suit and compel arbitration in September 1994. *Id.* That conclusion conflicts with the decisions of two other courts of appeals holding that *HN6* unless the parties contract otherwise, the burden to initiate arbitration rests on the plaintiff as the party seeking relief. *See Moore v. Morris, 931 S.W.2d 726, 729* (Tex. App.--Austin 1996, orig. proceeding); *Mamlin v. Susan Thomas, Inc., 490 S.W.2d 634, 639* (Tex. Civ. App.--Dallas 1973, no writ). [4]

 **[**10]** This Court has never squarely addressed the question of who has the burden to go forward with arbitration after a trial court grants a defendant's motion to compel arbitration. However, we tacitly endorsed *Moore* and *Mamlin*'s result in *Prudential Securities, Inc. v. Marshall, 909 S.W.2d 896 (Tex. 1995)*. The plaintiffs in *Prudential* argued that the defendant had waived the right to arbitration by a number of actions, including its failure to pursue arbitration of certain claims that the trial court had ruled were subject to arbitration. *See Prudential, 909 S.W.2d at 898*. Noting that mere delay does not waive a party's arbitration rights, we held that there was no waiver. *See id. at 898-99*.

According to the court of appeals, it would be "illogical . . . [to] place[] the onus of proceeding to arbitration on the very party who may be seeking to avoid it." *953 S.W.2d at 540*. But placing the burden on the party against whom relief is sought would lead to an even stranger reversal of the litigants' proper roles. "It is antithetical to the interests of such a party to itself initiate a proceeding, be it a court suit or arbitration, that would expose it to the risk **[**11]** of liability." *Gold Coast Mall, Inc. v. Larmar Corp., 298 Md. 96, 468 A.2d 91, 100 (Md. 1983)*. "If no arbitration clause existed, [the plaintiff] would have had the task and expense of initiating suit; she could not have required the [defendant] to sue itself. The rule is the same with arbitration substituted for suit: the party seeking relief is the one who must go forward with arbitration proceedings." *Johnson v. Fireman's Fund Ins. Co., 272 N.W.2d 870, 882 (Iowa 1978)* (Uhlenhopp, J., **[*706]** dissenting). We therefore hold that *HN7* absent a contrary agreement, a party against whom a claim is asserted does not waive its right to arbitrate by failing to initiate arbitration of that claim.

Although the parties may choose to contract around this default rule and require the party against whom relief is sought to initiate arbitration, *see Mamlin, 490 S.W.2d at 639*, Bates and Terminix did not do so. Their contract states that the AAA's Commercial Arbitration Rules shall govern. Those rules define "*HN8* the initiating party" as the "claimant" and provide that the claimant shall initiate arbitration through a "demand" containing "a statement setting forth "the nature of the dispute, **[**12]** the amount involved, . . . [and] the remedy sought." AMERICAN ARBITRATION ASS'N, COMMERCIAL ARBITRATION RULES Rule 6(a) (1996). Moreover, the party who files a claim must pay a filing fee that varies based on the amount of the claim. *Id. at 27*. The duty to define the nature of the dispute and the remedy as provided by AAA Rule 6(a) "naturally and logically falls on the claimant." *Mamlin, 490 S.W.2d at 639*. It would be anomalous to require the party against whom relief is sought to present its opponent's case and pay a filing fee whose amount is based on the size of its

---

[4]  *Accord Shanferoke Coal & Supply Corp. v. Westchester Serv. Corp.*, 70 F.2d 297, 299 (2d Cir. 1934) (Learned Hand, J.), *aff'd*, 293 U.S. 449, 79 L. Ed. 583, 55 S. Ct. 313 (1935); *Mountain Plains Constructors, Inc. v. Torrez*, 785 P.2d 928, 930 (Colo. 1990); *Gold Coast Mall, Inc. v. Larmar Corp.*, 298 Md. 96, 468 A.2d 91, 97-101 (Md. 1983); *Lane-Tahoe, Inc. v. Kindred Constr. Co.*, 91 Nev. 385, 536 P.2d 491, 494 (Nev. 1975); *Tothill v. Richey Ins. Agency, Inc.*, 117 N.H. 449, 374 A.2d 656, 658 (N.H. 1977); 1 DOMKE, DOMKE ON COMMERCIAL ARBITRATION § 19:06 (rev. ed. 1997); 1 OEHMKE, COMMERCIAL ARBITRATION § 27:02 (rev. ed. 1995).

opponent's claim. "This scenario is not reasonable and clearly not the design of the rules." *Moore, 931 S.W.2d at 728-29* (discussing National Association of Securities Dealers rules). By agreeing to the AAA rules, Terminix and Bates placed the burden of initiating arbitration on the party seeking relief.

\* \* \*

Under *Texas Rule of Appellate Procedure 59.1*, without hearing oral argument, we conditionally grant Bruce Terminix Company's petition for writ of mandamus. We are confident that the trial court will abate Bates's lawsuit pending arbitration in accordance with this opinion and we instruct the **[\*\*13]** clerk to issue the writ only if it does not.

Opinion Delivered: June 5, 1998



⚠ Caution
As of: September 1, 2015 5:21 PM EDT

## *In re Christus Spohn Health Sys. Corp.*

Court of Appeals of Texas, Thirteenth District, Corpus Christi - Edinburg

July 31, 2007, Opinion Delivered ; July 31, 2007, Filed

NUMBER 13-07-399-CV

**Reporter**
231 S.W.3d 475; 2007 Tex. App. LEXIS 6143

IN RE CHRISTUS SPOHN HEALTH SYSTEM CORPORATION D/B/A CHRISTUS SPOHN HOSPITAL SHORELINE

## Core Terms

arbitration, discovery, real party in interest, judicial process, right to arbitration, orig, invoked, parties, trial court, interrogatories, request for production, mandamus, motion to compel arbitration, pet, compel arbitration, lawsuit, writ petition, third party, first set, movant

## Case Summary

### Procedural Posture

Real parties in interest, the family of a deceased employee, brought a wrongful death claim against relator employer. A Texas trial court denied the employer's motion to compel arbitration based on an arbitration clause included in its employee benefit plan. The employer petitioned for a writ of mandamus ordering the trial court to compel arbitration.

### Overview

The underlying lawsuit was filed in December 2005. The employer did not move to compel arbitration until February 2007, after the case had been set for trial on three separate dates. During the fourteen-month interval before the motion was filed, the parties substantially litigated the case and engaged in voluminous discovery. The court concluded that under the circumstances, the employer had substantially invoked the judicial process so as to waive arbitration. Although none of the employer' actions alone would establish waiver, the combination of those actions--including delaying the motion for arbitration, requesting continuance, and seeking substantive discovery--did establish waiver. In addition, there was evidence that compelling arbitration would have greatly prejudiced the employee's family because it had gone to substantial time and expense in developing the matter for trial, and that such time and expense had been greatly increased by the employer's conduct.

### Outcome

The petition for writ of mandamus was denied.

# LexisNexis® Headnotes

Civil Procedure > ... > Writs > Common Law Writs > Mandamus

Civil Procedure > Appeals > Standards of Review > Abuse of Discretion

Evidence > Burdens of Proof > Allocation

*HN1* A writ of mandamus will issue to correct a clear abuse of discretion when there is no adequate remedy by appeal. A trial court abuses its discretion if it reaches a decision so arbitrary and unreasonable as to amount to a clear and prejudicial error of law or if it clearly fails to correctly analyze or apply the law. The relator has the burden to establish that the trial court abused its discretion.

Civil Procedure > ... > Arbitration > Federal Arbitration Act > Orders to Compel Arbitration

Civil Procedure > ... > Writs > Common Law Writs > Mandamus

*HN2* If a trial court erroneously denies a party's motion to compel arbitration under the Federal Arbitration Act, the movant has no adequate remedy at law and is entitled to a writ of mandamus.

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > Waiver

Evidence > Inferences & Presumptions > Presumptions

Evidence > Burdens of Proof > General Overview

*HN3* There is a strong presumption against waiver of arbitration rights. A heavy burden of proof is required to establish waiver of arbitration rights, and the court must resolve all doubt in favor of arbitration. Whether a party has waived its contractual right to arbitrate is a question of law. Waiver may be express or implied. Whether waiver has occurred depends on the individual facts and circumstances of each case.

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > Waiver

*HN4* Waiver of arbitration rights occurs only where a party has acted inconsistently with its right to arbitrate and such actions prejudiced the other party. Stated differently, a party waives an arbitration clause when it substantially invokes the judicial process to the other party's detriment. Waiver of an arbitration right must be intentional. Therefore, the test for determining waiver is two-pronged: (1) did the party seeking arbitration substantially invoke the judicial process, and (2) did the opposing party prove that it suffered prejudice as a result. The judicial process has been substantially invoked when the party seeking arbitration has taken specific and deliberate actions, after the filing of suit, that are inconsistent with a right to arbitrate or has actively tried, but failed, to achieve a satisfactory result through litigation before turning to arbitration.

Civil Procedure > Pleading & Practice > Pleadings > Answers

Civil Procedure > ... > Pleadings > Counterclaims > General Overview

Civil Procedure > Discovery & Disclosure > General Overview

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > Waiver

Civil Procedure > Pretrial Matters > Continuances

*HN5* Actions that are inconsistent with the right to arbitrate and thus raise the issue of waiver may include some combination of filing an answer, setting up a counterclaim, pursuing extensive discovery, moving for a continuance, and failing to timely request arbitration.

Civil Procedure > ... > Summary Judgment > Motions for Summary Judgment > General Overview

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > Waiver

Civil Procedure > Settlements > General Overview

*HN6* Examples of actions that indicate that a party is attempting to achieve a satisfactory result through litigation before turning to arbitration include moving for summary judgment or seeking a final resolution of the dispute. However, attempts at settlement do not evidence waiver.

Civil Procedure > Discovery & Disclosure > General Overview

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > Waiver

*HN7* Delay alone generally does not establish waiver of arbitration rights. Similarly, purely defensive measures do not substantially invoke the judicial process so as to establish waiver. A party does not, for instance, substantially invoke the judicial process merely by participating in discovery. In contrast, pursuing extensive discovery may substantially invoke the judicial process.

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > Waiver

*HN8* Even when a party has substantially invoked the judicial process, a party's right to arbitration is not waived absent a clear showing that the opposing party has been prejudiced. In determining whether or not a party has been prejudiced, courts focus on factors such as: (1) the movant's access to information that is not discoverable in arbitration; and (2) the opponent's incurring costs and fees due to the movant's actions or delay.

**Counsel:** For RELATOR: Charles W. Hurd, III, Joy M. Soloway, FULBRIGHT & JAWORSKI, Houston, TX.; Christine Kirchner, Jennifer Simons, Stephen J. Knight, CHAMBERLAIN, HRDLICKA, WHITE, WILLIAMS & MARTIN, Houston, TX.; Darrell L. Barger, HARTLINE, DACUS, BARGER, DREYER, Corpus Christi, TX.

For REAL PARTY IN INTEREST: David T. Bright, WATTS LAW FIRM, Corpus Christi, TX.; Robert C. Hilliard, HILLIARD & MUNOZ, Corpus Christi, TX.

**Judges:** **[**1]** Before Chief Justice Valdez and Justices Benavides and Vela. Opinion by Chief Justice Valdez.

**Opinion by:** ROGELIO VALDEZ

## Opinion

 [*477] **On Petition for Writ of Mandamus**

**OPINION**

Before Chief Justice Valdez and Justices Benavides and Vela

Opinion by Chief Justice Valdez

Relator, Christus Spohn Health System Corporation d/b/a Christus Spohn Hospital Shoreline, seeks a writ of mandamus ordering the trial court to compel arbitration of a wrongful death claim brought by real parties in interest, the family of a deceased employee. We deny the petition for writ of mandamus.

I. Standard of Review

*HN1* A writ of mandamus will issue to correct a clear abuse of discretion when there is no adequate remedy by appeal. *See Walker v. Packer, 827 S.W.2d 833, 840 (Tex. 1992)*. A trial court abuses its discretion if it reaches a decision so arbitrary and unreasonable as to amount to a clear and prejudicial error of law or if it clearly fails to correctly analyze or apply the law. *In re Ford Motor Co., 165 S.W.3d 315, 317 (Tex. 2005)*. The relator has the burden to establish that the trial court abused its discretion. *See id*. *HN2* If a trial court erroneously denies a party's motion to compel arbitration under the FAA, the movant has no adequate remedy **[**2]** at law and is entitled **[*478]** to a writ of mandamus. *In re Nexion Health at Humble, Inc., 173 S.W.3d 67, 69 (Tex. 2005)* (orig. proceeding); *Serv. Corp. Int'l v. Lopez, 162 S.W.3d 801, 808 (Tex. App.-Corpus Christi 2005, no pet.)*.

## II. Background

This is a premises liability case. Debra Slough worked as a nurse at Christus Spohn Shoreline. Jesus Alvarez abducted Slough from Christus Spohn's parking garage and murdered her. Debra Slough's husband, Corey Slough, filed suit against Christus Spohn individually and on behalf of their three minor children. Relator contends that the trial court erred in failing to grant its motion to compel arbitration based on an arbitration clause included in its employee benefit plan. Real parties in interest contend, *inter alia*, that there is neither a valid arbitration agreement nor that their claims fall within the scope of that agreement. Real parties in interest raise further defenses to arbitration, including waiver, estoppel, and procedural and substantive unconscionability. We conclude that the issue of waiver is dispositive of this matter. *See TEX. R. APP. P. 47.1*.

## III. Applicable Law

*HN3* There is a strong presumption against waiver of arbitration rights. *In re Bank One, 216 S.W.3d 825, 827 (Tex. 2007)*; **[**3]** *In re D. Wilson Constr. Co., 196 S.W.3d 774, 783 (Tex. 2006)* (orig. proceeding); *see In re Vesta Ins. Group, Inc., 192 S.W.3d 759, 763 (Tex. 2006)* (orig. proceeding). A ″heavy burden of proof″ is required to establish waiver of arbitration rights, and the court must resolve all doubt in favor of arbitration. *In re Bruce Terminix Co., 988 S.W.2d 702, 702 (Tex. 1998)*. Whether a party has waived its contractual right to arbitrate is a question of law. *See In re Oakwood Mobile Homes, 987 S.W.2d 571, 574 (Tex. 1999)* (orig. proceeding). Waiver may be express or implied. *EZ Pawn Corp. v. Mancias, 934 S.W.2d 87, 89 (Tex. 1996)* (orig. proceeding); *Southwind Group, Inc. v. Landwehr, 188 S.W.3d 730, 735 (Tex. App.-Eastland 2006, orig. proceeding)*. Whether waiver has occurred depends on the individual facts and circumstances of each case. *Southwind Group, Inc., 188 S.W.3d at 735*; *Williams Indus., Inc. v. Earth Dev. Sys. Corp., 110 S.W.3d 131, 135 (Tex. App.-Houston [1st Dist.] 2003, no pet.)*; *Sedillo v. Campbell, 5 S.W.3d 824, 827 (Tex. App.-Houston [14th Dist.] 1999, no pet.)*.

*HN4* Waiver occurs only where ″a party has acted inconsistently with its right to arbitrate and such actions prejudiced the **[**4]** other party.″ *In re Oakwood Homes, 987 S.W.2d at 574*. Stated differently, ″a party waives an arbitration clause when it substantially invokes the judicial process to the other party's detriment.″ *In re Bank One, 216 S.W.3d at 827*; *see In re Vesta, 192 S.W.3d at 763*. Waiver of an arbitration right must be intentional. *In re Bank One, 216 S.W.3d at 827*; *EZ Pawn Corp., 934 S.W.2d at 89*; *In re Certain Underwriters at Lloyd's, 18 S.W.3d 867, 872 (Tex. App.-Beaumont 2000, orig. proceeding)*. Therefore, the test for determining waiver is two-pronged: (1) did the party seeking arbitration substantially invoke the judicial process, and (2) did the opposing party prove that it suffered prejudice as a result. *Perry Homes v. Cull, 173 S.W.3d 565, 569-70 (Tex. App.-Fort Worth 2005, pet. granted)*.

The judicial process has been substantially invoked when the party seeking arbitration has taken specific and deliberate actions, after the filing of suit, that are inconsistent with a right to arbitrate or has actively tried, but failed, to achieve a satisfactory result through litigation before turning to arbitration. *In re Vesta Group,* **[*479]** *Inc., 192 S.W.3d at 763*; *Williams Indus., 110 S.W.3d at 135*. *Compare* **[**5]** *Sedillo, 5 S.W.3d at 827* (waiver may occur when a party has taken specific and deliberate acts after suit has been filed that are inconsistent with

the right to arbitrate), and *Nationwide of Bryan v. Dyer, 969 S.W.2d 518, 521 (Tex. App.-Austin 1998, no pet.)* (same), *with Grand Homes 96, L.P. v. Loudermilk, 208 S.W.3d 696, 703-704 (Tex. App.-Fort Worth 2006, pet. filed)* (waiver may occur when a party has actively tried, but failed, to achieve a satisfactory result in litigation before turning to arbitration); *Southwind Group, Inc., 188 S.W.3d at 736* (same); *Williams Indus., Inc., 110 S.W.3d at 135* (same).

*HN5* Actions that are inconsistent with the right to arbitrate and thus raise the issue of waiver may include some combination of filing an answer, setting up a counterclaim, pursuing extensive discovery, moving for a continuance, and failing to timely request arbitration. *See In re Certain Underwriters at Lloyd's, 18 S.W.3d at 872-873*; *Sedillo, 5 S.W.3d at 827*; *Central Nat'l Ins. Co. v. Lerner, 856 S.W.2d 492, 494 (Tex. App.-Houston [1st Dist.] 1993, orig. proceeding)*. *HN6* Examples that indicate the party is attempting to achieve a satisfactory result through litigation before turning to arbitration **[**6]** include moving for summary judgment or seeking a final resolution of the dispute. *Williams Indus., Inc., 110 S.W.3d at 135*. In this regard, we would note that attempts at settlement do not evidence waiver. *In re Certain Underwriters at Lloyd's, 18 S.W.3d at 876*; *D. Wilson Constr. Co. v. McAllen Indep. Sch. Dist., 848 S.W.2d 226, 230 (Tex. App.-Corpus Christi 1992, writ dism'd w.o.j.)*.

*HN7* Delay alone generally does not establish waiver. *In re Vesta, 192 S.W.3d at 763*. Similarly, purely defensive measures do not substantially invoke the judicial process. *See Transwestern Pipeline Co. v. Horizon Oil & Gas Co., 809 S.W.2d 589, 593 (Tex. App.-Dallas 1991, writ dism'd w.o.j.)* (citing filing of general denial to preclude default judgment and filing of protective order in response to discovery request as examples of defensive measures ); *see also In re Serv. Corp. Int'l, 85 S.W.3d 171, 174 (Tex. 2002)* (orig. proceeding) (holding that objecting to trial setting showed intent to avoid rather than to participate in judicial process). A party does not, for instance, substantially invoke the judicial process merely by participating in discovery. *In re Bruce Terminix Co., 988 S.W.2d at 704*; *Southwind Group, Inc., 188 S.W.3d at 736-737*; **[**7]** *In re Nasr, 50 S.W.3d 23, 27 (Tex. App.-Beaumont 2001, orig. proceeding)*. In contrast, pursuing extensive discovery may substantially invoke the judicial process. *Southwind Group, Inc., 188 S.W.3d at 736-737*; *Nationwide of Bryan, Inc., 969 S.W.2d at 522*.

*HN8* Even when a party has substantially invoked the judicial process, a party's right to arbitration is not waived absent a clear showing that the opposing party has been prejudiced. *See In re Vesta Ins. Group, 192 S.W.3d at 763*; *In re Bruce Terminix Co., 988 S.W.2d at 704*. In determining whether or not a party has been prejudiced, courts focus on factors such as: (1) the movant's access to information that is not discoverable in arbitration; and (2) the opponent's incurring costs and fees due to the movant's actions or delay. *See In re Bruce Terminix Co., 988 S.W.2d at 704*; *Southwind Group, Inc., 188 S.W.3d at 737*; *Williams Indus., Inc., 110 S.W.3d at 135*.

IV. Analysis

We now turn to the procedural history of this matter. The underlying lawsuit was originally filed on December 16, 2005. Spohn did not move to compel arbitration **[*480]** until February 8, 2007, after the case had been set for trial on three separate dates and almost fourteen months **[**8]** after the inception of the lawsuit. Spohn filed an amended motion to compel arbitration on February 22, 2007. The trial court heard arguments on the motion to compel arbitration on March 2, 2007, and requested supplemental briefing, which was subsequently filed in April and May. On June 20, 2007, Spohn filed a petition for writ of mandamus complaining of the trial court's failure to rule and argued that the trial court's failure to rule was a denial of the motion to compel "[f]or all practical purposes." The trial court entered an order denying Spohn's motion to compel arbitration on June 28, 2007.

During the fourteen-month interval before the motion to compel arbitration was filed, the parties substantially litigated this case. The real parties added an additional defendant to the lawsuit, and Spohn filed a motion for

leave to designate Jesus Alvarez as a responsible third party and filed an original third party petition seeking to add claims against Jesus Alvarez to the lawsuit. Spohn also applied for a temporary restraining order and temporary injunction against real parties in interest, which were granted by the trial court.

As mentioned previously, the matter was set for trial **[**9]** on no less than three occasions before Spohn first mentioned the issue of arbitration. Spohn participated in a docket control conference and a docket control order was entered setting this matter for trial on December 3, 2006, with an alternate setting for April 2, 2007. After plaintiffs added an additional defendant, the parties agreed to pass the December setting and proceed with the April 2, 2007 setting. On January 3, 2007, Spohn filed a verified motion for continuance, requesting that the trial date be reset, and also requested entry of a Level III discovery plan. The trial court granted Spohn's motion for continuance and, on January 8, 2007, reset the case for trial in August of 2007.

During this same fourteen-month period of time before Spohn moved to compel arbitration, the parties engaged in voluminous discovery. Spohn initiated and commenced a significant amount of affirmative discovery. In addition to standard requests for disclosure, Spohn sent seven separate sets of written discovery to real parties in interest. These discovery requests, which are part of the record, are substantive and address the merits of the case, including both liability and damage issues. [1] Spohn **[**10]** also ordered nineteen sets of business records from third parties. Spohn filed numerous discovery motions, including eight motions to compel, and requested entry of an agreed protective order. Without referencing or mentioning **[*481]** an alleged right to arbitration, Spohn presented seventeen of its employees for deposition.

The parties, including Spohn, sought affirmative relief regarding their discovery efforts. In the criminal cause pending against Jesus Alvarez filed in the 156th District Court of Bee County, Texas, Spohn moved to hold counsel for real parties in interest in contempt of court based on alleged discovery abuse. While we ordinarily would not consider actions in a separate cause as indicative of waiver, we would note that Spohn's motion for contempt expressly stated that:

> Movant seeks a contempt finding from this Court, so it may present such finding to [respondent in this underlying proceeding] in connection with various steps civil defense counsel will take to suppress the use of the improperly obtained video and/or transcript of Mr. Alvarez's sworn statement, for any purpose, in the civil matter.

Accordingly, we construe Spohn's actions in this separate lawsuit as part of its strategic plan of defense in the underlying **[**12]** matter that would be inconsistent with a right to arbitrate. Moreover, real parties in interest sought and received sanctions against Spohn in the instant case for its failure to identify persons with relevant knowledge and its representations regarding the lack of video surveillance of Spohn's premises, when it possessed, but failed to identify or produce, video surveillance of Spohn's premises on the date of Debra Slough's abduction and murder.

Finally, counsel for real parties in interest testified, by affidavit, that he had asked counsel for Spohn early in the litigation whether there were any reasons real parties could not bring the claims set out in their petition

---

[1] Written discovery propounded by Spohn includes: (1) Spohn's first set of interrogatories and first request for production to Corey Slough, individually (thirteen interrogatories and thirteen requests for production); (2) Spohn's first request for production to Corey Slough, as representative of the estate of Debra Slough, deceased (nine interrogatories); (3) Spohn's second request for production and first set of interrogatories to Corey Slough, as representative of the estate of Debra Slough, deceased (seven requests for production and one interrogatory); (4) Spohn's third request for production to Corey Slough, as representative of the estate of Debra Slough, deceased (twelve requests for production); (5) Spohn's first set of interrogatories and requests for production to Corey Slough, as next friend to Katelyn Slough (fourteen interrogatories and ten requests for production); **[**11]** (6) Spohn's first set of interrogatories and requests for production to plaintiff, Corey Slough, as next friend to Holly Slough (same); and (7) Spohn's first set of interrogatories and requests for production to plaintiff, Corey Slough, as next friend to Stacey Slough (same).

because he was concerned that Spohn might consider decedent Debra Slough to be an employee within the course and scope of her employment, and thus subject to the employee benefit plan containing the arbitration agreement. Counsel stated that Spohn repeatedly and expressly denied this. Counsel for Spohn also took the position that Slough's murder did not qualify as an "event" under the employee benefit plan because of a "criminal act by a third party." Further, Spohn has denied any benefits to the Slough family under **[\*\*13]** the employee benefit plan.

Considering the individual facts and circumstances of this case, we conclude that Spohn substantially invoked the judicial process. Although delay alone does not establish waiver, fourteen months passed before Christus moved to compel arbitration, and, under these circumstances, we would conclude that Spohn failed to timely request arbitration. *See In re Certain Underwriters at Lloyd's, 18 S.W.3d at 872-873*; *Sedillo, 5 S.W.3d at 827*. Two separate trial settings had been passed and the matter had already been set for trial a third time, at Spohn's request via a verified motion for continuance, before Spohn moved to compel arbitration. *Cf. Interconex, Inc. v. Ugarov, 224 S.W.3d 523, 534-35 (Tex. App.-Houston [1st Dist.] 2007, no pet.)* (movant acted inconsistently with its right to arbitrate when it requested that the case be reset and failed to file a motion to compel arbitration until shortly before trial, which it had specifically requested and caused to be set at a certain date). According to the written discovery contained in the record, Spohn sought substantive discovery on the merits, pertaining to both liability and damages, through numerous discovery **[\*\*14]** requests and motions. *Southwind Group, Inc., 188 S.W.3d at 736-737*; *Nationwide of Bryan, Inc., 969 S.W.2d at 522*. Moreover, Spohn's third-party petition, motion for contempt, and attempt to impose sanctions constitute specific and deliberate actions that are inconsistent **[\*482]** with the right to arbitrate and suggest that Spohn was attempting to achieve a satisfactory result through the judicial process.

While none of these factors alone would establish waiver of the right to arbitration, the combination herein does. *See In re Certain Underwriters at Lloyd's, 18 S.W.3d at 872-873*; *Sedillo, 5 S.W.3d at 827*; *Central Nat'l Ins. Co. v. Lerner, 856 S.W.2d 492, 494 (Tex. App.-Houston [1st Dist.] 1993, orig. proceeding)*.

Having determined that Spohn substantially invoked the judicial process, we next consider whether real parties in interest have made a clear showing that they have been prejudiced. *See In re Vesta Ins. Group, 192 S.W.3d at 763*; *In re Bruce Terminix Co., 988 S.W.2d at 704*.

In the instant case, counsel for real parties in interest testified by affidavit that compelling arbitration would "greatly prejudice" real parties in interest. Counsel testified that real parties in interest spent **[\*\*15]** approximately $ 60,000 to $ 70,000 in expenses in developing this matter for trial. Counsel further testified that he and co-counsel spent more than 1,000 hours on the case in preparing it for trial, and, estimating their hourly rate at $ 350 per hour, had invested more than $ 350,000 in attorney's fees. Counsel deposed seventeen witnesses before Spohn moved to compel arbitration and ordered records through depositions on written questions from twenty-three non-parties. Counsel propounded twelve substantive sets of written discovery to Spohn. Counsel testified that, had Spohn requested arbitration before discovery, he would have used a different discovery strategy and limited the depositions and expenses incurred because of the limits customarily proposed in arbitration proceedings. Counsel further testified that Spohn's failure to identify fact witnesses and failure to acknowledge the existence of, or produce, video surveillance of its premises on the date of the incident, greatly increased the time and expense of this lawsuit. Finally, counsel for real parties testified that he had relied on representations by Spohn's counsel that this was not an "event" under Spohn's plan because **[\*\*16]** of a "criminal act by a third party."

Corey Slough testified by affidavit that he and his children were expecting this matter to be resolved by trial in April or August, and having to continue this matter via arbitration, with no specific end date in sight, would be "highly prejudicial and detrimental" to him and his three daughters. "We have been receiving counseling to

get through this ordeal, and it will be very prejudicial for this to keep going because of Spohn's agreement to the trial setting, and now trying to back out of it . . . ."

Based on the record, we conclude that real parties in interest have made a clear showing of prejudice. *See In re Vesta Ins. Group, 192 S.W.3d at 763*.

V. Conclusion

Even given the strong presumption against waiver, we conclude that Spohn substantially invoked the judicial process to its opponents' detriment. Real parties in interest have identified acts by Spohn that are inconsistent with its right to arbitrate and have further shown resultant prejudice on their part. Accordingly, the Court, having examined and fully considered the petition for writ of mandamus and response thereto is of the opinion that relator has not shown itself entitled to the **[**17]** relief sought. Accordingly, the petition for writ of mandamus is DENIED. *See TEX. R. APP. P. 52.8(a)*. Any pending motions are dismissed as moot.

ROGELIO VALDEZ,

Chief Justice

Opinion delivered and filed

this the 31st day of July, 2007.



⚠ Caution

As of: September 1, 2015 5:10 PM EDT

## *In re Conseco Fin. Servicing Corp.*

Court of Appeals of Texas, Tenth District, Waco

June 7, 2000, Delivered ; June 7, 2000, Filed

No. 10-00-121-CV

**Reporter**

19 S.W.3d 562; 2000 Tex. App. LEXIS 3822

IN RE CONSECO FINANCE SERVICING CORP. F/K/A GREEN TREE FINANCIAL SERVICING CORPORATION

**Disposition:** [**1] Writ conditionally granted.

## Core Terms

arbitration, unconscionable, disputes, parties, arbitration agreement, arbitration clause, motion to compel arbitration, mobile home, trial court, interstate commerce, parties agree, mandamus, Collection, scope of arbitration, statutory claim, Manufactured, enforceable, provides, issues, orig

## Case Summary

### Procedural Posture

Petitioner requested a writ of mandamus directing respondent trial judge of the 82nd District Court (Texas) to grant petitioner's motion to compel arbitration in a suit against petitioner alleging violations of the Texas Debt Collection Act, *Tex. Fin. Code Ann. § 392.301* (1998), and Texas Deceptive Trade Practices Act, *Tex. Bus. & Com. Code Ann. §§ 17.46(b)(12)*, *17.50* (Supp. 2000).

### Overview

After receiving a loan from petitioner to purchase a manufactured home, respondent borrower and his wife sued petitioner for violations of the Texas Debt Collection Act, *Tex. Fin. Code Ann. § 392.301* (1998), and the Texas Deceptive Trade Practices Act, *Tex. Bus. & Com. Code Ann. §§ 17.46(b)(12)*, *17.50* (Supp. 2000). Respondent trial judge denied petitioner's motion to compel arbitration pursuant to a clause in the sales contract. Petitioner sought a writ of mandamus. Because an arbitration clause could not be challenged in a Texas court as unconscionable and because respondent borrower's statutory claims "related to" the sales contract, the court granted mandamus directing respondent trial judge to order arbitration of respondent borrower's claims in compliance with the Federal Arbitration Act, *9 U.S.C.S. § 1 et seq. (1999)*. However, since respondent wife was not a party to the contract, her claims were not required to be arbitrated.

### Outcome

The court granted petitioner's mandamus request as to respondent borrower's claims, directing respondent trial judge to order arbitration, but denied petitioner's request as to respondent wife's claims because she was not a party to contract that contained arbitration clause.

## LexisNexis® Headnotes

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview

Civil Procedure > ... > Arbitration > Federal Arbitration Act > General Overview

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Mandatory ADR

International Trade Law > Dispute Resolution > International Commercial Arbitration > Arbitration

Labor & Employment Law > Collective Bargaining & Labor Relations > Labor Arbitration > Enforcement

*HN1* Both Texas and federal public policy strongly favor the submission of disputes to arbitration. Both governing bodies have established specific statutes to govern arbitration disputes. *9 U.S.C.S. § 1 et seq. (1999)*; *Tex. Civ. Prac. & Rem. Code Ann. § 171.001 et seq.* (2000).

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview

Civil Procedure > ... > Arbitration > Federal Arbitration Act > General Overview

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Mandatory ADR

Civil Procedure > Remedies > Writs > General Overview

Civil Procedure > Appeals > Appellate Jurisdiction > Interlocutory Orders

International Trade Law > Dispute Resolution > International Commercial Arbitration > Arbitration

*HN2* The Federal Arbitration Act, *9 U.S.C.S. § 1 et seq. (1999)*, provides for mandamus review of the denial of a demand for arbitration.

Civil Procedure > ... > Arbitration > Federal Arbitration Act > General Overview

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Mandatory ADR

International Trade Law > Dispute Resolution > International Commercial Arbitration > Arbitration

*HN3* The Federal Arbitration Act, *9 U.S.C.S. § 1 et seq. (1999)*, applies to any contract which "involves" interstate commerce. A contract "involves" interstate commerce if it "affects" interstate commerce, within the broadest meaning of the word approved by the United States Supreme Court.

Civil Procedure > ... > Arbitration > Federal Arbitration Act > General Overview

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Mandatory ADR

International Trade Law > Dispute Resolution > International Commercial Arbitration > Arbitration

*HN4* The happenstance of whether the parties happen to think to insert a reference to interstate commerce in a document is not determinative of whether the contract is governed by the Federal Arbitration Act (FAA), *9 U.S.C.S. § 1 et seq. (1999)*. Rather, the United States Supreme Court insists that the "transaction" in fact "involve interstate commerce" to fall within the coverage of the FAA.

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview

Civil Procedure > ... > Arbitration > Federal Arbitration Act > General Overview

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Mandatory ADR

International Trade Law > Dispute Resolution > International Commercial Arbitration > Arbitration

**HN5** Although the United States Supreme Court requires that the transaction reflected in a contract involve interstate commerce in fact in order for the Federal Arbitration Act, *9 U.S.C.S. § 1 et seq. (1999)*, to apply, it also allows the parties to specify by contract the rules under which arbitration will be conducted. On that basis, the parties may designate which arbitration act they wish to control proceedings under the contract, and the courts will honor that choice.

Civil Procedure > ... > Arbitration > Federal Arbitration Act > General Overview

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Mandatory ADR

International Trade Law > Dispute Resolution > International Commercial Arbitration > Arbitration

**HN6** The Federal Arbitration Act, *9 U.S.C.S. § 1 et seq. (1999)*, creates a substantive body of law that is applicable in state courts.

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview

Civil Procedure > ... > Arbitration > Federal Arbitration Act > General Overview

Civil Procedure > ... > Arbitration > Federal Arbitration Act > Arbitration Agreements

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Mandatory ADR

Estate, Gift & Trust Law > Wills > Revocation of Wills > General Overview

International Trade Law > Dispute Resolution > International Commercial Arbitration > Arbitration

**HN7** A court called upon to determine if arbitration should be compelled under the Federal Arbitration Act, *9 U.S.C.S. § 1 et seq. (1999)*, must determine whether the parties agreed to arbitrate, and if so, whether the scope of the agreement encompasses the asserted claims. Additionally, the agreement to arbitrate may be avoided upon such grounds as exist at law or in equity for the revocation of any contract. *9 U.S.C.S. § 2*.

Civil Procedure > Preliminary Considerations > Federal & State Interrelationships > Erie Doctrine

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview

Civil Procedure > ... > Arbitration > Federal Arbitration Act > General Overview

Civil Procedure > ... > Arbitration > Federal Arbitration Act > Arbitration Agreements

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Mandatory ADR

Contracts Law > Contract Conditions & Provisions > Arbitration Clauses

Estate, Gift & Trust Law > Wills > Revocation of Wills > General Overview

International Trade Law > Dispute Resolution > International Commercial Arbitration > Arbitration

**HN8** Texas procedure controls the decision by a Texas court when it is called on to decide if a disputed claim is subject to an arbitration clause under the Federal Arbitration Act, *9 U.S.C.S. § 1 et seq. (1999)*. Thus, if the opposing party disputes the agreement to arbitrate, i.e., claims that there is no agreement to arbitrate or, conceding that the agreement exists, raises a ground in law or in equity for the revocation of any contract, the court may decide the issue on the basis of affidavits, pleadings, discovery and stipulations, unless the material facts are controverted. If the facts are controverted, by opposing affidavit or otherwise admissible evidence, the trial court must conduct an evidentiary hearing to determine those disputed facts before deciding if there is an enforceable agreement to arbitrate between the parties.

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview

Civil Procedure > ... > Arbitration > Federal Arbitration Act > General Overview

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Mandatory ADR

Contracts Law > Contract Conditions & Provisions > Arbitration Clauses

International Trade Law > Dispute Resolution > International Commercial Arbitration > Arbitration

Labor & Employment Law > Collective Bargaining & Labor Relations > Federal Preemption > Primacy of Labor Policy

*HN9* Under the Federal Arbitration Act, *9 U.S.C.S. § 1 et seq. (1999)*, when addressing whether a dispute falls within the scope of the parties' arbitration agreement, the court should analyze the agreement under standard contract construction principles. The court's focus should be on the factual allegations involved in the dispute and not on the legal causes of action raised by the parties. As a matter of federal substantive law, any doubts as to whether the dispute falls within the scope of the arbitration agreement should be resolved in favor of arbitration.

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Mandatory ADR

*HN10* The presumption of arbitrability is particularly applicable where the clause is broad; that is, the clause provides for arbitration of "any dispute arising between the parties," or "any controversy or claim arising out of or relating to the contract thereof," or "any controversy concerning the interpretation, performance or application of the contract." In such instances, absent any express provisions excluding a particular grievance from arbitration, only the most forceful evidence of purpose to exclude the claim from arbitration can prevail.

Civil Procedure > ... > Arbitration > Federal Arbitration Act > General Overview

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Mandatory ADR

Civil Procedure > Remedies > Writs > General Overview

Civil Procedure > Appeals > Standards of Review > Abuse of Discretion

International Trade Law > Dispute Resolution > International Commercial Arbitration > Arbitration

*HN11* Mandamus issues only to correct a clear abuse of discretion or the violation of a duty imposed by law when there is no other adequate remedy by law. When the trial court's decision rests on the resolution of factual issues or matters committed to the court's discretion, the relator must establish that the trial court could reasonably have reached only one decision. A trial court's failure to correctly apply the Federal Arbitration Act, *9 U.S.C.S. § 1 et seq. (1999)*, to the facts of a dispute constitutes an abuse of discretion for which there is no adequate remedy at law.

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Judicial Review

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Mandatory ADR

Civil Procedure > Remedies > Writs > General Overview

Contracts Law > Contract Conditions & Provisions > Arbitration Clauses

*HN12* With respect to a mandamus action, if the trial court has held an evidentiary hearing and has resolved disputed issues of fact, the reviewing court may not substitute its judgment on the facts for that of the trial court. Thus, if the enforceability of an arbitration agreement is properly challenged and the trial court resolves disputed facts in route to determining that issue, the reviewing court may disturb the trial court's decision only if it was "arbitrary and unreasonable." A review of a trial court's determination of the legal principles controlling its

ruling, however, is much less deferential. A trial court has no discretion in determining what the law is or applying the law to the facts. Thus, a clear failure by the trial court to analyze or apply the law correctly will constitute an abuse of discretion, and may result in reversal by the extraordinary writ.

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Mandatory ADR

Civil Procedure > Appeals > Standards of Review > De Novo Review

Contracts Law > Contract Interpretation > General Overview

Labor & Employment Law > Collective Bargaining & Labor Relations > Labor Arbitration > Enforcement

*HN13* The scope of an unambiguous arbitration agreement is an issue of contract construction. Thus, it is a question of law subject to de novo review on appeal.

Civil Procedure > Appeals > Reviewability of Lower Court Decisions > Preservation for Review

*HN14* If the trial court's decision does not require resolution of factual issues or if there is no indication that it received and considered evidence in arriving at its judgment, a complete record of the hearing is not required for appellate review.

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview

Civil Procedure > ... > Arbitration > Federal Arbitration Act > General Overview

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Mandatory ADR

Contracts Law > Contract Conditions & Provisions > Arbitration Clauses

Estate, Gift & Trust Law > Wills > Revocation of Wills > General Overview

International Trade Law > Dispute Resolution > International Commercial Arbitration > Arbitration

Real Property Law > Mobilehomes & Mobilehome Parks > General Overview

*HN15* To avoid being compelled to arbitrate claims within the scope of an agreement, a party must come forward with grounds as exist at law or in equity for the revocation of any contract. *9 U.S.C.S. § 2*.

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Mandatory ADR

Contracts Law > Contract Conditions & Provisions > Arbitration Clauses

Contracts Law > Defenses > Unconscionable > General Overview

Contracts Law > Defenses > Unconscionable > Arbitration Agreements

Real Property Law > Mobilehomes & Mobilehome Parks > General Overview

*HN16* Whether the terms and conditions of an arbitration agreement are themselves unconscionable is a matter which must be submitted to the designated arbitrator. Thus, in Texas, a claim that the substance of an arbitration clause is unconscionable is not a ground which can be asserted in court to defeat a motion to compel arbitration as a matter of law.

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Mandatory ADR

Contracts Law > Contract Conditions & Provisions > Arbitration Clauses

*HN17* An agreement to arbitrate "all disputes, claims or controversies arising from or relating to" the contract is a broad arbitration agreement, which does not exclude any claims from its scope. Thus, a party opposing arbitration is required to present the most forceful evidence of purpose to exclude a claim from arbitration to avoid the effect of a broad arbitration clause.

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Mandatory ADR

Civil Procedure > Appeals > Standards of Review

*HN18* If there is no claim that an arbitration clause is ambiguous, the appellate court will construe the clause as a matter of law, dispensing with the necessity of a record from the motion-to-compel hearing.

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Mandatory ADR

Contracts Law > Contract Conditions & Provisions > Arbitration Clauses

Contracts Law > Contract Interpretation > General Overview

*HN19* Claims based on the collection of debts owed on a contract arise from or relate to the contract. Such claims are within the scope of a broad arbitration clause.

Antitrust & Trade Law > Consumer Protection > Deceptive & Unfair Trade Practices > General Overview

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Mandatory ADR

Contracts Law > Contract Conditions & Provisions > Arbitration Clauses

*HN20* Claims under the Texas Deceptive Trade Practices Act, *Tex. Bus. & Com. Code Ann. §§ 17.46(b)(12)*, *17.50* (Supp. 2000), fall within the scope of an arbitration agreement.

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview

Civil Procedure > ... > Arbitration > Federal Arbitration Act > General Overview

Civil Procedure > ... > Arbitration > Federal Arbitration Act > Arbitration Agreements

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Mandatory ADR

Contracts Law > Contract Conditions & Provisions > Arbitration Clauses

Governments > Legislation > Statutory Remedies & Rights

International Trade Law > Dispute Resolution > International Commercial Arbitration > Arbitration

*HN21* Statutory claims may be the subject of an arbitration agreement, enforceable pursuant to the Federal Arbitration Act (FAA), *9 U.S.C.S. § 1 et seq. (1999)*. Only if Congress itself has evinced an intention to preclude a waiver of judicial remedies for the statutory rights at issue may a party avoid its bargain to arbitrate its claims. However, because the FAA preempts state laws to the contrary, a state may not avoid the application of the FAA to its statutory claims by its own acts.

Banking Law > Consumer Protection > Fair Debt Collection > General Overview

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview

Civil Procedure > ... > Arbitration > Federal Arbitration Act > General Overview

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Mandatory ADR

Contracts Law > Contract Conditions & Provisions > Arbitration Clauses

Contracts Law > Defenses > Unconscionable > Arbitration Agreements

International Trade Law > Dispute Resolution > International Commercial Arbitration > Arbitration

*HN22* Although a federal statutory claim may escape an arbitration clause that is subject to the Federal Arbitration Act, *9 U.S.C.S. § 1 et seq. (1999)*, depending upon Congress's intent, a state statutory cause of action, such as a claim for violations of the Texas Debt Collections Act, *Tex. Fin. Code Ann. § 392.301* (1998), may not.

**Counsel:** Richard A. McKinney, HIGIER, LAUTIN, FOXMAN & McKINNEY, P.C., Austin, TX, for Relator.

Ron Butler, Attorney at Law, Marlin, TX, for Real Party in Interest.

**Judges:** BILL VANCE, Justice. Before Chief Justice Davis, Justice Vance, and Justice Gray.

**Opinion by:** BILL VANCE

## Opinion

 **[*565] Original Proceeding**

Conseco Finance Servicing Corp. loaned Jody Grams money to purchase a manufactured home. When Jody and his wife, Candace, sued Conseco for violations of the Texas Debt Collection Act and the Texas Deceptive Trade Practices Act, Conseco invoked an arbitration clause contained in the sales contract. Respondent, Judge of the 82nd District Court, denied Conseco's motion to compel arbitration, and Conseco brings this mandamus proceeding asking us to order Respondent to grant that motion. Jody argues that his claims are not subject to arbitration because the arbitration clause in the contract is unconscionable and his statutory claims are not within its scope. Because the Texas Supreme Court has stated that an arbitration clause cannot be challenged in a court as unconscionable and because Jody's statutory claims "relate to" his contract with Conseco, we will direct Respondent to order the parties to arbitrate his claims. We will not require Candace's claims to be arbitrated because she is not a party to the contract **[**2]** with Conseco and Conseco has not attempted to show that she should be bound by that contract otherwise.

Jody purchased his home on August 12, 1997. The contract is a three-page preprinted, fill-in-the-blank form. There are three parties listed: the buyer--Jody Grams, the seller--Budget Mobile Homes, and the assignee--Green Tree Financial Servicing Corp. (Conseco's predecessor). The contract defines "I" to be the buyer and "you" to be the seller and the assignee. The first page lists the details of the transaction, including the number and amounts of payments, the make, model, and serial number of the home, and states that Jody is giving a security interest in the home. The next two pages state the terms of the contract. By these provisions, Jody agrees to make payments on the home according to the schedule on the first page, to keep the home in good condition and to keep it fully insured by a policy payable to the seller. He also agrees that Conseco could accelerate the amount he owed if he defaulted in performing any obligation created by the contract.

The arbitration clause at issue is on the third page of the contract and provides, in full:

14. ARBITRATION: All disputes, claims **[**3]** or controversies arising from or **[*566]** relating to this Contract or the parties thereto shall be resolved by binding arbitration by one arbitrator selected by you with my consent.

This agreement is made pursuant to a transaction in interstate commerce and shall be governed by the Federal Arbitration Act at *9 U.S.C. Section 1*. Judgment upon the award rendered may be entered in any court having jurisdiction. The parties agree and understand that they chose arbitration instated of litigation to resolve disputes. The parties understand that they have a right to litigate disputes in court, but that they prefer to resolve their disputes through arbitration except as provided herein. THE PARTIES VOLUNTARILY AND KNOWINGLY WAIVE ANY RIGHT THEY HAVE TO A JURY TRIAL EITHER PURSUANT TO ARBITRATION UNDER THIS CLAUSE OR PURSUANT TO A COURT ACTION BY YOU (AS PROVIDED HEREIN). The parties agree and understand that all disputes arising under case law, statutory law and any other laws including, but not limited to all contract, tort and property disputes, will be subject to binding arbitration in accord with this Contract. The parties agree that the arbitrator shall have all powers provided **[\*\*4]** by law, the Contract and the agreement of the parties. These powers shall include all legal and equitable remedies including, but not limited to, money damages, declaratory relief and injunctive relief. Notwithstanding anything hereunto the contrary, you retain an option to use judicial (filing a lawsuit) or non-judicial relief to enforce a security agreement relating to the Manufactured Home secured in a transaction underlying this arbitration agreement, to enforce the monetary obligation secured by the Manufactured Home or to foreclose on the Manufactured Home. The institution and maintenance of a lawsuit to foreclose upon any collateral, to obtain a monetary judgment or to enforce the security agreement shall not constitute a waiver of the right of any party to compel arbitration regarding any other dispute or remedy subject to arbitration in this Contract, including the filing of a counterclaim in a suit brought by you pursuant to this provision.

On November 12, 1999, the Grams filed suit against Conseco, alleging that it had violated both the Texas Debt Collection Act and the Deceptive Trade Practices Act. *TEX. FIN. CODE ANN. § 392.301* (Vernon 1998); *TEX. BUS. & COM. CODE ANN.* **[\*\*5]** *§§ 17.46(b)(12)*, *17.50* (Vernon Supp. Pamph. 2000). Conseco filed a motion to compel arbitration, relying on this clause to argue that the parties had agreed to arbitrate "all disputes, claims and controversies which arise from or relate to the Contract." Apparently, Respondent conducted a hearing on the motion to compel, [1] and denied Conseco's request. This mandamus proceeding followed.

**[\*\*6]** *What law applies*

*HN1* Both Texas and Federal public policy strongly favor the submission of disputes to arbitration. *D. Wilson Constr. Co. v. Cris Equip. Co., Inc., 988 S.W.2d 388, 393* (Tex. App.--Corpus Christi 1999, orig. proceeding). Both governing bodies have established specific statues to govern arbitration disputes. *9 U.S.C.A. § 1, et seq. (West 1999)*; *TEX. CIV. PRAC. & REM. CODE ANN. § 171.001, et seq.* (Vernon Supp. 2000). Which statute applies to this contract has several implications. First, if Conseco's demand for arbitration comes **[\*567]** within the ambit of *HN2* the Federal Arbitration Act (FAA), it is entitled to seek review of the denial of that motion by mandamus. *Jack B. Anglin Co., Inc. v. Tipps, 842 S.W.2d 266, 272 (Tex. 1992)*. If its claim must be based on the Texas Act, mandamus is not appropriate because an interlocutory appeal is available. *Id*.; *TEX. CIV. PRAC. & REM. CODE ANN. § 171.098(a)(1)*. Secondly, on the substance of the claim, Texas law provides for different restrictions on an arbitration clause than does the Federal statute. **[\*\*7]** *See, e.g., TEX. CIV. PRAC. & REM. CODE ANN. § 171.002*. Thus, depending upon which law governs, we must consider different requirements to determine if Respondent abused his discretion when he refused to order the dispute to arbitration.

*HN3* The Federal act applies to any contract which "involves" interstate commerce. A contract "involves" interstate commerce if it "affects" interstate commerce, within the broadest meaning of the word approved by

---

[1]  We say "apparently" because Conseco has not presented us with a reporter's record from a hearing on its motion even though the order denying that motion indicates that "[a] record was duly made." However, the parties agree that the only evidence Respondent had before him was the pleadings, including the Grams' verified pleading seeking a temporary restraining order, the exhibits attached to Conseco's motion to compel arbitration, and the exhibits attached to its brief in support of that motion. The parties agree that no other evidence was heard by Respondent during the course of the hearing.

the United States Supreme Court. *Allied-Bruce Terminix Co. v. Dobson, 513 U.S. 265, 273-74, 115 S. Ct. 834, 839, 130 L. Ed. 2d 753 (1995)*. **HN4** The "happenstance [of] whether the parties happened to think to insert a reference to interstate commerce in the document" is not determinative of whether the contract is governed by the FAA. *Dobson, 513 U.S. at 278, 115 S. Ct. at 842*. Rather, the United States Supreme Court "insists that the 'transaction' in fact 'involve[]' interstate commerce" to fall within the coverage of the act. *Id., 513 U.S. at 281, 115 S. Ct. at 843*.

**HN5** Although the United States Supreme Court requires that the transaction reflected in the contract **[**8]** involve interstate commerce in fact, it has also allowed the parties to "specify by contract the rules under which that arbitration will be conducted." *Volt Info. Sciences v. Board of Trustees, 489 U.S. 468, 479, 109 S. Ct. 1248, 1256, 103 L. Ed. 2d 488 (1989)*. On that basis, "the parties may designate which arbitration act they wish to control proceedings under the contract, and the courts will honor that choice." *Russ Berrie and Co. v. Gantt, 998 S.W.2d 713, 715 n.6* (Tex. App.--El Paso 1999, no pet.). Here, the parties agreed in the contract that the arbitration would be governed by the FAA, and we will apply those provisions to this dispute. Thus, this proceeding is properly before us on Conseco's petition for a writ of mandamus.

### The law as applied in a trial court

**HN6** The Federal Arbitration Act creates a substantive body of law that is applicable in state courts. *Perry v. Thomas, 482 U.S. 483, 489, 107 S. Ct. 2520, 2525, 96 L. Ed. 2d 426 (1987)*. **HN7** A court called upon to determine if arbitration should be compelled under the FAA must determine (1) whether the parties agreed to arbitrate, and if so, (2) whether the scope **[**9]** of the agreement encompasses the asserted claims. *Chelsea Square Textiles, Inc. v. Bombay Dyeing and Manufacturing Co., 189 F.3d 289, 294 (2nd Cir. 1999)*; *see also Leander Cut Stone Co. v. Brazos Masonry, Inc., 987 S.W.2d 638, 640* (Tex. App.--Waco 1999, no pet.). Additionally, the agreement to arbitrate may be avoided "upon such grounds as exist at law or in equity for the revocation of any contract." *9 U.S.C.A. § 2*; *Doctor's Associates, Inc. v. Casarotto, 517 U.S. 681, 686, 116 S. Ct. 1652, 1656, 134 L. Ed. 2d 902 (1996)*.

**HN8** Texas procedure controls the decision by a Texas court when it is called on to decide if a disputed claim is subject to an arbitration clause under the Federal Act. *Jack B. Anglin, 842 S.W.2d at 268*. Thus, if the opposing party disputes the agreement to arbitrate, *i.e.*, claims that there is no agreement to arbitrate or, conceding that the agreement exists, raises a ground in law or in equity for the revocation of any contract, the court may decide the issue on the basis of affidavits, pleadings, discovery and stipulations, unless the material facts are controverted. *Leander Cut Stone, 987 S.W.2d at 640*. **[**10]** If the facts **[*568]** are controverted, by opposing affidavit or otherwise admissible evidence, the trial court must conduct an evidentiary hearing to determine those disputed facts before deciding if there is an enforceable agreement to arbitrate between the parties. *Id*.

**HN9** When addressing the second issue--whether the dispute falls within the scope of the parties' arbitration agreement--the court should analyze the agreement under standard contract construction principles. *Id*. Its focus should be on the factual allegations involved in the dispute and not on the legal causes of action raised by the parties. *Id*. As a matter of federal substantive law, any doubts as to whether the dispute falls within the scope of the arbitration agreement should be resolved in favor of arbitration. *Mastrobuono v. Shearson Lehman Hutton, Inc., 514 U.S. 52, 62* & n.8, *115 S. Ct. 1212, 1218* & n.8, *131 L. Ed. 2d 76 (1995)*. As our sister court of appeals has observed:

**HN10** The presumption of arbitrability is particularly applicable where the clause is broad; that is, it provides for arbitration of "any dispute arising between the parties," or "any controversy or claim arising out of or relating **[**11]** to the contract thereof," or "any controversy concerning the interpretation, performance or application of the contract." [citations omitted]. In such instances, absent any express provisions excluding a particular

grievance from arbitration, only the most forceful evidence of purpose to exclude the claim from arbitration can prevail.

*Babcock & Wilcox Co. v. PMAC, Ltd., 863 S.W.2d 225, 230* (Tex. App.--Houston [14th Dist.] 1993, writ denied); *see also Southwest Health Plan, Inc. v. Sparkman, 921 S.W.2d 355, 358* (Tex. App.--Fort Worth 1996, no writ).

### Our review of the trial court's actions

"**HN11** Mandamus issues only to correct a clear abuse of discretion or the violation of a duty imposed by law when there is no other adequate remedy by law." *Walker v. Packer, 827 S.W.2d 833, 839 (Tex. 1992)* (quoting *Johnson v. Fourth Court of Appeals, 700 S.W.2d 916, 917 (Tex. 1985))*; *In re Bishop, 8 S.W.3d 412, 416* (Tex. App.--Waco 1999, orig. proceeding). When the trial court's decision rests on the resolution of factual issues or matters committed to the court's discretion, "the relator must **[**12]** establish that the trial court could reasonably have reached only one decision." *Walker, 827 S.W.2d at 839-40*. A trial court's failure to correctly apply the FAA to the facts of a dispute constitutes an abuse of discretion for which there is no adequate remedy at law. *Jack B. Anglin, 842 S.W.2d at 272-73*.

**HN12** If the trial court has held an evidentiary hearing and has resolved disputed issues of fact, we may not substitute our judgment on the facts for that of the trial court. *Walker, 827 S.W.2d at 839*. Thus, if the enforceability of the arbitration agreement was properly challenged and Respondent resolved disputed facts in route to determining that issue, we may disturb his decision only if it was "arbitrary and unreasonable." *Walker, 827 S.W.2d at 840*.

A review of a trial court's determination of the legal principles controlling its ruling, however, is much less deferential. A trial court has no discretion in determining what the law is or applying the law to the facts. *Id*. Thus, a clear failure by the trial court to analyze or apply the law correctly will constitute an abuse of discretion, and may result in reversal by the extraordinary **[**13]** writ. *Id*.; *In re Monsanto Co., 998 S.W.2d 917, 921-22* (Tex. App.--Waco 1999, orig. proceeding). **HN13** The scope of an unambiguous arbitration agreement is an issue of contract construction, thus, a question of law subject to *de novo* review on appeal. *Leander Cut Stone, 987 S.W.2d at 640*. Similarly, if the court was not required or not allowed to resolve fact issues to determine if the arbitration agreement was enforceable, but based its ruling on a pure issue of law, our **[*569]** review of its decision on the first prong is much less deferential.

On a related matter, when a trial court's decision is based on a factual determination, we may not find that the court abused its discretion in the absence of a complete record from the hearing. *See Walker, 827 S.W.2d at 837*. **HN14** If the court's decision does not require resolution of factual issues or if there is no indication that it received and considered evidence in arriving at its judgment, a complete record of the hearing is not required. *See Walker, 827 S.W.2d at 837 n.3*; *Barnes v. Whittington, 751 S.W.2d 493, 495 (Tex. 1988)*; *Humphreys v. Caldwell, 881 S.W.2d 940, 944* **[**14]** (Tex. App.--Corpus Christi 1994, orig. proceeding).

### Is there an enforceable agreement to arbitrate?

Conseco attached a copy of the contract to its motion to compel arbitration. Thus, it has met its burden of presenting evidence of an arbitration agreement between it and Jody. *In re Oakwood Mobile Homes, Inc., 987 S.W.2d 571, 573 (Tex. 1999)*; *Leander Cut Stone, 987 S.W.2d at 640*. **HN15** To avoid being compelled to arbitrate claims within the scope of that agreement, Jody must have come forward with "grounds as exist at law or in equity for the revocation of any contract." *9 U.S.C.A. § 2*; *Casarotto, 517 U.S. at 687, 116 S. Ct. at 1656*; *Oakwood Mobile Homes, 987 S.W.2d at 573*. Because we do not have a reporter's record from the hearing before the trial court, we do not know what grounds Jody argued to avoid the arbitration clause. However, in this court,

he advances only one reason that the clause is unenforceable: He claims that the clause was unconscionable when it was made because its terms potentially require arbitration of intentional torts and require him to arbitrate any claim he may **[**15]** have against Conseco but reserves Conseco's right to litigate most of its claims against him.

Although we are sympathetic to Jody's complaints regarding this arbitration clause, [2] **[**16]** our hands are tied by the Texas Supreme Court's decision in *Oakwood Mobile Homes*. According to the Court, "*HN16* whether the terms and conditions of an arbitration agreement are themselves unconscionable is a matter which must be submitted to the designated arbitrator." *Oakwood Mobile Homes, 987 S.W.2d at 573 n.3*. [3] Thus, in Texas, a claim **[*570]** that the substance of an arbitration clause is unconscionable is not a ground which can be asserted in court to defeat a motion to compel arbitration as a matter of law. *Id.*

**[**17]** Because Jody asserts only a ground which is outside of the authority of Respondent to consider, it is irrelevant what evidence Respondent might have heard on the issue. Thus, we do not need a reporter's record from the hearing to conclude Respondent abused his discretion if he determined that the arbitration agreement was unenforceable because it is unconscionable. *Walker, 827 S.W.2d at 837*; *Barnes, 751 S.W.2d at 495*; *Humphreys, 881 S.W.2d at 944*.

Are the claims in this suit within the scope of the arbitration agreement?

When he purchased the mobile home, Jody *HN17* agreed to arbitrate "all disputes, claims or controversies arising from or relating to" the contract. This is a broad arbitration agreement, which does not exclude any of Jody's claims from its scope; thus, Jody was required to present "the most forceful evidence of purpose to exclude" his claim from arbitration to avoid its effect. *Babcock, 863 S.W.2d at 230*. Because the scope of the clause is a matter of contract construction, the only source that a court can look to for that "forceful evidence" is the terms of the contract itself, unless the **[**18]** clause is ambiguous. *See Leander Cut Stone, 987 S.W.2d at*

---

[2] Courts have held that arbitration clauses which require the party with lesser bargaining power to arbitrate their claims but reserve the right to litigate the claims of the party with the greater power are unconscionable. *Iwen v. U.S. West Direct, 1999 MT 63, 977 P.2d 989, 293 Mont. 512 (Mont. 1999)*; *Arnold v. United Companies Lending Corp., 204 W. Va. 29, 511 S.E.2d 854 (W.Va. 1998)*; *Ramirez v. Circuit City Stores, Inc., 76 Cal. App. 4th 1229, 90 Cal. Rptr. 2d 916 (Cal. App. 1999)*, *review granted*, **94 Cal. Rptr. 2d 1, 995 P.2d 137 (Cal. 2000)**.

[3] Although this statement is contained in a footnote in a per curiam opinion and refers only to an unpublished El Paso Court of Appeals decision for support, we feel obligated to follow it. If we were writing on a blank slate, we would instead follow the United States Supreme Court's holding that "generally applicable contract defenses, such as fraud, duress, or unconscionability, may be applied to invalidate arbitration agreements [by a court] without contravening" the enforcement provision of the FAA. *Doctor's Associates, Inc. v. Casarotto, 517 U.S. 681, 687, 116 S. Ct. 1652, 1656, 134 L. Ed. 2d 902 (1996)*. Unconscionability is a generally applied legal theory in Texas, which allows a court to "refuse to enforce the contract, or [to] enforce the remainder of the contract without the unconscionable clause, or [to] limit the application of any unconscionable clause as to avoid any unconscionable result." TEX. BUS. & COM. CODE ANN. § 2.302 (Vernon 1994). This section applies to the purchase of a mobile home. *See Apeco Corp. v. Bishop Mobile Homes, Inc., 506 S.W.2d 711, 717* (Tex. Civ. App.--Corpus Christi 1974, writ ref'd n.r.e.). Thus, unconscionability is included in the "grounds as exist at law or in equity for the revocation of any contract" which may be applied by a state court to invalidate an arbitration agreement. 9 U.S.C.A. § 2 (West 1999); *Casarotto, 517 U.S. at 686, 116 S. Ct. at 1656*. Our research has disclosed no other court that has taken the position that only the arbitrator has the authority to determine if the terms of the arbitration clause are unconscionable. We have found many courts that have ruled upon an argument based on unconscionability. *See, e.g., Dobbins v. Hawk's Enterprises, 198 F.3d 715 (8th Cir. 1999)*; *Harris v. Green Tree Financial Corp., 183 F.3d 173 (3rd Cir. 1999)*; *We Care Hair Development, Inc. v. Engen, 180 F.3d 838 (7th Cir. 1999)*; *Doctor's Associates, Inc. v. Hamilton, 150 F.3d 157 (2nd Cir. 1998)*; *Stedor Enterprises, Ltd. v. Armtex, Inc., 947 F.2d 727 (4th Cir. 1991)*; *Iwen v. U.S. West Direct, 1999 MT 63, 977 P.2d 989, 293 Mont. 512 (Mont. 1999)*; *Arnold v. United Companies Lending Corp., 204 W. Va. 29, 511 S.E.2d 854 (W.Va. 1998)*; *Williams v. Aetna Finance Co., 83 Ohio St. 3d 464, 700 N.E.2d 859 (Ohio 1998)*; *Sosa v. Paulos, 924 P.2d 357 (Utah 1996)*; *Buraczynski v. Eyring, 919 S.W.2d 314 (Tenn. 1996)*; *Stirlen v. Supercuts, Inc., 51 Cal. App. 4th 1519, 60 Cal. Rptr. 2d 138 (Cal. App. 1997)*; *Powertel, Inc. v. Bexley, 743 So. 2d 570 (Fla. App. 1999)*. Most have rejected the claim.

*640*. **HN18** There is no claim made here that the clause is ambiguous. Thus, we construe the clause as a matter of law, again dispensing with the necessity of a record from the motion-to-compel hearing.

Jody argues that his claims for violations of the Debt Collection Act and the Deceptive Trade Practices Act are not arbitrable under this provision because (1) these claims are not based on the formation, negotiation, terms, or performance of the contract, but relate to Conseco's behavior after the contract was entered, and (2) his claims are statutory causes of action sounding wholly in intentional tort separate and apart from any dispute based on his contractual relationship with Conseco.

Although true that the claim raised by Jody is not based on the formation or the terms of the contract, the arbitration clause is not so limited. Rather, the clause provides for arbitration of any claims "arising from or relating to" the contract. Jody's complaint arises from Conseco's alleged efforts to collect the amounts due under the terms of the agreement. Absent the contract, there would be no relationship between Jody and **[**19]** Conseco, and there would have been no debt the collection of which caused the difficulty between them. *See American Employers' Ins. Co. v. Aiken, 942 S.W.2d 156, 160* (Tex. App.--Fort Worth 1997, no writ). Therefore, we conclude that Jody's **HN19** claims based on Conseco's acts in collecting the debt owed on the contract arise from or relate to the contract and so are within the scope of the arbitration clause. Furthermore, **HN20** the Texas Supreme Court has held that claims under the DTPA fall within the scope of an arbitration agreement. *Jack B. Anglin, 842 S.W.2d at 270-71*.

Jody's second argument for finding that his claim is not within the scope of the arbitration clause is equally **[*571]** unavailing. Although there was some debate as to whether statutory claims were exempt from arbitration, "it is by now clear that **HN21** statutory claims may be the subject of an arbitration agreement, enforceable pursuant to the FAA." *Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 26, 111 S. Ct. 1647, 1652, 114 L. Ed. 2d 26 (1991)*. Only if "*Congress* itself has evinced an intention to preclude a waiver of judicial remedies for the statutory rights at issue" may **[**20]** a party avoid its bargain to arbitrate its claims. *Id*. (emphasis added). However, because the FAA preempts state laws to the contrary, a state may not avoid the application of the FAA to its statutory claims by its own acts. *See Jack B. Anglin, 842 S.W.2d at 271* (holding that the FAA preempts the nonwaiver provisions of the DTPA to the extent it would prevent or restrict enforcement of an arbitration agreement). Thus, **HN22** although a federal statutory claim may escape an arbitration clause that is subject to the FAA, depending upon Congress's intent, a state statutory cause of action, such as Jody's claim for violations of the Texas Debt Collections Act, may not.

### *To what relief is Conseco entitled?*

We have concluded that Jody cannot show that the arbitration agreement in the contract with Conseco is unconscionable and has failed to show that his claims are not within the scope of that clause. Thus, Respondent abused his discretion when he failed to grant Conseco's motion to compel arbitration of Jody's claims. Conseco has no adequate remedy at law to correct this abuse of discretion. Thus, it is entitled to writ of mandamus compelling Respondent to **[**21]** grant the motion and order that Jody's claims be submitted to arbitration. [4]

Conseco goes further than merely asking that Jody be compelled to submit to arbitration. First, it also asks that Candace be required to arbitrate her claims. However, the contract is between only Jody and Conseco. Candace is not a party to it. Conseco has not presented any argument or authority which would allow it to force Candace

---

[4] Although the Civil Practice and Remedies Code provides that the court should "order the parties to arbitrate," Jody, as the party seeking relief, has the burden to go forward with the arbitration after Respondent grants Conseco's motion to compel arbitration of his claims. TEX. CIV. PRAC. & REM. CODE ANN. § 171.021(a) (Vernon Supp. 2000); *In re Bruce Terminix Co., 988 S.W.2d 702, 705-06 (Tex. 1998)*.

to arbitrate any claims she may have against it in the absence of an agreement with Conseco to do so. Thus, we conclude that Respondent did not err in refusing **[\*\*22]** to require Candace to submit her claims to arbitration, and we will not instruct him to do so. *Pepe Int'l Dev. Co. v. Pub Brewing Co., 915 S.W.2d 925, 931* (Tex. App.--Houston [1st Dist.] 1996, no writ); *Prudential-Bache Securities, Inc. v. Garza, 848 S.W.2d 803, 807* (Tex. App.--Corpus Christi 1993, orig. proceeding).

Conseco also asks that we issue an order requiring that Respondent dismiss both Jody's and Candace's claims with prejudice if they have not submitted to arbitration within thirty days of Respondent's order compelling arbitration. Conseco presents no authority or argument justifying this request. Therefore, this relief is denied.

### *Conclusion*

Respondent is directed to withdraw his order denying Conseco's motion to compel arbitration and order that Jody's claims be submitted to arbitration. Confident that Respondent will comply, the writ will issue only if he fails to do so within fourteen days of this opinion.

BILL VANCE

Justice

Before Chief Justice Davis

Justice Vance, and

Justice Gray

Writ conditionally granted

Opinion delivered and filed June 7, 2000



⚠ Caution

As of: September 1, 2015 2:39 PM EDT

# *Am. Std. v. Brownsville Indep. Sch. Dist. (In re D. Wilson Constr. Co.)*

Supreme Court of Texas

February 14, 2006, Argued ; June 30, 2006, Delivered

NO. 05-0326, consolidated with NO. 05-0327

**Reporter**

196 S.W.3d 774; 2006 Tex. LEXIS 644; 49 Tex. Sup. J. 909

IN RE D. WILSON CONSTRUCTION COMPANY, ET AL., RELATORS; AMERICAN STANDARD AND THE TRANE COMPANY, ET AL., PETITIONERS, v. BROWNSVILLE INDEPENDENT SCHOOL DISTRICT, RESPONDENT

**Subsequent History:** **[\*\*1]** Released for Publication August 18, 2006.

**Prior History:** ON PETITION FOR WRIT OF MANDAMUS.

ON PETITION FOR REVIEW FROM THE COURT OF APPEALS FOR THE THIRTEENTH DISTRICT OF TEXAS.

*Am. Std. v. Brownsville Indep. Sch. Dist., 2005 Tex. App. LEXIS 1016 (Tex. App. Corpus Christi, Feb. 10, 2005)*

## Core Terms

arbitration, ambiguous, arbitration agreement, interlocutory appeal, court of appeals, Conditions, contracts, mandamus, parties, trial court, AIA, third-party, orig, state law, Supplementary, per curiam, motion to compel arbitration, consolidated appeal, preempts, invoke, joined, interstate commerce, subcontractors, proceedings, commerce, applies, motions, schools, pet

## Case Summary

### Procedural Posture

Petitioner subcontractor sought review of a judgment from the Court of Appeals for the Thirteenth District (Texas), which denied an interlocutory appeal and a mandamus petition challenging the trial court's refusal to compel arbitration of respondent school district's construction defect claims under the Federal Arbitration Act (FAA), *9 U.S.C.S. §§ 1-16*, and the Texas Arbitration Act (TAA), *Tex. Civ. Prac. & Rem. Code Ann. §§ 171.001-171.098*.

### Overview

The subcontractor sought injunctive relief against the district to preserve evidence in a personal injury action. The district counterclaimed for alleged construction defects and filed third-party actions against several parties, including two general contractors. The trial court found the arbitration agreements, which referenced neither the

FAA nor the TAA, to be ambiguous. The court of appeals dismissed the interlocutory appeal for want of jurisdiction, finding the TAA inapplicable because the dispute concerned a transaction involving commerce. The court concluded that the TAA was not preempted by the FAA because the parties did not assert that anything in the TAA or other state law would subvert enforcement of the agreements; hence, the court of appeals had jurisdiction under both laws. The contracts with the general contractors validly and expressly incorporated by reference the expansive arbitration language in a standard construction industry document. There was no ambiguity in either the validity or the scope of the arbitration agreements. No waiver was effected by cross-actions for indemnity in the personal injury suit or by the subcontractor's pursuit of injunctive relief.

## Outcome

The court conditionally granted the writ of mandamus and directed the trial court to vacate the order that had denied the motions to compel arbitration, to grant one contractor's motion to compel arbitration, to conduct further proceedings to determine whether the other contractor was entitled to arbitration, and to conduct further proceedings to determine whether the various nonsignatories were entitled to arbitration.

## LexisNexis® Headnotes

Civil Procedure > ... > Federal & State Interrelationships > Choice of Law > General Overview

Civil Procedure > ... > Arbitration > Federal Arbitration Act > Arbitration Agreements

Contracts Law > Contract Conditions & Provisions > Arbitration Clauses

*HN1* Contracts that reference neither the Federal Arbitration Act, *9 U.S.C.S. §§ 1-16*, nor the Texas Arbitration Act, *Tex. Civ. Prac. & Rem. Code Ann. §§ 171.001-171.098*, but merely note that the contracts shall be governed by the law of the place where the project is located, invoke federal and state law.

Civil Procedure > ... > Arbitration > Federal Arbitration Act > Scope

*HN2* The Federal Arbitration Act (FAA), *9 U.S.C.S. §§ 1-16*, only preempts contrary state law, not consonant state law. The FAA contains no express pre-emptive provision, nor does it reflect a congressional intent to occupy the entire field of arbitration. But even when Congress has not completely displaced state regulation in an area, state law may nonetheless be pre-empted to the extent that it actually conflicts with federal law--that is, to the extent that it stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress. The question before a court, therefore, is whether application of state law to stay arbitration under a contract in interstate commerce would undermine the goals and policies of the FAA. The FAA preempts state statutes to the extent they are inconsistent with that act.

Civil Procedure > ... > Arbitration > Federal Arbitration Act > Scope

*HN3* There is a four-factor test to determine whether the Texas Arbitration Act, *Tex. Civ. Prac. & Rem. Code Ann. §§ 171.001-171.098*, would thwart the goals and policies of the Federal Arbitration Act (FAA), *9 U.S.C.S. §§ 1-16*, in a particular case. The FAA only preempts the TAA if: (1) the agreement is in writing, (2) it involves interstate commerce, (3) it can withstand scrutiny under traditional contract defenses under state law, and (4) state law affects the enforceability of the agreement. The mere fact that a contract affects interstate commerce, thus triggering the FAA, does not preclude enforcement under the TAA as well. For the FAA to preempt the TAA, state law must refuse to enforce an arbitration agreement that the FAA would enforce, either because (1) the TAA has expressly exempted the agreement from coverage, or (2) the TAA has imposed an enforceability requirement not found in the FAA.

Civil Procedure > ... > Arbitration > Federal Arbitration Act > Orders to Compel Arbitration

Civil Procedure > ... > Writs > Common Law Writs > Mandamus

*HN4* Mandamus is proper to correct a clear abuse of discretion when there is no adequate remedy by appeal, as when a party is erroneously denied its contracted-for arbitration rights under the Federal Arbitration Act, *9 U.S.C.S. §§ 1-16*. Also, a trial court has no discretion in determining what the law is or applying the law to the facts.

Civil Procedure > ... > Arbitration > Federal Arbitration Act > Orders to Compel Arbitration

*HN5* In evaluating a motion to compel arbitration, a court must determine first whether a valid arbitration agreement exists, and then whether the agreement encompasses the claims raised. When deciding whether the parties agreed to arbitrate under the Federal Arbitration Act, *9 U.S.C.S. §§ 1-16*, courts should apply ordinary state law principles regarding the formation of contracts.

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Judicial Review

*HN6* Whether a valid arbitration agreement exists is a legal question subject to de novo review.

Contracts Law > Contract Interpretation > Ambiguities & Contra Proferentem > General Overview

*HN7* Whether contractual ambiguity exists is a question of law. Inartful drafting does not alone render a contractual provision ambiguous. A contract is ambiguous only if it is subject to two or more reasonable interpretations after applying the pertinent rules of construction. Ambiguity does not exist merely because the parties assert forceful and diametrically opposing interpretations.

Civil Procedure > ... > Arbitration > Federal Arbitration Act > Arbitration Agreements

Contracts Law > Contract Conditions & Provisions > Arbitration Clauses

*HN8* A contractual term is not rendered invalid merely because it exists in a document incorporated by reference, and arbitration-related language is no exception to this rule.

Civil Procedure > ... > Arbitration > Federal Arbitration Act > Arbitration Agreements

Contracts Law > Contract Conditions & Provisions > Arbitration Clauses

*HN9* The strong presumption favoring arbitration generally requires that a court resolve doubts as to the scope of the agreements in favor of coverage. Once an agreement is established, a court should not deny arbitration unless it can be said with positive assurance that an arbitration clause is not susceptible of an interpretation which would cover the dispute at issue.

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > Waiver

*HN10* There is a strong presumption against waiver under the Federal Arbitration Act, *9 U.S.C.S. §§ 1-16*. Merely taking part in litigation is not enough unless a party has substantially invoked the judicial process to its opponent's detriment.

**Counsel:** For RELATOR: Mr. John R. Griffith, Ms. Lucia Thompson, GRIFFITH & GARZA, L.L.P., McAllen, TX; Mr. Paul W. Gertz, GERMER GERTZ, L.L.P., Beaumont, TX; Mr. David P. Benjamin, O'CONNELL & BENJAMIN, L.L.P., Mr. Albert M. Gutierrez, Jr., AVAREZ, NOTZON, GUTIERREZ, L.L.P., San Antonio, TX; Ms. Cindy A. Lopez Garcia, Harlingen, TX; Ms. Margery Huston, Mr. Rick Fancher, BARKER LEON

FANCHER & MATTHYS, L.L.P., Corpus Christi, TX; Mr. Rob Martin, BATEMAN/PUGH, P.L.L.C., Mr. Fred L. Shuchart, KROGER, MYERS, FRISBY & HIRSCH, Houston, TX; Mr. Robert A. Skipworth, LAW OFFICE of ROBERT A. SKIPWORTH, El Paso, TX; Mr. Ewing Edben Sikes, III, ROYSTON, RAYZOR, VICKERY & WILLIAMS, L.L.P., Brownsville, TX; Mr. Mark T. Beaman, Mr. David E. Little, GERMER GERTZ BEAMAN & BROWN, L.L.P., Austin, TX.

For REAL PARTIES IN INTEREST: Mr. Ernesto Gamez, Jr., LAW OFFICES of ERNESTO GAMEZ, JR., Brownsville, TX; Mr. Ramon Garcia, Ms. Catherine W. Smith, LAW OFFICES of RAMON GARCIA, P.C., Edinburg, TX; Mr. Baltazar Salazar, LAW OFFICE of BALTAZAR SALAZAR, Houston, TX.

For OTHER: Mr. William K. Luyties, Mr. Paul Goldenberg, LORANCE & THOMPSON, Houston, TX; Mr. Moises R. Hernandez, HERNANDEZ LAW FIRM, Edinburg, TX.

**Judges:** JUSTICE WILLETT delivered the opinion of the Court, in which CHIEF JUSTICE JEFFERSON, JUSTICE HECHT, JUSTICE O'NEILL, JUSTICE WAINWRIGHT, JUSTICE MEDINA, JUSTICE GREEN, and JUSTICE JOHNSON joined. JUSTICE BRISTER filed a concurring opinion.

**Opinion by:** Don R Willett

## Opinion

 **[\*777]**  In this consolidated proceeding, we decide whether the court of appeals had jurisdiction over an interlocutory appeal under the Texas Arbitration Act and whether the parties' arbitration agreements are ambiguous. We hold that the court of appeals had jurisdiction over the interlocutory appeal and that the agreements are not ambiguous.

### I. Background

In 1993, the Brownsville Independent School District contracted with two general contractors, D. Wilson Construction Company and Stotler Construction Company, to build two schools in Brownsville. Both contracts incorporate General Conditions and Supplementary Conditions.

The General Conditions expressly incorporate AIA Document A201, a standard construction industry **[\*\*2]** document published by the American Institute of Architects that details the parties' respective rights, responsibilities and relationships on the project. [1] Paragraph 4.5 of A201 is titled "Arbitration," and subparagraph 4.5.1, titled "Controversies and Claims Subject to Arbitration," sets forth the broad, catch-all scope of the arbitration agreement: "Any controversy or Claim arising out of or related to the Contract, or the breach thereof, shall be settled by arbitration in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association . . . ."

---

[1]  *Document Synopses by Series, at* http://www.aia.org/docs_series. The American Institute of Architects represents the professional interests of America's architects. *The AIA: Advocacy Community, Knowledge, at* http://www.aia.org/about_default. Among other things, the AIA publishes industry standard documents for design and construction projects. *About AIA Contract Documents, at* http://www.aia.org/docs_about&defPr=1. Document A201 "is frequently adopted by reference into a variety of other agreements . . . to establish a common basis for the primary and secondary relationships on the typical construction project." *Instruction Sheet for AIA Document A201, General Conditions of the Contract for Construction--1987 Edition* at 1, *available at* http://www.engin.umich.edu/class/cee431/AIA/A201Inst.PDF. In the instant case, the General Conditions incorporate the 1987 (14th) Edition of AIA Document A201, which is approved and endorsed by the Associated General Contractors of America. AIA Document A201, General Conditions of the Contract for Construction (1987).

**[**3]** The Supplementary Conditions state that they "modify, change, delete from or add to" the General Conditions. Among other things, the Supplementary Conditions "[a]dd new Clause 4.5.1.1" to the arbitration provision: "Except as otherwise provided in this Contract, any dispute concerning a question of fact arising under this contract, which is not disposed of by agreement shall be decided by [BISD] . . . . The decision of [BISD] shall be final and conclusive unless" it is timely appealed to the Superintendent and then to the BISD Board of Trustees, "whose decision shall be final and conclusive."

**[*778]** This litigation began when one of the subcontractors, American Standard and the Trane Company (Trane), sought injunctive relief against BISD to preserve evidence in a personal injury action that students and teachers brought against Trane in another court. BISD counterclaimed for alleged defects in the construction of the two schools and filed third-party actions against several parties, including general contractors Wilson and Stotler, as well as subcontractors and second-tier subcontractors. Trane and the third-party defendants filed or joined motions to compel arbitration under the **[**4]** Federal Arbitration Act, *9 U.S.C. §§ 1- 16*, and the Texas Arbitration Act, *TEX. CIV. PRAC. & REM. CODE §§ 171.001-.098*. [2] After a hearing, the trial court issued a brief letter ruling denying arbitration, saying "the Court finds the contract in question ambiguous." Trane and the third-party defendants filed both a petition for writ of mandamus under the FAA and an interlocutory appeal under the TAA, and the court of appeals consolidated the two proceedings. *__ S.W.3d __, __, 2005 Tex. App. LEXIS 1016, Nos. 13-04-184-CV, 13-04-333-CV, 2005 WL 310777, at *1* (citing *In re Valero Energy Corp., 968 S.W.2d 916, 916-17, 41 Tex. Sup. Ct. J. 817 (Tex. 1998)*). The court of appeals dismissed the interlocutory appeal for want of jurisdiction, finding the TAA inapplicable since the dispute concerned a "'transaction involving commerce.'" *Id. at __, 2005 Tex. App. LEXIS 1016, 2005 WL 310777, at *2* (quoting *In re MONY Secs. Corp., 83 S.W.3d 279, 282-83* (Tex. App.--Corpus Christi 2002, consolidated appeal and orig. proceeding). The court also denied the petition for writ of mandamus, holding that clause 4.5.1.1 in the Supplementary **[**5]** Conditions creates ambiguity. *Id. at __, 2005 Tex. App. LEXIS 1016, 2005 WL 310777, at *3*. In this appeal, Trane and the third-party defendants complain that (1) the court of appeals erred in dismissing their interlocutory appeal under the TAA for want of jurisdiction, and (2) the trial court erred in deeming the arbitration agreements ambiguous and abused its discretion in denying their motions to compel arbitration.

**[**6]** II. Jurisdiction of the Court of Appeals

Trane and the third-party defendants first argue that the court of appeals erred in dismissing their TAA-based interlocutory appeal for want of jurisdiction. We agree. [3]

*HN1* The contracts in question reference neither the FAA nor TAA, merely noting that "[t]he Contracts shall be governed by the law of the place where the Project is located." We have interpreted identical language **[*779]** to invoke federal *and* state law. *In re L & L Kempwood Assocs., L.P., 9 S.W.3d 125, 127-28, 43 Tex. Sup. Ct. J. 138 (Tex. 1999)* (per curiam) (consolidated appeal and orig. proceeding). Trane **[**7]** and the third-party defendants sought relief under both statutes in the court of appeals, bringing a petition for writ of mandamus

---

[2] Four third-party defendants filed independent motions to compel arbitration: Wilson, Stotler, Mijares Mora Architects, Inc., and Zamora Engineering, Inc. Mac's Insulation, Inc. joined Stotler's motion. Trane, Victoria Air Conditioning, Ltd., and Superheat Air Balancing Co., Inc. joined the Wilson and Stotler motions. Al Cardenas Masonry Inc. joined Trane's motion. Sechrist-Hall Co., Wrightway Construction, Inc., and Rio Mechanical, Inc. joined the Wilson and Trane motions. The independent motions of Mijares Mora Architects, Inc. and Zamora Engineering, Inc. do not invoke the FAA or TAA. Wilson's motion is not in the record, and we are thus unable to determine whether it invokes the FAA, TAA, both, or neither. All other motions invoke the FAA or both the FAA and the TAA. The motions of all subcontractors and second-tier subcontractors also argue that the doctrine of equitable estoppel allows nonsignatories to the Wilson and Stotler contracts to obtain the benefits of the arbitration agreements therein.

[3] This Court undeniably has jurisdiction to review the correctness of the court of appeals' decision that it lacked jurisdiction over the TAA-based interlocutory appeal. *See McAllen Med. Ctr., Inc. v. Cortez,* 66 S.W.3d 227, 231, 44 Tex. Sup. Ct. J. 1094 (Tex. 2001) ("When a court of appeals determines that it lacks jurisdiction over an interlocutory appeal, this Court has jurisdiction to review that decision.").

under the FAA, *see Jack B. Anglin Co. v. Tipps, 842 S.W.2d 266, 272-73, 36 Tex. Sup. Ct. J. 205 (Tex. 1992)*, and an interlocutory appeal under the TAA, *TEX. CIV. PRAC. & REM. CODE § 171.098(a)(1)*.

While refusing jurisdiction under the TAA, the court of appeals recognized that it at least had jurisdiction under the FAA to consider the mandamus petition. *__ S.W.3d at __, 2005 Tex. App. LEXIS 1016, 2005 WL 310777, at *2*. We held in *Jack B. Anglin Co*. that mandamus is appropriate to review a trial court's denial of a motion to compel arbitration under the FAA. *842 S.W.2d at 272-73*.

The court of appeals determined that it lacked jurisdiction over the interlocutory appeal under the TAA because the construction contracts involved interstate commerce, thus implicating the FAA. *__ S.W.3d at __, 2005 Tex. App. LEXIS 1016, 2005 WL 310777, at *2*; *see Perry v. Thomas, 482 U.S. 483, 489, 107 S. Ct. 2520, 96 L. Ed. 2d 426 (1987)* (the FAA applies when the dispute concerns a "contract evidencing interstate commerce"); *9 U.S.C. § 1* [**8] ("'commerce' . . . means commerce among the several States"); *In re L & L Kempwood Assocs., L.P., 9 S.W.3d at 127* (noting that the FAA "extends to any contract affecting commerce, as far as the *Commerce Clause of the United States Constitution* will reach").

The court of appeals is not alone in dismissing interlocutory appeals under the TAA when the FAA applies. *See Kroupa v. Casey, 2005 Tex. App. LEXIS 10212, Nos. 01-05-00224-CV, 01-05-00376-CV, 2005 WL 3315279, at *4 (Tex. App.--Houston [1st Dist.] 2005, consolidated appeal and orig. proceeding)* (not designated for publication); *Am. Med. Techs., Inc. v. Miller, 149 S.W.3d 265, 269-70 (Tex. App.--Houston [14th Dist.] 2004, consolidated appeal and orig. proceeding)*; *Verlander Family Ltd. P'ship v. Verlander, 2003 Tex. App. LEXIS 1413, No. 08-02-00135-CV, 2003 WL 304098, at *3 (Tex. App.--El Paso 2003, no pet.)*; *Pennzoil Co. v. Arnold Oil Co., 30 S.W.3d 494, 498* (Tex. App.--San Antonio 2000, consolidated appeal and orig. proceeding). Other courts have granted mandamus relief and dismissed the consolidated interlocutory appeal as moot. *See, e.g., Kirby Highland Lakes Surgery Ctr., L.L.P. v. Kirby, 183 S.W.3d 891, 895 & n.5 (Tex. App.--Austin 2006, consolidated appeal and orig. proceeding)* [**9] ; *In re MacGregor (FIN) Oy, 126 S.W.3d 176, 181, 184 (Tex. App.--Houston [1st Dist.] 2003, consolidated appeal and orig. proceeding)*.

We take this opportunity to clarify precisely when the *FAA* preempts the *TAA*. Many courts of appeals wrongly view the FAA and TAA as mutually exclusive, but the United States Supreme Court and this Court have held a different view for some time: *HN2* the FAA only preempts *contrary* state law, not consonant state law. The United States Supreme Court has said:

> The FAA contains no express pre-emptive provision, nor does it reflect a congressional intent to occupy the entire field of arbitration. But even when Congress has not completely displaced state regulation in an area, state law may nonetheless be pre-empted to the extent that it actually conflicts with federal law--that is, to the extent that it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." The question before us, therefore, is whether application of [state law] to stay arbitration under this contract in interstate commerce . . . would undermine the [**10] goals and policies of the FAA.

[*780] *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ., 489 U.S. 468, 477-78, 109 S. Ct. 1248, 103 L. Ed. 2d 488 (1989)* (citations omitted) (quoting *Hines v. Davidowitz, 312 U.S. 52, 67, 61 S. Ct. 399, 85 L. Ed. 581 (1941)*). Similarly, this Court has noted that the FAA "preempts state statutes to the extent they are inconsistent with that Act." *Jack B. Anglin Co., 842 S.W.2d at 271*.

Recently, in the case of *In re Nexion Health at Humble, Inc.*, *HN3* this Court articulated a four-factor test to determine whether the TAA would thwart the goals and policies of the FAA in a particular case. *173 S.W.3d 67, 69, 48 Tex. Sup. Ct. J. 805 (Tex. 2005)* (per curiam) (construing *9 U.S.C. § 2*). The FAA only preempts the TAA

if: "(1) the agreement is in writing, (2) it involves interstate commerce, (3) it can withstand scrutiny under traditional contract defenses [under state law], and (4) *state law affects the enforceability of the agreement.*" *Id.*. (emphasis added). In today's case, the court of appeals ignored the fourth factor. The mere fact that a contract affects interstate commerce, thus triggering the **[**11]** FAA, does not preclude enforcement under the TAA as well. For the FAA to preempt the TAA, state law must refuse to enforce an arbitration agreement that the FAA would enforce, either because (1) the TAA has expressly exempted the agreement from coverage, *see TEX. CIV. PRAC. & REM. CODE § 171.002(a)* (detailing various claims the TAA "does not apply to"), or (2) the TAA has imposed an enforceability requirement not found in the FAA, *see In re Nexion Health at Humble, Inc., 173 S.W.3d at 69* ("The TAA interferes with the enforceability of the arbitration agreement by adding an additional requirement--the signature of a party's counsel--to arbitration agreements in personal injury cases."). The parties have asserted nothing in the TAA or other state law that would subvert enforcement of the agreements at issue. Therefore, the FAA does not preempt the TAA in this case, and the court of appeals had jurisdiction under both laws. [4]

## **[**12]** III. Ambiguity of the Arbitration Agreements

Trane and the third-party defendants next argue that the trial court wrongly deemed the arbitration agreements ambiguous and abused its discretion in denying their motions to compel arbitration. We decide the merits under our mandamus jurisdiction. [5]

*HN4* Mandamus is proper to correct a clear abuse of discretion when there is no adequate remedy by appeal, *Walker v. Packer, 827 S.W.2d 833, 839, 35 Tex. Sup. Ct. J. 468 (Tex. 1992)* **[**13]** (orig. proceeding), as when a party is erroneously denied its contracted-for arbitration rights under the FAA, *Jack B. Anglin* **[*781]** *Co., 842 S.W.2d at 272-73*. Also, a trial court "has no 'discretion' in determining what the law is or applying the law to the facts." *Walker, 827 S.W.2d at 840*. *HN5* In evaluating a motion to compel arbitration, a court must determine first whether a valid arbitration agreement exists, and then whether the agreement encompasses the claims raised. *In re Oakwood Mobile Homes, Inc., 987 S.W.2d 571, 573, 42 Tex. Sup. Ct. J. 377 (Tex. 1999)* (per curiam). When deciding whether the parties agreed to arbitrate under the FAA, courts should apply ordinary state law principles regarding the formation of contracts. *First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 944, 115 S. Ct. 1920, 131 L. Ed. 2d 985 (1995)*; *J.M. Davidson, Inc. v. Webster, 128 S.W.3d 223, 227-28, 47 Tex. Sup. Ct. J. 196 (Tex. 2003)*.

In a letter ruling, the trial court found "the contract in question ambiguous"; however, the record does not indicate whether the trial court was uncertain as to the agreements' existence or merely their scope. We address these two issues in turn.

## **[**14] A. Ambiguity Concerning the Existence of Valid Agreements

*HN6* Whether a valid arbitration agreement exists is a legal question subject to de novo review. *J.M. Davidson, Inc., 128 S.W.3d at 227*. *HN7* Whether contractual ambiguity exists is likewise a question of law. *See Columbia*

---

[4]   While we continue to see no benefit in requiring parties to pursue parallel proceedings that are "unnecessarily expensive and cumbersome," we remain mindful that "we may not enlarge appellate jurisdiction absent legislative mandate." *Jack B. Anglin Co., 842 S.W.2d at 272*. We again invite the Legislature, "[i]n the interests of promoting the policy considerations of rigorous and expedited enforcement of arbitration agreements, . . . to consider amending the Texas Act to permit interlocutory appeals of orders issued pursuant to the Federal Act." *Id*.

[5]   Our analysis today proceeds under the FAA because, as a procedural matter, Trane and the third-party defendants only assert in their "Statement of Jurisdiction" that this Court has jurisdiction under *Cortez* to decide whether the lower court had jurisdiction. *66 S.W.3d at 231* ("When a court of appeals determines that it lacks jurisdiction over an interlocutory appeal, this Court has jurisdiction to review that decision."). They do not assert "conflict or dissent" jurisdiction under the general interlocutory appeal statute. *TEX. GOV'T CODE § 22.225(c)*.

*Gas Transmission Corp. v. New Ulm Gas, Ltd., 940 S.W.2d 587, 589, 40 Tex. Sup. Ct. J. 42 (Tex. 1996)*. Inartful drafting does not alone render a contractual provision ambiguous. *See Universal C.I.T. Credit Corp. v. Daniel*, 150 Tex. 513, 243 S.W.2d 154, 157 (Tex. 1951). A contract is ambiguous only if it is subject to "two or more reasonable interpretations after applying the pertinent rules of construction." *Columbia Gas Transmission Corp., 940 S.W.2d at 589*. Ambiguity does not exist merely because the parties assert forceful and diametrically opposing interpretations. *Id*.

BISD contends that the contracts with Wilson and Stotler (1) contain no arbitration language at all, or (2) contain ambiguous language. The trial court's three-sentence letter ruling is silent on the first point, while the court of appeals, "[a]ssuming without determining that the contracts contain **[**15]** arbitration language," concluded that "the supplementary conditions create ambiguity." *__ S.W.3d at __, 2005 Tex. App. LEXIS 1016, 2005 WL 310777, at *3*.

We disagree with BISD that its contracts with Wilson and Stotler contained no arbitration language. The contracts validly and expressly incorporate by reference the expansive arbitration language of subparagraph 4.5.1 of A201. Innumerable contracts are consummated every day in Texas that incorporate other documents by reference. *HN8* A contractual term is not rendered invalid merely because it exists in a document incorporated by reference, *Owen v. Hendricks, 433 S.W.2d 164, 166, 12 Tex. Sup. Ct. J. 28 (Tex. 1968)*, and we agree with the courts of appeals that arbitration-related language is no exception to this rule. *See, e.g., Teal Constr. Co./Hillside Villas Ltd. v. Darren Casey Interests, Inc., 46 S.W.3d 417, 420 (Tex. App.--Austin 2001, pet. denied)* (holding that an unsigned arbitration agreement contained in a document incorporated by reference into the signed contract constitutes an enforceable arbitration agreement); *D. Wilson Constr. Co. v. McAllen Indep. Sch. Dist., 848 S.W.2d 226, 230 (Tex. App.--Corpus Christi* **[**16]** *1992, writ dism'd w.o.j.)* (rejecting the argument that an arbitration agreement incorporated by reference is invalid or unenforceable). Accordingly, we reject BISD's argument that these provisions were not validly incorporated into the contracts with Wilson and Stotler.

 **[*782]** We likewise reject BISD's argument, and the trial court's holding, that the arbitration agreements are ambiguous. Subparagraph 4.5.1 of A201 states: "Any controversy or Claim arising out of or related to the Contract, or the breach thereof, shall be settled by arbitration in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association . . . ." The Supplementary Conditions "[a]dd new Clause 4.5.1.1" to the arbitration provision: "Except as otherwise provided in this Contract, any dispute concerning a question of fact arising under this contract, which is not disposed of by agreement shall be decided by [BISD] . . . . The decision of [BISD] shall be final and conclusive unless" it is timely appealed to the Superintendent and then to the BISD Board of Trustees, "whose decision shall be final and conclusive."

The caption of clause 4.5.1.1 in the Supplementary Conditions evinces **[**17]** the parties' intent to "[a]dd new Clause 4.5.1.1 to subparagraph 4.5.1." Clause 4.5.1.1 is *added* to subparagraph 4.5.1, and the clause's numerical designation places it beneath subparagraph 4.5.1. In addition, clause 4.5.1.1 begins with the caveat, "[e]xcept as otherwise provided in this Contract." Subparagraph 4.5.1 does provide otherwise in certain cases. If the parties intended for clause 4.5.1.1 to supplant subparagraph 4.5.1, they could have easily drafted language to accomplish exactly that. [6] Further, clause 4.5.1.1 does not mention the additional arbitration procedures set forth in subparagraphs 4.5.2-4.5.7. If clause 4.5.1.1 negates subparagraph 4.5.1, as BISD contends, then subparagraphs 4.5.2-4.5.7 are meaningless. The placement, caption, and caveat of clause 4.5.1.1, as well as the language of subparagraphs 4.5.2-4.5.7, indicate that the clause is subordinate to subparagraph 4.5.1 if subparagraph 4.5.1 applies in a given situation.

---

[6]   A subparagraph later in the Supplementary Conditions states that it "[d]elete[s] the first sentence [of subparagraph 5. 2. 1 of the General Conditions] and substitute[s] the following . . . ." Clearly, the parties were free to delete and replace language in the General Conditions with language in the Supplementary Conditions, and they had done so elsewhere.

 [**18]  BISD argues that such a construction would render clause 4.5.1.1 meaningless. We disagree. By its terms, clause 4.5.1.1 applies to "any dispute concerning a question of *fact* arising under this contract," while subparagraph 4.5.1 applies to "[a]ny controversy or Claim arising out of or relating to the Contract, or the breach thereof . . . ." (emphasis added). While the scope of clause 4.5.1.1 is narrower than the scope of subparagraph 4.5.1, certain situations would fall solely under the factual dispute clause. For example, the construction contracts could have called for solid brass doorknobs throughout the schools. BISD could have argued that the doorknobs Wilson and Stotler used were brass-plated instead of solid brass. Whether the doorknobs are solid brass or brass-plated would be a factual dispute subject to clause 4.5.1.1.

We hold that the arbitration agreements and clause 4.5.1.1 can be reconciled; the arbitration agreements are not susceptible to more than one reasonable interpretation and are therefore not ambiguous. *Columbia Gas Transmission Corp., 940 S.W.2d at 589*.

## B. Ambiguity Concerning the Scope of the Agreements

We next consider whether [**19]  there is ambiguity concerning the agreements' scope. *HN9* The strong presumption favoring arbitration generally requires that we resolve doubts as to the scope of the agreements in favor of coverage. *In re Kellogg, Brown & Root, Inc., 166 S.W.3d 732, 737,* [*783] 48 Tex. Sup. Ct. J. 678 (Tex. 2005)*; *In re FirstMerit Bank, 52 S.W.3d 749, 753, 44 Tex. Sup. Ct. J. 900 (Tex. 2001)*; *Cantella & Co. v. Goodwin, 924 S.W.2d 943, 944, 39 Tex. Sup. Ct. J. 856 (Tex. 1996)* (per curiam) (orig. proceeding). Once an agreement is established, "a court should not deny arbitration 'unless *it can be said with positive assurance* that an arbitration clause is *not* susceptible of an interpretation which would cover the dispute at issue.'" *Prudential Sec. Inc. v. Marshall, 909 S.W.2d 896, 899, 39 Tex. Sup. Ct. J. 116 (Tex. 1995)* (per curiam) (orig. proceeding) (emphasis in original) (quoting *Neal v. Hardee's Food Sys., Inc., 918 F.2d 34, 37 (5th Cir. 1990)*).

Here, BISD claims there are construction defects throughout the two schools. This dispute is a "controversy or Claim arising out of or related to the Contract" to build the schools and thus falls squarely within the scope of the arbitration agreements.

We find no ambiguity [**20]  in either the validity or the scope of these arbitration agreements. Trane and the third-party defendants have proven the existence of valid arbitration agreements that cover the present dispute. *In re Oakwood Mobile Homes, Inc., 987 S.W.2d at 573*. The trial court abused its discretion by denying the motions to compel arbitration after finding "the contract in question ambiguous."

## C. Waiver

Finally, BISD argues that Trane and Stotler waived any right to arbitrate. In a personal injury suit filed by students and teachers in a separate court, Trane, Stotler, and Mac's Insulation, Inc. filed cross-actions against BISD, seeking indemnity in that case. Trane also filed the present suit against BISD to obtain injunctive relief to preserve evidence in that personal injury case.

*HN10* There is a strong presumption against waiver under the FAA. *In re Vesta Ins. Group, Inc., 192 S.W.3d 759, __, 49 Tex. Sup. Ct. J. 445, 2006 WL 662335, at *2 (Tex. 2006)* (per curiam). "Merely taking part in litigation is not enough unless a party 'has substantially invoked the judicial process to its opponent's detriment.'" *Id*. (quoting *In re Serv. Corp. Int'l, 85 S.W. 3d 171, 174, 45 Tex. Sup. Ct. J. 1241 (Tex. 2002)*). [**21]  In *In re Vesta Ins. Group, Inc.*, we held that the relators, who litigated in the trial court for two years, did not substantially invoke the judicial process to their opponent's detriment because the relators engaged in minimal discovery, and the real party in interest failed to demonstrate sufficient prejudice to overcome the strong presumption against waiver. *Id. at __, 49 Tex. Sup. J. 445, 2006 WL 662335, at *3*.

Likewise, BISD has failed to demonstrate how the cross-actions for indemnity in the separate personal injury suit or Trane's pursuit of injunctive relief related to that case have worked to BISD's detriment. We hold that the actions of Trane, Stotler, and Mac's Insulation, Inc. do not constitute waiver of their right to arbitrate.

## IV. Conclusion

The trial court abused its discretion by finding the contracts ambiguous and denying the motions to compel arbitration. There is no ambiguity in either the existence or scope of these arbitration agreements. We conditionally grant the writ of mandamus and direct the trial court to (1) vacate its order denying the motions to compel arbitration, (2) grant Stotler's motion to compel arbitration, (3) conduct further proceedings **[\*\*22]** to determine whether Wilson is entitled to arbitration, [7] and (4) conduct further proceedings to determine whether the various nonsignatories are entitled to arbitration. The writ will issue only if the trial court fails to comply. Insofar **[\*784]** as we have granted full relief under our mandamus jurisdiction, we dismiss the related interlocutory appeal as moot.

Don R. Willett

Justice

**Concur by:** Scott Brister

## Concur

JUSTICE BRISTER, concurring.

I agree that the court of appeals erred in dismissing the petitioners' interlocutory appeal, and join in the Court's judgment. I disagree that we should continue requiring litigants to pursue parallel mandamus and interlocutory appeal proceedings in arbitration cases. This unnecessary duplication makes arbitration more cumbersome and costly than other cases, rather than the "simplicity, informality, and expedition" intended for them. *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 628, 105 S. Ct. 3346, 87 L. Ed. 2d 444 (1985).* **[\*\*23]**

An interlocutory appeal is proper to enforce arbitration agreements under the Texas Arbitration Act. *See TEX. CIV. PRAC. & REM. CODE § 171.098*. Mandamus is proper to enforce arbitration agreements under the Federal Arbitration Act. *See In re Weekley, 180 S.W. 3d 127, 130, 49 Tex. Sup. Ct. J. 55 (Tex. 2005)*.

When a party chooses the wrong form to enforce arbitration, Texas appellate courts "must not . . . dismiss an appeal for formal defects or irregularities in appellate procedure without allowing a reasonable time to correct or amend the defects or irregularities." *TEX. R. APP. P. 44.3*; *Higgins v. Randall County Sheriff's Office, 193 S.W.3d 898, 899, 49 Tex. Sup. Ct. J. 645 (Tex. 2006)* (per curiam); *Linwood v. NCNB Texas, 885 S.W.2d 102, 103, 38 Tex. Sup. Ct. J. 30 (Tex. 1994)*; *Grand Prairie Indep. Sch. Dist. v. S. Parts Imps., Inc., 813 S.W.2d 499, 500, 34 Tex. Sup. Ct. J. 743 (Tex. 1991)* (per curiam). When this and other Texas appellate courts decide that an appeal or other pleading should have been pursued by mandamus, we do not generally toss out the appeal or require it to be done twice; instead, we treat the improper appeal as a proper mandamus. **[\*\*24]** *See, e.g., Powell v. Stover, 165 S.W.3d 322, 324, 48 Tex. Sup. Ct. J. 780 (Tex. 2005)*; *Edgewood Indep. Sch. Dist. v. Kirby*, 804 S.W.2d 491, 494, 34 Tex. Sup. Ct. J. 287 (Tex. 1991); *Bielamowicz v. Cedar Hill Indep. Sch. Dist., 136 S.W.3d 718, 719-20 (Tex. App.--Dallas 2004, pet. denied)*; *In re Cobos, 994 S.W.2d 313, 314 (Tex. App.--Corpus*

---

[7]   Wilson's motion to compel arbitration is not in the record.

*Christi 1999, no pet.)*; *In re Swarthout, 982 S.W.2d 92, 92 (Tex. App.--Houston [1st Dist.] 1998, no pet.)*; *State ex rel. Wade v. Stephens, 724 S.W.2d 141, 143 (Tex. App.--Dallas 1987, no writ)*; *Clark v. Russell, 590 S.W.2d 651, 652 (Tex. Civ. App.--Dallas 1979, no writ)*.

Parties should not have to file both an interlocutory appeal and an original proceeding; even attorneys who can predict which one an appellate court will find proper may hesitate to gamble with their client's money. I would allow them to file either, and then have the appellate courts treat it as they think proper.

Scott Brister

Justice



⚠ Caution

As of: September 1, 2015 5:09 PM EDT

# *In re FirstMerit Bank, N.A.*

Supreme Court of Texas

February 14, 2001, Argued ; June 14, 2001, Delivered

NO. 00-0548

**Reporter**

52 S.W.3d 749; 2001 Tex. LEXIS 59; 44 Tex. Sup. J. 900

IN RE FIRSTMERIT BANK, N.A. F/K/A SIGNAL BANK, N.A. AND MOBILE CONSULTANTS, INC., RELATORS

**Subsequent History:** **[\*\*1]** As Amended August 2, 2001.

**Prior History:** ON PETITION FOR WRIT OF MANDAMUS.

**Disposition:** Court conditionally grants writ of mandamus and directs trial court to order that all claims proceed to arbitration.

## Core Terms

arbitration, sellers, installment contract, Mobile, costs, trial court, unconscionable, mandamus, parties', compel arbitration, defenses, interstate commerce, allegations, security interest, revocation, Servicing, repossess, covers

## Case Summary

**Procedural Posture**

Respondents sued petitioners, alleging breach of contract, breach of warranty, negligence, and fraud, among other things, related to a security interest in a home purportedly purchased by respondents. Petitioners filed a petition seeking mandamus relief after the trial court denied their motion to compel arbitration. The Third Court of Appeals, Texas, denied the writ of mandamus. Petitioners filed a second writ of mandamus.

**Overview**

Respondents bought a mobile home for their daughter. They bought the home under an installment financing agreement. The seller assigned this financing contract, which respondents signed, to petitioner bank's predecessor. The agreement contained an arbitration addendum, which required binding arbitration for "all disputes, claims, or other matters in question arising out of or relating to the loan, its interpretation, validity, performance, or the breach thereof." The addendum stated "the scope of arbitrability was broad." After the home was delivered, respondents tried to revoke their acceptance, claiming the home was defective. They stopped making loan payments. In response, bank's predecessor took possession of the home. Respondents then sued petitioners and others. The trial court denied petitioners' motion to compel arbitration. The instant court granted petitioners' writ of mandamus request. In light of the addendum's broad language, all of respondents' factual

allegations arose out of or related to either the sale of the home and negotiation of the installment contract, or to the performance or alleged breach of the installment contract. Arbitration could be compelled.

**Outcome**

The petition for writ of mandamus was conditionally granted. The trial court was ordered to compel arbitration in accordance with the parties' agreement.

# LexisNexis® Headnotes

Civil Procedure > Remedies > Writs > General Overview

*HN1* Mandamus is an extraordinary remedy available only in limited circumstances. A court should issue mandamus only to correct a clear abuse of discretion or the violation of a legal duty when there is no other adequate remedy at law.

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview

Civil Procedure > ... > Arbitration > Federal Arbitration Act > General Overview

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Mandatory ADR

Civil Procedure > Remedies > Writs > General Overview

Civil Procedure > ... > Writs > Common Law Writs > Mandamus

International Trade Law > Dispute Resolution > International Commercial Arbitration > Arbitration

*HN2* When a trial court erroneously denies a party's motion to compel arbitration under the Federal Arbitration Act, *9 U.S.C.S. § 1 et seq.*, the movant has no adequate remedy at law and is entitled to a writ of mandamus.

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview

Civil Procedure > ... > Arbitration > Federal Arbitration Act > General Overview

Civil Procedure > ... > Arbitration > Federal Arbitration Act > Arbitration Agreements

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Mandatory ADR

Civil Procedure > Remedies > Writs > General Overview

Civil Procedure > ... > Writs > Common Law Writs > Mandamus

Contracts Law > Contract Conditions & Provisions > Arbitration Clauses

International Trade Law > Dispute Resolution > International Commercial Arbitration > Arbitration

*HN3* A party seeking to compel arbitration by mandamus must first establish the existence of an arbitration agreement subject to the Federal Arbitration Act, *9 U.S.C.S. § 1 et seq.* Once the movant establishes an agreement, the court must then determine whether the arbitration agreement covers the nonmovant's claims.

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > General Overview

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview

Civil Procedure > ... > Arbitration > Federal Arbitration Act > General Overview

Civil Procedure > ... > Arbitration > Federal Arbitration Act > Arbitration Agreements

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Mandatory ADR

Contracts Law > Contract Conditions & Provisions > Arbitration Clauses

International Trade Law > Dispute Resolution > International Commercial Arbitration > Arbitration

*HN4* Because state and federal policies continue to favor arbitration, a presumption exists favoring agreements to arbitrate under the Federal Arbitration Act, *9 U.S.C.S. § 1 et seq.*, and courts must resolve any doubts about an arbitration agreement's scope in favor of arbitration. Once the trial court concludes that the arbitration agreement encompasses the claims, and that the party opposing arbitration has failed to prove its defenses, the trial court has no discretion but to compel arbitration and stay its own proceedings.

Civil Procedure > ... > Arbitration > Federal Arbitration Act > General Overview

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Mandatory ADR

Contracts Law > ... > Sales of Goods > Breach, Excuse & Repudiation > Installment Contracts

Contracts Law > ... > Secured Transactions > Installment Contracts > General Overview

Contracts Law > ... > Secured Transactions > Installment Contracts > Recordings

Contracts Law > Types of Contracts > Installment Contracts

International Trade Law > Dispute Resolution > International Commercial Arbitration > Arbitration

Labor & Employment Law > Collective Bargaining & Labor Relations > Federal Preemption > Primacy of Labor Policy

*HN5* As defined in the Federal Arbitration Act (FAA), *9 U.S.C.S. § 1 et seq.*, "interstate commerce" is not limited to the interstate shipment of goods, but includes all contracts "relating to" interstate commerce. In fact, the United States Supreme Court has construed the FAA to extend as far as the *Commerce Clause of the United States Constitution* will reach.

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Mandatory ADR

Contracts Law > Contract Conditions & Provisions > Arbitration Clauses

*HN6* To determine whether a party's claims fall within an arbitration agreement's scope, a court focuses on the complaint's factual allegations rather than the legal causes of action asserted. The court resolves any doubts about the arbitration agreement's factual scope in favor of coverage.

Contracts Law > Contract Interpretation > General Overview

Contracts Law > Types of Contracts > Installment Contracts

*HN7* A litigant who sues based on a contract subjects himself to the contract's terms.

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Mandatory ADR

Contracts Law > ... > Affirmative Defenses > Coercion & Duress > General Overview

Contracts Law > Types of Contracts > Installment Contracts

*HN8* Defenses that pertain to an entire installment contract can be arbitrated.

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Mandatory ADR

*HN9* Since the law favors arbitration, the burden of proving a defense to arbitration is on the party opposing arbitration.

> Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview
>
> Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Mandatory ADR
>
> Contracts Law > Contract Conditions & Provisions > Arbitration Clauses
>
> Labor & Employment Law > Collective Bargaining & Labor Relations > Labor Arbitration > Enforcement

*HN10* An arbitration agreement's mere silence with respect to costs and fees, by itself, is a "plainly insufficient" basis for invalidating the agreement. Instead, the party opposing arbitration must prove the likelihood of incurring such costs.

> Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview
>
> Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Judicial Review
>
> Commercial Law (UCC) > ... > Contract Provisions > Contract Terms > Unconscionable Terms
>
> Contracts Law > Formation of Contracts > Consideration > General Overview
>
> Contracts Law > Formation of Contracts > Consideration > Adequate Consideration
>
> Contracts Law > Contract Conditions & Provisions > General Overview
>
> Contracts Law > Contract Conditions & Provisions > Arbitration Clauses
>
> Contracts Law > Defenses > Unconscionable > General Overview
>
> Contracts Law > Defenses > Unconscionable > Arbitration Agreements
>
> Contracts Law > ... > Priorities > Perfected Secured Parties & Purchasers > Buyers & Lessees in Ordinary Course
>
> Labor & Employment Law > Collective Bargaining & Labor Relations > Labor Arbitration > Enforcement

*HN11* The basic test for unconscionability in an arbitration agreement is whether, given the parties' general commercial background and the commercial needs of the particular trade or case, the arbitration clause involved is so one-sided that it is unconscionable under the circumstances existing when the parties made the contract. *Tex. Bus. & Com. Code Ann. §2.302*, cmt. 1.

> Contracts Law > Contract Conditions & Provisions > Arbitration Clauses
>
> Contracts Law > ... > Affirmative Defenses > Fraud & Misrepresentation > General Overview

*HN12* The elements of a fraud in the inducement claim are: (1) that a material representation was made; (2) the representation was false; (3) when the representation was made, the speaker knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion; (4) the speaker made the representation with the intent that the other party should act upon it; (5) the party acted in reliance on the representation; and (6) the party thereby suffered injury.

> Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview
>
> Contracts Law > Contract Interpretation > General Overview
>
> Contracts Law > Types of Contracts > Installment Contracts

*HN13* An arbitration addendum's validity is a separate issue from the validity of the whole contract.

**Judges:** JUSTICE ENOCH delivered the opinion of the Court.

**Opinion by:** Craig T. Enoch

# Opinion

 **[*752]**  ON PETITION FOR WRIT OF MANDAMUS

JUSTICE ENOCH delivered the opinion of the Court.

FirstMerit Bank and Mobile Consultants seek mandamus relief after the trial court denied their motion to compel arbitration. Because the Federal Arbitration Act (FAA) requires the trial court to compel arbitration in this case, we conditionally grant their petition and order the trial court to compel arbitration in accordance with the parties' agreement.

## I. BACKGROUND

Pete and Janie de los Santos purchased a mobile home for their daughter, Sarah, and her husband, Gary Alvarez. They bought the home from Verde Homes under Verde's retail installment financing agreement. Verde assigned this contract, which Pete and Janie signed, to Signal Bank (now FirstMerit Bank). The agreement contained an Arbitration Addendum, which required binding arbitration for "all disputes, claims, or other matters in question arising out of or relating to this Loan, its interpretation, validity, performance or the breach thereof." The word "Loan" referred to "all manufactured home loan documents, including **[**2]**  but not limited to the retail installment contract. . . ." The Addendum further stated that "the scope of arbitrability is broad and includes, without limitation, contractual, tort, statutory, and caselaw claims." The Addendum also permitted the bank to seek judicial relief to enforce its security interest, recover the buyers' monetary loan obligation, and foreclose.  **[*753]**  But aside from these three exceptions, the Addendum required arbitration for all other disputes relating to the installment contract.

After Verde delivered the home, the de los Santoses tried to revoke their acceptance, claiming that the home was defective and that Verde failed to perform certain promised repairs. Although Verde Homes refused to rescind the sale, the de los Santoses apparently stopped making their monthly loan payments. In response, Signal Bank took possession of the home. The de los Santoses then sued Signal Bank, Mobile Consultants (Signal's servicing agent), Verde Homes, and two Verde employees, alleging breach of contract, revocation of acceptance, breach of warranty, negligence, and fraud. They also alleged violations of the Deceptive Trade Practices Act, Fair Debt Collection Practices Act, Equal **[**3]**  Credit Opportunity Act, and Fair Credit Reporting Act. Additionally, the de los Santoses claimed that their successful revocation of acceptance entitled them to a security interest in the home, equal to the amount they had paid on the installment contract. To enforce their security interest, they requested an injunction forcing FirstMerit to return possession of the home until it refunded the de los Santoses' loan payments.

In response, FirstMerit and Mobile moved to compel arbitration. [1] The trial court denied their motion. FirstMerit Bank and Mobile then petitioned the Third Court of Appeals for a writ of mandamus, which the court denied. FirstMerit and Mobile now ask this Court for mandamus relief.

## II. WHETHER TO ORDER ARBITRATION

---

[1]   The other parties did not answer the suit, and a default judgment was entered against them.

*HN1* Mandamus is an extraordinary remedy available only in limited circumstances. [2] A court should issue mandamus only to correct a clear abuse of discretion or the violation **[**4]** of a legal duty when there is no other adequate remedy at law. [3] *HN2* When a trial court erroneously denies a party's motion to compel arbitration under the FAA, the movant has no adequate remedy at law and is entitled to a writ of mandamus. [4] Thus, we must determine whether the movants established their right to arbitration.

*HN3* A party seeking to compel arbitration by mandamus must first establish the existence of an arbitration agreement subject to the FAA. [5] Once the movant establishes an agreement, the court must then determine whether the arbitration agreement covers the nonmovant's claims. [6] *HN4* Because state and federal policies continue to favor arbitration, [7] a presumption exists favoring agreements to arbitrate under the FAA, [8] and courts must resolve any doubts about an arbitration agreement's scope in favor of arbitration. [9] Once the **[**5]** trial court **[*754]** concludes that the arbitration agreement encompasses the claims, and that the party opposing arbitration has failed to prove its defenses, [10] the trial court has no discretion but to compel arbitration and stay its own proceedings. [11]

## A. SCOPE OF ARBITRATION

Here, there is no dispute **[**6]** about the Arbitration Addendum's existence. The de los Santoses instead contend that the installment contract was completed entirely in Texas, did not involve interstate commerce, and, accordingly, was not subject to the FAA. *HN5* As defined in the FAA, however, "interstate commerce" is not limited to the interstate shipment of goods, but includes all contracts "relating to" interstate commerce. [12] In fact, the United States Supreme Court has construed the FAA to extend as far as the *Commerce Clause of the United States Constitution* will reach. [13] In this case, the evidence demonstrates that the loan was made in interstate commerce. Signal Bank and Mobile Consultants were Ohio corporations, while the de los Santoses were Texas residents. The installment contract stated that Signal Bank was located in Ohio. The record includes several photocopies of loan payment checks drawn on a Texas bank that Signal Bank had deposited in Ohio. And both Signal and Mobile Consultants corresponded with the de los Santoses from Ohio. The de los Santoses also listed Signal's Ohio address at the top of their revocation of acceptance letter. Moreover, the Arbitration Addendum, which Pete and Janie de los Santos **[**7]** both signed, states that the loan "involves interstate commerce . . . and

---

[2] *In re Masonite Corp.,* 997 S.W.2d 194, 197 (Tex. 1999).

[3] *Id.*

[4] *EZ Pawn Corp. v. Mancias,* 934 S.W.2d 87, 88 (Tex. 1996).

[5] *In re Oakwood Mobile Homes,* 987 S.W.2d 571, 573 (Tex. 1998).

[6] *Cantella & Co., v. Goodwin,* 924 S.W.2d 943, 944 (Tex. 1996).

[7] *Id.*; *Green Tree Fin. Corp. v. Randolph,* 531 U.S. 79, ___, 121 S. Ct. 513, 522, 148 L. Ed. 2d 373 (2000).

[8] *Cantella,* 924 S.W.2d at 944.

[9] *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.,* 473 U.S. 614, 626, 87 L. Ed. 2d 444, 105 S. Ct. 3346 (1985); *Prudential Sec., Inc. v. Marshall,* 909 S.W.2d 896, 899 (Tex. 1995).

[10] *See In re Oakwood,* 987 S.W.2d at 573.

[11] *Cantella,* 924 S.W.2d at 944.

[12] *See Lost Creek Mun. Util. Dist. v. Travis Indus. Painters, Inc.,* 827 S.W.2d 103, 105 (Tex. App.-Austin 1992, writ denied).

[13] *Allied-Bruce Terminix Cos. v. Dobson,* 513 U.S. 265, 272-74, 276-78, 130 L. Ed. 2d 753, 115 S. Ct. 834 (1995).

shall be governed by the Federal Arbitration Act . . . ." In light of these facts, we conclude that the installment contract relates to interstate commerce and is subject to the FAA. [14]

Because FirstMerit and Mobile have established the existence of an agreement to arbitrate under the FAA, we must next determine whether the Arbitration Addendum covers the de los [**8] Santoses' claims. *HN6* To determine whether a party's claims fall within an arbitration agreement's scope, we focus on the complaint's factual allegations rather than the legal causes of action asserted. [15] And again, we resolve any doubts about the Arbitration Addendum's factual scope in favor of coverage. Further, we reiterate that the parties' Arbitration Addendum covers "all disputes, claims, or other matters in question arising out of or relating to this Loan, its interpretation, validity, performance, or the breach thereof" and states that "the scope of arbitrability is broad and includes, without limitation, contractual, tort, statutory, and case law claims."

We now turn to the de los Santoses' factual allegations. The de los Santoses asserted that the sellers misrepresented that they owned the homesite, and that the homesite included a driveway and septic system. They also claimed that the sellers were not properly licensed, misrepresented [*755] the terms [**9] of the loan, failed to provide a credit report to Sarah and Gary Alvarez, and failed to make other disclosures regarding interest rates and credit. The de los Santoses further alleged that the sellers fraudulently double-charged them for insurance that was already paid for in the installment contract. In addition, the de los Santoses asserted that after taking possession of the home, they learned that the home was not yet complete, that it lacked carpeting and air conditioning, and that it was not installed properly. They also charged that the sellers failed to repair these defects in a timely and workmanlike manner, that they never installed an air conditioner, and that the sellers' attempts to repair the septic tank were untimely and defective. Finally, the de los Santoses asserted that the bank wrongfully denied their attempt to revoke the contract, criminally trespassed on their property, and wrongfully repossessed the home.

In light of the Addendum's broad language, all of the de los Santoses' factual allegations fall within the Addendum's scope. The de los Santoses contend that because the Addendum "relat(es) to the Loan," it only covers claims that relate directly to the home's [**10] financing, and does not cover their allegations about the home's post-sale condition and repairs. But this interpretation ignores the Addendum's broad definition of "Loan" to include the installment contract and all other loan documents. Further, irrespective of the Addendum's broad language, we also note that the home was the bank's collateral under the Loan. The de los Santoses alleged that the sellers' failure to remedy the home's physical problems entitled them to a security interest in the home, which would prevent the bank from repossessing its collateral. [16] Thus, the home's post-sale condition, and the sellers' post-sale failure to remedy the home's problems, relate to the bank's right to repossess its collateral under the loan. In sum, all of the de los Santoses' factual allegations arise out of or relate to either the sellers' conduct in selling the home and negotiating the installment contract, or to the performance or alleged breach of the installment contract. Furthermore, while fraud in the inducement of an arbitration agreement is a defense to arbitration, whether the sellers made any misrepresentations in the inducement of the underlying contract relates to the contract's [**11] validity and can be arbitrated. [17] As for the de los Santoses' wrongful repossession allegations, the Addendum provides that "any counterclaims in suits brought by Seller/Assignee pursuant to this provision," including complaints about foreclosure, may be arbitrated. Given the Addendum's

---

[14] *See, e.g.*, *Mesa Operating Ltd. P'ship v. Louisiana Intrastate Gas Corp., 797* F.2d 238, 243 (5th Cir. 1986); *Snyder v. Smith, 736 F.2d 409* , 418 (7th Cir. 1984), *cert. denied*, **469 U.S. 1037, 83 L. Ed. 2d 403, 105 S. Ct. 513 (1984)**.

[15] *Prudential Sec., 909 S.W.2d at 900*.

[16] *See* TEX. BUS. & COM. CODE § 2.608(a), 2.711(c).

[17] *See* *Pepe Int'l Dev. Co. v. Pub Brewing* Co., 915 S.W.2d 925, 930 (Tex. App.-Houston [1st Dist.] 1996, no writ); *New Process Steel Corp. v. Titan Indus. Corp.*, 555 F. Supp. 1018, 1022 (S.D. Tex. 1983).

language on counterclaims, the Arbitration Addendum covers all of the de los Santoses' complaints about the bank's right to repossess the home.

As a specific challenge, Sarah and Gary Alvarez contend that their claims are exempt from the Arbitration Addendum because they did not sign the contract. But *HN7* a litigant who sues based on a contract subjects him or herself to the [**12] contract's terms. [18] Here, the Alvarezes fully joined the de los Santoses' contract claims. In fact, the de los Santoses' original petition [*756] makes no distinction between the parents' claims and the Alvarezes' claims. Thus, by suing FirstMerit based on the de los Santoses' installment contract, the Alvarezes subjected themselves to the contract's terms, including the Arbitration Addendum.

Accordingly, unless the de los Santoses can prove one of their defenses to the Arbitration Addendum, the FAA requires arbitration. [19]

## B. DEFENSES TO ARBITRATION

The de los Santoses assert the defenses of unconscionability, duress, fraudulent inducement, and revocation. [**13] We again note that these defenses must specifically relate to the Arbitration Addendum itself, not the contract as a whole, if they are to defeat arbitration. [20] *HN8* Defenses that pertain to the entire installment contract can be arbitrated. [21] We further note that the de los Santoses' defenses against the Addendum are governed by Texas law. [22] Again, *HN9* since the law favors arbitration, the burden of proving a defense to arbitration is on the party opposing arbitration. [23]

The de los Santoses contend that the Arbitration Addendum is unconscionable because arbitration might subject them to substantial costs and fees. On this issue, in *Green Tree Financial Corp. v. Randolph*, the United States Supreme Court recognized that "the existence of large arbitration costs [**14] could preclude a litigant . . . from vindicating her federal statutory rights . . . ." [24] Nonetheless, the Supreme Court concluded that *HN10* an arbitration agreement's mere silence with respect to costs and fees, by itself, is a "plainly insufficient" basis for invalidating the agreement. [25] Instead, the party opposing arbitration must prove the likelihood of incurring such costs. [26] To hold otherwise would "undermine the liberal federal policy favoring arbitration agreements." [27]

While the Supreme Court did not specify "how detailed the showing of prohibitive expense must be," there is no doubt that *some* specific information of future costs is required. [28] In *Green Tree*, the party resisting arbitration cited what she claimed were American Arbitration Association (AAA) figures on arbitration costs, but she provided no evidence that the AAA would actually conduct the arbitration or charge [**15] her the fees

---

[18]   *See Nationwide of Bryan, Inc. v. Dyer*, 969 S.W.2d 518, 520 (Tex. App.-Austin 1998, no pet.).

[19]   *See In re Oakwood*, 987 S.W.2d at 573.

[20]   *See Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 403-04, 18 L. Ed. 2d 1270, 87 S. Ct. 1801 (1967).

[21]   *See id.*

[22]   *In re Oakwood*, 987 S.W.2d at 574.

[23]   *Id.* at 573.

[24]   531 U.S. 79, 90; 121 S. Ct. at 522.

[25]   *Id.*

[26]   *Id.*

[27]   *Id.*

[28]   121 S. Ct. at 522-23.

she identified. [29] Because of this uncertainty, the Supreme Court deemed the evidence insufficient to defeat arbitration. [30]

Here, the de los Santoses testified, in two sworn affidavits, that the AAA charged a minimum $ 2,000 filing fee and a $ 250/day/party hearing fee, along with several other unspecified fees, for hearings before a three-member panel. But we **[*757]** need not decide whether these costs would be excessive. As in *Green Tree*, the de los Santoses provided no evidence that the AAA would actually conduct the arbitration or charge the specified fees. The Arbitration Addendum does not state that the AAA will conduct the arbitration, and it makes no mention of arbitration costs. We also note that the most recent AAA commercial arbitration rules provide that "the AAA may, in the event of extreme hardship on the part of any party, defer or reduce the administrative fees." [31] Moreover, in the **[**16]** event the de los Santoses do not avail themselves of FirstMerit Bank's choice of arbitrators, the FAA permits the trial court to choose an alternate set of arbitrators. [32] The de los Santoses also complain that the requirement of three arbitrators is inherently costly. But again, without any specific information on what the costs will be, this requirement is not evidence of unconscionability. Finally, in agreeing to the Addendum, Pete and Janie de los Santos agreed "that arbitration is a less expensive method of dispute resolution that decreases servicing costs of this loan . . . ." Because the record contains no specific evidence that the de los Santoses will actually be charged excessive arbitration fees, we conclude that there is legally insufficient evidence that the plaintiffs would be denied access to arbitration based on excessive costs.

The de los Santoses **[**17]** also argue that the agreement's terms are unconscionable because they force the weaker party to arbitrate their claims, while permitting the stronger party to litigate their claims. [33] They point us to decisions in other jurisdictions that have found this type of clause to be unconscionable. [34] Most federal courts, however, have rejected similar challenges on the grounds that an arbitration clause does not require mutuality of obligation, so long as the underlying contract is supported by adequate consideration. [35] **[**19]** In any event, *HN11* the basic test for unconscionability is whether, given the parties' general commercial background and the commercial needs of the particular trade or case, the clause involved is so one-sided that it is unconscionable under the circumstances existing when the parties made the contract. [36] The principle is one of preventing oppression and unfair surprise and not of disturbing allocation of risks because of superior bargaining power. [37] Here, the Arbitration Addendum allows the bank to seek judicial relief to enforce its security agreement, recover the buyers' monetary loan obligation, and foreclose. Given the weight of federal precedent and the routine **[**18]** nature of mobile **[*758]** home financing agreements, [38] we find that the Arbitration Addendum in this case, by excepting claims essentially protecting the bank's security interest, is not

---

[29] 121 S. Ct. at 522 & n.6.

[30] *See id.*

[31] American Arbitration Association, Arbitration Rules for the Real Estate Industry, Rule 51.

[32] *See* 9 U.S.C. § 5.

[33] *See In re Conseco Fin. Servicing Corp.*, 19 S.W.3d 562, 569 n.3 (Tex. App.-Waco 2000, pet. dism'd by agr.).

[34] *See, e.g.*, *Armendariz v. Foundation Health Psychcare Servs.*, 24 Cal. 4th 83, 6 P.3d 669, 691-94 (Cal. 2000); *Iwen v. U.S. West Direct*, 1999 MT 63, 977 P.2d 989, 995-96, 293 Mont. 512 (Mont. 1999).

[35] *See, e.g.*, *Harris v. Green Tree Fin. Corp.*, 183 F.3d 173, 183 (3d Cir. 1999); *Doctor's Assoc., Inc. v. Distajo*, 66 F.3d 438, 451-53 (2d Cir. 1995); *Wilson Elec. Contractors, Inc. v. Minnotte Contracting Corp.*, 878 F.2d 167, 168-69 (6th Cir. 1989); *Young v. Jim Walter Homes, Inc.*, 110 F. Supp. 2d 1344, 1350 (M.D. Ala. 2000); *Pridgen v. Green Tree Fin. Servicing Corp.*, 88 F. Supp. 2d 655, 658-59 (S.D. Miss. 2000); *Gray v. Conseco, Inc.*, 2000 U.S. Dist. LEXIS 14821, 13-16 (C.D. Cal. Sept. 29, 2000).

[36] TEX. BUS. & COM. CODE § 2.302 cmt. 1.

[37] *Id.*

[38] *See Palm Harbor Homes, Inc. v. McCoy*, 944 S.W.2d 716, 723 n.8 (Tex. App.-Fort Worth 1997, orig. proceeding).

unconscionable. [39] We also recognize that the plaintiffs are free to pursue their unconscionability defense in the arbitral forum.

Moreover, the de los Santoses cannot prevail on their duress defense, since there is no evidence that the sellers threatened to do anything they did not have a legal right to do. [40] At most, the sellers stated only that they would not sell the home if the de los Santoses would not sign the Addendum, which is not evidence of duress. [41]

The de los Santoses also alleged fraud in the inducement of the Arbitration Addendum. *HN12* The elements of fraud are: **[**20]** (1) that a material representation was made; (2) the representation was false; (3) when the representation was made, the speaker knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion; (4) the speaker made the representation with the intent that the other party should act upon it; (5) the party acted in reliance on the representation; and (6) the party thereby suffered injury. [42] In this case, the de los Santoses alleged that the sellers fraudulently represented that they owned the land under the home, and that the home had a septic system and driveway. They also allege that the sellers' advertisements and pre-sale statements made no reference to an arbitration clause, and that the sellers did not adequately explain the consequences of signing the Addendum. However, there is no evidence that the sellers actually misrepresented the Addendum's terms, or that they made any false material representations with regard to the Arbitration Addendum itself. Accordingly, we decline to invalidate the Arbitration Addendum based on fraud.

**[**21]** Finally, the de los Santoses argue that their alleged revocation of the installment contract also applies to the Arbitration Addendum, rendering it unenforceable. But this claim really pertains to the entire installment contract and not just the Arbitration Addendum. Again, the *HN13* Arbitration Addendum's validity is a separate issue from the validity of the whole contract. [43] And given that the FAA's primary objective is to encourage the arbitration of contract-related issues, the issue of whether the underlying contract was revoked is an issue that should be arbitrated, since it "arises from or relates to" the contract. [44]

## III. CONCLUSION

Because the claims in this lawsuit are within the scope of the parties' agreement to arbitrate, we conditionally **[**22]** grant the writ of mandamus and direct the trial court to order that all claims proceed to arbitration. The clerk is instructed to issue **[*759]** the writ only if the trial court fails to do so.

Craig T. Enoch

Justice

Opinion delivered: June 14, 2001

---

[39] *See Pridgen, 88 F. Supp. 2d at 658-59*; see *also Conseco Fin. Servicing Corp. v. Wilder, 47 S.W.3d 335, 2001 Ky. App. LEXIS 60* (Ky. Ct. App. May 18, 2001).

[40] *In re Oakwood, 987 S.W.2d at 574*.

[41] *See id*.

[42] *Formosa Plastics Corp. v. Presidio Engrs. & Contractors, Inc., 960 S.W.2d 41, 47 (Tex. 1998)*.

[43] *See Miller v. Puritan Fashions Corp., 516 S.W.2d 234, 238-39* (Tex. Civ. App.-Waco 1974, writ ref'd n.r.e.).

[44] *See Mewbourne Oil Co. v. Blackburn, 793 S.W.2d 735, 737* (Tex. App.-Amarillo 1990, orig. proceeding).



⚠ Caution

As of: September 1, 2015 2:40 PM EDT

## *In re Fleetwood Homes of Tex., L.P.*

Supreme Court of Texas

June 20, 2008, Opinion Delivered

NO. 06-0943

### Reporter

257 S.W.3d 692; 2008 Tex. LEXIS 579; 51 Tex. Sup. J. 1066

IN RE FLEETWOOD HOMES OF TEXAS, L.P. AND FLEETWOOD ENTERPRISES, INC., RELATORS

**Subsequent History:** Released for Publication August 1, 2008.

**Prior History:** *In re Fleetwood Homes of Tex., L.P., 2006 Tex. App. LEXIS 9198 (Tex. App. Waco, Oct. 25, 2006)*

## Core Terms

arbitration, discovery, parties, unconscionable, waived, express waiver, trial setting

## Case Summary

### Procedural Posture

Relator manufacturers filed a petition for a writ of mandamus to challenged a decision from a Texas court of appeals, which denied a request for the same relief. Mandamus was sought to challenge a finding that arbitration had been waived.

### Overview

A dealer agreement contained an arbitration clause. The agreement was cancelled, and the dealer filed suit. The answer demanded arbitration, but a motion to compel arbitration was not filed for some time. The dealer contended that arbitration was expressly waived due to several e-mails about a trial setting; moreover, limited discovery was allowed. The trial court found that arbitration had been waived, and the court of appeals agreed. This writ petition followed. In conditionally granting relief, the supreme court determined that the evidence here was legally insufficient to support a finding of prejudice to the dealer based on the exchange of e-mails. The communications were merely a factor to be considered. No dispositive motions were filed, and the motion to compel was not filed on the eve of trial. The actions complained of were not enough to overcome the presumption against waiver. Finally, the supreme court rejected the assertion that the arbitration clause was substantively unconscionable due to its limit on discovery or its provision regarding attorney's fees.

### Outcome

The petition for a writ of mandamus was conditionally granted. The writ only issued if the trial court failed to compel arbitration.

## LexisNexis® Headnotes

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > Waiver

*HN1* Parties that conduct full discovery, file motions going to the merits, and seek arbitration only on the eve of trial waive any contractual right to arbitration.

Civil Procedure > ... > Arbitration > Federal Arbitration Act > Arbitration Agreements

Civil Procedure > ... > Writs > Common Law Writs > Mandamus

*HN2* Mandamus relief is proper to enforce arbitration agreements governed by the Federal Arbitration Act.

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > Waiver

*HN3* A party waives an arbitration clause by substantially invoking the judicial process to the other party's detriment or prejudice. Waiver is a legal question for the court based on the totality of the circumstances, and asks whether a party has substantially invoked the judicial process to an opponent's detriment, the latter term meaning inherent unfairness caused by a party's attempt to have it both ways by switching between litigation and arbitration to its own advantage.

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > Waiver

*HN4* In the context of waiver, while communications by a party seeking to compel arbitration is a factor to be considered in the totality-of-the-circumstances, it is not the only factor.

Civil Procedure > Discovery & Disclosure > General Overview

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > Waiver

*HN5* In the context of waiver, a party who requests lots of discovery is not prejudiced by getting it and taking it to arbitration in the same way as a party who produces lots of discovery.

Civil Procedure > Discovery & Disclosure > General Overview

Contracts Law > Defenses > Unconscionable > Arbitration Agreements

*HN6* An arbitration's limits on discovery for both parties does not make it unconscionable. The test for substantive unconscionability is whether, given the parties' general commercial background and the commercial needs of the particular trade or case, the clause involved is so one-sided that it is unconscionable under the circumstances existing when the parties made the contract.

Civil Procedure > ... > Attorney Fees & Expenses > Basis of Recovery > Statutory Awards

Contracts Law > Contract Conditions & Provisions > General Overview

*HN7* Absent a contractual agreement, Texas law allows attorney's fees only for a prevailing plaintiff. *Tex. Civ. Prac. & Rem. Code Ann. §§ 38.001-.002*.

**Counsel:** For Fleetwood Homes of Texas, L.P., RELATOR: Mr. Michael J. Craddock, Ms. Felicia Norvell, Ms. Rachel Elizabeth Khirallah, Mr. David Charles Routzon Jr., Craddock Reneker & Davis, L.L.P., Dallas, TX.

For Fleetwood Enterprises, Inc., RELATOR: Ms. Felicia Norvell, Craddock Reneker & Davis, L.L.P., Dallas, TX.

For Gulf Regional Services, Inc., REAL PARTIES: Mr. Michael Allen Starzyk, Mr. Alan M. Bush, Ms. April Lee Walter, Starzyk & Associates, The Woodlands, TX.

For WD Inc., RELATOR: Ms. Felicia Norvell, Craddock Reneker & Davis, L.L.P., Dallas, TX.

For Gary Adamek, RELATOR: Ms. Felicia Norvell, Craddock Reneker & Davis, L.L.P., Dallas, TX.

## Opinion

[**1]

[*693] ON PETITION FOR WRIT OF MANDAMUS

**PER CURIAM**

*HN1* Parties that "conduct full discovery, file motions going to the merits, and seek arbitration only on the eve of trial" waive any contractual right to arbitration. *In re Vesta Ins. Group, Inc., 192 S.W.3d 759, 764 (Tex. 2006)*. The relators here did none of those, instead merely discussing a potential trial setting and sending a set of written discovery the day before moving to compel arbitration. The trial court held the relators waived arbitration, and a divided court of appeals denied mandamus relief. *S.W.3d , 2006 Tex. App. LEXIS 9198*. We disagree, and thus conditionally grant it. *See In re Weekley, 180 S.W.3d 127, 130 (Tex. 2005)* (*HN2* "Mandamus relief is proper to enforce arbitration agreements governed by the FAA.").

Fleetwood Enterprises, Inc., manufactures mobile homes. In January 2005 it signed a dealer agreement with Gulf Regional Services, Inc., an owner and developer of mobile home parks in southeast Texas that also sells and leases mobile homes. The agreement included an arbitration clause covering "any dispute, controversy or claim among the Parties." In August 2005 Fleetwood cancelled the agreement on the ground that Gulf was planning to sell or use mobile [**2] homes at a location other than that specified in the dealer agreement.

After Gulf filed suit in October 2005, Fleetwood filed an answer demanding arbitration, [*694] but did not actually move to compel arbitration until July 2006. Gulf opposed the motion on two grounds: express waiver and unconscionability.

*HN3* "[A] party waives an arbitration clause by substantially invoking the judicial process to the other party's detriment or prejudice." *Perry Homes v. Cull, 258 S.W.3d 580, , 2008 Tex. LEXIS 423, *18 (Tex. 2008)*. Waiver is a legal question for the court based on the totality of the circumstances, and asks whether a party has substantially invoked the judicial process to an opponent's detriment, the latter term meaning inherent unfairness caused by "a party's attempt to have it both ways by switching between litigation and arbitration to its own advantage." *Id. at , 2008 Tex. LEXIS 423 at *74*.

Gulf argues that Fleetwood expressly waived arbitration, pointing to several emails from Fleetwood's counsel regarding a proposed trial setting, culminating in the following:

> I have reviewed the Setting Request and would ask that we try to get a setting in March . . . . Given the documentation I received last week and the work we need to do as a result [**3] of those documents, Fleetwood is not going to be in a position to try this case in December. If you are agreeable to this, we could sign an agreed Setting Request, otherwise, I will have to oppose the request after you submit it and request a later setting.

We need not decide whether Gulf is correct that express waiver is governed by different rules than those that

govern implied waiver, as we disagree that this rises to the level of an express waiver. Nothing in this communication expressly waives arbitration or revokes the arbitration demand Fleetwood included in every answer it filed.

Instead, the question here is whether Fleetwood *impliedly* waived arbitration by failing to pursue its arbitration demand for eight months while discussing a trial setting and allowing limited discovery. We have already answered that question ″No.″ In *EZ Pawn Corp. v. Mancias,* we held a party had not waived arbitration by filing an answer, discussing a docket-control order, sending written discovery, noticing a deposition, and agreeing to postpone a trial setting. *934 S.W.2d 87, 90 (Tex. 1996)*. Gulf points out correctly that the movant in *EZ Pawn* had not yet ″discovered″ the arbitration clause until after **[**4]** these actions had already taken place. *Id. at 89*. But our opinion was based on the nonmovant's failure to show any prejudice, *id. at 90*, a requirement we recently reaffirmed. *See Perry Homes, 258 S.W.3d at ___, 2008 Tex. LEXIS 423 at *29*.

As in *EZ Pawn,* the evidence here is legally insufficient to support a finding of prejudice. Gulf does not explain how it possibly could have been prejudiced by exchanging emails about a trial setting. Moreover, *HN4* while these communications are a factor to be considered in the totality-of-the-circumstances, they are not the only factors. *See id.* at __. Here, Fleetwood took no depositions, although it noticed one deposition before cancelling it. [1] It served one set of written discovery the day before it moved to compel arbitration. It filed no dispositive motions, nor did it wait until the eve of **[*695]** trial to move to compel. Taken together, these actions are not enough to overcome the presumption against waiver. *See In re Vesta Ins. Group, Inc., 192 S.W.3d 759, 763 (Tex. 2006)*; *In re Bruce Terminix, 988 S.W.2d 702, 704 (Tex. 1998)*.

Gulf also argues the arbitration clause is substantively unconscionable, citing two reasons. First, it asserts that arbitration limits its right to discovery. But limited discovery is one of arbitration's ″most distinctive features.″ *Perry Homes, 258 S.W.3d at ___, 2008 Tex. LEXIS 423 at *46*; *see also Preston v. Ferrer, ___ U.S. ___, ___, 128 S. Ct. 978, 986, 169 L. Ed. 2d 917 (2008)* (″A prime objective of an agreement to arbitrate is to achieve streamlined proceedings and expeditious results.″). Gulf's argument that ″streamlined″ discovery makes arbitration unconscionable would nullify almost all arbitration agreements. We hold that *HN6* arbitration's limits on discovery for *both* parties does not make it unconscionable. *See In re Palm Harbor Homes, Inc., 195 S.W.3d 672, 678 (Tex. 2006)* (″The test for substantive unconscionability is whether, given the parties' general commercial background and the commercial needs of the particular trade or case, the clause involved is so one-sided that it is unconscionable under the circumstances existing when the parties made the **[**6]** contract.″ (internal quotation marks omitted)).

Second, Gulf asserts the agreement here is unconscionable because it allows the prevailing party to recover attorney's fees. It is true that *HN7* absent a contractual agreement like this, Texas law allows attorney's fees only for a prevailing plaintiff. *See TEX. CIV. PRAC. & REM. CODE § 38.001-.002*. But allowing *both* parties to recover fees hardly makes an agreement ″one-sided″; such agreements, common in commercial contexts, surely make them less so.

Because Gulf has failed to show that Fleetwood waived its contractual right to arbitration, we conditionally grant Fleetwood's petition for writ of mandamus and direct the trial court to compel arbitration. We are confident that the trial court will promptly comply, and our writ will issue only if it does not.

OPINION DELIVERED: June 20, 2008

---

[1] Gulf deposed three Fleetwood representatives, but does not explain how it was prejudiced in being allowed to do so. *See Perry Homes,* 258 S.W.3d at ___, 2008 Tex. LEXIS 423 at *50* (*HN5* ″[A] **[**5]** party who *requests* lots of discovery is not prejudiced by getting it and taking it to arbitration in the same way [as] a party who *produces* lots of discovery . . . .″) (emphasis in original).



⚠ Caution

As of: September 1, 2015 4:53 PM EDT

# In re Kaplan Higher Educ. Corp.

Supreme Court of Texas

August 24, 2007, Opinion Delivered

NO. 06-0072

**Reporter**

235 S.W.3d 206; 2007 Tex. LEXIS 707; 50 Tex. Sup. J. 1058

IN RE KAPLAN HIGHER EDUCATION CORPORATION AND LETICIA VENTURA, RELATORS

**Subsequent History:** Released for Publication October 12, 2007.

**Prior History:** [**1] ON PETITION FOR WRIT OF MANDAMUS.
*In re Kaplan Higher Educ. Corp., 2006 Tex. App. LEXIS 239 (Tex. App. Corpus Christi, Jan. 10, 2006)*

## Core Terms

arbitration, enrollment, arbitration clause, fraudulent inducement, affiliate, induced

## Case Summary

### Procedural Posture

Relators, an educational corporation and an admissions director, challenged a ruling from the Thirteenth Court of Appeals (Texas), which denied mandamus relief from the trial court's refusal to compel arbitration of real party in interest students' claims for negligent misrepresentation and other causes of action.

### Overview

The students enrolled at a vocational college that was a subsidiary of the educational corporation. They alleged that they were fraudulently induced to enroll by misrepresentations from the admissions director and others. Each student signed an enrollment agreement that required arbitration of any controversy or claim arising out of, or relating to, the agreement. The court observed that the substance of the claim was fraudulent inducement because the students sought refunds of tuition and other costs they would not have incurred had they not been induced to enroll. Fraudulent inducement claims fell within an agreement to arbitrate all disputes involving an underlying contract. Although the claims were not on the contract, the court stated that the agents of a signatory sometimes could invoke an arbitration clause even if they themselves were nonsignatories and a claimant was not suing on the contract. The court concluded that arbitration was necessary because the college would be liable under *Tex. Educ. Code Ann. § 132.061(a)(2)* for any judgment; if its liability could be decided by a suit against an agent, then the arbitration contract would have been effectively abrogated.

### Outcome

The court conditionally granted the writ of mandamus and directed the trial court to order that the students' claims proceed to arbitration.

## LexisNexis® Headnotes

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > Arbitrability

*HN1* Arbitrability turns on the substance of the claim, not artful pleading.

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > Arbitrability

Torts > Business Torts > Fraud & Misrepresentation > General Overview

*HN2* Fraudulent inducement claims fall within an agreement to arbitrate all disputes involving an underlying contract.

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > Arbitrability

*HN3* Claims must be brought on the contract (and arbitrated) if liability arises solely from the contract. Claims can be brought in tort (and in court) if liability arises from general obligations imposed by law.

Torts > Business Torts > Fraud & Misrepresentation > General Overview

*HN4* Claims of fraudulent inducement arise from general obligations imposed by law, not the underlying contract.

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > Arbitrability

Torts > Business Torts > Fraud & Misrepresentation > General Overview

*HN5* The agents of a signatory may sometimes invoke an arbitration clause even if they themselves are nonsignatories and a claimant is not suing on the contract. Thus, if two companies sign a contract to arbitrate disputes, one cannot avoid it by recasting a contract dispute as a tortious interference claim against an owner, officer, agent, or affiliate of the other. Every contract claim against a corporation could be recast as a tortious interference claim against its agents, and it is impractical to require every corporate agent to signor be listed in every contract. As a contracting party generally cannot avoid unfavorable clauses by suing the other party's agents, this rule is necessary to place arbitration agreements on equal footing with other contracts. For the same reasons, the same rule must apply when a party to an arbitration contract seeks to avoid it by pleading a contract dispute as fraudulent inducement by an officer, agent, or affiliate of the other. Here too, almost every contract claim against a corporation could be recast as a fraudulent inducement claim against the agents or employees who took part in the negotiations preceding it. If such arbitration clauses are enforceable only if every officer, employee, agent, or affiliate signs or is listed in the contract, they would be more easily avoided than other contract clauses.

Education Law > Administration & Operation > Career & Technical Schools

*HN6* The Texas Education Code requires vocational schools to provide full refunds if enrollment was procured by representations by the owner or representatives of the school. *Tex. Educ. Code Ann. § 132.061(a)(2)*.

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > Arbitrability

*HN7* A challenge to the validity of a contract as a whole, and not specifically to the arbitration clause, must go to the arbitrator.

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > Arbitrability

*HN8* Arbitration clauses do not automatically cover all corporate agents or affiliates. Like other contracts, arbitration agreements are enforced according to their terms and according to the intentions of the parties. Thus, for example, owners may not be able to invoke a subsidiary's arbitration clause when they act on their own behalf rather than for their subsidiary. But when an agreement between two parties clearly provides for the substance of a dispute to be arbitrated, one cannot avoid it by simply pleading that a nonsignatory agent or affiliate was pulling the strings.

**Counsel:** For Kaplan Higher Education Corporation, RELATOR: Ms. Joy M Soloway, Mr. Richard N. Carrell, Fulbright & Jaworski, L.L.P., Houston, TX.; Mr. David G. Oliveira, Roerig Oliveira & Fisher, Brownsville, TX.

For Rios, Mr. Luis, REAL PARTIES: Mr. Joe Escobedo Jr., Mr. Mauro Ferando Ruiz, Mr. David H. Hockema, Hockema Tippet & Escobedo, McAllen, TX.; Mr. Damian Orozco, Pharr, TX.; Mr. Jeffrey D. Small, Law Office of Jeff Small, San Antonio, TX.; Mr. David R. Montpas, Mr. Brendan K. McBride, Prichard Hawkins McFarland & Young, L.L.P., San Antonio, TX.

## Opinion

 **[*208] PER CURIAM**

A vocational college and 45 of its students agreed to arbitrate any dispute "arising from or relating to" their enrollment agreement. Claiming they were fraudulently induced to sign up, the students nevertheless seek to avoid arbitration by pursuing their claims only against two nonsignatories. The parties agree the Federal Arbitration Act applies. *See 9 U.S.C. § 1 et. seq.* The trial court refused to compel arbitration, and the Thirteenth Court of Appeals denied mandamus relief. We conditionally grant it. *See In re Weekley Homes, L.P., 180 S.W.3d 127, 130 (Tex. 2005)* ("Mandamus relief is proper to enforce arbitration agreements governed by the FAA.").

The students enrolled in an electrician's program at the San Antonio College of Medical and Dental Assistants -- McAllen Branch ("the College"), a wholly-owned subsidiary of Kaplan Higher Education Corporation. They allege they were fraudulently induced to enroll by assurances that upon graduation they would be eligible for licenses as journeymen or master electricians. Each student signed an enrollment agreement detailing tuition, rules, and graduation requirements, and requiring them to arbitrate **[**2]** "[a]ny controversy or claim arising out of, or relating to, this Agreement." [1]

Initially, the plaintiffs filed suit against Kaplan, the College, Frank Jennings (the College's president) and Leticia Ventura (the College's admissions director). When the defendants moved for arbitration, the plaintiffs dropped their claims against the College and Jennings (both signatories to the agreements) as well as all claims of joint venture or enterprise, leaving only claims against Kaplan and Ventura (both nonsignatories).

Although alleged in various forms, [2] the substance of the students' claim was fraudulent inducement, as they seek refunds of tuition and other costs they would not have incurred had they not been induced **[*209]** to sign up. *See Weekley, 180 S.W.3d at 131-32* **[**3]** (stating that *HN1* arbitrability "turns on the substance of the claim, not artful pleading"); *Haase v. Glazner, 62 S.W.3d 795, 797-800 (Tex. 2001)* (distinguishing fraudulent

---

[1]   Each enrollment agreement contained the following arbitration provision: ACKNOWLEDGEMENT OF OBLIGATION: . . . Any controversy or claim arising out of, or relating to, this Agreement, or breach thereof, no matter how pleaded or styled, shall be settled by arbitration in accordance with the Commercial Rules of Arbitration Association, and judgment upon the award rendered by the Arbitrator(s) may be entered in any court having jurisdiction.

[2]   The students' pleadings alleged negligence, negligence per se based on alleged violations of the Texas Education and Texas Administrative Codes, violations of the Texas Deceptive Trade Practices Act, and negligent misrepresentation.

inducement from other fraud claims as it "presupposes that a party has been induced to enter a contract"). We have held that **HN2** such claims fall within an agreement to arbitrate all disputes "involving" an underlying contract. *See In re J.D. Edwards World Solutions Co., 87 S.W.3d 546, 550-51 (Tex. 2002)*. Clearly, the students' complaints arise out of and relate to their enrollment agreements.

We disagree with Kaplan that the students are suing on those agreements. **HN3** "Claims must be brought on the contract (and arbitrated) if liability arises solely from the contract . . . . [C]laims can be brought in tort (and in court) if liability arises from general obligations imposed by law." *Weekley, 180 S.W.3d at 132*. **HN4** Claims of fraudulent inducement arise from general obligations imposed by law, not the **[**4]** underlying contract. *Tony Gullo Motors I, L.P. v. Chapa, 212 S.W.3d 299, 304 (Tex. 2006)* ("The duty not to fraudulently procure a contract arises from the general obligations of law rather than the contract itself, and may be asserted in tort even if the only damages are economic."); *Formosa Plastics Corp. USA v. Presidio Eng'rs and Contractors, Inc., 960 S.W.2d 41, 46 (Tex. 1998)* ("[I]t is well established that the legal duty not to fraudulently procure a contract is separate and independent from the duties established by the contract itself.").

Nevertheless, **HN5** the agents of a signatory may sometimes invoke an arbitration clause even if they themselves are nonsignatories and a claimant is not suing on the contract. Thus, if two companies sign a contract to arbitrate disputes, one cannot avoid it by recasting a contract dispute as a tortious interference claim against an owner, officer, agent, or affiliate of the other. *In re Vesta Ins. Group, Inc., 192 S.W.3d 759, 762-63 (Tex. 2006)* (per curiam). "Every contract claim against a corporation could be recast as a tortious interference claim against its agents," and it is impractical to require every corporate agent to signor be listed in **[**5]** every contract. *Id. at 762*. As a contracting party generally cannot avoid unfavorable clauses by suing the other party's agents, this rule is necessary "'to place arbitration agreements on equal footing with other contracts'." *Id.* (quoting *E.E.O.C. v. Waffle House, Inc., 534 U.S. 279, 293, 122 S. Ct. 754, 151 L. Ed. 2d 755 (2002)*).

For the same reasons, the same rule must apply when a party to an arbitration contract seeks to avoid it by pleading a contract dispute as fraudulent inducement by an officer, agent, or affiliate of the other. Here too, almost every contract claim against a corporation could be recast as a fraudulent inducement claim against the agents or employees who took part in the negotiations preceding it. If such arbitration clauses are enforceable only if every officer, employee, agent, or affiliate signs or is listed in the contract, they would be more easily avoided than other contract clauses.

Further, the students' agreements with the College require arbitration here because the College will be liable for the judgment if their suit is successful. **HN6** The Texas Education Code requires vocational schools to provide full refunds if enrollment was procured by representations "by the owner or representatives **[**6]** of the school." *TEX. EDUC. CODE § 132.061(a)(2)*; *see also Minyard Food Stores, Inc. v. Goodman, 80 S.W.3d 573, 577 (Tex. 2002)* (stating that employers are generally liable for employees' torts committed in course, scope, and furtherance of employer's business). **[*210]** The enrollment agreements specifically provided for tuition refunds in the event enrollment was induced by misrepresentation. If the College's liability for such refunds (about $ 10,000 for each student) can be decided in court by suing its agents, then the arbitration contract has been effectively abrogated.

The students argue that Ventura and the other admissions officers to whom they spoke were not employees of the College but of Kaplan. But the undisputed facts (and the students' own pleadings) show that regardless of who paid them, they were acting as agents of the College when they advertised, recruited, and procured contracts on its behalf, and that the College itself will have to answer for any misrepresentations they made in doing so.

The students also assert that Kaplan cannot seek arbitration because of "unclean hands" in its dealings with them. But this defense pertains to the enrollment agreement in general rather **[**7]** than the arbitration clause

in particular, and thus must be arbitrated. *See Buckeye Check Cashing, Inc. v. Cardegna, 546 U.S. 440, 449, 126 S. Ct. 1204, 163 L. Ed. 2d 1038 (2006)* ("We reaffirm today that . . . *HN7* a challenge to the validity of the contract as a whole, and not specifically to the arbitration clause, must go to the arbitrator."); *In re FirstMerit Bank, N.A., 52 S.W.3d 749, 756 (Tex. 2001)*.

We emphasize again today that *HN8* arbitration clauses do not automatically cover all corporate agents or affiliates. *See In re Merrill Lynch Trust Co., 235 S.W.3d 185, 2007 Tex. LEXIS 736 at *33 (Tex. 2007)*; *In re Vesta Ins. Group, Inc., 192 S.W.3d 759, 763 (Tex. 2006)* (per curiam). Like other contracts, arbitration agreements "are enforced according to their terms and according to the intentions of the parties." *First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 947, 115 S. Ct. 1920, 131 L. Ed. 2d 985 (1995)* (internal citation omitted). Thus, for example, owners may not be able to invoke a subsidiary's arbitration clause when they act on their own behalf rather than for their subsidiary. *See*, *e.g.*, *Westmoreland v. Sadoux, 299 F.3d 462, 466 (5th Cir. 2002)*. But when an agreement between two parties clearly provides for the substance of a dispute to be arbitrated, one cannot avoid **[**8]** it by simply pleading that a nonsignatory agent or affiliate was pulling the strings.

Accordingly, without hearing oral argument, *see TEX. R. APP. P. 52.8(c)*, we conditionally grant the writ of mandamus and direct the trial court to order that the students' claims proceed to arbitration. Our writ will not issue unless the trial court fails to do so.

OPINION DELIVERED: August 24, 2007



⚠ Caution

# *In re Kellogg Brown & Root, Inc.*

Supreme Court of Texas

December 1, 2004, Argued ; May 20, 2005, Delivered

NO. 03-1129

**Reporter**

166 S.W.3d 732; 2005 Tex. LEXIS 393; 48 Tex. Sup. J. 678

IN RE KELLOGG BROWN & ROOT, INC., RELATOR

**Subsequent History:** Writ of mandamus granted *In re MaCgregor (FIN) Oy, 2005 Tex. App. LEXIS 9329 (Tex. App. Houston 1st Dist., Nov. 10, 2005)*

**Prior History:** [**1] ON PETITION FOR WRIT OF MANDAMUS.
*MacGregor (FIN) Oy v. Kellogg, Brown & Root, Inc. (In re MacGregor (FIN) Oy), 126 S.W.3d 176, 2003 Tex. App. LEXIS 5903 (Tex. App. Houston 1st Dist., 2003)*

## Core Terms

arbitration, non-signatory, fabrication, subcontract, collateral, estoppel, arbitration provision, direct benefit, trial court, state law, ownership, elevator, court of appeals, moot, arbitration agreement, arbitration clause, services, trunks, liens, federal court, contracts, possessed, parties, quantum meruit claim, quantum meruit, subcontractor, declaration, mandamus relief, equitable, materials

## Case Summary

### Procedural Posture

Relator sub-subcontractor sought mandamus relief from a judgment of the court of appeals (Texas), which ordered a trial court to vacate its order denying a contractor's motion to compel the sub-subcontractor to pursue its claims in an ongoing arbitration between the contractor and a subcontractor and to issue an order compelling the sub-subcontractor to arbitrate all claims.

### Overview

At issue was whether the sub-subcontractor, as a non-signatory to a contract containing an arbitration clause governed by the Federal Arbitration Act, *9 U.S.C.S. §§ 1-16*, had to arbitrate its claims against the subcontractor and the contractor, the signatories to the contract. The court held that the sub-subcontractor could not be so compelled. Under direct benefits estoppel, although a non-signatory's claim might relate to a contract containing an arbitration provision, that relationship did not, in itself, bind the non-signatory to the arbitration provision. Instead, a non-signatory should be compelled to arbitrate a claim only if it sought, through the claim, to derive a direct benefit from the contract containing the arbitration provision. In its quantum meruit claim against the contractor, the sub-subcontractor sought payment for services rendered under its contract with the subcontractor.

Thus, the court of appeals abused its discretion to the extent it compelled the sub-subcontractor to arbitrate its quantum meruit claim against the contractor. The court did not decide whether other arguments existed to compel the sub-subcontractor to arbitrate the validity of its liens.

**Outcome**

The court conditionally granted mandamus relief and ordered the court of appeals to vacate its order compelling the sub-subcontractor to arbitrate all claims. The writ was to issue only if the court of appeals failed to comply.

# LexisNexis® Headnotes

Civil Procedure > ... > Justiciability > Mootness > General Overview

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Mandatory ADR

*HN1* A case becomes moot if a controversy ceases to exist between the parties at any stage of the legal proceedings, including the appeal. A case is not rendered moot simply because some of the issues become moot during the appellate process.

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > General Overview

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview

Civil Procedure > ... > Arbitration > Federal Arbitration Act > General Overview

Civil Procedure > ... > Arbitration > Federal Arbitration Act > Arbitration Agreements

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Mandatory ADR

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Validity of ADR Methods

Contracts Law > Contract Conditions & Provisions > Arbitration Clauses

Evidence > Inferences & Presumptions > General Overview

Evidence > Burdens of Proof > General Overview

International Trade Law > Dispute Resolution > International Commercial Arbitration > Arbitration

*HN2* A party seeking to compel arbitration under the Federal Arbitration Act (FAA) must establish that: (1) there is a valid arbitration agreement; and (2) the claims raised fall within that agreement's scope. Doubts regarding an agreement's scope are resolved in favor of arbitration because there is a presumption favoring agreements to arbitrate under the FAA. However, the presumption arises only after the party seeking to compel arbitration proves that a valid arbitration agreement exists because the purpose of the FAA was to make arbitration agreements as enforceable as other contracts, not more so.

Administrative Law > Agency Adjudication > Alternative Dispute Resolution

Civil Procedure > ... > Jurisdiction > Subject Matter Jurisdiction > General Overview

Civil Procedure > ... > Subject Matter Jurisdiction > Jurisdiction Over Actions > Concurrent Jurisdiction

Civil Procedure > Preliminary Considerations > Federal & State Interrelationships > General Overview

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview

Civil Procedure > ... > Arbitration > Federal Arbitration Act > General Overview

Civil Procedure > ... > Arbitration > Federal Arbitration Act > Arbitration Agreements

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Mandatory ADR

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Validity of ADR Methods

Contracts Law > Contract Conditions & Provisions > Arbitration Clauses

Contracts Law > ... > Estoppel > Equitable Estoppel > General Overview

International Trade Law > Dispute Resolution > International Commercial Arbitration > Arbitration

*HN3* Under the Federal Arbitration Act (FAA), ordinary principles of state contract law determine whether there is a valid agreement to arbitrate. Because arbitration is contractual in nature, the FAA generally does not require parties to arbitrate when they have not agreed to do so. Federal and Texas state courts have recognized, however, that it does not follow that under the FAA an obligation to arbitrate attaches only to one who has personally signed the written arbitration provision; instead, under certain circumstances, principles of contract law and agency may bind a non-signatory to an arbitration agreement. Although state law determines the validity of an arbitration agreement, courts have applied both federal and state law to determine the related, but distinct, issue of whether non-signatory plaintiffs should be compelled to arbitrate their claims. The FAA does not specify whether state or federal law governs, and the United States Supreme Court has not directly addressed the issue. Federal courts of appeals, however, have frequently applied federal substantive law when deciding whether a non-signatory must arbitrate. Federal and state courts have concurrent jurisdiction to enforce the FAA.

Administrative Law > Agency Adjudication > Alternative Dispute Resolution

Business & Corporate Law > ... > Duties & Liabilities > Causes of Action & Remedies > General Overview

Business & Corporate Law > ... > Duties & Liabilities > Causes of Action & Remedies > Breach of Contract

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Mandatory ADR

Contracts Law > Contract Conditions & Provisions > Arbitration Clauses

Contracts Law > ... > Estoppel > Equitable Estoppel > General Overview

Labor & Employment Law > Collective Bargaining & Labor Relations > Labor Arbitration > Enforcement

*HN4* Federal courts have recognized six theories, arising out of common principles of contract and agency law, that may bind non-signatories to arbitration agreements: (1) incorporation by reference; (2) assumption; (3) agency; (4) alter ego; (5) equitable estoppel, and (6) third-party beneficiary. Under direct benefits estoppel, a non-signatory plaintiff seeking the benefits of a contract is estopped from simultaneously attempting to avoid the contract's burdens, such as the obligation to arbitrate disputes. Thus, a non-signatory plaintiff may be compelled to arbitrate if it seeks to enforce terms of a contract containing an arbitration provision. For example, if a non-signatory's breach-of-warranty and breach-of-contract claims are based on certain terms of a written contract, then the non-signatory cannot avoid an arbitration provision within that contract. If, however, a non-signatory's claims can stand independently of the underlying contract, then arbitration generally should not be compelled under this theory. Consistent with the federal doctrine of direct benefits estoppel, the Texas Supreme Court has held that a non-signatory plaintiff may be compelled to arbitrate if its claims are based on a contract containing an agreement to arbitrate.

Civil Procedure > Pleading & Practice > Pleadings > Rule Application & Interpretation

Contracts Law > Contract Conditions & Provisions > Arbitration Clauses

Contracts Law > Remedies > Equitable Relief > General Overview

*HN5* Quantum meruit is an equitable remedy that is based upon the promise implied by law to pay for beneficial services rendered and knowingly accepted. A party generally cannot recover under quantum meruit when there is a valid contract covering the services or materials furnished. A party to a contract may, however, seek alternative relief under both contract and quasi-contract theories. Pleading in the alternative does not defeat the effect of an arbitration clause that broadly covers all disputes between signatories that arise out of the underlying agreement.

> Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview
>
> Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Mandatory ADR
>
> Contracts Law > Contract Conditions & Provisions > General Overview
>
> Contracts Law > Contract Conditions & Provisions > Arbitration Clauses

*HN6* Under "direct benefits estoppel," a non-signatory plaintiff cannot be compelled to arbitrate on the sole ground that, but for the contract containing the arbitration provision, it would have no basis to sue. The work to be performed under a second-tier subcontract will inherently be related to and, to a certain extent, defined by contracts higher in the chain. Under "direct benefits estoppel," although a non-signatory's claim may relate to a contract containing an arbitration provision, that relationship does not, in itself, bind the non-signatory to the arbitration provision. Instead, a non-signatory should be compelled to arbitrate a claim only if it seeks, through the claim, to derive a direct benefit from the contract containing the arbitration provision.

> Contracts Law > Third Parties > Beneficiaries > General Overview

*HN7* The intention to contract or confer a direct benefit to a third party must be clearly and fully spelled out or enforcement by the third party must be denied.

> Contracts Law > Types of Contracts > Construction Contracts
>
> Real Property Law > Construction Law > Contracts

*HN8* In construction contracts, in the absence of an express agreement to the contrary, a subcontractor is not in privity with the owner.

> Commercial Law (UCC) > Documents of Title (Article 7) > General Overview
>
> Commercial Law (UCC) > Documents of Title (Article 7) > Warehouse Receipts > Liens
>
> Contracts Law > ... > Sales of Goods > Remedies > General Overview
>
> Contracts Law > ... > Priorities > Liens > Warehousemen's Liens
>
> Real Property Law > ... > Liens > Nonmortgage Liens > General Overview

*HN9* The self-executing constitutional lien attaches to buildings and special-order articles that are made or repaired by mechanics, material men, and artisans who have a direct contractual relationship with the owner of the property. *Tex. Const. art. XVI, § 37*. The warehouseman's lien arises against the bailor on the goods covered by a warehouse receipt or on the proceeds thereof in his possession for charges for storage or transportation, insurance, labor, or charges present or future in relation to the goods, and for expenses necessary for preservation of the goods. *Tex. Bus. & Com. Code Ann. § 7.209(a)(1)*.

**Counsel:** For the RELATOR Kellogg Brown & Root, Inc.: Mr. Jack D. Carnegie, Mr. John L. Hagan, Jones Day, Houston, TX., Mr. Kevin B. Finkel, Johnson Finkel Deluca & Kennedy, P.C., Houston, TX.

For REAL PARTIES MacGregor (Fin) OY: Mr. Jeffrey Raizner, Johnson Finkel DeLuca & Kennedy, P.C., Houston, TX. Mr. Ira E. Hoffman, Grayson, Kubli & Hoffman, P.C., McLean, VA.,Mr. Jeff H. Galloway, Hughes Hubbard & Reed, New York, NY., Mr. John Fellas, Hughes Hubbard & Reed, LLP, New York, NY., Mr. Jack F. Burleigh,, Houston, TX.

For OTHER Gulf Coast Holdings, Inc.: Mr. Jeffrey T. Nobles, Beime Maynard & Parsons, LLP, Houston, TX., Mr. Clint Alexander Corrie, Bieme Maynard & Parsons, LLP, Dallas, TX., Mr. Joseph Lawrence Mira, Dallas, TX., Mr. Robert Bryan Tabor, Houston, TX., Mr. John D. White, Jones Walker Waechter Poitevent Carrere & Denegre, The Woodlands, TX..

**Judges:** CHIEF JUSTICE JEFFERSON delivered the opinion of the Court. JUSTICE JOHNSON did not participate in the decision.

**Opinion by:** Wallace B. Jefferson

# Opinion

 **[\*734]** In this original proceeding, the question is whether Kellogg Brown & **[\*\*2]** Root, Inc. (″KBR″), as a non-signatory to a contract containing an arbitration clause, must arbitrate its claims against Unidynamics, Inc. (″Unidynamics″) and MacGREGOR (FIN) Oy (″MacGregor″)--the signatories to the contract. The trial court denied MacGregor's motion, which sought to compel KBR to pursue its claims in an ongoing arbitration between MacGregor and Unidynamics. The court of appeals held that the trial court abused its discretion and conditionally granted mandamus relief, ordering the trial court to vacate its order denying MacGregor's motion and ″issue an order compelling KBR to arbitrate all claims.″ *126 S.W.3d 176, 184*. KBR sought mandamus relief in this Court.

Approximately two months after KBR filed its petition here, the arbitration between MacGregor and Unidynamics concluded. As a result, the relief MacGregor requested in the lower courts--that KBR be compelled ″to pursue its claims in the arbitration between MacGregor (FIN) and Unidynamics″--is no longer available. The case is not moot, however, because the parties continue to dispute whether KBR should be compelled to ″arbitrate all claims″ pursuant to the court of appeals' order. *Id. at 184.* **[\*\*3]** Because we conclude that KBR cannot be so compelled, we conditionally grant mandamus relief and order the court of appeals to vacate its order.

## I Factual Background

In October 1999, MacGREGOR (USA), Inc. contracted with Ingalls Shipbuilding, Inc. (″Ingalls″) to build elevator trunks for two cruise ships. MacGREGOR (USA) assigned the contract to its sister company, **[\*735]** MacGREGOR (FIN) Oy [1] **[\*\*4]** (″MacGregor″). In August 2000, MacGregor subcontracted part of the job to Unidynamics, which agreed to fabricate a set of the elevator trunks for one of the ships. [2] In June 2001, Unidynamics and KBR entered into a second-tier subcontract, under which KBR agreed to furnish labor, equipment, and facilities to fabricate the elevator trunks. In the fabrication subcontract between MacGregor and Unidynamics, the parties agreed that: ″Any disputes arising from the interpretation or application of this contract including any document pertaining thereto, shall be settled by arbitration in accordance with General Conditions

---

[1]  The term ″Oy″ for Finnish companies is an abbreviation of ″osakeyhtio″ (″osake″ means ″share,″ ″yhtio″ means ″society″). *See* http://encyclopedia.laborlawtalk.com/Oy (last visited May 18, 2005, and available in Clerk of Court's file).

[2]  In October 2000, MacGregor and Unidynamics entered into another subcontract, under which Unidynamics agreed to preassemble and install the elevator trunks. That subcontract is not at issue in this case.

(ECE 188), (Appendix 10)." [3] The second-tier subcontract between Unidynamics and KBR did not contain an arbitration provision.

After the ship buyer declared bankruptcy in November 2001, Ingalls directed MacGregor to cease work and notify its subcontractors to do the same. MacGregor directed Unidynamics to comply with "the same instructions that Ingalls gave MacGregor." Unidynamics conveyed those instructions to KBR. On or around November 5, 2001, KBR ceased work, stored the elevator trunks and other equipment, and sent Unidynamics invoices for unpaid fabrication services and storage costs. Because KBR had not been paid in full, it asserted liens on the elevator trunk fabrications, parts, and other materials (the "collateral").

 [**5] A dispute then arose between MacGregor and Unidynamics regarding who owned the collateral and who owed KBR for the fabrication services and storage costs. The dispute stemmed from MacGregor and Unidynamics' Agreement Concerning Passing of Title (the "Title Agreement"), executed on December 5, 2001, and fully incorporated into their fabrication subcontract. Among other things, the Title Agreement provided that full title to the collateral would pass irrevocably to MacGregor immediately after MacGregor made two payments to Unidynamics, which were to occur no later than December 19, 2001. The Title Agreement further required Unidynamics to release the collateral to MacGregor upon MacGregor's request. It is undisputed that MacGregor timely paid Unidynamics; however, Unidynamics asserted that the payments were ineffective to pass title to MacGregor. When MacGregor demanded that Unidynamics release the elevator trunks, Unidynamics refused. The collateral remained in KBR's possession.

## II Procedural Background

In May 2002, pursuant to the arbitration provision in the fabrication subcontract, MacGregor asked the International Chamber of Commerce ("ICC") to arbitrate its dispute with [**6] Unidynamics. Among other things, MacGregor sought: (1) damages for breach of contract by Unidynamics for failure to release the collateral, (2) a determination [*736] as to which defendant owned the collateral, and (3) a determination regarding MacGregor's proportionate responsibility for the storage costs KBR billed Unidynamics. Unidynamics filed an answer and asserted counterclaims. MacGregor and Unidynamics then commenced arbitration in Paris, France.

While the arbitration was proceeding, both MacGregor and Unidynamics demanded that KBR release the collateral. KBR refused the demands and, on September 17, 2002, filed suit against both companies in Harris County. KBR claimed that Unidynamics breached its contract and, in the alternative, that it was entitled to recover *quantum meruit* damages against Unidynamics and MacGregor. KBR also sued for declaratory relief to determine which defendant owned the collateral. Subject to the court's ruling on ownership, KBR sought a judicial declaration that it possessed valid constitutional and statutory liens against the collateral in its possession. [4] MacGregor answered and sought a temporary restraining order, temporary injunction, and permanent [**7] injunction directing KBR to release the collateral. Unidynamics opposed MacGregor's application, arguing that the court action should be abated because the collateral's ownership was "the very issue . . . being arbitrated before the ICC." MacGregor, Unidynamics, and KBR then negotiated an agreement, which the trial court entered as an Agreed Order. Pursuant to that order, MacGregor agreed to post a $ 1,000,000 bond

---

[3]   The arbitration provision in ECE 188 provided: "Any dispute arising out of the Contract shall be finally settled, in accordance with the Rules of Conciliation and Arbitration of the International Chamber of Commerce ["ICC"], by one or more arbitrators designated in conformity with those Rules."

[4]   *See* TEX. CONST. art. XVI, § 37; TEX. BUS. & COM. CODE § 7.209.

and, upon presentation of the bond, KBR agreed to release the collateral to MacGregor. [5] MacGregor posted the bond on October 28, 2002.

 [**8] Meanwhile, on October 18, 2002, MacGregor filed a motion to abate the state court proceedings pending its arbitration with Unidynamics or, in the alternative, to compel KBR to pursue its claims in the ongoing arbitration between MacGregor and Unidynamics. The trial court denied MacGregor's motion. On December 19, 2002, MacGregor filed an interlocutory appeal and a petition for writ of mandamus in the court of appeals, contending that the trial court abused its discretion. The court of appeals dismissed the interlocutory appeal as moot and conditionally granted mandamus relief, ordering the trial court "to vacate its order denying MacGregor's plea in abatement and motion to compel arbitration, to issue an order compelling KBR to arbitrate all claims, and to stay all proceedings pending arbitration." [6] *126 S.W.3d at 184-85*.

 [**9] On December 9, 2003, KBR petitioned this Court for a writ of mandamus. On February 4, 2004, while the petition was pending before us, the arbitration between MacGregor and Unidynamics concluded, and the ICC issued a final arbitration award. KBR does not contest that award.

### III Mootness

As a preliminary matter, we must decide whether the ICC's final arbitration [*737] award moots this mandamus proceeding. *HN1* A case becomes moot if a controversy ceases to exist between the parties at any stage of the legal proceedings, including the appeal. *Allstate Ins. Co. v. Hallman, 159 S.W.3d 640, 642, 48 Tex. Sup. Ct. J. 474 (Tex. 2005)*; *Bd. of Adjustment of San Antonio v. Wende, 92 S.W.3d 424, 427, 45 Tex. Sup. Ct. J. 674 (Tex. 2002)*; *Williams v. Lara, 52 S.W.3d 171, 184, 44 Tex. Sup. Ct. J. 998 (Tex. 2001)*. This case stems from the lower courts' action on MacGregor's motion to "compel[] KBR to pursue its claims in the arbitration between [MacGregor] and Unidynamics." Because that arbitration is over, KBR can no longer be compelled to "join the arbitration." *See 126 S.W.3d at 183* (concluding that the trial court abused its discretion by refusing to compel KBR to join the ongoing arbitration). The question, then, [**10] is whether this proceeding is moot.

A case is not rendered moot simply because some of the issues become moot during the appellate process. *See Allstate, 159 S.W.3d at 642* (holding that a dispute concerning attorney's fees preserved a live controversy in an otherwise moot appeal); *Camarena v. Tex. Employment Comm'n, 754 S.W.2d 149, 151, 31 Tex. Sup. Ct. J. 563 (Tex. 1988)* (same). In this case, the court of appeals ordered the trial court "to issue an order compelling KBR to arbitrate all claims." *126 S.W.3d at 184*. Although it is no longer possible for KBR to join the Paris arbitration, the court of appeals' ultimate directive has no temporal component. It requires KBR to "arbitrate all claims."

The live controversy in this proceeding is whether KBR must arbitrate those claims that remain now that the arbitration between MacGregor and Unidynamics has concluded. KBR's petition consisted of: (1) a breach-of-contract claim against Unidynamics; (2) in the alternative, a *quantum meruit* claim against Unidynamics and MacGregor; and (3) a declaratory judgment action to determine the collateral's owner and to establish that KBR possessed valid liens. The arbitrator determined that, [**11] pursuant to the Title Agreement between MacGregor and Unidynamics, title to the collateral passed from Unidynamics to MacGregor on December 10, 2001. KBR is satisfied with this resolution of the ownership dispute, and thus, we need not address whether the ownership dispute must be arbitrated. Additionally, we need not address whether KBR

---

[5]  The parties agreed that the bond would be enforceable and payable in Texas, and that it would "constitute an unconditional promise to pay upon demand accompanied by proof of Final Judgment adjudicating the validity and amount, if any, of [KBR's] lien or liens against . . . the collateral."

[6]  As of the date of this opinion, the trial court has not acted on the court of appeals' orders. Proceedings have not resumed in the trial court since the court of appeals ordered a stay on January 9, 2003. *See* 126 S.W.3d at 180-81.

should be compelled to arbitrate its claims against Unidynamics, because the parties now agree that those claims are not subject to arbitration. Our inquiry is accordingly limited to determining whether KBR must arbitrate its *quantum meruit* and lien-validity claims against MacGregor.

## IV Discussion

The parties do not dispute the court of appeals' holding that the arbitration provision at issue is governed by the Federal Arbitration Act ("FAA"). *See* 9 U.S.C. §§ 1-16; 126 S.W.3d at 181. In general, **HN2** a party seeking to compel arbitration under the FAA must establish that: (1) there is a valid arbitration agreement, and (2) the claims raised fall within that agreement's scope. *In re FirstMerit Bank, 52 S.W.3d 749, 753, 44 Tex. Sup. Ct. J. 900 (Tex. 2001)*; *In re Oakwood Mobile Homes, Inc., 987 S.W.2d 571, 573, 42 Tex. Sup. Ct. J. 377 (Tex. 1999).* [**12] Doubts regarding an agreement's *scope* are resolved in favor of arbitration because there is a presumption favoring agreements to arbitrate under the FAA. *In re FirstMerit Bank, 52 S.W.3d at 753*; *Cantella & Co. v. Goodwin, 924 S.W.2d 943, 944, 39 Tex. Sup. Ct. J. 856 (Tex. 1996)*. However, "the presumption arises only after the party seeking to compel arbitration proves that a valid arbitration agreement exists," *J.M. Davidson, Inc. v. Webster,* [*738] 128 S.W.3d 223, 227, 47 Tex. Sup. Ct. J. 196 (Tex. 2003), because "the purpose of the FAA was to make arbitration agreements as enforceable as other contracts, not more so." *Bridas S.A.P.I.C. v. Gov't of Turkm., 345 F.3d 347, 354 n.4 (5th Cir. 2003)* (citations omitted); *see also E.E.O.C. v. Waffle House, Inc., 534 U.S. 279, 293, 151 L. Ed. 2d 755, 122 S. Ct. 754 (2002)* ("The FAA directs courts to place arbitration agreements on equal footing with other contracts . . . .").

**HN3** Under the FAA, ordinary principles of state contract law determine whether there is a valid agreement to arbitrate. *First Options of Chi., Inc. v. Kaplan, 514 U.S. 938, 944, 131 L. Ed. 2d 985, 115 S. Ct. 1920 (1995)*; *Wash. Mut. Fin. Group, LLC v. Bailey, 364 F.3d 260, 264 (5th Cir. 2004)*; [**13] *J.M. Davidson, Inc., 128 S.W.3d at 227-28*; *In re Halliburton Co., 80 S.W.3d 566, 568, 45 Tex. Sup. Ct. J. 720 (Tex. 2002)*. Because arbitration is contractual in nature, the FAA generally "does not require parties to arbitrate when they have not agreed to do so." *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ., 489 U.S. 468, 478-79, 103 L. Ed. 2d 488, 109 S. Ct. 1248 (1989)* ("Arbitration under the [FAA] is a matter of consent, not coercion . . . ."), *quoted in E.E.O.C., 534 U.S. at 293-94*; *see also Bridas, 345 F.3d at 361* (citing J. Douglas Uloth & J. Hamilton Rial, III, *Equitable Estoppel as a Basis for Compelling Nonsignatories to Arbitrate--A Bridge Too Far?*, 21 REV. LITIG. 593, 632 (2002)). Federal and Texas state courts have recognized, however, that "it does not follow . . . that under the [FAA] an obligation to arbitrate attaches only to one who has personally signed the written arbitration provision"; instead, under certain circumstances, principles of contract law and agency may bind a non-signatory to an arbitration agreement. *Fisser v. Int'l Bank*, 282 F.2d 231, 233 (2d Cir. 1960), [**14] *quoted in Int'l Paper Co. v. Schwabedissen Maschinen & Anlagen, 206 F.3d 411, 416 (4th Cir. 2000)*, and *Thomson-CSF, S.A. v. Am. Arbitration Ass'n, 64 F.3d 773, 776 (2d Cir. 1995)*; *see also Bailey, 364 F.3d at 267* (quoting *Thomson-CSF, 64 F.3d at 776*); *In re FirstMerit Bank, 52 S.W.3d at 755* (citing *Nationwide of Bryan, Inc. v. Dyer, 969 S.W.2d 518, 520 (Tex. App.--Austin 1998, no pet.))*; *S.W. Tex. Pathology Assocs. v. Roosth, 27 S.W.3d 204, 208 (Tex. App.--San Antonio 2000, pet. dism'd w.o.j.)*. Although state law determines the validity of an arbitration agreement, courts have applied both federal and state law to determine the related, but distinct, issue of whether non-signatory plaintiffs should be compelled to arbitrate their claims. *See, e.g., Bailey, 364 F.3d at 267-68* (applying federal law); *Bridas, 345 F.3d at 355-63* (applying federal law); *Fleetwood Enters. v. Gaskamp, 280 F.3d 1069, 1074-77 (5th Cir. 2002)* (applying state law); *Roosth, 27 S.W.3d at 208-09* (applying state law); *Dyer, 969 S.W.2d at 520* [**15] (applying state law); *Lakeland Anesthesia, Inc. v. United Healthcare of La., Inc., 871 So. 2d 380, 392-95 (La. Ct. App. 2004)* (applying federal and state law). The FAA does not specify whether state or federal law governs, and the United States Supreme Court has not directly addressed the issue.

Federal courts of appeals, however, have frequently applied federal substantive law when deciding whether a non-signatory must arbitrate. *See, e.g., Bailey, 364 F.3d at 267 n.6*; *Bridas, 345 F.3d at 355-63*; *InterGen N.V.*

*v. Grina, 344 F.3d 134, 142-50 (1st Cir. 2003)*; *Dominion Austin Partners v. Emerson, 248 F.3d 720, 728 (8th Cir. 2001)*; *Int'l Paper Co., 206 F.3d at 417 n.4*; *Thomson-CSF, 64 F.3d at 778-79*. The Fourth and Fifth Circuits have reasoned that "'federal substantive law of arbitrability'. . . resolves this question," because the determination of whether a non-signatory is bound "presents no state **[*739]** law question of contract formation or validity." *R.J. Griffin & Co. v. Beach Club II Homeowners Ass'n, 384 F.3d 157, 160 n.1 (4th Cir. 2004)* (quoting *Int'l Paper Co., 206 F.3d at 417 n.4*); **[**16]** *Bailey, 364 F.3d at 267 n.6* (same). We are not convinced that state law plays no role in making this determination. *See Roosth, 27 S.W.3d at 208-09* (applying state law); *Dyer, 969 S.W.2d at 520* (applying state law). Nevertheless, we are mindful of the extensive body of federal precedent that has explored the extent to which non-signatories can be compelled to arbitrate. Moreover, we recognize that it is important for federal and state law to be as consistent as possible in this area, because federal and state courts have concurrent jurisdiction to enforce the FAA. *See Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 25, 74 L. Ed. 2d 765, 103 S. Ct. 927 (1983)*. Our decision today rests on state law, but it is informed by persuasive and well-reasoned federal precedent.

*HN4* Federal courts have recognized six theories, arising out of common principles of contract and agency law, that may bind non-signatories to arbitration agreements: (1) incorporation by reference; (2) assumption; (3) agency; (4) alter ego; (5) equitable estoppel, and (6) third-party beneficiary. *See, e.g., Bridas, 345 F.3d at 356*. [7] **[**18]** Here, **[**17]** MacGregor asserts that KBR is bound to arbitrate under the doctrine of "direct benefits estoppel"--a type of equitable estoppel that federal courts apply in the arbitration context. *See, e.g., Bailey, 364 F.3d at 268*; *Bridas, 345 F.3d at 361-62*; *DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S., 269 F.3d 187, 199-201 (3d Cir. 2001)*; *Int'l Paper Co., 206 F.3d at 418*. [8]

Under "direct benefits estoppel," a non-signatory plaintiff seeking the benefits of a contract is estopped from simultaneously attempting to avoid the contract's burdens, such as the obligation to arbitrate disputes. *R.J. Griffin & Co. at 160-61*; *Bailey, 364 F.3d at 268*; *Int'l Paper Co., 206 F.3d at 418* ("The doctrine recognizes that a party may be estopped from asserting that the lack of his signature precludes enforcement of the contract's arbitration clause when he has consistently maintained that other provisions of the same contract should be enforced to benefit him."); *Thomson-CSF, 64 F.3d at 778*. Thus, a non-signatory plaintiff may be compelled to arbitrate if it seeks to enforce terms of a contract containing an arbitration provision. *See R.J. Griffin & Co., 384 F.3d at 161-64*; *Bailey, 364 F.3d at 268*; *Bridas, 345 F.3d at 361-62* **[**19]** ("Direct benefits estoppel applies when a nonsignatory 'knowingly exploits the agreement containing the arbitration clause.'") (quoting *E.I. DuPont de Nemours & Co., 269 F.3d at 199*); *Int'l Paper Co., 206 F.3d at 418*. For example, if a non-signatory's breach-of-warranty and breach-of-contract claims are based on certain terms of a written contract, then the non-signatory cannot avoid an arbitration provision within that contract. *See Int'l Paper Co., 206 F.3d at 418*. If, however, a non-signatory's **[*740]** claims can stand independently of the underlying contract, then arbitration generally should not be compelled under this theory. *See, e.g., R.J. Griffin & Co., 384 F.3d at 164*; *Bridas, 345 F.3d at 362*.

Consistent with the federal doctrine of "direct benefits estoppel," this Court has held that a non-signatory plaintiff may be compelled to arbitrate if its claims are "based on a contract" containing an agreement to arbitrate. *In re FirstMerit Bank, 52 S.W.3d at 755* ("[A] litigant who sues based on a contract subjects him or

---

[7]   Most federal courts, however, list only five of these theories, omitting third-party beneficiary as a separate ground. *See Local Union No. 38, Sheet Metal Workers' Int'l Ass'n v. Custom Air Sys., Inc.*, 357 F.3d 266, 268 (2d Cir. 2004); *Javitch v. First Union Sec., Inc.*, 315 F.3d 619, 629 (6th Cir. 2003); *Fleetwood*, 280 F.3d at 1076; *Employers Ins. of Wausau v. Bright Metal Specialties, Inc.*, 251 F.3d 1316, 1322 (11th Cir. 2001); *Bel-Ray Co. v. Chemrite (PTY) Ltd.*, 181 F.3d 435, 446 (3d Cir. 1999); *Int'l Paper Co.*, 206 F.3d at 417; *Thomson-C.S.F.*, 64 F.3d at 776.

[8]   While not all federal courts use the phrase "direct benefits estoppel," we adopt that terminology from *Bridas* to describe this form of estoppel. *See* 345 F.3d at 361-62.

herself to the contract's terms."). In *FirstMerit Bank*, the **[**20]** non-signatory plaintiffs sued the signatory defendant for, among other things, breach of contract, revocation of acceptance, and breach of warranty. *Id. at 752-53, 755*. By bringing the breach-of-contract and breach-of-warranty claims, the plaintiffs sought benefits that stemmed directly from the contract's terms. We concluded that, by seeking to enforce the contract, the non-signatory plaintiffs "subjected themselves to the contract's terms, including the Arbitration Addendum." *Id. at 756*; *see also Roosth, 27 S.W.3d at 208* ("The nonsignatory cannot enforce specific terms of the agreement while seeking to avoid the arbitration provision.").

The issue here is whether KBR sought to enforce terms of the fabrication subcontract by (1) bringing a *quantum meruit* claim against MacGregor, or (2) seeking a declaration that it possessed valid liens. We begin with *quantum meruit*.

*HN5 Quantum meruit* is an equitable remedy that "'is based upon the promise implied by law to pay for beneficial services rendered and knowingly accepted.'" *Vortt Exploration Co., Inc. v. Chevron U.S.A., Inc., 787 S.W.2d 942, 944, 33 Tex. Sup. Ct. J. 409 (Tex. 1990)* **[**21]** (quoting *Truly v. Austin, 744 S.W.2d 934, 936, 31 Tex. Sup. Ct. J. 228 (Tex. 1988))*. A party generally cannot recover under *quantum meruit* when there is a valid contract covering the services or materials furnished. *Murray v. Crest Constr., Inc., 900 S.W.2d 342, 345, 38 Tex. Sup. Ct. J. 925 (Tex. 1995)*; *Woodard v. S.W. States, Inc., 384 S.W.2d 674, 675, 8 Tex. Sup. Ct. J. 145 (Tex. 1964)* ("Recovery on an express contract and on quantum meruit are inconsistent."). A party to a contract may, however, seek alternative relief under both contract and quasi-contract theories. Pleading in the alternative does not defeat the effect of an arbitration clause that broadly covers all disputes between signatories that arise out of the underlying agreement. But in this case, KBR is not a signatory to the fabrication subcontract between MacGregor and Unidynamics; therefore, the scope of that subcontract's arbitration clause does not answer whether KBR must arbitrate.

To advance its estoppel theory, MacGregor contends that KBR's *quantum meruit* claim is "based on" the fabrication subcontract in the sense that KBR's labor and services were linked inextricably to that subcontract. It is true, of course, that KBR was **[**22]** fabricating trunks that were at the contract's core and that, in performing the work, KBR relied on the fabrication subcontract's specifications. However, *HN6* under "direct benefits estoppel," a non-signatory plaintiff cannot be compelled to arbitrate on the sole ground that, but for the contract containing the arbitration provision, it would have no basis to sue. The work to be performed under a second-tier subcontract will inherently be related to and, to a certain extent, defined by contracts higher in the chain. *See* BLACK'S LAW DICTIONARY 1464 (8th ed. 2004) (defining subcontractor as "one who is awarded a portion of an existing contract by a contractor, esp. a general contractor"). If this were a sufficient basis for binding a non-signatory subcontractor, arbitration agreements would become easier to enforce than other contracts, counter to the FAA's purpose. *See InterGen, 344 F.3d at* **[*741]** *145-46* (noting that federal courts have "been hesitant to estop a nonsignatory seeking to avoid arbitration").

We conclude that, under "direct benefits estoppel," although a non-signatory's claim may relate to a contract containing an arbitration provision, that relationship does **[**23]** not, in itself, bind the non-signatory to the arbitration provision. Instead, a non-signatory should be compelled to arbitrate a claim only if it seeks, through the claim, to derive a direct benefit from the contract containing the arbitration provision. *See Bailey, 364 F.3d at 268*; *MAG Portfolio Consult, GMBH v. Merlin Biomed Group LLC, 268 F.3d 58, 61 (2d Cir. 2001)* ("The benefits must be direct--which is to say, flowing directly from the agreement."); *Int'l Paper Co., 206 F.3d at 417-18*; *Thomson-CSF, 64 F.3d at 778-79*; *In re FirstMerit Bank, 52 S.W.3d at 755* . [9]

---

[9]    Federal courts have also applied "direct benefits estoppel" to bind "non-signatories who, during the life of the contract, have embraced the contract despite their non-signatory status but then, during litigation, attempt to repudiate the arbitration clause in the agreement." *E.I. DuPont de Nemours & Co, 269* F.3d at 200; *see also InterGen, 344* F.3d at 146 (holding equitable estoppel theory inapplicable to

[**24]  In its *quantum meruit* claim against MacGregor, KBR seeks payment for services rendered. KBR provided services pursuant to its contract with Unidynamics. KBR's asserted right to payment therefore stems directly from the KBR-Unidynamics contract, not the fabrication subcontract. The fabrication subcontract includes no provision for paying KBR. In fact, KBR is effectively precluded from asserting rights under that contract, which expressly provides that "Approved use of any subcontractor creates no contractual relationship between the subcontractor and [MacGregor]." [10] Thus, we conclude that the court of appeals abused its discretion to the extent it compelled KBR to arbitrate its *quantum meruit* claim against MacGregor.

[**25]  Having determined that KBR's *quantum meruit* claim is not subject to arbitration, we turn to KBR's lien-validity claims. KBR sought a judicial declaration that it possessed valid constitutional and warehouseman's statutory liens. *See TEX. CONST. art. XVI, § 37*; *TEX. BUS. & COM. CODE § 7.209(a)(1)*. **HN9** The self-executing constitutional lien attaches to buildings and special-order articles that are made or repaired by mechanics, material men, and artisans who have a direct contractual relationship with the owner of the property. *See TEX. CONST. art. XVI, § 37*; *CVN Group, Inc. v. Delgado, 95 S.W.3d 234, 240, 46 Tex. Sup. Ct. J. 366 (Tex. 2002)* ("For constitutional liens that [*742] are self-executing, there are no technical requirements . . . ."); *First Nat'l Bank v. Whirlpool Corp., 18 Tex. Supp. 101, 517 S.W.2d 262, 268 (Tex. 1974)* (holding that "the constitutional lien on manufactured chattels is available . . . only upon articles made especially for a purchaser pursuant to a special order and in accordance with the purchaser's plans or specifications"); *Hayek v. W. Steel Co., 478 S.W.2d 786, 790, 15 Tex. Sup. Ct. J. 232 (Tex. 1972)*; *Strang v. Pray, 89 Tex. 525, 35 S.W. 1054, 1056 (Tex. 1896).* [**26]  The warehouseman's lien arises "against the bailor on the goods covered by a warehouse receipt or on the proceeds thereof in his possession for charges for storage or transportation . . ., insurance, labor, or charges present or future in relation to the goods, and for expenses necessary for preservation of the goods . . . ." *TEX. BUS. & COM. CODE § 7.209(a)(1)*; *see also Flores v. Didear Van & Storage Co., 489 S.W.2d 406, 407-09 (Tex. Civ. App.--Corpus Christi 1972, no writ)* (discussing validity and enforceability of warehouseman's lien).

In this Court, MacGregor's sole argument for compelling arbitration of KBR's lien-validity claims is that the claims require a determination of ownership, and thus, they are "based on" the Title Agreement within the fabrication subcontract. [11] Ownership was, of course, a central issue before and during the Paris arbitration. When the arbitration award resolved the ownership dispute, it also eliminated the only rationale that MacGregor has asserted thus far for arbitrating the liens' validity.

---

non-signatory that did not seek to derive direct benefits from contracts "during their currency"); *Am. Bureau of Shipping v. Tencara Shipyard S.P.A.*, 170 F.3d 349, 353 (2d Cir. 1999) (holding non-signatory who received lower insurance rates and ability to sail under French flag due to contract was bound by arbitration clause within contract); *In re VMS Ltd. P'ship Sec. Litig.*, 26 F.3d 50, 52 (7th Cir. 1994) (holding wife bound by arbitration clause that only her husband signed as she accepted benefits of investment services). We do not reach this application of "direct benefits estoppel" here. MacGregor's argument for arbitration rests not on KBR's actions during the life of the fabrication subcontract, but on KBR's attempt to benefit from that contract through litigation.

[10]  *See MCI Telecomms. Corp. v. Tex. Utils. Elec. Co.*, 995 S.W.2d 647, 651, 42 Tex. Sup. Ct. J. 656 (Tex. 1999) ("**HN7** The intention to contract or confer a direct benefit to a third party must be clearly and fully spelled out or enforcement by the third party must be denied."); *City of LaPorte v. Taylor*, 836 S.W.2d 829, 831 (Tex. App.--Houston [1st Dist.] 1992, no writ) ("Generally, **HN8** in construction contracts, in the absence of an express agreement to the contrary, a subcontractor is not in privity with the owner . . . .").

[11]  KBR's petition included the following:

29. **Ownership.** Given the Defendants' competing claims known to Plaintiff by the Defendants, Plaintiff seeks a declaration from the Court as to which Defendant(s) possesses the ownership rights, title and interest in the elevator shaft fabrications, component parts and other materials . . . .

30. **Constitutional Lien.** *Subject to the determination of ownership*, Plaintiff also seeks a judicial declaration that Plaintiff possesses a valid constitutional lien to the elevator shaft fabrications, component parts and other materials pursuant to Article 16, § 37 of the Texas Constitution.

**[**27]** .

We do not decide whether other arguments may exist to compel KBR to arbitrate the validity of its liens. To the extent a lien dispute still remains, the trial court is in the best position to determine, on principles we have declared today, whether it must be arbitrated.

**V Conclusion**

We conditionally grant mandamus relief and order the court of appeals to vacate its order compelling KBR to "arbitrate all claims." *See 126 S.W.3d at 184*. The writ will issue only if the court of appeals fails to comply.

Wallace B. Jefferson

Chief Justice

---

31. **Statutory Lien.** *Subject to the determination of ownership*, Plaintiff also seeks a judicial declaration that Plaintiff possesses a valid statutory lien to the elevator shaft fabrications, component parts and other materials pursuant to § 7.209 of the Texas Business and Commerce Code.

(Emphasis added.)



⚠ Caution

As of: September 1, 2015 4:47 PM EDT

# *In re Koch Indus.*

Court of Appeals of Texas, Fourth District, San Antonio

April 18, 2001, Delivered ; April 18, 2001, Filed

No. 04-01-00067-CV

**Reporter**

49 S.W.3d 439; 2001 Tex. App. LEXIS 2477

IN RE KOCH INDUSTRIES, INC., et al.

**Prior History:** **[**1]** Original Mandamus Proceeding Arising from the 229th Judicial District Court, Duval County, Texas. Trial Court Nos. DC-99-104 & DC-99-465. Honorable Alex W. Gabert, Judge Presiding.

**Disposition:** PETITION FOR WRIT OF MANDAMUS CONDITIONALLY GRANTED.

## Core Terms

arbitration, easement, abandonment, counterclaim, entities, parties, waived, arbitration provision, compel arbitration, discovery, arbitration clause, trial court, services, removal, motion to compel arbitration, arbitration agreement, federal court, scheduling, pipeline, lawsuit, district court judge, interstate commerce, employees, replacing, pet

## Case Summary

### Procedural Posture

The Fourth District Court of Appeals (Texas) considered petitioners' request for mandamus relief from the trial court's order denying their motion to compel arbitration and additional parties were permitted to join as relators in a case where petitioners and additional parties were sued for damages arising from their actions in digging up a pipeline located in an easement and removing, rebuilding, or replacing it.

### Overview

In 1931, a person granted a pipeline company an easement. The easement provision stated the pipeline company agreed to pay damages resulting from any acts in removing or replacing the pipeline. The easement provision also provided for arbitration if the parties could not agree on damages. The person's land was subsequently conveyed to two respondent landowners, subject to the easement. Petitioners became a successor-in-interest to the pipeline company. Thereafter, petitioners, with the aid of additional parties, dug up the pipeline located in the easement and removed, rebuilt, or replaced it. Respondent landowners challenged petitioners' actions by suing petitioners and additional parties for negligence and trespass. After petitioners' motion to compel arbitration was denied, the appellate court found that the motion to compel should have been granted. *9 U.S.C.S. § 2* of the Federal Arbitration Act applied because petitioners showed that the pipeline involved interstate commerce. It also found petitioners neither abandoned nor waived their arbitration claim, and that petitioners and the additional parties were entitled to enforce the arbitration provision.

**Outcome**

Petition for writ of mandamus conditionally granted because petitioners and additional parties were entitled to enforce the arbitration provision in the easement granted to petitioner's predecessor-in-interest. The writ was to be issued if the trial court failed to withdraw its order denying petitioners' motion to compel arbitration.

# LexisNexis® Headnotes

Civil Procedure > ... > Arbitration > Federal Arbitration Act > General Overview

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Mandatory ADR

International Trade Law > Dispute Resolution > International Commercial Arbitration > Arbitration

**HN1** The Federal Arbitration Act applies to a contract "evidencing a transaction involving commerce." *9 U.S.C.S. § 2*. The term "involving" has been broadly construed as the functional equivalent of "affecting." A transaction involves commerce if the transaction turns out in fact to involve commerce even if the parties did not contemplate an interstate commerce connection.

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > General Overview

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > Waiver

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Mandatory ADR

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Validity of ADR Methods

Contracts Law > Contract Conditions & Provisions > Arbitration Clauses

Contracts Law > ... > Affirmative Defenses > Coercion & Duress > General Overview

Contracts Law > ... > Affirmative Defenses > Fraud & Misrepresentation > General Overview

Contracts Law > Defenses > Unconscionable > General Overview

Evidence > Inferences & Presumptions > General Overview

Labor & Employment Law > Collective Bargaining & Labor Relations > Labor Arbitration > Enforcement

Real Property Law > Mobilehomes & Mobilehome Parks > General Overview

**HN2** A party seeking to compel arbitration must: (1) establish the existence of a valid, enforceable arbitration agreement; and (2) show that the claims asserted fall within the scope of that agreement. The party seeking arbitration has the initial burden to present evidence of an arbitration agreement. Once the existence of an arbitration agreement has been established, a presumption attaches favoring arbitration. The burden then shifts to the opposing party to present evidence that the agreement was procured in an unconscionable manner, induced or procured by fraud or duress, or that the other party has waived its right to compel arbitration under the agreement.

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Mandatory ADR

Civil Procedure > Appeals > Standards of Review > Abuse of Discretion

Contracts Law > Contract Conditions & Provisions > Arbitration Clauses

**HN3** Appellate courts have held that the proper standard for reviewing a trial court's determination regarding the existence of an arbitration agreement is abuse of discretion. Under this standard, a trial court's findings must

be upheld unless it is determined that the trial court could reasonably have reached only one decision. With regard to legal issues, a clear failure by the trial court to analyze or apply the law correctly will constitutes an abuse of discretion.

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Mandatory ADR

Contracts Law > Contract Conditions & Provisions > Arbitration Clauses

Contracts Law > Standards of Performance > Discharge & Termination

Labor & Employment Law > Collective Bargaining & Labor Relations > Labor Arbitration > Enforcement

*HN4* An arbitration agreement contained within a contract survives the termination or repudiation of the contract as a whole. When a party claims that the underlying contract has been terminated, the trial court's duty is to determine the validity of the arbitration clause in the contract separately from the validity of the contract itself.

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > Waiver

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Mandatory ADR

Contracts Law > Contract Conditions & Provisions > Arbitration Clauses

Labor & Employment Law > Collective Bargaining & Labor Relations > Labor Arbitration > Enforcement

*HN5* Courts will not find that a party has waived a right to enforce an arbitration clause by merely taking part in litigation unless the party has substantially invoked the judicial process to the opposing party's detriment. The test for determining waiver is two prong: (1) did the party seeking arbitration substantially invoke the judicial process; and (2) did the opposing party prove that it suffered prejudice as a result.

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > Waiver

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Mandatory ADR

Evidence > Inferences & Presumptions > General Overview

*HN6* Whether a party has waived its right to compel arbitration is a question of law. A strong presumption against waiver exists. Waiver of an arbitration right must be intentional. Implying waiver from a party's actions is appropriate only if the facts demonstrate that the party seeking to enforce arbitration intended to waive its arbitration right. The party seeking to prove waiver bears a "heavy burden of proof," and any doubts regarding waiver are resolved in favor of arbitration.

Civil Procedure > ... > Pleadings > Counterclaims > General Overview

Civil Procedure > ... > Pleadings > Crossclaims > General Overview

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Mandatory ADR

Contracts Law > Contract Conditions & Provisions > Arbitration Clauses

*HN7* Both federal and Texas courts recognize that the filing of a counterclaim is an action that may evidence waiver. However, not every counterclaim will amount to a waiver of arbitration. For instance, a counterclaim contesting the existence or scope of an arbitration agreement is not a waiver.

> Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Mandatory ADR

> Mergers & Acquisitions Law > General Business Considerations > General Overview

*HN8* Federal courts have held that affiliated companies, including parent and subsidiary corporations, and successor corporations can be forced to arbitrate where the claims against them arise out of the same operative facts and are inherently inseparable from the claims against the affiliate or predecessor corporation.

> Administrative Law > Agency Adjudication > Alternative Dispute Resolution

> Contracts Law > Contract Conditions & Provisions > Arbitration Clauses

> Contracts Law > ... > Estoppel > Equitable Estoppel > General Overview

*HN9* Application of equitable estoppel is warranted when the signatory to the contract containing an arbitration clause raises allegations of substantially interdependent and concerted misconduct by both the nonsignatory and one or more signatories to the contract.

**Counsel:** APPELLANT ATTORNEY: David L. Hanna, Larry D. Warren, Nicole D. Lodge, Ruth G. Malinas, Ball & Weed, P.C., San Antonio, TX. Marc O. Knisely, Shannon W. Bangle, W. Timothy George, McGinnis, Lochridge & Kilgore, L.L.P., Austin, TX. Travis A. Pearson, Attorney At Law, Wichita, KS. Shannon H. Ratliff, Akin, Gump, Strauss, Hauer & Feld, L.L.P., Austin, TX. Gene R. Ward, Hornblower, Manning & Ward, Corpus Christi, TX.

APPELLEE ATTORNEY: Christopher A. Bandas, Paula A. Wyatt, Waytt, Wyatt & Cowley, Corpus Christi, TX. Gabriella S. Canalas, Attorney At Law, Alice, TX. G. Don Schauer, Ronald A. Simank, Schauer & Simank, P.C., Corpus Christi, TX. John Charles Lemon, Lemon & Gonzalez-Lemon, L.L.P., Alice, TX.

**Judges:** Opinion by: Phil Hardberger, Chief Justice. Sitting: Phil Hardberger, Chief Justice, Alma L. Lopez, Justice, Sarah B. Duncan, Justice.

**Opinion by:** Phil Hardberger

## Opinion

 **[\*441]** This is an original proceeding in which Koch Industries, Inc., Koch Pipeline Company, L.P., Koch Petroleum Group, and Koch Gathering Systems, Inc. (collectively ″Koch″) seek mandamus relief from the trial court's order denying their motion to compel arbitration. AFC Lease Services, Inc. (″AFC″) and its owner, Allen Yates (″Yates″), were granted permission to join this proceeding as relators. Koch, AFC and Yates were sued for damages arising from their actions in digging up a pipeline located in an easement and removing, rebuilding, or replacing it. This proceeding presents four issues: (1) whether the Federal Arbitration Act is applicable; (2) whether the claim that the easement Koch relied upon was abandoned is an arbitrable issue; (3) whether Koch waived its right to arbitration; and **[\*\*2]** (4) whether all of the Koch entities, AFC and Yates are entitled to enforce the easement's arbitration provision. We conclude that the trial court erred in denying the motion to compel arbitration. Therefore, we conditionally grant the writ of mandamus.

**BACKGROUND**

In 1931, Pattie Jo Hamilton granted Humble Pipe Line Company an easement. The easement provided:

The said Humble Pipe Line Company hereby agrees to pay any damages which may result from its acts and/or omissions in laying, maintaining, operating, replacing, changing or removing said pipe line; said damages if not mutually agreed upon to be ascertained and determined by three disinterested persons, one of whom shall be appointed by the owners of said lands, their heirs or assigns, one by Humble Pipe Line Company, its successors and assigns, and the third by the two so appointed as aforesaid; and the award of such three persons shall be final and conclusive.

The land owned by Hamilton was subsequently conveyed in undivided interests to Hector Lopez and Rachel Canales. The deeds conveying that interest stated that the conveyance was subject to the Humble easements. Koch became a successor in interest to Humble, [**3] and, in 1997, dug up the pipeline located in the easement and removed, rebuilt or replaced it.

On April 14, 1999, Rachel Canales sued Koch for trespass and negligence, claiming that Koch's negligent actions had damaged her land and that the easement had been abandoned, therefore, Koch's actions also constituted a trespass. In May of 1999, Koch filed its original answer and its first requests for disclosures and admissions. On June 18, 1999, Koch filed a notice of removal.

 [*442] On September 28, 1999, Koch filed a report of meeting of counsel and joint discovery/case management plan. The report stated that Koch was informed that if the case was not settled, Canales would hire an attorney to represent her with regard to all matters, including the joint discovery/case management plan before the hearing scheduled for September 29, 1999; as a result, the joint case management plan could not be completed at the meeting.

At the scheduling conference on September 29, 1999, the attorney retained by Canales asserted the position that the easement had been abandoned, which Koch refuted. In response to the district court judge's inquiry about the validity and applicability of the arbitration provision, [**4] Koch's attorney responded: "We're not sure yet, Your Honor." Koch's attorney explained that Koch had not demanded that Canales appoint someone to evaluate her damage because it believed that the misunderstanding could be resolved at the Rule 26 meeting. Koch's attorney further stated: "As far as whether or not there's a binding arbitration requirement, I think that's something that all of us will need to pay particular consideration to." The district court judge concluded the hearing by ordering the parties to file statements concerning whether Hector Lopez needed to be joined as a party. In addition, the district court judge ordered that any intervention by Terry Canales and a new case management plan were to be filed within ten days.

Koch subsequently filed a statement of non-opposition to the joinder of the Lopezes as plaintiffs. Canales filed a motion for leave to file an amended petition to join additional defendants, and Terry Canales filed a motion for leave to intervene. Koch filed an opposition to Canales's motion to join additional defendants. The Lopezes filed a response to the original petition and a motion to remand.

On November 29, 1999, a second scheduling conference [**5] was held. When the issue of abandonment was again raised, the district court judge stated: "That's almost getting further than I can go today because I've got to make sure whether or not you're even in the right court, and that's what I'm struggling with today." The district court judge concluded the hearing by ordering four depositions per side limited to the jurisdictional issue.

In December of 1999, Koch filed an answer and counterclaim for declaratory judgment. Koch's pleading stated that the declaratory judgment is necessary because the plaintiffs complain that Koch trespassed on their property,

while Koch maintains it has a valid easement. In December of 1999 and January of 2000, Koch served discovery requests and deposition notices on Hector Lopez and the Canaleses.

On December 9, 1999, the Canaleses filed a second lawsuit against other Koch defendants, Koch's independent contractor (AFC), and Yates relating to the same alleged trespass and negligence. The second lawsuit also was removed to federal court by Koch. In February of 2000, the Canaleses filed their motion to remand both lawsuits. In March of 2000, Koch filed its opposition to the motion to remand.

On March 16, 2000, a **[\*\*6]** third scheduling conference was held. At the end of the hearing, the district court judge entered a ruling consolidating both pending lawsuits and remanding them to state court.

After the cause was remanded, the Canaleses filed an amended petition, naming numerous Koch entities, AFC, Yates, and the Lopezes as defendants. On April 20, 2000, Koch sent a letter to the Canaleses' **[\*443]** attorney demanding arbitration. When the Canaleses refused to arbitrate, Koch filed a motion to compel arbitration on May 5, 2000. Sometime thereafter, Hector Lopez filed a cross-claim against the Koch entities, AFC and Yeats. On May 31, 2000, Koch filed a motion to compel arbitration of Lopez's cross-claim. Koch's motions were set for a hearing on November 29, 2000.

The Canaleses responded to the Koch's motion to compel, claiming (1) Koch waived its right to arbitrate; (2) whether the easement had been abandoned was not an arbitrable issue; and (3) Koch did not have standing to invoke the arbitration provision of the easement. The Lopezes also filed a response to the motion to compel, claiming abandonment, waiver, absence of standing and prejudice. The trial court denied Koch's motions to compel arbitration.

## [\*\*7] APPLICABILITY OF FEDERAL ARBITRATION ACT

Koch contends that the Federal Arbitration Act applies because evidence was introduced in Koch's pleadings that employees from out of state were sent to Texas to work on the pipeline and materials and services were purchased from out-of-state companies to complete the work. The Canaleses contend that Koch failed to introduce any evidence of interstate commerce.

*HN1* The Federal Arbitration Act applies to a contract "evidencing a transaction involving commerce." *9 U.S.C. § 2*. The term "involving" has been broadly construed as the functional equivalent of "affecting." *Allied-Bruce Terminix Companies, Inc. v. Dobson, 513 U.S. 265, 274-75, 130 L. Ed. 2d 753, 115 S. Ct. 834 (1995)*. A transaction involves commerce if the transaction turns out in fact to involve commerce even if the parties did not contemplate an interstate commerce connection. *Id. at 282*. In *Dobson*, the Court held that the transaction in that case, a contract involving a lifetime "Termite Protection Plan" for a house located in Alabama, involved interstate commerce. *Id. at 283*. The Court concluded, "In **[\*\*8]** addition to the multistate nature of Terminix and Allied-Bruce, the termite treating and house-repairing material used by Allied-Bruce in its (allegedly inadequate) efforts to carry out the terms of the Plan, came from outside Alabama." Similarly, the Texas Supreme Court has held that a contract involving renovation work on Houston apartments to be done by a Texas business for Georgia owners involved interstate commerce. *In re L & L Kempwood Associates, L.P., 9 S.W.3d 125, 127 (Tex. 1999)*.

In this case, the transaction involved the removal and replacement of pipeline in Texas. A Texas entity, AFC, was engaged to perform the work, and Koch employees from Wichita, Kansas oversaw the project. A Kansas entity was retained as the inspector for the project. In addition, employees of an Oklahoma entity also provided services. The Canaleses contend that Koch failed to introduce any evidence of interstate commerce; however, the record contains two affidavits from Koch employees, detailing the work performed by out-of-state

employees and entities. Although the Canaleses objected to the affidavits, the trial court deferred its ruling on the objection when it was presented, but [**9] never issued a ruling prior to issuing its order. Therefore, the objection was waived. *See* *TEX. R. APP. P. 33.1(a)*; *Dolcefino v. Randolph, 19 S.W.3d 906, 926* (Tex. App.--Houston [14th Dist.] 2000, pet. denied) (noting party asserting objection must obtain written ruling or risk waiver).

Because the easement was a contract evidencing a transaction involving commerce, the Federal Arbitration Act applies.

## [*444] ARBITRABILITY OF ABANDONMENT CLAIM

The Canaleses and the Lopezes contend that the easement Koch relied upon to enter the property had been abandoned. They further assert that the abandonment claim is not subject to arbitration.

*HN2* A party seeking to compel arbitration must: (1) establish the existence of a valid, enforceable arbitration agreement; and (2) show that the claims asserted fall within the scope of that agreement. *In re Oakwood Mobile Homes, Inc., 987 S.W.2d 571, 573 (Tex. 1999)*; *Henry v. Gonzalez, 18 S.W.3d 684, 688* (Tex. App.--San Antonio 2000, pet. dism'd by agmt.). The party seeking arbitration has the initial burden to present evidence of an arbitration agreement. *In re Oakwood Mobile Homes, Inc., 987 S.W.2d at 573*; [**10] *Henry v. Gonzalez, 18 S.W.3d at 688-89*. Once the existence of an arbitration agreement has been established, a presumption attaches favoring arbitration. *Henry v. Gonzalez, 18 S.W.3d at 689*. The burden then shifts to the opposing party to present evidence that the agreement was procured in an unconscionable manner, induced or procured by fraud or duress, or that the other party has waived its right to compel arbitration under the agreement. *In re Oakwood Mobile Homes, Inc., 987 S.W.2d at 573*; *Henry v. Gonzalez, 18 S.W.3d at 689*.

*HN3* This court has held that the proper standard for reviewing a trial court's determination regarding the existence of an arbitration agreement is abuse of discretion. *See* *ANCO Ins. Services of Houston, Inc. v. Romero, 27 S.W.3d 1, 5* (Tex. App.--San Antonio 2000, pet. denied); *Hardin Const. Group, Inc. v. Strictly Painting, Inc., 945 S.W.2d 308, 312* (Tex. App.--San Antonio 1997, orig. proceeding [leave denied]). Under this standard, a trial court's findings must be upheld unless it is determined that the trial court could reasonably have reached only one decision. [**11] *See* *Walker v. Packer, 827 S.W.2d 833, 839 (Tex. 1992)*. With regard to legal issues, "a clear failure by the trial court to analyze or apply the law correctly will constitute an abuse of discretion." *Id. at 840*.

In this case, Koch introduced into evidence the easement containing the arbitration provision. The Canaleses and the Lopezes countered that the arbitration provision was not enforceable because the easement had been abandoned.

Koch primarily relies on two cases to support its position that the abandonment issue is arbitrable. In *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 406, 18 L. Ed. 2d 1270, 87 S. Ct. 1801 (1967), the United States Supreme Court held that a claim that a contract was fraudulently induced is subject to arbitration. The fraudulent inducement claim only becomes arbitrable "if the claim is fraud in the inducement of the arbitration clause itself - an issue which goes to the 'making' of an agreement to arbitrate." *Id.* at 403-04. In *Lawrence v. Comprehensive Business Services Co., 833 F.2d 1159, 1161-62 (5th Cir. 1987)*, the Fifth Circuit cited *Prima Paint* [**12] in holding that a claim that a contract is illegal would similarly be subject to arbitration. In this case, Koch argues the abandonment claim is also subject to arbitration because the abandonment claim would void the easement as a whole.

In *General Guaranty Ins. Co. v. New Orleans General Agency, Inc.*, the Fifth Circuit directly addressed whether a claim that a contract had been abandoned was arbitrable. *427 F.2d 924, 928-930 (5th Cir. 1970)*. In that case, one of the parties claimed that the first agreement between the parties containing an arbitration clause was

abandoned when the parties entered into a second agreement that did not contain **[*445]** an arbitration clause. *See* *id. at 926*. The district court's order provided:

The question is then presented - should the parties be directed to arbitrate? We think not. There is a possibility that the contract has been abandoned. If this were the case, it would be because of some subsequent agreement over which it is agreed the arbitrator has no jurisdiction. That issue must be determined by the Court, and to avoid a useless arbitration, should be, we believe, determined now. . . . IT IS FURTHER ORDERED that a **[**13]** separate trial of the issue of whether the contract was abandoned or merely terminated with reservation of rights be held.

The Fifth Circuit agreed with the district court, noting, ″We do not read [*Prima Paint*] as depriving the District Court of jurisdiction to decide the abandonment issue.″ *Id. at 930 n.9*.

In *Henry v. Gonzalez*, this court held that ″**HN4** an arbitration agreement contained within a contract survives the termination or repudiation of the contract as a whole.″ *18 S.W.3d at 690*. When a party claims that the underlying contract has been terminated, the trial court's duty is to determine the validity of the arbitration clause in the contract separately from the validity of the contract itself. *Id*.

In this case, the Canaleses and the Lopezes only challenged the validity of the easement, not the validity of the arbitration clause contained in the easement. Unlike *General Guaranty*, the parties did not enter into a subsequent easement that did not contain an arbitration provision. Therefore, the abandonment issue in this case is an issue relating to the validity of the easement or the abandonment of the contract as a whole, **[**14]** not an abandonment of the arbitration clause. Accordingly, the abandonment issue is an arbitrable issue, and the trial court did not have the discretion to deny the motion to compel based on the abandonment theory.

**WAIVER**

The Canaleses and the Lopezes further assert that Koch waived its right to compel arbitration. **HN5** Courts will not find that a party has waived a right to enforce an arbitration clause by merely taking part in litigation unless the party has substantially invoked the judicial process to the opposing party's detriment. *See* *Walker v. J.C. Bradford & Co., 938 F.2d 575, 577 (5th Cir. 1991)*. The test for determining waiver is two prong: (1) did the party seeking arbitration substantially invoke the judicial process; and (2) did the opposing party prove that it suffered prejudice as a result? *See* *Prudential Securities, Inc. v. Marshall, 909 S.W.2d 896, 898 (Tex. 1995)*.

**HN6** Whether a party has waived its right to compel arbitration is a question of law. *See* *Walker v. J.C. Bradford & Co., 938 F.2d at 577*; *In re Bruce Terminix Co., 988 S.W.2d 702, 704 (Tex. 1998)*. A strong presumption against waiver exists. **[**15]** *See* *Walker v. J.C. Bradford & Co., 938 F.2d at 577*; *Prudential Securities, Inc. v. Marshall, 909 S.W.2d at 898*. Waiver of an arbitration right must be intentional. *EZ Pawn Corp. v. Mancias, 934 S.W.2d 87, 89 (Tex. 1996)* (orig. proceeding). Implying waiver from a party's actions is appropriate only if the facts demonstrate that the party seeking to enforce arbitration intended to waive its arbitration right. *Id*. The party seeking to prove waiver bears a ″heavy burden of proof,″ and any doubts regarding waiver are resolved in favor of arbitration. *See* *Walker v. J.C. Bradford & Co., 938 F.2d at 577*; *In re Bruce Terminix Co., 988 S.W.2d at 705*.

The Canaleses and the Lopezes rely on the actions taken by Koch during the federal proceedings to support their **[*446]** waiver claim, specifically: (1) Koch's failure to assert its right to compel arbitration during the pendency of the federal proceedings; (2) Koch's failure to assert its right to compel arbitration when it filed its answers; (3) Koch's filing of counterclaims seeking declaratory relief regarding the enforceability of the easement; and (4) Koch's **[**16]** participation in discovery.

Koch filed its notice of removal within two months of the date the lawsuit was filed. *See In re Winter Park Const., Inc., 30 S.W.3d 576, 579* (Tex. App.--Texarkana 2000, no pet.) (right to arbitrate not waived based on temporary removal to federal court and participation in discovery). The discovery in which the parties engaged was limited to the issue of federal diversity jurisdiction. *See Price v. Drexel Burnham Lambert, Inc., 791 F.2d 1156, 1159 (5th Cir. 1986)* (holding pre-trial discovery related to non-arbitrable subject matter does not constitute waiver). All of the federal court's actions were mainly routine scheduling and discovery orders restricted to resolving the jurisdictional issue. *See Walker v. J.C. Bradford & Co., 938 F.2d at 577* (no waiver where district court's actions during thirteen month delay mainly were routine scheduling orders and discovery continuances). Although Koch did not assert its right to compel arbitration during the pendency of the federal court proceedings, Koch did not rule out that possibility. In response to the court's inquiry, Koch stated that it was not certain regarding **[**17]** the validity and applicability of the arbitration provision. Koch's attorney further stated: "As far as whether or not there's a binding arbitration requirement, I think that's something that all of us will need to pay particular consideration to."

The most problematic action taken by Koch was the filing of the counterclaims. *HN7* Both Federal and Texas courts recognize that the filing of a counterclaim is an action that may evidence waiver. *See Williams v. Cigna Financial Advisors, Inc., 56 F.3d 656, 661-62 (5th Cir. 1995)*; *Trade Arbed, Inc. v. S.S. Ellispontos, 482 F. Supp. 991, 998-99 (S.D. Tex. 1980)*; *Sedillo v. Campbell, 5 S.W.3d 824, 827* (Tex. App.--Houston [14th Dist.] 1999, no pet.); *Central Nat'l Ins. Co. v. Lerner, 856 S.W.2d 492, 494* (Tex. App.--Houston [1st Dist.] 1993, orig. proceeding). However, not every counterclaim will amount to a waiver of arbitration. *See Sedillo, 5 S.W.3d at 828*; *see also Williams v. Cigna Financial Advisors, Inc., 56 F.3d at 661-62* (no waiver despite counterclaim). In *Sedillo*, the court explained, "For instance, a counterclaim contesting **[**18]** the existence or scope of an arbitration agreement is not waiver." *5 S.W.3d at 828*. In this case, Koch's counterclaim requested declaratory relief relating to the ongoing validity of the easement containing the arbitration provision. Therefore, the counterclaim related to the existence of the arbitration agreement. Although the Lopezes contend that the filing of the counterclaim necessarily resulted in waiver as to their claims since the Lopezes did not have a claim filed against Koch at the time the counterclaim was filed, the Lopezes were joint owners of the property in question whose rights were necessarily implicated. In addition, considerable confusion existed as to the Lopezes' status in federal court. Under these circumstances, Koch's counterclaim is not evidence of waiver.

The federal court remanded the cause to state court in March of 2000. This was approximately one year after the lawsuit was originally filed. One month later, Koch asserted its right to compel arbitration. Although the decision whether to arbitrate is "one best made at the onset of the case, and not part of the way through," *Walker v. J.C. Bradford & Co., 938 F.2d at 577*, Koch's **[**19]** actions did not **[*447]** substantially invoke the judicial process. As a result, Koch did not waive the right to arbitrate.

## KOCH ENTITIES, AFC AND YATES

With regard to the ability of each of the Koch entities to enforce arbitration, *HN8* federal courts have held that affiliated companies, including parent and subsidiary corporations, and successor corporations can be forced to arbitrate where the claims against them arise out of the same operative facts and are inherently inseparable from the claims against the affiliate or predecessor corporation. *See, e.g., J.J. Ryan & Sons, Inc. v. Rhone Poulenc Textile, S.A., 863 F.2d 315, 321 (4th Cir. 1988)*; *Sam Reisfeld & Son Import Co. v. S.A. Eteco, 530 F.2d 679, 681 (5th Cir. 1976)*.

With regard to the claims against AFC and Yates, those claims are based on actions taken pursuant to a contract between AFC and Koch. The Fifth Circuit has adopted the equitable estoppel theory announced by the Eleventh Circuit in dealing with this type of situation. *See Grigson v. Creative Artists Agency, L.L.C., 210 F.3d 524, 527 (5th Cir. 2000)*. "*HN9* Application of equitable estoppel is warranted when the signatory **[**20]** to the contract

containing an arbitration clause raises allegations of substantially interdependent and concerted misconduct by both the nonsignatory and one or more signatories to the contract." *Id*. (quoting *MS Dealer Serv. Corp. v. Franklin, 177 F.3d 942, 947 (11th Cir. 1999))*. In this case, Koch contracted AFC to perform services, and the claims against AFC and Yates not only relate to the services AFC was contracted to perform but also relate to "acts and/or omissions in … maintaining .. replacing, changing, or removing [the pipeline]," which are the very claims that the easement requires to be submitted to arbitration.

We hold that the Koch entities, AFC and Yates are entitled to enforce the arbitration provision.

**CONCLUSION**

Because the trial court erred in denying Koch's motion to compel arbitration, we conditionally grant the writ of mandamus. The writ will only issue if the trial court fails to withdraw its order denying Koch's motion to compel arbitration.

PHIL HARDBERGER,

CHIEF JUSTICE



⚠ Caution

As of: September 1, 2015 4:45 PM EDT

# *In re Oakwood Mobile Homes, Inc.*

Supreme Court of Texas

February 11, 1999, Delivered

No. 98-0662

**Reporter**

987 S.W.2d 571; 1999 Tex. LEXIS 14; 42 Tex. Sup. J. 377

IN RE OAKWOOD MOBILE HOMES, INC., RELATOR

**Disposition:** [**1] Writ of mandamus conditionally granted..

## Core Terms

arbitration, unconscionable, arbitration agreement, trial court, mandamus, right to arbitration, motion to compel arbitration, initiate, parties, duress, waived

## Case Summary

### Procedural Posture

In an appeal stemming from plaintiff mobile home buyers' action to rescind a contract for the purchase of a mobile home from defendant seller, defendant sought review of the decision, by the Court of Appeals (Texas), denying defendant's motion to compel arbitration and defendant's petition for mandamus.

### Overview

Defendant mobile home seller sought review of a decision denying defendant's motion to compel arbitration and denying defendant's petition for mandamus. The court held that defendant met its initial burden of presenting evidence of an arbitration agreement that governed the parties' dispute. Thereafter, the burden was on plaintiffs to demonstrate the agreement was obtained in an unconscionable manner, induced by fraud or duress, or that defendant waived its right to arbitration. Plaintiffs' contention that, without the arbitration provision, the purchase agreement would not have been approved was insufficient to support fraud or misrepresentation claims. Defendant's failure to initiate arbitration upon receipt of plaintiffs' complaints was not sufficient to establish waiver of defendant's right to arbitration. The court held that plaintiffs failed to meet their burden of showing the arbitration agreement had been improperly obtained or waived and, as a result, it was an abuse of discretion to have denied defendant's motion to compel arbitration.

### Outcome

The court conditionally granted defendant a writ of mandamus because, after defendant met its burden of demonstrating the existence of an arbitration agreement governing the parties' dispute, plaintiffs failed to meet their own burden of demonstrating the agreement had been obtained in an unconscionable manner, induced by fraud or duress, or that defendant had waived its right to arbitration.

## LexisNexis® Headnotes

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview

Civil Procedure > ... > Arbitration > Federal Arbitration Act > General Overview

Civil Procedure > ... > Arbitration > Federal Arbitration Act > Arbitration Agreements

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Judicial Review

International Trade Law > Dispute Resolution > International Commercial Arbitration > Arbitration

*HN1* In Texas, mandamus relief is available to a party who is improperly denied arbitration under an agreement subject to the Federal Arbitration Act, *9 U.S.C.S. §§ 1-16*.

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Judicial Review

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Mandatory ADR

Contracts Law > Contract Conditions & Provisions > Arbitration Clauses

*HN2* A party seeking to compel arbitration must establish the existence of an arbitration agreement, and show that the claims raised fall within the scope of that agreement.

Civil Procedure > ... > Defenses, Demurrers & Objections > Affirmative Defenses > General Overview

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Judicial Review

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Mandatory ADR

Contracts Law > Contract Conditions & Provisions > Arbitration Clauses

*HN3* Once the party establishes a claim within the arbitration agreement, the trial court must compel arbitration and stay its own proceedings.

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Judicial Review

Contracts Law > Contract Conditions & Provisions > Arbitration Clauses

Contracts Law > ... > Affirmative Defenses > Fraud & Misrepresentation > General Overview

Contracts Law > ... > Affirmative Defenses > Fraud & Misrepresentation > Material Misrepresentations

*HN4* To establish fraud in the formation of an arbitration agreement, a party must prove, inter alia, that (1) a material misrepresentation was made, and (2) it was false.

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview

Civil Procedure > ... > Arbitration > Federal Arbitration Act > General Overview

Civil Procedure > ... > Arbitration > Federal Arbitration Act > Arbitration Agreements

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Judicial Review

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Validity of ADR Methods

Contracts Law > Contract Conditions & Provisions > Arbitration Clauses

Contracts Law > ... > Affirmative Defenses > Fraud & Misrepresentation > General Overview

Contracts Law > Formation of Contracts > Execution

International Trade Law > Dispute Resolution > International Commercial Arbitration > Arbitration

*HN5* Under the Federal Arbitration Act, *9 U.S.C.S. §§ 1-16*, state law should be applied to assess the validity of arbitration agreements if that law arose to govern issues concerning the validity, revocability, and enforceability of contracts generally.

Contracts Law > ... > Affirmative Defenses > Coercion & Duress > General Overview

Contracts Law > Defenses > Unconscionable > General Overview

Contracts Law > Defenses > Unconscionable > Adhesion Contracts

Contracts Law > Types of Contracts > Adhesion Contracts

*HN6* Adhesion contracts are not automatically unconscionable or void.

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Judicial Review

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Validity of ADR Methods

Contracts Law > Contract Conditions & Provisions > Arbitration Clauses

Contracts Law > Defenses > Unconscionable > General Overview

Contracts Law > Defenses > Unconscionable > Arbitration Agreements

Labor & Employment Law > Collective Bargaining & Labor Relations > Labor Arbitration > Enforcement

*HN7* There is nothing per se unconscionable about arbitration agreements.

Contracts Law > ... > Affirmative Defenses > Coercion & Duress > General Overview

Labor & Employment Law > Collective Bargaining & Labor Relations > Labor Arbitration > Enforcement

*HN8* Duress is defined as a threat to do some act which the threatening party has no legal right to do.

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > Waiver

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Judicial Review

Contracts Law > Contract Conditions & Provisions > Waivers > General Overview

Labor & Employment Law > Collective Bargaining & Labor Relations > Labor Arbitration > Enforcement

*HN9* Because public policy favors resolving disputes through arbitration, there is a strong presumption against the waiver of contractual arbitration rights.

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > Waiver

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Judicial Review

Civil Procedure > Trials > Jury Trials > Province of Court & Jury

Contracts Law > Contract Conditions & Provisions > Waivers > General Overview

*HN10* Whether a party's conduct waives its arbitration rights is a question of law.

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Judicial Review

Contracts Law > Contract Conditions & Provisions > Waivers > General Overview

*HN11* The court should resolve any doubts about waiver in favor of arbitration.

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Judicial Review

Contracts Law > Contract Conditions & Provisions > Waivers > General Overview

*HN12* Waiver may be found when it is shown that a party acted inconsistently with its right to arbitrate and such actions prejudiced the other party.

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > Waiver

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Judicial Review

Contracts Law > Contract Conditions & Provisions > Waivers > General Overview

*HN13* Absent an agreement to the contrary, a party against whom a claim is asserted does not waive its right to arbitrate by failing to initiate arbitration of that claim.

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview

Civil Procedure > ... > Arbitration > Federal Arbitration Act > General Overview

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Judicial Review

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Mandatory ADR

Civil Procedure > Remedies > Writs > General Overview

Civil Procedure > ... > Writs > Common Law Writs > Mandamus

International Trade Law > Dispute Resolution > International Commercial Arbitration > Arbitration

*HN14* A party erroneously denied the right to arbitrate under the Federal Arbitration Act, *9 U.S.C.S. §§ 1-16*, has no adequate remedy on appeal, and mandamus relief is appropriate.

## Opinion

 [*573]  ON PETITION FOR WRIT OF MANDAMUS

**Per Curiam Opinion**

In this original proceeding, Oakwood Mobile Homes, Inc. seeks relief from the denial of its motion to compel arbitration. Because the trial court abused its discretion in denying arbitration, and because Relator has no adequate remedy by appeal, we conditionally grant the writ of mandamus. Shirley and David Brandon purchased a mobile home from Oakwood. Three days before completing the sales transaction, and again on the closing date, the Brandons signed Oakwood's Arbitration Agreement. This Agreement required the parties to submit all disputes arising out of the sale to binding arbitration under American Arbitration Association rules. When they began experiencing problems with the mobile home, the Brandons twice wrote to Alan Warren and Charles

Boyner of Oak Creek Homes, the manufacturer of the home, and requested that they arrange an arbitration hearing. [1] Receiving no response, the Brandons sued Oakwood for rescission of the contract.

 **[\*\*2]** Oakwood moved to compel arbitration under the Agreement. In support of its motion, Oakwood submitted a copy of the Agreement, together with an affidavit attesting that it was voluntarily executed and negotiated at arm's length. The Brandons responded, claiming that the Agreement was unconscionable and void for fraud, duress, and misrepresentation. In support of their contentions, the Brandons submitted affidavits stating that they were told "we had to sign [the Agreement] or we couldn't finance the house," and "we had to sign the arbitration provision or we could not take possession of the house." The Brandons also claimed Oakwood waived the right to compel arbitration by failing to respond to their letters requesting an arbitration hearing. The trial court denied Oakwood's motion to compel arbitration. The court of appeals concluded that the Brandons' uncontroverted affidavits provided sufficient evidence for the trial court's summary disposition of the motion to compel arbitration, and denied Oakwood's petition for mandamus. *In re Oakwood Mobile Homes, 1998 Tex. App. LEXIS 2613,    S.W.2d   *. Oakwood now petitions this Court for mandamus relief. [2]

 **[\*\*3]** *HN2*

A party seeking to compel arbitration must establish the existence of an arbitration agreement, and show that the claims raised fall within the scope of that agreement. *See Cantella & Co. v. Goodwin, 924 S.W.2d 943, 944 (Tex. 1996)*. *HN3* Once the party establishes a claim within the arbitration agreement, the trial court must compel arbitration and stay its own proceedings. *Id*.

Here, Oakwood met its burden of presenting evidence of an arbitration agreement that governs the dispute between the parties. *See Weekley Homes, Inc. v. Jennings, 936 S.W.2d 16, 18* (Tex. App.--San Antonio 1996, writ denied) (per curiam). The burden then shifted to the Brandons to present evidence that the Agreement was procured in an unconscionable manner, induced or procured by fraud or duress, [3] or that Oakwood had waived arbitration under the Agreement. *Id*. Oakwood contends the Brandons presented no evidence to support their claims; therefore, they did not satisfy their burden and the trial court erred in denying arbitration. We agree.

 **[\*\*4]** *HN4* To establish fraud in the formation of an arbitration agreement, a party must **[\*574]** prove, *inter alia*, that (1) a material misrepresentation was made, and (2) it was false. *See Green Int'l, Inc. v. Solis, 951 S.W.2d 384, 390 (Tex. 1997)*; *see also Perry v. Thomas, 482 U.S. 483, 492 n. 9, 96 L. Ed. 2d 426, 107 S. Ct. 2520 (1987)* (noting that *HN5* under the FAA, state law should be applied to assess the validity of arbitration agreements "if that law arose to govern issues concerning the validity, revocability, and enforceability of contracts generally"). The Brandons' fraud and misrepresentation claims rest solely on their contention that Oakwood represented the sale would not go through if they did not sign the Agreement. Because neither party asserts that these representations were false, they cannot support the Brandons' fraud or misrepresentation claims.

---

[1]   Although there is some confusion in the record as to which entity, Oak Creek or Oakwood, employed Warren and Boyner, this determination is not material to our analysis.

[2]   *HN1* In Texas, mandamus relief is available to a party who is improperly denied arbitration under an agreement subject to the Federal Arbitration Act (FAA), *9 U.S.C. §§ 1-16*. *See EZ Pawn Corp. v. Mancias, 934 S.W.2d 87, 88 (Tex. 1996)*. Neither party disputes the applicability of the FAA.

[3]   As the court of appeals correctly notes in its opinion, whether the terms and conditions of an arbitration agreement are themselves unconscionable is a matter which must be submitted to the designated arbitrator. Here, however, the Brandons complain of procedural unconscionability that relates to the actual making or inducement of the Arbitration Agreement. Claims of procedural unconscionability are reserved for judicial review. *See Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 403-404, 18 L. Ed. 2d 1270, 87 S. Ct. 1801 (1966) (relying on FAA, *9 U.S.C. § 4*); *In re Foster Mold, Inc., 979 S.W.2d 665, 667-68* (Tex. App.--El Paso 1998) (orig. proceeding).

In support of their claims of unconscionability and duress, the Brandons contend the Agreement "is a classic example of a contract of adhesion where one party . . . had absolutely no bargaining power or ability to change the contract terms." Even if this contention is true, however, *HN6* adhesion contracts are not automatically unconscionable or void. *See Merrill* [**5] *Lynch, Pierce, Fenner & Smith, Inc. v. Security Pac. Corp., 961 F.2d 1148, 1154 (5th Cir. 1992)*, *cert. denied*, 506 U.S. 1079, 113 S. Ct. 1046, 122 L. Ed. 2d 355 (1993) (citing 6A ARTHUR CORBIN, CONTRACTS § 1376, at 20-21 (1962) & 7-9 (Supp. 1991)). Moreover, "*HN7* there is nothing per se unconscionable about arbitration agreements." *EZ Pawn, 934 S.W.2d at 90*; *see Emerald Tex., Inc. v. Peel, 920 S.W.2d 398, 402-403* (Tex. App.--Hous. [1 Dist.] 1996, no writ) (holding that to find the arbitration provision unconscionable under the evidence presented would negate the public policy in favor of arbitration). The Brandons did not present the trial court with evidence of unconscionability or duress in their affidavits. *See Tenneco Oil Co. v. Gulsby Eng'g, Inc., 846 S.W.2d 599, 604* (Tex. App.--Hous. [14 Dist.] 1993, writ denied) (*HN8* defining "duress" as "a threat to do some act which the threatening party has no legal right to do"). Accordingly, the Brandons failed to meet their burden.

The Brandons next contend Oakwood waived its right to arbitrate when it failed to respond to their requests for arbitration. *HN9* Because public policy favors resolving disputes through arbitration, there is a strong presumption [**6] against the waiver of contractual arbitration rights. *See In re Bruce Terminix Co., 988 S.W.2d 702, 704 (Tex. 1998)*; *Prudential Sec., Inc. v. Marshall, 909 S.W.2d 896, 898 (Tex. 1995)*. *HN10* Whether a party's conduct waives its arbitration rights is a question of law. *See In re Bruce Terminix Co., 988 S.W.2d at 703*. *HN11* We should resolve any doubts about waiver in favor of arbitration. *See Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24-25, 74 L. Ed. 2d 765, 103 S. Ct. 927 (1983)*.

*HN12* Waiver may be found when it is shown that a party acted inconsistently with its right to arbitrate and such actions prejudiced the other party. *See In re Bruce Terminix Co., 988 S.W.2d at 704*. The Brandons contend Oakwood's failure to respond to their letters requesting arbitration was inconsistent with Oakwood's right to arbitrate. However, in *In re Bruce Terminix Co.*, we held that, *HN13* absent an agreement to the contrary, "a party against whom a claim is asserted does not waive its right to arbitrate by failing to initiate arbitration of that claim." *In re Bruce Terminix Co., 988 S.W.2d at 706*. It was never Oakwood's burden under the Agreement [**7] to initiate the arbitration process against itself or assist the Brandons in doing so. The Agreement specifically provides that the parties shall arbitrate in accordance with "the applicable rules of the American Arbitration Association." [4] By agreeing to these rules, the parties placed the burden of initiating arbitration on the claimant, in this instance the Brandons. Accordingly, Oakwood's failure to initiate arbitration in response to the Brandons' letters is not a waiver as a matter of law.

We conclude that the trial court abused its discretion by denying Oakwood's motion to compel arbitration. *HN14* A party erroneously [*575] denied the right to arbitrate under the FAA has no adequate remedy on appeal, and mandamus relief is appropriate. *See Jack B. Anglin Co. v. Tipps, 842 S.W.2d 266, 272-73 (Tex. 1992)*. Accordingly, without hearing oral argument, *TEX. R. APP. P. 52.8(c)*, we conditionally [**8] grant the writ of mandamus. We are confident the trial court will grant Oakwood's motion to compel arbitration in accordance with this opinion. We instruct the clerk to issue the writ only if the trial court fails to do so.

OPINION DELIVERED: February 11, 1999

---

[4] Rule 6(a) of the AAA's Commercial Arbitration Rules states the procedure to be followed by the initiating party or "claimant."



<span>⬥</span> Positive

As of: September 1, 2015 4:56 PM EDT

# *In re Olshan Found. Repair Co., LLC*

Supreme Court of Texas

March 23, 2010, Argued; December 3, 2010, Opinion Delivered

NOS. 09-0432, 09-0433, 09-0474, 09-0703

**Reporter**

328 S.W.3d 883; 2010 Tex. LEXIS 897; 54 Tex. Sup. J. 300

IN RE OLSHAN FOUNDATION REPAIR COMPANY, LLC AND OLSHAN FOUNDATION REPAIR COMPANY OF DALLAS, LTD., RELATORS

**Subsequent History:** Released for Publication January 14, 2011.

**Prior History:** *In re Olshan Found. Repair Co., LLC, 2010 Tex. LEXIS 39 (Tex., Jan. 15, 2010)*
*In re Olshan Found. Repair Co., LLC, 2010 Tex. LEXIS 37 (Tex., Jan. 15, 2010)*
*In re Olshan Found. Repair Co., LLC, 2010 Tex. LEXIS 48 (Tex., Jan. 15, 2010)*
*In re Olshan Found. Repair Co., LLC, 2010 Tex. LEXIS 40 (Tex., Jan. 15, 2010)*

## Core Terms

arbitration, arbitration agreement, unconscionable, parties, contracts, consumer, homeowners, trial court, costs, claimant, unenforceable, arbitration clause, disputes, cases, choice-of-law, arbitral forum, preempts, void, compel arbitration, plea in abatement, expensive, deposit, courts, rights, arbitration costs, court of appeals, state law, vindicate, damages, invoice

## Case Summary

### Procedural Posture

In consolidated cases, relator repair companies sought mandamus relief from orders of respondent trial courts (Texas), which denied its pleas in abatement and refused to compel arbitration of real party in interest homeowners' claims for breach of contract, breach of warranty, negligence, violations of the Texas Deceptive Trade Practices Act, and violations of the Texas Home Solicitation Act arising from four contracts to repair home foundations.

### Overview

One of the contracts specified arbitration pursuant to the Texas General Arbitration Act (TAA). The other three contracts contained a reference to the arbitration laws of the state but did not specify the governing laws. The court held that the Federal Arbitration Act (FAA) governed the contracts that referred to the arbitration laws of the state because the FAA was part of the arbitration laws in Texas and was thus applicable in the absence of further language specifically excluding its application. In those three cases, the FAA preempted *Tex. Civ. Prac. & Rem. Code Ann. § 171.002(a)(2)*, which rendered unenforceable the contract that specified application of the

TAA in the other case. The court further held that the contracts governed by the FAA were not unconscionable under *Tex. Bus. & Com. Code Ann. § 2.302* and the case law. Although the homeowners argued that the cost of arbitration would be prohibitive, their evidence of arbitration invoices for two unrelated cases did not meet their burden of presenting specific evidence that their arbitration fees would be excessive when compared to the expected cost of litigation, the amount of their claims, or their ability to pay.

**Outcome**

The court denied mandamus relief with regard to the case in which the agreement specified arbitration pursuant to the TAA; conditionally granted mandamus relief in the cases where the FAA governed; and remanded to the trial court, with directions to conduct further proceedings, each of the cases where the FAA governed.

## LexisNexis® Headnotes

Civil Procedure > ... > Arbitration > Federal Arbitration Act > Orders to Compel Arbitration

Civil Procedure > ... > Writs > Common Law Writs > Mandamus

*HN1* Mandamus will not issue unless: (1) the trial judge has committed a clear abuse of discretion; and (2) there is no adequate remedy on appeal. A trial court abuses its discretion if it reaches a decision so arbitrary and unreasonable it amounts to a clear and prejudicial error of law or it clearly fails to correctly analyze or apply the law. The second requirement for mandamus relief, that the relator has no adequate remedy by appeal, has no comprehensive definition. However, case law has determined that relators have no adequate remedy by appeal when a trial judge erroneously refuses to compel arbitration under the Federal Arbitration Act.

Civil Procedure > ... > Arbitration > Federal Arbitration Act > Orders to Compel Arbitration

*HN2* Trial courts abuse their discretion by refusing to compel arbitration if the Federal Arbitration Act preempts the Texas General Arbitration Act and the arbitration agreements are not unconscionable.

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Validity of ADR Methods

*HN3* The Texas General Arbitration Act renders arbitration agreements unenforceable if the agreements containing the arbitration clauses are agreements for services in which the total consideration to be furnished by the individual is not more than $ 50,000 and the agreements are not in writing, signed by each party, and each party's attorney. *Tex. Civ. Prac. & Rem. Code Ann. § 171.002(a)(2)*.

Civil Procedure > ... > Arbitration > Federal Arbitration Act > Arbitration Agreements

Constitutional Law > Supremacy Clause > Federal Preemption

*HN4* *9 U.S.C.S. § 2* preempts state law that would otherwise render arbitration agreements unenforceable in a contract involving interstate commerce. The Federal Arbitration Act (FAA) was designed to overrule the judiciary's longstanding refusal to enforce agreements to arbitrate, and place such agreements upon the same footing as other contracts. The FAA preempts parts of the Texas General Arbitration Act, including *Tex. Civ. Prac. & Rem. Code Ann. § 171.002(a)(2)*. But the FAA does not confer a right to compel arbitration of any dispute at any time. The FAA policy is simply to ensure that private agreements to arbitrate are enforced according to their terms.

Civil Procedure > ... > Arbitration > Federal Arbitration Act > Arbitration Agreements

Constitutional Law > Supremacy Clause > Federal Preemption

*HN5* The Federal Arbitration Act (FAA) preempts state laws which require a judicial forum for the resolution of claims which the contracting parties agreed to resolve by arbitration. But the FAA does not prevent the enforcement of agreements to arbitrate under different rules than those set forth in the act itself. Arbitration under the act is a matter of consent, not coercion, and parties are generally free to structure their arbitration agreements as they see fit. Just as they may limit by contract the issues which they will arbitrate, so too may they specify by contract the rules under which that arbitration will be conducted. By permitting the courts to rigorously enforce such agreements according to their terms, courts give effect to the contractual rights and expectations of the parties, without doing violence to the policies behind by the FAA.

Civil Procedure > ... > Arbitration > Federal Arbitration Act > Arbitration Agreements

*HN6* Courts treat arbitration agreements as other contracts in applying the legal rules to interpret them. The goal is to discern the true intentions of the parties, as the primary purpose of the Federal Arbitration Act is to ensure private agreements to arbitrate are enforced according to their terms, no more, no less.

Civil Procedure > ... > Arbitration > Federal Arbitration Act > Arbitration Agreements

*HN7* An agreement containing a general choice-of-law provision stating that the entire contract will be governed by the law of the place where the project is located does not preclude application of the Federal Arbitration Act (FAA). When the language of the provision includes federal law, further language specifically excluding application of the FAA is necessary for a court to apply the Texas General Arbitration Act to the FAA's exclusion. Absent such an exclusion, a court will not read the choice-of-law clause as having such an effect. Rather, a general choice-of-law provision may reasonably be read as merely a substitute for the conflict-of-laws analysis that otherwise would determine what law to apply to disputes. Courts apply the FAA unless language in the arbitration agreement indicates its exclusion.

Civil Procedure > ... > Arbitration > Federal Arbitration Act > Arbitration Agreements

Contracts Law > Contract Conditions & Provisions > Arbitration Clauses

*HN8* Courts rarely read general choice-of-law provisions to choose state law to the exclusion of federal law. Further, just as the Federal Arbitration Act (FAA) is part of the substantive law of Texas, the FAA is part of the arbitration laws in Texas. The language of an arbitration clause designating arbitration pursuant to the arbitration laws of the state includes the FAA.

Civil Procedure > ... > Federal & State Interrelationships > Choice of Law > General Overview

*HN9* A valid choice-of-law provision makes a conflicts-of-law analysis unnecessary.

Civil Procedure > ... > Arbitration > Federal Arbitration Act > Arbitration Agreements

Contracts Law > Contract Conditions & Provisions > Arbitration Clauses

*HN10* The Federal Arbitration Act (FAA) is not part of the Texas General Arbitration Act (TAA), at least to the extent the two are inconsistent. An arbitration clause specifically invoking the TAA designates the TAA to govern all aspects of arbitration under the agreement, to the exclusion of the FAA. The parties may specify the law governing interpretation of the scope of the arbitration clause. The focus of the determination is on the parties' choice.

Civil Procedure > ... > Arbitration > Federal Arbitration Act > Arbitration Agreements

Constitutional Law > Supremacy Clause > Federal Preemption

Contracts Law > Contract Conditions & Provisions > Arbitration Clauses

*HN11* An agreement specifying that arbitration occur pursuant to the Texas General Arbitration Act excludes the Federal Arbitration Act's preemption of *Tex. Civ. Prac. & Rem. Code Ann. § 171.002(a)(2)*.

Civil Procedure > Preliminary Considerations > Federal & State Interrelationships > General Overview

Civil Procedure > ... > Arbitration > Federal Arbitration Act > Arbitration Agreements

Contracts Law > Defenses > General Overview

*HN12* *9 U.S.C.S. § 2* states arbitration agreements shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract. A central purpose of the Federal Arbitration Act is to reverse the longstanding judicial hostility to arbitration agreements and to place arbitration agreements upon the same footing as other contracts. Such agreements are enforceable only if they meet the requirements of the general contract law of the applicable state. When determining whether an agreement to arbitrate is valid, state law, whether of legislative or judicial origin, is applicable if that law arose to govern issues concerning the validity, revocability, and enforceability of contracts generally.

Commercial Law (UCC) > ... > Contract Provisions > Contract Terms > Unconscionable Terms

Contracts Law > Defenses > Unconscionable > Arbitration Agreements

*HN13* Texas law renders unconscionable contracts unenforceable. Texas further recognizes both substantive and procedural unconscionability. Substantive unconscionability refers to the fairness of the arbitration provision itself, whereas procedural unconscionability refers to the circumstances surrounding adoption of the arbitration provision. A complaint of the prohibitive cost of arbitration is grounded in substantive unconscionability. Generally, a contract is unconscionable if, given the parties' general commercial background and the commercial needs of the particular trade or case, the clause involved is so one-sided that it is unconscionable under the circumstances existing when the parties made the contract. The principle is one of the prevention of oppression and unfair surprise and not of disturbance of allocation of risks because of superior bargaining power. *Tex. Bus. & Com. Code Ann. § 2.302*, cmt. 1.

Contracts Law > Defenses > Unconscionable > Arbitration Agreements

*HN14* Statutory claims may be arbitrated so long as the prospective litigant effectively may vindicate his or her statutory cause of action in the arbitral forum. Conversely, an arbitration agreement may render a contract unconscionable if the existence of large arbitration costs could preclude a litigant from effectively vindicating his or her federal statutory rights in the arbitral forum.

Civil Procedure > ... > Arbitration > Federal Arbitration Act > Arbitration Agreements

Contracts Law > Defenses > Unconscionable > Arbitration Agreements

*HN15* Courts should be wary of setting the bar for holding arbitration clauses unconscionable too low. First, arbitration is favored in both federal and Texas law, and to conclude that an arbitration agreement is unconscionable based merely on the risk that the claimant will be saddled with prohibitive costs would undermine the liberal federal policy favoring arbitration agreements. Second, the theory behind unconscionability in contract law is that courts should not enforce a transaction so one-sided, with so gross a disparity in the values exchanged, that no rational contracting party would have entered the contract. But there is nothing per se unconscionable about arbitration agreements. In fact, historically, Texas law favors settling disputes by arbitration. Arbitration agreements offer a permissible choice to traditional litigation that does not favor either party. Moreover, assuming unequal bargaining power between the parties exists does not establish grounds for

defeating an agreement to arbitrate under the Federal Arbitration Act. Furthermore, arbitration clauses in consumer contracts reduce merchants' operating costs and produce savings passed on to the consumer in the form of lower prices. Thus, a fairly administered arbitration should not create a gross disparity in the values exchanged.

Contracts Law > Defenses > Unconscionable > Arbitration Agreements

*HN16* Arbitration is intended as a lower cost, efficient alternative to litigation. Where these justifications are vanquished by excessive arbitration costs that deter individuals from bringing valid claims, the unconscionability doctrine may protect unfairly disadvantaged consumers. Excessive costs imposed by an arbitration agreement render a contract unconscionable if the costs prevent a litigant from effectively vindicating his or her rights in the arbitral forum.

Contracts Law > Defenses > Unconscionable > Arbitration Agreements

Evidence > Burdens of Proof > Allocation

*HN17* A party opposing arbitration bears the burden to show that the costs of arbitration render it unconscionable. When a party seeks to invalidate an arbitration agreement on the ground that arbitration would be prohibitively expensive, that party bears the burden of showing the likelihood of incurring such costs. Likewise, some evidence is required that a complaining party will likely incur arbitration costs in such an amount as to deter enforcement of statutory rights in the arbitral forum. A number of federal courts of appeals have applied a case-by-case analysis of the effect the arbitration clause has on the particular plaintiff's ability to effectively vindicate his rights. Such an analysis evaluates whether the arbitral forum in a particular case is an adequate and accessible substitute to litigation. That inquiry focuses, among other things, upon the claimant's ability to pay the arbitration fees and costs, the expected cost differential between arbitration and litigation in court, and whether that cost differential is so substantial as to deter the bringing of claims. The key factor is not where the cost to pursue the claim goes, but what the total cost to the claimant to pursue the claim is. A claimant is not deterred from pursuing his statutory rights in arbitration where the overall cost of arbitration is equal to or less than the cost of litigation in court.

Contracts Law > Defenses > Unconscionable > Arbitration Agreements

*HN18* In applying the unconscionability standard, the crucial inquiry is whether the arbitral forum in a particular case is an adequate and accessible substitute to litigation, a forum where the litigant can effectively vindicate his or her rights.

Contracts Law > Defenses > Unconscionable > Arbitration Agreements

*HN19* Litigation allows claimants to effectively vindicate their rights, despite the expense. The desire to avoid steep litigation expense--including the costs of longer proceedings, more complicated appeals on the merits, discovery, investigations, fees, and expert witnesses--is the purpose of arbitration in the first place. In the absence of unusual animus between the parties or external motives, plaintiffs continue to pursue claims when the expected benefits of the lawsuit outweigh the total cost of bringing it. If the total cost of arbitration is comparable to the total cost of litigation, the arbitral forum is equally accessible. Thus, a comparison of the total costs of the two forums is the most important factor in determining whether the arbitral forum is an adequate and accessible substitute to litigation. Other factors include the actual cost of arbitration compared to the total amount of damages the claimant is seeking and the claimant's overall ability to pay the arbitration fees and costs. These factors may also show arbitration to be an inadequate and inaccessible forum for the particular claimants to vindicate their rights. However, these considerations are less relevant if litigation costs more than arbitration.

Contracts Law > Defenses > Unconscionable > Arbitration Agreements

Evidence > Burdens of Proof > Burden Shifting

Evidence > Weight & Sufficiency

*HN20* Case law creates a burden-shifting test in which the party seeking to invalidate an arbitration agreement on the ground that arbitration would be prohibitively expensive bears the burden of showing the likelihood of incurring such costs. Once met, the burden shifts to the party seeking arbitration, who must come forward with contrary evidence. Evidence of the risk of possible costs of arbitration is insufficient evidence of the prohibitive cost of the arbitration forum. Rather, the courts require specific evidence that a party will actually be charged excessive arbitration fees. The party opposing arbitration must show the likelihood of incurring such costs in her particular case. Thus, for evidence to be sufficient, it must show that the plaintiffs are likely to be charged excessive arbitration fees. While claimants need not actually incur the cost of arbitration before they can show its excessiveness, parties must at least provide evidence of the likely cost of their particular arbitration, through invoices, expert testimony, reliable cost estimates, or other comparable evidence. Evidence that merely speculates about the risk of possible cost is insufficient.

Contracts Law > Defenses > Unconscionable > Arbitration Agreements

Evidence > Weight & Sufficiency

*HN21* Merely showing that other claimants have incurred arbitration costs of some amount falls well short of specific evidence that a party seeking to invalidate an arbitration agreement will be charged excessive fees. Substantive unconscionability threatens to become the exception that swallows the rule if all that must be done to avoid arbitration is to assume the most expensive possible scenario. Absent specific evidence that the party opposing arbitration will actually be charged excessive arbitration fees, there is no legally sufficient evidence that such fees prevent the party opposing arbitration from effectively pursuing the claim in the arbitral forum.

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > Arbitrability

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Validity of ADR Methods

Contracts Law > Defenses > Unconscionable > Arbitration Agreements

*HN22* It is tempting to avoid the unnecessary costs that would accompany an allegedly unnecessary arbitration. But to do so requires the trial court to make a determination of issues relating to the contract generally, even if it seems clear that one party or the other will prevail. When the parties have contracted for arbitration of their disputes, a trial court may consider only issues relating to the making and performance of the agreement to arbitrate. There is no way to fashion a standard to determine whether arbitration is unnecessary without giving the trial court some discretion over issues relating to the making and performance of the contract generally--exactly what the case law has sought to avoid. Allowing courts to make this determination under an unconscionability analysis would provide an end run around the rule. While in some cases this rule permits a court to enforce an arbitration agreement in a contract that the arbitrator later finds to be void, the opposite approach permits a court to deny effect to an arbitration provision in a contract that the court later finds to be perfectly enforceable. This conundrum is solved with a rule that allocates such decisions to arbitration, which is consistent with the liberal policy favoring arbitration in the Federal Arbitration Act and the case law.

Contracts Law > Contract Conditions & Provisions > Arbitration Clauses

Contracts Law > Contract Interpretation > General Overview

*HN23* A court endeavors to interpret agreements, including those to arbitrate, as they are written.

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Validity of ADR Methods

Contracts Law > Contract Conditions & Provisions > Arbitration Clauses

**HN24** When an agreement specifically states that it is to be governed by the Texas General Arbitration Act, it will be governed by the act, which may mean that disputes arising from its terms will be excluded from arbitration.

**Counsel:** For Olshan Foundation Repair Company, LLC (09-0432, 09-0433, 09-0474, 09-0703), RELATOR: Mr. Stephan B. Rogers, Rogers & Moore, Boerne, TX; Mr. Duncan Roderick MacRae II, Mr. Jeffrey D. Janota, Henslee Schwartz, LLP, Austin, TX; Mr. Mark C. Roberts, Henslee Schwartz, LLP, Dallas, TX.

For Kilpatrick, Kenneth, Tisdale, Mr. Charley, Waggoner, Mr. Craig, Tingdale, Robert (09-0432, 09-0433, 09-0474, 09-0703), REAL PARTIES IN INTEREST: Mr. Robert W. Loree, Mr. Edwin Todd Lipscomb, Loree, Hernandez & Lipscomb, PLLC, San Antonio, TX; Mr. Steven W. Thornton, McCorkle Westerburg & Thornton, PC., Dallas, TX; Mr. David M. Walsh IV, Chamblee & Ryan, P.C., Dallas, TX.

For Tingdale, Robert (09-0703), REAL PARTY IN INTEREST: Mr. Christopher Dean Below, Loree, Hernandez & Lipscomb, PLLC, San Antonio, TX.

**Judges:** **[**1]** JUSTICE WAINWRIGHT delivered the opinion of the Court. JUSTICE HECHT filed a concurring opinion, in which JUSTICE MEDINA joined.

**Opinion by:** Dale Wainwright

# Opinion

 **[*886]** ON PETITIONS FOR WRITS OF MANDAMUS

Olshan Foundation Repair Company filed these petitions for writs of mandamus in four different cases in which three separate trial courts denied Olshan's pleas in abatement, refusing to compel arbitration of consumer claims against it. Three different courts of appeals also declined to order the disputes to arbitration. We consolidated these cases for argument and now issue a consolidated opinion. Because the Texas General Arbitration Act (TAA), and not the Federal Arbitration Act (FAA), governs the arbitration dispute in one of the cases (Waggoner, No. 09-0474), we deny Olshan mandamus relief in that case. We conclude that for the other three cases, the trial courts erred in holding that the TAA governs the arbitrations, there is no evidence that the arbitration agreements were unconscionable as a matter of law, and all other disputed issues are questions for the arbitrator. Because the trial court erred by denying Olshan's pleas in abatement in the arbitrations governed by the FAA, we conditionally grant mandamus **[**2]** relief in those three actions.

## I. Factual and Procedural Background

Olshan is a national company that repairs residential home foundations. In 1998, Craig and Joy Waggoner contracted with Olshan to repair their home's foundation. The Waggoners subsequently discovered new damage to the foundation and hired an engineer, Peter De la Mora, to investigate the problems. In a 2007 report, De la Mora concluded that Olshan had not properly repaired the home. The Waggoners filed suit against Olshan for breach of contract, breach of warranty, negligence, violations of the Texas Deceptive Trade Practices Act, and violations of the Texas Home Solicitation Act.

In three other cases, similar circumstances unfolded. In 2002, Olshan contracted with Vickie and Kenneth Kilpatrick, who filed suit against Olshan in 2007. The Kilpatricks' case was consolidated at the appellate court

level with claims brought by Charley and Gladys Tisdale, again with nearly identical facts. In June 2007, Robert and Marta Tingdale, who initially contracted with Olshan in 2004, filed another similar case. All plaintiffs are represented by the same counsel, and each case includes a report from De la Mora opining that Olshan had [**3] not properly repaired each home.

The four repair contracts were in writing, and each contained arbitration clauses. The arbitration clauses in Kilpatrick (No. 09-0432), Tisdale (No. 09-0433), and Tingdale (No. 09-0703) provide:

> Notwithstanding, any provision in this agreement to the contrary, any dispute, controversy, or lawsuit between any of the parties to this agreement about any matter arising out of this agreement, shall be resolved by mandatory and [*887] binding arbitration administered by the American Arbitration Association ("AAA") **pursuant to the arbitration laws in your state** and in accordance with this arbitration agreement and the commercial arbitration rules of the AAA . . . .

(emphasis added). The arbitration clause in the Waggoner (No. 09-0474) agreement is identical except for the language in bold, which states "**pursuant to the Texas General Arbitration Act**." (emphasis added). None of the agreements addressed in this opinion was signed by the consumers' attorney or exceeded $ 50,000 in consideration.

Olshan filed a plea in abatement in each case and sought to compel arbitration under the Federal Arbitration Act (FAA). The homeowners responded to the pleas, arguing that: (1) the [**4] TAA applies to the agreements to the exclusion of the FAA, rendering the arbitration agreements unenforceable because the agreements were not signed by the homeowners' attorney; and (2) arbitration with the AAA is substantively unconscionable because of the expense required and because the contract itself was undisputably unenforceable under the Texas Home Solicitation Act.

The trial court denied Olshan's plea in the Waggoners' action. It held that the TAA applies to the agreement, and thus the arbitration agreement was unenforceable pursuant to Chapter 171 of the Texas Civil Practice and Remedies Code. *See* TEX. CIV. PRAC. & REM. CODE § 171.002(a)(2) (requiring arbitration agreements in service contracts for less than $ 50,000 be signed by all parties and their attorneys). The trial court alternatively held that the prohibitive cost of arbitration rendered the agreement to arbitrate unconscionable. Olshan petitioned for mandamus relief with the court of appeals, which was denied. The court of appeals held the TAA was not preempted by the FAA, and *section 171.002(a)(2)* of the TAA rendered the agreement unenforceable. It denied Olshan's writ of mandamus without reaching the other issues. [**5] In the remaining three actions, the trial courts denied Olshan's pleas in abatement and the courts of appeals denied Olshan's petitions for writs of mandamus. [1]

## II. Standard for Mandamus

At the time these petitions were filed, there was no method under Texas procedure for parties to file interlocutory appeals of a trial court's refusal to compel arbitration under the FAA. [2] Olshan sought relief through petitions

---

[1] The Tingdale, Kilpatrick and Tisdale trial courts issued memorandum opinions, which are addressed by the courts of appeals, respectively, in No. 10-09-00119-CV, 2009 Tex. App. LEXIS 4985, 2009 WL 1886648 (Tex. App.--Waco July 1, 2009, orig. proceeding); Nos. 2-08-336-CV, 2-08-342-CV, 2008 Tex. App. LEXIS 9660, 2008 WL 4661815 (Tex. App.--Fort Worth Oct. 2, 2008, orig. proceeding).

[2] The Legislature recently amended the Texas Civil Practice and Remedies Code to allow an interlocutory appeal "to the court of appeals from the judgment or interlocutory order of a district court . . . under the same circumstance that an appeal from a federal district court's order or decision would be permitted by 9 U.S.C. Section 16." TEX. CIV. PRAC. & REM CODE § 51.016. However, this act

for writs of mandamus. *See Jack B. Anglin Co. v. Tipps, 842 S.W.2d 266, 272 (Tex. 1992)*. **HN1** Mandamus will not issue unless: (1) the trial judge has committed a clear abuse of discretion; and (2) there is no adequate remedy on appeal. *In re Odyssey Healthcare,* **[*888]** *Inc., 310 S.W.3d 419, 422 (Tex. 2010)* (per curiam) (citing *In re Prudential Ins. Co. of Am., 148 S.W.3d 124, 135-36 (Tex. 2004))*. A trial court abuses its discretion if it reaches a decision so arbitrary **[**6]** and unreasonable it amounts to a clear and prejudicial error of law or it clearly fails to correctly analyze or apply the law. *Walker v. Packer, 827 S.W.2d 833, 840 (Tex. 1992)* (citations omitted). The second requirement for mandamus relief, that the relator has no adequate remedy by appeal, "has no comprehensive definition." *See In re Ford Motor Co., 165 S.W.3d 315, 317 (Tex. 2005)* (citing *Prudential, 148 S.W.3d at 136*). However, we have determined that relators have no adequate remedy by appeal when a trial judge erroneously refuses to compel arbitration under the FAA. *In re FirstMerit Bank, N.A., 52 S.W.3d 749, 753 (Tex. 2001)*.

This Court must decide whether the trial courts abused their discretion by not compelling arbitration pursuant to the FAA, as requested in Olshan's pleas in abatement. The **HN2** trial courts abuse their discretion by refusing to compel arbitration if the FAA preempts the TAA and the arbitration agreements are not unconscionable. However, the trial courts did not err by denying Olshan's pleas in abatement if the TAA applies to the agreements or the agreements are unconscionable.

## III. Federal Preemption

### A. The FAA and Choice of Law

**HN3** The TAA renders arbitration agreements unenforceable if the agreements containing the arbitration clauses are agreements for services "in which the total consideration to be furnished by the individual is not more than $ 50,000" and the agreements are not in writing, signed by each party, and each party's attorney. *TEX. CIV. PRAC. & REM. CODE § 171.002(a)(2)*. The homeowners contend that the arbitration agreements are governed by the TAA and are unenforceable for failure to meet the two identified **[**8]** TAA requirements. Olshan argues that the FAA applies to the agreements and preempts the TAA's exemption from coverage under *section 171.002(a)(2)*, making the arbitration clauses enforceable. *See In re Nexion Health at Humble, Inc., 173 S.W.3d 67, 69 (Tex. 2005)* (per curiam) (addressing a similar exemption under the TAA for personal injury cases).

**HN4** *Section 2* of the FAA preempts state law that would otherwise render arbitration agreements unenforceable in a contract involving interstate commerce. *9 U.S.C. § 2*; *Southland Corp. v. Keating, 465 U.S. 1, 10-11, 104 S. Ct. 852, 79 L. Ed. 2d 1 (1984)*. "The Act was designed to overrule the judiciary's longstanding refusal to enforce agreements to arbitrate, and place such agreements upon the same footing as other contracts." *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ., 489 U.S. 468, 474, 109 S. Ct. 1248, 103 L. Ed. 2d 488 (1989)* (internal quotations omitted). We have recognized that the FAA preempts parts of the TAA, including *section 171.002(a)(2) of the Civil Practice and Remedies Code*. *See Jack B. Anglin Co., 842 S.W.2d at 271* (discussing FAA's preemption of non-waiver provision of DTPA); *Nexion, 173 S.W.3d at 69 (Tex. 2005)* (discussing FAA's preemption of TAA *section 171.002(a)(3)*).

But **[**9]** the FAA does not "confer a right to compel arbitration of any dispute at any time." *Volt, 489 U.S. at 474*. The FAA policy is simply to "ensur[e] that private agreements to arbitrate are enforced according to their terms." *Id. at 479*. In *Volt*, the Court upheld the application of a California statute that allowed a stay of arbitration proceedings pending resolution of related litigation because the contract **[*889]** also contained a choice-of-law clause providing that "[t]he Contract shall be governed by the law of the place where the Project

is not applicable to appeals of an interlocutory order in an action pending as of September 1, 2009. Act of June 19, 2009, 81st Leg., R.S., ch. 820, § 2, 2009 Tex. Gen. **[**7]** Laws 2061. Because all four actions in this consolidated opinion were pending as of September 1, 2009, section 51.016 does not allow an interlocutory appeal of these causes.

is located." *Id. at 470*. The Court reiterated that **HN5** "the FAA pre-empts state laws which 'require a judicial forum for the resolution of claims which the contracting parties agreed to resolve by arbitration.'" *Id. at 478* (quoting *Southland Corp., 465 U.S. at 10*). But the FAA does not prevent

> the enforcement of agreements to arbitrate under different rules than those set forth in the Act itself. . . . Arbitration under the Act is a matter of consent, not coercion, and parties are generally free to structure their arbitration agreements as they see fit. Just as they may limit by contract the issues which they will arbitrate, so too may they specify by contract **[**10]** the rules under which that arbitration will be conducted. . . . By permitting the courts to "rigorously enforce" such agreements according to their terms, we give effect to the contractual rights and expectations of the parties, without doing violence to the policies behind by the FAA.

*Id. at 479* (citations omitted).

Subsequently, in *Mastrobuono v. Shearson Lehman Hutton, Inc.*, the Court held that the FAA preempted New York's prohibition against arbitral awards of punitive damages despite a choice of law provision in an arbitration agreement that stated the agreement "shall be governed by the laws of the State of New York." *514 U.S. 52, 63-64, 115 S. Ct. 1212, 131 L. Ed. 2d 76 (1995)*. The Court first stressed that the agreement would be enforced as written, stating that "the case before us comes down to what the contract has to say about the arbitrability of petitioners' claim for punitive damages." *Id. at 58*. Where the Court in *Volt* read the choice-of-law provision as definitively choosing state law over federal law, the Court in *Mastrobuono* read the provision differently:

> The choice-of-law provision, when viewed in isolation, may reasonably be read as merely a substitute for the conflict-of-laws analysis that otherwise **[**11]** would determine what law to apply to disputes arising out of the contractual relationship.
>
> . . .
>
> At most, [it] introduces an ambiguity into an arbitration agreement that would otherwise allow punitive damages awards.

*Id. at 59, 62*. Then, using FAA mandated rules of contract construction, the Court concluded that the provision should be read "to encompass substantive principles that New York courts would apply, but not to include special rules limiting the authority of arbitrators." *Id. at 62-64*.

Thus, **HN6** courts treat arbitration agreements as other contracts in applying the legal rules to interpret them. The goal is to discern the true intentions of the parties, as the FAA's primary purpose is to ensure private agreements to arbitrate are enforced according to their terms, no more, no less. *Volt, 489 U.S. at 479*; *see also Baravati v. Josephthal, Lyon & Ross, Inc., 28 F.3d 704, 709 (7th Cir. 1994)* (Posner, C.J.) ("[S]hort of authorizing trial by battle or ordeal or, more doubtfully, by a panel of three monkeys, . . . parties are as free to specify idiosyncratic terms of arbitration as they are to specify any other terms in their contract.").

### B. This Court's Treatment of Choice-of-Law Provisions **[**12]** Relating to Arbitration Agreements

This Court analyzed contractual language in the context of the relationship **[*890]** between an arbitration clause and a general choice-of-law provision in *In re L & L Kempwood Associates, L.P., 9 S.W.3d 125, 127-28 (Tex. 1999)* (per curiam). We held that **HN7** an agreement containing a general choice-of-law provision stating that the entire contract will be governed by "the law of the place where the Project is located," does not preclude application of the FAA. *Id*. The Court observed that the Project was located in Houston, thus the FAA was part of "the law of the place where the Project is located." *Id.; see also Capital Income Props. v. Blackmon, 843 S.W.2d 22, 23 (Tex. 1992)* (per curiam) (stating that "[t]he Federal [Arbitration] Act is part of the substantive law

of Texas"). When the language of the provision included federal law, further language specifically excluding application of the FAA is necessary for a court to apply the TAA to the FAA's exclusion. "The choice-of-law provision did not specifically exclude the application of federal law, and absent such an exclusion we decline to read the choice-of-law clause as having such an effect." *L & L Kempwood, 9 S.W.3d at 127-28.* **[**13]** Rather, a general choice-of-law provision "may reasonably be read as merely a substitute for the conflict-of-laws analysis that otherwise would determine what law to apply to disputes." *Id. at 127 n.16* (citing *Mastrobuono, 514 U.S. at 59-60*). Courts apply the FAA unless language in the arbitration agreement indicates its exclusion.

### C. The Law the Parties Chose

Three of the arbitration agreements state that disputes arising out of the contract "shall be resolved by mandatory and binding arbitration administered . . . pursuant to the arbitration laws in your state . . . ." *HN8* Courts rarely read such general choice-of-law provisions to choose state law to the exclusion of federal law. *See Mastrobuono, 514 U.S. at 59*; *L & L Kempwood, 9 S.W.3d at 127 n.16*. Further, just as the FAA is part of the substantive law of Texas, the FAA would be part of the arbitration laws in Texas. *See L & L Kempwood, 9 S.W.3d at 127 n.15* (quoting *Capital Income Props., 843 S.W.2d at 23*). The language of the arbitration clause designating arbitration pursuant to "the arbitrations laws in your state" includes the FAA. *See id. at 127-28.* Thus, the FAA applies to the three agreements that include the "arbitration laws **[**14]** in your state" language, and the FAA preempts the provisions of *section 171.002(a)(2)* of the TAA that would otherwise render the agreements unenforceable. The trial courts abused their discretion in denying Olshan's requests to compel arbitration based on the unenforceability of the arbitration under *section 171.002(a)(2)* in the Kilpatrick, Tisdale and Tingdale cases.

In contrast, the Waggoner agreement states that disputes arising out of the contract "shall be resolved by mandatory and binding arbitration . . . pursuant to the Texas General Arbitration Act . . . ." This provision distinguishes the Waggoner agreement from the other agreements and the agreements in *L & L Kempwood* and *Mastrobuono*. This is not the same general choice-of-law provision. This provision chooses a state's substantive law, specifically the TAA, to govern disputes under the agreement. *HN9* A valid choice-of-law provision makes a conflicts-of-law analysis unnecessary; this provision expresses a preference between federal and state law. *Id*. The FAA is part of the arbitration laws of Texas and can be applied to arbitration administered pursuant to the laws of Texas. However, *HN10* the FAA is not part of the TAA, at least to **[**15]** the extent the two are inconsistent.

[*891] The Fifth Circuit has likewise interpreted an arbitration clause specifically invoking the TAA as designating the TAA to govern all aspects of arbitration under the agreement, to the exclusion of the FAA. *Ford v. Nylcare Health Plans of the Gulf Coast, Inc., 141 F.3d 243, 246 (5th Cir. 1998)* (applying Texas law). The court stated the parties may "specify the law governing interpretation of the scope of the arbitration clause." *Id. at 248*. The focus of the determination is on the parties' choice. Thus, the court held that the parties intended the TAA to govern the scope of the arbitration clause. *Id. at 249*.

The language of the Waggoner agreement also indicates the parties' intention that the TAA govern the scope of their arbitration agreement. The plain language clearly indicates that the parties intend their arbitration to be governed by the TAA rather than merely "the law of the state" or "Texas law." The parties' intention that arbitration be administered pursuant to the TAA would be thwarted if the FAA preempted the TAA's specific provisions. Thus, *HN11* an agreement specifying that arbitration occur "pursuant to the Texas General Arbitration Act" excludes **[**16]** the FAA's preemption of *section 171.002(a)(2)* of the TAA. [3]

Because the TAA would render the Waggoners' arbitration agreement unenforceable, and because the FAA was not chosen by the parties, the trial court correctly denied Olshan's plea in abatement, seeking to compel

---

[3] We do not believe the choice-of-law provision to be ambiguous.

arbitration of Waggoner's action against Olshan. However, because the parties in the Kilpatrick, Tisdale, and Tingdale contracts chose to arbitrate pursuant to the laws of Texas, which include the FAA, the FAA preempts section *171.002(a)(2)* of the TAA and precludes those requirements from barring arbitration.

### IV. Unconscionability

Even though the FAA governs the arbitration agreements in the Kilpatrick, Tisdale, and Tingdale contracts, if those agreements are unconscionable, they are unenforceable. The homeowners contend that the arbitration agreements are unconscionable because "mandatory binding arbitration administered by the American Arbitration Association . . . in accordance with this arbitration agreement and the commercial arbitration rules of the AAA" is prohibitively expensive, preventing their ability to vindicate their claims. Further, they contend **[\*\*17]** the contracts are clearly void because Olshan violated the Home Solicitation Act, exacerbating the unconscionability of the agreement.

### A. Unconscionability of Arbitration Agreements

***HN12*** *Section 2* of the FAA states arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." *9 U.S.C. § 2*. A central purpose of the FAA is "to reverse the longstanding judicial hostility to arbitration agreements . . . and to place arbitration agreements upon the same footing as other contracts." *Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 24, 111 S. Ct. 1647, 114 L. Ed. 2d 26 (1991)* (citations omitted). Such agreements are enforceable only if they meet "the requirements of the general contract law of the applicable state." *In re Poly-America, L.P., 262 S.W.3d 337, 347 (Tex. 2008)* (citation omitted). When determining whether an agreement to arbitrate is valid, "state law, whether of legislative or judicial origin, is applicable *if* that law arose to govern issues concerning the validity, **[\*892]** revocability, and enforceability of contracts generally." *Perry v. Thomas, 482 U.S. 483, 493 n.9, 107 S. Ct. 2520, 96 L. Ed. 2d 426 (1987)*.

***HN13*** Texas law renders unconscionable contracts unenforceable. **[\*\*18]** *Poly-America, 262 S.W.3d at 348*. Texas further recognizes both substantive and procedural unconscionability. "Substantive unconscionability refers to the fairness of the arbitration provision itself, whereas procedural unconscionability refers to the circumstances surrounding adoption of the arbitration provision." *In re Palm Harbor Homes, Inc., 195 S.W.3d 672, 677 (Tex. 2006)*. Because the homeowners complain of the prohibitive cost of arbitration, their claim is grounded in substantive unconscionability. Generally, a contract is unconscionable if, "given the parties' general commercial background and the commercial needs of the particular trade or case, the clause involved is so one-sided that it is unconscionable under the circumstances existing when the parties made the contract." *FirstMerit Bank, 52 S.W.3d at 757* (citing *TEX. BUS. & COM. CODE § 2.302* cmt. 1). "The principle is one of the prevention of oppression and unfair surprise and not of disturbance of allocation of risks because of superior bargaining power." *TEX. BUS. & COM. CODE § 2.302* cmt. 1 (internal citation omitted).

The U.S. Supreme Court has held that ***HN14*** statutory claims may be arbitrated "so long as the prospective **[\*\*19]** litigant effectively may vindicate [his or her] statutory cause of action in the arbitral forum." *Green Tree Fin. Corp.-Ala. v. Randolph, 531 U.S. 79, 90, 121 S. Ct. 513, 148 L. Ed. 2d 373 (2000)* (citing *Gilmer, 500 U.S. at 28*). Conversely, an arbitration agreement may render a contract unconscionable if "the existence of large arbitration costs could preclude a litigant . . . from effectively vindicating [his or her] federal statutory rights in the arbitral forum." *Id.; see also Poly-America, 262 S.W.3d at 355-57*; *FirstMerit Bank, 52 S.W.3d at 756* (citing *Green Tree, 531 U.S. at 91*).

***HN15*** We should be wary of setting the bar for holding arbitration clauses unconscionable too low. First, arbitration is favored in both federal and Texas law, and to conclude that an arbitration agreement is

unconscionable based merely on the "'risk' that [the claimant] will be saddled with prohibitive costs" would undermine the "'liberal federal policy favoring arbitration agreements.'" *Green Tree, 531 U.S. at 91* (quoting *Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24, 103 S. Ct. 927, 74 L. Ed. 2d 765 (1983))*; *FirstMerit Bank, 52 S.W.3d at 756*. Second, the theory behind unconscionability in contract law is that courts should not enforce a transaction so one-sided, **[**20]** with so gross a disparity in the values exchanged, that no rational contracting party would have entered the contract. *RESTATEMENT (SECOND) OF CONTRACTS § 208 cmt. b* (1981). But as we have recognized previously,

> there is nothing *per se* unconscionable about arbitration agreements. In fact, historically, Texas law favors settling disputes by arbitration. Arbitration agreements, like the one here, offer a permissible choice to traditional litigation that does not favor either party. Moreover, assuming unequal bargaining power between [the parties] exists does not establish grounds for defeating an agreement to arbitrate under the FAA.

*EZ Pawn Corp. v. Mancias, 934 S.W.2d 87, 90-91 (Tex. 1996)* (per curiam) (citations omitted). Furthermore, arbitration clauses in consumer contracts reduce merchants' operating costs and produce savings passed on to the consumer in the form of lower prices. Thus, a fairly administered **[*893]** arbitration should not create a gross disparity in the values exchanged. Stephen J. Ware, *Paying the Price of Process: Judicial Regulation of Consumer Arbitration Agreements*, 2001 J. DISP. RESOL. 89, 89 (2001); *see generally* Steven Shavell, *Alternative Dispute Resolution: An Economic* **[**21]** *Analysis*, 24 J. LEGAL STUD. 1 (1995). However, we also recognize that **HN16** arbitration is intended as a lower cost, efficient alternative to litigation. *See Poly-America, 262 S.W.3d at 347* ("[A]rbitration is intended to provide a lower-cost, expedited means to resolve disputes . . . ."). Where these justifications are vanquished by excessive arbitration costs that deter individuals from bringing valid claims, the unconscionability doctrine may protect unfairly disadvantaged consumers. We agree, as in *Green Tree,* that excessive costs imposed by an arbitration agreement render a contract unconscionable if the costs prevent a litigant from effectively vindicating his or her rights in the arbitral forum. *See Green Tree, 531 U.S. at 90*.

### B. Application of the Standard

**HN17** The party opposing arbitration bears the burden to show that the costs of arbitration render it unconscionable. When "a party seeks to invalidate an arbitration agreement on the ground that arbitration would be prohibitively expensive, that party bears the burden of showing the likelihood of incurring such costs." *Green Tree, 531 U.S. at 92*. This Court likewise requires "*some evidence* that a complaining party will likely incur arbitration **[**22]** costs in such an amount as to deter enforcement of statutory rights in the arbitral forum." *Poly-America, 262 S.W.3d at 356*; *accord In re U.S. Home Corp., 236 S.W.3d 761, 764 (Tex. 2007)*; *FirstMerit Bank, 52 S.W.3d at 756-57*.

The Court in *Green Tree* did not explain how detailed the showing of prohibitive expense need be to invalidate an arbitration agreement. *Green Tree, 531 U.S. at 92* ("How detailed the showing of prohibitive expense must be before the party seeking arbitration must come forward with contrary evidence is a matter we need not discuss . . . ."). However, a number of federal courts of appeals, relying on *Green Tree*, have applied a case-by-case analysis of the effect the arbitration clause has on the particular plaintiff's ability to effectively vindicate his rights. [4] The Fourth Circuit's approach in *Bradford v. Rockwell Semiconductor Systems, Inc*. is particularly instructive. *238 F.3d 549 (4th Cir. 2001)*. The court noted the proper analysis "evaluates whether the arbitral forum in a particular case is an adequate and accessible substitute to litigation." *Id*. According to the

---

[4]   *See Musnick v. King Motor Co. of Fort Lauderdale, 325 F.3d 1255, 1259 (11th Cir. 2003)* ("Since *Green Tree*, all but one of the other Circuits that have reconsidered this issue have applied a similar case-by-case approach."); *see also Blair v. Scott Specialty Gases, 283 F.3d 595, 609-10 (3d Cir. 2002)*; *Bradford v. Rockwell Semiconductor Sys., Inc., 238 F.3d 549, 556 (4th Cir. 2001)*; *LaPrade v. Kidder, Peabody & Co., Inc., 246 F.3d 702, 708, 345 U.S. App. D.C. 358 (D.C. Cir. 2001)*. *But see Circuit City Stores, Inc. v. Adams, 279 F.3d*

court, that inquiry requires "a case-by-case analysis that focuses, among other things, upon [**23] the claimant's ability to pay the arbitration fees and costs, the expected cost differential between arbitration and litigation in court, and whether that cost differential is so substantial as to deter the bringing of claims." *Id.* (quotations omitted). The key factor is not *where* the cost to pursue the claim goes, but *what* the total cost to the claimant to pursue the claim is. The [*894] court "fail[ed] to see how a claimant could be deterred from pursuing his statutory rights in arbitration simply by the fact that his fees would be paid to the arbitrator where the overall cost of arbitration is otherwise equal to or less than the cost of litigation in court." *Id.*

Likewise, in *Honrubia Properties, Ltd. v. Gilliland,* the Corpus Christi-Edinburg Court of Appeals essentially accepted *Bradford's* conceptual framework. *Nos. 13-07-210-CV, 13-07-249-CV, 2007 Tex. App. LEXIS 8085, 2007 WL 2949567 at *6 (Tex. App.--Corpus Christi-Edinburg Oct. 11 2007, no pet.)* (mem. op.). It considered the party's ability to pay the arbitration fee, the actual amount of the fee in relation to the amount of the underlying claim, and the cost differential between arbitration and litigation in court. *Id.* (citations omitted). Applying the standard, the court held the arbitration agreement was not substantively unconscionable where evidence showed the arbitration would cost approximately $ 15,000 to $ 20,283, plus expenses and other possible fees; the claimant was seeking more than $ 4,000,000 in compensatory and punitive damages; and arbitration costs would range from 11 percent to 15 percent of the claimant's gross income. *2007 Tex. App. LEXIS 8085,* [WL] at *7. The claimant failed to submit any evidence pertaining to the expected cost differential between [**25] arbitration and litigation. *Id.*

*HN18* In applying the unconscionability standard, the crucial inquiry is whether the arbitral forum in a particular case is an adequate and accessible substitute to litigation, a forum where the litigant can effectively vindicate his or her rights. With this in mind, we agree that the approach taken by the Fourth Circuit in *Bradford* effectively pursues this inquiry. We note all of the analyses previously discussed correctly assume that *HN19* litigation allows claimants to effectively vindicate their rights, despite the expense. The desire to avoid steep litigation expense--including the costs of longer proceedings, more complicated appeals on the merits, discovery, investigations, fees, and expert witnesses--is the purpose of arbitration in the first place. *See Jack B. Anglin Co., 842 S.W.2d at 272-73* ("[T]he purpose of [arbitration is] providing a rapid, inexpensive alternative to traditional litigation . . . ."). In the absence of unusual animus between the parties or external motives, plaintiffs continue to pursue claims when the expected benefits of the lawsuit outweigh the total cost of bringing it. If the total cost of arbitration is comparable to the total [**26] cost of litigation, the arbitral forum is equally accessible. [5] Thus, a comparison of the total costs of the two forums is the most important factor in determining [*895] whether the arbitral forum is an adequate and accessible substitute to litigation. Other factors include the actual cost of arbitration compared to the total amount of damages the claimant is seeking and the claimant's overall ability to pay the arbitration fees and costs. These factors may also show arbitration to be an inadequate and inaccessible forum for the particular claimants to vindicate their rights. However, these considerations are less relevant if litigation costs more than arbitration.

---

889, 895 (9th Cir. 2002) [**24] (holding that plaintiff employees should not "have to pay either unreasonable costs or any arbitrators' fees or expenses as a condition of access to the arbitration forum").

[5] "Total cost" refers to the total cost of pursuing a claim in either forum, notwithstanding who will be financing the claim. Some courts have noted the argument that attorneys will be unwilling to represent plaintiffs on a contingency fee basis in the arbitral forum and that contingent fee arrangements make litigation less expensive for plaintiffs than arbitration. *See Morrison v. Circuit City Stores, Inc.,* 317 F.3d 646, 664 (6th Cir. 2003); *Poly-America,* 262 S.W.3d at 355. But other commentators argue that there is no reason why [**27] plaintiffs cannot secure the same financing when arbitration is mandated if both the value of their claim and the cost to pursue it remain constant. *See* Christopher R. Drahozal, *Arbitration Costs and Contingent Fee Contracts*, 59 VAND. L. REV. 729, 768 (2006) ("On the face of it, there is no reason to expect contingent fee contracts to treat arbitration costs differently than they treat other litigation expenses." ). We recognize arbitration is not always a lower-cost, efficient litigation alternative. Forcing consumer plaintiffs into an arbitral forum may affect their ability to pursue remedies when small claims are at issue. However, this does not excuse parties opposing arbitration from providing sufficient evidence to demonstrate that excessive costs make arbitration unconscionable in their particular case.

## C. Sufficiency of the Evidence

**HN20** *Green Tree* creates a burden-shifting test in which the "party seek[ing] to invalidate an arbitration agreement on the ground that arbitration would be prohibitively expensive . . . bears the burden of showing the likelihood of incurring such costs." *Green Tree, 531 U.S. at 92*. Once met, the burden shifts to "the party seeking arbitration [who] must **[**28]** come forward with contrary evidence." *Id.*; see also *Poly-America, 262 S.W.3d at 348* ("The burden of proving such a ground--such as fraud, unconscionability or voidness under public policy--falls on the party opposing the contract."); *FirstMerit Bank, 52 S.W.3d at 756* ("Again, since the law favors arbitration, the burden of proving a defense to arbitration is on the party opposing arbitration.").

Evidence of the "risk" of possible costs of arbitration is insufficient evidence of the prohibitive cost of the arbitration forum. *Green Tree, 531 U.S. at 91* ("The 'risk' that [the plaintiff] will be saddled with prohibitive costs is too speculative to justify the invalidation of an arbitration agreement."). Rather, "both the United States Supreme Court and this Court require specific evidence that a party will actually be charged excessive arbitration fees." *U.S. Home Corp., 236 S.W.3d at 764*; *see also FirstMerit Bank, 52 S.W.3d at 757* ("Because the record contains no specific evidence that the [plaintiffs] will actually be charged excessive arbitration fees, we conclude that there is legally insufficient evidence that the plaintiffs would be denied access to arbitration based on excessive **[**29]** costs."). The party opposing arbitration must show the likelihood of incurring such costs in her particular case.

Thus, for evidence to be sufficient, it must show that the plaintiffs are likely to be charged excessive arbitration fees. While we do not mandate that claimants actually incur the cost of arbitration before they can show its excessiveness, parties must at least provide evidence of the likely cost of their particular arbitration, through invoices, expert testimony, reliable cost estimates, or other comparable evidence. *See Poly-America, 262 S.W.3d at 354-55* (concluding that the plaintiff's "own affidavit and that of an expert witness providing detailed estimates of the likely cost of arbitration in [the plaintiff's] case" constituted sufficient evidence); *Olshan Found. Repair Co. v. Ayala, 180 S.W.3d 212, 215-16 (Tex. App.--San Antonio 2005, pet. denied)* (holding invoice for party's share of arbitration expenses sufficient). Evidence that merely speculates about the risk of possible cost is insufficient.

## D. Application to the Facts

In applying this analysis to the facts at hand, we begin with the agreement itself, which states, "any matter arising out of this agreement shall **[**30]** be resolved by mandatory and binding arbitration administered by the American Arbitration Association . . . in accordance with this arbitration agreement and the commercial arbitration rules of the AAA." According to the commercial arbitration rules, the AAA:

**[*896]** applies the *Supplementary Procedures for Consumer-Related Disputes* to arbitration clauses in agreements between individual consumers and businesses where the business has a standardized, systematic application of arbitration clauses with customers and where the terms and conditions of the purchase of standardized, consumable goods or services are nonnegotiable or primarily non-negotiable in most or all of its terms, conditions, features, or choices.

AAA Commercial Arbitration Rule R-1 (2007, 2009). The *Supplementary Procedures for Consumer-Related Disputes* have a separate fee schedule for consumer arbitration:

**Administrative Fees**

Administrative fees are based on the size of the claim and counterclaim in a dispute. They are based only on the actual damages and not on any additional damages, such as attorneys' fees or punitive damages. Portions of these fees are refundable pursuant to the Commercial Fee Schedule.

**Arbitrator Fees**

For cases **[**31]** in which no claim exceeds $ 75,000, arbitrators are paid based on the type of proceeding that is used. The parties make deposits as set forth below. Any unused deposits are returned at the end of the case.

Desk Arbitration or Telephone Hearing $ 250 for service on the case

In Person Hearing $ 750 per day of hearing

For cases in which a claim or counterclaim exceeds $ 75,000, arbitrators are compensated at the rates set forth on their panel biographies.

**Fees and Deposits to be Paid by the Consumer**:

If the consumer's claim or counterclaim does not exceed $ 10,000, then the consumer is responsible for one-half the arbitrator's fees up to a maximum of $ 125. This deposit is used to pay the arbitrator. It is refunded if not used.

If the consumer's claim or counterclaim is greater than $ 10,000, but does not exceed $ 75,000, then the consumer is responsible for one-half the arbitrator's fees up to a maximum of $ 375. This deposit is used to pay the arbitrator. It is refunded if not used.

If the consumer's claim or counterclaim exceeds $ 75,000, or if the consumer's claim or counterclaim is non-monetary, then the consumer must pay an Administrative Fee in accordance with the Commercial Fee Schedule. **[**32]** [6] A portion of this fee is refundable pursuant to the Commercial Fee Schedule. The consumer must also deposit one-half of the arbitrator's compensation. This deposit is used to pay the arbitrator. This deposit is refunded if not used. The arbitrator's compensation rate is set forth on the panel biography provided to the parties when the arbitrator is appointed.

AAA *Supplementary Procedures for Consumer-Related Disputes*, Administrative Fees, Arbitrator Fees, Fees and Deposits to be Paid by the Consumer (2005, 2010). Thus, for a consumer claim up to $ 75,000, the most a consumer will have to pay under these rules is $ 375 for the arbitrator. **[*897]** *Id.; see also* [Green Tree, 531 U.S. at 95](https://) (Ginsburg, J., dissenting) (describing the AAA's Consumer Arbitration Rules as a model "for fair cost and fee allocation").

The homeowners bear the burden to show the likelihood of incurring excessive costs, yet no homeowners provided any concrete idea of the amount of their claims. It is impossible to know how much they will be charged under the AAA rules, even if the fees charged by AAA were excessive. Instead, the homeowners provided two invoices from the AAA for arbitration in, as the homeowners allege, "similar cases" to show the likelihood of excessive litigation costs. The first was a copy of the invoice from the AAA to the Ayalas who were plaintiffs in a different lawsuit against Olshan. It shows that the Ayalas' claim against Olshan was for $ 200,000, and that the Ayalas' were charged $ 35,900 to arbitrate that claim. The second was an invoice from the AAA to an anonymous claimant for the arbitration of a construction dispute, a similar type of case using only one arbitrator. [7] The amount of this claim is not stated on this invoice, but based on the administrative fee and case

---

[6] "The filing fee shall be advanced by the party or parties making a claim or counterclaim, subject to final apportionment by the arbitrator in the award. The AAA may, in the event of extreme hardship on the part of any party, defer or reduce the administrative fees." AAA Commercial Arbitration Rule R-49 (2007, 2009). In 2008, when Olshan sought to compel arbitration, the total initial filing **[**33]** fee and case service fee ranges from $ 2,550 for claims between $ 75,000-$ 150,000 to $ 8,500 for claims above $ 500,000. AAA Commercial Arbitration Administrative Fees, Fees (2007).

[7] It is unclear whether this means that the Ayalas requested three arbitrators. That the cost of the arbitrator to the Ayalas per day of hearing was $ 3,350, compared to $ 1,250 per day in the anonymous case, leads us to believe they did.

service fee charged by the AAA, we can **[**34]** deduce that it was between $ 75,000 and $ 150,000. The anonymous claimants were charged $ 11,406 to arbitrate.

*HN21* Merely showing that other claimants have incurred arbitration costs of some amount falls well short of specific evidence that these particular parties will be charged excessive fees. There is no evidence that the homeowners' claims are similar in amount or difficulty as the claims of the Ayalas or the anonymous claimant. In fact, the Ayalas' invoice shows that their claim was for $ 200,000, while none of the homeowners' claims in this case exceeded $ 20,000. Moreover, there is no evidence that the homeowners have made any effort to reduce the likely charges through requests for fee waivers, pro bono arbitrators, or even simply requesting a one arbitrator panel. As the court in *In re MHI Partnership, Ltd*. aptly noted, "Substantive unconscionability threatens to become the exception that swallows the rule if all that must be done to avoid arbitration **[**35]** is to assume the most expensive possible scenario." *No. 14-07-00851-CV, 2008 Tex. App. LEXIS 4053, 2008 WL 2262157 at *7 (Tex. App.--Houston [14th Dist.] May 29, 2008, no pet.)* (mem. op.).

Even if we took these invoices as evidence of the likely arbitration charges to the homeowners, they have provided no comparison of these charges to the expected cost of litigation, the amount of their claim, or their ability to pay these costs. *See Green Tree, 531 U.S. at 90 n.6* (concluding that a party's unsupported statement that she did not have the resources to pay the high costs of arbitration was insufficient); *Bradford, 238 F.3d at 556 n.5* ("The cost of arbitration, as far as its deterrent effect, cannot be measured in a vacuum or premised upon a claimant's abstract contention that arbitration costs are 'too high.'"). The record contains no specific evidence that the homeowners will actually be charged excessive arbitration fees, and thus there is no legally sufficient evidence that such fees prevent the homeowners from effectively pursuing their claim in the arbitral forum.

### E. Unconscionability in Light of the Texas Home Solicitation Act

Finally, the homeowners argue that the arbitration is unconscionable because the **[**36]** parties will expend time, energy, **[*898]** and money needlessly going to arbitration when the arbitrator will find the contract--including the arbitration clause--void, sending the case back to court. [8] They assert that their contract with Olshan violated the Texas Home Solicitation Act (THSA), which would render the agreements, including the arbitration clauses, void. The alleged basis for violation of the THSA is Olshan's failure to include in the agreements certain language regarding cancellation in at least 10-point boldfaced type, where the transactions occurred by personal solicitation outside Olshan's place of business. *TEX. BUS. & COM. CODE §§ 601.002(a)*, *.052*, *.053*, *.201*. Further, the homeowners contend that there is no dispute over whether the contract violates the THSA, and the arbitrator will thus certainly find the contract void. [9]

*HN22* It is tempting to avoid the unnecessary costs that would accompany an allegedly unnecessary arbitration. But to do so requires the trial court to make a determination of issues relating to the contract generally, even if it seems clear that one party or the other will prevail. As the U.S. Supreme Court stated in *Prima Paint Corp. v. Flood & Conklin Manufacturing Co.*, when the parties have contracted for arbitration of their disputes, a trial court "may consider only issues relating to the making and performance of the agreement to arbitrate." *388 U.S. 395, 404, 87 S. Ct. 1801, 18 L. Ed. 2d 1270 (1967)*; *see also Rent-A-Ctr., W., Inc. v. Jackson, 130 S. Ct. 2772, 2778, 177 L. Ed. 2d 403 (2010)*; *Buckeye Check Cashing, Inc. v. Cardegna, 546 U.S. 440, 445-46, 126 S. Ct.*

---

[8] The homeowners concede that the arbitrator and not a court decides a contractual defense to the contract as a whole as opposed to a contractual defense to just the arbitration provision. *See Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 445-46, 126 S. Ct. 1204, 163 L. Ed. 2d 1038 (2006); *In re Labatt Food Serv., L.P.*, 279 S.W.3d 640, 647-49 (Tex. 2009).

[9] Olshan states in its brief **[**37]** and stated at argument to the contrary that it will present certain defenses to this claim. It is neither our province nor the province of the trial court to determine the merits of these defenses when the parties have contracted to arbitrate such disputes.

*1204, 163 L. Ed. 2d 1038 (2006)* ("[U]nless the challenge is to the arbitration clause itself, the issue of the contract's validity is considered by the arbitrator in the first instance."). There is no way to fashion a standard to determine whether arbitration **[**38]** is unnecessary without giving the trial court some discretion over issues relating to the making and performance of the contract generally--exactly what *Prima Paint,* and later *Buckeye* and *Rent-A-Center,* sought to avoid. Allowing courts to make this determination under an unconscionability analysis would provide an end run around the rule. While in some cases this "rule permits a court to enforce an arbitration agreement in a contract that the arbitrator later finds to be void[,] . . . it is equally true that [the opposite] approach permits a court to deny effect to an arbitration provision in a contract that the court later finds to be perfectly enforceable." *Buckeye, 546 U.S. at 448-49*. This conundrum is solved with a rule that allocates such decisions to arbitration, which is consistent with the liberal policy favoring arbitration in the FAA, U.S. Supreme Court decisions, and decisions of this Court. The homeowners failed to provide legally sufficient evidence of the prohibitive cost of arbitration to prove unconscionability, and this failure cannot be remedied by allowing the trial court to determine if it believes the contract itself is void.

## V. Conclusion

*HN23* This Court endeavors to **[**39]** interpret agreements, including those to arbitrate, as they **[*899]** are written. *HN24* When an agreement specifically states that it is to be governed by the Texas General Arbitration Act, we hold that it will be governed by the Act, which may mean that disputes arising from its terms will be excluded from arbitration. Thus, the TAA applies to the arbitration agreement between the Waggoners (No. 09-0474) and Olshan and renders it unenforceable. *See TEX. CIV. PRAC. & REM. CODE § 171.002(a)(2)*. The trial court did not err by denying Olshan's plea in abatement, and the court of appeals denied relief. We also deny mandamus relief in the Waggoner case.

However, where an arbitration agreement states that it is to be governed by the law of this state, that law includes the Federal Arbitration Act. Because it is proper to apply the FAA to the Kilpatrick (No. 09-0432), Tisdale (No. 09-0433), and Tingdale (No. 09-0703) agreements that use such language, the FAA preempts the provisions of *section 171.002(a)(2)* that would otherwise render those agreements unenforceable. And the parties opposing arbitration in those three cases did not submit legally sufficient evidence that arbitration of their claims would **[**40]** be unconscionable. Therefore, the trial court erred by denying Olshan's pleas in abatement, and we conditionally grant mandamus relief in the Kilpatrick, Tisdale, and Tingdale cases and remand those cases to the trial court for further proceedings consistent with this opinion. We are confident that the trial courts will comply, and the writs will issue only if they fail to do so.

Dale Wainwright

Justice

**OPINION DELIVERED: December 3, 2010**

**Concur by:** Nathan L. Hecht; MEDINA

## Concur

JUSTICE HECHT, concurring, in which JUSTICE MEDINA joined.

I join fully in the Court's opinion and write only with this further observation.

The homeowners contend that the contracts at issue violated the Texas Home Solicitation Act [1] because they did not contain the requisite notice of their right to cancellation and are therefore void by express provision of the Act. [2] In response, Olshan tells us in its briefing only that it "will present its defenses . . . in the arbitral forum". Asked at oral argument what defenses it has to the homeowners' contention that their contracts, including the arbitration provisions, are void and unenforceable, counsel answered that "there might be an estoppel defense" because the homeowners did not [**41] challenge the validity of the contracts until work was completed. Counsel also argued that even if the contracts are void, the arbitration provision is severable and valid, and the homeowners [*900] must still submit their complaints to arbitration. Olshan has cited no authority for either of these arguments.

The homeowners acknowledge that, as the Court notes, the validity of the contracts is a matter for the arbitrator to decide. [3] But the homeowners argue that the invalidity of the contracts is a foregone conclusion and that "the entire process . . . will be a needless waste of time, energy, and money". [4] I agree with the Court that even if this is true, the contracts are not unconscionable. But being led on a wild goose chase, [5] if that is all arbitration comes to, is not without remedy.

If, as the homeowners predict, the arbitrator concludes that the contracts are indeed void, Olshan and its counsel are subject to being sanctioned by the trial court for filing a groundless motion to compel arbitration. [6] The trial court certainly has the authority to sanction frivolous resistance to arbitration, and sanctions are not a one-way ratchet. The court's authority to sanction a frivolous motion to compel is not displaced by the arbitrator's authority to determine the predicate issue-that the contracts are unenforceable. If the dispute returns to the trial court, the homeowners may seek full redress for Olshan's lark.

Nathan L. Hecht

Justice

Opinion delivered: December 3, 2010

---

[1] Act of May 18, 1973, 63rd Leg., R.S., ch. 246, § 1, 1973 Tex. Gen. Laws 574, codified as TEX. REV. CIV. STAT. ANN. art. 5069-13.01, amended by Act of April 4, 1975, 64th Leg., R.S., ch. 59, § 1, 1975 Tex. Gen. Laws 124, and by Act of May 27, 1995, 74th Leg., R.S., ch. 926, § 1, 1995 Tex. Gen. Laws 4649, recodified by Act of May 24, 1997, 75th Leg., R.S., ch. 1008, § 3, 1997 Tex. Gen. Laws 3091, 3583, as TEX. BUS. & COM . CODE §§ 39.001-.009, and by Act of May 15, 2007, 80th Leg., R.S., ch. 885, § 2.01, 2007 Tex. Gen. Laws 1905, 2026, as TEX. BUS. & COM . CODE §§ 601.001-.205.

[2] Section 601.201, TEX. BUS. & COM . CODE, provides that "[a] sale or contract entered into under a consumer transaction in violation of . . . Subchapter D is void." Section 601.152, in subchapter D, states: "A merchant may not: (1) at the time the consumer signs the contract pertaining to a consumer transaction or [**42] purchases the goods, services, or real property, fail to inform the consumer orally of the right to cancel the transaction; or (2) misrepresent in any manner the consumer's right to cancel." The prior versions of the Act contained substantively identical provisions. Former TEX. BUS. & COM . CODE. § 39.008(a)(3)-(4) & (b); TEX. REV. CIV . STAT . ANN. art. 5069-13.03(a)(3)-(4) & (b).

[3] *Ante* at __ (citing *Prima Paint Corp. v. Flood & Conklin Mfg. Co*., 388 U.S. 395, 404, 87 S. Ct. 1801, 18 L. Ed. 2d 1270 (1967)).

[4] *E.g*., Brief of Real Parties in Interest Kenneth and Vickie Kilpatrick at 21.

[5] *See* WILLIAM SHAKESPEARE, ROMEO AND JULIET act 2, sc. 4:

"Romeo: Switch and spurs, switch and spurs; or I'll cry a match.

"Mercutio: Nay, if thy wits run the [**43] wild-goose chase, I have done; for thou hast more of the wild-goose in one of thy wits than, I am sure, I have in my whole five."

[6] TEX. R. CIV. P. 14; TEX. CIV. PRAC. & REM . CODE §§ 9.001-.014, 10.001-.006.



Positive

As of: September 1, 2015 5:34 PM EDT

## *In re Serv. Corp. Int'l*

Supreme Court of Texas

August 29, 2002, Delivered

NO. 01-0650

**Reporter**

85 S.W.3d 171; 2002 Tex. LEXIS 132; 45 Tex. Sup. J. 1241

IN RE SERVICE CORPORATION INTERNATIONAL, ROBERT L. WALTRIP, L. WILLIAM HEILIGBRODT, AND GEORGE R. CHAMPAGNE, RELATORS

**Prior History:** *In re Serv. Corp. Intl, 234 F.3d 29, 2000 U.S. App. LEXIS 26967 (5th Cir. Tex., 2000)*

**Disposition:** [**1] Petition for writ of mandamus conditionally granted.

## Core Terms

relators, arbitration, federal court, merger, state court, trial court, waived, right to arbitration, state law claim, discovery, per curiam, Securities, litigate, compel arbitration, judicial process, mandamus, parties, invoke

## Case Summary

### Procedural Posture

Relator officers moved the trial court, Texas, to compel respondent shareholders' security litigation claims to arbitration. The trial court denied the officers' motion and the officers sought a writ of mandamus.

### Overview

The officers were involved in two lawsuits involving their roles as officers in two publicly traded corporations and allegations of securities fraud in a merger transaction. One action had been filed in federal court and involved only federal claims, and the instant action involved only state law claims. The shareholders were in the instant action were bound by an arbitration agreement covering all their claims, but most of the federal plaintiffs were not. The shareholders argued that the officers waived any right to arbitrate by delaying their request for arbitration, opposing a trial setting, and proceeding in federal court. The state supreme court noted that there was a strong presumption against waiver of arbitration. The court noted that the officers' delay in moving to compel arbitration or objecting to the shareholders' request for a trial setting did not waive their right to compel arbitration as the shareholders did not demonstrate any prejudice by the delay. The officers action reflected efforts to avoid litigation and not participate it. The denial of their motion to compel arbitration was reversed.

### Outcome

The officers' petition for mandamus was granted, and the trial court was directed to promptly to vacate its order denying the officers' to compel arbitration and to grant the motion as to the shareholders.

## LexisNexis® Headnotes

Civil Procedure > ... > Responses > Defenses, Demurrers & Objections > Waiver & Preservation of Defenses

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > Arbitrability

Civil Procedure > ... > Arbitration > Federal Arbitration Act > General Overview

Contracts Law > Contract Conditions & Provisions > Arbitration Clauses

International Trade Law > Dispute Resolution > International Commercial Arbitration > Arbitration

*HN1* The Federal Arbitration Act, *9 U.S.C.S. §§ 1-307* establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability.

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview

Civil Procedure > ... > Arbitration > Federal Arbitration Act > General Overview

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > Waiver

Contracts Law > Contract Conditions & Provisions > Arbitration Clauses

International Trade Law > Dispute Resolution > International Commercial Arbitration > Arbitration

*HN2* The Texas Supreme Court has held that under the federal statute, courts will not find that a party has waived its right to enforce an arbitration clause by merely taking part in litigation unless it has substantially invoked the judicial process to its opponent's detriment. There is a strong presumption against waiver. The Texas Supreme Court has also held that whether a party's conduct waives its arbitration rights under the Federal Arbitration Act, *9 U.S.C.S. §§ 1-307* is a question of law.

Civil Procedure > Discovery & Disclosure > General Overview

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview

Contracts Law > Contract Conditions & Provisions > Arbitration Clauses

*HN3* The filing of a motion to dismiss the claims of class members does not waive arbitration.

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > Waiver

Contracts Law > Contract Conditions & Provisions > Arbitration Clauses

*HN4* Only prior litigation of the same legal and factual issues as those the party now wants to arbitrate results in waiver of the right to arbitrate.

## Opinion

 [*172]  ON PETITION FOR WRIT OF MANDAMUS

**Per Curiam**

Relators in this original mandamus proceeding are the four defendants in both a federal court class action involving only federal law claims and a state court action involving only state law claims. Both actions raise

similar but not identical factual allegations of securities fraud in a merger transaction. The two plaintiffs in the state court action are members of the class in federal court. At least one of the plaintiffs in state court is bound by an arbitration agreement covering all his claims, state and federal, but almost all of the other members of the class in federal court are not. Relators moved the state to compel arbitration of the state law claims, and the plaintiffs responded that relators had waived any right to arbitration by delay and because of their willingness to litigate the federal law claims in federal court. The trial court denied relators' motion. We conclude that this was an abuse of discretion remediable by mandamus.

Service Corporation International and Equity Corporation International, **[\*\*2]** two large, publicly traded corporations engaged in the death care business, merged in a stock-for-stock transaction in January 1999. One week later, SCI announced that its earnings for the prior quarter were lower than expected, and its stock fell. Within days, more than twenty identical class actions were filed in federal courts against SCI and three of its officers at the time of the merger [1] alleging securities fraud. The actions were consolidated, [2] and in August 1999 a class was certified that included all SCI shareholders other than its officers at the time of the merger. The four defendants, relators in the proceeding now before us, moved to dismiss the complaint under _Rule 12(b)(6) of the Federal Rules of Civil Procedure_ and the Private Securities Litigation Reform Act of 1995. [3] The parties here tell us that this **[\*173]** motion remains pending and has the effect of staying proceedings in federal court.

 **[\*\*3]** James P. Hunter, III, ECI's chairman and chief executive officer, and the James P. Hunter, III Family Trust (collectively, "the Hunters") were major shareholders in ECI and received SCI stock in the merger. The Hunter Family Trust was thus a member of the class in federal court, but Hunter himself was excluded because he had become an officer of SCI as part of the merger. In November 1999, a little over two months after the class was certified, the Hunters filed suit in state court against SCI and the three individual defendants in the federal action, along with three other SCI officers and its accountant, PricewaterhouseCoopers. The Hunters' factual allegations are much like those made in federal court, but there are differences. For example, an allegation made only in federal court is that SCI failed to disclose that its pre-need funeral business was a drain on profits. Also, the Hunters argue that they complain only of misrepresentations made near the time of the merger while class members who obtained SCI stock independent of the merger may not be able to recover absent proof of misrepresentations made long before the merger closed. And just as the federal action does not involve **[\*\*4]** any state law claims, the state action does not involve any federal law claims.

Relators moved the federal court in December 1999 to stay all discovery in the state action under the Securities Litigation Uniform Standards Act of 1998, [4] and the court heard the motion in May 2000. At that hearing, in response to questions from the court, SCI suggested that Hunter be made a member of the class. The court issued two orders, one amending the class definition to include Hunter, and the other staying discovery in the state action as relators had requested and also ordering on its own initiative that the Hunters litigate all of their claims in the federal action. The Fifth Circuit vacated the second order in September 2000, holding that the district court was not authorized to prohibit the Hunters from opting out of the class and pursuing their claims elsewhere. [5] Relators immediately renewed their motion to stay discovery in state court, and the federal court granted the motion a few days later.

---

[1] They are Robert L. Waltrip, L. William Heiligbrodt, and George R. Champagne.

[2] _In re Service Corp. Int'l_, Civil No. H-99-280 (S.D. Tex.).

[3] Pub. L. No. 104-67, 109 Stat. 737 (1995).

[4] Pub. L. No. 105-353, 112 Stat. 3227 (1998).

[5] _In re Service Corp. Int'l, 234 F.3d 29, 2000 U.S. App. LEXIS 26967_, No. 00-20451 (5th Cir., Sept. 13, 2000) (per curiam) (unpublished).

 [**5] Since the federal court had not stayed all proceedings in state court, the Hunters moved the state court for a preferential trial setting. In February 2001, the same day that motion was heard, relators and the other defendants in state court filed a motion to compel arbitration of the Hunters' state law claims, based on the following provision in the merger agreement between SCI and ECI:

upon the request of any party (defined for the purpose of this provision to include affiliates, principles [sic] and agents of any such party), any dispute, controversy or claim arising out of, relating to, or in connection with this Agreement or any agreement executed in connection herewith or contemplated hereby, . . . shall be finally resolved by mandatory and binding arbitration in accordance with the terms hereof.

In a written response, the Hunters urged that relators had waived any right to arbitrate by delaying their request for arbitration, opposing a trial setting, and proceeding in federal court. The Hunters agreed to nonsuit the four defendants other than relators. At the hearing on relators' motion, [*174] the Hunter Family Trust also argued that it was not covered by the arbitration [**6] agreement, an argument it had not made in the written response to relators' motion. The trial court denied the motion, and the court of appeals denied mandamus relief. [6]

The parties agree that the arbitration provision is governed by the Federal Arbitration Act. [7] In the words of the United States Supreme Court, **HN1** "The Arbitration Act establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." [8] **HN2** We have held that under the federal statute, "Courts will not find that a party has waived its right to enforce an arbitration clause by merely taking part in litigation unless it has substantially invoked the judicial process to its opponent's detriment." [9] [**7] There is a strong presumption against waiver. [10] We have also held that "whether a party's conduct waives its arbitration rights under the Federal Arbitration Act is a question of law." [11]

 [**8] Relators' delay in moving to compel arbitration and their opposition to the Hunters' request for a trial setting do not amount to a waiver of arbitration. Neither involved a substantial invocation of the state judicial process. During the delay relators sought no relief from the state court, and their objection to a trial setting reflects an intent to avoid the state judicial process, not invoke it. Moreover, we have held that "[a] party does not waive a right to arbitration merely by delay; instead, the party urging waiver must establish that any delay resulted in prejudice." [12] To show prejudice from delay, the Hunters argue only that they would not have had to appeal the federal court order requiring them to try all their claims in federal court had relators earlier asked for arbitration of the state law claims. But relators did not invoke the federal court issuance of that portion of its order; the federal court issued that part of the order on its own initiative, and it is far from clear that the court would have ruled differently had arbitration already been requested. The Hunters complain that relators defended the federal court's order on appeal, and to some extent they [**9] did, although the Fifth Circuit noted

[6]   *In re Service Corp. Int'l*, No. 09-01-252-CV (Tex. App.--Beaumont, order issued June 29, 2001) (per curiam) (unpublished).

[7]   9 U.S.C. §§ 1-307.

[8]   *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25, 74 L. Ed. 2d 765, 103 S. Ct. 927 (1983).

[9]   *In re Bruce Terminix Co.*, 988 S.W.2d 702, 704, 41 Tex. Sup. J. 941 (Tex. 1998) (per curiam) (citing *Walker v. J.C. Bradford & Co.*, 938 F.2d 575, 577 (5th Cir. 1991)); *accord*, *EZ Pawn Corp. v. Mancias*, 934 S.W.2d 87, 89, 40 Tex. Sup. J. 104 (Tex. 1996) (per curiam) (citing *Miller Brewing Co. v. Fort Worth Distrib. Co.*, 781 F.2d 494, 497 (5th Cir. 1986) ).

[10]   *Bruce Terminix*, 988 S.W.2d at 704 (citing *Moses H. Cone*, 460 U.S. at 24); *EZ Pawn*, 934 S.W.2d at 89 (same); *Prudential Securities, Inc. v. Marshall*, 909 S.W.2d 896, 898, 39 Tex. Sup. J. 116 (Tex. 1995) (per curiam) (same).

[11]   *Bruce Terminix*, 988 S.W.2d at 703-704 (citing *Price v. Drexel Burnham Lambert, Inc.*, 791 F.2d 1156, 1159 (5th Cir. 1986)).

[12]   *Prudential Securities*, 909 S.W.2d at 898-899 (citing *Rush v. Oppenheimer & Co.*, 779 F.2d 885, 887 (2d Cir. 1985) ).

that relators argued that the federal district court "did not intend [the] effect" its language had. In any event, the detriment to the Hunters was caused by the federal court's ruling, not by relators' defense of it.

 **[\*175]** The Hunters' principal argument is that relators have waived arbitration of the state law claims by invoking the federal judicial process -- specifically, by moving to dismiss the complaint, moving for a stay of state court discovery, supporting Hunter's inclusion in the class, and otherwise indicating a willingness to litigate in federal court. We do not agree. *HN3* The filing of a motion to dismiss the claims of class members, almost all of whom are not subject to arbitration, did not waive arbitration. [13] The effect of that motion was to stay discovery in federal court, and federal law authorized a stay of **[\*\*10]** discovery in state court. Relators' efforts in moving to dismiss and staying discovery were to avoid litigation, not participate in it. Including Hunter in the class was the federal court's suggestion in which relators at most acquiesced.

The Hunters would have a stronger position if the federal and state claims were more alike. Regarding the similarity of the state and federal claims, the parties have maintained flexibility. In opposing a trial setting, relators told the state court that the claims are "virtually identical" while the Hunters characterized them as "quite different"; now relators tell us that the claims are "different" while the Hunters embrace relators' earlier view that they are "virtually identical". The truth, as we have noted, is that the federal and state actions are quite similar, arising as they do out of the same merger transaction, yet different in several particular respects. **[\*\*11]** The important thing, however, is that almost all of the class members' claims cannot be arbitrated. Relators should not be forced to arbitrate the Hunters' federal claims alone of all the other class members in order to preserve their right to arbitrate state claims that only the Hunters have asserted.

The Fifth Circuit has held that "a party only invokes the judicial process to the extent it litigates a specific claim it subsequently seeks to arbitrate." [14] We do not read this to suggest that a party has unlimited freedom to decide to arbitrate some interrelated claims and litigate others. On the other hand, the arbitration provision involved here gave parties the right to arbitrate "*any* dispute, controversy or claim" related to the merger agreement. This provision is broad enough to permit relators to litigate the Hunters' federal claims with those other class members while insisting on arbitration of the Hunters' state claims.

 **[\*\*12]** The Hunter Family Trust argues that it is not subject to the arbitration provision. It did not raise this argument in its written response to relators' motion to compel but mentioned it at the hearing on the motion. Although relators asserted in their motion to compel arbitration that the provision extended to the Hunter Family Trust, they now contend that the issue is not before us because it is not clear that the trial court ruled on it. The issue involves arguments that we think should be addressed by the trial court in the first instance, and therefore we express no opinion on the subject. We leave the matter for further consideration by the trial court.

We conclude that as a matter of law relators did not waive their right to arbitrate the Hunters' state law claims, and **[\*176]** that the trial court therefore abused its discretion in denying the relators' motion on this basis. For reasons we have explained in similar contexts, relators have no adequate legal remedy. [15] Accordingly, we grant relators' petition for mandamus and without hearing oral argument [16] direct the trial court promptly to vacate its order of May 7, 2001, denying relators' motion to compel arbitration, and to grant **[\*\*13]** the motion as to James P. Hunter, III. We are confident the trial court will comply, and our writ will issue only if it does not.

---

[13] *See Sweater Bee by Banff, Ltd. v. Manhattan Indus., Inc.*, 754 F.2d 457 (2d Cir. 1985).

[14] *Subway Equip. Leasing Corp. v. Forte*, 169 F.3d 324, 328 (5th Cir. 1999) (citing *Doctor's Assocs. v. Distajo*, 107 F.3d 126, 132-33 (2d Cir.), *cert. denied*, **522 U.S. 948, 139 L. Ed. 2d 284, 118 S. Ct. 365 (1997)** *HN4* ("only prior litigation of the same legal and factual issues as those the party now wants to arbitrate results in waiver of the right to arbitrate")).

[15] *E.g.*, *EZ Pawn, 934 S.W.2d at 90*; *Prudential, 909 S.W.2d at 900*.

[16] TEX. R. APP. P. 59.1.



⚠ Caution

As of: September 1, 2015 2:48 PM EDT

# *In re Universal Underwriters of Tex. Ins. Co.*

Supreme Court of Texas

December 8, 2010, Argued; May 6, 2011, Opinion Delivered

NO. 10-0238

**Reporter**

345 S.W.3d 404; 2011 Tex. LEXIS 357; 54 Tex. Sup. J. 931

IN RE UNIVERSAL UNDERWRITERS OF TEXAS INSURANCE COMPANY, RELATOR

**Subsequent History:** Released for Publication June 17, 2011.

**Prior History:** *In re Universal Underwriters of Tex. Ins. Co., 2010 Tex. App. LEXIS 2077 (Tex. App. Fort Worth, Mar. 23, 2010)*

## Core Terms

appraisal, insurer, parties, impasse, negotiations, waived, invoked, demanding, amount of loss, arbitration, reasonable time, courts, days, clauses, showing of prejudice, circumstances, mandamus, cases, appraisal clause, relinquishment, damages, rights

## Case Summary

### Procedural Posture

A Texas trial court denied appellant insurer's motion to compel an appraisal of appellee insured's property and to abate all other proceedings in the interim. The Texas Court of Appeals denied mandamus relief to the insurer. The insurer petitioned for review.

### Overview

The supreme court noted that while an unreasonable delay was a factor in finding wavier, reasonableness had to be measured from the point of impasse. The insurer invoked appraisal within a reasonable time after the parties reached an impasse. The policy contained no time limit for the appraisal request, and the insurer never denied liability for the loss. At no point did the insured notify the insurer that it refused to discuss the matter further. The supreme court would not infer waiver where neither explicit language nor conduct indicated that such was the party's intent. It was difficult to see how prejudice could ever be shown when the policy gave both sides the opportunity to demand appraisal. Mandamus relief was appropriate to enforce an appraisal clause because denying the appraisal would vitiate the insurer's right to defend its breach of contract claim.

### Outcome

Mandamus was conditionally granted and the trial court was directed to grant the insurer's motion to compel appraisal.

# LexisNexis® Headnotes

Insurance Law > ... > Coverage > Real Property > Appraisals

*HN1* Appraisal clauses, commonly found in homeowners, automobile, and property policies in Texas, provide a means to resolve disputes about the amount of loss for a covered claim. These clauses are generally enforceable, absent illegality or waiver. Appraisals can provide a less expensive, more efficient alternative to litigation, and they should generally go forward without preemptive intervention by the courts. Indeed, appraisals have proceeded for well over a century with little judicial involvement.

Insurance Law > Types of Insurance > Property Insurance > Estoppel & Waiver

*HN2* To constitute waiver the acts relied on must be such as are reasonably calculated to induce the assured to believe that a compliance by him with the terms and requirements of the policy is not desired, or would be of no effect if performed. The acts relied on must amount to a denial of liability, or a refusal to pay the loss. Waiver requires intent, either the intentional relinquishment of a known right or intentional conduct inconsistent with claiming that right.

Insurance Law > Types of Insurance > Property Insurance > Estoppel & Waiver

*HN3* While the time period may be instructive in interpreting the parties' intentions, it alone is not the standard by which courts determine the reasonableness of a delay.

Insurance Law > ... > Coverage > Real Property > Appraisals

Insurance Law > Types of Insurance > Property Insurance > Estoppel & Waiver

*HN4* While an unreasonable delay is a factor in finding waiver, reasonableness must be measured from the point of impasse, as several cases have recognized. That requires an examination of the circumstances and the parties' conduct, not merely a measure of the amount of time involved in seeking appraisal.

Insurance Law > ... > Coverage > Real Property > Appraisals

*HN5* An impasse is not the same as a disagreement about the amount of loss. Ongoing negotiations, even when the parties disagree, do not trigger a party's obligation to demand appraisal. Nor does an insurer's offer of money to cover damages necessarily indicate a refusal to negotiate further, or to recognize additional damages upon reinspection.

Insurance Law > ... > Coverage > Real Property > Appraisals

*HN6* In deciding whether a demand for appraisal was made within a reasonable time, and consequently has not been waived even if suit was filed before the demand was made, courts have considered the timeliness of the demand in light of the circumstances as they existed at the time the demand was made. Pertinent circumstances include (1) the time between the breakdown of good faith negotiations concerning the amount of the loss suffered by the insured and the appraisal demand; and (2) whether there would be any prejudice to the other party resulting from the delay in demanding an appraisal.

Insurance Law > ... > Coverage > Real Property > Appraisals

Insurance Law > Types of Insurance > Property Insurance > Estoppel & Waiver

*HN7* Using the point of ″impasse,″ rather than the first sign of disagreement, corresponds with the Texas Supreme Court's definition of waiver as an intentional relinquishment of a known right or intentional conduct inconsistent with claiming that right. In other words, both parties must be aware that further negotiations would be futile, or would be of no effect if performed. If one party genuinely believes negotiations to be ongoing, it cannot have intended to relinquish its right to appraisal (unless it expressly waives it).

Labor & Employment Law > Collective Bargaining & Labor Relations > Impasse Resolution

*HN8* The definition of impasse as the apparent breakdown of good-faith negotiations is supported in another context as well. Under the National Labor Relations Act, *29 U.S.C.S. § 151*, an employer may implement unilateral changes in employment terms only after good-faith negotiations have been exhausted, and the parties have reached an ″impasse.″ The United States Supreme Court has defined impasse under these circumstances as that point at which the parties have exhausted the prospects of concluding an agreement and further discussions would be fruitless.

Insurance Law > ... > Coverage > Real Property > Appraisals

*HN9* Once the parties have reached an impasse—that is, a mutual understanding that neither will negotiate further—appraisal must be invoked within a reasonable time.

Insurance Law > Types of Insurance > Property Insurance > Estoppel & Waiver

*HN10* If the insured has suffered no prejudice due to delay, it makes little sense to prohibit appraisal when it can provide a more efficient and cost-effective alternative to litigation. Of course, prejudice to a party may arise in any number of ways that demonstrate harm to a party's legal rights or financial position.

Insurance Law > Types of Insurance > Property Insurance > Estoppel & Waiver

*HN11* In the context of waiver of arbitration clauses, which is in some ways similar to waiver of appraisal, the Texas Supreme Court also requires a showing of prejudice. In addition, the supreme court requires an insurer to show prejudice before it can deny coverage based on an insured's failure to comply with a policy's as soon as practicable notice provision.

Insurance Law > ... > Coverage > Real Property > Appraisals

Insurance Law > Types of Insurance > Property Insurance > Estoppel & Waiver

*HN12* In order to establish waiver, therefore, a party must show that an impasse was reached, and that any failure to demand appraisal within a reasonable time prejudiced the opposing party.

Civil Procedure > ... > Writs > Common Law Writs > Mandamus

Insurance Law > ... > Coverage > Real Property > Appraisals

*HN13* Mandamus relief is appropriate to enforce an appraisal clause because denying the appraisal would vitiate the insurer's right to defend its breach of contract claim.

**Counsel:** **[**1]** For Universal Underwriters of Texas Insurance Company, RELATOR: Mr. Don Martinson, Ms. Rebecca Raper.

For Grubbs Infiniti, Ltd., REAL PARTIES: Mr. Scott M. Keller, Mr. Robert Nathan Grisham.

For Insurance Council of Texas and Property Casualty Insurer, AMICUS CURIAE: Mr. Wade Caven Crosnoe.

For Texas Trial Lawyers Association, AMICUS CURIAE: Mr. Peter M. Kelly, Mr. George (Tex) Quesada, Mr. James B. Lewis.

For Texas Apartment Assoc., Inc., Texas Assoc. of School Boards, AMICUS CURIAE: Mr. Brendan K. McBride.

For United Policyholders, AMICUS CURIAE: Mr. William F. Merlin Jr.

For Texas Building Owners and Managers Association, AMICUS CURIAE: Mr. Gardner C. Pate.

For Houston Apartment Association, Inc. ("HAA"), AMICUS CURIAE: Mr. Howard M. Bookstaff.

For Texas Automobile Dealers Association, AMICUS CURIAE: Ms. Karen Phillips.

For Texas Community Association Advocates, AMICUS CURIAE: Ms. Connie Niemann Heyer.

For Universal Underwriters of Texas Insurance Company, Relator: Mr. Don Martinson, Fanning Harper Martinson Brandt & Kutchin, P.C., Dallas TX.

For Universal Underwriters of Texas Insurance Company, Relator: Ms. Rebecca Raper, Fanning Harper Martinson Brandt & Kutchin, P.C., Dallas TX.

For Real [**2] Party in Interest: Mr. Scott M. Keller, The Law Offices of Scott M. Keller, Dallas TX.

For Real Party in Interest: Mr. Robert Nathan Grisham, The Law Offices of Robert N. Grisham II, Dallas TX.

For Amicus Curiae: Mr. Wade Caven Crosnoe, Thompson Coe Cousins & Irons, L.L.P., Austin TX.

For Amicus Curiae: Mr. Peter M. Kelly, Kelly Durham & Pittard LLP, Houston TX.

For Amicus Curiae: Mr. George (Tex) Quesada, Sommerman & Quesada, L.L.P., Dallas TX.

For Amicus Curiae: Mr. Brendan K. McBride, The McBride Law Firm, San Antonio TX.

For United Policyholders, Amicus Curiae: Mr. William F. Merlin Jr., Merlin Law Group, P.A., Houston TX.

For Amicus Curiae: Mr. James B. Lewis, Lewis & Hildebrand PC, Houston TX.

For BOMA, Amicus Curiae: Mr. Gardner C. Pate, Locke Lord Bissell & Liddell LLP, Austin TX.

For Amicus Curiae: Mr. Howard M. Bookstaff, Hoover Slovacek LLP, Houston TX.

For Amicus Curiae: Ms. Karen Phillips, Texas Automibile Dealers Association, Austin TX.

For Amicus Curiae: Ms. Connie Niemann Heyer, Niemann & Niemann, L.L.P., Austin TX.

**Judges:** CHIEF JUSTICE JEFFERSON delivered the opinion of the Court. JUSTICE LEHRMANN did not participate in the decision. Wallace B. Jefferson, Chief Justice

**Opinion by:** Wallace B. Jefferson

## Opinion

[*405] O<small>N</small> [**3] P<small>ETITION</small> F<small>OR</small> W<small>RIT</small> O<small>F</small> M<small>ANDAMUS</small>

Appraisal clauses, a common component of insurance contracts, spell out how parties will resolve disputes concerning a property's value or the amount of a covered loss. When the parties disagree, but neither seeks appraisal until one has filed suit, has the party demanding appraisal waived its right to insist on the contractual procedure? Because we conclude that, absent conduct indicating waiver and a showing of prejudice, it has not, we conditionally grant relief.

### I. Background

Grubbs Infiniti, a car dealership in the Dallas-Fort Worth area, suffered hail damage to buildings on its property. When Grubbs filed a claim with its insurer, [*406] Universal Underwriters, a claims representative inspected the property. Universal subsequently paid Grubbs $4,081.95 for the damage. Grubbs asked Universal to reinspect the property, contending that the claim had not been properly investigated or fully paid. Universal sent an engineer to reinspect the property, after which it issued a $3,000 supplemental payment to cover scuff marks on the roof. In November 2008, Universal explained that

> [i]f you would like to have your roof expert discuss the findings with [the engineer], [**4] please advise and we will put the two parties in touch with one another. We will hold our file open for 15 days pending any further contact from you regarding this matter.
>
> . . . .
>
> . . . Should you disagree with [Universal's] decision as set forth in this letter, please review your policy and govern yourself accordingly being mindful of the policy requirement that legal action contesting [Universal's] decision on this claim must be brought within 24 months and 1 day from the date you discover the loss, but no sooner than 90 days after you file a sworn proof of loss.
>
> Please feel free to contact me . . . if you should have any questions.

Universal also sent Grubbs a copy of the engineer's roof inspection report. Grubbs made no further inquiries or demands for payment.

Four months later, Grubbs sued Universal for underpayment of its claim, alleging breach of contract, breach of the duty of good faith and fair dealing, as well as violations of the Deceptive Trade Practice-Consumer Protection Act, Insurance Code, and Prompt Payment of Claims Act. In response, Universal invoked the policy's appraisal clause, which provides, in pertinent part,

> [i]f YOU or WE can't agree on the value of the property [**5] or the amount of YOUR property LOSS, either of us can demand in writing, an appraisal within 20 days of such demand. Then, each will select a competent and disinterested appraiser who will, in turn, select a competent and disinterested umpire. . . .
>
> The appraisal shall be then made at a reasonable time and place. Each appraiser will state his appraisal of the value or LOSS. If they can't agree, they will submit their differences to the umpire. The value of the property or amount of the LOSS will be determined by a written agreement of any two of them. Such an agreement is binding.

Universal moved to compel an appraisal and to abate all other proceedings in the interim. Grubbs alleged that Universal waived its right to appraisal by not invoking it sooner. When the trial court denied the motion, Universal unsuccessfully sought mandamus relief from the court of appeals. __S.W.3d at__. Universal petitioned this Court, [1] and, after hearing oral argument, we conditionally grant relief.

## II. Waiver of appraisal clauses

*HN1* Appraisal clauses, commonly found in homeowners, automobile, and property [*407] policies in Texas, provide a means to resolve disputes about the amount of loss for a covered claim. *See State Farm Lloyds v. Johnson, 290 S.W.3d 886, 888 (Tex. 2009)*. These clauses are generally enforceable, absent illegality or waiver. *See id*. ("'In the absence of fraud, accident, or mistake, the parties having agreed that the amount of loss shall be determined in a particular way, we are constrained to hold that such stipulation is valid.'" (quoting *Scottish Union & Nat'l Ins. Co. v. Clancy, 71 Tex. 5, 8 S.W. 630, 631 (Tex. 1888)))*. Appraisals can provide a less expensive, more efficient alternative to litigation, and we recently held that they "should generally go forward without preemptive [**7] intervention by the courts." *Id. at 895*.

Indeed, appraisals have proceeded for well over a century with little judicial involvement. *Id. at 889* (noting that only five of our prior decisions involved appraisals). Of our three cases to address waiver of appraisal clauses, only one found that waiver had actually occurred. *See Del. Underwriters v. Brock, 109 Tex. 425, 211 S.W. 779, 780-81 (Tex. 1919)* (waiver due to insurer's selection of biased arbitrator, in violation of the policy); *Am. Cent. Ins. Co. v. Bass, 90 Tex. 380, 38 S.W. 1119, 1119-20 (Tex. 1897)* (same); *Scottish Union, 8 S.W. at 632* (no waiver). In that case, we held that an insurer could not claim as a defense that the insured failed to submit to an appraisal because the insurer did not nominate a "disinterested appraiser" as the policy required. *Brock, 211 S.W. at 780*.

We have explained that

> *HN2* [to] constitute waiver the acts relied on must be such as are reasonably calculated to induce the assured to believe that a compliance by him with the terms and requirements of the policy is not desired, or would be of no effect if performed. The acts relied on must amount to a denial of liability, or a refusal to pay the loss.

*Scottish Union, 8 S.W. at 632*. Or, as [**8] we more recently concluded, "[w]aiver requires intent, either the intentional relinquishment of a known right or intentional conduct inconsistent with claiming that right." *In re Gen. Elec. Capital Corp., 203 S.W.3d 314, 316 (Tex. 2006)* (quotations omitted). [2]

Grubbs asserts that Universal waived its right to invoke appraisal by waiting eight months, from the date that Grubbs asked for [**9] a reinspection of its property to the date that Grubbs sued, before demanding an

---

[1] The Insurance Council of Texas and Property Casualty Insurers Association of America submitted a brief of amici curiae in support of Universal. The Texas Apartment Association, Inc., the Texas Association [**6] of School Boards Legal Assistance Fund, and the Texas Organization of Rural & Community Hospitals, joined by the Houston Apartment Association, the Texas Building Owners and Managers Association, and United Policyholders, submitted a brief of amici curiae in support of Grubbs, as did the Texas Trial Lawyers Association, the Texas Automobile Dealers Association, and the Texas Community Association Advocates.

[2] *See also Dwyer v. Fid. Nat'l Prop. & Cas. Ins. Co.*, 565 F.3d 284, 288 (5th Cir. 2009) ("The district court incorrectly homed in on the interval between the appraisal request and the trial date. The appropriate waiver inquiry examines Fidelity's knowledge and action—when Fidelity knew that the appraisal clause could be invoked, whether it reacted timely to the knowledge."); *Round Rock Indep. Sch. Dist. v. First Nat'l Ins. Co.*, 324 F.2d 280, 284 (5th Cir. 1963) (quoting *Scottish Union*); *Rolison v. Puckett*, 145 Tex. 366, 198 S.W.2d 74, 78 (Tex. 1946) ("A waiver is the intentional relinquishment of a known right,—or, . . . acts as would warrant inference of the relinquishment of such right."); *In re Slavonic Mut. Fire Ins. Ass'n*, 308 S.W.3d 556, 563 (Tex. App.—Houston [14th Dist.] 2010, no pet.) (quoting *Scottish Union*).

appraisal. Grubbs argues that this delay was unreasonable as a matter of law, citing a number of cases in which our courts of appeals found appraisal demands untimely when made as little as thirty-nine days from the date of disagreement. *See, e.g., Int'l Serv. Ins. Co. v. Brodie, 337 S.W.2d 414, 416 (Tex Civ. App.—Fort Worth, 1960, writ ref'd n.r.e.)* (noting that the parties disputed whether it had been thirty-nine or seventy-two days from the date of disagreement); *Boston Ins. Co. v. Kirby, 281 S.W. 275, 276 (Tex. Civ. App.—Eastland 1926, no writ)* (noting that insurer **[*408]** waited fifty-eight days after receiving proof of loss to make demand for appraisal); *Am. Fire Ins. Co. v. Stuart, 38 S.W. 395, 396 (Tex. Civ. App. 1896, no writ)* ("The retention of the proofs of loss by appellant for an unreasonable time without objection would be a waiver of any defect therein."). These decisions, however, were not based solely on the length of delay, but rather on the parties' conduct, as indications of waiver. [3] In *Brodie*, for example, after several attempts to reach a settlement, the insurer wrote to the insured that **[**10]** "[i]t would be superfluous" to further enumerate the claims, and that "there appears to be no item that has or will need a point of compromise." *Brodie, 337 S.W.2d at 416*. The court concluded that "[t]his [wa]s evidence of a failure to agree. The Company could then pay what Mrs. Brodie demanded, do nothing, or demand an appraisal." *Id.* The fact that thirty-nine or seventy-two days had passed during their negotiations was not determinative of the waiver issue. Instead, the expression of the parties' unwillingness to negotiate further indicated that the clause should have been invoked. In other words, *HN3* while the time period may be instructive in interpreting the parties' intentions, it alone is not the standard by which courts determine the reasonableness of a delay. *See Equitable Life Assurance Soc. v. Ellis, 105 Tex. 526, 152 S.W. 625, 629 (Tex. 1913)* ("A waiver may be created by acts, conduct, or declarations." (quotations omitted)); *Scottish Union, 8 S.W. at 632* (describing the kind of "acts relied on" that constitute waiver).

### A. Delay must be measured from the point of impasse.

Thus, *HN4* while an unreasonable delay is a factor in finding waiver, reasonableness must be measured from the point of impasse, as several cases have recognized. *See In re Slavonic Mut. Fire Ins. Ass'n, 308 S.W.3d 556, 562 (Tex. App.—Houston [14th Dist.] 2010, no pet.)* (holding that "the date of disagreement, or impasse, is the point of reference to determine whether a demand for an appraisal is made within a reasonable time"); *see also Sanchez v. Prop. & Cas., Ins. Co. of Hartford, No. H-09-1736, 2010 U.S. Dist. LEXIS 6295, *13-14 (S.D. Tex. Jan. 27, 2010)* ("The proper point of reference for determining whether an insurer waived the right **[**12]** to invoke appraisal by delay is the point at which the insurer knew the appraisal clause could be invoked because of a disagreement over the amount of damages, that is, the point of impasse with the insured."). That requires an examination of the circumstances and the parties' conduct, not merely a measure of the amount of time involved in seeking appraisal.

*HN5* An impasse is not the same as a disagreement about the amount of loss. Ongoing negotiations, even when the parties disagree, do not trigger a party's obligation to demand appraisal. Nor does an insurer's offer of money to cover damages necessarily indicate a refusal to negotiate further, or to recognize additional damages upon reinspection. *See Scottish Union, 8 S.W. at 632*.

 **[*409]** Texas state and federal courts have cited a federal district court case from Iowa, *Terra Industries, Inc. v. Commonwealth Insurance Co. of America, 981 F. Supp. 581 (N.D. Iowa 1997)*, for its analysis of the point of "impasse" in insurance negotiations. *See Tran v. Am. Econ. Ins. Co.*, No. H-10-0016, *2010 U.S. Dist. LEXIS 66283, at *6-7 (S.D. Tex. July 2, 2010)*; *Sanchez, 2010 U.S. Dist. LEXIS 6295, at *11*; *Laas v. State Farm Mut.*

---

3  In *Boston Insurance Company v. Kirby*, 281 S.W. 275, 276 (Tex. Civ. 3 App.—Eastland 1926, no writ), the court did not describe what acts may have constituted waiver, but held **[**11]** that "[t]here [wa]s sufficient evidence in the record to support the finding" of the jury that the delay had been "unreasonable." Without further elaboration from the Court, we presume that the evidence presented to the jury included some evidence of the parties' conduct beyond the mere stipulation that fifty-eight or fifty-nine days had passed from the date that the insurer received proof of loss. To the extent the case may have been decided on the length of delay alone, we disapprove of that holding.

*Auto. Ins. Co., No. 14-98-00488-CV, 2000 Tex. App. LEXIS 5332, at \*16-18 (Tex. App.—Houston [14th Dist.] Aug. 10, 2000, no pet.)* **[**13]** (not designated for publication). The *Terra* court looked to other jurisdictions for insight in determining at what point an insurer has waived its appraisal right and formulated the following factors:

> *HN6* In deciding whether a demand for appraisal was made within a reasonable time, and consequently has not been waived even if suit was filed before the demand was made, courts have considered the timeliness of the demand in light of the circumstances as they existed at the time the demand was made. Pertinent circumstances include (1) the time between the breakdown of good faith negotiations concerning the amount of the loss suffered by the insured and the appraisal demand; and (2) whether there would be any prejudice to the other party resulting from the delay in demanding an appraisal.

*Id. at 602* (citation omitted). In *Terra*, despite two and a half years of negotiations, "and evident dispute," *id. at 601*, the court found that the insurer "had no notice that an impasse had been reached, because only the filing of [the insured]'s suit demonstrated [the insured]'s unilateral conclusion that the parties were at an impasse." *Id. at 603*.

Other courts have relied on *Terra* to measure the point of **[**14]** impasse at which parties are to invoke appraisal clauses. *See, e.g., Lyon v. Am. Family Mut. Ins. Co., 617 F. Supp. 2d 754, 760 (N.D. Ill. 2009)*; *Rebel Tractor Parts, Inc. v. Auto-Owners Ins. Co., No. CV206-102, 2006 U.S. Dist. LEXIS 86502, at \*8 (S.D. Ga. Nov. 28, 2006)*; *SR Int'l Bus. Ins. Co., Ltd. v. World Trade Ctr. Props. LLC, No. 01 Civ. 9291, 2003 U.S. Dist. LEXIS 3881, at \*4 (S.D.N.Y. Mar. 18, 2003)*. *HN7* Using the point of "impasse," rather than the first sign of disagreement, corresponds with our definition of waiver as an "intentional relinquishment of a known right or intentional conduct inconsistent with claiming that right." *In re GE Capital, 203 S.W.3d at 316* (quotation omitted). In other words, both parties must be aware that further negotiations would be futile, "or would be of no effect if performed." *Scottish Union, 8 S.W. at 632*. If one party genuinely believes negotiations to be ongoing, it cannot have intended to relinquish its right to appraisal (unless it expressly waives it). *See Keesling v. W. Fire Ins. Co., 10 Wn. App. 841, 520 P.2d 622, 627 (Wash. Ct. App. 1974)* (finding no waiver where, "insofar as the record shows, until the insured filed suit, the frame of mind of both parties **[**15]** welcomed additional communications and negotiations rather than confrontation").

*HN8* The definition of impasse as the apparent breakdown of good-faith negotiations is supported in another context as well, which we find persuasive in our analysis. Under the National Labor Relations Act, *29 U.S.C. § 151*, an employer may implement unilateral changes in employment terms only after good-faith negotiations have been exhausted, and the parties have reached an "impasse." *Beverly Farm Found. v. NLRB, 144 F.3d 1048, 1052 (7th Cir. 1998)*; *Taft Broadcasting Co., 163 N.L.R.B. 475, 478 (1967)*. The United **[\*410]** States Supreme Court has defined impasse under these circumstances as "that point at which the parties have exhausted the prospects of concluding an agreement and further discussions would be fruitless." *Laborers Health & Welfare Trust Fund v. Advanced Lightweight Concrete Co., 484 U.S. 539, 544, 108 S. Ct. 830, 98 L. Ed. 2d 936 (1988)*; *see also Beverly Farm Found., 144 F.3d at 1052* ("The touch-stone for determining whether a genuine 'impasse' or 'deadlock' existed . . . is the absence of any realistic possibility that continuation of the negotiations would have been fruitful.").

Universal invoked appraisal within a reasonable time after **[**16]** the parties reached an impasse. The policy contained no time limit for the appraisal request, and Universal never denied liability for the loss. At no point did Grubbs notify Universal that it refused to discuss the matter further, despite Universal's statement that it would leave its file open for further discussions should Grubbs care to do so. Whether Universal was aware of Grubbs' disagreement as to the estimate of damages is also irrelevant, since mere disagreement does not in itself signal an unwillingness to negotiate further. *See NLRB v. Cent. Plumbing Co., 492 F.2d 1252, 1254 (6th Cir.*

*1974)* ("[M]ere rejection of a bargaining proposal does not create an impasse."); *Lyon, 617 F.Supp. 2d at 759 n.8* ("[T]he relevant event is not the existence of a difference of views as to the loss amount, but rather the parties' inability to resolve that difference despite their attempts to do so."). **HN9** Once the parties have reached an impasse—that is, a mutual understanding that neither will negotiate further—appraisal must be invoked within a reasonable time. Here Universal sought appraisal approximately one month after Grubbs sued. We conclude that Universal demanded appraisal within a reasonable **[**17]** time after the parties reached an impasse.

Grubbs contends that, because Universal's correspondence included a provision alerting the insured of the statute of limitations on bringing suit, Universal effectively acknowledged that the parties were at an impasse ("... being mindful of the policy requirement that legal action contesting Universal Underwriter's decision on this claim must be brought within 24 months and 1 day from the date you discover the loss ... ."). Universal counters that its letters included no statements regarding waiver of appraisal, or any suggestion that it was not open to further negotiation. To the contrary, it "specifically reserve[d] its rights under both the laws of the State of Texas and the terms of the subject policy of insurance." Moreover, Universal stated that it would leave the file open should Grubbs want to pursue further discussions. We will not infer waiver where neither explicit language nor conduct indicates that such was the party's intent.

*Scottish Union* is again instructive. In that case, the insurer conducted an inspection in response to the insured's claim and offered its calculation of damages. *8 S.W. at 630*. When the parties disagreed **[**18]** on their estimates, the insurer offered an amount in settlement. *Id*. The insured declined the offer, then brought suit. *Id*. When the insurer demanded appraisal, the insured argued that the insurer had waived its right to do so. *Id. at 631*. We held that the insurer's attempt at reaching a settlement did not constitute a refusal to pay the loss: "It does not appear that [the insurer] at any time denied its liability or refused to pay whatever amount of loss and damage might be determined in the manner required by the policy to be due." *Id. at 632*. As such, it had not waived its **[*411]** appraisal right. The same reasoning applies here.

## B. Delay alone is not enough; a party must also show prejudice.

Even if Universal had waited to request appraisal, mere delay is not enough to find waiver; a party must show that it has been prejudiced. *See* 15 Lee R. Russ & Thomas F. Segalla, Couch On Insurance § 210:77 (3d ed. 1999) ("In addition, a waiver will not be declared where there has been no showing of prejudice to the other party by a delay in demanding an appraisal."); *Terra, 981 F. Supp. at 602* (requiring courts to examine "whether there would be any prejudice to the other party resulting from the delay **[**19]** in demanding an appraisal"). **HN10** If the insured has suffered no prejudice due to delay, it makes little sense to prohibit appraisal when it can provide a more efficient and cost-effective alternative to litigation. Of course, prejudice to a party may arise in any number of ways that demonstrate harm to a party's legal rights or financial position. *See, e.g., Perry Homes v. Cull, 258 S.W.3d 580, 597 (Tex. 2008)* (defining prejudice for purposes of waiver of arbitration as "the inherent unfairness in terms of delay, expense, or damage to a party's legal position" (quoting *Republic Ins. Co. v. PAICO Receivables, LLC, 383 F.3d 341, 346 (5th Cir. 2004)))*; *see also In re Tyco Int'l Ltd. Sec. Litig., 422 F.3d 41, 47 n.5 (1st Cir. 2005)* ("[A] party should not be allowed purposefully and unjustifiably to manipulate the exercise of its arbitral rights simply to gain an unfair tactical advantage over the opposing party." (*quoted in Perry Homes, 258 S.W.3d at 597*)); *Menorah Ins. Co., Ltd. v. INX Reinsurance Corp., 72 F.3d 218, 222 (1st Cir. 1995)* (finding prejudice where party "incurred expenses as a direct result of [opponent's] dilatory behavior").

We have, in other instances, required a showing of **[**20]** prejudice to establish waiver. *See, e.g., In re ADM Investor Servs., 304 S.W.3d 371, 374 (Tex. 2010)* ("A party waives a forum-selection clause by substantially invoking the judicial process to the other party's detriment or prejudice."); *In re Fleetwood Homes of Tex., L.P., 257 S.W.3d 692, 694 (Tex. 2008)* (per curiam) ("'[A] party waives an arbitration clause by substantially invoking

the judicial process to the other party's detriment or prejudice.'" (alteration in original) (quoting *Perry Homes, 258 S.W.3d at 589-90*)); *In re Automated Collection Techs., 156 S.W.3d 557, 559 (Tex. 2004)* (per curiam) ("'[E]ven substantially invoking the judicial process does not waive a party's arbitration rights unless the opposing party proves that it suffered prejudice as a result.'" (quoting *In re Bruce Terminix Co., 988 S.W.2d 702, 704 (Tex. 1998)))*.

*HN11* In the context of waiver of arbitration clauses, which is in some ways similar to waiver of appraisal, we also require a showing of prejudice. *See Prudential Sec. v. Marshall, 909 S.W.2d 896, 898-899 (Tex. 1995)* ("A party does not waive a right to arbitration merely by delay; instead, the party urging waiver must establish that any delay resulted in **[**21]** prejudice."). In addition, we require an insurer to show prejudice before it can deny coverage based on an insured's failure to comply with a policy's "as soon as practicable" notice provision. *See Prodigy Commc'ns Corp. v. Agric. Excess & Surplus Ins. Co., 288 S.W.3d 374, 382 (Tex. 2009)* (noting that, because the insurer "admitted that it was not prejudiced by the delay in receiving notice, it could not deny coverage based on [the insured's] alleged failure to provide notice 'as soon as practicable'").

Other jurisdictions have recognized that there can be no appraisal waiver absent a showing of prejudice to the other party. *See, e.g., Kester v. State Farm Fire & Cas. Co., 726 F. Supp. 1015, 1019-20* **[*412]** *(E.D. Pa. 1989)*; *Meineke v. Twin City Fire Ins. Co., 181 Ariz. 576, 892 P.2d 1365, 1371 (Ariz. Ct. App. 1994)* ("Among the circumstances courts consider are the timing between the breakdown of good faith negotiations concerning the amount of the loss suffered by the insured and the appraisal demand, and whether any prejudice to the other party resulted from the delay in demanding an appraisal."); *Sch. Dist. v. Globe & Republic Ins. Co., 146 Mont. 208, 404 P.2d 889, 893 (Mont. 1965)* ("Whether a demand for appraisal has **[**22]** been made within a reasonable time depends upon the circumstances of each case. An examination of the cases involving this issue reveals that principally, two factors have been decisive: prejudice resulting from the delay, and the breakdown of good-faith negotiations concerning the amount of loss." (citations omitted)). Because the prejudice requirement aligns with our own analysis of waiver in arbitration and other insurance contexts, we find it useful here as well. *HN12* In order to establish waiver, therefore, a party must show that an impasse was reached, and that any failure to demand appraisal within a reasonable time prejudiced the opposing party.

Grubbs has not attempted to show prejudice here. Instead, Grubbs contends that requiring prejudice would be "new law," and because no Texas cases have required such a showing, we should not impose such a requirement. But waiver is an equitable doctrine, [4] and we have frequently required a showing of prejudice before concluding that rights are waived. *See, e.g., In re E.I. du Pont de Nemours & Co., 92 S.W.3d 517, 524 (Tex. 2002)* (holding that delay did not waive defendant's right to dismissal, as plaintiffs "failed to show how the delay . **[**23]** . . prejudiced them in any way"); *EZ Pawn Corp. v. Mancias, 934 S.W.2d 87, 89 (Tex. 1996)* (per curiam) (noting that party waives right to arbitration only if party seeking to enforce agreement substantially invoked the judicial process to the other party's detriment). Our failure to explicitly require prejudice is more a function of the paucity of cases in which we have addressed waiver of appraisal than its inapplicability to the doctrine.

Moreover, it is difficult to see how prejudice could ever be shown when the policy, like the one here, gives both sides the same opportunity to demand appraisal. If a party senses that impasse has been reached, it can avoid prejudice by demanding an appraisal itself. This could short-circuit potential litigation and should be pursued before resorting to the courts.

### III. Propriety of mandamus relief

We have held that*HN13* mandamus relief is appropriate to enforce an appraisal clause because denying the appraisal would vitiate the insurer's right to defend its breach of contract claim. *In re Allstate Cnty. Mut. Ins.*

---

[4]   *See Pacheco v. Rice*, 966 F.2d 904, 906 (5th Cir. 1992); *Baker v. Fort Worth Mut. Benevolent Ass'n*, 115 Tex. 300, 280 S.W. 165, 169 (Tex. 1926).

*Co., 85 S.W.3d 193, 196 (Tex. 2002)*. **[**24]** There, as here, "the parties . . . agreed in the contracts' appraisal clause to the method by which to determine whether a breach has occurred," and, if the appraisal determined that the full value was what the insurer offered, there would be no breach of contract. *Id*. The same is true here. We conditionally grant the writ of mandamus and direct the trial court to grant Universal's motion to compel appraisal. [5] *See id*. (holding that refusal to order appraisal would "den[y] the **[*413]** development of proof going to the heart of a party's case and cannot be remedied by appeal"). We are confident the trial court will comply, and our writ will issue only if it does not.

Wallace B. Jefferson

Chief Justice

Opinion Delivered: May 6, 2011

---

[5] The trial court's failure to grant the motion to abate is not subject to mandamus, and the proceedings need not be abated while the appraisal goes forward. *See In re Allstate Cnty. Mut. Ins. Co., 85 S.W.3d 193, 196 (Tex. 2002)*.



⚠ Caution

As of: September 1, 2015 5:14 PM EDT

# *In re Vesta Ins. Group, Inc.*

Supreme Court of Texas

March 17, 2006, Delivered

NO. 04-0141, NO. 04-0156, NO. 04-0157, NO. 04-0165, NO. 04-0179

**Reporter**

192 S.W.3d 759; 2006 Tex. LEXIS 220; 49 Tex. Sup. J. 445

IN RE VESTA INSURANCE GROUP, INC., ET AL. consolidated with IN RE JAMES E. TAIT consolidated with IN RE JIMMY K. WALKER consolidated with IN RE WILLIAM PERRY CRONIN consolidated with IN RE NATIONAL BENEFIT ADVISORY ASSOCIATION, ET AL.

**Subsequent History:** Related proceeding at *Vesta Fire Ins. Corp. v. Emplrs Reinsurance Corp., 2006 U.S. Dist. LEXIS 38122 (N.D. Tex., May 31, 2006)*
Rehearing denied by *In re Vesta Ins. Group, 2006 Tex. LEXIS 602 (Tex., June 30, 2006)*

**Prior History:** *In re Vesta Ins. Group, 2004 Tex. App. LEXIS 1159 (Tex. App. Fort Worth, Feb. 2, 2004)*

## Core Terms

arbitration, signatory, affiliates, tortious interference, parties, arbitration clause, trial court, discovery, disputes, relators

## Case Summary

### Procedural Posture

Relators, owners and officers of an insurance company and others, sought review of a judgment from the Second Court of Appeals (Texas), which, in a tortious interference with contract suit brought by real party in interest, an insurance agent, denied mandamus relief from the trial court's refusal to compel arbitration under the Federal Arbitration Act, *9 U.S.C.S. § 1 et seq.*

### Overview

The insurance company acquired a company that had been doing business with the agent. Thereafter, the agent's contract with the acquired company, which contained an arbitration clause, was terminated. The agent brought suit, alleging tortious interference with his contracts with the acquired company and with his own sub-agents. The parties who sought to compel arbitration were all nonsignatories to the contract, but they were all current or former owners, officers, agents, or affiliates of the acquired company. The court noted that Texas law, consistent with federal law of direct-benefits estoppel, required a nonparty to arbitrate a claim if it sought, through the claim, to derive a direct benefit from the contract containing the arbitration provision. The court concluded that tortious interference claims between a signatory to an arbitration agreement and agents or affiliates of the other signatory arose more from the contract than general law; hence, arbitration could be

compelled. Although litigation had been ongoing for two years, the right to arbitration was not waived because the agent did not demonstrate sufficient prejudice to overcome the strong presumption against waiver.

**Outcome**

The court conditionally granted the writ of mandamus and directed the trial court to order that the claims proceed to arbitration.

# LexisNexis® Headnotes

Civil Procedure > ... > Arbitration > Federal Arbitration Act > Orders to Compel Arbitration

Civil Procedure > ... > Writs > Common Law Writs > Mandamus

*HN1* Mandamus relief is proper to enforce arbitration agreements governed by the Federal Arbitration Act, *9 U.S.C.S. § 1 et seq.*

Civil Procedure > ... > Arbitration > Federal Arbitration Act > Scope

Torts > ... > Commercial Interference > Contracts > General Overview

*HN2* Texas law, consistent with federal law of direct-benefits estoppel, requires a nonparty to arbitrate a claim if it seeks, through the claim, to derive a direct benefit from the contract containing the arbitration provision. While the boundaries of direct-benefits estoppel are not always clear, nonparties generally must arbitrate claims if liability arises from a contract with an arbitration clause, but not if liability arises from general obligations imposed by law. Tortious interference claims do not fall comfortably in either category. The obligation not to interfere with existing contracts is a general obligation imposed by law. But it is not imposed on the parties to that contract, as a party cannot tortiously interfere with its own contract. Nor is it imposed on corporate agents, except for actions completely contrary to corporate interests. In other words, a person must be a stranger to a contract to tortiously interfere with it. Thus, while liability for tortious interference arises from the general law, nonliability arises from connections with the contract.

Civil Procedure > ... > Arbitration > Federal Arbitration Act > Scope

Torts > ... > Commercial Interference > Contracts > General Overview

*HN3* Tortious interference claims between a signatory to an arbitration agreement and agents or affiliates of the other signatory arise more from the contract than general law, and thus fall on the arbitration side of the scale.

Civil Procedure > ... > Arbitration > Federal Arbitration Act > Arbitration Agreements

*HN4* The Federal Arbitration Act, *9 U.S.C.S. § 1 et seq.*, directs courts to place arbitration agreements on equal footing with other contracts. Accordingly, courts must avoid any rule that makes it easier to avoid arbitration clauses than other clauses of a contract.

Contracts Law > Contract Conditions & Provisions > Arbitration Clauses

*HN5* Courts interpreting arbitration clauses look first to whether the parties agreed to arbitrate a dispute.

Civil Procedure > ... > Arbitration > Federal Arbitration Act > Scope

*HN6* Courts must remain mindful of the importance of keeping federal and state law uniform so that arbitrability does not depend on where one seeks to compel it.

Civil Procedure > ... > Arbitration > Federal Arbitration Act > Orders to Compel Arbitration

*HN7* There is a strong presumption against waiver under the Federal Arbitration Act, *9 U.S.C.S. § 1 et seq.* Merely taking part in litigation is not enough unless a party has substantially invoked the judicial process to its opponent's detriment. Delay alone generally does not establish waiver.

## Opinion

[*760] ON PETITION FOR WRIT OF MANDAMUS

**PER CURIAM**

An insurance company and an independent agent agreed to arbitrate rather than litigate any dispute "under or with respect to" their contract. But when the contract was terminated, the agent neither litigated nor arbitrated his dispute with the company; instead, he filed a tortious interference with contract suit against the insurer's parent company, the agent who took his place, and two officers or affiliates of each. The trial court refused to compel arbitration under the Federal Arbitration Act, [1] and the Second Court of Appeals denied mandamus relief. We conditionally grant it. *See In re Weekley, 180 S.W.3d 127, 130, 49 Tex. Sup. Ct. J. 55 (Tex. 2005) HN1* ("Mandamus relief is proper to [*761] enforce arbitration agreements governed by the FAA.").

James Cashion and [**2] States General Insurance Company signed a contract on September 28, 1999, in which Cashion agreed to sell health insurance policies as a general agent for States General. The contract provided that States General could modify or cancel Cashion's commissions on 60 days' notice, and either party could terminate the relationship on 180 days' written notice. The contract also required arbitration of "any dispute between them under or with respect to this contract." [2] States General and Cashion were the only parties to the contract.

[**3] In November 2000, States General gave notice of its intent to reduce Cashion's commissions. In December 2000, Vesta Insurance Group and Vesta Fire Insurance Corporation (collectively "Vesta") purchased 100 percent of the stock of States General. A month later, States General terminated Cashion and replaced him with Jimmy Walker.

On March 1, 2001, Cashion filed suit against Vesta and two of its corporate officers, James Tait and William Perry Cronin, [3] and against Walker and two of his affiliates. [4] Generally, the suit alleged tortious interference with Cashion's contracts with States General and with his own sub-agents. States General (now a Vesta affiliate) intervened, but later settled with Cashion and is no longer a party. Accordingly, the only remaining party who was a signatory of the arbitration agreement is Cashion; the relators who seek to compel arbitration are all nonsignatories.

---

[1] *9 U.S.C. § 1 et. seq.* The parties stipulated that the arbitration clause here is governed by the FAA.

[2] The provision stated:

> ARBITRATION. The parties intend that any dispute between them under or with respect to this contract shall be resolved without resort to any litigation. . . . States and Cashion agree that they will submit such dispute to arbitration in the manner specified in, and such arbitration proceeding will be conducted in accordance with the rules of the American Arbitration Association. . . . This shall be the sole and exclusive method of resolving such disputes.

[3] Tait was Vesta's former chief executive officer, and Cronin was Vesta's former chief financial officer.

[4] National Benefit Advisory Association, a company Walker owned, and Robert Merill, his business partner.

 [**4] We recently held that *HN2* Texas law, consistent with federal law of direct-benefits estoppel, requires a nonparty to arbitrate a claim "if it seeks, through the claim, to derive a direct benefit from the contract containing the arbitration provision." *In re Kellogg Brown & Root, Inc., 166 S.W.3d 732, 741, 48 Tex. Sup. Ct. J. 678 (Tex. 2005)*; *see also Weekley, 180 S.W.3d at 131*. While the boundaries of direct-benefits estoppel are not always clear, nonparties generally must arbitrate claims if liability arises from a contract with an arbitration clause, but not if liability arises from general obligations imposed by law. *Weekley, 180 S.W.3d at 132, 134*.

Tortious interference claims do not fall comfortably in either category. The obligation not to interfere with existing contracts is a general obligation imposed by law. But it is *not* imposed on the parties to that contract, as "a party cannot tortiously interfere with its own contract." *Holloway v. Skinner, 898 S.W.2d 793, 796, 38 Tex. Sup. Ct. J. 582 (Tex. 1995)*. Nor is it imposed on corporate agents, except for actions completely contrary to corporate interests. *Id.* In other words, "a person must be a stranger [**5] to a contract to tortiously interfere with it." *Morgan Stanley & Co., Inc. v. Texas Oil Co., 958 S.W.2d 178, 179, 40 Tex. Sup. Ct. J. 692 (Tex. 1997)*. Thus, while liability for tortious interference arises from the general law, *nonliability* [*762] arises from connections with the contract.

For several reasons, we hold that *HN3* tortious interference claims between a signatory to an arbitration agreement and agents or affiliates of the other signatory arise more from the contract than general law, and thus fall on the arbitration side of the scale.

First, corporations must act through human agents. *Holloway, 898 S.W.2d at 795*. As a result, every contract claim against a corporation could be recast as a tortious interference claim against its agents. *See id.* While legal rules might render such claims unprofitable in the long run, in the short run they could be used to forestall arbitration. *HN4* "The FAA directs courts to place arbitration agreements on equal footing with other contracts." *E.E.O.C. v. Waffle House, Inc., 534 U.S. 279, 293, 122 S. Ct. 754, 151 L. Ed. 2d 755 (2002)*. Accordingly, we must avoid any rule that makes it easier to avoid arbitration clauses than other clauses [**6] of a contract. *See J.M. Davidson, Inc. v. Webster, 128 S.W.3d 223, 230 n.2, 47 Tex. Sup. Ct. J. 196 (Tex. 2003)* (noting most courts have found illusory any contract allowing one party to unilaterally avoid arbitration).

Second, requiring arbitration of such claims complies with the rule that *HN5* "we look first to whether the parties agreed to arbitrate a dispute." *Waffle House, 534 U.S. at 294*. When contracting parties agree to arbitrate all disputes "under or with respect to" a contract (as they did here), they generally intend to include disputes about their agents' actions because "as a general rule, the actions of a corporate agent on behalf of the corporation are deemed the corporation's acts." *Holloway, 898 S.W.2d at 795*. If arbitration clauses only apply to contractual signatories, then this intent can only be accomplished by having every officer and agent (and every affiliate and its officers and agents) either sign the contract or be listed as a third-party beneficiary. This would not place such clauses on an equal footing with all other parts of a corporate contract.

Finally, many Texas courts of appeals have held that a tortious interference claim [**7] against a signatory's employees or affiliates must be arbitrated, even though the latter are nonsignatories. [5] [**8] Several federal

---

[5] *See, e.g., In re Media Arts Group, Inc.*, 116 S.W.3d 900, 905 n.4, 908 (Tex. App.-Houston [14th Dist.] 2003, orig. proceeding [mand. denied]) (compelling arbitration of suit alleging tortious interference and other claims brought by one signatory against employees and affiliates of the other); *Williams Indus., Inc. v. Earth Dev. Sys. Corp.*, 110 S.W.3d 131, 137-38 (Tex. App.-Houston [1st Dist.] 2003, no pet.) (same in suit by one signatory against employees and subcontractors of the other); *In re EGL Eagle Global Logistics, L.P.*, 89 S.W.3d 761, 765-66 (Tex. App.-Houston [1st Dist.] 2002, orig. proceeding [mand. denied]) (same in suit by one signatory against subsequent employer of signatory employee, and its employees); *McMillan v. Computer Translation Sys. & Support, Inc.*, 66 S.W.3d 477, 482-83 (Tex. App - Dallas 2001, no pet.) (same in suit by one signatory against chairman and corporate counsel of the other); *In re Pennzoil Co.*, 30 S.W.3d 494, 499 (Tex. App.-San Antonio 2000, orig. proceeding) (same in suit by one signatory against corporation hired by other signatory as replacement); *Valero Energy Corp. v. Teco Pipeline Co.*, 2 S.W.3d 576, 593 (Tex. App - Houston [14th Dist.]

**[*763]** courts have agreed. [6] *HN6* We remain mindful of the importance of keeping federal and state law uniform so that arbitrability does not depend on where one seeks to compel it. *Kellogg, 166 S.W.3d at 739*.

We agree with Cashion that he would not be required to arbitrate a tortious interference claim **[**9]** against a complete stranger to his contract and its arbitration clause. But he did not sue any strangers here; every defendant is a current or former owner, officer, agent, or affiliate of States General, with whom he agreed to arbitrate these disputes.

Cashion also asserts that several of the relators waived any right to arbitration by litigating for two years in the trial court. *HN7* There is a strong presumption against waiver under the FAA. *See In re Serv. Corp. Int'l, 85 S.W.3d 171, 174, 45 Tex. Sup. Ct. J. 1241 (Tex. 2002)*. Merely taking part in litigation is not enough unless a party "has substantially invoked the judicial process to its opponent's detriment." *Id.* (internal citations omitted). Delay alone generally does not establish waiver. *Id.*

According to the affidavit of one of his attorneys, Cashion incurred more than $ 200,000 in expenses and fees due to "prolonged and extensive discovery" that "would not have been allowed or occurred in an arbitration." The record shows that Cashion's pre-trial costs were largely self-inflicted -- he sent far more discovery requests than he received, and amended his petition at least eleven times. The relators did not "shower" him with interrogatories **[**10]** and discovery requests, *see Keytrade USA, Inc. v. Ain Temouchent M/V, 404 F.3d 891, 898 (5th Cir. 2005)*; other than standard requests for disclosure (all requiring the same responsive information, *see TEX. R. CIV. P. 194.2*), they noticed a total of four depositions, and the Vesta defendants each sent a request for production. Because Cashion offered none of these documents in the trial court and presented no details about any of them, the record does not show whether these requests were limited or extensive, whether they sought information for affirmative claims or defensive ones, or even whether they addressed the merits or merely the arbitration issue. Further, Cashion does not allege that the discovery already conducted would not be useful in arbitration; to the contrary, he concedes it would be useful whether the case is arbitrated or tried. *See In re Bruce Terminix Co., 988 S.W.2d 702, 704, 41 Tex. Sup. Ct. J. 941 (Tex. 1998)* (noting that even substantial invocation of judicial process does not constitute waiver absent proof of prejudice). On this record, Cashion has not demonstrated sufficient prejudice to overcome the strong presumption against **[**11]** waiver.

**[*764]** Cashion's attorney also averred that Vesta and Cronin successfully moved to dismiss his commercial bribery claims against them, and that Walker unsuccessfully moved for summary judgment. But the former motions sought dismissal for lack of standing rather than on the merits, and the record reveals nothing about the latter as it was never tendered into the record or described in any particulars. Without more details than this, Cashion has not shown that the relators substantially invoked the judicial process enough to overcome the strong presumption against waiver.

---

1999, no pet.) (same in suit by one signatory against corporate affiliate of the other, as well as the affiliate's officers and directors); *Carlin v. 3V, Inc., 928 S.W.2d 291, 297 (Tex. App-Houston [14th Dist.] 1996, no writ)* (same in suit by one signatory against sister corporation of the other); *Valero Energy Corp. v. Wagner & Brown, II, 777 S.W.2d 564, 565 (Tex. App.-El Paso 1989, writ denied)* (same in suit by one signatory against other signatory and affiliates); *Lette v. Brooke Corp., 2004 Tex. App. LEXIS 7205, No. 13-02-00527-CV, 2004 WL 1797578, at *5-6 (Tex. App.--Corpus Christi, Aug. 12, 2004, pet. denied)* (not designated for publication) (same in suit by one signatory against corporate affiliates of signatory buyer). *But see Fridl v. Cook, 908 S.W.2d 507, 513 (Tex. App.-El Paso 1995, writ dism'd w.o.j.)* (refusing to compel arbitration of suit alleging tortious interference brought by one signatory against sole shareholder and alleged alter ego of the other because of independent fraud claim).

6 *See, e.g., Grigson v. Creative Artists Agency, 210 F.3d 524, 527-28 (5th Cir. 2000)* (compelling arbitration of suit alleging tortious interference and other claims brought by one signatory against third parties); *Smith/Enron Cogeneration Ltd. P'ship, Inc. v. Smith Cogeneration Intern., Inc., 198 F.3d 88, 97-99 (2d Cir. 1999)* (same in suit by one signatory against corporate affiliates of the other); *Sunkist Soft-Drinks, Inc. v. Sunkist Growers, Inc., 10 F.3d 753, 757-758 (11th Cir. 1993)* (same in suit by one signatory against corporate affiliates of the other); *J.J. Ryan & Sons, Inc. v. Rhone Poulenc Textile, S.A., 863 F.2d 315, 320-321 (4th Cir. 1988)* (same in suit by one signatory against corporate affiliates of the other); *Hughes Masonry Co., Inc. v. Greater Clark County Sch. Bldg. Corp., 659 F.2d 836, 839, 841, n. 9 (7th Cir. 1981)* (same in suit by one signatory against construction manager hired by the other).

We agree that allowing a party to conduct full discovery, file motions going to the merits, and seek arbitration only on the eve of trial defeats the FAA's goal of resolving disputes without the delay and expense of litigation. *See Com-Tech Assoc. v. Computer Assoc. Int'l, Inc., 938 F.2d 1574, 1576-77 (2nd Cir. 1991)*. We disagree that the record here shows that the relators did so, at least not to the degree necessary to overcome the presumption against waiver.

Accordingly, without hearing oral argument, *see TEX. R. APP. P. 52.8(c)*, we conditionally grant the writ of mandamus **[**12]** and direct the trial court to order that Cashion's claims proceed to arbitration. We are confident that the trial court will promptly comply, and our writ will issue only if it does not.

**OPINION DELIVERED:** March 17, 2006.



⚠ Caution

As of: September 1, 2015 2:32 PM EDT

# *In re Weekley Homes, L.P.*

Supreme Court of Texas

November 30, 2004, Argued ; October 28, 2005, Opinion Delivered

No. 04-0119

**Reporter**

180 S.W.3d 127; 2005 Tex. LEXIS 989; 49 Tex. Sup. J. 55

IN RE WEEKLEY HOMES, L.P.

**Prior History:** *In re Weekley Homes, L.P., 176 S.W.3d 740, 2005 Tex. LEXIS 817 (Tex., 2005)*

## Core Terms

arbitration, nonparty, arbitration clause, estoppel, binding, repairs, nonsignatory, equitable, direct benefit, arbitration agreement, federal law, trial court, benefits, compel arbitration, contract claim, prevents, courts

## Case Summary

### Procedural Posture

The Texas Court of Appeals denied appellant home construction company's request for mandamus relief to enforce arbitration agreements as governed by the Federal Arbitration Act (FAA), *9 U.S.C.S. § 1 et seq.*, after the trial court concluded that the FAA applied to all claims by appellee homeowner against the company. The company sought mandamus relief.

### Overview

The company moved to compel arbitration of all claims under the FAA. The trial court refused to compel arbitration of the homeowner's daughter's claim because she did not sign the Purchase Agreement. The supreme court noted that the daughter made no claim on the contract, claiming only that she developed asthma from dust created by the company's repairs of the home. A contractor performing repairs had an independent duty under Texas tort law not to injure bystanders by its activities, or by premises conditions it left behind. There was nothing to suggest that the daughter's claim was different from what any bystander might assert, or what she might assert if the contractor were not the company. The daughter could not equitably object to the arbitration clause attached to the contract where she obtained substantial actions from the company by demanding compliance with provisions of the contract. Once the daughter, as a non-party, deliberately sought substantial and direct benefits from the contract, and the company agreed to comply, equity prevented her from avoiding the arbitration clause that was part of the agreement.

### Outcome

The writ of mandamus was conditionally granted and the trial court was ordered to vacate that part of its order denying the company's motion, and to enter a new order compelling arbitration of the daughter's claim.

## LexisNexis® Headnotes

Civil Procedure > ... > Arbitration > Federal Arbitration Act > Scope

*HN1* Nonparties may be bound to an arbitration clause when the rules of law or equity would bind them to the contract generally.

Civil Procedure > ... > Arbitration > Federal Arbitration Act > Arbitration Agreements

Civil Procedure > ... > Writs > Common Law Writs > Mandamus

*HN2* Mandamus relief is proper to enforce arbitration agreements governed by the Federal Arbitration Act, *9 U.S.C.S. § 1 et seq.*

Civil Procedure > ... > Arbitration > Federal Arbitration Act > Arbitration Agreements

*HN4* The Federal Arbitration Act, *9 U.S.C.S. § 1 et seq.*, preempts any state requirements that apply only to arbitration clauses.

Civil Procedure > Preliminary Considerations > Federal & State Interrelationships > Choice of Law

Civil Procedure > ... > Arbitration > Federal Arbitration Act > Arbitration Agreements

*HN3* Under the Federal Arbitration Act (FAA), *9 U.S.C.S. § 1 et seq.*, absent unmistakable evidence that the parties intended the contrary, it is the courts rather than arbitrators that must decide "gateway matters" such as whether a valid arbitration agreement exists. Whether an arbitration agreement is binding on a nonparty is one of those gateway matters. Texas courts apply Texas procedural rules in making that determination. Those rules call for determination by summary proceedings, with the burden on the moving party to show a valid agreement to arbitrate. It is not entirely clear what substantive law governs whether a nonparty must arbitrate. Generally under the FAA, state law governs whether a litigant agreed to arbitrate, and federal law governs the scope of an arbitration clause. Whether a nonparty must arbitrate can involve aspects of either or both. Pending an answer from the United States Supreme Court, the supreme court applies state law while endeavoring to keep it as consistent as possible with federal law.

Civil Procedure > ... > Arbitration > Federal Arbitration Act > Arbitration Agreements

*HN5* Texas law has long recognized that nonparties may be bound to a contract under various legal principles. Although the supreme court has never considered these principles in the context of arbitration, it recently noted that contract and agency law may bind a nonparty to an arbitration agreement. Indeed, if Texas law would bind a nonparty to a contract generally, the Federal Arbitration Act, *9 U.S.C.S. § 1 et seq.*, would appear to preempt an exception for arbitration clauses alone.

Civil Procedure > ... > Arbitration > Federal Arbitration Act > Orders to Compel Arbitration

*HN6* A nonparty may be compelled to arbitrate if it seeks, through the claim, to derive a direct benefit from the contract containing the arbitration provisions. This rule is consistent with federal law of direct benefits estoppel.

Civil Procedure > ... > Arbitration > Federal Arbitration Act > Arbitration Agreements

Contracts Law > Contract Conditions & Provisions > Arbitration Clauses

*HN7* Under both Texas and federal, law, whether a claim seeks a direct benefit from a contract containing an arbitration clause turns on the substance of the claim, not artful pleading. Claims must be brought on the contract

(and arbitrated) if liability arises solely from the contract or must be determined by reference to it. On the other hand, claims can be brought in tort (and in court) if liability arises from general obligations imposed by law.

Contracts Law > Contract Conditions & Provisions > Arbitration Clauses

*HN8* Nonparties face a choice when they may plead in either contract or tort, but pleading the former invokes an arbitration clause broad enough to cover both (as most do). If they pursue a claim on the contract, then they must pursue all claims--tort and contract--in arbitration. Conversely, if they choose not to sue on the contract, they may pursue the tort claims in court, but the contract claims will thereby likely be waived under the election-of-remedies doctrine. Given these options, it is not clear at this point that nonparties will always choose to forfeit potentially viable contract claims solely to avoid arbitration.

Contracts Law > Contract Conditions & Provisions > Arbitration Clauses

*HN9* A nonparty may seek or obtain direct benefits from a contract by means other than a lawsuit. In some cases, a nonparty may be compelled to arbitrate if it deliberately seeks and obtains substantial benefits from the contract itself. The analysis here focuses on the nonparty's conduct during the performance of the contract. Thus, for example, a firm that uses a trade name pursuant to an agreement containing an arbitration clause cannot later avoid arbitration by claiming to have been a nonparty. Nor can nonsignatories who received lower insurance rates and the ability to sail under the French flag due to a contract avoid the arbitration clause in that contract.

Contracts Law > Formation of Contracts > Consideration > Promissory Estoppel

*HN10* The Texas Supreme Court has never addressed such an estoppel claim in the arbitration context. But it has long recognized in other contexts the defensive theory of promissory estoppel. When a promisor induces substantial action or forbearance by another, promissory estoppel prevents any denial of that promise if injustice can be avoided only by enforcement. Promissory estoppel does not create liability where none otherwise exists, but prevents a party from insisting upon his strict legal rights when it would be unjust to allow him to enforce them.

Estate, Gift & Trust Law > ... > Trustees > Duties & Powers > Claims Against & By

*HN11* Under Texas law, a suit involving a trust generally must be brought by or against the trustee, and can be binding on the beneficiaries whether they join it or not. If a trustee's agreement to arbitrate can be avoided by simply having the beneficiaries bring suit, the strong state policy favoring arbitration would be effectively thwarted.

Contracts Law > Contract Conditions & Provisions > Arbitration Clauses

*HN12* Direct-benefits estoppel requires a colorable claim to the benefits; a meddlesome stranger cannot compel arbitration by merely pleading a claim that quotes someone else's contract.

Contracts Law > Formation of Contracts > Consideration > Promissory Estoppel

Contracts Law > Contract Conditions & Provisions > Arbitration Clauses

*HN13* Like the equitable doctrine of promissory estoppel, the supreme court does not understand direct-benefits estoppel to create liability for noncontracting parties that does not otherwise exist.

Contracts Law > Contract Conditions & Provisions > Arbitration Clauses

*HN14* When a nonparty consistently and knowingly insists that others treat it as a party, it cannot later turn its back on the portions of the contract, such as an arbitration clause, that it finds distasteful. A nonparty cannot both have his contract and defeat it too.

**Judges:** **[\*\*1]** JUSTICE BRISTER delivered the opinion of the Court. JUSTICE WILLETT did not participate in the decision.

**Opinion by:** BRISTER

# Opinion

 **[\*129]**  ON PETITION FOR WRIT OF MANDAMUS

We are asked to decide whether Weekley Homes, L.P., a party to a contract containing an arbitration clause, can compel arbitration of a personal injury claim brought by Patricia Von Bargen, a nonparty. We have previously compelled arbitration by nonparties to an arbitration agreement when they brought suit "based on a contract," [1] which Von Bargen purports to avoid here.

But as both state and federal courts have recognized, *HN1* nonparties may be bound to an arbitration clause when the rules of law or equity would bind them to the contract generally. Because we find those rules applicable here, we conditionally grant mandamus relief.

## I. Background

In the summer of 2000, Vernon **[\*\*2]** Forsting contracted with Weekley for construction of a 4,000 square foot home at a purchase price of $ 240,000. At the time, Forsting was a seventy-eight year-old widower with an assortment of health problems. His intention in purchasing such a large home was to live with his daughter, Von Bargen (his only child) and her husband and three sons.

Von Bargen and her husband negotiated directly with Weekley on many issues before and after construction--paying a $ 1,000 deposit, selecting the floor plan, signing a letter of intent as, "purchasers," and making custom design choices. But only Forsting executed the various financing and closing documents on the home, including the Real Estate Purchase Agreement that contained the following arbitration clause:

> Any claim, dispute or cause of action between Purchaser and Seller …, whether sounding in contract, tort, or otherwise, shall be resolved by binding arbitration . . . . Such claims, disputes or causes of action include, but are not limited to, those arising out of or relating to … the design, construction, preparation, maintenance or repair of the Property.

Shortly after closing, Forsting transferred the home to the **[\*\*3]** Forsting Family Trust, a revocable trust established ten years earlier whose sole beneficiary was Von Bargen. At his deposition, Forsting testified that the only reason he signed the Purchase Agreement individually rather than as trustee was because he "forgot to put [the home] in the trust." Forsting and Von Bargen served as the only trustees of the Trust, the purpose of which was to transfer Forsting's property to Von Bargen after his death.

According to the plaintiffs' pleadings, numerous problems arose with the home after completion. When the family moved out of the house briefly so Weekley could perform some of those repairs, it was Von Bargen who

---

[1]  *In re FirstMerit Bank, N.A.,* 52 S.W.3d 749, 755, 44 Tex. Sup. Ct. J. 900 (Tex. 2001).

requested and received reimbursement. Indeed, Von Bargen admitted handling "almost . . . all matters related to the house, the problems and the warranty work and even the negotiations."

Unsatisfied with the home and Weekley's efforts to repair it, Forsting, Von Bargen, and the Trust filed suit against Weekley in December 2002. Forsting and the Trust asserted claims for negligence, breach of contract, statutory violations, and breach of warranty. Von Bargen sued only for personal injuries, alleging Weekley's negligent repairs caused **[**4]** her to develop asthma.

Weekley moved to compel arbitration of all claims under the Federal Arbitration **[*130]** Act (FAA). [2] The trial court concluded the FAA applied, and granted the motion as to all claims by Forsting and the Trust. But the trial court refused to compel arbitration of Von Bargen's claim because she did not sign the Purchase Agreement.

*HN2* Mandamus relief is proper to enforce arbitration agreements governed by the FAA. [3] After the Fifth Court of Appeals denied Weekley's request for such relief, Weekley filed a similar request in this Court.

## **[**5] II. Governing Law**

Neither party challenges the trial court's conclusion that the FAA governs the arbitration clause here. [4] *HN3* Under the FAA, absent unmistakable evidence that the parties intended the contrary, it is the courts rather than arbitrators that must decide "gateway matters" such as whether a valid arbitration agreement exists. [5] **[**6]** Whether an arbitration agreement is binding on a nonparty is one of those gateway matters. [6]

Texas courts apply Texas procedural rules in making that determination. [7] Those rules call for determination by summary proceedings, [8] with the burden on the moving party to show a valid agreement to arbitrate. [9]

But as we recently noted, it is not entirely clear what substantive law governs whether a nonparty must arbitrate. [10] Generally under the FAA, state law governs whether a litigant agreed to arbitrate, [11] **[**8]** and federal law

---

[2] *See* 9 U.S.C. §§ 1-16.

[3] *In re Oakwood Mobile Homes, Inc.,* 987 S.W.2d 571, 573 n.2, 42 Tex. Sup. Ct. J. 377 (Tex. 1999) (per curiam); *EZ Pawn Corp. v. Mancias,* 934 S.W.2d 87-88, 40 Tex. Sup. Ct. J. 104 (Tex. 1996) (per curiam).

[4] Although Von Bargen asserts that her personal injury claim cannot be arbitrated under the Texas Arbitration Act as i t was not signed by an attorney, *see* TEX. CIV. PRAC. & REM. CODE § 171.002(a)(3), (c), she does not challenge the trial court's conclusion that the FAA governs here. *HN4* The FAA not only contains no such limitation, but also preempts any state requirements that apply only to arbitration clauses. *Doctor's Assocs., Inc. v. Casarotto,* 517 U.S. 681, 686-87, 134 L. Ed. 2d 902, 116 S. Ct. 1652 (1996).

[5] *Green Tree Fin. Corp. v. Bazzle,* 539 U.S. 444, 452, 156 L. Ed. 2d 414, 123 S. Ct. 2402 (2003); *PacifiCare Health Sys., Inc. v. Book,* 538 U.S. 401, 407 n.2, 155 L. Ed. 2d 578, 123 S. Ct. 1531 (2003).

[6] *John Wiley & Sons, Inc. v. Livingston,* 376 U.S. 543, 546-47, 11 L. Ed. 2d 898, 84 S. Ct. 909 (1964).

[7] *Jack B. Anglin Co. v. Tipps,* 842 S.W.2d 266, 268, 36 Tex. Sup. Ct. J. 205 (Tex. 1992).

[8] *Id.* at 269.

[9] *J.M. Davidson, Inc. v. Webster,* 128 S.W.3d 223, 227, 47 Tex. Sup. Ct. J. 196 (Tex. 2003).

[10] *In re Kellogg Brown & Root, Inc.,* 166 S.W.3d 732, 738-39, 48 Tex. Sup. Ct. J. 678 (Tex. 2005); *see also Howsam v. Dean Witter Reynolds, Inc.,* 537 U.S. 79, 87, 154 L. Ed. 2d 491, 123 S. Ct. 588 (2002) (Thomas, J., concurring) (suggesting Supreme Court sometimes looks to federal law and sometimes law chosen by parties); *Wash. Mut. Fin. Group, LLC v. Bailey,* 364 F.3d 260, 267 n.6 (5th Cir. 2004) (noting that whether state or federal law of arbitrability applies "is often an uncertain question").

[11] *Doctor's Assocs.,* 517 U.S. at 686-87; *First Options of Chi., Inc. v. Kaplan,* 514 U.S. 938, 944, 131 L. Ed. 2d 985, 115 S. Ct. 1920 (1995); *Perry v. Thomas,* 482 U.S. 483, 492, n.9, 96 L. Ed. 2d 426, 107 S. Ct. 2520 (1987). Parties may also agree that state law governs

governs the scope of an arbitration clause. [12] Whether **[*131]** a nonparty must arbitrate can involve aspects of either **[**7]** or both. Pending an answer from the United States Supreme Court, [13] we apply state law while endeavoring to keep it as consistent as possible with federal law. [14]

## Estoppel and Nonsignatories

**HN5** Texas law has long recognized that nonparties may be bound to a contract under various legal principles. [15] Although we have never considered these principles in the context of arbitration, we recently noted that contract and agency law may bind a nonparty to an arbitration agreement. [16] Indeed, if Texas law would bind a nonparty to a contract generally, the FAA would appear to preempt an exception for arbitration clauses **[**9]** alone. [17]

 **[**10]** In the one case in which we have compelled nonparties to arbitrate, *In re FirstMerit Bank, N.A.,* we stated that "a litigant who sues based on a contract subjects him or herself to the contract's terms." [18] Because the nonparties there asserted claims identical to the signatories' contract claims, we held all had to be arbitrated. [19]

We did not describe in *FirstMerit* what it means to sue "based on a contract." Von Bargen asserts a narrow interpretation that would apply only to explicit contract claims, and thus not to hers for personal injury; Weekley argues for a broad application to any claim that "arises from or relates to" the contract involved.

We recently adopted an approach between these two extremes, holding that **HN6** a nonparty may be compelled to arbitrate "if it seeks, through the claim, to derive a direct benefit from the contract containing the arbitration provisions." [20] As we noted, this rule is consistent **[**11]** with federal law of "direct benefits estoppel." [21]

---

their arbitration. *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Jr. Univ.,* 489 U.S. 468, 476, 103 L. Ed. 2d 488, 109 S. Ct. 1248 (1989).

[12]    *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 24, 74 L. Ed. 2d 765, 103 S. Ct. 927 (1983).

[13]    The United States Supreme Court has not answered this question, though it has applied federal substantive law to bind a nonparty to labor-union arbitration, a field in which federal law has traditionally yielded little deference to state labor-law principles. *See John Wiley & Sons,* 376 U.S. at 548 (citing *Textile Workers Union of Am. v. Lincoln Mills,* 353 U.S. 448, 456, 1 L. Ed. 2d 972, 77 S. Ct. 912 (1957)).

[14]    *Kellogg,* 166 S.W.3d at 739.

[15]    *See, e.g.,* TEX. BUS. CORP. ACT art. 2.21(A)(2) (holding shareholders maybe liable for corporation's contracts under alter ego theory if they cause corporation to perpetrate actual fraud for their direct personal benefit); *Stine v. Stewart,* 80 S.W.3d 586, 590, 45 Tex. Sup. Ct. J. 966 (Tex. 2002) (holding third-party beneficiary could enforce contract); *Biggs v. U.S. Fire Ins. Co.,* 611 S.W.2d 624, 629, 24 Tex. Sup. Ct. J. 204 (Tex. 1981) (holding agent acting within the scope of apparent authority binds the principal).

[16]    *Kellogg,* 166 S.W.3d at 738. Accordingly, it is no longer true, that "the [Texas] decisions do not even mention the possibility of additional bases for binding non-signatories to arbitration." *Fleetwood Enters., Inc. v. Gaskamp,* 280 F.3d 1069, 1076 (5th Cir. 2002).

[17]    *Doctor's Assocs.,* 517 U.S. at 686-87; *Allied-Bruce Terminix Cos. v. Dobson,* 513 U.S. 265, 281, 130 L. Ed. 2d 753, 115 S. Ct. 834 (1995) ("What States may not do is decide that a contract is fair enough to enforce all its basic terms (price, service, credit), but not fair enough to enforce its arbitration clause. The Act makes any such state policy unlawful, for that kind of policy would place arbitration clauses on an unequal 'footing,' directly contrary to the Act's language and Congress' intent.").

[18]    52 S.W.3d at 755.

[19]    *Id.* at 755-56.

[20]    *Kellogg,* 166 S.W.3d at 741.

[21]    *Id.*

*HN7* Under both Texas and federal, law, whether a claim seeks a direct benefit from a contract containing an arbitration **[\*132]** clause turns on the substance of the claim, not artful pleading. [22] Claims must be brought on the contract (and arbitrated) if liability arises solely from the contract or must be determined by reference to it. [23] **[\*\*12]** On the other hand, claims can be brought in tort (and in court) if liability arises from general obligations imposed by law. [24]

We question Weekley's conclusion that this rule will inevitably drive claimants to plead only noncontractual claims to avoid arbitration. *HN8* Nonparties face a choice when they may plead in either contract or tort, but pleading the former invokes an arbitration clause broad enough to cover both (as most do). If they pursue a claim "on the contract," then they must pursue all claims--tort and contract--in arbitration. [25] Conversely, if they choose not to sue "on the contract," they may pursue the tort claims in court, **[\*\*13]** but the contract claims will thereby likely be waived under the election-of-remedies doctrine. [26] Given these options, it is not clear at this point that nonparties will always choose to forfeit potentially viable contract claims solely to avoid arbitration.

In this case, Von Bargen purports to make **[\*\*14]** no claim on the Weekley contract, claiming only that she developed asthma from dust created by Weekley's repairs of the home. While Weekley's duty to perform those repairs arose from the Purchase Agreement, a contractor performing repairs has an independent duty under Texas tort law not to injure bystanders by its activities, [27] or by premises conditions it leaves behind. [28] There is nothing in the sparse record here to suggest Von Bargen 's claim is different from what any bystander might assert, or what she might assert if the contractor were not Weekley.

But **[\*\*15]** *HN9* a nonparty may seek or obtain direct benefits from a contract by means other than a lawsuit. In some cases, a nonparty may be compelled to arbitrate if it deliberately seeks and obtains substantial benefits from the contract itself. [29] **[\*\*16]** The analysis here focuses on the **[\*133]** nonparty's conduct during the

---

[22] *Hughes Masonry Co., Inc. v. Greater Clark County Sch. Bldg. Corp.,* 659 F.2d 836, 838-39 (7th Cir. 1981); *Southwestern Bell Tel. Co. v. DeLanney,* 809 S.W.2d 493, 495, 34 Tex. Sup. Ct. J. 402 (Tex. 1991).

[23] *Int'l Paper Co. v. Schwabedissen Maschinen & Anlagen GMBH,* 206 F.3d 411, 418 (4th Cir. 2000); *DeWitt County Elec. Coop., Inc. v. Parks,* 1 S.W.3d 96, 105, 42 Tex. Sup. Ct. J. 979 (Tex. 1999); *DeLanney,* 809 S.W.2d at 494.

[24] *See, e.g., R.J. Griffin & Co. v. Beach Club II Homeowners Ass'n,* 384 F.3d 157, 163-164 (4th Cir. 2004); *InterGen N.V. v. Grina,* 344 F.3d 134, 145-46 (1st Cir. 2003); *Westmoreland v. Sadoux,* 299 F.3d 462, 467 (5th Cir. 2002); *Fleetwood Enters., Inc. v. Gaskamp,* 280 F.3d 1069, 1076-77 (5th Cir. 2002); *DeLanney,* 809 S.W.2d at 494; *see also Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.,* 960 S.W.2d 41, 47, 41 Tex. Sup. Ct. J. 289 (Tex. 1998).

[25] *See, e.g., Jack B. Anglin Co. v. Tipps,* 842 S.W.2d 266, 271, 36 Tex. Sup. Ct. J. 205 (Tex. 1992) (holding DTPA claim was factually intertwined with contract claim and thus subject to arbitration clause).

[26] *Bocanegra v. Aetna Life Ins. Co.,* 605 S.W.2d 848, 851, 23 Tex. Sup. Ct. J. 502 (Tex. 1980) (holding election-of-remedies doctrine prevents pursuit of inconsistent rights or remedies when result would be manifest injustice); *cf. Medina v. Herrera,* 927 S.W.2d 597, 598-99, 39 Tex. Sup. Ct. J. 627 (Tex. 1996) (holding election-of-remedies doctrine barred pursuit of both workers' compensation claim and suit against employer for intentional act).

[27] *See Redinger v. Living, Inc.,* 689 S.W.2d 415, 417, 28 Tex. Sup. Ct. J. 404 (Tex. 1985) (noting general contractor on a construction site in control of the premises may be subject to direct liability for negligence arising from: (1) a premises defect, or (2) an activity or instrumentality).

[28] *Strakos v. Gehring,* 360 S.W.2d 787, 790, 5 Tex. Sup. Ct. J. 462 (Tex. 1962).

[29] *Astra Oil Co., Inc. v. Rover Navigation, Ltd.,* 344 F.3d 276, 281 (2d Cir. 2003) (holding affiliate of signatories could enforce arbitration clause as opposing party treated affiliate as part of charter contract during occurrences involved); *Am. Bureau of Shipping v. Tencara Shipyard S.P.A.,* 170 F.3d 349, 353 (2d Cir. 1999) (holding nonsignatories who received lower insurance rates and ability to sail under French flag due to contract were bound by arbitration clause in it); *see also Matter of VMS Ltd. P'ship Sec. Litig.,* 26 F.3d 50, 52

performance of the contract. [30] Thus, for example, a firm that uses a trade name pursuant to an agreement containing an arbitration clause cannot later avoid arbitration by claiming to have been a nonparty. [31] Nor can nonsignatories who received lower insurance rates and the ability to sail under the French flag due to a contract avoid the arbitration clause in that contract. [32]

*HN10* This Court has never addressed such an estoppel claim in the arbitration context. [33] **[\*\*17]** But we have long recognized in other contexts the defensive theory of promissory estoppel. [34] When a promisor induces substantial action or forbearance by another, promissory estoppel prevents any denial of that promise if injustice can be avoided only by enforcement. [35] Promissory estoppel does not create liability where none otherwise exists, [36] but "prevents a party from insisting upon his strict legal rights when it would be unjust to allow him to enforce them." [37]

Here, Von Bargen has not merely resided in the home. Claiming the authority of the Purchase Agreement, she directed how Weekley should construct many of its features, repeatedly demanded extensive repairs to "our home," [38] personally requested and received financial reimbursement for expenses "I incurred" while those repairs were made, and conducted settlement negotiations with Weekley (apparently never consummated) about moving the family to a new home. Having obtained these substantial actions from Weekley by demanding compliance with provisions of the contract, Von Bargen cannot equitably object to the arbitration **[\*\*18]** clause attached to them.

In addition to these benefits, Forsting and the Trust have sued Weekley on claims which are explicitly based on the contract. *HN11* Under Texas law, a suit involving a trust generally must be brought by or against the trustee, and can be binding on the beneficiaries whether they join it or **[\*134]** not. [39] Although Von Bargen did not purport to sue as either trustee or beneficiary, she was both, and any recovery will inure to her direct benefit as

---

(7th Cir. 1994) (holding wife bound by settlement agreement related to investment services contract signed only by her husband, but under which she had accepted services as well); *see also* InterGen, 344 F.3d at 146 (holding equitable estoppel inapplicable as nonsignatory never sought to derive direct benefits from contracts during their currency).

[30] *E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S.,* 269 F.3d 187, 200 n.7 (3d Cir.2001).

[31] *Deloitte Noraudit A/S v. Deloitte Haskins & Sells, U.S.,* 9 F.3d 1060, 1064 (2d Cir. 1993).

[32] *Tencara Shipyard,* 170 F.3d at 353.

[33] *See* Kellogg, 166 S.W.3d at 741 n.9 (reserving question of whether to apply direct-benefits estoppel to benefits obtained from contract rather than subsequent litigation).

[34] *See, e.g.,* 'Moore' Burger, Inc. v. Phillips Petroleum Co., 492 S.W.2d 934, 16 Tex. Sup. Ct. J. 11 (Tex.1972).

[35] *Trammel Crow Co. No. 60 v. Harkinson,* 944 S.W.2d 631, 636, 40 Tex. Sup. Ct. J. 425 (Tex. 1997).

[36] *Hruska v. First State Bank of Deanville,* 747 S.W.2d 783, 785, 31 Tex. Sup. Ct. J. 292 (Tex. 1988).

[37] *Wheeler v. White,* 398 S.W.2d 93, 96, 9 Tex. Sup. Ct. J. 105 (Tex. 1965).

[38] In various lists submitted in the months after the sale, Von Bargen demanded repairs to sagging floors, buckling walls and windows, cracking brick work, as well as replacing the front door, repainting the back door and the kitchen cabinets, regrouting the bathrooms and entry way, replacing the fireplace screen, closing gaps at carpet seams, removing drainage problems in the yard, and repairing a noisy garage door.

[39] *See* TEX. PROP. CODE §§ 111.004(7), 115.011, 115.015; *Huie v. DeShazo,* 922 S.W.2d 920, 926, 39 Tex. Sup. Ct. J. 288 (Tex. 1996)(holding trusts are not legal entities); *Transamerican Leasing Co. v. Three Bears, Inc.,* 586 S.W.2d 472, 476-77, 22 Tex. Sup. Ct. J. 516 (Tex. 1979) (holding beneficiaries were bound by judgment against trust and trustees, as some participated in trial in their capacity as trustees, and remainder showed neither prejudice, conflict of interest, nor inadequate representation by trustees).

the sole beneficiary and equitable titleholder of the home. [40] **[\*\*20]** As one Texas court has noted, if a trustee's agreement to arbitrate **[\*\*19]** can be avoided by simply having the beneficiaries bring suit, "the strong state policy favoring arbitration would be effectively thwarted." [41]

While we based our decision in *FirstMerit Bank* on the nonparties' contract-based claims, more was involved in that case than the format of the pleadings. *HN12* Direct-benefits estoppel requires a colorable claim to the benefits; a meddlesome stranger cannot compel arbitration by merely pleading a claim that quotes someone else's contract. The nonparties in *FirstMerit Bank* were the daughter and son-in-law of the signatories, the actual occupants of the mobile home, and (according to the briefs) the future owners to whom the signatories planned to transfer title. It is hard to see what direct benefits they expected from that contract that Von Bargen did not expect from this one.

*HN13* Like the equitable doctrine of promissory estoppel, we do not understand direct-benefits estoppel to create liability for noncontracting parties that does not otherwise exist. As Von Bargen and Weekley had no contract between them, estoppel alone cannot grant either a right to **[\*\*21]** sue for breach. [42] Nor do we understand the doctrine to apply when the benefits alleged are insubstantial or indirect. But once Von Bargen deliberately sought substantial and direct benefits from the contract, and Weekley agreed to comply, equity prevents her from avoiding the arbitration clause that was part of that agreement.

We recognize that direct-benefits estoppel has yet to be endorsed by the United States Supreme Court, and that its application and boundaries are not entirely clear. [43] For example, while federal courts often state the test as whether a nonsignatory has "embraced the contract," [44] the **[\*135]** metaphor gives little guidance in deciding what particular conduct embraces or merely shakes hands with it. Indeed, the equitable nature of the doctrine may render firm standards inappropriate, requiring **[\*\*22]** trial courts to exercise some discretion based on the facts of each case. [45]

---

[40] *Perfect Union Lodge No. 10 v. Interfirst Bank of San Antonio, N.A.,* 748 S.W.2d 218, 220, 31 Tex. Sup. Ct. J. 277 (Tex. 1988) (holding trust beneficiaries hold equitable title to trust property); *cf. Javitch v. First Union Sec., Inc.,* 315 F.3d 619, 627 (6th Cir. 2003) (holding arbitration agreements were binding on receiver who succeeded to interests of entities that signed them); *Hays & Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 885 F.2d 1149, 1153-54 (3d Cir. 1989) (holding arbitration agreements were binding on successor trustee in bankruptcy).

[41] *Merrill Lynch, Pierce, Fenner & Smith v. Eddings,* 838 S.W.2d 874, 879 (Tex. App.--Waco 1992, writ denied).

[42] *See Sun Oil Co. v. Madeley,* 626 S.W.2d 726, 734, 25 Tex. Sup. Ct. J. 101 (Tex. 1981) (holding estoppel based on division orders could not permanently amend underlying lease).

[43] See, e.g., J. Douglas Uloth & J. Hamilton Rial, III, *Equitable Estoppel as a Basis for Compelling Nonsignatories to Arbitrate--A Bridge Too Far?,* 21 REV. LITIG. 593 (2002).

[44] *See, e.g., InterGen,* 344 F.3d at 145; *DuPont,* 269 F.3d at 200; *Peltz ex rel. Peltz v. Sears, Roebuck & Co.,* 367 F. Supp. 2d 711, 721 (E.D.Pa. 2005); *In re Universal Serv. Fund Tel. Billing Practices Litig.,* 300 F. Supp. 2d 1107, 1138 (D.Kan. 2003); *Amkor Tech., Inc. v. Alcatel Bus. Sys.,* 278 F. Supp. 2d 519, 521-22 (E.D.Pa. 2003); *Cherry Creek Card & Party Shop, Inc. v. Hallmark Mktg. Corp.,* 176 F. Supp. 2d 1091, 1098 (D.Colo. 2001).

[45] *See, e.g., Bridas S.A.P.I.C. v. Turkmenistan,* 345 F.3d 347, 360 (5th Cir. 2003) ("The use of equitable estoppel is within a district court's discretion."); *accord, Hill v. G.E. Power Sys., Inc.,* 282 F.3d 343, 348 (5th Cir. 2002); *Grigson v. Creative Artists Agency,* 210 F.3d 524, 528 (5th Cir. 2000).

 **[**23]** But we agree with the federal courts that ***HN14*** when a nonparty consistently [46] and knowingly [47] insists that others treat it as a party, it cannot later "turn[] its back on the portions of the contract, such as an arbitration clause, that it finds distasteful." [48] A nonparty cannot both have his contract and defeat it too.

 **[**24]** While Von Bargen never based her personal injury claim on the contract, her prior exercise of other contractual rights and her equitable entitlement to other contractual benefits prevents her from avoiding the arbitration clause here. Accordingly, the trial court abused its discretion in failing to compel arbitration. We conditionally grant the writ of mandamus and order the trial court to vacate that part of its order denying Weekley's motion, and to enter a new order compelling arbitration of Von Bargen's claim. We are confident the trial court will comply, and our writ will issue only if it does not.

Scott Brister

Justice

---

[46]   *See lnt'l Paper,* 206 F.3d at 418 (estopping nonsignatory from denying agreement to arbitrate "when he has *consistently* maintained that other provisions of the same contract should be enforced to benefit him.") (emphasis added).

[47]   *See Bridas,* 345 F.3d at 361-62 ("Direct[-]benefits estoppel applies when a nonsignatory *'knowingly* exploits the agreement containing the arbitration clause.'") (emphasis added) (citing *DuPont,* 269 F.3d at 199); *Tencara Shipyard,* 170 F.3d at 353 (requiring nonsignatories to arbitrate pursuant to provision in contract they neither requested nor executed, as they had duty to obtain that contract and received copies of it).

[48]   *DuPont,* 269 F.3d at 200; *accord Astra Oil Co.,* 344 F.3d at 281.



⚠ Caution

As of: September 1, 2015 2:37 PM EDT

## *J.M. Davidson, Inc. v. Webster*

Supreme Court of Texas

December 11, 2002, Argued ; December 31, 2003, Opinion delivered

NO. 01-0774

**Reporter**

128 S.W.3d 223; 2003 Tex. LEXIS 527; 47 Tex. Sup. J. 196; 20 I.E.R. Cas. (BNA) 1315

J.M. DAVIDSON, INC. v. CHELSEY J. WEBSTER

**Prior History:** [**1] ON PETITION FOR REVIEW FROM THE COURT OF APPEALS FOR THE THIRTEENTH DISTRICT OF TEXAS.

*J. M. Davidson, Inc. v. Webster, 49 S.W.3d 507, 2001 Tex. App. LEXIS 3678 (Tex. App. Corpus Christi, 2001)*

**Disposition:** Reversed and remanded.

## Core Terms

arbitration, arbitration agreement, notice, parties, illusory, personnel policy, modify, terminate, ambiguous, trial court, unilaterally, at-will, prior notice, abolish, contemporaneous, terms, unilateral termination, pet, reserves, disputes, enforceable, promises, mutuality, alternative dispute resolution, right to terminate, compel arbitration, unenforceable, unambiguous, provisions, contracts

## Case Summary

### Procedural Posture

Plaintiff former employee filed a wrongful termination action against defendant former employer under *Tex. Lab. Code § 451.001*. The trial court denied the employer's motion to compel arbitration under the employer's written alternative dispute resolution policy. The Court of Appeals for the Thirteenth District of Texas affirmed and denied the employer's petition for a writ of mandamus. The employer petitioned for interlocutory review.

### Overview

While working, the employee agreed to sign a one-page document as a condition of his at-will employment. The document purported to be an alternative dispute resolution policy, but also referenced the employment application process. The employee was later rendered unable to work due to an accident, his employment ceased, and he filed the instant action. On appeal, the employer asked for an order requiring the trial court to stay the action pending binding arbitration pursuant to *Tex. Civ. Prac. & Rem. Code § 171.098* of the Texas Arbitration Act. The court held that it could not make such a determination because it was unclear whether the employer's reservation to unilaterally terminate personnel policy, as stated in the signed document, included the arbitration policy. If it did, then the agreement was unenforceable, because it was illusory. Only half of the one-page document regarded the arbitration policy. The rest addressed several issues that referred specifically

to the employment application process and included the modification provision, but had no bearing on alternative dispute resolution. The court held that the document was ambiguous.

**Outcome**

The court reversed the intermediate court of appeals' judgment and remanded the case to the trial court for a determination on what the parties intended by the language under which the employer unilaterally reserved the right to terminate personnel policy in the document that contained the written alternative dispute resolution policy.

# LexisNexis® Headnotes

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Mandatory ADR

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Validity of ADR Methods

Contracts Law > Contract Conditions & Provisions > Arbitration Clauses

Labor & Employment Law > Collective Bargaining & Labor Relations > Labor Arbitration > Enforcement

Labor & Employment Law > Employment Relationships > At Will Employment > General Overview

Labor & Employment Law > Wrongful Termination > Breach of Contract > Employer Handbooks

*HN1* Arbitration agreements between an employer and an at-will employee are enforceable when there is an agreement that is valid under traditional contract principles.

Civil Procedure > ... > Defenses, Demurrers & Objections > Affirmative Defenses > Arbitration & Award

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > General Overview

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Judicial Review

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Mandatory ADR

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Validity of ADR Methods

Civil Procedure > Appeals > Standards of Review > De Novo Review

Contracts Law > Contract Conditions & Provisions > Arbitration Clauses

Labor & Employment Law > Collective Bargaining & Labor Relations > Labor Arbitration > Enforcement

*HN2* A party attempting to compel arbitration must first establish that the dispute in question falls within the scope of a valid arbitration agreement. If the other party resists arbitration, the trial court must determine whether a valid agreement to arbitrate exists. *Tex. Civ. Prac. & Rem. Code § 171.021*. A trial court's determination of the arbitration agreement's validity is a legal question subject to de novo review. If the trial court finds a valid agreement, the burden shifts to the party opposing arbitration to raise an affirmative defense to enforcing arbitration.

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Mandatory ADR

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Validity of ADR Methods

Contracts Law > Contract Conditions & Provisions > Arbitration Clauses

Labor & Employment Law > Collective Bargaining & Labor Relations > Labor Arbitration > Enforcement

**HN3** Although there is a strong presumption favoring arbitration, the presumption arises only after the party seeking to compel arbitration proves that a valid arbitration agreement exists.

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Validity of ADR Methods

Contracts Law > Contract Conditions & Provisions > Arbitration Clauses

Labor & Employment Law > Collective Bargaining & Labor Relations > Labor Arbitration > Enforcement

**HN4** Arbitration agreements are interpreted under traditional contract principles. Thus, an employer attempting to enforce an arbitration agreement must show the agreement meets all requisite contract elements.

Contracts Law > Contract Conditions & Provisions > Arbitration Clauses

Contracts Law > Standards of Performance > Illusory Promises

Labor & Employment Law > Collective Bargaining & Labor Relations > Labor Arbitration > Enforcement

Labor & Employment Law > Employment Relationships > At Will Employment > General Overview

Labor & Employment Law > Employment Relationships > At Will Employment > Duration of Employment

**HN5** At-will employment does not preclude formation of other contracts between employer and employee, so long as neither party relies on continued employment as consideration for the contract.

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Validity of ADR Methods

Civil Procedure > Trials > Jury Trials > Province of Court & Jury

Contracts Law > Contract Interpretation > General Overview

Contracts Law > Defenses > Ambiguities & Mistakes > General Overview

Evidence > Types of Evidence > Documentary Evidence > Parol Evidence

Labor & Employment Law > Collective Bargaining & Labor Relations > Labor Arbitration > Enforcement

**HN6** In construing an arbitration agreement, a court first determines whether it is possible to enforce the contract as written, without resort to parol evidence. Deciding whether a contract is ambiguous is a question of law for the court.

Contracts Law > Contract Interpretation > General Overview

**HN7** In construing a written contract, the primary concern of the court is to ascertain the true intentions of the parties as expressed in the instrument. To achieve this objective, a court must examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless. No single provision taken alone will be given controlling effect; rather, all the provisions must be considered with reference to the whole instrument.

Contracts Law > Contract Interpretation > Ambiguities & Contra Proferentem > General Overview

Contracts Law > Defenses > Ambiguities & Mistakes > General Overview

*HN8* A contract is unambiguous if it can be given a definite or certain legal meaning. On the other hand, if the contract is subject to two or more reasonable interpretations after applying the pertinent rules of construction, the contract is ambiguous, creating a fact issue on the parties' intent.

> Contracts Law > Contract Interpretation > Ambiguities & Contra Proferentem > General Overview
>
> Contracts Law > Defenses > Ambiguities & Mistakes > General Overview
>
> Real Property Law > Construction Law > Contracts

*HN9* A court may conclude that a contract is ambiguous even in the absence of such a pleading by either party.

**Judges:** JUSTICE JEFFERSON delivered the opinion of the Court, joined by CHIEF JUSTICE PHILLIPS, JUSTICE HECHT, JUSTICE OWEN, JUSTICE WAINWRIGHT, and JUSTICE BRISTER. JUSTICE SCHNEIDER filed a dissenting opinion, joined by JUSTICE O'NEILL. JUSTICE SMITH filed a dissenting opinion.

**Opinion by:** Wallace B. Jefferson

# Opinion

 **[\*225]**  This is an interlocutory appeal of a trial court's order denying an employer's motion to compel arbitration under the company's alternative dispute resolution policy. We recently held that *HN1* arbitration agreements between an employer and an at-will employee are enforceable when there is an agreement that is valid under traditional contract principles. *In re Halliburton Co., 80 S.W.3d 566, 573, 45 Tex. Sup. Ct. J. 720 (Tex. 2002)*. Here, we consider whether an arbitration agreement between an employer and an employee is enforceable if the employer reserves the unilateral right to modify or terminate personnel policies without notice. The trial court denied the employer's motion to compel arbitration, and the court of appeals affirmed. *49 S.W.3d 507*.

We conclude that the arbitration agreement **[\*\*2]** is ambiguous because it is not possible to determine from the document itself whether the unilateral termination right applies to the parties' agreement to arbitrate, or only to "personnel policies" concerning the at-will employment relationship. Accordingly, we reverse the court of appeals' judgment and remand to the trial court for further proceedings consistent with this opinion.

## I

### Background

J. M. Davidson, Inc. hired Chelsey Webster as a mechanic in December 1997. Soon after, Davidson asked Webster to sign a one-page document as a condition of his at-will employment. Webster signed the document, which provided:

> J.M. Davidson, Inc.
>
> **ALTERNATIVE DISPUTE RESOLUTION POLICY**
>
> EMPLOYMENT APPLICATION LANGUAGE
>
> I, the applicant whose signature is affixed hereto, and the above listed Company, (hereinafter referred to as the "Company"), for itself and all of its officers, directors, agents and employees, all of which mutually agree and contract that any and all claims, disputes or controversies, whether based on the Construction

[sic], Statutes, Code(s), Ordinances, Rules, Orders Regulations, and/or common law of he [sic] United States and/or of any State, **[**3]** and/or all subdivisions, of either, and/or asserted on the basis of contract, quasi-contract, personal injury, tort, offenses, quasi-offenses or otherwise, or arising out of, or in any way relating to this application for employment, or any other application for employment that I may have previously submitted, or may submit in the future, or the Company's decision to hire or not to hire me; including the arbitrability of any claim, dispute or controversy shall be exclusively and finally settled by binding arbitration administered by, Conducted [sic] under the Arbitration Rules of, and before the Arbitrator(s) of **[*226]** an Arbitration Tribunal of the National Association for Dispute Resolution, Inc., pursuant to the provisions of the *Federal Arbitration Act* and/or any applicable *Alternative Dispute Resolutions Act*, whichever shall have, the broadest effect, all claims of any rights to the contrary, including any right to trail [sic] by jury, being hereby expressly waived. The Arbitration Tribunal shall be the sole and existence [sic] of its jurisdiction over all parties and issues. Judgment upon any award may be entered in any Court - State or Federal - having jurisdiction.

I hereby **[**4]** certify that all of the information and statements made or furnished on this application are true and correct and I hereby grant the "Company" permission to verify such information and statements. I understand that any false statement or omission on this application may be considered as sufficient cause for rejection of this application, or for dismissal, if such false statement or omission is discovered subsequent to my employment. I further understand that the "Company" may perform a pre-employment investigation to determine my suitability for employment and I authorize the "Company" to have access to any and all records concerning my education or employment background. I hereby authorize any person or Entity having such information to release same to the "Company". I understand that the pre-employment investigation may include contacting my previous employers, and I hereby authorize such previous employers to release any and all information relating to my employment to the "Company". I understand that if I am extended an offer of employment, I will have to pass a physical examination as a condition of such employment. If employed, I agree to abide by and comply with all of the rules, **[**5]** policies and procedures of the "Company." I understand that if I am employed by the "Company", such employment will be "at-will" and that the "Company" may terminate my employment at any time and for any reason. I understand and agree that, in the event of my separation from any employment with the "Company", any and all information concerning my employment history may be furnished to any other employer with whom I seek employment and I hereby release and hold harmless the "Company", its affiliates, parents, subsidiaries, and successors, and its and their officers, directors, trustees, employees and agents from and against any and all claims and liability for furnishing such information. No supervisor or person other than the President of the "Company", can change or otherwise modify any employment agreement. The "Company" reserves the right to unilaterally abolish or modify any personnel policy without prior notice. I understand that this application will be considered valid and current for a period of not more than thirty (30) days.

In November 1998, Webster was injured at work and subsequently filed a workers' compensation claim. Although his condition improved temporarily, **[**6]** his doctor eventually placed him on "no work" status. Shortly thereafter, Webster's employment with Davidson ceased. The parties dispute whether Webster quit or was terminated.

Webster sued Davidson for wrongful termination under *section 451 of the Texas Labor Code*, alleging he was terminated in retaliation for filing a workers' compensation claim. *See TEX. LAB. CODE § 451.001*. Davidson denied Webster's allegations and filed a motion to compel binding arbitration under the company's alternative dispute resolution policy. Webster **[*227]** responded that the arbitration agreement was unenforceable because it was illusory, unconscionable, and lacked mutuality. Following a hearing, the trial court denied Davidson's motion without explanation.

Davidson then filed an interlocutory appeal seeking to compel arbitration under the *Texas Arbitration Act*, and a mandamus action to compel arbitration pursuant to the *Federal Arbitration Act*. The court of appeals denied the petition for writ of mandamus, held that the arbitration agreement was illusory, and affirmed the trial court's order denying Davidson's motion to compel arbitration. *49 S.W.3d 507, 514*. One **[**7]** justice dissented, concluding that the arbitration agreement was enforceable because both parties mutually agreed to arbitrate workplace injury disputes. *Id. at 519*. The dissent observed that the reservation language -- concerning the company's unilateral right to modify or terminate personnel policies without notice -- did not render Davidson's promise illusory, because it was "separable" from the promise to arbitrate. *Id. at 518*.

Davidson asks us to reverse the court of appeals' judgment and order the trial court to stay the trial pending binding arbitration pursuant to the *Texas Arbitration Act*. [1] *See TEX. CIV. PRAC. & REM. CODE § 171.098*.

## II

### Standard of Review

 **[**8]** *HN2* A party attempting to compel arbitration must first establish that the dispute in question falls within the scope of a valid arbitration agreement. *In re Oakwood Mobile Homes, Inc., 987 S.W.2d 571, 573, 42 Tex. Sup. Ct. J. 377 (Tex. 1999)*. If the other party resists arbitration, the trial court must determine whether a valid agreement to arbitrate exists. *Id.*; *TEX. CIV. PRAC. & REM. CODE § 171.021*. The trial court's determination of the arbitration agreement's validity is a legal question subject to de novo review. *In re Kellogg Brown & Root, 80 S.W.3d 611, 615* (Tex. App.--Houston [1st Dist.] 2002, orig. proceeding). If the trial court finds a valid agreement, the burden shifts to the party opposing arbitration to raise an affirmative defense to enforcing arbitration. *Oakwood, 987 S.W.2d at 573*.

## III

### Analysis

*HN3* Although we have repeatedly expressed a strong presumption favoring arbitration, the presumption arises only after the party seeking to compel arbitration proves that a valid arbitration agreement exists. *See, e.g., Prudential Secs., Inc. v. Marshall, 909 S.W.2d 896, 898, 39 Tex. Sup. Ct. J. 116 (Tex. 1995)*; **[**9]** *High Valley Homes, Inc. v. Fudge, 2003 Tex. App. LEXIS 3273, 2003 WL 1882261, at *3 (Tex. App.--Austin April 17, 2003, no pet.)* (memorandum opinion); *see also Fleetwood Enters., Inc. v. Gaskamp, 280 F.3d 1069, 1073 (5th Cir. 2002)* (federal policy favoring arbitration does not apply to the determination of whether there is a valid agreement to arbitrate; instead, ordinary contract principles are applied). *HN4* Arbitration agreements are interpreted under traditional contract principles. *Jenkens & Gilchrist v. Riggs, 87 S.W.3d 198, 201 (Tex. App.-Dallas 2002, no pet.)*; *Pepe Int'l Dev. Co. v. Pub Brewing Co., 915 S.W.2d 925, 930 (Tex. App.-Houston [1st Dist.] 1996, no writ)*; *see also First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 944, 131 L. Ed. 2d 985, 115 S. Ct. 1920 (1995)* (holding that, when deciding whether the parties agreed to **[*228]** arbitrate, "courts generally . . . should apply ordinary state-law principles that govern the formation of contracts"). Thus, an employer attempting to enforce an arbitration agreement must show the agreement meets all requisite contract elements. *HN5* At-will employment does not preclude formation of other contracts between employer **[**10]** and employee, so long as neither party relies on continued employment as consideration for the contract. *See Light v. Centel Cellular Co., 883 S.W.2d 642, 645, 37 Tex. Sup. Ct. J. 838 (Tex. 1994)* (because at-will employer always retains the option to discontinue employment at any time, the promise of continued employment is

---

[1]   Davidson has not filed a petition for writ of mandamus with this Court under the Federal Arbitration Act, *see Jack B. Anglin Co. v. Tipps,* 842 S.W.2d 266, 272-73, 36 Tex. Sup. Ct. J. 205 (Tex. 1992), and does not dispute that the Texas Arbitration Act controls.

illusory and insufficient consideration for employee's promise not to compete). Here, the parties dispute whether the reciprocal promises to arbitrate are sufficient consideration to support enforcing the arbitration agreement.

We recently considered whether an arbitration agreement between an employer and at-will employee was supported by sufficient consideration. *See In re Halliburton Co., 80 S.W.3d at 566*. We note, however, that the court of appeals' decision and both parties' submissions to this Court occurred before we decided *Halliburton.* In *Halliburton,* the employer notified employees of a new alternative dispute resolution program that required both the employer and the employees to submit all employment-related disputes to binding arbitration. *Id. at 568*. The terms included the employer's right to modify or discontinue **[**11]** the program, but also required the employer to give its employees notice of changes and stated that any amendments would apply only prospectively. *Id. at 569-70*.

We upheld the arbitration agreement between Halliburton and its employee. *Id. at 570*. We concluded that the employee's at-will employment status did not render the agreement illusory because Halliburton did not rely on continued employment as consideration for the agreement. Instead, mutual promises to submit all employment disputes to arbitration constituted sufficient consideration, because both parties were bound to the promises to arbitrate. *Id. at 569*.

Halliburton's right to modify or terminate the policy did not allow the employer to avoid its promise to arbitrate because it was limited by express contract provisions. *Id. at 569-70*. First, the policy stated that any changes only applied prospectively to unknown claims. *Id.* And second, if Halliburton terminated the policy, such termination required notice and applied to both Halliburton's and the employees' rights. *Id.* Therefore, Halliburton could not avoid its promise to arbitrate by amending **[**12]** or terminating the dispute resolution program. *Id.* Because the express terms of the policy provided that both the employee and Halliburton were bound to their promises to arbitrate, we held the agreement was not illusory. *Id. at 570*. Here, we are asked to decide whether the terms of the agreement between Davidson and Webster are distinguishable from *Halliburton.*

Davidson argues that its dispute resolution policy is enforceable because, like *Halliburton,* the agreement includes reciprocal promises to waive the right to litigation and submit all employment disputes to binding arbitration. *See In re Alamo Lumber Co., 23 S.W.3d 577, 579-80 (Tex. App.-San Antonio 2000, pet. denied)* ("Since the parties surrendered their rights to trial by jury, these mutual promises supply valid consideration."). Thus, Davidson contends there is sufficient consideration to support the arbitration agreement. On the other hand, Webster argues that the arbitration agreement is illusory because the express terms of the agreement provide that Davidson was not bound by its terms.

**[*229]** It is clear that Davidson and Webster "mutually agreed and contracted" to submit disputes **[**13]** to arbitration. At the end of the one-page document containing their agreement, however, is the following statement: "The Company reserves the right to unilaterally abolish or modify any personnel policy without prior notice." Our resolution of this case depends on the relationship between those two provisions.

*HN6* In construing this agreement, we first determine whether it is possible to enforce the contract as written, without resort to parol evidence. Deciding whether a contract is ambiguous is a question of law for the court. *Coker v. Coker, 650 S.W.2d 391, 394, 26 Tex. Sup. Ct. J. 368 (Tex. 1983)*. *HN7* In construing a written contract, the primary concern of the court is to ascertain the true intentions of the parties as expressed in the instrument. *R & P Enters. v. LaGuarta, Gavrel & Kirk, Inc., 596 S.W.2d 517, 518, 23 Tex. Sup. Ct. J. 280 (Tex. 1980)*; *City of Pinehurst v. Spooner Addition Water Co.,* 432 S.W.2d 515, 518, 12 Tex. Sup. Ct. J. 25 (Tex. 1968). To achieve this objective, we must examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless. *Universal C.I.T. Credit Corp. v. Daniel,* 150 Tex. 513, 243 S.W.2d 154, 158 (Tex. 1951). **[**14]** No single provision taken alone will be given controlling

effect; rather, all the provisions must be considered with reference to the whole instrument *Myers v. Gulf Coast Minerals Mgmt. Corp., 361 S.W.2d 193, 196, 6 Tex. Sup. Ct. J. 24 (Tex. 1962)*; *Citizens Nat'l Bank v. Tex. & P. Ry. Co., 136 Tex. 333, 150 S.W.2d 1003, 1006 (Tex. 1941)*. **HN8** A contract is unambiguous if it can be given a definite or certain legal meaning. *Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd., 940 S.W.2d 587, 589, 40 Tex. Sup. Ct. J. 42 (Tex. 1996)*. On the other hand, if the contract is subject to two or more reasonable interpretations after applying the pertinent rules of construction, the contract is ambiguous, creating a fact issue on the parties' intent. *Id.*

In this case, we cannot give the arbitration agreement a definite or certain legal meaning because it is unclear whether Davidson's unrestricted right to "unilaterally abolish or modify any *personnel policies*" gives it the right to terminate the *arbitration agreement* without notice. (Emphasis added.) Stated more succinctly, is the arbitration agreement a "personnel policy"?

We cannot answer this question by reading the agreement's terms. The **[**15]** agreement is titled "Alternative Dispute Resolution Policy" on one line, and "Employment Application Language" on the next. The document addresses several issues that refer specifically to the employment application process but have no bearing on alternative dispute resolution. For example, Webster agreed to submit to a background check and physical examination. He promised to abide by company policies and acknowledged that his employment was at-will. The "personnel policy" language is not in the first paragraph, which contains the promise to arbitrate, but appears only in the second paragraph, which discusses these other, unrelated employment issues.

In their attempt to construe the agreement, the court of appeals' justices could not agree on the scope of Davidson's right to terminate the agreement. Although silent on ambiguity, the majority held that the "personnel policy" language permitted Davidson to terminate the arbitration agreement at any time. *49 S.W.3d at 514* ("Although Davidson agreed to submit 'any and all claims, disputes or controversies' arising between it and appellee to arbitration, it explicitly retained the absolute right to modify or terminate the **[**16]** policy at any time."). Conversely, the dissent held that Davidson's unilateral right to terminate or modify personnel policies did not **[*230]** affect the parties' separate agreement to arbitrate; in fact, the dissent noted that "in the event the employer exercised that right [to modify or terminate] *the employee retained the right to force arbitration on the issue.*" *Id. at 518* (emphasis added). If the dissent had interpreted the "personnel policy" language as applying to the arbitration agreement itself, Webster would not have the right to seek arbitration on the issue following termination of the arbitration agreement.

The proper interpretation of this language is critical. [2] In *Halliburton,* we rejected the argument that the arbitration agreement at issue was illusory because, among other things, it required ten days notice of any

---

[2]   We note that most courts that have considered this issue have held that, if a party retains the unilateral, unrestricted right to terminate the arbitration agreement, it is illusory. *Dumais v. Am. Golf Corp., 299 F.3d 1216, 1219 (10th Cir. 2002)* ("We join other circuits in holding that an arbitration agreement allowing one party the unfettered right to alter the arbitration agreement's existence or its scope is illusory."); *Floss v. Ryan's Family Steak Houses, Inc., 211 F.3d 306, 315-16 (6th Cir. 2000)* (arbitration agreement was "fatally indefinite" and illusory because employer "reserved the right to alter applicable rules and procedures without any obligation to notify, much less receive consent from," other parties) (citing 1 SAMUEL WILLISTON, CONTRACTS § 43, at 140 (3d ed. 1957)); *Hooters of Am., Inc. v. Phillips, 173 F.3d 933, 939 (4th Cir. 1999)* (arbitration agreement unenforceable in part because Hooters, but not employee, could cancel agreement with 30 days notice, and Hooters reserved the right to modify the rules "without notice"; nothing in the rules even prohibits Hooters from changing the rules in the middle of an arbitration proceeding."); *Gibson v. Neighborhood Health Clinics, 121 F.3d 1126, 1133 (7th Cir. 1997)* (Cudahy, J., concurring) (promise to arbitrate was illusory in part because employer retained the right to change or revoke the agreement "at any time and without notice"); *Snow v. BE&K Constr. Co., 126 F. Supp. 2d 5, 14-15 (D. Maine 2001)* (citations omitted)(arbitration agreement illusory because employer "reserved the right to modify or discontinue [the arbitration] program at any time"; "Defendant, who crafted the language of the booklet, was trying to 'have its cake and eat it too.' Defendant wished to bind its employees to the terms of the booklet, while carving out an escape route that would enable the company to avoid the terms of the booklet if it later realized the booklet's terms no longer served its interests."); *Trumbull v. Century Mktg. Corp., 12 F. Supp. 2d 683, 686 (N.D. Ohio 1998)*(no binding arbitration agreement because "the plaintiff would be bound by all the terms of the handbook

modification or termination and stated that any such amendment would apply prospectively only. *80 S.W.3d at 569-70*. Thus, we held that "Halliburton cannot avoid its promise to arbitrate by amending the provision or terminating it altogether." *Id. at 570*. The termination provision in this case does not contain **[\*\*17]** similar limitations. Accordingly, we hold that the agreement is ambiguous and must be remanded to the trial court to determine what the parties intended by the clause 'The 'Company' reserves the **[\*231]** right to unilaterally abolish or modify any personnel policy without prior notice."

 **[\*\*18]** We add a brief response to the dissents. The proper interpretation of this document has split both the court of appeals and this Court. Justice Smith contends the agreement is unambiguous and clearly compels Webster to arbitrate. Justice Schneider says the agreement is unambiguous but clearly illusory. We will not reiterate our thoughts on ambiguity, but believe it helpful to respond to some of the dissents' concerns. Both dissents assert that the title of the document must be considered insofar as it references arbitration, but they omit from consideration that portion of the title, and contents of the document, that pertain to personnel policies. Justice Smith determines that the document is "primarily devoted to setting forth an arbitration policy," even though arbitration is discussed in only the first paragraph, which comprises less than fifty percent of the text (and, as Justice Schneider points out, only two of fifteen sentences). *49 S.W.3d at 510*. The document is set out in full in this opinion, and we need not belabor the point. Suffice it to say that - as evidenced by the multiple disagreements about its meaning among this Court's justices - the agreement **[\*\*19]** is subject to more than one reasonable interpretation. Under our precedent, the document is ambiguous. *Columbia, 940 S.W.2d at 589*.

Rather than follow this precedent, however, Justice Smith would enforce a deeply flawed agreement that he admits is "far from a model of precise drafting." *49 S.W.3d at 510*. Indeed, the one-page document is rife with grammatical errors, misspellings, and omitted words. Webster waived his right to "trail by jury," even for claims "based on the Construction of . . . he United States." He also agreed that "the Arbitration Tribunal shall be the sole and existence of its jurisdiction over all parties and issues," whatever that means. While we generally favor arbitration agreements, we should not reflexively endorse an agreement so lacking in precision that a court must first edit the document for comprehension, and then rewrite it to ensure its enforceability.

Justice Schneider implies that, because the parties do not contend the agreement is ambiguous, we may not hold that it is. This is contrary to Texas law. *See Sage St. Assoc. v. Northdale Constr. Co., 863 S.W.2d 438, 444-45, 36 Tex. Sup. Ct. J. 1118 (Tex. 1993)* (holding jury question **[\*\*20]** was presented by ambiguity in construction agreement; *HN9* a court may conclude that a contract is ambiguous even in the absence of such a pleading by either party); *Coker, 650 S.W.2d at 393* (concluding agreement was ambiguous even though both parties asserted property settlement agreement was unambiguous and moved for summary judgment); *Acadian Geophysical Servs., Inc. v. Cameron, 119 S.W.3d 290, 302 (Tex. App.-Waco 2003, no pet. h.)*; *W. W. Laubach Trust/The Georgetown Corp. v. The Georgetown Corp./W. W. Laubach Trust, 80 S.W.3d 149, 155 (Tex. App.-Austin 2002, pet. denied)*; *Arredondo v. City of Dallas, 79 S.W.3d 657, 667 (Tex. App.-Dallas 2002, pet. denied)*; *Z.A.O., Inc. v. Yarbrough Drive Ctr. Joint Venture, 50 S.W.3d 531, 540 (Tex.App.-El Paso 2001, no pet.)*; *N. Cent. Oil Corp. v. Louisiana Land & Exploration Co., 22 S.W.3d 572, 576 (Tex. App.-Houston [1st Dist.] 2000, pet. denied)*; *Curbo v. State, 998 S.W.2d 337, 343 (Tex. App.-Austin 1999, no pet.)*.

Finally, Justice Schneider states that he is reluctant to send this matter back to the trial court "because [he] **[\*\*21]** cannot imagine what such a hearing would look like." *49 S.W.3d at 511*. It is not necessary to speculate

while defendant could simply revoke any term (including the arbitration clause) whenever it desired. Without mutuality of obligation, a contract cannot be enforced."); *Simpson v. Grimes, 849 So. 2d 740, 748 (La. Ct. App. 2003)* (arbitration agreement lacked mutuality, making it "unconscionable and unenforceable": "By retaining the right to modify at will any and all provisions of the agreement in question, Argent allows itself an escape hatch from its promise to be similarly bound to arbitrate all disputes arising between the parties. Argent's ability to modify the specific terms of the agreement at will is not shared by the potential customer signing the agreement."); *In re C&H News Co., No. 13-02-529-CV, 133 S.W.3d 642, 2003 Tex. App. LEXIS 393, \*11-\*12 (Tex. App.-Corpus Christi January 16, 2003, orig. proceeding)* (employer's right to change, modify, delete, or amend the arbitration agreement "with or without prior notification to employees" made the arbitration agreement illusory).

on the character of that proceeding: the trial court will conduct an evidentiary **[\*232]** hearing to determine the parties' intent. *See Anglin, 842 S.W.2d at 269* (noting that, "if the material facts necessary to determine [a motion to compel arbitration] are controverted, by an opposing affidavit or otherwise admissible evidence, the trial court must conduct an evidentiary hearing to determine the disputed material facts"); *see also Armijo v. Prudential Ins. Co., 72 F.3d 793, 801 (10th Cir. 1995)* (Jenkins, J., concurring) (if arbitration agreement is ambiguous "the issue then becomes a factual question, to be decided from external evidence of the parties' intent, unless only one conclusion can be drawn from the undisputed evidence"); *Montgomery County Cmty. Coll. Dist. v. Donnell, Inc., 752 N.E.2d 342, 345, 141 Ohio App. 3d 593 (Ohio Ct. App. 2001)* (holding that "an ambiguity in the [arbitration] agreement . . . must be resolved by an evidentiary hearing").

Because we cannot discern whether Davidson's unilateral right to terminate "personnel policies" **[\*\*22]** applies to the agreement to arbitrate, we conclude that the arbitration agreement is ambiguous. We reverse the court of appeals' judgment and remand this case to the trial court for further proceedings consistent with this opinion. *TEX. R APP. P. 60.2(d)*.

Wallace B. Jefferson

Justice

**Dissent by:** SCHNEIDER ; ; SMITH

## Dissent

Justice Schneider, joined by Justice O'Neill, dissenting.

I respectfully dissent. The controversy in this case involves a company's arbitration policy that an employee agreed to sign after beginning his employment. When the company sought to enforce the arbitration policy, the trial court denied the motion to compel arbitration. A divided court of appeals affirmed the trial court's order. The Court says that the wording in the arbitration policy is ambiguous and that the case should be sent back to the trial court to hear evidence concerning the parties' intent. But I would not be as hasty as the Court to send this matter back to the trial court because I cannot imagine what such a hearing would look like. I would, in the first instance, hold that the policy provisions are not ambiguous. Then, in the second instance, I would hold the employee is entitled to complete relief **[\*\*23]** in this Court. The arbitration promise made by the company is illusory, and because it is, I would affirm the court of appeals' judgment denying the motion to compel arbitration.

### FACTS

Chelsey Webster ("Webster") went to work for J.M. Davidson, Inc. ("Davidson"). A few days after beginning employment, Webster signed the agreement that is at the heart of the controversy in this matter. The document, prepared by Davidson, is titled "Alternative Dispute Resolution Policy" ("ADR Policy"). [1] It is undisputed that **[\*233]** Webster was employed by Davidson at the time he signed the agreement.

---

[1]   The ADR Policy Webster signed contained only two paragraphs. The first paragraph had two sentences covering thirteen lines, and the second paragraph had thirteen sentences and nineteen lines, for a total of fifteen sentences spanning twenty-seven lines of text. Arbitration is only discussed in two of the fifteen sentences. The body of the document occupied approximately half of a letter size page. The ADR Policy has the company name, J.M. Davidson, Inc., at the top of the page in an all capitals, bold face font similar to a company letterhead. The title of the agreement, also in all capital, bold letters, is "**ALTERNATIVE DISPUTE RESOLUTION POLICY**." The sub-title of the document is "EMPLOYMENT APPLICATION LANGUAGE," styled in all capitals under the title.

 **[\*\*24]** Approximately eleven months after commencing his employment, Webster was injured on the job. Webster filed for workers' compensation benefits. Then, about one month later, Davidson terminated Webster. Webster filed suit, alleging Davidson fired him in retaliation for filing a workers' compensation claim. Davidson sought to enforce the arbitration clause contained in the ADR Policy that Webster had signed.

A hearing on Davidson's Motion to Compel Arbitration was held before the trial court. During the hearing, Davidson introduced a copy of the arbitration policy signed by Webster. Davidson never signed the agreement. But, Webster has never complained about the absence of Davidson's signature.

Davidson had the initial burden of proof to establish the arbitration agreement's existence and to show that the claims asserted against it fell within the arbitration agreement's scope. *See Williams Indus. Inc. v. Earth Dev. Sys. Corp., 110 S.W.3d 131, 134 (Tex. App.-Houston [1st Dist.] 2003, no pet.)*. If Davidson had met its burden of proof, then the burden would have shifted to Webster to show why the arbitration agreement did not apply. *Id.* At the Motion to Compel **[\*\*25]** Arbitration hearing, the trial court properly considered the pleadings of the parties, the motion to compel arbitration, and responses. *See Jack B. Anglin Co. Inc. v. Tipps, 842 S.W.2d 266, 269, 36 Tex. Sup. Ct. J. 205 (Tex. 1992)* ("the trial court may summarily decide whether to compel arbitration on the basis of affidavits, pleadings, discovery, and stipulations."). But, the trial court heard no live testimony about the ADR Policy *Cf. id.* (noting that "if the material facts necessary to determine the issue are controverted, "the trial court must conduct an evidentiary hearing to determine the disputed material facts").

After considering the evidence, the trial court denied the motion to compel arbitration without stating a reason for the denial. The record must be construed in a light favorable to supporting the judgment. *See Keller v. Nevel, 699 S.W.2d 211, 212, 29 Tex. Sup. Ct. J. 60 (Tex. 1985)*. Davidson appealed, and the court of appeals affirmed the trial court.

## ANALYSIS

In deciding the motion to compel arbitration, the trial court should have considered two issues: 1) was there a valid arbitration agreement; and 2) if so, did the agreement encompass the claim? *See In re Oakwood Mobile Homes, Inc., 987 S.W.2d 571, 573, 42 Tex. Sup. Ct. J. 377 (Tex. 1999)*; **[\*\*26]** *Dallas Cardiology Assocs., P.A. v. Mallick, 978 S.W.2d 209, 212 (Tex. App.-Texarkana 1998, pet. denied)*; *Dalton Contractors, Inc. v. Bryan Autumn Woods, Ltd., 60 S.W.3d 351, 353 (Tex. App.-Houston [1st Dist.] 2001, no pet.)*. The first of these issues is the subject of this appeal; thus, we must decide if the trial court was correct in concluding there was no valid arbitration agreement.

### A. Standard of Review

We review a trial court's decision to deny a motion to compel arbitration under a legal sufficiency or "no evidence" standard of review when factual findings are in dispute. *See Certain Underwriters v. Celebrity Inc., 950 S.W.2d 375, 377 (Tex. App.-Tyler 1996, writ dism'd w.o.j.)*. However, in this case, the only issue before us is the trial court's legal interpretation of the arbitration clause; no findings of fact were made. Thus, *de novo* review is appropriate. *Id.; see also Nationwide of Bryan, Inc. v. Dyer, 969 S.W.2d 518, 520 (Tex. App.-Austin 1998, no pet.)*; *Dalton Contractors, Inc., 60 S.W.3d at 353*.

### **[\*234]** B. Construction of the ADR Policy

Under the guise of a *de novo* **[\*\*27]** review of the trial court's legal interpretation of the agreement, the Court may not create an agreement for the parties that is different from the one they entered. But, the Court attempts to do just that. The ADR Policy expressly reserves Davidson's right to "unilaterally abolish or modify any

personnel policy without prior notice." The Court raises ambiguity as an issue *sua sponte* and concludes that this unilateral termination provision in the ADR Policy is ambiguous because "it is not possible to determine from the document itself whether the unilateral termination right applies to the parties' agreement to arbitrate, or only to 'personnel policies' concerning the at-will employment relationship." But neither Webster, Davidson, the trial court, nor the Court of Appeals have suggested the language quoted above is ambiguous. I would hold that this language regarding the unilateral termination right unambiguously applies to the entire agreement, including the agreement to arbitrate. Although ultimately the contract fails for lack of consideration (see discussion below), it cannot be said that the ADR Policy is ambiguous.

*1. The ADR Policy is not ambiguous.*

There are several **[**28]** reasons why the document can be unambiguously read so that the universal termination right language applies to the entire document. First, the document is entitled "Alternative Dispute Resolution Policy," which suggests that the unilateral termination right contained within it would apply to arbitration, as the title would be applicable to the entire document. *See e.g. Neece v. A.A.A. Realty Co.,* 159 Tex. 403, 322 S.W.2d 597, 606, 2 Tex. Sup. Ct. J. 199 (Tex. 1959) (Calvert, J., dissenting) (recognizing that the title of an agreement can have the legal effect of importing words into the contract).

Secondly, the unilateral termination right applies to "any personnel policy," and it is reasonable to conclude that an arbitration policy would fall under the category of a personnel policy. Arbitration agreements are often a part of employee manuals or personnel policies. *See e.g., In re Tenet Healthcare Ltd., 84 S.W.3d 760, 763* (Tex. App.-Houston [1st Dist.] 2002, orig. proceeding) (analyzing a legally binding arbitration agreement appearing in an employee handbook containing personnel policies). Moreover, the ADR Policy was provided by an employer to be signed by an employee, suggesting **[**29]** it is a personnel policy. It is not only reasonable to believe the arbitration provision is a personnel policy of the company, it is unreasonable to reach any other conclusion. The Court seems to suggest that the "personnel policy" must be one or the other-either a policy, or an agreement. Surely a reasonable interpretation is that it could be both.

Webster even promises to abide by all of Davidson's "policies" in the ADR Policy, and it is reasonable to conclude that Davidson wanted to retain the right to unilaterally terminate all parts of the ADR Policy because the policy did not specifically exempt the arbitration agreement from the unilateral termination right.

Finally, neither Davidson nor Webster have ever argued that the unilateral termination right did not apply to the arbitration agreement. The actions of both the parties throughout their litigation reflect the belief that the arbitration policy is a personnel policy. They both came to the Motion to Compel Arbitration hearing arguing about several issues, none of which ever raised the question of whether the arbitration policy was a personnel policy. All of their actions throughout the litigation are consistent with the **[**30]** notion that the right to unilaterally terminate applied to the arbitration policy.

 **[*235]** Webster and Davidson do offer different interpretations of the unilateral termination clause. But their differences have nothing to do with factual issues; rather, they differ in the legal significance of the arbitration policy. Nevertheless, the fact that their explanations differ does not render the contract ambiguous. *See Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd., 940 S.W.2d 587, 589, 40 Tex. Sup. Ct. J. 42 (Tex. 1996)* (noting that an ambiguity does not arise simply because parties offer conflicting interpretations of the contract). For an ambiguity to exist, both explanations must be *reasonable. Id.* Conversely, a contract is ambiguous if its language is subject to two or more reasonable interpretations. *See Monsanto v. Boustany, 73 S.W.3d 225, 229, 45 Tex. Sup. Ct. J. 497 (Tex. 2002)*. Here, there is only one reasonable interpretation of the ADR Policy, and the Court's insistence that it is ambiguous flies in the face of well-established rules of construction.

*2. Finding the ADR Policy ambiguous is contrary to well-established rules of construction.*

One of the basic tenets of contract interpretation **[**31]** is the assumption that the parties intend every part of an agreement to mean something. When construing a written contract, we are to ascertain the intent of the parties as expressed in the instrument *Nat'l Union Fire Ins. Co. of Pittsburgh, PA. v. CBI Indus. Inc., 907 S.W.2d 517, 520, 39 Tex. Sup. Ct. J. 7 (Tex. 1995)*; *718 Assocs., Ltd. v. Sunwest N.O.P., Inc., 1 S.W.3d 355, 360 (Tex. App.-Waco 1999, pet. denied)* (courts will enforce an "unambiguous instrument as written, and ordinarily, the writing alone will be deemed to express the parties intentions"). Contracts are to be read as a whole, and an interpretation that gives effect to every part of the agreement is favored so that no provision is rendered meaningless or as surplusage. *See Westwind Exploration Inc. v. Homestate Savings Ass'n., 696 S.W.2d 378, 382, 28 Tex. Sup. Ct. J. 603 (Tex. 1985)*.

The Court ignores these well-settled principles of contract interpretation when it concludes the agreement is ambiguous. Davidson's right to unilaterally abolish or modify *any* personnel policy without prior notice must be given its plain and ordinary meaning. Thus, the unilateral termination language must mean that Davidson can **[**32]** cancel or alter any personnel policy without informing Webster. Although I ultimately conclude that the ADR Policy is not binding because it is illusory, the agreement is not ambiguous.

C. The ADR Policy is unenforceable because it is illusory.

In my view, the unilateral termination right in the ADR Policy makes Davidson's performance optional as to the entire policy, and thus, renders the ADR Policy illusory. Thus, I would find that the agreement between Davidson and Webster fails to rise to the level of a contract as it lacks consideration.

*1. The ADR Policy does not contain consideration.*

Consideration is an essential element for a valid, enforceable contract. *Federal Sign v. Texas S. Univ., 951 S.W.2d 401, 408-09, 40 Tex. Sup. Ct. J. 676 (Tex. 1997)*. If mutual, reciprocal promises are binding on both parties, they may constitute consideration for a contract. *Texas Gas Util. Co. v. Barrett, 460 S.W.2d 409, 412, 14 Tex. Sup. Ct. J. 98 (Tex. 1970)*; *Johnson v. Breckenridge-Stephens Title Co., 257 S.W. 223, 225 (Tex. Com. App. 1924)*.

But, if the terms of a promise make performance optional, the promise is illusory and cannot constitute valid consideration. *Light v. Centel Cellular Co. of Texas, 883 S.W.2d 642, 645, 37 Tex. Sup. Ct. J. 838 (Tex. 1994)* **[**33]** ("When illusory promises are all that support a purported bilateral contract, there is no **[*236]** contract."); *RESTATEMENT (SECOND) OF CONTRACTS §§ 2 cmt. e*; *77 cmt. a*. Valid consideration exists if a party reserves the right to terminate an agreement with notice. *See RESTATEMENT (SECOND) OF CONTRACTS § 77 cmt. b*, illus. 5. But, a termination clause that allows a party to terminate the contract at will makes performance optional, and thus, makes any promise illusory. *See Light, 883 S.W.2d at 645*; *see also, Tenet Healthcare Ltd. v. Cooper, 960 S.W.2d 386, 388-89 (Tex. App.-Houston [14th Dist.] 1998, pet. dism'd w.o.j.)*.

Here, the ADR Policy reserves Davidson's right to "unilaterally abolish or modify any personnel policy without prior notice." Under the plain language of the contract, Davidson reserved the right to abolish or modify *any* personnel policy As explained above, the unilateral termination right would also apply to the agreement to arbitrate all claims. By retaining the right to terminate the ADR Policy at any time, Davidson can avoid arbitration. Thus, Davidson **[**34]** is not bound to its promise to arbitrate, and its promise to avoid litigation does not amount to consideration. *See In re Halliburton, 80 S.W.3d 566, 570, 45 Tex. Sup. Ct. J. 720 (Tex. 2002)* (reciprocal promises are not sufficient if one party can avoid its promise). Because there is no consideration for the ADR Policy, the agreement is illusory and unenforceable.

*2. Davidson's attempts to create consideration fail.*

In an attempt to create consideration where none exists, Davidson claims that the language regarding the unilateral termination right complied with contractual mutuality requirements because, "If…Davidson changed

the ADR policy, or abolished it altogether, the changes would have applied to both parties." However, because Davidson alone had the unilateral right to terminate or change the agreement, the agreement is illusory. It is irrelevant that any changes made by Davidson would apply to both parties.

Davidson also argues that the promise to arbitrate is not illusory because, under *Halliburton, 80 S.W.3d at 570*, it is bound to resolve any dispute according to the ADR plan in effect at the time the dispute arises. However, the express contract terms we **[**35]** relied on to find the *Halliburton* agreement enforceable are missing here. The plain language of the Halliburton ADR plan required the employer to provide notice before enacting any modifications or terminating the plan. Davidson suggests that because the agreement we upheld in *Halliburton* required notice and prospective application, the same protective language can be implied here. I disagree.

In *Halliburton,* we relied on the ADR policy's notice provisions to conclude that Halliburton could not "avoid its promise to arbitrate by amending the [policy] or terminating it altogether." *Halliburton, 80 S.W.3d at 570*. Here, we cannot imply the obligations that precluded Halliburton from avoiding its promise to arbitrate. The agreement's plain language establishes Davidson's unhindered right to modify or terminate the agreement without notice. It is not proper to imply terms that contradict the express contract language. *See Haws & Garrett Gen. Contractors, Inc. v. Gorbett Bros. Welding Co., 480 S.W.2d 607, 609-610, 15 Tex. Sup. Ct. J. 321 (Tex. 1972)* (the terms of an implied contract are inferred from the circumstances).

Davidson further attempts to explain the unilateral **[**36]** termination language as simply acknowledging an employer's right to make changes to at-will employment terms, as in *Hathaway v. Gen. Mills, Inc., 711 S.W.2d 227, 229, 29 Tex. Sup. Ct. J. 333 (Tex. 1986)*. But, the arbitration agreement's language contradicts Davidson's explanation.

 **[*237]** In *Hathaway,* we held that an employer may enforce changes to an at-will employment contract if the employer unequivocally provides notice of a definite change and the employee accepts the change by continuing employment. *Hathaway, 711 S.W.2d at 229*. Here, the contract expressly allows Davidson to effect a change in the ADR plan's terms without notice. Thus, it is inconsistent to explain the reservation language as merely restating our holding in *Hathaway,* because the arbitration agreement's terms contradict the *Hathaway* requirements.

Additionally, whether an employer has satisfied the *Hathaway* requirements is a separate inquiry from the determination of whether the arbitration agreement is enforceable under traditional contract principles. If an employer seeks to change the terms of an employment relationship by implementing an agreement to arbitrate all disputes, the employer must **[**37]** show the arbitration agreement, standing alone, satisfies all requisite elements of a valid contract. *See Light, 883 S.W.2d at 645-46*; *Halliburton, 80 S.W.3d at 569*. This showing is separate from the employer's duty to meet the *Hathaway* requirements of notice and acceptance. *Id.*

Davidson's attempts to create consideration *via* an alternate reading of the language of the agreement are not reasonable. When the meaning of an agreement is plain and unambiguous, a party's construction is immaterial. *718 Associates, Ltd., 1 S.W.3d at 360*. I would find the contract unenforceable because it fails for lack of consideration and is illusory.

*3. The Court incorrectly concludes that the unilateral termination right is ambiguous.*

The Court sends this case back for the trial court to consider parol evidence, finding that a fact issue exists concerning the applicability of the language in question to the arbitration agreement. But, as discussed above, the language unambiguously gives Davidson the right to unilaterally terminate any part of the agreement. Thus, there is no fact issue to be determined by the trial court and there is **[**38]** no need for parole evidence to be taken.

*4. The unilateral termination right does not only apply prospectively.*

Although I agree with Justice Smith that the contract is unambiguous and the arbitration agreement is a personnel policy subject to Davidson's unilateral termination right, I cannot agree that the right to abolish or modify personnel policies only applies prospectively with contemporaneous notice. The ADR Policy allows Davidson to unilaterally abolish or modify any personnel policy "without prior notice." Justice Smith looks to England to determine how to interpret the phrase "without prior notice."

However, applicable precedent can be found closer to home. For example, in *Shumway v. Horizon Credit Corp., 801 S.W.2d 890 (Tex. 1991)*, we held that the language "without prior notice" waived the right to all notice. *801 S.W.2d at 893-94*. Similarly, in *Musgrave v. HCA Mideast, Ltd., 856 F.2d 690 (4th Cir. 1988)*, the court interpreted a contract providing that the employer had the right to terminate an employee's service "without prior notice." The Fourth Circuit concluded that this language "states simply that [the employee] **[**39]** could be terminated during the probation period without notice." *856 F.2d at 694*. Justice Smith's interpretation that "without prior notice" means "with contemporaneous notice" is not supported-and indeed, is contradicted-by caselaw from American jurisdictions.

Justice Smith is essentially inserting a qualifying phrase into Davidson's unilateral, unqualified right to terminate. Even **[*238]** though the ADR Policy permits Davidson to "unilaterally abolish or modify any personnel policy without prior notice," Justice Smith interprets this as requiring contemporaneous notice. The agreement contains no such limitation.

Justice Smith also attempts to distinguish our holding in *Hathaway* by noting that in that case, while we required an employer making a change to an at-will employment policy to provide notice, we did not specify that the notice had to be given before the change was made. Justice Smith contends that under our decision in *Hathaway,* notice could be "either in advance of or contemporaneous with the policy change." However, Justice Smith misunderstands our holding in *Hathaway.* In *Hathaway,* we explained the employee must have knowledge of the employer's proposed **[**40]** modification to an at-will employment policy to constitute effective notice; that is, the employee must "know the nature of the changes and the certainty of their imposition." *Hathaway, 711 S.W.2d at 229*. Requiring the employer to prove unequivocal notification of changes to the employment terms was based, in part, on fairness to the employee. *See id.* The requirement that an employee be aware that changes to the employment policy are certain to be imposed implies that there must be prior notice. It is unreasonable to conclude contemporaneous notice of a policy change is permissible under *Hathaway.* Indeed, permitting an employer to give contemporaneous notice of changed employment terms undermines *Hathaway's* concerns for fairness to an employee and stretches our holding in *Hathaway* too far.

Moreover, Justice Smith confuses the *Hathaway* requirements for changes to an at-will employment agreement with the requirements for a valid, enforceable arbitration agreement. They are two separate inquiries. Even assuming Justice Smith is correct that Davidson may give contemporaneous notice of a change to the terms of Webster's employment terms under *Hathaway,* **[**41]** the arbitration clause of the ADR Policy remains illusory and unenforceable. If contemporaneous notice to cancel the arbitration agreement is permissible, Davidson retains the right to discontinue performance at any time. Under this scenario, there is no consideration, as Davidson is not giving up a benefit or suffering a detriment. *See e.g., In re C&H News Co., 2003 Tex. App. LEXIS 393, No. 13-02-529-CV, 2003 WL 131770 at *4 (Tex. App.-Corpus Christi 2003*, orig. proceeding). Thus, the arbitration clause would still be illusory and unenforceable.

D. Enforceable arbitration agreements must bind both the employer and the employee.

There is no mystery to drafting an enforceable arbitration agreement. Capable counsel know that limitations on an employer's right to terminate the agreement are necessary so the agreement is not illusory. *See, e.g., In re*

*Tenet Healthcare, Ltd., 84 S.W.3d at 766-67* (arbitration provision was enforceable because the right to terminate the agreement specifically excepted the arbitration agreement); *In re Kellogg Brown & Root, 80 S.W.3d 611, 616* (Tex. App.-Houston [1st Dist.] 2002, orig. proceeding) (arbitration agreement **[**42]** enforceable because it provided that it could be amended or terminated by the company by giving at least 10 days notice to employees and that such amendment would not apply to a dispute that had been initiated); *In re Jebbia, 26 S.W.3d 753, 758* (Tex. App.-Houston [14th Dist.] 2000, orig. proceeding).

In this agreement, however, there was no limitation to Davidson's right to terminate, amend, or cancel the agreement. **[*239]** The only consideration for the agreement was continued at-will employment, which amounts to no consideration. *Light, 883 S.W.3d at 644*. Thus, the arbitration agreement is illusory and unenforceable.

**CONCLUSION**

I disagree with the Court's determination that the arbitration agreement is ambiguous. I also believe the agreement is illusory. In *Halliburton,* we said that an arbitration agreement's terms must bind both the employer and employee if the agreement relies on mutual promises to arbitrate for consideration Davidson's ADR Policy lacks the protections we relied on in *Halliburton* to find the promises to arbitrate mutually binding. The unilateral right to modify or terminate the agreement without notice allows Davidson **[**43]** to avoid its promise at any time. Accordingly, I would hold that the arbitration agreement between Davidson and Webster fails to bind Davidson, and thus, the promise is illusory and the agreement is unenforceable for want of consideration. I would affirm the court of appeals' judgment.

MICHAEL H. SCHNEIDER

JUSTICE

OPINION DELIVERED: December 31, 2003

JUSTICE SMITH, dissenting.

I share the Court's view that the contract executed by the parties is far from a model of precise drafting, but I disagree that the phrase "any personnel policy" cannot be given a definite legal meaning. Like Justice Schneider, I believe that the arbitration policy falls within the ambit of the phrase "any personnel policy." However, I disagree with the portion of Justice Schneider's dissent that concludes the entire contract is unenforceable.

I would hold that the contractual provision allowing Davidson to "abolish or modify any personnel policy without prior notice" applies to the company's alternative dispute resolution policy, but that it does not waive Webster's right under Texas at-will employment law to contemporaneous notice of any change in Davidson's ADR policy. The rules of contract interpretation **[**44]** counsel against construing termination clauses as being retroactively exercisable and in favor of interpreting contracts to be valid. Because the relevant provision is properly construed as applying only prospectively to disputes arising after contemporaneous notice to Webster of Davidson's decision to abolish or modify its ADR policy, it does not render illusory the parties' otherwise clearly enforceable arbitration agreement.

**I**

Whether an agreement imposes a duty on the parties to arbitrate a dispute is a matter of contract interpretation and a question of law for the court. *Tenet Healthcare Ltd. v. Cooper, 960 S.W.2d 386, 388 (Tex. App.-Houston [14th Dist.] 1998, pet. dism'd w.o.j.)*. Similarly, whether a contract is ambiguous is itself a question of law. *Kelley-Coppedge, Inc. v. Highlands Ins. Co., 980 S.W.2d 462, 464, 42 Tex. Sup. Ct. J. 130 (Tex. 1998)*. We

review questions of law de novo. *El Paso Natural Gas Co. v. Minco Oil & Gas, Inc., 8 S.W.3d 309, 312, 43 Tex. Sup. Ct. J. 116 (Tex. 1999)*. In a de novo review, no deference is accorded to the lower court decision. *Quick v. City of Austin, 7 S.W.3d 109, 116, 42 Tex. Sup. Ct. J. 1217 (Tex. 1998)*.

The one-page contract was the **[**45]** only evidence presented by the parties in the trial court. Accordingly, the only issues on appeal are the legal questions of whether the contract is ambiguous and illusory. I apply de novo review to both.

## II

The contract states that Davidson "reserves the right to unilaterally abolish or modify any personnel policy without prior notice." The Court professes an inability to decipher whether the arbitration policy ratified by the contract is a "personnel **[*240]** policy" and, *sua sponte,* therefore concludes that the contract is ambiguous. However, uncertainty or lack of clarity is not enough to render a contract ambiguous. *Universal C.I.T. Credit Corp. v. Daniel,* 150 Tex. 513, 243 S.W.2d 154, 157 (Tex. 1951) ("It must be conceded that there is an absence of artistry in the grammatical construction and punctuation of paragraph 1 of the contract, but is its meaning when properly read and interpreted so dubious as to subject the contract to the charge of ambiguity, thereby justifying the court in calling into play the rule of strong construction against the author of an instrument? We think not."); *Preston Ridge Fin. Servs. Corp. v. Tyler, 796 S.W.2d 772, 777 (Tex.* **[**46]** *App.-Dallas 1990, writ denied)*; *Med. Towers, Ltd. v. St. Luke's Episcopal Hosp., 750 S.W.2d 820, 822 (Tex. App.-Houston [14th Dist.] 1988, writ denied)*.

Contractual provisions must be considered with reference to the entire instrument *Myers v. Gulf Coast Minerals Mgmt. Corp., 361 S.W.2d 193, 196, 6 Tex. Sup. Ct. J. 24 (Tex. 1962)*. The main heading of the parties' contract reads "Alternative Dispute Resolution Policy" and the text below purports to determine the relationship between Davidson and its personnel. *See E.H.Perry & Co. v. Langbehn, 113 Tex. 72, 252 S.W. 472, 474-75 (Tex. 1923)* (title of an instrument, like every other portion of a contract, may be consulted in determining its meaning). In this context, we must give the phrase "any personnel policy" its natural and obvious import. *See, e.g., Pagel v. Pumphrey, 204 S.W.2d 58, 64 (Tex. Civ. App.-San Antonio 1947, writ ref'd n.r.e.)*.

Applying the foregoing rules of construction, it is clear that the arbitration policy memorialized in the contract is a "personnel policy" and that the disputed provision unambiguously provides that Davidson has the right to abolish or modify its arbitration policy **[**47]** without prior notice. I simply cannot conclude that an arbitration policy that governs the conditions of employment for personnel is not encompassed by the phrase "any personnel policy," particularly when that phrase appears in a contract that is primarily devoted to setting forth an arbitration policy.

## III

Justice Schneider asserts, and the Court implies, that if the disputed termination provision does apply to Davidson's arbitration policy, the contract is illusory. Because Davidson retained the ability to unilaterally abolish or modify its arbitration policy at any time, the argument goes, it assumed no obligation to Webster, and therefore Davidson's promise to arbitrate does not constitute consideration for Webster's reciprocal promise. [1] In my view, the provision's "without prior notice" language does not disclaim the requirement set forth in *Hathaway v. General Mills, Inc., 711 S.W.2d 227, 29 Tex. Sup. Ct. J. 333 (Tex. 1986)* of contemporaneous notice for modifications to the at-will employment relationship. The provision is properly construed as applying only

---

[1] However, there is no evidence that Davidson ever attempted to abolish or modify the arbitration agreement or that Webster ever harbored any doubt that he could compel arbitration for any dispute that arose, including the one before the Court.

prospectively to disputes arising after contemporaneous notice to Webster of Davidson's decision to abolish or modify **[\*\*48]** its ADR policy.

It is significant that the word "prior" precedes "notice" in the relevant provision. We must presume that each word in a contract has some significance and meaning. *Gates v. Asher, 154 Tex. 538, 280 S.W.2d 247, 249 (Tex. 1955)*. For example, courts presume that words that follow one another are not intended to be redundant. *See Gulf Metals Indus., Inc. v. Chicago* **[\*241]** *Ins. Co., 993 S.W.2d 800, 805 (Tex. App.-Austin 1999, pet. denied)* (in construing the phrase "sudden and accidental," a temporal meaning was applied to "sudden" because "accidental" describes an unforeseen or unexpected event and ascribing the same meaning to "sudden" would render the terms redundant and violate the rule that each word in a contract be given effect.). Applying **[\*\*49]** the foregoing Texas case law, we must presume that the parties in this case did not intend for the phrase "without prior notice" to mean without any notice. [2]

I have been unable to locate any Texas or federal case law specifically addressing whether the phrase "without prior notice" should be given the same meaning as "without notice." [3] However, an English appellate court concluded:

> A clause providing for termination of the scheme by the employer "without prior notice" means without notice in advance. Those words do not suggest that notice does not have to be given to effect termination of rights under the contract of employment. The clause puts the employee on warning that the scheme might not be permanent and that the employer reserves the right to terminate **[\*\*50]** it without giving advance warning, but it does not mean that the employer's obligations can end without the employee being told.

*Bainbridge v. Circuit Foil (UK) Ltd.* [1997], Industrial Relations Law Reports (IRLR) 305 (Eng. C.A.). While authority authored on this side of the Atlantic is obviously preferable, an opinion issued by an English appellate court can surely be considered on a question such as the one presented here that does not involve interpretation of a statutory or constitutional provision, but rather interpretation of three basic English words contained in a private employment contract.

**[\*\*51]** Consistent with the well-established rule that each word in a contract be given effect, the phrase "without prior notice" contained in the parties' contract should be interpreted to mean without notice in advance rather than without any notice. Therefore, the "without prior notice" language does not disclaim the contemporaneous notice that is required by Texas common law to effect a change in the terms of an at-will employment relationship. [4]

In *Hathaway,* **[\*\*52]** we held that the party asserting a change to an at-will employment contract "must prove two things: (1) notice of the change; and, (2) acceptance of the change." *711 S.W.2d at 229*. We noted that "to prove notice, an employer **[\*242]** asserting a modification must prove that he unequivocally notified the

---

[2]  Neither the Court nor Justice Schneider attributes any meaning to "prior" and both repeatedly refer to the disputed provision as stating "without notice," thereby, *sub silentio,* writing the word "prior" out of the parties' contract.

[3]  Justice Schneider argues that *Shumway v. Horizon Credit Corp.,* 801 S.W.2d 890 (Tex. 1991) and *Musgrave v. HCA Mideast, Ltd.,* 856 F.2d 690 (4th Cir. 1988) are "applicable precedent." 49 S.W.3d at 520. However, neither case is on point. In both *Shumway* and *Musgrave,* whether the phrase "without prior notice" should be given a different meaning from "without notice" was not at issue and, therefore, was neither addressed nor decided.

[4]  Another factor counseling in favor of interpreting the relevant provision as applying only prospectively without diselaiming Texas common law requiring contemporaneous notice is the use of the word "reserves." This word choice suggests that Davidson is memorializing a right that is consistent with its existing legal rights. "This word [reserves] means to keep or retain; that is to say, to keep what one already has. You do not reserve a right which you do not possess." *Baldwin v. Bd. of Tax-Roll Corrs.,* 331 P.2d 412, 414, 1958 OK 202 (Okla. 1958).

employee of definite changes in employment terms." *Id.* We did not indicate when the notice had to be provided, thereby implying it could be given either in advance of or contemporaneous with the policy change. [5]

The *Hathaway* requirements are applicable here because the parties sought to modify their pre-existing at-will employment relationship to include binding arbitration. The contract, including the arbitration agreement therein, is incident to the at-will employment relationship between Davidson **[**53]** and Webster and refers to this relationship in several places. Therefore, if Davidson abolished or modified its arbitration policy, this would effect a change in the terms of the at-will employment relationship between it and Webster.

"Words of promise which by their terms make performance entirely optional with the 'promisor' do not constitute a promise." *RESTATEMENT (SECOND) OF CONTRACTS § 77 cmt. a* (1981). However, "[a] limitation on the promisor's freedom of choice need not be stated in words. It may be an implicit term of the promise, or it may be supplied by law." *Id.* cmt. d. The provision at issue here, while disclaiming advance notice, is consistent with *Hathaway's* contemporaneous notice requirement and, as such, should not be read as an attempt to disclaim this implied, default legal prerequisite for modifying the conditions of an at-will employment relationship. [6]

**[**54]** Other courts have determined that when a contractual termination or modification provision does not state whether it applies prospectively or retroactively, the default interpretation should be prospective only, as this avoids nullifying the intent of the parties to form an agreement. *See Barker v. Ceridian Corp., 122 F.3d 628, 638 (8th Cir. 1997)* (where retirement plan was silent regarding whether terms could be modified retroactively, prospective application favored because it avoids finding promise illusory); *Kemmerer v. ICI Ams., Inc., 70 F.3d 281, 287-88 (3d Cir. 1995)*.

Several other courts have adopted *Kemmerer's* rationale:

> The court's reasoning [in *Kemmerer*] can be captured in a simple illustration. If an employee is promised $ 10 per hour effective Monday, and told that her wage can be reduced at any time, and on Wednesday her wage is cut to $ 5 effective Thursday, her employer cannot refuse on pay day to give her $ 10 per hour for her work on Monday through Wednesday. Far from requiring that the employer express an explicit intent to pay $ 10 per hour for Monday through Wednesday's work notwithstanding the employer's freedom **[**55]** to reduce wages at any time, the Third Circuit held that what would have to be preserved explicitly would be an employer's right to **[*243]** apply the reduced wage *retroactively* to Monday through Wednesday's work. A contrary rule would lack any basis in contract law.

*Abbott v. Schnader, Harrison, Segal & Lewis, LLP, 2002 PA Super 247, 805 A.2d 547, 559 (Pa. Super. Ct. 2002)* (quoting *Amatuzio v. Gandalf Sys. Corp., 994 F. Supp. 253, 266 (D.N.J. 1998))*.

---

[5]   Justice Schneider argues that the relevant provision "contradicts the *Hathaway* requirements." *49 S.W.3d at 515*. However, in *Hathaway* we required only notice, not advance notice.

[6]   This case is distinguishable from the following cases cited in the Court's second footnote in which arbitration agreements were held to be illusory because the provision at issue allowed one party to terminate the agreement at anytime without any notice. *Floss v. Ryan's Family Steak Houses, Inc., 211 F.3d 306, 315-16 (6th Cir. 2000)* (arbitration agreement was "fatally indefinite" and illusory because employer reserved the right to alter applicable rules and procedures without any obligation to notify employee); *Gibson v. Neighborhood Health Clinics, 121 F.3d 1126, 1133 (7th Cir. 1997)* (Cudahy, J., concurring) (promise to arbitrate was illusory because employer retained the right to change or revoke the agreement "at any time and without notice.").

Indeed, Justice Schneider's dissent [7] and, if its second footnote is more than mere dicta, the Court's opinion, would render the entire at-will employment contract between Webster and Davidson illusory because Webster's rate of compensation and all other "personnel policies" would be subject to unilateral, retroactive change by Davidson. Certainly, this is not a reasonable interpretation.

 [**56] Because the disputed provision did not expressly authorize Davidson to retroactively alter the arbitration agreement, I would follow the rule that, unless expressly stated otherwise, such provisions should be interpreted to apply only prospectively. Consequently, Davidson would be perpetually bound to arbitrate any dispute that arose prior to Davidson informing Webster of a change in its arbitration policy. As such, Davidson could not, after a dispute had arisen, let alone during the final stages of binding arbitration, implement a change in its arbitration policy that would be applicable to that dispute.

Finally, reading the contract as allowing Davidson to unilaterally abolish or modify the arbitration policy only prospectively with contemporaneous notice is supported by the longstanding rule that contracts should be construed in favor of validity. *See Wood Motor Co., Inc. v. Nebel, 150 Tex. 86, 238 S.W.2d 181, 183 (Tex. 1951)* ("It is elementary that if a contract is susceptible of two constructions, one of which would render it valid and the other void, the former will be adopted."); *Harris v. Rowe, 593 S.W.2d 303, 306, 22 Tex. Sup. Ct. J. 523 (Tex. 1979)*; *Lavaca Bay Autoworld v. Marshall Pontiac Buick Oldsmobile, 103 S.W.3d 650, 657* [**57] (Tex. App.-Corpus Christi 2003, no pet.).* Since the parties are presumed to know the law and intend their contract to have legal effect, their contract will be construed in view of this presumption. *Foard County v. Sandifer, 105 Tex. 420, 151 S.W. 523, 524 (Tex. 1912)*; *Dewhurst v. Gulf Marine Inst. of Tech., 55 S.W.3d 91, 97 (Tex. App.-Corpus Christi 2001, pet. denied)*. We have specifically held that contracts should be construed in favor of mutuality. *Tex. Gas Utils. Co. v. Barrett, 460 S.W.2d 409, 412, 14 Tex. Sup. Ct. J. 98 (Tex. 1970)*.

Under this prospective construction, whereby Davidson is free to alter its arbitration policy after giving contemporaneous notice only as to claims that had not yet arisen, it is clear that the contract is not illusory. Once the parties' contract is read as not disclaiming the contemporaneous notice requirement set forth in *Hathaway,* this case becomes indistinguishable from *In re Halliburton Co., 80 S.W.3d 566, 45 Tex. Sup. Ct. J. 720 (Tex. 2002)* in which we held that a similar arbitration agreement was not illusory because the unilateral termination provision could be exercised only with notice.

## IV

By binding itself to arbitration [**58] until it provides contemporaneous notice of a new dispute resolution policy that will apply only prospectively, Davidson has provided consideration to Webster, and the parties' contract is therefore not illusory. If the [*244] contract were interpreted as allowing Davidson to retroactively revoke the arbitration agreement without contemporaneous notice, it would either be illusory or unconscionable, as Davidson could decide after a dispute arises whether it prefers to arbitrate or go to court. However, that is not this case.

Based on the foregoing, I conclude that the contract is neither ambiguous nor illusory, and therefore validly compels the parties to arbitrate their dispute. Accordingly, I respectfully dissent.

Steven Wayne Smith

Justice

---

[7] For example, Justice Schneider asserts: "Davidson's right to unilaterally abolish or modify any personnel policy without prior notice must be given its plain and ordinary meaning. Thus, the unilateral termination language must mean that Davidson can cancel or alter any personnel policy without informing Webster." 49 S.W.3d at 518.

Opinion delivered: December 31, 2003



**Q** Questioned

As of: September 1, 2015 2:35 PM EDT

# *Jack B. Anglin Co. v. Tipps*

Supreme Court of Texas

November 18, 1992, DELIVERED

NO. D-1750

**Reporter**

842 S.W.2d 266; 1992 Tex. LEXIS 150; 36 Tex. Sup. J. 205; 61 U.S.L.W. 2376

JACK B. ANGLIN CO., INC. v. THE HONORABLE ARTHUR TIPPS, JUDGE

**Disposition:** **[**\*\*1**]** Although mandamus relief will not issue merely because an appellate remedy may be more expensive and time-consuming than mandamus, it will issue when the failure to do so would vitiate and render illusory the subject matter of an appeal. Absent mandamus relief, Anglin would be deprived of the benefits of the arbitration clause it contracted for, and the purpose of providing a rapid, inexpensive alternative to traditional litigation would be defeated. Accordingly, we conditionally grant the writ of mandamus and direct the trial court to order that all claims, including the City's DTPA claims, proceed to arbitration under the Federal Arbitration Act. The clerk is instructed to issue the writ only should the trial court fail to do so.

## Core Terms

arbitration, compel arbitration, trial court, parties, interlocutory appeal, courts, subject to arbitration, arbitration agreement, no writ, mandamus, commerce, discovery, summarily, consumer, summary judgment, writ of mandamus, applicability, interlocutory, issues, orders

## Case Summary

### Procedural Posture

Relator corporation petitioned for a writ of mandamus to direct respondent trial court to order that plaintiff city's Texas Deceptive Trade Practices Act, *Tex. Bus. & Comm. Code Ann. § 17.41-17.63* (1987) claims proceed to arbitration under the Federal Arbitration Act, *9 U.S.C.S. §§ 1-16*.

### Overview

Relator corporation sought to compel arbitration under the Federal Arbitration Act (Federal Act), *9 U.S.C.S. §§ 1-16*, of plaintiff city's claims pursuant to the arbitration clause included in their contract. Relator submitted an affidavit that averred interstate activity occurred in its contract with plaintiff. Plaintiff did not offer any evidence. The trial court ordered arbitration only with respect to plaintiff's breach of contract claim and denied arbitration for claims under the Texas Deceptive Trade Practices Act (DTPA), *Tex. Bus. & Comm. Code Ann. § 17.41-17.63* (1987). The court of appeals denied relator's motion for leave to file its petition for a writ of mandamus. Relator sought and was granted review by the Texas Supreme Court. The supreme court held that plaintiff's DTPA claims were factually intertwined with its contract claims. The supreme court conditionally granted relator's writ of mandamus because relator's undisputed evidence established interstate activity and the applicability of the

Federal Act to the contract, as such, plaintiff's DTPA claims were subject to arbitration under the Federal Act as that it preempted otherwise applicable state laws.

**Outcome**

The court conditionally granted relator corporation a writ of mandamus because relator's undisputed evidence established interstate activity in its contract with plaintiff city and the applicability of the Federal Arbitration Act to the contract, and as such, plaintiff 's Texas Deceptive Trade Practices Act claims were subject to arbitration under the Federal Arbitration Act as that it preempted otherwise applicable state laws.

# LexisNexis® Headnotes

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Validity of ADR Methods

*HN1* Arbitration has been defined as a contractual proceeding by which the parties to a controversy or dispute, in order to obtain a speedy and inexpensive final disposition of matters involved voluntarily select arbitrators or judges of their own choice, and by consent submit the controversy to such tribunal for determination in substitution for the tribunals provided by the ordinary processes of the law.

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview

Civil Procedure > ... > Arbitration > Federal Arbitration Act > General Overview

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Validity of ADR Methods

Contracts Law > Contract Conditions & Provisions > Arbitration Clauses

International Trade Law > Dispute Resolution > International Commercial Arbitration > Arbitration

*HN2* When Texas courts are called on to decide if disputed claims fall within the scope of an arbitration clause under the Federal Arbitration Act, *9 U.S.C.S. §§ 1 - 16*, Texas procedure controls that determination. Under the Texas General Arbitration Act, *Tex. Rev. Civ. Stat. Ann. art. 224* - 236-8, when a party contests the applicability of an arbitration provision in an agreement, the court is instructed to proceed summarily to the determination of the issue. *Tex. Rev. Civ. Stat. Ann. art. 225*.

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Mandatory ADR

Contracts Law > Contract Conditions & Provisions > Arbitration Clauses

Evidence > Types of Evidence > Documentary Evidence > Affidavits

*HN3* The trial court may summarily decide whether to compel arbitration on the basis of affidavits, pleadings, discovery, and stipulations. However, if the material facts necessary to determine the issue are controverted, by an opposing affidavit or otherwise admissible evidence, the trial court must conduct an evidentiary hearing to determine the disputed material facts.

Admiralty & Maritime Law > Arbitration > General Overview

Admiralty & Maritime Law > Arbitration > Enforcement of Arbitration

Admiralty & Maritime Law > Maritime Contracts > General Overview

Civil Procedure > ... > Arbitration > Federal Arbitration Act > General Overview

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Mandatory ADR

International Trade Law > Dispute Resolution > International Commercial Arbitration > Arbitration

**HN4** See Federal Arbitration Act, *9 U.S.C.S. § 2*.

Civil Procedure > ... > Arbitration > Federal Arbitration Act > General Overview

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Validity of ADR Methods

International Trade Law > Dispute Resolution > International Commercial Arbitration > Arbitration

**HN5** The Federal Arbitration Act, *9 U.S.C.S. §§ 1 - 16*, applies to all suits in state and federal court when the dispute concerns a contract evidencing a transaction involving commerce. *9 U.S.C.S. § 1*.

Civil Procedure > ... > Responses > Defenses, Demurrers & Objections > Waiver & Preservation of Defenses

**HN6** See Deceptive Trade Practices Act, *Tex. Bus. & Com. Code Ann. § 17.42* (1987).

Civil Procedure > ... > Arbitration > Federal Arbitration Act > General Overview

Constitutional Law > Supremacy Clause > General Overview

Constitutional Law > Supremacy Clause > Federal Preemption

Contracts Law > ... > Affirmative Defenses > Fraud & Misrepresentation > General Overview

International Trade Law > Dispute Resolution > International Commercial Arbitration > Arbitration

**HN7** A Texas Deceptive Trade Practices Act, *Tex. Bus. & Comm. Code Ann. §§ 17.41--17.63* (1987), claim for misrepresentation is considered separate and distinct from any breach of contract claim. However, under U.S. Const. art. VI, cl. 2, the Federal Arbitration Act, *9 U.S.C.S. §§ 1 - 16*, preempts all otherwise applicable state laws.

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview

Civil Procedure > ... > Arbitration > Federal Arbitration Act > General Overview

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Judicial Review

Contracts Law > Contract Conditions & Provisions > Arbitration Clauses

International Trade Law > Dispute Resolution > International Commercial Arbitration > Arbitration

**HN8** The Federal Arbitration Act, *9 U.S.C.S. §§ 1 - 16*, creates substantive rules applicable in state and federal courts to prevent states from limiting the enforceability of arbitration agreements.

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview

Civil Procedure > ... > Arbitration > Federal Arbitration Act > General Overview

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Validity of ADR Methods

Contracts Law > Contract Conditions & Provisions > Arbitration Clauses

International Trade Law > Dispute Resolution > International Commercial Arbitration > Arbitration

**HN9** The Federal Arbitration Act, *9 U.S.C.S. §§ 1 - 16*, preempts state statutes to the extent they are inconsistent with the Federal Arbitration Act.

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview

Civil Procedure > ... > Arbitration > Federal Arbitration Act > General Overview

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Mandatory ADR

Contracts Law > Contract Conditions & Provisions > Arbitration Clauses

Contracts Law > Defenses > Unconscionable > Arbitration Agreements

International Trade Law > Dispute Resolution > International Commercial Arbitration > Arbitration

*HN10* A claim under the Texas Deceptive Trade Practices Act, *Tex. Bus. & Comm. Code Ann. §§ 17.41--17.63* (1987), is subject to arbitration under the Federal Arbitration Act, *9 U.S.C.S. §§ 1 - 16*.

Civil Procedure > Remedies > Writs > General Overview

Civil Procedure > ... > Writs > Common Law Writs > Mandamus

*HN11* Mandamus will issue only to correct a clear abuse of discretion or violation of a duty imposed by law when that abuse cannot be remedied by appeal.

Civil Procedure > Appeals > Standards of Review > Abuse of Discretion

*HN12* A clear failure by the trial court to analyze or apply the law correctly constitutes an abuse of discretion.

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview

Civil Procedure > ... > Arbitration > Federal Arbitration Act > General Overview

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Judicial Review

Civil Procedure > Appeals > Appellate Jurisdiction > Interlocutory Orders

International Trade Law > Dispute Resolution > International Commercial Arbitration > Arbitration

*HN13* Both the Texas General Arbitration Act, *Tex. Rev. Civ. Stat. Ann. art. 224* - 236-8, and the Federal Arbitration Act (Federal Act), *9 U.S.C.S. §§ 1 - 16*, permit a party to appeal from an interlocutory order granting or denying a request to compel arbitration. However, federal procedure does not apply in Texas courts, even when Texas courts apply the Federal Act.

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview

Civil Procedure > Appeals > Appellate Jurisdiction > Interlocutory Orders

Civil Procedure > Appeals > Reviewability of Lower Court Decisions > Adverse Determinations

International Trade Law > Dispute Resolution > International Commercial Arbitration > Arbitration

*HN14* The Texas General Arbitration Act (Texas Act), Tex. Rev. Civ. Stat. Ann. art. 238-2(a), affords an aggrieved party a right to an interlocutory appeal from a grant or denial of arbitration under the Texas Act. Similarly, a party denied arbitration in federal court is entitled to an interlocutory appeal under federal procedure. *9 U.S.C.S. § 15*.

Civil Procedure > Appeals > Appellate Jurisdiction > Final Judgment Rule

*HN15* Under Texas procedure appeals may be had only from final orders or judgments. *Tex. Civ. Prac. & Rem. Code Ann. § 51.014*. Interlocutory orders may be appealed only if permitted by statute. A final judgment is one which disposes of all legal issues between all parties.

**Counsel:** For Judge: Tipps, Hon. Arthur, JUD 020072000 827/767-1911, 3200 Speedway, Wichita Falls, TX 76301.

For Other: Good, Mr. Kevin H., ATT 008139300 214/651-4300, Strasburger & Price, 4300 NationsBank Plaza, 901 Main Street, Dallas, TX 75202.

For Relator: Allbritton, M. Kelly, ATT 001015100 214/651-4300, Donheiser, Mr. Mark M., ATT 005974800 214/651-4300, Strasburger & Price, 4300 NationsBank Plaza, 901 Main Street, Dallas, TX 75202.

For [**2] Respondent: Willatt, Mr. Mike, ATT 021505000 512/476-6604, 2001 North Lamar, Austin, TX 78705, Spiller, Mr. David Lee, ATT 018934950 817/567-6644, P.O. Drawer 447, Jacksboro, TX 76056, Holcomb, Mr. Don, ATT 009821300 512/478-1500, Hearne, Knolle, Livingston and Holcomb, P. O. Drawer 1687, Austin, TX 78767, Griffin, Mr. John Pierce, ATT 008460500 214/954-3333, Nichols, Jackson, Kirk & Dillard, 500 North Akard Street, 1800 Lincoln Plaza, Dallas, TX 75201.

**Judges:** John Cornyn, Justice

**Opinion by:** JOHN CORNYN

## Opinion

[*267] ON PETITION FOR WRIT OF MANDAMUS

**OPINION**

In this mandamus proceeding we decide three issues: 1) whether claims arising out of a construction contract dispute are arbitrable under the Federal Arbitration Act, 9 U.S.C. § 1--16 (the Federal Act), or the Texas General Arbitration Act, *TEX. REV. CIV. STAT. ANN. art. 224--236-8*, (the Texas Act); 2) whether claims brought under the Texas Deceptive Trade Practices Act, *TEX. BUS. & COMM. CODE § 17.41--17.63* (DTPA), are subject to the Federal Act; and 3) the nature of the hearing a trial court must conduct on an application for arbitration. Because we hold that the Relator has established the applicability of the Federal [**3] Act and that the Plaintiff's DTPA claims are subject to arbitration, we conditionally grant the relief requested.

In July 1988, the Jack B. Anglin Company, a Michigan corporation, agreed to build an earthen dam for the City of Jacksboro. The contract contains the following arbitration clause: All questions subject to arbitration under the Contract may be submitted to arbitration at the choice of either party to the dispute.

Following a mud slide on the downstream side of the dam, the City discovered that excessive moisture had weakened the dam. After remedial work was performed, a dispute arose between the parties over the expenses incurred for such work. The City claimed damages for extra engineering work and loss of water; Anglin claimed damages for extra work and the balance of the contract price. The City then filed this suit for breach of contract and negligence against Anglin, its bonding company, and two engineering firms. The City later amended its petition to add a cause of action against Anglin under the DTPA.

Anglin filed an application to compel arbitration and stay court proceedings, asserting that all of the City's claims were subject to arbitration pursuant [**4] to the parties' contract and must be arbitrated under the Federal Act or alternatively the Texas Act. Seeking to establish the project's impact on interstate commerce and thus the

applicability of the Federal Act, Anglin tendered the affidavit of its president, Jack **[*268]** Anglin. [1] In response, the City denied that its DTPA claims were subject to arbitration, claimed that no material issues were subject to the arbitration provision, and argued that arbitration would result in multiple suits because other defendants were are not parties to the contract between Anglin and the City could not be compelled to arbitrate.

At the hearing on Anglin's application to compel arbitration, the trial **[**5]** court admitted Jack Anglin's affidavit over the City's hearsay objections. The City did not offer any evidence. The court granted the application in part and denied it in part, ordering arbitration "only with respect to the City's cause of action for breach of contract," thus denying arbitration of the City's DTPA claim. Anglin first sought a writ of mandamus in the court of appeals, which overruled Anglin's motion for leave to file its petition. Anglin then filed its motion in this court, which we granted.

I.

*HN1* Arbitration has been defined as:

a contractual proceeding by which the parties to a controversy or dispute, in order to obtain a speedy and inexpensive final disposition of matters involved voluntarily select arbitrators or judges of their own choice, and by consent submit the controversy to such tribunal for determination in substitution for the tribunals provided by the ordinary processes of the law.

*Alderman v. Alderman, 296 S.W.2d 312, 315* (Tex. Civ. App.--San Antonio 1956, writ ref'd) (quoting 6 C.J.S. *Arbitration and Award § 1*). Arbitration has been sanctioned in Texas since at least the time of our first state constitution in 1845. *TEX. CONST.* **[**6]** art. XVI, § 13 (repealed), interp. commentary (Vernon 1955). The public policy of both our state [2] **[**7]** and federal governments favors agreements to resolve legal disputes through such voluntary settlement procedures. *See TEX. CIV. PRAC. & REM. CODE § 154.003* (Texas' Alternative Dispute Resolution statute); *Southland Corp. v. Keating, 465 U.S. 1, 10, 79 L. Ed. 2d 1, 104 S. Ct. 852 (1984)*(citing "national policy favoring arbitration"). Both Texas and federal courts have noted their favorable disposition toward such agreements. *See e.g., Volt Informational Sciences v. Board of Trustees, 489 U.S. 468, 476, 103 L. Ed. 2d 488, 109 S. Ct. 1248 (1989)*; *Southland Corp., 465 U.S. at 14-16*; *Neal v. Hardee's Food Sys. Inc., 918 F.2d 34, 37 (5th Cir. 1990)*; *House Grain Co. v. Obst, 659 S.W.2d 903, 905* (Tex. App.--Corpus Christi 1983, writ ref'd n.r.e.); *Manes v. Dallas Baptist College, 638 S.W.2d 143, 145* (Tex. App.--Dallas 1982, writ ref'd n.r.e.). Efficiency and lower costs are frequently cited as the main benefits of arbitration. [3]

II.

---

[1] Jack Anglin averred that the Anglin Company is a Michigan corporation and that it had transported machinery and equipment from Michigan to Texas to fulfill its obligations under the contract. He also stated that the billings for the project were prepared and transmitted to the City from Anglin's offices in Michigan.

[2] At least 36 states, including Texas, have adopted all or part of the Uniform Arbitration Act to encourage and facilitate the use of arbitration.

[3] *See Dean Witter Reynolds, Inc. v. Byrd, 470 U.S. 213, 219, 84 L. Ed. 2d 158, 105 S. Ct. 1238 (1985)*(goal of Federal Act is the expeditious resolution of claims and avoidance of cost and delay of litigation); *Shearson Lehman Hutton, Inc. v. McKay, 763 S.W.2d 934, 939* (Tex. App.--San Antonio 1989, no writ). *See also Hartford Lloyd's Ins. Co. v. Teachworth, 898 F.2d 1058, 1061 (5th Cir. 1990)*(arbitration aims to submit a dispute to a third party for speedy and efficient resolution without resort to the courts); *Manes, 638 S.W.2d at 145*; Jeffrey W. Stempel, *Pitfalls of Public Policy: The Case of Arbitration Agreements,* 22 ST. MARY'S L. J. 259, 269 (1990)("courts tend to take longer, cost more money, and lack the expert fact finders found in arbitration").

*HN2* When Texas courts are called on to decide if disputed claims fall within the scope of an arbitration clause under the Federal Act, Texas procedure controls that determination. *See Southland Corp., 465 U.S. at 10, n. 10*; *see also Batton v. Green, 801 S.W.2d 923, 928* (Tex. App.--Dallas 1990, no writ). **[**8]** Under the Texas Act, when a party contests the **[*269]** applicability of an arbitration provision in an agreement, the court is instructed to proceed summarily to the determine the issue. *TEX. REV. CIV. STAT. ANN. art. 225*.

Because the City complains that Anglin failed to offer any evidence other than Jack Anglin's affidavit in support of its application to compel arbitration, we must decide how a trial court is to summarily determine the applicability of an arbitration clause. The nature of such a hearing is a matter of first impression in Texas.

Summary disposition of contested issues is the exception under our rules of civil procedure. Ordinarily, contested issues are decided after a plenary hearing, that is, a hearing at which witnesses present sworn testimony in person or by deposition rather than by affidavit. For example, our rules permit trial courts to render final judgments in civil cases on motions for summary judgment. A trial court may render a summary judgment based on a record consisting of deposition transcripts, interrogatory answers, and other discovery responses, along with the pleadings, admissions, affidavits, stipulations, and authenticated or certified **[**9]** public records before the court at the time the motion is heard. *TEX. R. CIV. P. 166a(c)*. This procedure, as the title suggests, is summary in nature. *See In re Price's Estate, 375 S.W.2d 900, 904 (Tex. 1964)*; *see also Dae Won Choe v. Chancellor, Inc., 823 S.W.2d 740, 742* (Tex. App.--Dallas 1992, no writ)(summary judgment serves to summarily dispose of patently unmeritorious cases); *Beech Aircraft Corp. v. Jinkins, 698 S.W.2d 722, 728* (Tex. App.--Houston [1st Dist.] 1985), *aff'd, 739 S.W.2d 19 (Tex. 1987)*(summary judgment summarily disposes of cases when no questions of fact and judgment may be rendered as a matter of law). Our rules also prescribe summary determination of motions to transfer venue, objections to discovery requests, and special appearances contesting jurisdiction. These matters are likewise determinable on the basis of affidavits, pleadings, the results of discovery, and the stipulations of the parties. *TEX. R. CIV. P. 87*, *88* (venue); *TEX. R. CIV. P. 166b(4)*(objections to discovery); *TEX. R. CIV. P. 120a(3)*(special appearance). [4]

**[**10]** Because the main benefits of arbitration lie in expedited and less expensive disposition of a dispute, and the legislature has mandated that a motion to compel arbitration be decided summarily, we think it unlikely that the legislature intended the issue to be resolved following a full evidentiary hearing in all cases. [5] We also envision that the hearing at which a motion to compel arbitration is decided would ordinarily involve application of the terms of the arbitration agreement to undisputed facts, amenable to proof by affidavit. With these considerations in mind, we hold that *HN3* the trial court may summarily decide whether to compel arbitration on the basis of affidavits, pleadings, discovery, and stipulations. However, if the material facts necessary to determine the issue are controverted, by an opposing affidavit or otherwise admissible evidence, the trial court must conduct an evidentiary hearing to determine the disputed material facts.

**[**11]** III.

Next we consider whether the Federal Act applies to this dispute. *HN4 Section 2* of the Federal Act provides in pertinent part:

A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, . . . shall be valid,

---

[4]    Live testimony may be considered at a special appearance, *TEX. R. CIV. P. 120a(3)*, and on objections to discovery requests, *TEX. R. CIV. P. 166b(4)*, but not at a summary judgment hearing, *TEX. R. CIV. P. 166a(c)* or venue hearing, *TEX. R. CIV. P. 87*, *88*.

[5]    Commentators agree that a less than plenary hearing is desirable. *See* M. DOMKE & G. WILNER, COMMERCIAL ARBITRATION § 17:02 (rev. ed. 1984); R. RODMAN, COMMERCIAL ARBITRATION § 11.7 (1984).

irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

*HN5* The Federal Act thus applies to all suits in state and federal court when the dispute **[\*270]** concerns a "contract evidencing a transaction involving commerce." *Perry v. Thomas, 482 U.S. 483, 489, 96 L. Ed. 2d 426, 107 S. Ct. 2520 (1987)*; *Southland Corp., 465 U.S. at 14-16*; *9 U.S.C. § 1* ("commerce" means commerce "among the several states . . ."). Nor is its application limited solely to interstate shipment of goods. *Prima Paint v. Flood & Conklin Mfg. Co.,* 388 U.S. 395, 401, 18 L. Ed. 2d 1270, 87 S. Ct. 1801 n.7 (1967); *Mesa Operating Ltd. Partnership v. Louisiana Intrastate Gas Corp., 797 F.2d 238, 243 (5th Cir. 1986)*; *Lost Creek Util. v. Travis Indep. Painters, 827 S.W.2d 103,* **[\*\*12]** *105* (Tex. App.--Austin 1992, writ denied). [6] Here, the material evidence before the court consisted of the pleadings, the contract, and Jack Anglin's affidavit, which states that Anglin transported materials across state lines pursuant to the contract and prepared the billings for the job in Michigan. Under the procedure we have approved here, the trial court, as well as this court, must accept as true the clear, direct, and positive evidence of an undisputed affidavit, even of a party's agent. *See Americana Motel, Inc. v. Johnson, 610 S.W.2d 143 (Tex. 1980)* (uncontroverted testimony by an interested party may support summary judgment when testimony is clear, direct, and positive); *Whitehead v. Julian, 476 S.W.2d 844, 845 (Tex. 1972)* (uncontroverted affidavit must be accepted as true); *Great Am. Reserve Ins. Co. v. San Antonio Plumbing Supply Co.,* 391 S.W.2d 41, 47 (Tex. 1965). The undisputed evidence presented to the trial court thus established the applicability of the Federal Act.

 **[\*\*13]** IV.

Anglin argues that the trial court erred in excluding the City's DTPA claims from the order compelling arbitration. The City responds that its DTPA claims are not subject to arbitration for two reasons: first, because its DTPA claims do not arise out of the contract and therefore are beyond the scope of the arbitration clause, and second, because the DTPA's nonwaiver provision, *TEX. BUS. & COM. CODE ANN. § 17.42* (Vernon 1987), [7] prevents the City from waiving a judicial determination of its DTPA claims. Both of these contentions are without merit.

---

[6] Because the undisputed evidence clearly establishes interstate activity, the Federal Act governs arbitration of this dispute. We need not and do not today define the scope of the "involving commerce" clause. We do note, however, that some courts have focused on whether the contract itself indicates that the parties contemplated substantial interstate activity, so that the fortuity of diverse citizenship or ancillary travel across state lines would not alone trigger application of the Federal Act. *Metro Indus. Painting Corp. v. Terminal Constr. Co.,* 287 F.2d 382, 387 (2d Cir. 1961) (Lumbard, C.J. concurring); *Warren v. Jim Skinner Ford, Inc.,* 548 So. 2d 157, 160 (Ala.) *cert. denied,* **493 U.S. 998, 107 L. Ed. 2d 550, 110 S. Ct. 554 (1989)**; *Riverfront Properties, Ltd., v. Max Factor III,* 460 So. 2d 948, 953 (Fla. Dist. Ct. App. 1984); *Burke County Pub. Sch. Bd. of Educ. v. The Shaver Partnership,* 279 S.E.2d 816, 822 (N.C. 1981); *but see Del E. Webb Constr. v. Richardson Hosp. Auth.,* 823 F.2d 145, 147-48 (5th Cir. 1987) (rejecting the "substantial" contacts test in favor of "relating to" test in order to implement strong federal policy favoring arbitration).

[7] *HN6* That section provides in pertinent part:

**Waivers: Public Policy**

Any waiver by a consumer of the provision of this subchapter is contrary to public policy and is unenforceable and void. . . .

The version of § 17.42 in effect at the time permitted written contractual waiver by certain business consumers. The legislature broadened the categories of consumers eligible to waive DTPA remedies 1989. TEX. BUS. & COM. CODE ANN. § 17.42 (VERNON SUPP. 1992) (excluding purchase or lease of family residence, waiver permitted by consumers in transactions exceeding $ 500,000 who are represented by legal counsel, are not in significantly disparate bargaining positions, and who, along with their attorneys, sign express waivers in written contracts). John T. Montford, Will G. Barber, & Robert L. Duncan, *1989 Texas DTPA Reform: Closing the DTPA Loophole in the 1987 Tort Reform Laws and the Ongoing Quest for Fairer DTPA Laws,* 21 ST. MARY'S L.J. 525, 556-562 (1990).

 [**14]  The DTPA claims arise out of Anglin's alleged misrepresentations regarding the quality of its services and materials used in its work. [8] Generally, *HN7* a DTPA  [*271]  claim for misrepresentation is considered separate and distinct from any breach of contract which may have also occurred. *Weitzel v. Barnes, 691 S.W.2d 598, 600 (Tex. 1985)*; *see also Decision Control Systems, Inc. v. Personnel Cost Control, Inc., 787 S.W.2d 98, 100* (Tex. App.--Dallas 1990, no writ). However, under the supremacy clause of the United States Constitution, U.S. Const. art. VI, cl. 2, the Federal Act preempts all otherwise applicable state laws. *Perry, 482 U.S. at 489*; *Southland Corp., 465 U.S. at 14-16* (*HN8* Federal Act creates substantive rules applicable in state and federal courts to prevent states from limiting the enforceability of arbitration agreements); *see also Batton, 801 S.W.2d at 927* (the Federal Act is substantive and is the law of Texas).

 [**15]  The primary purpose of the Federal Act is to require the courts to compel arbitration when the parties have so provided in their contract, despite any state legislative attempts to limit the enforceability of arbitration agreements. *Volt, 489 U.S. at 474*; *Shearson/Am. Express, Inc. v. McMahon, 482 U.S. 220, 225 (1987)*; *Perry, 482 U.S. at 490*; *Southland Corp., 465 U.S. at 10*. To this end, *HN9* the Federal Act preempts state statutes to the extent they are inconsistent with that Act. *See Volt, 489 U.S. at 478*. We likewise are of the opinion that federal law preempts application of the nonwaiver provision of the DTPA to prevent or restrict enforcement of this arbitration agreement. *See Commerce Park v. Mardian Construction Co., 729 F.2d 334, 338 (5th Cir. 1984)* (*HN10* claim under Texas Deceptive Trade Practices Act subject to arbitration under Federal Act). [9]

 [**16]  Furthermore, Texas law favors the joint resolution of multiple claims to prevent multiple determinations of the same matter. *See Valero Energy Corp. v. Wagner & Brown, 777 S.W.2d 564, 567* (Tex. App.--El Paso 1989, writ denied). The city alleges that Anglin's goods and services were less than Anglin represented they would be. Evidence to support these allegations will be required to establish the City's breach of contract claim. Although the City's misrepresentation claims are grounded in a legal theory distinct from its contract claim, they are factually intertwined, and thus are subject to the arbitration provision of the contract. For the foregoing reasons, we hold that the City's DTPA claims are arbitrable pursuant to the parties' agreement and shall be arbitrated under the Federal Act.

V.

Finally, we must decide whether a party that has been wrongfully denied the benefits of its agreement to arbitrate is entitled to the extraordinary remedy of the writ of mandamus. *HN11* Mandamus will issue only to correct a clear abuse of discretion or violation of a duty imposed by law when that abuse cannot be remedied by appeal. *Walker v. Packer, 827 S.W.2d 833, 840 (Tex. 1992)*;  [**17]  *Johnson v. Fourth Court of Appeals, 700 S.W.2d 916, 917 (Tex. 1985)*. In *Walker* we stated that *HN12* "[A] clear failure by the trial court to analyze or apply the law correctly will constitute an abuse of discretion. . . ." *827 S.W.2d at 840* (citations omitted). Because we have held that the trial court failed to correctly apply the Federal Act to the facts of this case, its decision in this regard amounts to a clear abuse of discretion under the *Walker* standard. The remaining question is whether Anglin has an adequate remedy on appeal.

---

[8]    Specifically, the City alleges:

The false, misleading or deceptive acts or practices include . . .

1. Representing that goods or services were of a particular standard, quality or grade . . . if they were that of another; and/or

2. The failure to disclose information concerning goods or services which were known at the time of the transaction, and such failure to disclose such information was intended to induce the consumer into a transaction into which the consumer would not have entered had the information been disclosed.

[9]    The parties to this arbitration agreement were of relatively equal bargaining strength. We do not foreclose the possibility of DTPA relief for a party establishing that an agreement to arbitrate was unconscionable and therefore unenforceable as a matter of law.

*HN13* Both the Texas and Federal Acts permit a party to appeal from an interlocutory order granting or denying a request to  **[\*272]**  compile arbitration. [10] **[\*\*18]** As we have noted, however, federal procedure does not apply in Texas courts, even when Texas courts apply the Federal Act. *See [Southland Corp., 465 U.S. at 16 n.10](); [NCR Corp. v. Mr. Penguin Tuxedo Rental, 663 S.W.2d 107, 108]()* (Tex. App.--Eastland 1983, writ ref'd n.r.e.). When a Texas court enforces or refuses to enforce an arbitration agreement pursuant to the Federal Act, we must determine whether that decision should be reviewed by interlocutory appeal or mandamus. [11]

**[\*\*19]**  *HN15*

Under Texas procedure appeals may be had only from final orders or judgments. *TEX. CIV. PRAC. & REM. CODE § 51.014*. [12] **[\*\*20]** Interlocutory orders may be appealed only if permitted by statute. [13] *Cherokee water Co. v. Ross, 698 S.W.2d 363, 365 (Tex. 1985)* (orig. proceeding); *[Henderson v. Shell Oil, 143 Tex. 142, 182 S.W.2d 994, 995 (Tex. 1944)]()*. A final judgment is one which disposes of all legal issues between all parties. *[Hinde v. Hinde, 701 S.W.2d 637, 639 (Tex. 1986)]()*. An order denying arbitration under the Federal Act meets neither the rule nor the statutory exceptions. Anglin and other similarly situated litigants who allege entitlement to arbitration under the Federal Act, and in the alternative, under the Texas Act, are burdened with the need to pursue parallel proceedings--an interlocutory appeal of the trial court's denial under the Texas Act, and a writ of mandamus from the denial under the Federal Act.

Although we can conceive of no benefit from such an unnecessarily expensive and cumbersome rule, we may not enlarge appellate jurisdiction absent legislative mandate. In the interests of promoting the policy considerations of rigorous and expedited enforcement of arbitration agreements, we urge the legislature to consider amending the Texas Act to permit interlocutory appeals of orders issued pursuant to the Federal Act. Such a procedure, already available for orders under the Texas Act, is preferable to reliance on the writ of mandamus to fill this gap in appellate jurisdiction.

Although mandamus relief will not issue merely because an appellate remedy may be more expensive and time-consuming than mandamus, it will issue when the failure to do so would vitiate and render illusory the subject matter of an appeal. Absent mandamus relief, Anglin would be deprived of the benefits of the arbitration

---

[10]    *HN14* Article 238-2(a) of the Texas Act affords an aggrieved party a right to an interlocutory appeal from a grant or denial of arbitration under the Texas Act. Similarly, a party denied arbitration in federal court is entitled to an interlocutory appeal under federal procedure. *See [Stedor Enter., Ltd. v. Armtex, Inc., 947 F.2d 727, 730 (4th Cir. 1991)](); see also [Arnold v. Arnold Corp., 920 F.2d 1269, 1274 (6th Cir. 1990)]();* ***9 U.S.C. § 15 (1988)***, *amended by **9 U.S.C. §§ 15**, 16 (Supp. 1992)*.

[11]    The courts of appeals have variously permitted appeal under the Texas Act, and mandamus or appeal under the Federal Act. *See [Merrill Lynch v. Hughes,]() 809 S.W.2d 679, 680-81* (Tex. App.--Corpus Christi 1991)(Texas Act allows for interlocutory appeal of order denying motion to compel arbitration), *dism'd as moot, 827 S.W.2d 859 (Tex. 1992)*; *[Transwestern Pipeline v. Horizon Oil,]() 809 S.W.2d 589, 591* (Tex. App.--Dallas 1991, writ dism'd w.o.j.)(interlocutory appeal reversing trial court's order denying motion to compel arbitration); *[Merrill Lynch v. Wilson,]() 805 S.W.2d 38* (Tex. App.--El Paso 1991, no writ); *[Batton v. Green,]() 801 S.W.2d 923, 929* (Tex. App.--Dallas 1990, no writ)(Texas law specifically allows an interlocutory appeal from an order denying an application to compel arbitration or granting an application to stay arbitration); *[USX Corp. v. West,]() 759 S.W.2d 764, 765* (Tex. App.--Houston [1st Dist.] 1988, no writ)(Texas Act "apparently permits interlocutory review of order denying application to compel arbitration"); *[Mr. Penguin Tuxedo Rental,]() 663 S.W.2d at 108* (when agreement to compel arbitration is unenforceable under the Texas Act, "the interlocutory appeal authorized by that act is not available"); *[Central Tex. Clarklift, Inc. v. Simmons,]() 540 S.W.2d 745, 746* (Tex. Civ. App.--Waco 1976, no writ)(although order denying motion to compel arbitration "is an interlocutory one, it is expressly appealable under the provisions of Article 238-2").

[12]    Texas does not have a statute comparable to ***28 U.S.C. 1292(b)***, which in effect permits a federal district court to certify that an appeal is appropriate from an interlocutory order addressing a matter of controlling law.

[13]    This court has, however, deemed orders relating to sealing or unsealing court records to be final, appealable judgments. TEX. R. CIV. P. 76a(8).

clause it contracted for, and the purpose of  **[\*\*21]**    **[\*273]**   providing a rapid, inexpensive alternative to traditional litigation would be defeated. [14] Accordingly, we conditionally grant the writ of mandamus and direct the trial court to order that all claims, including the City's DTPA claims, proceed to arbitration under the Federal Arbitration Act. The clerk is instructed to issue the writ only should the trial court fail to do so.

John Cornyn

Justice

OPINION DELIVERED: November 18, 1992.

---

[14]    Indeed, the United States Supreme Court has apparently indicated that it will promptly review any state court decision to the contrary: "For us to delay review of a state judicial decision denying enforcement of the contract to arbitrate until the state-court litigation has run its course would defeat the core purpose of a contract to arbitrate." *Southland Corp.,* 465 U.S. at 7-8.



🟢 Positive

As of: September 1, 2015 2:43 PM EDT

# *Kennedy Hodges, L.L.P. v. Gobellan*

Supreme Court of Texas

May 16, 2014, Opinion Delivered

NO. 13-0321

**Reporter**

433 S.W.3d 542; 2014 Tex. LEXIS 393; 57 Tex. Sup. J. 584; 2014 WL 1998246

KENNEDY HODGES, L.L.P., PETITIONER, v. VENTURA GOBELLAN, JR. AND PAULA GOBELLAN, RESPONDENTS

**Subsequent History:** Released for Publication June 27, 2014.

**Prior History:** [**1] ON PETITION FOR REVIEW FROM THE COURT OF APPEALS FOR THE THIRTEENTH DISTRICT OF TEXAS.

*Kennedy v. Gobellan, 433 S.W.3d 579, 2013 Tex. App. LEXIS 2634 (Tex. App. Corpus Christi, Mar. 14, 2013)*

## Core Terms

arbitration, invoke, litigation process, discovery, party's, right to arbitration, contingency, litigate, waived, former client

## Case Summary

### Overview

ISSUE: Whether a law firm waived its right to arbitrate a fee dispute with former clients by litigating with a former associate. HOLDINGS: [1]-The firm's litigation with the associate did not substantially invoke the litigation process with the clients, who were not parties to the suit; [2]-By litigating with the associate, the firm did not litigate with the clients; [3]-The firm's litigation with the associate did not prejudice the clients because it did not cause delay, expense, or damage to the clients' legal position; [4]-The firm's activity did not substantially invoke the litigation process against the clients or prejudice them because the firm's litigation conduct involved suing the associate with whom it had no arbitration agreement and filing limited pleadings against the clients; [5]-The firm did not waive its right to arbitrate its dispute with the clients.

### Outcome

Judgment reversed. Case remanded.

## LexisNexis® Headnotes

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > Waiver

Evidence > Inferences & Presumptions > Presumptions > Particular Presumptions

Evidence > Burdens of Proof > Allocation

*HN1* A party waives its right to arbitration by substantially invoking the judicial process to the other party's detriment or prejudice. Proving waiver is a high hurdle due to the strong presumption against waiver of arbitration.

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > Waiver

Civil Procedure > Appeals > Standards of Review > De Novo Review

Civil Procedure > Appeals > Standards of Review > Questions of Fact & Law

*HN2* When the parties do not dispute the facts, whether a party's conduct waived its right to arbitrate is a question of law an appellate court reviews de novo.

Evidence > Inferences & Presumptions > Presumptions > Particular Presumptions

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > Waiver

Evidence > Burdens of Proof > Allocation

*HN3* A party waives the right to arbitrate by substantially invoking the judicial process to the other party's detriment or prejudice. The strong presumption against waiver of arbitration renders this hurdle a high bar. A court decides waiver on a case-by-case basis by assessing the totality of the circumstances. The Supreme Court of Texas has considered such factors as (1) when the movant knew of the arbitration clause; (2) how much discovery was conducted; (3) who initiated the discovery; (4) whether the discovery related to the merits rather than arbitrability or standing; (5) how much of the discovery would be useful in arbitration; and (6) whether the movant sought judgment on the merits. Further, the substantial invocation of the litigation process must also have prejudiced the opposing party. In this context, prejudice is inherent unfairness in terms of delay, expense, or damage to a party's legal position that occurs when the party's opponent forces it to litigate an issue and later seeks to arbitrate that same issue.

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > Waiver

*HN4* The Supreme Court of Texas's statement that waiver of arbitration occurs when a party substantially invokes litigation with the other party indicates the party claiming waiver is the other party in the litigation.

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > Waiver

*HN5* In the context of waiver of arbitration, a party who litigates one claim with an opponent does not substantially invoke the litigation process for a related yet distinct claim against another party with whom it has an arbitration agreement.

**Counsel:** For Kennedy Hodges, L.L.P., Petitioner: Cory Reed, Zandra Elayne Foley, Thompson, Coe, Cousins & Irons, Houston TX; Kevin F. Risley, Thompson Coe Cousins & Irons LLP, Houston TX.

For Gobellan, Ventura, and Paula Gobellan, Respondent: John W. Griffin Jr., Robert Edward McKnight Jr., Marek, Griffin & Knaupp L.L.P., Victoria TX; Robert P. Houston, Attorney at Law, Victoria TX.

## Opinion

 **[*543]  PER CURIAM**

*HN1* A party waives its right to arbitration by substantially invoking the judicial process to the other party's detriment or prejudice. Proving waiver is a high hurdle due to the strong presumption against waiver of arbitration. This appeal concerns whether a law firm waived its right to arbitrate a fee dispute with former clients by litigating with a former associate. After the associate left the firm and took several clients with him, the firm sued the **[*544]** former associate—with whom it had no arbitration agreement—over client contingency fees. The firm also sued the former clients and moved to compel that dispute to arbitration pursuant to an arbitration clause in the contingency fee agreement between the firm and the clients. **[**2]** The trial court and the court of appeals both concluded that because the firm had litigated the fee issue with the former associate, it waived its right to arbitrate any claims stemming from its fee agreement with the former clients. Importantly, the firm could not arbitrate its dispute with the former associate because it had no arbitration agreement with him. Because the firm's litigation with the former associate neither prejudiced the former clients nor substantially invoked the litigation process with them, we reverse the court of appeals' judgment and remand to the trial court.

Ventura Gobellan was driving an armored car for his employer when the vehicle became unstable and rolled over, killing a passenger and injuring Gobellan. Gobellan and his wife retained Kennedy Hodges, L.L.P. to defend against a wrongful death suit and to bring suit against Gobellan's employer and other defendants (the Gobellan Suit). The Gobellans agreed to pay Kennedy Hodges forty percent of the gross recovery obtained after suit was filed but before trial. Their fee agreement provided that the Gobellans would be liable for the entire contingency fee if they terminated Kennedy Hodges without cause and **[**3]** required the Gobellans and Kennedy Hodges to arbitrate any fee dispute. Kennedy Hodges assigned associate attorney Canonero Brown to the case.

Brown subsequently left Kennedy Hodges and assured Gobellan "he would work out a fee splitting arrangement with Kennedy Hodges and that [they] would not be affected." The Gobellans retained Brown to represent them. Kennedy Hodges sued Brown to recover contingency fees for former clients he took with him (the Brown Suit). The Gobellans were not a party to that suit. Kennedy Hodges later settled with Brown for a portion of all contingency fees collected from former firm clients who retained Brown, including the Gobellans.

In the Gobellan Suit, Gobellan's employer and the Gobellans submitted their dispute to arbitration. The Gobellans obtained an award that was confirmed in a final judgment, which Gobellan's employer satisfied by paying $470,000. Kennedy Hodges sued the Gobellans in a separate proceeding, and moved for a no-answer default judgment. But after conferring with the Gobellans, Kennedy Hodges pursued its claim in the Gobellan Suit by intervening and moving to compel arbitration. The trial court denied the motion, and the court of appeals **[**4]** affirmed, concluding that Kennedy Hodges substantially invoked the litigation process as to the Gobellan fee based on the discovery it conducted in the Brown Suit. __S.W.3d __, __. The court also found the Gobellans established prejudice because Kennedy Hodges attempted to "have it both ways" by switching between litigation and arbitration. *Id*. at __. As we explain below, the court of appeals' decision conflicts with our decision in *Perry Homes v. Cull, 258 S.W.3d 580 (Tex. 2008)*, on a question of law material to the disposition of the case, which confers jurisdiction on this Court over this interlocutory appeal, *TEX. CIV. PRAC. & REM. CODE § 171.098(a)(1)*; *TEX. GOV'T CODE §§ 22.001(a)(2)*, *22.225(c)*.

The Gobellans argue Kennedy Hodges's litigation in the Brown Suit substantially invoked the litigation process against them. Kennedy Hodges counters that the Brown Suit contained tort and contract claims not involving the Gobellans as parties. We agree with Kennedy Hodges.

**[*545]** *HN2* Because the parties do not dispute the facts, whether Kennedy Hodges's conduct waived its right to arbitrate is a question of law we review de novo. *Cull, 258 S.W.3d at 598* & n.102. *HN3* A party waives the right to arbitrate **[**5]** "by substantially invoking the judicial process to the other party's detriment or prejudice." *Id. at 589-90*. The strong presumption against waiver of arbitration renders this hurdle a high bar.

*Id. at 590*. We decide waiver on a case-by-case basis by assessing the totality of the circumstances. *Id*. We have considered such factors as (1) when the movant knew of the arbitration clause; (2) how much discovery was conducted; (3) who initiated the discovery; (4) whether the discovery related to the merits rather than arbitrability or standing; (5) how much of the discovery would be useful in arbitration; and (6) whether the movant sought judgment on the merits. *Id. at 591-92*. Further, the substantial invocation of the litigation process must also have prejudiced the opposing party. *Id. at 593*. In this context, prejudice is "inherent unfairness in terms of delay, expense, or damage to a party's legal position that occurs when the party's opponent forces it to litigate an issue and later seeks to arbitrate that same issue." *Id. at 597*.

Two cases in particular illuminate how we apply this standard. First, in *Cull*, the Culls substantially invoked the litigation process by initially resisting **[**6]** the opposing party's motion to compel arbitration, filing motions to compel discovery, conducting extensive discovery about every aspect of the merits, and waiting until shortly before trial to request arbitration. *Id. at 595-97*. There, we specifically emphasized the extreme delay the Culls caused, which we noted undercuts one of the prime benefits of arbitration: an expedient and cost-effective dispute resolution process. *Id. at 596*. Additionally, **HN4** our statement that waiver occurs when a party substantially invokes litigation with "the other party[]" indicates the party claiming waiver was the other party in the litigation. *Id. at 590*.

More relevant to our inquiry here, we held in *In re Service Corp. International* that **HN5** a party who litigated one claim with an opponent did not substantially invoke the litigation process for a related yet distinct claim against another party with whom it had an arbitration agreement. *85 S.W.3d 171, 175 (Tex. 2002)*.

Here, Kennedy Hodges's litigation with Brown in the Brown Suit did not substantially invoke the litigation process with the Gobellans, who were not parties to the Brown Suit. The Brown Suit involved alleged breaches of Brown's employment agreement **[**7]** with Kennedy Hodges as well as tort claims. And there was no arbitration agreement between Kennedy Hodges and Brown. By contrast, the Gobellan Suit involved an alleged breach of the Gobellans' contingency fee agreement with Kennedy Hodges, which contains an arbitration clause. By litigating with Brown, Kennedy Hodges did not litigate with the Gobellans. Our holding in *Service Corp. International*, compels this conclusion. *Id*. Additionally, Kennedy Hodges's litigation with Brown did not prejudice the Gobellans as it did not cause delay, expense, or damage to the Gobellans' legal position. *See Cull, 258 S.W.3d at 597*.

Likewise, we cannot agree that Kennedy Hodges substantially invoked the litigation process with its pleadings against the Gobellans. Kennedy Hodges filed pleadings against the Gobellans in two suits. First, Kennedy Hodges initiated litigation against the Gobellans in a separate proceeding in Harris County and filed a motion for a no-answer default judgment. But these pleadings alone do not rise to the level required to show waiver. *See, e.g., id. at 592* (assessing whether a party **[*546]** moved for judgment on the merits); *In re Vesta Ins. Grp., Inc., 192 S.W.3d 759, 763-64 (Tex. 2006)* **[**8]** (holding that seeking initial discovery, taking four depositions, and moving for dismissal did not substantially invoke the litigation process). Second, after conferring with the Gobellans, Kennedy Hodges intervened in the existing Gobellan Suit and moved to compel their dispute to arbitration. The firm conducted no discovery. In sum, we conclude Kennedy Hodges did not substantially invoke the litigation process with the Gobellans by intervening and moving to compel arbitration. *See Vesta, 192 S.W.3d at 763-64*.

To conclude, Kennedy Hodges's litigation conduct involved suing a third party with whom it had no arbitration agreement and filing limited pleadings against the Gobellans. Such activity did not substantially invoke the litigation process against the Gobellans or prejudice them. Thus, Kennedy Hodges did not waive its right to arbitrate its dispute with the Gobellans. Accordingly, without hearing oral argument, *Tex. R. App. P. 59.1*, we grant the petition for review, reverse the court of appeals' judgment, and remand to the trial court to grant Kennedy Hodges's motion to compel arbitration.

**OPINION DELIVERED**: May 16, 2014



⚠ Caution

As of: September 1, 2015 5:16 PM EDT

## *Kroger Tex. Ltd. P'ship v. Suberu*

Supreme Court of Texas

November 9, 2004, Argued ; May 5, 2006, Delivered

No. 03-0913

**Reporter**

216 S.W.3d 788; 2006 Tex. LEXIS 441; 49 Tex. Sup. J. 592

Kroger Texas Limited Partnership and Robert Moody, Petitioners, v. Theresa Suberu, Respondent

**Subsequent History:** **[**1]** As Corrected May 10, 2006. Released for Publication September 22, 2006. Rehearing denied by *Kroger Tex. L.P. v. Suberu, 2006 Tex. LEXIS 998 (Tex., Sept. 22, 2006)*

**Prior History:** ON PETITION FOR REVIEW FROM THE COURT OF APPEALS FOR THE FIFTH DISTRICT OF TEXAS.
*Kroger Tex. Ltd. P'ship v. Suberu, 113 S.W.3d 588, 2003 Tex. App. LEXIS 7079 (Tex. App. Dallas, 2003)*

## Core Terms

cart, probable cause, groceries, lack of probable cause, no evidence, criminal proceeding, outrageous, employees, innocent, malice, shoplifting, initiated, legal insufficiency, honestly, intentional infliction of emotional distress, malicious, motives, malicious prosecution, presumes, rebut, reasonably believed, exemplary damages, legal sufficiency, jury's finding, circumstances, pharmacy, basket, honest

## Case Summary

### Procedural Posture

Petitioners grocery store and assistant store manager sought review of an order of the Court of Appeals for the Fifth District of Texas affirming a trial court judgment entered in favor of respondent customer in her action asserting claims of malicious prosecution and intentional infliction of emotional distress.

### Overview

The customer sued petitioners after she was acquitted on misdemeanor theft charges arising from an alleged shoplifting incident. On appeal of the lower courts' judgments in favor of the customer, the court held that the evidence was legally insufficient to support liability under the customer's claims. With regard to the customer's malicious prosecution claim, the evidence favorable to her was legally insufficient to rebut the presumption that petitioners acted reasonably and with probable cause. The fact that no one investigated the customer's explanation for leaving the store was not evidence that probable cause was lacking, an employee's credibility did not affect whether petitioners, at the time the police were called, reasonably believed that the customer was guilty of shoplifting, and the customer's testimony that she did not have cart when she attempted to leave the store did not establish the absence of probable cause. The customer produced no evidence that petitioners

initiated her prosecution on the basis of something other than a reasonable belief that she was guilty. The customer also failed to show that petitioners' conduct was extreme and outrageous.

**Outcome**

The order affirming the trial court judgement for the customer was reversed and judgment was rendered for petitioners.

# LexisNexis® Headnotes

Torts > ... > Malicious Prosecution > Elements > Favorable Termination

Torts > ... > Malicious Prosecution > Elements > Malice

Torts > ... > Elements > Lack of Probable Cause > General Overview

*HN1* The Supreme Court of Texas has long recognized a cause of action for those subjected unjustifiably to criminal proceedings, but has also made clear that the cause of action must sometimes yield to society's greater interest in encouraging citizens to report crimes, real or perceived. The elements necessary to prevail on a malicious prosecution claim reflect this balance. Thus, a plaintiff must prove not only that the defendant commenced criminal proceedings against her and she is innocent of the crime charged, but also that the defendant lacked probable cause and harbored malice toward her. These latter elements guard against a jury's natural inclination to punish those who, through error but not malevolence, commence criminal proceedings against a person who is ultimately exonerated. The probable cause element asks whether a reasonable person would believe that a crime had been committed given the facts as the complainant honestly and reasonably believed them to be before the criminal proceedings were instituted. Courts must presume that the defendant acted reasonably and had probable cause to initiate criminal proceedings. To rebut this presumption, the plaintiff must produce evidence that the motives, grounds, beliefs, or other information upon which the defendant acted did not constitute probable cause.

Civil Procedure > ... > Standards of Review > Substantial Evidence > Sufficiency of Evidence

*HN2* In reviewing a verdict for legal sufficiency, an appellate court credits evidence that supports the verdict if reasonable jurors could, and disregard contrary evidence unless reasonable jurors could not. A challenge to the legal sufficiency of evidence will be sustained when, among other things, the evidence offered to establish a vital fact does not exceed a scintilla. Evidence does not exceed a scintilla if it is so weak as to do no more than create a mere surmise or suspicion that the fact exists.

Torts > ... > Elements > Lack of Probable Cause > Evidence

*HN3* It is well settled that a private citizen has no duty to investigate a suspect's alibi or explanation before reporting a crime. If the acts or omissions necessary to constitute a crime reasonably appear to have been completed, a complainant's failure to investigate does not negate probable cause.

Torts > ... > Elements > Lack of Probable Cause > Evidence

*HN4* To rebut the probable cause presumption, a plaintiff has to produce evidence that the motives, grounds, beliefs, or other information upon which the defendant acted demonstrate that it did not reasonably believe the plaintiff was guilty of a crime.

Torts > ... > Elements > Lack of Probable Cause > Evidence

*HN5* In a malicious prosecution action, the civil law presumes a defendant's good faith and requires a plaintiff to rebut this presumption, because it is more important that a private citizen report an apparent subversion of our laws than for the wrongly accused to attain monetary redress from the accuser.

Evidence > Inferences & Presumptions > General Overview

*HN6* Evidence that is so slight as to make any inference a guess is in legal effect no evidence.

Torts > ... > Elements > Lack of Probable Cause > Evidence

*HN7* Unless there is evidence rebutting the presumption of probable cause, a prosecution resulting from eyewitness identifications that turn out to be incorrect or, at least, insufficient to warrant a conviction, does not satisfy the exacting requirements for a plaintiff to prevail in a malicious prosecution case.

Torts > Intentional Torts > Intentional Infliction of Emotional Distress > Elements

*HN8* To prevail on a claim of intentional infliction of emotional distress, a plaintiff has to prove by a preponderance of the evidence that: (1) the defendant acted intentionally or recklessly; (2) its conduct was extreme and outrageous; (3) its actions caused her emotional distress; and (4) the emotional distress was severe. A defendant's conduct satisfies the second element only if it is so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Conduct that is merely insensitive or rude is not extreme and outrageous, nor are mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities.

**Judges:** CHIEF JUSTICE JEFFERSON delivered the opinion of the Court, in which JUSTICE HECHT, JUSTICE O'NEILL, JUSTICE WAINWRIGHT, JUSTICE BRISTER, JUSTICE GREEN, and JUSTICE WILLETT joined. JUSTICE JOHNSON filed an opinion concurring in part and dissenting in part, in which JUSTICE MEDINA joined, and in Part III of which JUSTICE WAINWRIGHT joined.

**Opinion by:** Wallace B. Jefferson

## Opinion

 [*791]  Theresa Suberu sued Kroger Texas Limited Partnership and assistant store manager Robert Moody (collectively, Kroger) for malicious prosecution and intentional infliction of emotional distress after she was acquitted on misdemeanor theft charges arising from an alleged shoplifting incident. The jury returned a verdict in Suberu's favor on both claims, and the trial court signed a judgment in conformity with the verdict. The court of appeals affirmed. Kroger argues that the evidence is legally insufficient to support liability under each claim, and we agree. Accordingly, we reverse the court of appeals' judgment and render judgment for Kroger.

**I**

**Background**

On the evening of March 1, 1999, Theresa Suberu went to a Kroger grocery **[**2]**  store in Garland to purchase medication. Karrah Parkey, Kroger's pharmacy technician, recognized Suberu as a prior customer, assumed she had come to pick up medicine for her husband, Michael, and placed his medicine on the counter. Suberu uses cash for all transactions and did not have enough in her purse to pay for both her medicine and Michael's. Therefore, she told Parkey she would retrieve money from her vehicle and would return momentarily.

Suberu was leaving the store when Kellie Wier, the front-end manager, yelled "Stop!" According to Wier, Suberu was pushing a grocery cart full of unsacked goods. Suberu, however, testified that she has never used a cart to shop for groceries and did not have one that evening. Wier reached Suberu in the foyer, where the two had a brief quarrel. Suberu testified that Wier said, "Those two people who just left, you are with them," and "You are going to jail for a long time." Wier, however, denied making those statements. She claims Suberu became hostile when Wier asked to see a receipt, and that Suberu kept shouting, "You're crazy!" Suberu testified that she was annoyed because Wier would not listen to her explanation for leaving the store.

 [**3] Major Belton, another Kroger employee, was bagging groceries when Wier yelled for Suberu to stop. Belton testified that he looked up and saw Suberu pushing a cart. He watched as Wier questioned Suberu in the foyer, and, when Wier called him over to take the cart, he noticed that it contained mostly unsacked groceries. Robert Moody, the assistant manager, arrived and discussed the occurrence with Suberu and Wier. Moody asked Suberu if she had a receipt, and she replied "No." Belton then wheeled the cart to register three, where Matt Helwig was working as a checker. Helwig testified that he, too, saw Suberu pushing the cart out of the store. Moody and Wier escorted Suberu to an office, where Moody directed Wier to call the police.

Police officers arrived ten minutes after receiving Wier's call. Moody explained the events and filled out a shoplifting incident report. Meanwhile, Wier took the cart from Helwig's register and scanned [*792] the unsacked groceries. Moody stapled to his report a printed list of the scanned items, which totaled $ 261. While sitting in the office, Suberu explained that she had been at the pharmacy and was going outside to get cash from her vehicle. Despite these [**4] pleas, neither the officers nor any Kroger employee checked with the pharmacy. [1] The officers arrested Suberu and walked her out in handcuffs.

Suberu testified that she felt humiliated and has been traumatized as a result of the ordeal. Her husband, Michael, said she was "in a state of shock" when he picked her up at the jail four hours after her arrest. Suberu could not sleep that night, and was unable to cook, do laundry, and shop for groceries for several months. At trial, Michael said he and Suberu were "still working through it."

After a jury acquitted her on misdemeanor theft charges, Suberu filed the present suit, alleging malicious prosecution and intentional infliction [**5] of emotional distress. The trial court rendered judgment on the jury's verdict, which found in Suberu's favor on both claims and awarded $ 500 in actual damages for expenses in defending the prosecution, $ 28,000 for past and future mental anguish, and $ 50,500 in exemplary damages based on the malicious prosecution claim. The jury awarded no exemplary damages for intentional infliction of emotional distress. The court of appeals affirmed. *113 S.W. 3d 588*. We granted Kroger's petition for review. *2004 Tex. LEXIS 884 (Sept. 10, 2004)*.

## II

**Malicious Prosecution**

*HN1* This Court has long recognized a cause of action for those subjected unjustifiably to criminal proceedings, but has also made clear that the cause of action must sometimes yield to society's greater interest in encouraging citizens to report crimes, real or perceived. [2] [**7] The elements necessary to prevail on a malicious prosecution

---

[1]  Karrah Parkey testified that, although she does not remember seeing a cart, she heard Suberu "maneuver" a cart over a bump that joins carpet around the pharmacy with Kroger's tile floor. Suberu's cross examination revealed inconsistencies in Parkey's testimony but, as explained below, Parkey's testimony is immaterial to our disposition.

[2]  *See, e.g., Sebastian v. Cheney, 86 Tex. 497, 25 S.W. 691, 694 (Tex. 1894)* ("It is important that every citizen should be protected against malicious prosecutions, and it is equally important that crimes should be punished, in order that the law-abiding citizen may be

claim reflect this balance. [3] Thus, the plaintiff must prove not only that the defendant commenced criminal proceedings against her and she is innocent of the crime charged, but also that the defendant lacked probable cause and harbored malice toward her. These **[\*\*6]** latter elements guard against a jury's natural inclination to punish those who, through error but not malevolence, commence criminal proceedings against a person who is ultimately exonerated. [4] The probable cause element "asks **[\*793]** whether a reasonable person would believe that a crime had been committed given the facts as the complainant honestly and reasonably believed them to be before the criminal proceedings were instituted." *Richey v. Brookshire Grocery Co., 952 S.W.2d 515, 517 (Tex. 1997)* (citing *Akin v. Dahl, 661 S.W.2d 917, 920 (Tex. 1983)*, *cert. denied*, *466 U.S. 938, 104 S. Ct. 1911, 80 L. Ed. 2d 460 (1984)*). Courts must presume that the defendant acted reasonably and had probable cause to initiate criminal proceedings. *Id*. To rebut this presumption, the plaintiff must produce evidence that the motives, grounds, beliefs, or other information upon which the defendant acted did not constitute probable cause. *Id. at 518*.

In the court of appeals, Kroger challenged the legal sufficiency of the evidence to support the second, fourth, fifth, and sixth elements of Suberu's claim, [5] and her award for mental anguish and exemplary damages. *113 S.W. 3d 588, 596-601*. **[\*\*8]** The court resolved all issues against Kroger. *113 S.W.3d at 605*. In upholding the jury's finding on probable cause, the court cited Suberu's testimony that she was in the store for a few minutes to obtain a prescription, left to get money from her car, and never had a cart. *Id. at 598*. The court reasoned that it was the province of the jury to assess credibility, and the jury apparently found that Wier never saw Suberu with a cart. *Id. at 598-99*. For the reasons considered below, the evidence favorable to Suberu is legally insufficient to rebut the presumption that Kroger acted reasonably and with probable cause. As this conclusion is dispositive, we do not reach Kroger's remaining challenges to malicious prosecution liability and exemplary damages.

**A**

**Standard of Review**

*HN2* In reviewing a verdict for legal sufficiency, we credit evidence that supports the verdict if reasonable jurors could, and disregard contrary evidence unless reasonable **[\*\*9]** jurors could not. *City of Keller v. Wilson, 168 S.W.3d 802, 827 (Tex. 2005)*. A challenge to the legal sufficiency of evidence will be sustained when, among other things, the evidence offered to establish a vital fact does not exceed a scintilla. *Id. at 810* (citing Robert W. Calvert, "*No Evidence*" & "*Insufficient Evidence*" *Points of Error*, 38 TEX. L. REV. 361, 362-63 (1960)). Evidence does not exceed a scintilla if it is "'so weak as to do no more than create a mere surmise or suspicion'" that the fact exists. *Ford Motor Co. v. Ridgway, 135 S.W.3d 598, 601(Tex. 2004)* (quoting *Kindred v. Con/Chem, Inc., 650 S.W.2d 61, 63 (Tex. 1983)*).

**B**

secure in life, liberty, and property. To make the citizen liable to be mulcted in damages for an honest discharge of duty is to give immunity to crime, and to weaken the restraining power of the criminal law, thereby endangering the security of law-abiding people.").

[3]   In its entirety, the claim for malicious criminal prosecution required Suberu to prove by a preponderance of the evidence that: (1) a criminal prosecution was commenced against her; (2) Kroger initiated or procured that prosecution; (3) the prosecution terminated in her favor; (4) she was innocent of the charges; (5) Kroger lacked probable cause to initiate the prosecution; (6) Kroger acted with malice; and (7) she suffered damages. *Richey v. Brookshire Grocery Co., 952 S.W.2d 515, 517 (Tex. 1997)*.

[4]   *See* Restatement (Second) of Torts ch. 29, intro. cmt. (1977) (discussing competing social interests and stating that "private persons who aid in the enforcement of the law should be given an effective protection against the prejudice that is likely to arise from the termination of the prosecution in favor of the accused.").

[5]   *See supra* note 3.

**Application**

Suberu points to the following evidence as supporting a finding that Kroger lacked probable cause:

1. Kroger's failure to check Suberu's explanation with the pharmacy technician before initiating criminal proceedings;

2. Inconsistencies in Karrah Parkey's testimony regarding whether she saw Suberu with a cart; and

3. Suberu's testimony that she did not have a cart.

 [*794] Starting with the first item, *HN3* it is well settled [**10] that a private citizen has no duty to investigate a suspect's alibi or explanation before reporting a crime. *Richey, 952 S.W.2d at 518* (citing *Marathon Oil Co. v. Salazar, 682 S.W.2d 624, 627 (Tex. App.--Houston [1st Dist.] 1984, writ ref'd n. r. e.))*. If the acts or omissions necessary to constitute a crime reasonably appear to have been completed, a complainant's failure to investigate does not negate probable cause. *Id*. Thus, the fact that no one investigated Suberu's explanation is not evidence that probable cause was lacking.

The second item is irrelevant to whether Kroger had probable cause, because none of the Kroger employees spoke to Karrah Parkey before Moody initiated criminal proceedings. Parkey's credibility does not affect whether Kroger, at the time it called the police, reasonably believed Suberu was guilty of shoplifting. Accordingly, this evidence must be disregarded.

Suberu relies primarily on the third item--her testimony that she did not have a cart. In contrast to the criminal case, however, here the question is not whether Suberu had a cart, but whether Kroger reasonably believed she did. *See Richey, 952 S.W.2d at 517*; [**11] *Akin, 661 S.W.2d at 920-21*. Wier, Belton, and Helwig each testified that they observed Suberu leaving the store with a cart containing items she had not purchased. The law presumes that Kroger honestly and reasonably acted on the basis of these observations in reporting Suberu to police. *See Richey, 952 S.W.2d at 517*; *see also City of Keller, 168 S.W. 3d at 817* (discussing legal sufficiency where the fact finding examined concerns what a party knew or why it took a certain course). Kroger contends that Suberu's evidence is legally insufficient to rebut this presumption. We agree.

*HN4* To rebut the probable cause presumption, Suberu had to produce evidence that the motives, grounds, beliefs, or other information upon which Kroger acted demonstrate that it did not reasonably believe Suberu was guilty of shoplifting. *See Richey, 952 S.W.2d at 518*; *Akin, 661 S.W.2d at 920*. While Suberu's evidence supports the jury's determination--consistent with her acquittal--that she did not steal groceries, it does not establish the absence of probable cause.

The criminal law presumes Suberu's innocence and presents the [**12] State with a heavy burden of proof for a conviction, because it is more important that the guilty occasionally go free than for the innocent to be jailed. *In re Winship, 397 U.S. 358, 372, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970)* (Harlan, J., concurring). *HN5* The civil law presumes Kroger's good faith and requires Suberu to rebut this presumption, because it is more important that a private citizen report an apparent subversion of our laws than for the wrongly accused to attain monetary redress from the accuser. [6] These presumptions provide benchmarks with which to evaluate this case.

Suberu's acquittal does not prove that Kroger lacked probable cause, just as her arrest does not prove her guilt. Her acquittal is not evidence, then, that she was unjustifiably subjected to criminal proceedings; it shows only that the government did not prove her guilt beyond a reasonable doubt. *United States v. Watts, 519 U.S. 148, 155, 117 S. Ct. 633, 136 L. Ed. 2d 554 (1997)*. Because probable cause [**13] is presumed, Suberu was required

---

[6] *See supra* notes 2, 4.

to produce evidence that Kroger initiated her prosecution on the basis of information or [*795] motives that do not support a reasonable belief that she was guilty of shoplifting. *See Richey, 952 S.W.2d at 518*; *Akin, 661 S.W.2d at 920*. If there was no such evidence, Kroger is entitled to judgment as a matter of law.

Suberu was Kroger's regular customer, yet she introduced no evidence of, for example, prior bad relations, preexisting debt, racial animus, or any private motivation to harm her. There is no evidence that, on the night in question, Wier, Belton, and Helwig caucused prior to Suberu's detention; nor is there evidence that there was time for them to confer before recounting their similar observations to Moody. Further, there is no evidence that Kroger withheld exculpatory information from the police or capriciously enforced its shoplifting policy against customers. Although the critical question in this case was Kroger's state of mind, Suberu produced no evidence that Kroger initiated her prosecution on the basis of something other than a reasonable belief that she was guilty. *See City of Keller, 168 S.W. 3d at 829-30.* [**14]

Suberu's testimony does no more than create a surmise or suspicion that Kroger did not believe she was guilty of shoplifting, because it merely invites speculation that Kroger framed her and lied to the police. This conclusion, however, is no more probable than the proposition that Kroger's employees, each independent of the others, mistakenly believed they observed the commission of a crime. We have cautioned that, *HN6* ″[e]vidence that is so slight as to make any inference a guess is in legal effect no evidence.″ *Ridgway, 135 S.W. 3d at 601* (citing *Lozano v. Lozano, 52 S.W.3d 141, 148 (Tex. 2001))*. *HN7* Unless there is evidence rebutting the presumption of probable cause, a prosecution resulting from eyewitness identifications that turn out to be incorrect or, at least, insufficient to warrant a conviction, does not satisfy the exacting requirements for a plaintiff to prevail in a malicious prosecution case. [7]

[**15] **III**

**Intentional Infliction of Emotional Distress**

Kroger also challenges the legal sufficiency of the evidence to support its liability for intentional infliction of emotional [*796] distress. [8] *HN8* To prevail on this claim, Suberu had to prove by a preponderance of the evidence that: (1) Kroger acted intentionally or recklessly; (2) its conduct was extreme and outrageous; (3) its actions caused her emotional distress; and (4) the emotional distress was severe. *Hoffmann-La Roche Inc. v. Zeltwanger, 144 S.W. 3d 438, 445 (Tex. 2004)*; *Wal-Mart Stores, Inc. v. Canchola, 121 S.W. 3d 735, 740 (Tex. 2003)*. A defendant's conduct satisfies [**16] the second element only if it is ″'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly

---

[7] In sum, the jury could reasonably conclude, based on her acquittal and her testimony, that Suberu did not, in fact, steal groceries. Without more, however, Suberu's innocence is insufficient to support a finding that Kroger lacked probable cause. Courts must be especially careful in malicious prosecution cases to ensure that sufficient evidence supports each element of liability. Otherwise, the fourth element (innocence) automatically swallows the fifth (lack of probable cause) and sixth (malice) elements of this claim.

*See, e.g.Burrows v. Neiman-Marcus Group, Inc.*, 976 S.W.2d 784, 788 (Tex. App.--Houston [1st Dist.] 1998, no pet.) (no evidence that the defendant lacked probable cause where two employees accused the plaintiff of using a customer's lost credit card to make purchases at nearby stores); *Diamond Shamrock Corp. v. Ortiz*, 753 S.W.2d 238, 242 (Tex. App.--Corpus Christi 1988, writ denied) (no evidence that the defendant lacked probable cause where its employees gave written statements alleging the plaintiff was stealing merchandise); *Stringer v. Cross*, 564 S.W.2d 121, 122 (Tex. Civ. App.--Beaumont 1978, no writ) (no evidence of malice where a man injured in a riot identified the plaintiff as a participant); *Deaton v. Montgomery Ward & Co.*, 159 S.W.2d 969, 972 (Tex. Civ. App.--Beaumont 1942, writ ref'd w. o. m.) (probable cause was established as a matter of law where the defendant's employees identified the plaintiff as the person who cashed a forged check).

[8] The parties briefed this issue in the court of appeals, but the court did not address it. 113 S.W. 3d at 600; TEX. R. APP. P. 47.1. Because Kroger raised the issue to this Court in a supplemental brief, we have authority to consider it. TEX. R. APP. P. 53.4; *Little v. Texas Dep't of Criminal Justice*, 148 S.W. 3d 374, 384 (Tex. 2004); *N. Nat. Gas Co. v. Conoco, Inc.*, 986 S.W.2d 603, 609 (Tex. 1998).

intolerable in a civilized community.'" *Twyman v. Twyman, 855 S.W.2d 619, 621 (Tex. 1993)* (quoting *RESTATEMENT (SECOND) OF TORTS § 46 cmt. d* (1965)). Conduct that is merely insensitive or rude is not extreme and outrageous, nor are "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." *GTE Sw., Inc. v. Bruce, 998 S.W.2d 605, 612 (Tex. 1999)*.

 [**17]  Meritorious claims for intentional infliction of emotional distress are relatively rare precisely because most human conduct, even that which causes injury to others, cannot be fairly characterized as extreme and outrageous. *See Creditwatch, Inc. v. Jackson, 157 S.W. 3d 814, 815 n. 1 (Tex. 2005)* (citing cases in which conduct was not extreme and outrageous). But despite the danger of fictitious claims, the difficulty of measuring damages, and the indeterminacy of its proscriptions, intentional infliction of emotional distress can be an effective "cause of action for egregious conduct that might otherwise go unremedied." *Hoffmann-La Roche, 144 S.W. 3d at 447* (quoting *Standard Fruit and Vegetable Co. v. Johnson, 985 S.W.2d 62, 68 (Tex. 1998))*; *see, e.g.Morgan v. Anthony, 27 S.W.3d 928, 930 (Tex. 2000)* (man who stopped to assist motorist having car trouble on a rural highway repeatedly blocked her escape and harassed her); *GTE Sw., 998 S.W.2d at 613-14* (supervisor physically and verbally threatened employees over a two-year period). Applying the standard of review outlined in Part II A, we turn [**18]  to the evidence in this case.

Kroger contends that the evidence is legally insufficient to support a finding that its conduct was extreme and outrageous. Suberu, however, argues that knowingly providing false information to police so that an innocent person is prosecuted for shoplifting is extreme and outrageous. While we are inclined to agree that Suberu's premise is sound, her argument is hypothetical in light of the record before us. The only evidence that conceivably suggests Kroger and its employees knew Suberu was innocent is her testimony that she did not have a cart. In the preceding analysis, however, we concluded that her claimed innocence, by itself, is insufficient to find that Kroger did not honestly and reasonably believe Suberu was guilty. Further, Suberu produced no evidence of prior bad relations, racial animus, or other ulterior motives, nor does she allege that Kroger subjected her to outrageous or abusive treatment while she was detained on its premises. We do not doubt that the incident caused Suberu embarrassment and emotional distress, but there is no evidence that Kroger intentionally subjected her to such distress knowing she was  [*797]  innocent. Consequently, Suberu's [**19] testimony does not exceed a scintilla of evidence and is legally insufficient to support a finding that Kroger's conduct was extreme and outrageous.

## IV

### Conclusion

The evidence is legally insufficient to support a finding that Kroger lacked probable cause to initiate criminal proceedings against Suberu for shoplifting, and legally insufficient to support a finding that Kroger's conduct was extreme and outrageous. Accordingly, we reverse the court of appeals' judgment and render judgment that Suberu take nothing. *See TEX. R. APP. P. 60.2(c)*.

Wallace B. Jefferson

Chief Justice

**Concur by:** Phil Johnson (In Part)

**Dissent by:** JOHNSON

## Dissent

JUSTICE JOHNSON, joined by JUSTICE MEDINA and by JUSTICE WAINWRIGHT as to Part III, concurring in part and dissenting in part.

In connection with the first jury question, which submitted Theresa Suberu's malicious prosecution claim, the jury was instructed, without objection, that:

"Malice" means ill will, bad or evil motive, or such gross indifference to the rights of others as to amount to a willful or wanton act.

"Probable cause" means the existence of such facts and circumstances as would excite belief in a person of reasonable mind, **[\*\*20]** acting on the facts or circumstances within his knowledge at the time the prosecution was commenced, that the other person was guilty of a criminal offense. The probable cause determination asks whether a reasonable person would believe that a crime had been committed given the facts as the complainant honestly and reasonably believed them to be before the criminal proceedings were instituted.

See *Richey v. Brookshire Grocery Co., 952 S.W.2d 515, 517 (Tex. 1997)*; Comm. on Pattern Jury Charges, State Bar of Tex., Texas Pattern Jury Charges-General Negligence & Intentional Personal Torts PJC 6.4 (2000). We must evaluate the evidence according to the charge given and the contentions of the parties. *Sw. Bell Tel. Co. v. Garza, 164 S.W.3d 607, 618-19 (Tex. 2004)* ("In assessing the evidence, we assume that the portions of the charge just quoted, because they were given without objection, correctly state the law.").

I

The instruction as to probable cause tasked the jury, in part, to resolve conflicting testimony as to whether Suberu was exiting the Kroger store with a basket of groceries when she was stopped and detained by Kroger employees. **[\*\*21]** As the court of appeals' opinion and the Court's opinion set out in detail, she testified, unequivocally, "No"; Kroger's employees testified, unequivocally, "Yes." Under the first sentence of the probable cause instruction (that part of the instruction defining probable cause), the jury had to resolve the clearly conflicting testimony to find what facts and circumstances existed, and then to find if those facts and circumstances were such that they would excite belief in a person of "reasonable mind" that Suberu was guilty of a criminal offense. The second sentence of the instruction authorized the jury to find that probable cause existed if a reasonable person would believe Suberu committed a crime given the facts as Kroger *both* honestly *and* reasonably believed them to be.

The Court focuses on Suberu's failure to prove that Kroger did not honestly believe that Suberu was leaving the store with a cart full of groceries for which she had not **[\*798]** paid. Even assuming a lack of evidence that Kroger did not subjectively honestly believe that Suberu was leaving with a basket of groceries and that Kroger's witnesses did not subjectively honestly believe Suberu was leaving with a basket **[\*\*22]** of groceries, an honest belief was not enough. Under the charge, the jury's finding that Kroger did not have probable cause could have been, and we must presume that it was, based on a finding that an honest belief was not reasonable because the credibility conflict was resolved in favor of Suberu: she was not leaving with a basket regardless of Kroger's witnesses' honest belief that she was.

Suberu's testimony contained inconsistencies. Nevertheless, her testimony that she did not have a cart and that there was no cart next to her at the time Kellie Wier stopped her was some evidence supporting the jury's finding that Kroger's belief in a contrary set of facts was not reasonable regardless of Kroger's subjective sincerity in holding that belief. I would hold that the evidence was legally sufficient to support the jury's finding that Kroger lacked probable cause. I dissent from the Court's holding that it was not.

II

As to petitioner Robert Moody, individually, however, I agree that the evidence was legally insufficient to support the jury's finding that he lacked probable cause; that is, that facts and circumstances within his

knowledge were not such as **[**23]** would have excited belief in a person of reasonable mind that Suberu was guilty of a criminal offense. The jury charge required separate findings as to whether Kroger maliciously prosecuted Suberu and as to whether Moody maliciously prosecuted her. Suberu alleged that Kroger was liable by and through its employees, but she did not allege that Moody was liable based on the actions or knowledge of anyone other than himself.

Moody was not present when Suberu was exiting the store and thus had to make a decision based on conflicting factual reports from Suberu and Kroger employee witnesses. There is no evidence that Moody, as assistant manager, did not have an honest, reasonable belief that Suberu was exiting the store with a basket of unpaid groceries and was probably committing a crime. I concur in the Court's opinion and judgment as to Moody.

III

Finally, I note that Kroger does not challenge the evidentiary sufficiency of the jury findings as to malice, except in relation to exemplary damages. Kroger's failure to challenge the evidentiary support as to malice is understandable in light of our decisions holding that malice may be inferred merely from a lack of probable cause. **[**24]** *See, e.g., Shannon v. Jones, 76 Tex. 141, 13 S.W. 477, 479 (Tex. 1890)*; *Gulf, Colo. & Santa Fe Ry. Co. v. James, 73 Tex. 12, 10 S.W. 744, 747 (Tex. 1889)*; *Biering v. First Nat'l Bank of Galveston, 69 Tex. 599, 7 S.W. 90, 92 (Tex. 1888)*. Evidence of a defendant's subjective motives, state of mind, and good faith and honesty of belief in initiating or commencing a prosecution is relevant to the malice element of the cause of action. A re-examination of our holdings that lack of probable cause will support an inference of malice without further examination of the evidence may well be in order.

Phil Johnson

Justice



 Positive

As of: September 1, 2015 5:31 PM EDT

## Mendelsohn v. A & D Catering Corp.

Supreme Court of New York, Special Term, Kings County

May 24, 1983

No Number in Original

### Reporter

119 Misc. 2d 581; 464 N.Y.S.2d 331; 1983 N.Y. Misc. LEXIS 3559

Jacob Mendelsohn et al., Petitioners, v. A & D Catering Corporation, Respondent

## Core Terms

arbitration, Caterers, parties, liquor license, public policy, right to arbitration, waived, lease, liquor, criminal violation, demised premises, notice, specific performance, violations, courts, tenant

## Case Summary

### Procedural Posture

Petitioner landlords sought to permanently stay arbitration. Respondent tenant sought an order prohibiting the landlords from proceeding with an action in a civil court.

### Overview

The lease agreement between the landlords and the tenant provided for arbitration. The parties had numerous contractual disputes. The landlords claimed a clause in the lease agreement governing the relations between the landlords and the tenant violated *N.Y. Alco. Bev. Cont. Law § 111* by permitting the tenant to improperly utilize the landlords' liquor license. Following the filing of a nonpayment action by the landlords, the tenant filed a motion for a temporary restraining order and specific performance of the lease agreement. The court held the arbitration clause was enforceable because the state favored the use of arbitration as a means of settling disputes. The fact that the lease agreement might have violated public policy and might have sanctioned the commission of a misdemeanor did not void the arbitration clause because there were a plethora of other unresolved issues between the parties. The court also ruled that the action filed by the tenant seeking specific performance was, in reality, an action to preserve the status quo and that the tenant did not waive its right to arbitration by filing the action.

### Outcome

The court granted the tenant's motion for a stay of the landlords' action in civil court conditioned upon the tenant's payment of the rent due under the lease. The court denied the landlords' motion to stay arbitration.

## LexisNexis® Headnotes

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Validity of ADR Methods

Labor & Employment Law > Collective Bargaining & Labor Relations > Labor Arbitration > Enforcement

*HN1* The state favors and encourages arbitration as a means of conserving the time and resources of the courts and the contracting parties. The law has adopted a policy of noninterference, with few exceptions, in this mode of dispute resolution. Arbitration is a recognized and favored means by which parties expeditiously and efficiently may settle disputes which might otherwise take years to resolve.

Criminal Law & Procedure > Criminal Offenses > Miscellaneous Offenses > General Overview

Governments > State & Territorial Governments > Licenses

*HN2* The proprietary operation by one entity as a catering establishment by utilizing the liquor license issued to another entity would be in violation of law and against public policy. *N.Y. Alco. Bev. Cont. Law § 111*.

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Validity of ADR Methods

Labor & Employment Law > Collective Bargaining & Labor Relations > Federal Preemption > Primacy of Labor Policy

*HN3* Notwithstanding the practicable utility of denominating a breach of statute as being a "criminal violation," such labeling ought not to prevent a court from analyzing the various public policies involved in either allowing a dispute to proceed to arbitration or barring the parties from utilizing the remedy.

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Validity of ADR Methods

Contracts Law > Defenses > Public Policy Violations

Labor & Employment Law > Collective Bargaining & Labor Relations > Labor Arbitration > Enforcement

*HN4* It is for the courts to decide, as a threshold question, whether the enforcement of an agreement to arbitrate a particular matter would so contravene an important public policy that arbitration should not proceed.

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Validity of ADR Methods

Contracts Law > Defenses > Illegal Bargains

Labor & Employment Law > Collective Bargaining & Labor Relations > Labor Arbitration > Enforcement

*HN5* The law will not presume an agreement void as illegal or against public policy when it is capable of a construction which would make it consistent with the laws and valid.

Administrative Law > Agency Adjudication > Alternative Dispute Resolution

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Judicial Review

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Validity of ADR Methods

*HN6* Generally, exceptions to arbitration are narrowly confined to rights and remedies created by state regulatory statutes, and represent a determination that the public interest is best served by maintaining access to the remedies which the legislature has provided. In these exceptional cases arbitration is forbidden not because matters of public interest are involved, but because statutes require that the decisions be made by certain specified authorities.

Administrative Law > Agency Adjudication > Alternative Dispute Resolution

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Validity of ADR Methods

Contracts Law > Defenses > Usury

Insurance Law > Claim, Contract & Practice Issues > Arbitration

Business & Corporate Compliance > ... > Industry Practices > Federal Regulations > Antitrust Regulations

Insurance Law > Insurer Insolvency > Liquidations & Rehabilitations

*HN7* Public policy exceptions to arbitration have been limited to controversies involving antitrust law, the liquidation of insolvent insurance companies, and usurious loans.

Administrative Law > Agency Adjudication > Alternative Dispute Resolution

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Validity of ADR Methods

*HN8* Where the public policy pendulum has swung away from arbitration, the guiding criteria have been the pervasiveness of the regulatory scheme rather than the label of criminal violation.

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Validity of ADR Methods

Contracts Law > Contract Conditions & Provisions > Arbitration Clauses

Labor & Employment Law > Collective Bargaining & Labor Relations > Labor Arbitration > Enforcement

*HN9* It is the function of the courts to pass upon the legality of the provision sought to be arbitrated, and the courts will deny arbitration where the performance which is the subject of the demand for arbitration is prohibited by statute.

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > General Overview

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > Waiver

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Mandatory ADR

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Validity of ADR Methods

Contracts Law > Contract Conditions & Provisions > Arbitration Clauses

Contracts Law > Contract Conditions & Provisions > Waivers > General Overview

Contracts Law > Remedies > Specific Performance

Labor & Employment Law > Collective Bargaining & Labor Relations > Federal Preemption > Primacy of Labor Policy

*HN10* An arbitration provision in a contract like any other provision of a contract may be waived or abandoned by the parties, and such waiver may be evidenced by their conduct in seeking judicial relief instead of arbitration. Moreover, a party entitled to demand arbitration waives that right by bringing an action involving the same claim. Consequently, the courts have held that the right to compel arbitration is waived by taking any action in a litigation that is deemed unequivocal and a sufficient use of the judicial process so as to be inconsistent with the intention to arbitrate. Finally, it has been held that where there has been an intention to abandon the right to arbitration, that right is irrevocably lost.

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Validity of ADR Methods

Civil Procedure > Judgments > Relief From Judgments > General Overview

Contracts Law > Contract Conditions & Provisions > Waivers > General Overview

*HN11* There is neither waiver nor an election of remedies, where a plaintiff moves in court for protective relief in order to preserve the status quo while at the same time exercising its right under the contract to demand arbitration.

## Headnotes/Syllabus

**Headnotes**

**[***1] Arbitration -- Violation of Statute -- Waiver of Right to Arbitrate**
The fact that the agreement between the parties in connection with the purchase and operation of a catering business whereby the parties agreed that respondent, the purchaser of the business, would utilize the liquor license issued to the entity that formerly operated the business is in violation of the law and against public policy (*Alcoholic Beverage Control Law, § 111*) does not render the broad arbitration clauses contained in the lease and management agreements void so as to bar arbitration of the other disputes that have arisen between the parties as a result of petitioners' refusal to maintain the liquor license since respondent is no longer seeking to impose any obligation upon petitioners to procure a liquor license and, in any event, any violation of the Alcoholic Beverage Control Law, although technically a "criminal violation", does not rise to the level of a pervasive scheme of legislation which would oust an arbitrator from exercising jurisdiction on public policy grounds; respondent did not waive its right to arbitration by commencing a prior action for specific performance with respect to petitioners' **[***2]** obligations to maintain the liquor license and resorting to discovery proceedings by serving a notice to admit since respondent's actions were precipitated solely by the nonpayment proceeding commenced against it and only manifested an intention to maintain the *status quo* rather than forsake its rights under arbitration.

**Counsel:** *Bressler, Lipsitz & Rothenberg* (*William R. Kutner* of counsel), for petitioners.

*Vann & Borenstein* (*Abraham Borenstein* of counsel), for respondent.

**Judges:** Vincent Pizzuto, J.

**Opinion by:** PIZZUTO

## Opinion

**[*581] [**332] OPINION OF THE COURT**
Motions numbered 28, 87, 108 and 109 of the March 18, 1983 calendar are consolidated for the purposes of this decision. In brief these motions seek the following types of relief:
(1) motion number 28 is brought by petitioners, Jacob Mendelsohn and Mordchai Z. Greenfield, pursuant to *CPLR 7503* (subd [b]) seeking to permanently stay the arbitration demanded by respondent;
(2) motion number 87 is brought by the respondent, A & D Catering Corporation, for an order staying the petitioners from proceeding with a landlord and tenant action in the Civil Court, Kings County (index No. 40911/83) pending **[***3]** the outcome of the arbitration between these parties;

(3) motion number 108 is brought by the respondent for an order seeking to punish petitioners for contempt for **[*582]** failing to abide by the order of Hon. Frank Pino, dated March 8, 1983 which enjoined the petitioners from proceeding with the landlord and tenant proceeding in the Civil Court, Kings County, under index No. 40911/83;

(4) motion number 109 is brought by the respondent for an order directing the law firm of Regosin, Edward, Stone & Feder to turn over to respondent's attorneys all files relating to the matters in controversy between the petitioners and respondents.

BACKGROUND

Sometime prior to February 1, 1976 respondent purchased a catering business known as the Aperion Manor from Joseph and Moshe Pruzansky, the then landlords of 813 Kings Highway, Brooklyn, New York, and the principals of W & L Caterers, Inc. In connection with this purchase, numerous documents were executed between the parties, including a lease for a 10-year term. Article 30 of said lease provides as follows:

"30.1 The Lessee shall make application on or before February 1, 1976 to the State Liquor Authority for a license to serve liquor **[***4]** at the demised premises and will diligently prosecute such application by furnishing and filing all information and all documents required by such authority.

"30.2 Pending approval or disapproval of this lease by the State Liquor Authority and the issuance or denial of an appropriate liquor license to the Lessee, the Lessee shall operate a catering establishment at the demised premises but shall in no manner or form serve liquor at the demised premises. In the event that any customer requests liquor to be served at an affair then such request shall be submitted to W & L Caterers, Inc. and independent arrangements shall be made between the customer and W & L Caterers, Inc., or the customer may bring in his own liquor, at the customer's option.

"30.3 In the event that the State Liquor Authority does not approve an appropriate liquor license to the Lessee then the arrangement provided for in Section 30.2 shall continue during the term of the lease."

**[*583]** Additionally, article 31 of this lease provided for a broad arbitration clause. Finally a management agreement which the Pruzanskys signed contemporaneously with the lease also provided for arbitration of any **[**333]** **[***5]** disputes. Pursuant to these various agreements respondent operated a catering establishment utilizing the liquor license issued to W & L Caterers, Inc. On August 15, 1978 the demised premises were sold to the petitioners who assumed all of the obligations of the Pruzanskys.

Subsequently, relations between the respondent and the Pruzanskys began to sour, with the Pruzanskys refusing to sign the necessary papers for maintaining the liquor license of W & L Caterers, Inc. This dispute ultimately lead petitioners to institute a nonpayment action on December 9, 1981 (index No. 123260/81). Respondent countered immediately by securing a temporary restraining order on December 17, 1981, which stayed the landlord and tenant proceeding. Concomitant with this relief, respondent commenced an action, seeking specific performance against the petitioners with respect to their obligations to maintain the liquor license. Both of these proceedings were thereafter discontinued and the parties proceeded to arbitrate their disputes in front of a rabbinical court. On or about March, 1982, that court issued a sealed arbitration award.

On January 17, 1983 petitioners served a notice of termination **[***6]** of tenancy upon the respondent alleging violation of subdivision 7-a of section 3, section 64, section 67 (subd 1, par [b]), subdivision 3 of section 110 and *section 111 of the Alcoholic Beverage Control Law*. That same date, respondent replied by demanding arbitration pursuant to the terms of the lease and management agreement. On February 28, 1983 petitioners commenced a holdover proceeding in the Civil Court, Kings County, under index No. 40911/83. This

proceeding was stayed pursuant to the temporary restraining order of Hon. Justice Pino on March 8, 1983. Finally, on March 14, 1983, respondent served petitioners with a notice to admit pursuant to *CPLR 408* and *3123*.

ARBITRATION

The threshold issue to be decided by this court is whether or not the dispute between these parties which arose in **[\*584]** connection with the maintenance of a liquor license is amenable to arbitration. In this respect petitioners argue that the strong public policy of this State precludes the use of a forum in arbitration where the dispute involves violations of the Alcoholic Beverage Control Law. In the alternative, petitioners contend that respondent's institution of an action on or about **[\*\*\*7]** December 17, 1981 constitutes a waiver of its rights to arbitration.

It is by now a settled proposition that **HN1** this State favors and encourages arbitration as a means of conserving the time and resources of the courts and the contracting parties ( *Matter of Nationwide Gen. Ins. Co. v Investors Ins. Co. of Amer., 37 NY2d 91, 95*; *Matter of Maye* [*Bluestein*], *40 NY2d 113*). In furtherance of the laudable purposes served by permitting consenting parties to submit controversies to arbitration the law has adopted a policy of noninterference, with few exceptions, in this mode of dispute resolution (*Matter of Sprinzen* [*Nomberg*], *46 NY2d 623, 629)*. Clearly, arbitration is a recognized and favored means by which parties expeditiously and efficiently may settle disputes which might otherwise take years to resolve.

What must be untangled, however, is the nettlesome question of whether the public policy of this State precludes arbitration of the present dispute. In this respect the statement has been bandied about that excluded from the ambit of arbitration have been questions of violations of the criminal law (see, e.g., 8 Weinstein-Korn-Miller, *NY Civ Prac, par 7501.19*; **[\*\*\*8]** *Harris v Shearson Hayden Stone, 82 AD2d 87, 92)*. At the outset, it should be noted that there is no quarrel with the proposition that **HN2** the proprietary operation by one entity as a catering establishment by utilizing the liquor license issued to another entity would be in violation of law and against public policy (*Alcoholic Beverage Control Law, § 111*; *Matter of South Shore Yacht Club v State Liq. Auth.*, 34 AD2d 794; *Smith v Pope*, 72 AD2d 913). Respondent has taken the position, that notwithstanding **[\*\*334]** what has happened in the past, it is not presently using nor will it attempt to utilize the liquor license of W & L Caterers, Inc., in the operation of its catering enterprise. It is not readily apparent, however, whether a violation of the Alcoholic Beverage Control Law **[\*585]** *ipso facto* mandates the denial of an arbitration forum. Put another way, does the label of criminal violation so envelop the proceeding that the underlying contract of arbitration is rendered null and void? **HN3** Notwithstanding the practicable utility of denominating a breach of statute as being a "criminal violation" (see, e.g., *Alcoholic Beverage Control Law, § 130*, making any violation **[\*\*\*9]** thereof a "misdemeanor"), such labeling ought not to prevent a court from analyzing the various public policies involved in either allowing a dispute to proceed to arbitration or barring the parties from this remedy.

Consequently, **HN4** it is for the courts to decide, as a threshold question, whether the enforcement of an agreement to arbitrate a particular matter would so contravene an important public policy that arbitration should not proceed (*Matter of Board of Educ.* [*Buffalo Council of Supervisors & Administrators*], *52 AD2d 220, 225*; *Matter of National Equip. Rental* [*American Pecco Corp.*], *35 AD2d 132, 135*, affd *28 NY2d 639*; *Durst v Abrash, 22 AD2d 39, 44*, affd *17 NY2d 445*). Obviously, the function which W & L Caterers, Inc. was required to perform under the lease was to act as a conduit for respondent's use of its liquor license. If this was the sole issue in dispute between these parties, this court would properly construe that purported agreement as being against public policy and invalid. On the other hand, a too rigorous application of this prohibition would impinge upon and weaken the broad public policy favoring arbitration. Thus, **HN5** the law will not **[\*\*\*10]** presume an agreement void as illegal or against public policy when it is capable of a construction which would make it

consistent with the laws and valid ( *Curtis v Gokey, 68 NY 300, 304*; *Bigelow v Benedict, 70 NY 202, 204-205*; *Lorillard v Clyde, 86 NY 384, 387*; *Shedlinsky v Budweiser Brewing Co., 163 NY 437, 439)*. In addition to the dispute over the liquor license there remains a plethora of unresolved issues between these parties. Accordingly, there is an element of respondent's dispute which may properly be resolved by arbitration.

Furthermore, the alleged violation of the Alcoholic Beverage Control Law should not deprive respondent of its right to arbitration. Thus, in *Matter of National Equip.* **[*586]** *Rental* (*American Pecco Corp*.) (*supra*), the purchaser of two terminal container loaders sought to avoid arbitration by alleging that the installation of this equipment violated applicable rules and regulations of the New York City Fire Department. In rejecting this attempt to thwart arbitration the Appellate Division, First Department, declared (*supra, p 135*) that, "it may be assumed that the arbitrators will not render an award which would require **[***11]** the doing of an act prohibited by law or offensive to public policy. If there is such an award, the court has the power to vacate it." ***HN6*** Generally, exceptions to arbitration are narrowly confined to rights and remedies created by State regulatory statutes, and represent a determination that the public interest is best served by maintaining access to the remedies which the Legislature has provided ( *Keating v Superior Ct. of Alameda County, 31 Cal 3d 584, 601-602*; see, also, *Kamakazi Music Corp. v Robbins Music Corp., 684 F2d 228, 231)*. In these exceptional cases arbitration is forbidden not because matters of public interest are involved, but because statutes require that the decisions be made by certain specified authorities. Over the years, therefore, a small number of problems have been recognized as so interlaced with strong public policy considerations that they have been **[**335]** placed beyond the reach of the arbitrators ( *Matter of Associated Teachers of Huntington v Board of Educ., 33 NY2d 229, 235)*.

Consequently, such ***HN7*** public policy exceptions to arbitration have been limited to controversies involving antitrust law (*Matter of Aimcee Wholesale Corp.* [ **[***12]** *Tomar Prods*.], *21 NY2d 621*; *Matter of Allied Van Lines* [*Hollander Express & Van Co*.], *29 NY2d 35*), liquidation of insolvent insurance companies (*Matter of Knickerbocker Agency* [*Holz*], *4 NY2d 245*), and usurious loans ( *Durst v Abrash, 22 AD2d 39*, *supra*). The area of public policies which preclude the arbitration forum is not easily defined. However, it seems apparent that in those cases ***HN8*** where the public policy pendulum has swung away from arbitration the guiding criteria have been the pervasiveness of the regulatory scheme rather than the label of criminal violation. Accordingly, in *Matter of Kingswood Mgt. Corp. (Salzman) (272 App Div 328)*, the court held that the Emergency Price Control Act **[*587]** was adopted from urgent reasons of public policy which the Congress did not intend to turn over to private arbitrators to administer. Again in *Matter of Kramer & Uchitelle (Eddington Fabrics Corp.) (288 NY 467)* the Court of Appeals found that an agreement to arbitrate was put to an end by the presence of the Office of Price Administration. Finally, in *Matter of Goldmar Hotel Corp.* (*Morning-side Studios*) (283 App Div 935), the **[***13]** Appellate Division prevented a tenant from arbitrating its obligation to make repairs to the demised premises where violations of the Multiple Dwelling Law existed. In this latter case, the court was obviously more concerned with the health, safety and welfare of the citizenry (*Multiple Dwelling Law, § 2*) rather than with any attendant criminal violations (*Multiple Dwelling Law, § 304*). For this reason the court stated (*supra*, p 935) that, "The Municipal Court will be concerned solely with the question of whether there were violations which were not removed in time. It will not be concerned with any question as to whether repairs were otherwise necessary or required by virtue of the contract between the parties."

***HN9*** It is, of course, the function of the courts to pass upon the legality of the provision sought to be arbitrated and the courts will deny arbitration where the performance which is the subject of the demand for arbitration is prohibited by statute (*Matter of Dairymen's League Co-op. Assn.* [*Conrad*], *18 AD2d 321*). This is not to say however that the mere mouthing of a criminal violation will suffice to invalidate an arbitration agreement. Rather, the court **[***14]** will weigh the public policy considerations against the parties' agreement to resolve their dispute outside of the judicial forum. Since it is alleged by the respondent that it no longer seeks to impose any obligation upon W & L Caterers, Inc. to procure a liquor license, any violations of the Alcoholic Beverage

Control Law have been rendered moot. In any event, any violation of those laws, although concededly a "criminal violation" (see *Alcoholic Beverage Control Law, § 130*), does not rise to the level of a pervasive scheme of legislation which would oust an arbitrator from exercising jurisdiction on public policy grounds. This type of statutory violation simply does not fit into the small category **[*588]** of cases that have been excepted from the parameters of arbitration on public policy grounds.

Petitioners argue in the alternative that by previously resorting to litigation of this very dispute, respondent has waived its right to arbitration. In this respect petitioners point to the commencement by respondent of its specific performance action on or about December 17, 1981 as manifesting an unequivocal intention to forego any right to arbitration. It is well established **[***15]** that *HN10* an arbitration provision in a contract like any other provision of a contract may be waived or abandoned by the parties, and such waiver may be evidenced by their conduct in seeking judicial relief instead of arbitration ( *Esquire Inds.* **[**336]** *v East Bay Textiles, 68 AD2d 845*). Moreover, a party entitled to demand arbitration waives that right by bringing an action involving the same claim ( *Matter of Spirs Trading Co. v Occidental Yarns*, 73 AD2d 542). Consequently, the courts have held that the right to compel arbitration is waived by taking any action in a litigation that is deemed unequivocal and a sufficient use of the judicial process so as to be inconsistent with the intention to arbitrate ( *Jade Press v Packard, 91 Misc 2d 820*). Finally, it has been held that where there has been an intention to abandon the right to arbitration, that right is irrevocably lost (see *Zurich Ins. Co. v Evans, 89 Misc 2d 717, 720*; *Matter of Young v Crescent Dev. Co., 240 NY 244, 251)*.

Despite the myriad number of situations whereby arbitration may be waived (i.e., participating in prior litigation [*Van Den Bogaerde v Staub, Warmbold & Assoc. Int., 80 AD2d 517]*, **[***16]** seeking arrears in Family Court [*Salisbury v Salisbury*, 83 AD2d 990]) it is nevertheless essential that a court find an intention to proceed in a judicial arena. A review of the facts herein reveals that such an intention was not manifested by the respondent when it commenced the prior action for specific performance. It is quite clear that respondents' actions at that time were precipitated solely by the nonpayment proceeding commenced against them on December 9, 1981 and limited to the extent of seeking specific performance with respect to petitioners' obligations to maintain the liquor license. What respondent intended was to maintain the *status quo* rather than **[*589]** forsaking its rights under arbitration. Most significantly that dispute was ultimately resolved by arbitration in a rabbinical court.

Petitioners also emphasize the fact that respondent has resorted to discovery proceedings in the instant litigation by serving a notice to admit. All of the actions taken together, petitioners argue, bring the respondent within the ambit of *De Sapio v Kohlmeyer (35 NY2d 402)* and mandate a finding that the right to arbitration has been waived. In that case plaintiff, **[***17]** a block trader on the stock exchange, sued his former employer for defamation (*supra, p 403*). Although the defendant raised arbitration as an affirmative defense, it obtained a deposition of plaintiff prior to moving for a stay of the action based on arbitration (*supra, p 404*). On these facts the Court of Appeals held that the actions by defendant were "a sufficiently affirmative use of the judicial process so as to be inconsistent with a later motion to stay" (*supra, p 406*).

Notwithstanding the *raison d'etre* of *De Sapio v Kohlmeyer* (*supra*), that decision is not determinative in a situation where the party attempting to enforce arbitration rights has resorted to the judicial forum solely for the purpose of maintaining the *status quo*. In this respect the Court of Appeals has recently observed that *HN11* there is neither waiver nor an election of remedies, where, as here, plaintiff moves in court for protective relief in order to preserve the *status quo* while at the same time exercising its right under the contract to demand arbitration. ( *Preiss/Breismeister Architects v Westin Hotel Co. -- Plaza Hotel Div., 56 NY2d 787*.) For several cogent reasons **[***18]** this court holds that *Preiss/Breismeister* is controlling on the issue of waiver.

In the first place, the plaintiff therein commenced an action seeking an injunction and declaratory relief in order to recover 80 architectural drawings alleged seized by that defendant. Thereafter that plaintiff served a

deposition notice, followed several days later by a demand for arbitration. At the Appellate Division, Justice Silverman writing for the dissent argued that "[having] decided against arbitration and in favor of court action with respect to some portion of the relief to which plaintiff deems itself entitled **[*590]** by reason of the same matters 'arising out of, or relating to this **[**337]** Agreement or the breach thereof,' plaintiff has waived the right to arbitration as to those matters" ( *Preiss/Breismeister Architects v Westin Hotel Co. -- Plaza Hotel Div., 86 AD2d 844, 847)*. Needless to say, this argument was rejected by the Court of Appeals. Moreover, the action taken by the plaintiff in *Preiss/Breismeister* was no different in either quality or quantity than those taken by the respondent herein. Secondly, the case of *De Sapio v Kohlmeyer (35 NY2d 402*, **[***19]** *supra*) was relied on by the dissent in *Preiss/Breismeister*. Finally, the notice to admit which was served by the respondent on March 14, 1983, albeit one of the discovery mechanisms, which can be indicative of an intent to waive arbitration, may not be so construed under the circumstances of this case. Although the delineation between an intent to waive the arbitration process and efforts to maintain the *status quo* can rarely be made with absolute clarity, the totality of circumstances herein does not warrant a finding that there was a waiver. There can be little doubt that respondent commenced the action for specific performance in 1981 solely to protect its status as a tenant in the demised premises. Furthermore, the notice to admit does little more than seek verification of petitioners' obligations under the various contractual agreements between respondent and the Pruzansky brothers as well as reiterating respondent's right to arbitration. For all of these reasons, the court finds that respondent did not waive the right to arbitrate this matter.

Accordingly, petitioners' motion to stay arbitration is denied in all respects. Respondent's motion to stay the Civil **[***20]** Court from proceeding with the holdover action under index No. 40911/83 pending the outcome of arbitration is granted on condition that respondents continue to pay any and all moneys due under the lease. Such payments may be accepted by petitioners without prejudice to any rights they may have to the ultimate possession of the premises. Finally, both the motion to punish petitioners for contempt and the motion seeking a turn over of files in the possession of the law firm of Regosin, Edward, Stone & Feder are denied in all respects.



Positive

As of: September 1, 2015 4:49 PM EDT

# *Menna v. Romero*

Court of Appeals of Texas, Fourth District, San Antonio

February 28, 2001, Delivered ; February 28, 2001, Filed

No. 04-99-00475-CV

**Reporter**

48 S.W.3d 247; 2001 Tex. App. LEXIS 1234

Jay MENNA and Jay Menna Insurance Agency, Inc., d/b/a USI Wood/Menna & Co. and d/b/a Wood/Menna & Co., Appellants v. Ron ROMERO, d/b/a Physicians, Surgeons and Hospitals Professional Services, Appellee

**Prior History:** **[\*\*1]** From the 288th Judicial District Court, Bexar County, Texas. Trial Court No. 99-CI-04605. Honorable Frank Montalvo, Judge Presiding [1]

This Opinion Substituted on Grant of Rehearing for Withdrawn Opinion of January 5, 2000, Previously Reported at: *2000 Tex. App. LEXIS 44*

**Disposition:** REVERSED AND REMANDED IN PART; AFFIRMED IN PART.

## Core Terms

arbitration, temporary injunction, trial court, injunction, injunctive relief, parties, no writ, waived, proceedings pending arbitration, trial court's order, plea in abatement, motion to stay, proceedings, restrained, referral

## Case Summary

### Procedural Posture

Appellee broker sued appellant insurer for tortious interference with contract, breach of contract, and libel and slander. The 288th Judicial District Court, Bexar County, Texas granted appellee a temporary injunction from appellant contacting certain clients for medical malpractice insurance except through appellee, and denied appellant referral of the case to, and stay for, arbitration. Appellant sought interlocutory review.

### Overview

Appellant insurer arranged to submit names of doctors whom he had solicited to appellee broker for application to a medical malpractice carrier for coverage. The parties made an agreement that had an arbitration clause and a noncompete clause as to appellant. Appellee sued for tortious interference with contract, breach of contract, libel and slander, and obtained a temporary restraining order prohibiting appellant from soliciting business involving the provision of insurance coverage from any doctor listed in the agreement. Appellant's response

---

[1] The arbitration matter was heard by Visiting Judge James Clawson and the order denying relief was signed by Visiting Judge Carlos C. Cadena. The temporary injunction matter was heard by Judge Andy Mireles, of the 73rd Judicial District Court.

requested that all claims be referred to binding arbitration. Appellee was granted a temporary injunction that appellant only make contact with listed doctors through appellee. Stay and referral for arbitration were denied. The court reversed as to arbitration. Appellee failed to show that compelling arbitration would adversely affect enforcement of the injunction. The court affirmed the injunction. The trial court had found that appellee had a probable right of recovery, and that to permit appellant to continue his conduct would alter the status quo, thus rendering any judgment for appellee an inadequate remedy at law.

**Outcome**

Motion for rehearing was granted. The opinion and judgment were substituted. Denial of motion to stay proceedings and for referral to arbitration was reversed. Temporary injunction was affirmed. Appellee failed to show that compelling arbitration would adversely affect its injunction. Permitting appellant to have continued his conduct would have altered the status quo of the parties.

# LexisNexis® Headnotes

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > General Overview

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview

Contracts Law > Contract Conditions & Provisions

Contracts Law > Contract Conditions & Provisions > Arbitration Clauses

Torts > ... > Commercial Interference > Contracts > General Overview

*HN1* Texas courts favor arbitration agreements. Accordingly, any doubts regarding the scope of the arbitration agreement are resolved in favor of arbitration.

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Mandatory ADR

Contracts Law > Contract Conditions & Provisions > Arbitration Clauses

Contracts Law > Contract Interpretation

*HN2* Whether arbitration is required is a matter of contract interpretation and a question of law for the court. A court deciding a motion to compel arbitration must determine whether the parties agreed to arbitrate, and, if so, the scope of the arbitration agreement. Therefore, two questions must be decided: (1) was there an agreement to arbitrate; and (2) does the agreement encompass the claims asserted. If the court answers these two questions affirmatively, it must compel arbitration.

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > Waiver

Contracts Law > Contract Conditions & Provisions > Arbitration Clauses

Contracts Law > Contract Conditions & Provisions > Waivers > General Overview

Labor & Employment Law > Collective Bargaining & Labor Relations > Labor Arbitration > Enforcement

*HN3* Courts will not find that a party has waived a right to enforce an arbitration clause by merely taking part in litigation unless the party has substantially invoked the judicial process to the opposing party's detriment. The test for determining waiver is two prong: (1) did the party seeking arbitration substantially invoke the judicial process; and (2) did the opposing party prove that it suffered prejudice as a result.

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > Waiver

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Mandatory ADR

Contracts Law > Contract Conditions & Provisions > Waivers > General Overview

*HN4* Whether a party has waived its right to compel arbitration is a question of law. A strong presumption against waiver exists. Waiver of an arbitration right must be intentional. Implying waiver from a party's actions is appropriate only if the facts demonstrate that the party seeking to enforce arbitration intended to waive its arbitration right. The party seeking to prove waiver bears a "heavy burden of proof," and any doubts regarding waiver are resolved in favor of arbitration.

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Mandatory ADR

Civil Procedure > ... > Entry of Judgments > Stays of Judgments > General Overview

Civil Procedure > Remedies > Injunctions > General Overview

Civil Procedure > Remedies > Injunctions > Preliminary & Temporary Injunctions

Governments > Legislation > Statute of Limitations > Time Limitations

*HN5* *Tex. Civ. Prac. & Rem. Code § 171.086* (Vernon Supp. 2000) allows the trial court to grant injunctions before arbitration proceedings begin and to enforce such orders during the period that arbitration is pending.

Civil Procedure > Remedies > Injunctions > Preliminary & Temporary Injunctions

Constitutional Law > ... > Freedom of Speech > Defamation > General Overview

Torts > ... > Defamation > Remedies > Injunctions

*HN6* Defamation alone is not a sufficient justification for restraining an individual's right to speak freely.

Civil Procedure > Remedies > Injunctions > Preliminary & Temporary Injunctions

Civil Procedure > Appeals > Appellate Jurisdiction > Interlocutory Orders

Civil Procedure > Appeals > Standards of Review > Abuse of Discretion

*HN7* In an interlocutory appeal from a temporary injunction, the appellate court does not review the merits of the applicant's case. Rather, it limits its review to whether there has been a clear abuse of discretion. It may not substitute its judgment for that of the trial court's, it merely determines whether the court's action was so arbitrary as to exceed the bounds of reasonable discretion. It is required to draw all legitimate inferences from the evidence in a manner most favorable to the trial court's judgment.

Civil Procedure > Remedies > Injunctions > Preliminary & Temporary Injunctions

*HN8* The trial court's obligation at the temporary injunction stage is to maintain the status quo until a trial on the merits resolves the dispute. The trial court abuses its discretion in granting or denying a temporary injunction when it misapplies the law to the established facts or when the evidence does not reasonably support the conclusion that the applicant has a probable right of recovery.

**Counsel:** ATTORNEY FOR APPELLANT: Joe House, House & House, P.C., Houston, TX. Vincent L. Marable, III, Law Firm Of Paul Webb, P.C., Wharton, TX. Steve A. Chiscano, Law Offices Of Davis, Cedillo & Mendoza, Inc., San Antonio, TX.

ATTORNEY FOR APPELLEE: Thomas E. Quirk, Law Offices Of Aaron & Quirk, San Antonio, TX.

**Judges:** Opinion by: Alma L. Lopez, Justice, Dissenting opinion by: Sarah B. Duncan, Justice, Sitting: Alma L. Lopez, Justice, Catherine Stone, Justice, Sarah B. Duncan, Justice.

**Opinion by:** Alma L. Lopez

## Opinion

### [*249] ON APPELLANTS' MOTION FOR REHEARING

Appellant's motion for rehearing is granted. This court's opinion and judgment dated January 5, 2000 are withdrawn, and this opinion and judgment are substituted.

This is an accelerated, interlocutory appeal of an order granting a temporary injunction and an order denying appellant's motion to stay proceedings pending arbitration and to refer the case [**2] to arbitration. For reasons stated in this opinion, we reverse the trial court's order denying the motion to stay proceedings and for referral to arbitration, but we affirm the order granting the temporary injunction. The cause is remanded to the trial court for further proceedings consistent with this opinion.

### BACKGROUND

The parties to this dispute are insurance agents and agencies, each of whom markets medical malpractice insurance to physicians, surgeons, and hospitals. The parties had an arrangement whereby Romero's agency solicited clients and submitted them to Menna's agency, as broker, for application to a malpractice carrier for coverage. Litigation between the two parties was resolved by an agreement signed on August 6, 1998. The agreement provided, *inter alia,* an agreement to continue their business relationship and a covenant not to compete clause by Menna concerning any of Romero's clients for a period of two years from the expiration of any policy covered by the agreement. The agreement also contains an arbitration clause.

As it became time to renew the policies affected by the agreement, the dispute erupted again. On March 31, 1999, Romero filed a petition [**3] alleging tortious interference with the contract, breach of contract, libel and slander, and seeking recovery of attorney's fees. Romero also sought injunctive relief and obtained a temporary restraining order prohibiting Menna from directly or indirectly contacting and soliciting business involving the provision of insurance coverage from any doctor listed in the 1998 agreement. The order also restrained Menna from not issuing policies to the doctors on the list and from taking any action to cancel such policies. The hearing on a temporary injunction was originally set for April 12, 1999, but was reset for April 21, 1999. On April 20, 1999, Menna filed a response denying the allegations and requesting that all claims be referred to binding arbitration. On that same day, Menna also filed a motion for continuance of the preliminary injunction hearing.

At the injunction hearing on April 21, the trial court heard and denied the motion for continuance. Romero limited his request for injunctive relief to requiring all contact by Menna with the listed physicians about their insurance policies be made through Romero until a final judgment resolves the current dispute. After hearing testimony [**4] from four witnesses, the court issued a temporary injunction, finding that Romero had presented

a prima facie case on three causes of action: libel and slander, breach of contract, and tortious interference with contract. The court further found that, if Menna's actions were not restrained, there was a probability of injury for which there was no adequate remedy at law, specifically loss of business, loss of good will, loss of commissions, and loss of reputation in the **[*250]** context of these causes of action. Bond was set at $ 1,000.

During the lunch recess on the day of the injunction hearing, Menna filed a plea to the jurisdiction, a motion to abate, and a "subject to" original answer. Menna subsequently filed a motion to stay proceedings pending arbitration and for referral to arbitration. On May 12, 1999, Menna's plea in abatement was heard and focused on the arbitration clause in the agreement. The court took judicial notice of the agreement in the court's file and the transcript of the injunction hearing (as no written orders had issued yet). The court denied the plea in abatement and motion to stay proceedings pending arbitration and for referral to arbitration on the grounds that **[**5]** Menna had waived these contractual rights by participating in the injunction hearing without urging arbitration. Menna appealed both orders.

## ARBITRATION

Menna first complains that the trial court erred in denying his motion to refer this matter to a binding arbitration proceeding. Menna introduced the arbitration agreement into evidence and requested the trial court to stay the proceedings and refer the matter to arbitration based on the pleadings on file. The agreement contemplates that the parties will resort to arbitration should either party claim "a right to recover damages or other relief for contract, tort, fraud, misrepresentation or any other such claims."

*HN1* Texas courts favor arbitration agreements. *See Jack B. Anglin Co. v. Tipps, 842 S.W.2d 266, 268 (Tex. 1992)*. Accordingly, any doubts regarding the scope of the arbitration agreement are resolved in favor of arbitration. *See Cantella & Co.*, *Inc. v. Goodwin, 924 S.W.2d 943, 944 (Tex. 1996)* (orig. proceeding). Romero's claims grounded in breach of contract, tortious interference with contract, libel and slander easily fall within the scope of the agreement. Furthermore, the claim **[**6]** for injunctive relief arguably falls within the arbitration provision of the parties' agreement. *See J.J. Gregory Gourmet Servs., Inc. v. Antone's Import Co., 927 S.W.2d 31, 35-36* (Tex. App.-Houston [1st Dist.] 1995, no writ) (broad arbitration clause and absence of specific prohibition to grant injunctive relief brings such claim within scope of agreement). Romero argued, however, that Menna had waived his right to arbitrate because he did not raise it during the temporary injunction hearing.

*HN2* Whether arbitration is required is a matter of contract interpretation and a question of law for the court. *Emerald Texas*, *Inc. v. Peel, 920 S.W.2d 398* (Tex. App.-Houston [1st Dist.] 1996, no writ). A court deciding a motion to compel arbitration must determine whether the parties agreed to arbitrate, and, if so, the scope of the arbitration agreement. *Merrill Lynch*, *Pierce, Fenner & Smith, Inc. v. Longoria, 783 S.W.2d 229, 230* (Tex. App.-Corpus Christi 1989, no writ). Therefore, two questions must be decided: (1) Was there an agreement to arbitrate? (2) Does the agreement encompass the claims asserted? If the court **[**7]** answers these two questions affirmatively, it must compel arbitration. *See Smith Barney Shearson, Inc. v. Finstad, 888 S.W.2d 111, 114* (Tex. App.- Houston [1st Dist.] 1994, no writ). The agreement containing the arbitration agreement was entered into evidence without objection. To the extent Romero's claims concern contacts Menna has made to clients listed in the agreement for the time period specified, we find that the claims fall within the scope of the arbitration agreement.

We next turn to Romero's claim that Menna waived his right to arbitration. **[*251]** The arbitration agreement invokes the provision of the Texas General Arbitration Statute. *See TEX. CIV. PRAC. & REM. CODE § 171.001 et seq.* (Vernon 1997). *HN3* Courts will not find that a party has waived a right to enforce an arbitration clause by merely taking part in litigation unless the party has substantially invoked the judicial process to the opposing party's detriment. *See In re Bruce Terminix Co., 988 S.W.2d 702, 704 (Tex. 1998)*. The test for determining

waiver is two prong: (1) did the party seeking arbitration substantially invoke the judicial process; **[\*\*8]** and (2) did the opposing party prove that it suffered prejudice as a result? *See Prudential Securities*, *Inc. v. Marshall, 909 S.W.2d 896, 898 (Tex. 1995)*.

*HN4* Whether a party has waived its right to compel arbitration is a question of law. *See In re Bruce Terminix Co., 988 S.W.2d at 704*. A strong presumption against waiver exists. *See id.*; *see also Prudential Securities*, *Inc. v. Marshall, 909 S.W.2d 896, 898 (Tex. 1995)*. Waiver of an arbitration right must be intentional. *EZ Pawn Corp. v. Mancias, 934 S.W.2d 87, 89 (Tex. 1996)* (orig. proceeding). Implying waiver from a party's actions is appropriate only if the facts demonstrate that the party seeking to enforce arbitration intended to waive its arbitration right. *Id.* The party seeking to prove waiver bears a "heavy burden of proof," and any doubts regarding waiver are resolved in favor of arbitration. *See In re Bruce Terminix Co., 988 S.W.2d at 705*.

We resolve the waiver issue based on the second prong of the test. Assuming, without deciding, that the first prong of the test was met by the actions Menna had taken, including Menna's **[\*\*9]** demand for a jury trial and prompt setting which the trial court granted, Romero failed to prove that he was prejudiced as a result.

Romero filed his lawsuit on March 31, 1999. The temporary injunction hearing was held twenty-one days after the lawsuit was filed. Menna's response to the injunction application, which was filed prior to the hearing, requested that the claims be referred to arbitration. Menna's plea in abatement and motion for referral to arbitration was heard on May 12, 1999 - approximately forty days after suit was filed. Although the hearing on the plea in abatement occurred after the trial court granted Romero a temporary injunction, Romero did not prove that compelling arbitration would have an adverse effect on the enforcement of the temporary injunction order. *See HN5 TEX. CIV. PRAC. & REM. CODE § 171.086* (Vernon Supp. 2000) (allowing trial court to grant injunctions before arbitration proceedings begin and to enforce such orders during the period that arbitration is pending). As a result, Romero failed to meet the "heavy burden" of proving that he suffered prejudice as a result of Menna's actions during the forty days the lawsuit **[\*\*10]** was pending before the hearing on Menna's plea in abatement. The trial court's order denying Menna's motion to stay proceedings pending arbitration and to refer the case to arbitration is reversed.

## TEMPORARY INJUNCTIVE RELIEF

Menna's three remaining issues concern the trial court's temporary injunction. First, Menna claims that the court erred by granting injunctive relief for alleged defamation because this order represents an impermissible prior restraint on free speech. *See Hajek v. Bill Mowbray Motors, Inc., 647 S.W.2d 253, 255 (Tex. 1983)* ("*HN6* Defamation alone is not a sufficient justification for restraining an individual's right to speak freely."). Secondly, Menna asserts that Romero has an adequate remedy at law because he is also seeking money damages. And lastly, Menna labels as abuse of discretion the court's granting **[\*252]** injunctive relief in the absence of a showing of irreparable injury.

*HN7* In an interlocutory appeal from a temporary injunction, we do not review the merits of the applicant's case. *See Davis v. Huey, 571 S.W.2d 859, 861 (Tex. 1978)*. Rather, we limit our review to whether there has been a clear abuse of discretion. **[\*\*11]** *See id. at 861-62*. We may not substitute our judgment for that of the trial court's, we merely determine whether the court's action was so arbitrary as to exceed the bounds of reasonable discretion. *Id. at 862*. We are required to draw all legitimate inferences from the evidence in a manner most favorable to the trial court's judgment. *See Miller v. K&M Partnership, 770 S.W.2d 84, 87* (Tex. App.-Houston [1st Dist.] 1989, no writ).

At the injunction hearing, the court heard testimony from Holly Munchak, the office manager to Dr. Balli, one of the clients listed in the agreement. She testified that she received an unsolicited telephone call from Menna:

Munchak: … At that time he informed me that we did not have coverage; that he was not going to cover us for our malpractice policy, and did I understand this. And I told him yes.

He then informed me that Mr. Romero had only forwarded five-hundred-and-thirty-something dollars of the $ 900 that I had paid of my premium. And that led me to believe that there was something illegal going on. And then he gave me the name and the phone number of the Texas Department of Insurance and an investigator [**12] to contact if I had any other questions or needed to know anything else …or wanted to talk to somebody about it.

* * * * *

Quirk: Did he encourage you to call him?

Munchalk: He told me if I wanted any other answers, that I could call him and he could tell me what happened to, like, the rest of my money. And I just told him that I would be in touch with Ron.

* * * * *

Quirk: Okay. What was your impression after having this discussion with Mr. Menna?

Munchalk: Well, after the discussion, I was very concerned. I felt that maybe he was telling me, without actually telling me, that Mr. Romero was doing something wrong and illegal and that there was an investigation going on and that I needed to call.

* * * * *

Quirk: Okay, Did he tell you that Mr. Romero was under investigation?

Munchalk: Yes, he did tell me that.

The court also heard Romero testify that Menna, in violation of the agreement, received documents and information from Romero concerning insurance applications and then contacted the clients directly without copying Romero, in effect, leaving Romero, their agent, out of the communication loop. This put Romero at a disadvantage in servicing the client. Romero stated [**13] that he was seeking injunctive relief to enforce the agreement:

Because he's saying bad things about me. And also, by our previous agreement, any correspondence he's supposed to send to me in writing and he doesn't do any of that, nor has he in the past.

And I don't know what's going on with the doctors … there is a gap, … I [*253] don't know what's happening. You know, that leaves me to where I'm not doing my full duties as an agent …

Romero also testified that this was a highly competitive business where agents steal clientele from other agents and that he had suffered serious damage because his clients had been told derogatory information about him. This had resulted in losing clients to Menna. Romero further testified that Menna had written directly to some of Romero's clients and tried to keep him from getting his commission. In addition, the court heard testimony that on at least one occasion, two Laredo doctors who practiced together with essentially similar practices were treated differently when their insurance applications to the same carrier were presented through Menna's agency. The doctor whose application was placed directly with Menna received a more favorable [**14] premium quote than the doctor whose agent, Romero, placed the application with Menna, as broker. Romero opined that Menna, as the exclusive broker for the carrier, had considerable influence with the carrier over rates.

Based upon this and other evidence presented, the trial court found that Romero had a probable right of recovery relative to libel and/or slander, a probable and substantial right of recovery concerning his breach of contract claim and his tortious interference with contractual agreements claim. The court further found imminent, irreparable harm in the potential loss of business, good will, income, and reputation if the conduct in evidence were not restrained. Further, the court found that to permit Menna to continue this conduct would alter the status quo during the interim and render any judgment in Romero's favor ineffective - an inadequate remedy at law because Romero would continue to lose business, good will, income, and suffer a damaged reputation. *HN8* The trial court's obligation at the temporary injunction stage is to maintain the status quo until a trial on the merits resolves the dispute. *See Turcotte v. Alice National Bank, 402 S.W.2d 894, 896 (Tex. 1966).* **[**15]** The trial court abuses its discretion in granting or denying a temporary injunction when it misapplies the law to the established facts or when the evidence does not reasonably support the conclusion that the applicant has a probable right of recovery. *See State v. Southwestern Bell Tel. Co., 526 S.W.2d 526, 528 (Tex. 1975).* We find no clear abuse of discretion in the court's ruling.

**CONCLUSION**

The trial court's order granting temporary injunction is affirmed. The trial court's order overruling and denying Menna's motion to stay proceedings pending arbitration and for referral to arbitration is reversed. The cause is remanded to the trial court for further proceedings consistent with this opinion.

Alma L. Lopez, Justice

**Dissent by:** Sarah B. Duncan

# Dissent

DISSENTING OPINION

I respectfully dissent. On its face, the injunction constitutes a prior restraint on speech; it is overly broad; and it is not supported by evidence of imminent irreparable harm. *See*, *e.g.*, *Markel v. World Flight, Inc., 938 S.W.2d 74 (Tex. App.-San Antonio 1996, no writ).* Accordingly, I would reverse the trial court's orders and remand the case to the trial court with **[**16]** instructions to refer the case to arbitration.

Sarah B. Duncan, Justice



Q Questioned

As of: September 1, 2015 5:36 PM EDT

# *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*

Supreme Court of the United States

November 2, 1982, Argued ; February 23, 1983, Decided

No. 81-1203

**Reporter**

460 U.S. 1; 103 S. Ct. 927; 74 L. Ed. 2d 765; 1983 U.S. LEXIS 17; 51 U.S.L.W. 4156

MOSES H. CONE MEMORIAL HOSPITAL v. MERCURY CONSTRUCTION CORP.

**Prior History:** CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT.

**Disposition:** *656 F.2d 933*, affirmed.

## Core Terms

arbitration, district court, court of appeals, state court, River, federal court, parties, state-court, federal suit, abstention, disputes, cases, provides, issues, proceedings, merits, factors, circumstances, stay order, arbitration agreement, district judge, water rights, piecemeal, mandamus, orders, appellate jurisdiction, death knell, appeals, courts, federal jurisdiction

## Case Summary

### Procedural Posture

Petitioner hospital sought review of a judgment from the United States Court of Appeals for the Fourth Circuit in an action brought by respondent construction company to compel arbitration under the Arbitration Act, *9 U.S.C.S. § 4*, to resolve a contract dispute.

### Overview

Petitioner hospital sought review of a judgment in favor of respondent construction company in an action to compel arbitration under *§ 4* of the Arbitration Act, *9 U.S.C.S. § 4*, to resolve contract dispute. The appellate court held that it had jurisdiction over the case under *28 U.S.C.S. § 1291*, reversed a stay of proceedings, and remanded the case for entry of an order to arbitrate. Petitioner asserted that the stay order from which respondent appealed was not a final decision and was not appealable under *§ 1291*. The United States Supreme Court held that a stay order was final and appealable when its sole purpose and effect was to surrender jurisdiction of a federal suit to a state court. The Court also held that the a stay of federal proceedings was improper because of the probable inadequacy of the state court proceeding to protect respondent's rights where there was a doubt as to whether respondent could obtain an order compelling arbitration from the state court, and because there were no exceptional circumstances or the clearest of justifications to support surrender of federal jurisdiction. Accordingly, the judgment in favor of respondent was affirmed.

**Outcome**

The judgment asserting appellate jurisdiction and ordering arbitration between petitioner hospital and respondent construction company was affirmed because the stay of proceedings was final and appealable when its sole purpose was to surrender jurisdiction, and where there were no exceptional circumstances to support the surrender of federal jurisdiction.

# LexisNexis® Headnotes

Civil Procedure > Appeals > Appellate Jurisdiction > Final Judgment Rule

*HN1* See *28 U.S.C.S. § 1291*.

Civil Procedure > Appeals > Appellate Jurisdiction > Interlocutory Orders

*HN2* *28 U.S.C.S. § 1292* in terms applies only to interlocutory orders.

Civil Procedure > Preliminary Considerations > Federal & State Interrelationships > Abstention

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > Arbitrability

*HN3* A district court stay pursuant to Pullman abstention is entered with the expectation that the federal litigation will resume in the event that a plaintiff does not obtain relief in state court on state-law grounds.

Civil Procedure > Appeals > Appellate Jurisdiction > Final Judgment Rule

*HN4* The usual rule is that a stay of proceedings is not ordinarily a final decision for purposes of *28 U.S.C.S. § 1291*, since most stays do not put a plaintiff "effectively out of court."

Civil Procedure > Preliminary Considerations > Federal & State Interrelationships > Abstention

Civil Procedure > Appeals > Appellate Jurisdiction > Final Judgment Rule

*HN5* Appeal from a stay on abstention or Colorado River grounds presents no prospect of appeals of right from nonfinal orders that turn on the facts of a particular case.

Civil Procedure > Appeals > Appellate Jurisdiction > Final Judgment Rule

*HN6* A stay order is final when the sole purpose and effect of the stay are precisely to surrender jurisdiction of a federal suit to a state court.

Civil Procedure > Appeals > Appellate Jurisdiction > Final Judgment Rule

*HN7* To come within the "small class" of decisions excepted from the final-judgment rule, an order must conclusively determine the disputed question, resolve an important issue completely separate from the merits of an action, and be effectively unreviewable on appeal from a final judgment.

Civil Procedure > Preliminary Considerations > Federal & State Interrelationships > Abstention

Civil Procedure > Appeals > Appellate Jurisdiction > Final Judgment Rule

*HN8* Abstention from the exercise of federal jurisdiction is the exception, not the rule. The doctrine of abstention, under which a district court may decline to exercise or postpone the exercise of its jurisdiction, is

an extraordinary and narrow exception to the duty of a district court to adjudicate a controversy properly before it. Abdication of the obligation to decide cases can be justified under this doctrine only in the exceptional circumstances where the order to the parties to repair to a state court would clearly serve an important countervailing interest.

Civil Procedure > ... > Jurisdiction > Jurisdictional Sources > General Overview

Civil Procedure > Preliminary Considerations > Federal & State Interrelationships > Abstention

*HN9* The pendency of an action in a state court is no bar to proceedings concerning the same matter in a federal court having jurisdiction, and the federal courts have a virtually unflagging obligation to exercise the jurisdiction given them. Given this obligation, and the absence of weightier considerations of constitutional adjudication and state-federal relations, the circumstances permitting the dismissal of a federal suit due to the presence of a concurrent state proceeding for reasons of wise judicial administration are considerably more limited than the circumstances appropriate for abstention. The former circumstances, though exceptional, do nevertheless exist.

Civil Procedure > ... > Jurisdiction > Jurisdictional Sources > General Overview

Civil Procedure > ... > Jurisdiction > Subject Matter Jurisdiction > General Overview

Civil Procedure > ... > Subject Matter Jurisdiction > Jurisdiction Over Actions > General Overview

Civil Procedure > ... > Subject Matter Jurisdiction > Jurisdiction Over Actions > Concurrent Jurisdiction

Civil Procedure > Preliminary Considerations > Federal & State Interrelationships > Abstention

*HN10* Some factors relevant to the decision for a federal court to dismiss proceedings in favor of state court proceedings are: a court first assuming jurisdiction over property may exercise that jurisdiction to the exclusion of other courts; in assessing the appropriateness of dismissal in the event of an exercise of concurrent jurisdiction, a federal court may also consider such factors as the inconvenience of the federal forum, the desirability of avoiding piecemeal litigation, and the order in which jurisdiction was obtained by the concurrent forums. No one factor is necessarily determinative; a carefully considered judgment taking into account both the obligation to exercise jurisdiction and the combination of factors counseling against that exercise is required. Only the clearest of justifications will warrant dismissal.

Civil Procedure > Preliminary Considerations > Federal & State Interrelationships > Abstention

*HN11* Under both Calvert and Colorado River, the decision whether to defer to the state courts is necessarily left to the discretion of a district court in the first instance. Yet to say that a district court has discretion is not to say that its decision is unreviewable; such discretion must be exercised under the relevant standard prescribed by the United States Supreme Court.

Civil Procedure > Preliminary Considerations > Federal & State Interrelationships > Abstention

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > Arbitrability

Civil Procedure > ... > Arbitration > Federal Arbitration Act > General Overview

Contracts Law > Contract Conditions & Provisions > Arbitration Clauses

*HN12* Under the Arbitration Act, an arbitration agreement must be enforced notwithstanding the presence of other persons who are parties to the underlying dispute but not to the arbitration agreement.

Civil Procedure > Preliminary Considerations > Federal & State Interrelationships > Abstention

*HN13* Priority should not be measured exclusively by which complaint was filed first, but rather in terms of how much progress has been made in the two actions.

    Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview

    Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > Arbitrability

    Civil Procedure > ... > Arbitration > Federal Arbitration Act > General Overview

    Civil Procedure > ... > Arbitration > Federal Arbitration Act > Stay Pending Arbitration

    Contracts Law > Contract Conditions & Provisions > Arbitration Clauses

    Criminal Law & Procedure > ... > Standards of Review > Plain Error > General Overview

    Criminal Law & Procedure > ... > Standards of Review > Plain Error > Definition of Plain Error

    International Trade Law > Dispute Resolution > International Commercial Arbitration > Arbitration

*HN14* The Arbitration Act provides two parallel devices for enforcing an arbitration agreement: a stay of litigation in any case raising a dispute referable to arbitration, *9 U.S.C.S. § 3*, and an affirmative order to engage in arbitration, *9 U.S.C.S. § 4*. Both of these sections call for an expeditious and summary hearing, with only restricted inquiry into factual issues.

    Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview

    Civil Procedure > ... > Arbitration > Federal Arbitration Act > General Overview

    Civil Procedure > ... > Arbitration > Federal Arbitration Act > Stay Pending Arbitration

    Civil Procedure > ... > Entry of Judgments > Stays of Judgments > General Overview

    Contracts Law > Contract Conditions & Provisions > Arbitration Clauses

    International Trade Law > Dispute Resolution > International Commercial Arbitration > Arbitration

    Labor & Employment Law > Collective Bargaining & Labor Relations > Federal Preemption > Primacy of Labor Policy

*HN15* *Section 3* of the Arbitration Act provides that if a suit is brought on the merits of a dispute covered by an arbitration agreement, a court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration. *9 U.S.C.S. § 3*.

    Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview

    Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > Arbitrability

    Civil Procedure > ... > Arbitration > Federal Arbitration Act > General Overview

    Civil Procedure > ... > Entry of Judgments > Stays of Judgments > General Overview

    Contracts Law > Contract Conditions & Provisions > Arbitration Clauses

    International Trade Law > Dispute Resolution > International Commercial Arbitration > Arbitration

*HN16* *Section 4* of the Arbitration Act provides that a district court must enter an order to arbitrate upon being satisfied that the making of an agreement for arbitration or the failure to comply therewith is not in issue. If either of these points is in issue, *§ 4* provides that a court shall proceed summarily to a trial on that point. *Section*

*6* further provides that a request for relief under either *§ 3* or *§ 4* is to be treated procedurally as a motion. *9 U.S.C.S. §§ 4*, *6*.

> Admiralty & Maritime Law > Arbitration > General Overview
>
> Admiralty & Maritime Law > Arbitration > Enforcement of Arbitration
>
> Admiralty & Maritime Law > Arbitration > Federal Arbitration Act
>
> Admiralty & Maritime Law > Arbitration > Judicial Review
>
> Admiralty & Maritime Law > Maritime Contracts > General Overview
>
> Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview
>
> Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > Arbitrability
>
> Civil Procedure > ... > Arbitration > Federal Arbitration Act > General Overview
>
> Civil Procedure > ... > Arbitration > Federal Arbitration Act > Arbitration Agreements
>
> Contracts Law > Contract Conditions & Provisions > Arbitration Clauses
>
> Contracts Law > ... > Affirmative Defenses > Fraud & Misrepresentation > General Overview
>
> Contracts Law > Formation of Contracts > Execution
>
> Insurance Law > ... > Property Insurance > Coverage > Flood Insurance
>
> International Trade Law > Dispute Resolution > International Commercial Arbitration > Arbitration
>
> Labor & Employment Law > Collective Bargaining & Labor Relations > Federal Preemption > Primacy of Labor Policy

*HN17* *Section 2* is the primary substantive provision of the Arbitration Act, declaring that a written agreement to arbitrate in any maritime transaction or a contract evidencing a transaction involving commerce shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract. *9 U.S.C.S. § 2*. *Section 2* is a congressional declaration of a liberal federal policy favoring arbitration agreements, notwithstanding any state substantive or procedural policies to the contrary. The effect of the section is to create a body of federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the Arbitration Act.

> Admiralty & Maritime Law > Arbitration > General Overview
>
> Admiralty & Maritime Law > Arbitration > Federal Arbitration Act
>
> Admiralty & Maritime Law > Maritime Contracts > General Overview
>
> Civil Procedure > ... > Arbitration > Federal Arbitration Act > General Overview
>
> International Trade Law > Dispute Resolution > International Commercial Arbitration > Arbitration

*HN19* Maritime transactions and commerce are defined in *§ 1* of the Arbitration Act, *9 U.S.C.S. § 1*.

> Civil Procedure > ... > Responses > Defenses, Demurrers & Objections > Waiver & Preservation of Defenses
>
> Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview
>
> Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > Arbitrability
>
> Civil Procedure > ... > Arbitration > Federal Arbitration Act > General Overview

*HN18* The Arbitration Act establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability.

   Civil Procedure > ... > Jurisdiction > Subject Matter Jurisdiction > General Overview

   Civil Procedure > ... > Subject Matter Jurisdiction > Federal Questions > General Overview

   Civil Procedure > Preliminary Considerations > Federal & State Interrelationships > Abstention

   Civil Procedure > Appeals > Standards of Review > General Overview

*HN20* A reviewing court's task in cases where a federal court has dismissed a case in favor of state court proceedings is not to find some substantial reason for the exercise of federal jurisdiction by a district court; rather, the task is to ascertain whether there exist "exceptional" circumstances, the "clearest of justifications," that can suffice under Colorado River to justify the surrender of that jurisdiction. Although in some rare circumstances the presence of state-law issues may weigh in favor of that surrender, the presence of federal-law issues must always be a major consideration weighing against surrender.

   Civil Procedure > ... > Jurisdiction > Jurisdictional Sources > General Overview

   Civil Procedure > ... > Entry of Judgments > Stays of Judgments > General Overview

*HN21* A stay is as much a refusal to exercise federal jurisdiction as a dismissal. When a district court decides to dismiss or stay under Colorado River, it presumably concludes that the parallel state-court litigation will be an adequate vehicle for the complete and prompt resolution of the issues between the parties. If there is any substantial doubt as to this, it would be a serious abuse of discretion to grant the stay or dismissal at all.

   Civil Procedure > ... > Entry of Judgments > Stays of Judgments > General Overview

   Civil Procedure > Appeals > Appellate Jurisdiction > Final Judgment Rule

*HN22* The decision to invoke Colorado River necessarily contemplates that a federal court will have nothing further to do in resolving any substantive part of the case, whether it stays or dismisses.

   Civil Procedure > Appeals > Appellate Jurisdiction > General Overview

*HN23* *28 U.S.C.S. § 2106* gives a court of appeals some latitude in entering an order to achieve justice in the circumstances.

   Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview

   Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > Arbitrability

   Civil Procedure > ... > Arbitration > Federal Arbitration Act > General Overview

   Contracts Law > Contract Conditions & Provisions > Arbitration Clauses

*HN24* The Arbitration Act calls for a summary and speedy disposition of motions or petitions to enforce arbitration clauses.

## Lawyers' Edition Display

**Decision**

Federal District Court's stay of federal suit seeking arbitration under 4 of Arbitration Act (*9 USCS 4*), in deference to parallel litigation in North Carolina state court, held appealable to Federal Court of Appeals under *28 USCS 1291*, and improper as not having met requisite exceptional circumstances for surrender of jurisdiction.

## Summary

A hospital and a construction contractor entered into a contract for the construction of additions to the hospital, the contract including provisions for binding arbitration of certain claims. After the contractor submitted a claim for increased construction costs upon completion of the work, the hospital filed an action against the contractor and the architect of the additions in the Superior Court of Guilford County, North Carolina, alleging that the contractor had lost any right to arbitration under the contract due to waiver, laches, estoppel and failure to make a timely demand for arbitration, the hospital's complaint also alleging various delinquencies on the part of the architect. The hospital sought in the action a declaration that there was no right to arbitration, a stay of arbitration, a declaration that the hospital bore no liability to the contractor, and that it would be entitled to indemnity from the architect if the hospital was found liable. The contractor mailed a demand for arbitration on the same day that the hospital served its complaint on the contractor. The hospital then obtained in the state court an ex parte injunction forbidding the contractor from taking steps towards arbitration. The contractor later objected, and the stay was dissolved by the state court. The contractor then filed suit, based on diversity of jurisdiction, in the United States District Court for the Middle District of North Carolina, seeking an order compelling arbitration under 4 of the Arbitration Act (*9 USCS 4*). On the hospital's motion, the District Court stayed the contractor's federal court suit, pending resolution of the state court suit, because the two suits involved the identical issue of the arbitrability of the contractor's claim. The United States Court of Appeals for the Fourth Circuit, after finding that it had appellate jurisdiction under *28 USCS 1291* to review the District Court's stay, reversed the District Court's stay order and remanded the case, the Court of Appeals also holding that the contractual dispute between the hospital and the contractor was arbitrable (*656 F2d 933*).

On certiorari, the United States Supreme Court affirmed. In an opinion by Brennan, J., joined by White, Marshall, Blackmun, Powell, and Stevens, JJ., it was held that (1) the Court of Appeals had appellate jurisdiction under *28 USCS 1291* to review the District Court's stay order, as the stay order was a final decision for purposes of 1291, and even if not final, the order was appealable as an exception to the finality rule, (2) the District Court abused its discretion in granting the stay, there being no showing of the requisite exceptional circumstances to justify a stay of a federal court suit in deference to the parallel state court litigation, and (3) the Court of Appeals was within its authority in deciding the arbitrability of the contractor's claim, even though the issue was not formally appealed to the Court of Appeals.

Rehnquist, J., joined by Burger, Ch. J., and O'Connor, J., dissented, expressing the view that the District Court's order was not a final decision nor within an exception to the finality rule for purposes of appealability under *28 USCS 1291*, and that it was improper for the Court of Appeals to decide the arbitrability of the contractor's claim when that issue had not yet been decided by the District Court.

## Headnotes

COURTS §709  > ystay of federal suit to compel arbitration -- deference to parallel litigation in state court -- propriety -- > Headnote:

*LEdHN[1A]* [1A]*LEdHN[1B]* [1B]*LEdHN[1C]* [1C]*LEdHN[1D]* [1D]*LEdHN[1E]* [1E]*LEdHN[1F]* [1F]

A United States District Court abuses its discretion in granting a stay of a federal suit brought by a construction contractor to compel arbitration of its claim against a hospital under 4 of the Arbitration Act (*9 USCS 4*), the

court doing so in deference to parallel litigation in a state court having concurrent jurisdiction upon the District Court's finding that the two suits involved the identical issue of the claim's arbitrability, there being no showing of the requisite exceptional circumstances to justify the stay, where there was no assumption by either court over any res or property, there was no contention that the federal forum was less convenient to the parties than the state forum, there was no danger of piecemeal litigation in allowing the issue of arbitrability to be determined in the federal court, the District Court had proceeded further in resolving the arbitrability issue notwithstanding that the state court suit was filed first, the stay frustrated the Arbitration Act's (*9 USCS 1 et seq.*) policy of rapid and unobstructed enforcement of arbitration agreements, federal law in terms of the Arbitration Act governed the issue of arbitrability in either state or federal court, and the state court proceeding was probably inadequate to protect the contractor's rights, there being substantial room for doubt that the contractor could obtain from the state court an order compelling the hospital to arbitrate.

ERROR §23  > stay of federal court suit -- appealability as final decision --  > Headnote:

*LEdHN[2]* [2]

A United States District Court's stay of a federal court suit brought by a construction contractor to compel arbitration of its claim against a hospital under 4 of the Arbitration Act (*9 USCS 4*), pending resolution of a state court suit, because the two suits involved the identical issue of the claim's arbitrability, is a final decision and therefore appealable to the United States Court of Appeals under *28 USCS 1291*, where the contractor is effectively out of court pursuant to the stay, the stay amounting to a dismissal of the suit. (Rehnquist, J., Burger, Ch. J., and O'Connor, J., dissented from this holding).

ERROR §24  > stay of federal court suit -- appealability as exception to finality rule --  > Headnote:

*LEdHN[3]* [3]

A United States District Court's stay of a federal court suit brought by a construction contractor to compel arbitration of its claim against a hospital under 4 of the Arbitration Act (*9 USCS 4*), pending resolution of a state court suit, because the two suits involved the identical issue of the claim's arbitrability, is appealable to the United States Court of Appeals under *28 USCS 1291*, even if the order is not final, as an exception to the finality rule, where the order refusing to adjudicate the merits presents an important issue separate from the merits, the order would be entirely unreviewable if not appealed now, and the order conclusively determined the disputed question, the practical effect of the order being the same as a dismissal. (Rehnquist, J., Burger, Ch. J., and O'Connor, J., dissented from this holding).

COURTS §709  > dismissal of federal court suit -- deference to parallel state court litigation -- application of factors in determining propriety --  > Headnote:

*LEdHN[4]* [4]

The decision whether to dismiss a federal action because of parallel state court litigation does not rest on a mechanical checklist, but on a careful balancing of the important factors as they apply in a given case, with the balance heavily weighted in favor of the exercise of jurisdiction; the weight to be given to any one factor may vary greatly from case to case, depending on the particular setting of the case.

MANDAMUS §2  > use of writ in aid of appellate jurisdiction -- showing of right to writ --  > Headnote:

*LEdHN[5]* [5]

Extraordinary writs of mandamus under *28 USCS 1651* are used in aid of appellate jurisdiction only to confine an inferior court to a lawful exercise of its prescribed authority, or to compel it to exercise its authority when it is its duty to do so; the movant must show that his right to the writ is clear and indisputable.

COURTS §709 > stay of federal court suit -- deference to parallel state court litigation -- propriety of stay or dismissal -- exceptional circumstances -- > Headnote:

*LEdHN[6]* [6]

The "exceptional circumstances" test for determining whether it is proper for a United States District Court to dismiss a federal suit in deference to parallel state court litigation, as elucidated by such factors as a court's assumption of jurisdiction over property, the inconvenience of the federal forum, the desirability of avoiding piecemeal litigation, the order in which jurisdiction was obtained by the concurrent forums, the absence of any substantial progress in the federal court litigation, the presence in the suit of extensive rights governed by state law, the geographical inconvenience of the federal forum, and the government's previous willingness to litigate similar suits in state court, remains the relevant standard for determining whether a United States District Court abused its discretion in granting a stay of a federal suit brought by a construction contractor to compel arbitration of its claim against a hospital under 4 of the Arbitration Act (*9 USCS 4*), pending resolution of a state court suit, on the basis that the two suits involved the identical issue of the claim's arbitrability.

ARBITRATION §2 > enforcement of arbitration agreement -- involvement of nonarbitrating parties in dispute -- stay of litigation among nonparties -- > Headnote:

*LEdHN[7A]* [7A]*LEdHN[7B]* [7B]

Under the Arbitration Act (*9 USCS 1 et seq.*), an arbitration agreement must be enforced notwithstanding the presence of other persons who are parties to the underlying dispute but not to the arbitration agreement, and the decision of whether to stay litigation among the nonarbitrating parties pending the outcome of the arbitration is left to the District Court as a matter of its discretion to control its docket.

COURTS §709 > dismissal or stay of federal court suit -- deference to parallel state court litigation -- propriety -- application of factors -- > Headnote:

*LEdHN[8]* [8]

The order in which concurrent tribunals obtained jurisdiction, as well as the other factors to be considered in the "exceptional circumstances" test for determining whether a United States District Court may dismiss or stay a federal suit in deference to parallel state court litigation, is to be applied in a pragmatic, flexible manner with a view to the realities of the case at hand, and the priority in taking jurisdiction should not be measured exclusively by which complaint was filed first, but rather in terms of how much progress has been made in the two actions.

ARBITRATION §2 > federal substantive law of arbitrability -- congressional policy favoring arbitration -- > Headnote:

*LEdHN[9]* [9]

*Section 2* of the Arbitration Act (*9 USCS 2*) is a congressional declaration of a liberal federal policy favoring arbitration agreements, notwithstanding any state substantive or procedural policies to the contrary, the effect of the section being the creation of a body of federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the Arbitration Act (*9 USCS 1 et seq.*); the Act establishes as a matter of

federal law that any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability.

COURTS §709 > surrender of federal court jurisdiction -- deference to parallel state court litigation -- propriety -- presence of of federal law issues -- > Headnote:

*LEdHN[10]* [10]

The United States Supreme Court's task in cases regarding the propriety of a District Court's surrender of jurisdiction in a federal suit in deference to parallel litigation in a state court having concurrent jurisdiction is not to find some substantial reason for the exercise of federal jurisdiction by the District Court, but to ascertain whether there exist "exceptional circumstances, the clearest of justifications," that can suffice to justify the surrender of that jurisdiction, and although in some rare circumstances the presence of state law issues may weigh in favor of that surrender, the presence of federal law issues must always be a major consideration weighing against surrender.

COURTS §709 > stay of federal court suit -- deference to parallel state court litigation -- propriety -- stay as dismissal -- > Headnote:

*LEdHN[11]* [11]

The "exceptional circumstances" test for determining the propriety of a District Court's dismissal of a federal suit in deference to parallel litigation in a state court having concurrent jurisdiction is applicable to a District Court's order staying a federal suit in deference to the state court litigation, the stay being as much a refusal to exercise federal jurisdiction as a dismissal, where the District Court, whether it decides to dismiss or stay, concludes that the parallel state court litigation will be an adequate vehicle for the complete and prompt resolution of the issues between the parties, the decision to invoke the test therefore necessarily contemplating that the federal court will have nothing further to do in resolving any substantive part of the case, whether it stays or dismisses.

ERROR §1670 > United States Court of Appeals -- authority to decide issue not formally appealed -- > Headnote:

*LEdHN[12]* [12]

A United States Court of Appeals acts within its authority in deciding the arbitrability of a claim under the Arbitration Act (*9 USCS 1 et seq.*) in order to facilitate the prompt arbitration that Congress envisaged, even though the only issue formally appealed to the Court of Appeals was the propriety of a United States District Court's order staying the federal suit brought to compel arbitration, where *28 USCS 2106* gives the Court of Appeals some latitude in entering an order to achieve justice in the circumstances, the Arbitration Act calls for a summary and speedy disposition of motions or petitions to enforce arbitration clauses, and the Court of Appeals had in the record full briefs and evidentiary submissions from both parties on the merits of arbitrability, and held that there were no disputed issues of fact requiring a jury trial before an order compelling arbitration could issue under 4 of the Arbitration Act. (Rehnquist, J., Burger, Ch. J., and O'Connor, J., dissented from this holding).

## Syllabus

Petitioner, a hospital located in North Carolina, entered into a contract with respondent contractor, an Alabama corporation, for construction of additions to the hospital building. Contract disputes were to be initially referred

to the architect who was hired to design and oversee the construction project. Disputes decided by the architect or not decided within a specified time could be submitted to binding arbitration under an arbitration clause in the contract. Subsequently, during construction, respondent submitted claims to the architect for extended overhead or increase in construction costs due to petitioner's delay or inaction. But the claims were not resolved, and petitioner refused to pay them. Petitioner then filed an action in a North Carolina state court against respondent and the architect, seeking a declaratory judgment that there was no right to arbitration, that petitioner was not liable to respondent, and that if it was liable it would be entitled to indemnity from the architect. A few days later petitioner obtained an *ex parte* injunction from the state court forbidding respondent to take any steps toward arbitration, but when respondent objected the stay was dissolved. Respondent then filed a diversity-of-citizenship action in Federal District Court, seeking an order compelling arbitration under *§ 4* of the United States Arbitration Act. The District Court stayed the action pending resolution of the state-court suit because the two suits involved the identical issue of the arbitrability of respondent's claims. The Court of Appeals, holding that it had jurisdiction under *28 U. S. C. § 1291*, reversed the District Court's stay order and remanded the case with instructions to enter an order to arbitrate.

*Held*:

1. The District Court's stay order was appealable as a "final decision" to the Court of Appeals under *28 U. S. C. § 1291*. Since the order was based on the conclusion that the federal and state actions involved the identical issue of arbitrability, and this issue was the only substantive issue present in the federal action, a stay of the federal action pending resolution of the state action meant that there would be no further litigation in the federal court. Thus, respondent was "effectively out of court" so that the stay order amounted to a dismissal of the federal action. Moreover, even if the stay order was not final for appealability purposes, it was nevertheless appealable within the finality rule exception that applies where an order conclusively determines the disputed question, resolves an important issue completely separate from the merits, and is effectively unreviewable on appeal from a final judgment. *Cohen v. Beneficial Loan Corp., 337 U.S. 541*. Pp. 8-13.

2. The District Court abused its discretion in granting the stay. Pp. 13-28.

(a) A federal district court may decline to exercise its jurisdiction because of parallel state-court litigation only in exceptional circumstances; only the clearest of justifications will warrant dismissal. *Colorado River Water Conservation District v. United States, 424 U.S. 800, 818-819*. The decision whether to stay or dismiss a federal action on grounds of wise judicial administration does not rest on a mechanical checklist but on a careful balancing of the important factors (which court first assumed jurisdiction over property involved in the litigation, inconvenience of the federal forum, avoidance of piecemeal litigation, and the order in which the concurrent forums obtained jurisdiction) relevant to the decision as they apply in a given case, with the balance heavily weighted in favor of the exercise of jurisdiction. *Ibid*. Pp. 13-16.

(b) The exceptional-circumstances test set forth in *Colorado River, supra*, was not undermined by *Will v. Calvert Fire Insurance Co., 437 U.S. 655*. Pp. 16-19.

(c) There was no showing of the requisite exceptional circumstances to justify the District Court's stay order. Concededly, there was no assumption by either court of jurisdiction over any res or property or any contention that the federal court was any less convenient to the parties than the state court. The other factors -- avoidance of piecemeal litigation and the order in which the current forums obtained jurisdiction -- rather than supporting the stay, counsel against it. The fact that if respondent obtains an arbitration order, petitioner will be forced to resolve the dispute with respondent and the related dispute with the architect in different forums is not the result of any choice between federal and state courts but occurs because the relevant federal law, the Arbitration Act, requires piecemeal resolution when necessary to give effect to an arbitration agreement. Hence, a decision to

allow the issue of arbitrability to be decided in federal rather than state court does not cause piecemeal resolution of the parties' underlying disputes. And the fact that the state-court suit was filed before the federal suit is not sufficient reason to justify the stay order, where because petitioner's refusal to arbitrate did not occur until less than a day before it filed its state suit, respondent had no reasonable opportunity to file its federal suit first. Moreover, priority should not be measured exclusively by which complaint was filed first, but rather in terms of how much progress has been made in the two actions. Here, no substantial proceedings had taken place in the state suit at the time of the District Court's stay order, whereas in the federal suit the parties had taken most of the steps necessary to a resolution of the arbitrability issue. The stay order thus frustrated the Arbitration Act's policy of rapid and unobstructed enforcement of arbitration agreements. Pp. 19-23.

(d) The fact that federal law in the terms of the Arbitration Act governs the issue of the arbitrability of the dispute between petitioner and respondent in either the state or the federal court is another factor militating against the District Court's stay order. See *Calvert, supra.* Pp. 23-26.

(e) Finally, an important reason against allowing a stay is the probable inadequacy of the state suit to protect respondent's rights, since it is doubtful that respondent could obtain from the state court an order compelling petitioner to arbitrate. Pp. 26-27.

(f) The fact that the District Court stayed the federal action rather than dismissing it outright does not render the *Colorado River* exceptional-circumstances test inapplicable. Pp. 27-28.

3. The Court of Appeals acted within its authority in deciding that the contractual dispute was arbitrable under the Arbitration Act and the contract, where the court had briefs and evidentiary submissions from both parties on the merits of arbitrability. P. 29.

**Counsel:** Jack W. Floyd argued the cause for petitioner. With him on the briefs were Stephen P. Millikin and Douglas W. Ey, Jr.

A. H. Gaede, Jr., argued the cause for respondent. With him on the brief were Joseph B. Mays, Jr., Charles Nichols, and Frank H. McFadden.

**Judges:** BRENNAN, J., delivered the opinion of the Court, in which WHITE, MARSHALL, BLACKMUN, POWELL, and STEVENS, JJ., joined. REHNQUIST, J., filed a dissenting opinion, in which BURGER, C. J., and O'CONNOR, J., joined, post, p. 30.

**Opinion by:** BRENNAN

## Opinion

 [*4]   [***772]   [**930]  JUSTICE BRENNAN delivered the opinion of the Court.

*LEdHN[1A]* [1A]This case, commenced as a petition for an order to compel arbitration under *§ 4* of the United States Arbitration Act of 1925 (Arbitration Act or Act), *9 U. S. C. § 4*, presents the question whether, in light of the policies of the Act and of our decisions  [**931]  in *Colorado River Water Conservation District v. United States, 424 U.S. 800 (1976)*, and *Will v. Calvert Fire Insurance Co., 437 U.S. 655 (1978)*, the District Court for the Middle District of North Carolina properly stayed this diversity action pending resolution of a concurrent state-court suit. The Court of Appeals for the Fourth Circuit reversed the stay. *656 F.2d 933*, rehearing denied, *664 F.2d 936 (1981)*. We granted certiorari. *455 U.S. 937 (1982)*. We affirm.

I

Petitioner Moses H. Cone Memorial Hospital (Hospital) is located in Greensboro, N. C. Respondent Mercury [***773] Construction Corp. (Mercury), a construction contractor, has its principal place of business in Alabama. In July 1975, Mercury and the Hospital entered into a contract for the construction of additions to the Hospital building. The contract, drafted by representatives of the Hospital, included provisions for resolving disputes arising out of the contract or its breach. All disputes involving interpretation of the contract or performance of the construction work were to be referred in the first instance to J. N. Pease Associates (Architect), an independent architectural firm hired by the Hospital to design and oversee the construction project. With certain [*5] stated exceptions, [1] any dispute decided by the Architect (or not decided by it within a stated time) could be submitted by either party to binding arbitration under a broad arbitration clause in the contract:

"All claims, disputes and other matters in question arising out of, or relating to, this Contract or the breach thereof, . . . shall be decided by arbitration in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association then obtaining unless the parties mutually agree otherwise. This agreement to arbitrate shall be specifically enforceable under the prevailing arbitration law. The award rendered by the arbitrators shall be final, and judgment may be entered upon it in accordance with applicable law in any court having jurisdiction thereof." App. 29-30.

The contract also specified the time limits for arbitration demands. [2]

Construction on the project began in July 1975. Performance was to be completed by October 1979. [3] In fact, construction was substantially completed in February 1979, and final inspections were made that June.

[*6] At a meeting in October 1977 (during construction), attended by representatives of Mercury, the Hospital, and the Architect, Mercury agreed, at the Architect's request, to withhold its claims for delay and impact costs (*i. e.*, claims for extended overhead or increase in construction costs due to delay or inaction by the Hospital) until the work was substantially completed. On this record, the Hospital does not contest the existence of this agreement, although it asserts that the Architect lacked [**932] authority to agree to a delay in presentation of claims or to entertain claims after the contract work was completed.

In January 1980, Mercury submitted to the Architect its claims for delay and impact costs. Mercury and [***774] the Architect discussed the claims over several months, substantially reducing the amount of the claims. According to the Hospital, it first learned of the existence of Mercury's claims in April 1980; its lawyers assumed active participation in the claim procedure in May. The parties differ in their characterizations of the events of the next few months -- whether there were "ongoing negotiations," or merely an "investigation" by the Hospital. In any event, it appears from the record that lawyers for the Hospital requested additional information concerning Mercury's claims. As a result, on August 12, 1980, Mercury gave a detailed presentation of its claims at a meeting attended by Mercury's representatives and lawyers, the Hospital's representatives and lawyers, and representatives of the Architect. Mercury agreed to send copies of its files to an expert hired by the Hospital, and the parties agreed to meet again on October 13.

---

[1] The Architect was given final say on "matters relating to artistic effect." App. 28-29. The contract also excluded arbitration on any claim waived by the making or acceptance of final payment. *Id.*, at 29. Neither of these exceptions is asserted to apply in this case.

[2] The contract provided that no demand for arbitration could be made later than 30 days after the Architect's written final decision. In the case of arbitrable disputes not subject to submission to the Architect, the demand was required to be made "within a reasonable time after the claim . . . has arisen," and in no event after the applicable statute of limitations had run. *Id.*, at 29-30.

The contract also set a starting time limit for arbitration demands. No demand could be made earlier than 10 days after presentation of evidence to the Architect, unless the Architect rendered a written decision before that time. *Id.*, at 29.

[3] The completion date, originally set as November 14, 1978, was extended to October 1979 by agreement of the parties.

On October 6, Mercury's counsel telephoned the Hospital's counsel to confirm that the scheduled meeting would go forward. The Hospital's counsel said he would call back the next day. When he did, he informed Mercury's counsel that the Hospital would pay nothing on Mercury's claim. He also said that the Hospital intended to file a declaratory judgment action in North Carolina state court.

 [*7] True to its word, the Hospital filed an action on the morning of October 8 in the Superior Court of Guilford County, N. C., naming Mercury and the Architect as defendants. The complaint alleged that Mercury's claim was without factual or legal basis and that it was barred by the statute of limitations. It alleged that Mercury had lost any right to arbitration under the contract due to waiver, laches, estoppel, and failure to make a timely demand for arbitration. The complaint also alleged various delinquencies on the part of the Architect. As relief, the Hospital sought a declaration that there was no right to arbitration; a stay of arbitration; a declaration that the Hospital bore no liability to Mercury; and a declaration that if the Hospital should be found liable in any respect to Mercury, it would be entitled to indemnity from the Architect. The complaint was served on Mercury on October 9. On that same day, Mercury's counsel mailed a demand for arbitration.

On October 15, without notice to Mercury, the Hospital obtained an *ex parte* injunction from the state court forbidding Mercury to take any steps directed toward arbitration. Mercury objected, and the stay was dissolved on October 27. As soon as the stay was lifted, Mercury filed the present action in the District Court, seeking an order compelling arbitration under *§ 4* of the Arbitration Act, *9 U. S. C. § 4*. [4] Jurisdiction was based on diversity of citizenship. On the Hospital's motion, the District Court stayed Mercury's federal-court suit pending resolution of the state-court suit because [***775] the two suits involved the identical issue of the arbitrability of Mercury's claims. App. to Pet. for Cert. A-38.

 [*8] Mercury sought review of the District Court's stay by both a notice of appeal and a petition for mandamus. A panel of the Court of Appeals for the Fourth Circuit heard argument in the case, but before the panel issued any decision, the court informed the parties that it would consider the case en banc. After reargument, the en banc court held that it had appellate jurisdiction over the case under *28 U. S. C. § 1291*. It reversed the District Court's stay order and remanded the case to the [**933] District Court with instructions for entry of an order to arbitrate.

II

Before we address the propriety of the District Judge's stay order, we must first decide whether that order was appealable to the Court of Appeals under *28 U. S. C. § 1291*. [5]

*LEdHN[2]* [2]Mercury sought appellate review through two alternative routes -- a notice of appeal under *§ 1291*, and a petition for mandamus under the All Writs Act, *28 U. S. C. § 1651*. [6] Mercury expressly stated that its appeal was based only on *§ 1291*, and not on *28 U. S. C. § 1292* (relating to interlocutory appeals). The

---

[4]   Simultaneously, Mercury filed a petition for removal of the Hospital's state-court action. The District Court remanded the removed case on the ground that, because the Hospital and the Architect are both North Carolina corporations, there was no complete diversity. The propriety of the removal or remand is not before this Court.

[5]   *Section 1291* provides in relevant part:

*HN1* ″The courts of appeals shall have jurisdiction of appeals from all final decisions of the district courts of the United States, . . . except where a direct review may be had in the Supreme Court.″

[6]   The Hospital argues that because Mercury's filing in the Court of Appeals was styled a petition for mandamus first and a notice of appeal only ″in the alternative,″ the Hospital was somehow entitled to have the Court of Appeals apply the stricter standards of review that obtain under the mandamus procedure before considering any appeal. Brief for Petitioner 30-31. We do not understand why this order of proceeding would be of any benefit to the Hospital; but in any event the contention is frivolous. In the first place, Mercury also filed a proper notice of appeal in the District Court, see *Fed. Rule App. Proc. 3(a)*. More fundamentally, a court of appeals has no occasion

Hospital contends that the order appealed from was not a "final [decision]" within *§ 1291*. We **[*9]** disagree and hold that the stay order was final for purposes of appellate jurisdiction.

*Idlewild Liquor Corp*. v. *Epstein, 370 U.S. 713 (1962)*, is instructive in this regard. There the plaintiff brought a federal suit challenging the constitutionality of a state statute. The District Judge declined to convene a three-judge court and stayed the federal suit under the *Pullman* abstention doctrine. [7] We held that the District Court's action was final and therefore reviewable by the Court of Appeals, stating:

"The Court of Appeals properly rejected the argument that the order of the District Court 'was not final and hence unappealable under *28 U. S. C. §§ 1291*, *1292*,' pointing out that '[appellant] was effectively **[***776]** out of court.'" *370 U.S., at 715, n. 2*. [8]

 **[*10]** Here, the argument for finality of the District Court's order is even clearer. **[**934]** *HN3* A district court stay pursuant to *Pullman* abstention is entered with the expectation that the federal litigation will resume in the event that the plaintiff does not obtain relief in state court on state-law grounds. [9] Here, by contrast, the District Court predicated its stay order on its conclusion that the federal and state actions involved "the identical issue of arbitrability of the claims of Mercury Construction Corp. against the Moses H. Cone Memorial Hospital." App. to Pet. for Cert. A-38. That issue of arbitrability was the only substantive issue present in the federal suit. Hence, a stay of the federal suit pending resolution of the state suit meant that there would be no further litigation in the federal forum; the state court's judgment on the issue would be res judicata. [10] Thus, here, even more surely than in *Idlewild*, Mercury was "effectively out of court." Hence, as the Court of Appeals held, this stay order amounts to a dismissal of the suit. [11]

---

to engage in extraordinary review by mandamus "in aid of [its] [jurisdiction]," *28 U. S. C. § 1651*, when it can exercise the same review by a contemporaneous ordinary appeal. See, *e. g., Hines* v. *D'Artois, 531 F.2d 726, 732, and n. 10 (CA5 1976)*.

[7]   *Railroad Comm'n* v. *Pullman Co., 312 U.S. 496 (1941)*.

[8]   The plaintiff in *Idlewild* had requested injunctive relief against enforcement of the state statute. Nevertheless, it is clear that neither the Court of Appeals nor this Court based the holding of appealability on the argument that the District Court had effectively denied injunctive relief. See generally *28 U. S. C. § 1292(a)(1)*; *Carson* v. *American Brands, Inc., 450 U.S. 79 (1981)*. *Section 1292 HN2* in terms applies only to *interlocutory* orders, and therefore could hardly have been the basis for a holding that the orders were "final."

There is no basis for the dissent's attempt, *post*, at 33, to distinguish *Idlewild* on the basis that in that case there was no pending state-court action when the District Court's stay issued. Neither the Court of Appeals nor this Court suggested in *Idlewild* that the state court's doors were anything but wide open to the plaintiff. "[Effectively] out of court" means effectively out of *federal* court -- in keeping with the fact that the decision under appeal is the refusal to exercise *federal* jurisdiction.

Moreover, the dissent's resolution of the appealability issue would yield the odd result that *Pullman* abstention orders would be immediately appealable in Texas but not in the other 49 States. Compare *American Trial Lawyers Assn*. v. *New Jersey Supreme Court, 409 U.S. 467 (1973)* (stays appropriate in *Pullman* cases), with *Harris County Commissioners Court* v. *Moore, 420 U.S. 77, 88-89, and n. 14 (1975)* (dismissal permissible to accommodate Texas jurisdictional requirements). This oddity illustrates the artificiality of resting appealability on an otherwise substanceless distinction between stays and dismissals in the present context. See Part IV-E, *infra*.

[9]   See *England* v. *Louisiana Bd. of Medical Examiners, 375 U.S. 411 (1964)*.

[10]   See, *e. g., Ultracashmere House, Ltd*. v. *Meyer, 664 F.2d 1176, 1183-1184 (CA11 1981)*; *Merrill Lynch, Pierce, Fenner & Smith, Inc*. v. *Haydu, 637 F.2d 391, 397-398 (CA5 1981)*.

[11]   See *656 F.2d 933, 937-938, and n. 6 (CA4 1981)*, citing as dispositive *Amdur* v. *Lizars, 372 F.2d 103, 105-106 (CA4 1967)*. See also *Federman* v. *Empire Fire & Marine Insurance Co., 597 F.2d 798, 808, and n. 15 (CA2 1979)*; *Baltimore Bank for Cooperatives* v. *Farmers Cheese Cooperative, 583 F.2d 104, 108-109 (CA3 1978)*; *Sun Oil Co*. v. *FEA, 572 F.2d 867 (Temp. Emerg. Ct. App. 1978)*; *Rancho Palos Verdes Corp*. v. *Laguna Beach, 547 F.2d 1092, 1093, n. 1 (CA9 1976)*; *Hines* v. *D'Artois, supra, at 730-732*; *Drexler* v. *Southwest Dubois School Corp., 504 F.2d 836, 838 (CA7 1974)* (en banc); *Druker* v. *Sullivan, 458 F.2d 1272, 1274, n. 3 (CA1 1972)*. But see *Acton Corp*. v. *Borden, Inc., 670 F.2d 377, 380-382 (CA1 1982)*; *State Farm Mutual Automobile Insurance Co*. v. *Scholes, 601 F.2d 1151, 1153-1154 (CA10 1979)*; *Frederick L*. v. *Thomas, 578 F.2d 513, 515-516 (CA3 1978)* (dictum).

 **[\*11]**  **[\*\*\*777]**  *LEdHN[3]* [3]In any event, if the District Court order were not final for appealability purposes, it would nevertheless be appealable within the exception to the finality rule under *Cohen v. Beneficial Loan Corp., 337 U.S. 541 (1949)*. The factors required to show finality under this exception have been summarized as follows:

*HN7* "To come within the 'small class' of decisions excepted from the final-judgment rule by *Cohen*, the order must conclusively determine the disputed question, resolve an important issue completely **[\*\*935]** separate from the merits of the action, and be effectively unreviewable on appeal **[\*12]** from a final judgment." *Coopers & Lybrand v. Livesay, 437 U.S. 463, 468 (1978)* (footnote omitted). [12]

There can be no dispute that this order meets the second and third of these criteria. An order that amounts to a refusal to adjudicate the merits plainly presents an important issue separate from the merits. [13] For the same reason, this order would be entirely unreviewable if not appealed now. Once the state court decided the issue of arbitrability, the federal court would be bound to honor that determination as res judicata.

The Hospital contends nevertheless that the District Court's stay order did not meet the first of the criteria, namely that it "conclusively **[\*\*\*778]** determine the disputed question." But this is true only in the technical sense that every order short of a final decree is subject to reopening at the discretion of the district judge. [14] In this case, however, there is **[\*13]** no basis to suppose that the District Judge contemplated any reconsideration

---

Of course, as these cases recognize, *Idlewild* does not disturb *HN4* the usual rule that a stay is not ordinarily a final decision for purposes of *§ 1291*, since most stays do not put the plaintiff "effectively out of court." See, *e. g., Amdur, supra,* at 105-106. *Idlewild*'s reasoning is limited to cases where (under *Colorado River*, abstention, or a closely similar doctrine) the object of the stay is to require all or an essential part of the federal suit to be litigated in a state forum.

This answers the dissent's argument, *post,* at 33-34, that *Idlewild* was overruled by that part of *Coopers & Lybrand* v. *Livesay,* 437 U.S. 463, 469-477 (1978), which rejected the "death knell" doctrine of appealability. The "death knell" doctrine rested on the argument that in some situations an interlocutory decision (such as a refusal to certify a class) might terminate a suit as a practical matter because the named plaintiff would lack an economic incentive to pursue his individual claim. In a "death knell" case, however, the order sought to be appealed had no *legal* effect on the named plaintiff's ability to proceed with his individual claim in federal court. There is an obvious difference between a case in which the plaintiff himself *may choose* not to proceed, and a case in which the district court *refuses to allow* the plaintiff to litigate his claim in federal court. *HN5* Appeal from a stay on abstention or *Colorado River* grounds, therefore, presents no prospect of "appeals of right from nonfinal orders that turn on the facts of a particular case," as in *Coopers & Lybrand, supra,* at 476. We foresee no great difficulty in determining when a district court has surrendered jurisdiction over a federal lawsuit.

For much the same reason, the dissent errs in likening the stay in this case to an ordinary delay in the interest of docket control, *post,* at 30-31. We do not hold that an order becomes final merely because it may have the practical effect of allowing a state court to be the first to rule on a common issue. We hold only that *HN6* a stay order is final when the sole purpose and effect of the stay are precisely to surrender jurisdiction of a federal suit to a state court.

[12]    Accord, *Firestone Tire & Rubber Co.* v. *Risjord,* 449 U.S. 368, 375 (1981); *United States* v. *MacDonald, 435 U.S. 850, 854-855 (1978)*; *Abney* v. *United States, 431 U.S. 651, 658-659 (1977)*.

[13]    The "completely separate from the merits" requirement is a distillation of the principle that there should not be piecemeal review of "steps towards final judgment in which they will merge." *Cohen* v. *Beneficial Loan Corp., 337 U.S. 541, 546 (1949)*. In this case, of course, there is no step towards final judgment, but a refusal to proceed at all.

[14]    See *Fed. Rule Civ. Proc. 54(b)*; 18 C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure § 4478, pp. 788-792 (1981).

*Coopers & Lybrand* held that the *Cohen* rule did not apply to a class decertification order because, among other reasons, such an order is "inherently tentative" under *Federal Rule of Civil Procedure 23(c)(1)*, which provides that such an order may be "altered or amended before the decision on the merits." 437 U.S., at 469, and n. 11. Of course, as *Rule 54(b)* provides, virtually all interlocutory orders may be altered or amended before final judgment if sufficient cause is shown; yet that does not make all pretrial orders "inherently tentative" in the sense of that phrase in *Coopers & Lybrand*. The rationale behind *Rule 23(c)(1)* is that a certification decision should be made "[as] soon as practicable," even though later events or discoveries may mandate a different result. Many other orders, by contrast, are made with the expectation that they will be the final word on the subject addressed. Certainly that was true of the order at issue in this case.

of his decision to defer to the parallel state-court suit. He surely would not have made that decision in the first instance unless he had expected the state court to resolve all relevant issues adequately. See Part IV-E, *infra*. It is not clear why the judge chose to stay the case rather than to dismiss it outright; for all that the record shows, there was no reason other than the form of the Hospital's motion. Whatever the reason, however, the practical effect of his order was entirely the same for present purposes, and the order was appealable.

III

We turn now to the principal issue to be addressed, namely, the propriety of the District Court's decision to stay this federal suit out of deference to the parallel litigation brought in state court. *Colorado River Water Conservation District v. United States, 424 U.S. 800 (1976)*, provides persuasive guidance in deciding this question.

A

*Colorado River* involved the effect of the McCarran Amendment, 66 Stat. 560, *43 U. S. C. § 666*, on the existence and exercise of federal-court jurisdiction to adjudicate federal water rights, *28 U. S. C. § 1345*. The Amendment waives the Government's [**936] sovereign immunity to permit the joinder of the United States in some state-court suits for the adjudication of water rights. In *Colorado River*, however, the Government proceeded in Federal District Court, bringing suit against some 1,000 nonfederal water users, seeking a declaration of the water rights of certain federal entities and Indian tribes. Shortly thereafter, a defendant in that suit [*14] sought to join the United States in a state-court proceeding for the comprehensive adjudication and administration of all water rights within the river system that was the subject of the federal-court suit. The District Court dismissed the federal suit, holding that the abstention doctrine required deference to the state-court proceedings. [***779] The Court of Appeals for the Tenth Circuit reversed, holding that the suit of the United States was within the District Court's jurisdiction under *28 U. S. C. § 1345* and that abstention was inappropriate. We reversed the judgment of the Court of Appeals and affirmed the judgment of the District Court dismissing the complaint.

We began our analysis by examining the abstention doctrine in its various forms. We noted:

*HN8* "Abstention from the exercise of federal jurisdiction is the exception, not the rule. 'The doctrine of abstention, under which a District Court may decline to exercise or postpone the exercise of its jurisdiction, is an extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it. Abdication of the obligation to decide cases can be justified under this doctrine only in the exceptional circumstances where the order to the parties to repair to the State court would clearly serve an important countervailing interest.'" [15]

After canvassing the three categories of abstention, we concluded that none of them applied to the case at hand. *424 U.S., at 813-817*. [16]

Nevertheless, we held that the District Court's dismissal was proper on another ground -- one resting not on considerations of state-federal comity or on avoidance of constitutional [*15] decisions, as does abstention, but on "considerations of '[wise] judicial administration, giving regard to conservation of judicial resources and

The reasoning of *Coopers & Lybrand* does not reach all pretrial orders that are formally subject to revision, but only those as to which some revision might reasonably be expected in the ordinary course of litigation.

[15]    *424 U.S., at 813*, quoting *County of Allegheny* v. *Frank Mashuda Co., 360 U.S. 185, 188-189 (1959)*.

[16]    There is no contention here that any of the categories of the abstention doctrine apply to this case.

comprehensive disposition of litigation.'" [17] We noted that *HN9* " 'the pendency of an action in the state court is no bar to proceedings concerning the same matter in the Federal court having jurisdiction,'" and that the federal courts have a "virtually unflagging obligation . . . to exercise the jurisdiction given them." [18] We continued:

"Given this obligation, and the absence of weightier considerations of constitutional adjudication and state-federal relations, the circumstances permitting the dismissal of a federal suit due to the presence of a concurrent state proceeding for reasons of wise judicial administration are considerably more limited than the circumstances appropriate for abstention. The former circumstances, though exceptional, do nevertheless exist." *Id., at 818*.

We declined to prescribe a hard-and-fast rule for dismissals of this type, but instead described some of the factors relevant to the decision.

"It has been held, for example, that the *HN10* court first assuming jurisdiction over property may exercise [***780] that jurisdiction to [**937] the exclusion of other courts. . . . In assessing the appropriateness of dismissal in the event of an exercise of concurrent jurisdiction, a federal court may also consider such factors as the inconvenience of the federal forum; the desirability of avoiding piecemeal litigation; and the order in which jurisdiction was obtained by the concurrent forums. No one factor is necessarily determinative; a carefully considered judgment taking into account both the obligation to exercise jurisdiction [*16] and the combination of factors counselling against that exercise is required. *Only the clearest of justifications will warrant dismissal.*" *Id., at 818-819* (emphasis added; citations omitted).

*LEdHN[4]* [4] As this passage makes clear, the decision whether to dismiss a federal action because of parallel state-court litigation does not rest on a mechanical checklist, but on a careful balancing of the important factors as they apply in a given case, with the balance heavily weighted in favor of the exercise of jurisdiction. The weight to be given to any one factor may vary greatly from case to case, depending on the particular setting of the case. *Colorado River* itself illustrates this principle in operation. By far the most important factor in our decision to approve the dismissal there was the "clear federal policy . . . [of] avoidance of piecemeal adjudication of water rights in a river system," *id., at 819*, as evinced in the McCarran Amendment. We recognized that the Amendment represents Congress' judgment that the field of water rights is one peculiarly appropriate for comprehensive treatment in the forums having the greatest experience and expertise, assisted by state administrative officers acting under the state courts. *Id., at 819-820*. In addition, we noted that other factors in the case tended to support dismissal -- the absence of any substantial progress in the federal-court litigation; the presence in the suit of extensive rights governed by state law; the geographical inconvenience of the federal forum; and the Government's previous willingness to litigate similar suits in state court. *Id., at 820*.

B

Before discussing the application of *Colorado River's* exceptional-circumstances test, we must address the Hospital's argument that that test was undermined by our subsequent decision in *Will v. Calvert Fire Insurance Co., 437 U.S. 655 (1978)*. We find no merit in this argument for at least two reasons.

[*17] The Hospital relies on the opinion of JUSTICE REHNQUIST, announcing the judgment of the Court. The Hospital argues that JUSTICE REHNQUIST's opinion, if not expressly overruling *Colorado River*, at least modifies its holding substantially. But it is clear that a majority of the Court reaffirmed the *Colorado River* test

---

[17] *424 U.S., at 817*, quoting *Kerotest Mfg, Co*. v. *C-O-Two Fire Equipment Co., 342 U.S. 180, 183 (1952)*.

[18] *424 U.S., at 817*, quoting *McClellan* v. *Carland, 217 U.S. 268, 282 (1910)*.

in *Calvert*. JUSTICE REHNQUIST's opinion commanded only four votes. It was opposed by the dissenting opinion, in which four Justices concluded that the *Calvert* District Court's stay was impermissible under *Colorado River*. *437 U.S., at 668-669, 672-674* (BRENNAN, J., joined by BURGER, C. J., and MARSHALL and POWELL, JJ., dissenting). JUSTICE BLACKMUN, although **[***781]** concurring in the judgment, agreed with the dissent that *Colorado River*'s exceptional-circumstances test was controlling; he voted to remand to permit the District Court to apply the *Colorado River* factors in the first instance. [19] *437 U.S., at 667-668*. On remand, the Court of Appeals correctly recognized that the four dissenting Justices and JUSTICE BLACKMUN formed a majority to require application of the *Colorado River* test. *Calvert Fire Insurance Co.* v. *Will*, 586 F.2d 12 (CA7 1978). [20]

 **[*18]**  **[**938]** *LEdHN[5]* [5]Even on the basis of JUSTICE REHNQUIST's opinion, however, there is an obvious distinction between *Calvert* and this case. The key to *Calvert* was the standard for issuance of a writ of mandamus under *28 U. S. C. § 1651*. [21] As JUSTICE REHNQUIST stressed, such extraordinary writs are used in aid of appellate jurisdiction only to confine an inferior court to a lawful exercise of its prescribed authority, or to compel it to exercise its authority when it is its duty to do so. The movant must show that his right to the writ is clear and indisputable. *437 U.S., at 661-662, 664, 665-666* (opinion of REHNQUIST, J.). JUSTICE REHNQUIST concluded that the movant in *Calvert* had failed to meet this burden. At the same time, he noted that the movant might have succeeded on a proper appeal. *Id., at 665*. In this case we have held that the Court of Appeals did have appellate jurisdiction; it properly exercised that jurisdiction to find that the District Court's stay was impermissible under *Colorado River*.

 **[***782]** *LEdHN[6]* [6]The Hospital further contends that *Calvert* requires reversal here because the opinions of JUSTICE REHNQUIST and **[*19]** JUSTICE BLACKMUN require greater deference to the discretion of the District Court than was given by the Court of Appeals in this case. *HN11* Under both *Calvert* and *Colorado River*, of course, the decision whether to defer to the state courts is necessarily left to the discretion of the district court in the first instance. Yet to say that the district court has discretion is not to say that its decision is unreviewable; such discretion must be exercised under the relevant standard prescribed by this Court. In this case, the relevant standard is *Colorado River*'s exceptional-circumstances test, as elucidated by the factors

---

[19]    Our decision in *ColoradoRiver* came down after the District Court's stay order in *Calvert* but before the Court of Appeals issued its mandamus in that case.

[20]    On remand from our decision in *Calvert*, the District Court and Court of Appeals concluded that the stay should be continued, but rested that decision on a ground not addressed in the prior Court of Appeals decision (*Calvert Fire Insurance Co.* v. *Will*, 560 F.2d 792 (CA7 1977)) or in any of this Court's opinions in the case. They concluded that the filing of the federal suit was a "defensive tactical maneuver" based on a contrived federal claim; hence, a stay was called for as "a means to deter vexatious use of the federal courts." The courts also noted that, in the interim, the basis for the plaintiff's assertion of exclusive federal jurisdiction had vanished. *Calvert Fire Insurance Co.* v. *American Mutual Reinsurance Co.*, 600 F.2d 1228, 1234-1236 (CA7 1979), aff'g 459 F.Supp. 859 (ND Ill. 1978). The case did not come before this Court for review a second time.

The Court of Appeals in this case relied on similar reasoning. It concluded that, despite chronological priority of filing, the Hospital's state-court suit was a contrived, defensive reaction to Mercury's expected claim for relief and for arbitration. 656 F.2d, at 944-945.

The reasoning of the Courts of Appeals in this case and in *Calvert* -- that the vexatious or reactive nature of either the federal or the state litigation may influence the decision whether to defer to a parallel state litigation under *Colorado River* -- has considerable merit. We need not rely on such reasoning here, however, for we conclude *infra* that even if the Hospital acted in complete good faith there were no exceptional circumstances warranting the District Court's stay.

[21]    The Court of Appeals in *Calvert* had held that it lacked jurisdiction to entertain an ordinary appeal, apparently because a portion of the federal litigation was the subject of exclusive federal jurisdiction and would therefore remain to be disposed of in federal court after the conclusion of state-court proceedings. *Calvert Fire Insurance Co.* v. *Will*, 560 F.2d, at 794, citing *Cotler* v. *Inter-County Orthopaedic Assn.*, 526 F.2d 537, 540 (CA3 1975). Cf. *Drexler* v. *Southwest Dubois School Corp.*, 504 F.2d, at 838 (stay of litigation pending exhaustion of state remedies is final under *Idlewild*). The issue of appellate jurisdiction was not presented to this Court in *Calvert*.

discussed in that case. As we shall now explain, we agree with the Court of Appeals that the District Court in this case abused its discretion in granting the stay.

IV

**LEdHN[1B]** [1B] Applying the *Colorado River* factors to this case, it is clear that there was no showing of the requisite exceptional circumstances to justify the District Court's stay.

The Hospital concedes that the first two factors mentioned in *Colorado River* are **[**939]** not present here. There was no assumption by either court of jurisdiction over any res or property, nor is there any contention that the federal forum was any less convenient to the parties than the state forum. The remaining factors -- avoidance of piecemeal litigation, and the order in which jurisdiction was obtained by the concurrent forums -- far from supporting the stay, actually counsel against it.

A

**LEdHN[1C]** [1C]There is no force here to the consideration that was paramount in *Colorado River* itself -- the danger of piecemeal litigation.

**LEdHN[7A]** [7A]The Hospital points out that it has two substantive disputes here -- one with Mercury, concerning Mercury's claim for delay and impact costs, and the other with the Architect, concerning the Hospital's claim for indemnity for any liability it may have to Mercury. The latter dispute cannot be sent **[*20]** to arbitration without the Architect's consent, since there is no arbitration agreement between the Hospital and the Architect. It is true, therefore, that if Mercury obtains an arbitration order for its dispute, the Hospital will be forced to resolve these related disputes in different forums. That misfortune, however, is not the result of any choice between the federal and state courts; it occurs because the relevant federal law *requires* piecemeal resolution when necessary to give effect to an arbitration agreement. [22] **HN12** Under the Arbitration Act, an arbitration agreement must be enforced notwithstanding the presence of other persons who are parties to the underlying dispute but not to the arbitration agreement. [23] If the dispute between Mercury and the Hospital *is* arbitrable **[***783]** under the Act, then the Hospital's two disputes will be resolved separately -- one in arbitration, and the other (if at all) in state-court litigation. Conversely, if the dispute between Mercury and the Hospital *is not* arbitrable, then both disputes will be resolved in state court. But neither of those two outcomes depends at all on *which court* decides the question of arbitrability. Hence, a decision to allow that issue to be decided in federal rather than state court does not cause piecemeal resolution of the parties' underlying disputes. Although **[*21]** the Hospital will have to litigate the arbitrability issue in federal rather than state court, that dispute is easily severable from the merits of the underlying disputes.

B

**LEdHN[1D]** [1D]The order in which the concurrent tribunals obtained and exercised jurisdiction cuts against, not for, the District Court's stay in this case. The Hospital argues that the stay was proper because the state-court

---

[22]   This provides a sharp contrast with the key statute at issue in *Colorado River* -- the McCarran Amendment. There, as we stressed, the primary policy of the statute was the *avoidance* of piecemeal litigation. 424 U.S., at 819-820.

[23]   **LEdHN[7B]** [7B]

*E. g., C. Itoh & Co.* v. *Jordan International Co., 552 F.2d 1228, 1231-1232 (CA7 1977)*; *Acevedo Maldonado* v. *PPG Industries, Inc., 514 F.2d 614, 617 (CA1 1975)*; *Hamilton Life Insurance Co.* v. *Republic National Life Insurance Co., 408 F.2d 606, 609 (CA2 1969)*.

In some cases, of course, it may be advisable to stay litigation among the nonarbitrating parties pending the outcome of the arbitration. That decision is one left to the district court (or to the state trial court under applicable state procedural rules) as a matter of its discretion to control its docket. See generally *Landis* v. *North American Co., 299 U.S. 248, 254-255 (1936)*.

suit was filed some 19 days before the federal suit. In the first place, this argument disregards the obvious reason for the Hospital's priority in filing. An indispensable element of Mercury's cause of action under *§ 4* for an arbitration order is the Hospital's refusal to arbitrate. See n. 27, *infra*. That refusal did not occur until less than a day before the Hospital filed its state suit. Hence, Mercury simply had no reasonable opportunity to file its *§ 4* petition **[**940]** first. Moreover, the Hospital succeeded in obtaining an *ex parte* injunction from the state court forbidding Mercury to take any steps to secure arbitration. [24] Mercury filed its *§ 4* petition the same day that the injunction was dissolved. [25]

*LEdHN[8]* [8]That aside, the Hospital's priority argument gives too mechanical a reading to the "priority" element of the *Colorado River* balance. This factor, as with the other *ColoradoRiver* factors, is to be applied in a pragmatic, flexible manner with a view to the realities of the case at hand. Thus, *HN13* priority should not be measured exclusively by which complaint was filed first, but rather in terms of how much progress has been made in the two actions. *Colorado River* illustrates **[*22]** this point well. There, the federal suit was actually filed first. Nevertheless, we pointed out as a factor favoring dismissal "the apparent absence of any proceedings in the District Court, other than the filing of the complaint, prior to the motion to dismiss." *424 U.S., at 820*. Here, the opposite was true. It was the state-court suit in which no substantial proceedings (excepting **[***784]** only the abortive temporary injunction) had taken place at the time of the decision to stay. In the federal suit, by contrast, the parties had taken most of the steps necessary to a resolution of the arbitrability issue. [26] In realistic terms, the federal suit was running well ahead of the state suit at the very time that the District Court decided to refuse to adjudicate the case.

This refusal to proceed was plainly erroneous in view of Congress' clear intent, in the Arbitration Act, to move the parties to an arbitrable dispute out of court and into arbitration as quickly and easily as possible. *HN14* The Act provides two parallel devices for enforcing an arbitration agreement: a stay of litigation in any case raising a dispute referable to arbitration, *9 U. S. C. § 3*, and an affirmative order to engage in arbitration, *§ 4*. Both of these sections call for an expeditious and summary hearing, with only restricted inquiry into factual issues. [27]

---

[24] Of course we do not mean to say that the state court's injunction could properly have been applied to prevent Mercury from filing or prosecuting a federal lawsuit. See *General Atomic Co.* v. *Felter*, 434 U.S. 12 (1977); *Donovan* v. *City of Dallas*, 377 U.S. 408 (1964). Mercury was not obliged, however, to put itself in danger of contempt sanctions merely in order to cut short the period of the Hospital's priority of filing.

[25] See also n. 20, *supra*.

[26] Under *§ 6* of the Arbitration Act, *9 U. S. C. § 6*, Mercury's application for a *§ 4* order was properly treated procedurally as a motion. Mercury submitted affidavits, legal briefs, and documentary evidence in support of the order sought. The Hospital responded with full briefing and extensive evidentiary submissions on the arbitrability issue, and it requested oral argument and a jury trial. At the same time, it made its successful motion for a stay. It is readily apparent that if the District Court had denied the stay, it doubtless could and should have gone on to decide the arbitrability point in very short order.

[27] *HN15* Section 3 provides that if a suit is brought on the merits of a dispute covered by an arbitration agreement, "the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration." *9 U. S. C. § 3*.

*HN16* Section 4 provides that a district court must enter an order to arbitrate "upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue." If either of these points is in issue, *§ 4* provides that "the court shall proceed summarily" to a trial on that point. Section 6 further provides that a request for relief under either *§ 3* or *§ 4* is to be treated procedurally as a motion.

Moreover, the policy of the Arbitration Act requires a liberal reading of arbitration agreements, see *infra*, at *24*-25. As a result, some issues that might be thought relevant to arbitrability are themselves arbitrable -- further speeding the procedure under *§§ 3* and *4*. See, *e. g., Prima Paint Corp.* v. *Flood & Conklin Mfg. Co.*, 388 U.S. 395 (1967).

Assuming that the state **[**941]** court would **[*23]** have granted prompt relief to Mercury under the Act, [28] there still would have been an inevitable delay as a result of the District Court's stay. The stay thus frustrated the statutory policy of rapid and unobstructed enforcement of arbitration agreements.

C

***LEdHN[1E]*** [1E]Besides the four factors expressly discussed in *Colorado River*, there is another that emerges from *Calvert* -- the fact that federal law provides the rule of decision on the merits. The state-versus-federal-law factor was of ambiguous relevance in *Colorado River*. [29] In *Calvert*, however, **[***785]** both the four-vote dissenting opinion and JUSTICE BLACKMUN's opinion concurring in the judgment pointed out that the case involved issues of federal law. *437 U.S., at 667* (BLACKMUN, J., concurring in judgment); *id., at 668-677* (BRENNAN, J., **[*24]** dissenting). See also *Colorado River, 424 U.S., at 815, n. 21*. It is equally apparent that this case involves federal issues.

***LEdHN[9]*** [9]The basic issue presented in Mercury's federal suit was the arbitrability of the dispute between Mercury and the Hospital. Federal law in the terms of the Arbitration Act governs that issue in either state or federal court. ***HN17*** *Section 2* is the primary substantive provision of the Act, declaring that a written agreement to arbitrate "in any maritime transaction or a contract evidencing a transaction involving commerce . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." *9 U. S. C. § 2*. [30] *Section 2* is a congressional declaration of a liberal federal policy favoring arbitration agreements, notwithstanding any state substantive or procedural policies to the contrary. The effect of the section is to create a body of federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the Act. In *Prima Paint Corp*. v. *Flood & Conklin Mfg. Corp*., 388 U.S. 395 (1967), for example, the parties had signed a contract containing an arbitration clause, but one party alleged that there had been fraud in the inducement of the entire contract (although the alleged fraud did not go to the arbitration clause in particular). The issue before us was whether the issue of fraud in the inducement was itself an arbitrable controversy. We held that the language and policies of the Act required the conclusion that the fraud issue was arbitrable. *Id., at 402-404*. Although our holding in *Prima Paint* extended only to the specific issue presented, the Courts of Appeals have since consistently concluded that questions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration. We agree. ***HN18*** The Arbitration Act establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues **[*25]** should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability. [31]

**[***786]** **[**942]** ***LEdHN[10]*** [10]To be sure, the source-of-law factor has less significance here than in *Calvert*, since the federal courts' jurisdiction to enforce the Arbitration Act is concurrent with that of the state

---

[28] See n. 34, *infra*; but cf. nn. 35, 36, *infra*.

[29] Although the dissenting Justices in *Colorado River* relied on this point, see *424 U.S., at 825-826*, the majority concluded that the federal/state law point was not controlling for two reasons. First, there was an affirmative policy in federal law expressly approving litigation of federal water rights in state court -- the McCarran Amendment. Second, although the water rights of the United States and the Indian tribes were governed in part by federal law, the bulk of the litigation would necessarily revolve around the state-law water rights of the thousand nonfederal parties in the case -- a factor on which we expressly relied in approving the District Court's stay. *Id., at 820*.

[30] ***HN19*** "Maritime transactions" and "commerce" are defined in *§ 1* of the Arbitration Act, *9 U. S. C. § 1*.

[31] *E. g., Dickinson* v. *Heinold Securities, Inc*., 661 F.2d 638, 643 (CA7 1981); *Wick* v. *Atlantic Marine, Inc*., 605 F.2d 166, 168 (CA5 1979); *Becker Autoradio U. S. A., Inc*. v. *Becker Autoradiowerk GmbH*, 585 F.2d 39, 43-45 (CA3 1978); *Hanes Corp*. v. *Millard*, 174 U. S. App. D. C. 253, 266, 531 F.2d 585, 598 (1976); *Acevedo Maldonado* v. *PPG Industries, Inc*., 514 F.2d, at 616-617; *Germany* v. *River Terminal R. Co*., 477 F.2d 546, 547 (CA6 1973); *Coenen* v. *R. W. Pressprich & Co*., 453 F.2d 1209, 1211-1212 (CA2 1972); *Hart* v. *Orion Insurance Co*., 453 F.2d 1358, 1360-1361 (CA10 1971).

courts. [32] But we emphasize that our *HN20* task in cases such as this is not to find some substantial reason for the *exercise* of federal jurisdiction by the district court; rather, the task is to ascertain whether there exist "exceptional" circumstances, the "clearest of justifications," that can suffice under *Colorado* **[\*26]** *River* to justify the *surrender* of that jurisdiction. Although in some rare circumstances the presence of state-law issues may weigh in favor of that surrender, see n. 29, *supra*, the presence of federal-law issues must always be a major consideration weighing against surrender. [33]

D

*LEdHN[1F]* [1F]Finally, in this case an important reason against allowing a stay is the probable inadequacy of the state-court proceeding to protect Mercury's rights. We are not to be understood to impeach the competence or procedures of the North Carolina courts. Moreover, state courts, as much as federal courts, are obliged to grant stays of litigation under *§ 3* of the Arbitration Act. [34] It is less clear, however, whether the same is true of an order to compel arbitration under *§ 4* of the Act. [35] We need not resolve that question here; it suffices to say that there was, at a minimum, substantial room for doubt that Mercury could obtain from the state court an order compelling **[\*27]** the Hospital to arbitrate. [36] **[\*\*\*787]** In many cases, no doubt, a *§ 3* stay is quite **[\*\*943]** adequate to protect the right to arbitration. But in a case such as this, where the party opposing arbitration is the one from whom payment or performance is sought, a stay of litigation alone is not enough. It leaves the recalcitrant party free to sit and do nothing -- neither to litigate nor to arbitrate. If the state court stayed litigation pending arbitration but declined to compel the Hospital to arbitrate, Mercury would have no sure way

---

[32] See n. 34, *infra*.

The Arbitration Act is something of an anomaly in the field of federal-court jurisdiction. It creates a body of federal substantive law establishing and regulating the duty to honor an agreement to arbitrate, yet it does not create any independent federal-question jurisdiction under *28 U. S. C. § 1331 (1976 ed., Supp. V)* or otherwise. Section 4 provides for an order compelling arbitration only when the federal district court would have jurisdiction over a suit on the underlying dispute; hence, there must be diversity of citizenship or some other independent basis for federal jurisdiction before the order can issue. *E. g., Commercial Metals Co.* v. *Balfour, Guthrie, & Co., 577 F.2d 264, 268-269 (CA5 1978)*, and cases cited. Section 3 likewise limits the federal courts to the extent that a federal court cannot stay a suit pending before it unless there is such a suit in existence. Nevertheless, although enforcement of the Act is left in large part to the state courts, it nevertheless represents federal policy to be vindicated by the federal courts where otherwise appropriate.

We need not address whether a federal court might stay a state-court suit pending arbitration under *28 U. S. C. § 2283*.

[33] Cf. n. 20, *supra*.

[34] Although *§ 3* refers ambiguously to a suit "in any of the courts of the United States," the state courts have almost unanimously recognized that the stay provision of *§ 3* applies to suits in state as well as federal courts, requiring them to issue the same speedy relief when a dispute is referable to arbitration. (The North Carolina Supreme Court has so held, although not until after the District Court ordered this stay. *Burke County Public Schools Board of Education* v. *Shaver Partnership, 303 N. C. 408, 279 S. E. 2d 816 (1981)*.) This is necessary to carry out Congress' intent to mandate enforcement of all covered arbitration agreements; Congress can hardly have meant that an agreement to arbitrate can be enforced against a party who attempts to litigate an arbitrable dispute in federal court, but not against one who sues on the same dispute in state court. See also *Prima Paint*, 388 U.S., at 404.

[35] Section 4, unlike *§ 3*, speaks only of a petition to "any United States district court." Nonetheless, at least one state court has held that *§ 4* does require state courts to issue *§ 4* orders to arbitrate where the section's conditions are met. *Main* v. *Merrill Lynch, Pierce, Fenner & Smith Inc., 67 Cal. App. 3d 19, 24-25, 136 Cal. Rptr. 378, 380-381 (1977)*.

[36] As a historical matter, there was considerable doubt at the time of the District Court's stay that the North Carolina court would have granted even a *§ 3* stay of litigation. The then-controlling precedent in North Carolina was to the effect that a contract such as that between Mercury and the Hospital was not subject to the Arbitration Act at all, on the reasoning that a construction project is not "commerce" within the meaning of *§§ 1* and *2* of the Act. *Burke County Public Schools Board of Education* v. *Shaver Partnership, 46 N. C. App. 573, 265 S. E. 2d 481 (1980)*; *Bryant-Durham Electric Co.* v. *Durham County Hospital Corp., 42 N. C. App. 351, 256 S. E. 2d 529 (1979)*. The North Carolina Supreme Court has, however, since repudiated those decisions. *Burke County Public Schools Board of Education* v. *Shaver Partnership, 303 N. C. 408, 279 S. E. 2d 816 (1981)*.

to proceed with its claims except to return to federal court to obtain a *§ 4* order -- a pointless and wasteful burden on the supposedly summary and speedy procedures prescribed by the Arbitration Act.

E

*LEdHN[11]* [11]The Hospital argues that the *Colorado River* test is somehow inapplicable because in this case the District Court merely stayed the federal litigation rather than dismissing the suit outright, as in *Colorado River*. It contends that Mercury remains free to seek to reopen the federal suit on a showing that the state suit has failed to adjudicate its rights, and that a stay is less onerous than a dismissal. We have already rejected this distinction, for purposes of this case, in discussing appellate jurisdiction. *Supra, at 12-13*. We reject it in this context for the same reasons.

 [*28]  We have no occasion in this case to decide whether a dismissal or a stay should ordinarily be the preferred course of action when a district court properly finds that *Colorado River* counsels in favor of deferring to a parallel state-court suit. [37] We can say, however, that *HN21* a stay is as much a refusal to exercise federal jurisdiction as a dismissal. When a district court decides to dismiss or stay under *Colorado River*, it presumably concludes that the parallel state-court litigation will be an adequate vehicle for the complete and prompt resolution of the issues between the parties. If there is any substantial doubt as to this, it would be a serious abuse of discretion to grant the stay or dismissal at all. See Part IV-D, *supra; McNeese v. Board of Education, 373 U.S. 668, 674-676 (1963)*. Thus, *HN22* the decision to invoke *Colorado River* necessarily contemplates that the federal court will have nothing further to do in resolving any substantive part of the case, whether it stays or dismisses. See 17 C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure § 4247, pp. 517-519 (1978).

 [***788]  Moreover, assuming that for some unexpected reason the state forum does turn out to be inadequate in some respect, the Hospital's argument fails to make out any genuine difference between a stay and a dismissal. It is true that Mercury could seek to return to federal court if it proved necessary; but that would be equally true if the District Court had dismissed the case. It is highly questionable whether this Court would have approved a dismissal of a federal suit in *Colorado River* (or in any of the abstention cases, see *supra, at 14*) if the federal courts did not remain open to a dismissed plaintiff who later demonstrated the inadequacy of the state forum.

 [*29]  V

In addition to reversing the District Court's stay, the Court of Appeals decided that the underlying contractual dispute between  [**944]  Mercury and the Hospital is arbitrable under the Arbitration Act and the terms of the parties' arbitration agreement. It reversed the District Court's judgment and remanded the case "with directions to proceed in conformity herewith." *656 F.2d, at 946*. In effect, the Court of Appeals directed the District Court to enter a *§ 4* order to arbitrate.

*LEdHN[12]* [12]In this Court, the Hospital does not contest the substantive correctness of the Court of Appeals' holding on arbitrability. It does raise several objections to the procedures the Court of Appeals used in considering and deciding this case. In particular, it points out that the only issue formally appealed to the Court of Appeals was the propriety of the District Court's stay order. Ordinarily, we would not expect the Court of Appeals to pass on issues not decided in the District Court. In the present case, however, we are not disposed to disturb the court's discretion in its handling of the case in view of the special interests at stake and the apparent lack of any prejudice to the parties. Title *28 U. S. C. § 2106* *HN23* gives a court of appeals some

---

[37]   This reservation, of course, applies only to cases under *Colorado River*. Cf., *e. g., American Trial Lawyers Assn*. v. *New Jersey Supreme Court, 409 U.S. 467 (1973)* (stay rather than dismissal in *Pullman* abstention).

latitude in entering an order to achieve justice in the circumstances. *HN24* The Arbitration Act calls for a summary and speedy disposition of motions or petitions to enforce arbitration clauses. The Court of Appeals had in the record full briefs and evidentiary submissions from both parties on the merits of arbitrability, and held that there were no disputed issues of fact requiring a jury trial before a *§ 4* order could issue. Under these circumstances, the court acted within its authority in deciding the legal issues presented in order to facilitate the prompt arbitration that Congress envisaged.

*Affirmed.*

**Dissent by:** REHNQUIST

## Dissent

 **[*30]** JUSTICE REHNQUIST, with whom THE CHIEF JUSTICE and JUSTICE O'CONNOR join, dissenting.

In its zeal to provide arbitration for a party it thinks deserving, the Court has made an exception to established rules of procedure. The Court's attempt to cast the District Court's decision as a final judgment fails to do justice to the meaning of the word "final," to the Act of Congress that limits the jurisdiction of the courts of appeals, or to the district **[***789]** judges who administer the laws in the first instance.

If the District Court had not stayed the proceeding, but had set a trial date two months away, there would be no doubt that its order was interlocutory, subject to review only by mandamus or pursuant to *28 U. S. C. § 1292(b)*. This would be true even though *§ 4* of the Arbitration Act provides that "the court shall proceed summarily" to trial, because an order setting a trial date only guides the course of litigation, and does not, of its own force, dispose of it on the merits. Such an order is tentative; that is, it is subject to change at any time on the motion of a party or by the court, *sua sponte*.

The order the District Court actually entered is no more final. It delayed further proceedings until the completion of pending litigation in the state courts. This order was also tentative; it was subject to change on a showing that the state proceedings were being delayed, either by the Hospital or by the court, or that the state courts were not applying the federal Act, or that some other reason for a change had arisen. This order did not dispose of the case on the merits. If the state court had found that there was no agreement to arbitrate within the meaning of the United States Arbitration Act, the District Court would have been bound by that finding. But res judicata or collateral estoppel would apply if the state court reached a decision before the District Court in the absence of a stay. The likelihood that a state court of competent jurisdiction may enter a judgment that may determine some issue in a case does not render final a federal district court's decision to take a two-day recess, or to order additional **[*31]** briefing by the parties in five days or five months, or to take a case under advisement rather than render an immediate decision **[**945]** from the bench. Such a possibility did not magically change that character of the order the District Judge entered in this case.

*Section 1291* of the Judicial Code is a congressional command to the federal courts of appeals not to interfere with the district courts' management of ongoing proceedings. Unless the high standards for a writ of mandamus can be met, or the district court certifies an interlocutory appeal pursuant to *§ 1292(b)*, Congress has directed that the district courts be permitted to conduct their cases as they see fit. The reason for this rule is simple:

"Since the right to a judgment from more than one court is a matter of grace and not a necessary ingredient of justice, Congress from the very beginning has, by forbidding piecemeal disposition on appeal of what for practical purposes is a single controversy, set itself against enfeebling judicial administration. Thereby is avoided the obstruction to just claims that would come from permitting the harassment and cost of a succession

of separate appeals from the various rulings to which a litigation may give rise, from its initiation to entry of judgment. To be effective, judicial administration must not be leaden-footed. Its momentum would be arrested by permitting separate reviews of the component elements in a unified cause." *Cobbledick v. United States, 309 U.S. 323, 325 (1940)* (Frankfurter, J., for a unanimous Court).

 [***790] The Court's decision places an unwarranted limitation upon the power of district courts to control their own cases. The Court's opinion does not establish a broad exception to *§ 1291*, see *ante*, at 10-11, n. 11, but it does create uncertainty about when a district court order in a pending case can be appealed. This uncertainty gives litigants opportunities to disrupt or delay proceedings by taking colorable appeals from interlocutory [*32] orders, not only in cases nearly identical to this but also in cases which the ingenuity of counsel disappointed by a district court's ruling can analogize to this one. *Section 1291* established a policy that district judges should conduct their own cases from beginning to end. The occasional injustice to a litigant that results from an erroneous district court decision is far outweighed by the far greater systemic disruption created by encouraging parties to attempt interlocutory appeals. The former attracts the Court's attention because the legal error it perceives is apparent on the surface of the case. The latter receives inadequate attention because it does not appear in published decisions or in petitions for certiorari. It is, rather, obscured by the "merits" of cases and hidden among statistics on the cost and seeming interminable nature of litigation. Both respect for district judges and concern for the course of litigation generally should make the Court hesitate before creating another exception, however narrow, to *§ 1291*.

The Court has acknowledged the importance of the rule of finality as recently as *Coopers & Lybrand v. Livesay, 437 U.S. 463 (1978)*, which rejected the so called "death knell" exception to *§ 1291*. In *Coopers*, a putative representative plaintiff whose motion for class certification had been denied by the District Court sought to appeal under *§ 1291*. We accepted his argument that this order effectively put him out of court, *id., at 470*, but held that this circumstance did not justify an exception to the statute. "[Allowing] appeals of right from nonfinal orders that turn on the facts of a particular case thrusts appellate courts indiscriminately into the trial process and thus defeats one vital purpose of the final-judgment rule -- 'that of maintaining the appropriate relationship between the respective courts. . . . This goal, in the absence of most compelling reasons to the contrary, is very much worth preserving.'" *Id., at 476* (quoting *Parkinson v. April Industries, Inc., 520 F.2d 650, 654 (CA2 1975)* (concurring opinion)).

 [*33] The Court has not given any sound, principled justification for permitting the Court of Appeals to thrust itself into the trial process in this case. It begins by citing [**946] *Idlewild Liquor Corp.* v. *Epstein, 370 U.S. 713 (1962)*. There the District Court had stayed an action challenging the constitutionality of a state statute "to give the state courts an opportunity to pass upon the constitutional issues presented, although there was no relevant litigation then pending in the state courts." *Id., at 714*. This Court held that the order was appealable because the plaintiff "was effectively out of court." *Id., at 715, n. 2*. *Idlewild* does not control this case.

 [***791] First, Mercury is less "effectively out of court" than was Idlewild. There was no pending state proceeding that might have resolved the issues in the case, and Idlewild might well have been obliged to take the risk of violating the statute and challenging it in an enforcement proceeding in state court.

More importantly, however, the decision in *Idlewild* cannot be good law after *Coopers, supra.* The Court describes *Coopers* as holding only that the collateral-order doctrine of *Cohen v. Beneficial Loan Corp., 337 U.S. 541 (1949)*, does not apply to a class decertification order under *Federal Rule of Civil Procedure 23(c)(1)*. *Ante*, at 12-13, n. 14. We did hold that "the collateral-order doctrine is not applicable to" a decertification order. *437 U.S., at 468-469*. We then went on to reject the argument that the decertification order was final under the so-called "death knell" doctrine, holding that an order does not become final simply because the plaintiff will be unable to pursue his claim if the order stands. *Id., at 469-477*. We declined to attach any importance to the fact that the plaintiff in *Coopers* was just as "effectively out of court" as Idlewild or Mercury. We noted that "if

the 'death knell' doctrine has merit, it would apply equally to the many interlocutory orders in ordinary litigation . . . that may have such tactical economic significance that a defeat is tantamount to a 'death knell' for the entire case." *Id., at 470*. We also noted that *28 U. S. C. § 1292(b)* provides for review **[*34]** of certain nonfinal orders, and that the "death knell" doctrine circumvents its restrictions. *437 U.S., at 474-475*. By ignoring this discussion and holding from *Coopers*, the Court has created an unjustified exception to *§ 1291*.

The Court also states that the stay order in this case is appealable under *Cohen, supra.* It quotes the formulation of the *Cohen* collateral-order doctrine from *Coopers*:

"[The] order must conclusively determine the disputed question, resolve an important issue completely separate from the merits of the action, and be effectively unreviewable on appeal from a final judgment." *437 U.S., at 468*, quoted, *ante*, at 11-12.

The District Court's order did not "conclusively determine the disputed question" for the reasons stated above. The Court's assertion to the contrary, *ante*, at 12-13, is nothing short of sheer speculation about the state of mind of the District Judge. Such speculation is hardly the "practical rather than . . . technical construction" * of *§ 1291* contemplated by *Cohen, supra, at 546*. In *Cohen* itself, the District Court denied the defendant's motion **[***792]** to require the plaintiff to post a bond on the ground that the statute requiring the bond did not apply. That order "conclusively determined" the question whether a bond was required because no conceivable change of circumstances could affect the basis of the District Court's decision. In this case, any number of plausible events might have convinced the District Court that a necessary basis of its decision -- that the state court would proceed promptly and fairly to adjudicate the issue **[**947]** of the existence of an agreement to arbitrate -- no longer applied.

 **[*35]** Furthermore, I am not as certain as is the Court that by staying this case the District Court resolved "an important issue." An issue should not be deemed "important" for these purposes simply because the court of appeals or this Court thinks the appellant should prevail. The issue here was whether the factual question whether there was an agreement to arbitrate should be adjudicated in a state or federal court. Unless there is some reason to believe that the state court will resolve this factual question wrongly, which the Court quite rightly disclaims, *ante*, at 26, I do not see how this issue is more important than any other interlocutory order that may place a litigant at a procedural disadvantage.

For these reasons, I do not believe the District Court's order was appealable. Interlocutory orders are committed by statute to the judgment of the district courts, and this Court ill-serves the judges of those courts and the overwhelming majority of litigants by devising exceptions to the statute when it believes a particular litigant has been wronged.

Given my view of appealability, I do not find it necessary to decide whether the District Court's order was proper in this case. I am disturbed, however, that the Court has sanctioned an extraordinary departure from the usual and accepted course of judicial proceedings by affirming the Court of Appeals decision on an issue that was not decided in the District Court.

The Court of Appeals ordered the District Court to enter an order compelling arbitration, even though that issue was not considered by the District Court. This Court has maintained the difference between appellate jurisdiction and original jurisdiction at least since *Marbury v. Madison, 1 Cranch 137, 174-176 (1803)* ("It is

---

\*   As a practical matter, it is not at all clear to me that the Court of Appeals' course would have provided arbitration more quickly than that of the District Court, even if this Court had not granted certiorari. If the Court of Appeals was correct that this dispute is plainly arbitrable, there is no reason to expect that the state courts would not have resolved that issue in the 11 months during which the case was before the Court of Appeals.

the essential criterion of appellate jurisdiction, that it revises and corrects the proceedings in a case already instituted"). I do not understand how the Court can say that the Court of Appeals had discretion to perform a nonappellate act.

 **[\*36]**  The Court relies on *28 U. S. C. § 2106*, which provides that a court of appeals

"may affirm, modify, vacate, set aside or reverse any judgment, decree, or order of a court lawfully brought before it for review, and may remand the cause and direct the entry of such appropriate judgment, decree, or order, or require such further proceedings to be had as may be just under the circumstances."

This statute does not grant the courts of appeals authority to constitute themselves as trial courts. *Section 4* of the Arbitration Act gives  **[\*\*\*793]**  the Hospital a right to a jury trial. See *ante*, at 23, n. 27. By deciding that there were no disputed issues of fact, the Court of Appeals seems to have decided a motion for summary judgment that was not before it. This is the kind of issue that district judges decide every day in the ordinary course of business. It is not the kind of issue that courts of appeals determine. The Court of Appeals did have before it the memoranda filed in the District Court but, contrary to the Court's intimation, *ante*, at 29, this issue was not argued in the Court of Appeals. See *656 F.2d 933, 948, n. 1 (1981)* (Hall, J., dissenting) ("No one argued that this court should decide that issue").

There was no reason to believe that the District Court would not have acted promptly to resolve the dispute on the merits after being reversed on the stay. That judges of a court of appeals believe they know how a case should be decided is no reason for them to substitute their own judgment for that of a district judge without regard to the normal course of appellate procedure.

The judgment below should be vacated and the case remanded to the Court of Appeals with directions to dismiss the appeal for want of jurisdiction. Failing that, even if the Court is correct that the stay order was an error, the judgment should be reversed insofar as it decides the question of arbitrability, and the case should be remanded to the District Court for further proceedings under the Arbitration Act.

# References

; 32A, Federal Practice and Procedure 898-901, 906, 907, 923-17781 Federal Procedure, L Ed, Access to District Courts 1:558-1:575; 2 Federal Procedure, L Ed, Appeal, Certiorari, and Review 3:306, 3:307, 3:309, 3:314, 3:315-3:17, 3:31, 3:645; 3 Federal Procedure, L Ed, Arbitration 4:17-4:30, 4:128-4:1472 Federal Procedural Forms, L Ed, Appeal, Certiorari, and Review 3:11-3:40; 3 Federal Procedural Forms, L Ed, Arbitration 4:21-4:802 Am Jur Pl & Pr Forms (Rev ),Arbitration and Award, Forms 11-31; 11 Am Jur Pl & Pr Forms (Rev), Federal Practice and Procedure, Forms 2051-2055US L Ed Digest, Appeal and Error 23, _24_, 1670; Arbitration 2; Courts 709L Ed Index to Annos, Appeal and Error; Arbitration and Award; CourtsALR Quick Index, Appeal and Error; Arbitration and Award; Courts; District Courts; Federal Courts; Supersedeas or StayFederal Quick Index, Appeal and Error; Arbitration and Award; Courts; State Courts; Stay of Proceedings          Annotation References:.Supreme Court authorizing Supreme Court..Stay of action in federal court..



🛈 Cited

As of: September 1, 2015 5:28 PM EDT

## *MYERS v. ROSENBERG*

United States District Court for the Northern District of Illinois Eastern Division

March 6, 1986

No. 83 C 1342

**Reporter**

1986 U.S. Dist. LEXIS 28488; 1986 WL 3329

NANCY MYERS, Plaintiff, vs. ROBERTS ROSENBERG, Defendant

## Core Terms

arbitration, Securities, arbitration agreement, compel arbitration, motion to dismiss, Racketeer, discovery, subject to arbitration, right to arbitration, scope of arbitration, judicial protection, intent of congress, defense motion, requirements, boilerplate, analogize, manifest, courts

## Case Summary

### Procedural Posture

Defendant man filed a motion to compel arbitration of plaintiff woman's claims alleging a violation of the Racketeer Influenced and Corrupt Organizations Act (RICO), *18 U.S.C.S. § 1961 et seq.* and a breach of fiduciary duty. Litigation was ongoing for more than two years, and the man filed an answer and a motion to dismiss and engaged in discovery. A claim under the Securities and Exchange Act of 1934, 15 U.S.C.S. § 78, was already dismissed.

### Overview

The man relied on a boilerplate contractual arbitration provision. The woman argued that he had waived his rights thereunder. The court held that (1) a waiver of arbitration was not lightly inferred, delay alone was insufficient, and the issue was whether the party seeking arbitration acted inconsistently with the arbitration right under the totality of the circumstances; (2) waiver was implied where a party substantially invoked the litigation machinery; (3) the man had sought judicial dismissal of all claims and accepted dismissal of the Securities Act claim, and if his motion to dismiss all claims had been granted, it was doubtful that he then would have insisted upon arbitration; and (4) RICO was enacted as part of the criminal code to allow victims of a racketeering enterprise to act as true arms of the state, and although federal policy promotes arbitration, *9 U.S.C.S. § 4*, neither this policy nor RICO reasonably contemplated the arbitration of criminal activity.

### Outcome

The court denied the motion to compel arbitration of the RICO count and arbitration as to both counts was deemed waived.

# LexisNexis® Headnotes

Civil Procedure > ... > Responses > Defenses, Demurrers & Objections > Waiver & Preservation of Defenses

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > Waiver

Contracts Law > Contract Conditions & Provisions > Arbitration Clauses

*HN1* A waiver of arbitration is not lightly to be inferred. A court must determine whether the defaulting party acted "inconsistently" with the arbitration right under the totality of the circumstances. Delay alone will not constitute a waiver of arbitration rights, nor are preliminary negotiations for settlement inconsistent with the right to arbitrate.

Civil Procedure > ... > Responses > Defenses, Demurrers & Objections > Waiver & Preservation of Defenses

Contracts Law > Contract Conditions & Provisions > Arbitration Clauses

*HN2* When a party has substantially invoked the litigation machinery, a waiver of a contractual arbitration right will be implied.

Antitrust & Trade Law > Clayton Act > Penalties

Antitrust & Trade Law > ... > Private Actions > Racketeer Influenced & Corrupt Organizations > General Overview

Antitrust & Trade Law > ... > Private Actions > Racketeer Influenced & Corrupt Organizations > Scope

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview

Contracts Law > Contract Conditions & Provisions > Arbitration Clauses

Criminal Law & Procedure > ... > Racketeering > Racketeer Influenced & Corrupt Organizations Act > General Overview

*HN3* The Racketeering Influenced and Corrupt Organizations Act (RICO) was enacted as part of the criminal code; not as a criminal provision of a civil code. Its purpose is to allow victims of a racketeering enterprise to act as true arms of the state. A plaintiff under RICO becomes, in essence, a civil prosecutor. The strict pleading requirements for effectively stating a claim under RICO are designed to protect the innocent defendant from the stigma attached to being publicly labelled a criminal racketeer. This concern should not be undermined by allowing a boilerplate arbitration agreement to circumvent this judicial protection.

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview

Civil Procedure > ... > Arbitration > Federal Arbitration Act > General Overview

Contracts Law > Contract Conditions & Provisions > Arbitration Clauses

Criminal Law & Procedure > ... > Racketeering > Racketeer Influenced & Corrupt Organizations Act > General Overview

International Trade Law > Dispute Resolution > International Commercial Arbitration > Arbitration

*HN4* While federal policy promotes arbitration, *9 U.S.C.S. § 4*, neither this policy nor RICO itself reasonably contemplates the arbitration of criminal activity.

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview

Civil Procedure > ... > Arbitration > Federal Arbitration Act > General Overview

Civil Procedure > ... > Arbitration > Federal Arbitration Act > Arbitration Agreements

Contracts Law > Contract Conditions & Provisions > Arbitration Clauses

Criminal Law & Procedure > ... > Racketeering > Racketeer Influenced & Corrupt Organizations Act > General Overview

Governments > Legislation > Interpretation

International Trade Law > Dispute Resolution > International Commercial Arbitration > Arbitration

**HN5** Just as it is the congressional policy manifested in the Federal Arbitration Act that requires courts liberally to construe the scope of arbitration agreements covered by the Act, it is the congressional intention expressed in some other statute on which the courts must rely to identify any category of claims as to which agreements to arbitrate will be held unenforceable. The statutory intent to provide judicial protection to litigants, while not expressly stated, is clearly manifest by the Racketeering Influenced and Corrupt Organizations Act's placement in the criminal code and by its legislative history.

**Opinion by:  [\*1]**  PARSONS

# Opinion

*MEMORANDUM OPINION AND ORDER*

The defendant Rosenberg here presents the interesting question of whether a defendant, after 2-1/2 years of litigation, having filed an answer and a motion to dismiss, and having substantially engaged in discovery, may thereafter seek to compel arbitration of the claims all purportedly covered by a standard arbitration agreement. One of the claims sought to be arbitrated alleges a violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), *18 U.S.C. § 1961 et seq.*; the other claims allege a breach of fiduciary duty owed to the plaintiff. The plaintiff's claim under the Securities and Exchange Act of 1934, 15 U.S.C. § 78, has already been dismissed by the Court.

It is well established that **HN1** "a waiver of arbitration is not lightly to be inferred." See *Midwest Window Systems, Inc. v. Amcor Industries, Inc., 630 F.2d 535, 536 (7th Cir. 1980)*; *Dickinson v. Heinold Securities, Inc., 661 F.2d 638 (1981)*. The court must determine whether the defaulting party acted "inconsistently" with the arbitration right under the totality of the circumstances. *Dickinson, supra, at 641*. Delay alone will not constitute  **[\*2]**  a waiver of arbitration rights, nor are preliminary negotiations for settlement inconsistent with the right to arbitrate.

However, **HN2** when a party has "substantially invoked the litigation machinery", waiver will be implied. *E.C. Ernst, Inc. v. Manhattan Construction Co. of Texas, 559 F.2d 268 (5th Cir. 1977)*. While the defendant here did not instigate the judicial process as the defendant did in Midwest Window, like in Midwest Window the defendant here accepted a judicial decision in his favor on a motion to dismiss the securities count. Unlike the defendant in Dickinson, defendant here has confined neither his motion to dismiss nor his discovery to "non-arbitrable" claims. And while the defendant may have had reservations concerning the arbitrability of the Securities Act claim, he expressed no reason for postponing his request for arbitration of certain pendent state claims.

Unlike in Dickinson, here the delay pending the motion to compel arbitration did not arise from "good faith efforts to resolve the controversy without reference to an adjudicatory body." Indeed there is little question that had defendant's motion to dismiss been granted by this Court, the **[\*3]**  defendant would not now attempt to insist upon his arbitration "right". Having actively sought adjudication of claims including those subject to the

arbitration agreement, the defendant should not now attempt to recant from substantive arguments and discovery, and stand upon a boilerplate arbitration agreement. As the Seventh Circuit concluded in *Midwest Windows, supra, at 537*: the case has "gone too far with too much prejudice to shift part of the responsibility for resolution elsewhere." See also *Barrantine v. Arkansas Best Freight System, Inc., 450 U.S. 728, 101 S. Ct. 1427 (1981)* at 744-5.

Furthermore, I cannot find that RICO claims are subject to arbitration agreements. While the defendant attempts to analogize civil RICO claims with the antitrust provisions of the Sherman Act, *15 U.S.C. §1 et seq.*, the analogy is not persuasive for the purpose of determining the scope of an arbitration agreement. *HN3* RICO was enacted as part of the criminal code; not as a criminal provision of a civil code. Its purpose is to allow victims of a racketeering enterprise to act as true arms of the state. A plaintiff under RICO becomes, in essence, a civil prosecutor. The strict pleading requirements **[*4]** in this Circuit for effectively stating a claim under RICO are designed to protect the innocent defendant from the stigma attached to being publically labelled a criminal "racketeer". This concern should not be undermined by allowing a boilerplate arbitration agreement to circumvent this judicial protection.

And *HN4* while federal policy promotes arbitration, See: *9 U.S.C. §4*, neither this policy not RICO itself reasonably contemplates the arbitration of criminal activity. As the Supreme Court states in Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth,    U.S.    *105 S.Ct. 3346* (July 2, 1985), *HN5* "just as it is the congressional policy manifested in the Federal Arbitration Act that requires courts liberally to construe the scope of arbitration agreements covered by the Act, it is the congressional intention expressed in some other statute on which the courts must rely to identify any category of claims as to which agreements to arbitrate will be held unenforceable." *Id. at 3355*. (emphasis added) Here the statutory intent to provide judicial protection to the litigants, while not expressly stated, is clearly manifest by RICO's placement in the criminal code and **[*5]** by its legislative history. Under Mitsubishi, then, this is a case in which the policy towards arbitration is outweighed by clear countervailing congressional intent and sound policy reasons.

Accordingly, the defendant's motion to compel arbitration of the RICO count is denied, and arbitration as to both counts is deemed waived.



**A** Neutral

# NCP Fin. Ltd. P' ship v. Escatiola

Court of Appeals of Texas, Fourth District, San Antonio

April 27, 2011, Delivered; April 27, 2011, Filed

No. 04-10-00644-CV

**Reporter**

350 S.W.3d 152; 2011 Tex. App. LEXIS 3110

NCP FINANCE LIMITED PARTNERSHIP and NMCapital, Inc., Appellants v. Humberto ESCATIOLA, Appellee

**Subsequent History:** Released for Publication October 20, 2011.

**Prior History:** [**1] From the 150th Judicial District Court, Bexar County, Texas. Trial Court No. 2009-CI-19255. Honorable Antonia Arteaga, Judge Presiding.
*In re NCP Fin. Ltd. P'ship, 2010 Tex. App. LEXIS 7570 (Tex. App. San Antonio, Sept. 15, 2010)*

**Disposition:** REVERSED AND REMANDED.

## Core Terms

arbitration, trial court, parties', class certification, arbitration agreement, credit service, class action, proceedings, disputes

## Case Summary

### Procedural Posture

In an accelerated appeal, appellants, a lender and a finance company, appealed the order of the 150th Judicial District Court, Bexar County, Texas, denying their motion to compel individual arbitration and stay litigation.

### Overview

Appellee debtor obtained a loan from the finance company. The parties signed a credit services agreement and an arbitration agreement providing that the arbitrator had to decide class certification issues. On behalf of a purported class, the debtor sued the finance company and a credit services organization for usury and violations of the Texas Deceptive Trade Practices Act and the Texas Credit Services Organization Act. Because a party could not be compelled to submit to class arbitration absent its express consent, the trial court erred by denying the finance company's motion to compel individual arbitration and by permitting the debtor to seek class certification before the arbitrator.

### Outcome

The order was reversed, and the case was remanded to the trial court for proceedings.

# LexisNexis® Headnotes

Civil Procedure > Special Proceedings > Class Actions > General Overview

Civil Procedure > ... > Arbitration > Federal Arbitration Act > Arbitration Agreements

*HN1* The United States Supreme Court has held that whether an arbitration agreement forbids a class action is a question for the arbitrator, not the trial court, to decide.

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview

Contracts Law > Contract Interpretation > General Overview

*HN2* Arbitrators are well suited to answer questions of contract interpretation.

Civil Procedure > Special Proceedings > Class Actions > Certification of Classes

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview

*HN3* The Texas Supreme Court has held the arbitrator, not the trial court, must rule on class certification issues.

Civil Procedure > Special Proceedings > Class Actions > Certification of Classes

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview

Contracts Law > Contract Conditions & Provisions > Arbitration Clauses

*HN4* When the contracts at issue commit all disputes arising out of the agreement to the arbitrator, the arbitrator must decide class certification issues.

Civil Procedure > Special Proceedings > Class Actions > General Overview

Civil Procedure > ... > Arbitration > Federal Arbitration Act > Orders to Compel Arbitration

Contracts Law > Contract Conditions & Provisions > Arbitration Clauses

*HN5* A party may not be compelled to submit to class arbitration unless there is a contractual basis for concluding that the party agreed to do so.

Civil Procedure > Special Proceedings > Class Actions > General Overview

Civil Procedure > ... > Arbitration > Federal Arbitration Act > Orders to Compel Arbitration

*HN6* The United States Supreme Court has held a party cannot be compelled to submit to class arbitration absent its express consent.

**Counsel:** For APPELLANT: Bryan James Wick, Wick Phillips, LLP, Dallas, TX; Jeffrey Wallace Hellberg Jr., Wick Phillips LLC, Dallas, TX.

For APPELLEE: John Steven Dwyre, John Dwyre & Associates, San Antonio, TX.

**Judges:** Sitting: Sandee Bryan Marion, Justice, Rebecca Simmons, Justice, Steven C. Hilbig, Justice. Opinion by: Sandee Bryan Marion, Justice.

**Opinion by:** Sandee Bryan Marion

## Opinion

[*152] REVERSED AND REMANDED

In this accelerated appeal, appellants, NCP Finance Limited Partnership and NMCapital, Inc. (collectively "NCP"), appeal from the trial court's order on their motion to compel individual arbitration and stay litigation pending arbitration. We reverse and remand.

[*153] **BACKGROUND**

ACE Credit Service, LLC ("ACE") is a registered Texas credit services organization, and NMCapital is an out-of-state lender and a general partner of NCP Finance Limited Partnership, a Texas limited partnership. On February 16, 2008, appellee, Humberto Escatiola, obtained a loan from NCP through credit services provided by ACE. On that same date, Escatiola, ACE, and NCP signed a credit services agreement, [**2] a loan agreement, a promissory note, and an arbitration agreement. The arbitration agreement states:

> [U]pon the election of either [Escatiola], [ACE] . . ., or [NCP] . . ., any legal dispute between [Escatiola], on the one hand, and ACE and/or [NCP], on the other hand, will be resolved by binding arbitration. . . . (1) NO PARTY MAY PARTICIPATE IN A CLASS ACTION IN COURT OR IN CLASS-WIDE ARBITRATION . . . ; (2) NO PARTY MAY ACT AS A PRIVATE ATTORNEY GENERAL IN COURT OR IN AN ARBITRATION; (3) CLAIMS BROUGHT BY OR AGAINST [ESCATIOLA] MAY NOT BE JOINED OR CONSOLIDATED WITH CLAIMS BROUGHT BY OR AGAINST ANY OTHER PERSON; AND (4) THE ARBITRATOR SHALL HAVE NO AUTHORITY TO CONDUCT A CLASS-WIDE ARBITRATION, PRIVATE ATTORNEY GENERAL ARBITRATION OR MULTIPLE-PARTY ARBITRATION.

The arbitration agreement commits any "claim," which it defines as "any legal dispute between [Escatiola], on the one hand, and ACE and/or [NCP], on the other hand," to the arbitrator. However, the arbitration agreement also states: "[A]ny dispute about the validity, effect or enforceability of the prohibitions against class proceedings, private attorney general proceedings and/or multiple-party proceedings . . . *shall be resolved* [**3] *by a court and not by an arbitrator or arbitration administrator*" (emphasis added). Escatiola refinanced the loan three times over the next two months, and he signed identical arbitration agreements on each occasion.

On behalf of a purported class, Escatiola sued ACE and NCP for usury, violation of the Texas Deceptive Trade Practices Act, and violation of the Texas Credit Services Organization Act. NCP filed a motion in the trial court to compel individual arbitration, to strike Escatiola's request for class action certification, and to stay the litigation pending completion of arbitration. The trial court's order on the motion reads, in part: "IT IS . . . ORDERED THAT [NCP's] Motion as to individual arbitration is denied and that the case shall proceed in arbitration and [Escatiola] may seek class certification therein." The trial court stayed the litigation and appointed an arbitrator.

On appeal, NCP argues the trial court was required to grant the motion as to individual arbitration because (a) the parties' arbitration agreement specifically prohibits class arbitration, and (b) the United States Supreme Court recently ruled in *Stolt-Nielsen S.A. v. AnimalFeeds International Corp.* [**4] that class arbitration may not be compelled absent express agreement of the parties.

**DISCUSSION**

Several years ago, **HN1** the United States Supreme Court held that whether an arbitration agreement forbids a class action is a question for the arbitrator, not the trial court, to decide. *Green Tree Fin. Corp. v. Bazzle, 539*

*U.S. 444, 452, 123 S. Ct. 2402, 156 L. Ed. 2d 414 (2003)* (plurality opinion). In *Green Tree*, Lynn and Burt Bazzle ("the Bazzles") obtained a home improvement loan from Green Tree **[*154]** Financial Corporation ("Green Tree"). *Id. at 447*. The Bazzles and Green Tree signed a contract, which included this arbitration clause: "'All disputes, claims, or controversies arising from or relating to this contract or the relationships which result from this contract . . . *shall be resolved by binding arbitration by one arbitrator selected by [Green Tree] with consent of [the Bazzles]*.'" *Id. at 448* (emphasis in original). The Bazzles subsequently sued Green Tree in South Carolina state court for violation of the South Carolina Consumer Protection Code and asked the trial court to certify their claim as a class action. *Id. at 449*. The trial court certified a class and entered an order compelling arbitration. *Id.* Affirming the trial **[**5]** court's order, the South Carolina Supreme Court held class arbitration was authorized because the contract was silent on the matter. *Id. at 450*.

A plurality of the United States Supreme Court vacated the South Carolina Supreme Court's ruling, holding that in certain limited circumstances, courts must decide "gateway" arbitration-related matters, "such as whether the parties have a valid arbitration agreement at all or whether a concededly binding arbitration clause applies to a certain type of controversy." *Id. at 452*. However, the Court concluded the question involved in *Green Tree*—whether the parties' contract forbade class arbitration—did not fall into that narrow exception because it concerned neither the validity of the arbitration clause nor the clause's applicability to the underlying dispute. *Id.* According to the Court, whether the parties' contract forbade class arbitration was a question of what kind of arbitration the parties agreed to—a matter of contract interpretation and arbitration procedures. *Id. at 452-53*. Given that **HN2** "[a]rbitrators are well suited to answer" questions of contract interpretation, and that the parties' contract contained "sweeping language concerning **[**6]** the scope of the questions committed to arbitration," the Court held the matter should be decided by the arbitrator, not the trial court. *Id. at 453*.

Expressly relying upon the United States Supreme Court's ruling in *Green Tree*, **HN3** the Texas Supreme Court also held the arbitrator, not the trial court, must rule on class certification issues. *In re Wood, 140 S.W.3d 367, 368 (Tex. 2004)* (per curiam). In *Wood*, an attorney and three of his clients signed fee agreements providing that all disputes arising from the agreements would be submitted to binding arbitration. *Id.* When the clients sued the attorney over a fee dispute, the trial court ordered the case to arbitration and signed a second order specifically authorizing the arbitrator to decide whether the clients could seek class certification in arbitration. *Id.* The court of appeals issued a writ of mandamus directing the trial court to vacate its second order and determine whether the parties' agreement permitted class arbitration. *Id.* However, the Texas Supreme Court concluded the decision in *Green Tree* was "directly on point" and held the court of appeals erred in directing the trial court to determine the class certification issue. *Id. at 369-70*. **[**7]** According to the unanimous Texas Supreme Court, **HN4** "when the contracts at issue commit[] all disputes arising out of the agreement to the arbitrator," the arbitrator must decide class certification issues. *Id. at 368*.

Recently, a majority of the United States Supreme Court recognized *Green Tree* did not garner a majority on the question of whether the trial court or the arbitrator must decide class certification questions. *Stolt-Nielsen, 130 S. Ct. 1758, 1772, 176 L. Ed. 2d 605* **[*155]** *(2010)*. However, the *Stolt-Nielsen* majority declined to resolve this unsettled question because the parties' agreement expressly assigned the class certification question to the arbitration panel. *Id.* Instead, the Court turned to the question the *Green Tree* Court did not address—the standard to be applied when determining whether a contract permits class arbitration. *Id.* The Court held that **HN5** "a party may not be compelled . . . to submit to class arbitration unless there is a contractual basis for concluding that the party *agreed* to do so." *Id. at 1775* (emphasis in original). Because the parties conceded their agreement was silent on the matter of class certification, the Court found the arbitration panel's certification of a class "fundamentally **[**8]** at war with the foundational . . . principle that arbitration is a matter of consent." *Id.*

Here, the arbitration agreement expressly assigns "any dispute about the validity, effect or enforceability of the prohibitions against class proceedings" to the trial court, not the arbitrator. Accordingly, because the contract at

issue here did not commit all disputes to the arbitrator, but rather expressly assigned disputes involving the class action waiver provision to the trial court, the trial court was required to rule on NCP's motion to compel individual arbitration.

Turning to whether the trial court's denial of NCP's motion was correct in light of recent precedent, we must conclude it was not. The clear language of the parties' agreement expressly forbids class certification in arbitration. Because *HN6* the United States Supreme Court recently held in *Stolt-Nielson* that a party cannot be compelled to submit to class arbitration absent its express consent, the trial court erred by denying NCP's motion to compel individual arbitration and by permitting Escatiola to seek class certification before the arbitrator.

## CONCLUSION

We reverse the trial court's order and remand this matter to the trial **[**9]** court for proceedings consistent with this opinion.

Sandee Bryan Marion, Justice



⚠ Caution

As of: September 1, 2015 2:42 PM EDT

# *Perry Homes v. Cull*

Supreme Court of Texas

March 20, 2007, Argued; May 2, 2008, Opinion Delivered

NO. 05-0882

**Reporter**

258 S.W.3d 580; 2008 Tex. LEXIS 423; 51 Tex. Sup. J. 819

PERRY HOMES, A JOINT VENTURE, HOME OWNERS MULTIPLE EQUITY, INC., AND WARRANTY UNDERWRITERS INSURANCE COMPANY, PETITIONERS, v. ROBERT E. CULL AND S. JANE CULL, RESPONDENTS

**Subsequent History:** Released for Publication August 29, 2008.
Rehearing denied by *Perry Homes v. Cull, 2008 Tex. LEXIS 792 (Tex., Aug. 29, 2008)*
US Supreme Court certiorari denied by *Cull v. Perry Homes, 2009 U.S. LEXIS 486 (U.S., Jan. 12, 2009)*

**Prior History:** [**1] ON PETITION FOR REVIEW FROM THE COURT OF APPEALS FOR THE SECOND DISTRICT OF TEXAS.
*Perry Homes v. Cull, 173 S.W.3d 565, 2005 Tex. App. LEXIS 7254 (Tex. App. Fort Worth, 2005)*

## Core Terms

arbitration, discovery, parties, trial court, waived, depositions, warranty, arbitration clause, Defendants', reimbursement, prejudiced, unfairness, invoked, merits, detriment, requests, orders, litigation process, attorneys', courts, arbitration agreement, right to arbitration, cases, compelling arbitration, arbitration award, opposing party, circumstances, trial judge, companies, compel arbitration

## Case Summary

**Procedural Posture**

Petitioners, a builder and two home warranty companies, sought review of a judgment from the Court of Appeals for the Second District (Texas), which affirmed the trial court's confirmation of an arbitration award in favor of respondent homeowners for construction defects.

**Overview**

The homeowners complained of serious structural and drainage problems. When the homeowners filed suit, the warranty companies immediately requested arbitration pursuant to an arbitration clause, and the homeowners vigorously opposed it. No ruling was made. The homeowners' attorneys engaged in extensive discovery for more than a year. After most of the discovery was completed and the case was set for trial, the homeowners changed their minds about litigating and instead asked the trial court to compel arbitration. The trial court found no prejudice from their conduct. The court noted that the denial of pre-arbitration mandamus proceedings

without comment on the merits did not foreclose review and that *9 U.S.C.S. § 16(b)(2)* provided for review after, not before, arbitration. Waiver of arbitration by litigation conduct was a question of law for the court, not the arbitrators. The court concluded that the homeowners waived their right to arbitration under the Federal Arbitration Act, *9 U.S.C.S. § 1 et seq.*, because their conduct substantially invoked the judicial process and unfairly manipulated the litigation to the detriment or prejudice of the builder and the warranty companies.

**Outcome**

The court reversed the judgment of the court of appeals, vacated the arbitration award, and remanded to the trial court for a prompt trial.

# LexisNexis® Headnotes

Civil Procedure > Judgments > Preclusion of Judgments > Law of the Case

Civil Procedure > ... > Writs > Common Law Writs > Mandamus

*HN1* As mandamus is a discretionary writ, its denial, without comment on the merits, cannot deprive another appellate court from considering the matter in a subsequent appeal. Mandamus is only available when a final appeal would be inadequate; if filing for mandamus precluded a final appeal, that requirement would be self-fulfilling.

Civil Procedure > Appeals > Appellate Jurisdiction > Interlocutory Orders

*HN2* Parties waive nothing by foregoing interlocutory review and awaiting a final judgment to appeal.

Civil Procedure > ... > Arbitration > Federal Arbitration Act > Orders to Compel Arbitration

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Judicial Review

*HN3* See *9 U.S.C.S. § 16(b)(2)*.

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Judicial Review

*HN4* Reviewing a trial court's initial referral to arbitration is not the same as reviewing the arbitrator's final award; courts conduct ordinary review of the former and deferential review only of the latter.

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > Arbitrability

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > Waiver

*HN5* Although the federal courts do not defer to arbitrators when waiver is a question of litigation conduct, they consistently do so when waiver concerns limitations periods or waiver of particular claims or defenses. Parties to an arbitration contract would normally expect a forum-based decisionmaker to decide forum-specific procedural gateway matters. By contrast, when waiver turns on conduct in court, the court is obviously in a better position to decide whether it amounts to waiver. Contracting parties would expect the court to decide whether one party's conduct before the court waived the right to arbitrate. Parties generally intend arbitrators to decide matters that grow out of the dispute and bear on its final disposition, while they intend courts to decide gateway matters regarding whether the parties have submitted a particular dispute to arbitration. Waiver of a substantive claim or delay beyond a limitations deadline could affect final disposition, but waiver by litigation conduct affects only the gateway matter of where the case is tried.

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > Arbitrability

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > Waiver

*HN6* Arbitrators generally must decide defenses that apply to the whole contract, while courts decide defenses relating solely to the arbitration clause. Thus, for example, arbitrators must decide if an entire contract was fraudulently induced, while courts must decide if an arbitration clause was. As waiver by litigation conduct goes solely to the arbitration clause rather than the whole contract, consistency suggests it is an issue for the courts.

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > Waiver

*HN7* A party waives an arbitration clause by substantially invoking the judicial process to the other party's detriment or prejudice. Due to the strong presumption against waiver of arbitration, this hurdle is a high one.

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > Waiver

*HN8* Federal courts decide questions of waiver of arbitration by applying a totality-of-the-circumstances test on a case-by-case basis. In doing so, they consider a wide variety of factors including whether the movant was plaintiff (who chose to file in court) or defendant (who merely responded); how long the movant delayed before seeking arbitration; whether the movant knew of the arbitration clause all along; how much pretrial activity related to the merits rather than arbitrability or jurisdiction; how much time and expense has been incurred in litigation; whether the movant sought or opposed arbitration earlier in the case; whether the movant filed affirmative claims or dispositive motions; what discovery would be unavailable in arbitration; whether activity in court would be duplicated in arbitration; and when the case was to be tried. Of course, all these factors are rarely presented in a single case. Federal courts have found waiver based on a few, or even a single one.

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > Waiver

*HN9* Under Texas case law, waiver of arbitration must be decided on a case-by-case basis, and courts should look to the totality of the circumstances. The factors considered include when the movant knew of the arbitration clause; how much discovery has been conducted; who initiated it; whether it related to the merits rather than arbitrability or standing; how much of it would be useful in arbitration; and whether the movant sought judgment on the merits. Thus, waiver is not ruled out solely because the party seeking arbitration did not ask the court to make any judicial decisions on the merits of the case. While this is surely a factor, it is not the only one. Waiver involves substantial invocation of the judicial process, not just judgment on the merits.

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > Waiver

*HN10* As parties may begin arbitration without a court order, it is relevant to the issue of waiver that a plaintiff chose to file suit instead. But Texas procedure also contemplates that parties may file suit in order to compel arbitration. Thus, while the movant's status is a factor to consider, it does not alone justify a finding of waiver or change the basic nature of the totality-of-the-circumstances test.

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > Waiver

*HN11* A party who enjoys substantial direct benefits by gaining an advantage in the pretrial litigation process should be barred from turning around and seeking arbitration with the spoils. The answer to most questions regarding arbitration flow inexorably from the fact that arbitration is simply a matter of contract between the parties. Like any other contract right, arbitration can be waived if the parties agree instead to resolve a dispute in court. Such waiver can be implied from a party's conduct, although that conduct must be unequivocal. And in close cases, the strong presumption against waiver should govern.

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > Waiver

*HN12* Even substantially invoking the judicial process does not waive a party's arbitration rights unless the opposing party proves that it suffered prejudice as a result. Prejudice is a necessary requirement of waiver by litigation conduct.

Contracts Law > Contract Conditions & Provisions > Waivers > General Overview

Contracts Law > ... > Estoppel > Equitable Estoppel > General Overview

Contracts Law > Types of Contracts > Option Contracts

*HN13* Under Texas law, waiver may not include a prejudice requirement, but estoppel does. In cases of waiver by litigation conduct, the precise question is not so much when waiver occurs as when a party can no longer take it back. Texas estoppel law does not allow a party to withdraw a representation once the other party takes action or forbearance of a definite and substantial character. A party is not allowed to withdraw an option contract when the offeree has taken substantial action based upon it. In these contexts, prejudice is an element of the normal contract rules.

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > Waiver

*HN14* The rule that one cannot wait until the eve of trial to request arbitration is not limited to the evening before trial; it is a rule of proportion.

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > Waiver

*HN15* "Prejudice" has many meanings, but in the context of waiver under the Federal Arbitration Act, *9 U.S.C.S. § 1 et seq.*, it relates to inherent unfairness -- that is, a party's attempt to have it both ways by switching between litigation and arbitration to its own advantage. For purposes of a waiver of an arbitration agreement, prejudice refers to the inherent unfairness in terms of delay, expense, or damage to a party's legal position that occurs when the party's opponent forces it to litigate an issue and later seeks to arbitrate that same issue. Thus, a party should not be allowed purposefully and unjustifiably to manipulate the exercise of its arbitral rights simply to gain an unfair tactical advantage over the opposing party.

Civil Procedure > ... > Arbitration > Federal Arbitration Act > Arbitration Agreements

*HN16* Arbitration contracts should not be more enforceable than other contracts. That is not what Congress intended when it enacted the Federal Arbitration Act, *9 U.S.C.S. § 1 et seq.*

Civil Procedure > Appeals > Standards of Review > Abuse of Discretion

*HN17* Every abuse-of-discretion review is not identical because a trial judge's discretion may be applied to scores of situations and in many different ways. A totality-of-the-circumstances test presumes a multitude of potential factors and a balancing of evidence on either side; if appellate courts must affirm every time there is some factor that was not negated or some evidence on either side, then no ruling based on the totality-of-the-circumstances could ever be reversed.

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > Waiver

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Judicial Review

*HN18* Under a proper abuse-of-discretion review, waiver of arbitration is a question of law for the court, and an appellate court does not defer to the trial court on questions of law. The appellate court defers to a trial court's factual findings if they are supported by evidence, but in the absence of a factual dispute, there is only the

conclusion whether a party's trial conduct constitutes prejudice, a legal question that cannot simply be abandoned to the trial court.

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > Waiver

*HN19* Because courts must consider all the circumstances, the amount of discovery needed to show prejudice will vary depending on what the other circumstances are. Prejudice should be easier to show against a party that initially opposed arbitration than against one who sought it from the start. While the mere failure to assert the right to demand arbitration does not alone translate into a waiver of that right, such failure does bear on the question of prejudice, and may, along with other considerations, require a court to conclude that waiver has occurred. The failure to demand arbitration affects the burden placed upon the party opposing waiver. When a timely demand for arbitration was made, the burden of proving waiver falls even more heavily on the shoulders of the party seeking to prove waiver. A demand for arbitration puts a party on notice that arbitration may be forthcoming, and therefore, affords that party the opportunity to avoid compromising its position with respect to arbitrable and nonarbitrable claims. In contrast, where a party fails to demand arbitration and in the meantime engages in pretrial activity inconsistent with an intent to arbitrate, the party later opposing a motion to compel arbitration may more easily show that its position has been compromised, i.e., prejudiced.

**Counsel:** For PETITIONER: Mr. Geoffrey H. Bracken, GARDERE WYNNE SEWELL, L.L.P., Houston, TX; Mr. Stacy R. Obenhaus, GARDERE WYNNE SEWELL, L.L.P., Dallas, TX; Mr. Kent Hance, HANCE SCARBOROUGH WRIGHT WOODWARD & WEISBART, L.L.P., Austin, TX; Mr. Gary W. Javore, JOHNSON CRISTOPHER JAVORE & COCHRAN, INC., San Antonio, TX.

For RESPONDENT: Mr. Thomas M. Michel, GRIFFITH, JAY & MICHEL, L.L.P., Fort Worth, TX; Mr. Evan (Van) Lane Shaw, LAW OFFICES of VAN SHAW, Dallas, TX.

For AMICUS CURIAE: Mr. M. Scott Norman, Jr., TEXAS ASSOCIATION of BUILDERS, Austin, TX.

**Judges:** JUSTICE BRISTER delivered the opinion of the Court, in which JUSTICE HECHT, JUSTICE O'NEILL, JUSTICE WAINWRIGHT, and JUSTICE MEDINA joined, and in which CHIEF JUSTICE JEFFERSON, JUSTICE GREEN, JUSTICE JOHNSON, and JUSTICE WILLETT joined as to parts I-V. JUSTICE O'NEILL filed a concurring opinion. JUSTICE JOHNSON filed an opinion concurring in part and dissenting in part, in which CHIEF JUSTICE JEFFERSON and JUSTICE GREEN joined. JUSTICE WILLETT filed an opinion concurring in part and dissenting in part.

**Opinion by:** Scott Brister

# Opinion

 [*584] Since 1846, Texas law has provided that parties to a dispute may choose to arbitrate rather than litigate. [1] But that choice cannot be abused; a party cannot substantially invoke the litigation process and then switch to arbitration on the eve of trial. [2] There is a strong presumption against waiver of arbitration, [3] but it is not irrebuttable and was plainly rebutted here. The Plaintiffs vigorously opposed (indeed spurned) arbitration in their pleadings and in open court; then they requested hundreds of items of merits-based information and

---

[1] *See L. H. Lacy Co. v. City of Lubbock,* 559 S.W.2d 348, 351 (Tex. 1977).

[2] *See Republic Ins. Co. v. PAICO Receivables, LLC,* 383 F.3d 341, 348 (5th Cir. 2004); *Com-Tech Assoc. v. Computer Assoc. Int'l, Inc.,* 938 F.2d 1574, 1576-77 (2d Cir. 1991); *Price v. Drexel Burnham Lambert, Inc.,* 791 F.2d 1156, 1160 (5th Cir. 1986); *In re Vesta Ins. Group, Inc.,* 192 S.W.3d 759, 764 (Tex. 2006).

conducted months of discovery under the rules of **[**2]** court; finally only four days before the trial setting they changed their minds and decided they would prefer to arbitrate after all. Having gotten what they wanted from the litigation process, they could not switch to arbitration at the last minute like this.

The Plaintiffs argue -- and we agree -- that sending them back to the trial court not only deprives them of a substantial award but also wastes the time and money spent in arbitration. But they knew of this risk when they requested arbitration at the last minute because all of the Defendants objected. Accordingly, we vacate the arbitration award and remand the case to the trial court for **[**3]** a prompt trial.

## I. Background

In 1996, Robert and Jane Cull bought a house from Perry Homes for $ 233,730. They also bought a warranty from Home Owners Multiple Equity, Inc. and Warranty Underwriters Insurance Company. The warranty agreement included a broad arbitration clause providing that all disputes the Culls might have against Perry Homes or the warranty companies were subject to the Federal Arbitration Act, and would be submitted to the American Arbitration **[*585]** Association (AAA) or another arbitrator agreed upon by the parties. [4]

Over the next several years, the home suffered serious structural and drainage problems. According to the Culls, the Defendants spent more effort shifting blame than repairing the home. When the Culls sued in October 2000, the warranty **[**4]** companies (but not Perry Homes) immediately requested arbitration; the Culls vigorously opposed it, and no one ever pressed for a ruling. At the same time, the Culls' attorneys began seeking extensive discovery from all of the Defendants.

After most of the discovery was completed and the case was set for trial, the Culls changed their minds about litigating. Instead they asked the trial court to compel arbitration under precisely the same clause and conditions to which they had originally objected. The trial judge expressed reservations, saying:

> I really have a problem with people who have competent counsel who wait 14 months and after all this much effort in the courthouse has taken place, to come in and say that they have not waived that arbitration. That arbitration clause was there when the lawsuit was filed.

Nevertheless, the trial court ordered arbitration because the Defendants had not shown any prejudice from litigation conduct:

> [A]ll I have heard from [defense counsel] insofar as what is the prejudice suffered by people you represent is that they have participated in litigation activities that may or may not have been required by the arbitrator. So without anything further, I **[**5]** am going to grant the motion to abate the case for arbitration.

The order was signed December 6, 2001, four days before the case was set for trial. The Defendants filed

---

[3] *See, e.g., In re Vesta,* 192 S.W.3d at 763; *In re Bruce Terminix Co.,* 988 S.W.2d 702, 704-05 (Tex. 1998); *EZ Pawn Corp. v. Mancias,* 934 S.W.2d 87, 89-90 (Tex. 1996).

[4] The warranty provided:

> Any "unresolved dispute" (defined below) that you may have with [Perry Homes or the warranty companies] shall be submitted to binding arbitration governed by the procedures of the Federal Arbitration Act, 9 U.S.C. 1 et seq. . . . The dispute will be submitted to the American Arbitration Association, or such other independent arbitration service as is agreeable to the [warranty administrator] and you . . . .

petitions for mandamus in the court of appeals and this Court, both of which were denied without opinion within a few days. [5]

After a year in arbitration, on December 24, 2002, the arbitrator awarded the Culls $ 800,000, including restitution of the purchase price of their home ($ 242,759), mental anguish ($ 200,000), exemplary damages ($ 200,000), and attorney's fees ($ 110,000). The Defendants moved to vacate the award, again arguing (among other things) that the case should never have been sent to arbitration after so much activity in court. The trial court overruled the objection, confirmed the award, and added post-judgment interest duplicating that already in the award; the court of appeals affirmed after deleting the duplicative interest. [6] We granted the Defendants' petition to consider whether the arbitration award should be set aside because **[**6]** the Culls waived their right to arbitration.

## II. When Should Orders Compelling Arbitration Be Reviewed?

At the outset, the Culls assert it is too late to review the trial court's order referring this case to arbitration. First, they argue the pre-arbitration mandamus proceedings establish the law of the case **[*586]** and preclude the Defendants from raising the same arguments now. We recently rejected this argument, holding that *HN1* as mandamus is a discretionary writ, "its denial, without comment on the merits, cannot deprive another appellate court from considering the matter in a subsequent appeal." [7] Mandamus is only available when a final appeal would be inadequate; [8] if filing for mandamus precluded a final appeal, that requirement would be self-fulfilling. Because the earlier proceedings here were denied without comment on the merits, they do not foreclose our review.

Second, the Culls argue that an order compelling arbitration can only be reviewed *before* arbitration occurs. The Culls address none of **[**7]** the cases in which this Court and the United States Supreme Court have reviewed such orders *after* arbitration. [9] Nor do they address the general rule that *HN2* parties waive nothing by foregoing interlocutory review and awaiting a final judgment to appeal. [10]

But most important, the Culls do not address *section 16* of the Federal Arbitration Act, which expressly prohibits pre-arbitration appeals:

> *HN3* Except as otherwise provided in section 1292(b) of title 28 [providing for certified questions to federal circuit courts], an appeal may not be taken from an interlocutory order . . . directing **[**8]** arbitration to proceed under section 4 of this title [providing for orders compelling arbitration] . . . . [11]

---

[5] Perry Homes sought mandamus in the court of appeals on April 11, 2002, and was denied 7 days later. It refiled in this Court on April 26, and was denied 13 days later.

[6] *173 S.W.3d 565, 568.*

[7] *Chambers v. O'Quinn,* 242 S.W.3d 30, 32 (Tex. 2007).

[8] *In re Prudential Ins. Co. of Am.,* 148 S.W.3d 124, 135-36 (Tex. 2004); *Walker v. Packer,* 827 S.W.2d 833, 840 (Tex. 1992).

[9] *See Green Tree Fin. Corp.-Ala. v. Randolph,* 531 U.S. 79, 89, 121 S. Ct. 513, 148 L. Ed. 2d 373 (2000); *Chambers,* 242 S.W.3d at 31; *see also Gulf Oil Corp. v. Guidry,* 160 Tex. 139, 327 S.W.2d 406, 408 (Tex. 1959) (invalidating portion of award regarding nonarbitrable issues); *Fortune v. Killebrew,* 86 Tex. 172, 23 S.W. 976, 978 (Tex. 1893) (same).

[10] *Pope v. Stephenson,* 787 S.W.2d 953, 954 (Tex. 1990) ("The decision not to pursue the extraordinary remedy of mandamus does not prejudice or waive a party's right to complain on appeal."); *accord, City of San Benito v. Rio Grande Valley Gas Co.,* 109 S.W.3d 750, 756 (Tex. 2003); *Walker v. Packer,* 827 S.W.2d 833, 842 n.9 (Tex. 1992).

[11] *See* 9 U.S.C. § 16(b)(2); *see also* TEX. CIV. PRAC. & REM. CODE § 171.098 (providing for interlocutory appeal only of orders denying motion to compel arbitration).

This ban on interlocutory appeals of orders compelling arbitration was added by Congress in 1988 to prevent arbitration from bogging down in preliminary appeals. [12] We have held that routine mandamus review of such orders in state court would frustrate this federal law. [13]

 [*587]  The Culls assert that post-arbitration review is unavailable because an arbitration award can be vacated only for statutory grounds like corruption, fraud, or evident partiality. [14] But *HN4* reviewing the trial court's initial referral to arbitration is not the same as reviewing the arbitrator's final award; as the United States Supreme Court has held, courts conduct ordinary review of the former and deferential review only of the latter. [15]

We agree that post-arbitration review of referral may create (as the Culls allege) a "huge waste of the parties' resources." But if review is available before arbitration, parties may also waste resources appealing every referral when a quick arbitration might settle the matter. Frequent pre-arbitration review would inevitably frustrate Congress's intent "to move the parties to an arbitrable dispute out of court and into arbitration as quickly and easily as possible." [16] We recognize the potential for waste, but that is a risk a party must take if it moves for arbitration after substantially invoking the litigation process.

### III. Do Courts or Arbitrators Decide Waiver?

The Culls also assert that waiver of arbitration by litigation conduct is an issue to be decided by arbitrators rather than courts. To the contrary, this Court and the federal courts have  [**11]  held it is a question of law for the court. [17] Rather than referring such claims to arbitrators, we have decided them ourselves at least eight times, [18] as does every federal circuit court. [19]

---

[12]  *See* David D. Siegel, *Appeals from Arbitrability Determinations,* Practice Commentary to 9 U.S.C. § 16 ("The mission of § 16 is to assure that if the district court does determine that arbitration is called for, the court system's interference with the arbitral process will terminate then and there, leaving the arbitration free to go forward. To accomplish this, § 16 provides in general that there may be no appeal from the pro-arbitration determination until after the arbitration has gone forward to a final award."); *see also* CHARLES ALAN WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE § 3914.17 (2d ed. 1992).

[13]  *In re Palacios,* 221 S.W.3d 564, 565 (Tex. 2006). [**9] Courts may review an order compelling arbitration if the order also dismisses the underlying litigation so it is final rather than interlocutory. *See Green Tree Fin. Corp.-Ala.,* 531 U.S. at 87 n.2; *Childers v. Advanced Found. Repair, L.P.,* 193 S.W.3d 897, 898 (Tex. 2006). As we noted in *Palacios,* the Fifth Circuit has indicated it may review a district court's decision to stay rather than dismiss if a petitioner shows "clearly and indisputably that the district court did not have the discretion to stay the proceedings pending arbitration." *Id.* (citing *Apache Bohai Corp., LDC v. Texaco China, B. V.,* 330 F.3d 307, 310-11 (5th Cir. 2003)).

[14]  *See* 9 U.S.C. § 10(a).

[15]  *First Options of Chi., Inc. v. Kaplan,* 514 U.S. 938, 947-48, 115 S. Ct. 1920, 131 L. Ed. 2d 985 (1995). The Court noted that a  [**10]  different rule would apply if the parties clearly and unmistakably indicated in the arbitration contract that the arbitrator should decide arbitrability, *id.,* but there is no such indication in this contract.

[16]  *Preston v. Ferrer,    U.S.    ,    ,* 128 S. Ct. 978, 169 L. Ed. 2d 917 (2008) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 22, 103 S. Ct. 927, 74 L. Ed. 2d 765 (1983)).

[17]  *In re Serv. Corp. Int'l,* 85 S.W.3d 171, 174 (Tex. 2002); *In re Bruce Terminix Co.,* 988 S.W.2d 702, 703-04 (Tex. 1998); *accord, In re Citigroup, Inc.,* 376 F.3d 23, 26 (1st Cir. 2004); *Thyssen, Inc. v. Calypso Shipping Corp., S.A.,* 310 F.3d 102, 104 (2d Cir. 2002); *Ivax Corp. v. B. Braun of Am., Inc.,* 286 F.3d 1309, 1316 n.18 (11th Cir. 2002); *Price v. Drexel Burnham Lambert, Inc.,* 791 F.2d 1156, 1159 (5th Cir. 1986).

[18]  *See In re Bank One, N.A.,* 216 S.W.3d 825, 827 (Tex. 2007) (finding no waiver under FAA); *In re D. Wilson Constr. Co.,* 196 S.W.3d 774, 783 (Tex. 2006) (same); *In re Vesta Ins. Group, Inc.,* 192 S.W.3d 759, 764 (Tex. 2006) (same); *In re Serv. Corp. Int'l,* 85 S.W.3d at 174 (same); *In re Bruce Terminix Co.,* 988 S.W.2d at 704-05 (same); *In re Oakwood Mobile Homes, Inc.,* 987 S.W.2d 571, 574 (Tex.

 [*588]  The Culls argue this was all changed in 2002 by *Howsam v. Dean Witter Reynolds,* in which the United States Supreme Court said the "presumption is that the arbitrator should decide 'allegation[s] of waiver, delay, or a like defense to arbitrability.'" [20] For several reasons, we disagree that this single sentence changed the federal arbitration landscape.

First, "waiver" and "delay" are broad terms used in many different contexts. *Howsam* involved the National Association of Securities Dealers' six-year limitations period for arbitration claims, not waiver by litigation conduct; indeed, it does not appear the United States Supreme Court has ever addressed the latter kind of waiver. *HN5* Although the federal courts do not defer to arbitrators when waiver is a question of litigation conduct, they consistently do so when waiver concerns limitations periods or waiver of particular claims or defenses. [21] As *Howsam* involved the latter rather than the former, [22] its reference to waiver must be read in that context.

Second, the *Howsam* court specifically stated that "parties to an arbitration contract would normally expect a forum-based decisionmaker to decide forum-specific procedural gateway matters." [23] Thus, the NASD's six-year limitations rule in that case was a gateway matter for the NASD  [**15] arbitrator because "the NASD arbitrators, comparatively more expert about the meaning of their own rule, are comparatively better able to interpret and to apply it." [24] By contrast, when waiver turns on conduct in court, the court is obviously in a better position to decide whether it amounts to waiver. [25] "Contracting parties would expect the court to decide whether one party's conduct before the court waived the right to arbitrate." [26]

---

1999) (same); *EZ Pawn Corp. v. Mancias,* 934 S.W.2d 87, 89-90 (Tex. 1996) (same); *Prudential Sec. Inc. v. Marshall,* 909 S.W.2d 896, 899 (Tex. 1995).

[19]  *See, e.g., Creative Solutions Group, Inc. v. Pentzer Corp.,* 252 F.3d 28, 32-34 (1st Cir. 2001);  [**12] *Doctor's Assocs., Inc. v. Distajo,* 66 F.3d 438, 456 (2d Cir. 1995); *Wood v. Prudential Ins. Co. of Am.,* 207 F.3d 674, 680 (3d Cir. 2000); *Am. Recovery Corp. v. Computerized Thermal Imaging, Inc.,* 96 F.3d 88, 96 (4th Cir. 1996); *Subway Equip. Leasing Corp. v. Forte,* 169 F.3d 324, 329 (5th Cir. 1999); *Germany v. River Terminal Ry. Co.,* 477 F.2d 546, 547 (6th Cir. 1973); *Ernst & Young LLP v. Baker O'Neal Holdings, Inc.,* 304 F.3d 753, 758 (7th Cir. 2002); *Ritzel Commc'ns v. Mid-American Cellular,* 989 F.2d 966, 969-71 (8th Cir. 1993); *Martin Marietta Aluminum, Inc. v. Gen. Elec. Co.,* 586 F.2d 143, 146 (9th Cir. 1978); *Metz v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 39 F.3d 1482, 1489-90 (10th Cir. 1994); *Ivax Corp.,* 286 F.3d at 1316; *Nat'l Found. for Cancer Research v. A.G. Edwards & Sons, Inc.,* 261 U.S. App. D.C. 284, 821 F.2d 772, 777-78 (D.C. Cir. 1987).

[20]  537 U.S. 79, 84, 123 S. Ct. 588, 154 L. Ed. 2d 491 (2002)  [**13] (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 24-25, 103 S. Ct. 927, 74 L. Ed. 2d 765 (1983)).

[21]  *See, e.g., Green Tree Fin. Corp. v. Bazzle,* 539 U.S. 444, 447, 123 S. Ct. 2402, 156 L. Ed. 2d 414 (2003) (holding whether arbitration could proceed by class action was question for arbitrator); *John Wiley & Sons, Inc. v. Livingston,* 376 U.S. 543, 557, 84 S. Ct. 909, 11 L. Ed. 2d 898 (1964) (holding question whether steps of grievance procedure prerequisite to arbitration had been completed was for arbitrator); *Sleeper Farms v. Agway, Inc.,* 506 F.3d 98, 104 (1st Cir. 2007) (noting question whether breach of contract  [**14] voided arbitration clause would normally be for arbitrator); *United Steelworkers of Am. v. Saint Gobain Ceramics & Plastics, Inc.,* 505 F.3d 417, 422 (6th Cir. 2007) (holding question of timely demand for arbitration was for arbitrator); *Ansari v. Qwest Communs. Corp.,* 414 F.3d 1214, 1220-21 (10th Cir. 2005) (holding question whether plaintiffs waived forum selection clause by filing suit elsewhere was for arbitrator); *Pro Tech Indus., Inc. v. URS Corp.,* 377 F.3d 868, 871-72 (8th Cir. 2004) (holding questions of timely demand and waiver by failing to initiate arbitration were for arbitrator); *Glass v. Kidder Peabody & Co.,* 114 F.3d 446, 457 (4th Cir. 1997) (holding question of timely demand for arbitration was for arbitrator); *Great W. Mortgage Corp. v. Peacock,* 110 F.3d 222, 231-32 (3d Cir. 1997) (holding question of waiver of substantive state law rights was for arbitrator).

[22]  *See Howsam,* 537 U.S. at 81-82.

[23]  *Id.* at 86.

[24]  *Id.* at 85.

[25]  *Tristar Fin. Ins. Agency, Inc. v. Equicredit Corp. of Am.,* 97 F. App'x 462, 464 (5th Cir. 2004).

[26]  *Id.*

 **[*589]** Third, as the *Howsam* Court itself stated, parties generally intend arbitrators to decide matters that "grow out of the dispute and bear on its final disposition," while they intend courts to decide gateway matters regarding "whether the parties have submitted a particular dispute to arbitration." [27] Waiver of a substantive claim or delay beyond a limitations deadline could affect final disposition, but waiver by litigation conduct affects only the gateway matter of where the case is tried. [28]

Finally, *HN6* arbitrators generally must decide defenses that apply to the whole contract, while courts decide defenses relating solely to the arbitration clause. [29] Thus, for example, arbitrators must decide if an entire contract was fraudulently induced, while courts must decide if an arbitration clause was. [30] As waiver by litigation conduct goes solely to the arbitration clause rather than the whole contract, consistency suggests it is an issue for the courts.

Every federal circuit court that has addressed this issue since *Howsam* has continued to hold that substantial invocation of the litigation process is a question for the court rather than the arbitrator -- including the First, [31] Third, [32] Fifth, [33] and Eighth Circuits. [34] Legal commentators appear to agree. [35] So do we.

## IV. When Is the Litigation Process Substantially Invoked?

We have said on many occasions that *HN7* a party waives an arbitration clause by substantially **[*590]** invoking the judicial process to the other party's detriment or prejudice. [36] Due to the strong presumption against waiver

---

[27] *Howsam,* 537 U.S. at 83-84 (internal quotations omitted); *see also Green Tree Fin. Corp. v. Bazzle,* 539 U.S. 444, 451-52, 123 S. Ct. 2402, 156 L. Ed. 2d 414 (2003).

[28] *See* **[**16]** *Marie v. Allied Home Mortgage Corp.,* 402 F.3d 1, 13 (1st Cir. 2005).

[29] *Buckeye Check Cashing, Inc. v. Cardegna,* 546 U.S. 440, 449, 126 S. Ct. 1204, 163 L. Ed. 2d 1038 (2006) ("We reaffirm today that . . . a challenge to the validity of the contract as a whole, and not specifically to the arbitration clause, must go to the arbitrator.").

[30] *In re Merrill Lynch Trust Co. FSB,* 235 S.W.3d 185, 190 (Tex. 2007) (holding claim that contract was illusory went to contract as a whole and thus was for arbitrators); *In re FirstMerit Bank, N.A.,* 52 S.W.3d 749, 756 (Tex. 2001) ("The de los Santoses assert the defenses of unconscionability, duress, fraudulent inducement, and revocation. We again note that these defenses must specifically relate to the Arbitration Addendum itself, not **[**17]** the contract as a whole, if they are to defeat arbitration."); *see also In re Kaplan Higher Educ. Corp.,* 235 S.W.3d 206, 210 (Tex. 2007) (holding claim of "unclean hands" that went to contract as a whole rather than arbitration clause was question for arbitrators).

[31] *In re Tyco Int'l Ltd. Sec. Litig.,* 422 F.3d 41, 45-47 (1st Cir. 2005); *Marie,* 402 F.3d at 13-14; *In re Citigroup, Inc.,* 376 F.3d 23, 27-29 (1st Cir. 2004); *Rankin v. Allstate Ins. Co.,* 336 F.3d 8, 12-14 (1st Cir. 2003); *Restoration Pres. Masonry, Inc. v. Grove Eur. Ltd.,* 325 F.3d 54, 61-63 (1st Cir. 2003).

[32] *Ehleiter v. Grapetree Shores, Inc.,* 482 F.3d 207, 217-21, 48 V.I. 1034 (3d Cir. 2007).

[33] *Republic Ins. Co. v. PAICO Receivables, LLC,* 383 F.3d 341, 344-47 (5th Cir. 2004); *Tristar Fin. Ins. Agency, Inc. v. Equicredit Corp. of Am.,* 97 F. App'x 462, 464 (5th Cir. 2004).

[34] *Lewallen v. Green Tree Servicing, L.L. C.,* 487 F.3d 1085, 1090-94 (8th Cir. 2007); **[**18]** *Kelly v. Golden,* 352 F.3d 344, 349-50 (8th Cir. 2003). The Eighth Circuit did refer to *Howsam* in one case as requiring waiver to be referred to arbitrators, but that case involved an allegation of waiver by previous arbitration, not litigation. *See Nat'l Am. Ins. Co. v. Transamerica Occidental Life Ins. Co.,* 328 F.3d 462, 463-66 (8th Cir. 2003).

[35] *See* David LeFevre, Note, *Whose Finding is it Anyway?: The Division of Labor Between Courts and Arbitrators with Respect to Waiver,* 2006 J. DISP. RESOL. 305, 316-17 (2006); Stephen K. Huber, *The Arbitration Jurisprudence of the Fifth Circuit, Round II,* 37 TEX. TECH L. REV. 531, 542 (2005).

[36] *In re Bank One, N.A.,* 216 S.W.3d 825, 827 (Tex. 2007); *In re D. Wilson Constr. Co.,* 196 S.W.3d 774, 783 (Tex. 2006); *In re Vesta Ins. Group, Inc.,* 192 S.W.3d 759, 763 (Tex. 2006); *In re Serv. Corp. Int'l,* 85 S.W.3d 171, 174 (Tex. 2002); *In re Oakwood Mobile*

of arbitration, this hurdle is a high one. [37] To date, we have never found such a waiver, holding in a series of cases that parties did not waive arbitration by:

. filing suit; [38]

. moving to dismiss a claim for lack of standing; [39]

. moving to set aside a default judgment and requesting a new **[**19]** trial; [40]

. opposing a trial setting and seeking to move the litigation to federal court; [41]

. moving to strike an intervention and opposing discovery; [42]

. sending 18 interrogatories and 19 requests for production; [43]

. requesting an initial round of discovery, noticing (but not taking) a single deposition, and agreeing to a trial resetting; [44] or

. seeking initial discovery, taking four depositions, and moving for dismissal based on standing. [45]

These cases well illustrate the kind of conduct that falls short. But because none amounted to a waiver, they are less instructive about what conduct suffices. We have stated that "allowing a party to conduct full discovery, file motions going to the merits, and seek arbitration only on the eve of trial" would be sufficient. [46] But what if (as in this case) only two out of these three are met? And how much is "full discovery"?

We begin by looking to the standards imposed by the federal courts. *HN8* They decide questions of waiver by applying a totality-of-the-circumstances test on a case-by-case basis. [47] In doing so, they **[*591]** consider a wide variety of factors including:

---

*Homes, Inc.,* 987 S.W.2d 571, 574 (Tex. 1999); *In re Bruce Terminix Co.,* 988 S.W.2d 702, 704 (Tex. 1998); *EZ Pawn Corp. v. Mancias,* 934 S.W.2d 87, 89 (Tex. 1996); *Prudential Sec. Inc. v. Marshall,* 909 S.W.2d 896, 898-99 (Tex. 1995).

[37] *In re Bank One, N.A.,* 216 S.W.3d at 827; *In re D. Wilson Constr. Co.,* 196 S.W.3d at 783; *In re Vesta Ins. Group, Inc.,* 192 S.W.3d at 763; *In re Serv. Corp. Int'l,* 85 S.W.3d at 174; *In re Bruce Terminix Co.,* 988 S.W.2d at 704; *EZ Pawn Corp.,* 934 S.W.2d at 89.

[38] *In re D. Wilson Constr. Co.,* 196 S.W.3d at 783.

[39] *In re Vesta Ins. Group, Inc.,* 192 S.W.3d at 764.

[40] *In re Bank One, N.A.,* 216 S.W.3d at 827.

[41] *In re Serv. Corp. Int'l,* 85 S.W.3d at 174-75.

[42] *Prudential Sec. Inc. v. Marshall,* 909 S.W.2d 896, 898-99 (Tex. 1995).

[43] *In re Bruce Terminix Co.,* 988 S.W.2d at 704.

[44] *EZ Pawn Corp. v. Mancias,* 934 S.W.2d 87, 90 (Tex. 1996).

[45] *In re Vesta Ins. Group, Inc.,* 192 S.W.3d at 763 **[**20]** (holding requests for disclosure, four depositions, and request for production did not waive arbitration absent proof regarding extent of requests and whether they addressed merits or arbitrability).

[46] *Id.* at 764.

[47] *In re Tyco Int'l Ltd. Sec. Litig.,* 422 F.3d 41, 46 (1st Cir. 2005) ("[E]ach case is to be judged on its particular facts."); *Republic Ins. Co. v. PAICO Receivables, LLC,* 383 F.3d 341, 346 (5th Cir. 2004) ("Ultimately, however, the question of what constitutes a waiver of the right of arbitration depends on the facts of each case."); *accord, Ivax Corp. v. B. Braun of Am., Inc.,* 286 F.3d 1309, 1315 (11th Cir. 2002); *Grumhaus v. Comerica Secs., Inc.,* 223 F.3d 648, 650 (7th Cir. 2000); *Nat'l Found. for Cancer Research v. A. G. Edwards & Sons, Inc.,* 261 U.S. App. D.C. 284, 821 F.2d 772, 774 (D.C. Cir. 1987); *Tenneco Resins, Inc. v. Davy Int'l, AG,* 770 F.2d 416, 420 (5th Cir. 1985).

. whether the movant was plaintiff (who chose to file in court) or defendant (who merely responded); [48]

. how long the movant delayed before seeking arbitration; [49]

. whether the movant knew of the arbitration clause all along; [50]

. how much pretrial activity related to the merits rather than arbitrability or jurisdiction; **[\*\*21]** [51]

. how much time and expense has been incurred in litigation; [52]

. whether the movant sought or opposed arbitration earlier in the case; [53]

. whether the movant filed affirmative claims or dispositive motions; [54]

. what discovery would be unavailable in arbitration; [55]

. whether activity in court would be duplicated in arbitration; [56] and

. when the case was to be tried. [57]

Of course, all these factors are rarely presented in a single case. Federal courts have found waiver based on a few, or even a single one. [58]

*HN9* We agree waiver must be decided on a case-by-case basis, and that courts should look to the totality of the circumstances. Like the federal courts, this Court has considered factors such as:

. when the movant knew of the arbitration clause; [59]

---

[48]  *Grumhaus,* 223 F.3d at 650; **[\*\*22]** *see also Cabinetree of Wis., Inc. v. Kraftmaid Cabinetry, Inc.,* 50 F.3d 388, 391 (7th Cir. 1995).

[49]  *PAICO,* 383 F.3d at 346; *In re Citigroup, Inc.,* 376 F.3d 23, 26 (1st Cir. 2004); *Metz v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 39 F.3d 1482, 1489 (10th Cir. 1994); *Hoxworth v. Blinder, Robinson & Co.,* 980 F.2d 912, 926 (3d Cir. 1992).

[50]  *Brown v. Dillard's, Inc.,* 430 F.3d 1004, 1012 (9th Cir. 2005); *Patten Grading & Paving, Inc. v. Skanska USA Bldg., Inc.,* 380 F.3d 200, 206 (4th Cir. 2004).

[51]  *PAICO,* 383 F.3d at 346; *Kelly v. Golden,* 352 F.3d 344, 349 (8th Cir. 2003); *Hoxworth,* 980 F.2d at 926; *Gilmore v. Shearson/American Express Inc.,* 811 F.2d 108, 112 (2d Cir. 1987); *Sedco, Inc. v. Petroleos Mexicanos Mexican Nat'l Oil Co.,* 767 F.2d 1140, 1150-51 (5th Cir. 1985).

[52]  *PAICO,* 383 F.3d at 346; *Patten Grading,* 380 F.3d at 205; *In re Citigroup,* 376 F.3d at 26; *Metz,* 39 F.3d at 1489; *Hoxworth,* 980 F.2d at 927.

[53]  *Hoxworth,* 980 F.2d at 927; *Com-Tech Assoc. v. Computer Assoc. Int'l, Inc.,* 938 F.2d 1574, 1577 (2d Cir. 1991); *E.C. Ernst, Inc. v. Manhattan Constr. Co.,* 551 F.2d 1026, 1040-41 (5th Cir. 1977); *Blake Constr. Co. v. United States for Use and Benefit of Lichter,* 252 F.2d 658, 662 (5th Cir. 1958).

[54]  *In re Citigroup,* 376 F.3d at 26; **[\*\*23]** *Metz,* 39 F.3d at 1489.

[55]  *In re Citigroup,* 376 F.3d at 26; *Kelly,* 352 F.3d at 349; *Metz,* 39 F.3d at 1489.

[56]  *Kelly,* 352 F.3d at 349; *Metz,* 39 F.3d at 1489.

[57]  *Leadertex, Inc. v. Morganton Dyeing & Finishing Corp.,* 67 F.3d 20, 25 (2d Cir. 1995); *Peterson v. Shearson/American Express, Inc.,* 849 F.2d 464, 468 (10th Cir. 1988) (finding waiver as movant waited until five weeks before trial date to move to compel).

[58]  *See, e.g., Restoration Preserv. Masonry, Inc. v. Grove Eur. Ltd.,* 325 F.3d 54, 62 (1st Cir. 2003) (finding three-year delay alone sufficient to establish waiver); *Cabinetree of Wis., Inc. v. Kraftmaid Cabinetry, Inc.,* 50 F.3d 388, 391 (7th Cir. 1995) (finding removal to federal court alone sufficient to establish waiver).

[59]  *See EZ Pawn Corp. v. Mancias,* 934 S.W.2d 87, 88-89 (Tex. 1996) (finding no waiver as defendant did not discover existence of arbitration agreement for almost a year).

[*592] . how much discovery has been conducted; [60]

. who initiated it; [61]

. whether it related to the merits rather than arbitrability or standing; [62]

. how much of it would be useful in arbitration; [63] and

. whether the movant sought judgment [**24] on the merits. [64]

Thus, we disagree with the court of appeals that waiver is ruled out in this case solely because the Culls "did not ask the court to make any judicial decisions on the merits of their case." [65] While this is surely a factor, [66] it is not the only one. Waiver involves substantial invocation of the judicial *process,* not just judgment on the merits.

We also disagree with the Defendants that different standards should apply to plaintiffs and defendants. *HN10* As parties may begin arbitration without a court order, it is certainly relevant that a plaintiff chose to file suit instead. But Texas procedure also contemplates that parties may file suit in order to compel arbitration. [67] Thus, while the movant's status is a factor to consider, it does not alone justify [**25] a finding of waiver or change the basic nature of the totality-of-the-circumstances test. [68]

We recognize, as we have noted before, "the difficulty of uniformly applying a test based on nothing more than the totality of the circumstances." [69] But there appears to be no better test for "substantial invocation." [70] As the United States Supreme Court has said about minimum contacts, tests based on "reasonableness" are never susceptible to mechanical application -- "few answers will be written in black and white[;] [t]he greys are dominant [*593] and even among them the shades are innumerable." [71] How much litigation conduct will be

---

[60]   *In re Vesta Ins. Group, Inc.,* 192 S.W.3d 759, 763 (Tex. 2006).

[61]   *Id.*

[62]   *Id.*

[63]   *Id.; In re Bruce Terminix Co.,* 988 S.W.2d 702, 704 (Tex. 1998).

[64]   *In re Bruce Terminix Co.,* 988 S.W.2d at 704.

[65]   173 S.W.3d at 570.

[66]   *See In re Bruce Terminix Co.,* 988 S.W.2d at 704.

[67]   *See, e.g.,* TEX. CIV. PRAC. & REM. CODE § 171.021(a) ("A court shall order the parties to arbitrate on application of a party showing: (1) an agreement to arbitrate; and (2) the opposing party's refusal to arbitrate.").

[68]   *In re D. Wilson Constr. Co.,* 196 S.W.3d 774, 783 (Tex. 2006); *accord, United Computer Sys., Inc. v. AT&T Corp.,* 298 F.3d 756, 764 (9th Cir. 2002).

[69]   *See R.R. St. & Co. v. Pilgrim Enters., Inc.,* 166 S.W.3d 232, 242-43 (Tex. 2005) [**26] (quotation marks omitted) (applying totality-of-the-circumstances test in determining whether party "otherwise arranged" to dispose of hazardous waste).

[70]   *See Burton-Dixie Corp. v. Timothy McCarthy Constr. Co.,* 436 F.2d 405, 407-08 (5th Cir. 1971) ("There is no set rule, however, as to what constitutes a waiver or abandonment of the arbitration agreement. The question depends upon the facts of each case and usually must be determined by the trier of facts."); Joel E. Smith, Annotation, *Defendant's Participation in Action as Waiver of Right to Arbitration of Dispute Involved Therein,* 98 A.L.R. 3d 767, 771 (1980) ("In those cases involving the issue of whether the defendant's participation in an action constitutes a waiver of the right to arbitrate the dispute involved therein, no general rules are readily apparent for determining waiver other than the general adherence by the courts to the principle that waiver is to be determined from the particular facts and circumstances of each case . . . .").

[71]   *Kulko v. Superior Court of Cal.,* 436 U.S. 84, 92, 98 S. Ct. 1690, 56 L. Ed. 2d 132 (1978) (quoting *Estin v. Estin,* 334 U.S. 541, 545, 68 S. Ct. 1213, 92 L. Ed. 1561 (1948)).

"substantial" depends very much on the context; three or four depositions may be all the discovery needed in one case, [72] but purely preliminary in another. [73]

Moreover, this test is quite similar to one we have long recognized and recently applied to arbitration -- estoppel. Estoppel is a defensive theory barring parties from asserting a claim or defense when their representations have induced "action or forbearance of a definite and substantial character" and "injustice can be avoided only by enforcement." [74] In arbitration cases, we have held a nonparty who enjoys substantial direct benefits from a contract may be estopped from denying an arbitration clause in the same contract. [75] By the same token, *HN11* a party who enjoys substantial direct benefits by gaining an advantage in the pretrial litigation process should be barred from turning around and seeking arbitration with the spoils.

The answer to most questions regarding arbitration "flow inexorably from the fact that arbitration is simply a matter of contract between the parties." [76] Like any other contract right, arbitration can be waived if the parties agree instead to resolve a dispute in court. Such waiver can be implied from a party's conduct, although that conduct must be unequivocal. [77] And in close cases, the "strong presumption against waiver" should govern. [78]

## V. Is a Showing of Prejudice Required?

Although convinced that **[\*\*29]** the Culls had substantially invoked the litigation process, the trial court compelled arbitration because the Defendants did not prove an arbitrator would not have allowed the same discovery. *HN12* "Even substantially invoking the judicial process does not waive a party's arbitration rights unless the opposing party proves that it suffered prejudice as a result." [79] On at least eight occasions, we have said prejudice is a necessary requirement of waiver by litigation **[\*594]** conduct. [80]

The Defendants ask us to reconsider this requirement. They point out that Texas law does not require a showing of prejudice for waiver, but only an intentional relinquishment of a known right. [81] Waiver "is essentially unilateral **[\*\*30]** in its character" and "no act of the party in whose favor it is made is necessary to complete

---

[72] *See, e.g.,* TEX. R. CIV. P. 190.2(c)(2) (limiting parties in Level 1 cases to six **[\*\*27]** hours of depositions).

[73] *See, e.g., In re Vesta Ins. Group, Inc.,* 192 S.W.3d 759, 763 (Tex. 2006) (holding four depositions did not waive arbitration as record did not show whether they were limited or extensive or whether they addressed merits or merely arbitrability).

[74] *Trammel Crow Co. No. 60 v. Harkinson,* 944 S.W.2d 631, 636 (Tex. 1997); *see English v. Fischer,* 660 S.W.2d 521, 524 (Tex. 1983); *"Moore" Burger, Inc. v. Phillips Petroleum Co.,* 492 S.W.2d 934, 936-37 (Tex. 1972); **[\*\*28]** *Wheeler v. White,* 398 S.W.2d 93, 96 (Tex. 1965); RESTATEMENT (SECOND) OF CONTRACTS § 90 (1979).

[75] *In re Weekley Homes, L.P.,* 180 S.W.3d 127, 133-35 (Tex. 2005); *accord, Meyer v. WMCO-GP, LLC,* 211 S.W.3d 302, 305 (Tex. 2006).

[76] *First Options of Chi., Inc. v. Kaplan,* 514 U.S. 938, 943, 115 S. Ct. 1920, 131 L. Ed. 2d 985 (1995).

[77] *See Van Indep. Sch. Dist. v. McCarty,* 165 S.W.3d 351, 353 (Tex. 2005); *First Valley Bank of Los Fresnos v. Martin,* 144 S.W.3d 466, 471 (Tex. 2004); *Jernigan v. Langley,* 111 S.W.3d 153, 156 (Tex. 2003); *Equitable Life Assurance Soc'y of U.S. v. Ellis,* 105 Tex. 526, 152 S.W. 625, 628 (Tex. 1913).

[78] *In re D. Wilson Constr. Co.,* 196 S.W.3d 774, 783 (Tex. 2006); *EZ Pawn Corp. v. Mancias,* 934 S.W.2d 87, 89 (Tex. 1996).

[79] *In re Bruce Terminix Co.,* 988 S.W.2d 702, 704 (Tex. 1998).

[80] *In re Bank One, N.A.,* 216 S.W.3d 825, 827 (Tex. 2007); *In re D. Wilson Constr. Co.,* 196 S.W.3d at 783; *In re Vesta Ins. Group, Inc.,* 192 S.W.3d 759, 763 (Tex. 2006); *In re Serv. Corp. Int'l,* 85 S.W.3d 171, 174 (Tex. 2002); *In re Bruce Terminix Co.,* 988 S.W.2d at 704; *In re Oakwood Mobile Homes, Inc.,* 987 S.W.2d 571, 574 (Tex. 1999); *EZ Pawn Corp.,* 934 S.W.2d at 89; *Prudential Sec. Inc. v. Marshall,* 909 S.W.2d 896, 898-99 (Tex. 1995).

[81] *See In re Gen. Elec. Capital Corp.,* 203 S.W.3d 314, 316 (Tex. 2006); *Sun Exploration & Prod. Co. v. Benton,* 728 S.W.2d 35, 37 (Tex. 1987); *Bocanegra v. Aetna Life Ins. Co.,* 605 S.W.2d 848, 851 (Tex. 1980); *Mass. Bonding & Ins. Co. v. Orkin Exterminating Co.,*

it." [82] Thus, they argue we cannot impose a waiver rule for arbitration contracts that does not apply to all others. [83]

We decline the Defendants' invitation based on both federal and state law. The Defendants say the federal courts are split on the issue, but the **[\*\*31]** split is not very wide. Of the twelve regional circuit courts, ten require a showing of prejudice, [84] and the other two treat it as a factor to consider. [85] We have noted before the importance of keeping federal and state arbitration law consistent. [86]

**[\*595]** *HN13* Under Texas law, waiver may not include a prejudice requirement, but estoppel does. In cases of waiver by litigation conduct, the precise question is not so much when waiver occurs as when a party can no longer take it back. As noted above, Texas estoppel law does not allow a party to withdraw a representation once the other party takes "action or forbearance of a definite and substantial character." [87] Using precisely the same terms, the Restatement does not allow a party to withdraw an option contract when the offeree has taken substantial action based upon it. [88] In these contexts, prejudice is an element of the normal contract rules. Thus, we agree with the courts below that waiver of arbitration requires a showing of prejudice.

## VI. Was Arbitration Waived Here?

416 S.W.2d 396, 401 (Tex. 1967); *Texas & P. Ry. Co. v. Wood,* 145 Tex. 534, 199 S.W.2d 652, 656 (Tex. 1947); *Kennedy v. Bender,* 104 Tex. 149, 135 S.W. 524, 526 (Tex. 1911); *see also Cabinetree of Wis., Inc. v. Kraftmaid Cabinetry, Inc.,* 50 F.3d 388, 390 (7th Cir. 1995) (citing authorities showing that contract law generally holds waiver effective without proof of detrimental reliance).

[82] *Mass. Bonding & Ins. Co. v. Orkin Exterminating Co.,* 416 S.W.2d 396, 401 (Tex. 1967).

[83] *See Doctor's Assocs., Inc. v. Casarotto,* 517 U.S. 681, 686-87, 116 S. Ct. 1652, 134 L. Ed. 2d 902 (1996); *Allied-Bruce Terminix Cos. v. Dobson,* 513 U.S. 265, 281, 115 S. Ct. 834, 130 L. Ed. 2d 753 (1995).

[84] *In re Citigroup, Inc.,* 376 F.3d 23, 26 (1st Cir. 2004) ("We have emphasized that, to succeed on a claim of waiver, plaintiffs must show prejudice."); *Thyssen, Inc. v. Calypso Shipping Corp., S.A.,* 310 F.3d 102, 105 (2d Cir. 2002); *Hoxworth v. Blinder, Robinson & Co.,* 980 F.2d 912, 925 (3d Cir. 1992) ("[P]rejudice is the touchstone for determining whether the right to arbitrate has been waived . . . ."); *Patten Grading & Paving, Inc. v. Skanska USA Bldg., Inc.,* 380 F.3d 200, 206 (4th Cir. 2004) ("[T]he dispositive question is whether the party objecting to arbitration has suffered actual prejudice.") (internal quotations and italics omitted); *Republic Ins. Co. v. PAICO Receivables, LLC,* 383 F.3d 341, 346 (5th Cir. 2004) ("In addition to the invocation of the judicial process, there must be prejudice to the party opposing arbitration before we will find that the right to arbitrate has been waived."); *O.J. Distrib., Inc. v. Hornell Brewing Co.,* 340 F.3d 345, 356 (6th Cir. 2003); **[\*\*32]** *Kelly v. Golden,* 352 F.3d 344, 349 (8th Cir. 2003) ("The actions must result in prejudice to the other party for waiver to have occurred."); *Brown v. Dillard's, Inc.,* 430 F.3d 1004, 1012 (9th Cir. 2005); *Metz v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 39 F.3d 1482, 1490 (10th Cir. 1994); *Ivax Corp. v. B. Braun of Am., Inc.,* 286 F.3d 1309, 1316 (11th Cir. 2002) ("[W]e look to see whether, by [invoking the litigation process], that party has in some way prejudiced the other party.") (internal quotations omitted).

[85] *St. Mary's Med. Ctr. of Evansville, Inc. v. Disco Aluminum Prods. Co.,* 969 F.2d 585, 590-91 (7th Cir. 1992); *Nat'l Found. for Cancer Research v. A. G. Edwards & Sons, Inc.,* 261 U.S. App. D.C. 284, 821 F.2d 772, 777 (D.C. Cir. 1987) (holding "a court may consider prejudice to the objecting party as a relevant factor among the circumstances that the court examines in deciding whether the moving party has taken action inconsistent with the agreement to arbitrate").

[86] *In re Weekley Homes, L.P.,* 180 S.W.3d 127, 130-31 (Tex. 2005); *In re Kellogg Brown & Root, Inc.,* 166 S.W.3d 732, 738-39 (Tex. 2005); *see also Howsam v. Dean Witter Reynolds,* Inc., 537 U.S. 79, 87, 123 S. Ct. 588, 154 L. Ed. 2d 491 (2002) (Thomas, J., concurring) (suggesting **[\*\*33]** Supreme Court sometimes looks to federal law and sometimes law chosen by parties); *Wash. Mut. Fin. Group, LLC v. Bailey,* 364 F.3d 260, 267 n.6 (5th Cir. 2004) (noting that whether state or federal law of arbitrability applies "is often an uncertain question").

[87] *Trammel Crow Co. No. 60 v. Harkinson,* 944 S.W.2d 631, 636 (Tex. 1997); *see English v. Fischer,* 660 S.W.2d 521, 524 (Tex. 1983); "Moore" *Burger, Inc. v. Phillips Petroleum Co.,* 492 S.W.2d 934, 936 (Tex. 1972); *Wheeler v. White,* 398 S.W.2d 93, 96 (Tex. 1965); RESTATEMENT (SECOND) OF CONTRACTS § 90 **[\*\*34]** (1979).

[88] RESTATEMENT (SECOND) OF CONTRACTS § 87(2) (1981) ("An offer which the offeror should reasonably expect to induce action or forbearance of a substantial character on the part of the offeree before acceptance and which does induce such action or forbearance is binding as an option contract to the extent necessary to avoid injustice.").

## A. Did the Culls Waive Arbitration?

It remains only to apply these rules to this case.

Unquestionably, the Culls substantially invoked the litigation process, as their conduct here far exceeds anything we have reviewed before. Before arbitration was ordered, the Culls did not deny taking ten depositions, and the court's file (of which the trial judge took judicial notice) included:

. their initial objection to arbitration covering 79 pages;

. the Defendants' responses to requests for disclosure;

. the Culls' five motions to compel, attached to which were 76 requests for production of documents regarding complaints, inspections, repairs, and settlements relating to eight other homes in the same subdivision;

. Perry Homes' two **[\*\*35]** motions for protective orders regarding six designees noticed for deposition by the Culls on nine issues (including purchase and preparation of the lot, design and construction of the foundation, sale of this home and others in the subdivision, and attempts to deal with the Culls' and other foundation complaints), with an attachment requesting 67 categories of documents (including all photos, videos, correspondence, insurance policies, plans, soil tests, permits, subcontractors, contracts for sale, and repairs relating to the house or the suit, all complaints about any house in the subdivision, and Perry Homes' articles of incorporation, by-laws, minutes, and financials); and

. the Culls' notices of depositions for three of the Defendants' experts with 24 categories of documents requested from each (including all documents relating to this case, all their articles, **[\*596]** publications, or speeches given in their fields of expertise, all courses or seminars they had attended, all persons they had studied under, and all reference books or treatises in their libraries).

There is simply no question on this record that the Culls conducted extensive discovery about every aspect of the merits. [89]

But under the totality-of-the-circumstances test, discovery is not the only measure of waiver. Here, when the warranty defendants initially moved to compel arbitration, the Culls filed a 79-page response opposing it, asserting that the AAA "is incompetent, is biased, and fails to provide fair and appropriate arbitration panels." They complained of the AAA's fees, and asserted that as a result the "purported arbitration clause is unconscionable and unenforceable, and this Court's enforcement of such would be nothing short of ridiculous and absurd." This, plus their prayer asking the trial court to deny the motion to compel arbitration "in its entirety," belies the court of appeals' conclusion that "the Culls merely opposed the use of the AAA" rather than arbitration itself. [90] In some federal courts, the Culls' objection alone could suffice to waive arbitration. [91]

The Culls also moved for arbitration very late in the trial process. It is true that Perry Homes moved to continue the trial setting when the Culls sought arbitration, requesting about ten weeks to finish deposing experts.

---

[89] Because **[\*\*36]** we limit our review to the record before the trial judge, we do not consider the Defendants' additional seven volumes of discovery exhibits filed after the arbitration award.

[90] 173 S.W.3d 565, 570; *see also* *Green Tree Fin. Corp.-Ala. v. Randolph,* 531 U.S. 79, 89, 121 S. Ct. 513, 148 L. Ed. 2d 373 (2000) (holding that unconscionable arbitration fee would render **[\*\*37]** clause unenforceable).

[91] *See* *In re Tyco Int'l Ltd. Sec. Litig.,* 422 F.3d 41, 46 (1st Cir. 2005) (holding defendant's objections to arbitration before criminal trial waived his right to arbitration); *Gilmore v. Shearson/American Exp. Inc.,* 811 F.2d 108, 112 (2d Cir. 1987) (holding party's withdrawal of its prior motion to compel arbitration constituted express waiver of that right).

Because the trial court ordered arbitration, no one knows whether the case would have gone to trial (including the unnamed court clerk cited by the dissent). But in view of the written discovery and depositions already completed, the record is nevertheless clear that most of the discovery in the case had already been completed before the Culls requested arbitration. **HN14** The rule that one cannot wait until "the eve of trial" to request arbitration is not limited to the evening before trial; it is a rule of proportion that is implicated here. [92]

Then 14 months after filing suit and shortly before the December 2001 trial setting, the Culls changed their minds and requested arbitration. They justified their change of heart on the basis that they wanted to avoid the delays of an appeal. But their change unquestionably delayed adjudication of the merits; instead of a trial beginning in a few days or weeks, the plenary arbitration hearing did not begin until late September of 2002 -- almost ten months after the Culls abandoned their trial setting. Moreover, to the extent arbitration reduces delay, it does so by severely limiting *both* pretrial discovery *and* post-trial review. Having enjoyed the benefits of extensive discovery for 14 **[*597]** months, the Culls could not decide only then that they were in a hurry.

It is also unquestionably true that this conduct prejudiced the Defendants. **HN15** "Prejudice" has many meanings, but in the context of waiver under the FAA it relates to inherent unfairness - that is, a party's attempt to have **[**39]** it both ways by switching between litigation and arbitration to its own advantage:

> [F]or purposes of a waiver of an arbitration agreement[,] prejudice refers to the inherent unfairness in terms of delay, expense, or damage to a party's legal position that occurs when the party's opponent forces it to litigate an issue and later seeks to arbitrate that same issue. [93]

Thus, "a party should not be allowed purposefully and unjustifiably to manipulate the exercise of its arbitral rights simply to gain an unfair tactical advantage over the opposing party." [94]

Here, the record before the trial court showed that the Culls objected to arbitration initially, and then insisted on it after the Defendants acquiesced in litigation. They got extensive discovery under one set of rules and then sought to arbitrate the case under another. They delayed disposition by switching to arbitration when trial was imminent and arbitration was not. They got the court to order discovery for them and then limited their opponents' rights to appellate review. Such manipulation of litigation for one party's advantage and another's detriment is precisely the kind of inherent unfairness that constitutes prejudice under federal and state law.

## B. A Response to the Dissents

Although we have repeatedly said arbitration agreements can be waived, today's dissents would effectively hold they cannot. That would favor arbitration too much; because most agreements can be waived by the parties'

---

[92] *See In re Vesta Ins. Group, Inc.,* 192 S.W.3d 759, 764 (Tex. 2006) **[**38]** (citing *Com-Tech Assocs. v. Computer Assocs. Int'l, Inc.,* 938 F.2d 1574, 1576-77 (2d Cir. 1991), in which arbitration was waived by request that did not come until 18 months after filing and 4 months before trial).

[93] *Republic Ins. Co. v. PAICO Receivables, LLC,* 383 F.3d 341, 346 (5th Cir. 2004) (punctuation omitted); *accord, In re Tyco,* 422 F.3d at 46 n.5 ("[A] party should not be allowed purposefully and unjustifiably to manipulate the exercise of its arbitral rights simply to gain an unfair tactical advantage over the opposing party."); *In re Citigroup, Inc.,* 376 F.3d 23, 28 (1st Cir. 2004); *Subway Equip. Leasing Corp. v. Forte,* 169 F.3d 324, 327 (5th Cir. 1999); *PPG Indus., Inc. v. Webster Auto Parts, Inc.,* 128 F.3d 103, 107 (2d Cir. 1997); *Doctor's Assocs. v. Distajo,* 107 F.3d 126, 134 (2d Cir. 1997) ("[P]rejudice as defined by our cases refers **[**40]** to the inherent unfairness-in terms of delay, expense, or damage to a party's legal position-that occurs when the party's opponent forces it to litigate an issue and later seeks to arbitrate that same issue.").

[94] *In re Tyco,* 422 F.3d at 46 n.5.

conduct, [95] *HN16* arbitration contracts should not **[\*\*41]** be *more* enforceable than other contracts. That is not what Congress intended when it enacted the FAA. [96] Indeed, one dissent cannot even bring itself to say the Culls substantially invoked the litigation process. If the litigation conduct here is not enough, it is hard to imagine what would be.

The dissents make several mistakes in their analyses. First, they misconstrue the standard of review. *HN17* Every **[\*598]** abuse-of-discretion review is not identical because "a trial judge's discretion may be applied to scores of situations and in many different ways." [97] Reviewing a declaratory judgment fee award (where trial judges have broad discretion) **[\*\*42]** [98] is not the same as reviewing admission of hearsay (where trial judges follow detailed rules), [99] even though an abuse-of-discretion standard applies to both. [100] Moreover, a totality-of-the-circumstances test presumes a multitude of potential factors and a balancing of evidence on either side; if appellate courts must affirm every time there is some factor that was not negated or some evidence on either side, then no ruling based on the totality-of-the-circumstances could ever be reversed. That standard of review would be the same as no review at all. By applying such a standard, both dissents would allow trial judges to send any case to arbitration no matter what has occurred in court.

*HN18* Under a proper abuse-of-discretion **[\*\*43]** review, waiver is a question of law for the court, [101] and we do not defer to the trial court on questions of law. [102] We do defer to a trial court's factual findings if they are supported by evidence, [103] but there was no factual dispute here regarding whether the Culls initially opposed arbitration, whether they conducted extensive merits discovery, or whether they sought arbitration late in the

---

[95] *See, e.g., Tenneco Inc. v. Enter. Prods. Co.,* 925 S.W.2d 640, 643 (Tex. 1996) (holding companies waived contractual right to approve assignments by treating assignee as full partner); *Ford v. State Farm Mut. Auto. Ins. Co.,* 550 S.W.2d 663, 666 (Tex. 1977) (holding insurer waived contractual right to consent to settlement by denying liability under policy).

[96] *See Prima Paint Corp. v. Flood & Conklin Mfg. Co.,* 388 U.S. 395, 404 n.12, 87 S. Ct. 1801, 18 L. Ed. 2d 1270 (1967) ("[T]he purpose of Congress in 1925 was to make arbitration agreements as enforceable as other contracts, but not more so.").

[97] W. Wendell Hall, *Standards of Review in Texas,* 38 ST. MARY'S L.J. 47, 63 (2006).

[98] TEX. CIV. PRAC. & REM. CODE § 37.009 ("In any proceeding under this chapter, the court *may* award costs and reasonable and necessary attorney's fees as are equitable and just." (emphasis added)).

[99] *See* TEX. R. EVID. 801-806.

[100] *See Nat'l Liab. and Fire Ins. Co. v. Allen,* 15 S.W.3d 525, 529 (Tex. 2000) (hearsay); *Bocquet v. Herring,* 972 S.W.2d 19, 21 (Tex. 1998) (declaratory fee award).

[101] *In re Serv. Corp. Int'l,* 85 S.W.3d 171, 174 (Tex. 2002); *In re Oakwood Mobile Homes, Inc.,* 987 S.W.2d 571, 574 (Tex. 1999); *In re Bruce Terminix Co.,* 988 S.W.2d 702, 703-04 (Tex. 1998).

[102] *Brainard v. State,* 12 S.W.3d 6, 30 (Tex. 1999) (holding that in abuse-of-discretion standard "we defer to the trial court's factual determinations if they are supported by the evidence and review its legal determinations de novo"); *Walker v. Packer,* 827 S.W.2d 833, 840 (Tex. 1992) ("A trial court has no 'discretion' in determining what the law is or applying the law to the facts. Thus, a clear failure by the trial court to analyze or apply the **[\*\*44]** law correctly will constitute an abuse of discretion . . . ."); *see* Hall, *supra* note 97, at 284 ("When the trial court's findings involve [mixed] questions of law and fact, the appellate court reviews the trial court's decision for an abuse of discretion. In applying the standard, the reviewing court defers to the trial court's factual determinations if supported by the evidence and reviews its legal determinations de novo."); *cf. Gulf Guar. Life Ins. Co. v. Conn. Gen. Life Ins. Co.,* 304 F.3d 476, 484 (5th Cir. 2002) ("This court reviews de novo a district court's dismissal of a claim that a party waived its right to arbitrate."); *accord, Ivax Corp. v. B. Braun of Am., Inc.,* 286 F.3d 1309, 1316 (11th Cir. 2002); *Subway Equip. Leasing Corp. v. Forte,* 169 F.3d 324, 326 (5th Cir. 1999).

[103] *Brainard,* 12 S.W.3d at 30; *Walker,* 827 S.W.2d at 840; *see* Hall, *supra* note 97, at 284; *cf. Gulf Guar.,* 304 F.3d at 484; *accord, Ivax Corp.,* 286 F.3d at 1316; *Subway Equip.,* 169 F.3d at 326.

litigation process. This leaves only the conclusion whether such conduct constitutes prejudice, a legal question we cannot simply abandon to the trial court. [104]

 [*599] Second, the dissents define prejudice in a way that makes it impossible to prove. While recognizing that "waiver" has a special definition in the arbitration context, the dissents overlook that "prejudice" does too. Instead of the inherent-unfairness standard used by the federal courts, [105] they impose what appears to be an irretrievable-loss standard. One dissent would go so far as to hold that no amount of discovery, no matter how extensive, can show prejudice if the fees incurred might be compensated in the final arbitration award, *even if erroneously.* [106] No one could ever show prejudice under this standard, because even if a contract allowed no reimbursement of discovery costs (as in this case), [107] it is always hypotetically possible that a rogue arbitrator might reimburse costs regardless. The same dissent would find no prejudice from extensive discovery without proof that an arbitrator would have prohibited it. That again is impossible; arbitrators have almost unbridled discretion regarding discovery, so no one can predict [**46] what they might do in advance. Presuming (as the dissents do) that broad discovery is generally available in arbitration simply ignores one of its most distinctive features. [108]

Third, both dissents quibble with the Defendants' proof of prejudice because it was insufficiently detailed. [109] This confuses proof of the *fact* of prejudice with proof of its *extent;* the Defendants had to show substantial invocation that prejudiced them, not precisely how much it all was. Referral to arbitration should be decided summarily with the evidence limited to disputed facts; [110] as the Culls did not dispute that the parties had conducted more than a dozen depositions and other extensive discovery [**48] on the merits, requiring proof of each one would have merely made the referral hearing longer and more [*600] expensive. The pre-arbitration

---

[104]    See *Reliance Nat'l Indem. Co. v. Advance'd Temps., Inc.,* 227 S.W.3d 46, 50 (Tex. 2007) ("What might otherwise be a question of fact becomes one of law when the fact is not in dispute or is conclusively established."); [**45] Hall, *supra* note 97, at 284 ("[A] trial court abuses its discretion [if the court] . . . fails to properly apply the law to the undisputed facts . . . .").

[105]    See *supra* Part VI.A.

[106]    __ S.W.3d at __("But even if the Court is right and the reimbursement clause does not allow for recovery of all Defendants' litigation attorney's fees, an arbitration award would not be subject to being vacated if an arbitrator interpreted it to allow recovery of all the fees.").

[107]    The parties contract limited reimbursement to costs incurred in "seeking dismissal" of litigation, not costs incurred in preparing it for trial:

> Inasmuch as this Agreement provides for mandatory arbitration of disputes, if any party commences litigation in violation of this Agreement, such party shall reimburse the other parties to the litigation for their costs and expenses including attorney's fees *incurred in seeking dismissal of such litigation.*

 (emphasis added).

[108]    See *Preston v. Ferrer,*    U.S.    ,    , 128 S. Ct. 978, 169 L. Ed. 2d 917 (2008) ("A prime objective of an agreement to arbitrate is to achieve streamlined proceedings and expeditious results."); *Cabinetree of Wis., Inc. v. Kraftmaid Cabinetry, Inc.,* 50 F.3d 388, 391 (7th Cir. 1995) [**47] (noting that "the discovery provisions of the Federal Rules of Civil Procedure are more generous than those of the American Arbitration Association"); *cf. Price v. Drexel Burnham Lambert, Inc.,* 791 F.2d 1156, 1160 (5th Cir. 1986) (finding prejudice due to discovery as "discovery --whether meaningful or otherwise--is not available in arbitration"); *Miller Brewing Co. v. Fort Worth Distrib. Co.,* 781 F.2d 494, 498 (5th Cir. 1986) ("A party to arbitration does not have a right to the pre-trial discovery procedures that are used in a case at law."); *Developments in the Law--Discovery,* 74 HARV. L. REV. 940, 943 (1961) (noting expense of discovery as inconsistent with desire to arbitrate).

[109]    The court of appeals affirmed on this basis. 173 S.W.3d at 570 ("Appellants did not provide any evidence of the work done, time spent, or costs incurred that would not have been done or incurred in anticipation of an arbitration hearing.").

[110]    TEX. CIV. PRAC. & REM. CODE § 171.021(b); see *Jack B. Anglin Co. v. Tipps,* 842 S.W.2d 266, 269 (Tex. 1992).

record proved that discovery was extensive; the evidence demanded by the dissents would have merely showed how much it cost.

Finally, the dissents' focus on discovery ignores all the other circumstances that the totality-of-the-circumstances test requires us to consider. *HN19* Because we must consider all the circumstances, the amount of discovery needed to show prejudice will vary depending on what the other circumstances are. As the Fifth Circuit has held, prejudice should be easier to show against a party that initially opposed arbitration than against one who sought it from the start:

> While the mere failure to assert the right to demand arbitration does not alone translate into a waiver of that right, such failure [**49] does bear on the question of prejudice, and may, along with other considerations, require a court to conclude that waiver has occurred. The failure to demand arbitration affects the burden placed upon the party opposing waiver. When a timely demand for arbitration was made, the burden of proving waiver falls even more heavily on the shoulders of the party seeking to prove waiver. A demand for arbitration puts a party on notice that arbitration may be forthcoming, and therefore, affords that party the opportunity to avoid compromising its position with respect to arbitrable and nonarbitrable claims. In contrast, where a party fails to demand arbitration . . . and in the meantime engages in pretrial activity inconsistent with an intent to arbitrate, the party later opposing a motion to compel arbitration may more easily show that its position has been compromised, i.e., prejudiced. [111]

It is these other circumstances that make this case different from *In re Vesta*. [112] The parties seeking arbitration in *Vesta* had not opposed arbitration from the outset and then [**50] invoked it after getting all the discovery they wanted. [113] Nor was the *Vesta* case close to trial, as was the case here. The parties in *Vesta* had taken four depositions (rather than 15); they had also exchanged standard requests for disclosure and one request for production, but only one of those documents was in the record so there was no evidence whether this limited discovery related to the merits (as the extensive discovery here clearly did). [114] And while the party opposing arbitration in *Vesta* allegedly incurred more than $ 200,000 in expenses, most of that was incurred in *getting* discovery rather than *providing* it; [115] a party who *requests* lots of discovery is not prejudiced by getting it and taking it to arbitration in the same way that a party who *produces* lots of discovery outside the stricter discovery limits in arbitration. [116]

Applying the proper standard of review and the proper definition of prejudice, we disagree with the dissents that the Defendants have failed to show prejudice here.

### [*601] C. Did the Warranty Companies Waive Arbitration?

Finally, the Culls argue the warranty companies cannot object to arbitration for two reasons.

First, the warranty companies originally requested arbitration (which the Culls opposed), so it could be argued that it is unfair to hold the Culls to their original position without holding the warranty companies to theirs. Of

---

[111] *Republic Ins. Co. v. PAICO Receivables, LLC,* 383 F.3d 341, 346 (5th Cir. 2004) (internal citations and punctuation omitted).

[112] *In re Vesta Ins. Group, Inc.,* 192 S.W.3d 759 (Tex. 2006).

[113] Two of the numerous defendants in *Vesta* initially objected to the remaining defendants' motion to compel arbitration, but withdrew that objection before the hearing on the motion.

[114] *Id.* at 763.

[115] *Id.*

[116] The defendants in *Vesta* had stipulated that all discovery obtained so far could be [**51] used in arbitration.

course, we cannot hold both parties to their original positions as those positions were contradictory. More important, while the parties' original demands are relevant factors, the test is the totality of the circumstances. Looking to all the circumstances, it is quite clear from the parties' extensive co-participation in months of discovery that everyone waived their right to arbitration -- whether they asserted that right early (as did the warranty companies) or late (as did the Culls).

Second, the Culls argue that the only objection to the trial court's order compelling arbitration was filed by Perry Homes, not the warranty companies. It **[\*\*52]** is true that only Perry Homes' attorneys signed the motion, but in that motion and at the hearing held on it they represented that they were authorized to do so on behalf of all the Defendants. If the Culls wanted to question their authority to speak for the warranty companies, they should have done so by sworn motion. [117]

\* \* \*

Accordingly, we reverse the court of appeals' judgment, vacate the arbitration award, and remand this case to the trial court for a prompt trial.

Scott Brister

Justice

OPINION DELIVERED: May 2, 2008

**Concur by:** Harriet O'Neill; Phil Johnson (In Part); Don R. Willett (In Part)

# Concur

JUSTICE O'NEILL, concurring.

Most members of the Court agree that the Culls substantially invoked the litigation process before requesting arbitration; the point of disagreement is whether Perry Homes adequately proved it suffered prejudice as a result. I join the Court's opinion, but write separately to note that I believe the proof required to demonstrate prejudice in any given case should be measured by the degree to which the litigation process has been invoked. In some circumstances, a party's invocation of the judicial process may be so substantial that a court could presume **[\*\*53]** the party resisting arbitration has been prejudiced and the right to arbitration has been waived. In my view, such a presumption may easily be drawn on this record.

Harriet O'Neill

Justice

**OPINION DELIVERED:** May 2, 2008

**Dissent by:** Phil Johnson (In Part); Don R. Willett (In Part)

# Dissent

JUSTICE JOHNSON, joined by CHIEF JUSTICE JEFFERSON and JUSTICE GREEN, concurring in part and dissenting in part.

---

[117] *See* TEX. R. CIV. P. 12.

I disagree that the trial court abused its discretion in compelling arbitration. I concur with the disposition of part VI-C. I dissent from parts VI-A and VI-B of the Court's opinion and dissent from its judgment.

The parties agree that their arbitration agreement covers the dispute and that the Federal Arbitration Act (FAA) applies. Thus, whether the Culls waived the right to arbitrate is a question of law. *In re Oakwood Mobile Homes, Inc., 987 S.W.2d 571, 574* **[*602]** *(Tex. 1999)*; *In re Bruce Terminix Co., 988 S.W.2d 702, 703-04 (Tex. 1998)*. The Court has said previously, and says again today, that prejudice is a required element of waiver of the right to arbitrate cases subject to the FAA. __S.W.3d at __; *see In re Bank One, N.A., 216 S.W.3d 825, 827 (Tex. 2007)*. The party asserting waiver has the burden to prove prejudice. **[**54]** *See In re FirstMerit Bank, N.A., 52 S.W.3d 749, 753-54 (Tex. 2001)* (noting that if an agreement to arbitrate exists and the party opposing arbitration fails to prove its defenses, then a trial court has no discretion and its only option is to compel arbitration); *In re Bruce Terminix Co., 988 S.W.2d at 704* ("Even substantially invoking the judicial process does not waive a party's arbitration rights unless the opposing party proves that it suffered prejudice as a result."). In the context of the issue before us, prejudice means detriment. *See In re Bank One, 216 S.W.3d at 827* ("A party waives an arbitration clause when it substantially invokes the judicial process to the other party's detriment."). We review a trial court's order compelling arbitration for an abuse of discretion. *See In re Bruce Terminix Co., 988 S.W.2d at 705*. That standard is in accord with the general practice of reviewing a trial court's actions for an abuse of discretion when a trial court has discretion to grant or deny relief based on its factual determinations. *See Bocquet v. Herring, 972 S.W.2d 19, 20-21 (Tex. 1998)* (noting that the abuse of discretion standard of review as to a trial court's factual determinations **[**55]** applies when a trial court has discretion either to grant or deny relief based on its factual determinations). The test for abuse of discretion is not whether, in the opinion of the reviewing court, the trial court's ruling was proper, but whether the trial court acted without reference to guiding rules and principles. *See Cire v. Cummings, 134 S.W.3d 835, 838-39 (Tex. 2004)*. The trial court's ruling should be reversed only if it was arbitrary or unreasonable. *Id. at 839*. Generally, if there is any evidence to support the trial court's ruling then the court did not abuse its discretion. *See In re BP Prods. N. Am., Inc., 244 S.W.3d 840, 849 (Tex. 2008)* (citing *Butnaru v. Ford Motor Co., 84 S.W.3d 198, 211 (Tex. 2002))*. That is because it is only when the evidence is such that the trial court could have made but one decision, yet made another, that we say the trial court abused its discretion. *Id.* Our decisions affording deference to trial court rulings when evidence supports those rulings comport with the standard of review utilized by the United States Fifth Circuit Court of Appeals in regard to whether a party has suffered prejudice for purposes of waiving arbitration rights subject **[**56]** to the FAA. The Fifth Circuit's position is that trial court findings on which the legal conclusion of waiver is based are predicate questions of fact "which may not be overturned unless clearly erroneous." *Price v. Drexel Burnham Lambert, Inc., 791 F.2d 1156, 1159 (5th Cir. 1986)*; *see also Republic Ins. Co. v. Paico Receivables, LLC, 383 F.3d 341, 347 (5th Cir. 2004)* ("[T]he district court's finding that PRLLC would suffer prejudice if arbitration was compelled is not clearly erroneous.").

The waiver issue in this matter is not determined by general waiver elements, but by waiver as that term is used in regard to avoiding arbitration agreements subject to the FAA. Generally, "waiver" is the intentional relinquishment of a right actually or constructively known, or intentional conduct inconsistent with claiming that right. *See Jernigan v. Langley, 111 S.W.3d 153, 156 (Tex. 2003)*. The elements of waiver include (1) an existing right, benefit, or advantage held by a party; (2) the party's actual or constructive knowledge **[*603]** of its existence; and (3) the party's actual intent to relinquish the right or intentional conduct inconsistent with the right. *See Tenneco Inc. v. Enter. Prods. Co., 925 S.W.2d 640, 643 (Tex. 1996)*. **[**57]** The Culls' actions and their attorneys' statements in court, taken as a whole, present compelling evidence of those elements.

Waiver as that term is used in regard to arbitration agreements subject to the FAA, however, requires more than is required for general waiver--it requires proof that the party asserting waiver as a defense to arbitration has suffered detriment. __S.W.3d at __; *In re Bank One, 216 S.W.3d at 827*. So, when the Culls finally moved to

compel arbitration and proved applicability of an arbitration agreement, Defendants unquestionably had the burden to raise and prove their defense of waiver, including prejudice, if they wanted to avoid arbitration. *In re Bruce Terminix Co., 988 S.W.2d at 704*.

Defendants recognized that to avoid arbitration they had to prove a defense to the arbitration agreement. As part of their response to the Culls' motion to compel arbitration, Defendants pled that (1) after suit was filed, all parties conducted written and oral discovery, (2) the Culls filed several motions and obtained two hearings and court rulings on discovery-related issues, and (3) a trial setting was imminent. Defendants conceded applicability of the arbitration clause, **[**58]** then cited authorities for and took the position that "Plaintiffs have waived arbitration because they substantially invoked the judicial process to the detriment of Defendants." Subsequently, Defendants more clearly detailed the detriment they were claiming:

> In this case, the *costs incurred by Defendants in responding to the motions to compel* filed by Plaintiffs would not have been incurred during the course of arbitration. Similarly, defendants are prejudiced by the fact that it [sic] was required to comply with the Court's orders on such motions to compel, *when such means and methods would not have been available in arbitration.* Because of Plaintiffs' delay in seeking arbitration, coupled with the resulting *prejudice by Defendants being required to respond to multiple discovery motions and comply with orders thereon,* Plaintiffs cannot now rely on the Limited Warranty Agreement to compel arbitration.

(Emphasis added). A second part of Defendants' response was a motion for continuance of trial to complete discovery.

At the hearing on the Culls' motion to compel arbitration, the trial judge, who noted at the end of the hearing that "I just finished [an arbitration] with the American Arbitration **[**59]** Association," admitted all the evidence offered, and took judicial notice of the court file as requested by Defendants. After evidence was introduced at the hearing, Defendants again argued that there were two factors involved: "whether or not the parties have acted inconsistently with the agreement to arbitrate and then whether those actions and the actions that were taken actually worked to the detriment or prejudice of the party that's opposing transference to arbitration."

During the hearing, the trial judge expressed considerable concern over the Culls' conduct. He discussed the Culls' testimony that they had knowledge of the arbitration clause before suit was filed, the extended time for which the case had been filed, and the impending trial setting. He also discussed the arbitration provision itself, [1] its mandatory nature, and pressed **[*604]** the Culls' attorney about the reason for the delay in requesting arbitration. Finally, he asked about a provision in the arbitration provision that provided "if any party commences litigation in violation of this Agreement, such party shall reimburse the other parties to the litigation for their costs and expenses including attorney's fees incurred **[**60]** in seeking dismissal of such litigation." The Culls' attorney acknowledged the provision and asserted that it would be up to the arbitrator to determine whether the Culls would be responsible for such fees and costs of Defendants. Defendants did not dispute the

---

[1] In relevant part, the provision provided for the homeowners, **[**61]** the builder, the administrator of the warranty program, and the warranty insurer to submit to arbitration

> all claims, demands, disputes, controversies, and differences that may arise between the parties to this Agreement of whatever kind or nature, including without limitation, disputes: (1) as to events, representations, or omissions which pre-date this Agreement; (2) arising out of this Agreement or other action performed or to be performed by the Builder, the Administrator or the Insurer pursuant to this Agreement.

As to procedures in arbitration, the arbitration provision provided that "The Arbitration shall be conducted in accordance with the Arbitrator's rules and regulations to the extent that they are not in conflict with the Federal Arbitration Act."

Culls' position. Then, agreeing with the assertions of the parties, the trial judge did not address whether the judicial process had been substantially invoked; rather, the court concluded Defendants had not shown the prejudice they claimed and granted the Culls' motion:

> The question is, I think, when it deals with waiver is *are the defendants prejudiced by this delay, and if they are not prejudiced or if there is not proof of prejudice, then the Court has no alternative but to order the case abated for arbitration purposes.*
>
> And, [counsel for Defendants], *all* I have heard from you insofar as what is the prejudice suffered by people you represent is that *they have participated in litigation activities that may or may not have been required by the arbitrator.* So without anything further, I'm going to grant the motion to abate the case for arbitration. [2]

(Emphasis added).

Perry Homes filed a motion for reconsideration. In their motion, Perry Homes again asserted that "all parties have conducted written and oral discovery under the Texas Rules of **[**62]** Civil Procedure" but did not complain that they had been denied any discovery. Perry Homes' motion recapped the prejudice they were claiming:

> Defendants have in fact been prejudiced by Plaintiffs' last-minute attempt to disclaim their election to file suit and instead choose arbitration. In this case, *the costs incurred by Defendants*--including attorneys' fees and man hours--in attending 16 depositions, responding to multiple sets of written discovery and responding to the motions to compel filed by Plaintiffs *would not have been incurred during the course of arbitration. Similarly, Defendants are prejudiced by the fact that they were required to comply with the Court's orders on such motions to compel, when such means and methods would not have been available in arbitration.* The amount of attorney time Perry Homes has invested in responding to Plaintiffs' discovery requests and related motions thus far is 122 attorney hours and 20 paralegal hours.

 **[*605]** (Emphasis added). An affidavit was attached setting out that the law firm representing Perry Homes had spent 122 attorney hours and 20 paralegal hours in responding to the Culls' discovery requests and related motions. [3] The hours were not **[**63]** broken down and no dates, times, or tasks were set out. There was no specification as to time spent on actions Defendants claimed as prejudice--responding to motions to compel discovery and complying with court orders compelling discovery that would not have been available in arbitration. The docket sheet reflects that the trial court denied the motion, but the record contains neither a transcript from the hearing nor an order ruling on the motion.

The Court agrees that the standard of review applicable to the trial court's order compelling arbitration is abuse of discretion, but its holding that the Culls waived their right to arbitrate misses the mark. In reaching its conclusion, the Court says the question of prejudice is a matter of law because all the relevant facts were undisputed. It seems to me that (1) there was evidence requiring the trial court to make evidentiary determinations as to prejudice, **[**64]** and (2) Defendants did not prove that they were prejudiced or that the Culls obtained an advantage because of the litigation process.

As to the evidence that the trial court was required to weigh and make evidentiary determinations on, the record reveals that Defendants took depositions and engaged in written discovery, as did the Culls. Yet Defendants did

---

[2]   The trial court did not order arbitration as to defendants Jerald W. Kunkel, the foundation engineer, and his firm. The Culls agreed the Kunkel defendants were not covered by the arbitration agreement. The Kunkel defendants are not parties to this appeal.

[3]   Defendants referenced depositions in their motion for rehearing. They did not take the position or offer proof at the hearing on the Culls' motion to compel arbitration that depositions would not have occurred in arbitration either by permission of the arbitrator or by agreement.

not claim prejudice due to the Culls somehow reaping an unfair advantage through discovery. The trial court could have considered the advantages accruing to all parties by depositions and bilateral written discovery and determined that no prejudice was shown because all parties were more fully prepared to proceed with dispute resolution by knowing what the testimony of witnesses would be, and that such knowledge would shorten arbitration and reduce further costs.

Next, at the time of the hearing on the motion to compel there was an imminent trial setting. But Defendants did not claim they had spent time preparing to go to trial at the December 10 setting and that those hours would be wasted unless they went to trial immediately. At the December 6 hearing on the motion to compel, the parties agreed the case would not be ready for trial **[**65]** at the December 10 setting, and the Culls' attorney stated that, according to the court clerk, the case probably would not be reached for trial. In any event, a trial setting and actually going to trial are different matters. Even though Defendants moved for a continuance and requested the case to be reset in two months, there is nothing in the record to show when the next setting actually would have been, much less when the case would have gone to trial if the motion for continuance had been granted. The Court speculates that trial would have occurred sooner than arbitration took place. To the extent a resetting or actual future trial date should be considered, however, the trial court was in the best position to determine when any new setting would have occurred--whether days, weeks, or months in the future--and to determine the weight to give the setting and a potential trial date along with the other factors.

**[*606]** Further, the Court discounts evidence of a contractual provision in the arbitration clause requiring any party that commenced litigation in violation of the arbitration clause to reimburse other parties' litigation expenses and costs. The clause is not a model of clarity as **[**66]** to exactly what was recoverable:

> Inasmuch as this Agreement provides for mandatory arbitration of disputes, if any party commences litigation in violation of this Agreement, such party shall reimburse the other parties to the litigation for their costs and expenses including attorney's fees incurred in seeking dismissal of such litigation.

It was the trial court's goal, just as it is ours, to ascertain the true intent of the parties to the agreement. *See J.M. Davidson, Inc. v. Webster, 128 S.W.3d 223, 229 (Tex. 2003)*. The language used in the agreement is the primary evidence of that intent. *See id.; National Union Fire Ins. Co. of Pittsburgh, Pa. v. CBI Indus., Inc., 907 S.W.2d 517, 520 (Tex. 1995)*. If the contract is subject to two or more reasonable interpretations after applying the pertinent rules of construction, the contract is ambiguous, creating a fact issue on the parties' intent. *See J.M. Davidson, 128 S.W.3d at 229*.

The Court construes the clause as allowing reimbursement for expenses and attorneys' fees incurred in seeking dismissal of the lawsuit, but not for expenses and fees in preparing the suit for trial. However, the clause can also be read as requiring reimbursement **[**67]** of *all* litigation costs and expenses, including but not limited to attorneys' fees incurred in seeking dismissal of the litigation. And that, apparently, is how the parties interpreted the agreement. The trial court questioned the Culls' attorney about whether the Culls would be responsible for the Defendants' attorneys' fees and costs. When the Culls' attorney replied that it was an issue for the arbitrator, the Defendants' attorney did not contend otherwise. *See Mathis v. Lockwood, 166 S.W. 3d 743, 744-45 (Tex. 2005)*; *Banda v. Garcia, 955 S.W.2d 270 (Tex. 1997)*. The Culls' attorney's representations and lack of protestation by Defendants' attorney is the only evidence in the hearing record about the parties' intent as to the language in the clause. [4] Under the abuse of discretion standard by which we review the trial court's order,

---

[4] Although not before the **[**68]** trial court when it ordered arbitration, the arbitration record now before us shows that Defendants considered the clause to provide for recovery of *all* litigation costs and attorneys' fees, not just those incurred in seeking dismissal of the lawsuit. The arbitration record shows Defendants claimed that pursuant to the reimbursement clause they were "entitled to recover or setoff [their] attorney's fees from [the Culls], which were incurred in connection, with the litigation." Perry Homes' attorney submitted

the reimbursement clause and the attorneys' respective representations and silence is part of the entire record which we must consider in determining whether the trial court followed guiding rules and principles. *See Chrysler Corp. v. Blackmon, 841 S.W.2d 844, 852 (Tex. 1992)*; *Walker v. Packer, 827 S.W.2d 833, 839-40 (Tex. 1992)*.

But even if the Court **[**69]** is right and the reimbursement clause does not allow for **[*607]** recovery of all Defendants' litigation attorney's fees, an arbitration award would not be subject to being vacated if an arbitrator interpreted the clause to allow recovery of all the fees. If arbitrators simply misinterpret a contractual clause such as the reimbursement clause, that type of error is not one which will justify setting aside an award. [5] *See Wise v. Wachovia Securities, LLC, 450 F.3d 265, 269 (7th Cir. 2006)* (noting that in reviewing an arbitration award under the FAA, "the issue for the court is not whether the contract interpretation is incorrect or even wacky but whether the arbitrators had failed to interpret the contract at all"). Under the circumstances, it was proper for the trial court to weigh, and the record shows it did, the reimbursement provision and the parties' representations in deciding that Defendants had not proved they suffered prejudice. Regardless of the trial court's interpretation of what costs and expenses would be recoverable under the reimbursement provision, the mere existence of the provision and its reimbursement requirement comprise evidence supporting the decision to order arbitration **[**70]** and properly leave construction and application of the clause to the arbitrator.

In **[**71]** sum, there were decisions for the trial court to make based upon weighing evidence, drawing inferences from it in light of the parties' contentions, determining what the evidence and inferences proved, and drawing a conclusion as to Defendants' claims of prejudice. That situation requires our deferring to the trial court's findings and order when the standard of review is abuse of discretion.

Despite evidentiary matters the trial court had before it which warrant our deferring to its implied and stated findings, the Court sets out factors that were uncontroverted, then concludes, without ever saying exactly how, that Plaintiffs were advantaged or Defendants were prejudiced by the "inherent unfairness" of it all:

> Here, the record before the trial court showed that the Culls objected to arbitration initially, and then insisted on it after the Defendants acquiesced in litigation. They got extensive discovery under one set of rules and

---

an affidavit to the arbitrator in support of the claim for attorneys' fees recovery or setoff. The affidavit mirrored the affidavit submitted as part of Defendants' motion for reconsideration that was earlier filed in the lawsuit. The arbitration affidavit claimed that

> Prior to the Court's order compelling arbitration, Perry Homes incurred one-hundred-twenty-two (122) attorney hours and twenty (20) paralegal hours responding to Claimants' discovery requests and discovery-related motions. Accordingly, Perry Homes is entitled to an offset in the amount of $ 26,400.00 against any damages awarded to Claimants, due to their violation of the arbitration agreement.

[5]    The Federal Arbitration Act provides that an arbitration award may be set aside for limited reasons:

> (1) where the award was procured by corruption, fraud, or undue means;

> (2) where there was evident partiality or corruption in the arbitrators, or either of them;

> (3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or

> (4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10(a).

then sought to arbitrate the case under another. They delayed disposition by switching to arbitration when trial was imminent and arbitration was not. They got the court to order discovery for them and then limited their opponents' rights to appellate review. **[**72]** Such manipulation of litigation for one party's advantage and another's detriment is precisely the kind of inherent unfairness that constitutes prejudice under federal and state law.

_S.W.3d at _. No one (but the Culls and their attorneys) could seriously disagree that the Culls' conduct smacks of inequity. But even disregarding the evidentiary questions the trial court had to resolve as set out above, when the record is searched for evidence that Defendants suffered prejudice *as Defendants* **[*608]** *claimed*--by incurring expenses in discovery proceedings, responding to discovery motions, and complying with court orders on discovery when that type of activity would not be available in arbitration--there is none. Nor is there evidence that the Culls were unfairly advantaged. The fact of the matter is that all parties took part in litigation discovery as part of the process to resolve their dispute. The Court discusses at length how the facts are undisputed, how ordering the parties to arbitration resulted in "inherent unfairness" to Defendants, and that such "inherent unfairness" equates to prejudice to Defendants, or conversely, unfair advantage to the Culls. However, the authorities used **[**73]** to support the Court's statements do not cut nearly so broadly as the Court indicates. The cases cited incorporate elements such as delay, expense, damage to a party's legal position, or "tactical advantage" by which to measure prejudice to one party or unfairness to the other party. _S.W.3d at _n.94 (citing *In re Tyco Int'l Ltd. Sec. Litig., 422 F.3d 41, 47 n.5 (1st Cir. 2005)* ("[A] party should not be allowed purposefully and unjustifiably to manipulate the exercise of its arbitral rights simply to gain an *unfair tactical advantage* over the opposing party." (emphasis added)); *Doctor's Assocs. v. Distajo, 107 F.3d 126, 134 (2d Cir. 1997)* ("[P]rejudice as defined by our cases refers to the inherent unfairness--*in terms of delay, expense, or damage to a party's legal position*--that occurs when the party's opponent forces it to litigate an issue and later seeks to arbitrate that same issue." (emphasis added)).

The following passage embodies the substance of the Court's opinion as to prejudice or unfair advantage:

> It is also unquestionably true that [the Cull's] conduct prejudiced the Defendants. "Prejudice" has many meanings, but in the context of waiver under the FAA it relates **[**74]** to inherent unfairness--that is, a party's attempt to have it both ways by switching between litigation and arbitration to its own advantage:
>
> > [F]or purposes of a waiver of an arbitration agreement[,] prejudice refers to the inherent unfairness in terms of delay, expense, or damage to a party's legal position that occurs when the party's opponent forces it to litigate an issue and later seeks to arbitrate that same issue.
>
> Thus, "a party should not be allowed purposefully and unjustifiably to manipulate the exercise of its arbitral rights simply to gain an unfair tactical advantage over the opposing party."
>
> . . . Such manipulation of litigation for one party's advantage and another's detriment is precisely the kind of inherent unfairness that constitutes prejudice under federal and state law.

_S.W.3d at _(citations omitted). As noted previously, the Court does not specify how Defendants proved, at the hearing on the Culls' motion to compel arbitration, detriment from delay, damage to Defendants' legal position or a tactical advantage achieved by the Culls, which perhaps is just as well because Defendants did not claim those types of prejudice in the trial court. Defendants claimed **[**75]** prejudice because of discovery and court hearings that would not have occurred in arbitration. But contrary to the Court's conclusion that discovery would have been limited in arbitration, the broad arbitration clause did not preclude any particular type or level of discovery. It provided that arbitration would be conducted according to the arbitrator's rules so long as they did not conflict with the FAA. Specifically, and by way of example, Defendants did not claim prejudice from or prove that (1) delay because of litigation interfered with **[*609]** their business activities, caused them loss

of evidence, or interfered with their ability to arbitrate; (2) if an arbitrator had ordered the lawsuit discovery pursuant to the arbitration clause, the order would have violated the arbitration clause; (3) had the litigation discovery been requested in arbitration, Defendants would have agreed to it and conferences with the arbitrator would not have been necessary; (4) the litigation discovery was not useable in arbitration; (5) Defendants had already begun trial preparations or taken other litigation related actions that would have been wasted effort if the case went to arbitration; or (6) Defendants **[**76]** suffered compromise of their legal position on the merits of the Culls' claims.

There was not an offer of proof such as by expert testimony, Defendants themselves, their attorneys or otherwise, that all, some, or any arbitrators probably would not have allowed the discovery, that their agreement or a rule limited discovery in arbitration, or Defendants wasted any litigation discovery effort. And to boot, arbitrators do not come free. Disclosure conferences in arbitration might well have cost more than discovery hearings in litigation because arbitrators generally charge for preparing for and attending conferences while trial judges do not. Nor have Defendants claimed that their attorneys would not have charged fees for arbitration discovery activities. So the possibility exists that the disclosure process in arbitration could have ended up costing more than litigation discovery.

The Court questions whether broad discovery is generally available in arbitration, but the parties here do not argue that it is. What *is* argued here is that the parties' contract provided how the arbitration was to be conducted--through adherence to the arbitrator's rules so long as those rules do not conflict **[**77]** with the FAA--and that Defendants did not prove any litigation discovery that would have been in violation of the contract. The Court says that as of the time of the hearing on the Culls' motion to compel arbitration, what discovery an arbitrator would allow was purely speculative. But arbitration is not new; Defendants could have at least attempted to prove the custom and practice, if any, of arbitrators as to discovery in arbitration, even though each arbitration is governed by the particular agreement between the parties. Even if such evidence might have been ruled speculative, as the Court concludes it would have been, the obligation to overcome the burden of proof still lay with Defendants. *See Borg-Warner Corp. v. Flores, 232 S.W.3d 765, 772-74 (Tex. 2007)* (recognizing difficulties of proving asbestos claims against individual defendants, yet requiring plaintiffs to meet that burden).

The Court says that "a party who enjoys substantial direct benefits by gaining an advantage in the pretrial litigation process should be barred from turning around and seeking arbitration with the spoils." __S.W.3d at __. I agree with that statement. The problem is that the Court does not apply **[**78]** the statement in its entirety to this case. The Court assumes, without requiring Defendants to prove, that the Culls obtained some advantage or caused detriment to Defendants by both parties having engaged in discovery activities. It is hard to see how discovery of facts, witness names, documents, and testimony about the controversy can prejudice either party. *See Jampole v. Touchy,* 673 S.W.2d 569, 573 (Tex. 1984) (noting that discovery is done so disputes may be decided by what the facts are, not by what facts are concealed). Defendants neither alleged nor proved that they were prejudiced because some privileged, proprietary, or confidential matter had been disclosed. Discovery in both judicial proceedings and in arbitration facilitates just **[*610]** and reasonable resolutions of disputes and helps prevent unjust and unreasonable resolutions because of ambush, surprise, or concealment of relevant, nonprotected, nonprivileged evidence which could sway the outcome. Furthermore, I disagree with the idea that merely making discovery disclosures is evidence of wasted effort or other prejudice. Although the extent to which a party engages in litigation discovery plays a significant part in determining **[**79]** whether that party substantially engaged the litigation process, disclosure of relevant, nonprivileged evidence, names of witnesses, and information makes just and reasonable dispute resolution more likely regardless of whether disclosure is strictly voluntary or is made in judicial discovery proceedings or arbitration proceedings.

Evidence at the hearing on the Culls' motion to compel arbitration consisted only of testimony by the Culls and five documents they introduced: the earnest money contract, the application for warranty, the limited warranty

agreement containing the arbitration provision, a letter from the warranty company, and a copy of one of Defendants' original answers. The Culls acknowledged in their testimony that discovery and depositions had occurred, but they were unsure of how many depositions and how much discovery. Defendants requested the trial court to take judicial notice of "five separate motions to compel discovery and two separate orders on some, but not all, of the motions to compel." The court took notice of "its file," which at that time mostly consisted of copies of pleadings and discovery requests attached as exhibits to motions. The file contained only **[**80]** one or two of the documents actually produced in discovery. There were two orders on the Culls' motions to compel discovery. The second order referred only to the Kunkel defendants who were not ordered to arbitration. Because the Kunkel defendants were not ordered to arbitration, the trial court could have determined that any orders or motions relating solely to them should not be considered in regard to prejudice as to the other Defendants. In short, the record on which the trial court ruled on December 6 was not extensive, and although it showed what the Culls *requested,* practically none of the record was of what Defendants *produced* in discovery, which was filed later when Defendants sought to set aside the arbitration award. And Defendants did not allege in the trial court that some or even any of the discovery would not be *useful* in arbitration, only that the discovery would not be *available* in arbitration.

Last, the Court says that requiring Defendants to file detailed proof of the discovery would have made the record more cumbersome and would have entailed more expense, and that to show prejudice, Defendants only had to show substantial wasted effort anyway. The Court then concludes **[**81]** that the record before the trial court at the time of the hearing showed substantial wasted effort, and thus detriment, to Defendants. But in *In re Vesta Ins. Group, Inc., 192 S.W.3d 759 (Tex. 2006)*, the Court declined to determine that waiver of the right to arbitrate occurred when the party opposing arbitration failed to introduce any of the discovery documents, present details about them, or contend that the discovery would not be useful in arbitration. The record, the Court stated,

> does not show whether these requests were limited or extensive, whether they sought information for affirmative claims or defensive ones, or even whether they addressed the merits or merely the arbitration issue. Further, [plaintiff] does not allege that the discovery already conducted would not be useful in arbitration; to the contrary, he concedes **[*611]** it would be useful whether the case is arbitrated or tried.

*Id. at 763*.

Neither party here claimed before arbitration (nor, for that matter, after arbitration) that the litigation discovery would not be useful in arbitration. On the other hand, and as addressed below, Defendants claimed after arbitration that they suffered prejudice because Plaintiffs' attorney **[**82]** used the discovery depositions to prepare for arbitration. In this regard, there are further inferences from the record that the Court does not credit but that the trial court could have made when it compelled arbitration: both parties would use the litigation discovery and depositions to prepare for arbitration, the discovery would be useful in arbitration, and neither party was unfairly advantaged or suffered detriment from the discovery.

In summary, the Court (1) does not limit its review to Defendants' claims of prejudice made in the trial court, (2) disregards factors that presented the trial court with decisions to make based on evidence allowing for different interpretations and inferences, and (3) assumes "inherent unfairness" equates to Defendants' prejudice or the Culls' unfair advantage from litigation conduct and effectively forgives Defendants' failure to prove detriment to themselves or advantage to the Culls.

Defendants make other contentions not reached by the Court, but none of them warrant holding that the trial court abused its discretion. In their brief to this Court, Defendants reference rules of the American Arbitration Association and urge that the AAA Rules of **[**83]** Procedure provide for limited discovery in that the arbitrator is limited to directing "(i) the production of documents and other information, and (ii) the identification of any

witnesses to be called." Defendants also assert that they were prejudiced because during post-arbitration proceedings, the Culls' attorney testified that he reviewed deposition testimony in preparing for the arbitration and depositions are not generally available in arbitration. [6] First, Defendants did not introduce the AAA rules into evidence at the hearing or ask the trial court to take judicial notice of them. Second, to the extent the arguments encompass discovery depositions, Defendants did not complain in the trial court that they were prejudiced by the taking of depositions or that the Culls planned to use them in arbitration, and the argument cannot be raised here. *See* *TEX. R. APP. P. 33.1*; *Mack Trucks, Inc. v. Tamez, 206 S.W.3d 572, 577 (Tex. 2006)* (noting that except for fundamental error, appellate courts are not authorized to consider issues not properly raised by the parties). Third, even if the AAA rules had been before the trial court, there was no evidence that all, most, or any arbitrators **[**84]** would have refused to require disclosure of any of the matters disclosed by Defendants. Finally, Defendants' attorneys had access to the same deposition testimony to use for arbitration preparation, so there could not have been an unfair advantage to the Culls by use of the depositions.

I conclude the record is not conclusive either that Defendants suffered prejudice as they claimed or that the Culls obtained an unfair advantage by litigation conduct as the Court holds. I also conclude that evidence before the trial court required the court to weigh and draw inferences from it and that some evidence supports the trial court's determination that Defendants did not prove prejudice to themselves **[*612]** or unfair advantage to the Culls by use of the litigation process. Accordingly, I would hold that the trial court did not abuse its discretion by compelling the parties to arbitrate and I would affirm the judgment of the court of appeals.

Phil Johnson

Justice

**OPINION DELIVERED:** May 2, 2008

JUSTICE WILLETT, concurring in part and dissenting in part.

Arbitration has become a hot-button topic for the Court of late-in **[**85]** this Term alone we have decided at least three arbitration-related cases [1] and heard argument in four more. [2] As the range of opinions in this case demonstrates, the invocation and operation of arbitration provisions can present tricky legal questions that spark honest differences of opinion. I agree with Parts I-V of the Court's decision, and also with much of Part VI regarding waiver. However, I respectfully dissent from the Court's ultimate result, not on an arbitration law issue, but on a much more old-fashioned ground--the applicable standard of review.

The **[**86]** Court properly acknowledges that a trial court's order compelling arbitration is reviewed for abuse of discretion. Under this standard, we will reverse the trial court only when "it acts in an arbitrary or unreasonable manner, without reference to any guiding rules or principles." [3] I agree with the Court, and the trial judge for that matter, that the record clearly shows that the Culls substantially invoked the judicial process. I also agree with the Court that the cost-reimbursement provision in the arbitration agreement does not prevent Perry

---

[6]   Of course, that argument cuts against the idea that discovery was not usable in arbitration.

[1]   *See* *Chambers v. O'Quinn,* 242 S.W.3d 30 (Tex. 2007); *In re U.S. Home Corp.,* 236 S.W.3d 761 (Tex. 2007). This case is the third.

[2]   *In re Great Western Drilling,* 211 S.W.3d 828 (Tex. App.--Eastland 2006), *pet. granted,* 51 Tex. Sup. Ct. J. 77 (Nov. 2, 2007); *E. Tex. Salt Water Disposal Co. v. Werline,* 209 S.W.3d 888 (Tex. App.--Texarkana 2006), *pet. granted,* 51 Tex. Sup. Ct. J. 77 (Nov. 2, 2007); *Bison Bldg. Materials v. Aldridge,* 2006 Tex. App. LEXIS 8162, 2006 WL 641280 (Tex. App.--Houston [1st Dist.] 2006), *pet. granted,* 51 Tex. Sup. Ct. J. 77 (Nov. 2, 2007); *Forest Oil Corp. v. McAllen,* 2005 Tex. App. LEXIS 10441, 2005 WL 3435061 (Tex. App.--Corpus Christi 2005), *pet. granted,* 51 Tex. Sup. Ct. J. 667 (Apr. 27, 2007).

[3]   *In re Nitla,* 92 S.W.3d 419, 422 (Tex. 2002) (citing *Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 241-42 (Tex. 1985)).

Homes from showing prejudice resulting from the Culls' arbitration flip-flop. JUSTICE JOHNSON is comforted by the possibility that an arbitrator might (mis)construe this provision to award Perry Homes *all* its litigation-related costs and fees, but I am not. The provision limits reimbursement to "costs and expenses including attorney's fees incurred *in seeking dismissal of such litigation*," and we cannot plausibly say Perry Homes fails on prejudice because an arbitrator may misread the agreement.

Having said all that, **[**87]** I cannot conclude, as does the Court, that the trial court abused its discretion by compelling arbitration. I believe in waiver-by-conduct, but Perry Homes bore the threshold responsibility of building a record upon which the trial court could find prejudice. The record on appeal is far more extensive than what the trial court considered (and the arguments far more refined), but I agree with JUSTICE JOHNSON that the trial court--sitting where it sat, seeing what it saw, hearing what it heard, reviewing what it reviewed--did not abuse its discretion in concluding "no prejudice." Trial courts do not have carte blanche "to send any case to arbitration no matter what has occurred in court," [4] but I cannot conclude that this trial court acted "without reference to any **[*613]** guiding rules or principles" [5] in ruling that Perry Homes fell short of building a trial-court record that showed prejudice. This is admittedly a close call, and the Court makes the best possible case for going the other way. Given the relevant record, however, I have a difficult time saying the trial court acted arbitrarily or disregarded all guiding standards in not reaching the opposite result. Accordingly, I dissent from **[**88]** the Court's decision vacating the arbitration award and remanding for trial.

Don R. Willett

Justice

Opinion delivered: May 2, 2008

---

[4] __ S.W.3d __.

[5] *Nitla,* 92 S.W.3d at 422.



⚠ Caution

As of: September 1, 2015 4:55 PM EDT

## *Porter & Clements, L.L.P. v. Stone*

Court of Appeals of Texas, First District, Houston

December 5, 1996, Opinion filed

NOS. 01-96-00872-CV, 01-96-00873-CV

**Reporter**

935 S.W.2d 217; 1996 Tex. App. LEXIS 5422

PORTER & CLEMENTS, L.L.P., JOHN O'NEILL, EVELYN V. KEYES, AND J. EUGENE CLEMENTS, Relators v. THE HONORABLE KATHLEEN S. STONE, JUDGE OF THE 55TH DISTRICT COURT OF HARRIS COUNTY, TEXAS, Respondent. PORTER & CLEMENTS, L.L.P., JOHN O'NEILL, EVELYN V. KEYES, AND EUGENE CLEMENTS, Appellants v. SCARLETT RABALAIS, ALVIN RABALAIS, AND HOT DIGGITY DOG, INC., Appellees

**Prior History:** [**1] On Appeal from the 55th District Court. Harris County, Texas. Trial Court Cause No. 95-43759. KATHLEEN S. STONE, Judge.

**Disposition:** Judgment reversed and remanded, motion for leave to file petition for writ of mandamus overruled.

## Core Terms

arbitration, parties, binding, arbitration agreement, binding arbitration, federal arbitration, fee agreement, trial court, non-binding, settlement, provides, arbitration award, entering judgment, appointed, disputed, mandamus, lawsuit

## Case Summary

### Procedural Posture

Appellants, a law firm and several of its partners, sought review of a judgment of the 55th District Court of Harris County (Texas), which denied appellants' motion to compel arbitration following the commencement of a suit by appellees, former clients with whom appellants had a fee agreement, that charged appellants with misrepresenting to them their legal position in an unsuccessful suit appellees earlier filed against a third party.

### Overview

Appellees, appellant law firm's former clients, argued that the omission of the word "binding" from the arbitration clause of their fee agreement with appellant, which unsuccessfully represented them in a suit against a third party, automatically transformed the agreement into a nonbinding arbitration agreement. The court disagreed, rejecting appellees' contention that the Alternative Dispute Resolution Act (ADR Act), *Tex. Civ. Prac. & Rem. Code Ann. § 154.027* (1996), which provided for binding arbitration only if the parties stipulated to that effect, so required. The ADR Act only dealt with court-ordered referrals of pending litigation and did not deal with private, contractually agreed-upon provisions for arbitration, the court explained. The controlling Texas

Arbitration Act (TAA), *§§ 171.001*-.023, in authorizing a trial court to enter a final judgment upon an arbitrator's award, contemplated that the award would be binding, the court ruled, noting the absence of any provision in the TAA for a non-binding arbitration procedure. Moreover, the court concluded, the parties' agreement intimated that the arbitrator's decision would be final, and provided no appeal mechanism.

**Outcome**

Judgment denying motion by appellant law firm and named partners to compel arbitration with appellees, former clients with whom they had a fee agreement, reversed, because appellants entitled to enforce binding arbitration clause with appellees, as omission of word "binding" from clause made it nonbinding only for court-ordered referrals of pending litigation, but not for private, contractually agreed upon arbitration clauses.

## LexisNexis® Headnotes

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview

Civil Procedure > ... > Arbitration > Federal Arbitration Act > General Overview

Civil Procedure > ... > Arbitration > Federal Arbitration Act > Orders to Compel Arbitration

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Judicial Review

Civil Procedure > Remedies > Writs > General Overview

Civil Procedure > ... > Writs > Common Law Writs > Mandamus

Civil Procedure > Appeals > Appellate Jurisdiction > Interlocutory Orders

International Trade Law > Dispute Resolution > International Commercial Arbitration > Arbitration

*HN1* A writ of mandamus is required to allow a Texas court to review an order refusing to compel arbitration under the Federal Arbitration Act, *9 U.S.C.S. § 2*.

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Judicial Review

*HN2* See *Tex. Civ. Prac. & Rem. Code Ann. §§ 171.001-.023* (1996).

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Validity of ADR Methods

*HN3* See *Tex. Civ. Prac. & Rem. Code Ann. § 154.027* (1996).

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Judicial Review

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Mandatory ADR

Labor & Employment Law > Collective Bargaining & Labor Relations > Federal Preemption > Primacy of Labor Policy

*HN4* The Texas Alternative Dispute Resolution Act, *Tex. Civ. Prac. & Rem. Code Ann. § 154.027* (1996), does not deal with private, contractually agreed-upon provisions for arbitration.

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview

Contracts Law > Contract Conditions & Provisions > Arbitration Clauses

Contracts Law > Contract Interpretation > General Overview

Contracts Law > Contract Interpretation > Intent

*HN5* An arbitration agreement need not be in any particular form, but no party is under a duty to arbitrate unless by clear language he has so agreed, and it must clearly appear that the intention of the parties was to submit their dispute to the arbitrators and to be bound by that decision. A clause requiring arbitration is interpreted under contract principles, and the language contained within will be enforced according to its plain meaning unless this would defeat the intention of the parties.

Administrative Law > Judicial Review > Standards of Review > General Overview

Civil Procedure > Appeals > Standards of Review > Clearly Erroneous Review

*HN6* An arbitrator's award has the same effect as a judgment of a court of last resort, and the trial court may not substitute its judgment for the arbitrator's merely because it would have reached a different conclusion. An arbitrator's award can only be set aside by the courts under limited circumstances. *Tex. Civ. Prac. & Rem. Code Ann. § 171.014* (1996).

**Counsel:** For Appellants: SAM CRUSE, JR., STEPHEN BAILEY, BILLY SHEPHERD, HOUSTON.

For Appellees: SEAN F. O'NEILL, SAN ANTONIO.

**Judges:** Margaret Garner Mirabal, Justice. Justices O'Connor and Wilson also sitting.

**Opinion by:** Margaret Garner Mirabal

# Opinion

[*218] OPINION

By way of an interlocutory appeal and a mandamus action, Porter & Clements, L.L.P., and several attorneys employed by the firm attack the trial court's denial of their motion to compel arbitration. We reverse and remand in the interlocutory appeal and overrule the motion for leave to file a petition for writ of mandamus as improvidently granted.

On May 9, 1991, Porter & Clements entered into a fee agreement with Alvin and Scarlett Rabalais, owners of a food services company known as Hot Diggity Dog (HDD). Porter & Clements is a law firm located in Houston, Texas. Scarlett Rabalais is a resident of Harris County, Texas. Alvin Rabalais is a resident of Dallas County, Texas. [*219] [**2] HDD's principal place of business is Dallas, Texas.

The Rabalais hired Porter & Clements to represent them in a suit against Sam's Wholesale Clubs (Sam's). Sam's is a Delaware corporation with its headquarters in Arkansas. The lawsuit concerned HDD's rights to operate hot dog carts at Sam's locations throughout the country. The Rabalais' claims against Sam's included unfair competition, trademark infringement, breach of contract, breach of fiduciary duties, and other business-related torts. Ultimately, a take nothing judgment was entered against the Rabalais.

On August 31, 1995, the Rabalais sued their attorneys, Porter & Clements. The Rabalais claimed that Porter & Clements had misrepresented to them the potential for a recovery in the Sam's lawsuit, and that if they had known the weakness of their legal position they would not have pursued the lawsuit, but would have accepted a settlement offer made by Sam's.

On May 29, 1996, Porter & Clements filed a motion to compel arbitration and stay litigation based on an arbitration provision in the fee agreement with the Rabalais. Porter & Clements then filed a motion to clarify that it was requesting *binding* arbitration. The Rabalais [**3] filed a response in which they agreed to arbitration, but objected to *binding* arbitration. After considering the motion, the response, and the attached exhibits, the trial court denied Porter & Clements' motion to compel binding arbitration. No evidentiary hearing was held.

Porter & Clements filed a motion for leave to file a petition for writ of mandamus, contending that arbitration was required by the Federal Arbitration Act. [1] [**4] Porter & Clements contemporaneously filed an interlocutory appeal, contending that arbitration was required by the Texas Arbitration Act. [2] Parallel proceedings were required because an interlocutory appeal is only available to pursue a claim under the Texas Arbitration Act. *Tex. Civ. Prac. & Rem. Code Ann. 171.017(a)(1)* (Vernon Supp. 1996). *HN1* A writ of mandamus is required to allow a Texas court to review an order refusing to compel arbitration under the Federal Arbitration Act. *Jack B. Anglin v. Tipps, 842 S.W.2d 266, 272 (Tex. 1992)*; *Smith Barney Shearson, Inc. v. Finstad, 888 S.W.2d 111, 113* (Tex. App.--Houston [1st Dist.] 1994, no writ).

The trial court did not specify whether state or federal arbitration laws applied to the contract in question. Porter & Clements argues that under either Act, arbitration is required.

The Federal Arbitration Act applies to "a contract evidencing a transaction involving commerce." *9 U.S.C 2*. In this case, the only possible connection to commerce is the fact that one of the parties to the underlying lawsuit, Sam's, is a foreign corporation doing business in several different states. However, all parties to the fee agreement at issue in this case are residents of Texas. The fee agreement involves the providing of legal services in Texas. The dispute giving rise to the claim for arbitration involves misrepresentations that were allegedly made to the Rabalais in Texas. The underlying lawsuit, the handling of which gives rise to the Rabalais' claim against Porter & Clements, was filed in federal court in Texas. The fee agreement does not fall within the terms of the Federal Arbitration Act. *See Withers-Busby Group v. Surety [**5] Industries, 538 S.W.2d 198, 199* (Tex. Civ. App.-- Dallas 1976, no writ).

Accordingly, our order granting Porter & Clements' motion for leave to file petition for writ of mandamus was improvidently granted. We withdraw our order and overrule the motion for leave to file. We will apply the Texas Arbitration Act [3] to this case.

[**6] [*220] The fee agreement between Porter & Clements and the Rabalais indicated that the law firm would represent the Rabalais in their suit against Sam's and the firm would be paid a contingency fee. The fee agreement also contained the following arbitration clause:

---

[1] U.S.C. 2.

[2] 2 *Tex. Civ. Prac. & Rem. Code Ann. 171.001*-171.023 (Vernon Supp. 1996).

[3] *HN2* The Texas Arbitration Act reads, in relevant part:

171.001. A written agreement to submit any existing controversy to arbitration or a provision in a written contract to submit to arbitration any controversy thereafter arising between the parties is valid, enforceable and irrevocable . . . .

171.002 (a). On application of a party showing an agreement described in section 171.001, and the opposing party's refusal to arbitrate, the Court shall order the parties to proceed with arbitration . . . .

171.003. If the arbitration agreement provides a method of appointment of arbitrators, this method shall be followed . . . .

171.011 (b). The making of an agreement described in section 171.001 and to which that section is applicable . . . which provides for or authorizes an arbitration in this state, confers jurisdiction on the Court to enforce the agreement under this chapter and to enter judgment on an award thereunder.

171.013. Upon application of a party, the Court shall confirm an award . . . .

Should any dispute arise regarding the terms or conditions of this contract or the fees, costs, or expenses payable thereunder, all parties hereby agree that the dispute shall be referred to arbitration by an arbitrator appointed by the senior United States District Judge for the Southern District of Texas. For example, if you receive intangible or illiquid assets such as contract or lease provisions by way of settlement, and if we are unable to agree on their fair value, an arbitrator will set fair value for division purposes.

Both Porter & Clements and the Rabalais agree that an arbitration agreement exists and that the agreement encompasses the claims asserted. The only issue is whether the arbitration is to be binding.

The Rabalais first argue that only nonbinding arbitration is required because *section 154.027* of the Texas Alternative Dispute Resolution Act (ADR Act) [4] requires the parties to [**7] an arbitration to stipulate in advance if they intend for an arbitration award to be binding.

The Rabalais' reliance on *section 154.027* of the ADR Act is misplaced because the ADR Act only deals with court-ordered referrals of pending litigation to alternative dispute resolution procedures. *Tex. Civ. Prac. & Rem. Code Ann. 154.021* (Vernon Supp. 1996). **HN4** The ADR Act does not deal with private, contractually agreed-upon provisions for arbitration.

The [**8] present case does not involve court-ordered referral of pending litigation to an ADR procedure. Rather, the parties contractually agreed to arbitration before the current dispute ever arose. As such, the current dispute is governed by the Texas Arbitration Act, not the ADR Act.

The Rabalais also argue that the plain language of the arbitration agreement requires nonbinding arbitration. We note that neither party contends the agreement is ambiguous; therefore, we will construe its meaning as a matter of law. *Manes v. Dallas Baptist College, 638 S.W.2d 143, 145* (Tex. App.--Dallas 1982, writ ref'd n.r.e.).

**HN5** An arbitration agreement need not be in any particular form, but no party is under a duty to arbitrate unless by clear language he has so agreed, and it must clearly appear that the intention of the parties was to submit their dispute to the arbitrators and to be bound by that decision. *Wetzel v. Sullivan, King & Sabom, P.C., 745 S.W.2d 78, 81* (Tex. App.--Houston [1st Dist.] 1988, no writ); *Manes, 638 S.W.2d at 145*. A clause requiring arbitration is interpreted under contract principles, and the language contained within will be enforced according to its plain meaning [**9] unless this would defeat the intention of the parties. *Pepe Int'l Dev. Co. v. Pub Brewing Co., 915 S.W.2d 925, 930* (Tex. App.--Houston [1st Dist.] 1996, no writ). Historically, the settlement of disputes by arbitration has been favored in Texas law. *L.H. Lacy Co. v. City of Lubbock, 559 S.W.2d 348, 351 (Tex. 1977)*; *Massey v.* [*221] *Galvan, 822 S.W.2d 309, 316* (Tex. App.--Houston [14th Dist.] 1992, writ denied).

In *McKee v. Home Buyers Warranty Corp. II, 45 F.3d 981, 983-85 (5th Cir. 1995)*, the court construed the Louisiana arbitration statute, which is similar to the Texas statute. There the court considered whether the parties to a contract had agreed to binding arbitration. The clause at issue provided that the parties would submit any dispute to "an arbitration to be conducted by the American Arbitration Association (A.A.A.)." [5] The plaintiffs

---

[4]   **HN3** The ADR Act provides:

(a) Nonbinding arbitration is a forum in which each party and counsel for the party present the position of the party before an impartial third party, who renders a specific award.

(b) If the parties stipulate in advance, the award is binding and is enforceable in the same manner as any contract obligation. If the parties do not stipulate in advance that the award is binding, the award is not binding and serves only as a basis for the parties' further settlement negotiations.

Tex. Civ. Prac. & Rem. Code Ann. 154.027 (Vernon Supp. 1996).

[5]   The complete text of the arbitration agreement in McKee provided:

argued that the agreement did not contemplate "binding" arbitration. *Id. at 983*. The court held that under Louisiana law, binding arbitration was required because arbitration, by definition, was a binding procedure. *Id. at 985*.

[**10] Arbitration is binding only if a court may enter judgment on the award made pursuant to the arbitration. While the Louisiana Arbitration Law generally parallels the Federal Arbitration Act, there is a significant difference between the sections dealing with entry of judgment. Disputes about whether arbitration is binding can arise under the Federal Arbitration Act because the Federal Arbitration Act provides that a court may enter judgment on the arbitration only if the parties agreed that a court may enter judgment. *See 9 U.S.C. 9*. Such disputes do not arise under the Louisiana Arbitration Law because the Louisiana law provides that a court may enter judgment if the parties agreed to arbitration; the Louisiana law simply makes no provision for non-binding arbitration. *See* LSA-R.S. 9:4209. Thus under the Louisiana Arbitration Law, if the parties agreed to a non-binding procedure, they did not agree to arbitration.

*McKee, 45 F.3d at 985*.

The Texas Arbitration Act is similar to the Louisiana arbitration statute in that it also authorizes the trial court to enter a final judgment based upon the arbitrator's award. *Tex. Civ. Prac. & Rem. Code Ann. 171.011* [**11] (b), 171.013 (Vernon Supp. 1996). We agree with the Fifth Circuit's interpretation of the similar statute in *McKee*. By providing that a trial court "shall confirm an award," the Texas Arbitration Act necessarily contemplates that the arbitration award will be binding. The Texas Arbitration Act makes no provision for a non-binding arbitration procedure.

This interpretation of the Texas Arbitration Act is consistent with the historical nature of arbitration in Texas law. In Texas, "arbitration" is generally a contractual proceeding by which the parties to a controversy, in order to obtain a speedy and inexpensive *final disposition* of the disputed matter, select arbitrators or judges of their own choice, and by consent, submit the controversy to these arbitrators *for determination*. *Manes, 638 S.W.2d at 145*; *Alderman v. Alderman, 296 S.W.2d 312, 315* (Tex. Civ. App.--San Antonio 1956, writ ref'd). **HN6** An arbitrator's award has the same effect as a judgment of a court of last resort, and the trial court may not substitute its judgment for the arbitrator's merely because it would have reached a different conclusion. *City of Baytown v. C.L. Winter, Inc., 886 S.W.2d* [**12] *515, 518* (Tex. App.--Houston [1st Dist.] 1994, writ denied). An arbitrator's award can only be set aside by the courts under limited circumstances. *See Tex. Civ. Prac. & Rem. Code Ann. 171.014* (Vernon Supp. 1996).

These authorities, as well as the reasoning of *McKee*, lead us to conclude that, by its very nature, arbitration under the Texas Arbitration Act is a mechanism by which the [*222] parties to a contract reach a *binding resolution* to their differences.

In *McDonnell Douglas Finance Corp. v. Pennsylvania Power & Light Co., 858 F.2d 825, 830-31 (2nd Cir. 1988)*, the court considered whether the parties had entered a binding arbitration agreement. The clause at issue provided:

---

Should the Builder of Homebuyer(s) disagree with the Insurer's decision to deny the claim as recommended by the Service, the contesting party shall call for conciliation with the Service or an arbitration to be conducted by the American Arbitration Association (A.A.A.), or other mutually agreeable arbitration service at the Service's expense . . . . The conciliation and/or arbitration process will be conducted in accordance with the warranty conditions described herein and the rules and regulations of the A.A.A. or other mutually agreeable arbitration service. The dispute settlement process shall precede any litigation attempted by either party on items that are specifically included in this warranty. . . . The dispute will be resolved or an award rendered by the arbitrator within 40 days from the time the form is received by the arbitration service.

If the Company should disagree with any Owner's computation of the amount of the required indemnity payment or refund thereof as provided below or if any Owner should disagree with such good faith determination of the Company that there is substantial risk, *the Company and the Owner shall appoint an independent tax counsel to resolve the dispute*, and if the parties cannot agree to the appointment of such counsel, said independent tax counsel shall be appointed by the American **[\*\*13]** Arbitration Association and the Company shall not be obligated to pay, and such Owner shall not be obligated to refund, the disputed portion of such amount until and only to the extent that such dispute is resolved adversely to the party required to make payment.

*Id. at 827* (emphasis added). The Second Circuit stated that it was irrelevant that the clause did not use the word "arbitration;" what was important was that the parties agreed to submit their dispute for binding resolution by a third party. *858 F.2d at 830-31*. Similarly, the absence of the words "final" or "binding" was considered insignificant. *Id. at 830*.

The agreement in this case designates a mechanism for choosing an arbitrator. The agreement also gives an example of the type of claim that will be referred to arbitration. In the example, the agreement states that the arbitrator "will set fair value" of intangible assets received in any settlement. The use of the term "will set," like the use of the term "resolve" in *McDonnell Douglas*, indicates that the arbitrator's decision will be final. The arbitration clause does not provide for any appeal mechanism.

We hold that the mere omission of the term **[\*\*14]** "binding" from an arbitration agreement does not automatically transform it into a nonbinding arbitration agreement. The arbitration agreement in the present case provides for binding arbitration. Therefore, the trial court erred by denying Porter & Clements' motion to compel binding arbitration.

We sustain Porter & Clements' sole point of error.

We reverse the judgment of the trial court and remand for further proceedings consistent with this opinion.

/s/ Margaret Garner Mirabal

Justice

Justices O'Connor and Wilson also sitting.

Judgment rendered and opinion delivered



Positive

As of: September 1, 2015 5:27 PM EDT

## *Prescott-Follett & Assocs. v. Delasa/ Prescott Follett & Assocs.*

United States District Court for the Eastern District of Louisiana

November 8, 2002, Decided ; November 8, 2002, Filed; November 12, 2002, Entered

CIVIL ACTION No. 01-3178 SECTION: I/2

**Reporter**

2002 U.S. Dist. LEXIS 21988; 2002 WL 31528463

PRESCOTT-FOLLETT & ASSOCIATES, INC. ET AL versus DELASA/ PRESCOTT FOLLETT & ASSOCIATES, ET AL

**Subsequent History:** Appeal dismissed by *Prescott-Follett & Assocs. v. Delasa/Prescott-Follett & Assocs., 2004 U.S. App. LEXIS 11035 (5th Cir. Tex., June 7, 2004)*

**Disposition:** **[*1]** Defendant's motion to compel arbitration granted. Case stayed pending arbitration.

## Core Terms

arbitration, operating agreement, parties, arbitration clause, plaintiffs', inducement, commerce, void, judicial process, defendants', charges, lawsuit, Lease, compel arbitration, district court, court finds, Memorandum, waive

## Case Summary

### Procedural Posture

Plaintiffs sued defendants to have a November operating agreement declared null and void and to reinstate a March operating agreement. Plaintiffs also sought damages for defendant's alleged breach of the March operating agreement. Defendants moved to compel arbitration.

### Overview

The parties formed a Delaware limited liability company (one of the defendants) for the purpose of securing a 25 year lease of the port facilities at Puerto Cabezas, Nicaragua. The parities signed an operating agreement in March of 1999 which contained an arbitration agreement. In November of 1999 the parties negotiated a new operating agreement. The Delaware company's agent in Nicaragua wrongfully deposited checks that belonged to the Delaware company into another account. The court found that both the March and November operating agreements contained an identical arbitration clause. Plaintiffs' fraud defense related to the operating agreements generally therefore the Federal Arbitration Act (FAA), *9 U.S.C.S. § 1 et seq.*, mandated that plaintiffs' claims be resolved by the arbitrator. Defendants' filing of alleged civil and/ or criminal matters in Nicaragua against the agent and another person did not amount to a substantial invocation of the judicial process and it was not inconsistent with defendants' desire to arbitrate the present claims arising out of the parties' operating agreement.

**Outcome**

The motion to compel arbitration was granted.

# LexisNexis® Headnotes

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview

Civil Procedure > ... > Arbitration > Federal Arbitration Act > General Overview

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Validity of ADR Methods

Constitutional Law > Congressional Duties & Powers > Commerce Clause > General Overview

Constitutional Law > ... > Commerce Clause > Interstate Commerce > Prohibition of Commerce

Contracts Law > Contract Conditions & Provisions > Arbitration Clauses

International Trade Law > Dispute Resolution > International Commercial Arbitration > Arbitration

Transportation Law > Interstate Commerce > Federal Powers

*HN1* The Federal Arbitration Act (FAA), *9 U.S.C.S. § 1 et seq.*, applies to written arbitration provisions contained in contracts involving commerce and its reach is coextensive with the Congressional power to regulate under the *Commerce Clause*.

Admiralty & Maritime Law > Arbitration > General Overview

Admiralty & Maritime Law > Maritime Contracts > General Overview

Civil Procedure > ... > Arbitration > Federal Arbitration Act > General Overview

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Validity of ADR Methods

International Trade Law > Dispute Resolution > International Commercial Arbitration > Arbitration

*HN2* See *9 U.S.C.S. § 2*.

Civil Procedure > ... > Diversity Jurisdiction > Alienage Jurisdiction > General Overview

Civil Procedure > ... > Arbitration > Federal Arbitration Act > General Overview

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Validity of ADR Methods

International Trade Law > General Overview

International Trade Law > Dispute Resolution > International Commercial Arbitration > Arbitration

*HN3* With regard to the Federal Arbitration Act (FAA), *9 U.S.C.S. § 1 et seq.*, the term "commerce" refers to commerce among the several states or with foreign nations, *9 U.S.C.S. § 1*, and it is to be broadly construed. Furthermore, it is well established that although the FAA is substantive law, the FAA applies in diversity cases because Congress has so intended.

Civil Procedure > ... > Subject Matter Jurisdiction > Federal Questions > General Overview

Civil Procedure > ... > Arbitration > Federal Arbitration Act > General Overview

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Validity of ADR Methods

Contracts Law > Contract Conditions & Provisions > Arbitration Clauses

International Trade Law > Dispute Resolution > International Commercial Arbitration > Arbitration

**HN4** The Federal Arbitration Act (FAA), *9 U.S.C.S. § 1 et seq.*, preempts state law.

> Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview
>
> Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > Arbitrability
>
> Civil Procedure > ... > Arbitration > Federal Arbitration Act > General Overview
>
> Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Mandatory ADR
>
> Contracts Law > Contract Conditions & Provisions > Arbitration Clauses
>
> Contracts Law > Formation of Contracts > Execution
>
> International Trade Law > Dispute Resolution > International Commercial Arbitration > Arbitration

**HN5** The Federal Arbitration Act (FAA), *9 U.S.C.S. § 1 et seq.*, expresses a strong presumption favoring arbitration of disputes and all doubts concerning the arbitrability of claims should be resolved in favor of arbitration. By its terms, the FAA leaves no place for the exercise of discretion by a district court, but instead mandates that district courts shall direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed. In determining whether the parties should be compelled to arbitrate a dispute, the court performs a two-step inquiry. First, the court must determine whether the parties agreed to arbitrate the dispute. Once the court finds that the parties agreed to arbitrate, it must consider whether any federal statute or policy renders the claims nonarbitrable. In conducting this two step analysis, courts must not consider the merits of the underlying action.

> Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview
>
> Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Mandatory ADR
>
> Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Validity of ADR Methods
>
> Contracts Law > Contract Conditions & Provisions > Arbitration Clauses
>
> Labor & Employment Law > Collective Bargaining & Labor Relations > Labor Arbitration > Enforcement
>
> Labor & Employment Law > Collective Bargaining & Labor Relations > Federal Preemption > Primacy of Labor Policy

**HN6** A court must determine whether the parties agreed to arbitrate the dispute, this determination involves two considerations: (1) whether there is a valid agreement to arbitrate between the parties; and (2) whether the dispute in question falls within the scope of that arbitration agreement.

> Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview
>
> Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Mandatory ADR
>
> Contracts Law > Contract Conditions & Provisions > Arbitration Clauses

**HN7** Where an arbitration clause is "broad," the action should be stayed and the arbitrator permitted to decide if the dispute falls within the clause. Whereas in cases where the clause is "narrow," the case is not referred to arbitration or stayed, unless the court determines that the dispute falls within the clause.

> Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview
>
> Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Validity of ADR Methods
>
> Contracts Law > Contract Conditions & Provisions > Arbitration Clauses

**HN8** With regard to arbitration, clauses which contain the term "any dispute" have been held to be "broad."

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview

Civil Procedure > ... > Arbitration > Federal Arbitration Act > General Overview

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Validity of ADR Methods

Contracts Law > Contract Conditions & Provisions > Arbitration Clauses

Contracts Law > ... > Affirmative Defenses > Fraud & Misrepresentation > General Overview

International Trade Law > Dispute Resolution > International Commercial Arbitration > Arbitration

*HN9* The United States Supreme Court holds that pursuant to the Federal Arbitration Act (FAA), *9 U.S.C.S. § 1 et seq.*, if the claim is fraud in the inducement of the arbitration clause itself -- an issue which goes to the "making" of the agreement to arbitrate -- the federal court may proceed to adjudicate it, but the federal court cannot consider claims of fraud in the inducement of the contract itself. Thus, unless a defense relates solely to the arbitration clause, it must be submitted to the arbitrator for consideration as part of the underlying dispute between the parties.

Civil Procedure > ... > Responses > Defenses, Demurrers & Objections > Waiver & Preservation of Defenses

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > Arbitrability

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > Waiver

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Validity of ADR Methods

Contracts Law > Contract Conditions & Provisions > Waivers > General Overview

*HN10* Waiver of arbitration is not a favored finding and there is a presumption against it. In general, courts hesitate to find that a party has waived its contractual right to arbitration. Any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract itself or an allegation of waiver, delay, or a like defense to arbitrability. Accordingly, a party asserting waiver of arbitration bears a heavy burden of proof. Waiver will be found when the party seeking arbitration substantially invokes the judicial process to the detriment or prejudice of the other party. Waiver requires a showing of both a substantial invocation of the judicial process and either detriment or prejudice to the other party. Finally, it is well established that a party only invokes the judicial process to the extent it litigates a specific claim it subsequently wants to arbitrate. Only prior litigation of the same legal and factual issues as those the party now wants to arbitrate results in a waiver of the right to arbitrate.

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Validity of ADR Methods

Labor & Employment Law > Collective Bargaining & Labor Relations > Federal Preemption > Primacy of Labor Policy

*HN11* With regard to waiver of arbitration, "substantial" invocation of the judicial process requires active participation in a lawsuit or some other type of act inconsistent with the desire to arbitrate. With respect to the requirement of "prejudice," the United States Court of Appeals for the Fifth Circuit holds that, when one party reveals a disinclination to resort to arbitration on any phase of a lawsuit involving all parties, those parties are prejudiced by being forced to bear the expenses of a trial. Arbitration is designed to avoid this very expense. Substantially invoking the litigation machinery qualifies as the kind of prejudice that is the essence of waiver.

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview

Civil Procedure > ... > Arbitration > Federal Arbitration Act > General Overview

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > Waiver

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Validity of ADR Methods

International Trade Law > Dispute Resolution > International Commercial Arbitration > Arbitration

*HN12* Federal courts hold that the Federal Arbitration Act (FAA), *9 U.S.C.S. § 1 et seq.*, while promoting arbitration, does not contemplate the arbitration of criminal activity.

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Validity of ADR Methods

Contracts Law > Contract Conditions & Provisions > Arbitration Clauses

*HN13* Arbitration clauses containing the "any dispute" language are of the broad type.

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Mandatory ADR

Contracts Law > Contract Conditions & Provisions > Arbitration Clauses

*HN14* Absent allegations of fraud in the inducement of the arbitration clause itself, arbitration must proceed when an arbitration clause on its face appears broad enough to encompass the party's claims.

**Counsel:** For PRESCOTT-FOLLETT & ASSOCIATES, INC., LATIN AMERICA ENERGY DEVELOPMENT, INC., plaintiffs: John I. Hulse, IV, Hulse & Wanek, New Orleans, LA.

For DELASA/ PRESCOTT FOLLETT & ASSOCIATES, ALMA FINANCE GROUP, KRIS N MAHABIR, ARETE LLC, MARY A WRIGHT, defendants: Guy W. Smith, Simon, Peragine, Smith & Redfearn, LLP, New Orleans, LA.

**Judges:** LANCE M. AFRICK, UNITED STATES DISTRICT JUDGE.

**Opinion by:** LANCE M. AFRICK

## Opinion

Before this Court is the motion of defendants, Delasa/ Prescott Follett & Associates, a Delaware limited liability company, Alma Finance Group, Kris N. Mahabir, Arete, LLC, and Mary Wright, to compel arbitration pursuant to an operating agreement of Delasa/ Prescott Follett & Associates. Plaintiffs, Prescott-Follett & Associates, Inc. and Latin American Energy Development, Inc. d/ b/ a Delasa oppose the motion. For the following reasons, the motion is **GRANTED.**

*FACTUAL BACKGROUND*

In 1999, Prescott-Follett & Associates, Inc., Latin American **[*2]** Energy Development, Inc. d/ b/ a Delasa, [1] Alma Finance Group, and Arete, LLC, (the "Parties") formed a Delaware limited liability company, Delasa/ Prescott-Follett & Associates LLC (the "Delaware Company"), for the purpose of securing a twenty five year

---

[1]   Plaintiffs, Prescott-Follett & Associates, Inc. and Latin American Energy Development, Inc. d/ b/ a Delasa, are both Louisiana corporations. Alma Finance Group and Arete LLC are foreign companies. R. Doc. No. 1, P 1.

lease of the port facilities at Puerto Cabezas, Nicaragua. [2] [*3] Shortly after forming the Delaware Company, the Parties signed an operating agreement dated March 29, 1999, (the "March Operating Agreement") to formalize their agreement to work together on the project. [3] The March Operating Agreement contained a clause requiring that, "in the Event of any dispute under this Agreement, such dispute shall be settled by arbitration in New York, New York, in accordance with the rules then promulgated by the American Arbitration Association …" [4]

In November 1999, the Parties allegedly negotiated a new operating agreement (the "November Operating Agreement"). The terms of the November Operating Agreement were substantially different from the March Operating Agreement, but contained the same dispute resolution clause as the original March Operating Agreement, in that it required the members to resolve "any dispute under this Agreement … by arbitration in New York." [5]

The Delaware Company was ultimately successful in securing the lease and it assumed control of the port at Puerto Cabezas in July, 2001. [6] As a prerequisite for doing business in Nicaragua, Nicaraguan law required the Delaware Company to be registered in Nicaragua and to appoint an agent who resided in Nicaragua. [7] The Delaware Company appointed [*4] Arnaldo Talavera to act as its agent and it granted him power of attorney to handle, *inter alia,* certain banking transactions for the Delaware Company. [8]

In August, 2001, the majority shareholder of the Delaware Company requested that Talavera provide an accounting of funds he handled on behalf of the Delaware Company. [9] Talavera failed to respond to these requests. Shortly thereafter, it was discovered that John Wheelock [10] had allegedly opened a bank account in Nicaragua under the same name as the Delaware Company and that he wrongfully deposited checks belonging to the Delaware Company. [11]

[*5] Consequently, the Delaware Company filed charges in Nicaragua against Talavera on September 18, 2002, seeking an accounting of the Delaware Company's funds. [12] On December 12, 2001, a judge of the Criminal Court of Puerto Cabezas convicted Talavera of the crime of theft with abuse of trust in violation of the Nicaraguan Criminal Code. [13] In the judgment of conviction, defendants allege that the judge also set forth a

---

[2] R. Doc. No. 18, Memorandum, p. 2.

The purpose of the project was "the commercial, long-term development and privatization of Puerto Cabezas, as a major port in Nicaragua, on the Atlantic coast, serving the North Atlantic Autonomous Region of Nicaragua." R. Doc. No. 1, P 8.

[3] *Id.* at pp. 2-3.

[4] R. Doc. No. 5, Exhibit D-1, Article XXII, § 22.1.

[5] R. Doc. No. 18, Exhibit 1, Operating Agreement, Article 10, § 10.1.

[6] R. Doc. No. 18, Memorandum, p. 3.

[7] *Id.*

[8] *Id.* at p. 4.

[9] *Id.*

[10] John Wheelock is the principal of Latin American Energy Development d/ b/ a Delasa, and a member of the Delaware Company. R. Doc. No. 1, P 8-9.

[11] R. Doc. No. 18, p. 4. Plaintiffs dispute that Wheelock wrongfully deposited money into this account.

[12] R. Doc. No. 18, p. 5; R. Doc. No. 5, Exhibits M-1, M-2, and N.

[13] R. Doc. No. 18, p. 5; R. Doc. No. 32, p. 2.

criminal complaint [14] against Wheelock for being presumed to be Talavera's co-conspirator. [15] Plaintiffs agree that Wheelock was subsequently convicted of this alleged crime *in absentia.* [16]

 [*6]  On October 19, 2001, plaintiffs filed the present lawsuit seeking to have the November Operating Agreement declared null and void and to reinstate the March Operating Agreement. Plaintiffs also seek damages arising from the defendants' alleged breach of the March Operating Agreement.

*LAW AND ANALYSIS*

***HN1*** The Federal Arbitration Act ("FAA") applies to written arbitration provisions contained in contracts involving commerce and "its reach is coextensive with the Congressional power to regulate under the *Commerce Clause.*" *Trapp Chevrolet-Oldsmobile-Cadillac, Inc. v. General Motors Corporation, 2002 U.S. Dist. LEXIS 10412, 2002 WL 11633611*, *2 (E.D.La. 5/31/02). Specifically, *Section 2* of the FAA provides:

> ***HN2*** A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity [*7]  for the revocation of any contract.

*9 U.S.C. § 2*. ***HN3*** The term "commerce" refers to "commerce among the several States or with foreign nations" [17] and it is to be broadly construed. *Atlantic Aviation, Inc. v. EBM Group, Inc., 11 F.3d 1276, 1280 (5th Cir. 1994)*. Furthermore, it is well established that although the FAA is substantive law, the Act applies "in diversity cases because Congress has so intended." [18] *Allied Bruce Terminex Companies, Inc. v. Dobson, 513 U.S. 265, 271, 115 S. Ct. 834, 838, 130 L. Ed. 2d 753 (1995)*.

In this case, none of the parties dispute that the operating agreements between the parties are contracts involving commerce within the meaning of *9 U.S.C. § 2*. [19] Moreover, it is also undisputed that both the March and November [*8]  operating agreements contain written arbitration provisions. [20] Accordingly, the FAA governs this Court's determination regarding the arbitrability of this dispute.

 [*9]  ***HN5*** The FAA expresses a strong presumption favoring arbitration of disputes and "all doubts concerning the arbitrability of claims should be resolved in favor of arbitration." *Primerica Life Insurance Co. v. Brown,*

---

[14]    According to the record, the judge ordered that an "instructive of law" be opened against Wheelock. R. Doc. No. 32, p. 5.

[15]    R. Doc. No. 18, p. 5 and Exhibit 2.

[16]    R. Doc. No. 23, p. 12. Plaintiffs further argue that the conviction was subsequently overturned by the judge who held that the charges against Wheelock were civil in nature. Id. However, plaintiffs arguments are unsupported by any evidence in the record.

[17]    *9 U.S.C. § 1*.

[18]    In fact, the U.S. Supreme Court has made it clear that ***HN4*** the FAA preempts state law. *Id., 513 U.S. at 272, 115 S. Ct. at 838*.

[19]    R. Doc. No. 18, Memorandum, p. 6; R. Doc. No. 23, pp. 1, 6-7. Although the parties dispute whether the March or November operating agreement should apply, it is clear that both agreements "involve commerce" as the parties to the agreements are residents of different states and the agreements relate to the operations of a Delaware Company whose business was the development of a major foreign port in Nicaragua. As such, they fall under the coverage of the FAA. *See Rushe v. NMTC, Inc.,* 2002 U.S. Dist. LEXIS 7420, 2002 WL 575706, *5 (E.D.La. 4/16/02)(holding that where distributorship agreement was between residents of different states and involved the distribution of products from outside the State of Louisiana and "where the claims and allegations of the suit involved meetings and communications which took place between Ohio and Louisiana," the agreement was one which involved commerce within the meaning of the FAA).

[20]    R. Doc. No. 18, Memorandum, p. 6; R. Doc. No. 1, p. 1.

*304 F.3d 469, 471 (5th Cir. 2002)*. "By its terms, the Act leaves no place for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Dean Witter Reynolds, Inc. v. Byrd, 470 U.S. 213, 217-18, 105 S. Ct. 1238, 1241, 84 L. Ed. 2d 158 (1985)*(emphasis added). In determining whether the parties should be compelled to arbitrate a dispute, the Court performs a two-step inquiry. *Primerica Life Insurance Co. v. Brown, 304 F.3d 469, 471 (5th Cir. 2002)*. "First, the court must determine whether the parties agreed to arbitrate the dispute. [21] Once the court finds that the parties agreed to arbitrate, it must consider whether any federal statute or policy renders the claims nonarbitable." *Id.* In conducting this two step analysis, "courts must not consider the merits of the underlying [*10] action." *Downer v. Siegel, 2002 U.S. Dist. LEXIS 17752, 2002 WL 31106920*, *2 (E.D.La. 9/19/02).

Here, plaintiffs do not deny that both the March and November operating agreements at issue contain an identical arbitration clause requiring "any dispute" under the agreement to be arbitrated in New York. [22] Likewise, plaintiffs do not contest that their claims for breach of the original operating agreement (i.e. the March Operating Agreement) fall within the broad scope [23] [*12] of the arbitration clause. [24] Rather, plaintiffs sole argument is that they should not be compelled to arbitrate at all because both the March and November agreements are invalid as a whole as a result of fraudulent misrepresentations by the defendants. [25] Specifically, [*11] plaintiffs contend "that the entire consent to form the contract initially was obtained by the fraud,

---

[21] This **HN6** determination involves two considerations: "(1) whether there is a valid agreement to arbitrate between the parties; and (2) whether the dispute in question falls within the scope of that arbitration agreement." *Webb v. Investacorp, Inc., 89 F.3d 252, 258 (5th Cir. 1996)*.

[22] R. Doc. No. 5, Exhibit D-1, Operating Agreement, Article XXII, § 22.1; R. Doc. No. 18, Exhibit 1, Article 10, § 10.1.

[23] The Fifth Circuit has differentiated between arbitration clauses which are "broad" and those which are "narrow." *Rushe, 2002 U.S. Dist. LEXIS 7420, 2002 WL 575706* at *5. **HN7** "Where an arbitration clause is 'broad,' the action should be stayed and the arbitrator permitted to decide if the dispute falls within the clause. Whereas in cases where the clause is 'narrow,' the case is not referred to arbitration or stayed, unless the Court determines that the dispute falls within the clause." *Id.* (citing In *Re Complaint of Hornbeck Offshore Corp., 981 F.2d 752, 755 (5th Cir. 1993)).

**HN8** Clauses which contain the term "any dispute" have been held to be "broad." *Id.;* see also *Pennzoil Exploration & Prod. Co. v. Ramco Energy, 139 F.3d 1061, 1067*; *Mesa Operating Limited Partnership v. Louisiana Intrastate Gas Corporation, 797 F.2d 238, 244 (5th Cir. 1986)*(finding that arbitration clause requiring arbitration of "any controversy between the parties … arising under this Contract" was broad); *Rojas v. TK Communications, Inc., 87 F.3d 745 (5th Cir. 1996)*("any other dispute" was sufficiently broad); *In Re Complaint of Hornbeck, 981 F.2d at 755* (holding that arbitration clause in towage agreement providing for reference to arbitration of "any dispute" arising between the parties was broad); *Sedco v. Petroleos Mexicanos Mexican Nat'l Oil, 767 F.2d 1140, 1144 (5th Cir. 1985)*(finding that clause providing for arbitration of "any dispute or difference between the parties" was sufficiently broad); *Neal v. Hardee's Food Systems, Inc., 918 F.2d 34, 38 (5th Cir. 1990)*(clause governing "any and all disputes" between the parties was broad). In this case, both the March and November Operating Agreements contain identical arbitration provisions requiring arbitration of "any dispute under this Agreement." The Court finds that regardless of which operating agreement is applied, the clauses are of the "broad" type. Therefore, in accordance with the jurisprudence, the matter should be stayed and submitted to arbitration.

[24] In fact, plaintiffs do not even address this issue in their opposition memorandum.

[25] R. Doc. No. 23, p. 7-10. The Court notes that plaintiffs' original and first supplemental and amending complaints assert only that the November Operating Agreement should be voided. R. Doc. No. 1, R. Doc. No. 5. On September 19, 2002, plaintiffs requested leave to file a second supplemental and amending complaint wherein they asserted claims that the March operating agreement should also be rescinded on the same basis as the November agreement. R. Doc. No. 27. Although the Court denied plaintiffs request for leave, the Court, in the interest of justice, nevertheless considers plaintiffs' arguments with respect to the March Operating Agreement as these are raised in opposition to the present motion to compel arbitration.

manipulation and misrepresentation″ [26] of facts by the defendants ″upon which the plaintiffs relied, and without which the entire contract, including the arbitration clause, would never have been entered into or agreed to.″ [27]

The Court notes that plaintiffs' arguments, legally actionable as they may be, do not render their claims nonarbitrable. At no time have plaintiffs asserted that there was fraud in the inducement or misrepresentations relative [*13] to the arbitration clause alone. [28] [*14] In *Prima Paint Corporation v. Flood & Conklin Mfg. Co.,* 388 U.S. 395, 403-04, 87 S. Ct. 1801, 1806, 18 L. Ed. 2d 1270 (1967), the **HN9** United States Supreme Court specifically held that pursuant to the FAA, ″'if the claim is fraud in the inducement of the arbitration clause itself -- an issue which goes to the 'making' of the agreement to arbitrate -- the federal court may proceed to adjudicate it,' but the federal court cannot consider claims of fraud in the inducement of the contract itself.″ *Downer v. Siegel, 2002 U.S. Dist. LEXIS 17752, 2002 WL 31106920*, *2 (E.D.La. 9/19/02)(citing *Prima Paint,* 388 U.S. at 403-04, 87 S. Ct. at 1806)). Thus, unless a defense relates solely to the arbitration clause, it must be submitted to the arbitrator for consideration as part of the underlying dispute between the parties. [29] *Primerica Life Insurance Co. v. Brown, 304 F.3d 469, 471-72 (5th Cir. 2002).*

 [*15] Plaintiffs in this case seek a declaratory judgment that the November operating agreement is ″null, void, ultra vires, in violation of the Original Consent and Terms of the Operating Agreement, and of no effect whatsoever″ as a result of alleged fraudulent misrepresentations by the defendants. [30] In their opposition to the motion to compel arbitration, the plaintiffs further allege that ″even the March 29 Operating Agreement was manipulated by defendants″ and should be voided. [31] As plaintiffs' fraud defense relates to the operating agreements *generally,* the jurisprudence and the FAA mandate that plaintiffs' claims, including the fraud in the inducement defense, be resolved by the arbitrator. [32] See *Prima Paint,* 388 U.S. 395, 404, 87 S. Ct. 1801, 1806, 18 L. Ed. 2d 1270; *Rushe, 2002 U.S. Dist. LEXIS 7420, 2002 WL 575706* at *7.

---

[26] R. Doc. No. 23, p. 14.

[27] *Id.* at p. 7.

[28] Plaintiffs' contention that the arbitration clause should be voided because the entire contract is null and void is not a challenge to the arbitration clause, itself, but a challenge to the entire contract, *including* the arbitration clause.

[29] *See Primerica Life Insurance Company v. Brown,* 304 F.3d 469, 471-72 (5th Cir. 2002)(holding that where defendant's capacity defense was a defense to the entire agreement and not a specific challenge to the arbitration clause, the defense was part of the underlying dispute between the parties which must be submitted to the arbitrator); *Snap-On Tools Corp. v. Mason,* 18 F.3d 1261, 1267-68 (5th Cir. 1994)(submitting allegations of fraud in the inducement to arbitration because allegations did not concern arbitration clause specifically, but rather was a challenge to the contract in its entirety); *Lawrence v. Comprehensive Business Services Company,* 833 F.2d 1159, 1162 (5th Cir. 1987)(submitting defense of illegality of the contract to arbitration because it was not a challenge to the arbitration clause, itself, but rather to the contract as a whole); *Mesa Operating Limited Partnership v. Louisiana Intrastate Gas Corp.,* 797 F.2d 238, 244 (5th Cir. 1986)(submitting to arbitration a defense that contract was void from its inception because defendant did not argue ″that the agreement to arbitrate [was] invalid separately from the entire contract).

[30] R. Doc. No. 1, P 21,

[31] R. Doc. No. 23, p. 2.

[32] Plaintiffs cite *George Engine Co., Inc. v. Southern Shipbuilding Corp.,* 350 So.2d 881 (La. 1977) in support of their contention that the district court, not the arbitrator, has jurisdiction to decide the issue of fraud in the inducement of a contract containing an arbitration clause. *Id.* at 884. In *George Engine,* the Louisiana Supreme Court declined to follow *Prima Paint.* However, in *Rushe* and *Downer,* the federal district courts, faced with the same argument presented by the plaintiffs herein, rejected the holding in *George Engine,* explaining that in *George Engine* the Louisiana Supreme Court ″was interpreting the Louisiana Arbitration Act §§ 4201, 4203, not the FAA.″ *Rushe,* 2002 U.S. Dist. LEXIS 7420, 2002 WL 575706 at *6; *Downer,* 2002 U.S. Dist. LEXIS 17752, 2002 WL 31106920 at *3, n. 3.

**[*16]** Plaintiffs next argue that arbitration should be denied in this case because defendants sought the intervention of the judicial system in Nicaragua rather than resorting to arbitration, thereby waiving their right to compel arbitration. [33] Specifically, in their supplemental and amending complaint plaintiffs aver:

> Defendants have waived any right to arbitration of this claim both by their filing or causing the filing of civil and criminal litigation against John Wheelock and Arnoldo Talavera in matters arising out of the Lease and Operating Agreement; and by their conscious and deliberate efforts to violate, illegally modify and undermine the operation of DELASA/ Delaware and the proper operation of Puerto Cabezas under the Lease. [34]

"*HN10* Waiver of arbitration is not a favored finding and there is a presumption against it." *Lawrence v. Comprehensive Bus. Servs. Co., 833 F.2d 1159, 1164 (5th Cir. 1987)*; *Subway Equipment Leasing v. Forte, 169 F.3d 324, 326 (5th Cir. 1999)* **[*17]** ("There is a strong presumption against waiver of arbitration"); *Walker v. J.C. Bradford & Co., 938 F.2d 575, 577 (5th Cir. 1991)*("In general, we hesitate to find that a party has waived its contractual right to arbitration."); *Moses H. Cone Mem'l Hosp., 460 U.S. 1, 24-25, 103 S. Ct. 927, 941, 74 Led.2d 765 (1983)*("Any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract itself or an allegation of waiver, delay, or a like defense to arbitrability"). Accordingly, a party asserting waiver of arbitration bears a heavy burden of proof. *Subway, 169 F.3d at 326 (5th Cir. 1999)*. "Waiver will be found when the party seeking arbitration substantially invokes the judicial process to the detriment or prejudice of the other party." *Miller v. Brewing Co. v. Forth Worth Distrib. Co., 781 F.2d 494, 497 (5th Cir. 1986)*. Waiver requires a showing of "both a substantial invocation of the judicial process and either detriment or prejudice to the other party." [35] *Consorcio Rive v. Briggs of Cancun, Inc., 134 F. Supp.2d 789, 795 (E.D.La. 2001)*. **[*18]** Finally, it is well established that "a party only invokes the judicial process to the extent it litigates a specific claim it subsequently wants to arbitrate." *Subway, 169 F.3d at 328*; *Doctor's Associates v. Distajo, 107 F.3d 126, 134 (2nd Cir. 1997)*("Only prior litigation of the same legal and factual issues as those the party now wants to arbitrate results in a waiver of the right to arbitrate").

**[*19]** Defendants' filing of alleged civil and/ or criminal matters in Nicaragua against Talavera and Wheelock did not amount to a substantial invocation of the judicial process and it was not inconsistent with the defendants' desire to arbitrate the present claims arising out of the parties' operating agreement. With respect to the alleged civil and criminal proceedings against Talavera, plaintiffs have presented no evidence that Talavera was a member of the Delaware Company or a party to the March and/ or November agreements. [36] **[*21]** Accordingly, the Court fails to see how litigation against a non-party to an agreement can result in a waiver of arbitration

---

[33] R. Doc. No. 23, p. 11.

[34] R. Doc. No. 5, P 50.

[35] *HN11* "Substantial" invocation of the judicial process requires "active participation in a lawsuit or some other type of act inconsistent with the desire to arbitrate." *Consorcio Rive v. Briggs of Cancun, Inc.,* 134 F. Supp.2d 789, 795 (E.D.La. 2001). With respect to the requirement of "prejudice," the Fifth Circuit has held that, "when one party reveals a disinclination to resort to arbitration on any phase of a lawsuit involving all parties, those parties are prejudiced by being forced to bear the expenses of a trial … Arbitration is designed to avoid this very expense. Substantially invoking the litigation machinery qualifies as the kind of prejudice … that is the essence of waiver." *Id.* (quoting *E.C. Ernst, Inc. v. Manhattan Construction Co. of Texas,* 559 F.2d 268, 269 (5th Cir. 1977)).

[36] To the contrary, the Operating Agreements themselves show that the only parties to the operating agreements and the only entities/ individuals having an ownership interest in the Delaware Company are Alma Finance (through its principal, Kris N. Mahabir), Arete LLC (through its principal, Mary A. Wright), Delasa, Inc. (through its principal John F. Wheelock), Prescott Follett and Associates, Inc. (through its principal, Prescott Follett), Michael Beaury, and Todd Esse. See R. Doc. No. 18, Exhibit 1, Schedule A.

rights pursuant to that agreement. [37] Further, defendants' actions in filing proceedings against Talavera for theft of funds could not have resulted in any detriment or prejudice to plaintiffs with respect to this action. Plaintiffs were not even parties to the litigation against Talavera and did not have to bear the expense of burdensome litigation. Plaintiffs' claims against defendants for breach of the operating agreements are unrelated to any claims against Talavera, individually, for alleged theft of funds. Consequently, the Court [*20] finds that any proceeding by defendants against Talavera, whether civil or criminal, did not result in a waiver of arbitration rights in this matter. See *Subway Equip. Leasing Corp. v. Forte, 169 F.3d 324, 328* (holding that franchisor did not waive right to arbitration under franchise agreement by filing previous lawsuit against franchisees where the earlier action involved claims that were different from the one the franchisor now sought to arbitrate); *Amalgamated Local No. 55, United Automobile, Aerospace & Agricultural Implement Workers of America v. Metal and Alloy Division of Silver Creek Precision Corporation, 396 F. Supp. 667, 670 (N.D.N.Y. 1975)*(finding that union did not waive arbitration under collective bargaining agreement by filing criminal charge against one of employer's officers where criminal action was based upon different issues than those before the court and was brought against an individual and not the defendant corporation).

Similarly, the Court finds that the alleged filing of criminal charges against Wheelock [38] [*22] did not amount to a waiver of defendants' right to arbitrate. **HN12** Federal courts have held that the FAA, while promoting arbitration, does not contemplate the arbitration of criminal activity. See *Myers v. Rosenberg, 1986 U.S. Dist. LEXIS 28488, 1986 WL 3329*, *2 (N.D.Ill. 3/7/86). Therefore, defendants' alleged filing of criminal charges cannot be held to be inconsistent with their desire to arbitrate. Nor can it be held to have resulted in any detriment or prejudice to the plaintiffs, particularly in light of the fact that Wheelock "was convicted *in absentia,* being out of the Country of Nicaragua at the time, never having been formally faced with his accusers, never having been permitted to go to trial." [39] Accordingly, plaintiffs fail to meet their burden of proving a waiver of the arbitration.

In sum, the Court finds that there is no impediment to the arbitration of plaintiffs' claims. All of the parties, including the plaintiffs, admittedly signed the operating agreements. [40] All agreed to arbitrate "any dispute under the Agreement[s]." [41] Further, plaintiffs point to no federal statute or policy that may render their claims nonarbitrable. Consequently, considering the broad nature of the arbitration clause [42] [*23] and the U.S.

---

[37] Clearly, as a non-party to the agreement, there was no duty owed to Talavera to resolve any disputes arising out of the agreement through arbitration.

[38] The Court notes that although plaintiffs argue that civil charges were also filed against Wheelock, the evidence submitted by plaintiffs to the Court do not reveal the filing of any such civil matters. See R. Doc. No. 5, Exhibits M-1, M-2 and N. To the contrary, a review of the documents submitted by plaintiffs show that the only matter against Wheelock is/ was pending before the Criminal District Court of Puerto Cabezas. R. Doc. No. 5, Exhibit M-2. Accordingly, any arguments by plaintiff that a civil lawsuit was filed against Wheelock or, alternatively, that the criminal charges "were purely civil in nature," R. Doc. No. 23, p. 12, are merely speculative and unsupported by any evidence in the record.

[39] R. Doc. No. 23, p. 12. Because Wheelock was convicted *in absentia,* there was no "active participation in a lawsuit" sufficient to amount to substantial invocation of the judicial process. *Consorcio Rive,* 134 F. Supp.2d at 795.

[40] R. Doc. No. 23, p. 2.

[41] R. Doc. No. 23, p. 1.

[42] *In Re Complaint of Hornbeck Offshore Corp.,* 981 F.2d at 755 (**HN13** "Arbitration clauses containing the 'any dispute' language … are of the broad type.").

Supreme Court's pronouncement in *Prima Paint,* this Court holds that plaintiffs' claims, including their claim for fraud in the inducement of the operating agreement, must be submitted to arbitration. [43]

Accordingly,

**IT IS ORDERED** that the motion to compel arbitration of defendants, Delasa/ Prescott Follett & Associates, a Delaware Limited Liability Company, Alma Finance Group, Kris N. Mahabir, Arete, LLC, and Mary Wright, is **GRANTED.**

**IT IS FURTHER ORDERED** that the claims of plaintiffs, Prescott-Follett & Associates, Inc. and Latin American Energy Development, Inc. d/ b/ a Delasa, shall be submitted to arbitration, in accordance with the parties' arbitration agreement.

**IT IS FURTHER ORDERED** that this case **BE AND IS HEREBY STAYED PENDING ARBITRATION.**

**IT IS FURTHER ORDERED** that the Clerk of Court mark this action closed for statistical **[*24]** purposes and place this matter in a Civil Suspense File;

**IT IS FURTHER ORDERED** that the Court shall retain jurisdiction and the matter shall be restored to the trial docket if circumstances change this action, upon motion of a party, within thirty (30) days of any such change of circumstances, so that it may proceed to final disposition. This order shall not prejudice the rights of the parties to this litigation.

New Orleans, Louisiana, November 8, 2002.

**LANCE M. AFRICK**

**UNITED STATES DISTRICT JUDGE**

---

[43]    *Id.; Sedco, Inc. v. Petroleos Mexicanos Mexican National Oil Co.,* 767 F.2d 1140, 1148 (5th Cir. 1985)("'absent *HN14* allegations of fraud in the inducement of the arbitration clause itself, arbitration must proceed when an arbitration clause on its face appears broad enough to encompass the party's claims.'")(quoting *Life of America Insurance Co. v. Aetna Life Insurance Co.,* 744 F.2d 409, 413 (5th Cir. 1984)).



⚠️ Caution

As of: September 1, 2015 4:41 PM EDT

## *Prudential Sec. v. Marshall*

Supreme Court of Texas

November 16, 1995, Delivered

No. 95-0698

**Reporter**

909 S.W.2d 896; 1995 Tex. LEXIS 157; 39 Tex. Sup. J. 116

PRUDENTIAL SECURITIES INCORPORATED, JOHN RHOADES, KEVIN O'FRIEL, KENT VARNER, JOE NITTOLO, AND MIKE MCCLAIN, RELATORS v. THE HONORABLE JOHN MCCLELLAN MARSHALL, JUDGE, RESPONDENT

**Subsequent History:** Related proceeding at *Hawkins v. NASD, 149 F.3d 330, 1998 U.S. App. LEXIS 17610 (5th Cir. Tex., 1998)*

## Core Terms

arbitration, trial court, broker, subject to arbitration, right to arbitration, defendants', Securities, discovery, mandamus, allegations, scope of arbitration, compel arbitration, slander, libel, waive

## Case Summary

**Procedural Posture**

Defendants, former employer and current employees, sought mandamus relief from an order by the trial court (Texas), which denied arbitration of several libel and slander claims asserted against them by plaintiffs, former employees.

**Overview**

Plaintiff former employees were terminated and brought a cause of action against defendants, former employer and current employees, for libelous and slanderous statements they allegedly made. Defendants claimed that the Federal Arbitration Act, *9 U.S.C.S. §§ 1-14 (Act)*, required the trial court to enforce the arbitration agreement signed by the parties. The court found that under the Act any doubts to whether the claims fell within the scope of arbitration had to be resolved in favor of arbitration. The court, in determining whether a claim fell within the scope of arbitration, focused on the factual allegations of the complaint. The court held that plaintiffs' contention that their claims were outside the scope of the arbitration agreement was inherently inconsistent with their allegations that the statements were uttered to further a conspiracy to blackball them from the securities industry and tended to injure them as brokers. The court conditionally granted the writ of mandamus because in order to injure plaintiffs' professional reputations the statements had to touch upon their performance as brokers, which made their claims referable to arbitration.

**Outcome**

The court conditionally granted the writ of mandamus and directed the trial court to order that all claims proceed to arbitration because the claims at issue in the cause of action were within the scope of the parties' arbitration agreement. Furthermore, the policy in favor of enforcing arbitration agreements was compelling. The writ was to be issued only if the trial court failed to follow the court's order.

## LexisNexis® Headnotes

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > Waiver

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Validity of ADR Methods

*HN1* Arbitration of disputes is strongly favored under federal and state law.

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > Waiver

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Validity of ADR Methods

Contracts Law > Contract Conditions & Provisions > Arbitration Clauses

*HN2* A party does not waive a right to arbitration merely by delay; instead, the party urging waiver must establish that any delay has resulted in prejudice.

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > Waiver

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Validity of ADR Methods

Contracts Law > Contract Conditions & Provisions > Arbitration Clauses

*HN3* Parties do not waive their right to arbitration by invoking the judicial process in the absence of prejudice to the opposing party.

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview

Civil Procedure > ... > Arbitration > Federal Arbitration Act > General Overview

International Trade Law > Dispute Resolution > International Commercial Arbitration > Arbitration

*HN4* Under the Federal Arbitration Act, *9 U.S.C.S. §§ 1-14*, any doubts as to whether claims fall within the scope of the agreement must be resolved in favor of arbitration.

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Mandatory ADR

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Validity of ADR Methods

Contracts Law > Contract Conditions & Provisions > Arbitration Clauses

Labor & Employment Law > Collective Bargaining & Labor Relations > Labor Arbitration > Enforcement

*HN5* The policy in favor of enforcing arbitration agreements is so compelling that a court should not deny arbitration unless it can be said with positive assurance that an arbitration clause is not susceptible of an interpretation which would cover the dispute at issue.

Civil Procedure > ... > Federal & State Interrelationships > Federal Common Law > General Overview

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview

Civil Procedure > ... > Arbitration > Federal Arbitration Act > General Overview

Contracts Law > Contract Conditions & Provisions > Arbitration Clauses

International Trade Law > Dispute Resolution > International Commercial Arbitration > Arbitration

Labor & Employment Law > Collective Bargaining & Labor Relations > Federal Preemption > Primacy of Labor Policy

*HN6* When a party asserts a right to arbitration under the Federal Arbitration Act, 9 U.S.C.S. 1-14, the question of whether a dispute is subject to arbitration is determined under federal law.

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Validity of ADR Methods

Contracts Law > Contract Conditions & Provisions > Arbitration Clauses

*HN7* In determining whether a claim falls within the scope of an arbitration agreement, the court focuses on the factual allegations of the complaint, rather than the legal causes of action asserted.

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Validity of ADR Methods

Contracts Law > Contract Conditions & Provisions > Arbitration Clauses

Evidence > Burdens of Proof > General Overview

*HN8* The burden is upon plaintiffs to show that their claims fall outside the scope of the arbitration agreement.

Civil Procedure > Judicial Officers > Judges > Discretionary Powers

Civil Procedure > ... > Arbitration > Federal Arbitration Act > General Overview

Civil Procedure > Remedies > Writs > General Overview

International Trade Law > Dispute Resolution > International Commercial Arbitration > Arbitration

*HN9* Mandamus is issued only to correct a clear abuse of discretion when the abuse cannot be remedied by appeal.

**Counsel:** **[**1]** For RELATORS: Pierce, Jr., Mr. Stephen J., Bryant, Jr., Mr. Corbet F., Carrington Coleman Sloman & Blumenthal, Dallas, TX. Berry, Mr. Steven J., Wright, Mr. Robert L., Gardere & Wynne, Dallas, TX. Hill, Hon. John L., Essig, Mr. James E., Liddell Sapp Zivley Hill & LaBoon, Houston, TX.

For RESPONDENT: Abbey, Mr. Joe, B., Dallas, TX. Carlton, Mr. Dean, The Carlton Firm, Dallas, TX. Ackels, Jr., Joseph E., Ackels & Ackels, Dallas, TX.

## Opinion

 **[*897]** ON PETITION FOR WRIT OF MANDAMUS
PER CURIAM
Prudential Securities Incorporated, John Rhoades, Kevin O'Friel, Kent Varner, Joe Nittolo, and Mike McClain seek mandamus relief from a trial court order denying arbitration of several libel and slander claims asserted against them by the real parties in interest, former Prudential stockbrokers Edwin Troy Hawkins and Francis Moise. Because we conclude that the claims are within the scope of arbitration agreements Hawkins and Moise entered into with Prudential, we conditionally grant the relief requested.
While employed at Prudential, Hawkins and Moise each signed Uniform Applications for Securities Industry Registration or Transfer in which they agreed to arbitrate "any dispute, claim or controversy **[**2]** that may arise

between [them and Prudential] . . . that is required to be arbitrated under the rules" of organizations with which they were registered. Hawkins and Moise were both registered with the New York Stock Exchange. Rule 347 of the Board of Directors of the New York Stock Exchange provides that "any controversy between a registered representative and any member or member organization *arising out of the employment or termination of employment* of such registered representative . . . shall be settled by arbitration." (Emphasis added). Hawkins and Moise do not dispute that they are bound by this rule.

Prudential fired Moise April 25, 1994 and terminated Hawkins on September 6, 1994. Prudential filed criminal charges against Hawkins for allegedly stealing customer lists shortly after he was fired, but a grand jury declined to indict him. Later, he sued Prudential and its employees, Rhoades, O'Friel, Varner, and Nittolo. Hawkins alleged that the defendants had conspired to blackball him from the brokerage industry and had made several libelous or slanderous statements to further the conspiracy. He also asserted that the individual defendants were acting in the course and [**3] scope of their employment for Prudential and that their allegedly defamatory statements injured him in his profession as a broker.

Prudential and the individual defendants moved to stay the trial court proceedings and compel arbitration of Hawkins' claims. They argued that the Federal Arbitration Act, *9 U.S.C. §§ 1-14 (1970)*, and the Texas General Arbitration Act, *TEX. REV. CIV. STAT. ANN. art. 224* to 238-6, 238-20 (Vernon Supp. 1995), required the trial court to enforce the arbitration agreement.

 [*898] The trial court ruled that three of Hawkins' claims were subject to arbitration. These included claims based upon statements that Hawkins was fired "for insubordination, and the office has been broken into and records stolen," "because he lost so much money," and because he made an "unauthorized entry into his office using a false name to seize files of customer complaints." The trial court also ruled that three claims were not subject to arbitration. These included claims based upon statements that Hawkins "lied, cheated and stole," "is a thief, a criminal and should be in jail," and "is a dishonest person and should not be hired [and] omitted truths." Two weeks later, the defendants [**4] filed a motion asking the trial court to reconsider its decision and rule that all of Hawkins' claims were subject to arbitration. Hawkins then filed an amended petition, in which he limited his libel and slander allegations to the specific statements the trial court had ruled were not subject to arbitration. He retained, however, the allegations that the statements were made to blackball him from the securities industry, that the individual defendants were acting in the course and scope of their employment, and that the statements tended to injure him in his profession as a broker.

Five weeks later, Moise intervened in Hawkins' lawsuit as a third-party plaintiff. Moise's third-party petition alleged libel and slander claims against Prudential, O'Friel, and another Prudential employee, McClain. The allegedly libelous or slanderous statements forming the basis for Moise's lawsuit were that "Moise is a dishonest person" and "Moise churned accounts." Like Hawkins, Moise alleged that the defendants made these statements to further a conspiracy to blackball him from the securities industry and that the statements tended to injure him in his profession as a broker. The defendants moved [**5] to strike Moise's intervention; the trial court overruled their motions on June 14, 1995.

The defendants then moved to compel arbitration of the claims alleged by Moise in his third party petition and to stay, dismiss, or abate the lawsuit. The trial court denied this motion on June 20, 1995; it signed an order overruling the defendants' motion for reconsideration of the order denying arbitration of some of Hawkins' claims on July 19, 1995. Prudential then sought mandamus relief from the orders denying arbitration of Hawkins' and Moise's claims.

Before we reach the merits of the defendants' mandamus petition, we must consider Hawkins' and Moise's contention that the defendants waived any right to arbitration. They contend that the defendants waived their

rights to arbitration by invoking the judicial process to strike Moise's intervention, by seeking and resisting discovery, by delaying seeking mandamus relief from the trial court's orders, and by not pursuing arbitration of Hawkins' claims that the trial court ruled were subject to arbitration. We disagree.

*HN1* Arbitration of disputes is strongly favored under federal and state law. *Moses H. Cone Memorial Hosp. v. Mercury Constr.* **[\*\*6]** *Corp., 460 U.S. 1, 24-25, 74 L. Ed. 2d 765, 103 S. Ct. 927 (1983)*; *Brazoria County v. Knutson, 142 Tex. 172, 176 S.W.2d 740, 743 (Tex. 1943)*. Accordingly, a presumption exists against the waiver of a contractual right to arbitration. *See Moses H. Cone, 460 U.S. at 24-25*. The record before us in this case does not overcome that presumption. Instead, the record indicates that the defendants consistently and timely sought to invoke any contractual rights to arbitration they might have. The first responsive pleading the defendants filed to Hawkins' petition in this case was their Motion to Stay All Proceedings and to Compel Arbitration and Original Answer Subject Thereto. After Moise filed his petition in intervention, the defendants moved to strike his intervention; within three days of the date the trial court overruled the motion to strike, they moved to compel arbitration of Moise's claims.

*HN2* A party does not waive a right to arbitration merely by delay; instead, the **[\*899]** party urging waiver must establish that any delay resulted in prejudice. *See Rush v. Oppenheimer & Co., 779 F.2d 885, 887 (2d Cir. 1985)*; *Transwestern Pipeline Co. v. Horizon Oil & Gas Co., 809 S.W.2d 589, 592* (Tex. App.--Dallas 1991, writ dism'd w.o.j.). **[\*\*7]** Similarly, *HN3* parties do not waive their right to arbitration by invoking the judicial process in the absence of prejudice to the opposing party. *See Miller Brewing Co. v. Fort Worth Distrib. Co., 781 F.2d 494, 496-97 (5th Cir. 1986)*.

Hawkins asserts no prejudice as a result of the defendants' conduct in this litigation. Moise, on the other hand, contends that the defendants' ″dilatory tactics″ have prejudiced him, apparently referring to various discovery disputes in the trial court. These tactics, Moise alleges, have cost him time and money and prevented him from earning a living as a broker. The record provided us, however, contains no discovery requests served by the defendants on Moise. Instead, the record evidences a dispute, spanning a period of a little more than a month, arising from Moise's efforts to obtain certain discovery from the defendants and a law firm that had previously represented Moise and Prudential in connection with a Securities and Exchange Commission investigation. We cannot conclude, based upon this record, that the defendants' efforts to resist discovery overcome the strong presumption in favor of arbitration. *See Steinberg & Lyman v. Takacs, 774* **[\*\*8]** *F. Supp. 885, 887 (S.D.N.Y. 1991)*; *Home Club, Inc. v. Barlow, 818 S.W.2d 192, 193* (Tex. App.--San Antonio 1991, orig. proceeding). The defendants' opposition to Moise's discovery was based on their contention that his requests were overbroad or oppressive, or sought privileged material. While we do not address the merits of the defendants' position in the discovery disputes, their opposition is not inconsistent with an intent to invoke contractual arbitration rights. We therefore hold that the defendants did not waive their rights to arbitration.

On the merits, the defendants argue that the factual allegations in Hawkins' and Moise's petitions on their face establish that the claims fall within the scope of the arbitration agreements, and that the trial court thus abused its discretion by declining to compel arbitration of all of the claims and stay the trial court proceedings. We agree.

*HN4* Under the Federal Arbitration Act, any doubts as to whether Hawkins' and Moise's claims fall within the scope of the agreement must be resolved in favor of arbitration. *Moses H. Cone, 460 U.S. at 24-25*. *HN5* The policy in favor of enforcing arbitration agreements is so compelling that a court **[\*\*9]** should not deny arbitration ″*unless it can be said with positive assurance* that an arbitration clause is *not* susceptible of an interpretation which would cover the dispute at issue.″ *Neal v. Hardee's Food Sys., Inc., 918 F.2d 34, 37 (5th Cir. 1990)* (quoting *Commerce Park at DFW Freeport v. Mardian Constr. Co., 729 F.2d 334, 338 (5th Cir. 1984))* (emphasis added).

*HN6* When a party asserts a right to arbitration under the Federal Arbitration Act, the question of whether a dispute is subject to arbitration is determined under federal law. *See Genesco, Inc. v. T. Kakiuchi & Co., 815 F.2d 840, 845 (2d Cir. 1987)*. The federal courts have interpreted the arbitration provision of Rule 347 of the Stock Exchange to include any dispute involving significant aspects of the employment relationship or depending upon the evaluation of the employee's performance as a broker. *See Fleck v. E.F. Hutton Group, Inc., 891 F.2d 1047, 1053 (2d Cir. 1989)*. Applying that standard, claims very similar to those raised by Hawkins and Moise have been held to be arbitrable. *See, e.g., id.* (holding that defamation claim based upon statement that broker was "basically a criminal" was subject **[**10]** to arbitration); *Smith Barney Shearson, Inc. v. Finstad, 888 S.W.2d 111, 117* (Tex. App.--Houston [1st Dist.] 1994, no writ) (holding that claims based upon statement that fired broker was "unethical" were subject to arbitration to the extent statement related to broker's business practices, as opposed to his sexual mores).

 **[*900]** *HN7* In determining whether a claim falls within the scope of an arbitration agreement, we focus on the factual allegations of the complaint, rather than the legal causes of action asserted. *See Jack B. Anglin Co. v. Tipps, 842 S.W.2d 266, 271 (Tex. 1992)*; *Genesco, Inc., 815 F.2d at 846*. *HN8* The burden was upon Hawkins and Moise to show that their claims fell outside the scope of the arbitration agreement. *See Merrill Lynch, Pierce, Fenner, and Smith v. Longoria, 783 S.W.2d 229, 231* (Tex. App.--Corpus Christi 1989, orig. proceeding).

On this record, we cannot conclude with positive assurance that the statements at issue here are not at least "factually intertwined" with the arbitrable claims. *See Jack B. Anglin, 842 S.W.2d at 271*. Hawkins and Moise's contention that their claims are outside the scope of the arbitration agreement is inherently inconsistent **[**11]** with their allegations that the statements were uttered to further a conspiracy to blackball them from the securities industry and tended to injure them in their professions as brokers. In order to injure the plaintiffs' professional reputations, the statements must, as a matter of logic, at least touch upon their performance as brokers, making the claims referable to arbitration. *See Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 624 n.13, 87 L. Ed. 2d 444, 105 S. Ct. 3346 (1985)*. [1]

*HN9* Mandamus will issue only to correct a clear abuse of discretion when the abuse cannot be remedied **[**12]** by appeal. *Walker v. Packer, 827 S.W.2d 833, 840 (Tex. 1992)*. In this case, the trial court abused its discretion because it misapplied the Federal Arbitration Act to the facts of this case. *See Jack B. Anglin, 842 S.W.2d at 271*. A party who is erroneously denied the right to arbitration has no adequate remedy at law because the fundamental purpose of arbitration--to provide a rapid, less expensive alternative to traditional litigation--would be defeated. *Id.* Because the claims at issue in this lawsuit are within the scope of Hawkins' and Moise's agreements to arbitrate, we conditionally grant the writ of mandamus and direct the trial court to order that all claims proceed to arbitration. The clerk is instructed to issue the writ only if the trial court fails to do so.

OPINION DELIVERED: November 16, 1995

---

[1]   The defendants also rely on arbitration requirements imposed by the regulations of the National Association of Securities Dealers, the constitution of the New York Stock Exchange, and a "Financial Adviser in Training Agreement" signed by Hawkins. Because we conclude that the disputes between the parties in this case fall within the scope of Rule 347 of the Stock Exchange, we do not address the reach of the other arbitration provisions.



Positive

As of: September 1, 2015 4:51 PM EDT

# *Richmont Holdings, Inc. v. Superior Recharge Sys., L.L.C.*

Supreme Court of Texas

December 19, 2014, Opinion Issued

NO. 13-0907

**Reporter**

455 S.W.3d 573; 2014 Tex. LEXIS 1211; 58 Tex. Sup. J. 179

RICHMONT HOLDINGS, INC., NUKOTE HOLDING, INC., NUKOTE INTERNATIONAL, INC., INKBRARY, L.L.C., SUPERIOR ACQUISITIONS L.L.C., JOHN P. ROCHON, SR., JOHN P. ROCHON, JR., KELLY KITTRELL, RUSSELL MACK, C & R SERVICES, INC. AND KENNETH R. SCHLAG, PETITIONERS, v. SUPERIOR RECHARGE SYSTEMS, L.L.C., AND JON BLAKE, RESPONDENTS

**Subsequent History:** Rehearing denied by *Richmont Holdings, Inc. v. Superior Recharge Sys., L.L.C., 2015 Tex. LEXIS 225 (Tex., Mar. 13, 2015)*

**Prior History:** [**1] ON PETITION FOR REVIEW FROM THE COURT OF APPEALS FOR THE SECOND DISTRICT OF TEXAS.

*Richmont Holdings, Inc. v. Superior Recharge Sys., L.L.C., 453 S.W.3d 443, 2013 Tex. App. LEXIS 10689 (Tex. App. Fort Worth, Aug. 22, 2013)*

## Core Terms

arbitration, waive, per curiam, discovery, compel arbitration, discovery request

## Case Summary

### Overview

HOLDINGS: [1]-A party did not waive its right to arbitration by filing a second suit, engaging in very limited discovery, and moving for a venue transfer; considered as a whole, these circumstances did not approach a substantial invocation of the judicial process.

### Outcome

Court of appeals' judgment reversed and case remanded to the trial court.

## LexisNexis® Headnotes

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > Waiver

Evidence > Inferences & Presumptions > Presumptions > Effects

*HN1* A party waives an arbitration clause by substantially invoking the judicial process to the other party's detriment or prejudice, but due to the strong presumption against waiver of arbitration, this hurdle is a high one.

Whether a party has substantially invoked the judicial process depends on the totality of the circumstances; key factors include the reason for delay in moving to enforce arbitration, the amount of discovery conducted by the movant, and whether the movant sought disposition on the merits.

> Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > Waiver

*HN2* Merely filing suit does not waive arbitration, even when the movant files a second, separate suit in another county based in part on a contract at issue in the first action. Nor does moving to transfer venue. The motion does not address the merits of the case. Moreover, objections to improper venue must be made at the outset of the case. *Tex. R. Civ. P. 86*.

> Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > Waiver

*HN3* Mere delay in moving to compel arbitration is not enough for waiver. A party does not waive a right to arbitration merely by delay; instead, the party urging waiver must establish that any delay resulted in prejudice.

**Counsel:** For Richmont Holdings Inc., et al., Petitioner: Scott Ryan Doody, Law Offices of Scott R. Doody, Fort Worth TX.

For Superior Recharge System L.L.C., and Jon Blake, Respondent: Stephen D. Colbert, Colbert Johnston Dion PLLC, Flower Mound TX.

## Opinion

[*574] **PER CURIAM**

In holding that petitioner waived arbitration by substantially invoking the judicial process, the court of appeals, *453 S.W.3d 443, 2013 Tex. App. LEXIS 10689 (Tex. App.—Fort Worth 2013)*, misapplied our decision in *Perry Homes v. Cull, 258 S.W.3d 580 (Tex. 2008)*. Accordingly, we reverse the court of appeals' judgment and remand the case to the trial court. *TEX. GOV'T CODE § 22.225(b)(3)*, *(c)*.

"We have said on many occasions that *HN1* a party waives an arbitration clause by substantially invoking the judicial process [*575] to the other party's detriment or prejudice," but "[d]ue to the strong presumption against waiver of arbitration, this hurdle is a high one." *Perry Homes, 258 S.W.3d at 589-90* (footnotes omitted). We have often determined that arbitration was not waived.[1] Whether a party has substantially invoked the judicial process depends on the totality of the circumstances; key factors include the reason for delay in moving to

---

[1]    *See Kennedy Hodges, L.L.P. v. Gobellan*, 433 S.W.3d 542, 544-45 (Tex. 2014) (per curiam) (law firm did not waive right to arbitrate a fee dispute with former clients by litigating with a former associate); *In re Fleetwood Homes of Tex., L.P.*, 257 S.W.3d 692, 694 (Tex. 2008) (per curiam) (defendant did not waive by "failing to pursue its arbitration demand for eight months while discussing a trial setting and allowing limited discovery"); *In re Citigroup Global Mkts., Inc.*, 258 S.W.3d 623, 625-26 (Tex. 2008) (per curiam) (defendant did not waive arbitration by removing case to federal court and acceding to remand seven months later before demanding arbitration); *In re Bank One, N.A.*, 216 S.W.3d 825, 827 (Tex. 2007) (per curiam) (defendant did not waive arbitration by moving to set aside a default judgment, requesting a new trial, and waiting eight months to move to compel arbitration); *In re D. Wilson Constr. Co.*, 196 S.W.3d 774, 783 (Tex. 2006) (contractors did not waive arbitration by suing to preserve evidence and cross-claiming for indemnity in a separate suit, absent a showing that their actions detrimentally affected the defendant); *In re Vesta Ins. Group, Inc.*, 192 S.W.3d 759, 763 (Tex. 2006) (per curiam) (defendants did not waive arbitration by litigating for two years, especially when the plaintiff initiated more discovery requests than he received); *In re Serv. Corp. Int'l*, 85 S.W.3d 171, 174-75 (Tex. 2002) (per curiam) (defendants did not waive arbitration by supporting plaintiffs' inclusion in a federal class action whose members were not subject to arbitration, and moving, inter alia, to [**3] dismiss in that action); *In re Bruce Terminix Co.*, 988 S.W.2d 702, 704 (Tex. 1998) (per curiam) (defendant did not waive arbitration by its delay and discovery requests, when the responses were insufficient to show prejudice); *EZ Pawn Corp. v. Mancias*, 934 S.W.2d 87, 89-90 (Tex. 1996) (per curiam) (in the absence of a showing of prejudice, defendants did not waive arbitration by, e.g.,

enforce arbitration, the amount of discovery conducted by the movant, and whether the movant sought disposition **[\*\*2]** on the merits. *Perry Homes, 258 S.W.3d at 590-93*.

Richmont Holdings, Inc., through an affiliate, bought the assets of Superior Recharge Systems, L.L.C. The parties' Asset Purchase Agreement contained an arbitration provision. Superior Recharge's part-owner, Jon Blake, agreed to continue as general manager of the business for two years. The employment contract contained a covenant not to compete but not an arbitration clause. After six months, Blake's employment was terminated, allegedly for cause.

Superior Recharge and Blake (collectively "Blake") sued Richmont and several of its affiliates and principals (collectively "Richmont") in Denton County for fraud, breach of contract, a declaration that the covenant not to compete was unenforceable, **[\*\*4]** and an injunction. Richmont sued Blake individually in Dallas County to enforce the covenant not to compete, invoking a forum selection clause in that agreement, and moved to transfer venue of the Denton County suit to Dallas County or Collin County. The Dallas County suit was abated, and the motion to transfer was never decided.

In the Denton County suit, Richmont does not appear to have sought discovery other than a request for disclosure. *See* *Tex. R. Civ. P. 194.1* and *194.2*. Richmont failed to respond to Blake's discovery requests and was sanctioned $5,000. No trial date appears to have been set. Nineteen **[\*576]** months after being sued, Richmont moved to compel arbitration, asserting that Blake's claims arose out of the Asset Purchase Agreement and were therefore subject to arbitration. Blake did not dispute that assertion but argued that Richmont had waived arbitration by engaging in litigation. The trial court denied the motion to compel.

The court of appeals affirmed, but not on waiver, the only ground Blake raised. Rather, it held that Blake's claims were not covered by the arbitration agreement. *392 S.W.3d 174, 182-83 (Tex. App.—Fort Worth 2011)* (mem. op.). On Richmont's petition for review in this Court, Blake conceded that the court of appeals **[\*\*5]** had erred. Accordingly, we reversed, stating:

> The court of appeals' conclusion that the arbitration provision in the asset purchase agreement has no application to Blake's lawsuit is contrary to the parties' contentions and has no support in the record. Moreover, the court's failure to recognize the arbitration agreement here is contrary to our precedent, which mandates enforcement of such an agreement absent proof of a defense.

*392 S.W.3d 633, 635 (Tex. 2013)* (per curiam). On remand, the court of appeals held that Richmont had waived arbitration by suing Blake in Dallas County, moving to transfer venue of the Denton County suit, failing to respond to discovery requests, and delaying in moving to compel arbitration. *453 S.W.3d 443, 446, 2013 Tex. App. LEXIS 10689 (Tex. App.—Fort Worth 2013)*.

*HN2* Merely filing suit does not waive arbitration, even when the movant, as in this case, files a second, separate suit in another county based in part on a contract at issue in the first action. *See* *In re D. Wilson Constr. Co., 196 S.W.3d 774, 783 (Tex. 2006)*. Nor, we think, does moving to transfer venue. The motion does not address the merits of the case. Moreover, objections to improper venue must be made at the outset of the case. *Tex. R. Civ. P. 86*. Richmont engaged in only minimal discovery. For the most part, it refused to respond to Blake's discovery requests. **[\*\*6]** Richmont argues that it delayed in moving to compel arbitration because, while it drafted the Asset Purchase Agreement and knew full well of the arbitration clause, it was very slow in recognizing that the clause could apply to Blake's claims. We think this explanation implausible; certainly, it

---

requesting discovery and waiting ten months to ask for arbitration); *Prudential Sec. Inc. v. Marshall, 909 S.W.2d 896, 898-99 (Tex. 1995)* (per curiam) (defendants did not waive arbitration by moving to strike an intervention, seeking and resisting discovery, and failing to timely seek mandamus review).

does not justify the delay. But **HN3** mere delay in moving to compel arbitration is not enough for waiver. *In re Fleetwood Homes of Tex., L.P., 257 S.W.3d 692, 694 (Tex. 2008)* (per curiam) (eight-month delay); *In re Vesta Ins. Group, Inc., 192 S.W.3d 759, 763 (Tex. 2006)* (per curiam) (two-year delay); *see also Prudential Sec. Inc. v. Marshall, 909 S.W.2d 896, 898-99 (Tex. 1995)* (per curiam) ("A party does not waive a right to arbitration merely by delay; instead, the party urging waiver must establish that any delay resulted in prejudice."). The circumstances here, considered as a whole, do not approach a substantial invocation of the judicial process.

Having reached this conclusion, we need not consider whether Blake was prejudiced by the delay. Accordingly, we grant the petition for review and, without hearing oral argument, reverse the court of appeals' judgment and remand the case to the trial court. *Tex. R. App. P. 59.1*.

Opinion issued: December 19, 2014



⚠ Caution

As of: September 1, 2015 4:57 PM EDT

## *Seagull Energy E&P, Inc. v. Eland Energy, Inc.*

Supreme Court of Texas

November 30, 2005, Argued ; June 16, 2006, Delivered

No. 04-0662

**Reporter**
207 S.W.3d 342; 2006 Tex. LEXIS 550; 49 Tex. Sup. J. 744; 168 Oil & Gas Rep. 655; 36 ELR 20115

Seagull Energy E&P, Inc., Petitioner, v. Eland Energy, Inc., Respondent

**Subsequent History:** [**1] Released for Publication December 29, 2006.
Rehearing denied by *Seagull Energy E&P, Inc. v. Eland Energy, Inc., 2006 Tex. LEXIS 1333 (Tex., Dec. 29, 2006)*

**Prior History:** On Petition for Review from the Court of Appeals for the Fourteenth District of Texas.
*Eland Energy, Inc. v. Seagull Energy E&P, Inc., 135 S.W.3d 122, 2004 Tex. App. LEXIS 1574 (Tex. App. Houston 14th Dist., 2004)*

## Core Terms

operating agreement, parties, obligations, Lease, assigning, Participating, costs, working interest, provisions, expenses, withdraw, Oil, proportion, platform, Abandonment, delegation, operations

## Case Summary

### Procedural Posture

Petitioner, the operator of oil and gas leases, sued respondents, the seller and the assignee of an interest in the leases, for breach of the operating agreement. The trial court held that the seller and the assignee remained jointly and severally liable to operator for $ 268,418.90. The Court of Appeals for the Fourteenth District of Texas reversed, holding that the seller was not liable due to the assignment. The operator petitioned for review.

### Overview

In 1994, the seller obtained an interest in two offshore oil and gas leases. In July 1996, the seller sold its interest in these leases to an assignee who received the seller's rights and obligations under the operating agreements. The assignee failed to reimburse the operator of the lessees for its share of operating costs. The operator sought these costs from the seller as an interest owner. The seller refused to pay because it no longer owned an interest in the leases. The state supreme court interpreted the operating agreement and found that it was unambiguous. The court held that the operating agreement did not expressly provide that the seller's obligations would terminate upon assignment and the operator did not expressly release the seller following the assignment of its working interest. Therefore, the seller remained liable for operating costs under the agreement.

### Outcome

The court of appeals' judgment was reversed, and the trial court's judgment was reinstated.

# LexisNexis® Headnotes

Contracts Law > Contract Interpretation > Ambiguities & Contra Proferentem > General Overview

***HN1*** A contract is not ambiguous merely because the parties disagree on its meaning. An ambiguity exists only if the contract language is susceptible to two or more reasonable interpretations.

Civil Procedure > Appeals > Standards of Review > De Novo Review

Contracts Law > Contract Interpretation > General Overview

***HN2*** The meaning of an unambiguous agreement is a question of law.

Contracts Law > Contract Interpretation > General Overview

***HN3*** The court's primary concern when interpreting a contract is to ascertain and give effect to the intent of the parties as that intent is expressed in the contract. To discern this intent, the court examines and considers the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless. No single provision taken alone will be given controlling effect; rather, all the provisions must be considered with reference to the whole instrument.

Contracts Law > Standards of Performance > Assignments > General Overview

***HN4*** A party cannot escape its obligations under a contract merely by assigning the contract to a third party. Thus, as a general rule, a party who assigns its contractual rights and duties to a third party remains liable unless expressly or impliedly released by the other party to the contract. The principle is similarly recognized by *Tex. Bus. & Com. Code Ann. § 2.210 (a)*.

Contracts Law > Third Parties > Delegation of Performance

***HN5*** See *Tex. Bus. & Com. Code Ann. § 2.210 (a)*.

Contracts Law > Standards of Performance > Assignments > General Overview

***HN6*** Even when the contract does not expressly provide for the consequences resulting from the assignment of one's interest, the contract's subject or other circumstances may indicate that obligations were not intended to survive assignment.

**Counsel:** For Petitioner: William P. Maines, Fulbright & Jaworski L.L.P., Houston, TX; Paul J. Franzetti McDade Fogler, Houston, TX; William J. Boyce, Fulbright & Jaworski L.L.P., Houston, TX.

For Respondent: Carl D. Rosenblum, Jones Walker Waechter Poitevent Carrere & Denegre, The Woodlands, TX; Alida C. Hainkel, person interested in case, Jones Walker Waechter Poitevent Carrere & Denegre, New Orleans LA; J. D. Page, Doyle Restrepo Harwin & Robbins, Houston, TX; John D. White, Jones Walker Waechter Poitevent Carrere & Denegre, The Woodlands, TX.

**Judges:** Justice Medina delivered the opinion of the Court. JUSTICE O'NEILL and JUSTICE BRISTER did not participate in the decision.

**Opinion by:** David M. Medina

## Opinion

 [*344] In this case we must determine whether the sale of an oil and gas working interest, which was subject to an operating agreement, [1] released the seller from any further obligations to the operator. The court of appeals concluded that it did, reversing the trial court's judgment in favor of the operator. _135 S.W.3d 122._ [**2] We conclude that, despite selling its working interest, the seller remains liable under the operating agreement, unless released by the operator or the terms of the agreement. Because neither the operating agreement nor the operator expressly released the seller from its obligations under that agreement, we reverse the court of appeals' judgment and render judgment for the operator.

Seagull Energy E&P, Inc. is a lessee and operator of two offshore oil and gas leases in the Gulf of Mexico near the Texas coast -- Blocks 828 and 831, Mustang Island Area. In 1994, Eland Energy, [**3] Inc. purchased an interest in both leases, acquiring a 1.09375% interest in Block 828 from General Atlantic Resources, Inc. and a 9.41719% interest in Block 831 from UMC Petroleum Corporation. As the new owner, Eland expressly assumed certain rights and responsibilities under two offshore operating agreements, each applicable to its respective block. Both agreements designated Seagull as the operator and were essentially the same. They provided that Eland and the other lessees were to share the cost of operations in proportion to their respective interests, and that Seagull, as operator, was to exploit the minerals and collect the operating costs from the other lessees.

In July 1996, Eland sold its interest in these leases to Nor-Tex Gas Corporation, also assigning to Nor-Tex its rights and obligations under the operating agreements. Not long thereafter, Nor-Tex failed to reimburse Seagull for its share of operating costs, and Seagull sought these costs from Eland as an interest owner. Eland, however, refused to pay because it no longer owned an interest in the leases.

Seagull then sued Eland and Nor-Tex for breach of the operating agreement. Both Seagull and Eland moved for summary [**4] judgment. The trial court denied Eland's motion but granted a partial summary judgment in Seagull's favor. In its summary judgment, the court concluded that Nor-Tex had breached the operating agreement by failing to pay its share of the operating expenses and that Eland also remained liable for these expenses which it incurred under the operating agreement. Damages were tried to the court which found Eland and Nor-Tex jointly and severally liable to Seagull in the amount of $ 268,418.90, plus interest and attorney's fees. Eland appealed.

The court of appeals reversed the trial court's judgment to the extent it awarded damages against Eland. The court concluded that Eland had no continuing liability under the operating agreements after [*345] the assignment of its working interest because the agreements did not expressly provide for such a continuing obligation. _135 S.W.3d at 127-28_.

Seagull argues, however, that Texas contract law generally provides that an assignor's contractual obligations survive assignment unless the contract expressly provides otherwise or the assignor obtains an express release. Because the operating agreements here were silent on the subject and they [**5] did not expressly release Eland, Seagull submits that the court of appeals should have applied this general rule. Eland responds that the court

---

[1] An operating agreement is a contract typical to the oil and gas industry whose function is to designate an "operator, describe the scope of the operator's authority, provide for the allocation of costs and production among the parties to the agreement, and provide for recourse among the parties if one or more default in their obligations." 3 Ernest E. Smith & Jacqueline L. Weaver, Texas Law of Oil and Gas ' 17.3 at 17-7 (2d ed. 2006).

of appeals was right to ignore this rule of continuing liability because the express language of the operating agreements indicated that the rule did not apply. Eland maintains that its obligation to pay expenses under the operating agreement terminated on the date it sold its interests because the agreement imposed liability for expenses only upon current working interest owners.

This dispute thus turns on whether the parties to the operating agreement expressly agreed upon the consequences that should follow an assignment of one's interest to a third party. Although Seagull and Eland construe their obligations under this contract quite differently, *HN1* a contract is not ambiguous merely because the parties disagree on its meaning. *Sun Oil Co. (Delaware) v. Madeley, 626 S.W.2d 726, 727, 25 Tex. Sup. Ct. J. 101 (Tex. 1981)*. "An ambiguity exists only if the contract language is susceptible to two or more reasonable interpretations." *Am. Mfrs Mut. Ins. Co. v. Schaefer, 124 S.W.3d 154, 157, 47 Tex. Sup. Ct. J. 40 (Tex. 2003)*. Neither the parties nor the lower courts **[**6]** have found this operating agreement ambiguous, and we likewise agree that it is not. *HN2* Its meaning is therefore a question of law. *Coker v. Coker, 650 S.W.2d 391, 394, 26 Tex. Sup. Ct. J. 368 (Tex. 1983)*.

*HN3* Our primary concern when interpreting a contract is to ascertain and give effect to the intent of the parties as that intent is expressed in the contract. *Gulf Ins. Co. v. Burns Motors, Inc. 22 S.W.3d 417, 423, 43 Tex. Sup. Ct. J. 647 (Tex. 2000)*; *Ideal Lease Serv., Inc. v. Amoco Prod. Co., 662 S.W.2d 951, 953, 27 Tex. Sup. Ct. J. 150 (Tex. 1983)*. To discern this intent, we "examine and consider *the entire writing* in an effort to harmonize and give effect to *all the provisions* of the contract so that none will be rendered meaningless. No single provision taken alone will be given controlling effect; rather, all the provisions must be considered with reference to the whole instrument." *Coker, 650 S.W.2d at 393* (emphasis in original) (citations omitted).

Eland focuses on several provisions that connect its obligation to reimburse the operator for costs and expenses to its participating interest, which is in turn based on its ownership in the lease. The pertinent provisions define **[**7]** participating interest and allocate costs and expenses in proportion to these interests as follows:

Article 2

Definitions

* * *

2.10 Participating Interest. The respective percentage of participation of each Party electing to participate in each of the operations conducted hereunder, including the production of Oil and Gas, based on ownership in the Lease.

* * *

Article 8

Expenditures

8.1 Basis of Charge to the Parties. Operator shall pay all costs and each Party shall reimburse Operator in proportion to its Participating Interest.

* * *

**[*346]** Article 14

Abandonment and Salvage

14.1 Platform Salvage and Removal Costs. When the Parties owning a platform mutually agree to dispose of such platform, it shall be disposed of by the Operator as approved by such Parties. The costs, risks, and

net proceeds, if any, resulting from such disposition shall be shared by such Parties in proportion to their Participating Interests.

* * *

14.4 <u>Abandonment Operations Required by Governmental Authority</u>. Any well abandonment or platform removal required by governmental authority shall be accomplished by Operator with the costs, risks, and net proceeds, if any, to be **[\*\*8]** shared by the Parties owning such well or platform in proportion to their Participating Interests.

Eland concludes from these provisions that its obligation to reimburse the operator continued only so long as it owned a participating interest. Once it assigned its interest, it was, according to Eland's interpretation, released from any continuing obligation to the operator for future costs or expenses.

Eland, however, reads far too much into these provisions. Nowhere do they mention the subject of release or the consequences which are to follow the assignment of a working interest. These subjects are, however, mentioned elsewhere in the agreement.

For example, section 15.1, entitled ″Withdrawal,″ [2] **[\*\*10]** permits a party to withdraw from the agreement by assigning its interest to the other parties, while section 14.3, entitled ″Assignment of Interest,″ [3] provides that a party desiring to abandon a well shall assign its interest to the non-abandoning parties. Moreover, Article 26 pertains generally to the subject of assignment, providing that the ″[a]greement shall be binding upon and inure to the benefit of the parties and their respective heirs, successors, representatives **[\*\*9]** and assigns″ and providing further that any assignment be made subject to the operating agreement. But like the cost allocation provisions on which Eland relies, none of these provisions deals specifically with the present circumstances. The operating agreement simply does not explain the consequences of an assignment of a working interest to a third party. Thus, we disagree with Eland that the parties expressly agreed that an assignment of a working interest was to operate as a novation, effectively ending any further obligation of the assignor under the operating agreement.

Generally speaking, **HN4** a party cannot escape its obligations under a contract merely by assigning the contract to a third **[\*347]** party. *Farah v. Mafrige & Kormanik, P.C., 927 S.W.2d 663, 677 (Tex. App.--Houston [1st Dist.] 1996, no writ)*; *Univ. of Tex. Med. Branch at Galveston v. Allan, 777 S.W.2d 450, 453 (Tex. App.--Houston [14th Dist.] 1989, no writ)*. Thus, as a general rule, a party who assigns its contractual rights and duties to a third party remains liable unless expressly or impliedly released by the other party to the contract. *See W. Oil Sales Corp. v. Bliss & Wetherbee, 299 S.W. 637, 638 (Tex.* **[\*\*11]** *Comm'n App. 1927, judgm't adopted)*; *Cauble v. Hanson, 249 S.W. 175, 178 (Tex. Comm'n App. 1923, judgm't adopted)*; *see also* 29 Richard A. Lord, Williston on Contracts § 74.30, at 436-38 (4th ed. 2003). The principle is similarly recognized by statute and the *Restatement*. *See* **HN5** *Tex. Bus. & Com. Code § 2.210 (a)* (″No delegation of performance relieves the party delegating of any duty to perform or any liability for breach.″); *Restatement (Second) of Contracts § 318(3)* (unless the obligee agrees to delegation of performance, the delegation does not effect a discharge of the delegating obligor).

---

[2] 15.1 <u>Withdrawal.</u> A Party may withdraw from this Agreement as to a Lease by assigning, to the other Parties who do not desire to withdraw, all its interest in such Lease and the wells, platforms and Facilities used in operations on such Lease . . . Providing all such expenses, including any deficiency hereunder, due from the withdrawing Party have been paid within thirty (30) days after the rendering of such final payment, the assignment shall be effective the first day of the month following its receipt, and, the withdrawing Party shall thereafter be relieved from all further obligations and liabilities with respect to such Lease.

[3] 14.3 <u>Assignment of Interest</u>. Each Participating Party desiring to abandon a well pursuant to Section 14.2 shall assign effective as of the last applicable election date, to the non-abandoning Parties, in proportion to their Participating Interests, its interest in such well and the equipment therein and its ownership in the production from such well. Any Party so assigning shall be relieved from any further liability with respect to said well.

*HN6* Even when the contract does not expressly provide for the consequences resulting from the assignment of one's interest, the contract's subject or other circumstances may indicate that obligations were not intended to survive assignment. For example, the *Restatement of Property* provides that "[w]hether a promise respecting the use of land of the promisor will continue to bind the promisor after he has ceased to have an interest in the land with respect to which the promise was made depends upon the **[**12]** intention manifested in the making of the promise." *Restatement of Prop.: Servitudes § 538*. The comment notes that "[s]uch promises are often of such a character that they can be satisfactorily performed only by the possessor of the land affected." *Id*. *cmt. a.* As an example, the *Restatement* suggests that a promise to maintain a dam on one's property to provide a certain water level for a neighbor would cease upon the conveyance of the land. *Id*. *cmt. c, illus. 2*. Eland does not argue that this contract's subject or circumstances imply that it should be released of its obligations after assignment. Even if it were to argue this, it is not apparent why Eland would not have been able to fulfill its obligations under the operating agreement even after the transfer of its interest in the underlying lease. *See id. cmt. c, illus. 1*.

Because the operating agreement did not expressly provide that Eland's obligations under the operating agreement should terminate upon assignment and Seagull did not expressly release Eland following the assignment of its working interest, we reverse the court of appeals' judgment and render judgment for Seagull as the trial court did.

David **[**13]** M. Medina

Justice



**i** Cited

As of: September 1, 2015 5:33 PM EDT

# *Taft v. Burttram*

Supreme Court of Georgia

September 5, 1985, Decided

Nos. 42329, 42330 - CONSOLIDATED

**Reporter**

254 Ga. 687; 333 S.E.2d 585; 1985 Ga. LEXIS 886

TAFT v. BURTTRAM, JR. et al. KILROY v. BURTTRAM, JR. et al.

**Prior History:** [***1] Equity. Fulton Superior Court. Before Judge Daniel.

**Disposition:** *Judgment reversed.*

## Core Terms

arbitration, appellees, lawsuits, pending arbitration, initiating, securities, charges, trial court, encourages, defended, disputes, requires, warrants, parties, records, slander, cases, libel, join

## Case Summary

### Procedural Posture

Appellant former employees appealed orders of the Fulton Superior Court (Georgia), which granted motions by appellees, brokerage firm and its officers, to stay the former employees' lawsuits pending arbitration.

### Overview

The brokerage hired the former employees as account executives, and they resigned to join a similar business. When the former employees failed to return certain corporate information, a corporate officer swore out warrants charging them with theft by taking. The former employees were arrested, and the charges were dismissed for lack of probable cause. The former employees filed suits alleging malicious prosecution, libel, abuse of process, slander, wrongful interference with an employment relationship, and intentional infliction of emotional harm. They appealed the trial court's grant of stays pending arbitration. In reversing, the court held that (1) under the agreement the former employees signed prior to their employment with the brokerage firm, they agreed to arbitrate any dispute; (2) by swearing out criminal warrants against the former employees, appellees waived the agreement to arbitrate; and (3) the trial court should have denied the motions for stay of the lawsuits pending arbitration.

### Outcome

The court reversed the orders staying the former employees' lawsuits against appellees pending arbitration.

**Counsel:** *Rex M. Lamb III, Henry D. Fellows, Jr., Hurt, Richardson, Garner, Todd & Cadenhead, Atlanta*, for appellants.

*Robert M. Axelrod, Rogers & Hardin, Phillip S. McKinney, Atlanta*, for appellees.

**Judges:** Smith, Justice. All the Justices concur.

**Opinion by:** SMITH

## Opinion

 [*687]   [**585]  Appellants, William H. Taft and Kevin P. Kilroy, each sued appellees, H. Dyar Burttram, Jr., and Robert Rosenberg, officers of appellee Norris and Hirshberg, Inc., for malicious prosecution, libel, abuse of process, slander, wrongful interference with an employment relationship, and intentional infliction of emotional harm. Taft and Kilroy appeal the trial court's grants of appellees' motions to stay the lawsuits pending arbitration. The appeals have been consolidated. We reverse.

Norris and Hirshberg, a securities brokerage business, hired Taft and Kilroy as account executives in August 1983. Taft and Kilroy resigned in August 1984, to join a similar business. They allege that the appellees altered their employment records to show that they were terminated for cause, and that the appellees mailed libelous  [***2]  material and related slanderous charges about them to various people involved in the securities business.

In October 1984, after requesting the return of certain information and records to Norris and Hirshberg, appellee Burttram swore out warrants charging Taft and Kilroy with theft by taking. He contended that they had stolen client lists, confirmation slips, and other information regarding Norris and Hirshberg's clients when they left Norris and Hirshberg to join the other business. Taft and Kilroy were arrested on November 2, 1984.

On November 6, a Fulton County Magistrate dismissed the charges for lack of probable cause. He stated that the controversy was best suited for civil court. The  [**586]  appellees subsequently requested Taft and Kilroy to submit the dispute to arbitration. Taft and Kilroy filed the complaints initiating these lawsuits five days later, on December  [*688]  12, 1984.

1. Taft and Kilroy contend that the trial court erred in staying their lawsuits pending arbitration.

Under the agreement that the appellants signed prior to their employment with Norris and Hirshberg, they "[agreed] to arbitrate any dispute, claim, or controversy" that the National  [***3]  Association of Securities Dealers [NASD] requires to be arbitrated. The NASD requires its member to arbitrate "*any dispute*, claim, or controversy arising out of or in connection with the business of any member of the Association . . ." (Emphasis supplied.) As the appellees note, this procedure broadly encourages the members to arbitrate their disputes.

When the appellees failed to abide by this policy, in swearing out criminal warrants against the appellants "instead of seeking to arbitrate, this was the clearest kind of waiver on their part of an agreement to arbitrate." [1] *Morales Rivera v. Sea Land of Puerto Rico, 418 F2d 725, 726 (1st Cir. 1969)*. Any other holding would be contrary to the clear federal policy of encouraging parties to resolve disputes through arbitration, rather than a resort to the courts. See *Sweater Bee By Banff, Ltd. v. Manhattan Indus., 754 F2d 457, 461 (2nd Cir. 1985)*, as the dispute involved in the criminal case and this case, and the parties involved in both cases for all practical purposes are identical. [2] The appellees, in choosing the forum of criminal law rather than arbitration in their first

---

[1]   Here, the party who initiated legal proceedings subsequently seeks arbitration, and the party who defended that action claims waiver by inconsistency. This distinguishes this case from waiver cases in which the party defending the initial action seeks arbitration belatedly and the party initiating the action claims waiver. See, e.g., *Sweater Bee*, infra.

[2]   Compare *Amalgamated Local No. 55, etc. v. Metal & Alloy Div.*, 396 FSupp. 667 (W.D.N.Y. 1975).

attempt to sort out their dispute with **[\*\*\*4]** Taft and Kilroy, waived their right to compel arbitration. To put it simply, appellees cannot run with the hare and the hounds. Accordingly we find that the trial court should have denied appellees' motions for stay of these lawsuits pending arbitration.

2. Following the holding in Division 1, we need not reach appellants' remaining enumerations of error.

*Judgment reversed.*



**A** Neutral

As of: September 1, 2015 5:38 PM EDT

## *Taylor v. Gately*

Court of Appeals of Texas, Tenth District, Waco

February 9, 1994, Delivered ; February 9, 1994, Filed

No. 10-93-244-CV

**Reporter**

870 S.W.2d 204; 1994 Tex. App. LEXIS 259

FRENANDO RAY TAYLOR, Appellant v. SANDY GATELY, Appellee

**Prior History:** [**1] From the 52nd District Court. Coryell County, Texas. Trial Court # 27,900

**Disposition:** Affirmed

## Core Terms

ministerial, mandamus, prosecuting attorney, inaugurated, accepting

## Case Summary

### Procedural Posture

Appellant inmate sought review of an order of the 52nd District Court, Coryell County, Texas, that dismissed his petition for writ of mandamus to compel appellee district attorney to initiate a prosecution by accepting a complaint charging assault and battery and a violation of his civil rights.

### Overview

Appellant inmate attempted to initiate a prosecution charging assault and battery and a violation of his civil rights. He sought review from a judgment dismissing his petition for a writ of mandamus. Appellant argued that the court abused its discretion in refusing to compel appellee district attorney to initiate a prosecution concerning his charges. He claimed that *Tex. Code Crim. Proc. Ann. art. 2.04*, *2.05*, *2.12*, *2.13* (1977) imposed a ministerial duty upon appellee to accept and file his complaint. The court was aware of no case in which mandamus was issued against a district attorney for failure to institute a criminal case. District attorneys were constitutional officers with duties specified by art. 201. The prosecuting attorney had the authority to determine whether prosecution in any given case should be initiated. A writ of mandamus would not issue unless the petitioner established that he had no adequate remedy at law and that the act sought to be compelled was purely ministerial, as opposed to discretionary. The court concluded that appellant failed to meet the second prong of the test. The court overruled the point of error and affirmed the judgment of the trial court.

### Outcome

The court affirmed the judgment of the trial court that dismissed his petition for a writ of mandamus to compel appellee district attorney to initiate a prosecution by accepting a complaint charging assault and battery and a

violation of appellant's civil rights. Appellant failed to show that the act he sought was purely ministerial as opposed to discretionary.

**Counsel:** For Appellant: Frenando Ray Taylor, Pro Se, Gatesville, TX.

For Appellee: Sandy S. Gately, Disrict Attorney, Gatesville, TX.

**Judges:** Before Chief Justice Thomas, Justice Cummings, and Justice Vance

**Opinion by:** BILL VANCE

# Opinion

 **[*204] OPINION**

Frenando Taylor, an inmate, appeals from a judgment dismissing his petition for a writ of mandamus in the court below. *See Hogan v. Turland, 428 S.W.2d 316, 317 (Tex. 1968)*. He complains that the court abused its discretion in refusing to compel the District Attorney to initiate a prosecution by accepting a complaint charging assault and battery and a violation of his civil rights. He asserts that articles 2.04, 2.05, 2.12, and 2.13 of the Code of Criminal Procedure impose a "ministerial duty" upon the District Attorney to accept and file his complaint. *See TEX. CODE CRIM. PROC. ANN. arts. 2.04, 2.05, 2.12, 2.13* (Vernon 1977). In support of this proposition, he cites language from *Anderson v. City of Seven Points, 806 S.W.2d 791, 793 (Tex. 1991)*: "An act is ministerial when the law clearly spells out the duty to be performed **[**2]** by the official with sufficient certainty that nothing is left to the exercise of discretion.

We have been directed to no case, nor has our research revealed any case, in which mandamus has issued against a prosecuting attorney for failure to institute a criminal case. District Attorneys are constitutional officers. TEX. CONST. art 5, § 21. Their duties are specified by *article 2.01 of the Code of Criminal Procedure. TEX. CODE CRIM. PROC. ANN. art. 2.01*. The interpretative commentary to section twenty-one attributes the importance of the office to the "fact that upon the prosecuting attorneys rests the power of determining whether prosecution in any given case shall be inaugurated, or if inaugurated, pushed to a successful conclusion." TEX. CONST. art. 5, § 21 interp. commentary (Vernon 1993).

A writ of mandamus will not issue unless the petitioner establishes that he has no adequate remedy at law and that the act sought to be compelled is purely ministerial, as opposed to discretionary. *Walker v. Packer, 827 S.W.2d 833, 839 (Tex. 1992)*. Taylor has failed to meet the second prong of the test. Discretion is a necessary ingredient in the determination of whether the requisites **[**3]**   **[*205]**  for accepting and filing a criminal complaint have been met. *See id.*

We overrule the point of error and affirm the judgment.

BILL VANCE

Justice

Before Chief-Justice Thomas,

Justice Cummings, and

Justice Vance

Affirmed

Opinion delivered and filed February 9, 1994



⚠ Caution

As of: September 1, 2015 2:38 PM EDT

## *Valero Energy Corp. v. Teco Pipeline Co.*

Court of Appeals of Texas, Fourteenth District, Houston

August 26, 1999, Rendered ; August 26, 1999, Opinion Filed

NO. 14-96-01234-CV

**Reporter**

2 S.W.3d 576; 1999 Tex. App. LEXIS 6369

VALERO ENERGY CORP., ET AL., Appellants v. TECO PIPELINE CO., Appellee

**Prior History:** [**1] On Appeal from the 215th District Court. Harris County, Texas. Trial Court Cause No. 96-20628.

**Disposition:** Reversed and Remanded.

## Core Terms

arbitration, partnership, Pipeline, parties, arbitration clause, transportation, joint venture, arbitration agreement, nonsignatory, Ownership, asserts, compel arbitration, disputes, agreement to arbitrate, Remedies, set forth, argues, waived, condition precedent, natural gas, provides, terms, third party, trial court, contracts, mutual mistake, net revenue, contends, losses, merger

## Case Summary

### Procedural Posture

Appellant sought review of an interlocutory decision from the 215th District Court, Harris County, Texas, which denied its motion to stay proceedings and compel arbitration in a suit brought by appellee asserting causes of action for breach of fiduciary duty, fraud, tortious interference, and professional malpractice arising from an agreement to purchase and sell a natural gas pipeline.

### Overview

Appellant sought review of a decision denying its motion to stay the litigation and compel arbitration pursuant to the Texas General Arbitration Act, Tex. Civ. Prac. & Rem. Ch. 171 (TGAA). Appellant brought this interlocutory appeal in appellee's suit asserting causes of action for breach of fiduciary duty, fraud, tortious interference, and professional malpractice arising from a purchase and sale agreement for a natural gas pipeline. The court reversed, holding that the TGAA was not limited to disputes between nonprofit entities and that whether appellant failed to comply with conditions precedent to enforce the agreement to arbitrate was for the arbitrator's determination. The court found no evidence of any partnership separate from the joint venture established under the terms of the Operating Agreement or evidence that the arbitration agreement was revoked or later revived as a result of fraudulent inducement or a mutual mistake, and concluded the arbitration clause remained in full force and effect. The court held that because appellee's claims against the other nonsignatory defendants were based on the same operative facts, they were also permitted to compel arbitration.

**Outcome**

The court reversed and remanded the decision which denied appellant's motion to stay proceedings and compel arbitration upon a finding that there were no grounds to support a decision to deny enforcement of the arbitration clause contained in the agreement between the parties.

# LexisNexis® Headnotes

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Mandatory ADR

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Validity of ADR Methods

Commercial Law (UCC) > Sales (Article 2) > Form, Formation & Readjustment > General Overview

Contracts Law > Contract Conditions & Provisions > Arbitration Clauses

Labor & Employment Law > Collective Bargaining & Labor Relations > Labor Arbitration > Enforcement

*HN1* In determining whether to compel arbitration, the court must decide two issues: (1) whether a valid, enforceable arbitration agreement exists, and (2) if so, whether the claims asserted fall within the scope of the agreement. The court has no discretion but to compel arbitration if the answer to both questions is affirmative.

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Mandatory ADR

Civil Procedure > Appeals > Standards of Review > Questions of Fact & Law

*HN2* Whether the parties have agreed to arbitrate is a question of fact to be summarily determined by the trial court. Appellate courts use a ″no evidence″ standard for review of factual questions. In a no evidence point, we consider only the evidence that supports the finding, while disregarding the evidence to the contrary. If there is any evidence of probative force to support the finding, the point must be overruled and the finding upheld.

Civil Procedure > Appeals > Standards of Review > De Novo Review

*HN3* Legal conclusions are subject to de novo review. De novo review is appropriate when the legal interpretation of the arbitration clause, and no fact issue, is before the court.

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > Arbitrability

Civil Procedure > ... > Arbitration > Federal Arbitration Act > General Overview

Civil Procedure > ... > Arbitration > Federal Arbitration Act > Arbitration Agreements

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Mandatory ADR

Contracts Law > Contract Conditions & Provisions > Arbitration Clauses

International Trade Law > Dispute Resolution > International Commercial Arbitration > Arbitration

*HN4* Because the Texas General Arbitration Act, Tex. Civ. Prac. & Rem. Ch. 171 does not require or authorize the trial court to address questions of procedural arbitrability, the trial court need only decide two issues: (1) whether there is an agreement to arbitrate, and (2) whether the dispute comes within the scope of the arbitration agreement.

Business & Corporate Law > General Partnerships > Formation > General Overview

Business & Corporate Law > General Partnerships > Formation > Partnership Agreements

Business & Corporate Law > General Partnerships > Formation > Partnership by Estoppel

Business & Corporate Law > General Partnerships > Management Duties & Liabilities > General Overview

Business & Corporate Law > ... > Management Duties & Liabilities > Rights of Partners > General Overview

Business & Corporate Law > ... > Management Duties & Liabilities > Rights of Partners > Losses & Profits

Business & Corporate Law > ... > Management Duties & Liabilities > Rights of Partners > Management & Voting

Contracts Law > Types of Contracts > Partnership Agreements

*HN5* A partnership is an association of two or more persons to carry on as co-owners of a business for profit. *Tex. Rev. Civ. Stat. Ann. art. 6132b § 6(1)*. This association must be based on an express or implied agreement. An express or implied partnership agreement has four essential elements: (1) a community of interest in the venture, (2) an agreement to share profits, (3) an agreement to share losses, and (4) a mutual right of control or management of the enterprise. As a matter of law, a partnership does not exist if any one of these elements is not established. The burden of proof is on the party seeking to establish the partnership.

Business & Corporate Law > General Partnerships > Formation > General Overview

Business & Corporate Law > ... > Management Duties & Liabilities > Rights of Partners > Losses & Profits

*HN6* Without an agreement providing for the sharing of profits and losses, there can be no partnership.

Business & Corporate Law > General Partnerships > Formation > General Overview

*HN7* A representation contained in a document or made to a third party that a partnership relationship exists constitutes a legal conclusion and is not determinative of the relationship.

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview

Contracts Law > Contract Conditions & Provisions > Arbitration Clauses

Contracts Law > Defenses > Ambiguities & Mistakes > Mutual Mistake

Contracts Law > ... > Affirmative Defenses > Fraud & Misrepresentation > General Overview

Contracts Law > Formation of Contracts > Mistake > Mutual Mistake

Estate, Gift & Trust Law > Wills > Revocation of Wills > General Overview

*HN8* To establish fraud in the inducement in the formation of arbitration agreement, a party must prove (1) a material representation was made, and (2) it was false.

Contracts Law > Contract Conditions & Provisions > Arbitration Clauses

Contracts Law > Contract Interpretation > General Overview

Contracts Law > Defenses > Ambiguities & Mistakes > Mutual Mistake

Contracts Law > Formation of Contracts > Mistake > Mutual Mistake

*HN9* The law presumes that a written agreement correctly embodies the parties' intentions, and is an accurate expression of the agreement the parties reached in prior oral negotiations.

Contracts Law > Defenses > Ambiguities & Mistakes > General Overview

Contracts Law > Defenses > Ambiguities & Mistakes > Mutual Mistake

*HN10* A mutual mistake occurs when both parties to a transaction have a belief in the present existence of a thing, material to the transaction, that does not exist.

>     Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview
>
>     Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Mandatory ADR
>
>     Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Validity of ADR Methods
>
>     Civil Procedure > Appeals > Standards of Review > De Novo Review
>
>     Contracts Law > Contract Conditions & Provisions > Arbitration Clauses
>
>     Contracts Law > Contract Interpretation > General Overview
>
>     Labor & Employment Law > Collective Bargaining & Labor Relations > Labor Arbitration > Enforcement

*HN11* Once the existence of an arbitration agreement is shown, the party seeking to avoid the effects of the arbitration agreement may do so by establishing that the dispute is not within the terms of the agreement. Whether the parties' agreement imposes a duty to arbitrate is a matter of contract interpretation and a question of law for the court. Therefore, the language of the contract will be enforced according to its plain meaning unless such a reading would defeat the intentions of the parties. Because this issue involves the trial court's interpretation of the arbitration clause, de novo review is appropriate.

>     Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview
>
>     Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Mandatory ADR
>
>     Contracts Law > Contract Conditions & Provisions > Arbitration Clauses
>
>     Real Property Law > Torts > General Overview
>
>     Torts > Procedural Matters > Alternative Dispute Resolution

*HN12* In determining whether a tort claim falls within the scope of an agreement to arbitrate, the focus should be on the factual allegations contained in the petition rather than on the legal causes asserted. The test should be based on a determination of whether the particular tort claim is so interwoven with the contract that it could not stand alone or, on the other hand, is a tort completely independent of the contract and could be maintained without reference to the contract. Arbitration is favored by Texas courts. Therefore, any doubts regarding the scope of an arbitration agreement are to be resolved in favor of arbitration.

>     Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview
>
>     Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > Waiver
>
>     Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Mandatory ADR
>
>     Contracts Law > Contract Conditions & Provisions > Arbitration Clauses
>
>     Labor & Employment Law > Collective Bargaining & Labor Relations > Labor Arbitration > Enforcement

*HN13* A party waives its right to arbitration if it substantially invokes the judicial process to the detriment of the opposing party. To establish waiver, a party bears the burden of showing that the other party acted inconsistently with the arbitration agreement and that it was prejudiced by such conduct. There is a strong presumption against waiver, which must be intentional and may only be implied from a party's actions if the facts demonstrate that the party seeking to enforce arbitration intended to waive its arbitration right. Therefore, any doubts regarding waiver should be resolved in favor of arbitration. Whether a party waives arbitration is a question of law.

Civil Procedure > Pretrial Matters > Alternative Dispute Resolution > Mandatory ADR

Contracts Law > Contract Conditions & Provisions > Waivers > General Overview

*HN14* It has long been the law in Texas that even though a party may have once waived a contract right in the past, it may enforce that right in the future by giving notice of its intention to do so.

**Counsel:** J. Clifford Gunter, III of Houston, TX. Gayle A. Boone of Houston, TX. Martin Edward Loeber of Houston, TX. Gael Plauche of Houston, TX. Andrew M. Edison of Houston, TX, for appellants.

Craig B. Glidden of Houston, TX. Timothy J. Hill of Houston, TX. Donald B. McFall of Houston, TX, for appellees.

**Judges:** Panel consists of Chief Justice Murphy and Justices Anderson and Edelman.

**Opinion by:** JOHN S. ANDERSON

# Opinion

[*579] OPINION

This is an interlocutory appeal of an order denying a motion to stay proceedings and compel arbitration. *See TEX. CIV. PRAC. & REM. CODE ANN. § 171.098(a)* (Vernon Supp. 1999). [1] [**2] Teco Pipeline has sued Valero Energy Corp., 24 related companies, and two officers and directors, Stan L. McLelland and William L. Greehey (collectively "Valero"). [2] Valero filed a motion to stay proceedings and compel arbitration. In response, Teco filed a motion to stay arbitration. The trial court granted Teco's motion, while denying Valero's motion. In two points of error, Valero asserts the trial court erred in denying its motion to stay proceedings and compel arbitration and granting Teco's motion to stay arbitration. We reverse and remand.

**Background**

From 1969 to 1985, Valero was the sole operator and owner of the TransTexas Pipeline System, which delivered gas from Waha, Texas to New Braunfels, Texas. Through a merger with a network of pipelines, the TransTexas Pipeline was also able to deliver gas to the Texas Gulf Coast. InterNorth, Inc. owned an interstate pipeline connecting West Texas to northern states.

On November 6, 1994, Valero and Northern Natural [**3] Gas Company, a division of InterNorth, signed a letter of intent to form a joint venture for the purpose of purchasing, transporting, and marketing natural gas. This agreement was formalized [*580] on February 1, 1985, when Valero and Northern Intrastate Pipeline Company entered into a partnership agreement, forming the Nor-Val Gas Company ("Nor-Val"). On February 28, 1985, Valero entered into a Purchase Agreement with InterNorth and Northern Texas Intrastate Pipeline Company

---

[1] The provision for interlocutory appeal of an order granting or denying arbitration was formerly found in § 171.017 of the Texas Civil Practice & Remedies Code. Act of June 14, 1995, 74th Leg., R.S., ch. 588, § 1, 1995 Tex. Gen. Laws 3408, *amended by* Act of May 21, 1997, 75th Leg., R.S., ch. 165, § 5.01, 1997 Tex. Gen. Laws 336.

[2] The other Valero companies are Valero Management Company, VGMA Company, VNGC Holding Company, Valero Natural Gas Company, Valero Eastex Pipeline Company, Valero Transmission Company, Valero Gas Marketing Company, Valero Gas Storage Company, Valero Industrial Gas Company, Valero Hydrocarbons Company, VT Company, Valero Marketing Company, Valero Natural Gas Partners, L.P., Valero Management Partnership, L.P., Valero Transmission, L.P., Valero Hydrocarbons, L.P., Valero Marketing L.P., Valero Industrial Gas, L.P., Valero Gas Marketing, L.P., VLDC, L.P., Reata Industrial Gas, L.P., Valero Nortex, L.P., Valero Northern Texas Company, and West Texas Transmission Company.

("NorTex"), a wholly owned subsidiary of InterNorth, for the purpose of transporting natural gas via the TranTexas Pipeline. Under the Purchase Agreement, Valero sold a one-half undivided interest in the TransTexas Pipeline to NorTex and 125,000 shares of Valero stock to InterNorth.

As exhibits to the Purchase Agreement, Valero entered into three additional agreements with InterNorth and NorTex. The first agreement was the Operating Agreement, which created a joint venture for the purpose of providing for the operation, management, and maintenance of the TransTexas Pipeline. Valero Transmission Company ("VTC") was appointed operator. The second agreement was the Ownership Agreement, which set forth a mutual understanding [**4] between the parties with regard to the rights of each party in the joint ownership of the TransTexas Pipeline. The third agreement was the Transportation Agreement, which allowed InterNorth to transport gas from New Braunfels to Houston on other portions of Valero's integrated pipeline system.

Two months later, InterNorth merged with Houston Natural Gas ("HNG") to form Enron, Inc. At that time, HNG was a primary Valero competitor, owning a 50% interest in the only other pipeline delivering gas from West Texas to the Texas Gulf Coast. Seeking to block the merger, Valero filed suit against InterNorth and NorTex in the United States District Court for the Western District of Texas, San Antonio Division. Valero asserted that the merger violated NorTex's fiduciary duties under the Ownership Agreement.

On May 28, 1985, the parties entered into a Settlement Agreement ("1985 Settlement Agreement"). Under the 1985 Settlement Agreement: (1) Nor-Val was to be dissolved, (2) NorTex agreed to sell its one-half interest to an acceptable purchaser, (3) Valero retained the right to disapprove of any pipeline purchaser tendered by NorTex, and (4) Valero reaffirmed its right of first refusal to [**5] repurchase the pipeline as set forth in the Ownership Agreement.

In addition to filing suit in federal court, Valero also had lodged a complaint with the Federal Trade Commission ("FTC") regarding the proposed InterNorth/HNG merger. The FTC, finding antitrust implications, drew up a Consent Decree, which provided that in order for the merger to proceed, InterNorth had to divest itself of its interest in the TransTexas Pipeline.

In 1987, in an effort to reorganize and refinance its internal operations, Valero assigned its interest in the TransTexas Pipeline to a related entity. Enron threatened to block the assignment by exercising its right of first refusal under the Ownership Agreement. On March 24, 1987, the parties executed the TransTexas Settlement Agreement, which eliminated Valero's veto rights over any pipeline purchaser tendered by NorTex, but allowed Valero to continue with its reorganization.

On July 15 1987, Enron and Teco entered into an agreement for the sale of NorTex, which included its interest in the TransTexas Pipeline. Valero opposed the sale to Teco and, exercising its right of first refusal, proposed to purchase the NorTex stock, thereby obtaining complete [**6] ownership of the pipeline. Enron submitted both proposed sales to the FTC for approval. The FTC approved the sale to Teco and disapproved the sale to Valero.

Believing that the FTC did not have the authority to disapprove of the sale to Valero in view of its right of first refusal, Valero sued Enron, NorTex, and Teco in state court, for breach of contract. Valero also sought and received a temporary injunction blocking the conveyance of the pipeline to Teco. The case was removed to [*581] the United States District Court. After a trial on the merits, judgment was entered in favor of Enron, NorTex, and Teco and the temporary injunction was dissolved. The United States Fifth Circuit Court of Appeals affirmed the judgment. *See West Tex. Transmission, L.P. v. Enron Corp., 907 F.2d 1554 (5th Cir. 1990).* On December 12, 1988, Enron closed on the sale to Teco. Purchasing NorTex's interest in the pipeline, Teco became a successor in interest to NorTex's partnership rights and succeeded to all of the contractual agreements between NorTex and Valero.

On April 24, 1996, Teco filed the underlying suit, asserting causes of action for breach of fiduciary duty, fraud, tortious interference, **[**7]** and professional malpractice. Valero counterclaimed for breach of contract of the Operating Agreement, breach of fiduciary duty, and fraud. Asserting that Teco's claims are based on the Operating Agreement, Valero moved to stay the litigation and compel arbitration pursuant to the Texas General Arbitration Act ("TGAA"), Chapter 171 of the Texas Civil Practice & Remedies Code, and the arbitration clause found in the Operating Agreement:

3.01 General. Any dispute arising with respect to any matter within the scope of the Operating Agreement shall be resolved by arbitration pursuant to this Article C, which is intended to provide the exclusive means for resolving all such disputes. . . .

Teco moved to stay arbitration on several grounds: (1) the TGAA applies only to disputes between nonprofit entities, (2) its claims arise out of a partnership separate and independent of the joint venture established in the Operating Agreement, (3) the arbitration clause has been revoked, (4) the Operating Agreement specifically excludes from arbitration claims regarding the transporting of third party natural gas, (5) the scope of the arbitration clause is too narrow to include its claims, (6) **[**8]** the Valero defendants, who are not signatories to the Operating Agreement, may not enforce the arbitration clause, (7) Valero has waived its right to enforce the arbitration clause by its previous litigation, and (8) Valero has failed to satisfy any conditions precedent to arbitration. After a hearing, the trial court denied Valero's motion to stay litigation and compel arbitration and granted Teco's motion to stay arbitration.

## Standard of Review

*HN1* In determining whether to compel arbitration, the court must decide two issues: (1) whether a valid, enforceable arbitration agreement exists, and (2) if so, whether the claims asserted fall within the scope of the agreement. *See Dallas Cardiology Assocs., P.A. v. Mallick, 978 S.W.2d 209, 212* (Tex. App.-Texarkana 1998, pet. denied); *Nationwide of Bryan, Inc. v. Dyer, 969 S.W.2d 518, 520* (Tex. App.-Austin 1998, no pet.). The court has no discretion but to compel arbitration if the answer to both questions is affirmative. *See Dallas Cardiology Assocs., P.A., 978 S.W.2d at 212*; *Merrill Lynch, Pierce, Fenner & Smith v. Eddings, 838 S.W.2d 874, 878* (Tex. App.-Waco 1992, **[**9]** writ denied).

*HN2* Whether the parties have agreed to arbitrate is a question of fact to be summarily determined by the trial court. *See TEX. CIV. PRAC. & REM. CODE ANN. § 171.021(b)* (Vernon Supp. 1999); *see also Weber v. Hall, 929 S.W.2d 138, 141* (Tex. App.-Houston [14th Dist.] 1996, orig. proceeding). Appellate courts use a "no evidence" standard for review of factual questions. *See Fridl v. Cook, 908 S.W.2d 507, 511* (Tex. App.-El Paso 1995, writ dism'd w.o.j.). In a no evidence point, we consider only the evidence that supports the finding, while disregarding the evidence to the contrary. *Hearthshire Braeswood Plaza Ltd. Partnership v. Bill Kelly Co., 849 S.W.2d 380, 384* (Tex. App.-Houston [14th Dist.] 1993, writ denied). If there is any evidence of probative force to support the finding, the point must be overruled and the finding upheld. *See id.*

*HN3* **[*582]** Legal conclusions, on the other hand, are subject to *de novo* review. *See Fridl, 908 S.W.2d at 511*; *see also Certain Underwriters at Lloyd's of London v. Celebrity, Inc., 950 S.W.2d 375, 377* (Tex. App. **[**10]** -Tyler 1996), *writ dism'd w.o.j.*, *988 S.W.2d 731 (Tex. 1998)* (per curiam). *De novo* review is appropriate when the legal interpretation of the arbitration clause, and no fact issue, is before the court. *See Nationwide of Bryan, Inc., 969 S.W.2d at 520*; *Certain Underwriters at Lloyd's of London, 950 S.W.2d at 377*; *Texas Private Employment Ass'n v. Lyn-Jay Int'l, Inc., 888 S.W.2d 529, 531* (Tex. App.-Houston [1st Dist.] 1994, no writ).

## Scope of the TGAA

As a preliminary matter, Teco argues the TGAA applies only to nonprofit entities. Until 1995, when it was codified and moved to Chapter 171 of the Texas Civil Practice and Remedies Code, the TGAA was found in

articles 224 through 238-20 of the Texas Revised Civil Statutes. *See* Act of June 18, 1965, 59th Leg., R.S., ch. 689, § 1, 1965 Tex. Gen. Laws 1593-1601, *redesignated and amended by* Act of June 14, 1995, 74th Leg., R.S., ch. 588, § 1, 1995 Tex. Gen. Laws 3402-09. Teco contends that when the Texas Legislature amended the TGAA in 1995, it limited the entire Act to disputes between nonprofit entities. In support of this argument, Teco cites *section* [**11] *171.022 of the Texas Civil Practice & Remedies Code*, which states:

The provisions of this chapter apply only to the arbitration of controversies between members of associations or corporations which are exempt from the payment of federal income taxes pursuant to *Section 501(c) of the U.S. Internal Revenue Code* or which are incorporated pursuant to the Texas Non-Profit Corporation Act (Article 1396-1.01 et seq., Vernon's Texas Civil Statutes).

*TEX. CIV. PRAC. & REM. CODE ANN. 171.022*.

Reading *section 171.022* out of context from the preceding sections appears to support the argument that the TGAA is limited to disputes involving members of nonprofit entities. *See D. Wilson Constr. Co. v. Cris Equip. Co., 988 S.W.2d 388, 394* (Tex. App.-Corpus Christi 1999, no pet. h.); *Holk v. Biard, 920 S.W.2d 803, 807* (Tex. App.-Texarkana 1996, orig. proceeding [leave denied]). Prior to its codification in 1995, *§ 171.022* was found in § 3 of *article 238-20 of the Texas Revised Civil Statutes.* Article 238-20 had four sections, which expressly applied to specific enforcement of executory agreements to arbitrate future disputes. [**12] *See Holk, 920 S.W.2d at 807-08*. When the TGAA was redesignated as Chapter 171 of the Texas Civil Practice and Remedies Code, former § 3 of article 238-20 was carried forward into Chapter 171. *See id. at 808*. Through error, however, § 3 was separated from the remaining three sections of former article 238-20, which were moved to *section 171.021*. *See id.* Rather than being designated as subsection (d) of *section 171.021*, § 3 was placed alone as *section 171.022*. *See id.* This made *section 171.022* appear to limit the entire act, rather than applying only to specific performance of executory arbitration agreements in the bylaws of nonprofit corporations. *See id.*; *see also D. Wilson Constr. Co., 988 S.W.2d at 394*.

The *Holk* court's reasoning is further strengthened by the fact that since Teco filed the underlying suit in 1996, the Texas Legislature has corrected the error by renumbering the TGAA. *Section 171.022* is now designated *§ 173.002 of the Texas Civil Practice & Remedies Code*. *See* Act of June 14, 1995, 74th Leg., R.S., ch. 588, § 1, 1995 Tex. Gen. Laws 3409, *added by* Act of May 21, 1997, 75th Leg., R.S., [**13] ch. 165, § 5.03, 1997 Tex. Gen. Laws 349. Chapter 173 of the Texas Civil Practice & Remedies Code specifically and expressly applies to controversies between certain nonprofit entities. *See TEX. CIV. PRAC. & REM. CODE ANN. §§ 173.001-173.003* (Vernon Supp. 1999). Accordingly, we hold the TGAA, chapter 171 of the Civil Practice & [*583] Remedies Code, is not limited to disputes between nonprofit entities.

**Conditions Precedent**

Teco asserts Valero has failed to comply with contractual conditions precedent to enforce the agreement to arbitrate. [3] Valero, on the other hand, maintains that whether it has satisfied any condition precedent is a question for the arbitrator, not the court. In support of this contention, Valero cites several federal cases construing the Federal Arbitration Act. *See, e.g., Del E. Webb Constr. v. Richardson Hosp. Auth., 823 F.2d 145, 149 (5th Cir.*

---

[3] The arbitration clause in the Operating Agreement contains a condition precedent, which provides:

. . . Any Party (or the Operator) wishing to submit a dispute or other matter for arbitration hereunder shall first, by notice to the other Party and the Operator, call a meeting of the Management Committee to consider such dispute or other matter, such meeting to be held when, where and as reasonably specified in said notice, but not less than ten days nor more than twenty-five days after such notice is received. If such meeting is called and held as herein provided and the dispute or other matter submitted for consideration at such meeting is not resolved to the satisfaction of both Parties, . . . then either Party may within ten days thereafter submit the matter to arbitration in accordance with the following Sections 3.02 through 3.09.

*1987)*; *Smith Barney Shearson, Inc. v. Boone, 838 F. Supp. 1156, 1158 (N.D. Tex. 1993)*, *aff'd*, *47 F.3d 750 (5th Cir. 1995)*. We note that in construing the TGAA, there is a conflict among Texas courts of appeals on this issue. **[**14]** *See, e.g., D. Wilson Constr. Co., 988 S.W.2d at 395* (holding the trial court may determine issue of condition precedent to enforcement of agreement to arbitrate); *City of Lubbock v. Hancock, 940 S.W.2d 123, 127* (Tex. App.-Amarillo 1996, orig. proceeding) (holding that under the TGAA, procedural questions, such as compliance with conditions precedent, are left to arbitrator's determination).

**[**15]** Addressing the question of whether a collective bargaining agreement with an arbitration provision required an employer, who did not sign the agreement, to arbitrate, the United States Supreme Court stated, "Once it is determined . . . that the parties are obligated to submit to arbitration, 'procedural' questions which grow out of the dispute and bear on its final disposition should be left to the arbitrator." *John Wiley & Sons, Inc. v. Livingston, 376 U.S. 543, 557, 11 L. Ed. 2d 898, 84 S. Ct. 909 (1964)*. In reaching this conclusion, the Court distinguished substantive arbitrability, i.e., whether the dispute is encompassed by an agreement to arbitrate, and procedural arbitrability, i.e., issues such as compliance with a condition precedent to arbitrate. *See City of Lubbock, 940 S.W.2d at 126* (citing *John Wiley & Sons, Inc., 376 U.S. at 556-58*). This reasoning has been followed in construing the Federal Arbitration Act. *See Smith Barney Shearson, Inc., 838 F. Supp. at 1158*. [4] The Amarillo Court of Appeals found the TGAA, like the Federal act, distinguishes substantive from procedural arbitrability. *See City of Lubbock, 940 S.W.2d at 127*. **[**16]** [5] Therefore, *HN4* because **[*584]** the TGAA does not require or authorize the trial court to address questions of procedural arbitrability, the trial court need only decide two issues: (1) whether there is an agreement to arbitrate, and (2) whether the dispute comes within the scope of the arbitration agreement. *See id.*

**[**17]** Similarly, this court has previously decided procedural issues are for the arbitrator's determination. *See Kline v. O'Quinn*, 874 S.W.2d 776, 782 (Tex. App.-Houston [14th Dist.] 1994, writ denied) (holding that while the determination of the scope of an arbitration agreement is for the court, the enforcement of pleading requirements before the arbitrator is a procedural matter for the arbitrator). We conclude, therefore, that whether Valero satisfied any conditions precedent to arbitration is for the arbitrator's determination. Hence, it is not necessary for this court to make that determination.

**Separate Partnership**

Teco further argues its claims are not based on the Operating Agreement, which contains an arbitration clause, but rather, arise out of a separate unwritten partnership agreement, which was created as a result of the sale of

---

[4] Section 4 of the Federal Arbitration Act provides, in part:

The court shall hear the parties, and upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement.

9 U.S.C.A. § 4 (1999).

[5] Section 171.002(a) of the Texas Civil Practice and Remedies Code, as cited in *City of Lubbock*, states:

On application of a party showing an agreement described in Section 171.001, and the opposing party's refusal to arbitrate, the court shall order the parties to proceed with arbitration; but if the opposing party denies the existence of the agreement to arbitrate, the court shall proceed summarily to the determination of the issue so raised and shall order arbitration if found for the moving party; otherwise, the application shall be denied.

Act of June 14, 1995, 74th Leg., R.S., ch. 588, § 1, 1995 Tex. Gen. Laws 3403, *amended by* Act of May 21, 1997, 75th Leg., R.S., ch. 165, § 5.01, 1997 Tex. Gen. Laws 330. The current version of this provision, without any substantive changes, is found at TEX. CIV. PRAC. & REM. CODE ANN. § 171.021 (Vernon Supp. 1999).

the 50% undivided interest in the pipeline. Therefore, according to Teco, because its claims are related to this separate partnership, they are not subject to the arbitration clause of the Operating Agreement. [6]

 [**18] "HN5 A partnership is an association of two or more persons to carry on as co-owners of a business for profit." *TEX. REV. CIV. STAT. ANN. art. 6132b § 6(1)* (Vernon 1970). This association must be based on an express or implied agreement. See *Grimmett v. Higginbotham*, 907 S.W.2d 1, 2 (Tex. App.-Tyler 1994, writ denied). An express or implied partnership agreement has four essential elements: (1) a community of interest in the venture, (2) **[*585]** an agreement to share profits, (3) an agreement to share losses, and (4) a mutual right of control or management of the enterprise. See *Schlumberger Tech. Corp. v. Swanson, 959 S.W.2d 171, 176 (Tex. 1997)*. As a matter of law, a partnership does not exist if any one of these elements is not established. *See id.*; *Stephanz v. Laird, 846 S.W.2d 895, 900* (Tex. App.-Houston [1st Dist.] 1993, no writ); *State v. Houston Lighting & Power Co., 609 S.W.2d 263, 268* (Tex. Civ. App.-Corpus Christi 1980, writ ref'd n.r.e.). The burden of proof is on the party seeking to establish the partnership. See *Stephanz, 846 S.W.2d at 899*; *Ben Fitzgerald Realty Co. v. Muller, 846 S.W.2d 110, 120* **[**19]** (Tex. App.-Tyler 1993, writ denied).

At his deposition, Craig New, President of Teco, testified as to his beliefs concerning the existence of a relationship independent of the Operating Agreement:

Q. Okay. So now that we've said that, did you have any reason to believe that some type of partnership existed separate and apart from that when you signed this letter on July the 15th, 1987?

A. Yes, sir, I did.

Q. What did you believe existed?

A. I believed that a partnership, a commercial partnership existed outside of these written documents.

* * *

---

[6]   Although Teco raises this argument in its rejoinder brief to this court, a review of the reporter's record of the hearing on the motion to compel arbitration reflects that Teco abandoned its contention that there was a separate partnership:

THE COURT: Well now, when you say the partnership there, let's make it clear exactly what you're talking about.

* * *

MR. MCFALL [Counsel for Teco]: Talking about the TransTexas Pipeline Partnership, Your Honor.

THE COURT: Okay. So we're talking about the written partnership and not the oral or the implied partnership as has been alleged by the defendant, right? You're claiming - what I'm trying to get clear is - see, what I get out of this is there's two things. Clearly, there is a joint venture that everybody agrees is in existence.

* * *

THE COURT: Then there is this other partnership theory that's out there; is that right?

MR. GLIDDEN [Counsel for Teco]: It's not really another partnership. What it is is the scope of the partnership. We say that there are duties beyond what's contained in the written agreement, they say there cannot be and as a result, they want to call what we're saying are the additional duties some separate independent partnership or some contrived independent partnership and we aren't saying that. We're saying these guys are partners. The relationship is defined in part by the agreement and in part by what they do and in part by the law. And -

* * *

THE COURT: Okay. Okay. So what we're looking at right here today then, just to be clear, make it clear is whether or not these are stand alone causes of action, independent torts.

MR. GLIDDEN: That's right.

Q. Now, what did you believe the terms of the partnership were on July the 15th, 1987?

A. I believed that it was - on July 15, '87, it was a partnership that existed between Valero and NorTex. Valero was the general partner or managing general partner. They were to conduct the business affairs, commercial affairs of the partnership.

* * *

A. That Valero would manage this partnership.

With respect to the division of profits and losses, New further testified:

Q. And how were the partnership profits and expenses to be split up or accounted for?

A. The - all of the revenues and all of the expenses were going to be divided, or **[**20]** were divided equally between the partners.

Q. Was there any agreement that provided that?

A. The - in the Operating Agreement, which was an agreement between Valero as operator and the partners, Valero and Teco, Valero was elected to be the operator and also had a long accounting procedure that was appended to that agreement that provided for accounting for revenues, costs, allocations of overhead, whatnot.

Q. So you're saying - are you saying that that procedure was what you thought was to be used for accounting for the partnership revenues and profits?

A. Yes, sir, I believe that's right.

Teco also points to several documents, which it contends establishes the existence of a separate partnership. The first document is a Valero "offering memorandum," which states, in part:

In February, 1985, Valero sold a 50% undivided interest to Northern Natural Gas Company forming the TransTexas Pipeline Partnership.

The second document is an internal Valero memorandum stating, in part:

. . . whether TransTexas Pipeline Company ("TPC"), a joint venture between Valero Transmission, L.P. and TECO on the West Texas pipeline, can enjoin and/or prohibit the use of "TransTexas Transmission **[**21]** Corporation" ("TTC") as the new name of TransAmerican Natural **[*586]** Gas Corporation due to similarity of name and possible customer confusion.

The third document is the minutes of a meeting of the Management Committee stating:

Need to structure TransTexas as Partnership - As a result of previous conversations between Teco and Valero concerning the TransTexas Extension Project, there was some thought given to drafting a partnership agreement between Teco and Valero to formalize the actions taken jointly as TransTexas Pipeline in the past. After some discussion, the Management Committee took the posture of "if it isn't broke, don't fix it" and tabled the issue pending any future input Teco may have on the matter.

While concluding that a partnership existed, New did not testify as to any facts to support his conclusion. Without more, New's belief that there was a separate partnership relationship between Valero and Teco is not probative evidence of a separate partnership. *See Ben Fitzgerald Realty Co., 846 S.W.2d at 121* (finding mere

legal conclusions by a lay witness do not prove existence of a partnership) (citing *Murphy v. McDermott, Inc., 807 S.W.2d 606, 613* **[**22]** (Tex. App.-Houston [14th Dist.] 1991, writ denied)). Moreover, Teco has failed to present any evidence of an agreement to share either profits or losses. New's belief that the partners would divide revenues and expenses in accordance with accounting procedures set forth in the Operating Agreement is not sufficient to establish an agreement to share profits or losses necessary to prove the existence of the separate partnership. If anything, this suggests the relationship is based on the Operating Agreement. ***HN6*** Without an agreement providing for the sharing of profits and losses, there can be no partnership. *See, e.g., Schlumberger Tech. Corp., 959 S.W.2d at 176*; *Coastal Plains Dev. Corp. v. Micrea, Inc., 572 S.W.2d 285, 288 (Tex. 1978)*; *Ben Fitzgerald Realty Co., 846 S.W.2d at 121*; *Houston Lighting & Power Co., 609 S.W.2d at 268*. With respect to the documents evidencing a separate partnership, we reach the same conclusion, i.e., without an agreement to share profits and losses there is no partnership agreement. *See Grimmett*, 907 S.W.2d at 2-3 (finding that although there were numerous documents reflecting **[**23]** the existence of a partnership, in addition to witness testimony of party representations of a partnership, there was no partnership in the absence of an agreement to share losses). ***HN7*** A representation contained in a document or made to a third party that a partnership relationship exists constitutes a legal conclusion and is not determinative of the relationship. *See 907 S.W.2d at 2 n.3* (citing *Coastal Plains Dev. Corp., 572 S.W.2d at 288*) (stating "just as the words used by the parties in a contract do not necessarily control the substance of the relationship, the terms used by the parties in referring to the arrangement do not control"); *see also Murphy, 807 S.W.2d at 613* (finding summary judgment proof that one party referred to another as a partner was a legal conclusion, which cannot give rise to an issue of disputed fact of the existence of a partnership). Accordingly, we find no evidence of any partnership separate from the joint venture established under the terms of the Operating Agreement.

**Agreement to Arbitrate**

Teco contends that even if its claims are based on the Operating Agreement, there is no agreement to arbitrate because **[**24]** the arbitration clause was revoked by the 1985 Settlement Agreement. Without an agreement to arbitrate, arbitration cannot be compelled. *See Freis v. Canales, 877 S.W.2d 283, 284 (Tex. 1994)* (original proceeding) (per curiam). Teco asserts the May 1985 Settlement Agreement redefined the parties relationship and governed all aspects of the relationship in place of the four agreements, including the Operating Agreement, signed **[*587]** in February 1985. The May 1985 Settlement Agreement provides:

14.3 Governing Law and Jurisdiction.
(b) Each party irrevocably consents and agrees that any legal action, suit or proceeding against any of them with respect to their obligations, liabilities, or any other matter under or arising out of or in connection with this Agreement may be brought in the United States District Court for the Western District of Texas, San Antonio Division, or in the courts of the State of Texas, and hereby irrevocably accepts and submits to the jurisdiction of each of the aforesaid court in personam, generally and unconditionally with respect to any such action, suit or proceeding for itself and in respect of its properties, assets and revenues.

Teco asserts **[**25]** the above clause provides for the procedure to be used in future disputes, i.e., that the parties will go through judicial channels, not arbitration. Teco also asserts the intent to revoke the arbitration clause is signified by the merger clause contained in the Settlement Agreement. [7]

**[**26]** We disagree with Teco's contention. A review of the 1985 Settlement Agreement reflects that it did not revoke any clause to arbitrate. First, this clause refers to "this Agreement." The first page of the 1985 Settlement

---

[7] 14.6 Entire Agreement; Amendments and Waivers. This Agreement, together with all exhibits and schedules attached hereto, constitutes the entire agreement between the Parties hereto pertaining to the subject matter hereof and supercedes all prior agreements, understandings, negotiations and discussions, whether oral or written, of the Parties, and there are no warranties, representation or other agreements between the Parties in connection with the subject matter hereof except as set forth specifically herein or contemplated

Agreement shortens its title to the "Agreement." Therefore, this provision applies to disputes arising out of the 1985 Settlement Agreement, not the previously executed Purchase, Operating, Ownership, and Transportation Agreements.

Second, while the Settlement Agreement may have modified some select terms of the Purchase, Operating, Ownership, and Transportation Agreements, those modifications are expressly set forth. Section 14.10 of the Settlement Agreement specifically amends the Operating Agreement:

14.10 Operating Agreement Amendment. Simultaneously with the execution of this Agreement, Transmission and NorTex have executed Amendment No. 1 to Pipeline Operating Agreement in the form attached hereto as Schedule D.

Amendment No. 1, as referenced above, relates to the direction of gas flow.

Third, there is nothing to indicate that *all* the terms of those previous agreements have been superceded by the Settlement Agreement. If this were the case, **[**27]** then nearly all material aspects of the relationship between the parties would be left undetermined.

On June 12, 1985, Valero Transmission Company and InterNorth entered into an agreement regarding the distribution of NorTex's share of net revenues from its joint ownership of the TransTexas Pipeline. This agreement further provided:

Should InterNorth, Inc. desire to audit the amount of such payment, then, notwithstanding the sale of NorTex to a third party, VTC will permit InterNorth, Inc. to audit such payment amount in accordance with the provisions of the Operating Agreement. *Should a dispute arise as to such payment amount, such dispute shall be submitted to arbitration as set forth in the Operating Agreement.*

**[*588]** [emphasis added]. Article V of the Operating Agreement establishes how the revenues are to be shared between the joint venturers. A review of the Operating Agreement reveals no limitation on submitting any dispute under Article V to arbitration. The June 12, 1985 letter, which was entered into after the Settlement Agreement, indicates that the arbitration clause is still in full force and effect.

Teco, however, argues that a letter dated February 10, 1986, between **[**28]** Valero and InterNorth confirms the revocation of the arbitration clause. In referencing Amendment No. 1 to the Purchase Agreement and Amendment No. 2 to the Operating Agreement, both dated January 1, 1986, the letter states, in relevant part:

Execution of the attached Amendments by InterNorth and NorTex is not, and shall in no way be deemed or construed to be, a waiver of InterNorth's or NorTex's right or rights to pursue any remedies now or in the future, at law or in equity, with regard to any matter arising out of or in connection with the Purchase Agreement, dated February 28, 1985 or the Operating Agreement, dated February 28, 1985.

Teco claims that NorTex was not waiving its right to pursue any remedies available to it with regard to matters arising from the Purchase and Operating Agreements and that all matters arising out of or connected with the Operating Agreement were not subject to forced arbitration. Valero responds by pointing out the letter agreement merely states the execution of the referenced amendments would not be interpreted as a waiver of any rights arising under the Operating Agreement, which includes compelling arbitration. Therefore, according to Valero, **[**29]** the letter agreement confirms that the right to compel arbitration under the Operating Agreement is still available.

hereby. No supplement, modification or waiver of this Agreement shall be binding unless executed in writing by the Party to be bound thereby. No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provision hereof (regardless of whether similar), nor shall any such waiver constitute a continuing waiver unless otherwise expressly provided.

On October 1, 1991, Valero and Teco amended several provisions of the Operating Agreement. One such modification concerned § 3.03, which pertains to how the Management Committee is to conduct its meetings. A comparison of the original Operating Agreement and the 1991 Amendment reveals a minor modification, otherwise leaving the entire section, including the reference to arbitration intact. It states, in part: "matters which cannot be resolved by the Management Committee as set forth above shall be resolved by arbitration as provided in Exhibit B, Article C." The amendment reaffirms that the arbitration clause found in Exhibit B, Article C of the Operating Agreement, which is at issue here, is still in effect.

Valero argues that even if the arbitration clause had been previously revoked, it was revived by its incorporation in the 1991 Amendment. Teco responds that any revival of the arbitration agreement was the result of fraudulent inducement or a mutual mistake. *HN8* To establish fraud in the inducement in the formation of arbitration agreement, Teco must prove (1) a **[\*\*30]** material representation was made, and (2) it was false. *See In re Oakwood Mobile Homes, Inc., 987 S.W.2d 571, 574 (Tex. 1999)* (per curiam). Teco argues that had Valero fulfilled its duty to inform it that the 1991 Amendment would revive the arbitration clause, Teco would not have signed the amendment. Teco has not cited any record evidence in support of this assertion.

Teco also refers to the mention of "arbitration as provided in Exhibit B, Article C" as a "casual reference at the bottom of a long paragraph." Teco contends the inclusion of this reference is a mutual mistake because the parties never intended to revive the arbitration clause. "*HN9* The law presumes that a written agreement correctly embodies the parties' intentions, and is an accurate expression of the agreement the parties reached in prior oral negotiations." *See Estes v. Republic Nat'l Bank of Dallas, 462 S.W.2d 273, 275 (Tex. 1970)*. *HN10* A mutual mistake occurs when both parties to a transaction have a belief **[\*589]** in the present existence of a thing, material to the transaction, that does not exist. *See United Interests, Inc. v. Brewington, Inc., 729 S.W.2d 897, 903* (Tex. App. **[\*\*31]** -Houston [14th Dist.] 1987, writ ref'd n.r.e.). An example is when the parties to the contract have a common intention, but the written contract erroneously reflects that intention because of a mistake by both parties in writing the agreement. *See id.* Teco, as the party claiming relief, must show what the parties's true agreement was and that the instrument incorrectly reflects that agreement because of a mutual mistake. *See Estes, 462 S.W.2d at 275*. Parole evidence is admissible to show mutual mistake. *See id.* Teco has failed to present any evidence to satisfy its burden of establishing mutual mistake. Finding there is no evidence that the arbitration agreement was revoked or that it was later revived as a result of fraudulent inducement or a mutual mistake, we conclude the arbitration clause remains in full force and effect.

**Scope of the Operating Agreement**

Teco further claims the Operating Agreement excludes the subject matter of its claims. Teco states § 2.11(D) of the Operating Agreement is the only provision covering third-party transportation transactions, which are at issue in the underlying litigation. According to Teco, § 2.11(D) specifically **[\*\*32]** precludes arbitration of its claims:

2.11 Transportation Fee.

\* \* \*

(D) All Other Volumes. For all volumes of gas transported through the System other than those volumes set forth and described in Section 2.11(A) and (B), the Joint Venture shall charge such transportation fee as the Management Committee shall, within applicable regulatory contraints, determine to be appropriate. Notwithstanding any other provisions of this Operating Agreement, the failure of the Management Committee to agree upon a transportation fee for any proposed transportation service involving volumes described in this Section 2.11(d) shall be deemed to be a final decision not to perform such particular service and any dispute with regard to such decision shall not be submitted to arbitration. . . .

Valero asserts this clause provides only that it is the Management Committee's responsibility to set the transportation fee. If a party does not approve of the transportation fee or wants a reduction or an increase in a fee, then it must go to the Management Committee and request a change in the transportation fee. If the Management Committee cannot agree upon the transportation fee, neither party can force **[**33]** the decision to arbitration. Therefore, Valero contends it does not provide an exception to arbitration for all disputes over third party contracts.

We agree. Teco's claims revolve around Valero's alleged diversion of business opportunities, the rerouting of gas to other pipelines owned by Valero, discounting services to customers in exchange for benefits to Valero, and usurping opportunities for pipeline interconnects and facilities. Teco's claims do not involve the Management Committee's failure to agree on a certain transportation fee. Therefore, we find Teco's claims are not excluded from arbitration by the express terms of the Operating Agreement.

**Intertwining of Claims**

Teco also asserts that even if there is a valid arbitration agreement between the parties, its claims still do not come within the purview of the agreement. *HN11* Once the existence of an arbitration agreement is shown, the party seeking to avoid the effects of the arbitration agreement may do so by establishing that the dispute is not within the terms of the agreement. *See D. Wilson Constr. Co., 988 S.W.2d at 394*. Whether the parties' agreement imposes a duty to arbitrate is a matter of **[*590]** contract **[**34]** interpretation and a question of law for the court. *See Kline, 874 S.W.2d at 782*. Therefore, the language of the contract will be enforced according to its plain meaning unless such a reading would defeat the intentions of the parties. *See D. Wilson Constr. Co., 988 S.W.2d at 394*. Because this issue involves the trial court's interpretation of the arbitration clause, *de novo* review is appropriate. *See Nationwide, 969 S.W.2d at 520*; *Certain Underwriters, 950 S.W.2d at 377*.

*HN12* In determining whether a tort claim falls within the scope of an agreement to arbitrate, the focus should be on the factual allegations contained in the petition rather than on the legal causes asserted. *See Valero Energy Corp. v. Wagner & Brown, II, 777 S.W.2d 564, 566* (Tex. App.-El Paso 1989, writ denied).

The test should be based on a determination of whether the particular tort claim is so interwoven with the contract that it could not stand alone or, on the other hand, is a tort completely independent of the contract and could be maintained without reference to the contract.

*Id.* Arbitration is favored by Texas **[**35]** courts. *See Fridl, 908 S.W.2d at 511*; *Hearthshire Braeswood Plaza Ltd. Partnership, 849 S.W.2d at 386*. Therefore, any doubts regarding the scope of an arbitration agreement are to be resolved in favor of arbitration. *See Emerald Texas, Inc. v. Peel, 920 S.W.2d 398, 403* (Tex. App.-Houston [1st Dist.] 1996, no writ); *Fridl, 908 S.W.2d at 511*.

In support of its claims, Teco makes the following factual allegations and charges Valero with: 1) diverting business opportunities for the transportation of gas on the TransTexas Pipeline; 2) disconnecting gas from the TransTexas Pipeline and rerouting it to other Valero owned or controlled pipelines; 3) providing discounts to customers of the TransTexas Pipeline in exchange for benefits to Valero; 4) providing discounts without proper authorization; 5) discounting services on the TransTexas Pipeline to obtain higher fees for services on other facilities owned by Valero; 6) usurping opportunities for pipeline interconnects and facilities; and 7) knowingly and willfully acting to destroy the TransTexas Partnership in order to secure its own pecuniary interests.

The Operating **[**36]** Agreement establishes a joint venture for the purpose of operating the pipeline. [8] **[**37]** Section 2.02 further provides for joint management and control of the pipeline, and the appointment of the

---

[8] It states:

operator. [9] Section 8.02 provides that Valero **[*591]** and Teco each has the right to use 50% of the pipeline to transport gas. Section 2.11 provides that when a party transports gas on the pipeline under its own contracts, it must account for the use by paying the Joint Venture joint tariff of 11.9 cents for the entire 337 miles or a proportionally reduced rate for shorter distances.

Section 5.01 of the Operating Agreement establishes that revenues and costs are to be divided equally between the parties. With respect to the distribution of net revenues, section 5.02 further provides the distribution of net revenues is to be done in accordance with established accounting procedures. [10] To that end, Exhibit A to the Operating Agreement establishes **[**38]** the accounting procedures to be used in calculating net revenues for distribution.

Teco's causes of action depend upon the factual allegations that VTLP and Teco are joint venturers with respect to the pipeline, and that VTC is the operator. Teco asserts the purpose of the joint venture was to maximize third party revenues to be generated by the use of the pipeline. Essentially, Teco's complaints allege improper discounting of third party transportation fees and diversion of partnership or joint venture business opportunities. The Operating Agreement establishes (1) the tariff charged for transporting gas on **[**39]** the pipeline, and (2) that each party has an equal right to use the pipeline. We find that Teco's tort claims are so interwoven with the Operating Agreement that they cannot stand independent of it.

Teco further argues the arbitration clause is too narrow in scope to include its tort claims. This assertion is based on the assumption that its tort claims are not related to the Operating Agreement. Teco contends that "within" is at least as narrow as the phrase "arising under," which has been found to be too narrow to encompass unrelated torts. *See Mediterranean Enters., Inc. v. Ssangyong Corp., 708 F.2d 1458, 1464 (9th Cir. 1983)* (finding "arising hereunder" is intended to cover disputes relating to the interpretation and performance of the contract itself). In any event, this argument, however, has been rejected by the *Valero Energy Corp.* court. In developing the test for intertwining tort claims, the court found any difference in an agreement to arbitrate any dispute "'arising under this contract'" and "'arising out of the contract'" to be "unnecessarily sophisticated." *See Valero Energy Corp., 777 S.W.2d at 564*; *see also J.J. Ryan & Sons, Inc. v. Rhone Poulenc Textile, S.A., 863 F.2d 315, 321 (4th*

---

WHEREAS, the Parties desire to create a joint venture solely for the purpose of providing for the operation, management and maintenance of the System and to appoint VTC as the Operator thereof; . . ."

* * *

2.01 Creation of Joint Venture. VTC and NorTex hereby establish a joint venture having the exclusive right of operating, managing and maintaining the System for the purpose of sharing the net revenues derived therefrom as specified in Article V hereof. The joint venture shall be named the "TransTexas Pipeline" and shall be referred to herein as the "Joint Venture". The Joint Venture shall file appropriate corporate charter documents in the State of Texas to permanently preserve "TransTexas Pipeline". This Operating Agreement shall not govern each Party's ownership interest in the assets of the System; the respective rights and obligations of each of the Parties as owners are set forth and governed under the terms of the Ownership Agreement.

[9] Section 2.02 states:

2.02 Establishment of a Management Committee and Appointment of an Operator. For purposes of management of the System, the Parties hereby establish a Management Committee and assign the duties and responsibilities as specified in Article III hereof. The sole responsibility for setting policies for operating, maintaining and managing the System on behalf of the Joint Venture shall be vested in the Managment Committee. No Party shall be empowered to act on behalf of the Joint Venture except as specifically authorized by the Management Committee or otherwise provided herein. VTC is hereby appointed as the Operator of the System and shall provide the Joint Venture with all the services fully stated herein. . . .

[10] Section 5.02 states:

5.02 Distribution of Net Revenues. The distribution of net revenues shall be as set forth in the Accounting Procedure, or as the Management Committee shall otherwise determine from time to time, for monies in excess of anticipated working capital requirements after payment of all operating, maintenance, general and overhead expenses from revenues received by the Joint Venture.

*Cir. 1988)* **[\*\*40]** (concluding difference between "in connection with" and "may arise out of or in relation to" is largely semantic). Moreover, to the contrary, we find the agreement to arbitrate "any dispute with respect to any matter within the Operating Agreement" is sufficiently broad to encompass related torts. *See, e.g., Acevedo Maldonado v. PPG Indus., Inc., 514 F.2d 614, 616 (1st Cir. 1975)* ("any claim or controversy arising out or relating to this agreement" broad enough to cover related torts); *Griffin v. Semperit of Am., Inc., 414 F. Supp. 1384, 1387 (S.D. Tex. 1978)* (same).

**Nonparties to the Agreement to Arbitrate**

Teco argues that, even if its claims come within the terms of the Operating Agreement and the arbitration clause is still in full force and effect, only VTLP, as joint owner in the pipeline, and VTC, as operator of the pipeline, are entitled to arbitration. The remaining 25 Valero defendants are not parties to the Operating **[\*592]** Agreement and, therefore, may not seek enforcement of an arbitration agreement to which they are not parties.

In support of this contention, Teco relies on a case from the First Court of Appeals. *See Pepe Int'l Dev. Co. v. Pub Brewing Co., 915 S.W.2d 925, 930* **[\*\*41]** (Tex. App.-Houston [1st Dist.] 1996, no writ). In *Pepe Int'l Dev. Co.*, PIDCO and Pub entered into two contracts under which Pub would sell goods and provide services to PIDCO related to the construction of breweries in the Republic of Kazakhstan. *See Pepe Int'l Dev. Co., 915 S.W.2d at 928*. The contracts contained arbitration clauses. *See id.* PIDCO canceled the contracts with Pub for material breach. *See id.* Pub sued PIDCO, Moffett, secretary of PIDCO, Chappelle, president of PIDCO, and Pepe International, Inc. *See id.* The defendants sought arbitration. *See id.*

Pub argued only PIDCO was a party to the contracts and that any matter resolved through arbitration would not be enforceable as against Moffett, Chappelle, and Pepe International. *See Pepe Int'l Dev. Co., 915 S.W.2d at 930*. The court found the breach of contract claim against PIDCO clearly fell within the scope of the arbitration clause. *See id. at 931*. The individual claims against Moffett, Chappelle, and Pepe International, however, fell outside the scope of the arbitration clauses. *See id. at 931*. The court observed that Moffett, Chappelle, and Pepe International were not signatories to **[\*\*42]** the contract and, therefore, were not subject to the contracts' provisions. *See id.*

Valero contends that because Teco has sued nonsignatories to Operating Agreement, and the allegations against the nonsignatory Valero defendants are fundamentally grounded in obligations arising from the Operating Agreement, Teco is equitably estopped to deny the enforceability of the arbitration clause by the nonsignatory Valero defendants. Valero cites a number of cases in support of this argument. Teco maintains that Valero's estoppel argument is not applicable here because that theory has been decided under the Federal Act, not the Texas Act. *See, e.g., Sunkist Soft Drinks, Inc. v. Sunkist Growers, Inc.*, 10 F.3d 753, 757-58 (11th Cir. 1993); *McBro Planning & Dev. Co. v. Triangle Elec. Constr. Co., 741 F.2d 342, 344 (11th Cir. 1984)*; *Hughes v. Masonry Co. v. Greater Clark County Sch. Bldg. Corp., 659 F.2d 836, 841 n.9 (7th Cir. 1981)*; *Sam Reisfeld & Son Import Co. v. S.A. Eteco, 530 F.2d 679, 681 (5th Cir. 1976)*. Teco also argues the estoppel theory is not applicable here because its claims are not fundamentally grounded or **[\*\*43]** intertwined with any obligation arising from the Operating Agreement, but instead, are related to its and the joint venture's existing contracts and prospective relationships with third parties.

This court, however, has previously considered the equitable estoppel theory. *See Carlin v. 3V, Inc., 928 S.W.2d 291* (Tex. App.-Houston [14th Dist.] 1996, no writ). Francesco Carlin ("Carlin") and SIGMA entered into a contract ("1981 Italian agreement"). *See id. at 292*. SIGMA and 3V are sister corporations and wholly owned subsidiaries of 3V Partecipazioni Industrial S.p.a. *See id.* The parent and subsidiary corporations manufacture, sell, and distribute specialty chemical products. *See id.* Under the 1981 Italian agreement, Carlin was to provide technical expertise with respect to the development of PVC suspendants, "Polivic." *See id.* Prior to the

termination of the 1981 Italian agreement, SIGMA assigned to 3V the rights to sell, manufacture, and distribute Polivic. *See id.* After the 1981 Italian agreement expired, Carlin and others developed other PVC suspendants. *See id.*

3V sued Carlin and Compagnia Italiana Di Ricerca e Sviluppo **[**44]** S.R.L. ("CIRS") for breach of the 1981 Italian agreement and related torts. *See id. at 292-93.* 3V argued because it was not a party to the 1981 Italian agreement, it was not bound by its terms, including the arbitration agreement. *See id. at 294.* This court disagreed, first noting that 3V based its entire case on the rights it acquired in the **[*593]** 1981 Italian agreement and would have no case if the agreement did not exist. *See id. at 295.*

The *Carlin* court noted that other cases, a finding that the claims of the nonsignatory party arise out of an agreement containing an arbitration clause, and the nonsignatory would have no claim in the absence of the underlying agreement, the arbitration clause was enforceable against the nonsignatory. *See id. at 295-96* (citing *J.J. Ryan & Sons v. Rhone Poulenc Textile, S.A., 863 F.2d 315, 320-21 (4th Cir. 1988)* (stating that when the claims against a parent company and its subsidiary are based on the same facts and are inherently inseparable, a court may refer claims against the parent to arbitration even though the parent is not formally a party to the arbitration **[**45]** agreement); *Merrill Lynch v. Eddings, 838 S.W.2d 874, 879* (Tex. App.-Waco 1992, writ denied) (holding that nonsignatory settlor and trust beneficiaries could be compelled to arbitrate under account agreement between trustee and Merrill Lynch, which contained an arbitration clause, because agreement was the underlying basis for all the claims of the beneficiaries and there would have been no claims without the agreement)).

In a discussion on the doctrine of equitable estoppel, the *Carlin* court observed that cases applying the doctrine were decided on the same ultimate fact, i.e., that each party must rely on the terms of the written agreement in asserting its claims. *See 928 S.W.2d at 296* (citing *Sunkist Soft Drinks, Inc.*, 10 F.3d at 757-58; *J.J. Ryan & Sons, Inc., 863 F.2d at 320-21*; *McBro Planning & Dev. Co., 741 F.2d at 344*; *Hughes Masonry Co.*, 659 F.2d at 841 n.9). Moreover, the focus of the inquiry in each case was a determination of the nature of the underlying claims asserted by the party resisting arbitration, and whether these claims were within the scope of the arbitration clause contained **[**46]** in the agreement. *See id.*

The *Carlin* court, finding that all of 3V's claims arose out and were directly related to the 1981 Italian agreement, concluded 3V was equitably estopped from avoiding arbitration of its claims even though it was not a signatory to the agreement. *See Carlin*, 928 S.W.2d at 297.

Here, Teco has alleged the other Valero defendants are either subsidiary, parent, or sister corporations of VTLP and VTC, or in the case of McLelland and Greehey, officers and directors of the various Valero defendants. Teco has brought the same claims against the nonsignatory Valero defendants as against VTLP and VTC. Specifically, Teco asserts that the Valero defendants acted "in concert to thwart the legitimate purposes of the Partnership." Having already found Teco's claims come within the scope of the Operating Agreement's arbitration clause, we conclude Teco must rely on the terms of the Operating Agreement in asserting its claims against the nonsignatories. Because Teco's claims against VTLP, VTC, and the other defendants are based on the same operative facts and are inherently inseparable, we hold the nonsignatory Valero defendants may also compel arbitration of Teco's claims against **[**47]** them. *See Sam Reisfeld & Son Import Co. v. S.A. Eteco, 530 F.2d 679, 681 (5th Cir. 1976)* (explaining because the claims against nonsignatory defendants, including the parent corporation of signatory defendant, were based on the same operative facts and were inherently inseparable from the claims against the signatory defendant). [11]

### **[**48]** **[*594]** Waiver

---

[11] Moreover, several federal circuit decisions have found that nonsignatories to arbitration agreements may be bound by the agreement under ordinary contract and agency principles. *See Pritzker v. Merrill Lynch, Pierce, Fenner & Smith, 7 F.3d 1110, 1122 (3d Cir. 1993)*

*HN13* Finally, Teco argues Valero has waived enforcement of the arbitration clause by its previous litigation. A party waives its right to arbitration if it substantially invokes the judicial process to the detriment of the opposing party. *See Turford v. Underwood, 952 S.W.2d 641, 643* (Tex. App.-Beaumont 1997, orig. proceeding); *Marble Slab Creamery, Inc. v. Wesic, Inc., 823 S.W.2d 436, 438* (Tex. App.-Houston [14th Dist.] 1992, no writ). To establish waiver, Teco bears the burden of showing Valero acted inconsistently with the arbitration agreement and that it was prejudiced by such conduct. *See In re Oakwood Mobile Homes, Inc., 987 S.W.2d at 574*; *Turford, 952 S.W.2d at 643*. There is a strong presumption against waiver, which must be intentional and may only be implied from a party's actions if the facts demonstrate that the party seeking to enforce arbitration intended to waive its arbitration right. *See Turford, 952 S.W.2d at 643*. Therefore, any doubts regarding waiver should be resolved in favor of arbitration. *See In re Oakwood Mobile Homes, Inc., 987 S.W.2d at 574*. **[**49]** Whether a party waives arbitration is a question of law. *See id.*; *Nationwide of Bryan, Inc., 969 S.W.2d at 521*.

In 1985, Valero filed suit against InterNorth, NorTex and HNG when InterNorth merged with HNG to form Enron. Valero asserted the merger violated NorTex's fiduciary duties under the Ownership Agreement. In 1987, Valero sued Enron, NorTex and Teco in an attempt to block the sale to Teco. Teco argues that Valero's bringing this previous litigation waives its right to enforce arbitration in the underlying litigation. Teco, in particular, complains the Ownership Agreement includes an arbitration clause similar to the one found in the Operating Agreement. Several courts have rejected similar contentions. *See, e.g., Lawrence v. Comprehensive Bus. Servs. Co., 833 F.2d 1159 (5th Cir. 1987)* (finding that a party who brings or participates in previous litigation does not forfeit the contractual right to compel arbitration as to all future disputes on the same contract); *Insurance Co. of N. Am. v. J.A. Jones Constr. Co., 1995 U.S. Dist. LEXIS 6553, 1995 WL 295280*, at *4 (E.D. La. 1995) (same); *Transwestern Pipeline Co. v. Horizon Oil & Gas Co., 809 S.W.2d 589, 593* **[**50]** (Tex. App.-Dallas 1991, writ dism'd w.o.j.) (stating that appellee's argument that appellant had settled a previous dispute without compelling arbitration is "of no import in the instant case"). "*HN14* It has long been the law in this state that even though a party may have once waived a contract right in the past, it may enforce that right in the future by giving notice of its intention to do so." *Transwestern Pipeline Co., 809 S.W.2d at 592*.

The United States Fifth Circuit Court of Appeals has addressed facts similar to those at hand. In *Lawrence v. Comprehensive Bus. Servs. Co.*, Comprehensive had sued the Lawrences in Illinois small claims court for payment of services it had provided under a franchise agreement, and obtained a judgment. *833 F.2d at 1161*. The Lawrences, in turn, sued Comprehensive in Texas state court seeking a declaratory judgment that the agreement was illegal and unenforceable, therefore, freeing them of any further liability under it. *See id.* Comprehensive removed that cause of action to federal court and moved to stay the litigation and compel arbitration pursuant to the arbitration clause in the franchise agreement. *See id.*

**[**51]** The Lawrences argued Comprehensive had waived arbitration by its earlier action on the same agreement. *See 833 F.2d at 1164*. The court found Comprehensive's previous suit in Illinois did not substantially invoke the judicial process to the Lawrences' detriment in the present suit. *See 833 F.2d at 1165*. The court further observed the Lawrences **[*595]** had not suggested Comprehensive either delayed its demand for arbitration or shown the earlier suit prejudiced their present claim. *See id.*

Similarly, Teco has not claimed Valero either delayed its demand for arbitration or explained how any previous litigation prejudices arbitration of its present claims. We hold Valero has not waived its right to enforce arbitration.

(claims against sister corporation fall within arbitration agreement based on agency principles); *Arnold v. Arnold Corp.-Printed Communications for Bus.*, 920 F.2d 1269, 1282 (6th Cir. 1990) (nonsignatory defendants allegedly committed acts related to running of corporation in shareholder suit); *Letizia v. Prudential Bache Sec., Inc.*, 802 F.2d 1185, 1187 (9th Cir. 1986) (individual defendants' allegedly wrongful acts related to handling of plaintiff's securities account as agents of brokerage house). Teco alleges the Valero defendants acted as agents by entering into third party transportation contracts on behalf of the joint venture.

**Conclusion**

We sustain both of Valero's points of error. Accordingly, the judgment of the trial court is reversed and remanded for proceedings consistent with this opinion. Our opinion moots all pending motions which were taken with the case.

/s/ John S. Anderson

Justice

Judgment rendered and Opinion filed August 26, 1999.

Panel consists of Chief Justice Murphy and Justices Anderson and Edelman.


# *Willis v. Donnelly*

Supreme Court of Texas

November 17, 2005, Argued ; June 2, 2006, Opinion Delivered

No. 04-0409

**Reporter**

199 S.W.3d 262; 2006 Tex. LEXIS 505; 49 Tex. Sup. J. 661

MICHAEL T. WILLIS, FRANCIE WILLIS, URBAN RETREAT OF HOUSTON, INC., AND WILLIS HITE ENTERPRISES, INC., PETITIONERS, v. DAN DONNELLY, RESPONDENT

**Subsequent History:** **[**1]** Released for Publication September 22, 2006.

Rehearing denied by *Willis v. Donnelly, 2006 Tex. LEXIS 1000 (Tex., Sept. 22, 2006)*

**Prior History:** ON PETITION FOR REVIEW FROM THE COURT OF APPEALS FOR THE FOURTEENTH DISTRICT OF TEXAS.

*Willis v. Donnelly, 118 S.W.3d 10, 2003 Tex. App. LEXIS 9176 (Tex. App. Houston 14th Dist., 2003)*

## Core Terms

letter agreement, stock, shareholder, court of appeals, damages, fiduciary duty, corporations, ratification, shares, spa, breach of fiduciary duty, Termination, ratified, loans, matters relating, contract claim, trial court, stock transfer, gross revenue, matter of law, new trial, individually, benefits, breach of contract, contract damages, no evidence, real estate, circumstances, argues, losses

## Case Summary

### Procedural Posture

Petitioners, two corporations and their majority shareholders, sought review of a judgment from the Court of Appeals for the Fourteenth District (Texas), which affirmed the trial court's judgment against the majority shareholders on respondent investor's claim for breach of fiduciary duty. The court of appeals reversed the trial court's judgment on a contract claim and remanded that claim to the district court for a new trial.

### Overview

The majority shareholders created two corporations to own and manage a spa. The parties signed an agreement that provided for the investor to transfer a hair salon business to one of the corporations. One of the majority shareholders stated that he did not intend to be personally liable and crossed out an individual signature block where his name was typed. The investor had no prior business or personal dealings with the majority shareholders. The investor agreed to delay a transfer of stock to him. The parties disputed whether the majority shareholders had made loans or capital contributions. The court held that the majority shareholders were not liable on the contract claim because they were not parties to the agreement. A common law ratification claim

was precluded by *Tex. Bus. Orgs. Code Ann. §§ 21.223(a)*, *21.224* and also lacked merit because the corporations did not act as the majority shareholders' agents. The breach of fiduciary duty claim failed because no personal relationship existed and the alleged acts occurred before the investor became a shareholder. As to the contract claim against the corporations, the jury was instructed on the wrong measure of damages.

**Outcome**

The court reversed in part the court of appeals' judgment and rendered a take-nothing judgment on all of the investor's claims against the majority shareholders. The court affirmed the court of appeals' judgment insofar as it granted a new trial on the contract claim against the corporations, and the court remanded to the district court for further proceedings.

# LexisNexis® Headnotes

Civil Procedure > Appeals > Reviewability of Lower Court Decisions > Preservation for Review

*HN1* As a general rule, a petitioner's complaint about a trial court's judgment must be raised in the court of appeals to preserve error in the Texas Supreme Court. However, a party should not lose its right to appeal based on an unduly technical application of procedural rules.

Business & Corporate Law > ... > Shareholders > Shareholder Duties & Liabilities > Personal Liability

*HN2* A bedrock principle of corporate law is that an individual can incorporate a business and thereby normally shield himself from personal liability for the corporation's contractual obligations. Avoidance of personal liability is not only sanctioned by the law; it is an essential reason that entrepreneurs choose to incorporate their businesses.

Business & Corporate Law > ... > Shareholder Duties & Liabilities > Piercing the Corporate Veil > General Overview

Business & Corporate Law > ... > Shareholders > Shareholder Duties & Liabilities > Personal Liability

*HN3* A shareholder may not be held liable to the corporation or its obligees with respect to any contractual obligation of the corporation on the basis that the holder is or was the alter ego of the corporation or on the basis of actual or constructive fraud, a sham to perpetrate a fraud, or other similar theory. *Tex. Bus. Orgs. Code Ann. § 21.223(a)*. The liability of a shareholder for a contractual corporate debt under this statute is exclusive and preempts any other liability imposed for that obligation under common law or otherwise. *Tex. Bus. Orgs. Code Ann. § 21.224*. There is a statutory exception to this rule where the shareholder caused the corporation to be used for the purpose of perpetrating and did perpetrate an actual fraud on the obligee primarily for the direct personal benefit of the shareholder. *Tex. Bus. Orgs. Code Ann. § 21.223(b)*. There is also a statutory exception where the shareholder expressly agrees to be personally liable to the obligee for the obligation. *Tex. Bus. Orgs. Code Ann. § 21.225(1)*.

Business & Corporate Law > ... > Shareholder Duties & Liabilities > Piercing the Corporate Veil > General Overview

Business & Corporate Law > ... > Shareholders > Shareholder Duties & Liabilities > Personal Liability

*HN4* To impose liability against shareholders under a common law theory of implied ratification because they accepted the benefits of an agreement made by the corporation would contravene the statutory imperative that, absent actual fraud or an express agreement to assume personal liability, a shareholder may not be held liable for contractual obligations of the corporation. Characterizing the theory as ″ratification″ rather than ″alter ego″ is simply asserting a similar theory of derivative liability that is covered by *Tex. Bus. Orgs. Code Ann. § 21.223(a)*.

Business & Corporate Law > Agency Relationships > Ratification > General Overview

*HN5* Generally, ratification is a doctrine of agency law, and allows a principal to be bound by an agent's unauthorized contract in circumstances where the principal becomes aware of the contract and retains benefits under it. Ratification presupposes that the principal has an agent who, by agreement, is authorized to act on the principal's behalf.

Business & Corporate Law > ... > Corporate Formation > Preincorporation > Incorporators & Promoters

*HN6* A promoter is not liable where a contract is made in the name and solely on the credit of the proposed corporation and the contracting party knows that the corporation does not yet exist.

Civil Procedure > ... > Jury Trials > Jury Instructions > Objections

Civil Procedure > Appeals > Reviewability of Lower Court Decisions > Preservation for Review

*HN7* A complaint about a defective jury instruction is waived unless specifically included in the objections to the charge. *Tex. R. Civ. P. 274*.

Civil Procedure > Trials > Jury Trials > Province of Court & Jury

Contracts Law > Contract Interpretation > General Overview

*HN8* The construction of an unambiguous contract is a question of law for the court.

Contracts Law > Contract Interpretation > Fiduciary Responsibilities

*HN9* Generally, while a fiduciary relationship or confidential relationship may arise from the circumstances of a particular case, to impose such a relationship in a business transaction, the relationship must exist prior to, and apart from the agreement made the basis of the suit.

Contracts Law > Contract Interpretation > Fiduciary Responsibilities

*HN10* Where a plaintiff is suing for breach of fiduciary duty based on his purported status as a minority shareholder, but (1) no transfer of stock to the purported minority shareholder ever occurred, (2) the purported majority and minority shareholders were both experienced businessmen who had never met prior to the business arrangement at issue, (3) the two were conducting business under a written agreement that expressly required corporate entities, not the majority shareholder, to issue the stock, and (4) the two were also operating under an oral agreement to postpone the transfer of stock when the alleged breaches of fiduciary duty occurred, Texas law does not recognize the existence of a fiduciary duty. This is consistent with the general reluctance of Texas law to ignore corporate formalities and hold an individual defendant liable where the plaintiff has agreed to conduct business with a corporation. It is also consistent with the courts' reluctance to recognize fiduciary relationships, especially in the commercial context. In order to give full force to contracts, courts do not create such a relationship lightly.

**Judges:** JUSTICE WILLETT delivered the opinion of the Court. JUSTICE O'NEILL, JUSTICE BRISTER, and JUSTICE MEDINA did not participate in the decision.

**Opinion by:** WILLETT

## Opinion

[**265]  JUSTICE WILLETT delivered the opinion of the Court.

This dispute centers on whether shareholders in closely held corporations can be held liable to an individual who agreed to a contractual business arrangement with the corporations. We agree with Petitioners Michael and Francie Willis (the Willises) that they cannot be held liable to Respondent Dan Donnelly under breach of contract and breach of fiduciary duty theories. We address other issues as well.

### I. Background

#### A. Factual Background

Michael Willis (Willis) is a successful Houston entrepreneur. In the late 1980s, he became intrigued with the idea of opening a high-end spa, where customers could receive hair styling and other personal services such as manicures and massages. He hired Richard Hite as a consultant to help develop the idea. Willis also received assistance from Charles Gebhardt, [**2]  an accountant. The business plan called for the spa to be named the Urban Retreat.

Willis and others created two corporations to carry out the plan. One of the corporations would operate the initial spa. If the business succeeded a second corporation would serve as an umbrella company. The plan was eventually to "roll up" the separate spas into a single company if the concept worked in multiple locations. In March 1989 Willis/Hite Enterprises, Inc. was incorporated, and the corporation was later renamed Urban Retreat of Houston, Inc. (URH). Willis and Gebhardt were the original shareholders of URH. In August 1989, a second company called Willis/Hite Enterprises, Inc. (WHE) was incorporated as the umbrella company. Willis, Gebhardt, and Bill Caudell were the original shareholders of WHE. URH and WHE were separate corporations, and one was not the subsidiary of the other. URH and WHE are Petitioners to this appeal along with the Willises. The articles of incorporation of URH and WHE name Willis, Hite, and Gebhardt as the original directors. Willis became the chairman of URH, and Hite was elected its president.

Hite contacted Dan Donnelly (Donnelly), a successful hair stylist. Donnelly [**3]  was the co-owner of Hairmasters of Houston, Inc. [*266] (Hairmasters), an incorporated business operating a hair salon. Hite and Willis met informally with Donnelly and discussed the idea for the spa. Donnelly had no prior business or personal dealings with Willis.

With drafting assistance from Gebhardt, Hite and Willis eventually signed a letter agreement that lies at the heart of this dispute. The agreement is typed but has numerous handwritten changes initialed by Hite and Donnelly. Gebhardt testified that Willis "didn't have anything to do with" the drafting of the agreement. There are several drafts of agreements concerning the Urban Retreat, and the record is uncertain as to when earlier drafts of the letter agreement were prepared and circulated. Donnelly showed a draft of the agreement to his lawyer and signed the final agreement on July 10, 1989, at a meeting attended by Donnelly, Hite, Willis, and Gebhardt. Donnelly signed as president of Hairmasters and individually. The only other person who signed the agreement was Hite, who signed as president of WHE and individually.

The agreement states in its opening sentence that it is "a letter agreement between [WHE], Richard H. Hite, [**4]  Mike Willis, and [URH], and Daniel Donnelly and [Hairmasters]." A signature block at the end of the agreement was typed for "Mike Willis, Individually," but Willis crossed out this signature block at the July 10 meeting where the agreement was signed, and did not sign or initial the agreement. Donnelly testified that he signed the agreement after Willis's name was crossed out. Willis testified that he crossed his name out to make

clear he did not agree to be bound in his individual capacity. Donnelly's expert witness testified that because Willis removed himself as an individual signatory to the agreement, "Mr. Willis did not intend to be a part of this agreement." Gebhardt testified that at the meeting where the agreement was signed, Willis made comments to the effect that he would not be individually responsible under the agreement, and Gebhardt passed these comments along to Hite and Donnelly.

The agreement obliged Donnelly to transfer the entire Hairmasters business to URH, but qualified this obligation with some "best efforts" language. [1] It provided that Donnelly "will have the responsibility to oversee the management of the day to day operations of the URH facility."

 [**5] The agreement provided that WHE and URH agree to issue Donnelly twenty-five percent ownership in URH within twelve months of the URH "Grand Opening," or when URH's gross revenues reached Hairmasters' 1988 annual gross revenues, whichever occurred first. It provided for additional stock transfers as various revenue targets for URH are met. It separately stated that WHE would issue Donnelly ten percent ownership in WHE under the same terms as the initial transfer of URH stock. It provided that Donnelly would receive a salary of $ 110,000, and a salary equal to five percent of URH's gross revenues after two years.

As discussed further below, the parties disputed the applicability of two other provisions of the letter agreement, the "Termination" provision and the provision for "Other Matters Relating to Shares." Donnelly [*267] argues by cross petition that the latter provision supplied the measure of damages for the failure to issue stock to him under the agreement. Willis argues that this provision is inapplicable to the dispute.

To create the Urban Retreat facility, Hite located a piece of property on San Felipe Drive. River Oaks Bank owned the property. URH obtained an $ 800,000 renovation [**6] loan for this property and a lease from the bank. URH and WHE were initially capitalized with only $ 1,000 each and were not creditworthy. Willis personally pledged a $ 600,000 certificate of deposit to secure the loan and guaranteed URH's lease.

The Urban Retreat facility had its grand opening on December 12, 1989. Donnelly moved into the spa and began cutting hair and managing of the facility. The spa was not profitable. Donnelly testified that he "knew it wasn't making money." Willis loaned money to URH to keep the business afloat. He eventually loaned URH approximately $ 2 million.

Much of the trial focused on the characterization of Willis's cash infusions into the business as loans and whether Willis failed to live up to a promise to provide capital. The debate extended to battling experts. [2] Willis and Hite claimed they told Donnelly that the funds provided by Willis were loans as opposed to capital contributions. The balance sheets and the tax returns of URH describe the funds from Willis as loans, and Petitioners offered evidence that Donnelly was shown the financial records and attended meetings where the loans were discussed. While Willis testified that he agreed to "provide [**7] the capital" or to "provide capital and funding," his testimony as a whole was clear that, with the exception of his initial $ 1,000 contribution, he

---

[1]   The agreement states:

> [Hairmasters] and any additional businesses owned by Daniel Donnelly and operating on its premises will transfer their entire operations, staff, and clientele to the URH premises on a date initiated by Richard H. Hite . . . . Mr. Donnelly will agree to use his best efforts to persuade his entire staff and Hairmasters' present clientele to transfer to the URH.

[2]   One of Willis's expert witnesses, an accountant, claimed that treating the cash infusions as capital contributions would mean that Willis was in effect making a gift to Donnelly once Donnelly received his stock in the corporation. One of Donnelly's expert witnesses, a tax lawyer, stated that the IRS would want to characterize the infusions as capital contributions rather than loans.

viewed these cash infusions into URH as loans. Hite likewise viewed the cash infusions as loans. Donnelly testified that he was told that "Mike's putting in the money," but conceded that "[t]hey did not tell me it would not be a loan." Regardless, the letter agreement did not expressly obligate Willis to provide any capital contributions to URH, or to provide loans for that matter.

The parties contested whether Donnelly fully transferred his hairstyling business to Urban Retreat **[**8]** as promised. As described above, the letter agreement is somewhat vague as to this obligation, requiring Hairmasters and Donnelly to "transfer their entire operations, staff, and clientele" to the Urban Retreat, but also stating that Donnelly was only required to use his "best efforts" to persuade his staff and clientele to transfer to URH.

Although the spa was losing money, it generated sufficient gross revenues to trigger the provisions in the letter agreement requiring the issuance of stock to Donnelly. Because the spa was so unprofitable, however, Willis asked Donnelly if he would agree to a reduced stock interest. Willis also asked Donnelly if he would agree to sign on to some of the spa's debt. Donnelly refused. Donnelly claims that Willis unilaterally cut his salary.

Willis also asked Donnelly if he would agree to delay the transfer of stock due to him under the letter agreement, and the trial testimony confirms that both Willis **[*268]** and Donnelly agreed to this delay. [3] **[**10]** Donnelly states in his respondent's and cross petitioner's briefs that he "agreed to wait, based on Willis's assurances that he would live up to the Letter Agreement when the business 'turned the corner.'" He made **[**9]** the same statement to the court of appeals. Willis wanted the transfer delayed until the spa turned the corner financially, because the delay supposedly allowed Willis to continue to take losses on the business on his personal tax

---

[3] Donnelly testified:

Q: Well, tell me about that discussion where you specifically asked [Willis] to give you the stock.

A: Well, I didn't make a demand on Mr. Willis, obviously, because he continually told me that we were--that there was a point--from day one, the revenues kept increasing every year; but the place still wasn't profitable. And the conversations we had . . . were to the effect that once we turned the corner . . . that he could at some point live up to the letter agreement. . . .

Q: Did you ever ask any officer or director of the corporations to issue you any stock?

A: I did not.

* * *

Q: Do you remember in your deposition you told me he said, "Is it all right if I don't issue you the stock at this time?"

A: "Is it all right?" In the first--I believe it was after the first year of business.

Q: He asked you that question?

A: Right.

Q: And you agreed?

A: Yes, I did.

returns. [4] Willis and Donnelly gave consistent and uncontradicted testimony confirming this oral agreement, and there was no evidence that, during Donnelly's employment with URH, he ever withdrew his consent to delay the transfer of stock. The stock was never issued to Donnelly.

Willis asked his wife, Francie Willis (Francie), to become involved in the spa. Willis hoped that Francie could turn the business around. Purportedly to enhance her credibility at the spa, Willis transferred all of his stock in URH to Francie in late 1990. [5]

 [**11]  In July 1992, Willis and Francie purchased the real estate on which the spa was located for $ 1.6 million. Although URH had an option to purchase the realty under its lease with River Oaks Bank, URH did not have the funds to purchase the property. Willis saw this purchase as a means of recouping some of the funds he had lent to URH to improve the premises.

Francie and Donnelly did not get along. Donnelly made plans to open a competing spa, and when Francie found out about these plans in late 1994, she testified that she confronted Donnelly and "asked him to leave and not come back," but also testified in her deposition that Donnelly left by mutual agreement.

The income statements and tax returns for URH indicate that it was never profitable during Donnelly's employment. Hite and Petitioners' accounting expert likewise testified that URH was not profitable during  [*269]  this period and had a negative book value. Donnelly's experts did not refute this lack of earnings, but instead focused on gross revenues. As of the time of trial in 1999, the Urban Retreat was still unprofitable according to Francie Willis and Urban Retreat's then-current general manager, although Francie admitted that  [**12]   she had testified in her deposition that she "wouldn't take $ 5 million for the Urban Retreat." The court of appeals noted that "Urban Retreat's liabilities and costs have always outstripped its tangible assets and revenue." *118 S.W.3d 10, 40*.

A separate dispute arose between Willis and Donnelly. In 1992, for personal financial reasons, Donnelly asked Willis for a loan of $ 18,000. Willis agreed and Donnelly signed a promissory note. Willis made a second personal loan to Donnelly and the two loans were rolled into a single note. Donnelly defaulted on the note.

## B. Proceedings Below

This suit began when Willis sued Donnelly on the personal note. Donnelly filed a counterclaim and third party action against Willis, Francie, WHE, and URH, alleging several causes of action. The case proceeded to trial,

---

[4]   Willis testified:

> Mr. Donnelly, in one of our meetings, he mentioned to me, you know, the time frame is up for the corporation to issue him some stock. . . . And the way Sub S Corporations work is the losses go directly to the shareholders. And Mr. Donnelly had no, what's known as basis, in those losses and, therefore, he couldn't take any of the . . . tax losses . . . . So I just, I asked Dan if it would be okay if I delayed issuing the stock, because the losses were still coming in, and I could get the tax benefit of those losses.

> A: Did he agree with that?

> Q: He did.

  Donnelly disputes that only Willis was qualified to take advantage of the tax losses.

[5]   Donnelly complains in his respondent's brief that Willis transferred his shares to Francie "in spite of Donnelly's right of first refusal under the Letter Agreement," but points to no record evidence that he had the desire or financial means to purchase Willis's shares under the terms of the agreement.

and the jury ruled in favor of Willis on the promissory note. The jury found that WHE and URH breached the letter agreement by failing to convey stock to Donnelly, and that Donnelly was entitled to ten percent of the stock in WHE and fifty percent of the stock in URH under the terms of the letter agreement. The jury also found that Willis and Francie were individually **[**13]** liable under the letter agreement because they ratified the agreement.

The jury rejected Donnelly's tortious interference and fraud claims. It ruled in favor of Donnelly on his breach of fiduciary duty claim against Willis but found no breach of fiduciary duty by Francie. The jury was instructed that the Willises owed Donnelly a fiduciary duty, and asked whether each complied with their fiduciary duty to Donnelly. Since the jury was also instructed that a "yes" answer must be based on a preponderance of the evidence, the Willises had the burden of proving that they had complied with their fiduciary duties in order to avoid liability.

As to both the breach of contract and breach of fiduciary duty claims, the jury found damages of $ 1,707,684.30.

The trial court entered judgment against Donnelly on the promissory note. It entered judgment against Willis, Francie, URH, and WHE, jointly and severally, on Donnelly's breach of contract claim, and entered judgment against Willis on Donnelly's breach of fiduciary duty claim, in the amounts found by the jury. As further relief the court awarded a constructive trust in favor of Donnelly on the Urban Retreat real estate, and on fifty percent **[**14]** of the URH's issued and unissued stock and ten percent of WHE's issued and unissued stock. It awarded attorney's fees of $ 400,000 to both sides as found by the jury.

Both sides appealed. The court of appeals held that the record supported the liability of all Petitioners for breach of contract. _118 S.W.3d at 25-30_. It agreed with the trial court that the Willises were liable for breach of contract because they ratified the letter agreement. _Id._ at 26. However, it reversed the judgment on the contract claim and remanded this portion of the case to the district court for a new trial on liability and damages, because it concluded that the jury had received an erroneous instruction on contract damages. _Id._ at 39-42.

The court of appeals affirmed the judgment against Willis for breach of fiduciary duty, except that it remanded the judgment **[*270]** for constructive trust on the realty for an election of remedies. _Id._ at 30-35, 43-44. It reversed and remanded the portions of the judgment awarding attorney's fees to Willis and Donnelly. _Id._ at 44-48.

## II. Discussion

### A. Breach of Contract

### 1. Liability **[**15]** of the Willises Individually

The Willises argue that their contract liability based on a ratification theory fails as a matter of law. We agree.

The jury found that the Willises had ratified the letter agreement. The court of appeals held that the Willises can be held liable for breach of contract based on this jury finding, and further held that they had waived any argument that the evidence is insufficient to support liability on the contract based on ratification.

Donnelly argues that the court of appeals correctly held that the Willises had waived any argument that they cannot be held liable under a ratification theory by failing to brief the issue in the court of appeals. **HN1** As a general rule, a petitioner's complaint about the trial court's judgment must be raised in the court of appeals to

preserve error in the Supreme Court. [6] **[\*\*16]** However, we have recognized that a party should not lose its right to appeal based on an unduly technical application of procedural rules. [7] We conclude that the Willises' opening brief in the court of appeals preserved error on this issue. [8]

**[\*\*17]** On the merits, we agree with the Willises that they are not liable for breach of the letter agreement under the undisputed facts presented. The ratification claim can only be based on a theory that the Willises expressly agreed to be bound by the agreement or impliedly ratified the agreement by retaining the benefits of the agreement. The jury was so instructed as to these alternative theories of ratification, [9] **[\*271]** and relying on the latter theory Donnelly argued to the jury that the Willises had ratified the agreement by accepting benefits under it. [10]

**[\*\*18]** As explained above, Willis is not a party to the letter agreement, and he incorporated two companies that by law would shield him from personal liability. While his name is included in the opening sentence of the

---

[6]   See *Bunton v. Bentley*, 153 S.W.3d 50, 53, 48 Tex. Sup. Ct. J. 197 (Tex. 2004) (citing Tex. R. App. P. 53.2(f)).

[7]   See *Republic Underwriters Ins. Co. v. Mex-Tex, Inc.*, 150 S.W.3d 423, 427, 48 Tex. Sup. Ct. J. 134 (Tex. 2004); *Briscoe v. Goodmark Corp.*, 102 S.W.3d 714, 717, 46 Tex. Sup. Ct. J. 534 (Tex. 2003).

[8]   The brief essentially presented the argument that as mere shareholders of the parties to the letter agreement, the Willises cannot as a matter of law be held liable for a breach of the letter agreement under a theory of ratification or some other theory of derivative liability, arguing, *inter alia*:

> Neither Francie Willis nor Michael Willis signed the Letter Agreement. Neither . . . was a party to the Letter Agreement. Thus, as a matter of law, neither . . . could have breached the Letter Agreement. There is no evidence, no legally sufficient evidence, and no factually sufficient evidence that Francie Willis or Michael Willis breached the Letter Agreement. . . . As a matter of law, the intentional deletion of Michael Willis' signature line establishes that the parties did not intend to include Michael Willis as a party. . . . Furthermore, Richard Hite did not sign the Letter Agreement on behalf of Michael Willis or Francie Willis and, even if he had, there is no evidence and no finding that Mr. Hite had actual or apparent authority to do so.

> \* \* \*

> With regard to the Letter Agreement as it relates to the Willises, the jury was asked only whether the Willises ratified it. But ratification is simply an affirmative defense to an equitable claim for rescission. . . . Absent a finding that Michael Willis or Francie Willis actually breached the Letter Agreement, as a matter of law the jury's affirmative response to the ratification question . . . cannot support a judgment against Michael Willis or Francie Willis for breach of contract. Furthermore, there is no evidence, no legally sufficient evidence, and no factually sufficient evidence to support . . . a finding that Francie Willis or Michael Willis ratified or breached the Letter Agreement.

 (Legal and record citations omitted).

[9]   The jury was instructed:

> A party's conduct includes conduct of others that the party has ratified. Ratification may be express or implied.

> Implied ratification occurs if a party, though he may have been unaware of unauthorized conduct taken on his behalf at the time it occurred, retains the benefits of the transaction involving the unauthorized conduct after he acquired full knowledge of the unauthorized conduct. Implied ratification results in the ratification of the entire transaction.

[10]   Donnelly's counsel argued in closing statement:

> Did Mike and Francie Willis ratify the July 10th, 1989 agreement? Ratification occurs when you retain the benefit of something you weren't an original party to.

agreement, the agreement obligated URH and WHE only to issue shares to Donnelly. Moreover, at the meeting where the agreement was signed, Willis crossed his signature line off the agreement and refused to sign it.

As a matter of law, the corporate shield from liability should operate in these circumstances. *HN2* A bedrock principle of corporate law is that an individual can incorporate a business and thereby normally shield himself from personal liability for the corporation's contractual obligations. [11] Avoidance of personal liability is not only sanctioned by the law; it is an essential reason that entrepreneurs like Willis choose to incorporate their businesses. Not surprisingly, Willis testified that his intent always "was for the corporation to be bound by this agreement and not me individually." Donnelly's own counsel, in his opening statement to the jury, argued that Willis scratched his name off the agreement because he "didn't want to have anything to do with it in [**19] an individual capacity."

In *Castleberry* [**20] *v. Branscum*, we stated that incorporation normally protects shareholders, officers, and directors from liability for corporate obligations, "but when these individuals abuse the corporate privilege, courts will disregard the corporate fiction and hold them individually liable." *721 S.W.2d at 271*. We also stated that "[w]e disregard the corporate fiction, even though corporate formalities have been observed and corporate and individual property have been kept separately, when the corporate form has been used as part of a basically unfair device to achieve an inequitable result." *Id.* The business [*272] community was displeased with the flexible approach to piercing the corporate veil embraced in *Castleberry*, and in response the Legislature in 1989 narrowly prescribed the circumstances under which a shareholder can be held liable for corporate debts. [12]

[**21] Under current law, by statute, *HN3* a shareholder "may not be held liable to the corporation or its obligees with respect to . . . any contractual obligation of the corporation . . . on the basis that the holder . . . is or was the alter ego of the corporation or on the basis of actual or constructive fraud, a sham to perpetrate

---

Now, I want y'all to think about who got this 2.2, 2.15 million dollars of Mr. Donnelly's. He don't have it. They've got it. So who kept the benefits of that agreement? That's a yes, yes. . . . Both Francie and Mike kept the benefits. Yes, they ratified the agreement.

[11] *Castleberry v. Branscum*, 721 S.W.2d 270, 271, 29 Tex. Sup. Ct. J. 481 (Tex. 1986) ("The corporate form normally insulates shareholders, officers, and directors from liability for corporate obligations . . . ."); *see also Pabich v. Kellar*, 71 S.W.3d 500, 507 (Tex. App.-Fort Worth 2002, pet. denied) ("A corporation is a separate legal entity that normally insulates its owners or shareholders from personal liability."); *Aluminum Chems. (Bol.), Inc. v. Bechtel Corp.*, 28 S.W.3d 64, 67 (Tex. App.-Texarkana 2000, no pet.) ("[A] major purpose of the corporate structure is to shield its shareholders from liabilities of the corporation."); *Nat'l Hotel Co. v. Motley*, 123 S.W.2d 461, 465 (Tex. App.-Eastland 1938, writ dism'd judgm't cor.) ("[A]n individual whose business is authorized to be incorporated may incorporate such business for the sole purpose of escaping individual liability of the owner for the debts of the corporation.").

[12] *See Farr v. Sun World Sav. Ass'n*, 810 S.W.2d 294, 296 (Tex. App.-El Paso 1991, no writ) ("Largely because of the uproar in the business community over the ramifications of *Castleberry* on stockholder liability, the 71st Texas Legislature amended Article 2.21A . . . ."). The 1996 Bar Committee Comment to Article 2.21 of the Business Corporation Act states:

*Castleberry*, in particular its use of constructive fraud as a basis of piercing the corporate veil, was considered by many practitioners to be incorrectly decided. Further, while questionable in the context of tort claims, the use of constructive fraud as a means of piercing the corporate veil created a cloud on the sanctity of contract and the public policy of recognizing corporations as separate entities apart from their shareholders. In response to *Castleberry*, Article 2.21 of the TBCA was amended in 1989 to establish a clear legislative standard under which the liability of a shareholder for the obligations of a corporation is to be determined in the context of contractual obligations and all matters relating thereto.

TEX. BUS. CORP. ACT ANN. art. 2.21 cmt. (Vernon 2003) (recodified at TEX. BUS. ORGS. CODE §§ 21.223-21.226).

a fraud, *or other similar theory* . . . ." [13] **[**22]** The liability of a shareholder for a contractual corporate debt under this statute "is exclusive and preempts any other liability imposed for that obligation under common law or otherwise." [14] There is a statutory exception to this rule where the shareholder "caused the corporation to be used for the purpose of perpetrating and did perpetrate an actual fraud on the obligee primarily for the direct personal benefit of the" shareholder. [15] The jury rejected Donnelly's fraud claim.

There is also a statutory exception where the shareholder "expressly . . . agrees to be personally liable to the obligee for the obligation." [16] We can find no evidence that the Willises expressly agreed to assume personal liability under the letter agreement. On the contrary, Francie Willis did not sign the agreement, and Donnelly admitted at trial that he never asked Francie to issue him the stock under the agreement. As to Michael Willis, Donnelly testified that in conversations Willis agreed to "live up to the letter agreement," but Donnelly did not indicate whether Willis made such statements in his individual or corporate capacity. Willis expressly provided that he would *not* be liable personally on the agreement by creating two corporations to be the obligors on the agreement, and crossing his name off the agreement during the meeting when it was signed by other parties.

 **[**23]** *HN4* To impose liability against the Willises under a common law theory of implied **[*273]** ratification because they accepted the benefits of the letter agreement would contravene the statutory imperative that, absent actual fraud or an express agreement to assume personal liability, a shareholder may not be held liable for contractual obligations of the corporation. We hold that characterizing the theory as "ratification" rather than "alter ego" is simply asserting a "similar theory" of derivative liability that is covered by the statute.

Even absent the statutory impediment to Donnelly's theory of liability, ratification is a common law doctrine that simply does not fit the factual circumstances presented. *HN5* Generally, ratification is a doctrine of agency law, and allows a principal to be bound by an agent's unauthorized contract in circumstances where the principal becomes aware of the contract and retains benefits under it. [17] Ratification, however, presupposes that the principal has an agent who, by agreement, is authorized to act on the principal's behalf. In the pending case, URH and WHE were not agents of Willis authorized to act on Willis's behalf and bind him to contracts. Quite the **[**24]** opposite, URH and WHE were separate corporations created to *prevent* the imposition of contractual liabilities on Willis personally. Again, the law allows an individual in these circumstances to incorporate a business and thereby protect himself from personal liability.

The court of appeals quoted *Hays v. Marble*, 213 S.W.2d 329 (Tex. App.-Amarillo 1948, writ dism'd), for the proposition that "[o]ne may ratify the act or contract of another . . . whether the other was his agent and exceeded his authority as such or was not his agent at all." *Id. at 333*. Assuming that *Hays* was correctly decided, we find it inapposite. In that case, one heir entered into a contract to **[**25]** sell property on behalf of all the heirs to the property and subsequently persuaded the other heirs to sign the deed. The court held that the other heirs had ratified the contract. In the pending case, Willis expressly *refused* to be bound personally by the contract, since he created separate corporations to assume liability on the letter agreement and crossed his name off the agreement when it was signed by others.

---

[13]   TEX. BUS. ORGS. CODE § 21.223(a) (emphasis added) (previously codified at Tex. Bus. Corp. Act Ann. art. 2.21(A) (Vernon 2003)). The references to "alter ego" and "other similar theory" in the current statute were added in 1993 amendments to the Business Corporation Act, Act of May 7, 1993, 73d Leg., R.S., ch. 215, § 2.05(A)(2), 1993 Tex. Gen. Laws 418, 446, before Donnelly asserted his claims against the Willises in this suit.

[14]   *Id.* § 21.224.

[15]   *Id.* § 21.223(b).

[16]   *Id.* § 21.225(1).

[17]   *See Land Title Co. of Dallas, Inc. v. F.M. Stigler, Inc.*, 609 S.W.2d 754, 756, 24 Tex. Sup. Ct. J. 117 (Tex. 1980) ("Ratification may occur when a principal, though he had no knowledge originally of the unauthorized act of his agent, retains the benefits of the transaction after acquiring full knowledge.").

Donnelly argues that the corporate separateness of URH should be disregarded because the letter agreement indicates that URH did not exist at the time the agreement was signed, and instead refers to "Urban Retreat of Houston, Inc., a corporation *to be formed* and originally owned by principals of Willis/Hite Enterprises, Inc." The corporate records of URH reveal, however, that it existed before the letter agreement was signed. [18] It is true that WHE is also a party to the letter agreement and was not incorporated until August 1989, shortly after the letter agreement was signed. [19] However, in **[*274]** these circumstances we think the better rule is that a contracting party must look to the unformed corporation for performance. The contract was made in the name of two corporations, **[**26]** stated that one of the corporations has not been formed, and the individual "promoter," assuming Willis can be characterized as such, struck his name from the agreement, thus indicating that he would not be held personally liable under it. [20]

**[**27] 2. Contract Damages**

The court of appeals held that the jury was improperly instructed on the measure of damages on the contract claim. Reasoning that liability was contested, it held that the proper remedy for the erroneous instruction was to remand the case for a new trial. It further held that "[t]he rules of appellate procedure do not permit a new trial solely on unliquidated damages if liability is contested," *118 S.W.3d at 42*, and accordingly remanded the contract claim for a new trial on liability and damages.

As explained above, the Willises are entitled to a rendition of judgment on the contract claim. The jury also held WHE and URH liable on the contract and awarded damages against them. A new trial is required for the contract claim against these corporations if the court of appeals' analysis as to them is correct.

The court of appeals concluded that the trial court incorrectly instructed the jury that the measure of contract damages included the value of Donnelly's stock ownership under the provision of the letter agreement for "Other Matters Relating to Shares." [21] This provision places a value on the stock equal to the appraised value of real **[**28]** estate plus the previous twelve months of gross revenue, [22] **[**29]** a measure more favorable to

---

[18]   According to the corporate records, Willis/Hite Enterprises, Inc. was incorporated in March 1989, before the letter agreement was signed in July 1989, and was renamed Urban Retreat of Houston, Inc. in August 1989.

[19]   Willis and Hite might have intended the company that existed at the time the letter agreement was signed to serve as the holding company for all Urban Retreat facilities, but later renamed that company and made it the operating company for the first Urban Retreat facility, and created a second company to serve as the holding company. Any uncertainties as to the intent of the original shareholders of the two corporations in this regard, however, is irrelevant to our analysis.

[20]   *See Fish v. Tandy Corp.*, 948 S.W.2d 886, 897 (Tex. App.-Fort Worth 1997, pet. denied) (stating that a promoter who enters into a contract is personally liable on a contract "unless there is an agreement with the contracting party that the promoter is not liable," or "unless the contract is made in the name and on the credit of the proposed corporation and the contracting party knows that the corporation does not yet exist"); *Aloe Ltd. v. Koch*, 733 S.W.2d 364, 366 (Tex. App.-Corpus Christi 1987, no writ) (stating that **HN6** a promoter is not liable "where the contract is made in the name and solely on the credit of the proposed corporation and the contracting party knows that the corporation does not yet exist").

[21]   The jury was instructed that the measure of damages for breach of the letter agreement consisted of the amount of money due Donnelly for salary and compensation under the agreement, and the value of stock ownership as set forth in the agreement under "other matters relating to shares." Donnelly offered evidence on each of these components of damages.

[22]   The Other Matters Relating to Shares provision states in part:

> Mr. Donnelly will agree to allow the other shareholders of URH and [WHE] a first right of refusal to purchase his shares of URH and [WHE] and will agree to a combination of the Urban Retreat companies when contacted by the majority shareholders of [WHE] which shall include an exchange of stock based on a valuation of the companies according to the following formula: "Book Value of Owners' Equity = Real Estate Appraised at Market Value Plus Previous Twelve (12)

Donnelly than the value of shares under the Termination provision of the letter agreement. [23] The court of [*275] appeals held that the correct measure of damages was the fair market value of the stock at the time of Donnelly's termination. [24]

[**30] Donnelly argues by cross petition that the measure of damages given in the jury charge is correct. He first argues that Petitioners waived any complaint about the measure of contract damages in the trial court. We disagree. *HN7* A complaint about a defective jury instruction is waived "unless specifically included in the objections" to the charge. *Tex. R. Civ. P. 274*. Petitioners specifically objected to the contract damages instruction on grounds that it was erroneously based on the Other Matters Relating to Shares provision. [25]

[**31] On the merits, we agree with the court of appeals that this provision does not set out the correct measure of damages for breach of contract in this case. *HN8* The construction of an unambiguous contract is a question of law for the court. *MCI Telecomms. Corp. v. Tex. Utils. Elec. Co., 995 S.W.2d 647, 650, 42 Tex. Sup. Ct. J. 656 (Tex. 1999)*. This provision is not a liquidated damages provision and unambiguously applies to only two situations: (1) it grants a right of first refusal to the original shareholders, allowing them to control ownership in the corporation in the event Donnelly wants to sell his shares, and grants a corresponding right of first refusal to Donnelly if the original shareholders want to sell their shares; and (2) it applies when there is an exchange of stock due to a combination of one or more Urban Retreat companies. Neither situation arose in this case.

---

Months Gross Revenues." . . . The Shareholders of URH and [WHE] agree to allow Mr. Donnelly a first right of refusal to purchase their share of URH and [WHE] based on a valuation of the companies according to the following formula: "Book Value of Owners' Equity = Real Estate Appraised at Market Value Plus Previous Twelve (12) Months Gross Revenue."

[23] The Termination provision states is part:

After twelve (12) months of employment, if Mr. Donnelly is terminated, Mr. Donnelly would likewise be required to sell his shares of URH and [WHE] to those companies and would receive book value of such share or the value of the stock as determined by multiplying two times prior year's earnings computed under Generally Accepted Accounting Principles, whichever is greater. "Book Value" is defined as the assets minus liabilities computed according to Generally Accepted Accounting Principles.

[24] Neither side complains that the Termination provision should apply in lieu of the fair market value of the stock at the time of Donnelly's termination. Petitioners argued in the court of appeals that the Termination provision provided the correct measure of damages for breach of contract, but argue to us that the fair market value measure adopted by the court of appeals is correct. We agree that the fair market value of the stock is the correct measure of contract damages, essentially for the reasons explained by the court of appeals in its discussion of contract damages and limitations, *118 S.W.3d at 28, 39-41*, and because the Termination provision by its terms would only apply if URH and WHE had, in compliance with their contractual obligations, issued stock to Donnelly, in which case Donnelly would "be required to sell his shares" back to the those companies.

[25] The trial court heard a motion for directed verdict immediately followed by objections to the charge. In moving for directed verdict Petitioners' counsel argued:

[T]here is no evidence to support any damage recovery by Mr. Donnelly on any of his liability claims. All of Mr. Donnelly's evidence relates to the formula contained in the Other Matters Relating to Shares provision of the contract. . . . As a matter of law, the Other Matters Relating to Shares clause applies only when there is the exercise of a right of first refusal or when the mandatory rollup clause or provision is triggered.

In objecting to the contract damages instruction, counsel argued: "Damages in this case are not properly determinable under the Other Matters Relating to Shares provision of the contract; and therefore, because this question instructs the jury to apply the Other Matters Relating to Shares provision, it erroneously instructs the jury on the wrong measure of damages."

The jury was instructed on the wrong measure of damages. The charge error "probably caused the rendition of an improper judgment" warranting reversal. *Tex. R. App. P. 44.1(a)(1)*. It allowed Donnelly's experts to opine, and his counsel **[*276]** to argue to the jury, that damages should include (1) the value **[**32]** of real estate that URH and WHE did not own, and (2) the gross revenues of URH, which were substantial, without regard to URH's negative earnings and negative book value. We agree with the court of appeals that, as to WHE and URH, a remand for new trial was the appropriate remedy, [26] and a remand for new trial on both damages and liability was warranted. [27]

## B. Breach of Fiduciary Duty

The trial court instructed the jury that the Willises owed Donnelly a fiduciary duty. The jury found that Michael Willis breached his fiduciary duty and that this conduct proximately caused damages to Donnelly of approximately $ 1.7 million. The trial court **[**33]** awarded judgment for this amount, and the court of appeals affirmed. We agree with Willis that on this record, as a matter of law, he cannot be subjected to liability for breach of fiduciary duty. [28]

Donnelly argues for the existence of a fiduciary relationship based on an alleged fiduciary duty of a majority shareholder to a minority shareholder. He argued at trial that breaches of fiduciary duty occurred when Willis failed to make capital contributions or treated cash infusions **[**34]** into URH as loans rather than capital contributions; when the Willises purchased the real estate on which the Urban Retreat was located, despite an option URH had in its lease to purchase the property; and when Michael Willis transferred his stock to his wife Francie. [29]

A host of legal questions are raised by this claim, including the issues of (1) whether a majority shareholder in a closely held corporations owes a minority shareholder a general fiduciary duty under Texas law, (2) whether a distinction must be drawn between breach of a duty owed to a minority shareholder qua shareholder and malfeasance by a majority shareholder, such as usurpation of a corporate opportunity, **[**35]** that would only give rise to a shareholder derivative action on behalf of the corporation, (3) whether on this record, assuming the existence of a fiduciary duty, any of the alleged wrongful conduct by the Willises, such as the act of loaning money to the corporation rather than simply giving cash to the corporation as a capital contribution, amounted to a breach of fiduciary duty under Texas law, and (4) whether Texas law recognizes a doctrine of equitable title to stock and the contours of such a doctrine.

We do not explore these issues, but hold instead that the breach of fiduciary duty claim in the pending case fails because all the alleged breaches of fiduciary duty occurred before Donnelly became a shareholder **[*277]** and before he was entitled to shareholder status. There can be no liability for alleged breaches of a duty that occurred before the duty arose.

---

[26] *See Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 817, 40 Tex. Sup. Ct. J. 591 (Tex. 1997) (holding that remand for new trial is proper remedy for defective damages instruction).

[27] *See* Tex. R. App. P. 44.1(b) ("The [appellate] court may not order a separate trial solely on unliquidated damages if liability is contested.").

[28] Donnelly argues that Willis did not preserve error on this complaint in the district court or the court of appeals. Willis moved for a directed verdict and argued to the court of appeals that the breach of fiduciary duty claim should fail as a matter of law because there was no evidence of a majority-minority shareholder relationship that could serve as a basis for recognizing a fiduciary duty, or any other legally recognized basis for such a duty, and because Donnelly was never a shareholder of URH or WHE. Willis preserved error.

[29] These alleged breaches of fiduciary duty were also given by Donnelly in his appellee's brief to the court of appeals, as examples of fiduciary duty breaches that were not barred by limitations. The court of appeals relied on these alleged breaches in rejecting the limitations defense to this claim. *118 S.W.3d at 35*.

Willis had never met Donnelly prior to the time the two met about Donnelly's participation in the Urban Retreat business. The two were experienced businessmen. Donnelly, Willis, and Hite participated in arms-length discussions that resulted in the letter agreement. **HN9** Generally, "while a fiduciary relationship or confidential relationship [**36] may arise from the circumstances of a particular case, to impose such a relationship in a business transaction, the relationship must exist prior to, and apart from the agreement made the basis of the suit." *Schlumberger Tech. Corp. v. Swanson, 959 S.W.2d 171, 177, 41 Tex. Sup. Ct. J. 165 (Tex. 1997)*. There was no evidence that, after the agreement was signed, Donnelly developed a close personal relationship of trust and confidence that could give rise to a fiduciary relationship. [30]

The only conceivable basis for a fiduciary relationship in this case would be a duty owed by a majority shareholder to a minority shareholder. Assuming without deciding that such a relationship can give rise to a general fiduciary duty, we decline to recognize the existence of such a duty on this record. Donnelly never [**37] actually became a shareholder of URH or WHE, and indeed his contract claim is based on the alleged failure of these corporations and the Willises to convey stock owed to him under the letter agreement.

Further, as detailed above, the trial testimony and Donnelly's own briefing confirm that Willis and Donnelly agreed to delay the transfer of Donnelly's stock until the business "turned the corner." Willis and Donnelly both gave uncontradicted testimony of the existence of this understanding. [31] [**39] The alleged breaches of fiduciary duty occurred before Donnelly was terminated in late 1994. At that time the spa was still losing money. Only after Donnelly was asked to leave did he treat the contract as terminated and bring suit alleging breach of contract and other claims. Until that time, Donnelly concedes in his briefing to this Court and the court of appeals that he "agreed to wait, based on Willis's assurances that he would live up to the Letter Agreement when the business 'turned the corner,'" and that he agreed to "await performance until satisfied that the contract must be terminated for the sake of litigation." [32] The court of appeals also noted "the undisputed evidence [*278] that deadlines [**38] [for the transfer of stock] were postponed so that the Willises could reap tax benefits and [URH] could 'turn the corner.' . . . Donnelly relied on Willis's assurances and accepted the delays." *118 S.W.3d at 28*. In addition, the agreement to delay the transfer of stock preceded the beginning of the statute of limitations

---

[30] See *id.* at 176 ("An informal relationship may give rise to a fiduciary duty where one person trusts in and relies on another, whether the relation is a moral, social, domestic, or purely personal one.").

[31] See *supra* notes 3-4 and accompanying text. This evidence, in our view, is consistent with the jury's answer to Question No. 6, which asked whether the failure to comply with the letter agreement was excused because Donnelly waived compliance with the agreement. The jury answered "no." This question defined a waiver as "an intentional surrender of a known right or intentional conduct inconsistent with claiming the right." The oral understanding, in our view, was not an intentional abandonment or surrender of Donnelly's right to the stock so as to constitute a waiver, but a mere postponement of the obligation, and the jury could have so found. As the court of appeals noted in its discussion of the waiver defense, Willis "merely delayed issuing the stock." *118 S.W.3d at 27*. The jury's acceptance of the existence of the oral agreement can also explain its answer to Question No. 7, concerning the limitations defense, where the jury answered "no" to the question of whether the failure to comply with the letter agreement occurred prior to August 24, 1991. By the original terms of the letter agreement, WHE and URH would have been obligated to transfer stock to Donnelly in 1990.

[32] This latter statement was made in Donnelly's appellee's brief in the court of appeals, in response to a statute of limitations argument. In context, Donnelly argued:

A cause of action for breach of contract accrues only if the injured party elects to treat the contract as terminated. . . . A party to a contract is allowed to cooperate with the other party, continue performing the contract, and await performance until satisfied that the contract must be terminated for the sake of litigation. A contrary rule would require contracting parties to interrupt performance and sue a party who may yet perform. . . . The termination of Mr. Donnelly's employment at the Urban Retreat was the first time the Willises "made clear their intent never to comply with the agreement."

period for breach of fiduciary duty, so there was no time within the limitations period where this agreement was not in effect. [33]

 **[\*\*40]** We hold that in these circumstances, *HN10* where a plaintiff is suing for breach of fiduciary duty based on his purported status as a minority shareholder, but (1) no transfer of stock to the purported minority shareholder ever occurred, (2) the purported majority and minority shareholders were both experienced businessmen who had never met prior to the business arrangement at issue, (3) the two were conducting business under a written agreement that expressly required corporate entities, not the majority shareholder, to issue the stock, and (4) the two were also operating under an oral agreement to postpone the transfer of stock when the alleged breaches of fiduciary duty occurred, Texas law does not recognize the existence of a fiduciary duty. Our holding is consistent with the general reluctance of Texas law, described above, to ignore corporate formalities and hold an individual defendant liable where the plaintiff has agreed to conduct business with a corporation. It is also consistent with our previously recognized reluctance to recognize fiduciary relationships, especially in the commercial context. "In order to give full force to contracts, we do not create such a relationship **[\*\*41]** lightly." *Schlumberger, 959 S.W.2d at 177*.

## C. Other Issues

Petitioners argue that the rate of prejudgment and post-judgment interest **[\*279]** awarded by the trial court should be reduced in light of a statutory change in the interest rate on judgments. They also complain that the trial court erred in imposing a constructive trust on the stock allegedly due Donnelly under the letter agreement, and the real estate owned by the Willises on which the Urban Retreat property is located. Because of our disposition of other issues discussed above, there is no longer a judgment of liability against any Petitioner on which to award interest or a constructive trust. Because the Willises are entitled to a take-nothing judgment on all claims, we reverse and render the portion of the judgment imposing a constructive trust on the real estate they own and on any issued stock in WHE or URH that they own. As to a contract claim against WHE and URH for a constructive trust on unissued stock, the corporations make no persuasive argument that the trial court could not order such relief if Donnelly properly pleads and elects such relief, but this issue is moot until such time as Donnelly **[\*\*42]** secures a judgment on the surviving contract claim against WHE or URH.

## III. Conclusion

We reverse in part the court of appeals' judgment and render a take-nothing judgment on all of Donnelly's claims against the Willises. We affirm the court of appeals' judgment insofar as it remanded the case for a new trial on the contract claim against WHE and URH. We remand the case to the district court for further proceedings consistent with this opinion.

Don R. Willett

---

[33]   The statute of limitations for a breach of fiduciary duty claim in this case is at most four years. *See* Tex. Civ. Prac. & Rem. Code § 16.004(a)(5) (four-year statute of limitations for breach of fiduciary duty); *Rice v. Louis A. Williams & Assocs., Inc., 86 S.W.3d 329, 335-36 (Tex. App.-Texarkana 2002, pet. denied)* (applying section 16.004(a)(5) retroactively). Donnelly's third party action against Willis was filed in August 1995, so the limitations period extends at most to August 1991. Any breach of fiduciary duty claim for conduct occurring before August 1991 would be barred by limitations. Donnelly thought the agreement to delay the stock transfer occurred "after the first year in business." The letter agreement was signed in July 1989 and the Urban Retreat grand opening was in December 1989, so Donnelly at most testified that the agreement occurred after mid-December 1990. Willis testified that the agreement was in place in 1990, stating that he was grateful to Donnelly in 1990 for allowing him to delay the stock transfer so that he could take full advantage of the tax losses on the business in 1990. Willis also testified that he had documents prepared that would cap Donnelly's stock ownership, and that Donnelly orally agreed to delay the stock transfer either simultaneously or before the preparation of these documents. These documents were never signed and have February and March 1991 dates. Hence, the totality of evidence indicates that the agreement to delay the transfer of stock was in place by March 1991 at the latest, before the start of the relevant limitations period.

Justice



## *Tex. Penal Code § 2.04*

This document is current through the 2015 regular session, 84th Legislature, S.B. 45, S.B. 293 (ch. 2), S.B. 415(ch. 15), S.B. 459, S.B. 529 (ch. 37), S.B. 835 (ch. 6), S.B. 901 (ch. 54), S.B. 903 (ch. 3), S.B. 1749 (ch. 29), and S.B. 1985 (ch. 4).

*Texas Statutes & Codes Annotated by LexisNexis®* **>** *Penal Code* **>** *Title 1 Introductory Provisions* **>** *Chapter 2 Burden of Proof*

## Sec. 2.04. Affirmative Defense.

**(a)**  An affirmative defense in this code is so labeled by the phrase: "It is an affirmative defense to prosecution ... ."

**(b)**  The prosecuting attorney is not required to negate the existence of an affirmative defense in the accusation charging commission of the offense.

**(c)**  The issue of the existence of an affirmative defense is not submitted to the jury unless evidence is admitted supporting the defense.

**(d)**  If the issue of the existence of an affirmative defense is submitted to the jury, the court shall charge that the defendant must prove the affirmative defense by a preponderance of evidence.

## History

Enacted by Acts 1973, 63rd Leg., ch. 399 (S.B. 34), § 1, effective January 1, 1974; am. *Acts 1993, 73rd Leg., ch. 900 (S.B. 1067), § 1.01*, effective September 1, 1994.

Texas Statutes & Codes Annotated by LexisNexis®

Copyright © 2015 Matthew Bender & Company, Inc.

a member of the LexisNexis Group. All rights reserved.



## *Tex. Penal Code § 2.05*

This document is current through the 2015 regular session, 84th Legislature, S.B. 45, S.B. 293 (ch. 2), S.B. 415(ch. 15), S.B. 459, S.B. 529 (ch. 37), S.B. 835 (ch. 6), S.B. 901 (ch. 54), S.B. 903 (ch. 3), S.B. 1749 (ch. 29), and S.B. 1985 (ch. 4).

*Texas Statutes & Codes Annotated by LexisNexis®* > *Penal Code* > *Title 1 Introductory Provisions* > *Chapter 2 Burden of Proof*

## Sec. 2.05. Presumption.

**(a)** Except as provided by Subsection (b), when this code or another penal law establishes a presumption with respect to any fact, it has the following consequences:

**(1)** if there is sufficient evidence of the facts that give rise to the presumption, the issue of the existence of the presumed fact must be submitted to the jury, unless the court is satisfied that the evidence as a whole clearly precludes a finding beyond a reasonable doubt of the presumed fact; and

**(2)** if the existence of the presumed fact is submitted to the jury, the court shall charge the jury, in terms of the presumption and the specific element to which it applies, as follows:

**(A)** that the facts giving rise to the presumption must be proven beyond a reasonable doubt;

**(B)** that if such facts are proven beyond a reasonable doubt the jury may find that the element of the offense sought to be presumed exists, but it is not bound to so find;

**(C)** that even though the jury may find the existence of such element, the state must prove beyond a reasonable doubt each of the other elements of the offense charged; and

**(D)** if the jury has a reasonable doubt as to the existence of a fact or facts giving rise to the presumption, the presumption fails and the jury shall not consider the presumption for any purpose.

**(b)** When this code or another penal law establishes a presumption in favor of the defendant with respect to any fact, it has the following consequences:

**(1)** if there is sufficient evidence of the facts that give rise to the presumption, the issue of the existence of the presumed fact must be submitted to the jury unless the court is satisfied that the evidence as a whole clearly precludes a finding beyond a reasonable doubt of the presumed fact; and

**(2)** if the existence of the presumed fact is submitted to the jury, the court shall charge the jury, in terms of the presumption, that:

**(A)** the presumption applies unless the state proves beyond a reasonable doubt that the facts giving rise to the presumption do not exist;

**(B)** if the state fails to prove beyond a reasonable doubt that the facts giving rise to the presumption do not exist, the jury must find that the presumed fact exists;

**(C)** even though the jury may find that the presumed fact does not exist, the state must prove beyond a reasonable doubt each of the elements of the offense charged; and

**(D)** if the jury has a reasonable doubt as to whether the presumed fact exists, the presumption applies and the jury must consider the presumed fact to exist.

## History

Enacted by Acts 1973, 63rd Leg., ch. 399 (S.B. 34), § 1, effective January 1, 1974; am. Acts 1975, 64th Leg., ch. 342 (S.B. 127), § 2, effective September 1, 1975; am. *Acts 1993, 73rd Leg., ch. 900 (S.B. 1067), § 1.01*, effective September 1, 1994; am. *Acts 2005, 79th Leg., ch. 288 (H.B. 823), § 2*, effective September 1, 2005.

Texas Statutes & Codes Annotated by LexisNexis®
Copyright © 2015 Matthew Bender & Company, Inc.
a member of the LexisNexis Group. All rights reserved.



## *Tex. Penal Code § 32.41*

This document is current through the 2015 regular session, 84th Legislature, S.B. 45, S.B. 293 (ch. 2), S.B. 415(ch. 15), S.B. 459, S.B. 529 (ch. 37), S.B. 835 (ch. 6), S.B. 901 (ch. 54), S.B. 903 (ch. 3), S.B. 1749 (ch. 29), and S.B. 1985 (ch. 4).

*Texas Statutes & Codes Annotated by LexisNexis®* > *Penal Code* > *Title 7 Offenses Against Property* > *Chapter 32 Fraud* > *Subchapter D Other Deceptive Practices*

## Sec. 32.41. Issuance of Bad Check or Similar Sight Order.

**(a)** A person commits an offense if he issues or passes a check or similar sight order for the payment of money knowing that the issuer does not have sufficient funds in or on deposit with the bank or other drawee for the payment in full of the check or order as well as all other checks or orders outstanding at the time of issuance.

**(b)** This section does not prevent the prosecution from establishing the required knowledge by direct evidence; however, for purposes of this section, the issuer's knowledge of insufficient funds is presumed (except in the case of a postdated check or order) if:

  **(1)** he had no account with the bank or other drawee at the time he issued the check or order; or

  **(2)** payment was refused by the bank or other drawee for lack of funds or insufficient funds on presentation within 30 days after issue and the issuer failed to pay the holder in full within 10 days after receiving notice of that refusal.

**(c)** Notice for purposes of Subsection (b)(2) may be actual notice or notice in writing that:

  **(1)** is sent by:

    **(A)** first class mail, evidenced by an affidavit of service; or

    **(B)** registered or certified mail with return receipt requested;

  **(2)** is addressed to the issuer at the issuer's address shown on:

    **(A)** the check or order;

    **(B)** the records of the bank or other drawee; or

    **(C)** the records of the person to whom the check or order has been issued or passed; and

  **(3)** contains the following statement:

  **(3)** "This is a demand for payment in full for a check or order not paid because of a lack of funds or insufficient funds. If you fail to make payment in full within 10 days after the date of receipt of this notice, the failure to pay creates a presumption for committing an offense, and this matter may be referred for criminal prosecution."

**(d)** If notice is given in accordance with Subsection (c), it is presumed that the notice was received no later than five days after it was sent.

**(e)** A person charged with an offense under this section may make restitution for the bad checks or sight orders. Restitution shall be made through the prosecutor's office if collection and processing were initiated through that office. In other cases restitution may be, with the approval of the court in which the offense is filed:

    **(1)**   made through the court; or

    **(2)**   collected by a law enforcement agency if a peace officer of that agency executes a warrant against the person charged with the offense.

**(f)**   Except as otherwise provided by this subsection, an offense under this section is a Class C misdemeanor. If the check or similar sight order that was issued or passed was for a child support payment the obligation for which is established under a court order, the offense is a Class B misdemeanor.

**(g)**   An offense under this section is not a lesser included offense of an offense under Section 31.03 or 31.04.

## History

Enacted by Acts 1973, 63rd Leg., ch. 399 (S.B. 34), § 1, effective January 1, 1974; am. Acts 1983, 68th Leg., ch. 911 (H.B. 1606), § 1, effective August 29, 1983; am. *Acts 1987, 70th Leg., ch. 687 (S.B. 1083), § 2*, effective June 18, 1987; am. *Acts 1989, 71st Leg., ch. 1038 (H.B. 803), § 1*, effective June 16, 1989; am. *Acts 1993, 73rd Leg., ch. 900 (S.B. 1067), § 1.01*, effective September 1, 1994; am. *Acts 1995, 74th Leg., ch. 753 (H.B. 576), § 2*, effective September 1, 1995; am. *Acts 1997, 75th Leg., ch. 702 (S.B. 1594), § 14*, effective September 1, 1997; am. *Acts 2007, 80th Leg., ch. 976 (S.B. 548), § 2*, effective September 1, 2007; am. *Acts 2007, 80th Leg., ch. 1393 (H.B. 485), § 1*, effective September 1, 2007; am. *Acts 2013, 83rd Leg., ch. 128 (S.B. 821), §§ 3*, 4, effective September 1, 2013.

Texas Statutes & Codes Annotated by LexisNexis®
Copyright © 2015 Matthew Bender & Company, Inc.
a member of the LexisNexis Group. All rights reserved.



Cause No. 2015CI01545

| | | |
|---|---|---|
| HIAWATHA HENRY, ADDIE HARRIS, | § | IN THE DISTRICT COURT OF |
| MONTRAY NORRIS, and ROOSEVELT | § | |
| COLEMAN, JR., on behalf of themselves | § | |
| and for all others similarly situated | § | |
| Plaintiffs | § | |
| | § | |
| | § | BEXAR COUNTY, TEXAS |
| v. | § | |
| | § | |
| CASH BIZ, LP and | § | |
| CASH ZONE LLC, D/B/A | § | |
| CASH BIZ | § | 224 JUDICIAL DISTRICT |
| Defendants | | |

## ORDER DENYING DEFENDANTS' MOTION TO COMPEL ARBITRATION AND ENFORCEMENT OF WAIVER OF CLASS ACTION LAWSUITS

After considering Motion to Compel Arbitration Including the Enforcement of the Waiver of Class Action Lawsuits filed by Cash Biz, LP and Cash Zone LLC d/b/a Cash Biz, the Response filed by Plaintiffs, and the arguments of Counsel, and the evidence attached, this Court finds that the allegations in this case relate solely to Cash Biz's illegal use of the criminal justice system to enforce a civil debt. Cash Biz's illegal use of the criminal justice system occurred after the expiration of any contracts entered into by Plaintiffs and all of the damages are solely related to criminal fines, jail time, and loss of reputation related to Plaintiffs' criminal convictions. Therefore, the arbitration clauses and class action waivers relied on by Cash Biz is not applicable in this case and Cash Biz's motion should be denied.

Further, Cash Biz waived its right to arbitration by substantially invoking the judicial process when it filed criminal charges against Plaintiffs, participated in criminal trials, obtained criminal judgments, and attempted to collect from Plaintiffs.

Therefore the Court DENIES the motion and shall retain the above-styled case on its active jury docket.

SIGNED this ___9th___ day of ___July___, 2015.

_Laura Salinas_
JUDGE PRESIDING



## 9 USCS § 2

Current through PL 114-49, approved 8/7/15

*United States Code Service - Titles 1 through 54* > *TITLE 9. ARBITRATION* > *CHAPTER 1. GENERAL PROVISIONS*

## § 2. Validity, irrevocability, and enforcement of agreements to arbitrate

A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

## History

(July 30, 1947, ch 392, § 1,*61 Stat. 670*.)

**Prior law and revision:**
This section is based on Act Feb. 12, 1925, ch 213, § 2, *43 Stat. 883* (§ 2 of former Title 9).

UNITED STATES CODE SERVICE

Copyright © 2015 Matthew Bender & Company, Inc. a member of the LexisNexis Group ™ All rights reserved.



## 9 USCS § 3

Current through PL 114-49, approved 8/7/15

*United States Code Service - Titles 1 through 54* > *TITLE 9. ARBITRATION* > *CHAPTER 1. GENERAL PROVISIONS*

## § 3. Stay of proceedings where issue therein referable to arbitration

If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration.

## History

(July 30, 1947, ch 392, § 1,*61 Stat. 670*.)

**Prior law and revision:**
This section is based on Act Feb. 12, 1925, ch 213, § 3, *43 Stat. 883* (§ 3 of former Title 9).

UNITED STATES CODE SERVICE

Copyright © 2015 Matthew Bender & Company, Inc. a member of the LexisNexis Group ™ All rights reserved.



*United States Code Service - Titles 1 through 54* > *TITLE 9. ARBITRATION* > *CHAPTER 1. GENERAL PROVISIONS*

## § 16. Appeals

**(a)**  An appeal may be taken from--

  **(1)**  an order--

   **(A)**  refusing a stay of any action under section 3 of this *title [9 USCS § 3*],

   **(B)**  denying a petition under section 4 of this *title [9 USCS § 4*] to order arbitration to proceed,

   **(C)**  denying an application under section 206 of this *title [9 USCS § 206*] to compel arbitration,

   **(D)**  confirming or denying confirmation of an award or partial award, or

   **(E)**  modifying, correcting, or vacating an award;

  **(2)**  an interlocutory order granting, continuing, or modifying an injunction against an arbitration that is subject to this title; or

  **(3)**  a final decision with respect to an arbitration that is subject to this title.

**(b)**  Except as otherwise provided in section 1292(b) of title 28, an appeal may not be taken from an interlocutory order--

  **(1)**  granting a stay of any action under section 3 of this *title [9 USCS § 3*];

  **(2)**  directing arbitration to proceed under section 4 of this *title [9 USCS § 4*];

  **(3)**  compelling arbitration under section 206 of this *title [9 USCS § 206*]; or

  **(4)**  refusing to enjoin an arbitration that is subject to this title.

## History

   (Added Nov. 19, 1988,*P.L. 100-702*, Title X, § 1019(a), *102 Stat. 4671*; Dec. 1, 1990, *P.L. 101-650*, Title III, § 325(a)(1), *104 Stat. 5120*.)

UNITED STATES CODE SERVICE

Copyright © 2015 Matthew Bender & Company, Inc. a member of the LexisNexis Group ™ All rights reserved.



## *Tex. Civ. Prac. & Rem. Code § 51.016*

This document is current through the 2015 regular session, 84th Legislature, S.B. 45, S.B. 293 (ch. 2), S.B. 415(ch. 15), S.B. 459, S.B. 529 (ch. 37), S.B. 835 (ch. 6), S.B. 901 (ch. 54), S.B. 903 (ch. 3), S.B. 1749 (ch. 29), and S.B. 1985 (ch. 4).

*Texas Statutes & Codes Annotated by LexisNexis®* > *Civil Practice and Remedies Code* > *Title 2 Trial, Judgment, and Appeal* > *Subtitle D Appeals* > *Chapter 51 Appeals* > *Subchapter B Appeals from County or District Court*

## Sec. 51.016. Appeal Arising Under Federal Arbitration Act.

In a matter subject to the Federal Arbitration Act (*9 U.S.C. Section 1* et seq.), a person may take an appeal or writ of error to the court of appeals from the judgment or interlocutory order of a district court, county court at law, or county court under the same circumstances that an appeal from a federal district court's order or decision would be permitted by *9 U.S.C. Section 16*.

## History

Enacted by *Acts 2009, 81st Leg., ch. 820 (S.B. 1650), § 1*, effective September 1, 2009.

Texas Statutes & Codes Annotated by LexisNexis®

Copyright © 2015 Matthew Bender & Company, Inc.

a member of the LexisNexis Group. All rights reserved.



# Tex. Civ. Prac. & Rem. Code § 171.021

This document is current through the 2015 regular session, 84th Legislature, S.B. 45, S.B. 293 (ch. 2), S.B. 415(ch. 15), S.B. 459, S.B. 529 (ch. 37), S.B. 835 (ch. 6), S.B. 901 (ch. 54), S.B. 903 (ch. 3), S.B. 1749 (ch. 29), and S.B. 1985 (ch. 4).

*Texas Statutes & Codes Annotated by LexisNexis®  >  Civil Practice and Remedies Code  >  Title 7 Alternate Methods of Dispute Resolution  >  Chapter 171 General Arbitration  >  Subchapter B Proceedings to Compel or Stay Arbitrations*

## Sec. 171.021. Proceeding to Compel Arbitration.

**(a)**   A court shall order the parties to arbitrate on application of a party showing:

    **(1)**   an agreement to arbitrate; and

    **(2)**   the opposing party's refusal to arbitrate.

**(b)**   If a party opposing an application made under Subsection (a) denies the existence of the agreement, the court shall summarily determine that issue. The court shall order the arbitration if it finds for the party that made the application. If the court does not find for that party, the court shall deny the application.

**(c)**   An order compelling arbitration must include a stay of any proceeding subject to Section 171.025.

## History

Enacted by *Acts 1997, 75th Leg., ch. 165 (S.B. 898), § 5.01*, effective September 1, 1997.

Texas Statutes & Codes Annotated by LexisNexis®
Copyright © 2015 Matthew Bender & Company, Inc.
a member of the LexisNexis Group. All rights reserved.



# Tex. Civ. Prac. & Rem. Code § 171.098

This document is current through the 2015 regular session, 84th Legislature, S.B. 45, S.B. 293 (ch. 2), S.B. 415(ch. 15), S.B. 459, S.B. 529 (ch. 37), S.B. 835 (ch. 6), S.B. 901 (ch. 54), S.B. 903 (ch. 3), S.B. 1749 (ch. 29), and S.B. 1985 (ch. 4).

*Texas Statutes & Codes Annotated by LexisNexis®  >  Civil Practice and Remedies Code  >  Title 7 Alternate Methods of Dispute Resolution  >  Chapter 171 General Arbitration  >  Subchapter D Court Proceedings*

## Sec. 171.098. Appeal.

**(a)** A party may appeal a judgment or decree entered under this chapter or an order:

    **(1)** denying an application to compel arbitration made under Section 171.021;

    **(2)** granting an application to stay arbitration made under Section 171.023;

    **(3)** confirming or denying confirmation of an award;

    **(4)** modifying or correcting an award; or

    **(5)** vacating an award without directing a rehearing.

**(b)** The appeal shall be taken in the manner and to the same extent as an appeal from an order or judgment in a civil action.

## History

Enacted by *Acts 1997, 75th Leg., ch. 165 (S.B. 898), § 5.01*, effective September 1, 1997.

Texas Statutes & Codes Annotated by LexisNexis®

Copyright © 2015 Matthew Bender & Company, Inc.

a member of the LexisNexis Group. All rights reserved.

The text:

"Waiver of Jury Trial and Arbitration Provision"

is highlighted

*You authorize us to initiate debit entries on the original Payment Date as well as any extended payment dates thereafter and to re-initiate the debit entries, within the range of amounts set forth below, if any previous debit entry is dishonored for any reason. You also authorize us to initiate debit entries to your account to collect any amounts owed pursuant to the terms of the LOC, described above. If any payment is returned unpaid, you authorize us to make a one-time electronic fund transfer/debit entry from your account to collect a returned item fee of $30.00 (or the State Allowed returned item fee), applicable taxes and/or late fee.*

*Please note that you have the right to receive notice of all electronic fund transfers from Your Account that vary in amount, and that by signing this ACH Authorization, you agree to receive notice only when the debit entry amount falls outside the specified range of amounts described below (in lieu of receiving notice of each electronic fund transfer that varies in amount). <ins>The range of amounts for debits will be between the amount of any applicable late fee and the sum of the CSO fee and outstanding balance owing under the Loan Agreement (which may include the Total of Payments owing under the Loan plus any returned items fee, applicable taxes and/or late fee)</ins>.For any amount outside of this specified range, we will send you a notice at least 10 days prior to initiating such debit.*

*PLEASE NOTE THAT YOU ARE NOT REQUIRED TO AGREE TO THIS ACH AUTHORIZATION IN ORDER TO OBTAIN SERVICES FROM US. IF YOU WISH TO DISCUSS OTHER PAYMENT METHODS THAT ARE AVAILABLE SPEAK WITH THE CSO DIRECTOR at [PHONE # HERE]. This ACH Authorization is for your convenience. By signing below you agree to pay via this ACH Authorization, you acknowledge that you are voluntarily choosing to pay electronically, and that you are choosing to receive notice of varying amounts of debits only when a debit exceeds the range specified above. You understand and acknowledge that you may terminate the ACH Authorization by notifying us at L & G Finance, c/o Cash Zone, LLC, d.b.a. Cash Biz Attn: ACH Payments, 8280 Montgomery Road, Suite 305, Cincinnati, Ohio 45236 in such time and manner as to afford us and your bank a reasonable opportunity to act on it. You also authorize us to verify all of the information that you have provided to us or that you provide to the lender, as well as certain past and/or current information. If there is any missing or erroneous information in or with the information that you have provided to us or the loan application you may provide to the lender regarding your bank, bank routing and transit number, or account number, then you authorize us to verify and correct such information. You agree that this ACH Authorization is subject to the lender's approval of the Loan Application.*

You authorize L & G Finance, c/o Cash Zone, LLC, d.b.a. Cash Biz to use the information from my check to initiate an Electronic Fund Transfer (EFT) or the paper draft to debit my bank account for the amount of the transaction. I acknowledge and agree that the merchant-initiated EFT is not a check transaction and is governed by applicable EFT law. In the event that the EFT or draft is returned unpaid, I understand and agree that the merchant may charge a return fee or other administrative fee to my bank account via EFT or draft as permitted by state or federal law.

This authorization is to remain in full force and effect until L & G Finance, c/o Cash Zone, LLC, d.b.a. Cash Biz receives written notification from me terminating this authority in such time and manner as to afford CSO NAME HERE and my financial institution a reasonable opportunity to act on it.

**DEFAULT:** *You will be in default under this Agreement if you do not timely pay us what you owe us under this Agreement.*

**COLLECTION EXPENSES:** *You agree to pay our reasonable attorneys fees if this Agreement is referred to an attorney for collection, regardless of whether legal proceedings are actually filed, and all costs and disbursements.*

**INTERSTATE COMMERCE:** *You agree that this Agreement involves interstate commerce for all purposes.*

**ASSIGNMENT:** *We may transfer any of our rights, titles and interests under this Agreement at our discretion. You may not transfer your rights under this Agreement without our prior written consent.*

**MISCELLANEOUS:** Our principal place of business is *8280 Montgomery Road, Suite 305, Cincinnati, Ohio 45236*]. Our agent in Texas authorized to receive service of process is: National Registered Agents, Inc. 16055 Space Center Blvd. Suite 235, Houston, Texas 77062. Our phone number is 513-771-0111.

**WAIVER OF JURY TRIAL AND ARBITRATION PROVISION:** *Arbitration is a process in which persons with a dispute: (a) waive their rights to file a lawsuit and proceed in court and to have a jury trial to resolve their disputes; and (b) agree, instead, to submit their disputes to a neutral third person (an "arbitrator") for a decision. Each party to the dispute has an opportunity to present some evidence to the arbitrator. Pre-arbitration discovery may be limited. Arbitration proceedings are private and less formal than court trials. The arbitrator will issue a final and binding decision resolving the dispute, which may be enforced as a court judgment. A court rarely overturns an arbitrator's decision. THEREFORE, YOU ACKNOWLEDGE AND AGREE AS FOLLOWS:*

*1. For purposes of this Waiver of Jury Trial and Arbitration Provision (hereinafter the "Arbitration Provision"), the words "dispute" and "disputes" are given the broadest possible meaning and include, without limitation (a) all claims, disputes, or controversies arising from or relating directly or indirectly to the signing of this Arbitration Provision, the validity and scope of this Arbitration Provision and any claim or attempt to set aside this Arbitration Provision; (b) all federal or state law claims, disputes or controversies, arising from or relating directly or indirectly to this Agreement(including the Arbitration Provision), the information you gave us before entering into this Disclosure Statement, and/or any past and/or future claims or disputes between you and us and/or any Lender who provides you with a loan as a result of our services (the "Lender"); (c) all counterclaims, cross-claims and third party claims; (d) all common law claims, based upon contract, tort, fraud, or other intentional torts; (e) all claims based upon a violation of any state or federal constitution, statute or regulation; (f) all claims asserted by us against you, including claims for money damages to collect any sum we claim you owe us and/or the Lender; (g) all claims asserted by you individually against us and/or any of our employees, agents, directors, officers, shareholders, managers, members, parent company or affiliated entities (hereinafter collectively referred to as "related third parties"), including claims for money damages and/or equitable or injunctive relief; (h) all claims asserted on your behalf by another person; (i) all claims asserted by you as a private attorney general, as a representative and member of a class of persons, or in any other representative capacity, against us and/or related third parties (hereinafter referred to as "Representative Claims"); and/or (j) all claims arising from or relating directly or indirectly to the disclosure by us or related third parties of any non-public personal information about you.*

*2. You acknowledge and agree that by entering into this Arbitration Provision:*

*(a)     YOU ARE GIVING UP YOUR RIGHT TO HAVE A TRIAL BY JURY TO RESOLVE ANY DISPUTE ALLEGED AGAINST US, THE LENDER   AND/OR OUR/ITS RELATED THIRD PARTIES;*

*(b)     YOU ARE GIVING UP YOUR RIGHT TO HAVE A COURT, OTHER THAN A SMALL CLAIMS TRIBUNAL, RESOLVE ANY DISPUTE ALLEGED AGAINST US, THE LENDER AND/OR OUR/ITS RELATED THIRD PARTIES; and*

(c) **YOU ARE GIVING UP YOUR RIGHT TO SERVE AS A REPRESENTATIVE, AS A PRIVATE ATTORNEY GENERAL, OR IN ANY OTHER REPRESENTATIVE CAPACITY, OR TO PARTICIPATE AS A MEMBER OF A CLASS OF CLAIMANTS, IN ANY LAWSUIT FILED AGAINST US, THE LENDER AND/OR OUR/ITS RELATED THIRD PARTIES. YOUR DISPUTE MAY NOT BE CONSOLIDATED WITH THE DISPUTE OF ANY OTHER PERSON(S) FOR ANY PURPOSE(S).**

3. Except as provided in Paragraph 6 below, all disputes including any Representative Claims against us, the Lender and/or our/its related third parties shall be resolved by binding arbitration only on an individual basis with you. **THEREFORE, THE ARBITRATOR SHALL NOT CONDUCT CLASS ARBITRATION; THAT IS, THE ARBITRATOR SHALL NOT ALLOW YOU TO SERVE AS A REPRESENTATIVE, AS A PRIVATE ATTORNEY GENERAL, OR IN ANY OTHER REPRESENTATIVE CAPACITY FOR OTHERS IN THE ARBITRATION.** Notwithstanding any other provision herein to the contrary, the validity, effect, and enforceability of this waiver of class action lawsuit and class-wide arbitration shall be determined solely by a court of competent jurisdiction and not by the arbitrator. If the arbitrator fails or refuses to abide by the class-wide arbitration waiver and the court refuses to enforce the class-wide arbitration waiver, the parties agree that the dispute will proceed in court under applicable court rules and procedures, following all appeals, if any, of the court's decision.

4. Any party to a dispute, including related third parties, may send the other party written notice by certified mail return receipt requested of their intent to arbitrate and setting forth the subject of the dispute along with the relief requested, even if a lawsuit has been filed. If you send us such a notice, it must be sent to us at the same address as listed below in Paragraph 9 of this Arbitration Provision. Regardless of who demands arbitration, you may select any of the following arbitration organizations to administer the arbitration: the American Arbitration Association (1-800-778-7879) http://www.adr.org or Judicial Arbitration and Mediation Services ("JAMS"), http://www.jamsadr.com, main office JAMS, 1920 Main Street, Suite 300, Irvine, CA 92614, telephone 949-224-1810, or Dallas office, JAMS, 8401 N. Central Expressway, Suite 610, Dallas, TX 75225, telephone 214-722-5267; and if any of those arbitration organizations is not available to administer the arbitration, we may provide you with substitute organizations to add to the selection list. The parties may also agree, in writing, to select a local arbitrator who is an attorney, retired judge, or arbitrator registered and in good standing with an arbitration association and arbitrate pursuant to such arbitrator's rules. If all of the designated arbitration organizations are not available and the parties cannot otherwise agree upon an arbitrator, then a court of competent jurisdiction may appoint an arbitrator. The party receiving notice of arbitration will respond in writing by certified mail return receipt requested within twenty (20) days. If you demand arbitration, you must inform us in your demand of the arbitration organization you have selected or whether you desire to select a local arbitrator. If related third parties or we demand arbitration, you must notify us within twenty (20) days in writing by certified mail return receipt requested of your decision to select an arbitration organization or your desire to select a local arbitrator. If you fail to notify us, then we have the right to select an arbitration organization. The parties to such dispute will be governed by the rules and procedures of such arbitration organization applicable to consumer disputes, to the extent those rules and procedures do not contradict the express terms of this Disclosure Statement or the Arbitration Provision, including the limitations on the arbitrator herein. You may obtain a copy of the rules and procedures by contacting the arbitration organizations listed above. Each party agrees to provide the other written notice and a reasonable opportunity of at least 30 days to remedy any circumstances that the party contends might preclude arbitration of a dispute in accordance with the terms of this agreement.

5 Regardless of who demands arbitration, at your request we will advance your portion of the arbitration expenses, including the filing, administrative, hearing and arbitrator's fees ("Arbitration Fees"). Throughout the arbitration, each party shall bear his or her own attorneys' fees and expenses, such as witness and expert witness fees. The arbitrator shall apply applicable substantive law consistent with the Federal Arbitration Act ("FAA"), and applicable statutes of limitation, and shall honor claims of privilege recognized at law. The arbitration hearing will be conducted in the county of your residence, or within 30 miles from such county, or in such other place as shall be ordered by the arbitrator. The arbitrator may decide, with or without a hearing, any motion that is substantially similar to a motion to dismiss for failure to state a claim or a motion for summary judgment. In conducting the arbitration proceeding, the arbitrator shall not apply any federal or state rules of civil procedure or evidence. If the arbitrator renders a decision or an award in your favor resolving the dispute, then you will not be responsible for reimbursing us for your portion of the Arbitration Fees, and we will reimburse you for any Arbitration Fees you have previously paid. If the arbitrator does not render a decision or an award in your favor resolving the dispute, then the arbitrator shall require you to reimburse us for the Arbitration Fees we have advanced, not to exceed the amount which would have been assessed as court costs if the dispute had been resolved by a state court with jurisdiction, less any Arbitration Fees you have previously paid. At the timely request of any party, the arbitrator shall provide a written explanation for the award. The arbitrator's award may be filed with any court having jurisdiction.

6. All parties, including related third parties, shall retain the right to seek adjudication in a small claims tribunal for disputes within the scope of such tribunal's jurisdiction. Any dispute, which cannot be adjudicated within the jurisdiction of a small claims tribunal, shall be resolved by binding arbitration. Any appeal of a judgment from a small claims tribunal shall be resolved by binding arbitration.

7. This Arbitration Provision is made pursuant to a transaction involving interstate commerce and shall be governed by the FAA. If a final, non-appealable judgment of a court having jurisdiction over this transaction finds, for any reason, which the FAA does not apply to this transaction, then our agreement to arbitrate shall be governed by the arbitration law of the State of Texas.

8 This Arbitration Provision is binding upon and benefits you, your respective heirs, successors and assigns. This Arbitration Provision is binding upon and benefits us, the Lender, and/or our/its successors and assigns, and related third parties. This Arbitration Provision continues in full force and effect, even if your obligations have been paid or discharged through bankruptcy. This Arbitration Provision survives any termination, amendment, expiration or performance of any transaction between you and us and continues in full force and effect unless you and we otherwise agree in writing. If any of this Arbitration Provision is held invalid, the remainder shall remain in effect, unless the provision precluding the arbitrator from conducting a class or consolidated arbitration as set forth in paragraph 3 above is deemed invalid or unenforceable, in which case this entire Arbitration Provision shall be deemed void and the parties shall proceed in court.

9. **OPT-OUT PROCESS.** You may choose to opt-out of and not be subject to this Arbitration Provision but only by following the process set forth below. If you do not wish to be subject to this Arbitration Provision, then you must notify us in writing within ninety (90) calendar days of the date of this Agreement at the following address **L & G Finance, c/o Cash Zone, LLC, d.b.a. Cash Biz** Attn: Arbitration Opt-Out, **8280 Montgomery Road, Suite 305, Cincinnati, Ohio 45236** . Your written notice must include your name, address, social security number, the date of this Agreement, and a statement that you wish to opt-out of this Arbitration Provision. Your notice to opt-out will only apply to this particular transaction with us and not to subsequent or previous transactions; a separate opt-out notice is required for each transaction on which you wish to opt-out of this Arbitration Provision.

**GOVERNING LAW:** This Credit Services Agreement will be governed by the laws of the State of Texas, except that the Waiver of Jury Trial And Arbitration Provision is governed by the Federal Arbitration Act ("FAA").